UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 21-102-DLB-CJS

JASON LAIBLE, et al.                                                    PLAINTIFFS


v.                          **MEMORANDUM OPINION AND ORDER**


TIMOTHY LANTER, et al.                                                  DEFENDANTS

* * * * * * * * * * *

I.      **INTRODUCTION**

This matter is before the Court upon several pending motions: a Motion to Remand filed by Plaintiffs (Doc. # 8); a Motion to Dismiss filed by Defendants (Doc. # 10); a Motion to Stay filed by Defendants (Doc. # 11); a Petition for a Westfall Act Certification filed by Defendants (Doc. # 34); and a Motion for Leave to File a Sur-Reply filed by Plaintiffs. (Doc. # 52).  An Oral Argument on the pending motions was held on May 25, 2022.  (*See* Doc. # 63).  Jacqueline Greene and Roula Allouch appeared for Plaintiffs;  Aaron Herzig, Spencer Cowan, and Ken Foisy appeared for Defendants; and Tiffany Fleming appeared for the United States.  (*Id.*).  The Court heard arguments from all parties with respect to all pending motions.

In addition to the Oral Argument, all pending motions have been fully briefed (Docs. # 9, 12, 15, 16, 17, 40, 44, 49, 51, 53, and 61), and are thus ripe for the Court's review. Having considered the arguments made, and for the reasons stated herein, Plaintiffs' Motion to Remand (Doc. # 8) is **DENIED,** Defendants' Petition for a Westfall Act

1

Certification (Doc. # 34) is **DENIED**, Plaintiffs' Motion for Leave to File a Sur-Reply (Doc. # 50) is **GRANTED**, and all other pending Motions are **DENIED AS MOOT.**

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This case stems from an August 2020 incident in Newport, Kentucky, which resulted in the deaths of Raymond and Gayle Laible and in serious injuries to Steven and Maribeth Klein.  (Doc. # 1-1 ¶ 3).  During the afternoon of August 7, 2020, the Laibles were dining on the sidewalk patio of a Newport restaurant located at the corner of Fifth Street and Monmouth Street.  (*Id.* ¶ 81).  The Kleins were walking together on the sidewalk near the same corner.  (*Id.* ¶ 82).  Meanwhile, across the river, officers from the Cincinnati Police Department ("CPD") were working in conjunction with federal law enforcement agencies to apprehend Mason Meyer.  (*Id.* ¶¶ 16-19).

Mr. Meyer had been under investigation by law enforcement for drug and gun trafficking (*id.* ¶ 17), and in August 2020, Mr. Meyer had outstanding state and federal warrants. (*See* Doc. # 58-1 at 2).  A task force led by the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") sought out to arrest Mr. Meyer on August 7, 2020, but Mr. Meyer evaded capture and fled in a vehicle owned by Austin Lagory, a friend of Mr. Meyer's and a defendant in this action.  (*See generally id.*; Doc. # 1-1 ¶¶ 24-27).  The CPD's role in the task force operation was to "conduct a felony traffic stop with assistance from CPD K9s per [their Standard Operating Procedures]" in the event of Mr. Meyer's escape.  (Doc. # 58-1 at 4).  Accordingly, when Mr. Meyer fled, CPD Sgt. Timothy Lanter initiated a pursuit, following Mr. Meyer's vehicle, and Sgt. Lanter later directed K9 units led by Ofc. Brett Thomas and Spc. Michael Harper to join him.  (Doc. # 1-1 ¶¶ 27 and 31).  Spc. Harper was unable to get close enough to engage in the pursuit, and so

Sgt. Lanter and Ofc. Thomas, both driving marked Cincinnati Police vehicles, chased Mr. Meyer. (*Id.* ¶ 42; Doc. # 40-1 at 8). Meanwhile, Sgt. Donald Scalf supervised the pursuit via radio as the designated Officer-in-Charge ("OIC:"), but he did not actively engage in the pursuit. (Doc. # 1-1 ¶ 29). ATF Resident Agent In Charge (RAC) Frank Occhipinti assisted Sgt. Scalf by confirming Mr. Meyer's location using cell phone tracking data, and at this point, radio communications were changed from a CPD/ATF joint channel to a CPD-only general dispatch channel. (Doc. # 44-1 at 1). Via the CPD radio channel, Sgt. Scalf, as OIC, authorized Sgt. Lanter to pursue Mr. Meyer into Kentucky if Mr. Meyer crossed the Ohio River. (Doc. # 1-1 ¶¶ 34-35 and *id.* at 4).

The pursuit began on the west side of Cincinnati near the Price Hill neighborhood and continued through the Price Hill Incline District before Mr. Meyer circled back toward downtown Cincinnati on the Sixth Street Expressway and then got on the interstate. (*Id.* ¶¶ 38-44). On the interstate, Mr. Meyer's car struck a vehicle, but Mr. Meyer continued toward downtown Cincinnati, with his car and the police cruisers reaching speeds over 100 miles per hour. (*Id.* ¶¶ 47-49 and 53). From there, Mr. Meyer led Sgt. Lanter and Ofc. Thomas off the interstate and onto Second Street in Cincinnati, before crossing the Roebling Suspension Bridge into Covington, Kentucky. (*Id.* ¶¶ 63 and 66). Mr. Meyer and the officers passed eleven cars on the Roebling Bridge, crossing into oncoming lanes as they dodged traffic. (*Id.* ¶ 66). The chase continued through Covington, with the cars weaving through downtown Covington, and Sgt. Lanter authorized the CPD officers to go the wrong way down Covington's one-way streets without requesting clearance from Sgt. Scalf. (*Id.* ¶ 73; Doc. # 40-1 at 11).

After making a loop down and up Garrard Street in Covington through Sanford Alley, Mr. Meyer turned onto the Fourth Street Bridge in Covington to cross into Newport. (Doc. # 1-1 ¶ 73). Mr. Meyer's vehicle nearly struck several cars and a motorcycle on the bridge (*id.* ¶ 79), and he continued to head straight onto Fifth Street in Newport. (*Id.* ¶ 80). Still at a high rate of speed, Mr. Meyer then ran a red light at the corner of Fifth Street and Monmouth Avenue in Newport, losing control of his vehicle shortly thereafter, came onto the sidewalk, and crashed into the restaurant located on the corner. (*Id.* ¶ 83). Gayle and Raymond Laible were directly impacted by Mr. Meyer's car, and Steven and Maribeth Klein were thrown several yards onto the asphalt after being impacted by debris. (*Id.* ¶¶ 84-85).

Mrs. Laible was pronounced dead on the scene, and Mr. Laible was taken to a Cincinnati hospital, where he was later pronounced dead. (*Id.* ¶¶ 89-90). Mr. and Mrs. Klein suffered various injuries, including road rash. (*Id.* ¶¶ 91-92). After the crash, Mr. Meyer was taken into custody along with two passengers in the car. (*See generally* Doc. # 40-1). Mr. Meyer was charged with two counts of Murder for the deaths of Mr. and Mrs. Laible, and one count each of Wanton Endangerment and Fleeing or Evading Police, in addition to the previously outstanding drug and gun charges. (*Id.* at 11). Mr. Meyer remains incarcerated, as he pleaded guilty to the Murder counts and received a life sentence. (Docs. # 1-1 ¶ 10 and 34 at 8).

Jason Laible, as Executor of the Estates of Raymond and Gayle Laible, and Steven and Maribeth Klein filed this lawsuit in August 2021 in Campbell Circuit Court. (*See id.*). The lawsuit alleges counts of negligence resulting in injury, wrongful death, and negligent supervision against Sgt. Lanter, Ofc. Thomas, Sgt. Scalf, the City of

Cincinnati, and Mr. Meyer; and negligent entrustment against Mr. Lagory with respect to Mr. Meyer's driving of his vehicle. (*Id.* ¶¶ 138-164). The lawsuit also seeks a declaration of rights with respect to an under/uninsured motorists insurance policy issued by Travelers Casualty Insurance Company of America to Mr. and Mrs. Klein. (*Id.* ¶¶ 165-170).

Shortly after Plaintiffs filed suit, the individual CPD Defendants and the City of Cincinnati (collectively, "City Defendants") removed the case to this Court. (Doc. # 1). In their Notice of Removal, the City Defendants rely upon 28 U.S.C. § 1442, which provides federal officers with a right of removal. (*See id.*). The City Defendants assert that as part of the ATF-led task force, the CPD officers are federal officers for purposes of removal. (*See id.*). In the last paragraph, they mention briefly that they "have several federal defenses to Plaintiffs' claims, including federal-employee immunity under the Federal Tort Claims Act. *See* 28 U.S.C. § 2679." (*Id.* ¶ 8). Plaintiffs took issue with that last paragraph, filing a Motion to Remand soon after, arguing that the Court lacks subject-matter jurisdiction due to the City Defendants' failure to obtain a certification under 28 U.S.C. § 2679, which is a statute more commonly known as the Westfall Act.[1] (*See* Doc. # 8). According to Plaintiffs, without Westfall certification, the City Defendants have no colorable federal defense, which inhibits their right of removal, which in turn strips the Court of subject-matter jurisdiction. (*See id.*).

Over the following several weeks, briefing continued on the Motion to Remand, and the City Defendants filed a Motion to Dismiss (Doc. # 10) and a Motion to Stay (Doc.

