## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## AT COVINGTON

| | |
|---|---|
| JASON LAIBLE, EXECUTOR OF THE ESTATES OF RAYMOND AND GAYLE LAIBLE, <br> c/o Friedman, Gilbert + Gerhardstein <br> 35 East 7th Street, Suite 201 <br> Cincinnati, Ohio 45202, <br><br> and <br><br> STEVEN KLEIN AND MARIBETH KLEIN, <br> 536 East Third Street <br> Newport, Kentucky 41071 <br><br>     Plaintiffs, <br><br> -vs- <br><br> TIMOTHY LANTER, <br> c/o City of Cincinnati Law Department <br> 801 Plum Street, Suite 214 <br> Cincinnati, Ohio 45202, <br><br> and <br><br> BRETT THOMAS, <br> c/o City of Cincinnati Law Department <br> 801 Plum Street, Suite 214 <br> Cincinnati, Ohio 45202, <br><br> and <br><br> DONALD SCALF, <br> c/o City of Cincinnati Law Department <br> 801 Plum Street, Suite 214 <br> Cincinnati, Ohio 45202, <br><br> and <br><br> CITY OF CINCINNATI, <br> c/o City of Cincinnati Law Department <br> 801 Plum Street, Suite 214 <br> Cincinnati, OH 45202, | Case No. 2:21-cv-00102 <br><br> Judge David L. Bunning <br><br> Magistrate Judge Candace J. Smith <br><br><br> FIRST AMENDED COMPLAINT |

and

**MASON MEYER,**
Prisoner, Campbell County Detention Center
601 Central Avenue
Newport, Kentucky 41071,

and

**AUSTIN LAGORY,**
13718 Beaver Road
Union, KY 41091

and

**TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA,**
c/o Process Agent
421 West Main Street
Frankfort, KY 40601,

       Defendants,

and

**UNITED STATES OF AMERICA,**
c/o Assistant United States Attorney
260 West Vine Street, Suite 300
Lexington, Kentucky 40507-1612,

       New Party Defendant.

Plaintiffs Jason Laible, as executor of the Estates of Raymond and Gayle Laible, and Steven and Maribeth Klein, for their complaint against Defendants Cincinnati Police Sergeant Timothy Lanter, Officer Brett Thomas, Sergeant Donald Scalf, the City of Cincinnati, Mason Meyer, Austin Lagory, Travelers Casualty Insurance Company of America, and United States of America allege as follows:

## INTRODUCTION

1.      On the afternoon of August 7, 2020, police officers employed by the Cincinnati Police Department, or the United States of America as defined by 28 U.S.C. § 2671, initiated a reckless and dangerous high-speed chase, in pursuit of a car driven by Mason Meyer. Defendant officers raced through the streets over a distance nearly six miles long, and crossed state lines from Ohio into Kentucky. The Defendant officers chose to continue the high-speed pursuit for approximately seven minutes, despite causing at least one interstate crash and nearly causing a head-on collision with a motorcyclist as the pursuit continued through the urban, congested streets and highways of Cincinnati, Ohio; Covington, Kentucky; and Newport, Kentucky. The Defendant Officers' pursuit only ended when Meyer's vehicle careened violently into the sidewalk of a busy cafe, killing Raymond and Gayle Laible and seriously injuring Steven and Maribeth Klein.

2.      Police pursuits are known to be extraordinarily dangerous because they often put officers, the suspect, and the general public at risk. Recognizing this extreme danger to the public, the Cincinnati Police Department ("CPD") has promulgated specific and detailed policies to govern pursuits. Pursuit is not warranted and must be terminated when the level of danger to officers, suspects, or bystanders created by the pursuit outweighs the necessity for immediate apprehension, or when the suspect is identified so that he may be apprehended at a later time. Officers may not pursue suspects the wrong way on a road without specific authorization by the officer in charge ("OIC"), may not travel twenty or more miles per hour above the posted speed limit, and must obey traffic laws by slowing down and using due regard for safety at traffic lights and stop signs.

3.      On August 7, 2020, Defendant Officers flagrantly and knowingly violated these safety rules, traveling at speeds far beyond the posted limits in congested areas of downtown Cincinnati, Covington and Newport, Kentucky, crossing into the opposite lane of traffic, driving at high speeds the wrong way down busy one-way streets, and failing to terminate the pursuit that had clearly become far too dangerous to continue. They knew where the suspect lived, yet they pursued him. Video footage of the pursuit is filed along with this complaint.[1]

4.      Defendant City of Cincinnati is responsible for the operation of the Cincinnati Police Department and its officers, including the implementation of policies, practices, and customs of the Department, and the training, supervision, hiring, and retention of CPD officers.

5.      Defendant Meyer drove to escape from CPD officers at high speeds, flagrantly violating traffic laws and operating his vehicle with knowledge of the extreme risk of danger he was creating for himself, the officers, and bystanders.

6.      Plaintiffs bring this case seeking fair compensation and to deter Defendants and other police officers from continuing to engage in vehicle pursuits which threaten public safety.

