**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON**

| | | |
|---|---|---|
| **JASON LAIBLE,** *et al.*, | : | **Case No. 2:21-cv-00102** |
| | : | |
| **Plaintiffs** | : | **Judge David L. Bunning** |
| | : | **Magistrate Judge Candace J. Smith** |
| | : | |
| | : | |
| **v.** | : | **DEFENDANTS TIMOTHY LANTER,** |
| | : | **BRETT THOMAS, AND THE CITY** |
| **TIMOTHY LANTER,** *et al.*, | : | **OF CINCINNATI'S ANSWER** |
| | : | |
| **Defendants.** | : | |

For their answer to Plaintiffs' Amended Complaint, Defendants Timothy Lanter, Brett Thomas, and the City of Cincinnati (collectively, "City Defendants") state as follows.[1]  The City Defendants deny all allegations not specifically admitted to be true herein:

1.     On the afternoon of August 7, 2020, police officers employed by the Cincinnati Police Department initiated a reckless and dangerous high-speed chase, in pursuit of a car driven by Mason Meyer. Defendant officers raced through the streets over a distance nearly six miles long, and crossed state lines from Ohio into Kentucky. The Defendant officers chose to continue the high-speed pursuit for approximately seven minutes, despite causing at least one interstate crash and nearly causing a head-on collision with a motorcyclist as the pursuit continued through the urban, congested streets and highways of Cincinnati, Ohio; Covington, Kentucky; and Newport, Kentucky. The Defendant Officers' pursuit only ended when Meyer's vehicle careened violently into the sidewalk of a busy cafe, killing Raymond and Gayle Laible and seriously injuring Steven and Maribeth Klein.

---

[1] Defendant Donald Scalf meets the requirements for Westfall Act immunity.  *See Laible v. Lanter*, 91 F.4th 438, 446 (6th Cir. 2024).  The United States is substituting for Scalf in this litigation.

**ANSWER:  The allegations in paragraph 1 are summary in nature and do not require a response.  To the extent a further response is deemed necessary, the City Defendants deny the allegations in this paragraph.**

2.      Police pursuits are known to be extraordinarily dangerous because they often put officers, the suspect, and the general public at risk. Recognizing this extreme danger to the public, the Cincinnati Police Department ("CPD") has promulgated specific and detailed policies to govern pursuits. Pursuit is not warranted and must be terminated when the level of danger to officers, suspects, or bystanders created by the pursuit outweighs the necessity for immediate apprehension, or when the suspect is identified so that he may be apprehended at a later time. Officers may not pursue suspects the wrong way on a road without specific authorization by the officer in charge ("OIC"), may not travel twenty or more miles per hour above the posted speed limit, and must obey traffic laws by slowing down and using due regard for safety at traffic lights and stop signs.

**ANSWER:  The City Defendants admit the allegation that the Cincinnati Police Department has policies governing police pursuits, which speak for themselves.  The City Defendants deny the remaining allegations of this paragraph.**

3.      On August 7, 2020, Defendant Officers flagrantly and knowingly violated these safety rules, traveling at speeds far beyond the posted limits in congested areas of downtown Cincinnati, Covington and Newport, Kentucky, crossing into the opposite lane of traffic, driving at high speeds the wrong way down busy one-way streets, and failing to terminate the pursuit that had clearly become far too dangerous to continue. They knew where the suspect lived, yet they pursued him. Video footage of the pursuit is filed along with this complaint.

**ANSWER:  Deny.**

4.      Defendant City of Cincinnati is responsible for the operation of the Cincinnati Police Department and its officers, including the implementation of policies, practices, and customs of the Department, and the training, supervision, hiring, and retention of CPD officers.

**ANSWER:  The City Defendants admit the allegations in this paragraph and note that Scalf, Thomas, and Lanter were participating in a federal law enforcement task force at all times during the surveillance, pursuit, and arrest of Mason Meyer.**

5.      Defendant Meyer drove to escape from CPD officers at high speeds, flagrantly violating traffic laws and operating his vehicle with knowledge of the extreme risk of danger he was creating for himself, the officers, and bystanders.

**ANSWER:  Admit.**

6.      Plaintiffs bring this case seeking fair compensation and to deter Defendants and other police officers from continuing to engage in vehicle pursuits which threaten public safety.

**ANSWER:  The allegations in paragraph 6 are not an averment and do not require a response.  To the extent a response is required, the City Defendants deny the allegations in this paragraph.**

7.      The deadly crash giving rise to Plaintiffs' Complaint occurred in Newport, Kentucky.

**ANSWER:  Admit.**

8.      Plaintiff Jason Laible is Administrator of the Estates of Raymond and Gayle Laible and the adult son of the same. Decedents Raymond and Gayle Laible, pictured here, were residents of Newport, Kentucky in Campbell County, and resided in Newport at the time of their deaths. Jason Laible was appointed as the executor of the Estates of Raymond and Gayle Laible

on September 18, 2020 in Case Nos. 20-P-348 and 20-P-349 in the Campbell County Probate

Court. Gayle and Raymond Laible are shown in Figure 1:

> **ANSWER:  The City Defendants lack information sufficient to admit or deny the allegations in paragraph 8.**

9.      Plaintiffs Steven and Maribeth Klein are residents of Newport, Kentucky in

Campbell County. Maribeth and Steven Klein are shown in Figure 2:

> **ANSWER:  The City Defendants lack information sufficient to admit or deny the allegations in paragraph 9.**

10.      Defendant Mason Meyer is currently incarcerated in Campbell County Detention

Center in Newport, Kentucky. Upon information and belief, Defendant Meyer resided prior to his

incarceration at 802 Monroe Street in Newport, Kentucky.

> **ANSWER:  The City Defendants admit that Meyer is currently incarcerated, having pleaded guilty to the murder of Raymond and Gayle Laible and to federal criminal charges.  The City Defendants lack information sufficient to admit or deny (1) where Meyer is incarcerated; or (2) where Meyer resided prior to his incarceration.**

11.      Defendant Sergeant Timothy Lanter, Officer Brett Thomas, and Sergeant Donald

Scalf were employees of the Cincinnati Police Department at all times relevant herein.

> **ANSWER:  The City Defendants admit that Lanter, Thomas, and Scalf were employees of the Cincinnati Police Department and state that they  were acting as federal officers, in concert with a federal law enforcement task force, at all times during the surveillance, pursuit, and arrest of Mason Meyer.**

12.      Alternatively, if Defendants Lanter, Thomas, and Scalf were federal employees as

defined by 28 U.S.C. § 2671, at all times relevant herein as a result of their assignment to, and/or

assistance to, the ATF Task Force, then the United States of America is the appropriate

Defendant under the FTCA.  28 U.S.C. §§ 1346(b), 2671, *et seq.*

>    **ANSWER:  Admit.**

13.     The City of Cincinnati is a municipal corporation and at all relevant times was the

employer of Cincinnati Police Department officers, including all Defendant Officers named in

this Complaint.

