Case: 2:21-cv-00102-DLB    Doc #: 134    Filed: 11/06/25    Page: 1 of 280 - Page ID#: 983

Deposition of Officer Mark Bode                                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1                IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF KENTUCKY
2                         AT COVINGTON

3      JASON LAIBLE,              :
       et al.,                    :
4                                 :    CASE NO.
                                  :    2:21-cv-00102
5         Plaintiffs,             :
                                  :
6      vs.                        :    Judge David L.
                                  :    Bunning
7      TIMOTHY LANTER,            :
       et al.,                    :    Magistrate Judge
8                                 :    Candace J. Smith
                                  :
9         Defendants.             :

10         Zoom and in-person deposition of

11     CPD OFFICER MARK BODE, a witness herein,

12     taken by the plaintiffs as upon

13     cross-examination, pursuant to the Federal

14     Rules of Civil Procedure and pursuant to

15     Notice of counsel as to the time and place

16     and stipulations hereinafter set forth, at

17     the offices of Taft Stettinius &  Hollister,

18     425 Walnut Street, Suite 1800, Cincinnati,

19     Ohio, at 9:42 a.m., Monday, January 13, 2025,

20     before Stacey J. Murrin, a Court Reporter and

21     Notary Public, within and for the State of

22     Ohio.

23

24                         -  -  -

25

```
 1        APPEARANCES:

 2

 3        FOR THE PLAINTIFFS,     REBECCA P. SALLEY, ESQ.
          ESTATES OF RAYMOND      JACQUELINE GREENE, ESQ.
 4        AND GAYLE LAIBLE:       Friedman, Gilbert &
                                  Gerhardstein
 5                                35 East 7th Street
                                  Suite 201
 6                                Cincinnati, Ohio 45202

 7                                And

 8        FOR THE PLAINTIFFS,     ROULA ALLOUCH, ESQ.
          STEVEN AND MARIBETH     Bricker Graydon, LLP
 9        KLEIN:                  2400 Chamber Center Drive
                                  Suite 300
10                                Ft. Mitchell, KY 41017

11        FOR THE DEFENDANTS,     SPENCER S. COWAN, ESQ.
          CITY OF CINCINNATI,     AARON HERZIG, ESQ.
12        TIMOTHY LANTER and      (Zoom.)
          BRETT THOMAS:          Taft Stettinius &
13                                Hollister
                                  425 Walnut Street
14                                Suite 1800
                                  Cincinnati, Ohio 45202
15
          FOR THE DEFENDANT,      MATTHEW SLOVIN, ESQ.
16        CITY OF CINCINNATI:     MARVA BENJAMIN, ESQ.
                                  (Zoom.)
17                                City Solicitor
                                  801 Plum Street
18                                Cincinnati, Ohio 45202

19        FOR THE DEFENDANT,      TRISTAN PALMER, ESQ.
          TRAVELERS CASUALTY      Casey Bailey & Maines
20        INSURANCE COMPANY:      3151 Beaumont Centre Circle
                                  Suite 200
21                                Lexington, KY 40513

22

23        ALSO PRESENT:   Timothy Lanter
                          Elise Marrinan
24                        Jason Laible (Zoom.)

25
```

S T I P U L A T I O N S

It is stipulated by counsel for the respective parties that the deposition of CPD OFFICER MARK BODE, a witness herein, may be taken at this time by the plaintiffs as upon cross-examination and pursuant to the Federal Rules of Civil Procedure and Notice to take deposition, all other legal formalities being waived by agreement; that the deposition may be taken in stenotype by the Notary Public-Court Reporter and transcribed by her out of the presence of the witness; that the transcribed deposition was made available to the witness for examination and signature and that signature may be affixed out of the presence of the Notary Public-Court Reporter.

Case: 2:21-cv-00102-DLB    Doc #: 134    Filed: 11/06/25    Page: 4 of 280 - Page ID#: 986
Deposition of Officer Mark Bode
Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                          INDEX

 2      WITNESS         DIRECT  CROSS   RE-      RE-
                                        DIRECT   CROSS
 3
        CPD OFFICER MARK BODE
 4      BY MS. SALLEY:                  6

 5      EXHIBIT IDENTIFIED                       PAGE

 6      Exhibit 1                                104
        Exhibit 2                                163
 7      Exhibit 3                                172
        Exhibit 4                                181
 8      Exhibit 5                                191
        Exhibit 6                                224
 9      Exhibit 7                                226
        Exhibit 8                                241
10      Exhibit 9                                248
        Exhibit 10                               250
11      Exhibit 11                               277

12      OBJECTIONS                       PAGE  LINE

13      MR. COWAN:                       19     25
        MR. COWAN:                       22     21
14      MR. COWAN:                       24     23
        MR. COWAN:                       33     17
15      MR. COWAN:                       33     23
        MR. COWAN:                       43     23
16      MR. COWAN:                       48     15
        MR. COWAN:                       48     24
17      MR. COWAN:                       50     11
        MR. COWAN:                       53     18
18      MR. COWAN:                       63      8
        MR. COWAN:                       91     13
19      MR. COWAN:                      100      1
        MR. COWAN:                      132     17
20      MR. COWAN:                      139     22
        MR. COWAN:                      149      1
21      MR. COWAN:                      153      1
        MR. COWAN:                      195     20
22      MR. COWAN:                      208     10
        MR. COWAN:                      208     24
23      MR. COWAN:                      209      7
        MR. COWAN:                      209     14
24      MR. COWAN:                      236     12
        MR. COWAN:                      238      2
25      MR. COWAN:                      238     22
        MR. COWAN:                      239      5
```

| | | |
|---|---|---|
| MR. COWAN: | 240 | 12 |
| MR. COWAN: | 241 | 11 |
| MR. COWAN: | 258 | 8 |
| MR. COWAN: | 261 | 4 |
| MR. COWAN: | 262 | 7 |
| MR. COWAN: | 262 | 13 |
| MR. COWAN: | 263 | 2 |
| MR. COWAN: | 264 | 1 |
| MR. COWAN: | 266 | 24 |
| MR. COWAN: | 273 | 24 |
| MR. COWAN: | 274 | 7 |

```
 1                    CPD OFFICER MARK BODE,

 2       a witness herein, of lawful age, having been

 3       first duly sworn as hereinafter certified,

 4       was examined and testified as follows:

 5                         THE WITNESS:  Yes, ma'am, I do.

 6                         THE COURT REPORTER:  Thank you.

 7                         CROSS-EXAMINATION

 8       BY MS. SALLEY:

 9            Q.     Good morning, Officer Bode.

10       We --

11            A.     Good morning.

12            Q.     Thank you.  We met right before

13       we came on camera today, right?

14            A.     Yes.

15            Q.     And if -- if folks on the Zoom

16       can't hear me, my voice doesn't carry very

17       well, so if there's any issues, please just

18       let us know one way or the other.

19                         My name is Rebecca Salley.  I am

20       an attorney representing the Estate of

21       Raymond and Gayle Laible regarding the

22       vehicle pursuit and crash which occurred on

23       August 7th of 2020.  Are you familiar with

24       the events of that case?

25            A.     Yes, ma'am.
```

1       Q.    Okay.  And are you aware that

2    you're here today to testify as a witness

3    rather than a named party in the case?

4       A.    Yes, ma'am.

5       Q.    Okay.  And have you been deposed

6    before, Mr. Bode?

7       A.    A long time ago, yes, ma'am.

8       Q.    Okay.  And, also, do you have a

9    current rank or title that you use?

10      A.    Police officer.

11      Q.    Okay.  And can I call you

12   Officer Bode --

13      A.    Yes, ma'am.

14      Q.    -- is that fine?  Okay.

15   All right.  So you said you were deposed a

16   long time ago.  Do you know, was that a case

17   in your capacity as an officer?

18      A.    Yes, ma'am.

19      Q.    Okay.  Were you a defendant in

20   that case?

21      A.    I was not.

22      Q.    Okay.

23      A.    Similar to today.

24      Q.    A witness?

25      A.    Yes, ma'am.

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.     Okay.  So in order for us to

2    move smoothly, and since we've got a lot of

3    technology involved today, I'm gonna try and

4    keep my voice up.

5                But other things to remember for

6    the sanity of the court reporter is that we

7    will attempt to not speak over each other.

8    So the format of today will be a question and

9    answer.

10               I will ask questions.  You can

11   provide answers.  And let me finish my

12   question before you start your answer, and I

13   will try to do the same for you.

14               If at any point we do start

15   talking over each other, somebody in the room

16   will remind us and tell us to slow it down a

17   little bit.  Okay?

18         A.     Yes, ma'am.

19         Q.     Okay.  And we -- the court

20   reporter is not able to record gestures,

21   motions, head nods, things like that.

22               So please do know that if you're

23   giving an answer with an uh-huh, uh-uh, or a

24   head nod, that it needs to be a yes or a no

25   just to be clear for her sake to take that

1    down.  Okay?

2         A.    Yes, ma'am.

3         Q.    Okay.  And so, again, all -- all

4    answers are gonna be oral since this is a --

5    gonna be a written transcript.

6              And if you describe any

7    motions or -- if you make any motions

8    physically, we'll try to describe them for

9    the record so that we can capture anything

10   that you've -- that you've done kind of

11   physically.  Okay?

12        A.    Yes, ma'am.

13        Q.    All right.  And are you on

14   any -- do you have any medical issues, or are

15   you on any medications that would inhibit

16   your ability to testify truthfully or

17   interact with your memory today?

18        A.    No.

19        Q.    Okay.  And if you do need a

20   break at any point, I will ask that you

21   respond to any question that has been posed.

22   But otherwise, we can take bathroom breaks,

23   if you need to, you know, check in on a

24   family issue or anything like that, we can

25   make that happen, but I just ask that you

```
 1    answer any question that's pending.  Okay?

 2         A.    Yes, ma'am.

 3         Q.    Okay.  And before you came to

 4    the deposition today, did you review any

 5    documentary material or any documents?

 6         A.    No, ma'am.

 7         Q.    Okay.  Did you watch any video,

 8    read any reports?

 9         A.    No, ma'am.

10         Q.    Okay.  And did you -- without

11    telling me if you did speak to any attorney,

12    without telling me the contents of that

13    conversation, did you meet with anyone before

14    the deposition today?

15         A.    Outside of present; is that what

16    you're asking?

17         Q.    Yes.  Did you meet with legal

18    counsel?

19         A.    Not more than Mr. Cowan.

20         Q.    Okay.  Just Mr. Cowan.  Okay.

21    And without telling me the contents of that

22    conversation, how many times did you meet

23    with Mr. Cowan?

24         A.    Twice.

25         Q.    Okay.  And did you speak with
```

1    anyone at the police department, Cincinnati

2    Police Department, in order to prepare for

3    your deposition today?

4         A.    No, ma'am.

5         Q.    Okay.  And to your knowledge,

6    have you provided -- given statements or

7    interviews about the events in this case on

8    August 7th, 2020?

9         A.    Yes, ma'am.

10         Q.    Okay.  And do you know which

11    agencies or which groups you've given

12    statements to?

13         A.    One statement to our Internal

14    Department.

15         Q.    Okay.  And that's the Cincinnati

16    Police Department Internal Department?

17         A.    Yes, ma'am.

18         Q.    Okay.  Internal Investigations

19    Section?

20         A.    Yes.

21         Q.    And do you know when that

22    statement occurred?

23         A.    Several weeks after the

24    incident.

25         Q.    Okay.

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    I do not know the exact date.

2      Q.    And do you know who was in the
3    room and present at the time you gave that
4    statement?

5      A.    Sergeant Fink.  He -- there's
6    always another sergeant, but Sergeant Fink
7    asked all the questions.  I don't remember
8    the second sergeant.

9      Q.    Okay.  Did you have any union
10   representation at that meeting?

11     A.    I did not.

12     Q.    Okay.  And do you know if that
13   was recorded?

14     A.    Yes, ma'am.

15     Q.    Do you know if it was audio or
16   video recorded by chance?

17     A.    I know it's audio.  I'm not sure
18   on the video.

19     Q.    Okay.  And I'd like to learn
20   a little bit about your background, if you
21   can tell me.  I believe you've been with the
22   Cincinnati Police Department since, is it
23   2000?

24     A.    Yes, ma'am.

25     Q.    Okay.  So you were at -- you're

1   heading into the 25th year with the

2   department?

3         A.    Yes.

4         Q.    Okay.  And what is your

5   educational status?  Did you finish high

6   school/college?

7         A.    I finished college.  I have a

8   Batchelor's from Eastern Kentucky University.

9         Q.    Okay.  What year was that?

10        A.    Nineteen -- I graduated in 1998.

11        Q.    Okay.  And what was that degree

12  in?

13        A.    Police administration.

14        Q.    Okay.  Do you have any minors?

15        A.    No, ma'am.

16        Q.    All right.  And other than that

17  degree, do you have any licenses or

18  certificates?

19        A.    No, ma'am.

20        Q.    Okay.  And since you've been

21  with -- and -- okay.

22              So in August of 2020, that was

23  your 20th year with Cincinnati Police?

24        A.    Yes.

25        Q.    Have you been employed by any

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    other police department or law enforcement

2    agency?

3         A.    No, ma'am.

4         Q.    Okay.  And between '98 -- 1998

5    and 2000, did you hold other employment?

6         A.    Yes.

7         Q.    Okay.  What was that?

8         A.    I worked for a Dollar Store in

9    Richmond, Kentucky.

10        Q.    Okay.  All right.  And was that

11   the only employment prior to joining CPD?

12        A.    I also worked at a Rally's, but

13   I don't remember when that -- that was in the

14   late '90s as well, down in Richmond.

15        Q.    They have great french fries.

16             Okay.  And other than your

17   Cincinnati Police Department employment in

18   the last 25 years, have you had any other

19   employment?

20        A.    No, ma'am.

21        Q.    Okay.  You've been with the

22   Cincinnati Police Department that whole time?

23        A.    Yes, ma'am.

24        Q.    Okay.  And what is your

25   current rank, you said police officer?

1           A.    Yes, ma'am.

2           Q.    Have you been a police officer

3    your full tenure?

4           A.    Yes.

5           Q.    Okay.  And in -- so in 2020, you

6    were a police officer then?

7           A.    Yes, ma'am.

8           Q.    And have you had any -- in your

9    tenure at the department, any supervisory

10   responsibilities or capacity?

11          A.    No, ma'am.

12          Q.    And is it correct that in 2020

13   you were working on the Gang Unit?

14          A.    Yes.

15          Q.    Okay.  And was that a full-time

16   assignment?

17          A.    Yes.

18          Q.    Are you currently assigned to

19   the Gang Unit?

20          A.    No, ma'am.

21          Q.    Okay.  How did you become

22   assigned to the Gang Unit?

23          A.    I -- I don't know how the

24   Gang Unit originated.  I believe the unit was

25   new and they put out openings.

```
 1              And if you wished to apply, you
 2     complete a form and you go -- sometimes
 3     there's an interview or sometimes they just
 4     select the employees to put into the unit.
 5          Q.    And do you know around what year
 6     that would have been?
 7          A.    Let's see.  So there was a Gun
 8     Crimes Task Force, a Gang Unit.  They all
 9     kind of merged probably in 2021 to what's
10     referred to as CGIC now.  So I would say the
11     Gang Unit existed from maybe 2017-ish.
12          Q.    And you said those -- so the
13     other thing today also is that this is a
14     deposition where we're not gonna be very
15     familiar with acronyms terminology.
16          A.    Yes, ma'am.
17          Q.    So just so you know, I will
18     likely ask you to define terms and tell me
19     what acronyms mean throughout the deposition.
20     And you said CGIC?
21          A.    CGIC, it's the Crime Gun
22     Intelligence Center.
23          Q.    Okay.  And you said that began
24     in 2021 --
25          A.    I believe --
```

1    Q.    -- around 2021?

2    A.    -- around 2021.

3    Q.    Okay.

4    A.    Yes, ma'am.

5    Q.    And prior to that which -- what

6    agencies existed that then became part of

7    CGIC?

8    A.    CGIC is a joint effort from the

9    ATF and the Cincinnati Police Department.

10   The employees from the Cincinnati Police

11   Department came from what I refer to as the

12   Gang Unit and the Gun Crime Task Force.

13   Q.    And the Gang Unit and the Gun

14   Crime Task Force were groups or units within

15   the Cincinnati Police Department?

16   A.    Yes, ma'am.

17   Q.    Okay.  And did those units both

18   have their own independent purposes and

19   workloads?

20   A.    We worked in conjunction with

21   each other under the same roof.  Each unit

22   had its own supervisors, but the

23   responsibilities were the same.

24   Q.    And what were the

25   responsibilities of the Gang Unit?

```
 1          A.    We were a combination of

 2    uniformed and plainclothes police officers,

 3    and we responded to drug complaints

 4    throughout the City of Cincinnati, gun

 5    complaints, shootings.

 6          Q.    And were all officers on the

 7    Gang Unit assigned full time to that unit?

 8          A.    Yes, ma'am.

 9          Q.    Okay.  And did you actually join

10    the Gang Unit in 2017?

11          A.    I don't recall exactly when I

12    joined the Gang Unit.

13          Q.    Were you part of the first group

14    of officers to be in the Gang Unit?

15          A.    No.

16          Q.    Okay.  At the time you joined

17    the Gang Unit, who was your supervisor?

18          A.    Sergeant Jimmy Davis.

19          Q.    Davis.  Okay.  And were there

20    multiple supervisors on the Gang Unit at the

21    time --

22          A.    Yes.

23          Q.    -- that you joined?  Okay.  And

24    who were they?

25          A.    I don't recall the other ones.
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        My lieutenant was Lieutenant Schofield.
 2              Q.    Okay.  And just Davis as well,
 3        was he a sergeant?
 4              A.    Sergeant, yes, ma'am.
 5              Q.    Okay.  Was he your immediate
 6        supervisor?
 7              A.    He was.
 8              Q.    And then would
 9        Lieutenant Schofield have been the next
10        person up in the chain of command?
11              A.    Yes, ma'am.
12              Q.    Okay.  And was there anyone
13        above Lieutenant Schofield in the chain of
14        command for the Gang Unit?
15              A.    There would be a captain.
16              Q.    Okay.
17              A.    But we had various, so I
18        can't -- I do not remember who was captain in
19        2020.
20              Q.    And as far as your day-to-day
21        activities in the Gang Unit in 2020, were you
22        receiving directives or work assignments from
23        your sergeant?
24              A.    No, ma'am.
25              MR. COWAN:  Objection.
```

1    Q.    Okay.  How did you -- if you

2    came into work -- if there is an average day

3    in 2020, was there a person giving you

4    assignments to do work or directing what you

5    were going to be doing in a given day?

6          A.    No.

7          Q.    And how did you determine when

8    you came on a shift in 2020 what you'd be

9    doing on a shift?

10         A.    In 2020, my partner and I would

11   run multiple drug investigations at the time.

12         Q.    And how did you come to be

13   involved in a particular investigation?

14         A.    Whether through a citizen

15   complaint or cases that were brought to us

16   through confidential informants.

17         Q.    Okay.  And in the course of

18   performing those investigations, would you

19   also be responsible then for making arrests?

20         A.    No.

21         Q.    Okay.  And where did that

22   responsibility shift?

23         A.    To the uniformed police officers

24   who were assigned to the unit would be the

25   ones that would place any of our suspects

1    into custody.

2         Q.    And does that mean, were you

3    largely working as a plainclothes officer?

4         A.    Yes, ma'am.

5         Q.    Okay.  And was that true for

6    your full tenure in the Gang Unit?

7         A.    Yes, ma'am.

8         Q.    And was that true in 2020?

9         A.    Yes, ma'am.

10         Q.    Okay.  How -- if you can recall

11    around August 2020, what kind of schedule

12    were you working, as in how many days per

13    week, or how many shifts per week?

14         A.    Five, eight-hour shifts.

15         Q.    And were those regular hours,

16    was it like a Monday through Friday?

17         A.    Monday through Friday normally.

18         Q.    Okay.  And who was your partner

19    at the time?

20         A.    Officer Thomas Weigand.

21         Q.    And that's Weigand,

22    W-E-I-G-A-N-D?

23         A.    Yes, ma'am.

24         Q.    Okay.  Was he your partner for

25    your full tenure in the Gang Unit?

```
 1              A.    Yes, ma'am.

 2              Q.    And is he also an experienced,

 3       as in -- you know, you've got 20 years in, I

 4       don't know -- do you know how many years

 5       Officer Weigand had?

 6              A.    I believe he's in his 22nd or

 7       23rd.

 8              Q.    And that's -- sorry, just to be

 9       clear, around 2020, he had 20 years.  And

10       now -- just to the clear, now currently

11       Thomas Weigand is in his 22nd or 23rd year?

12              A.    Yes, ma'am.

13              Q.    Okay.  And in -- I believe you

14       testified that the Gun Crime Unit had similar

15       or same responsibilities as the Gang Unit?

16              A.    Yes.

17              Q.    And would they also use

18       uniformed and plainclothes officers to

19       respond to complaints about illegal firearms,

20       guns, weapons; is that what their role was?

21                    MR. COWAN:  Objection.  And I'll

22       want to -- can you just clarify what unit

23       you're referring to when you say "they"?

24              Q.    Yes.  This is the Gun Crime

25       Unit, if you're aware of --
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    The Gun Crime Task Force at the
 2       time?
 3              Q.    Yes.
 4              A.    Yes, we shared similar
 5       functions.  We just worked under two
 6       different names.
 7              Q.    Okay.
 8                    THE COURT REPORTER:  The Zoom
 9       just went out.  I'm going to go off the
10       record.
11          (Off the record.)
12       BY MS. SALLEY:
13              Q.    Okay.  All right.  Okay.  And in
14       the -- did you work with officers in the Gun
15       Crime Task Force as part of your
16       investigations?
17              A.    Yes, ma'am.
18              Q.    In 2020, was there also a unit
19       called -- within CPD called the Organized
20       Crime Investigation Squad?
21              A.    Not that I was -- that I'm a
22       aware of.
23              Q.    Okay.  Did you work regularly
24       with the Gun Crime Unit on a daily/weekly
25       basis?  I'm calling it unit, I'm sorry.  It
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        was called the Gun Crime Task Force.

2                A.      Task force.

3                Q.      Okay.   Did you work regularly

4        with the Gun Crime Task Force?

5                A.      Yes, ma'am.

6                Q.      And do you know who was the

7        supervisor or supervisors of that task force?

8                A.      Sergeant Perkins,

9        Sergeant Lanter, I don't remember their

10       lieutenant, or if they even had a lieutenant.

11               Q.      And does that mean

12       Sergeant Lanter was outside of your chain of

13       command?

14               A.      Not exactly.

15               Q.      And at any point, we can --

16       during your tenure on the Gang Unit, did you

17       take directives from Sergeant Lanter?

18               A.      No, not that I remember.

19               Q.      Was Sergeant Lanter a person

20       that you could seek out for advice or to

21       learn about how to do your duties, or does it

22       comply with policy --

23                      MR. COWAN:   Objection.

24               Q.      -- of the department?

25               A.      Sergeant Lanter was -- worked

1    about the same hours in the same building.

2    But any need that I would have would go

3    through my direct supervisor,

4    Sergeant Jimmy Davis.

5        **Q.    Okay.  And because -- you**

6    **described that your supervisor wasn't**

7    **necessarily giving you directives or telling**

8    **you what to do on a day-to-day basis.**

9            **What was your relationship with**

10    **your supervisor while you were on the**

11    **Gang Unit?**

12        A.    My relationship with

13    Sergeant Davis was I would make him aware of

14    any -- what operations I would be working on

15    that day.

16            If I would have a controlled

17    buy, or if I would want to prepare for a

18    search warrant, I would provide him with what

19    my partner and I would plan to do for that

20    day or that week.

21        **Q.    And were you actually setting up**

22    **or participating in controlled buys?**

23        A.    In 2020?

24        **Q.    Yeah, we can -- yeah, in 2020.**

25        A.    Yes.

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Yes.   Okay.   And, otherwise, can

2   you describe some of the common ways or means

3   of conducting your investigations, like what

4   kind of activities you would do to further

5   your cases?

6      A.    Yes.   I mainly investigated drug

7   complaints.   So through the use of

8   confidential informants, whether it was cases

9   they would bring to us or citizen complaints,

10  we would use informants and surveillance

11  methods to identify targets within the

12  community and then build cases on them,

13  either through controlled buys or

14  surveillance, eventually trying to conduct

15  search warrants.

16     Q.    And, for instance, setting up a

17  controlled buy, would that entail something

18  like getting that person's contact

19  information, the suspect or person of

20  interest in the case, and setting up a time

21  and place to attempt to, like, buy a narcotic

22  from them?

23     A.    Yes, ma'am.

24     Q.    And would that -- the

25  surveillance aspect of that, would that

1   involve, for instance, looking up addresses

2   of places where the person either might live

3   or might congregate to surveil and kind of

4   watch what's happening at that location?

5          A.    Yes, ma'am.

6          Q.    And what resources did you have

7   available to you on the Gang Unit to conduct

8   searches where you might find addresses

9   outside of confidential informants?

10         A.    We have a computer database

11  which has RCIC/NCIC, Regional Crime

12  Information Center and National Crime

13  Information Center.

14              If we would run a person's name

15  or Social Security Number, it would give us

16  affiliated addresses with that individual.

17              We also had access to TLO, and I

18  don't know what it's -- that acronym stands

19  for, but it's a paid service through the

20  department that generates information based

21  on phone numbers, name searches.

22         Q.    Okay.  And as far as NCIC and

23  RCIC, are those places where you could go to

24  look up a subject's criminal history?

25         A.    Yes, ma'am.

1    Q.    And that includes convictions

2    and arrests?

3        A.    Yes, ma'am.

4    Q.    Does that also include, if

5    available, like a picture of a person?

6        A.    You can get a driver's license

7    photo.

8    Q.    Okay.  And does that also

9    include whether or not the person has open

10   warrants?

11       A.    Yes, ma'am.

12   Q.    Are those felony warrants and

13   misdemeanor warrants?

14       A.    Yes, ma'am.

15   Q.    And would that include the

16   ability to access any underlying information

17   about the warrant and part of the warrant

18   application?

19       A.    It generally just states what

20   the warrant is.  There's not a lot of

21   detailed information other than what the

22   actual warrant is.

23   Q.    Okay.  And it tells -- does it

24   tell you the jurisdiction of where the

25   warrant is?

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes.
 2              Q.    Okay.  Does it tell you anything
 3      about the officer name of, for instance, who
 4      sought the warrant?
 5              A.    Sometimes there will be an
 6      officer's name.
 7              Q.    Okay.
 8              A.    To be clear, RCIC gives local.
 9              Q.    Uh-huh.
10              A.    So if there was a warrant, you
11      would have to run it by Social outside of
12      Hamilton County or Cincinnati to get those
13      hits to come back, and then it would give you
14      the jurisdiction that that warrant was
15      entered by.
16              Q.    Okay.  Are RCIC and NCIC like
17      connected in some way?
18              A.    Yes.
19              Q.    Okay.  And it's a question of
20      scope, RCIC is a more local scope?
21              A.    Yes, ma'am.
22              Q.    And NCIC is national?
23              A.    Yes, ma'am.
24              Q.    Okay.  And as far as -- is there
25      like a mileage or a radius that RCIC covers?
```

1      A.    I believe it's Hamilton County.

2      Q.    Okay.  And would it cover

3   anything in Northern Kentucky?

4      A.    No, ma'am.

5      Q.    Okay.  NCIC would cover Northern

6   Kentucky as well?

7      A.    Yes, ma'am.

8      Q.    And the whole State of Kentucky?

9      A.    Yes, ma'am.

10     Q.    Okay.  And then NCIC would also

11   cover the State of Ohio, correct?

12     A.    Yes, ma'am.

13     Q.    Okay.  And was it a regular part

14   of your practice on the Gang Unit to look up

15   individuals on NCIC or RCIC when their names

16   came up?

17     A.    Yes, ma'am.

18     Q.    And that would be a way to find

19   out what their criminal history looked like?

20     A.    Yes, ma'am.

21     Q.    The types of crimes that they

22   had been convicted or arrested of?

23     A.    Yes.  We can see local criminal

24   history.  You have to have -- to get out of

25   state or national criminal history, you have

1    to have what's called Triple I, and I don't

2    know what that Triple I stands for,

3    certification with its own password.

4              So I don't have Triple I.  So to

5    actually see criminal history, I can only see

6    criminal history within Hamilton County.

7         Q.    Okay.  And in -- do you have any

8    other ways, aside from these databases, of

9    learning about a suspect's criminal history

10   if it was not local or Hamilton County?

11        A.    No.

12        Q.    Could you learn from -- well,

13   could you learn about possible criminal

14   history from a CI or a source?

15        A.    That would just -- it

16   wouldn't -- you would not be able to confirm

17   it if a CI said it.

18        Q.    Okay.  Would you be able to rely

19   on, for your purposes of your work that you

20   had to do in the Gang Unit, the

21   representations of other units within CPD or

22   other agencies that you worked with?

23        A.    I'm sorry.  Could you repeat

24   that?

25        Q.    Sure.

1    A.    I apologize.

2    Q.    So if you're learning about a

3 suspect's criminal history, were you able to

4 rely on representations made by other units

5 within CPD or other agencies, law enforcement

6 agencies that you worked with to learn about

7 a person's criminal history?

8    A.    I just relied on the RCIC or the

9 NCIC, the data received from there.  It

10 wouldn't have to refer to anyone else within

11 CPD to view a criminal history.  I could -- I

12 would just run it myself on the database.

13    Q.    Okay.  And we'll go into more

14 detail in this later, but is it correct to

15 say that the Gang Unit in 2020 was

16 participating at some point in the

17 observation of Mason Meyer?

18    A.    I don't believe the Mason Meyer

19 investigation was handled by the Gang Unit.

20    Q.    And when you say "handled by,"

21 what do you mean?

22    A.    I believe the lead detective in

23 the Mason Meyer investigation was ATF TFO,

24 which stands for Task Force Officer.

25    Q.    And was that someone who was a

```
 1    police department employee who was on a task

 2    force?

 3            A.    He's a Cincinnati police officer

 4    with -- sworn in as an ATF agent.  So dual

 5    roles, Cincinnati police officer/ATF.

 6            Q.    And do you know the name of that

 7    person?

 8            A.    Officer Brett Stratmann.

 9            Q.    Stratmann.  Okay.  And was he in

10    the gang -- was he at any point during your

11    tenure in the Gang Unit a member of the

12    Gang Unit?

13            A.    No, ma'am.

14            Q.    Okay.  And was the Gang Unit

15    assisting Brett Stratmann and other agencies

16    involved in the task force?

17                 MR. COWAN:  Objection.

18            A.    Can you repeat?  I apologize.

19            Q.    Sure.  Was the Gang Unit

20    providing support or aiding the work of the

21    task force or other agencies that were

22    involved in the task force?