---

[1]      A Westfall certification, explained in depth at *infra* part III(D), is a federal employment certification that can be issued by the Department of Justice and reviewed by the court on subsequent petition by a defendant. If a defendant obtains a Westfall certification, the defendants are substituted by the United States in the action under the Federal Tort Claims Act. *See id.*

# 11).  While these Motions were pending, Plaintiffs effected service of process against all Defendants, including Mr. Meyer and Mr. Lagory.  During that time, the United States became involved in the case, as it declined to issue a Westfall certification to the City Defendants.  (Doc. # 30).   The City Defendants then petitioned this Court to issue the certification (Doc. # 34), and that Petition was fully briefed, including a Response filed by the United States.  (Doc. # 44).  Then, more recently, after all the previously detailed briefing, Plaintiffs filed a Motion for Leave to file a Sur-Reply (Doc. # 50), and the City Defendants filed a Motion for Leave to File an Operational Plan written by the ATF which detailed the August 2020 operation to apprehend Mason Meyer.  (Doc. # 52).  The Court conducted a telephonic hearing on April 28, 2022 regarding the ATF Operational Plan and conducted an *in camera* review of the document.  (Doc. # 57).  After reviewing the Operational Plan, the Court ordered a redacted copy filed into the open record (*id.*), and gave Plaintiffs leave to file a brief Response to the document.  (Doc. # 61).  With procedural history in mind, the Court is now prepared to adjudicate all of these Motions, beginning with the Motion to Remand.

## III.  ANALYSIS

### A.  Motion to Remand (Doc. # 8)

The City Defendants have removed this matter from Campbell Circuit Court by 28 U.S.C. § 1442(a)(1), which provides that any lawsuit directed against any officer of the United States "for or relating to any act under color of such office" may be removed to federal court.  (*See* Doc. # 1).  The statute, originally passed in 1948, recognizes a federal officer's right to removal as "essential to the preeminence of the Federal Government on those matters entrusted to it under the Constitution."  157 Cong. Rec. H1371-01 (daily ed.

Feb. 28, 2011) (statement of Rep. Lungren).[2]   However, the statute's roots date well before 1948, as "[t]he first such removal provision was included in an 1815 customs statute." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).   A brief look at the statute's history provides insight as to its purpose, which has informed the Court's decision in this case, in part.

In the first half of the 19th century, many states were hostile toward federal laws on trade and revenue.[3]   More specifically, during the War of 1812, the federal government enacted an all-encompassing trade embargo against Great Britain which was greatly unpopular in New England, leading many northeastern states to pass laws outlawing federal officials from enforcing the embargo. *Mays v. City of Flint*, 871 F.3d 437, 443 (6th Cir. 2017) (citing *Watson v. Phillip Morris Cos.*, 551 U.S. 142 (2007)).   In response, Congress enacted an earlier version of § 1442 to provide a federal forum to federal officers, in "an attempt to protect federal officers from interference by hostile state courts." *Willingham*, 395 U.S. at 405.

Later, in the years leading up to the Civil War, South Carolina passed a law declaring federal tariff laws to be unconstitutional and directing state authorities to

---

[2]      The statute has been amended three times since its original enactment but has substantively remained the same.   A 1996 amendment expanded the statute's language to include agencies, persons acting under officers of the United States, and suits brought in official and individual capacities. *See* Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 206, 110 Stat. 3847, 3847 (1996).   A 2011 amendment expanded the scope of the statute by adding "or relating to," and otherwise clarified that it applies to pre-suit discovery. *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2, 125 Stat. 545 (2011); *see also* H.R. Rep. No. 112-17(I), at 6 (2011), *reprinted in* 2011 U.S.C.C.A.N. 420, 425 (noting that the addition of "relating to" "intended to broaden the universe of acts that enable Federal officers to remove to Federal court.").   Lastly, a 2013 amendment clarified the applicability of the statute to law enforcement officers in criminal prosecutions. *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 1087, 126 Stat. 1632, 1970 (2013).

[3]      Elizabeth M. Johnson, Note, *Removal of Suits Against Federal Officers: Does the Malfeasant Mailman Merit a Federal Forum?*, 88 COLUM. L. REV. 1098, 1099-1100 (1988).

prosecute federal agents who enforced tariffs. *Watson*, 551 U.S. at 148. Congress then enacted another removal statute, which according to Senator Daniel Webster, would "give a chance to the [federal] officer to defend himself where the authority of the [federal] law was recognized," as opposed to state courts which were frequently inimical toward federal law. *Id.* (quoting 9 Cong. Deb. 461 (1833)). At the turn of the century, removal statutes were used to provide federal forums to prohibition agents and revenue officers who were often involved in violent scuffles with bootleggers and organized crime syndicates who ran the country's underground liquor market, as at that time, alcohol regulation was provided for by the internal revenue laws. *Id.* at 150.

When enforcing those laws became violent, many federal officials were charged with crimes in state courts. *Id.* For example, in *Tennessee v. Davis*, a federal revenue officer raided an illegal distillery in 1878, and was ambushed by a mob of armed men. 100 U.S. 257, 261 (1880). The federal officer returned fire, killing one of the attackers, and was then charged with murder in a Tennessee state court. *Id.* As many Tennesseans were less-than-friendly toward federal officers raiding unregulated distilleries, it seemed unlikely that the Tennessee courts (and a Tennessee jury) would provide a fair forum, and so the officer sought to remove the case to federal court. *See Watson*, 551 U.S. at 149 (citing *Davis*, 100 U.S. at 263). The statute in its current form was codified in 1948,[4] and in short, exists to protect the federal government from interference "that would occur if a federal officer could be tried in state court for a state offense related to the operation" of the federal government, in addition to mitigating "local prejudice against unpopular

---

[4]    The *Watson* court noted that even though the current law was passed in 1948, its intent remains the same as federal officer removal statutes before 1948, so case law on § 1442's predecessor statutes remains instructive. *See* 551 U.S. at 148-49.

federal laws or federal officials."  *Mays*, 871 F.3d at 443 (internal quotations omitted).  In other words, as the Supreme Court stated in *Davis*:

> A more important question can hardly be imagined.  Upon its answer may depend the possibility of the general government's preserving its own existence.  As was said in *Martin v. Hunter*, 'the general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers.'  It can only act through its officers and agents, and they must act within the States.
>
> If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection, – if their protection must be left to the action of the State court, – the operations of the general government may at any time be arrested at the will of one of its members.

100 U.S. 257, 262-63 (quoting *Martin v. Hunter's Lessee*, 14 U.S. 304, 363 (1816)).

The case currently before the Court implicates no such great question of federalism – the federal government's authority is not being challenged by a state law, and federal officers are not being persecuted (or prosecuted) for following federal directives, and the Court sees that as important to note at the outset.  The Court recognizes that the City Defendants in this case were operating under a plan written by the ATF, which spells out who the participants were in the operation in question, and what specific roles each would play.  However, an operational plan – an organizational and procedural document – is not the be-all-end-all of a complicated, multi-jurisdictional investigation, nor does it signify words directly from the proverbial mouth of the federal government.  The City Defendants have argued in essence that anyone who participates in a task force or who may be mentioned in an operational plan is a federal officer for purposes of removal.  However, applying § 1442 in that way would result in the statute

being applied in a way that was never intended by those who drafted it.  Just because a federal agency is involved in a situation doesn't make everyone else involved a federal officer, and to say otherwise would expand § 1442 far beyond the purpose which Congress intended in enacting it.  The law's history, replete with dramatic stories of criminal prosecutions and courts writing about existential threats to the federal government, makes that clear.  Thus, with its history and purpose in mind, the Court moves to § 1442's mechanics and its specific application to the case at hand.

Unlike other removal statutes, § 1442 confers subject-matter jurisdiction onto the federal courts, as it serves as a bypass to the well-pleaded complaint rule by allowing removal based on the existence of a federal defense.  *Mesa v. California*, 489 U.S. 121, 136 (1989) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983)).  The Supreme Court has labeled § 1442 as "a pure[ly] jurisdictional statute," reasoning that when a federal official raises a federal defense in state court, a federal question arises, thus invoking the federal court's Article III "arising under" jurisdiction.  *Id.* at 136-37.  However, the mere raising of a federal defense isn't automatically sufficient, as § 1442 and case law interpreting it contain specific elements and a standard of review.  *See infra* part III(A)(1).  Before diving into those elements, though, the Court notes that the statute also differs from other removal statutes in that one defendant can remove the entire cause of action without the consent of other defendants.  *Howes v. Childers*, 426 F. Supp. 358, 359 (E.D. Ky. 1977) ("When a single federal officer timely removes a case to federal court under 28 U.S.C. § 1442(a)(1), the entire case is thereby removed[.]" (internal citations omitted));  *see also Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.7 (6th Cir. 2010) (Section 1442 "authorizes removal of the *entire case* even if only one of the

controversies it raises involves a federal officer or agency[.]" (internal quotations omitted) (emphasis added) (alteration in original)).

Thus, even though the Notice of Removal in the case was filed by all the City Defendants, removal is proper (and remand is thus denied) if only one of them satisfies § 1442's requirements.  After considering the arguments made before the Court orally and in the written filings, the Court concludes that for purposes of removal, Sgt. Scalf was a federal officer acting under color of federal office during the incident in question, and that he otherwise satisfies all § 1442's requirements. *See infra* part III(A)(1)-(4).  As such, for the reasons that follow, the entire case has been properly removed to this Court, and Plaintiffs' Motion to Remand is **denied**.

### 1.    Standard of Review

As is the case with other removal statutes, under 28 U.S.C § 1442(a)(1), the removing party bears the burden of establishing federal jurisdiction under § 1442. *Mays*, 871 F.3d at 442 (citing *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006)).  However, unlike other removal statutes, § 1442's language "must be 'liberally construed.'" *Watson*, 551 U.S. at 147 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *see also Willingham*, 395 U.S. at 407 (noting that § 1442's purpose "should not be frustrated by a narrow, grudging interpretation[.]").