## JURISDICTION, VENUE, AND PARTIES

7.      The deadly crash giving rise to Plaintiffs' Complaint occurred in Newport, Kentucky.

8.      Plaintiff Jason Laible is Administrator of the Estates of Raymond and Gayle Laible and the adult son of the same. Decedents Raymond and Gayle Laible, pictured here, were residents of Newport, Kentucky in Campbell County, and resided in Newport at the time of their

---

[1] Lanter's and Thomas' Body-Worn Camera footage, along with Lanter's and Thomas' Cruiser Camera footage, are attached to this Complaint. (Exhibit A, Lanter Cruiser Cam; Exhibit B, Lanter Body-Worn Camera; Exhibit C, Thomas Cruiser Cam; Exhibit D, Thomas Body-Worn Camera). The attached videos are central to the claims in the Complaint. Should the Complaint be met with a motion to dismiss, the Court may consider the Complaint and attached exhibits in judging the sufficiency of the Complaint. Fed. R. Civ. Pro. 10(c); *Netherwood v. Fifth Third Bank, Inc.*, 514 S.W.3d 558, 563 (Ky. Ct. App. 2017).

deaths. Jason Liable was appointed as the executor of the Estates of Raymond and Gayle Laible on September 18, 2020 in Case Nos. 20-P-348 and 20-P-349 in the Campbell County Probate Court. Gayle and Raymond Laible are shown in Figure 1:



*Figure 1. Raymond and Gayle Laible*

9.      Plaintiffs Steven and Maribeth Klein are residents of Newport, Kentucky in Campbell County. Maribeth and Steven Klein are shown in Figure 2:



*Figure 2. Steven and Maribeth Klein*

10.     Defendant Mason Meyer is currently incarcerated in Campbell County Detention Center in Newport, Kentucky. Upon information and belief, Defendant Meyer resided prior to his incarceration at 802 Monroe Street in Newport, Kentucky.

11.     Defendant Sergeant Timothy Lanter, Officer Brett Thomas, and Sergeant Donald Scalf were employees of the Cincinnati Police Department at all times relevant herein.

12.     Alternatively, if Defendants Lanter, Thomas, and Scalf were federal employees as defined by 28 U.S.C. § 2671, at all times relevant herein as a result of their assignment to, and/or assistance to, the ATF Task Force, then the United States of American is the appropriate Defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671, *et seq.*[2]

13.     The City of Cincinnati is a municipal corporation and at all relevant times was the employer of Cincinnati Police Department officers, including all Defendant Officers named in this Complaint.

14.     Upon information and belief, Defendant Austin Lagory is currently a resident of Boone County, Kentucky.

15.     Defendant Travelers Casualty Insurance Company of America ("Travelers") was at all relevant times a business incorporated for profit and authorized to conduct business in the Commonwealth of Kentucky and an insurer for the Kleins.

16.     On January 27, 2022, Plaintiff Jason Laible timely filed administrative claims to the Bureau of Alcohol, Tobacco, Firearms and Explosives and to the United States Marshals Service. On January 28 and February 2, 2022, Plaintiffs Steven and Maribeth Klein timely filed

---

[2] This claim is pled in the alternative. Lanter, Thomas, and Scalf asked the Attorney General to certify that they were employees of the federal government and acting within the scope of that employment at the time of Plaintiffs' allegations. The Attorney General declined to issue a certification. The Officers then petitioned this Court to certify them. This Court likewise declined to do so. However, Defendants appealed the order denying their petition. This appeal is now pending in the Sixth Circuit Court of Appeals (Case No. 22-5496). Should Lanter, Thomas, and Scalf prevail on appeal, the proper defendant for Plaintiffs' claims as alleged against Defendants Lanter, Thomas, and Scalf will be the United States.

administrative claims to the Bureau of Alcohol, Tobacco, Firearms and Explosives and to the United States Marshals Service. These claims were all denied in letters sent on June 6, 2022. Accordingly, Plaintiffs have exhausted all potential administrative remedies and Plaintiffs' FTCA claim is timely filed pursuant to 28 U.S.C. § 2401(b).

17.     This Court has jurisdiction over this action because Defendants Lanter, Thomas, and Scalf raised a federal defense. Further, this Court has jurisdiction to grant relief in this action pursuant to 28 U.S.C. § 1346(b), for Plaintiffs' claim under the Federal Tort Claims Act, if necessary following the appeal.

18.     Venue is proper because the events giving rise to these claims occurred in this judicial district.

**FACTS**

*Events of August 7, 2020*

19.     Defendants Sergeant Timothy Lanter, Officer Brett Thomas, and Sergeant Donald Scalf are employees of the Cincinnati Police Department, and were on duty as Cincinnati police officers on August 7, 2020.

20.     Alternatively, Scalf is a deputized federal officer on the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Task Force and Lanter and Thomas, while not deputized officers on the Task Force, provided assistance to the ATF Task Force on August 7, 2020, sufficient to render them federal employees pursuant to 28 U.S.C. § 2679.

21.     On August 7, 2020, Defendant Meyer was under investigation for selling guns. Defendant Officers knew where he resided.

22.     That afternoon, Defendant Meyer departed from 721 Steiner Avenue in Cincinnati in a vehicle. Meyer drove the vehicle.

23.     At approximately 4:26pm, Defendant Officer Lanter, driving a marked cruiser, began to tail Mason Meyer's vehicle on Elberon Avenue in the Price Hill neighborhood of Cincinnati.[3]

24.     At the time, law enforcement was tracking Meyer's cell phone location, thereby making Meyer's location known to Defendants and their fellow officers.