>    **ANSWER:  The City of Cincinnati admits that it is a municipal corporation and is
>    an employer of Cincinnati Police Department officers, including the Defendant
>    Officers.  The City of Cincinnati further states that Lanter, Thomas, and Scalf  were
>    acting as federal officers, in concert with a federal law enforcement task force, at all
>    times during the surveillance, pursuit, and arrest of Mason Meyer.**

14.     Upon information and belief, Defendant Austin Lagory is currently a resident of

Boone County, Kentucky.

>    **ANSWER:  The City Defendants lack information sufficient to admit or deny the
>    allegations in paragraph 14.**

15.     Defendant Travelers Casualty Insurance Company of America ("Travelers") was at

all relevant times a business incorporated for profit and authorized to conduct business in the

Commonwealth of Kentucky and an insurer for the Kleins.

>    **ANSWER:  The City Defendants lack information sufficient to admit or deny the
>    allegations in paragraph 15.**

16.     On January 27, 2022, Plaintiff Jason Laible timely filed administrative claims to

the Bureau of Alcohol, Tobacco, Firearms, and Explosives and to the United States Marshals

Service.  On January 28 and February 2, 2022, Plaintiffs Steven and Maribeth Klein timely filed

administrative claims to the Bureau of Alcohol, Tobacco, Firearms and Explosives and to the

United States Marshals Service.  These claims were all denied in letters sent on June 6, 2022.

Accordingly, Plaintiffs have exhausted all potential administrative remedies and Plaintiffs'

FTCA claim is timely filed pursuant to 28 U.S. C. § 2401(b).

> **ANSWER:  The allegations in this paragraph call for legal conclusions to which no response is required.  Moreover, the City Defendants lack information sufficient to admit or deny the allegations in this paragraph.  To the extent a response is required, the City Defendants deny the allegations in paragraph 16.**

17.     This Court has jurisdiction over this action because Defendants Lanter, Thomas,

and Scalf raised a federal defense.  Further, this Court has jurisdiction to grant relief in this

action pursuant to 28 U.S.C. § 1346(b), for Plaintiffs' claim under the Federal Tort Claims Act,

if necessary following the appeal.

> **ANSWER:  Admit.**

18.     Venue is proper because the events giving rise to these claims occurred in this

judicial district.

> **ANSWER:  Admit.**

19.     Defendants Sergeant Timothy Lanter, Officer Brett Thomas, and Sergeant Donald

Scalf are employees of the Cincinnati Police Department, and were on duty as Cincinnati police

officers on August 7, 2020.

> **ANSWER:  The City Defendants admit that Lanter, Thomas, and Scalf were employees of the Cincinnati Police Department on August 7, 2020.  The City Defendants further state that Lanter, Thomas, and Scalf were acting as federal officers, in concert with a federal law enforcement task force, at all times during the surveillance, pursuit, and arrest of Mason Meyer.**

20.     Alternatively, Scalf is a deputized federal officer on the Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF") Task Force and Lanter and Thomas, while not

deputized officers on the Task Force, provided assistance to the ATF Task Force on August 7, 2020, sufficient to render them federal employees pursuant to 28 U.S.C. § 2679.

**ANSWER:  Admit.**

21.     On August 7, 2020, Defendant Meyer was under investigation for selling guns. Defendant Officers knew where he resided.

**ANSWER:  The City Defendants admit that Defendant Meyer was under investigation.  The City Defendants deny the remaining allegations in paragraph 21.**

22.     That afternoon, Defendant Meyer departed from 721 Steiner Avenue in Cincinnati in a vehicle. Meyer drove the vehicle.

**ANSWER:  Admit.**

23.     At approximately 4:26pm, Defendant Officer Lanter, driving a marked cruiser, began to tail Mason Meyer's vehicle on Elberon Avenue in the Price Hill neighborhood of Cincinnati.

**ANSWER:  Admit.**

24.     At the time, law enforcement was tracking Meyer's cell phone location, thereby making Meyer's location known to Defendants and their fellow officers.

**ANSWER:  Admit.**

25.     Defendant Mason Meyer was operating a black Ford Focus owned by Defendant Austin Lagory.

**ANSWER:  The City Defendants admit that Defendant Meyer was operating a black Ford Focus and lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 25.**

26.     Defendant Meyer was driving Defendant Lagory's vehicle with permission.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 26.**


27.     Before Defendant Lanter activated his lights and sirens, Meyer obeyed traffic

laws and operated his vehicle at a reasonable speed.

**ANSWER:  Deny.**


28.     Meyer used his turn signal to switch lanes and turn right on to Mount Hope

Avenue. (Exhibit A, Lanter Cruiser Cam at 00:34).

**ANSWER:  By way of response to paragraph 28, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**


29.     When Defendant Lanter activated his lights and sirens, Defendant Meyer

accelerated and began to flee.

**ANSWER:  Admit.**


30.     Defendant Officer Lanter radioed as he initiated pursuit, "83-10 got a vehicle

refusing to stop."

**ANSWER:  By way of response to paragraph 30, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**


31.     Defendant Lanter took the role of primary unit in the pursuit.

**ANSWER:  Defendant Lanter admits that he took the role of primary Cincinnati Police Department unit in the pursuit of Meyer, acting under the direction of federal law enforcement officers.**

32. CPD Policy 12.535(D)(3)(a) requires the supervisor of the primary unit to become Officer-In-Charge ("OIC").

**ANSWER:  By way of response to paragraph 32, the City Defendants refer to the referenced policy for its contents and deny any allegations inconsistent therewith.**

33. The role of the OIC is supervisory. CPD Policy 12.535(D)(4)(a) states that the OIC is responsible for continually monitoring and controlling the pursuit, including authorizing and reassigning units and terminating the pursuit.

**ANSWER:  By way of response to paragraph 33, the City Defendants refer to the referenced policy for its contents and deny any allegations inconsistent therewith.**

34. CPD Policy 12.535(D)(5)(a) states that only the OIC can authorize the active involvement of more than two units in the pursuit.

**ANSWER:  By way of response to paragraph 34, the City Defendants refer to the referenced policy for its contents and deny any allegations inconsistent therewith.**

35. However, Defendant Lanter authorized the participation of more units, including two canine units operated by Defendant Brett Thomas and Specialist Michael Harper, in violation of this procedure.