23                 MR. COWAN:  Objection.

24            A.    Yes.  We -- we commonly offered

25    support to other units within the department
```

1    to include the ATF TFOs.

2              Q.    So what did you say TFO stood

3    for?

4              A.    Task Force Officer.

5              Q.    Okay.  And those are officers

6    that are within the CPD working with ATF?

7              A.    Correct.  They carry ATF

8    credentials.

9              Q.    Okay.  And then did the

10   Gang Unit participate in the observation of

11   Mason Meyer at some point in August of 2020?

12             A.    Yes.

13             Q.    Okay.  And did you participate

14   in that observation?

15             A.    Only on the date of the

16   incident.

17             Q.    Okay.  And this may -- turning

18   to your training with CPD, we'll talk about

19   training, and I am gonna ask you some

20   questions about basic training that occurred

21   25 years ago, I guess at this point, but

22   we'll see what you -- what memory you have

23   now.

24             A.    Yes, ma'am.

25             Q.    Did you undergo academy training

1    or basic training when you joined CPD?

2          A.    Yes, ma'am.

3          Q.    Okay.  Can you briefly describe

4    what that entailed for you, what that looked

5    like?

6          A.    A combination of classroom and

7    physical training that lasted approximately

8    just under six months, I believe, January

9    through June of 2000.

10          Q.    Did you undergo any statewide

11    training, any Ohio training?

12          A.    You have to complete OPOTA, Ohio

13    Police Officers -- you have to pass a state

14    test at the end of the academy to be

15    certified through the State of Ohio.

16          Q.    And the training, the six-month

17    training that you did, was that OPOTA

18    training?

19          A.    Yes.

20          Q.    And was it administered by the

21    officers -- state officers or in the name of

22    the state?

23          A.    Most of the training was done by

24    Cincinnati police officers and supervisors

25    that have OPOTA certifications to teach the

1    specific subjects they were instructing.

2         Q.    Okay.  And did that include

3    things like investigation tactics?

4         A.    I don't remember anything as

5    specific as investigation tactics being

6    taught.

7         Q.    Did they teach you how to make

8    an arrest?

9         A.    Physically?  I apologize.  Can

10   you --

11        Q.    That's a good clarifying

12   question.  Did they teach you, for instance,

13   about the concepts of probable cause?

14        A.    Yes.

15        Q.    And did they teach you what you

16   needed to make a legally sufficient arrest?

17        A.    Yes.

18        Q.    And did they teach you about

19   concepts of illegal search and seizure?

20        A.    Yes, ma'am.

21        Q.    And did they teach you about use

22   of excessive force, for instance?

23        A.    Yes, ma'am.

24        Q.    And did they teach you then also

25   how to physically conduct an arrest and make

1    an arrest?

2         A.    Yes, ma'am.

3         Q.    And did they do that training to

4    teach you how to make an arrest safely?

5         A.    Yes, ma'am.

6         Q.    And that would include for the

7    safety of officers?

8         A.    Yes, ma'am.

9         Q.    And as well as for the subject?

10        A.    Yes, ma'am.

11        Q.    Would that also include

12   considerations about the safety of the

13   public?

14        A.    Yes, ma'am.

15        Q.    And did you undergo training

16   specific to vehicle pursuits?

17        A.    I know we had driving classes.

18   They did -- they did teach vehicle pursuit

19   training in the academy.

20        Q.    Okay.  Did -- did you also more

21   broadly learn about emergency response

22   driving?

23        A.    Yes.

24        Q.    Is that a different concept than

25   vehicle pursuit?

```
 1        A.    Yes, ma'am.

 2        Q.    Can you explain that a bit?

 3        A.    Vehicle pursuit is very specific

 4   to trying to apprehend a vehicle that has

 5   refused to stop and is fleeing.

 6             Emergency response driving may

 7   be operating with lights and sirens to an

 8   aggravated robbery or a shooting at a

 9   location, but you're not -- you're taking the

10   most direct route to the scene as opposed to

11   following a vehicle that is fleeing.

12        Q.    When you underwent your academy

13   training, did you also receive training on

14   how to conduct vehicle stops?

15        A.    Yes, ma'am.

16        Q.    And did that include being able

17   to observe and identify -- well, strike that.

18             Did you learn about the traffic

19   laws in Cincinnati?

20        A.    I don't know how in depth they

21   went to -- you were responsible to know the

22   traffic laws, but I don't remember the

23   specifics on the training of that.

24        Q.    And in the course of that

25   academy training, did you learn how to
```

1    identify a traffic violation by, you know,

2    watching, observing people driving?

3         A.    I don't remember that

4    specifically being taught.

5         Q.    Did -- well, you said you were

6    responsible for knowing the traffic laws or

7    code applicable, right?

8         A.    Yes, ma'am.

9         Q.    And did you learn that officers

10   within CPD are also responsible for following

11   traffic codes in the course of their work?

12        A.    Yes, ma'am.

13        Q.    And as far as traffic laws, when

14   I say "traffic laws," does that include Ohio

15   Revised Code?

16        A.    Ohio Revised Code, yes, ma'am.

17        Q.    As it applies to operating a

18   motor vehicle or driving?

19        A.    Yes, ma'am.

20        Q.    And does that also include

21   Cincinnati Municipal Code?

22        A.    Yes, ma'am.

23        Q.    And did your training include

24   how to conduct a stop of a vehicle that has

25   been observed to be violating traffic laws?

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes, ma'am.

 2              Q.    And do -- do you have any memory

 3   of how much time of your training was -- was

 4   spent on that topic, how to conduct a stop?

 5              A.    I don't recall that.

 6              Q.    Okay.  And have you had to do

 7   that in the course of your work as a police

 8   officer?

 9              A.    Have I had to do --

10              Q.    Conduct a vehicle stop.

11              A.    Yes, ma'am.

12              Q.    Based on traffic violations?

13              A.    Yes, ma'am.

14              Q.    Okay.  And was -- did your

15   training include how to make documentation of

16   the observations that you made leading to a

17   stop or an arrest for a traffic violation?

18              A.    Can you repeat that?

19              Q.    Uh-huh.  So take a step back to

20   as part of your role as an officer to make --

21   to document and make instant reports about

22   things that you observed or incidents that

23   occur on your shifts?

24              A.    Not obs -- there's no incident

25   reports based on observations.
```

1    Q.   Okay.  Do you at any point

2    record -- make a written record of, for

3    instance, if you're -- while you were at --

4    let's -- let's -- we'll look at while you

5    were on the Gang Unit.

6              Were there any points where you

7    were making written records of things that

8    you were observing, for instance, activity at

9    a house or the movements of a person that was

10   the subject of interest of the Gang Unit?

11   A.   No, ma'am.

12   Q.   Okay.  How did you keep track of

13   things that you learned about people that

14   were the subjects of your investigations?

15   A.   So if we completed a controlled

16   buy, there would be property associated with

17   that buy, which would give you date, time,

18   location that that buy occurred.

19   Q.   Uh-huh.

20   A.   And we would generally use those

21   controlled buys to build up the probable

22   cause for search warrants.

23              So we would have documentation

24   based on the controlled buys, but not

25   necessarily observations that occurred during

```
 1          the investigation.
 2                  Q.    Did you ever in the course of
 3          your work in the Gang Unit have to do --
 4          complete warrant applications for the search
 5          of a house suspected to have drug activity?
 6                  A.    Yes, ma'am.
 7                  Q.    And in the course of that type
 8          of application, did that require sometimes
 9          observing a certain house over multiple
10          occasions or days?
11                  A.    Yes, ma'am.
12                  Q.    And did you ever have
13          observation that occurred for more than, you
14          know, a week?
15                  A.    Yes, ma'am.
16                  Q.    And in those cases, did that
17          always include a controlled buy?
18                  A.    Generally, yes, ma'am.
19                  Q.    Okay.  Was there ever a case
20          where you were observing but were not, for
21          some -- for whatever reason, not able to set
22          up a controlled buy but sought a warrant
23          based on just observation what was going on
24          at that address?
25                  A.    I'd -- no, not that I can recall
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    doing any observation-based search warrants.

2         Q.    Okay.  And as far as controlled

3    buys, how did you document those?

4         A.    So whatever narcotic that you

5    purchased, you have to -- you have to weigh

6    it, place it in an envelope, and that goes to

7    the property room, and eventually to the

8    Hamilton County Lab for analysis.

9              So you'll have a copy of --

10   what's called the Evidence Admission Sheet,

11   which, again, would list the suspect's name,

12   offense location, and the weights of the

13   narcotics.

14        Q.    Okay.  And in the course of your

15   work on the Gang Unit, was there ever a case

16   that you learned information helpful to a

17   case from a member of a different CPD unit

18   or, for instance, the Gun Crime Task Force?

19        A.    Yes.

20        Q.    And was there a general practice

21   for communicating information between units?

22        A.    There was --

23             MR. COWAN:  Objection.  You can

24   answer.

25        A.    There was no general practice.

1    Q.    Okay.  And what types of ways

2    would you have that information communicated

3    to you?

4         A.    Generally through conversation.

5         Q.    Okay.  Like face-to-face, on the

6    phone?

7         A.    Face-to-face or on the phone,

8    both.

9         Q.    And did those conversations ever

10   take place by e-mail, text message?

11        A.    Probably for myself through text

12   message, but not generally through e-mail.

13        Q.    And when -- in the course of

14   your work with work involving other law

15   enforcement agencies, did you have instances

16   where investigations involved the sharing of

17   information across agencies outside of CPD?

18        A.    On occasion, yes, ma'am.

19        Q.    And how, to your memory, did

20   those communications take place?

21      (Marva Benjamin entered the deposition.)

22        A.    Through the same, through

23   intakes, face-to-face conversations, phone

24   calls, text messages.

25        Q.    Okay.  And did you also in your

```
 1      work provide information to other agencies or

 2      other units?

 3           A.    Yes, ma'am.

 4           Q.    And as far as observation in the

 5      course of your duties in the Gang Unit, when

 6      you're on the observation of a suspect, what

 7      are you looking for, what types of things?

 8           A.    My primary function, again, was

 9      investigating drug complaints.

10           Q.    Uh-huh.

11           A.    So I was looking for

12      interactions between the target and

13      individuals that might be purchasing

14      narcotics from him or her.

15           Q.    And was it part of your role

16      during those observations of interactions to

17      assess a behavior of a person who was the

18      subject of your observation?

19           A.    Yes, ma'am.

20           Q.    For instance, are they acting

21      normally, are they acting abnormally,

22      erratic?

23           A.    Yes, ma'am.

24           Q.    And were you observing their

25      movements and their locations during your
```

1    observations?

2          A.    Yes, ma'am.

3          Q.    And would you also be observing

4    any actions that indicate that they might

5    possess a weapon or in possession of other

6    illegal items?

7          A.    Yes, ma'am.

8          Q.    And could that also include

9    observation to observe whether or not they're

10   in violation of traffic laws?

11         A.    Yes, ma'am.

12         Q.    And in the course of your work

13   in the Gang Unit, did your investigations

14   ever result in making a traffic stop for the

15   person that you thought might be in

16   possession of drugs or was in the process of

17   buying and selling drugs?

18         A.    No, ma'am.  My role in the

19   Gang Unit was entirely in plainclothes.

20         Q.    Okay.  Right.  And you said --

21         A.    So to conduct a traffic stop,

22   you have to be in uniform and a uniformed

23   police vehicle.

24         Q.    Thank you for clarifying that.

25   And would -- would it be your role to

1  communicate to uniformed officers that a

2  traffic stop could be helpful in the course

3  of an investigation or to ask for that type

4  of --

5          A.   Would we ask uniformed officers

6  to stop vehicles for us?

7          Q.   Yes.

8          A.   Yes, ma'am.

9          Q.   Okay.  And how would you make

10  that type of request?

11         A.   Generally over the radio.

12         Q.   Okay.  And when you were -- in

13  2020, let's isolate there, did you always

14  have a radio on you when you were on shift?

15         A.   Yes, ma'am.

16         Q.   And did you keep a radio while

17  you were off shift?

18         A.   No, ma'am.

19         Q.   Okay.  And did you carry it --

20  was it in the car, was it on your own person?

21         A.   In the car.

22         Q.   Okay.  And did you keep it to

23  one channel?

24         A.   We generally would work off a

25  tactical channel.  Radio channels are

1    assigned by district.  At the time, we had

2    five districts.

3              The primary channel is A, and

4    the tactical channel was C, and it's just a

5    matter of how you turn the knobs on the

6    radio.

7              So whatever district we would be

8    working in that day, we would operate on the

9    corresponding tactical channel.

10         Q.    Okay.  In the course of your

11   work in the Gang Unit, did -- well, would it

12   be fair to say that arrests in the Gang Unit

13   might require a different approach than, for

14   instance, like a beat officer?

15             MR. COWAN:  Objection.

16         Q.    Who's like a -- so you're in the

17   Gang Unit.  There are other CPD officers who

18   are working on the street, correct?

19         A.    Yes, ma'am.

20         Q.    And would it be fair to say that

21   certain subjects in the -- that are targets

22   in the Gang Unit, might present more dangers

23   than the average, like, person on the street?

24             MR. COWAN:  Same objection.

25         A.    Our -- generally the people we

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    arrested were targeted, but it doesn't

2    necessarily by any means say that they posed

3    a higher threat than the unknowing of what a

4    uniformed police officer would have when they

5    would go to stop the individual.

6              Q.    Okay.  Did you receive any

7    training specific to the Gang Unit when you

8    joined the Gang Unit?

9              A.    No, ma'am.

10             Q.    Okay.  Did you receive any

11   training regarding how to conduct, for

12   instance, high-risk arrests?

13             A.    Specific high-risk arrest

14   training, no, ma'am.

15             Q.    Okay.  Was conducting an arrest

16   that was high risk or present dangers by way

17   of a person possessing weapons, firearms, was

18   that something that you had to do in the

19   course of your duties in the Gang Unit?

20             A.    No.  Again, generally the

21   arrests were being completed by the uniformed

22   police officers, and I was in the

23   plainclothes, so I had very limited

24   interaction with the actual physical portion

25   of the arrest.

1   Q.    Was there ever a situation where

2   you assisted uniformed officers to assess

3   risks or dangers making an arrest based on a

4   possible danger that the person presented,

5   the arrestee?

6        A.    Can you repeat?  I apologize.

7        Q.    Sorry.  One second.  Did you

8   learn in your training that some arrests may

9   require more strategy than others?

10       A.    Yes, ma'am.

11            MR. COWAN:  I'm just gonna

12  preserve the objection, if you don't mind.

13  Thanks.

14       Q.    Uh-huh.  And it might require

15  more planning than others?

16       A.    Yes, ma'am.

17       Q.    Okay.  And in what scenarios

18  based on your training could an arrest

19  require more strategy or planning?

20       A.    An arrest like the Fugitives

21  Unit who's assigned felonious assault

22  homicide style, I'm sure they actually have

23  briefings for how they want to go about and

24  arrest the individual.

25            So a lot of times it could be

1   based on the nature of the offense in which

2   you're arresting the suspect for.

3        Q.    And could that also be in the

4   case of persons considered or known to be

5   dangerous?

6        A.    Yes, ma'am.

7        Q.    And in such a case, are officers

8   trained to plan for contingencies?

9        A.    No.  I've never received any

10  contingency-based training.

11       Q.    Are officers trained to plan for

12  possible different outcomes or to respond to

13  different actions by the subject?

14       A.    Yes, ma'am.

15       Q.    Okay.  Does that include

16  assessing the time and place where an arrest

17  could be conducted?

18       A.    Yes, ma'am.

19       Q.    And would that also include

20  assessing risks to the safety of officers who

21  might be involved in conducting the arrest?

22       A.    Yes, ma'am.

23       Q.    And also risk to the public that

24  might arise during the conducting of an

25  arrest?

```
 1              A.    Yes, ma'am.

 2              Q.    Why are those factors -- would

 3      you consider those important things to

 4      consider?

 5              A.    Yes, ma'am.

 6              Q.    And why -- why would those

 7      things be important?

 8              A.    The basic word you hit on,

 9      safety for the officers and everyone else

10      that would be involved including the suspect.

11              Q.    Okay.  I'm gonna turn to

12      specifically training on vehicle pursuits.

13                    Did you receive training on when

14      and how to conduct a vehicle pursuit?

15              A.    Are we -- sorry.  Specifically

16      are we back to the academy or throughout the

17      course of my --

18              Q.    Good question.  Okay.  So at

19      least some portion of your academy training

20      involved vehicle pursuits, right?

21              A.    Yes, ma'am.

22              Q.    And in the course of your

23      employment at the City with the police

24      department, have you had other training on

25      pursuits, supplemental training, or any
```

1    further training on conducting vehicle

2    pursuits?

3            A.    Yes, ma'am.

4            Q.    And what was the nature of that

5    training?

6            A.    They would utilize Hamilton

7    County's -- the Sheriff Department's

8    headquarters and you would pretty much

9    practice pursuit driving.

10           Q.    So you're able to actually

11    operate a car as if you're in a scenario

12    where there's a pursuit taking place?

13           A.    Yes, ma'am.

14           Q.    And what types of roles did

15    officers play in that training as far as what

16    exactly officers were doing to participate in

17    that?

18                 MR. COWAN:   Objection.

19           A.    Officers would either play the

20    officer pursuing the vehicle or other

21    officers would drive the vehicle that was

22    fleeing from the arresting officer.

23           Q.    Do you recall what year -- well,

24    strike that.

25                 Have you -- have you done that

1    **training more than once?**

2           A.    Yes.

3           **Q.    Do you know how many times you**

4    **have done that training?**

5           A.    No.  I would -- I know it's less

6    than five, but I don't know the exact number.

7           **Q.    And do you recall which years or**

8    **approximately which years you completed that**

9    **training?**

10          A.    The early 2000s.

11         **Q.    And, for instance, in the --**

12    **let's say -- we'll say five years before**

13    **2020, so from 2015 to 2020, do you recall**

14    **undergoing that training?**

15          A.    No.  The -- the last time I was

16    assigned to any uniformed capacity was 2014.

17    So I have not received any uniformed-based

18    training, specific-based training since I

19    began plainclothes again in the fall of 2014.

20         **Q.    And the vehicle pursuit training**

21    **would be one -- based on your understanding,**

22    **it would only be given to a uniformed officer**

23    **or officers who are working in some capacity**

24    **in a uniform?**

25         A.    Yes, ma'am.

1    Q.    Okay.  In either your academy

2    training or follow-up training on vehicle

3    pursuits, were you trained on the policy of

4    CPD in regard to vehicle pursuits?

5         A.    Trained on policy, I would say,

6    no.  You're expected to understand and know

7    the policy based on the procedure manual.

8    When policy or procedure is updated, it is

9    revised in the staff notes.

10         The staff notes are provided to

11   officers on a weekly basis, but you're not

12   necessarily trained on the updates, but you

13   are provided with the updates.

14    Q.    Okay.  And how were the staff

15   notes given to officers or distributed to

16   officers?

17         A.    Through a system called

18   PowerDMS, and I apologize, I don't know what

19   the DMS stands for.  And it's -- it's just a

20   program within the Cincinnati Police

21   Department that we can access for multiple

22   functions, one of those is staff notes.

23    Q.    And are officers required to

24   read staff notes on a weekly basis?

25         A.    They are.

1      Q.    And are officers who -- if you

2   receive a staff note, are you tested on it in

3   any way?

4      A.    No, ma'am.

5      Q.    And is there any mechanism that

6   like you have to click something to --

7      A.    Yes.

8      Q.    -- show you read it?  There is?

9      A.    I apologize for speaking over

10  you.

11     Q.    That's okay.

12     A.    Yes.  There's -- once you read

13  it, you check off that it's been read.  And

14  you can't check that off unless the file has

15  been opened.

16     Q.    Okay.  And prior to August 7th

17  of 2020, do you recall receiving PowerDMS

18  updates specifically related to vehicle

19  pursuits?

20     A.    I apologize to get into -- so

21  PowerDMS wasn't around in 2020.  The staff

22  notes would have been through a different

23  name.

24     Q.    Okay.

25     A.    Similarly functioned.  But I

1    apologize, I don't know when -- DMS is the

2    current system --

3          Q.    Okay.

4          A.    -- but it was the same format.

5    I apologize.  I was just trying to clarify

6    that.

7          Q.    Oh, thank you for clarifying.

8                And on the system prior to

9    PowerDMS, was it -- did you also have to

10   click something to show that you read an

11   update?

12         A.    Yes.

13         Q.    And same question, prior to

14   August 7th of 2020, do you recall at any

15   point receiving a staff note about vehicle

16   pursuit policy or changes to that policy?

17         A.    I don't recall because, again,

18   they are weekly and there's a lot of

19   information.  So from that far back, I can't

20   remember the specifics.

21         Q.    And prior to 2020, you said you

22   don't know the name of the platform that

23   preceded PowerDMS?

24         A.    Correct.

25         Q.    Okay.  Do you know when that

1    switch occurred?

2              A.    No, ma'am.

3              Q.    Okay.  Did you -- in your

4    training either at the academy or in the

5    hands-on training you described, did you do

6    any training on the deployment of stop

7    sticks?

8              A.    Yes.

9              Q.    Did that -- did you do hands-on

10   or experience training in person with that?

11             A.    There was hands-on where you

12   would have stop sticks that didn't actually

13   have the spikes in them and you would

14   practice as cars would drive by.

15                   And then we had in-field

16   application where we were actually deploying

17   them.

18             Q.    And in-field application, was

19   that part of a training as well?

20             A.    No, that would be like actual

21   deployment of them.

22             Q.    In a real scenario?

23             A.    Yes.

24             Q.    Okay.  And have you used stop

25   sticks in the field before?

```
 1              A.    Yes, ma'am.

 2              Q.    And was that in the course of

 3     your work in the Gang Unit?

 4              A.    Yes, ma'am.

 5              Q.    But did you also deploy stop

 6     sticks prior to joining the Gang Unit?

 7              A.    Yes, ma'am.

 8              Q.    And how many times would you say

 9     in your tenure that you deployed stop sticks?

10              A.    Between 10 and 20.

11              Q.    And what's the purpose of a stop

12     stick?

13              A.    To deflate the tire of a vehicle

14     to try to slow the vehicle down.

15              Q.    And the idea there is that the

16     tire gets damaged and that should hopefully

17     slow a vehicle down to make it easier to

18     catch up to a vehicle?

19              A.    Yes, or disable the vehicle to

20     where if they're fleeing, the general

21     behavior we saw is they would then flee on

22     foot.

23              Q.    And is the idea that it is

24     easier or safer to catch someone who's on

25     foot versus in a moving car?
```

```
1              A.     Yes.
2              Q.     And did you ever confront a
3      situation where you used stop sticks
4      successfully and the person did, in fact,
5      flee on foot?
6              A.     Yes, ma'am.
7              Q.     And were you able to
8      successfully arrest people in that scenario?
9              A.     Yes, ma'am.
10             Q.     And how many times would you say
11     that you've been in a scenario where you've
12     had a successful arrest of a person who fled
13     on foot after a stop stick deployment?
14             A.     That's -- I don't know.
15             Q.     Have you had scenarios where
16     you've deployed the stop sticks and the
17     person flees and you didn't -- you weren't
18     able to catch them or make an arrest?
19             A.     Yes, ma'am.
20             Q.     Okay.  And in general terms, can
21     you describe the procedure, as you understand
22     it, for deploying stop sticks?
23             A.     Stop sticks are to be deployed
24     not from a moving vehicle.  There's various
25     sets of stop sticks.  You want to make your
```

1    location aware on the radio.

2                So they often announce so

3    responding officers know where you're at when

4    you're deploying them.  And then you want to,

5    depending on the version or style of the stop

6    sticks that you're using, get them out in

7    front of the vehicle.

8                And once they're run over,

9    remove those before other units that are

10   responding would run over them and flatten

11   their tires.

12        **Q.    And were you trained on**

13   **scenarios in which it's proper or improper to**

14   **use a stop stick?**

15        A.    Yes.

16        **Q.    And in what scenarios is it**

17   **proper to use a stop stick?**

18        A.    We do not use them on the

19   highway.  And you're allowed to deploy when

20   the officer feels that they're in a safe

21   enough situation to do that.

22                You're not allowed to use them

23   on motorcycles.  You're not allowed to use

24   them on four-wheelers, other style vehicles

25   normally -- four-wheeled or more motor

```
 1    vehicle.

 2          Q.    And in what situations can

 3    you -- is there any other situation in which

 4    it's proper to use a stop stick?

 5          A.    The subject's fleeing.  The

 6    subject presents a risk that a supervisor has

 7    made the determination that can be

 8    preemptively, before the vehicle has even

 9    fled before a uniformed officer initiates or

10    attempts to initiate a traffic stop, that

11    that stop stick is placed while the car is

12    being followed either by uniformed or

13    plainclothes uniforms.

14          Q.    And in the scenario where the

15    stop stick is employed before the stop even

16    takes place, does coordination take place

17    between officers to discuss, for instance,

18    the direction that you're traveling or the

19    road that you're traveling on so that the

20    stop stick can be placed in the direction

21    that you're headed?

22          A.    Yes, ma'am.

23          Q.    And does that kind of

24    communication take place by radio, cell

25    phone?
```

```
 1              A.      Radio, ma'am.

 2              Q.      Okay.  And what kind of

 3     considerations would come into play for that

 4     to be -- that scenario in which stop sticks

 5     are placed before the stop, what type of

 6     scenarios would that type of -- would that be

 7     used?

 8                      MR. COWAN:  Objection.

 9              A.      Can you -- I'm sorry.  Can you

10     clarify that just a little bit?

11              Q.      Yeah.  So in the scenario you're

12     talking about of placing stop sticks before a

13     stop occurs --

14              A.      Yes.

15              Q.      -- when is it appropriate to use

16     that tactic?

17              A.      That procedure was originally

18     designed for stolen cars.  If an officer ran

19     a plate and saw that that car was reported

20     stolen, the majority of the times stolen cars

21     would flee, that part of the procedure was

22     designed for the stolen car.

23                      Initially, they would ask

24     officers to get out in front when they were

25     following it, deploy the stop sticks, and
```

```
 1    then would attempt to initiate a traffic

 2    stop.

 3          Q.    And it's used for cars that are

 4    likely to flee?

 5          A.    Yes.

 6          Q.    And have you seen it used in

 7    that manner by CPD?

 8          A.    Yes, ma'am.

 9          Q.    Okay.  Has it been used that way

10    based on observations of yours while you were

11    in the Gang Unit?

12          A.    Yes, ma'am.

13          Q.    By officers making arrests

14    related to Gang Unit investigations?

15          A.    Yes, ma'am.

16          Q.    And is that a -- let's strike

17    that.

18                Okay.  So turning to the actual

19    policy --

20                MS. SALLEY:  Yeah, let's take a

21    quick break.  We probably all could use

22    three minutes to -- let's take five.

23                MR. COWAN:  Uh-huh.

24                MS. GREENE:  We're off the

25    record?
```

```
 1              MS. SALLEY:  We're off the
 2     record, yes.
 3        (Off the record.)
 4     BY MS. SALLEY:
 5          Q.    Officer Bode, we're back on the
 6     record.  I neglected to ask you earlier, are
 7     you from the Cincinnati area?
 8          A.    Northern Kentucky.
 9          Q.    Northern Kentucky.  Okay.
10              MS. SALLEY:  Oh, let's go off
11     for one second.
12        (Off the record.)
13     BY MS. SALLEY:
14          Q.    Okay.  And in your -- in the
15     course of your duties or in your residence
16     near the Cincinnati Metro area, are you
17     familiar with the west side?
18          A.    West side of Cincinnati.
19          Q.    Yeah, west side of Cincinnati.
20          A.    Yes, ma'am.
21          Q.    And the River Road area where
22     you were operating on August 7th, 2020?
23          A.    Yes, ma'am.
24          Q.    Okay.  I just wanted to check.
25     Okay.  So I'm gonna turn to the actual policy
```

 1    of the Cincinnati Police Department regarding

 2    vehicle pursuits and emergency response

 3    driving.  Are you familiar with that policy?

 4              A.    Vaguely.

 5              Q.    Okay.  You know it exists?

 6              A.    Yes.

 7              Q.    And have you -- you said earlier

 8    officers are responsible to know the content

 9    of policies, correct?

10              A.    Yes.

11              Q.    Okay.  And this is, you know,

12    not a memory test.  So please feel free -- if

13    you do not know something, please feel free

14    to just let -- just, you know, answer

15    truthfully that you don't remember so --

16    okay.

17                    As far as vehicles fleeing or

18    persons who are suspects or subjects of an

19    investigation fleeing in vehicles, is that a

20    scenario that Cincinnati Police Department

21    officers are -- are trained to address or

22    respond to?

23              A.    Can you repeat?

24              Q.    Yeah.  I probably made that more

25    complicated than it needed to be.

Jason Laible, et al., vs. Timothy Lanter, et al.,

1              Are fleeing vehicles, is that a

2    scenario that CPD officers are trained to

3    know how to respond to?

4          A.    Yes.

5          Q.    Okay.  And are fleeing vehicles

6    or a scenario in which a suspect is fleeing

7    in a vehicle, is that something that a

8    Cincinnati police officer can expect to face

9    in the course of a career?

10         A.    Yes, ma'am.

11         Q.    And would you say it's a common

12   occurrence in a police officer's work?

13         A.    No, ma'am.

14         Q.    Okay.  And how often would you

15   say -- at least in your experience, how often

16   would you say it has occurred?

17         A.    It is not a daily occurrence, by

18   any means, maybe a few a month for the

19   department.

20         Q.    You said a few a month within

21   the department?

22         A.    Yes, ma'am.

23         Q.    Okay.  And does that include

24   situations where the fleeing vehicle is

25   occupied by a person who is wanted or has

1    warrants out?

2             A.    That would include those, yes,

3    ma'am.

4             Q.    Okay.  Does that include

5    situations where people may be wanted for

6    violent crimes?

7             A.    Yes, ma'am.

8             Q.    And sometimes police officers

9    engage in pursuits to stop the fleeing

10   drivers?

11            A.    Yes, ma'am.

12            Q.    And would that generally be with

13   the end goal of arresting the person or

14   persons inside the car?

15            A.    Yes, ma'am.

16            Q.    And during pursuits, is it

17   accurate to say that fleeing vehicles will

18   often commit traffic violations?

19            A.    Yes, ma'am.

20            Q.    And that includes violations of

21   the Ohio Revised Code and the Municipal Code?

22            A.    Yes, ma'am.

23            Q.    And does that include exceeding

24   the speed limit?

25            A.    Yes, ma'am.

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    And possibly running red lights

2   or running stop signs?

3      A.    Yes, ma'am.

4      Q.    And possibly going the wrong way

5   on one-way streets?

6      A.    Yes, ma'am.

7      Q.    And does that include swerving

8   or operating in a hazardous way to avoid

9   other cars on the road?

10     A.    Yes, ma'am.

11     Q.    And does that include possibly

12  endangering bystanders or pedestrians?

13     A.    Yes, ma'am.

14     Q.    Driving on the sidewalk?

15     A.    Possibly, yes, ma'am.

16     Q.    And could that be the cause --

17  could a fleeing vehicle cause an at-fault

18  accident?

19     A.    Yes, ma'am.

20     Q.    And could that also include

21  driving on surfaces that are not necessarily

22  roads, like you said sidewalks, but center

23  lanes or grassy areas?

24     A.    Yes, ma'am.

25     Q.    And in your understanding of

1  CPD's policy and procedure for vehicle

2  pursuits, do you know what the purpose of

3  that policy is?

4         A.    The purpose is to regulate when

5  an officer can or cannot initiate or continue

6  to engage in a pursuit.

7         Q.    Sure.  And is another purpose of

8  the policy to ensure that the safety of

9  officers and citizens and suspects is taken

10 into account in the course of a possible

11 pursuit?

12        A.    Yes, ma'am.

13        Q.    And during the emergency

14 operation of police vehicles as well?

15        A.    Yes, ma'am.

16        Q.    And do you agree that the

17 pursuit and emergency response driving policy

18 requires officers not to commit traffic

19 violations in the course of a pursuit or

20 emergency response driving?

21        A.    No, ma'am.

22        Q.    You don't agree with that.  Is

23 that from your memory of the policy?

24        A.    Yes.  But from my memory of the

25 policy, some violations may occur from the

1    officer engaged in the pursuit, not -- not a

2    blank sheet, but violations can occur and

3    still remain within procedure.

4            Q.    Okay.  And do you know in which

5    type -- which scenarios permit officers to

6    incur traffic violations?

7            A.    The scenarios that if you're

8    chasing a vehicle and the car in front of you

9    stops, you may have to go around that car,

10   and that may -- you may go across the

11   centerline to get around that car, which

12   would be a violation of an ORC, Ohio Revised

13   Code, but still comply with the policy.

14           Q.    And is the purpose of that to

15   protect the safety of the person in the car

16   in front to avoid a risk to the person in

17   that car?

18           A.    I'm sorry.  Can you repeat?

19           Q.    Uh-huh.  Would the purpose --

20   the scenario you just gave, for instance,

21   would the purpose of that be to avoid

22   injuring the person in the car in front of

23   the officer that has stopped?

24           A.    Yes.

25           Q.    And, otherwise, as a general

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    rule with -- well, strike that.
 2                   Can you think of any other
 3    circumstances in which policy or traffic
 4    violations are permissible under the pursuit
 5    emergency driving policy?
 6         A.    Other scenarios where they would
 7    be permissible?
 8         Q.    Uh-huh.  Can you think of any?
 9         A.    Absolutely.  You get to a red
10    light, you stop, you look both ways.  Once
11    you can clearly -- safely clear the
12    intersection, you're allowed to clear that
13    intersection.
14                   But you do have to come to a
15    stop, but you then are allowed to go through
16    the red light.
17         Q.    And, for instance -- and just to
18    be totally clear, otherwise at a red light,
19    your average driver would have to stop and
20    wait until the signal changes in order to be
21    able to proceed through the intersection?
22         A.    Yes, ma'am.
23         Q.    But an officer is required to
24    stop, but is able to proceed before the light
25    turns green?
```

1    A.    Yes, ma'am.

2    Q.    In certain scenarios?

3    A.    Yes, ma'am.

4    Q.    Okay.  And -- once they've

5   determined that they can safety go through

6   the intersection; is that right?