Conversely, though, the Sixth Circuit has written that § 1442 is like other removal statutes in that "all doubts should be resolved against removal." *Mays*, 871 F.3d at 442 (quoting *Harnden v. Jayco, Inc.*, 496 F.3d 579, 581 (6th Cir. 2007)).  The Sixth Circuit's position on § 1442's construction in *Mays* differs from the positions of most other circuits, and some district courts within the Sixth Circuit have even departed from *Mays*, as other

circuits' positions seem to more align with the Supreme Court's holdings in *Watson* and *Willingham*.[5]  Nonetheless, however, *Mays* remains the most recent published Sixth Circuit opinion on the issue, and it has been affirmed by a more recent opinion, so this Court is compelled to follow it.  *See Nappier v. Snyder*, 728 F. App'x 571, 572 (6th Cir. 2018) (referring to *Mays* as "controlling").  Thus, in an effort to reconcile *Mays*, this Court will follow the example of *Doe v. ProMedica Health Systems, Inc.*, in which the Northern District of Ohio noted *Mays*' conflict with *Watson* and made a decision "with both principles in mind."  No. 3:20-CV-1581, 2020 WL 7705713, at *2 (N.D. Ohio Dec. 14, 2020) (internal citations omitted).  Accordingly, while doubts will be resolved against removal, § 1442 must be applied broadly and with liberal construction – in other words, in a manner by which doubts arise less frequently.  More specifically, there are three prongs a defendant must satisfy to successfully remove a case under § 1442, and the Court will apply each prong broadly, in accord with *Watson* and *Willingham*, but if even one prong is not satisfied, the Court will apply *Mays* and recognize that the case must then be remanded.[6]

---

[5]     *See, e.g., Ohio v. Meade*, No. 2:21-CV-5587, 2022 WL 486294 (S.D. Ohio Feb. 17, 2022) (not citing *Mays*);  *Johnson v. Tyson Foods, Inc.*, No. 21-CV-1161, 2021 WL 5107723, at *2 (W.D. Tenn. Nov. 3, 2021) (citing a rule from a Seventh Circuit case which states that "[t]he presumption against removal in ordinary diversity jurisdiction cases does not extend to the federal officer removal statute," directly inapposite to *Mays*);  *Cherokee Nation v. McKesson Corp. (In re Nat'l Prescription Opiate Litig.)*, 327 F. Supp. 3d 1064, 1069 (N.D. Ohio 2018) (disregarding *Mays* and noting that "the Sixth Circuit has endorsed 'the broad scope of the federal officer removal statute,' and thus this Court interprets the statute broadly and in favor of removal[.]" (quoting *Bennett*, 607 F.3d at 1084).

[6]     A similar approach was taken by the *Doe* court in a different Order resolving a Motion to Remand, as that Court noted that by applying *Watson* to *Mays*, "the doubt is not so easily resolved."  *See Doe v. ProMedica Health Sys., Inc.*, No. 3:20-cv-1581, 2020 WL 7705627, at *2 (N.D. Ohio Oct. 30, 2020).

To successfully remove a case under § 1442, a removing defendant must show that (1) he or she is a federal officer or a person acting under a federal officer; (2) that the actions in question must have been performed under color of federal office; and (3) that he or she has raised a colorable federal offense.  28 U.S.C. § 1442; *see also Mays*, 871 F.3d at 442-43 (applying statute to non-government employee); *Abernathy v. Kral*, 779 F. App'x 304, 307 (6th Cir. 2019) (applying statute to a government employee).[7]

### 2.      Federal Officer or a Person Acting Under a Federal Officer

**a.      Sgt. Scalf is a federal officer for purposes of removal because he is a deputized Task Force Officer with the ATF and was otherwise acting under the ATF's authority at the time in question.**

First, § 1442 requires that the removing defendant be "any officer (or any person acting under that officer) of the United States or of any agency thereof[.]"  28 U.S.C. § 1442(a)(1).  Section 1446, which is the definitions statute within Chapter 89 of Title 28, does not provide a definition of "federal officer."  *See* 28 U.S.C. § 1446.  However, the United States Code's overall definitions statute defines "officer" as "any person authorized by [federal] law to perform the duties of the office[.]"  1 U.S.C. § 1.  Accordingly, it follows that deputized task force officers are federal officers for removal purposes, as they are specifically authorized by federal law to perform proscribed duties of the office or position into which they are deputized.  *See, e.g.*, *Meade*, 2022 WL 486294, at *3 (designating a

---

[7]      Because a question exists as to whether the City Defendants are federal officers, the Court has combined the first prongs from *Mays* and *Abernathy* into one.  Other courts have referred to the first prong as establishing that a defendant is "a person within the meaning of the statute." *Johnson*, 2021 WL 5107723, at *2 (quoting *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018)).  "A person within the meaning of the statute" would be the United States, an agency of the United States, an officer of the United States, an officer of an agency of the United States, or a person acting under any of those.  *See* 28 U.S.C. § 1442(a)(1).  Because none of the City Defendants are agencies of the United States, the Court has distilled the statute into the stated first prong.

state officer deputized as a Special Deputy U.S. Marshal as "both a federal officer and a state officer" for removal purposes) (citing *Texas v. Kleinert*, 855 F.3d 305, 312 (5th Cir. 2017)).  Here, Sgt. Scalf was a deputized Task Force Officer with the ATF (Doc. # 40-1 at 8), and as such, he is likely a federal officer *per se* for removal purposes, especially considering that he carried an ATF badge, wore an ATF uniform, attended ATF trainings, worked from an ATF field office, and received pay from the federal government.  (Doc. # 34 at 9).  Otherwise, however even if Sgt. Scalf were not a federal officer *per se*, he was nonetheless acting under the ATF during the incident giving rise to this lawsuit, which would also satisfy the first prong.

For an individual to be "acting under" a federal official or agency for purposes of § 1442, their activity "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 152 (citing *Davis v. S. Carolina*, 107 U.S. 597, 600 (1883) (emphasis in original).  The Sixth Circuit has interpreted *Watson* to hold that "the acting-under relationship typically involves subjection, guidance, or control." *Mays*, 871 F.3d at 444 (internal quotations omitted).  In other words, an "acting-under" relationship arises "where the government is functioning as the defendant's superior."  *Id.*

However, *Mays*' reasoning indicates that its rule may not be as stringent as its language suggests, as the court pointed out myriad detailed factors about the relationship between the government and the defendants.  *Id.* at 438.  The *Mays* defendants, who were individuals tasked with testing water in Flint, Michigan through a state agency, argued that because their work was governed by EPA regulations, they were "acting under" the EPA.  *Id.*  Among the factors that the court mentioned as weighing against removal (under *Watson*) were that no "delegation of legal authority" existed between the

14

government and the defendants, *id.* at 445, that the federal government "was not involved in the key action underlying" the case, *id.* at 446, and that there were no "specific actions or inactions alleged . . . that the [federal government] required the [] [d]efendants to take or refrain from taking."  *Id.*  In short, while the *Mays* court began its analysis with a very broad statement, it provided reasoning that suggested many specific factors are applicable to the analysis, and thus assistive in removal.

Furthermore, cases beyond the Sixth Circuit align with *Mays*' reasoning.  In *Maryland v. Soper*, the Supreme Court wrote in 1926 that a private individual acting as a federal agent's driver in a distillery raid "has the same right to the benefit" of a removal statute as the federal agents.  270 U.S. 9, 30 (1926).  While that case is almost 100 years old, it is nonetheless instructive, as it cites *Davis v. South Carolina*, upon which the Supreme Court relied in *Watson*, as previously cited.  Otherwise, "[c]ourts have also found this element satisfied where a private contractor provided the government with a product that it needed or performed a job that the government would otherwise have to perform." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 739 (8th Cir. 2021) (citing *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1231 (8th Cir. 2012)); *see also Watson*, 551 U.S. at 153-54 (applying the same reasoning).  For these reasons, the Court will analyze Sgt. Scalf's involvement under the "liberal construction" commanded by the Supreme Court in *Watson* and as demonstrated by other courts, while keeping an eye out for "subjection, guidance, or control" as written in *Mays*.

In *United States v. Scurry*, notably similar facts to the instant case played out in a different context within the Sixth Circuit.  834 F. App'x 178 (6th Cir. 2020).  In *Scurry*, a criminal defendant was convicted of assaulting a federal officer in violation of 18 U.S.C.

15

§ 111(a)(1), which includes anyone who "assists" a federal officer as falling under the definition of "federal officer." *Id.* at 182. The officer Scurry assaulted was an Akron police officer serving on an ATF task force, which was investigating Scurry for gun crimes. *Id.* at 181. The Akron police officers and the ATF officers were acting under an Operational Plan, which noted that the Akron police officers were to conduct a traffic stop on Scurry's vehicle after he left a residence. *Id.* Scurry engaged in an altercation with an Akron police officer during the traffic stop and was charged with assaulting a federal officer. *Id.*

Even though *Scurry* isn't exactly on point, as the *Scurry* court only determined that the Akron officer was "assisting" the ATF, which was sufficient under the relevant statute in that case, the Court still takes note of the operative facts that the Sixth Circuit relied on: that "the ATF task force did not have its own marked units and depended on the Akron police for law enforcement encounters like traffic stops," that the Akron officer was mentioned in the ATF Operational Plan, and that the Akron officer's "participation was a key component of the ATF task force's plan." *See id.* at 183-85. If all these things suggest "assistance," it seems to follow naturally that they would also suggest "acting under," and many of those facts, in addition to others, are present in this case.