25.     Defendant Mason Meyer was operating a black Ford Focus owned by Defendant Austin Lagory.

26.     Defendant Meyer was driving Defendant Lagory's vehicle with permission.

27.     Before Defendant Lanter activated his lights and sirens, Meyer obeyed traffic laws and operated his vehicle at a reasonable speed.

28.     Meyer used his turn signal to switch lanes and turn right on to Mount Hope Avenue. (Exhibit A, Lanter Cruiser Cam at 00:34).

29.     When Defendant Lanter activated his lights and sirens, Defendant Meyer accelerated and began to flee.

30.     Defendant Officer Lanter radioed as he initiated pursuit, "83-10 got a vehicle refusing to stop."

31.     Defendant Lanter took the role of primary unit in the pursuit.

32.     CPD Policy 12.535(D)(3)(a) requires the supervisor of the primary unit to become Officer-In-Charge ("OIC").

---

[3] The time stamps on Defendant Lanter's cruiser cam video do not match the time stamps on his body-worn camera video, as the former begins at the timestamp 4:33PM, and the latter marks the same point in time at 4:26PM. The source of any allegations about the time of events is attributed to the source throughout the complaint.

33.     The role of the OIC is supervisory. CPD Policy 12.535(D)(4)(a) states that the OIC is responsible for continually monitoring and controlling the pursuit, including authorizing and reassigning units and terminating the pursuit.

34.     CPD Policy 12.535(D)(5)(a) states that only the OIC can authorize the active involvement of more than two units in the pursuit.

35.     However, Defendant Lanter authorized the participation of more units, including two canine units operated by Defendant Brett Thomas and Specialist Michael Harper, in violation of this procedure.

36.     Approximately one minute into the pursuit, a male voice on the radio channel stated, "We still have no OIC on this." (Exhibit B, Lanter Body-Worn Camera at 01:34).

37.     CPD internal investigation interviews conducted after the pursuit identified Defendant Donald Scalf as the OIC of the pursuit.

38.     Approximately two minutes into the pursuit, Defendant Lanter stated, "Don Scalf, are we going to Kentucky if he goes?" (Lanter Body-Worn Camera at 02:26).

39.     Defendant Scalf responded "Affirmative," authorizing the pursuit across state lines. (Lanter Body-Worn Camera at 02:33).

40.     Aside from the question of whether to cross state lines, Lanter continued to make—and Scalf permitted Lanter to make—all decisions during the pursuit.

41.     During the approximately seven minutes of active pursuit, Defendants traveled the following six-mile route, as depicted in Figure 3:



*Figure 3. Pursuit Route*

42.     Defendant Meyer began to speed north on Mount Hope Avenue, through the mixed use commercial and residential area of the Incline District. Meyer ran the stop sign at the corner of Eight Street, almost colliding with a sport utility vehicle turning on to Mount Hope. Defendant Lanter followed through the intersection of Mount Hope and Eighth Street without slowing or stopping. (Lanter Cruiser Cam at 01:12-01:16; Lanter Body-Worn Camera at 01:14-01:17).

43.     Defendant Meyer again sped through the stop signs at Price Avenue and Grand Avenue, followed by Defendant Lanter, neither of whom slowed or stopped. (Lanter Cruiser Cam at 01:33; Lanter Body-Worn Camera at 01:19-1:35).

44.     After turning on to Hawthorne Avenue without slowing or stopping at the stop sign, Defendant Meyer sped through the red light at the Warsaw Avenue intersection, followed by Defendant Lanter, neither of whom slowed or stopped. (Lanter Body-Worn Camera at 01:18).

45.     Defendant Thomas joined the pursuit as backup to Defendant Lanter.

46.     Throughout the pursuit, Defendants Lanter and Thomas drove their CPD-issued vehicles at dangerously high speeds, which were well in excess of posted speed limits and without due regard for the safety of the public.

47.     Defendant Thomas, following the same route as Defendants Lanter and Meyer, also sped through multiple stop signs without pause, and drove at speeds more than twenty miles over the posted speed limit. (See e.g., Exhibit C, Thomas Cruiser Cam at 01:26; 01:31; 01:45).

48.     After snaking through the Price Hill neighborhood of Cincinnati, Defendants sped down the 6th Street Expressway toward the interstate.

49.     Multiple cars traveling on the highway and interstate were forced to swerve out of the way at high speeds as Defendants Meyer and Lanter wove between passenger vehicles during rush hour, at 4:30 p.m. on Friday, August 7, 2020. (Lanter Cruiser Cam at 02:50-04:37).

50.     Pursuing officers are required by CPD policy to immediately report information about the pursuit to Cincinnati's Emergency Communications Center ("ECC"), including the speeds involved in the pursuit.

51.     Defendant Meyer operated his vehicle at over one hundred miles per hour.

52.     Defendant Lanter operated his vehicle at over one hundred miles per hour.

53.     Defendant Thomas operated his vehicle at over one hundred miles per hour.

54.     Officer Michael Harper, who attempted to join the pursuit at the authorization of Defendant Lanter, also operated his vehicle at over one hundred miles per hour.

55.     At no point did Defendants Lanter or Thomas, or Officer Harper, notify the ECC that they were traveling at speeds greater than one hundred miles per hour.

56.     At no point did Defendants Lanter or Thomas, or Officer Harper, notify the OIC that they were traveling at speeds greater than one hundred miles per hour.