**ANSWER:  Deny.**

36. Approximately one minute into the pursuit, a male voice on the radio channel stated, "We still have no OIC on this." (Exhibit B, Lanter Body-Worn Camera at 01:34).

**ANSWER:  By way of response to paragraph 36, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

37.     CPD internal investigation interviews conducted after the pursuit identified Defendant Donald Scalf as the OIC of the pursuit.

**ANSWER:  Admit.**

38.     Approximately two minutes into the pursuit, Defendant Lanter stated, "Don Scalf, are we going to Kentucky if he goes?" (Lanter Body-Worn Camera at 02:26).

**ANSWER:  By way of response to paragraph 38, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

39.     Defendant Scalf responded "Affirmative," authorizing the pursuit across state lines. (Lanter Body-Worn Camera at 02:33).

**ANSWER:  By way of response to paragraph 39, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

40.     Aside from the question of whether to cross state lines, Lanter continued to make—and Scalf permitted Lanter to make—all decisions during the pursuit.

**ANSWER:  Deny.**

41.     During the approximately seven minutes of active pursuit, Defendants traveled the following six-mile route, as depicted in Figure 3:

**ANSWER:  Admit.**

42.     Defendant Meyer began to speed north on Mount Hope Avenue, through the mixed use commercial and residential area of the Incline District. Meyer ran the stop sign at the corner of Eight Street, almost colliding with a sport utility vehicle turning on to Mount Hope. Defendant Lanter followed through the intersection of Mount Hope and Eighth Street without

slowing or stopping. (Lanter Cruiser Cam at 01:12-01:16; Lanter Body-Worn Camera at 01:14-01:17).

> **ANSWER:  By way of response to paragraph 42, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

43.     Defendant Meyer again sped through the stop signs at Price Avenue and Grand Avenue, followed by Defendant Lanter, neither of whom slowed or stopped. (Lanter Cruiser Cam at 01:33; Lanter Body-Worn Camera at 01:19-1:35).

> **ANSWER:  By way of response to paragraph 43, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

44.     After turning on to Hawthorne Avenue without slowing or stopping at the stop sign, Defendant Meyer sped through the red light at the Warsaw Avenue intersection, followed by Defendant Lanter, neither of whom slowed or stopped. (Lanter Body-Worn Camera at 01:18).

> **ANSWER:  By way of response to paragraph 44, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

45.     Defendant Thomas joined the pursuit as backup to Defendant Lanter.

> **ANSWER:  The City Defendants admit that Officer Thomas joined the pursuit.**

46.     Throughout the pursuit, Defendants Lanter and Thomas drove their CPD-issued vehicles at dangerously high speeds, which were well in excess of posted speed limits and without due regard for the safety of the public.

> **ANSWER:  Deny.**

47.     Defendant Thomas, following the same route as Defendants Lanter and Meyer, also sped through multiple stop signs without pause, and drove at speeds more than twenty miles over the posted speed limit. (See e.g., Exhibit C, Thomas Cruiser Cam at 01:26; 01:31; 01:45).

**ANSWER:  By way of response to paragraph 47, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

48.     After snaking through the Price Hill neighborhood of Cincinnati, Defendants sped down the 6th Street Expressway toward the interstate.

**ANSWER:  The City Defendants deny the allegations of paragraph 48, which are vague and imprecise.**

49.     Multiple cars traveling on the highway and interstate were forced to swerve out of the way at high speeds as Defendants Meyer and Lanter wove between passenger vehicles during rush hour, at 4:30 p.m. on Friday, August 7, 2020. (Lanter Cruiser Cam at 02:50-04:37).

**ANSWER:  By way of response to paragraph 49, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

50.     Pursuing officers are required by CPD policy to immediately report information about the pursuit to Cincinnati's Emergency Communications Center ("ECC"), including the speeds involved in the pursuit.

**ANSWER:  By way of response to paragraph 50, the City Defendants refer to the CPD policy, which speaks for itself, and deny any allegations inconsistent therewith.**

51.     Defendant Meyer operated his vehicle at over one hundred miles per hour.

**ANSWER:  By way of response to paragraph 51, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

52.      Defendant Lanter operated his vehicle at over one hundred miles per hour.

**ANSWER:  Deny.**

53.      Defendant Thomas operated his vehicle at over one hundred miles per hour.

**ANSWER:  By way of response to paragraph 53, the City Defendants refer to the camera footage that depicts the pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

54.      Officer Michael Harper, who attempted to join the pursuit at the authorization of Defendant Lanter, also operated his vehicle at over one hundred miles per hour.

**ANSWER:  Deny.**

55.      At no point did Defendants Lanter or Thomas, or Officer Harper, notify the ECC that they were traveling at speeds greater than one hundred miles per hour.

**ANSWER:  Admit**.

56.      At no point did Defendants Lanter or Thomas, or Officer Harper, notify the OIC that they were traveling at speeds greater than one hundred miles per hour.

**ANSWER:  Admit**.

57.      Three and a half minutes into the pursuit, while attempting to evade the Defendant Officers, Defendant Meyer sideswiped a vehicle traveling on the interstate, depicted in Figure 4:

**ANSWER: The City Defendants refer to the camera footage that depicts the pursuit and to the referenced Figure 4 for their contents and deny any allegations inconsistent therewith.**

58.     This collision occurred in full view of Defendant Lanter. However, despite the

obvious and *actualized* danger of continuing the pursuit, Defendant Lanter chose to continue the

pursuit.

**ANSWER:  The City Defendants admit that Defendant Lanter viewed the collision and that Defendant Lanter continued the pursuit.  The City Defendants deny all remaining allegations.**

59.     The sideswiped vehicle, disabled on the interstate shoulder, was in view of

Defendant Thomas as he followed just seconds behind Defendants Lanter and Meyer. Thomas,

likewise, chose to continue his pursuit.

**ANSWER:  The City Defendants deny that the vehicle was disabled.  Moreover, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

60.     The two young women in the sideswiped vehicle were forced to stand beside

the busy interstate after the crash, waiting for police to assist them.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.  To the extent a response is required, the City Defendants deny the allegations in this paragraph.**

61.     At this point, three and a half minutes into the pursuit, it was clear to Defendant

Officers that the risks to the public of continuing the pursuit were greater than the need to

apprehend Defendant Meyer. The location of the first crash is depicted in Figure 5:

**ANSWER:  Deny.**

62.     Neither Defendant Lanter nor Thomas communicated to the ECC or OIC that the

pursuit caused a car accident on the interstate.