7    A.    Yes, ma'am.

8    Q.    And under CPD pursuit -- pursuit

9   policy, are you familiar with the term

10  operational violation?

11    A.    No, ma'am.

12    Q.    Okay.  You don't know what that

13  is?

14    A.    No, ma'am.

15    Q.    Okay.  And under the CPD pursuit

16  policy, are you familiar with the term

17  administrative violation?

18    A.    No, ma'am.

19    Q.    Okay.  Do you agree that the CPD

20  pursuit policy requires that officers who are

21  considering whether to pursue or who are

22  actively engaged in a pursuit to consider

23  certain factors that include the degree of

24  the risk of the pursuit to others, the

25  officer, and the suspect?

1        A.    Yes, ma'am.

2        Q.    And as well to consider the

3   location where the pursuit would take place?

4        A.    Yes, ma'am.

5        Q.    As well as the traffic

6   conditions at the time?

7        A.    Yes, ma'am.

8        Q.    And -- and the amount of

9   pedestrian traffic?

10       A.    Yes, ma'am.

11       Q.    The time of day?

12       A.    Yes, ma'am.

13       Q.    The weather at the time?

14       A.    Yes, ma'am.

15       Q.    And as far as weather, could

16   that entail bad weather, like weather that

17   might affect the conditions of the road?

18       A.    Yes, ma'am.

19       Q.    And could it also include good

20   weather, for instance, there might be more

21   people outside if it's good weather?

22       A.    Yes, ma'am.

23       Q.    And could that include volume,

24   type, speed, and direction of the other

25   traffic on the road?

```
1              A.    Yes, ma'am.

2              Q.    And the direction of the pursuit

3       as it compares to other traffic?

4              A.    Yes, ma'am.

5              Q.    Does that include the nature and

6       seriousness of the suspected crime that the

7       pursuit is being -- that kicked off the

8       pursuit?

9              A.    Yes, ma'am.

10             Q.    Does that include the condition

11      of the police vehicle and of the suspect's

12      vehicle?

13             A.    Yes, ma'am.

14             Q.    And does that include any

15      circumstance that could lead to a situation

16      in which the pursuing officer will not be

17      able to maintain control of his vehicle?

18             A.    Yes, ma'am.

19             Q.    And does that include also the

20      type of vehicle that's being pursued?

21             A.    Can you ask that again?

22             Q.    Uh-huh.  One of the factors to

23      consider as far as considering weather to

24      pursue or actively engaging the pursuit, does

25      that include the type of vehicle that is
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    being pursued?

2              A.    Yes, ma'am.

3              Q.    And does that include the other

4    factors likelihood of successful apprehension

5    of a person who is driving?

6              A.    Yes, ma'am.

7              Q.    Or persons in the car?

8              A.    Yes, ma'am.

9              Q.    And whether the identity of the

10   suspect is known to the point that later

11   apprehension of the person could be possible?

12             A.    Yes, ma'am.

13             Q.    And any other factors, to your

14   knowledge based on your training and

15   experience, that officers should or must

16   consider in the course of deciding whether to

17   continue a pursuit?

18             A.    No, ma'am.

19             Q.    In regard to the factors that we

20   just discussed, the first one was the degree

21   of risk created by the pursuit to others,

22   officer, and suspect.

23                   Based on your training and

24   experience and your understanding of the

25   policy, what level of risk constitutes an

```
 1    unacceptable risk to continue a pursuit?

 2            A.    What level of risk?

 3            Q.    Uh-huh.  Or what -- what type of

 4    risk or what level of risk, what does that

 5    mean to you?

 6            A.    When determining to no longer

 7    pursue, was that the question?

 8            Q.    In making decisions about

 9    whether to pursue or to continue actively

10    pursuing?

11            A.    All the factors that -- the last

12    however many questions that we went over are

13    all the factors that you would use to

14    determine whether or not to engage and then

15    continue in the pursuit.

16            Q.    And so what I'm asking is in

17    regard to -- I'm gonna go through each

18    specific factor we talked about --

19            A.    Yes, ma'am.

20            Q.    -- to learn a little bit more

21    about your understanding of what the factors

22    mean --

23            A.    Okay.

24            Q.    -- or what your training or

25    understanding of the policy is in relation to
```

1    those factors.

2              So as far as that first factor

3    we talked about, which is the degree of risk

4    that's created by the pursuit to others,

5    officers, and suspects, the question is, what

6    level of risk, when we talk about degree of

7    risk, is unacceptable to continue the

8    pursuit?

9         A.    Have to be a very high risk.

10        Q.    And does that -- are you trained

11   in any way to understand what that means,

12   what's a high risk?

13        A.    I think that would be based on

14   employee-by-employee on how they are

15   observing and how they are -- how they

16   observe, and then rate that risk themselves.

17        Q.    At any point in your training,

18   are you -- do you learn how to assess what a

19   high risk is, like what would that look like?

20        A.    You're assessing, as you just

21   said by -- by the elements, whether it be the

22   weather, the road conditions, the amount of

23   vehicular traffic, that assessment is ongoing

24   leading up to the stop and then during the

25   pursuit itself.

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    And would that include the risk

2      of safety, like, for instance, physical

3      injury to the officer, bystanders, or the

4      subject?

5          A.    Yes, ma'am.

6          Q.    And would that include the risk

7      of possible death to officers, suspect, or

8      bystanders?

9          A.    Yes, ma'am.

10         Q.    Serious physical injury to

11     officers, a suspect, or bystanders?

12         A.    Yes, ma'am.

13         Q.    And how do you know when that

14     level of risk is present?

15         A.    How do I know when the level of

16     risk is present?

17         Q.    Were you ever -- in the training

18     that you received on vehicle pursuits, did

19     you -- do you have any memory sitting here

20     today of covering that topic?

21         A.    No, ma'am.

22         Q.    Okay.  So we'll move on to the

23     next factor, which is location where the

24     pursuit will take place.

25                Why does that factor matter in

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          the consideration of either starting or
 2          continuing a pursuit?
 3                  A.    The location?
 4                  Q.    Uh-huh.  Yes.
 5                  A.    The location itself is -- I
 6          don't think is the factor.  Again, the amount
 7          of vehicular traffic, pedestrian traffic in
 8          that area.
 9                  Q.    Could that also include like the
10          topography of the space that the pursuit is
11          taking place, like, for instance, you're on a
12          windy road, you're on a straight road, and
13          the physical features of an area?
14                  A.    Yes.
15                  Q.    And that there may be some
16          physical spaces where it might be more
17          dangerous to conduct a pursuit than others?
18                  A.    Yes, ma'am.
19                  Q.    And is that something that is
20          covered at all in your hands-on training or
21          in academy training about pursuits?
22                  A.    Not that I remember, ma'am.
23                  Q.    Okay.  And you alluded to this
24          as far as traffic conditions, why does it
25          matter for an officer to consider the traffic
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    conditions at the time of a pursuit?

2             A.    More congestion means there's

3    more vehicles on the road.  So, obviously,

4    the more elements that you have are for

5    factors that must be considered.

6             Q.    And that could mean that it

7    could be more difficult to evade other cars

8    or to prevent collision with other cars for

9    one thing?

10            A.    Yes, ma'am.

11            Q.    And that could mean that there

12   are more people who might be at risk in a

13   scenario if there's heavier traffic?

14            A.    Yes, ma'am.

15            Q.    And was that a topic that was

16   covered to your memory in any of your

17   training on vehicle pursuits?

18            A.    No, ma'am.  And I'll just say,

19   like, I don't remember the last time I had

20   any specific training to deal with vehicle

21   pursuits, so just so you understand, I'm not

22   trying to --

23            Q.    Sure.

24            A.    I just don't have -- cannot tell

25   you the last time I received specific

1  training on operating or decision-making

2  during vehicle pursuits.

3       Q.    That's totally fair.  Okay.

4  Okay.  So the next factor we talked about was

5  amount of pedestrian traffic.  Why is that a

6  factor to consider?

7       A.    The less people that are -- the

8  less pedestrians that are out, obviously is

9  the better scenario.  The more people, the

10  more cars becomes a higher risk factor.

11       Q.    And are -- should officers

12  consider the area in which a pursuit might

13  take place and their familiarity with general

14  levels of pedestrian traffic in that area?

15       A.    Yes, ma'am.

16       Q.    And the next factor is road

17  conditions.  Why is that a factor to

18  consider?

19       A.    Well, road conditions, if it's

20  icy out would be a much higher risk factor,

21  than on a day when there's no rain or adverse

22  weather and the road conditions are normal

23  driving status.

24       Q.    Time of day is the next factor.

25  Why is time of day a factor to consider?

1      A.     The visibility would be the main

2   concern there at night.  It's tougher to see

3   time of day if it's afternoon or if it's

4   sunny and bright out and there's no other

5   weather or things affecting vision.

6      Q.     Uh-huh.  And can time of day

7   also play into the other factors, for

8   instance, amount of pedestrian traffic?

9      A.     Yes, ma'am.

10     Q.     And certain times of day might

11  in certain areas have heavier pedestrian

12  traffic?

13     A.     Yes, ma'am.

14     Q.     And is it incumbent upon the

15  officer if they have familiarity with an area

16  to consider time of day in terms of traffic

17  conditions and pedestrian traffic?

18     A.     Yes, ma'am.

19     Q.     And the next factor is weather.

20  Why is weather a factor?  I think you got

21  into it a little bit in road conditions,

22  but...

23     A.     Yes, inclement weather makes

24  pursuits more dangerous.

25     Q.     And can weather also relate,

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    like we just spoke about, time of day and

2    amount of pedestrian traffic, for instance,

3    on a rainy day, there might be less

4    pedestrian traffic; is that fair to say?

5        A.    Yes, ma'am.

6        Q.    And on a -- like a sunny

7    afternoon, there might be more pedestrian

8    traffic?

9        A.    Yes, ma'am.

10        Q.    The next factor is volume, type,

11    speed, and direction of vehicular traffic,

12    and direction of the pursuit.  Why is that

13    factor a consideration?

14        A.    Volume, what were the others?  I

15    apologize.

16        Q.    Volume, type, speed, and

17    direction.

18        A.    The volume, again, the more

19    vehicles, the more pedestrians that are out

20    there.  Speed is -- obviously, at the higher

21    speeds, create a higher risk.

22        Q.    Could frequent stopping also be

23    a consideration as far as traffic patterns.

24    Like, if -- for instance, if it's an area

25    that's congested, it might have stoplights,

```
 1        is that also something to consider?
 2                A.    That is a consideration, yes,
 3        ma'am.
 4                Q.    And direction of pursuit, does
 5        that encompass, for instance, whether or not
 6        you're traveling with the direction of
 7        traffic or against it?
 8                A.    Can you repeat that?
 9                Q.    Sure.  So the second part of
10        that factor is the direction of pursuit.  Why
11        is that an important factor?
12                A.    Are you saying -- are you saying
13        if you have to go the wrong way, is that --
14        I'm -- I'm --
15                Q.    Well, I guess I --
16                A.    I guess -- I guess I don't
17        understand.  If you're just -- north, south,
18        east, west is what I think when you say
19        direction.
20                Q.    Okay.  Thank you for clarifying
21        that.  And -- so why does that matter?
22                A.    To me, north, south, east, west
23        doesn't matter.
24                Q.    Okay.
25                A.    That wouldn't be a factor.
```

1    Q.    Okay.  And as far as volume,

2  type, speed, and direction of vehicular

3  traffic, does that encompass the idea of

4  going with or against the flow of traffic?

5    A.    Yes, ma'am.

6    Q.    Okay.  Okay.  And then the next

7  factor is the nature and seriousness of the

8  suspected crime.  Why is that a factor?

9    A.    The seriousness of the offense

10 in which you are engaging in the pursuit will

11 always be a factor.  The more risk that the

12 suspect presents would be a bigger factor.

13   Q.    And does that -- the suspected

14 offense, is that an offense that has, for

15 instance, just occurred to -- and was kind of

16 the catalyst for the pursuit?

17   A.    That would have to be determined

18 on a case-by-case scenario.

19   Q.    And the next factor is condition

20 of police -- of the police vehicle and the

21 suspect's vehicle.  Why is that a

22 consideration?

23   A.    The conditions of the police

24 vehicles they should all be generally --

25 they're regularly serviced, so the condition

1    of that vehicle, unless it suffered some sort

2    of accident during the pursuit.

3                But the condition of the

4    suspect's vehicle, if it's getting ready to

5    lose a tire or there's some parts that could

6    maybe fall off, then those would be factors

7    that would be considered during the pursuit.

8         Q.    And is it the case, for

9    instance, if they were getting ready to lose

10   a tire, could that be important because it

11   could influence the ability of the driver to

12   control the vehicle?

13        A.    Yes, ma'am.

14        Q.    And if a tire either, you know,

15   bursts or is lost, in some way explodes, that

16   could cause a car to swerve, possibly flip,

17   other dangerous movement of the car itself?

18        A.    Yes, ma'am.

19        Q.    And are -- should an officer

20   then be observing for things like smoking

21   tires or exploding tires or tires that are

22   physically damaged?

23        A.    Yes, ma'am.

24        Q.    And then the other -- this other

25   factor is type of vehicle being pursued.  Do

1    you have -- do you have an understanding of

2    why that factor is included, what -- what

3    kind of consideration that would be?

4              A.    I do not.

5              Q.    Okay.  And the next one was, any

6    circumstance that can lead to a situation in

7    which the pursuing officer will not be able

8    to maintain control of his police vehicle.

9    Why does that matter?

10             A.    Well, you have to be in control

11   of your police vehicle to still be engaged in

12   the pursuit itself.

13             Q.    And is it fair to say that

14   losing ability to maintain control of the

15   vehicle could be dangerous to the officer, to

16   bystanders, or the suspect?

17             A.    Yes, ma'am.

18             Q.    And the next factor is

19   likelihood of successful apprehension.  Why

20   does that factor come into consideration?

21             A.    It comes into consideration

22   because whether the suspect has a higher or a

23   likely chance of getting away, or if there's

24   a better chance that the officers would have

25   to be able to apprehend him, would always be

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    an ongoing consideration.
 2           Q.    And does that include
 3    consideration of -- the next factor is
 4    whether the identity of the suspect is known.
 5    Does that also play into the likelihood of a
 6    successful apprehension?
 7           A.    No.
 8           Q.    Okay.  The -- as far as the
 9    likelihood of successful apprehension, does
10    that include considerations of whether the
11    person driving is, for instance, at a very
12    high rate of speed that the officer can't
13    keep up, or would it be unsafe to keep up?
14           A.    Yes, ma'am.
15           Q.    And would that include the
16    officer's ability to keep a visual on the
17    suspect and be able to see where they're
18    going?
19           A.    Yes, ma'am.
20           Q.    Would that include the
21    possibility that the person who is fleeing
22    has, for instance, previously escaped or fled
23    from officers?
24           A.    Would that be a consideration?
25           Q.    Yes.
```

1     A.    Yes, ma'am.

2         Q.    Okay.  And whether the -- well,

3    the next factor is whether the identity of a

4    suspect is known to the point that later

5    apprehension is possible.  Why does that

6    factor matter?

7         A.    That's very basic.  If you don't

8    know who the individual is and they flee and

9    get away, then there's no ability to identify

10   them.

11            If you know who the individual

12   is, you, obviously, readily have the identity

13   available for any subsequent charges that

14   would come if they were able to elude you.

15       Q.    And could that also be a

16   consideration of, for instance, whether it's

17   known if the suspect is being tracked by a

18   cell phone device or some other tracking

19   capability?

20       A.    Can you repeat that?

21       Q.    Would that -- would this factor

22   include the consideration of whether the

23   person is being tracked by their cell phone

24   or other GPS?

25       A.    Yes, ma'am.

1    Q.    Would that include the

2    consideration of because the person --

3    person's identity is known that -- like a

4    Be-On-The-Lookout, or a warrant could be

5    issued for that particular person that's

6    involved in the pursuit?

7    A.    Yes, ma'am.

8    Q.    And then that makes it more

9    likely that the person will be apprehended by

10   either the current law enforcement in

11   pursuit, Cincinnati Police Department, or

12   another law enforcement agency?

13            MR. COWAN:   Objection.

14   A.    Yes, ma'am.

15   Q.    And other than the factors that

16   we've discussed here, is there anything else,

17   any other factors that you've learned about

18   in training or experience that are important

19   to consider in a pursuit?

20   A.    No, ma'am.

21   Q.    Okay.  And just to be clear,

22   have you ever actually at any point in your

23   career engaged in a vehicular pursuit as a

24   driver?

25   A.    Yes, ma'am.

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    Okay.  How often has that

2    happened?

3        A.    Less than ten.

4        Q.    Okay.  Have you done that at any

5    point in the last, let's say, decade?

6        A.    No, ma'am.

7        Q.    Okay.  And in the ten percent

8    that you did take part, were these same

9    factors that we've just discussed, the same

10   factors that you needed to consider at those

11   times?

12       A.    Yes, ma'am.

13       Q.    And in any of the pursuits that

14   you personally engaged in, did you ever

15   decide to abort or discontinue a pursuit

16   because you determined that the circumstances

17   had gotten too dangerous or too high risk?

18       A.    I do not recall to rate any of

19   my pursuits.

20       Q.    Do you recall if -- did they all

21   result in successful arrests?

22       A.    No.  No, ma'am.

23       Q.    Turning back to the policy

24   itself and CPD's policy and procedure for

25   emergency response in pursuit driving, is it

Case: 2:21-cv-00102-DLB   Doc #: 134   Filed: 11/06/25   Page: 93 of 280 - Page
ID#: 1075
Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    accurate that the policy forbids officers

2    from attempting to slow or stop a pursuit

3    vehicle by using a box-in maneuver or heading

4    them off, ramming, or driving alongside of

5    them?

6            A.    Yes, ma'am.

7            Q.    And that's a mandatory rule in

8    the policy?

9            A.    Yes, ma'am.

10           Q.    And why does it -- why does that

11   matter?  What's -- what's the risk in

12   conducting those types of maneuvers?

13           A.    Blocking a vehicle in can lead

14   to damage to vehicles and injuries to those

15   in the vehicles.

16           Q.    And regarding other things

17   that -- do you agree the policy forbids

18   officers from pursuing vehicles the wrong way

19   on interstates or controlled access highways,

20   divided roadways, or one-way streets without

21   authorization from the officer in charge of

22   the pursuit?

23           A.    Yes, ma'am.

24           Q.    And that's also a mandatory rule

25   under the policy?

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes, ma'am.

 2              Q.    And why is that rule mandatory

 3    under the policy?

 4              A.    That -- when you go the wrong

 5    way or opposite the flow of traffic, it's

 6    obviously an increased risk for all vehicles

 7    that are there.  So that's why you need the

 8    permission from a -- the supervisor in charge

 9    of the pursuit.

10              Q.    And do all vehicles, again,

11    that's the officers involved in the pursuit,

12    civilian vehicles, and the subject of the

13    pursuit?

14              A.    Yes, ma'am.

15              Q.    Would that also include dangers

16    to bystanders as well as pedestrians?

17              A.    Yes, ma'am.

18              Q.    People on bikes?

19              A.    Yes, ma'am.

20              Q.    Okay.  Do you agree that the

21    policy also forbids officers from engaging in

22    pursuits in unmarked cars or wearing

23    plainclothes?

24              A.    Yes, ma'am.

25              Q.    And what's your understanding of
```

Deposition of Officer Mark Bode                         Jason Laible, et al., vs. Timothy Lanter, et al.,

1    why that -- is that a mandatory rule in the

2    policy?

3         A.    Yes, ma'am.

4         Q.    And what's your understanding of

5    why that's a mandatory rule?

6         A.    By definition alone, you have to

7    engage in an audible signal and an overhead

8    light, and you're not capable of doing that.

9    I don't think -- plainclothes cars you're not

10   equipped with what's required to engage in a

11   pursuit.

12        Q.    Okay.  And it also will increase

13   the danger of a scenario if the driver hasn't

14   identified themselves as law enforcement?

15        A.    Yes.  That's -- I don't know

16   how -- someone can't flee from someone if

17   there's no lights or sirens.

18        Q.    That's fair.  That's fair.  And

19   does, to your knowledge, the CPD policy

20   forbid officers from attempting to stop

21   vehicles while off duty unless it's a

22   life-threatening situation which could cause

23   serious physical harm to its victims?

24        A.    Yes, ma'am.

25        Q.    And does off duty mean being off

1    duty from CPD?

2             A.    Yes, ma'am, that's my

3    understanding.

4             Q.    Like not working a shift at the

5    time?

6             A.    Yes, ma'am.

7             Q.    And is that also a mandatory

8    rule under the policy?

9             A.    Yes, ma'am.

10            Q.    And why is that a mandatory rule

11   under the policy?

12            A.    That I -- there should be no --

13   like I said, unless it's something life

14   threatening for an off-duty officer to engage

15   in any sort of pursuit.

16            Q.    You said life threatening for

17   any officer to engage in any type of

18   pursuit --

19            A.    There should -- unless it grows

20   to the level of life threatening to someone,

21   there would -- should be no scenario where

22   the officer would be required to engage in

23   some sort of pursuit.

24            Q.    Okay.  And is that -- is your

25   understanding of life threatening, does that

1   mean like an imminent risk of harm to a

2   person's life or serious injury?

3        A.   Yes, ma'am.

4        Q.   Okay.  And is it accurate to

5   your understanding that CPD officers under

6   the pursuit policy are forbidden from

7   operating vehicles in emergency mode with

8   reckless disregard for the safety of other

9   citizens?

10        A.   Yes, ma'am.

11        Q.   What does that mean, "reckless

12   disregard for the safety of other citizens"?

13        A.   Driving in a manner in which --

14   like driving in a manner in which you're

15   putting your car, your vehicle, in a

16   situation that would bring harm to another.

17        Q.   And could that include driving

18   it in a way that causes other drivers to have

19   to react to you in a way that could cause an

20   injury or harm?

21        A.   That would be a factor, yes,

22   ma'am.

23        Q.   That -- and that requirement

24   that officers do not operate with reckless

25   disregard for the safety of other citizens,

Deposition of Officer Mark Bode                                   Jason Laible, et al., vs. Timothy Lanter, et al.,

1    is that a mandatory portion of the policy as

2    well?

3         A.    Yes, ma'am.

4         Q.    And is it true -- well, we

5    already went over that.

6               Under CPD pursuit policy and

7    procedures, do you agree that CPD officers

8    are required to maintain a vehicle speed

9    that's reasonable for the conditions?

10        A.    Yes, ma'am.

11        Q.    And what does that mean, the

12   speed is reasonable for the conditions?

13        A.    That you're maintaining

14   reasonable control of your vehicle.

15        Q.    Would that include operating at

16   a speed that allows you to respond to traffic

17   conditions on the road?

18        A.    Yes, ma'am.

19        Q.    And other drivers?

20        A.    Yes, ma'am.

21        Q.    And pedestrians as well?

22        A.    Yes, ma'am.

23        Q.    Is that -- is that also a

24   mandatory rule in the policy?

25        A.    I don't know.

1    Q.   Okay.  And is it accurate that

2  the CPD pursuit policy mandates that officers

3  do not exceed the speed limit by more than

4  20 miles per hour during a pursuit?

5    A.   I don't know.

6    Q.   And do you have any other

7  knowledge about what the CPD pursuit policy

8  requires as far as speed or controlling the

9  speed of a pursuit?

10    A.   No, ma'am.

11    Q.   Okay.  Why -- do you know why

12  officers are required when they're leaving

13  the initiating district of a pursuit to

14  switch to a radio channel in the district

15  where they enter?

16    A.   So the officers in the area of

17  the district that they're going into can hear

18  and be updated on the location of the

19  pursuit.  It gives them the ability to assist

20  in effecting the arrest.

21    Q.   And is it helpful to have

22  officers who are local to an area or more

23  familiar with an area to know about what's

24  happening in the pursuit that's entered their

25  district?

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1              MR. COWAN:  Objection.
2        A.    No, ma'am.
3        Q.    Okay.  Why are officers required
4    to ensure that their car DVRs and their
5    body-worn cameras are activated during --
6    operating in emergency mode or -- or a
7    pursuit?
8        A.    To be able to capture the entire
9    event for evidentiary purposes.
10       Q.    And as a plainclothes officer,
11   do you at any point wear a body camera?
12       A.    The -- are we talking 2020 or
13   2025?
14       Q.    Yeah.  Well, let's talk about
15   2020.
16       A.    I was not required to -- well,
17   neither 2020 or 2025 do I have to wear it
18   during the course of my day.
19       Q.    Uh-huh.
20       A.    If I am interacting with an
21   individual having a conversation, I would
22   wear it and activate it.  Now, driving around
23   the day-to-day basic shift in plainclothes, I
24   do not have one.
25       Q.    And what kind of criteria or
```

1    factors do you consider when you decide to

2    activate a body-worn camera?

3         A.    When I'm having a -- when I'm

4    engaged in any conversation with a citizen

5    that's not based -- that's not a consensual

6    encounter.

7         Q.    Okay.  So, for instance, when

8    you're doing an investigative stop?

9         A.    Yes.

10        Q.    Okay.  But not necessarily if

11   someone stops you to ask a question or ask

12   for help?

13        A.    Yes.  If I'm in plainclothes and

14   someone asked a general question, I would not

15   be required to activate a body camera.

16        Q.    And is that -- when did you

17   start wearing a body camera?

18        A.    I don't wear one like -- again,

19   I don't wear one on a regular basis.

20        Q.    Okay.  How do you decide when

21   you're gonna wear one or not?

22        A.    When I'm going to engage someone

23   in an encounter that's not consent in an

24   investigation or an interview.

25               Commonly just to get an

1    understanding of what I do, once they're in

2    custody, if I go up to talk to an individual

3    or something like that, I would then be

4    equipped with a body cam.

5         Q.    In 2020, were officers required

6    to wear or did they wear body cameras when

7    meeting with confidential informants or

8    sources in the case?

9         A.    No, ma'am.

10        Q.    No.  Okay.  And do you -- you

11   drive an unmarked car, correct?

12        A.    Yes, ma'am.

13        Q.    And you did in 2020 as well?

14        A.    Yes, ma'am.

15        Q.    Is that a personal vehicle?

16        A.    No, ma'am.

17        Q.    Okay.  And does that vehicle

18   have a dash cam in it?

19        A.    No, ma'am.

20        Q.    Okay.  Based on your

21   understanding of the CPD pursuit policy as we

22   have discussed it today, what does it mean

23   for a pursuit to be noncompliant?

24        A.    I'm not familiar with that term.

25        Q.    Okay.  Are you familiar with the

Deposition of Officer Mark Bode                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    idea of officer conduct being compliant with

2    policy or noncompliant with policy?

3          A.    Yes, ma'am.

4          Q.    Okay.  And to your

5    understanding, do you have an understanding

6    of what it means for an officer's conduct

7    during a pursuit to have been noncompliant,

8    just generally?

9          A.    That would be based on review by

10   supervision if they observe something that

11   went against the -- a policy and procedure

12   that we discussed through the prior

13   questions.

14         Q.    Okay.  And pursuit driving and

15   the permission of pursuit, are you familiar

16   with the instances in which pursuit driving

17   is permitted under a policy?

18         A.    Yes, ma'am.

19         Q.    Okay.  And what instances are

20   those -- or at least, actually, let me ask

21   you in 2020, what were the instances in which

22   a pursuit was permitted?