First, the facts similar to *Scurry* are as follows: that Sgt. Scalf was acting under an ATF Operational Plan (Doc. # 58-1); he was specifically named in the Operational Plan (*id.* at 5); and he was the Officer-in-Charge (OIC) during the pursuit of Mr. Meyer's vehicle, indicating that he was a "key component" of the operation. (Doc. # 40-1 at 9); *Scurry*, 834 F. App'x at 185. Additionally, however, facts provided by Frank Occhipinti, the Resident Agent in Charge (RAC) of the ATF's Cincinnati Field Office, show that Sgt. Scalf was acting under Agent Occhipinti's direction. Sgt. Scalf was present at the ATF's pre-

16

operation briefing, which occurred in person, and Agent Occhipinti specifically remembered his presence, while not remembering if other CPD officers were there.  (Doc. # 44-1 at 1).  Sgt. Scalf "was well-versed in ATF policy," and played a specific role of "surveillance" in the operation, during which he sat in an ATF vehicle.  (*Id.* at 3).  All these facts suggest that Sgt. Scalf "provided the government with a product that it needed or performed a job that the government would otherwise have to perform" – surveillance and specific support during the operation to arrest Mason Meyer.  *Buljic*, 22 F.4th at 739.

Otherwise, Agent Occhipinti wrote in his affidavit about a specific moment in time during which the operation was "turn[ed] over to CPD" and as a result, that they "switched radio frequencies from a joint ATF/CPD Tactical channel to a CPD Primary dispatch channel, to signify the turnover to CPD."[8]  (Doc. # 44-1 at 3).  Sgt. Scalf was on both channels, later identifying himself as the OIC on the CPD channel, while maintaining his surveillance role on the ATF/CPD joint channel.  (*Id.*).  While the specific delegation of authority will be more instructive to the later question regarding the Westfall Act, see *infra* part II(D), the Court finds it nonetheless instructive that Occhipinti mentions this transfer of power from the ATF to the CPD.  Power must first exist to be transferred or delegated. If Occhipinti delegated power from the ATF to the CPD, and Sgt. Scalf was on both sides of the delegation (signified by the switch in radio frequencies), then the ATF must have delegated him some power to begin with.  In *Mays*, the Sixth Circuit repeatedly mentions "delegation of legal authority" as weighing in favor of "acting under" a federal agency.  871

---

[8]     Notably, Sgt. Lanter and Ofc. Thomas would have joined the operation after or around the time that the channel was switched, but Sgt. Scalf remained on *both* channels.  While this fact is more relevant to the Westfall Act analyses for all three officers, it also illustrates a stark difference between the federal capacities of Lanter and Thomas versus that of Scalf, and that difference (among others) is why the Court relies upon Scalf for satisfying § 1442's jurisdictional prerequisites.

F.3d at 444.  Here, seeing that the ATF delegated legal authority to Sgt. Scalf, and that he played an important role in the operation while acting directly under the ATF (and not under the CPD until the change in command), the Court concludes that he satisfies the first element of federal officer removal under 28 U.S.C. § 1442.

### 3.    Under Color of Federal Office

Second, a removing defendant must establish that he was acting "in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title, or authority claimed under any Act of Congress for the apprehension or punishment of criminals."  28 U.S.C. § 1442(a)(1).  Before 2011, all federal courts used the test from *Jefferson County v. Acker* to decide the second prong, which required a "'causal connection' between the charged conduct and the asserted official authority." 527 U.S. 423, 431 (1999) (quoting *Willingham*, 395 U.S. at 409).  However, as previously stated, § 1442 was amended in 2011 to "broaden the universe of acts that enable federal officers to remove to federal court."  *See supra* note 1; *see also Ohio State Chiropractic Ass'n v. Humana Health Plan, Inc.*, 647 F. App'x 619, 624 (6th Cir. 2016) (acknowledging the amendment but stopping short of analyzing it).  As the Southern District of Ohio noted in *Ohio v. Meade*, a circuit split has emerged since 2011, as some courts have interpreted the amendment as expanding the *Jefferson County* test, while others adhere to it.  2022 WL 486294, at *4.

The Sixth Circuit has indicated that it will adhere to the *Jefferson County* test, requiring only "a causal connection between the charged conduct and asserted official [federal] authority."  *Abernathy*, 779 F. App'x at 307 (quoting *Jefferson Cnty.*, 527 U.S. at 431).  In other words, the acts in question must be "under color of federal authority and in

18

enforcement of federal law, and [the federal official] must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty." *Mesa*, 489 U.S. at 132 (quoting *Soper*, 270 U.S. at 33).  In *Meade*, the court concluded that the defendant was not acting under color of federal office when he deviated from the specific duties delegated to him by the US Marshals Service, which was the federal agency in question in that case.  2022 WL 486294, at *4.  In *Jefferson County*, the Supreme Court focused its inquiry on the word "for," inquiring as to whether the lawsuit (in terms of the remedy sought) was "for" actions taken under color of federal office.  527 U.S. at 432-33.  In that case, Jefferson County had sued federal judges seeking to collect on an occupational tax levied by the county, and the judges contested the tax's validity. *Id*. at 429.  The Supreme Court reasoned that because the judges held court and earned income in Jefferson County, which "gave rise to the tax liability" in question, the judges "ha[d] shown the essential nexus between their activity 'under color of office' and the county's demand" which gave rise to the lawsuit.  *Id*. at 433.  Thus, a distillation of the actions giving rise to the lawsuit and the remedies sought are necessary to begin.

In their Complaint, originally filed in Campbell Circuit Court, Plaintiffs write with respect to Sgt. Scalf that he was the OIC of the pursuit (Doc. # 1-1 ¶ 33), and that he authorized Sgt. Lanter and Ofc. Thomas to chase Mr. Meyer into Kentucky.  (*Id.* ¶ 35). Sgt. Scalf did not directly participate in the pursuit, but Plaintiffs allege that he "failed to maintain control of the pursuit." (*Id.* ¶¶ 68 and 76).  In the counts alleged, Sgt. Scalf is mentioned in Count One for personal injuries, Count Two for wrongful death, and Count Three for negligent supervision and training.  (*Id.* at ¶¶ 138-159).  Consequently, the critical question for this element is whether a causal connection exists between the parts

19

of the lawsuit which concern Sgt. Scalf and the federal duties previously outlined under the first element.  The Court concludes that there is a sufficient nexus, and that the second element is satisfied, for the foregoing reasons.

From the start, it is apparent that the second element isn't as straightforward as the first.  While Plaintiffs did not brief or argue on the second element, the Court surmises that an argument exists as to whether the lawsuit actually concerns Sgt. Scalf's federal activities, which largely took place before pursuit began – during his surveillance role in the operation, and during his day-to-day work as a deputized ATF agent.  *See supra* part III(A)(1)(a).  The Court will address this argument as part of its independent duty to ensure that subject-matter jurisdiction is present.  *Ky. Press Ass'n v. Kentucky*, 454 F.3d 505, 508 (6th Cir. 2006) (quoting *Mt. Healthy City Sch. Bd. of. Ed. v. Doyle*, 429 U.S. 274, 278 (1977)).

While Sgt. Scalf's federal duties extended well before the initiation of the pursuit, just like the federal judges in Jefferson County, Sgt. Scalf would not have been involved in the pursuit but for those federal duties, which placed him on the scene and involved him in the operation.  However, even this fact alone may not be sufficient.  Justice Scalia, concurring in part in *Jefferson County*, chided the Court for essentially imposing what he identified as a "but for" test for the "under color" element, writing that "'but for' causation . . . is not enough."  527 U.S. at 446 (Scalia, J., concurring in part).  Some courts have agreed with Justice Scalia, rejecting that "but for" causation is not sufficient to satisfy the second element.  *See, e.g.*, *Georgia v. Westlake*, 929 F. Supp. 1516, 1521 (M.D. Ga. 1996).  However, in making his argument, Justice Scalia relied upon *Maryland v. Soper*, which held that "the statute does not require that the prosecution must be for the very

acts which the officer admits to have been done by him under federal authority.  It is enough that his acts or his presence at the place in performance of his official duty constitute the basis[.]"  270 U.S. at 33; *see also Mesa*, 489 U.S. at 131-32 (quoting the same).   Thus, because Sgt. Scalf's ATF duties predicated his participation in the Meyer operation, it seems that *Soper*'s holding is satisfied.  Without being present on the scene as an ATF deputy, it seems highly unlikely that Sgt. Scalf would have been the OIC of the pursuit – in fact, the CPD Critical Incident Review identifies at least one other officer, Christopher Vogelpohl, who may have filled that role in Scalf's absence.  (Doc. # 40-1 at 4).

Furthermore, even Justice Scalia wrote "that the officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official functions."  *Jefferson Cnty.*, 527 U.S. at 447 (Scalia, J., concurring in part).  The gravamen of the suit with respect to Sgt. Scalf is his alleged failure to oversee Sgt. Lanter and Ofc. Thomas.  Plaintiffs mention that twice in their Complaint, writing that Sgt. Scalf "failed to maintain control of the pursuit."  (Doc. # 1-1 ¶¶ 68 and 76).  After identifying that gravamen, Scalia's partial concurrence would instruct us to determine if that gravamen is "required by [or] closely connected with" Sgt. Scalf's federal duties.  *Jefferson Cnty.*, 527 U.S. at 447.  As previously stated, Sgt. Scalf's duties in the operation were primarily surveillance-related, but he was nonetheless on scene with ATF agents and RAC Occhipinti when the pursuit began.  (Doc. # 44-1).  The ATF Operational Plan specifically provides that if "Agents/TFOs are unable to pin the vehicle, CPD uniform officers will attempt to conduct a felony traffic stop with assistance from CPD K9s per [their Standard Operating Procedures]."  (Doc. # 58-1 at 4).  While Sgt. Scalf is

listed by name under "Personnel and Assignments," there are otherwise two general listings for "CPD marked units" and "CPD K9." (*Id.* at 5). Sgt. Lanter, operating a marked unit, and Ofc. Thomas, a K9 unit, would fall under these categories, but how did they specifically become involved in the operation? Sgt. Scalf brought them in.