57.    Three and a half minutes into the pursuit, while attempting to evade the Defendant

Officers, Defendant Meyer sideswiped a vehicle traveling on the interstate, depicted in Figure 4:



*Figure 4. Defendant Meyer's vehicle (right) sideswiping a civilian vehicle at the shoulder of the Second Street exit.*
*(Still shot from Lanter Cruiser Cam at 04:02-04:08).*

58.    This collision occurred in full view of Defendant Lanter. However, despite the

obvious and *actualized* danger of continuing the pursuit, Defendant Lanter chose to continue the

pursuit.

59.    The sideswiped vehicle, disabled on the interstate shoulder, was in view of

Defendant Thomas as he followed just seconds behind Defendants Lanter and Meyer. Thomas,

likewise, chose to continue his pursuit.

60.    The two young women in the sideswiped vehicle were forced to stand beside the

busy interstate after the crash, waiting for police to assist them.

61.    At this point, three and a half minutes into the pursuit, it was clear to Defendant

Officers that the risks to the public of continuing the pursuit were greater than the need to

apprehend Defendant Meyer.  The location of the first crash is depicted in Figure 5:



*Figure 5. Map depicting location of first crash*

62.     Neither Defendant Lanter nor Thomas communicated to the ECC or OIC that the pursuit caused a car accident on the interstate.

63.     Defendants Lanter and Thomas continued the pursuit at speeds well beyond the speed limit on the highly congested stretch of I-71/I-75 encompassing the heart of downtown Cincinnati.

64.     Defendant Scalf did not inquire of Defendants Lanter and Thomas about the speeds involved in the chase or the traffic conditions, despite having the opportunity to do so.

65.     Defendant Thomas radioed to Defendants Lanter and Scalf, "His tires are going down, it looks like." (Exhibit D, Thomas Body-Worn Camera at 03:56).

66.     Defendant Officers knew Meyer's vehicle tires losing air pressure while traveling at high speeds increased the risk of Meyer losing control of the vehicle.

67.     The chase continued at high speeds through the mixed use residential and commercial area known as The Banks, where parks, a carousel, sports stadiums, and walkable bridges draw thousands of pedestrians and tourists on sunny summer Fridays like August 7,

2020.  The area features several stop signs, a roundabout, and pedestrian crosswalks heavily traversed by children and families.

68.     Defendant Meyer's tires were visibly smoking and burning as he drove through The Banks as depicted in Figure 6:



*Figure 6. Front passenger tire of Defendant Meyer's car smoking as he turns on to Elm Street (Lanter Cruiser Cam at 04:41)*

69.     Defendants Lanter and Thomas still did not notify the ECC of the traffic conditions or the speeds at which they were traveling. Scalf still did not inquire about the conditions of the chase.

70.     As Meyer crossed from Ohio into Kentucky, Defendants Lanter and Thomas followed, operating their vehicles at high speed on the heavily-traversed Roebling Bridge, passing eleven passenger cars and crossing the center line against oncoming traffic.

71.     At this time, it remained clear that the risk to the public outweighed any need to continue the pursuit.

72.     Defendant Scalf failed to maintain control of the pursuit, failed to inquire about the conditions of the pursuit, and failed to terminate the pursuit despite the obvious danger to officers, the suspect, and civilians, which clearly outweighed any need to apprehend Defendant Meyer.

73.     Defendants Lanter and Thomas continued their pursuit despite the obvious danger to officers, the suspect, and civilians, which clearly outweighed any need to apprehend Defendant Meyer.

74.     CPD Procedure 12.535 bars officers from pursuing vehicles the wrong way on divided roadways and one-way streets without specific authorization from the OIC.

75.     Neither Defendant Lanter nor Thomas asked for permission to travel the wrong way down divided roadways or one-way streets at any point.

76.     Defendant Scalf never authorized Defendants Lanter and Thomas to travel the wrong way on any street.

77.     Nonetheless, after reaching Covington, Defendants sped after Meyer the wrong way on multiple one-way streets without authorization from the OIC, including at the Roebling Way roundabout, Greenup Street, and a heavily trafficked area of Fourth Street as depicted in Figure 7:



*Figure 7.  Each arrow indicates an instance of Defendants engaging in pursuit the wrong way on one-way streets, without authorization.*

15

78.     Approximately five and a half minutes into the pursuit, Defendant Lanter authorized operation of pursuit vehicles the wrong way on Greenup Street, despite not having the authority to do so. (Lanter Body-Worn Camera at 05:42).

79.     Defendants Lanter and Thomas traveled against traffic on Fourth Street without authorization from the OIC as depicted in Figure 8:



*Figure 8.  Screenshot of Defendant Lanter traveling the wrong way on 4th Street in Covington (Lanter Cruiser Cam still shot)*

80.     Defendant Scalf did not maintain control of the pursuit, increasing the risk of danger to bystanders and officers.

81.     As Defendants Meyer, Lanter, and Thomas crossed the 4th Street Bridge connecting Covington and Newport, Defendants Lanter and Thomas operated their cruisers at high speeds, at multiple points traveling in the wrong lane against traffic during the prolonged pursuit.