**ANSWER:  Admit.**

63.     Defendants Lanter and Thomas continued the pursuit at speeds well beyond the speed limit on the highly congested stretch of 1-71/1-75 encompassing the heart of downtown Cincinnati.

**ANSWER:  The City Defendants admit that Lanter and Thomas continued the pursuit along I-71/I-75 and deny the remaining allegations as vague and imprecise.**

64.     Defendant Scalf did not inquire of Defendants Lanter and Thomas about the speeds involved in the chase or the traffic conditions, despite having the opportunity to do so.

**ANSWER:  Deny.**

65.     Defendant Thomas radioed to Defendants Lanter and Scalf, "His tires are going down, it looks like." (Exhibit D, Thomas Body-Worn Camera at 03:56).

**ANSWER:  By way of response to paragraph 65, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

66.     Defendant Officers knew Meyer's vehicle tires losing air pressure while traveling at high speeds increased the risk of Meyer losing control of the vehicle.

**ANSWER:  Deny.**

67.     The chase continued at high speeds through the mixed use residential and commercial area known as The Banks, where parks, a carousel, sports stadiums, and walkable bridges draw thousands of pedestrians and tourists on sunny summer Fridays like August 7, 2020. The area features several stop signs, a roundabout, and pedestrian crosswalks heavily traversed by children and families.

**ANSWER:  The City Defendants admit that the pursuit of Meyer continued through the area known as The Banks.  The City Defendants deny all remaining allegations for lack of knowledge and information.**

68.     Defendant Meyer's tires were visibly smoking and burning as he drove through The Banks as depicted in Figure 6:

**ANSWER:  Deny.**

69.     Defendants Lanter and Thomas still did not notify the ECC of the traffic conditions or the speeds at which they were traveling. Scalf still did not inquire about the conditions of the chase.

**ANSWER:  The City Defendants admit the allegations in the first sentence of paragraph 69.  The City Defendants deny the allegations in the second sentence of paragraph 69.**

70.     As Meyer crossed from Ohio into Kentucky, Defendants Lanter and Thomas followed, operating their vehicles at high speed on the heavily-traversed Roebling Bridge, passing eleven passenger cars and crossing the center line against oncoming traffic.

**ANSWER:  The City Defendants admit that Defendants Lanter and Thomas continued the pursuit of Meyer into Kentucky.  For all remaining allegations, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

71.     At this time, it remained clear that the risk to the public outweighed any need to continue the pursuit.

**ANSWER:  Deny.**

72.     Defendant Scalf failed to maintain control of the pursuit, failed to inquire about the conditions of the pursuit, and failed to terminate the pursuit despite the obvious danger to officers, the suspect, and civilians, which clearly outweighed any need to apprehend Defendant Meyer.

**ANSWER:  Deny.**

73.     Defendants Lanter and Thomas continued their pursuit despite the obvious danger to officers, the suspect, and civilians, which clearly outweighed any need to apprehend Defendant Meyer.

**ANSWER:  Deny.**

74.     CPD Procedure 12.535 bars officers from pursuing vehicles the wrong way on divided roadways and one-way streets without specific authorization from the OIC.

**ANSWER:  The City Defendants refer to the referenced policy, which speaks for itself, and deny any allegations inconsistent therewith.**

75.     Neither Defendant Lanter nor Thomas asked for permission to travel the wrong way down divided roadways or one-way streets at any point.

**ANSWER:  Deny**.

76.     Defendant Scalf never authorized Defendants Lanter and Thomas to travel the wrong way on any street.

**ANSWER:  Deny**.

77.     Nonetheless, after reaching Covington, Defendants sped after Meyer the wrong way on multiple one-way streets without authorization from the OIC, including at the Roebling Way roundabout, Greenup Street, and a heavily trafficked area of Fourth Street as depicted in Figure 7:

**ANSWER:  Deny.**

78.      Approximately five and a half minutes into the pursuit, Defendant Lanter authorized operation of pursuit vehicles the wrong way on Greenup Street, despite not having the authority to do so. (Lanter Body-Worn Camera at 05:42).

**ANSWER:  Deny.**

79.      Defendants Lanter and Thomas traveled against traffic on Fourth Street without authorization from the OIC as depicted in Figure 8:

**ANSWER:  The City Defendants refer to the referenced Figure 8 for its contents and deny all allegations inconsistent therewith.**

80.      Defendant Scalf did not maintain control of the pursuit, increasing the risk of danger to bystanders and officers.

**ANSWER:  Deny**.

81.      As Defendants Meyer, Lanter, and Thomas crossed the 4th Street Bridge connecting Covington and Newport, Defendants Lanter and Thomas operated their cruisers at high speeds, at multiple points traveling in the wrong lane against traffic during the prolonged pursuit.

**ANSWER:  By way of response to paragraph 81, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

82.      Several motorists were forced to defensively swerve to avoid being hit by the speeding vehicles in the pursuit.

**ANSWER:  Deny.**

83.     A motorcyclist traveling in the opposite lane of Defendant Meyer's and Lanter's oncoming vehicles was forced to swerve out of the way, nearly toppling to the side to avoid colliding with Meyer's vehicle as Meyer maneuvered into his lane to escape pursuit. (Lanter Cruiser Cam 06:55-07:05) as depicted in Figure 9.

> **ANSWER:  By way of response to paragraph 83, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

84.     Defendants Lanter and Thomas continued the pursuit into the dense mixed-use area of downtown Newport, six and a half minutes and four miles into the chase. (Lanter Cruiser Cam 06:58).

> **ANSWER:  By way of response to paragraph 84, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

85.     At approximately 4:30PM on Friday, August 7, 2020, Raymond and Gayle Laible were dining on the sidewalk patio of a cafe at the corner of Fifth Street and Monmouth Avenue in Newport, Kentucky.

> **ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 85.  To the extent a response is required, the City Defendants deny the allegations in this paragraph.**

86.     Plaintiffs Steven and Maribeth Klein were walking together on the sidewalk near the corner of 5th Street and Monmouth Avenue.

> **ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 86.  To the extent a response is required, the City Defendants deny the allegations in this paragraph.**

87.     Meyer's vehicle, traveling at high speed, ran the red light at the corner of Fifth Street and Monmouth Avenue in Newport, and crashed into the sidewalk and the outdoor dining area of the restaurant Press on Monmouth.