23         A.    I do not know --

24         Q.    Okay.

25         A.    -- in 2020.

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        Q.    Do you know if that has changed
 2   in the time from August 2020 to today?
 3        A.    Yes.
 4        Q.    Okay.  And do you know when
 5   those changes took place?
 6        A.    I do not.
 7        (Exhibit 1 was marked.)
 8   BY MS. SALLEY:
 9        Q.    And to your understanding -- I
10   think I'll actually -- this will be what
11   we'll mark as Plaintiffs' Exhibit 1.  I'll
12   share the copies.  The staple on this one is
13   not looking good.
14             I will give you this one, which
15   will be our official copy, and then I have
16   one other.
17             MS. GREENE:  We were gonna
18   e-mail them to you, but we can send a set
19   after if you want to take this.
20        Q.    And I'll identify the Bates as
21   well.  I've handed our witness the CPD Policy
22   12.535, Emergency Operation of Police
23   Vehicles and Pursuit Driving, which is --
24   this one is Bates stamped GB 26 through
25   GB 38.  There's like multiple identical
```

1   versions of this in the discovery, but this

2   is one version of it.

3                    Okay.  And if you could turn to

4   page 5 of this document, please.  Actually,

5   so before that, do you recognize the policy

6   in front of you?

7          A.    Yes, ma'am.

8          Q.    And is that the CPD pursuit

9   policy that was in place in 2020?

10         A.    I believe so.  It looks like

11  this one was revised in 2019, so that

12  probably would have been the most up-to-date.

13         Q.    And would it have been part of

14  your responsibility as an officer to be

15  familiar with this policy?

16         A.    Yes, ma'am.

17         Q.    At least insofar whether or not

18  you were applying it regularly in your work

19  might be a different question, but you're

20  familiar with it as far as it's a CPD policy?

21         A.    Yes, ma'am.

22         Q.    Okay.  And -- all right.  So on

23  page 5 there's a section -- Section D here.

24  Do you see that one --

25         A.    Yes, ma'am.

1     Q.    -- Pursuit Driving?  And we've

2     got -- I'm gonna read it aloud just for the

3     record, A motor vehicle pursuit is permitted

4     in the following instances:  A, On-sight

5     pursuit of a known or suspected felon; B,

6     On-sight pursuit of criminal misdemeanor

7     violations; C, There is reasonable suspicion

8     the occupants of a suspect vehicle have

9     committed a criminal misdemeanor offense --

10    and then I'll skip the example -- D, A

11    criminal warrant or capias is on file.

12              Proceeding to the next page,

13    there's also an E, just so you don't miss it,

14    When directed by a supervisor or by Emergency

15    Communications Center (ECC) at the direction

16    of a supervisor to assist in a police

17    pursuit.

18              Did I read those all correctly,

19    the main portions of each letter?

20         A.    Yes, ma'am.

21         Q.    And do all of these conditions

22    have to be present in order for a pursuit to

23    be permitted --

24         A.    No, ma'am.

25         Q.    -- at CPD?  Okay.  And can you

1  explain that?

2          A.    Any A, B, C, D, or E could be

3  present to engage in a pursuit at this time.

4          Q.    Okay.  In 1(a), The on-sight

5  pursuit of a known or suspected felon, how is

6  an officer to determine if a person is a

7  known or suspected felon?

8          A.    Either from personal knowledge

9  or from confirming through a -- the query

10  through the RCIC or NCIC database.

11          Q.    And when you say "personal

12  knowledge," what -- how would personal

13  knowledge --

14          A.    If you have arrested the

15  individual in the past and you knew him to be

16  a felon.

17          Q.    And B, On-sight pursuit of

18  criminal misdemeanor violations.  Similar

19  question, how does an officer make the

20  determination of whether or not there's been

21  a criminal misdemeanor violation?

22          A.    I can give an example.  If an

23  officer observes an assault, and then one --

24  the suspect of the assault would get in the

25  car and leave the area, and then you would be

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    behind the individual, you just saw the

2    misdemeanor/criminal action.

3         Q.    Okay.  So that entails actually

4    having witnessed the criminal action?

5         A.    That would be one scenario for

6    B, yes, ma'am.

7         Q.    Okay.  And can you think of any

8    other scenarios?

9         A.    Any -- so criminal means

10   non-traffic misdemeanor violation.  So

11   anything that the officer would observe

12   misdemeanor level criminal, not running of

13   the red light, that is described on-sight

14   that the officer witnessed.

15        Q.    So not -- that does not include

16   the observation of a traffic misdemeanor?

17        A.    Yes, ma'am.

18        Q.    Okay.  And B and C, I think you

19   just discussed that.  Okay.

20             And do you know why traffic

21   offenses are not a basis for pursuing a

22   vehicle pursuit?

23        A.    I do not know why administration

24   determined that traffic offenses were not

25   reasonable.

Deposition of Officer Mark Bode                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    Okay.  We'll turn to page 6 and
 2    Section 2, the Notification section.  Do you
 3    see that?
 4          A.    Yes, ma'am.
 5          Q.    And there are a variety of
 6    descriptive items that officers are -- A
 7    pursuing officer will immediately relay to
 8    the ECC.
 9                Do you, looking at this list,
10    understand that it's required for the
11    pursuing officer to relay that information?
12          A.    Yes, ma'am.
13          Q.    And why, these particular items
14    of information, do those need to be relayed?
15          A.    For other officers that are in
16    the area, location is very important,
17    description of the vehicle, license plate, so
18    they can ensure that that's the same vehicle
19    that is being pursued.
20                Reason for the pursuit, again,
21    always is going to be a factor, and then
22    speeds involved.
23          Q.    And why is car -- is car number
24    related to the police officer?
25          A.    Yes, that's the identifying
```

1  number that each officer has every day.

2  **Q.    Okay.  And is that printed**

3  **somewhere on the vehicle?**

4  A.    No, ma'am.  It's the one

5  assigned to -- so the vehicle does have a

6  number, but that's separate from this

7  procedure car number.

8  Normally a four-digit number

9  from the district and the shift and the

10  assignment that you're given.

11  **Q.    Do CPD officers have badge**

12  **numbers?**

13  A.    Yes, ma'am.

14  **Q.    Is that different -- is the car**

15  **number different than a badge number?**

16  A.    Yes, ma'am.

17  **Q.    Okay.  So the car itself has a**

18  **number?**

19  A.    They call that an equipment

20  number.

21  **Q.    Equipment number.  Thank you.**

22  **The officer has a badge number?**

23  A.    Yes, ma'am.

24  **Q.    And then there's a car number as**

25  **well?**

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        A.    So District 1, their car numbers

2    would start with 1.  If they're on dayshift,

3    they'd start with a 1.  The second shift

4    would start with a 2, and the area that

5    they're patrolling.  So Over-The-Rhine is

6    considered Beat 2.

7              So if you're on first shift in

8    District 1, 1-1-2-5, your car number would be

9    1125.  It represents the district, the shift,

10   and the area.  Specialized units have

11   specialized car numbers.

12       Q.    And could that number change on

13   a day-to-day basis?

14       A.    Yes, ma'am.

15       Q.    Okay.  So it would be a number

16   that comes up per shift?

17       A.    Yes, ma'am.

18       Q.    Okay.  And as far as location

19   and direction, is the pursuing officer

20   required to relay, like, their current

21   location, where they're headed?

22       A.    Yes, ma'am.

23       Q.    And if the direction changes at

24   any point, they're also meant to relay that?

25       A.    Yes, ma'am.

1      Q.    And the description of, for

2   instance, occupants -- I think vehicle and

3   license number speak for themselves.  You can

4   have a physical description of those things,

5   right?

6      A.    Yes, ma'am.

7      Q.    And then occupants as far as

8   what you can observe or what you -- who you

9   know to be in the vehicle, you describe that?

10     A.    How many and any description you

11  might have or what they would be wearing or

12  what they looked like.

13     Q.    Okay.  And is that partially so

14  that you can -- other officers can match a

15  moving vehicle to the occupants inside that

16  have been described as the subjects of the

17  pursuit?

18     A.    Yes.  And you also want to

19  identify as much as you can of the occupants

20  in case it turns into where they're now

21  fleeing on foot that you know what the

22  description of the occupants were.

23     Q.    Okay.  That was my next

24  question.  You read my mind.

25           And then reason for pursuit,

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    what kind of details should be included in

2    that description?

3           A.    Generally, the exact reason a

4    subject is wanted for open warrants, subject

5    is wanted for burglary.  It's just so the

6    officers have an understanding as much as the

7    pursuit driver is the reason for the pursuit.

8           Q.    Okay.  And then why is it

9    important to report speeds involved in a

10   pursuit?

11          A.    Speeds are always a big factor

12   obviously in pursuits.  If you're trying to

13   get to the area and the cars are traveling at

14   20 miles an hour and you know how much time

15   you have to get there --

16          Q.    Uh-huh.

17          A.    -- or if the cars are traveling

18   at 50, you may take a different direction to

19   try to assist with the pursuit.  And all that

20   could be based on how fast the pursuit is

21   moving.

22          Q.    And does that also provide other

23   individuals receiving the information to

24   determine the level of possible risk or

25   danger of the pursuit?

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes, ma'am.

 2              Q.    And, for instance, if there's

 3    high-speed involvement, other officers would

 4    want to know that to be able to assess the

 5    risks involved?

 6              A.    Yes, ma'am.

 7              Q.    And as far as -- I know that

 8    we've talked about your training and it's

 9    been a while, but in your training, did you

10    cover how to make these notifications

11    specific to that Section 2?

12              A.    You just broadcast it on the

13    radio.

14              Q.    Okay.  And regarding the next

15    section, Section 3, that section, if you're

16    following me, says that the dispatcher will

17    immediately notify the initiating pursuit

18    unit's supervisor.

19                    So the person who has provided

20    the notifications in Section 2(a), is that

21    the person initiating the pursuit?

22              A.    Yes, ma'am.

23              Q.    And the dispatcher then notifies

24    that person's supervisor?

25              A.    A supervisor on that channel
```

1    that is being broadcast, yes, ma'am.

2        Q.    Okay.  And -- so it's not

3    necessarily a chain of command?  Tell me if

4    I'm wrong.  That could be.

5        A.    Well, any supervisor would be in

6    that officer's chain of command whether any

7    sergeant on -- on the department would still

8    have supervision over me whether it would be

9    my director and direct supervisor.

10        Q.    I see.  Okay.  And how does the

11    dispatcher identify who the supervisor is; do

12    you know?

13        A.    Normally a supervisor

14    self-initiates that.

15        Q.    Okay.

16        A.    And states that he or she will

17    be the pursuit OIC.

18        Q.    Okay.  And then that person

19    becomes the OIC and is responsible for

20    directing a pursuit until it ends?

21        A.    Yes, absolutely.

22        Q.    And there's -- the subsection

23    here, unit supervisor -- mentions unit

24    supervisors and district supervisors.  Can

25    you describe to me what the difference is

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    between those two titles?

2            A.    So a specialized unit would not

3    be considered part of the normal district

4    patrol.  So a specialized unit would have

5    their own supervisor.

6            It wouldn't fall to the

7    responsibilities of a supervisor who's

8    managing patrol officers in the same area.

9        Q.    Okay.  So, for instance, a unit

10   supervisor for you, would that have been

11   Davis?

12           A.    Yes, ma'am.

13       Q.    Okay.  And then depending on

14   where in the city you're operating, there's

15   also a district that's a fixed area --

16           A.    Yes, ma'am.

17       Q.    -- right?  And is there a

18   district for residents in that district, that

19   fixed area?

20           A.    There would be multiple

21   sergeants and probably a lieutenant.  So the

22   unit supervisor should be responsible for

23   being the pursuit OIC.  And if one is not

24   available, then the district supervisor would

25   become the pursuit OIC.

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1         Q.    Okay.  And then skipping down to
2    that 3, Section 3, letter E --
3         A.    Yes.
4         Q.    -- where it notes that ECC will
5    broadcast the pursuit on all available
6    channels.  Do you know why that's done?
7         A.    To give as many people -- to
8    update as many people as possible that could
9    assist in it.
10        Q.    And forgive me for this simple
11   question, but does that mean that persons
12   listening can also interact with the channel,
13   or does it just mean to broadcast it?
14        A.    So that last thing, ACB, that's
15   in parentheses on E --
16        Q.    Uh-huh.
17        A.    -- stands for All-County
18   Broadcast.  So when that's done, all --
19   communication on all the radios through
20   Hamilton County, that would interrupt that,
21   that broadcast would go across all units.
22              The only ones that would be able
23   to interact and actually speak on the radio
24   channel would be those that were tuned to
25   that specific, as I've described earlier,
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    like a tactical channel or patrol channel.
 2            Q.    I see.  And then in Section F
 3    also calls for the ECC supervisor will
 4    provide the necessary support during the
 5    pursuit.
 6                  Do you have an understanding of
 7    what that means, what the role of the ECC
 8    supervisor is?
 9            A.    No.
10            Q.    Okay.  And in Section 4
11    following that, Supervisor Responsibilities,
12    Section A requires that the pursuit OIC will
13    retain control and continually monitor and
14    assess the situation.  How does the OIC do
15    that to your knowledge?
16            A.    By listening to -- if you go
17    back up to 2, everything that the pursuit --
18    the officer engaged in the pursuit, all the
19    information that he's putting out plus,
20    obviously, the supervisor can gauge time of
21    day, weather, and then that compiled with
22    what speeds, reason.
23                  So all that broad picture would
24    be the determination of the supervisor at
25    that point in time whether to continue.
```

Deposition of Officer Mark Bode                           Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    And is the pursuit OIC going to
2   be that someone who's in some capacity a
3   Cincinnati Police Department supervisor
4   whether that's district or a unit?
5        A.    It definitely has to be a
6   supervisor, yes, ma'am.
7        Q.    Okay.  And then that person, the
8   OIC, can also determine which units are
9   taking place in the pursuit?
10       A.    Yes.
11       Q.    And --
12       A.    And they can --
13       Q.    Go ahead.  Sorry.
14       A.    They can authorize additional
15  units.  It says, Reassign primary or
16  secondary units, set posts.  They can ask for
17  canine to respond, any other resources they
18  may feel would be useful.
19       Q.    Does that include things like
20  setting up stop sticks?
21       A.    Yes.
22       Q.    And what's a roadblock?
23       A.    I have never seen one in my
24  25 years, but it's just when you literally
25  would block the road.

1    Q.    Okay.  Like with vehicles or
2    some other --
3         A.    I've never seen it, so I --
4         Q.    Okay.
5         A.    As I read it, I would assume
6    with vehicles, but it's never been applied in
7    my 25 years that I'm aware of.
8         Q.    Okay.  And as far as final
9    decisions about -- Final decisions will rest
10   with the pursuit OIC.  What decisions does
11   that entail or include?
12        A.    To continue or terminate the
13   pursuit.
14        Q.    And how does that work?  How
15   does that decision get made?
16        A.    Case-by-case basis depending on
17   how each supervisor risks -- weighs the risk
18   levels of each pursuit.
19        Q.    And to your understanding, does
20   the policy forbid the primary unit in the
21   pursuit from also acting as the OIC?
22        A.    I do not know.
23        Q.    Okay.  And the policy in here
24   references a Form 34 in that last paragraph
25   on this page.  Have you ever seen a Form 34

Deposition of Officer Mark Bode                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    or filled one out?

2          A.    No, ma'am.

3          Q.    Okay.

4          A.    I may have seen one, but I'm not

5    familiar with it because, again, it's a

6    supervisory responsibility.

7          Q.    Okay.  We're gonna continue to

8    page 7, and I'm looking at Section 5 here.

9          A.    Yes.

10          Q.    Five(a) regards the -- it says,

11    Unless authorized by the pursuit OIC, no more

12    than two police vehicles will become actively

13    involved in the pursuit.  Did I read that

14    correctly?

15          A.    Yes, ma'am.

16          Q.    And is that a mandatory part of

17    the pursuit policy?

18          A.    Yes, ma'am.

19          Q.    And does this mean that no

20    individual other than the OIC has the

21    discretion to add or take away other units

22    from the pursuit?

23          A.    No one else can add additional

24    units except for the OIC.

25          Q.    Okay.  And why, to your

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    understanding, is that the case?

2         A.    Again, I don't want to guess at

3    why administration implemented the policies

4    that they have.

5         Q.    Okay.  And the 5(b) here --

6    well, first for the primary unit.  It says,

7    The primary unit will:  1, Be responsible for

8    keeping the suspect's vehicle in sight.  Do

9    you see that?

10        A.    Yes, ma'am.

11        Q.    And does that require keeping up

12   with the fleeing vehicle or following it in

13   order that you can record the location of the

14   vehicle?

15        A.    Yes, ma'am.

16        Q.    And 2 there, advising whether or

17   not more than two police units are needed for

18   the pursuit.  Do you know based on training

19   or experience how that determination would

20   get made?

21        A.    Absolutely.  If the primary unit

22   and the secondary unit are both individual

23   officers and there's four or five -- three,

24   four, five, six individuals in the suspect

25   vehicle, you would commonly request

1     additional cars.

2                    So you had at least as many

3     officers engaged in the pursuit as suspects

4     in the vehicle.

5          **Q.    Okay.  And does that dynamic**

6     **change the number of the suspect ratio to**

7     **officer radio if there's a canine involved?**

8          A.    It could.  And that's just one

9     scenario as to why one might ask for two or

10    more units.

11         **Q.    Okay.  And then the primary unit**

12    **will, B(3), Have the authority to terminate**

13    **the pursuit should conditions warrant.**

14                    **Based on your training and**

15    **experience, what type of conditions warrant**

16    **termination of a pursuit?**

17         A.    Where the officer determines

18    that the suspect's out of sight, the

19    conditions are too poor, all the factors that

20    we discussed earlier that they have

21    determined at that point in time that the

22    conditions are too poor for the pursuit or

23    the risks are too high for the pursuit to

24    continue.

25         **Q.    And that's based on the**

Deposition of Officer Mark Bode                                     Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        conditions that are required to consider

 2        based on this policy?

 3             A.    Yes, ma'am.

 4             Q.    And regarding Termination of the

 5        Pursuit, Section E that follows there, this

 6        section, to your understanding, does it

 7        indicate the circumstances under which

 8        officers are required to terminate pursuits

 9        if any of these conditions exist?

10             A.    Under which section?

11             Q.    Section E.

12             A.    Okay.  I'm sorry.  I'm gonna --

13        I'm gonna read it.

14             Q.    Sure.

15             A.    Okay.  Can you repeat the

16        question?  I'm sorry.

17             Q.    Okay.  Yes.  You understand this

18        section to refer to circumstances under which

19        officers were required by the policy to

20        terminate pursuits?

21             A.    Yes, ma'am.

22             Q.    And that's if any of these

23        conditions exist, and that's A through D?

24             A.    Yes, ma'am.

25             Q.    And that includes in Section A,
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      The pursuit OIC, or the primary unit,

 2      determines the level of danger created by the

 3      pursuit outweighs the necessity for immediate

 4      apprehension.

 5              And is that based on the

 6      consideration of the factors that we

 7      identified previously to assess the risk of a

 8      pursuit?

 9          A.    Yes, ma'am.

10          Q.    And the policy factors that are

11      required for an officer to consider in their

12      determination about whether to continue a

13      pursuit?

14          A.    Yes, ma'am.

15          Q.    And B of this E, B, E-1(b), is

16      that Establishment of the suspect's identity

17      allowing for apprehension at a later time and

18      there is no longer a need for immediate

19      apprehension.

20              The no longer a need for

21      immediate apprehension, what does that mean

22      to your understanding?

23          A.    The severity of what the

24      individual would be wanted for, you would

25      have to weigh that if you have the suspect
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    identified.

2         Q.    And is there an element of --

3    for instance, if an officer has knowledge

4    that a person may be on their way with intent

5    to commit a violent crime, like from A to B,

6    is that a situation where there might be a

7    need for immediate apprehension?

8         A.    Yes, ma'am.

9         Q.    Knowledge that a person is a

10   wanted felon, is that alone enough for the

11   need for immediate apprehension?

12        A.    Just the fact that they have a

13   felony record; is that your question?

14        Q.    Yes.

15        A.    No, ma'am.

16        Q.    Okay.  And if you can move past

17   that to section -- if you go to page 8 of the

18   policy.

19        A.    Yes, ma'am.

20        Q.    In Section F-1, this section

21   refers to when police officers do have the

22   authority to pursue outside of their

23   jurisdiction and arrest without a warrant

24   provided.

25             Section B here is that the

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1           pursuit takes place without unreasonable

2           delay after the offense.  What offense does

3           that refer to here?

4                   A.    In which section?

5                   Q.    In Section F(b) -- F-1(b).

6                   A.    F-1(b), The pursuit takes place

7           without unreasonable delay after the offense?

8                   Q.    Yes.  And to what offense is

9           that referring, is it one that has been

10          witnessed, or one for which a warrant is out?

11                  A.    Well, I think the offense itself

12          is defined in D where it's a felony or a

13          first- or second-degree misdemeanor would be

14          my understanding on that procedure.

15                  Q.    Where -- which D?  Oh, I see.

16                  A.    Just two -- two down from B.  It

17          says, Without unreasonable delay after the

18          offense, and then they define offense in D.

19                  Q.    Okay.  So to your understanding

20          that -- the Section D of -- F-1(d) refers

21          back to F-1(b)?

22                  A.    Yes, F-1(d) is my understanding

23          is defining the word offense in B.

24                  Q.    Okay.  And to your

25          understanding, what is an unreasonable delay?

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        Can you define that?
 2               A.     No, ma'am.
 3               Q.     Do you recall having any
 4        training on what that terminology means?
 5               A.     No, ma'am.
 6               Q.     Okay.  And in Section 2 --
 7        Sorry, F-1(2) right underneath that, If the
 8        above criteria are not met, the officers
 9        cannot pursue and cannot arrest outside their
10        jurisdiction.  Do you see that section?
11               A.     Yes, ma'am.
12               Q.     And does that mean all the
13        circumstances of F-1(a) through (d) have to
14        be present in order for an officer to pursue
15        an arrest outside of jurisdiction?
16               A.     Yes, ma'am.
17               Q.     Following that under F-1 --
18        sorry, F-3, this section refers to the fact
19        that it can be a felony to flee or elude a
20        police officer, but if this is the only
21        felony charge, fresh pursuit will terminate
22        at the county line.  Do you see that?
23               A.     Yes, Fresh pursuit of a criminal
24        misdemeanor violator will terminate at the
25        Hamilton County line.
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              Q.    I see.  Thank you.  That's
 2     important context.
 3                    So is it your understanding does
 4     that mean that fleeing itself is not the
 5     basis of -- cannot be the felony basis for
 6     pursuing outside the county lines?
 7              A.    Correct.  Felony to flee and
 8     eluding cannot be the underlying felony.
 9              Q.    And do you know why that is?
10              A.    I do not.
11              Q.    Okay.  In F-4 --
12              A.    Yes.
13              Q.    -- Officers may pursue felony
14     suspects beyond state boundaries.  However,
15     the new jurisdiction will continue the
16     pursuit as the primary unit (if available).
17                    In reference to that sentence,
18     how does the -- how do officers participating
19     in a pursuit find out if the new jurisdiction
20     has taken over as a primary, or will take
21     over as a primary?
22              A.    So communications tries to make
23     whatever jurisdiction the pursuit may be
24     headed to aware.
25                    And then when the uniformed
```

Deposition of Officer Mark Bode                                  Jason Laible, et al., vs. Timothy Lanter, et al.,

1    vehicle from the new jurisdiction gets behind

2    the vehicle or in front of the primary, they

3    have now taken the lead or control of the

4    pursuit.

5         Q.    Okay.  So if you turn to

6    page 9 --

7         A.    Yes.

8         Q.    -- the section on Roadblocks.

9         A.    Yes.

10        Q.    And you mentioned it was rare.

11   This portion of the policy says, Under normal

12   circumstances, officers will not set up

13   roadblocks to stop fleeing vehicles.

14             Then it says, The pursuit OIC

15   may grant permission for a roadblock if he

16   has knowledge the suspect has committed --

17   and then A through F, a series of crimes

18   including murder or aggravated murder,

19   aggravated arson, aggravated robbery,

20   aggravated burglary, rape, or complicity with

21   any of those crimes.  Is that correct to your

22   understanding?

23        A.    Yes, ma'am.

24        Q.    Why is that -- why is the tactic

25   of roadblocking limited to these crimes?

```
 1          A.    Those are some of the most

 2   severe crimes that we have.  And, again, just

 3   to be clear, it's not that it has been rare,

 4   I have never seen a roadblock used.

 5          Q.    Okay.  You've never seen it

 6   used.  Have you heard about it being used by

 7   CPD?

 8          A.    No, ma'am.

 9          Q.    Okay.  And do you know why it

10   under normal circumstances is not a tactic to

11   be used?

12          A.    Your -- again, my understanding

13   of the term roadblock is placing vehicles in

14   the way of a fleeing vehicle to try to

15   prevent them from going in the direction

16   they're going.

17                So, obviously, that's a very

18   dangerous scenario when you're asking

19   officers to put themselves in vehicles in the

20   immediate path of a fleeing felon.

21          Q.    And high risk of traffic crash

22   or other like --

23          A.    I would say an imminent risk of

24   a traffic crash.

25          Q.    Basically a requirement that
```

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          you're either the person slamming on their
 2          brakes and stops or there's gonna be an
 3          impact of some sort?
 4                  A.    Yes, ma'am.
 5                  Q.    Okay.  And that includes damage
 6          to the equipment in the cars, but also
 7          possibly a considerable risk of serious
 8          injury or death to people in the cars?
 9                  A.    Yes, ma'am.
10                  Q.    And could that -- is it fair to
11          say that in the scenarios that we talked
12          about and the different tactics that are
13          available to use by CPD officers, that any
14          scenario that presents an imminent risk of
15          bodily harm or death is one that would be
16          disfavored or avoided?
17                        MR. COWAN:  Objection.
18                  A.    Yes.
19                  Q.    And that includes possibly, like
20          you described, roadblocks?
21                  A.    Yes, ma'am.
22                  Q.    Okay.  And is it true that the
23          use of stop sticks can also result in, if the
24          person loses control of a vehicle, serious
25          physical injury or death?
```

Deposition of Officer Mark Bode                                  Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            A.    Yes, that's -- that is a factor.
 2      It's possible.
 3            Q.    And that is a consideration as
 4      far as the risk of the person losing control
 5      of their vehicle; is that fair?
 6            A.    Yes, ma'am.
 7            Q.    And as -- in your capacity, you
 8      know --
 9                  THE COURT REPORTER:  Sorry.  I'm
10      losing you.
11                  MS. SALLEY:  Oh, sure.
12      BY MS. SALLEY:
13            Q.    And in your capacity as a police
14      officer, did you have the ability or have you
15      had the ability to make the decision yourself
16      about whether or not to employ stop sticks?
17            A.    Yes, ma'am.
18            Q.    Okay.  And is that within your,
19      like, authority to do as an officer in
20      certain circumstances?
21            A.    Yes, ma'am.
22            Q.    Okay.  Do you ever need to seek
23      supervisory authority to use stop sticks?
24            A.    No, ma'am.
25            Q.    Okay.  You can set aside the
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    policy for now.

 2            A.    Okay.

 3                  MS. SALLEY:  Can we take another

 4    five minutes so I can drink some water?

 5                  MR. COWAN:  That's fine.  We

 6    have lunch out there if we want to stop for

 7    lunch, but it's up to you.  I wouldn't mind

 8    taking a break.

 9                  MS. SALLEY:  Yeah, let's go off

10    the record.

11                  MR. COWAN:  Yeah.

12       (Off the record.)

13    BY MS. SALLEY:

14            Q.    All right.  So when we first

15    started, I asked you, Officer Bode, about

16    whether you had memory of the events on

17    August 7th, 2020.  You said you did, right?

18            A.    Yes.

19            Q.    And how did your -- well, at

20    that time in 2020, were you -- you were

21    working the normal, like, Monday through

22    Friday shifts?

23            A.    Yes, ma'am.

24            Q.    And were you plainclothes on

25    August 7th, 2020?

Deposition of Officer Mark Bode                                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1           A.     Yes, ma'am.

2           Q.     And in an unmarked car?

3           A.     Yes, ma'am.

4           Q.     And how did your shift start on

5    August 7th of 2020?

6           A.     It started at nine o'clock in

7    the morning, and I was following up on an

8    investigation non-related to any of this from

9    the day prior.

10          Q.     Okay.  And did the investigation

11   from the day prior involve a vehicle pursuit?

12          A.     No.

13          Q.     Okay.  Did it involve

14   observation and investigation of a suspect?

15          A.     It was a followup from a search

16   warrant.

17          Q.     Okay.  And your -- did you have

18   any plans for the day, aside from starting

19   the day, following up on this -- the person

20   from the previous day?

21          A.     No, ma'am.

22          Q.     And eventually on that day,

23   August 7th, you came to be involved in some

24   duties, like Gang Unit duties related to

25   Mason Meyer, right?
```

 1          A.    Yes, ma'am.

 2          Q.    Okay.  And at some point, you

 3    learned during that day that the CPD

 4    Gang Unit was going to assist the ATF with

 5    the Mason Meyer investigation?

 6          A.    Yes, ma'am.

 7          Q.    And was there -- was that for a

 8    search for Mason Meyer?

 9          A.    Yes, ma'am.

10          Q.    And was the Gang Unit hoping to

11    locate and search and possibly arrest

12    Mason Meyer?

13          A.    My understanding, it was just to

14    locate and arrest Mr. Meyer.

15          Q.    And at that point, did you go

16    into that day knowing that he had outstanding

17    warrants?

18          A.    Not in the morning.

19          Q.    Okay.  So when you came in that

20    day, did you have -- was Davis your

21    supervisor --

22          A.    Yes, ma'am.

23          Q.    -- in your chain of command?

24    Okay.  And you said, yes?  Sorry.  I talked

25    over you.

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes, ma'am.

 2              Q.    Okay.  And was anyone else that

 3     day, any other CPD employee giving you

 4     directive or instructions about what to do

 5     that day?

 6              A.    No, ma'am.

 7              Q.    Okay.  And how did you -- well,

 8     had you heard of Mason Meyer before

 9     August 7th of 2020?

10              A.    Just the day before.

11              Q.    Just the day before.  Okay.  So

12     on August 6th of 2020, what did you learn on

13     August 6th of 2020?

14              A.    That there was an investigation

15     with ATF where they were trying to locate and

16     apprehend Mr. Meyer.

17              Q.    And was that ATF in conjunction

18     with other law enforcement agencies?

19              A.    As far as my understanding, it

20     was just CPD and ATF.

21              Q.    Okay.  Did you -- on August 6th

22     of 2020, did you learn about the involvement

23     of any other law enforcement agencies in

24     Northern Kentucky?

25              A.    No, ma'am.
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Okay.  And on August 6th of

2  2020, who did you -- was there -- did you

3  have a contact within CPD that you learned

4  about this investigation from?

5      A.    No, ma'am.

6      Q.    Okay.  Who did you learn about

7  the investigation from?

8      A.    The tactical channel.  We were

9  sharing the same channel, so I heard them

10  operating and searching for him while we were

11  conducting an independent investigation.

12      Q.    And do you know which -- did you

13  identify any individuals or officers who were

14  on that channel sharing that information?

15      A.    On the day prior?

16      Q.    Yes, on August 6th.

17      A.    I don't recall who was speaking

18  on the radio about Mr. Meyer on the 6th.

19      Q.    Okay.  And what did you learn

20  from those transmissions on the 6th?

21      A.    That they were unable to locate

22  or apprehend him on that specific day.

23      Q.    Okay.  And do you know who it

24  was that was on that channel that day, on the

25  6th?

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.     Specifically officers' names,
 2       no, ma'am.
 3              Q.     Okay.  And which agencies did
 4       you know to be on the channel?  Could you
 5       identify what agencies people were from?
 6              A.     Cincinnati Police Department and
 7       ATF.
 8              Q.     Okay.  Just those two?
 9              A.     Yes, ma'am.
10              Q.     Okay.  And how did it -- had
11       the -- strike that.
12                     Did the Gang Unit, even if not
13       yourself personally, have involvement in the
14       investigation on August 6th to your
15       knowledge?
16              A.     I don't know.
17              Q.     Okay.  Do you know of any other
18       individuals in the Gang Unit who were part of
19       providing support to the CPD's part, whatever
20       part it played, in the investigation of
21       Mason Meyer?
22                     MR. COWAN:  Objection.
23              A.     No.
24              Q.     Did you say no?
25              A.     No, ma'am.
```

1    Q.    Okay.  And in regard to the --

2    were there other units that you know of

3    within CPD that were -- that you learned were

4    involved on August 6th?

5        A.    Just CPD and ATF.

6        Q.    And within CPD, any particular

7    specialized units?

8        A.    Gang Unit and Gun Task Force.

9        Q.    Okay.  And on -- what types of

10    activities or actions did you learn that CPD

11    officers or supervisor officers took on

12    August 6th of 2020?

13        A.    Just surveillance.

14        Q.    Okay.  A surveillance of

15    Mason Meyer?

16        A.    Trying to locate Mason Meyer

17    based on phone pings.  They were surveilling

18    areas related to phone pings.

19        Q.    Okay.  And that's like a

20    geolocation based on a number that's attached

21    to Mason Meyer so that you can locate where

22    he is physically?

23        A.    Correct.

24        Q.    And was that being conducted by

25    the Gun Crime Task Force or somebody in the

1       Gang Unit?

2              A.    I don't know who was receiving

3       the pings.  I do not.

4              Q.    Okay.  And were you aware of

5       any -- on August 6th of 2020, any CPD officer

6       Gang Unit member or Gun Crime Task Force

7       member that actually was conducting the

8       surveillance based on the pings of

9       Mason Meyer's phone?

10             A.    I do not know the specific

11      officers.

12             Q.    Okay.  And did you respond

13      physically to any location involving the

14      Mason Meyer investigation on the 6th?

15             A.    No.

16             Q.    Okay.  And was the first time

17      that you responded in regard to the

18      Mason Meyer investigation on August 7th?

19             A.    Yes, ma'am.

20             Q.    When -- did you have any

21      understanding that there had been attempts to

22      arrest Mason Meyer on the 6th?