In the CPD Critical Incident Review, we learn that Sgt. Scalf, as a member of the Organized Crime Investigative Squad ("OCIS"), "met to discuss the joint investigation of Mr. Meyer's activities," where "the group developed a plan to arrest Mr. Meyer[.]" (Doc. # 40-1 at 8). The plan that the group developed was later recorded as the ATF Operational Plan, which as previously stated, accounts for marked CPD units to assist with traffic stops. (*See* Doc. # 58-1). During the week of July 24, 2020, Sgt. Scalf approached Sgt. Lanter, presumably on behalf of the ATF and the OCIS, and "requested assistance from the [CPD] Gang Unit with a drug and firearm trafficking investigation involving Mr. Meyer." (Doc. # 40-1 at 9). At that point, when Sgt. Scalf reached out to Sgt. Lanter, on behalf a joint operation between the ATF and CPD, he was acting under color of his federal office, and a chain of command was established. Thus, the allegations relating to Sgt. Scalf's supervision of Sgt. Lanter (and Ofc. Thomas, by extension), which are the gravamen of the portions of the lawsuit relating to Sgt. Scalf, are at least "closely connected with," if not "required by" his federal duties. *Jefferson Cnty.*, 527 U.S. at 447. Thus, a sufficient causal connection exists between the two, and the second element is satisfied.

### 4.   Colorable Federal Defense

Lastly, a removing defendant must show that he has raised a colorable federal defense. *Bennett*, 607 F.3d at 1088 (citing *Jefferson Cnty.*, 527 U.S. at 431). In this

context, a federal defense "need only be plausible; its ultimate validity is not to be determined at the time of removal." *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007) (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)). For example, in *Jefferson County*, the Supreme Court determined the defendant's defense to be plausible for purposes of removal, even though the trial court later rejected it. 527 U.S. at 431. In other words, "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court . . . [and] we therefore do not require the officer virtually to win his case before he can have it removed." *Id.* (internal quotations omitted).

Most of the briefing on the Motion to Remand has centered around this issue: whether the City Defendants can rely upon an invocation of Westfall Act immunity as a colorable federal defense without a Westfall certification by the Attorney General. Plaintiffs have vehemently argued that an uncertified defendant cannot remove a case under § 1442, as an uncertified defendant has no colorable federal defense. However, unfortunately for Plaintiffs, after reviewing the arguments and the law, the Court has concluded that the City Defendants can establish a colorable federal defense, and that the third element is thus satisfied.

But before moving into the standalone merits of the City Defendants' colorable federal defense, the Court first points out the differences between removal mechanisms in the Westfall Act and in § 1442, and how cases interpreting Westfall are either inapplicable or distinguishable from the facts at hand. During oral argument and in briefing on the Motion to Remand, Plaintiffs relied heavily on *Osborn v. Haley*, 549 U.S. 225 (2007), which held that a Westfall certification by the Attorney General is conclusive

for purposes of remand, even if the district court later determines that the Attorney General was incorrect and then decertifies the case.  Indeed, *Osborn* does state that the Westfall Act "gives the named defendant no right to remove an uncertified case" (Doc. # 8 at 3) (quoting 549 U.S. at 252 n.17), but that statement does not account for § 1442. Under the Westfall Act, the Attorney General can opt to remove a case to federal court after certification, but the Act provides no such right to a defendant, as after certification, the United States is substituted in the case for the defendant.  *See* 28 U.S.C. § 2679.

Conversely, § 1442 provides removal rights to defendants, but makes no mention of the Attorney General.  Thus, the sentence in *Osborn* cited by Plaintiffs in their Motion to Remand and brought up again by Plaintiffs' counsel during oral argument isn't instructive to the § 1442 analysis.  In other words, *Osborn* does not apply to removals under § 1442, and in no way discusses whether raising Westfall pre-certification constitutes a colorable federal defense, other than the footnote cited by Plaintiffs, which also reads "*but see* 28 U.S.C. § 1442."  549 U.S. at 252 n.17.  Rule 1.2(c) of the Bluebook states that a "but see" citation indicates authority that "clearly supports a position contrary to the main proposition."  The Bluebook: A Uniform System of Citation R. 1.2(c), at 59 (Columbia L. Rev. Ass'n et al. eds., 20th ed. 2015).  If § 1442 stands contrary to the proposition that a defendant cannot remove an uncertified case under Westfall, it seems that the *Osborn* footnote may actually suggest that a defendant *can* remove an uncertified case under § 1442.  For this reason, and in addition to the distinctions pointed out above, *Osborn* is not helpful to Plaintiffs' argument at this stage.

Otherwise, Plaintiffs rely upon two out-of-circuit district court cases, both citing *Osborn*, to support their proposition, but neither is assistive.  In *Dold-Apger v. Friends of*

*the San Pedro River, Inc.*, No. 11-CV-397, 2012 WL 2952413 (D. Ariz. July 19, 2012), the District of Arizona approved a Magistrate Judge's Report and Recommendation which recommended remand of an action removed under § 1442. However, in establishing their federal defense, the defendants in *Dold-Apger* primarily relied upon an agreement they entered into with the Bureau of Land Management, and the argument regarding Westfall certification was actually made by the United States, and not the defendants. *See id.* at ECF Nos. 35, 46. The specific issue of whether an uncertified case can be removed under § 1442 wasn't addressed at all in the Report and Recommendation, which the district court adopted. *See Dold-Apger v. Friends of the San Pedro River, Inc.*, No. 11-CV-397, 2011 WL 8317910 (D. Ariz. Oct. 14, 2011) *report and recommendation adopted in full by Dold-Apger*, 2012 WL 2952413. Otherwise, the *Dold-Apger* court relies upon the quote from *Osborn*, previously distinguished by this Court, see *supra* part II(A)(4), and cites a district court case from Kansas, also relied upon by Plaintiffs. In short, it appears that the *Dold-Apger* court mentioned the certification issue in response to the United States, a nonparty, beyond the confines of the R&R which it was adopting, and the paragraph is hardly central to the broader holding of the case. For that reason, the Court is not convinced that the case is helpful to Plaintiffs.

Both Plaintiffs and the *Dold-Apger* court also cite to *Vandeventer v. Guimond*, 494 F. Supp. 2d 1255 (Dist. Kan. 2007). In *Vandeventer*, the parents of two children killed in a plane crash sued county airport inspectors who were allegedly negligent in inspecting the airplane involved in the crash. *Id.* at 1256. From the outset, the federal connection is clearly more attenuated than the facts in the instant case, and after finding that the defendants were not "acting under" the FAA as they argued, the court considered the

colorable defense element *arguendo*.  *Id.* at 1267-68.  In rejecting the third element, the *Vandeventer* court first noted that it had already determined that the defendants were not acting under the FAA, and second, that "the Westfall Act does not provide either an independent basis for removal, nor a colorable federal defense to liability[.]"  *Id.* at 1267.  This Court agrees with the *Vandeventer* court that the Westfall Act does not provide an independent basis for removal (by defendants), as previously discussed, but the *Vandeventer* court's reasoning to support the proposition that Westfall cannot provide a colorable federal defense is flawed.

First, the *Vandeventer* court cited the Westfall Act, and wrote that "[a]bsent a certification . . . § 2679(d)(3) 'directs that the case must be remanded to the state court in which the action commenced.'"  494 F. Supp. 2d at 1267 (quoting *Osborn*, 549 U.S. at 242-43).  However, the *Vandeventer* court's reading of the Westfall Act is misguided, as the last two sentences of subsection (d)(3) of the Westfall Act begin with these words: "In the event the *petition* is filed in a civil action or proceeding pending in a State court, the action or proceeding may be removed without bond *by the Attorney General* . . . ."  28 U.S.C. § 2679(d)(3) (emphasis added).  The next sentence reads: "If, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment, the action or proceeding shall be remanded to the State court."  *Id.*  In other words, that part of the statute, relied upon by *Vandeventer*, is applicable in the event that (1) the petition for certification is filed in state court, (2) that the Attorney General removes the case, and (3) that the federal court later declines to issue certification.  In *Vandeventer*, no petition had been filed at all, and in the instant case, the petition for the Westfall certification was filed in federal court, the case was

removed not by the Attorney General, but by the defendants, and no decision on the petition had been made at the time of filing of the Notice of Remand. Thus, the *Vandeventer* court was incorrect in reading the Westfall Act to require remand without certification upon removal under § 1442. As such, subsection (d)(3) of the Westfall Act and the *Vandeventer* court's reading of it are not assistive to Plaintiffs here. Beyond *Vandeventer* and *Dold-Apger*, the Court has found no case to suggest that an uncertified Westfall petition for immunity facially disqualifies § 1442 removal. Thus, the Court will evaluate Defendants' argument in favor of the third prong on its own merit.

As previously stated, a colorable federal defense "need only be plausible; its ultimate validity is not to be determined at the time of removal." *City of Cookeville*, 484 F.3d at 391 (quoting *Magnin*, 91 F.3d at 1427). Furthermore, defenses which implicate immunity (but which aren't yet conclusively established) are frequently considered in the context of § 1442, as the statute "is [generally] meant to 'ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties.'" *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998) (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)). In other words, "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court . . . [and] [w]e therefore do not require the officer virtually to win his case before he can have it removed." *Jefferson Cnty.*, 527 U.S. at 431 (internal quotations omitted). Generally, the third prong "erects a low bar and merely requires that the defendant's assertion is both 'defensive' and 'based in federal law.'" *In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d at 1077 (quoting *Mesa*, 489 U.S. at 129-30). Because the right to have a federal defense litigated in federal court is so central to §

1442, the consideration "is not to be frustrated by a grudgingly narrow interpretation of the removal statute."   *Winters*, 149 F.3d at 398.