82.     Several motorists were forced to defensively swerve to avoid being hit by the speeding vehicles in the pursuit.

83.     A motorcyclist traveling in the opposite lane of Defendant Meyer's and Lanter's oncoming vehicles was forced to swerve out of the way, nearly toppling to the side to avoid

colliding with Meyer's vehicle as Meyer maneuvered into his lane to escape pursuit. (Lanter Cruiser Cam 06:55-07:05) as depicted in Figure 9:



*Figure 9. Still shot of Lanter Cruiser Cam showing Meyer traveling the wrong way on the Fourth Street Bridge connecting Covington and Newport, nearly colliding with a motorcyclist. (Lanter Cruiser Cam at 07:00)*

84.     Defendants Lanter and Thomas continued the pursuit into the dense mixed-use area of downtown Newport, six and a half minutes and four miles into the chase. (Lanter Cruiser Cam 06:58)

85.     At approximately 4:30PM on Friday, August 7, 2020, Raymond and Gayle Laible were dining on the sidewalk patio of a cafe at the corner of Fifth Street and Monmouth Avenue in Newport, Kentucky.

86.     Plaintiffs Steven and Maribeth Klein were walking together on the sidewalk near the corner of 5th Street and Monmouth Avenue.

87.     Meyer's vehicle, traveling at high speed, ran the red light at the corner of Fifth Street and Monmouth Avenue in Newport, and crashed into the sidewalk and the outdoor dining area of the restaurant Press on Monmouth.

88.     Meyer's vehicle jumped the curb at high speed and struck Raymond and Gayle Laible, causing their deaths.

89.     As Meyer crashed into the Laibles, the impact and debris of that collision struck Steven and Maribeth Klein, throwing them several yards onto the concrete, and causing severe physical injuries.

90.     At the time of the crash, Defendant Lanter was still fully and actively engaged in the high-speed pursuit of Meyer, with lights and sirens on, and was only approximately half a block behind Meyer's vehicle, which was fully visible to Lanter. (Thomas Cruiser Cam 07:40-07:43).

91.     At the time of the crash, Defendant Thomas was also still fully and actively engaged in the high-speed pursuit of Meyers and was approximately one block behind Meyer's vehicle, which was fully visible to Thomas.   (Thomas Cruiser Cam at 07:40-07:43).

92.     Plaintiffs Steven and Maribeth Klein observed the tragic incident occur and were themselves struck by debris from the violent collision.

93.     Gayle Laible was pronounced dead at the scene.

94.     Raymond Laible was transported to a Cincinnati hospital where he was later pronounced dead.

95.     Maribeth Klein almost lost a toe as a result of this crash and suffered severe road rash from the hip down along with injuries to her left shoulder, left wrist, stomach, right knee and hands and other injuries.

96.     Steven Klein had severe road rash and injuries to his collar bone, left ankle, left toe, and right elbow and other injuries.

97.     All Plaintiffs experienced the terror and pain of the impending impact and immediate effects of the crash.

98.     Defendant Officers failed to end the pursuit when it became clear that the fleeing vehicle was not slowing or stopping and that it was instead continually placing other vehicles, their occupants, and pedestrians at clear risk of injury or death.

99.     An officer using ordinary care in the situation would have concluded, at the times when Defendants Lanter and Thomas continued to pursue Meyer and when Scalf authorized such pursuit, that the pursuit posed an unjustified risk of injuries and death to bystanders, and would have terminated the pursuit due to the known risk of injury to others.

100.    Throughout the pursuit, Defendants Meyer, Thomas, and Lanter ran at least five stop signs, failed to slow their speed, and acted negligently and recklessly without due regard for the safety of all civilians.

101.    Defendants Meyer, Lanter, and Thomas ran multiple red lights before proceeding into intersections, acting negligently and recklessly without due regard for the safety of all civilians.

102.    Defendants Meyer, Lanter, and Thomas operated their vehicles negligently and recklessly at high speeds along narrow residential alleyways, failing to act with due regard to the safety of pedestrians and bystanders while rounding sharp corners with little to no visibility.

103.    The pursuit passed close by approximately twenty pedestrians, a cyclist, and dozens of cars whose occupants were put at risk by the Defendants' negligent and reckless actions.

104.    During the pursuit, Defendants Meyer, Lanter, and Thomas drove their vehicles in a negligent, grossly negligent, and reckless manner with a complete disregard for the value of

human life and with awareness that their conduct was likely to cause death or serious injury to others, including but not limited to pedestrians and bystanders to the chase such as Gayle Laible, Raymond Laible, Maribeth Klein, and Steven Klein.

105.     During the pursuit, Defendant Scalf's actions were negligent, grossly negligent, and reckless, with a complete disregard for the value of human life and with awareness that his conduct was likely to cause death or serious injury to others, including but not limited to pedestrians and bystanders to the chase such as Gayle Laible, Raymond Laible, Maribeth Klein, and Steven Klein.

106.     The actions of the Defendant Officers and Defendant Meyer served as direct and proximate causes of the crash and the Plaintiff's injuries and damages.

107.     As a direct and proximate result of the conduct of the Defendant Officers and Defendant Meyer, Raymond and Gayle Laible were killed. Jason Laible, as administrator of the Estates, claims damages on behalf of the Estates for wrongful death, including but not limited to destruction of power to labor and earn income, suffering and mental anguish, funeral and burial expenses, and punitive damages. Raymond and Gayle Laible's family, including their children Angela Endress and Jason Laible, their grandchildren, and the rest of their extended family, have suffered and continue to suffer mental anguish as a result of their loss of Raymond and Gayle.