**ANSWER:  By way of response to paragraph 87, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.  The City Defendants further state that Meyer has pleaded guilty to the murder of Raymond and Gayle Laible.**

88.     Meyer's vehicle jumped the curb at high speed and struck Raymond and Gayle Laible, causing their deaths.

**ANSWER:  By way of response to paragraph 88, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.   The City Defendants further state that Meyer has pleaded guilty to the murder of Raymond and Gayle Laible.**

89.     As Meyer crashed into the Laibles, the impact and debris of that collision struck Steven and Maribeth Klein, throwing them several yards onto the concrete, and causing severe physical injuries.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 89.  To the extent a response is required, the City Defendants deny the allegations in this paragraph.**

90.     At the time of the crash, Defendant Lanter was still fully and actively engaged in the high-speed pursuit of Meyer, with lights and sirens on, and was only approximately half a block behind Meyer's vehicle, which was fully visible to Lanter. (Thomas Cruiser Cam 07:40-07:43).

**ANSWER:  By way of response to paragraph 90, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

91.     At the time of the crash, Defendant Thomas was also still fully and actively engaged in the high-speed pursuit of Meyers and was approximately one block behind Meyer's vehicle, which was fully visible to Thomas. (Thomas Cruiser Cam at 07:40-07:43).

**ANSWER:  By way of response to paragraph 91, the City Defendants refer to the camera footage that depicts this pursuit, which speaks for itself, and deny any allegations inconsistent therewith.**

92.     Plaintiffs Steven and Maribeth Klein observed the tragic incident occur and were themselves struck by debris from the violent collision.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 92.**

93.     Gayle Laible was pronounced dead at the scene.

**ANSWER:  Admit.**

94.     Raymond Laible was transported to a Cincinnati hospital where he was later pronounced dead.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 94.**

95.     Maribeth Klein almost lost a toe as a result of this crash and suffered severe road rash from the hip down along with injuries to her left shoulder, left wrist, stomach, right knee and hands and other injuries.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 95.**

96.     Steven Klein had severe road rash and injuries to his collar bone, left ankle, left toe, and right elbow and other injuries.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 96.**

97.     All Plaintiffs experienced the terror and pain of the impending impact and

immediate effects of the crash.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 97.**

98.     Defendant Officers failed to end the pursuit when it became clear that the fleeing

vehicle was not slowing or stopping and that it was instead continually placing other vehicles,

their occupants, and pedestrians at clear risk of injury or death.

**ANSWER:  Deny.**

99.     An officer using ordinary care in the situation would have concluded, at the times

when Defendants Lanter and Thomas continued to pursue Meyer and when Scalf authorized such

pursuit, that the pursuit posed an unjustified risk of injuries and death to bystanders, and would

have terminated the pursuit due to the known risk of injury to others.

**ANSWER: Deny.**

100.    Throughout the pursuit, Defendants Meyer, Thomas, and Lanter ran at least five

stop signs, failed to slow their speed, and acted negligently and recklessly without due regard for

the safety of all civilians.

**ANSWER: Deny.**

101.    Defendants Meyer, Lanter, and Thomas ran multiple red lights before proceeding

into intersections, acting negligently and recklessly without due regard for the safety of all

civilians.

**ANSWER: Deny.**

102.     Defendants Meyer, Lanter, and Thomas operated their vehicles negligently and recklessly at high speeds along narrow residential alleyways, failing to act with due regard to the safety of pedestrians and bystanders while rounding sharp corners with little to no visibility.

**ANSWER: Deny.**

103.     The pursuit passed close by approximately twenty pedestrians, a cyclist, and dozens of cars whose occupants were put at risk by the Defendants' negligent and reckless actions.

**ANSWER: Deny.**

104.     During the pursuit, Defendants Meyer, Lanter, and Thomas drove their vehicles in a negligent, grossly negligent, and reckless manner with a complete disregard for the value of human life and with awareness that their conduct was likely to cause death or serious injury to others, including but not limited to pedestrians and bystanders to the chase such as Gayle Laible, Raymond Laible, Maribeth Klein, and Steven Klein.

**ANSWER: Deny.**

105.     During the pursuit, Defendant Scalf s actions were negligent, grossly negligent, and reckless, with a complete disregard for the value of human life and with awareness that his conduct was likely to cause death or serious injury to others, including but not limited to pedestrians and bystanders to the chase such as Gayle Laible, Raymond Laible, Maribeth Klein, and Steven Klein.

**ANSWER: Deny.**

106.     The actions of the Defendant Officers and Defendant Meyer served as direct and proximate causes of the crash and the Plaintiff's injuries and damages.

**ANSWER: Deny.**

107.     As a direct and proximate result of the conduct of the Defendant Officers and Defendant Meyer, Raymond and Gayle Laible were killed. Jason Laible, as administrator of the Estates, claims damages on behalf of the Estates for wrongful death, including but not limited to destruction of power to labor and earn income, suffering and mental anguish, funeral and burial expenses, and punitive damages. Raymond and Gayle Laible's family, including their children Angela Endress and Jason Laible, their grandchildren, and the rest of their extended family, have suffered and continue to suffer mental anguish as a result of their loss of Raymond and Gayle.

> **ANSWER: The City Defendants deny the allegations in the first sentence of paragraph 107.  The allegations in the second sentence of paragraph 107 are summary in nature and do not warrant a response; to the extent a response is required, the City Defendants deny the allegations in the second sentence.  The City Defendants lack knowledge and information sufficient to admit or deny the allegations in the third sentence of paragraph 107 and therefore deny the allegations.**

108.     As a direct and proximate result of the conduct of the Defendant Officers and Defendant Meyer, Steven and Maribeth Klein suffered severe physical injury. They suffered damages including but not limited to past medical expenses, future medical expenses, past wage loss, destruction of power to labor and earn income, past physical pain and suffering and mental anguish, future pain and suffering and mental anguish, allocation of damages for increased risks of future harms and expenses, and punitive damages.

**ANSWER: Deny.**

109.     Cincinnati Police Chief Eliot Isaac has publicly acknowledged "vehicle pursuits are one of the most dangerous activities that our officers engage in. . .[n]ot only for themselves, but for the community at large."

**ANSWER:  The City Defendants refer to Chief Isaac's statement for its contents and deny all allegations inconsistent therewith.**

110.     A study completed by the National Highway Traffic Safety Administration found 42% of individuals killed in police pursuits in Ohio between 1982 and 2014 were bystanders.[4]

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 110.**

111.     In Cincinnati, approximately one in five police pursuits result in vehicular crashes.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 111.**

112.     Since 2011, nearly 150 pursuits initiated by CPD officers have ended in a vehicle crash.

**ANSWER:  The City Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 112.**

113.     Because of the danger posed by police pursuits, the model policy of the International Association of Chiefs of Police (IACP) requires that "[u]nless a greater hazard would result, a pursuit should not be undertaken if the subject(s) can be identified with enough certainty that they can be apprehended at a later time."