23             A.    No, ma'am.

24             Q.    Okay.  And when you came in on

25      the --

1       A.    Well, I guess, let me clarify.

2       Q.    **Sure.  Go ahead.**

3       A.    They were attempting to arrest

4   him on the 6th.  They never physically saw

5   Mr. Meyer on the 6th.

6       Q.    **Okay.**

7       A.    So I believe the surveillance

8   would be classified as an attempt to arrest.

9       Q.    **And do you know at which**

10  **location or locations they were tracking him**

11  **on the 6th?**

12      A.    No, ma'am.

13      Q.    **Okay.  And is that -- did you**

14  **have any other knowledge about Mason Meyer**

15  **gained on the 6th?**

16      A.    No, ma'am.

17      Q.    **Okay.  And then coming into your**

18  **shift on the 7th, how did you learn there**

19  **were continued attempts to investigate**

20  **Mason Meyer?**

21      A.    Through communication on the

22  shared radio channel.

23      Q.    **And on the 7th, could you**

24  **identify which officers were communicating on**

25  **the channel information about Mason Meyer?**

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Yes, Officer Chris Vogelpohl.

2          **Q.    And is he a CPD officer?**

3          A.    He's a CPD task force officer

4    assigned to ATF.

5          **Q.    Any other officers that you**

6    **could recognize on the shared channel?**

7          A.    I'm gonna butcher his last name,

8    ATF Frank Occhipinti.

9          **Q.    Occhipinti possibly?**

10         A.    Yes.  Occhi -- yes.

11         **Q.    It's like, O-C-C-H-I-P-I-N-T-I,**

12   **I want to say.  It's in the documents, but I**

13   **think that's correct.**

14              **And to your understanding,**

15   **who -- which agency is Occhipinti with?**

16         A.    ATF.

17         **Q.    And what did you learn from**

18   **transmissions on the shared channel on the**

19   **7th before you actually took any action to**

20   **become involved with the investigation?**

21         A.    Right before I became involved

22   in the investigation, I was dropping my

23   partner off at our office, he was securing

24   for the day.

25              And they were -- there was

```
 1    discussion on the channel that they had

 2    observed Mason Meyer on Steiner with several

 3    other individuals in front and in and out of

 4    an address.  And I do not remember the

 5    address on Steiner.

 6         Q.    And where was it that your

 7    partner was working?  You said he was at

 8    the --

 9         A.    I was dropping him off.  He was

10    going in for the day.

11         Q.    Oh, okay.  Okay.  And when you

12    said -- you said you were dropping him off at

13    the office?

14         A.    At our office.

15         Q.    And where's that located?

16         A.    32 -- at the time, 3201 Warsaw

17    Avenue.

18         Q.    Okay.  And that's in Price Hill?

19         A.    Yes, ma'am.

20         Q.    And you were taking your partner

21    home at the time you heard those

22    transmissions?

23         A.    Dropping him off at the office

24    so he could go home.

25         Q.    Oh, I see.  So he could -- like,
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          was his car parked at the office?

2                    A.     Yes.

3                    Q.     Okay.  I gotcha.  Okay.  And did

4          you then look up the location of the Steiner

5          Avenue address?

6                    A.     I was familiar with the area.

7                    Q.     Okay.  And had you been on

8          Steiner Avenue before?

9                    A.     In relation to this

10         investigation --

11                   Q.     At all, yeah.

12                   A.     -- or ever?  Yes, but not in

13         relation to this investigation.

14                   Q.     Okay.  So you had not done any

15         observation of the address at Steiner Avenue?

16                   A.     Correct.

17                   Q.     Okay.  And Steiner Avenue, if

18         I'm -- tell me if I'm describing this

19         correctly, it's off of River Road.  River

20         Road is a pretty main busy artery?

21                   A.     Yes, ma'am.

22                   Q.     And Steiner itself is a

23         residential street that's kind of a short,

24         straight residential street that comes off of

25         River Road?

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Yes, a new outlet.

2          Q.    **New outlet, right.  And it's**

3  **kind of a mixture of some residential**

4  **housing, some empty lots, some wooded areas;**

5  **is that fair?**

6          A.    Yes, ma'am.

7          Q.    **Okay.  So you heard about the**

8  **address there.  Did you learn anything else**

9  **about Mason Meyer from transmissions?**

10         A.    Yes, that he was armed with a

11  rifle that was located inside a case of some

12  sort.

13         Q.    **Okay.  And did you hear anything**

14  **else about Mason Meyer's suspected activity**

15  **at that Steiner Avenue address?**

16         A.    They described the activity of

17  Mr. Meyer coming in and out of that house,

18  bringing the rifle out of the house and

19  showing it to other individuals.

20         Q.    **And at any point -- to that**

21  **point in the day when you were hearing these**

22  **transmissions, did you communicate with**

23  **anyone else in the Gang Unit or in the Gun**

24  **Crime Task Force about Mason Meyer or that**

25  **investigation?**

1          A.    No, ma'am.

2          Q.    And did you have any

3    communications other than by -- other than by

4    the radio channel that you've described, were

5    you in contact with any other CPD officers by

6    phone, text, about the investigation?

7          A.    No, ma'am.

8          Q.    Okay.  And to your knowledge at

9    the time you were learning these things on

10   the radio channel, did other -- did it become

11   apparent to you that other agencies were

12   involved besides the ATF and the Cincinnati

13   police?

14         A.    No, that was my understanding of

15   who was involved.

16         Q.    And did you at any point review

17   any documentation or written information

18   about the investigation of Mason Meyer?

19         A.    No.

20         Q.    Okay.  And is that true up until

21   the point that you became involved with the

22   investigation that you hadn't reviewed any

23   documentation?

24         A.    Correct.  Yes, ma'am.

25         Q.    Okay.  So everything you learned

```
 1    was verbal?

 2         A.    Yeah, over the shared radio

 3    channel.

 4         Q.    Okay.  Okay.  And you said that

 5    on the 6th there had been an attempt to

 6    arrest Mason Meyer, but he never -- they

 7    never physically saw him, correct?

 8         A.    That is my understanding, yes,

 9    ma'am.

10         Q.    And was it your understanding

11    that there would be a continued attempt at

12    least to arrest Mason Meyer on the 7th?

13         A.    Yes.

14         Q.    Okay.  And was that because

15    another address had been identified where he

16    might be present?

17         A.    They were just continuing the

18    investigation and continued to follow the

19    phone pings until they could find an

20    opportunity to apprehend him.

21         Q.    And as far as you observed from

22    the radio transmissions that you heard, was

23    there a definite plan in place up until the

24    point that you joined to arrest Mason Meyer

25    regardless -- no matter what on August 7th?
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    MR. COWAN:  Objection.

 2           A.    No.

 3           Q.    And was there a discussion of

 4      possible contingency plans or different

 5      possibilities for arresting Mason Meyer?

 6           A.    Yes, ma'am.

 7           Q.    Okay.  And do you recall what

 8      those were?

 9           A.    The talks on the radio were to

10      try to formulate a plan to arrest him on

11      Steiner.  There was another individual out on

12      the street who was walking openly with a

13      firearm, a pistol with an extended magazine.

14                So they knew there was at least

15      two people armed.  And I know they had

16      requested some canine respond to the area.

17      There was nothing -- no plan was concrete

18      before Mr. Meyer got into the vehicle and

19      exited.

20           Q.    And by that, you mean exited the

21      house on Steiner Avenue to get into the

22      vehicle?

23           A.    Yes, ma'am.

24           Q.    And the person walking with a

25      pistol, did you gather from what you heard on
```

1  the radio that that person was somehow

2  associated with Mason Meyer?

3       A.    He seemed to be a part of the

4  group that Mr. Meyer was interacting with

5  when he would come out of the house, yes,

6  ma'am.

7       Q.    Okay.  And when you refer to

8  this discussion going back and forth on the

9  radio or this description of these events,

10 could you identify CPD officers partaking in

11 this discussion?

12      A.    The officer that was giving the

13 eyes-on accounts of what was happening on

14 Steiner and at the address was

15 Officer Chris Vogelpohl.

16      Q.    And when you said there was a

17 request for a canine response, those are CPD

18 canine units?

19      A.    Yes, ma'am.

20      Q.    Okay.  And, again, forgive me

21 for the simpleton question, but does one

22 reference a canine -- like an officer with a

23 canine as a canine unit, just the one person,

24 or is there a unit --

25      A.    There's a canine-unit.

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Okay.  And that's like multiple

2  officers who have trained canine dogs?

3    A.    Yes, ma'am.

4    Q.    Okay.  And then if you're

5  requesting a canine unit, does that just mean

6  you're requesting a response with officers

7  with canines?

8    A.    Yes, an officer with his

9  partner, his canine partner, to respond to

10  the location.

11    Q.    And based on your hearing of the

12  discussion of the channel and plans to

13  confront and possibly arrest Mason Meyer, did

14  you learn of what -- of any plans to possibly

15  arrest him on Steiner Avenue?

16    A.    Yes.  They were discussing a

17  manner in which to get canines in uniforms

18  onto Steiner without -- the best way to do

19  that without Mr. Meyer seeing the police

20  approaching him.

21      And while that plan was still

22  being discussed on the radio, Mr. Meyer

23  entered the driver's seat of a vehicle with

24  two other individuals and shortly left.

25    Q.    And do you know if any canines

Deposition of Officer Mark Bode                                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1   and uniforms had started making their way to

2   the location prior -- before he got in the

3   car to leave?

4        A.    I don't.  I know there were --

5   there was at least one in the area, but I do

6   not know if that was Officer Thomas or not.

7        Q.    And was there -- when the car

8   moved or when Meyer got in the car, was there

9   then discussion on the channel about changes

10  to a plan or a different plan for possibly

11  arresting him?

12       A.    Yes.  They were going to follow

13  Mr. Meyer and initiate a traffic stop.

14       Q.    And was there discussion on the

15  channel about that traffic stop being

16  conducted by Cincinnati Police?

17       A.    Yes.  The only uniformed car

18  personnel out at the location was Cincinnati

19  Police.

20       Q.    And was there discussion on the

21  channel about a possibility for needing to

22  abort plans for dealing with Meyer if the

23  circumstances changed, such that the arrest

24  became too dangerous or too difficult to

25  complete?

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              MR. COWAN:  Objection.
 2        A.    No, ma'am.
 3        Q.    So can you describe to me --
 4   you're hearing this radio traffic.  You've
 5   dropped your partner off.  You're hearing
 6   radio traffic.
 7              Can you describe to me the
 8   timeline of this leading to the time that you
 9   responded to a call to become involved?
10        A.    Yes.  As I -- once I dropped my
11   partner off on Warsaw, I turned down Warsaw
12   and then I turned left onto Fairbanks
13   Avenue --
14        Q.    Okay.
15        A.    -- which goes down to State.  As
16   I was getting closer to State -- or, I'm
17   sorry, as I was getting closer to River, it
18   was a time that Mr. Meyer was entering the
19   vehicle with two other individuals, and they
20   stated that he was getting ready to pull off.
21              And that was the first time I
22   joined in any conversation on the radio.  And
23   I advised them that I was at River Road and
24   Fairbanks and that I would try to get eyes on
25   the vehicle once it got to River Road.
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    Okay.  And when you made -- you

2     made that transmission over the radio?

3          A.    Yes, ma'am.

4          Q.    When you made that transmission,

5     how far is Fairbanks and River from -- River

6     and Steiner?

7          A.    I think it's two streets away.

8          Q.    Okay.  So pretty --

9          A.    Very close.

10         Q.    Yeah.  Okay.  And at any point

11    prior to arriving near Fairbanks and -- or,

12    sorry, River and Steiner, did you learn about

13    Meyer's outstanding felony and misdemeanor

14    warrants for -- including fleeing and

15    evading, wanton endangerment, reckless

16    driving?

17         A.    Yes.  They said he had multiple

18    warrants, felony warrants, out of Kentucky.

19         Q.    Okay.  And did you learn about

20    those things on the radio channel?

21         A.    Yes, ma'am.

22         Q.    Okay.  And did you know about

23    the Boone County Sheriff's Office and the

24    Strike Force encounter with Mason Meyer on

25    July 30th of 2020?

1          A.    No, ma'am.

2          Q.    Or any other Northern Kentucky

3     Strike Force -- like activity that involved

4     Mason Meyer?

5          A.    No, ma'am.

6          Q.    Okay.  And leading up to your

7     arrival at River and Steiner, were you aware

8     that Mason Meyer had previously evaded police

9     in anyway?

10         A.    Yes, ma'am.

11         Q.    Okay.  And how did you learn

12    that?

13         A.    From the radio traffic.

14         Q.    Okay.  And what did you know

15    about it?

16         A.    That he had felony warrants for

17    that -- for those actions.

18         Q.    For evading police specifically?

19         A.    Yes, ma'am.

20         Q.    Okay.  And did you have any

21    knowledge of the underlying facts about those

22    incidents?

23         A.    No, ma'am.

24         Q.    Okay.  And then did you

25    understand that to be a vehicle incident,

1    like that he was in a car?

2              A.    Yes, ma'am, that was my

3    understanding.

4              Q.    Okay.  And did you have

5    understanding before you arrived at

6    River Road at Steiner Avenue that Meyer had

7    made statements about his intent to evade

8    arrests by police by violent means, if

9    necessary?

10             A.    Yes.  It was made clear on the

11   radio that he had made statements about

12   engaging in a gun fight with police -- with

13   law enforcement if he was stopped.

14             Q.    And did you also learn on the

15   radio prior to arriving at River and Steiner

16   that he had indicated that he would not go

17   back to prison and that he would shoot it out

18   with police if they intended to stop and

19   arrest him?

20             A.    Yes, ma'am.

21             Q.    Did you have -- was there any

22   reason to expect that Mason Meyer would not

23   behave in a manner like -- that went along

24   with that attitude that you knew about his

25   case on August 7th, 2020?

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    A.    You would prepare for him to act

2    like that, but for me to speculate as to what

3    he would actually do, I couldn't say.

4        Q.    And that is to prepare for him

5    to attempt to evade arrest or respond

6    violently if confronted by police?

7    A.    Yes, ma'am.

8        Q.    And were you aware of a --

9    before you arrived at River Road and Steiner,

10   of a task force meeting that took place in

11   the morning of August 7th of 2020?

12       A.    The officers that were on this

13   investigation started at 0700 and had a

14   meeting at Warsaw Avenue.

15       Q.    At the -- was that the same --

16       A.    Yes.

17       Q.    -- like your office in Warsaw?

18       A.    Yes, ma'am.

19       Q.    Okay.  So that was a CPD office

20   building that that meeting was held in?

21       A.    Yes, ma'am.

22       Q.    Okay.  And how did you learn

23   about that meeting?

24       A.    They asked if I could start at

25   seven o'clock, and I was unable, so I started

1    at nine.  So I knew there was a briefing for

2    it, but I was unable to start at that time.

3          Q.    Okay.  And who asked you to

4    start at the seven o'clock time?

5          A.    Sergeant Davis.

6          Q.    Okay.  And did Sergeant Davis

7    attend the meeting?

8          A.    I do not know.

9          Q.    Okay.  And are you aware of

10   which CPD employees did attend that meeting?

11         A.    No, ma'am.

12         Q.    Okay.  Did you have discussions

13   on August 7th at any point with any CPD

14   employees about that meeting?

15         A.    No, ma'am.

16         Q.    Okay.  And did you learn about

17   what happened at the meeting, what was

18   discussed?

19         A.    No.  Everyone that was at that

20   meeting was already out of the office before

21   I came in at nine.

22         Q.    Okay.  And was it your

23   understanding that that meeting would include

24   CPD Gang Unit, Gun Crimes, and task force

25   members?

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1              A.    Yes, ma'am.

2              Q.    Okay.  And do you know of any

3      other Gang Unit members that -- I think you

4      covered this -- that did attend that meeting?

5              A.    I do not, no, ma'am.

6              Q.    Any other Gun Crime members that

7      you know did attend that meeting?

8              A.    I do not know, ma'am.

9              Q.    Okay.  And did you hear any

10     transmissions about what occurred at that

11     meeting on the radio?

12             A.    No.

13             Q.    Okay.  And since the date of the

14     pursuit and the events of the pursuit, did

15     you -- have you learned anything about what

16     happened at that meeting?

17             A.    No, ma'am.

18             Q.    Okay.  And was there any means

19     or communication of -- for instance, like

20     minutes or updates that occurred at the task

21     force, like that type of meeting that was

22     held that morning to communicate to officers

23     who might be -- become involved in the

24     investigation?

25             A.    They were just conducting their

Deposition of Officer Mark Bode                                         Jason Laible, et al., vs. Timothy Lanter, et al.,

1    investigation on the same channels.  So

2    whatever location and real-time information

3    they were putting out, I was able to hear on

4    that same channel.

5         Q.    Okay.  So there was no, for

6    instance, like an e-mail blast --

7         A.    Oh --

8         Q.    -- or a summary of some sort?

9         A.    -- I'm sorry.

10        Q.    That's okay.

11        A.    Documented like --

12        Q.    Uh-huh.

13        A.    -- no, ma'am.  No e-mails or no

14   e-mail ops plans or anything like that.

15        Q.    Okay.  And was there any person

16   within CPD, to your knowledge, who had any

17   type of responsibility for sharing updates of

18   what was going on with task force activities?

19        A.    No, ma'am.

20        Q.    Okay.  And on August 7th before

21   you became involved in the Meyer

22   investigation, did you know of any other --

23   you mentioned Vogelpohl, any other officers

24   affiliated with the Cincinnati Police

25   Department that were involved in a Meyer

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    investigation?

2            A.    Whatever date I learned -- like

3    I said, I stated Officer Brett Stratmann was

4    in charge of that investigation, but don't

5    know on what date I learned that.

6            Q.    Okay.  And had you had any kind

7    of conversation with supervisory officers

8    including Sergeant -- was it Sergeant Davis

9    at the time?

10           A.    Yes, ma'am.

11           Q.    Is he still a sergeant?

12           A.    Yes, ma'am.

13           Q.    Okay.  And did you -- prior to

14   your involvement with the Meyer investigation

15   on the 7th, had you had any conversations

16   with any CPD supervisory officers about the

17   activities of the task force or CPD role in

18   that task force?

19           A.    No.

20           Q.    And had you had any

21   conversations with supervisors about the role

22   that the Gang Unit, what could play in

23   responding to the task force investigation?

24           A.    No, ma'am.

25           Q.    Well, how did you know that you

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    could respond to a task force investigation?

2            A.    Again, I was asked to join that

3    for the investigation.  They were a part that

4    started at nine.

5            Q.    Uh-huh.

6            A.    I was unable.  I concluded my

7    independent investigation on the same channel

8    during the afternoon, dropped my partner off,

9    and then went down to assist, but that did

10   not require approval from any supervisor.

11           Q.    Basically you heard that the

12   channel -- somebody on the channel was asking

13   for CPD officers to be involved and you were

14   able to respond to that?

15           A.    Yes.  I was asked to go to the

16   briefing.  And then during the -- during the

17   day, I heard them looking and searching for

18   Mr. Meyer and locations.

19                 They located him on Steiner.

20   That was a point in time my other

21   investigation was ending, dropped my partner

22   off, and responded to the area.

23           Q.    And on August 7th of 2020, was

24   Tim Lanter either in your chain of command or

25   providing directives to you at any point?

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    He was a sergeant in Montgomery

2  Crime Task Force.  So he was not my direct

3  supervisor, but we did work with them on a

4  daily basis.

5      Q.    Okay.  And did you hear him

6  being involved in any way in the channel

7  traffic?

8      A.    He was on the radio traffic on

9  the 7th, yes, ma'am.

10      Q.    Okay.  And what did you hear him

11  conveying or any discussion about his

12  involvement?

13      A.    I can't remember any direct

14  conversation I would have, but I do know that

15  he was on the radio channel.

16      (Exhibit 2 was marked.)

17  BY MS. SALLEY:

18      Q.    Okay.  I'm gonna mark this as

19  Plaintiffs' 2.  Let me make sure I have my

20  copies here.  It's in here somewhere.

21          MS. SALLEY:  (Handed.)

22          MR. COWAN:  Thanks.

23          MS. SALLEY:  All right.  I don't

24  have an extra copy of that.  I thought I did.

25  Sorry, guys, but I can identify it by Bates

```
 1    number.

 2                    MS. GREENE:  I can e-mail it

 3    also.

 4                    MR. COWAN:  Do you need mine?

 5                    MS. SALLEY:  Yeah.  If you don't

 6    mind?  Well, actually, you keep it.  I'll use

 7    it.  Tristan, are you okay?

 8                    MR. PALMER:  (Put thumb up.)

 9    BY MS. SALLEY:

10        Q.    For purposes of identification

11    of this document, this is in a production of

12    e-mails from the City of Cincinnati that were

13    e-mailed titled like Mason Meyer 1,

14    Mason Meyer 2.  They were not Bates stamped

15    in the way that they were produced.

16                    So we did reproduce the e-mail

17    files that we received, but they're so

18    voluminous that I actually could not locate

19    this specific e-mail in those files because

20    it's several -- it was like 20-plus thousand

21    pages of documents.

22                    So we will Bates stamp this

23    version of this document and make sure that

24    it's identified by Bates.  But it's an e-mail

25    from Tim Lanter with a Subject of Rounds with
```

Deposition of Officer Mark Bode                                Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the date of Friday, August 7th of 2020, at

2    8:08:34 p.m. and it was sent to

3    Paul Neudigate, Danita Pettis,

4    David Schofield, and James Davis.

5              And it has two attachments,

6    which are 7.docx and then Outlook.png, which

7    is just a signature image file.

8              Attached to it is Gang Unit -- a

9    document titled Gang Unit Supervisor Rounds

10   dated 8/7/2020.  And, Officer Bode, have you

11   seen this document before?

12        A.    No, ma'am.

13        Q.    And have you seen a document

14   like this with the title Gang Unit Supervisor

15   Rounds?

16        A.    Yes, ma'am.

17        Q.    Okay.  And is that a document

18   that is created by a supervisor in the unit

19   to record the actions of the CPD officers

20   assigned to the unit?

21        A.    Yes, at the end of each shift.

22        Q.    Okay.  And it lists the hours of

23   duty that are relevant to the report --

24        A.    Yes, ma'am.

25        Q.    -- is that fair?  And in this

Deposition of Officer Mark Bode                                Jason Laible, et al., vs. Timothy Lanter, et al.,

1    one, it's regular hours 0700 to 2000, which

2    is 7 a.m. to 8 p.m. --

3            A.    8 p.m.

4            Q.    -- correct?  Did I do that math

5    right?

6            A.    Yes, ma'am.

7            Q.    Okay.  And in this document, you

8    said you haven't seen this particular note

9    before?

10           A.    Correct.

11           Q.    Okay.  And in this one, the

12   second paragraph, I'll start there, because

13   you mentioned this, a prior investigation

14   that you started the day with him -- the day

15   with him before; is that right?

16           A.    Yes, ma'am.

17           Q.    And is that referenced here as a

18   summarization of your activities with -- like

19   your Gang Unit activities on that day of the

20   7th?

21           A.    Yes, ma'am.

22           Q.    Okay.  And then the supervisors

23   listed on this form are Lanter and Davis,

24   correct?

25           A.    Yes, ma'am.

```
 1           Q.    And that would be
 2   Sergeant Timothy Lanter and your sergeant,
 3   Sergeant Davis?
 4           A.    Yes, ma'am.
 5           Q.    Okay.  The arrest that's listed
 6   here is the arrest that you -- well, that you
 7   were involved in from the previous day?
 8           A.    Reading that paragraph
 9   refreshing my memory, it looks like he was
10   arrested on the 7th.
11           Q.    Okay.  Do you recall that being
12   the investigation that you carried over from
13   the previous day?
14           A.    Yes, ma'am.
15           Q.    Okay.  But you -- and you didn't
16   make that arrest because it was a uniformed
17   officer who made the arrest?
18           A.    Yes, ma'am.
19           Q.    Okay.  All right.  And then in
20   the first paragraph there, the first hour --
21   the first sentence says, We changed our hours
22   today to assist the ATF Task Force with the
23   search of Mr. Mason Meyer.
24                 Do you recall, was that one of
25   the reasons why you were asked to attend the
```

```
 1      early meeting that changed your hours to

 2      0700?

 3             A.    Yes, ma'am.

 4             Q.    Okay.  And that was to assist

 5      the task force?

 6             A.    With the search of Mr. Meyer --

 7             Q.    Okay.

 8             A.    -- yes, ma'am.

 9             Q.    In your Gang Unit duties to

10      assist the task force?

11             A.    Yes, ma'am.

12             Q.    And then the background there

13      that Mr. Meyer is wanted out of Kentucky for

14      felonious assault and wanton endangerment,

15      that's the background that you knew of that

16      you described learning about Mr. Meyer?

17             A.    On the 7th, yes, ma'am.

18             Q.    Okay.  And that he has also made

19      threats to law enforcement, that's also

20      information that you described learning about

21      on the morning of the 7th?

22             A.    Yes, ma'am.

23             Q.    Okay.  And that the Gang Unit

24      and ATF spent several hours at an address.

25      There were Gang Unit members waiting to spot
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Mr. Meyer in D-5?

2         A.    Yes, ma'am.

3         Q.    Okay.  And then the

4    investigation moved to D-3, Sedamsville area?

5         A.    Sedamsville, yes.

6         Q.    Sedamsville.  Thank you.  I live

7    right by there.  I should know that.

8         A.    At least that's how I was told.

9    I apologize.

10        Q.    Does the D --

11        A.    You may be true.

12        Q.    Oh, that's all right.  We're

13   gonna pronounce these wrong, I'm sure.  The D

14   in D-5 and D-3, is that for district?

15        A.    Yes, ma'am.

16        Q.    And to your understanding, was

17   this describing the movements of Gang Unit

18   members and ATF as well on the 7th?

19        A.    Yes, ma'am.

20        Q.    And did -- at the point at which

21   you joined with your unmarked car at River

22   and Steiner, was that the point where the

23   investigation had moved to Sedamsville?

24        A.    Yes.

25        Q.    Okay.  And that's the name of

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        the neighborhood that's there on River Road,
 2        West Price Hill adjacent?
 3             A.    Yes, exactly.
 4             Q.    Okay.  You can set that aside.
 5        Well, the last question on that, you don't
 6        have to look at it to know, but do you have
 7        any knowledge of why Sergeant Lanter
 8        transmitted that to the individuals named on
 9        that e-mail?
10             A.    That would have been his that --
11        the e-mail was sent to, that would have been
12        his chain of command.
13             Q.    Okay.  And do you know if
14        supervisors, including Sergeant Lanter, were
15        required to send that type of note on a daily
16        basis?
17             A.    Yes, ma'am.
18             Q.    Okay.  The other -- the last
19        question I have about that e-mail that you
20        looked at -- rounds that you looked at, do
21        you agree with me that the pursuit of
22        Mason Meyer and the events leading to the
23        death of the Laibles occurred on the
24        afternoon of August 7th, 2020?
25             A.    On the 7th.  I don't know if it
```

```
 1    was the afternoon.  I thought it was
 2    five-ish.
 3              Q.    Okay.  The sun was still out?
 4              A.    Yes.
 5              Q.    Okay.  So before that -- the end
 6    of the shift at 10 p.m.?
 7              A.    Yes, ma'am.
 8              Q.    Do you have any knowledge of why
 9    the pursuit itself is not mentioned in that
10    supervisory rounds that we just looked at?
11              A.    No, ma'am.
12              Q.    Okay.  Did you author yourself,
13    write down any type of incident report,
14    critical incident report, summary of anything
15    that you saw or did in relation to
16    Mason Meyer and this pursuit on August 7th?
17              A.    No, ma'am.
18              Q.    Okay.  And did you ever -- were
19    you ever asked to write down any incident
20    report or complete an incident report?
21              A.    No, ma'am.
22              Q.    Okay.  And do you recall -- you
23    mentioned that you remember providing a
24    statement for Internal Investigations; is
25    that right?
```

Deposition of Officer Mark Bode                     Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1           A.    Yes.

2           Q.    And you said that was some weeks

3    after the events that we're talking about on

4    August 7th?

5           A.    Yes, ma'am.

6           Q.    Okay.  And do you recall being

7    interviewed in relation to a Citizen

8    Complaint Authority investigation?

9           A.    I do not.

10          Q.    Okay.  And the IIS interview

11   that you did, was that only one interview, or

12   was it multiple?

13          A.    One interview.

14          Q.    One, okay.  Okay.  I'm going to

15   mark Plaintiffs' 3.

16        (Exhibit 3 was marked.)

17   BY MS. SALLEY:

18          Q.    Oh, I'm gonna give you this --

19   this is for you, the fancy one with a

20   sticker.  And do you recognize this document?

21               If you want to flip -- it's

22   several pages, so if you want to flip through

23   it, I don't know if you've seen this document

24   in full.  Do you recognize it?

25          A.    I have not seen this document.
```

1    Q.    Okay.  Do you recognize it to be

2    an Internal Investigations report --

3         A.    Yes, ma'am.

4         Q.    -- of the type that the

5    Cincinnati Police Department completes?

6         A.    Yes, ma'am.

7         Q.    Okay.  And does this appear to

8    you to be the investigation that took place

9    into the vehicle pursuit and the events of

10   August 7th, 2020?

11        A.    Yes, ma'am.

12        Q.    Okay.  And does this appear to

13   be the investigation for which you were

14   interviewed in 2020?

15        A.    Give me a minute to read --

16        Q.    Sure.

17        A.    -- read that real quick.  Yes,

18   this -- these paragraphs that are typed up

19   there were from the interview I had with

20   Internal.

21        Q.    Okay.  All right.  So looking at

22   page 4, is that where you are?

23        A.    Yes.

24        Q.    There is a heading that says,

25   Police Officer Mark Bode, EID Number 18811,

1    Gang Unit, and then paragraphs that follow

2    onto the next page.

3              Do you recognize that to be the

4    portion of the report that reflects

5    presumably some version of the statement that

6    you gave to the Internal Investigations

7    officer?

8         A.    Yes, ma'am.

9         Q.    Did you author this portion of

10    the report?

11        A.    No, ma'am.

12        Q.    To your understanding, would

13    this have been a summary that was created

14    based on the interview that you gave in

15    person?