Considering the "low bar" applicable to the third prong, it seems apparent to the Court that Westfall immunity, even uncertified, is a sufficiently colorable federal defense, especially considering the important federal policy questions implicated.   In *Mesa*, the Supreme Court noted that the defendants were being prosecuted for state crimes under state law even though they were postal workers who were on duty when the criminal incident occurred.  489 U.S. at 123.  In determining that those defendants could not aver a colorable federal defense, the Court reasoned through pre-1948 cases that established the third prong's roots in a need to have federal issues decided in federal court.  *Id.* at 127-29.  One of those cases cited is *Mayor v. Cooper*, which upheld a Civil War-era removal statute with the Court holding that "[n]or is it any objection that questions are involved which are not all of a Federal character. [But] [i]f one of the latter exist, if there be a single such ingredient in the mass, it is sufficient." 73 U.S. 247, 252 (1867).  Westfall Act certification is certainly of a federal character, as even *Osborn* recognizes that Westfall immunity raises a "significant federal question," writing that if raised in a complaint, the issue of Westfall certification itself would bestow Article III jurisdiction onto the federal court.  *See* 549 U.S. at 244-45 (citing *Verlinden*, 461 U.S. at 493).

Furthermore, finding uncertified Westfall questions to not be sufficiently colorable would fall beneath the spirit of § 1442, as a Westfall certification equates to determining immunity for individual defendants.  The Westfall Act is the exclusive remedy for tort actions against the United States, and it is the exclusive method by which an individual defendant can obtain federal immunity through the United States.  *See* 28 U.S.C. § 2679.

Requiring an individual defendant to obtain certification essentially amounts to requiring that defendant to win his immunity argument on the merits, and the law is clear that it "do[es] not require the officer virtually to win his case before he can have it removed." *Jefferson Cnty.*, 527 U.S. at 431.  For these reasons, and because Westfall's removal rights and § 1442's removal rights are separate from one another, the Court finds that the City Defendants' filing of a Westfall petition in this Court is a sufficiently colorable federal defense for removal purposes.  Sgt. Scalf accordingly satisfies the third element.

Because Sgt. Scalf has satisfied all three elements of § 1442, and because only one defendant must do so before removing the entire action, the Court finds that removal was proper with respect to all defendants.[9]  Plaintiffs' Motion to Remand (Doc. # 8) is thus **denied.**

### B.    Motion to Stay (Doc. # 11)

The City Defendants' Motion to Stay is **denied as moot**, as pleadings in this matter have continued beyond the filing of the Motion.

### C.    Motion for Leave to File a Sur-Reply (Doc. # 50)

The Local Rules of the United States District Court for the Eastern District of Kentucky provide that a motion is deemed finally submitted to the Court after a reply is filed.  *See* Joint Ky. Civ. Prac. R. 7.1.  Otherwise, the filing of a sur-reply is not expressly permitted by the Federal Rules, but they "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley*

---

[9]    For the same reason, the Court need not address the three elements of § 1442 with respect to Defendants Lanter and Thomas.

*Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)).  Sur-replies are generally "highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter."  *Loomis v. Unum Grp. Corp.*, 539 F. Supp. 3d 898, 905 (E.D. Tenn. 2021) (internal quotations omitted).  Lastly, sur-replies are more appropriate where a reply brief raises new evidence that the court relies upon in deciding the issue, versus when a reply brief merely raises new arguments based upon existing facts.  *See Mirando v. Dep't of Treasury*, 766 F.3d 540, 549 (6th Cir. 2014) (distinguishing *Seay* on these grounds and upholding a district court's denial of leave to file a sur-reply).

In this case, Plaintiffs Motion for Leave to File a Sur-Reply (Doc. # 50) stems from briefing on the City Defendants' Petition for Westfall Certification.  (Doc. # 34).  In their Motion, Plaintiffs argue that the City Defendants "raised new arguments and made misstatements in their reply brief, necessitating a sur-reply."   (Doc. # 50 at 2).  More specifically, Plaintiffs assert that the City Defendants raised a new argument regarding assistance to federal agencies, and that they misstated a position that Plaintiffs had conceded that they were acting within the scope of the ATF Task Force.  (*Id.*).  Plaintiffs additionally posit that the City Defendants misrepresented their own failure to meet the burden of proof.  (Doc. # 50-1 at 2).  None of Plaintiffs' arguments are based upon the City Defendants' raising of new evidence.

The Court sees that the City Defendants did not mention assistance to federal agencies in their initial Petition.  (Doc. # 34).  Even though the argument was not assistive to the Defendants, *see infra* part II(D)(3), because the Court did address it in this Order, the Court will **grant** Plaintiffs' Motion (Doc. # 50) and consider their sur-reply.

### D.    Petition for Westfall Certification (Doc. # 34)

28 U.S.C. § 2679, commonly known as the Westfall Act, provides an exclusive remedy for any common law tort action brought against "any employee of the Government while acting within the scope of his office or employment."   28 U.S.C. § 2679(a)-(b)(1). The statute's "exclusive remedy" is the Federal Tort Claims Act (FTCA), and it provides that upon a certification by the Department of Justice that "the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose . . . [the action] shall be deemed an action against the United States . . . and the United States shall be substituted as the party defendant."   *Id.* at (d)(1).   In other words, "federal employees have absolute immunity from personal liability for common law torts committed within the scope of their employment."   1 Jayson and Longstreth, *Handling Federal Tort Claims* § 4.11 (2022).

However, when the Department of Justice refuses to issue a Westfall certification, a defendant may petition the court to issue the certification.   *Id.* at (d)(3).   The Westfall Act also contains a removal provision, separate and distinct from the previously analyzed removal statute at 18 U.S.C. § 1442, *supra* part III(a), which allows the United States to remove an action to federal court.   *See Osborn v. Haley*, 549 U.S. 225, 249, 260 (2007) (discussing differences between the Westfall Act's removal rights granted to the United States and § 1442's removal applying to defendants);   *see also id.* at 252, n.17 (pointing out inapplicability of each statute to the other).

In this case, the Department of Justice, by the United States Attorney for the Eastern District of Kentucky, has refused to certify the City Defendants under the Westfall Act.   (Doc. # 30).   That refusal led the City Defendants to file a Petition for this Court to

review the decision (Doc. # 34), and that Petition has been fully briefed by all parties, including the United States, which opposes certification.  (Docs. # 40, 44, and 49).  Thus, the Petition is ripe for the Court's review.  Upon reviewing the filings and considering the arguments made orally before the Court, the Court has determined that the Petition will be **denied** with respect to all Defendants, and the United States' decision is affirmed.

### 1.   Standard of Review

To prevail on court review of a Westfall certification, a defendant must establish that he was a federal employee acting within the scope of his employment by a preponderance of the evidence.   *Osborn v. Haley*, No. 5:03-CV-192-TBR, 2011 WL 1832812, at *4 (W.D. Ky. May 13, 2011) (citing *Borneman v. United States*, 213 F.3d 819, 827 (4th Cir. 2000) (on remand from *Osborn*, 549 U.S. at 225); *see also S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990) (referring to the burden of proof as "the burden of altering the status quo").

Westfall certification is a legal question, but the district court should still "identify and resolve disputed issues of fact necessary to its decision before entering the order." *Singleton v. United States*, 277 F.3d 864, 870 (6th Cir. 2002).  If necessary, the court may hold an evidentiary hearing to resolve any issues of fact.  *Dolan*, 514 F.3d at 593 (citing *Singleton*, 277 F.3d at 870-71).  However, in this case, no issues of fact exist at this stage. The Court did not conduct an evidentiary hearing, but it held an Oral Argument, and the Court has considered the evidence presented by all parties, including affidavits (*e.g.*, Doc. # 44-1), the ATF Operational Plan (Doc. # 58-1), and the CPD Critical Incident Review (Doc. # 40-1).  While Plaintiffs have moved in the alternative for a delay in the Westfall decision to allow for additional discovery (Doc. # 40 at 23), the Court agrees with

Defendants (Doc. # 49 at 14) that it has sufficient evidence to make the determination at this time, as depositions would not provide any more information than what is currently available in the record.  Lastly, no case law suggests that the Westfall determination for one defendant applies to all defendants, and so the Court will analyze the law with respect to each individual defendant.

As previously stated, the Westfall Act provides for substitution when (1) the defendant is an employee of the federal government, and (2) when he was acting within the scope of his employment at the time of the incident in question.  28 U.S.C. § 2679. While the question of scope is most often the critical question in Westfall certification cases, the first question as to employment status is also necessary when status is potentially at issue, as the Westfall Act is part of the FTCA, and the FTCA only applies to government employees.  *Id*. at (b)(1); 28 U.S.C. § 2671 (defining "employee of the government").  Nonetheless, however, the status inquiry and the scope inquiry remain separate.  *See U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 249 (4th Cir. 2018).

### 2.    Employee Status

28 U.S.C. § 2671, the FTCA's definitions statute, provides that an "employee of the government" includes "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation[.]"  Otherwise, another federal statute, 5 U.S.C § 3374, provides that a "state or local government employee on detail to a federal agency . . . is deemed an employee of the agency for the purpose of . . . the Federal Tort Claims Act[.]"  Thus, an individual defendant can be

deemed an employee of the federal government for FTCA purposes by either statute. After reviewing the statutes, applicable case law, and the evidence, the Court concludes that Sgt. Scalf is a federal employee under 5 U.S.C § 3374, while Sgt. Lanter and Ofc. Thomas are not federal employees and are thus ineligible for the FTCA's protections.