108.     As a direct and proximate result of the conduct of the Defendant Officers and Defendant Meyer, Steven and Maribeth Klein suffered severe physical injury. They suffered damages including but not limited to past medical expenses, future medical expenses, past wage loss, destruction of power to labor and earn income, past physical pain and suffering and mental anguish, future pain and suffering and mental anguish, allocation of damages for increased risks of future harms and expenses, and punitive damages.

*Police Pursuits and Cincinnati Police Department Pursuit Policy*

109.   Cincinnati Police Chief Eliot Isaac has publicly acknowledged "vehicle pursuits are one of the most dangerous activities that our officers engage in. . .[n]ot only for themselves, but for the community at large."[4]

110.   A study completed by the National Highway Traffic Safety Administration found 42% of individuals killed in police pursuits in Ohio between 1982 and 2014 were bystanders.[5]

111.   In Cincinnati, approximately one in five police pursuits result in vehicular crashes.

112.   Since 2011, nearly 150 pursuits initiated by CPD officers have ended in a vehicle crash.

113.   Because of the danger posed by police pursuits, the model policy of the International Association of Chiefs of Police (IACP) requires that "[u]nless a greater hazard would result, a pursuit should not be undertaken if the subject(s) can be identified with enough certainty that they can be apprehended at a later time."

114.   Following a March 2021 pursuit which left five people hospitalized after traveling through Cincinnati, Lt. Ron Murphy, the spokesman of Cincinnati's neighboring police district, Norwood, Ohio, publicly opined on the extreme danger of police pursuits, stating, "you wonder are [pursuits] even justifiable anymore when innocent people are injured."[6]

---

[4] "If pursuits are one of police's most 'dangerous activities,' should policies be stricter?" WCPO, 6:00 AM, Nov 16, 2017, Updated: 2:20 PM, Dec 12, 2018, available at https://www.wcpo.com/longform/if-pursuits-are-one-of-polices-most-dangerous-activities-should-policies-be-stricter.

[5] Ohio Attorney General's Advisory Group on Law Enforcement Vehicle Pursuits, Special Report November 2016, available at  https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Policy-and-Legislation/Vehicular-Pursuit/AGLEVP-Special-Report-November-2016-w-links.aspx.

[6] "5 wounded after police chase ends in fiery crash into South Fairmount building" WLWT5, updated 6:38PM Mar 22, 2021 https://www.wlwt.com/article/fire-5-patients-hospitalized-after-police-pursuit-ends-with-a-car-in-a-building-and-a-fire/35895699#

115.    Due to the extreme risk posed to the public by police pursuits, the Cincinnati

Police Department has instituted a written policy governing pursuits and the factors which must

be weighed by officers driving in pursuit of a suspect.

116.    CPD policy 12.535 states, as a general matter:

Officers must terminate their involvement in motor vehicle pursuits whenever the risks to
their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the
consequences of the suspect's escape.

117.    CPD policy requires officers to weigh the following factors both before and

during a pursuit:

a.  Degree of risk created by pursuit to others, officer and suspect.
b.  Location where pursuit will take place.
c.  Traffic conditions and amount of pedestrian traffic.
d.  Road conditions.
e.  Time of day.
f.  Volume, type, speed and direction of vehicular traffic and direction of pursuit.
g.  Nature/seriousness of suspected crime.
h.  Any circumstance that could lead to a situation in which the pursuing officer(s) will
    not be able to maintain control of the police vehicle.
i.  Likelihood of successful apprehension.
j.  Whether the identity of the suspect is known to the point that later apprehension is
    possible.

118.    CPD policy declares that the OIC is responsible for approving pursuit of vehicles

the wrong way on the interstate, divided roadways, or one-way streets.

119.    The OIC must give specific authorization for officers to pursue suspects the

wrong way on divided roadways and one-way streets. Only the OIC can authorize the active

involvement of more than two units in the pursuit.

120.    CPD policy requires that officers must ensure video equipment, including DVR

and body worn cameras, are activated during pursuit.

121.    CPD policy requires that officers not operate their vehicles with reckless

disregard for the safety of other citizens.

122.     CPD policy requires, when approaching a red traffic signal or stop sign, that the operator must only enter the intersection with due regard to safety. This requires slowing down as necessary for the safety of traffic and proceeding only at a speed allowing themselves, other drivers, and pedestrians a reasonable opportunity to avoid a traffic crash.

123.     CPD policy requires the operator to maintain a reasonable speed for conditions, including, but not limited to, time of day and pedestrian and vehicle traffic.

124.     CPD Procedure 12.535 expressly bars officers from operating their vehicles more than twenty miles per hour above the posted speed limit.

125.     CPD policy requires the OIC to maintain control of the pursuit and direct it while underway, including the final decision to terminate the pursuit.

126.     CPD policy also requires the primary unit in the pursuit to terminate the pursuit if he determines the danger created by the pursuit outweighs the necessity to immediately apprehend the subject.

127.     CPD policy requires the termination of a pursuit when the suspect's identity is established such that he can be apprehended at a later time.

128.     CPD officers, including Defendants, are aware of the substantial likelihood that the pursuit will result in a crash, especially at high speeds, and that innocent civilian bystanders face substantial risk of injury or death.

129.     At all times relevant herein, the Defendant Officers were trained members of CPD who were well aware of the dangers posed by police pursuits and the policies governing pursuits.