**ANSWER: The City Defendants refer to the referenced policy for its contents and deny all allegations inconsistent therewith.**

114.     Following a March 2021 pursuit which left five people hospitalized after traveling through Cincinnati, Lt. Ron Murphy, the spokesman of Cincinnati's neighboring police district, Norwood, Ohio, publicly opined on the extreme danger of police pursuits, stating, "you wonder are [pursuits] even justifiable anymore when innocent people are injured."

**ANSWER: The City Defendants refer to Lt. Murphy's public statement for its contents and deny all allegations inconsistent therewith.**

115.     Due to the extreme risk posed to the public by police pursuits, the Cincinnati Police Department has instituted a written policy governing pursuits and the factors which must be weighed by officers driving in pursuit of a suspect.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

116.     CPD policy 12.535 states, as a general matter: Officers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

117.     CPD policy requires officers to weigh the following factors both before and during a pursuit:

a.     Degree of risk created by pursuit to others, officer and suspect.
b.     Location where pursuit will take place.
c.     Traffic conditions and amount of pedestrian traffic.
d.     Road conditions.
e.     Time of day.
f.     Volume, type, speed and direction of vehicular traffic and direction of pursuit.
g.     Nature/seriousness of suspected crime.
h.     Any circumstance that could lead to a situation in which the pursuing officer(s) will not be able to maintain control of the police vehicle.

    i.      Likelihood of successful apprehension.

    j.      Whether the identity of the suspect is known to the point that later apprehension is possible.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

118.    CPD policy declares that the OIC is responsible for approving pursuit of vehicles the wrong way on the interstate, divided roadways, or one-way streets.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

119.    The OIC must give specific authorization for officers to pursue suspects the wrong way on divided roadways and one-way streets. Only the OIC can authorize the active involvement of more than two units in the pursuit.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

120.    CPD policy requires that officers must ensure video equipment, including DVR and body worn cameras, are activated during pursuit.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

121.    CPD policy requires that officers not operate their vehicles with reckless disregard for the safety of other citizens.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

122.    CPD policy requires, when approaching a red traffic signal or stop sign, that the operator must only enter the intersection with due regard to safety. This requires slowing down as

necessary for the safety of traffic and proceeding only at a speed allowing themselves, other drivers, and pedestrians a reasonable opportunity to avoid a traffic crash.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

123.    CPD policy requires the operator to maintain a reasonable speed for conditions, including, but not limited to, time of day and pedestrian and vehicle traffic.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

124.    CPD Procedure 12.535 expressly bars officers from operating their vehicles more than twenty miles per hour above the posted speed limit.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

125.    CPD policy requires the OIC to maintain control of the pursuit and direct it while underway, including the final decision to terminate the pursuit.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

126.    CPD policy also requires the primary unit in the pursuit to terminate the pursuit if he determines the danger created by the pursuit outweighs the necessity to immediately apprehend the subject.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

127.    CPD policy requires the termination of a pursuit when the suspect's identity is established such that he can be apprehended at a later time.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

128.     CPD officers, including Defendants, are aware of the substantial likelihood that the pursuit will result in a crash, especially at high speeds, and that innocent civilian bystanders face substantial risk of injury or death.

**ANSWER: The City Defendants refer to the written policy for its contents and deny all allegations inconsistent therewith.**

129.     At all times relevant herein, the Defendant Officers were trained members of CPD who were well aware of the dangers posed by police pursuits and the policies governing pursuits.

**ANSWER: Admit.**

130.     In 2011, Defendant Lanter initiated a pursuit that ended fatally for bystanders. The six-minute pursuit through downtown Cincinnati ended in a crash which caused the deaths of two civilians: a taxi driver and his passenger.

**ANSWER:  Deny.**

131.     Due to his previous involvement in a fatal police pursuit, at the time of the events in this Complaint, Defendant Lanter was undeniably aware of the significant risk of death to bystanders which can result from a police pursuit.

**ANSWER:  The City Defendants admit that Lanter, like any police officer, understood the risks associated with police pursuits and deny all remaining allegations in paragraph 131.**

132.     Upon information and belief, since 2017 Defendant Lanter has been involved in at least five other vehicle crashes on duty, including multiple crashes where he was determined to be at fault.

**ANSWER:  Admit.**

133.     Upon information and belief, Defendant Lanter was previously disciplined for violation of CPD Rules and Regulations in connection to a vehicle crash in November 2017, including Rule 7.02 for failure to "operate official vehicles in a careful and prudent manner" in accordance with Department procedures.

**ANSWER:  The City Defendants refer to the referenced violation for its contents and deny all allegations inconsistent therewith.**

134.     Despite Defendant Lanter's history of involvement in at-fault crashes, fatal pursuits, and discipline related to his on-duty driving, the CPD considered him eligible for its "Safe Driving Award" through at least April 2020.

**ANSWER:  The City Defendants admit that Lanter was eligible for the CPD's "Safe Driving Award" and deny all remaining allegations.**

135.     Cincinnati Police Department Internal Investigation Section completed a Critical Incident Review of the events leading to fatal crash in this case.

**ANSWER: Admit.**

136.     The Critical Incident Review concluded Defendant Thomas violated policy by "markedly" exceeding the speed limit on Sixth Street viaduct, based on review of his body camera footage which caught a speedometer reading of 103 miles per hour.

**ANSWER: The City Defendants refer to the Critical Incident Review for its contents and deny all allegations inconsistent therewith.**

137.     The Critical Incident Review concluded Defendant Lanter similarly violated policy when he traveled at speeds well over twenty miles per hour above the posted speed limit.

**ANSWER: The City Defendants refer to the Critical Incident Review for its contents and deny all allegations inconsistent therewith.  Moreover, Defendant Lanter denies that he traveled at speeds well over twenty miles per hour above the posted speed limit.**

138.    The Critical Incident Review further concluded Defendant Lanter failed to

transmit speeds in violation of policy.

**ANSWER: The City Defendants refer to the Critical Incident Review for its contents and deny all allegations inconsistent therewith.**

139.    The Critical Incident Review found that Defendant Lanter violated CPD Rules

and Regulations when he authorized the operation of vehicles the wrong way on one-way streets

while actively involved in the pursuit and not acting as the pursuit OIC.