16        A.    Yes, ma'am.

17        Q.    Okay.  And in this summary here,

18    it starts out by noting that on August 7th,

19    there were members of the ATF, the -- do you

20    understand that NKDSF to be the Northern

21    Kentucky Drug Strike Force?

22        A.    Yes.

23        Q.    -- the Cincinnati Police

24    Gang Unit and the OCIS to discuss the joint

25    investigation of Meyer's activities.  Is that

Deposition of Officer Mark Bode                                     Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        the 7 a.m. meeting that you didn't attend?
 2              A.    Yes, ma'am.
 3              Q.    Okay.  And that OCIS had
 4        identified 721 Steiner Avenue as the
 5        residence of a Mr. Ihle.  Are you familiar
 6        with that name?
 7              A.    No, that name did not come up in
 8        the interview.
 9              Q.    Okay.  And did you understand
10        that the Steiner Avenue house was not Meyer's
11        house, but an associate of Meyers?
12              A.    Yes, that's my understanding.
13              Q.    Okay.  And then in the second
14        paragraph, you described not being present
15        for the meeting, but you knew about it and
16        heard OCIS requested additional plainclothes
17        officers to respond to Steiner Avenue to
18        assist with the investigation of Mr. Meyer.
19                    Is that -- does that comport
20        with your memory of the events?
21              A.    Yes.
22              Q.    And we talked earlier about
23        OCIS, Organized Crime Investigative Squad.
24        You said you were not familiar with that?
25              A.    I'm still not familiar with that
```

Case: 2:21-cv-00102-DLB    Doc #: 134    Filed: 11/06/25    Page: 176 of 280 - Page
ID#: 1158

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    acronym.
 2          Q.    Okay.  It doesn't refresh your
 3    recollection at all for working with that
 4    squad?
 5          A.    No.  And that's -- again, any
 6    Internal interview was never referred to as
 7    OCIS units unless that's the technical term
 8    for the ATF Task Force, as I would refer to
 9    it as the task force officers.
10          Q.    And if you turn to just -- we'll
11    turn back to your statement --
12          A.    Okay.
13          Q.    -- but just to look at page 8
14    briefly --
15          A.    Okay.
16          Q.    -- on this page,
17    Sergeant Timothy Lanter is identified here as
18    a member of the Gang Unit.  Do you see that?
19          A.    Yes.
20          Q.    And did you have an
21    understanding at the time that he was working
22    in the capacity based on supervisor notes we
23    looked at that he was involved in these
24    events that he was working in some capacity
25    with the Gang Unit?
```

Deposition of Officer Mark Bode                         Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          A.    Yes.  Like, we worked --
 2   Gang Unit and Gun Crime Task Force worked
 3   together on the -- in the same office.  I do
 4   believe, however, that Sergeant Lanter was
 5   technically assigned to the Gun Crime Task
 6   Force at the time.
 7          Q.    Okay.  And you described earlier
 8   the plan to arrest Mason Meyer at the Steiner
 9   Avenue address originally.
10                Did you develop an understanding
11   that that was determined to be the safest way
12   to apprehend him that day?
13          A.    My understanding, that was the
14   first time that they had seen him --
15          Q.    Okay.
16          A.    -- and that that operation was
17   dynamic.  And they were coming up with a plan
18   to apprehend him at that time.
19          Q.    Okay.  "Dynamic" meaning was
20   there any set outcome or -- yeah, outcome for
21   the day that was planned?
22          A.    No.
23          Q.    Okay.  And in your report at
24   this last -- the last paragraph here and --
25          A.    Page 8, ma'am?
```

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1        Q.     Sorry, back to page 4.

2        A.     Okay.

3        Q.     Thank you.  It starts,

4   Officer Bode was driving east on River Road

5   at Steiner Avenue when Mr. Meyer stopped at

6   the stop sign on Steiner Avenue at River

7   Road.

8               Is that the first time you saw

9   the vehicle with Mason Meyer in it?

10       A.     Yes, ma'am.

11       Q.     Okay.  And at that time, was

12  there -- did you -- did you know what car you

13  were looking for because of the radio

14  transmissions?

15       A.     Yes, ma'am.

16       Q.     And that you had understood that

17  he was heading down Steiner towards River

18  Road?

19       A.     Yes, ma'am.

20       Q.     There's really -- there's only

21  one direction --

22       A.     Can go.

23       Q.     -- you can go, right?

24       A.     Yes, ma'am.

25       Q.     And what -- did you observe a
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    car stopped at the stop sign there

2    attempting -- looking like it was going to

3    turn out onto River Road?

4              A.    Yes.

5              Q.    And was there anything notable

6    about the vehicle when you first saw it?

7              A.    Nothing -- all I said is that it

8    had heavy window tint that I couldn't

9    positively identify any of the occupants.

10             Q.    Okay.  And in the next sentence

11   here, you wrote that you were able to

12   identify that a white male was driving?

13             A.    I could see that it was a white

14   male, but could not identify the occupant.

15             Q.    Okay.  And was that through a

16   windshield window, or how could you --

17             A.    Windshield.

18             Q.    Windshield.  Okay.  And which

19   direction were you coming -- so I'm a little

20   familiar with that area because I'm from

21   there -- from that area.

22                   So there's -- Steiner kind of

23   comes south, right, and hits River Road.  And

24   then if you're coming from the west a little

25   bit past the intersection if you're heading

1    east going toward downtown Cincinnati,

2    there's a Speedway gas station that's about a

3    tenth of a mile past the intersection, right?

4          A.    Yes, ma'am.

5          Q.    And were you -- which direction

6    were you coming from when you first noted

7    Meyer?

8          A.    Okay.  If it makes it easier,

9    it's like you said, in towards the city, we

10   call that inbound --

11         Q.    Uh-huh.

12         A.    -- and outbound would be the

13   other direction.  So I was driving inbound

14   coming from further out.  I observed him

15   operating the vehicle.

16               And then I actually -- the

17   Speedway that you referred to, is where I --

18   I pulled into until he made the turn onto

19   River Road.

20         Q.    Okay.  So you made like a --

21   just a simple right turn into the --

22         A.    Speedway, yes, ma'am.

23         Q.    -- Speedway?  Okay.  Did I get

24   to 4?  Am I on 4?  I'll mark this as 4,

25   Plaintiffs' 4.  This is gonna be a little bit

Deposition of Officer Mark Bode                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    of an arts and crafts project.  We'll get you

 2    a pen.

 3         (Exhibit 4 was marked.)

 4    BY MS. SALLEY:

 5         Q.    Okay.  Excuse me.  I've been

 6    talking too much.  Okay.  So I've handed you

 7    what's a screenshot of a Google Maps' street

 8    view.

 9              Do you recognize what you're

10    looking at here on this map?

11         A.    Yes, ma'am.

12         Q.    Okay.  And do you recognize this

13    to be the area which includes Steiner Avenue

14    and then the area on River Road heading all

15    the way over to the 6th Street viaduct?

16         A.    Yes, ma'am.

17         Q.    Okay.  And is this the area that

18    generally encompasses where you encounter

19    Mason Meyer?

20         A.    Yes, ma'am.

21         Q.    Okay.  I'm gonna have you mark

22    with your pen in number format some things

23    that we're talking about so we can keep track

24    of it, right?

25         A.    Okay.
```

Deposition of Officer Mark Bode                                   Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    So can you mark with a 1 on this
2    map where your car was, like where you were
3    traveling when you first observed
4    Mason Meyer?
5    A.    Yes, ma'am.  I'm going out at
6    the intersection of Steiner and River Road.
7    (Witness complies.)
8    Q.    Okay.  Thank you.  And looking
9    at this map, if you look right south of
10   Steiner, there's a street that turns off of
11   River Road called Southside Avenue.  Do you
12   see that?
13   A.    Yes, ma'am.
14   Q.    And is it accurate there's a
15   stoplight that is at that turnoff onto
16   Southside Avenue at River?
17   A.    I do not know.
18   Q.    Okay.  And then you continued to
19   the Speedway -- after seeing Meyer in the
20   vehicle, turned into the Speedway?
21   A.    I turned into the Speedway.
22   Q.    Yes.
23   A.    Mr. Meyer did not.
24   Q.    No, he did not.  Did you observe
25   him actually turning out from Steiner Avenue?

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes, ma'am.

 2              Q.    Onto River Road?

 3              A.    Yes, ma'am.

 4              Q.    And did he -- was there anything

 5     notable about the way that he was operating

 6     the vehicle at that time?

 7              A.    No.  He even had his turn signal

 8     on to turn left.

 9              Q.    Okay.  To your knowledge, were

10     there any marked police vehicles at least in

11     your visual range at that time?

12              A.    No, ma'am.

13              Q.    Okay.  And as of today, that

14     intersection at River and Steiner, I believe

15     is a traffic light, but at that time are you

16     pretty certain it was a stop sign?

17              A.    Coming off of Steiner onto

18     River?

19              Q.    Yes.

20              A.    Yes, I believe it was a stop

21     sign.

22              Q.    Okay.  Okay.  And why did you

23     pull into the Speedway parking lot?

24              A.    So that once Mr. Meyer exited

25     and drove down River, then I could get back
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    in behind to try to follow.

2            Q.    And did you know which direction

3    he was gonna go because he had his blinker

4    on?

5            A.    Yes, ma'am.

6            Q.    Okay.  And then -- did he then

7    proceed onto River the way -- the direction

8    you were expecting him to go?

9            A.    Yes, ma'am.

10           Q.    And did you then pull out behind

11   him?

12           A.    I did.  I wasn't immediately

13   behind him.  There was a car or two in

14   between us.

15           Q.    Okay.  Do you know what the

16   speed limit on that road is or was on the day

17   of this event?

18           A.    No, ma'am.

19           Q.    Okay.  Did you make any

20   observation that Mason Meyer was breaking the

21   speed limit at that point?

22           A.    No, ma'am.

23           Q.    Okay.  Did he appear to be

24   operating the vehicle like safely in the flow

25   of traffic?

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1       A.    Yes, ma'am.

2       Q.    Okay.  And on this -- why don't

3    you go ahead and mark as your second stop on

4    here the Speedway?  We'll put -- put a number

5    2.

6       A.    At the Speedway?

7       Q.    Yes.

8       A.    Okay.  (Witness complies.)

9       Q.    And do you know -- at this time

10   there is currently a light.  If you look at

11   the map and -- there's a denotation of a

12   Shell gas station.  Do you see that?

13      A.    Yes.

14      Q.    There is currently a stoplight

15   there.  Do you know if there was on

16   August 7th, 2020?

17      A.    I do not.

18      Q.    Okay.  And at any point up

19   until -- okay.  Strike that.

20             Continuing onto the -- did you

21   then just -- did -- strike that.  I'm gonna

22   get a sentence out.

23             Did you then follow Mason Meyer

24   down River Road as he continued --

25      A.    Yes, ma'am.

Deposition of Officer Mark Bode                                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1     Q.     -- down the road?  Inbound?

2     A.     Inbound.

3     Q.     Okay.

4     A.     Yes, ma'am.

5     Q.     And the next major intersection

6  that you'll hit if you're continuing on River

7  Road is the State Avenue intersection, right?

8     A.     Yes, ma'am.

9     Q.     Okay.  And do you recall having

10 to stop at that light or -- like whether it

11 was red/green?

12    A.     I knew we stopped, but I don't

13 know if that was from oncoming traffic, if we

14 had the green, or if it was a red light.

15    Q.     Okay.  So it could have been

16 needing to yield to make a turn?

17    A.     Yes.

18    Q.     Or it could have been that the

19 light was red and stopped?

20    A.     Yes, ma'am.

21    Q.     Okay.  And was Meyer's car

22 stopped at that light as well --

23    A.     Yes, he was.

24    Q.     -- in front of you?

25    A.     Yes.

1    Q.    And you were observing this?

2    A.    Yes, ma'am.

3    Q.    Okay.  And while you were

4    following Meyer's car down River Road, were

5    you in communication with other CPD officers'

6    radio channel?

7    A.    Yes, every one that was

8    operating on that channel.

9    Q.    Okay.  And did you hear

10   Sergeant Lanter at all communicating on that

11   channel?

12   A.    Yes, ma'am.

13   Q.    Okay.  And did you communicate

14   your position to the channel and to

15   Sergeant Lanter?

16   A.    Yes, ma'am.

17   Q.    Okay.  And what -- can you

18   describe the exchange that took place to

19   communicate that location?

20   A.    I just would say that I'm behind

21   the car, we're going inbound River.  I don't

22   know what street I would pick next adding

23   towards the viaduct or State Avenue, and I

24   asked if they would like me to try to get a

25   license plate on the vehicle.

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1              At that point in time,

2    Sergeant Lanter stated that he was on River

3    Road.  As we progressed down closer to State,

4    he saw the vehicle.

5              He described the black Fusion

6    and asked me if that was the vehicle --

7         Q.    Uh-huh.

8         A.    -- Sergeant Lanter did.  And I

9    told him, yes, that was the vehicle that

10   Mr. Meyer was operating.

11        Q.    Okay.  And Sergeant Lanter was

12   in a marked SUV of the CPD?

13        A.    I knew it was a marked car, but

14   I don't know if it was a SUV --

15        Q.    Okay.

16        A.    -- but, yes, marked car, ma'am.

17        Q.    Okay.  And at some point, did

18   you get a visual of Sergeant Lanter's car?

19        A.    Yes, ma'am.

20        Q.    And which way was -- was he

21   coming on River Road, from behind you?

22        A.    Inbound as well from behind me.

23        Q.    Okay.  And do you know if he was

24   just in the area or if he was --

25        A.    He was -- he was part of the

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    investigation.
 2           Q.    Okay.  And had he been -- do you
 3    know if he had been waiting in the area or
 4    where he was before joining up behind you?
 5           A.    Yes.  He was in the area for the
 6    investigation.  Where he was parked, I do not
 7    know.
 8           Q.    Okay.  And at what point did you
 9    actually, if you did, see Lanter's vehicle as
10    it came up from behind?
11           A.    As we were approaching State
12    Avenue on River Road.
13           Q.    Okay.  And can you mark on this
14    map as number 3 the place where you first got
15    a visual of Lanter's car?
16           A.    Yes.  And just for clarity, this
17    will be a general area where I'll mark --
18           Q.    Okay.
19           A.    Yes.  So if you want to follow
20    along, probably there's a little street
21    called Galvin off to the side, probably about
22    midway between there and State is where I'm
23    marking the 3.
24           Q.    Okay.
25           A.    (Witness complies.)
```

1      Q.    Okay.

2      A.    (Showing Ms. Salley.)

3      Q.    Thank you.  Okay.  And did Meyer

4  use -- so, well, did it appear to you that

5  Meyer was attempting to make a left turn onto

6  State?

7      A.    Yes, ma'am.

8      Q.    Okay.  And did he use a blinker

9  to simulate he was taking a left?

10     A.    I do not know.

11     Q.    Okay.  And up until the point

12  where you're taking the left onto State, had

13  Meyer committed anything that was a traffic

14  infraction?

15     A.    No, ma'am.

16     Q.    Okay.

17     A.    Not that I observed.

18     Q.    Okay.  And after -- did you then

19  make the turn following Meyer onto State?

20     A.    Yes.  But I cannot recall if

21  Sergeant Lanter was in front of me or behind

22  me at that time.  I believe Sergeant Lanter

23  had already gotten in front of me and was in

24  between myself and Mr. Meyer's vehicle.

25     Q.    Do you recall pulling aside at

1    the intersection of State and Elberon to

2    allow Sergeant Lanter to go past you?

3         A.    Yeah.   It was somewhere in that

4    area.  I just don't remember exactly State,

5    River, but in that area, I pulled over for

6    Sergeant Lanter to get in front of me.

7         Q.    And was that something that you

8    discussed on the channel?

9         A.    That's just common practice in

10   these investigations.  Again, the uniformed

11   car has to be the one that initiates the

12   traffic stop, so we would always pull over to

13   allow them to get around.

14        Q.    Is that something that you're

15   trained on?

16        A.    Not specifically, ma'am, no.

17             MS. SALLEY:  All right.  I'm

18   going to mark this Exhibit 5.

19        (Exhibit 5 was marked.)

20   BY MS. SALLEY:

21        Q.    What I have here marked as

22   Exhibit 5 is a screenshot from some of the

23   dash cam in this case from Sergeant Lanter's

24   car.

25             What we're looking at, do you

1    recognize this to be the intersection that's

2    underneath the overpass where you can turn

3    onto Elberon from State?

4         A.    Yes, that's what it appears to

5    be.

6         Q.    And does that appear to be your

7    vehicle that you were driving that day?

8         A.    I was operating a Jeep Cherokee,

9    yes.

10        Q.    Okay.  Have you watched this

11   body- or the dash-cam video?

12        A.    I have not.

13        Q.    Okay.  Okay.  And would you

14   recognize this to be the moment when you

15   pulled aside to let Sergeant Lanter -- if

16   that's his dash cam -- pull aside?

17        A.    Yes, ma'am.

18        Q.    Okay.  Could you mark the

19   location of when Sergeant Lanter passed you

20   with a 4?

21        A.    Yes, ma'am.  (Witness complies.)

22   (Showing Ms. Salley.)  If you need to see

23   that.

24        Q.    Thank you.  And once

25   Sergeant Lanter passed you, did he then take

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1    the left onto Elberon?

2            A.    Yes, ma'am.

3            Q.    And there's a -- kind of an

4    onramp that you could go onto Elberon from

5    that turn, correct?

6            A.    Yes, ma'am.

7            Q.    And did you then follow him onto

8    Elberon?

9            A.    I followed -- I got in behind

10   Sergeant Lanter, yes, ma'am.

11           Q.    Okay.  And did you observe as --

12   Sergeant Lanter, did he position himself then

13   behind the car that Meyer was driving?

14           A.    Yes, ma'am.

15           Q.    Okay.  And at what point then

16   did he attempt to initiate a stop of

17   Mason Meyer's vehicle?

18           A.    After Mason Meyer had turned

19   right onto Mt. Hope, near the bottom of

20   Mt. Hope is where Sergeant Lanter initiated

21   the stop.

22           Q.    And can you -- were you -- did

23   you have a visual of those vehicles at the

24   time when Lanter initiated the stop?

25           A.    Yes, ma'am.
```

1    Q.    Okay.  Can you mark on this map

2    a 5 at the spot where the pursuit initiated?

3         A.    (Witness complies.)  (Showing

4    Ms. Salley.)

5         Q.    Thank you.  And when you say

6    initiate a stop, what does that mean as far

7    as you're observing?

8         A.    Turning your lights and sirens

9    on would be the basic way to explain that.

10        Q.    Was there a discussion on the

11   radio channel about the initiation of a stop?

12        A.    It was pre-approved for three

13   cars if the stop became a traffic pursuit.

14   So referenced that itself, that was the only

15   radio traffic I remember was the pre-approval

16   for a third car.

17        Q.    And was the discussion -- was

18   there a discussion on the channel regarding

19   this pre-approval for three cars?

20        A.    There was not a discussion as to

21   why there was pre-approval, just simply that

22   there was a pre-approval.

23        Q.    Okay.  And who participated in

24   that discussion?

25        A.    I do not recall.  It had to come

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1   from a supervisor.  I just don't remember

2   which one.

3       Q.    And can you describe anything

4   you remember about what was said to authorize

5   the three cars?

6       A.    Whoever the supervisor was

7   simply stated we are authorizing a third car

8   if this becomes a pursuit.

9       Q.    And to your understanding based

10  on policy and procedure, would that have been

11  a call that needed to be made by a CPD

12  employee?

13      A.    Yes, ma'am.

14      Q.    And that would be in accordance

15  with CPD pursuit policy?

16      A.    Yes, ma'am.

17      Q.    Okay.  And is that something

18  that Sergeant Lanter asked for randomly or,

19  like, do you remember how it came up?

20          MR. COWAN:  Objection.

21      A.    I do not recall how it came up.

22      Q.    Okay.  And do you recall any

23  response by Sergeant Lanter on the radio

24  channel in relation to that pre-approval?

25      A.    No, ma'am.

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Okay.  Okay.  So at the point of

2    the lights and sirens being turned on, what

3    did you observe after that?  Well, so strike

4    that actually.

5              At the time the lights and

6    sirens were turned on, did you have a visual

7    of Mr. Meyer's vehicle?

8      A.    Yes, ma'am.

9      Q.    And was there any obstruction

10   between your car and Lanter and Meyer?

11     A.    No, ma'am.

12     Q.    Okay.  And that kind of -- when

13   you turn onto Mt. Hope, it's a steep hill; is

14   that right?

15     A.    Yes.

16     Q.    Okay.  And that Mt. Hope Avenue

17   leads onto a residential street that then

18   also has businesses at the end of there; is

19   that right?

20     A.    Yes.  And I am not familiar with

21   a lot of the street names once you get up

22   into the Price Hill area.

23     Q.    Okay.  Have you been on Mt. Hope

24   before?

25     A.    Yes, ma'am.

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    And are you familiar with the

2     Incline District that's at the top of the

3     hill there?

4          A.    Yes, ma'am.

5          Q.    And did you understand that to

6     be an entertainment district where there's a

7     coffee shop, a restaurant, and theatre?

8          A.    Yes, ma'am.

9          Q.    Okay.  And when you -- what

10    happened when Sergeant Lanter turned on the

11    lights and sirens?

12         A.    Mr. Meyer was already

13    accelerating coming through the intersection

14    of Elberon and Mt. Hope.  Once

15    Sergeant Lanter turned on the lights and

16    sirens and initiated the traffic stop,

17    Mr. Meyer immediately fled.

18         Q.    Could you determine whether

19    Mr. Meyer's acceleration broke any speed

20    limits in that area on Elberon when he

21    turned?

22         A.    No, ma'am.

23         Q.    And when you say he fled, can

24    you describe what that looked like to you,

25    what you observed?

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Driving away at a higher rate of
 2    speed.
 3              Q.    And did it appear to you like he
 4    did escalate his speed such that he was
 5    trying to escape the attempted stop?
 6              A.    Yes, ma'am.
 7              Q.    And did you at any point while
 8    you were driving on Mt. Hope observe any
 9    posted speed limits at that time?
10              A.    No, ma'am.
11              Q.    Okay.  And what did you observe
12    Lanter do at that time?
13              A.    Follow the route that Mr. Meyer
14    was then taking.
15              Q.    And what did you hear over the
16    radio regarding what was happening?
17              A.    Sergeant Lanter would
18    continually state what street they would be
19    turning onto, updating the location for
20    everyone else.
21              Q.    And did you attempt to keep up
22    or keep them in sight for any portion of the
23    pursuit?
24              A.    Yes, ma'am.
25              Q.    And at the point when he turned
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the lights and sirens on and you saw Meyer

2    accelerate at that point, did you understand

3    that to be an active pursuit?

4         A.    Yes, ma'am.

5         Q.    And I'm sorry, did you say --

6    did you say that you did or did not attempt

7    to keep up or keep them in sight?

8         A.    I did.

9         Q.    Okay.  And were you able to do

10   that?

11        A.    For the majority of the pursuit,

12   yes, ma'am.  For -- for the majority of the

13   pursuit in Cincinnati, yes, ma'am.

14        Q.    Okay.  And in -- the majority of

15   the pursuit in Cincinnati included driving

16   through the Incline District there and the

17   northern part of Price Hill and then coming

18   back down towards the 6th Street viaduct?

19        A.    Yes, ma'am.

20        Q.    And did -- at some point during

21   your attempting to keep them in sight, did

22   you begin to lose distance on them, like as

23   in you were --

24        A.    Yes.

25        Q.    -- operating slower than them?

```
 1          A.    Yes.   There were times,
 2    obviously, where there were distances that
 3    were gained and lost during the pursuit, but
 4    obviously as the rates of speed increased, I
 5    would be further back.
 6          Q.    And was it required of you by
 7    CPD policy to maintain the legal speed limit
 8    while you were participating in the pursuit?
 9          A.    I do not know.
10          Q.    Okay.  Did you try to maintain
11    the speed limit while you were part of the
12    pursuit?
13          A.    Yes, ma'am.
14          Q.    So I know you said you're not as
15    familiar -- with possibly with street names,
16    but can you describe what you did see as you
17    were behind Meyer and Lanter?
18          A.    Just Mr. Meyer driving through
19    the streets didn't -- there didn't seem to be
20    any systematic area of route that he was
21    driving.  It seemed to be random until you
22    said, as we came out of the Incline District
23    and headed back down towards the 6th Street
24    viaduct.
25          Q.    And on the 6th Street viaduct,
```

1    did you observe Meyer and Lanter picking up

2    higher rates of speed on that road?

3              A.    Yes, ma'am.

4              Q.    And did you estimate at what

5    speed they were going on the 6th Street

6    viaduct?

7              A.    No, ma'am.

8              Q.    Okay.  Were you able to keep up

9    with them at the same rate on the 6th Street

10    viaduct?

11              A.    No, ma'am.

12              Q.    Okay.  And why -- why were you

13    not able to keep up with them?

14              A.    They were driving at a higher

15    rate of speed than I was.

16              Q.    And at some point during the --

17    if you could turn back to your statement in

18    your IIS report briefly?

19              A.    Sure.

20              Q.    Do you have a marked copy for

21    him to look at?  Oh, here it is.  Okay.  And

22    ask if you can look at page 5.

23              A.    Okay.

24              Q.    The second paragraph on page 5

25    starts with Mr. Occhipinti.  And it says, The

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    ATF RAC, via police radio, broadcast the

2    location of Meyer's cellular telephone was

3    consistent with the vehicle's location.

4                Sergeant Lanter was behind

5    Officer Bode, so he pulled off to the side as

6    they turned onto Elberon to allow

7    Sergent Lanter to pass and stop Mr. Meyer's

8    vehicle.  Do you see that paragraph?

9         A.    Yes, ma'am.

10        Q.    So to your understanding, as of

11   before you -- you, Meyer, and Lanter made the

12   left onto State Avenue, the -- Meyer's

13   location had been confirmed as within that

14   vehicle by this location ping?

15        A.    Correct.

16        Q.    Okay.  Turning back to your

17   following the pursuit, at what point did you

18   either abort your pursuit or lose sight of

19   them during the pursuit?

20        A.    Even though they gained distance

21   on the 6th Street, I was still able to

22   maintain visual as we came into the downtown

23   area.  Somewhere downtown, again, I saw a

24   uniformed officer approaching from behind, so

25   I pulled over.

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          That officer was Brett Thomas.
2    And then as we got into Kentucky is when I
3    would start to lose sight and have to listen
4    to radio traffic and try to pick back up the
5    pursuit.
6          **Q.    Okay.  In the course of**
7    **following a pursuit on the Cincinnati side,**
8    **did you observe Meyer swerving his vehicle**
9    **such that it ended up smashing into another**
10   **passenger vehicle that was on the 2nd Street**
11   **exit?**
12         A.    There was an accident on
13   2nd Street, yes, ma'am.
14         **Q.    Did you actually see that**
15   **happen?**
16         A.    I don't -- no, I don't believe I
17   did.
18         **Q.    Okay.**
19         A.    I don't remember it.  Until you
20   said about that accident, I didn't remember
21   that happening.
22         **Q.    Do you recall moving past a**
23   **disabled car as you were following the**
24   **pursuit?**
25         A.    I remember having to go past the

1    car that was struck, yes, ma'am.

2         Q.    And do you recall any discussion

3    on the radio transmissions about that

4    incident and the fact that there was a car

5    that had been struck?

6         A.    No.

7         Q.    And what were you hearing on

8    the -- do you recall anything you heard on

9    the radio transmissions while on the

10   Cincinnati side while you were following?

11        A.    Sergeant Lanter would just put

12   out the location where the vehicle was

13   heading.  Because until we got downtown, he

14   was still the only solo uniformed vehicle.

15        Q.    Okay.

16        A.    So they authorized three.  So

17   there was still an attempt to get one or two

18   more vehicles to assist him.

19        Q.    And do you recall at what point

20   you said Thomas joined in a marked vehicle?

21        A.    Yes.  I know I was in the

22   downtown area, but I don't know on what

23   street that he passed me.

24        Q.    Okay.  Do you recall if it was

25   before or after getting off the 2nd Street

Deposition of Officer Mark Bode                         Jason Laible, et al., vs. Timothy Lanter, et al.,

1    exit into downtown?

2         A.    I do not.

3         Q.    Okay.  Did you observe -- well,

4    how close following were you by the time cars

5    got to The Banks area, the -- 2nd Street, the

6    stadium?

7         A.    I could still see the sirens

8    from Sergeant Lanter's car.

9         Q.    Okay.  Could you see Meyer's car

10   at that time?

11        A.    I don't recall if I had a clear

12   vision of his car or just Sergeant Lanter's.

13        Q.    Okay.  And at that point, were

14   you able to follow because of the lights and

15   sirens?

16        A.    Yes, ma'am.

17        Q.    Okay.  And did you -- at some

18   point, did you -- no.

19              You said you continued to follow

20   the direction that would have been given on

21   the radio transmission channel?

22        A.    Yes.  When I was -- would have

23   -- in Kentucky, if I would you have lost

24   sight of it, I would have had to rely on the

25   locations given over the radio.

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    Okay.  And at some point while

2     you were in Kentucky, did you lose sight?

3          A.    Yes, ma'am.

4          Q.    Okay.  And do you know

5     whereabouts that occurred?

6          A.    I had sight on the vehicles as

7     we crossed the bridge and then it was soon

8     thereafter.  I don't know all the street

9     names over there that we would have -- that I

10    would have lost sight.

11         Q.    And you're referring -- when you

12    say "the bridge," you mean the Roebling

13    Bridge?

14         A.    Cincinnati, yes, the Roebling

15    Suspension Bridge, yes, ma'am.

16         Q.    Is that a two-lane bridge?

17         A.    Yes, ma'am.

18         Q.    Okay.  And did you observe

19    any -- well, in addition to -- at any point

20    in Price Hill, on the 6th Street expressway,

21    heading into downtown or the bridge, did you

22    at any point observe traffic having to move,

23    other drivers having to adjust their driving

24    based on the pursuit?

25         A.    Yes, ma'am.

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Can you describe that?

2    A.    Cars yield when there's an

3    officer with lights and sirens coming behind

4    them, and so cars are constantly needing to

5    get out of the way for the pursuit to

6    continue.

7    **Q.    And can you describe the traffic**

8    **conditions on the -- in Price Hill while the**

9    **pursuit occurred in the Price Hill**

10    **neighborhood area?**

11    A.    Obviously, there was minimal

12    vehicular traffic.

13    **Q.    And did you observe any**

14    **pedestrians on the sidewalk during the**

15    **pursuit in the Price Hill neighborhood area?**

16    A.    Not that I recall, ma'am.

17    **Q.    And when you continued to follow**

18    **into Kentucky, did you observe any drivers**

19    **having to adjust their driving or swerve out**

20    **of the way as their pursuit came behind them**

21    **or against the flow of traffic towards them?**

22    A.    Yes, ma'am.

23    **Q.    And where -- can you describe**

24    **that?**

25    A.    In the same manner of pulling in

Deposition of Officer Mark Bode                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    over to get out of the way of a cop with his

2    lights and sirens coming behind you.

3         Q.    Did you observe -- well, strike

4    that.

5              So moving over to The Banks

6    area, do you agree that that's a commercial

7    hub in Cincinnati with lots of restaurants,

8    theaters, places where there's heavy

9    pedestrian traffic?

10             MR. COWAN:  Objection.

11        A.    Yes.

12        Q.    And the Roebling Bridge, for

13   instance, has pedestrian traffic in the sense

14   that people -- it's a -- it's a sightseeing

15   landmark in Cincinnati, correct?

16        A.    Yes, the pedestrian is a divided

17   portion of that bridge.

18        Q.    Okay.  And moving over into the

19   Covington and Newport area, so right across

20   the bridge there, do you agree with me as

21   well that those are areas with theaters,

22   restaurants that -- the aquarium there, that

23   tend to be pedestrian-heavy areas?

24             MR. COWAN:  Objection.

25        A.    They can be at times pedestrian

```
 1    heavy.
 2            Q.    And depending on the time of the
 3    day, there may be an event at, you know, a
 4    stadium or a theater that will increase or
 5    decrease the level of pedestrian traffic in
 6    the area, for instance?
 7                 MR. COWAN:  Objection.
 8            A.    Yes, ma'am.
 9            Q.    And does the CPD train officers
10    generally to understand crowd control
11    measures, pedestrians -- how to deal with
12    heavy pedestrian areas in the course of your
13    duties?
14                 MR. COWAN:  Objection.
15            A.    Just crowd control, not related
16    to traffic pursuit?
17            Q.    Yeah.  Not related to traffic
18    pursuit, but just generally to understand the
19    dynamics of crowds in Cincinnati and areas
20    that may be pedestrian heavy?
21            A.    There is some crowd control
22    training, yes.
23            Q.    And as an officer who's been in
24    the CPD for 25 years now, do you have a
25    general understanding of where -- which areas
```

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      in Cincinnati tend to have more pedestrian

2      foot traffic than others?

3              A.    Yes, ma'am.

4              Q.    And is The Banks one of those

5      areas?

6              A.    Yes, ma'am.

7              Q.    You said at some point on the

8      Kentucky side of the river, you did lose a

9      visual of the pursuit?

10             A.    Yes, ma'am.

11             Q.    At what point did that happen?

12             A.    I'm not -- I don't know if it

13     was Covington or Newport.