> **a.    As a deputized ATF Task Force Officer, Sgt. Scalf is covered by 5 U.S.C § 3374 and is thus an employee of the federal government for FTCA purposes.**

As previously stated, 5 U.S.C § 3374 provides that a local government employee "on detail" to a federal agency is considered to be a federal employee for FTCA purposes "during the period of assignment."  5 U.S.C. § 3371, the definitions statute for that subchapter, does not provide a definition of "detail" or "assignment," but case law makes clear that when applied to law enforcement, § 3374 refers to cross-deputized state and local officers.  Thus, Sgt. Scalf is covered by the statute, and because he remained a deputized ATF Task Force officer during the time of the incident in question, he is a federal employee for FTCA purposes.

First, the Sixth Circuit has previously held that local police officers who are deputized federal task force members are "federal employee[s] for purposes of the FTCA." *Petty v. United States*, 80 F. App'x 986, 989 (6th Cir. 2003) (citing 5 U.S.C. § 3374).  The Sixth Circuit's holding tracks with the statute's purpose, as it was enacted "to facilitate the temporary assignment of personnel between the Federal Government and state and local governments[.]"  Intergovernmental Personnel Act of 1970, Pub. L. 91-648, 84 Stat. 1909, 1909 (1971).  Otherwise, § 3374 is cited in the United States Code by 21 U.S.C. § 878, which provides for the deputization of local law enforcement officers by the Drug Enforcement Administration and states that deputized DEA officers are not

federal employees, but otherwise are subject to § 3374(c), which deems them employees for FTCA purposes.

Because of § 878's referencing of § 3374, courts within the Sixth Circuit and elsewhere have equated § 3374's usage of "assignment" and "on detail" to deputization in a law enforcement context, including the DEA and other federal agencies. *E.g.*, *United States v. Goree*, 47 F. App'x 706, 710-11 (6th Cir. 2002) (citing § 3374 and § 878 and finding an on-duty, deputized DEA task force officer to be "on detail" within § 3374); *Petty*, 80 F. App'x at 989 (referring to a deputized local police officer as a federal employee "by virtue of his assignment to an FBI-operated task force"); *Robertson v. Lucas*, 753 F.3d 606, 614 n.3 (6th Cir. 2014) (citing § 878 and § 3374 in a Westfall Act context, noting that two Ohio officers were federal employees by nature of their deputization).[10]   Thus, by nature of Sgt. Scalf's deputization by the ATF, he is considered to be a federal employee for FTCA purposes.  Additionally, Sgt. Scalf's ATF deputization continued through August 7, 2020, and so he was "on detail" during the incident which gave rise to this lawsuit, bringing him fully within the confines of § 3374.

Conversely, however, the Court was unable to find any case demonstrating a scenario in which a non-deputized local officer was considered to be a federal employee under § 3374, meaning that Ofc. Thomas is in no way affected by the statute. While Sgt.

---

[10]    *See also Ellis v. Ficano*, 73 F.3d 361 (6th Cir. 1995) (unreported table case) (upholding a district court's determination that deputized DEA task force members were federal employees under the FTCA);  *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 534-35 (M.D.N.C. 2008) (citing § 3374 as "set[ting] forth procedures by which local law enforcement officers may be deputized as federal agents" and finding cross-deputized local officers to be federal employees (collecting cases));  *Aikman v. Cnty. of Westchester*, 691 F. Supp. 2d 496, 498 (S.D.N.Y. 2010) (citing § 3374 and § 878, holding that "state and local law enforcement officers designated as federal task force members are treated as federal employees for the purposes of any federal tort liability statute.").

Lanter was a deputized US Marshal, his special deputization was limited to Operation Triple Beam, a task force put together by the Southern Ohio Fugitive Apprehension Strike Team. (Doc. # 1-3).  ATF RAC Occhipinti wrote in his Affidavit that Operation Triple Beam had no connection to the operation to apprehend Mr. Meyer (Doc. # 44-1), and the ATF Operational Plan makes no mention of Operation Triple Beam or of the US Marshals. (Doc. # 58-1).  The deputization documents provided by Sgt. Lanter make no mention of the ATF or of the Northern Kentucky Drug Strike Force, and furthermore,  Sgt. Lanter's special deputization reads that he is "not authorized to participate in federal drug investigations unless deputized by DEA or FBI."  (Doc. # 1-3).  While the operation to apprehend Mr. Meyer included drug and gun trafficking (Doc. # 58-1 at 2), it seems highly unlikely, if not impossible, that Sgt. Lanter's deputation would be invoked by the Northern Kentucky Drug Strike Force based on the clear limitation included in Sgt. Lanter's special deputization documents.  For these reasons, even though Sgt. Lanter was a deputized federal officer, he was not "on detail" during the incident in question – meaning that § 3374 is inapplicable to him.

> ### b.    Sgt. Lanter and Ofc. Thomas were not "acting on behalf" of the ATF during the operation to apprehend Mr. Meyer.

However, even without § 3374, Sgt. Lanter and Ofc. Thomas can still establish federal employee status for FTCA purposes by showing that they were "acting on behalf" of the ATF, under 28 U.S.C § 2671.  The City Defendants have asserted that by nature of their assistance to the ATF, Sgt. Lanter and Ofc. Thomas were acting on behalf of the ATF.  (Doc. # 49 at 6).  Unfortunately, their argument is unavailing, and Sgt. Lanter and Ofc. Thomas are not federal employees.

28 U.S.C. § 2671 provides that a federal employee includes "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation[.]"  In short, this provision allows "even private individuals who are not on the Government's payroll [to] be considered employees for purposes of establishing the Government's liability under the statute." *Patterson & Wilder Constr. Co. v. United States*, 226 F.3d 1269, 1274 (11th Cir. 2000).  In *Logue v. United States*, the Supreme Court commented that "the language is designed to cover special situations such as the 'dollar-a-year' man who is in direct service of the Government without pay, or an employee fo another employer who is placed under direct supervision of a federal agency pursuant to contract or another arrangement."  412 U.S. 521, 531 (1973).  "Direct supervision" is the key phrase in that quote; otherwise in *Logue*, the Supreme Court applied traditional principles of principal-agent law to the question.[11]  412 U.S. at 527-28.  In other words, while many factors play into the determination, "the critical factor in making this determination is the authority of the principal to control the detailed physical performance of the contractor."  *Id.*;  *see also Fries v. United States*, 170 F.2d 726, 731-32 (6th Cir. 1948) (deciding an FTCA employee status question based on whether a federal or state entity was in physical control of an employee during an incident), *cert. denied*, 336 U.S. 954 (1949).

---

[11]     While the *Logue* Court dealt specifically with whether a government contractor is considered to be a government employee under the FTCA, the Court's analysis also applies to the "acting on behalf of" language.  *See* 412 U.S. at 531 ("But we are not persuaded that employees of a contractor with the Government, whose physical performance is not subject to governmental supervision, are to be treated as 'acting on behalf of' a federal agency simply because they are performing tasks that would otherwise be performed by salaried employees of the Government.").

Here, neither Sgt. Lanter nor Ofc. Thomas were placed under the direct supervision of the ATF or of the federal government.  Neither officer has provided any evidence that they were supervised or directed by the federal government, especially to the degree that it could "control the[ir] detailed physical performance." *Logue*, 412 U.S. at 527-28.  While Sgt. Lanter has written that he "assisted with the federal investigation of Mason Meyer" (Doc. # 1-3), and Ofc. Thomas has written that he was "following the orders of Deputized Officers of the United States and supporting the federal investigation of Meyer" (Doc. # 1-4), neither averment is sufficient.  Assisting with an investigation does nothing more than acknowledge that one is "performing tasks that would otherwise be performed by salaried employees of the federal government," which is an argument expressly rejected by *Logue*.  412 U.S. at 531-32.  Furthermore, RAC Occhipinti wrote in his Affidavit that he did not provide any direction or orders to Sgt. Lanter and Ofc. Thomas, further illustrating a lack of federal control over both.  (Doc. # 44-1 at 4).

Ofc. Thomas' following orders is likewise unhelpful to his argument, as the chain of command that led to him being involved in the pursuit began and ended with the Cincinnati Police Department.  Thomas was in a CPD uniform at a CPD training facility on August 7, 2020, when Sgt. Lanter requested his assistance via a CPD radio channel. (Doc. # 40-1 at 6).  At that time, it is unclear whether the ATF was even still involved in the operation at all, and Ofc. Thomas may not have even known that he was assisting in an ATF joint operation.  Additionally, as previously stated, Sgt. Lanter was not "on detail" within his special deputization to the US Marshals, as the ATF operation exceeded Lanter's deputization powers, and so it is disingenuous for Ofc. Thomas to aver that he was "following orders of Deputized Officers of the United States" when he answered Sgt.

Lanter's call.  (Doc. # 1-4).  To equate every request of a deputized officer as being within the scope of their deputization would be the same as a federal judge's every word being a court order – in other words, context matters, and the context here does not show that Ofc. Thomas was under direction of the federal government.

Because Sgt. Lanter and Ofc. Thomas cannot demonstrate by a preponderance of the evidence that they were federal employees within the FTCA, the Westfall Petition is **denied** with respect to each of them without further analysis.  However, because Sgt. Scalf satisfied the first prong, the Court will continue to analyze the second prong with respect to Sgt. Scalf.

### 3.    Scope of Employment

The second prong of the Westfall certification analysis requires the Court to determine whether each Defendant was "acting within the scope of his office or employment" when the allegedly tortious conduct occurred.   28 U.S.C § 2679(b)(1).  Unlike the first prong, when evaluating the scope of employment, a court applies the substantive laws of the forum state.  *Dolan*, 514 F.3d at 593.  The evidentiary standard remains a preponderance of the evidence.  *Osborn*, 2011 WL 1832812, at *4.