130.     In 2011, Defendant Lanter initiated a pursuit that ended fatally for bystanders. The six-minute pursuit through downtown Cincinnati ended in a crash which caused the deaths of two civilians: a taxi driver and his passenger.

131.    Due to his previous involvement in a fatal police pursuit, at the time of the events in this Complaint, Defendant Lanter was undeniably aware of the significant risk of death to bystanders which can result from a police pursuit.

132.    Upon information and belief, since 2017 Defendant Lanter has been involved in at least five other vehicle crashes on duty, including multiple crashes where he was determined to be at fault.

133.    Upon information and belief, Defendant Lanter was previously disciplined for violation of CPD Rules and Regulations in connection to a vehicle crash in November 2017, including Rule 7.02 for failure to "operate official vehicles in a careful and prudent manner" in accordance with Department procedures.

134.    Despite Defendant Lanter's history of involvement in at-fault crashes, fatal pursuits, and discipline related to his on-duty driving, the CPD considered him eligible for its "Safe Driving Award" through at least April 2020.

*Investigation of the August 7, 2020 Pursuit*

135.    Cincinnati Police Department Internal Investigation Section completed a Critical Incident Review of the events leading to fatal crash in this case.

136.    The Critical Incident Review concluded Defendant Thomas violated policy by "markedly" exceeding the speed limit on Sixth Street viaduct, based on review of his body camera footage which caught a speedometer reading of 103 miles per hour.

137.    The Critical Incident Review concluded Defendant Lanter similarly violated policy when he traveled at speeds well over twenty miles per hour above the posted speed limit.

138.    The Critical Incident Review further concluded Defendant Lanter failed to transmit speeds in violation of policy.

24

139.    The Critical Incident Review found that Defendant Lanter violated CPD Rules and Regulations when he authorized the operation of vehicles the wrong way on one-way streets while actively involved in the pursuit and not acting as the pursuit OIC.

140.    Defendant Lanter received a written reprimand for violations of two CPD Rules:

    i.   Rule 1.01(B), for committing "[a] negligent violation which may lead to risk of physical injury to another or financial loss to the City" and

    ii.   Rule 1.03, for failure to "exercise the responsibility and authority of the position to which [he was] assigned."

141.    The Critical Incident Review concluded Officer Michael Harper violated CPD policy due to his operation of his police vehicle at more than twenty miles over the posted speed limit.

## COUNT ONE: PERSONAL INJURY

142.    Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

143.    Defendants Lanter, Thomas, and Meyer breached their duty to operate their vehicles with due regard for all persons using the street or highway, including to Plaintiffs.

144.    As the OIC for the pursuit, Defendant Scalf breached his duty of care to Plaintiffs.

145.    The actions of Defendants Lanter, Thomas, and Scalf were ministerial in nature, as they were governed by specific directions and comprehensive procedures in CPD Procedure 12.535 for initiating and continuing a police pursuit, including but not limited to:

    i.   Procedure which bars officers from pursuing vehicles the wrong way on divided roadways and one-way streets without specific authorization from the OIC;

    ii.   Procedure which expressly bars officers from operating their vehicles more than twenty miles per hour above the posted speed limit;

    iii.   Procedure which states that officers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent

bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape;

    iv.   To operate the cruiser with due regard for the safety of all persons on the roadway;

    v.   To adhere to basic traffic safety practices.

146.    The actions of Defendants Lanter and Thomas were also ministerial in nature, as they were governed by Kentucky law, specifically that police vehicles in pursuit of an actual or suspected violator of the law shall slow down as necessary for safety to traffic upon approaching any red light or stop signal or any stop sign.

147.    Defendants Lanter, Thomas, and Scalf were plainly incompetent in their conduct in relation to this pursuit and knowingly violated the law.

148.    The actions of Defendants Lanter, Thomas, Scalf, and Meyer proximately caused the Plaintiffs' injuries.

149.    The actions of Defendants Lanter, Thomas, Scalf, and Meyer were reckless, willful, without justification, and grossly negligent.

150.    At all times relevant to this complaint, Defendants Lanter, Thomas, and Scalf were acting in the scope of their employment. As an agent or servant of Defendant City of Cincinnati, damages are recoverable from Defendant City.

151.    Alternatively, at all times relevant to this complaint, Lanter, Thomas, and Scalf were employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, ATF and the United States Marshals Service. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for their injuries. *See* 28 U.S.C. § 1346(b).

## COUNT TWO: WRONGFUL DEATH

152.   Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

153.   Pursuant to K.R.S. § 411.130 and K.R.S. § 411.133, Plaintiff Laible, as Personal Representative for the Estates of Raymond and Gayle Laible, seeks recovery for the negligence and wrongful acts of Defendants Lanter, Thomas, Scalf, and Meyer which resulted in the death of Raymond and Gayle.

154.   The actions of Defendants Lanter, Thomas, and Scalf were ministerial in nature, as they were governed by specific directions and comprehensive procedures for initiating and continuing a police pursuit.

155.   The actions of Defendants Lanter and Thomas were also ministerial in nature, as they were governed by Kentucky law, specifically that police vehicles in pursuit of an actual or suspected violator of the law shall slow down as necessary for safety to traffic upon approaching any red light or stop signal or any stop sign.