**ANSWER: The City Defendants refer to the Critical Incident Review for its contents and deny all allegations inconsistent therewith.**

140.    Defendant Lanter received a written reprimand for violations of two CPD Rules:

i.Rule 1.01(B), for committing "[a] negligent violation which may lead to risk of physical

injury to another or financial loss to the City" and

ii.Rule 1.03, for failure to "exercise the responsibility and authority of the position to which

[he was] assigned."

**ANSWER:  The City Defendants refer to the written document for its contents and deny all allegations inconsistent therewith.**

141.    The Critical Incident Review concluded Officer Michael Harper violated CPD

policy due to his operation of his police vehicle at more than twenty miles over the posted speed

limit.

**ANSWER: The City Defendants refer to the Critical Incident Review for its contents and deny all allegations inconsistent therewith.**

## COUNT ONE: PERSONAL INJURY

142.    Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

**ANSWER:  The City Defendants incorporate by reference their responses to the preceding paragraphs.**

143.    Defendants Lanter, Thomas, and Meyer breached their duty to operate their vehicles with due regard for all persons using the street or highway, including to Plaintiffs.

**ANSWER:  Deny.**

144.    As the OIC for the pursuit, Defendant Scalf breached his duty of care to Plaintiffs.

**ANSWER:  Deny.**

145.    The actions of Defendants Lanter, Thomas, and Scalf were ministerial in nature, as they were governed by specific directions and comprehensive procedures in CPD Procedure 12.535 for initiating and continuing a police pursuit, including but not limited to:

i.         Procedure which bars officers from pursuing vehicles the wrong way on divided roadways and one-way streets without specific authorization from the OIC;

ii.        Procedure which expressly bars officers from operating their vehicles more than twenty miles per hour above the posted speed limit;

iii.       Procedure which states that officers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape;

iv.        To operate the cruiser with due regard for the safety of all persons on the roadway;

v.        To adhere to basic traffic safety practices.

**ANSWER:  The allegations in paragraph 145 state legal conclusions to which no response is required.  To the extent a response is deemed necessary, the City Defendants deny the allegations in paragraph 145.**

146.     The actions of Defendants Lanter and Thomas were also ministerial in nature, as they were governed by Kentucky law, specifically that police vehicles in pursuit of an actual or suspected violator of the law shall slow down as necessary for safety to traffic upon approaching any red light or stop signal or any stop sign.

**ANSWER:  The allegations in paragraph 146 state legal conclusions to which no response is required.  To the extent a response is deemed necessary, the City Defendants deny the allegations in paragraph 146.**

147.     Defendants Lanter, Thomas, and Scalf were plainly incompetent in their conduct in relation to this pursuit and knowingly violated the law.

**ANSWER:  Deny.**

148.     The actions of Defendants Lanter, Thomas, Scalf, and Meyer proximately caused the Plaintiffs' injuries.

**ANSWER:  Deny.**

149.     The actions of Defendants Lanter, Thomas, Scalf, and Meyer were reckless, willful, without justification, and grossly negligent.

**ANSWER:  Deny.**

150.    At all times relevant to this complaint, Defendants Lanter, Thomas, and Scalf were acting in the scope of their employment. As an agent or servant of Defendant City of Cincinnati, damages are recoverable from Defendant City.

**ANSWER:  The allegations in paragraph 150 state legal conclusions to which no response is required.  To the extent a response is deemed necessary, the City Defendants deny the allegations in paragraph 150.**

151.    Alternatively, at all times relevant to this complaint, Lanter, Thomas, and Scalf were employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, ATF and the United States Marshals Service. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for their injuries.  *See* 28 U.S.C. § 1346(b).

**ANSWER: Admit.**

## COUNT TWO: WRONGFUL DEATH

152.    Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

**ANSWER:  The City Defendants incorporate by reference their responses to the preceding paragraphs.**

153.    Pursuant to K.R.S. § 411.130 and K.R.S. § 411.133, Plaintiff Laible, as Personal Representative for the Estates of Raymond and Gayle Laible, seeks recovery for the negligence and wrongful acts of Defendants Lanter, Thomas, Scalf, and Meyer which resulted in the death of Raymond and Gayle.

**ANSWER:  The allegations in paragraph 153 are summary in nature and state legal conclusions to which no response is required.  To the extent a response is deemed necessary, the City Defendants deny the allegations in paragraph 153.**

34

154.     The actions of Defendants Lanter, Thomas, and Scalf were ministerial in nature, as they were governed by specific directions and comprehensive procedures for initiating and continuing a police pursuit.

**ANSWER:  The allegations in paragraph 154 state legal conclusions to which no response is required.  To the extent a response is deemed necessary, the City Defendants deny the allegations in paragraph 154.**

155.     The actions of Defendants Lanter and Thomas were also ministerial in nature, as they were governed by Kentucky law, specifically that police vehicles in pursuit of an actual or suspected violator of the law shall slow down as necessary for safety to traffic upon approaching any red light or stop signal or any stop sign.

**ANSWER:  The allegations in paragraph 155 state legal conclusions to which no response is required.  To the extent a response is deemed necessary, the City Defendants deny the allegations in paragraph 155.**

156.     Defendants Lanter, Thomas, and Scalf were plainly incompetent in their conduct in relation to this pursuit and knowingly violated the law.

**ANSWER:  Deny.**

157.     The actions of Defendants Lanter, Thomas, Scalf, and Meyer proximately caused the deaths of Raymond and Gayle Laible.

**ANSWER:  Deny.**

158.     The actions of Defendants Lanter, Thomas, Scalf, and Meyer were willful, reckless, without justification, and grossly negligent.

**ANSWER:  Deny.**

159.     At all times relevant to this complaint, Defendants Lanter, Thomas, and Scalf were acting in the scope of their employment. As an agent or servant of Defendant City of Cincinnati, damages are recoverable from Defendant City.

**ANSWER:  The allegations in paragraph 159 state legal conclusions to which no response is required.  To the extent a response is deemed necessary, the City Defendants deny the allegations in paragraph 159.**

160.     Alternatively, at all times relevant to this complaint, Lanter, Thomas, and Scalf were employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, ATF and the United States Marshals Service. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for their injuries.  *See* 28 U.S.C. § 1346(b).

**ANSWER: Admit.**

### COUNT THREE: NEGLIGENCE IN SUPERVISION AND TRAINING

161.     Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

**ANSWER:  The City Defendants incorporate by reference their responses to the preceding paragraphs.**

162.     Defendant City of Cincinnati knew or had reason to know of the danger created by employees in engaging in police pursuits, both specifically in regard to Defendant Lanter and generally.