14             Q.    And at any point during the

15     pursuit, did you observe any CPD officer,

16     whether it was Thomas or Lanter, proceeding

17     the wrong way down a one-way street?

18             A.    When we came across the Roebling

19     Suspension Bridge, I think the initial left

20     that I took was against -- against the flow

21     of traffic, but I wasn't aware of that until

22     I entered that.  And then that was the only

23     time that I myself observed any of the other

24     cars do that.

25             Q.    And you're referring to once

1    you're -- when you're coming off the

2    Roebling, there are a couple of -- you can go

3    about -- the two ways that kind of go either

4    way off of the bridge, one of them is for

5    outgoing traffic on the bridge and one of

6    them is for incoming traffic on the bridge?

7           A.    Yes, right in that general area.

8           Q.    And did you take a turn that put

9    you in the lane for traffic that was supposed

10   to be coming to the bridge?

11          A.    Or right south of there we -- I

12   veered or turned left on a street that was a

13   one-way for traffic coming the other way.

14              There were no cars there at the

15   time.  But I wasn't aware until we merged

16   back onto whatever street that we went that

17   became a two-way.

18          Q.    Okay.  And do you recall being

19   given any type of permission during the

20   pursuit to pursue the wrong way on a one-way

21   street?

22          A.    No, ma'am.

23          Q.    At any point, did you hear

24   Don Scalf give permission to anyone in the

25   pursuit to proceed the wrong way on a one-way

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    street?
 2            A.    No, ma'am.
 3            Q.    And did you hear Don Scalf at
 4    any point give directives permitting people
 5    to either go through stop signs without
 6    stopping or go through red lights without
 7    stopping?
 8            A.    No, ma'am.
 9            Q.    Did you at any point hear
10    Don Scalf or any other CPD officer give a
11    directive permitting officers to proceed
12    above 20 miles per hour over the speed limit?
13            A.    No, ma'am.
14            Q.    Did you understand
15    Sergeant Lanter to be an officer giving the
16    directives for how to proceed in a pursuit?
17            A.    He was giving the updated speeds
18    and locations --
19            Q.    Okay.
20            A.    -- if that makes sense.
21            Q.    And did you understand
22    Sergeant Lanter to be the officer who
23    authorized the pursuit itself?
24            A.    No, that was Sergeant Scalf.
25    Sergeant Scalf was the pursuit OIC.
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    Sergeant Lanter was the primary pursuit
 2    vehicle.
 3         Q.    And do you have any memory of
 4    who authorized the other vehicles to join in
 5    to the pursuit?
 6         A.    I do not.  I do remember someone
 7    said three cars were authorized, but I do not
 8    remember who said that.
 9         Q.    Okay.  Do you know if you
10    followed the exact path of the pursuit as far
11    as what was being transmitted over the radio?
12         A.    I do not.
13         Q.    At some point, did you come upon
14    the vehicles once there had already been an
15    accident?
16         A.    Yes, ma'am.
17         Q.    Did you witness any -- the
18    accident happening at 5th and Walnut?
19         A.    No, ma'am.
20         Q.    Do you have any memory of how
21    long it was -- well, strike that.
22              Did you hear over the radio
23    transmission that there had been an accident?
24         A.    Yes, ma'am.
25         Q.    And were you heading towards the
```

1    location of that accident while you were

2    operating your vehicle?

3         A.    Yes, ma'am.

4         Q.    And how long did it take you

5    to -- once you heard about the transmission

6    of the accident, to get to the scene where it

7    occurred?

8         A.    Probably about 30 seconds.

9         Q.    Okay.  And what did you observe

10   when you arrived at the scene?

11        A.    The car -- there was obviously a

12   crash.  I observed a male, white, running

13   from the scene.  I originally thought that

14   potentially could be Mason or one of the

15   occupants.

16             So I drove -- I didn't stop at

17   the scene originally.  So when I came to the

18   intersection, I saw him running.  I quickly

19   realized he was just someone running from the

20   scene that was not involved.

21             It's -- it's a one-way street.

22   It took me several minutes to come back to

23   the scene to navigate the one-ways.  And then

24   by that time, Officers Thomas and Lanter were

25   giving verbal commands trying to get the

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    occupants of the car in custody and

2    repeatedly asking for medical units to

3    arrive, who did arrive very soon thereafter.

4         **Q.    Regarding the person that you**

5    **saw running, did you actually stop that**

6    **person or detain them for any --**

7         A.    No.

8         **Q.    You just kind of made by your**

9    **observation the realization that this person**

10   **was just running to get away from the crash?**

11        A.    Yes, ma'am.

12        **Q.    Okay.  And what did you see as**

13   **far as the crash scene itself when you did**

14   **come -- when you first came upon the crash**

15   **site?**

16        A.    The vehicle had crashed into the

17   building.  There were, obviously, pedestrians

18   laying on the sidewalk.

19             And there were another male and

20   female on the south side of the sidewalk that

21   had seemed to be injured in some capacity.

22        **Q.    And could you tell was the car**

23   **itself like smoking or on fire?**

24        A.    Smoking.

25        **Q.    Okay.  And was there damage to**

1  any CPD vehicles as far as you could tell?

2          A.    No, ma'am.

3          Q.    And you said the car seemed to

4  be crashed into a wall?

5          A.    A building.

6          Q.    A building.  Okay.  And was that

7  the building that houses the Press on

8  Monmouth Restaurant?

9          A.    I don't know the name of it, but

10  the corner building of 5th and Monmouth.

11          Q.    And what could you see of the

12  individuals that were on the ground on the

13  sidewalk?

14          A.    That they were laying on the

15  sidewalk not moving.

16          Q.    Okay.  And could you observe any

17  injuries to those persons?

18          A.    They -- they were severely

19  injured.

20          Q.    You know, forgive me for going

21  into details, but could you see blood?

22          A.    Yes, ma'am.

23          Q.    Can you see physical injury to

24  their bodies?

25          A.    Yes, ma'am.

```
 1          Q.    And the persons on the sidewalk

 2    on the other side of the street, what did you

 3    observe of them?

 4          A.    Blood.

 5          Q.    Okay.  And did those -- how were

 6    those individuals positioned on the other

 7    side of the street?

 8          A.    They had walked across the

 9    street.  So they were injured, but to the

10    point where they could still walk.

11          Q.    And where did you observe blood

12    on their persons?

13          A.    I don't recall.

14          Q.    Okay.  And do you recall if this

15    was males, females, what was the physical

16    description?

17          A.    One male -- one male and one

18    female.

19          Q.    And -- but at your first

20    observation, were those individuals seated on

21    the ground, were they standing one along the

22    other?

23          A.    They walked across the street

24    and sat.

25          Q.    Did you actually observe them
```

1   walk across?

2         A.    Yes.

3         Q.    Okay.  And at that point, the

4   first -- this first observation that you

5   made, was it from the window of a moving car?

6         A.    When I observed the male

7   running, when I came back, there was -- by

8   the time I made it back, there were multiple

9   other uniformed or Cincinnati Police officers

10  on the scene.

11              And the scene was -- obviously,

12  there was not a lot of standing around, so

13  people were moving a lot.

14        Q.    And your -- the observations we

15  discussed where you saw the individuals lying

16  on the sidewalk and individuals who walked

17  across the street, was that on your very

18  first observation of the scene, or was that

19  actually when you come around?

20        A.    On the secondary -- when I

21  actually stopped and got out of my vehicle.

22        Q.    And on your first time around,

23  did you -- had you observed these

24  individuals, any of the four of them on the

25  scene?

```
 1           A.    No, ma'am.

 2           Q.    Okay.  And that -- is that

 3    because your focus was on this individual you

 4    saw running?

 5           A.    Yes, ma'am, that's accurate.

 6           Q.    And at some point, did you stop

 7    at the scene or stop, park --

 8           A.    Yes.

 9           Q.    -- go towards the scene?

10           A.    Yes, ma'am.  I parked about a

11    block away, when I was finally able to

12    navigate back to the area of the crash.

13           Q.    And did you take any actions at

14    the scene?

15           A.    I just helped try to -- well,

16    like I said, when I first got out of the car,

17    they were still giving verbal commands to the

18    occupants of the car.

19                 So I provided cover to

20    Officers Lanter -- or Sergeant Lanter and

21    Officer Thomas while those occupants were

22    being placed into custody.

23           Q.    Did you pull your handgun?

24           A.    I do not recall.

25           Q.    And by providing cover, what
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    does that mean to you?

2         A.    Being in the area in case any of

3    the occupants would run, there would be any

4    resisting, one person gives verbal commands,

5    the other officer is standing in the area to

6    assist.

7              There were so many officers on

8    scene.  I did not want to actually assist

9    with any handcuffing or anything, but I was

10   there as cover to support.

11        Q.    Okay.  And did the persons in

12   the car attempt in any way to run from the

13   crash car?

14        A.    No.  Mr. Meyer was kind of on

15   the -- stuck inside.  I don't think he had

16   the ability to flee.  And then the other two

17   individuals did not flee.

18        Q.    Okay.  And could you see any

19   obstruction that was holding Meyer in the

20   car?

21        A.    No.

22        Q.    Okay.  And did you develop an

23   understanding that the way that the car had

24   crashed had somehow pinned him into the car?

25        A.    Yes, the car was obviously

```
 1    totaled, and as I said, smoking.  There was
 2    heavy damage to the front end to the area he
 3    was seated.
 4            Q.    Okay.  To just turn quickly back
 5    to Officer Thomas, you said you're not
 6    exactly sure when he overtook you in the
 7    pursuit; is that correct?
 8            A.    He passed me somewhere in the
 9    downtown -- on the Cincinnati side of the
10    river.
11            Q.    Okay.  And from that point
12    forward, did you also have Officer Thomas'
13    lights and sirens at least in your vision
14    until you lost sight of the marked cars?
15            A.    Yes, ma'am.
16            Q.    Okay.  Do you recall which
17    portion of the pursuit that you had a visual
18    of Thomas' vehicle?
19            A.    From the time we got into
20    Kentucky.  And that's why I said somewhere in
21    that Covington/Newport area is where I lost
22    sight.
23            Q.    Okay.  Is that because the two
24    officers in the car were proceeding at a
25    higher rate of speed than you?
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1          A.    Yes, ma'am.
2          Q.    How long were you on the scene
3    that day at 5th and Monmouth?
4          A.    Probably -- it's tough for me to
5    recall, maybe 30 to 45 minutes.
6          Q.    And did you take on any other
7    roles, do any other tasks while you were
8    there other than what you described about
9    providing cover?
10         A.    No, ma'am.
11         Q.    Okay.  And at what point did
12   you -- at some point, you left that scene
13   that day?
14         A.    Yes, ma'am.
15         Q.    And at what point did you leave?
16   What caused your decision to leave the scene?
17         A.    I don't know who the OIC was for
18   the crash site.  But once I told the
19   supervisor my involvement, it was determined
20   that I didn't need to stay for any interviews
21   for that evening.  And I was told that I
22   could go back to the office and secure.
23         Q.    And is that a directive that was
24   given to you by your supervisor?
25         A.    I do not -- I do not recall the
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    supervisor that gave me -- there was

2    supervision of all ranks, obviously, with the

3    nature of what had happened all the way up to

4    the assistant chief, and I don't know which

5    supervisor and what rank it would have been

6    that I stayed at my involvement and was

7    released to go back to secure.

8          Q.    And do you recall what you

9    conveyed to the person you spoke to about

10   your involvement was?

11         A.    That I was behind

12   Sergeant Lanter and then behind

13   Sergeant Thomas.  I did not observe the crash

14   itself, drove through the scene, came back,

15   and assisted.

16         Q.    And did you indicate to the

17   person that you spoke to on the scene that

18   you had been involved in observation of Meyer

19   at the time Lanter began the pursuit?

20         A.    Yes, ma'am.

21         Q.    Okay.

22         MR. COWAN:  I don't want to

23   interrupt your flow, but we've been going

24   about two hours.  Do you want to take a break

25   when it's convenient?

Case: 2:21-cv-00102-DLB    Doc #: 134    Filed: 11/06/25    Page: 224 of 280 - Page
ID#: 1206
Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    MS. SALLEY:  Yeah.  Give me
 2          a little bit more to finish this section and
 3          then we can take a break.
 4                    MR. COWAN:  Okay.
 5                    MS. SALLEY:  You know what, I
 6          think we can actually -- we can break now.
 7                    MR. COWAN:  Okay.  Thanks.  We
 8          just need five minutes or so.
 9                    MS. GREENE:  So we're off the
10          record?
11                    MS. SALLEY:  Off the record.
12            (Off the record.)
13            (Exhibit 6 was marked.)
14                    MS. GREENE:  And quickly before
15          we just ask any questions, I just want to
16          note for counsel, we've heard -- we talked
17          about the reference to the interview earlier
18          that I'm interested in you guys --
19                    MR. COWAN:  Uh-huh.
20                    MS. GREENE:  -- producing to us
21          of Officer Bode, but in addition to that, we
22          heard reference to radio traffic from August
23          6th and earlier on the 7th, but neither of
24          which I believe has been produced to date in
25          the litigation, so I'd ask that those things
```

```
 1    be produced.
 2                    MR. COWAN:  We'll look into it,
 3    yeah.
 4                    MS. GREENE:  Thank you.
 5    BY MS. SALLEY:
 6          Q.    Okay.  Briefly before we dive
 7    back into events, I have marked this document
 8    as Plaintiffs' 6.  Okay.  So I've handed the
 9    witness what's Exhibit 6.
10                    It's a Google Map screenshot.
11    And based on your testimony today,
12    Officer Bode, at the time this intersection
13    at Steiner Avenue and River Road was a stop
14    sign, but does this appear to you to be that
15    intersection?
16          A.    Yes, ma'am.
17          Q.    From the view of coming down
18    Steiner Avenue to turn onto River Road?
19          A.    Yes, ma'am.
20          Q.    Okay.  That's -- and is this the
21    lane to the right on Steiner where there'd be
22    a car facing River Road, is that the location
23    where you saw Mason Meyer for the first time?
24          A.    Yes, ma'am.
25          Q.    Okay.  And were you proceeding
```

1    through this intersection on River Road?

2          A.    Yes, ma'am.

3          (Exhibit 7 was marked.)

4    BY MS. SALLEY:

5          Q.    Okay.  All right.  You can set

6    that aside.  I've also marked this one as

7    Plaintiffs' 7 is another Google Maps'

8    screenshot.

9                And do you recognize this

10   screenshot from Google Maps to be a

11   screenshot of the intersection at State and

12   River Road?

13         A.    Yes, ma'am.

14         Q.    As taken from the perspective of

15   a person going inbound to Cincinnati on River

16   Road?

17         A.    Yes, ma'am.

18         Q.    And to the left there is State

19   Avenue; is that correct?

20         A.    Yes, ma'am.

21         Q.    And that light is in the same

22   form as it was on August 7th of 2020, to your

23   recollection; is that right?

24         A.    Yes, ma'am.

25         Q.    And over in the very left side

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    of this map, once you've gone under the
 2    overpass, can you also identify there the
 3    turn that's the Elberon Avenue left turn?
 4              A.    On the far left edge?
 5              Q.    Yes.
 6              A.    Yes, ma'am.
 7              Q.    It's not highly visible, but
 8    it's there and that's where Elberon Avenue
 9    is, correct?
10              A.    Yes, ma'am.
11              Q.    Okay.  And you can put that
12    aside as well.
13                    In your Internal Investigation
14    interview when you were interviewed,
15    everything that you said in that interview
16    was the truth to the best of your knowledge
17    and recollection, correct?
18              A.    Yes, ma'am.
19              Q.    Okay.  Do you know if you have a
20    duty or responsibility to tell the truth in
21    those interviews?
22              A.    Yes, ma'am.
23              Q.    And are you under oath during
24    those interviews?
25              A.    You're under Garrity, but you're
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    under oath.
 2            Q.    Okay.  So to your understanding,
 3    you have a responsibility to tell the truth
 4    in that interview?
 5            A.    Yes, ma'am.
 6            Q.    Okay.  In the -- the description
 7    that you've given about your involvement and
 8    what you were observing in the pursuit, were
 9    you also considered a unit that was partaking
10    in the pursuit?
11            A.    No, ma'am.
12            Q.    Okay.  Is that because you were
13    not designated as an -- by someone else in
14    the unit for participating in a pursuit?
15            A.    Can you repeat?
16            Q.    Yes.  So from what you've
17    described, it sounds like you kept up with
18    the pursuit for much of it at least until you
19    were able to get to Kentucky and then
20    followed it on the radio, correct?
21            A.    Yes, ma'am.
22            Q.    And then, ultimately, ended up
23    at the destination where the pursuit
24    terminated with the accident, correct?
25            A.    Yes, ma'am.
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    And to your understanding, you

2    were not designated as a part of the pursuit?

3    A.    Correct.

4    Q.    Okay.  And do you know why you

5    were not designated as a unit in the pursuit?

6    A.    You cannot be in pursuit if you

7    don't have overhead lights and sirens.

8    Q.    Were you -- did you have

9    anything available to you in your car like a

10   temporary light or a siren to use?

11   A.    No.  Unmarked vehicles aren't

12   equipped with anything like that.

13   Q.    Okay.  And at any point, did you

14   have anything available to you to indicate to

15   other drivers that you were part of this

16   pursuit or attempting to follow these cars --

17   A.    No, ma'am.

18   Q.    -- these police cars?  Same

19   answer?

20   A.    No, ma'am.

21   Q.    Sorry I talked over you.  Okay.

22   And in the course of -- when you lost sight

23   of the vehicles once you got over to the

24   Kentucky side, what was it that kept you from

25   keeping up with them?

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                 A.    I was unable to see them, so...
 2                 Q.    Did they proceed at a rate of
 3       speed that made it so that they got out of
 4       your viewpoint?
 5                 A.    Yes, ma'am.
 6                 Q.    And once they -- for instance,
 7       if they did a turn somewhere and you lost
 8       sight of them?
 9                 A.    I would assume.  I mean, I
10       just -- I could see them, yes, and then they
11       would turn maybe once or twice to the point
12       to where I couldn't continue following him.
13                 Q.    And you already -- you testified
14       at some points that there were points during
15       the pursuit that you drove at lower rates of
16       speed than the vehicles in the pursuit,
17       right?
18                 A.    Yes, ma'am.
19                 Q.    And why was that?
20                 A.    They were following a vehicle
21       that was traveling faster than I was.
22                 Q.    And was there a reason why you
23       specifically didn't keep up with those
24       speeds?
25                 A.    That I didn't keep up with those
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    speeds?

2          Q.    Uh-huh.  That you didn't

3    maintain the same speeds as those officers?

4          A.    Generally because of traffic in

5    front of me.

6          Q.    Okay.  Other cars and trying --

7          A.    Yes.

8          Q.    -- to move through those cars?

9          A.    Like I said, I had nothing

10   equipped with mine, lights or sirens, so they

11   knew that I was part of that.  So I would

12   have to wait to be able to navigate up back

13   to the pursuit.

14         Q.    And at any point, did you

15   consider the safety of pedestrians or

16   bystanders or other motorists while you were

17   operating your vehicle in that pursuit?

18         A.    That's always a factor to

19   consider, yes, ma'am.

20         Q.    Okay.  And was that another

21   reason why you maintained slower speeds at

22   certain points?

23         A.    Mainly vehicular traffic.  I

24   didn't observe a lot of pedestrian.

25         Q.    Okay.  And drivers in other cars

```
 1    and being able to maneuver around those cars?

 2         A.    Yes, ma'am.

 3         Q.    And the safety of the drivers in

 4    those cars?

 5         A.    Yes, ma'am.

 6         Q.    And did you observe at any

 7    point -- at any point on the pursuit route

 8    that you followed pedestrians on the

 9    sidewalks or in any vicinity of the pursuit?

10         A.    I don't recall any specific

11    pedestrians at any point in time.

12         Q.    If you had observed pedestrians,

13    would you have taken their safety into

14    consideration in the way that you were

15    operating the vehicle?

16         A.    Yes, ma'am.

17         Q.    Was -- at any point, was there

18    any discussion amongst officers involved in

19    the pursuit about the risks or dangers to

20    civilians as this pursuit continued?

21         A.    No, ma'am.

22         Q.    Would you have expected that

23    type of discussion to take place during a

24    vehicle pursuit?

25         A.    No, ma'am.
```

1    Q.    And why is that?

2    A.    Because the radio traffic is

3    limited to the officer -- the primary officer

4    putting out the speeds and locations.  It's

5    the responsibility of the primary and the OIC

6    to take those factors into consideration, but

7    they're not necessarily vocalized over the

8    radio.

9    **Q.    And if any party, including the**

10   **primary or the OIC develops a concern about**

11   **pedestrian safety or bystander safety during**

12   **a pursuit, how are they -- are they required**

13   **by policy to communicate it?**

14   A.    If they choose at some point in

15   time to terminate the pursuit, that would be

16   stated over the radio, and then the cars

17   would pull to the side and turn off their

18   lights and sirens.

19   **Q.    And is an officer -- if an**

20   **officer, primary or OIC, chooses to terminate**

21   **a pursuit, did they -- are they required to**

22   **give a reason why they terminated a pursuit?**

23   A.    They are not required to state a

24   reason, no, ma'am.

25   **Q.    But at the time that they give**

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      an order to terminate a pursuit, other

2      officers are immediately required to comply

3      with that directive?

4            A.    Yes, ma'am.

5            Q.    And can other vehicles that are

6      involved in the pursuit or in the vicinity of

7      a pursuit, are they concerned about bystander

8      safety during a pursuit even if they're not

9      in the primary unit or the OIC?

10           A.    Yes, ma'am.

11           Q.    And can they do that over radio

12     channels?

13           A.    Yes, ma'am.

14           Q.    And is there -- are there other

15     ways that they can communicate those

16     concerns?

17           A.    Radio traffic is the only

18     primary form of communication during a

19     traffic pursuit.

20           Q.    Did anyone do that here --

21           A.    No, ma'am.

22           Q.    -- in the pursuit?  Was there

23     any discussion about stopping or terminating

24     the pursuit at any point?

25           A.    No, ma'am.

1    Q.    And that was up until a report

2    that the car accident had stopped the

3    pursuit; is that right?

4    A.    Yes, ma'am.

5    Q.    So up until that point, no other

6    discussion about when the pursuit should end

7    or if it should be terminated at any point?

8    A.    Yes, ma'am, that's correct.

9    Q.    Did you observe any motorcyclist

10   during that pursuit?

11   A.    Not that I recall.

12   Q.    Okay.  And you -- well,

13   actually, so the surface of the roadway on

14   the bridge was not just asphalt, right?

15   A.    Correct.

16   Q.    It's more of like a steel grid

17   material?

18   MR. COWAN:  Are you talking

19   about the Roebling?

20   MS. SALLEY:  Yes.  Did I say --

21   MR. COWAN:  I'm sorry.  I maybe

22   just didn't catch, but...

23   BY MS. SALLEY:

24   Q.    Okay.  Yes.  The Roebling Bridge

25   is not asphalt, it's actually some sort of

Deposition of Officer Mark Bode                                Jason Laible, et al., vs. Timothy Lanter, et al.,

1    steel grid?

2           A.    Yes, ma'am.

3           Q.    Can you describe the sensation

4    of driving on the Roebling Bridge?

5           A.    A mild vibration.

6           Q.    And does that increase if you

7    are driving on it at a higher rate of speed?

8           A.    Yes, ma'am.

9           Q.    And it has a sensation of being

10   a less stable surface than asphalt; is that

11   fair?

12          MR. COWAN:  Objection.

13          A.    I do not feel that it's less

14   stable.

15          Q.    But you describe it as a

16   vibration or shaking your car a little bit?

17          A.    A vibration, yes, ma'am.

18          Q.    Okay.  And have you known of any

19   vehicle to drift or slip on the surface of

20   the Roebling Bridge?

21          A.    I'm not aware.

22          Q.    Have you ever felt that

23   sensation of a, like, slipping or a drifting?

24          A.    No, ma'am.

25          Q.    Okay.  You described an

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    encounter with a supervisory officer at the

2    scene before you left the scene.

3              And what did that supervisory

4    officer tell you regarding your

5    responsibilities of your involvement?

6        A.    He asked my involvement.  I

7    described it, as I talked and testified here

8    today.  In incidents like this, they will do

9    interviews that -- the same day.

10             So I asked if I needed to stay

11   around for an interview.  I was told that I

12   was not and that I could secure.

13       Q.    And in -- you said incidents

14   like these.  First of all, is there a

15   requirement to your knowledge for officers to

16   write incident reports for incidents

17   involving arrests, injuries, use of force,

18   like a variety of types of incidents?

19       A.    There are reports done the

20   officers are not required to fill out.  Like

21   an incident report related to the specific

22   use of force or anything like that.

23       Q.    As far as you know in your

24   duties, are there certain scenarios that

25   require an officer to write a written

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    incident report, at least fill out a report?

2              MR. COWAN:  Objection.

3         A.    Not that -- specific to an

4    incident like this, no, ma'am.

5         Q.    Okay.  And in regard to a -- do

6    you know the term "critical incident"?

7         A.    Yes, ma'am.

8         Q.    Do you know, what's that term

9    mean to you, to your understanding?

10        A.    Something where the police are

11   involved that results in serious injury or

12   death.

13        Q.    Okay.  And would this event have

14   qualified as a critical incident?

15        A.    Yes, ma'am.

16        Q.    And are you aware of any

17   policies/procedures at the Cincinnati Police

18   Department regarding duties of officers who

19   have knowledge of the critical incident to

20   write any report or summary of their

21   knowledge?

22              MR. COWAN:  Objection.

23        A.    No.

24        Q.    Okay.  And do you have any

25   understanding based on your experience, as

Deposition of Officer Mark Bode                      Jason Laible, et al., vs. Timothy Lanter, et al.,

1    far as the practices of the agency, about

2    which officers are required to create reports

3    when they have knowledge of a critical

4    incident?

5             MR. COWAN:  Objection.

6         A.    The reports would be done by the

7    supervision or the units that would

8    investigate the incident.

9         Q.    And do you know of any policy,

10   procedure, or practice regarding when an

11   individual officer with knowledge of a

12   critical incident has to give a statement or

13   an interview?

14        A.    Those that are directly involved

15   with that critical incident.

16        Q.    Okay.  And what does it mean to

17   be directly involved?

18        A.    If you're involved in a

19   shooting, if you were involved in that,

20   pulled your gun out, fired shots, were shot

21   at and had direct involvement with that

22   incident.

23        Q.    To your understanding, would

24   that include persons who witness an officer

25   pull their gun out or shoot?

1        A.    Yes, ma'am.

2        Q.    Does that include persons who

3   had knowledge about the events leading up to

4   or following such an incident?

5        A.    That would be a call from a

6   supervisor above my pay grade to make a

7   decision on that type of involvement.

8        Q.    And have you previously in your

9   experience had supervisory officers instruct

10   you to write reports about incidents that you

11   were involved with or had knowledge of?

12            MR. COWAN:   Objection.

13        A.    No, ma'am.

14        Q.    The supervisory officer that you

15   spoke to on the scene, did that person

16   indicate to you at any point that you may

17   need to provide an interview or a statement

18   in relation to what your knowledge was of

19   these events?

20        A.    No, ma'am.

21        Q.    And did you ever create any type

22   of even a draft of a written summary or a

23   statement regarding what you witnessed on

24   August 7th, 2020?

25        A.    No, ma'am.

```
 1              Q.    Okay.  Did anyone instruct you

 2      not to write a report or summary of your

 3      knowledge of the events of that day?

 4              A.    No, ma'am.

 5              Q.    Okay.  And upon the beginning of

 6      the pursuit and following at any point

 7      leading through to the vehicle crash, was

 8      there discussion at any point or conversation

 9      that Mason Meyer would be arrested no matter

10      what that day?

11                    MR. COWAN:  Objection.

12              A.    No, ma'am.

13          (Exhibit 8 was marked.)

14      BY MS. SALLEY:

15              Q.    Okay.  All right.  I am marking

16      what will be Plaintiffs' 8.  You can flip

17      through this document.  Let me know if it

18      appears to be familiar to you?

19              A.    I have not seen this document.

20              Q.    Okay.  This is -- do you

21      recognize this to be -- well, strike that.

22                    Are you familiar with the

23      Citizen Complaint Authority in Cincinnati?

24              A.    Yes, ma'am.

25              Q.    And it's known as the CCA,
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              correct?

 2                   A.    Yes, ma'am.

 3                   Q.    And they review incidents of

 4         police conduct for compliance with internal

 5         policy and review of the policy itself,

 6         correct?

 7                   A.    Yes, ma'am.

 8                   Q.    Okay.  And you said you have not

 9         seen such a report as it relates to the

10         Lanter and Thomas pursuit of Mason Meyer,

11         right?

12                   A.    Correct.  Yes, ma'am.

13                   Q.    Okay.  And earlier today you

14         mentioned that you had given the IIS

15         interview.  You do not have memory, correct

16         me if I'm wrong, of giving a second interview

17         to the CCA?

18                   A.    That's correct.

19                   Q.    Can you turn to page 7 of this

20         document?

21                   A.    Yes, ma'am.

22                   Q.    If you'd like to, you can --

23         there's a half page here, do you see your

24         name in the top, Officer Mark Bode?

25                   A.    Yes, ma'am.
```

1        Q.    Can you just read this half page

2    briefly and let me know when you're done

3    reading it?

4        A.    Yes.   (Witness complies.)  Yes,

5    ma'am.

6        Q.    Have you given CCA interviews in

7    the course of your employment since CCA has

8    existed?

9        A.    Yes, ma'am.

10        Q.    Do you know, has it happened

11    more than one time?

12        A.    Yes, ma'am.

13        Q.    And what kinds of cases have you

14    given CCA interviews?

15        A.    I can't recall the specifics.

16        Q.    And do you understand that there

17    would be a responsibility for officers being

18    interviewed by CCA to be truthful and to --

19    truthful and complete in the information that

20    they give to CCA?

21        A.    Yes, ma'am.

22        Q.    And do you, having read this

23    section here, recall being interviewed by

24    CCA?

25        A.    I really don't.

1    Q.    Okay.  And there's an

2    indication at the second paragraph here, it

3    says that CCA interviewed Officer Bode on

4    March 8th, 2022 at 10:31 a.m.

5              Now, if my math is right, is

6    that like about a year and a half after

7    August 7th of 2020?

8    A.    Yes, ma'am.

9    Q.    And sitting here today, you do

10   not have memory of participating in a CCA

11   interview?

12   A.    I do not remember the interview.

13   Q.    Okay.  Regardless, would it have

14   been your practice and intent to be truthful

15   to the CCA --

16   A.    Yes, ma'am.

17   Q.    -- interview -- interview --

18   interviewers?

19   A.    Yes, ma'am.

20   Q.    So in the third paragraph of

21   this report of this summary here, the

22   interviewer -- well, and I'll ask, so do you

23   understand CCA the way that that procedure

24   works is that they'll conduct an interview

25   and then summarize the contents of an

1    interview similarly to the way IIS might

2    summarize an interview?

3          A.    Yes, ma'am.

4          Q.    And this portion here, this

5    report was not actually written out by you,

6    correct?

7          A.    Correct.

8          Q.    And do officers have a chance to

9    review the statement or the summary that is

10   placed in the report based on the interview?

11         A.    No, ma'am.

12         Q.    Okay.  And also regarding IIS

13   reports, do officers have the ability to

14   review the portions of a report that is, you

15   know, the summary of the interview?

16         A.    No.

17         Q.    Okay.

18         A.    We -- they don't get to review

19   anything until the case or Internal files its

20   report.  So nothing based on what was said

21   that's transferred under here is reviewed.

22         Q.    Okay.  And at any point either

23   in IIS or in CCA, do you have the ability to

24   review the summary and address anything that

25   you might find inconsistent or incorrect?