Kentucky courts have adopted the Restatement (Third) of Agency's approach to scope of employment questions.  *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 52 (Ky. 2008);  *see also Hensley v. Traxx Mgmt. Co.*, 622 S.W.3d 652, 657 (Ky. Ct. App. 2020).  The Restatement (Third) test is as follows:

(1)    An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.

(2)    An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control.  An employee's act is not within the

scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

(3)    For purposes of this section,

    (a)    An employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work, and

    (b)    The fact that work is performed gratuitously does not relieve a principal of liability.

*Papa John's*, 244 S.W.3d at 657 (quoting Restatement (Third) of Agency § 7.07, Employee Acting Within Scope of Employment (2006)).   Other Kentucky courts have phrased the test differently, writing that the inquiry is "whether the master had the right or power to control the servant in the performance of the act which caused the injury." *Louisville/Jefferson Cnty. Metro Gov't v. Braden*, 519 S.W.3d 386, 393 (Ky. Ct. App. 2017) (quoting *Horne v. Hall*, 246 S.W.2d 441, 443 (Ky. 1951)).   Nonetheless, it seems that the critical questions are (1) whether the employee was performing work assigned by the employer or engaging in a course of conduct subject to the employer's control, and (2) whether the principal controlled or had the right to control the manner and means of the agent's performance of work.   *Papa John's*, 244 S.W.3d at 657 (internal quotations omitted).   After considering these rules and the arguments made by the parties, the Court concludes that Sgt. Scalf was not operating within the scope of any employment by the federal government. [12]

---

[12]    Even assuming *arguendo* that Sgt. Lanter and Ofc. Thomas satisfied the first prong, they would fail under the second prong for the same reasons as Sgt. Scalf.

1.      **Sgt. Scalf was not acting within the scope of his office or employment with the federal government when the pursuit and the accident occurred.**

Before moving into the merits of Sgt. Scalf's scope of employment, the Court is compelled to briefly discuss the differences between the question here and the question previously discussed regarding removal and jurisdiction.  The Court recognizes that it may seem counterintuitive for Sgt. Scalf to be a federal officer for purposes of removal, but not for Westfall and FTCA purposes.  However, the two inquiries are completely different from one another.  The removal statute exists to provide a proper forum for adjudication of applicable cases, and the inquiry focuses on the defendant's relationship with the federal government.  The Westfall inquiry focuses on the allegedly tortious act's relationship with the federal government – at the time of the incident out of which the claim arose, as the Westfall Act reads: "arising or resulting from the negligent or wrongful act or omission of any employee of the Government *while acting* within the scope of his office or employment[.]"  28 U.S.C § 2679(b)(1) (emphasis added).  In contrast, the federal officer removal statute is significantly broader, as it only requires a "causal connection between the charged conduct and the asserted official authority," *Abernathy*, 779 F. App'x at 307 (internal quotations omitted), and courts are instructed to construe the statute liberally.  *Watson*, 551 U.S. at 147.  No such instructions are given with respect to a Westfall certification.  The scope of employment test requires a closer connection than a mere causal connection, and because the tests are different, the outcomes can (and have) also differed.

The claims against Sgt. Scalf in this lawsuit arise from his alleged failure to "maintain control of the pursuit" (Doc. # 1-1¶¶ 68 and 76), as he served as the OIC during

41

the pursuit.  (*Id.* ¶ 33).  It is unclear where Sgt. Scalf was physically located during the pursuit, as the Critical Incident Review says that he arrived on the crash scene only after the accident occurred.  (Doc. # 40-1 at 9).  However, we know that Sgt. Scalf was on radio with Sgt. Lanter, as he authorized Sgt. Lanter to continue the pursuit into Kentucky.  (*Id.*). Sgt. Scalf could argue that during this time, he was performing work assigned by the federal government, as the ATF Operational Plan provided that "CPD uniform officers will attempt to conduct a felony traffic stop" (Doc. # 58-1), but such an argument would be unavailing, as there is no evidence to suggest that during the pursuit, the ATF or the federal government had any control over Sgt. Scalf.

Kentucky law is clear that for purposes of scope of employment, an "employee is an agent whose principal *controls or has the right to control the manner and means of the agent's performance of work*."  *Papa John's*, 244 S.W.3d at 657 (internal quotations omitted) (emphasis added).  All the facts in this case unequivocally point to authority resting squarely in the hands of the Cincinnati Police Department during the pursuit and subsequent accident.

First, the ATF Operational Plan itself is clear that "CPD uniform officers will attempt to conduct a felony traffic stop with assistance from CPD K9s per [their Standard Operating Procedures]."  (Doc. # 58-1 at 4).  In *Braden*, the Kentucky Court of Appeals recognized that the Louisville Metro Police Department's standard operating procedures would constitute "power to control the servant in the performance of the act which caused the injury[.]"  519 S.W.3d at 395 (quoting *Horne*, 246 S.W.2d at 443.[13]  Additionally, the

---

[13]    However, the *Braden* court also noted that such an assumption made *arguendo* would not override another Kentucky statute regarding indemnification, which is not at issue in this case, so the court's *arguendo* assumption remains instructive.  519 S.W.3d at 395.

Operational Plan notes that "Any vehicle pursuits will be initiated and monitored by CPD pursuit policy.  ATF will not initiate any pursuits[,]" and that the "ATF will assist [with traffic stops] as needed."  (Doc. # 58-1 at 4).  In particular, the Court finds the last sentence to be extremely relevant, as if the ATF was *assisting* the CPD with traffic stops, the language would imply that the CPD, not the ATF would have overseen traffic stops.  The Critical Incident Review supports this conclusion, as it notes that RAC Occhipinti confirmed Mr. Meyer's location via cell phone tracking while Sgt. Scalf monitored the pursuit, and RAC Occhipinti broadcast the confirmation on a CPD-only radio channel.  (Doc. # 44-1 at 3). In other words, RAC Occhipinti, on behalf of the ATF, assisted the CPD in effectuating the traffic stop – and not the other way around.  (Doc. # 40-1 at 9).  RAC Occhipinti's affidavit also notes that when the pursuit began, the team "switched radio frequencies from a joint ATF/CPD tactical channel to a CPD primary dispatch channel, to signify the turnover to CPD."  (Doc. 44-1 at 3).  While the changing of a radio station isn't entirely dispositive, it is instructive, as if the ATF were controlling the pursuit, they would need a communication channel to do so.  With the radio channel being changed to one without ATF presence, it seems clear that CPD, not the ATF was in charge after that point.

However, most fatal to Sgt. Scalf's scope of employment determination is that he declared himself as Officer-in-Charge (OIC) after the pursuit began, notifying the CPD command center that he was doing so, and approving Sgt. Lanter's request to continue the chase into Kentucky.  (Doc. # 40-1 at 9).  After the accident occurred, no formal investigation was conducted by the ATF.  (Doc. # 34-3).  The CPD conducted a lengthy investigation, compiling its Critical Incident Review, and in that document, only CPD policies are referenced, which accords with the ATF Operational Plan's provision that

CPD policy would govern the pursuit.  (Doc. # 58-1 at 4). All in all, the Court sees no evidence – let alone a preponderance of the evidence – to suggest that any entity besides the Cincinnati Police Department retained control over Sgt. Scalf after the pursuit began, and especially not to the level of "the right to control the manner and means of the agent's performance of work" required by Kentucky law. *Papa John's*, 244 S.W.3d at 657 (internal quotations omitted).

None of the City Defendants satisfy both required prongs of the test under the Westfall Act, 28 U.S.C § 2679, and their Petition for Westfall Act Certification (Doc. # 34) is **denied**.

### E.    Motion to Dismiss (Doc. # 10)

The City Defendants have filed a Motion to Dismiss (Doc. # 10), which alleges that Plaintiffs have not successfully stated a claim under the FTCA, and that the Plaintiffs have failed to name the United States as a party.  However, the Court has determined that the FTCA does not apply to this case, *supra* part III(D), and so the arguments contained in the City Defendants' Motion to Dismiss have been mooted.  The Motion is thus **denied as moot**.

## IV.    CONCLUSION

As the Court stated at the Oral Argument on these Motions, in any case, jurisdictional questions are prerequisite to every other question presented.  While the case's posture after the filing of this Order is not likely to be the outcome any of the parties expected, the Court is confident that it is the correct outcome.  Jurisdiction has been conferred on to the federal court by 28 U.S.C. § 1442, which also allowed the City Defendants to remove the action.  After establishing subject-matter jurisdiction, the Court

determined that the United States was correct in declining to issue a Westfall Act certification to the City Defendants.  Thus, the case will remain in this Court, with each City Defendant proceeding as an individual, and the United States is dismissed from the action.

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that:

(1)    Plaintiffs' Motion to Remand (Doc. # 8) is **DENIED**;

(2)    Defendants' Motion to Dismiss (Doc. # 10) is **DENIED AS MOOT**;

(3)    Defendants' Motion to Stay (Doc. # 11) is **DENIED AS MOOT**;

(4)    Defendants' Petition for Westfall Act Certification (Doc. # 34) is **DENIED**;

(5)    Plaintiffs' Motion for Leave to File a Sur-Reply (Doc. # 52) is **GRANTED**; and

(6)    The parties shall file a **Joint Status Report** within twenty (20) days from the date of entry of this Order setting forth a proposed case schedule for discovery going forward.  A case schedule will be set by subsequent Order.

This 3rd day of June, 2022.



**Signed By:**

**_David L. Bunning_**

**United States District Judge**

K:\DATA\ORDERS\Cov2021\21-102 MOO re Remand and Westfall.docx