156.   Defendants Lanter, Thomas, and Scalf were plainly incompetent in their conduct in relation to this pursuit and knowingly violated the law.

157.   The actions of Defendants Lanter, Thomas, Scalf, and Meyer proximately caused the deaths of Raymond and Gayle Laible.

158.   The actions of Defendants Lanter, Thomas, Scalf, and Meyer were willful, reckless, without justification, and grossly negligent.

159.   At all times relevant to this complaint, Defendants Lanter, Thomas, and Scalf were acting in the scope of their employment. As an agent or servant of Defendant City of Cincinnati, damages are recoverable from Defendant City.

160.     Alternatively, at all times relevant to this complaint, Lanter, Thomas, and Scalf were employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, ATF and the United States Marshals Service. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for their injuries. *See* 28 U.S.C. § 1346(b).

## COUNT THREE: NEGLIGENCE IN SUPERVISION AND TRAINING

161.     Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

162.     Defendant City of Cincinnati knew or had reason to know of the danger created by employees in engaging in police pursuits, both specifically in regard to Defendant Lanter and generally.

163.     Plaintiffs were injured by employees of Defendant City of Cincinnati.

164.     These injuries were proximately caused by the failure to supervise and train employees. Specifically, Defendant City of Cincinnati failed to adequately train, supervise, and discipline its employees to ensure that they followed CPD pursuit policies, and as a result, employees of Defendant City, including Defendants Lanter, Thomas, and Scalf engaged in dangerous and unnecessary police pursuits, causing harm to innocent bystanders, including the Laibles and Kleins, as a result.

165.     These negligent acts were outside of the legislative and judicial realms of Defendant City.

## COUNT FOUR: NEGLIGENT ENTRUSTMENT

166.     Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

167.     Defendant Lagory owned the 2014 Black Ford Focus operated by Defendant Meyer at the time of the chase and accident.

168.     Defendant Lagory knew or should have known Defendant Meyer was unable or unfit to operate a motor vehicle.

169.     Defendant Lagory negligently entrusted Defendant Meyer with the vehicle Defendant Meyer was operating at the time of the chase and accident.

170.     As a direct and proximate result of the negligent entrustment of the motor vehicle by Defendant Lagory to Defendant Meyer, Plaintiffs suffered the losses described above, including loss of society, loss of companionship, and loss of consortium, as well as past medical expenses, future medical expenses, past wage loss, destruction of power to labor and earn income, past physical pain and suffering and mental anguish, future pain and suffering and mental anguish, allocation of damages for increased risks of future harms and expenses, and punitive damages.

## COUNT FIVE: UNINSURED/UNDERINSURED MOTORIST COVERAGE

171.     Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

172.     On August 7, 2020, Defendant Meyer did negligently operate Defendant Lagory's motor vehicle, thereby causing a collision that resulted in injuries to Plaintiffs Steven and Maribeth Klein.

173.     At the time of the accident, Plaintiffs Steven and Maribeth Klein were covered by an insurance policy issued through Travelers with Policy No. 6062750612031, a copy of which policy is not attached hereto, with the same being in the possession of Travelers.

174.    As a direct and proximate result of the negligent actions of Defendant Meyer, Plaintiffs Steven and Maribeth Klein suffered severe physical injury. They suffered damages including but not limited to past medical expenses, future medical expenses, past wage loss, destruction of power to labor and earn income, past physical pain and suffering and mental anguish, future pain and suffering and mental anguish, allocation of damages for increased risks of future harms and expenses, and punitive damages.

175.    At the time of the motor vehicle accident, Defendant Meyer was an uninsured or underinsured driver.

176.    Pursuant to Kentucky Revised Statute 418.040, Plaintiffs Steven and Maribeth Klein move the Court for a declaration of their rights under the Travelers policy, and specifically an Order requiring Travelers to pay Plaintiffs PIP coverage and the uninsured and/or underinsured benefits to which they are entitled at law.

**WHEREFORE**, Plaintiffs, by counsel, demand as follows:

1.    That the clerk of this Court issue Summons to the Defendants, once addresses are identified and verified, and direct a copy thereof, along with a copy of this Complaint.

2.    Judgment for the Plaintiffs against the Defendants for all damages to which Plaintiffs are entitled, including both compensatory and punitive damages, as well as any permissible prejudgment and post-judgment interest, attorney fees, and costs incurred or expended.

3.    Trial by jury; and

4.    All just and proper relief to which Plaintiffs may appear entitled, including the right to amend this Complaint.

Respectfully submitted,

*/s/ Jacqueline Greene*                              */s/ Roula Allouch*
Jacqueline Greene (OH 0092733)          J. Stephen Smith (KBA #86612)

Alphonse A. Gerhardstein (OH 0032053)
Rebecca P. Salley (OH 0097269)
Friedman, Gilbert + Gerhardstein
35 East 7th Street, Suite 201
Cincinnati, Ohio 45202
T: 513-572-4200 / F: 216-621-0427
jacqueline@FGGfirm.com
al@FGGfirm.com
rebecca@FGGfirm.com

*Counsel for the Estates of Raymond and
Gayle Laible*

Roula Allouch (KBA #91594)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive, Suite 300
Ft. Mitchell, KY 41017
T: 513-629-2805
F: 513-333-4358
ssmith@graydon.law
rallouch@graydon.law

*Counsel for Steven and Maribeth Klein*