**ANSWER:  Deny.**

163.     Plaintiffs were injured by employees of Defendant City of Cincinnati.

**ANSWER:  Deny.**

164.     These injuries were proximately caused by the failure to supervise and train employees. Specifically, Defendant City of Cincinnati failed to adequately train, supervise, and discipline its employees to ensure that they followed CPD pursuit policies, and as a result, employees of Defendant City, including Defendants Lanter, Thomas, and Scalf engaged in dangerous and unnecessary police pursuits, causing harm to innocent bystanders, including the Laibles and Kleins, as a result.

**ANSWER:  Deny.**

165.     These negligent acts were outside of the legislative and judicial realms of Defendant City.

**ANSWER:  Deny.**

### COUNT FOUR: NEGLIGENT ENTRUSTMENT

166.     Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

**ANSWER:  The City Defendants incorporate by reference their responses to the preceding paragraphs.**

167.     Defendant Lagory owned the 2014 Black Ford Focus operated by Defendant Meyer at the time of the chase and accident.

**ANSWER:  The allegations in paragraph 167 are directed to a party other than the City Defendants.**

168.     Defendant Lagory knew or should have known Defendant Meyer was unable or unfit to operate a motor vehicle.

**ANSWER:  The allegations in paragraph 168 are directed to a party other than the City Defendants.**

169.    Defendant Lagory negligently entrusted Defendant Meyer with the vehicle Defendant Meyer was operating at the time of the chase and accident.

**ANSWER:  The allegations in paragraph 169 are directed to a party other than the City Defendants.**

170.    As a direct and proximate result of the negligent entrustment of the motor vehicle by Defendant Lagory to Defendant Meyer, Plaintiffs suffered the losses described above, including loss of society, loss of companionship, and loss of consortium, as well as past medical expenses, future medical expenses, past wage loss, destruction of power to labor and earn income, past physical pain and suffering and mental anguish, future pain and suffering and mental anguish, allocation of damages for increased risks of future harms and expenses, and punitive damages.

**ANSWER:  The allegations in paragraph 170 are directed to a party other than the City Defendants.**

**COUNT FIVE: UNINSURED/UNDERINSURED MOTORIST COVERAGE**

171.    Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and reincorporates the same by reference.

**ANSWER:  The City Defendants incorporate by reference their responses to the preceding paragraphs.**

172.    On August 7, 2020, Defendant Meyer did negligently operate Defendant Lagory's motor vehicle, thereby causing a collision that resulted in injuries to Plaintiffs Steven and Maribeth Klein.

**ANSWER:  The allegations in paragraph 172 are directed to a party other than the City Defendants.  To the extent a response is deemed necessary, the City Defendants admit that Defendant Meyer negligently operated a motor vehicle and caused a collision.  Moreover, Meyer has pleaded guilty to the murder of Gayle and Raymond Laible.  The City Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 172.**

173.    At the time of the accident, Plaintiffs Steven and Maribeth Klein were covered by an insurance policy issued through Travelers with Policy No. 6062750612031, a copy of which policy is not attached hereto, with the same being in the possession of Travelers.

**ANSWER:  The allegations in paragraph 173 are directed to a party other than the City Defendants.**

174.    As a direct and proximate result of the negligent actions of Defendant Meyer, Plaintiffs Steven and Maribeth Klein suffered severe physical injury. They suffered damages including but not limited to past medical expenses, future medical expenses, past wage loss, destruction of power to labor and earn income, past physical pain and suffering and mental anguish, future pain and suffering and mental anguish, allocation of damages for increased risks of future harms and expenses, and punitive damages.

**ANSWER:  The allegations in paragraph 174 are directed to a party other than the City Defendants.**

175.    At the time of the motor vehicle accident, Defendant Meyer was an uninsured or underinsured driver.

**ANSWER:  The allegations in paragraph 175 are directed to a party other than the City Defendants.**

176.     Pursuant to Kentucky Revised Statute 418.040, Plaintiffs Steven and Maribeth Klein move the Court for a declaration of their rights under the Travelers policy, and specifically an Order requiring Travelers to pay Plaintiffs PIP coverage and the uninsured and/or underinsured benefits to which they are entitled at law.

**ANSWER:  The allegations in paragraph 176 are directed to a party other than the City Defendants.**

## AFFIRMATIVE DEFENSES

Subject to further investigation and discovery and without assuming the burden of proof where it otherwise lies with Plaintiffs, the City Defendants assert these defenses:

1.     The CPD Officers are entitled to Westfall Act immunity.

2.     The City Defendants are entitled to qualified immunity.

3.     The City Defendants are entitled to absolute immunity.

4.     The City Defendants are entitled to state tort immunity.

5.     The Complaint fails to state a claim upon which relief can be granted.

6.     The City Defendants did not proximately cause Plaintiffs' and Decedents' injuries.

7.     Defendant Mason Meyer's criminal conduct is a superseding cause of Plaintiffs' and Decedents' injuries.

8.     Defendant Mason Meyer proximately caused Plaintiffs' and Decedents' injuries.

9.     The City Defendants engaged in no conduct that warrants an award of punitive damages.

10.     To the extent any relief sought by Plaintiffs would be duplicative of relief obtained from collateral source, Plaintiffs' recovery from the City Defendants is barred.

11.     All allegations not specifically admitted are denied.

12. The City Defendants reserve the right to plead, assert, and rely on all proper affirmative defenses lawfully available, including those which may be disclosed or discovered through further assertions by Plaintiffs or otherwise through discovery.

**WHEREFORE**, the City Defendants request that this Court enter an Order:

1. Dismissing the Complaint with prejudice;

2. Entering judgment for the City Defendants and against Plaintiffs;

3. Awarding the City Defendants its costs of suit, including reasonable attorney's fees; and

4. Granting such other and further relief as the Court deems just and necessary.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig, *pro hac vice*
Chad R. Ziepfel
Spencer S. Cowan, *pro hac vice*
Kenneth A. Foisy
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: 513-381-2838
Fax: 513-381-0205
aherzig@taftlaw.com
cziepfel@taftlaw.com
scowan@taftlaw.com
kfoisy@taftlaw.com

*Counsel for Defendants City of Cincinnati, Timothy Lanter, and Brett Thomas*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2024, the foregoing was filed through the Court's CM/ECF system, which will serve notice of the filing on all counsel of record, and was served via regular mail upon the following:

Mason Meyer
No. 199699-001
Butler County Jail
705 Hanover Street
Hamilton, OH 45011
*Defendant*

Austin Lagory
13718 Beaver Road
Union, KY 41091
*Defendant*

*/s/ Aaron M. Herzig*_____