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    No, ma'am.
 2              Q.    Okay.  Reading this portion
 3    here, the summary of your interview, do you
 4    have any reason to believe that this summary
 5    does not correctly accurately reflect what
 6    you told CCA?
 7              A.    No, ma'am.
 8              Q.    Okay.  And in the course of this
 9    third paragraph, in the third sentence it
10    says, Officer Bode was asked how fast he was
11    going during this pursuit, and his response
12    was, As quick as I could legally.  I don't
13    have lights and sirens, so I have to stop at
14    every stop sign.  I have to stop at every
15    traffic light.  So if it said 45, I was going
16    45.  I hardly had any sight of it, and I just
17    had to listen to the radio traffic.  Do you
18    see that?
19              A.    Yes.
20              Q.    And to your understanding when
21    you described that you don't have lights and
22    sirens so that you have to stop at every stop
23    sign and traffic light, is that because
24    that's mandatory for you under CPD policy?
25              A.    To stop at every stop sign, yes,
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    ma'am.
 2              Q.    Uh-huh.  And do you believe at
 3    any point that you did exceed the speed limit
 4    during the pursuit?
 5              A.    I do not know, ma'am.
 6              Q.    Okay.  Did you look down at your
 7    speedometer at any point during your pursuit?
 8              A.    No, ma'am.
 9              Q.    And why not?
10              A.    I was trying to stay focused on
11    the pursuit ahead of me.
12              Q.    And the statement, I hardly had
13    any sight of it.  I had to listen to the
14    radio traffic.
15                    The testimony that you've given
16    today was that you had sight of the pursuit
17    at least until some point in Kentucky --
18              A.    Yes, ma'am.
19              Q.    -- is that right?
20              A.    Yes, ma'am.
21              Q.    And to your memory sitting here
22    today, is that accurate?
23              A.    Yes, ma'am.
24              Q.    Is there anything else in that
25    statement -- strike that.  You
```

Case: 2:21-cv-00102-DLB   Doc #: 134   Filed: 11/06/25   Page: 248 of 280 - Page
ID#: 1230
Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        already testified.  Okay.
 2            (Exhibit 9 was marked.)
 3   BY MS. SALLEY:
 4            Q.    I am going to mark the next
 5   item, which will be Plaintiffs' 9.
 6                  Okay.  We -- we spoke briefly
 7   about critical incident review of certain
 8   incidents, right?
 9            A.    Yes, ma'am.
10            Q.    And do you -- the document in
11   front you is a June 16th, 2021, memorandum
12   with a subject Critical Incident Review Board
13   - Lanter Pursuit - IIS Case 2020-167.  Have
14   you seen this document before?
15            A.    No, ma'am.
16            Q.    Okay.  And do you have any
17   memory of being separately interviewed, asked
18   to give a statement for the purposes of this
19   report?
20            A.    No, ma'am.
21            Q.    Okay.  Do you have any knowledge
22   about the outcome of this report?
23            A.    No, ma'am.
24            Q.    Okay.  And do you have any
25   knowledge or memory of the outcome of this
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      report being discussed in any way as part of

2      your -- amongst officers in the department?

3              A.    No, ma'am.

4              Q.    If you turn to page 2 of this

5      report --

6              A.    Yes, ma'am.

7              Q.    -- there are some sections here,

8      there's one, two, three, four, five -- five

9      paragraphs down of the regular non-italic

10     font, it starts with your name,

11     Officer Mark Bode.

12             A.    Yes.

13             Q.    Do you see that?

14             A.    Yes, ma'am.

15             Q.    And that paragraph refers to

16     your conduct as well as the following one

17     about like your conduct in the pursuit.

18                  If you want to review those two

19     paragraphs briefly and let me know if those

20     comport with what you believe your previous

21     statements were regarding your involvement in

22     the events that day?

23             A.    Okay.  (Witness complies.)  Yes,

24     ma'am.

25             Q.    You can set that aside.  Is it

```
 1   accurate that your badge number is 3841?

 2           A.    No, ma'am.

 3           Q.    Okay.  What is your --

 4           A.    P21.

 5           Q.    Sorry.  What is it?

 6           A.    P21.

 7           Q.    P21?

 8           A.    Yes, ma'am.

 9           Q.    Okay.  Did you have any

10   affiliation with a number 3841 --

11                 MS. GREENE:  83 --

12           Q.    -- 8341?

13           A.    Oh, okay.  That would have been

14   my car number.

15           Q.    The car number.  Gotcha.  Okay.

16           A.    That could have been my car

17   number.  That would have been -- 8300 series

18   would have been the Gang Unit car numbers in

19   2020.

20        (Exhibit 10 was marked.)

21   BY MS. SALLEY:

22           Q.    Okay.  I'm gonna mark Exhibit 10

23   here.  Oh.  Wait, sorry.  I gave you the

24   wrong copy.  That's for you and that's for --

25   yes.
```

 1          **And do you recognize this --**
 2  **this document or what type of document it is?**
 3          A.    A CAD incident report.
 4          **Q.    And what does this report**
 5  **include, speaking generally, not necessarily**
 6  **the contents of this report?**
 7          A.    Timestamps for radio runs,
 8  locations, officers associated or assigned to
 9  the CAD.
10          **Q.    And how does an officer get**
11  **assigned to the CAD?**
12          A.    Either if they're dispatched or
13  an incident like this notifying
14  communications that they're associated with
15  this run or incident.
16          **Q.    And does the officer have to**
17  **notify someone that they're involved in an**
18  **incident to get on this list?**
19          A.    It was common for Sergeant Davis
20  to notify communications that Gang Unit would
21  be out at a location, and then anyone working
22  within the Gang Unit that day would get
23  attached to the CAD.
24          **Q.    Okay.**
25          A.    As opposed to every officer

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    individually notifying.
 2          Q.    And do you have any knowledge of
 3    whether Sergeant Davis notified dispatch
 4    about involvement in the pursuit of
 5    Mason Meyer?
 6          A.    No, ma'am.
 7          Q.    Okay.  Did you have any
 8    conversation with Sergeant Davis after the
 9    crash about anything involving Mason Meyer,
10    the investigation, or the car accident?
11          A.    No, ma'am.
12          Q.    Okay.  If you turn to page 2 of
13    this, it's a detail report, Personnel
14    Assigned, there is a list of individuals on
15    this page.  Do you see that list in the
16    Personnel Assigned?
17          A.    Yes.  Yes, ma'am.
18          Q.    And do you see individual names
19    on this list of persons who you know what --
20    who you knew were CPD officers who were
21    involved in the investigation or the pursuit
22    of Mason Meyer?
23          A.    Yes, ma'am.
24          Q.    Can you point out the names on
25    the list that you recognize?
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1              A.    To be involved with the pursuit

2      or the investigation?

3              Q.    Either one.

4              A.    Timothy Lanter, Kevin Broering,

5      Brett Thomas, Mark Bode, Chris Vogelpohl.

6      Those are the ones I recognize from that day.

7              Q.    Are there any other persons on

8      this list that you know to be members of the

9      Gang Unit?

10             A.    Charles Knapp, Cian McGrath,

11     Marvin Murrell, or it says Merlin --

12     Merlin Murrell, Deon Mack, Matt Ventre,

13     James Davis, Eric Schaible, Ryan Olthaus.

14             Those individuals are all

15     assigned to the Gang Unit.  So I think the

16     easiest thing is anything that started with

17     that 83 --

18             Q.    Uh-uh.  Okay.

19             A.    -- would have been assigned.

20             Q.    Okay.  And was there a -- is

21     there a way as well within this list to

22     identify who was Gun Crime Task Force?

23             A.    We may have both shared 8300

24     series car numbers.

25             Q.    Okay.

```
1              A.    Like I said while we were

2        separate, we worked under the same roof with

3        primarily the same hours and

4        responsibilities.

5              Q.    Okay.  And regarding -- there

6        are some other prefixes here like 8-1, do you

7        know that one?

8              A.    Canine.

9              Q.    Okay.  And 9-2, are you familiar

10       with that one?

11             A.    I am not.

12             Q.    7-6, do you know that one?

13             A.    That's Chris Vogelpohl.  He was

14       ATF Task Force.

15             Q.    And do you know if that 7-6

16       corresponded with the ATF Task Force?

17             A.    I do not.

18             Q.    Okay.  62?

19             A.    No, ma'am.

20             Q.    82?

21             A.    Traffic Unit.

22             Q.    32?

23             A.    32 is District 3, second shift.

24             Q.    Okay.  12?

25             A.    District 1, second shift.
```

```
 1            Q.      34?

 2            A.      District 3, power shift.

 3            Q.      What's a power shift?

 4            A.      They work -- they would start --

 5     they would be in between seconds and thirds.

 6     So sometime in the late afternoon early

 7     evening they would start.

 8            Q.      And 35?

 9            A.      District 3, Investigative Unit.

10            Q.      I think -- and 34?

11            A.      That's the District 3, power

12     shift.

13            Q.      Gotcha.  Okay.  Right.  And have

14     you ever reviewed this detail report?

15            A.      No, ma'am.

16            Q.      If you turn to page 8 of this

17     report --

18            A.      Yes, ma'am.

19            Q.      -- do you see about midway down

20     the page there is a number that they're

21     listing for 8341?

22            A.      Okay.

23            Q.      And does that correspond with

24     the number that you were assigned that day

25     based on this Personnel Assigned list?
```

Deposition of Officer Mark Bode                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes, ma'am.

 2              Q.    Okay.  And from looking at the

 3      entries here in the middle column there

 4      there's a D, do you know what that means?

 5              A.    No, ma'am.

 6              Q.    Do you know what update sector

 7      means?

 8              A.    No, ma'am.

 9              Q.    Okay.  And looking at the

10      timestamp there of August 7th, 2020 at

11      16:23:29, that would have been about 4:23 in

12      the afternoon; is that right?

13              A.    Yes, ma'am.

14              Q.    Okay.  Do you know where about

15      you would have been that day at 4:23?

16              A.    In the area of Steiner.

17              Q.    Okay.  And then the Steiner

18      Avenue address is listed there?

19              A.    Yes, ma'am.

20              Q.    Okay.  If you go down to the

21      bottom quarter of the page --

22              A.    Yes, ma'am.

23              Q.    -- there's an entry at

24      4:29:35 --

25              A.    Yes.
```

Deposition of Officer Mark Bode                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.      -- or 16:29:35 for the same

2    number.  Do you see that?

3      A.    Yes, ma'am.

4      Q.    And it says, Task Request Sent.

5    Do you know what that means?

6      A.    No, ma'am.

7      Q.    And do you know where 2140 Selim

8    Avenue is?

9      A.    2140 Selim Avenue, yes, ma'am.

10     Q.    And what does that entail?

11     A.    I have no idea what's that

12   about.  I know where that's at.

13     Q.    Okay.  Is that the police office

14   or is that the training center in Price Hill?

15     A.    No, ma'am.  It's a side street

16   off of Westwood Avenue.

17     Q.    Okay.  Do you remember being

18   there at any point on this day at that time?

19     A.    I was not there at that time,

20   no, ma'am.

21     Q.    Okay.  Okay.  And if you look at

22   page 11 of this incident report --

23     A.    Yes, ma'am.

24     Q.    -- in the top third of the page,

25   there's an entry at 5:35 -- 17:35, do you see

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        those?

 2               A.    Yes, ma'am.

 3               Q.    That are listed as ER and ONS at

 4        Monmouth Street and 5th.  Do you see those?

 5               A.    Yes, ma'am.

 6               Q.    Do you know what that

 7        notification -- what that note means?

 8                     MR. COWAN:  Objection.  Can you

 9        just clarify which one?

10               Q.    Yes.  Starting with the first

11        one, 17:35:35 for ER.

12               A.    I believe ER means en route.

13               Q.    Okay.

14               A.    But I -- the rest of it, I don't

15        know what that is in relation to.

16               Q.    And there's a note in the far

17        right column, it says, Status bypassed by

18        user due to allowable status change.  Do you

19        have any idea what that means?

20               A.    Absolutely no idea.

21               Q.    Okay.  And a note under in the

22        following -- in the column lower also at

23        17:35:35 saying, Responding from 2140 Selim

24        Avenue?

25               A.    Yes, ma'am.
```

Deposition of Officer Mark Bode                      Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    Were you doing that -- were you

2    at Selim Avenue at any point during that day?

3          A.    No, ma'am.

4          Q.    Okay.  Were you in the area of

5    Selim Avenue at any point?

6          A.    No, ma'am.

7          Q.    Okay.  You can set that aside.

8    Following August 7th, 2020, are you aware of

9    any changes to the Cincinnati Police

10   Department's pursuit policy or procedure?

11         A.    Yes, ma'am.

12         Q.    And what changes are you aware

13   of?

14         A.    I don't know the exact, but

15   there's more restrictions to what we can now

16   engage in in a traffic pursuit.

17         Q.    And how did you learn about

18   those restrictions?

19         A.    Through staff notes and roll

20   calls.

21         Q.    And what is a roll call?

22         A.    The beginning -- the beginning

23   of each shift when the officers and

24   sergeants -- it looks different for a unit

25   like mine than it would for a general patrol

```
 1    unit.

 2                   But any unit, like the

 3    Gang Unit, we would discuss what anyone had

 4    going on today and if there were any changes

 5    across the board for like the department like

 6    that, the sergeants would go over that with

 7    us.

 8         Q.    Okay.  We talked about staff

 9    notes before, that is an electronic item that

10    the officers are required to actually review

11    in written form, right?

12         A.    Yes, ma'am.

13         Q.    And roll call, does that ever

14    involve passing out of handouts or like

15    physical copies of written updates?

16         A.    No, ma'am.

17         Q.    Okay.  And roll call, is that

18    generally done verbally?

19         A.    Yes, ma'am.

20         Q.    Okay.  And are there any notes

21    or agendas that as far as your experience of

22    what you've seen associated with roll call?

23         A.    No, ma'am.

24         Q.    Okay.  So staff notes would be

25    in a place where if there was any -- any
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          written documentation that's passed out to

 2          officers for review about policy changes and

 3          things?

 4                    MR. COWAN:  Objection.

 5               A.    Yes, ma'am.

 6               Q.    Okay.  And are you -- are you

 7          able to describe what types of restrictions

 8          were put in place due to changes in a policy

 9          or procedure?

10               A.    I know there's no longer

11          misdemeanor pursuits, even criminal offenses.

12          And they did -- it is clear in the procedure,

13          I just have not been in uniform for over ten

14          years, so I haven't refreshed myself with

15          that procedure because it really doesn't -- I

16          don't have to deal with it on a day-to-day

17          basis.

18               Q.    And I may have asked this, but

19          since 2020, have you undergone any further

20          vehicle pursuit training?

21               A.    No, ma'am, I have not.

22               Q.    Okay.  And are you aware of any

23          new vehicle pursuit training that has been

24          provided to any officers in the police

25          department?
```

1        A.    No, ma'am.

2        Q.    Okay.  And are you aware of any

3   critical incident meetings, any events, any

4   forums at which the topic of vehicle pursuits

5   was discussed, analyzed, or reviewed

6   following August 7th, 2020?

7              MR. COWAN:  Objection.

8        A.    No, ma'am.

9        Q.    And are you aware of any meeting

10  or forum where the -- specifically the Meyer

11  pursuit was a topic of discussion or analysis

12  or review?

13             MR. COWAN:  Objection.

14       A.    No, ma'am.

15       Q.    We spoke a bit about what your

16  understanding was of like whether or not you

17  needed to complete incident reports or the

18  critical incident report.  Do you recall that

19  portion of our conversation?

20       A.    Yes.

21       Q.    What types of documentation by

22  anyone in the department, supervisory

23  officers, patrol officers, would you expect

24  to exist in a situation like the one we've

25  discussed today involving a pursuit or

```
 1     fatalities?
 2               MR. COWAN:  Objection.
 3          A.    I don't know of any documents --
 4     required documents that are filled out by the
 5     officers involved.  That would be interviews
 6     after an incident like this are
 7     comprehensive, and I'm assuming the tapes of
 8     those interviews would stand for the
 9     evidentiary value of what was written.
10               There's no standard --
11     standardized form for an incident for an
12     officer to complete.
13          Q.    Okay.  Is -- is Tim Lanter a
14     supervisor you encounter frequently in your
15     work in the Gang Unit?
16          A.    Yes, ma'am.
17          Q.    And was that true in 2020 as
18     well?
19          A.    I apologize.  That's what I was
20     referring to, in 2020.
21          Q.    Do you still have frequent
22     contact with him as of today?
23          A.    As a supervisor, no, ma'am.
24          Q.    Okay.  And what was your
25     relationship with him like as a supervisor?
```

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    MR. COWAN:  Objection, vague.
 2          A.    A sergeant PO.  He was my boss.
 3          Q.    Did you have conversation or
 4   contact on a daily basis in 2020?
 5          A.    Yes.  We worked at the same
 6   times out of the same office, yes, ma'am.
 7          Q.    And did you have any personal
 8   relationship with him outside of your working
 9   relationship?
10          A.    We serve on the union's
11   executive board together.
12          Q.    And does that include any, like,
13   socializing or non-work related --
14          A.    Two monthly meetings.
15          Q.    Okay.  And how would you
16   describe his style as a supervisor, if you
17   can?
18          A.    His style?
19          Q.    Yeah.
20          A.    I think Sergeant Lanter is a
21   good supervisor.  I think he's very
22   transparent.
23          Q.    And what do you mean by that?
24          A.    You know -- he's very decisive.
25   You know where he stands on an issue.
```

1      Q.    And does that include

2  work-related issues?

3      A.    Yes, ma'am.

4      Q.    And does that include personal

5  issues?

6      A.    I don't have that much of a

7  personal relationship with Sergeant Lanter.

8      Q.    Does that include interpersonal

9  issues that might arise in the course of

10 work?

11     A.    Yes.

12     Q.    Does Sergeant Lanter have any

13 nicknames in the department?

14     A.    Turbo.

15     Q.    Turbo.  And do you know why he

16 got that nickname?

17     A.    No, ma'am.

18     Q.    Okay.  Do you know when he got

19 the nickname?

20     A.    No, ma'am.

21     Q.    Do you know when you became

22 aware of him having that nickname?

23     A.    As long as I can remember

24 Sergeant Lanter.

25     Q.    Okay.  And did you start working

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1   with Sergeant Lanter when you first started

2   working in the Gang Unit in 2017?

3         A.    Yes, ma'am.

4         Q.    Okay.  And did you ever have any

5   type of supervisory relationship with

6   Officer Thomas?

7         A.    He's a police officer, so

8   supervisor.  We just -- he's the same rank as

9   I.

10        Q.    Okay.

11        A.    So there was no supervisory

12  relationship in either direction between

13  Officer Thomas and myself.

14        Q.    Makes sense.  Did you have a

15  working relationship with Officer Thomas in

16  2020?

17        A.    Not on a day-to-day basis, very,

18  very infrequent interaction with

19  Officer Thomas.

20        Q.    Okay.  And did you have any

21  notable interactions with him or interactions

22  that stood out to you based on working with

23  him?

24              MR. COWAN:  Objection.

25        A.    We worked in the same unit years

1    prior to that.

2         Q.    Okay.  So you had some other

3    knowledge of working with him in other

4    contexts?

5         A.    Yes, ma'am.

6         Q.    Okay.  And was he involved in

7    working with the Gang Unit on a regular basis

8    in 2020?

9         A.    No, ma'am.

10         Q.    Okay.  Did you -- had you ever

11    worked with Sergeant Scalf?

12         A.    He supervised me earlier in my

13    career.

14         Q.    And do you remember which spans

15    of years that might have been?

16         A.    It was in the Vortex Unit,

17    which was probably '07.

18         Q.    And do you know how long that he

19    was your supervisor?

20         A.    A couple years.

21         Q.    Okay.  What was the Vortex Unit?

22         A.    It's pretty much the Gang Unit.

23    It has been renamed so many times over the

24    years.

25         Q.    So similar responsibilities,

1    investigating drug sales like you described?

2         A.    My role is the exact same in

3    Vortex as it was in Gang, yes, ma'am.

4         Q.    Were you also plainclothes in

5    that?

6         A.    Yes, ma'am.

7         Q.    And what was your working

8    relationship with Sergeant Scalf like?

9         A.    We had a good working

10   relationship.

11        Q.    And did -- at any point in

12   working with either of those individuals,

13   aside from the vehicle pursuit we've spoken

14   about today, did you have scenarios with

15   either Sergeant Lanter -- or was he a

16   sergeant, Sergeant Scalf, was he a sergeant

17   at the time?

18        A.    Yes, ma'am.

19        Q.    Did you have situations where

20   you were involved in vehicle pursuits when

21   you were under his supervision?

22        A.    Yes, ma'am.

23        Q.    Do you recall specific incidents

24   of that happening?

25        A.    I'm sorry.  Just to clarify, the

```
 1   Gang Unit would have vehicle pursuits.  I was
 2   never engaged in -- engaged in a vehicle
 3   pursuit during the Gang Unit under the
 4   supervision of Sergeant Lanter.
 5        Q.    Okay.  And at any point, did
 6   either of those, Lanter or Scalf, ever review
 7   any action you took as part of a vehicle
 8   pursuit in their supervisory capacity?
 9        A.    No, ma'am.  I was never actually
10   engaged in a vehicle pursuit.  The unit --
11   the uniformed officers within the unit were.
12        Q.    Okay.  And does -- then
13   Sergeant Scalf, did he have any nicknames in
14   the department?
15        A.    No, ma'am.
16        Q.    What about Officer Thomas?
17        A.    No, ma'am.
18        Q.    If you give us -- wait, well,
19   hold on.  Have -- have you during your tenure
20   at Cincinnati Police been a subject of an
21   Internal investigation at any point?
22        A.    Yes, ma'am.
23        Q.    And do you know how many
24   instances that you've been subject to an
25   Internal investigation?
```

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          A.    No, ma'am.

 2          Q.    And do you know the topics or

 3    issues underlying those Internal

 4    investigations?

 5          A.    It's been probably over ten

 6    years since I've been a subject, so I don't

 7    have any -- recall any specifics of the

 8    allegations.

 9          Q.    Do you know if any were --

10    involved policy violations?

11          A.    I don't recall.

12          Q.    Do you know if any involved

13    citizen complaints?

14          A.    Yes, ma'am.

15          Q.    Okay.  And how many instances do

16    you recall of citizen complaints leading to

17    an Internal investigation?

18          A.    I don't -- I don't know a

19    number.

20          Q.    Okay.  And do you know the

21    outcome of those complaint investigations?

22          A.    Normally, not sustained or

23    exonerated.

24          Q.    And do you have a memory here

25    today of any time when an Internal
```

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      investigation has come to a conclusion that

2      an allegation against you was sustained?

3              A.    I'm sure there has been a

4      sustained in my career, but I don't recall

5      any specifics on that.

6              Q.    Okay.  Did any, to your memory

7      of any investigation that you've been the

8      subject of, any involve vehicle pursuits?

9              A.    Not that I recall.

10             Q.    Okay.  And do you -- at any

11     point before or following the pursuit of

12     Mason Meyer, did you have discussions with

13     Timothy Lanter about Mason Meyer or that

14     investigation?

15             A.    No, ma'am.

16             Q.    Did you have any discussions

17     with Sergeant Lanter following the vehicle

18     crash on August 7th of 2020 involving

19     Mason Meyer, that vehicle pursuit, or any of

20     the people injured in the pursuit?

21             A.    Yes, ma'am.

22             Q.    And when did you have those

23     conversations?

24             A.    I called Sergeant Lanter

25     probably within 24 hours just to check on --

1    to see how he was handling with the situation

2    emotionally.

3             Q.    And what did you discuss on that

4    phone call?

5             A.    I don't remember the specifics.

6    It was a long time ago.  I was just calling

7    to check in on him.

8             Q.    And what did he tell you about

9    how he was doing?

10            A.    He said that he was fine.

11            Q.    Okay.  Did he indicate whether

12    or not he was physically injured in any way?

13            A.    I don't recall him having any

14    physical injuries over this incident.

15            Q.    Okay.  And other than saying

16    that he was fine, did he say anything else to

17    you regarding the investigation or the

18    vehicle pursuit?

19            A.    No, ma'am.

20            Q.    And why -- why did you call him?

21            A.    Because he was involved in a

22    critical incident that resulted in the loss

23    of two lives.

24            Q.    And do you have the type of

25    relationship that you would call and have

Deposition of Officer Mark Bode                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          that kind of conversation?
 2                  A.      I called him, so I obviously had
 3          that relationship with him.
 4                  Q.      Yeah.  Did you have that type of
 5          relationship with any other officer involved
 6          in that pursuit?
 7                  A.      I called Brett Thomas as well.
 8                  Q.      Okay.  And did you -- what was
 9          the -- what was discussed on that
10          conversation?
11                  A.      It was of the same nature.  I
12          was calling to check to see how he was
13          handling himself emotionally.
14                  Q.      Okay.  And what did he tell you?
15                  A.      That he was fine as well.
16                  Q.      Okay.  Did he tell you anything
17          else regarding the investigation about
18          Mason Meyer, about the crash, or about any of
19          the persons injured in the crash?
20                  A.      No, ma'am.
21                  Q.      And did either Lanter or Thomas
22          make any statements during those calls about
23          investigation or review of the pursuit?
24                          MR. COWAN:  Objection.
25                  A.      No, ma'am.
```

1    Q.    Okay.  And other than Lanter and

2    Thomas, did you have discussions with any

3    other persons involved in the operations on

4    August 7th including the investigation and

5    the pursuit as any -- of any law enforcement

6    agency?

7                MR. COWAN:  Objection.

8    A.    No, ma'am.

9    Q.    And did you have following the

10   crash on August 7th, discussions with any

11   other persons at CPD related to the pursuit

12   or the events of August 7th aside from the

13   person you spoke to on the scene?

14   A.    No.  But to clarify, I had a

15   conversation with a probation officer who was

16   related to the family of the deceased.  He

17   called me about the pursuit.

18   Q.    Do you know who that officer

19   was?

20   A.    John Schwinn.

21   Q.    Schwinn.  Is that S-C-H-W-I --

22   A.    -- I-N-N, I believe.  I think

23   it's two Ns.

24   Q.    Okay.  And did you have any

25   connection or knowledge of that person prior

Deposition of Officer Mark Bode

Jason Laible, et al., vs. Timothy Lanter, et al.,

1  to discussing -- having a phone call with

2  him?

3         A.    Yes, I have a professional

4  relationship with Officer Schwinn.

5         Q.    Okay.  And what was discussed on

6  that phone call?

7         A.    He asked if I knew any of the

8  details of the pursuit.

9         Q.    And what did you tell him?

10        A.    I told him the basics of what we

11 discussed here about Mason Meyer, and that it

12 started down in the Sedamsville area, and

13 that it went over there.

14               And I told him that I didn't see

15 the crash, and then he told me that the

16 victims were related to his wife.

17        Q.    And, specifically, the two

18 individuals who died?

19        A.    Yes.  Sorry.

20        Q.    You understand that was the

21 Laible couple?

22        A.    The Laible couple, yes, ma'am.

23        Q.    And did he convey anything else

24 to you about the family or the Laibles?

25        A.    No, ma'am.

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              Q.    Okay.  And did you convey
 2      anything else to him other than the knowledge
 3      you've described about the pursuit?
 4              A.    No, ma'am.
 5              Q.    And when did that occur?
 6              A.    Either the day of or the
 7      following day.
 8              Q.    And is it accurate that you've
 9      been involved in a deadly force -- deadly
10      force incident during your tenure at the CPD?
11              A.    Yes, ma'am.
12              Q.    About how many such incidents
13      have you been involved in directly?
14              A.    One ma'am.
15              Q.    Okay.  And did that involve a
16      shooting following a vehicle stop?
17              A.    Yes, ma'am.
18              Q.    Okay.  Were you the person who
19      fired a weapon in the course of that event?
20              A.    Yes, ma'am.
21              Q.    And a person died?
22              A.    Yes, ma'am.
23              Q.    Okay.  Have you ever been a
24      defendant in a lawsuit related to your duties
25      with the Cincinnati Police Department?
```

Deposition of Officer Mark Bode                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1        A.    No, ma'am.

2        Q.    Okay.  And we have to ask

3    everyone this, have you been a defendant in

4    any other type of lawsuit?

5        A.    No.

6              MS. SALLEY:  Okay.  If you'd

7    give us just a couple minutes, we're wrapping

8    up and then we'll finish up for the day and

9    let you go.

10              THE WITNESS:  Yes, ma'am.

11              MS. GREENE:  Go off the record?

12              MS. SALLEY:  We can go off.

13       (Off the record.)

14              MS. GREENE:  We're back on the

15    record.

16              MS. SALLEY:  Oh, wait.  We're

17    not back on the record.

18       (Off the record.)

19              MS. SALLEY:  We're back on the

20    record.

21       (<mark>Exhibit 11</mark> was marked.)

22    BY MS. SALLEY:

23       Q.    Just one last thing, I've marked

24    this Plaintiffs' 11.  It's another Google

25    image screenshot that depicts -- do you

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    recognize this area of River Road?

2         A.    Yes.  This is the area in

3    between the Speedway we talked about and

4    heading inbound towards State.

5         Q.    Okay.  And there's a stoplight

6    in this photo, correct?

7         A.    Yes, ma'am.

8         Q.    Does this refresh your memory at

9    all about whether or not there was a

10    stoplight at this location at this time?

11        A.    I don't remember if that was

12    there at the time.

13             MS. SALLEY:  Okay.  That was my

14    only question.  I think nothing further on

15    our end.  If no one else has anything, I

16    think you're free to go.

17             THE WITNESS:  Thank you.

18             MS. SALLEY:  Oh, and, lastly,

19    because we are missing the audio -- because

20    we are missing the audio of the interview for

21    IIS, we'd ask that for the very limited

22    purpose of being able to access that audio

23    recording and anything that's on there --

24             MS. GREENE:  And to the extent

25    there's any other audio or video recording or

Deposition of Officer Mark Bode                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        other interviews, for example, with CCA.

2                    MS. SALLEY:  -- that we can keep

3        this deposition open so that we can address

4        those once they're produced, if need be.

5                    MR. COWAN:  Understood.

6                    MS. SALLEY:  Now we're off.

7

8                    _____

9                    CPD OFFICER MARK BODE

10

11

12                         *  *  *

13            (DEPOSITION CONCLUDED AT 4:00 P.M.)

14                         *  *  *

15

16

17

18

19

20

21

22

23

24

25

280

1                    C E R T I F I C A T E

2
        STATE   OF   OHIO
3                   :  SS
        COUNTY OF WARREN
4
             I, Stacey J. Murrin, the undersigned, a
5    duly qualified notary public within and for
     the State of Ohio, do hereby certify that
6    CPD OFFICER MARK BODE was by me first duly
     sworn to depose the truth and nothing but the
7    truth; foregoing is the deposition given at
     said time and place by said witness;
8    deposition was taken pursuant to stipulations
     hereinbefore set forth; deposition was taken
9    by me in stenotype and transcribed by me by
     means of computer; that the transcribed
10   deposition was made available to the witness
     for examination and signature and that
11   signature may be affixed out of the presence
     of the Notary Public-Court Reporter. I am
12   neither a relative of any of the parties or
     any of their counsel; I am not, nor is the
13   court reporting firm with which I am
     affiliated, under a contract as defined in
14   Civil Rule 28(D) and have no financial
     interest in the result of this action.
15      IN WITNESS WHEREOF, I have hereunto set my
     hand and official seal of office at
16   Cincinnati, Ohio this 28th day of April,
     2025.

17

18

19                            _____
     My commission expires:  Stacey J. Murrin
20   August 17, 2025,   Notary Public - State of Ohio

21

22

23

24

25