

city of
# CINCINNATI
CITIZEN COMPLAINT
AUTHORITY

---

**CCA Case No. 20155**

**Investigation Report and Finding**

**Involving (2) Deaths**

---

**Dena Brown**
**Chief Investigator**

**Makiedah Messam**
**Interim Director**

**Date: February 5, 2024**



PLAINTIFF'S
EXHIBIT

Confidential

CITY_001016

## Table of Contents

Complaint Summary

Involved Officer Statements

Officer Witness Statements

Witness Statements

Evidence

Significant Discrepancies and Clarifications

Authorities

Analysis

Findings

Observations

Previous Contacts and Commendations

2

CITY_001017

## COMPLAINT SUMMARY

Date: August 7, 2020

Time: 4:22 PM

Location: East 5th Street and Monmouth Newport, KY

CCA Receipt: August 7, 2020

On August 7, 2020, CPD Sergeant Timothy Lanter, Specialist Michael Harper and Officer Brett Thomas attempted to stop Mr. Mason Meyer who was the subject of a felony firearms investigation. Mr. Meyer and his associates, Ms. Kirsten Johnson, and Mr. Mark Ihle, were seen leaving 721 Steiner Avenue. Sergeant Lanter, Specialist Harper, and Officer Thomas pursued Mr. Meyer. During the pursuit, Mr. Meyer traveled through several streets at high rates of speed and eventually traveled into Covington, Kentucky, where he lost control of his vehicle and struck four bystanders who were located at the "Press on Monmouth" restaurant. Two of the four bystanders succumbed to their injuries.

CCA was notified by the Emergency Communications Center (ECC) of a Death in Custody vehicle pursuit by members of the Cincinnati Police Department and responded to the scene.

## INVOLVED OFFICER STATEMENTS

### Officer Brett Thomas

Officer Brett Thomas, #P0791, M/W/38, is currently assigned to Canine Unit and has been a CPD member since 2004. Officer Thomas was on routine patrol, in uniform, and operated a marked cruiser; his BWC was activated.

CCA interviewed Officer Thomas on July 14, 2021, at 11:35 a.m. He provided the following information:

Sergeant Lanter contacted Officer Thomas to assist with the investigation to apprehend Mr. Meyer who was going to be apprehended because he had felony warrants and was known to be armed with a firearm. Officer Thomas had no previous contact with Mr. Meyer. Officer Thomas and his canine were staged near River Road and Steiner Avenue. Plain clothes officers observed Mr. Meyer leaving. Sergeant Lanter attempted to stop the vehicle.

Officer Thomas became the secondary vehicle in the pursuit when Mr. Meyer exited I-71 South onto Second Street. Officer Thomas's responsibility was to broadcast to ECC and give an update on the status of the pursuit. The pursuit traveled through the Banks area, into Kentucky, and ended on Fifth Street. Officer Thomas was aware that Sgt. Scalf was the "Officer in Charge (OIC)," but he did not have any interaction with Mr. Meyer.

Mr. Meyer lost control of the vehicle and the accident occurred. Officer Thomas did not see the crash. Officer Thomas approached Mr. Meyer's vehicle with his firearm pointed (gun point-finger

3

positioned along the slide). Mr. Meyer was out of the vehicle but appeared to be having a medical emergency. Ms. Johnson was out of the vehicle and on the ground, Officer Thomas handcuffed her. Mr. Ihle, the rear seat passenger, was still inside the vehicle. Officer Thomas stated that he holstered his firearm after everyone was taken into custody.

Officer Thomas stated he did not recall the speed he was going when questioned by CCA. Officer Thomas told IIS "*he was not cognizant of the speeds he attained during the pursuit and failed to announce them because his attention was focused on traffic conditions, identifying location and direction of travel, and maintaining a safe distance between Mr. Meyer and other pursuing vehicles.*"

**Specialist Michael Harper**

Specialist Michael Harper, #PS597, M/W/45, is currently assigned to Central Business District and he has been a CPD member since 2001. Specialist Harper was assigned to the Canine Unit on the day of the incident. He was in uniform and operated a marked cruiser; his BWC was activated.

CCA interviewed Specialist Harper on March 8, 2022, at 9:55AM. He provided the following information:

Specialist Harper was contacted by the ATF Task Force asking for his assistance with reference to an investigation involving Mr. Meyer. The ATF informed him Mr. Meyer was wanted on open felony weapons violation and in connection to an investigation of a felonious assault involving a firearm, was not going back to prison and would shoot it out with the police if they attempted to stop and arrest him.

ATF officers were at a residence in District 5, expecting Mr. Meyer to either arrive or leave that location. Specialist Harper was there to use his canine to track Mr. Meyer on foot if he fled. However, Mr. Meyer never arrived at that location. Specialist Harper and two additional K-9 units, Officers Bret Thomas and Kelly Reindl responded to River Road.

ATF officers observed Mr. Meyer carrying a long rifle case with other people in the driveway looking at the rifle. Mr. Meyer placed the rifle in the vehicle. Specialist Harper met with Officers Thomas and Reindl and they developed a plan in case Mr. Meyer were to leave.

Sergeant Lanter advised he would be the primary, uniformed, vehicle to stop Mr. Meyer. Mr. Meyer quickly left heading toward River Road. Specialist Harper and Officer Thomas decided they would be the two additional cars that Sergeant Lanter requested to help stop Mr. Meyers' vehicle. Specialist Harper activated his lights and siren, which activated his in-car camera, he manually activated his BWC.

Officer Thomas was behind Sergeant Lanter and Specialist Harper was the third pursuing vehicle. Mr. Meyer accelerated, eluding the officers. Specialist Harper had to monitor the radio to see what direction they were going; all three vehicles were out of his sight. Specialist Harper verified over the radio that Sergeant Lanter authorized three cars in the pursuit. Sergeant Lanter reiterated he wanted two additional K-9 units in the pursuit.

The pursuit traveled through several streets. Specialist Harper entered the Sixth Street Viaduct and could barely see police lights off in the distance. Mr. Meyer continued to the Suspension Bridge to Kentucky. Specialist Harper continued his pursuit but did not see them. Officer Thomas broadcast they were heading toward The Newport Aquarium. A short time later, an officer broadcast that there was a crash in the area of Fifth and Monmouth Streets.

4

CITY_001019

Specialist Harper arrived on scene, drew his firearm (finger positioned on the outside of the trigger guard) positioned himself on the passenger side of the vehicle and provided coverage to the other officers as the occupants exited the vehicle. Once everyone was in custody Specialist Harper holstered his firearm and attempted along with other civilians to render aid to the injured. Specialist Harper called for the Fire Department and assisted in securing the scene.

Specialist Harper stated that "his only goal based on the information that Mr. Meyer would shoot it out with the police, was I was not going to let my two fellow officers be there on, you know, on their own. My goal was to try to maintain or try to catch up to them. Which I was never able to do. I was never in the pursuit. I was just trying to catch up doing double time." At certain points during the pursuit, they were far ahead, and he could only monitor the radio traffic to know their locations. He could barely see the tail end of their police lights.

When asked his speed Specialist Harper stated to CCA, "The road is short. I mean it was River Road. It wasn't very long. And then, you know, going left and then up the hill if you're familiar with that area. It's windy so I -- I don't know what speed I was going but I really wasn't paying attention. I was just trying to catch up to them." Specialist Harper stated to IIS "*As he crested the hill on Mt. Hope Avenue, Specialist Harper saw the pursuit, but was unable to get close enough to actively engage in it. Specialist Harper was aware Mr. Meyer was likely armed and intended to shoot at officers, so he made every effort to engage as an active tertiary unit and follow the pursuit via Officer Thomas's radio transmissions.*"

**Lieutenant Timothy Lanter**

Lieutenant Timothy Lanter, #L061, M/W/37, is currently assigned to District 4 Investigative Unit, and he has been a CPD member since 2006. At the time of this incident Lt. Lanter held the rank of Sergeant and was assigned to the Gang Unit. For the purpose of this report, he will be referred to as Sergeant Lanter. Sergeant Lanter was in plain clothes/uniform and operated an unmarked vehicle/marked cruiser; his BWC was activated.

CCA interviewed Sergeant Lanter on March 9, 2022, at 1:50PM. He provided the following information:

Sergeant Lanter worked with the ATF Task Force on a joint investigation that was carried out on a week or two prior to trying to apprehend Mr. Meyer. The morning of August 7th Sergeant Lanter consulted with Sergeant Scalf about the apprehension of Mr. Meyer. They were initially at an address in District 5 that they had for Mr. Meyer, but he was not there. Sergeant Lanter later returned to the office and switched into his uniform.

The phone ping indicated Mr. Meyers' location had moved to Steiner Avenue. Ms. Johnson and a few other unknown associates were at that residence. There were ATF and CPD agents on Steiner Avenue conducting surveillance of Mr. Meyer. Sergeant Lanter positioned himself on Delhi Pike at River Road. This position gave him the advantage of following Mr. Meyer's vehicle either inbound or outbound.

Mr. Meyer left the residence. Mr. Meyer turned onto State Avenue then onto Elbron Avenue. There were no cruisers directly behind him at that point. Officer Bode in an unmarked vehicle pulled to the right as they drove up Elbron Avenue, Sergeant Lanter was now directly behind Mr. Meyer. Sergeant Lanter radioed Officer Thomas who was two or three cars behind him. As Mr. Meyer turned on to Mt. Hope, Sergeant Lanter flicked his lights, hit his air horn, and siren, a couple of times to get his attention. It was evident Mr. Meyer was aware, but he did not stop, that is when Sergeant Lanter broadcast the vehicle pursuit.

5

Sergeant Lanter stated, "Going up that hill (Mt. Hope), the speeds were "maybe 30/40 miles an hour. It was all residential, There were multiple turns they had to make and had to slow down. I mean if he was going 100 miles an hour, he would never made a turn so. He was well within reason of speeds for those roads and those conditions at that point. I would say that his fastest speed was on Sixth Street viaduct which I believe was, you know, when we first got on the viaduct, we're coming down the hill, I believe it's a thirty-five when you get on and then when you get down to Mehring it goes up to fifty."

Mr. Meyer snaked through the traffic then pulled ahead of him. When Sergeant Lanter hit Mehring Way he indicated that "he believed his speeds were 50/60 miles an hour." Sergeant Lanter believed Mr. Meyer struck another vehicle but could not say "100% certainty that he did or did not hit that car. But he snaked through the side of them, and he may have clipped the front end."

Sergeant Lanter broadcasted turn by turn directions until Officer Thomas caught up to him then they went back and forth as to who gave transmissions and the traffic.  Specialist Harper asked permission to join the pursuit, but Sergeant Lanter did not think that "he was ever able to do what we would consider fully engage or fully take an active role."

Sergeant Lanter asked Sergeant Scalf if they were going to continue the pursuit into Kentucky. Sergeant Scalf (OIC) indicated yes. Mr. Meyer jerked over to the Second Street exit, proceeded downtown by the Banks, and then entered the Roebling Suspension Bridge into Kentucky. Sergeant Lanter advised ECC to notify Kentucky that "they were coming just in case we were headed that way." Sergeant Lanter stated he believed he repeated the warning once they were on the Roebling Suspension Bridge. An ATF officer also broadcast to notify Kentucky we have an armed violent felon In the vehicle coming into their jurisdiction.

Mr. Meyer took side streets to where his vehicle crashed at Fifth and Monmouth at the Press Coffee House Restaurant. Sergeant Lanter pulled up to the driver's side of Mr. Meyer's vehicle and could not see anything because the air bags were deployed. Officer Thomas was behind him and within thirty to sixty seconds the ATF and the other CPD plain clothes surveillance units arrived. Sergeant Lanter observed the rear seat passenger with his arms up. Ms. Johnson was out of the vehicle and on the ground. Mr. Meyer was lying across the driver's seat onto the passenger's seat trying to climb out of the vehicle. Sergeant Lanter's firearm was drawn (finger off the trigger) and pointed at Mr. Meyer. Sergeant Lanter issued commands to Mr. Meyer who had climbed out of the vehicle and began seizing.

Sergeant Lanter advised ECC of the crash and advised Fire was needed. Officer Thomas requested three ambulances to respond. Other officers placed all three occupants into custody without incident. An unknown female nurse provided aide to the injured.

Sergeant Lanter stated his BWC and MVR were activated the entire time, until Sergeant Scalf and the other ATF officers arrived on scene. Sergeant Lanter removed himself from the scene and deactivated his BWC because he no longer had contact with them. Sergeant Lanter stated his MVR malfunctioned approximately five blocks prior to the crash. Sergeant Lanter advised CCA he did his MVR check for the day at the beginning when he entered the cruiser at the beginning of his shift. Sergeant Lanter was unsure why it malfunctioned, but a review of it was conducted.

Sergeant Lanter relayed during the pursuit, he believed he followed all the policies and procedures that CPD set forth. Sergeant Lanter stated to IIS: *"He was not aware of the exact speeds he attained during the pursuit; however, given the light vehicular and pedestrian traffic, he did not believe he exceeded speeds safe for the conditions."*

Confidential



**OFFICER WITNESS STATEMENTS**

**Officer Mark Bode**

Officer Mark Bode, #P021, M/W/43, is currently assigned to District 2-Violent Crimes Squad, and he has been a CPD member since 2000. Officer Bode was in plain clothes and operated an unmarked vehicle.

CCA interviewed Officer Bode on March 8, 2022, at 10:31AM. He provided the following information:

Officer Bode heard over the radio his unit conducting surveillance on Steiner Ave. Officer Bode observed Mr. Meyer's vehicle turn inbound on River Rd. Officer Bode got behind him, followed, and broadcasted his location until Sergeant Lanter got behind Mr. Meyer.

The vehicle pursuit began once Sergeant Lanter got behind Mr. Meyer. Officer Bode kept the vehicles in view as long as he could. Officer Bode followed into Kentucky. Officer Bode was asked how fast he was going during this pursuit, and his response was, "As quick as I could legally. I don't have lights and sirens, so I have to stop at every stop sign. I have to stop at every traffic light. So, if it said forty-five, I was going forty-five. I hardly had any sight of it, and I just had to listen to the radio traffic." As Officer Bode got three or four blocks away, he observed dust and debris. As he approached the crash site, there was a male running away who Officer Bode thought was part of the vehicle pursuit, but he was a bystander trying to get away from the chaos. By the time Officer Bode approached the crash, officers were placing everyone in custody, and medical units were responding to treat the parties.

**Officer Kevin Broering**

Officer Kevin Broering, #P0262, M/W/45, is currently assigned to District 1, and he has been a CPD member since 2004. Officer Broering was in plain clothes and operated an unmarked vehicle; no BWC.

CCA interviewed Officer Broering on March 8, 2022, at 1:32PM. He provided the following information:

Officer Broering was a surveillance vehicle. Officer Broering parked on Steiner Ave. and observed Mr. Meyer and some other people exiting a residence. Officer Broering observed Mr. Meyer with a black guitar case that he put in the bed of a pickup truck which had a lot of people hanging around it. Officer Broering was unsure but believed Mr. Meyer, his girlfriend and another male got into the vehicle and left the area. Officer Broering recalled Mr. Meyer's phone was pinged and when that vehicle left the ping left and went to the same area where the vehicle was located. Officer Broering could not recall if they had confirmation that Mr. Meyer was in that vehicle but believed that he was in there.

Officer Broering remained at the house because he believed that a search warrant would be occurring. Officer Broering did not leave the residence until the accident was over. Officer Broering went to the scene to see if there was something that needed to be done.

Confidential

CITY_001022

**Officer Brett Stratmann**

Officer Brett Stratmann, #P0443, M/W/50, is currently assigned to the Gang Enforcement Squad, and he has been a CPD member since 1997. Officer Stratmann was initially in plain clothes then transitioned into a uniform and operated a marked cruiser.

CCA interviewed Officer Stratmann on July 14, 2021, at 10:04 a.m. He provided the following information:

Officer Stratmann's initial statement corroborated the other officers. He added Mr. Meyer was a target of investigation of firearm offenses and an ongoing drug investigation. Kentucky had a warrant for Mr. Meyer for wanton endangerment. Officer Stratmann's role was to assist the Northern Kentucky Strike Force to stop Mr. Meyer and arrest him on Steiner Avenue. Officer Stratmann had no previous contact with Mr. Meyer.

Officer Stratmann initially remained at the residence until it was confirmed that Mr. Meyer was inside the vehicle that left. Once the electronic surveillance was confirmed Officer Stratmann followed the pursuit into Kentucky. When Officer Stratmann arrived on scene the occupants of the vehicle were being placed into custody. Officer Stratmann rode in the ambulance with Mr. Meyer and an ATF agent.

**Sergeant Donald Scalf**

Sergeant Donald Scalf, #S0746, M/W/46, is currently assigned to the Criminal Investigation Section, and he has been a CPD member since 1999. Sergeant Scalf was in plain clothes and operated an unmarked vehicle.

CCA interviewed Sergeant Scalf on March 3, 2022, at 9:51AM. He provided the following information:

The Northern Kentucky Strike Force contacted Sergeant Scalf and the ATF Task Force to begin surveilling Mr. Meyer, which lasted for one to two weeks who had a felony warrant out of Kentucky. The initial warrant came from Boone County for a fleeing and alluding but there was an investigation by the Newport Police and the Northern Kentucky Strike Force. Mr. Meyer was the muscle for a drug organization, and he pistol-whipped, and a shot was either fired, or it went off as he was pistol-whipping an individual over in Newport. Mr. Meyer was the main suspect in that, and they had a DNA felony warrant for him. The source of information that they received from the traffic stop said that after that incident, he was all fired up, saying he was never getting arrested again, somebody was going to die. Their drug trafficking organization was based out of Ohio. His actual residence, I believe, was in Newport.

They were aware he was both homicidal, suicidal, and a violent felon. Mr. Meyer's cellphone was pinged, placing him on Steiner Avenue. While conducting surveillance they it was broadcast that there was a male white armed with a firearm (not Mr. Meyer) and a male black armed with a fireman. Mr. Meyer exited the residence and carried a large rifle case. Ms. Johnson was observed getting in and out of a black vehicle. Mr. Meyer opened the hard case, which they believed had a rifle in it.

Mr. Bailey placed the rifle into the vehicle and entered the back seat. They were unable to see who entered the front seat due to the positioning of their surveillance. The vehicle moved; unfortunately, they could not confirm that Mr. Meyer was in the vehicle. Their history of Mr. Meyer was that he was very violent, and they were afraid that if they stopped the vehicle and he was not

Confidential

CITY_001023

in it, but at the residence, he would have a better angle to shoot at them. The decision was made to let him go and try to stop him down the street.

Sergeant Lanter initiated the vehicle pursuit. They received confirmation that their ping (which are 15 minutes apart) of Mr. Meyer's phone was moving with the pursuit, which confirmed Mr. Meyer was in the vehicle. Sergeant Scalf stated, "he's made threats to have shoot outs with police. I know he has pistol whipped and kidnapped. Sources of information that we have talked to and interviewed ourselves. At this point we need to get him stopped before something bad happens. I became OIC of the pursuit." Sergeant Lanter was the primary unit. Officer Thomas was secondary. Sergeant Lanter "okayed" three cars in pursuit. Sergeant Scalf relayed he "tried to come over the radio to confirm everything with him but could not. This was because he did not get enough radio time. Sergeant Scalf stated he authorized the pursuit to go into Kentucky."

Sergeant Scalf was the seventh vehicle following the pursuit; he could see the pursuit but was not in it. Sergeant Scalf stated he was "okay with the pursuit." When the pursuit approached Warsaw or Glenway, he lost eyesight.

Sergeant Scalf arrived at the scene of the accident and was "shocked" then started managing the scene. Sergeant Scalf placed the rear seat passenger into custody. Other ATF Agents secured Ms. Johnson and Mr. Meyer and then they started doing victim assistance.

### Lieutenant Eric Vogelpohl

Lieutenant Eric Vogelpohl, #L0009, M/H/52, is currently assigned to the Special Services Section and he has been a CPD member since 1995. Lt. Vogelpohl was in plain clothes and operated a unmarked vehicle.

CCA interviewed Lieutenant Eric Vogelpohl on July 14, 2021, at 10:31 a.m. He provided the following information:

Lt. Vogelpohl conducted visual surveillance on the residence on Steiner Ave. Lt. Vogelpohl observed Mr. Meyer exit the residence then watched him go back towards the residence or a vehicle. Mr. Meyer was also seen with a long rifle outside the residence, along with other people with firearms and "money going around," this information was provided to the other officers.

A vehicle left the residence, but Lt. Vogelpohl stated he could not see the driver's side or if Mr. Meyer got in the vehicle because of a bush that obstructed his view, so he was not sure if he went back into the residence or was in the vehicle.

Once Mr. Meyer left the residence, a search warrant was issued, SWAT went inside the residence, and it was "trashed." Several people were arrested and charged with drug paraphernalia, no weapons. Lt. Vogelpohl had no prior contact with Mr. Meyer.

**WITNESS STATEMENTS**

No witness statements.

**EVIDENCE**

9

The scene was secured by officers from the Newport Police Department (NPD). CPD's Traffic Unit assisted NPD and Campbell County Major Accident Reconstruction Team with the crash investigation. IIS and CCA responded to the scene and monitored the investigation being conducted.

**Police Documents**

CCA reviewed all CPD-related forms, including but not limited to arrest forms, property receipts, the IIS Report, and information from CPD's Records Management System (RMS).

**Computer Aided Dispatch (CAD) for 08/07/2020**

#8310=Sgt. Lanter
#8102=Off. Thomas

| Type | Time | Location | Comments |
|------|------|----------|----------|
| Investigation | 09:06:15 | Monmouth St./E 5th St. | |
| | 11:49:36 | 588 De Votie Ave | MDC hit detected-wanted person (crimes-against person see MIS-wanton) Mason Meyer |
| | 11:50:42 | | Misdemeanor-warrant |
| Response | 15:39:56 | Secondary Location for #8310:721 Steiner Ave | |
| Response | 15:48:47 | Secondary Location for #8102:721 Steiner Ave | |
| | 15:54:32 | 721 Steiner Ave | MDC hit detected-wanted person-caution (amphetamine-possess) |
| | 15:55:10 | | Kirsten Johnson Female/White, White tank, semi auto pistol with extended mag, target still in vehicle |
| | 16:27:22 | | Vehicle refusing to stop |
| | 16:28:20 | | 3 cars in pursuit |
| | 16:31:27 | | South bound Suspension Bridge |
| | 16:31:50 | | Kentucky being notified |
| | 16:32:30 | | Across bridge south bound Court east bound Park south bound Green up wrong east bound 4th street |
| | 16:33:20 | | Crossing the 4th Bridge toward Newport at the Aquarium |
| | 16:33:59 | | Big Mac Bridge on 5th possible east bound 5th cross Columbia |
| | 16:34:06 | | Crashed |
| | 16:34:26 | | Starting Fire ASAP |
| | 16:34:32 | | Contacting KY for Fire ASAP |
| | 16:35:33 | | 3 at gun point from the vehicle |
| | 16:35:45 | | Pedestrians Newport injured in accident |
| | 16:38:52 | | All 3 in custody need Fire |

10

Confidential

## Body Worn Camera (BWC)

### Officer Thomas

The events recorded by Officer Thomas's BWC occurred on August 7, 2020, starting at 16:26:25, according to the BWC's timestamp. A review of that recording reveals the following:

*Officer Thomas drove in emergency mode and joined the vehicle pursuit; he accelerated several times during the pursuit.
*16:28:05 Officer Thomas stated he would be the secondary officer in the pursuit if he could catch up.
*Officer Thomas drove over 100mph on the Sixth Street Viaduct. (*103mph per IIS)
*16:30:07 Officer Thomas advised ECC that he had "caught up" will the secondary vehicle
*Officer Thomas broadcast the streets they were turning on in Ohio and Kentucky
*16:31:49 Sergeant Lanter authorized permission for the pursuing officers to go the wrong way
*16:33:50 Officer Thomas exited his cruiser with his firearm out and pointed at Mr. Meyer's crashed vehicle. Officer Thomas assisted in taking Mr. Meyer, Ms. Johnson, and Mr. Bailey into custody.
*Newport Emergency Medical Services responded and attended to the injured.
*Officer Thomas took control of Ms. Johnson and placed her inside a cruiser.
*Officer Thomas returned to the scene and provided assistance to the injured.
*Officer Thomas deactivated his BWC.

### Specialist Harper

The events recorded by Specialist Harper's BWC occurred on August 7, 2020, starting at 16:29:07, according to the BWC's timestamp. A review of that recording reveals the following:

*Specialist Harper requested permission to act as the third cruiser in the pursuit.
*Specialist Harper drove 100mph while on the Sixth Street Viaduct.
*Specialist Harper arrived at the crash site and attended to the injured then walked away and deactivated his BWC.

### Sergeant Lanter

The events recorded by Sergeant Lanter's BWC occurred on August 7, 2020, starting at 16:26, according to the BWC's timestamp. A review of that recording reveals the following:

*Sergeant Lanter's BWC activated when he attempted to initiate the traffic stop of Mr. Meyer.
*16:27:03 Sergeant Lanter advised ECC that he had a vehicle that was refusing to stop, gave a detailed description of the vehicle.
*Sergeant Lanter disregarded several stop signs.
*16:28:13 Sergeant Lanter stated to ECC that he wanted 3 vehicles in the pursuit and would take two canine officers with him.
*16:28:58 Sergeant Lanter asked Sgt. Scalf if they were going to Kentucky if he goes?
*16:29:05 Sergeant Scalf gave an affirmative. Sergeant Lanter wanted Kentucky PD notified.
*Sergeant Lanter BWC stopped working at 16:30:51

### Digital Video Recording

### Sergeant Lanter

11

*Sergeant Lanter attempted to stop Mr. Meyer's vehicle.

*Mr. Meyer refused to stop and failed to stop for all traffic control signals and devices.

*Mr. Meyer turned onto Warsaw Ave and proceeded to the Sixth Street Viaduct. Mr. Meyer weaved through traffic, pulled away from the officers in the pursuit.

*16:37: Mr. Meyer attempted to exit I-71/75 South and struck the passenger side of another vehicle when he veered left across the roadway to exit onto Second Street.

*Mr. Meyer turned onto Elm Street, crossed the center line, and drove on the wrong side of the road before he turned onto Freedom Way.

*Mr. Meyer turned onto Rosa Parks drive then onto Theodore M. Berry Way before he crossed the center line at the roundabout and turned onto the John A. Roebling Suspension Bridge.

*While crossing the bridge, Mr. Meyer crossed the center line with Sergeant Lanter following and traveled the wrong way around the roundabout exiting onto Third Street.

*Mr. Meyer traveled the wrong way on East Fourth Street, then turned onto Garrad Street, East Third Street, Sanford Alley then back to Garrad Street.

*Mr. Meyer turned onto the West Fourth Street Bridge, crossed the center line and passed in front of opposing traffic in westbound lanes of travel

*Sergeant Lanter crossed the center line while maintaining a position nearest the eastbound travel lane, causing a motorcyclist to yield to his emergency vehicle.

*Mr. Meyer pulled away from pursuing officers as he returned to eastbound lanes and onto West Fifth Street.

*Mr. Meyer turned onto Chestnut Way, made a U-turn back onto West Fifth Street

*The DVR malfunctioned and deactivated on Fifth Street.

### Specialist Harper

*Specialist Harper joined the pursuit

* Specialist Harper arrived on scene, exited his vehicle with his firearm drawn. He holstered and attempted to assist others rendering aid to the injured pedestrians.

### Officer Thomas

* Officer Thomas joined the pursuit second vehicle and attempted to stop Mr. Meyer's vehicle.

*While crossing the bridge, Mr. Meyer crossed the center line with Sergeant Lanter and Officer Thomas following and traveled the wrong way around the roundabout exiting onto Third Street.

*Mr. Meyer traveled the wrong way on East Fourth Street, then turned onto Garrad Street, East Third Street, Sanford Alley then back to Garrad Street.

*Mr. Meyer turned onto the West Fourth Street Bridge, crossed the center line and passed in front of opposing traffic in westbound lanes of travel

* Officer Thomas crossed the center line while maintaining a position nearest the eastbound travel lane, causing a motorcyclist to yield to his emergency vehicle.

*Mr. Meyer pulled away from pursuing officers as he returned to eastbound lanes and onto West Fifth Street where his vehicle veered left and struck a building and pedestrians.

### Kentucky Traffic Collision Report #72530408

Per the IIS report: *Mr. Mason Meyer, Unit 1, traveled east on 5th street at a high rate of speed. As Unit 1 approached Monmouth Street, traffic that had been stopped for a red light started to move. Unit 1 swerved to the left to avoid striking a vehicle, traveled onto the sidewalk and struck a set of tables and chairs, then struck two people seated at another table. Unit 1 then struck the building wall. The two people seated at the table were thrown several feet through the air where one or both struck two pedestrians. Unit 1 then spun counterclockwise, struck two trees and a pole holding two parking meters.*

Confidential

**Campbell County Inmate Summary Booking Sheet/Court Records**

°Mr. Meyer was charged with Murder (2 counts), Wanton Endangerment, Fleeing or Evading Police and Federal Drug and Weapon charges.

°Mr. Meyer was arrested on outstanding warrants: (Boone County, KY) Failure to comply with Order or Signal of PO, Ohio Revised Code (ORC) §2921.331 (Reading Police Department) Driving Under Suspension, ORC §4510.11 and two Probation Violations.

°Ms. Johnson was charged with Fleeing or Evading Police and Possession of a controlled substance.

Mr. Meyer and Ms. Johnson had 50 grams or more of methamphetamine, two loaded handguns, and a loaded rifle with them during the chase.

Mr. Meyer pleaded guilty to two counts of murder, two counts of wanton endangerment, fleeing or evading police and criminal mischief and was sentenced to Life in Prison. In exchange for Meyer pleading guilty, the Commonwealth Attorney's Office agreed to dismiss the charges of enhancement to trafficking in a controlled substance, two other wanton endangerment charges and a charge of a persistent felony offender.

**CPD Critical Incident Review Board**

On April 19, 2021, the Critical Incident Review Board (CIRB) met to review a pursuit resulting in two fatalities, which occurred on August 7, 2020, initiated at 400 Mt. Hope Avenue.  The CIRB determined the protocols, procedures, and training of the Cincinnati Police Department are proper and recommended no changes are needed to protocols, procedures, and training as a result of this incident. The CIRB determined the officers involved have the knowledge, skills, and resources necessary to perform their duties and they have full knowledge of the Department's protocols, procedures, and training. However, during this incident, the officers chose to disregard the Department's protocols, procedures, and training.

The CIRB recommended the officers undergo refresher training focusing on risk versus reward and pursuit driving.

**CPD Training on Vehicle Pursuits**

The information below was received from CPD Police Academy.

Police Academy

Each Officer receives thirty-two hours of drivers training in the Police Academy/Recruit Training. Eight of the thirty-two hours are classroom.
The remaining twenty-four hours are hands-on practical driving.
Eight of the twenty-four hours are vehicle pursuit training.

Vehicle Pursuit Training involves a dynamic practical exercise that enhances their understanding of policies and procedure and teaches the skills needed in a vehicle pursuit, deployment of stop sticks and a high-risk traffic stop.      (OPOTA 5-1 Driving Curriculum and Procedure 12535 Emergency Operation/Pursuit Driving attached)

Continuing Professional Training (CPT)

13

CITY_001028

Officers receive additional vehicle pursuit at yearly CPT training when time and space allow. Standards for Law Enforcement Vehicular Pursuit was taught at 2022 Day 2 CPT. (CPT 2022 Day 2 Agenda and OPOTA/Procedure).

## SIGNIFICANT DISCREPANCIES AND CLARIFICATIONS

At the time of the incident, Lieutenant Lanter held the rank of Sergeant. In this investigation, he is referred to as Sergeant Lanter.

Per BWC review Sergeant Lanter, Specialist Harper and Officer Thomas drove at speeds more than twenty miles over the posted speed limits with all three officers operating their cruisers at over one hundred miles per hour.

Pursuing officers are required to immediately report information about the pursuit to ECC including speeds involved in the pursuit. None of the pursuing officers notified ECC of their speeds.

Mr. Meyer sideswiped another vehicle on Interstate 75-S in front of Sergeant Lanter, which was not communicated to ECC.

Sergeant Lanter and Officer Thomas ran several stop signs and ran multiple red lights at a high rate of speed in residential areas.

Neither Sergeant Lanter nor Officer Thomas asked for permission to travel the wrong way down one-way streets at any point. Sergeant Scalf never gave the pursuing officers permission to travel down the wrong way on any street. However, Sergeant Lanter authorized the pursuing officers to pursue Mr. Meyer the wrong way on Greenup Street.

*IIS's Investigation of BWC footage clearly demonstrated Sergeant Lanter did not manipulate his DVR until the termination of the pursuit; however, the DVR malfunctioned and stopped recording prematurely without outside interference.*

### CPD Pursuit Policy Update-Revised February 24, 2022

Procedure 12.535, Emergency Operation of Police Vehicles and Pursuit Driving has been revised.

Revisions include the following: • Pursuits will only be permitted for violent felony offenses. • Pursuits for misdemeanor offenses are not authorized. • Pursuit 31 (Channel 16) will be utilized whenever possible and for pursuits leaving Cincinnati Jurisdiction. • Failure to ensure proper BWC operation during a pursuit has been added as an Equipment Violation. • Planning and Inspections Section will conduct an annual analysis of vehicle pursuits to ensure compliance with policies and procedures. • ECC is currently in the process of upgrading its systems to allow cross-agency communication on Channel 16 (Pursuit 31).

The revision is effective immediately. Personnel should review procedure 12.535 in its entirety.

## AUTHORITIES

14

## I. CPD Procedure Manual (in part)

### § 12.554 Investigatory Stops

**Information:**

There are three levels of police/citizen contact.

The first level is a consensual encounter. A police officer may approach any person in a public place and request to talk to him. So long as the person is free to leave whenever he wants, no Fourth Amendment seizure has occurred and no reasonable suspicion or probable cause is required.

The next level is the "Terry" type encounter. Here the officer has reasonable suspicion to believe the citizen is committing or has committed a crime. Based on this reasonable suspicion, the officer may forcibly stop and detain the citizen for a brief investigatory period. Failure to answer the questions asked by the officer or to properly identify oneself cannot provide the justification for detaining a person past the period necessary to complete the brief "Terry" type investigation. Once the reasonable suspicion is determined to be unfounded, the citizen must be released.

The third level of police/citizen contact is the arrest. The arrest occurs when the citizen is no longer free to leave and the officer has the intent to arrest. The arrest must be supported by probable cause to believe the citizen is committing or has committed a criminal offense.

Information or descriptions resulting from anonymous tips is not sufficient probable cause to stop and search individuals. Officers must carefully develop reasonable suspicion in cases involving anonymous tips. Officer's observations while on the scene, securing more complete information from the anonymous caller and other circumstances which would tend to support the information received are all ways that officers can use to articulate reasonable suspicion allowing a "Terry" stop.

Every "Terry" type stop does not automatically authorize a frisk. If a frisk is conducted, the officer must be able to articulate specific facts which led them to believe the individual could be armed and dangerous.

### § 12.205 Traffic Enforcement

**Policy:**

Officers must ensure video and audio recording equipment is activated and when operating in emergency mode and when participating in traffic stops and pursuits.

**Procedure:**

Officers will take appropriate enforcement action whenever a violation is detected.

### § 12.535 Emergency Operation of Police Vehicles and Pursuit Driving (Revised 05/30/19, Replaces 04/05/18)

**Definitions:**

15

CITY_001030

**Emergency Driving** (General Non-Pursuit) – the operation of an authorized emergency vehicle (emergency lights and siren in operation) by a police officer in response to a life-threatening situation or a violent crime in progress, using due regard for the safety of others.

**Following** – driving in close proximity to a subject vehicle without using any apprehension efforts, such as lights or sirens or any other method of direction to stop.

**Pursuit Driving** – an attempt by a law enforcement officer operating an emergency vehicle and simultaneously utilizing lights and siren to apprehend an occupant(s) of another moving vehicle, when the driver of the fleeing vehicle is aware of the attempt and is resisting apprehension by maintaining or increasing speed, disobeying traffic laws, ignoring or attempting to elude the officer.

Operational Violation – Any violation during a pursuit that would be considered a moving traffic violation according to the Ohio Revised Code (ORC) or the Cincinnati Municipal Code (CMC). An Operational Violation results in a non-compliant pursuit.

Example violations: One Way Streets; any at-fault accident.

**Purpose:**

Ensure the safety of citizens and police officers during the emergency operation of police vehicles.

**Policy:**

All sworn personnel will complete any established training program regarding vehicle pursuits.

Officers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape.

While operating a police vehicle in emergency mode, entry into an intersection against a stop sign or signal poses a heightened level of risk to both sworn personnel and the public, and thus requires an increased level of caution to meet the due regard to safety standard. In order to show due regard when approaching intersections against a stop sign or red traffic signal, sworn personnel shall slow down as necessary for the safety of traffic and shall only proceed into the intersection at a speed which would allow for themselves and/or other drivers and pedestrians a reasonably sufficient opportunity to avoid a traffic crash.

During the emergency operation of police vehicles, and prior to and during a pursuit, officers must weigh the following factors:

- Degree of risk created by pursuit to others, officer and suspect.
- Location where pursuit will take place.
- Traffic conditions and amount of pedestrian traffic.
- Road conditions.
- Time of day.
- Weather.
- Volume, type, speed and direction of vehicular traffic and direction of pursuit.
- Nature/seriousness of suspected crime.
- Condition of police vehicle and suspect's vehicle.

16

CITY_001031

- Any circumstance that could lead to a situation in which the pursuing officer(s) will not be able to maintain control of the police vehicle.
- Type of vehicle being pursued.
- Likelihood of successful apprehension.
- Whether the identity of the suspect is known to the point that later apprehension is possible.

Officers will not pursue vehicles the wrong way on the interstate or other controlled access highway, divided roadways, or one-way streets unless specifically authorized by the pursuit officer in charge (OIC).

Officers must ensure video and audio recording equipment (DVR and BWC) is activated when operating in emergency mode and when participating in traffic stops and pursuits.

Officers wearing plainclothes or using unmarked vehicles will avoid making stops of suspected vehicles and will not engage in vehicle pursuits. The danger presented to officers and citizens is much greater than when uniformed officers with marked vehicles make the initial contact.

**Procedure:**

A.  Emergency Operation of Police Vehicles

  1.  Emergency operation (lights and siren) of a police vehicle is authorized in the following emergency cases (call to duty) and under the following conditions:

    a.  Officer needs assistance.

    e.  Crimes in progress requiring the immediate presence of a police officer.

    h.  pursuit driving.

  2.  When operating a police vehicle in the emergency mode, officers:

    a.  Will not operate with reckless disregard for the safety of other citizens.

    b.  Will use the emergency lights (red/blue) and siren.

      1)  Do not use four-way flashers because they interfere with brake lights an turn signals.

    c.  Will ensure their DVR and BWC is activated.

  3.  When driving in emergency mode, the operator will conform to all applicable traffic laws and regulations.

    a.  When driving in emergency mode and approaching a red traffic signal or stop sign, the operator must only enter the intersection with a due regard to safety. In order to show due regard when approaching and entering intersections against a stop sign or red traffic signal, the operator shall slow down as necessary for the safety of traffic and shall proceed into these intersections at a speed which would allow for themselves and/or other drivers and pedestrians a reasonable opportunity to avoid a traffic crash.

17

CITY_001032

      b. When driving in emergency mode, the operator must maintain a vehicle speed which is reasonable for the conditions, including but not limited to: time of day, road conditions, pedestrian and vehicle traffic, and weather; the operator will not exceed the posted speed limit by more than 20 miles per hour.

D. Pursuit Driving

  1. A motor vehicle pursuit is permitted in the following instances:

    a. On-sight pursuit of a known or suspected felon.

    b. On-sight pursuit of **criminal** misdemeanor violations.

    c. There is reasonable suspicion the occupants of a suspect vehicle have committed a **criminal** misdemeanor offense.

    d. A **criminal** warrant/capias is on file.

      1) Officers must confirm the **criminal** warrant/capias through the Mobile Data Computer (MDC) or with the dispatcher prior to initiating a pursuit.

E. When directed by a supervisor or by ECC at the direction of a supervisor to assist in a police pursuit.

  4. Supervisory Responsibilities

    a. The pursuit OIC will retain control and continually monitor and assess the situation. The pursuit OIC will direct specific units in or out of the pursuit, reassign primary or secondary units, set posts, authorize roadblocks, and terminate the pursuit.

      1) Final decisions will rest with the pursuit OIC.

  5. Number of Units

    a. Unless authorized by the pursuit OIC, no more than two police vehicles will become actively involved in the pursuit.

    b. The primary unit will:

      1. Be responsible for keeping the suspect's vehicle in sight.

      2. Advise the supervisor if more than two police units are needed for the pursuit.

      3. Have the authority to terminate the pursuit should conditions warrant.

    c. The secondary unit will:

      1. Immediately notify ECC there are two police units involved in the pursuit.

      2. Assume responsibility for the transmission of all relevant pursuit information to ECC.

      3. Provide backup for the primary unit during the arrest process.

Confidential

CITY_001033

E. Termination of the Pursuit

   1. Officers will terminate pursuits under any of the following conditions:

      a. The pursuit OIC or the primary unit determines the level of danger created by the pursuit outweighs the necessity for immediate apprehension.

      b. Establishment of the suspect's identity allowing for apprehension at a later time and there is no longer a need for immediate apprehension.

      c. Location of the pursued vehicle is no longer known.

      d. The pursued misdemeanor violator crosses the Hamilton County line.

   2. Once a pursuit has been terminated, the pursuing officer(s) will immediately pull to the curb and stop.

F. Pursuits Leaving Cincinnati

   1. By statue, police officers have the authority to pursue outside their jurisdiction and arrest without a warrant provided:

      a. The officers would have authority to make the arrest inside their jurisdiction.

      b. The pursuit takes place without unreasonable delay after the offense.

      c. The pursuit starts within the police officers' jurisdiction.

      d. The offense is one of the following:

         1) Felony

         2) First or second-degree misdemeanor

   2. If the above criteria are not met, the officers cannot pursue and cannot arrest outside their jurisdiction.

   3. Although it can be a felony to flee and/or elude a police officer (ORC 2921.331), if this is the only felony charge, fresh pursuit of a criminal misdemeanor violator will terminate at the Hamilton County line.

      a. Officers must receive supervisory approval before signing ORC 2921.331 felony charges.

   4. Officers may pursue felony suspects beyond state boundaries. However, the new jurisdiction will continue the pursuit as the primary unit (if available). The Cincinnati primary unit and secondary unit will then assist.

      a. Officers will terminate pursuits if radio contact with ECC is lost due to officers going beyond radio range.

19

**§ 12.550 Discharging of Firearms by Police Personnel**

**Policy:**

**The most serious act in which a police officer can engage is the use of deadly force. The authority to carry and use firearms in the course of public service also carries with it the highest level of responsibility. Respect for human life requires that police officers exhaust all other reasonable means before resorting to the use of firearms and then only when an officer reasonably believes that such use of firearms is necessary to protect the officer or another from the risk of serious physical harm or loss of life.**

**In considering the use of firearms, understand that you are responsible for your acts and that you may be required to justify your acts in a court of law. The Hamilton County Prosecutor's Office will determine the legality of actions taken. You are not required to retreat in lieu of the justifiable use of deadly physical force.**

Officers should attempt to use non-confrontational verbal skills, empathy and/or active listening to stabilize a person in crisis or when confronted with a situation where control is required to effect an arrest or protect the public's safety. The suspect should be allowed to comply before force is used unless this causes unnecessary danger to the officer or others. De-escalation may also incorporate the use of additional time, distance and resources as well as persuasion, command presence, repositioning, and warnings, to reduce the intensity of a potentially violent situation to decrease the potential need to use force.

At such time as a police officer perceives what he interprets to be a threat of loss of life or serious physical harm to himself or others at the hands of another, he has the authority to display a firearm, **with finger outside the trigger guard** and have it ready for self-defense. **The finger is only to be placed on the trigger when on target and ready to engage a threat.**

**ANALYSIS**

On August 7, 2020, members of CPD and several other law enforcement agencies (ATF, Northern Kentucky Strike Force, Newport Police Department) at an address on Steiner Ave of Mr. Meyer, who was wanted on open felony weapons violations and in connection to an investigation of a felonious assault involving a firearm. Mr. Meyer's cellphone placed him inside of the vehicle that left the Steiner Ave residence. Ms. Johnson and Mr. Ihle were also inside the vehicle. All parties involved were aware that Mr. Meyer had advised "he was not going back to prison and would shoot it out with the police if they attempted to stop and arrest him."

Sergeant Lanter attempted to initiate a traffic stop, but Mr. Meyer fled instead of stopping. CPD Procedure Section §12.554 Investigatory Stops states the second level is a "Terry" type encounter where the officer has reasonable suspicion to believe the citizen is committing or has committed a crime. CPD §12.205 Traffic Enforcement allows officers to stop a person when a traffic violation is detected.

When Mr. Meyer fled, Sergeant Lanter broadcast that he was in a vehicle pursuit. Specialist Harper and Officer Thomas joined in the vehicle pursuit. CPD Procedure Section § 12.535 Emergency Operation of Police Vehicles and Pursuit Driving has several areas that will be specifically addressed.

Confidential

CITY_001035

1. Per CPD policy, all sworn personnel will complete any established training program regarding vehicle pursuits. Sergeant Lanter's last recorded pursuit training in CPD's ETS database occurred on December 17, 2013. Specialist Harper's last recorded pursuit training occurred on July 28, 2013. Officer Thomas's last recorded pursuit training occurred on November 17, 2010. CPD Training Academy stated that "the only vehicle pursuit drivers training that is required is in the initial recruit training phase at the Police Academy. Each officer receives 32 hours of driver training via OPOTA 5-1 Driving Curriculum and Procedure 12.535.

2. With respect to the officers' conduct when operating a police vehicle in emergency mode, officers Will not operate with reckless disregard for the safety of other citizens, will conform to all applicable traffic laws and regulations, and when driving in emergency mode, the operator must maintain a vehicle speed which is reasonable for the conditions, including but not limited to: time of day, road conditions, pedestrian and vehicle traffic, and weather; the operator will not exceed the posted speed limit by more than 20 miles per hour. BWCs established Sergeant Lanter, Specialist Harper, and Officer Thomas operated their cruisers at speeds higher than 100mph, which should have let them know their speeds were excessive and the pursuit should have ended. When questioned by CCA about their speeds specifically, it was answered with "I don't know what speed I was going, but I really wasn't paying attention. I was just trying to catch up to them," and "I do not recall." The pursuit should have ended when Mr. Meyer struck a vehicle, although Sergeant Lanter stated to CCA he was not sure if Mr. Meyer had struck another vehicle.

3. Unless authorized by the pursuit OIC, no more than two police vehicles will become actively involved in the pursuit. Sergeant Lanter was not the OIC on this day but authorized two additional cruisers to be involved in the pursuit. Sergeant Scalf stated to CCA he authorized the pursuit to travel into Kentucky. Mr. Meyer crossed the John A. Roebling Suspension Bridge into Kentucky. Mr. Meyer, still being pursued by Sergeant Lanter and Officer Thomas, drove the wrong way on a one-way street. Sergeant Lanter and Officer Thomas continued their pursuit without authorization from Sergeant Scalf. Sergeant Lanter authorized the other pursuing officers to navigate the wrong way down a one-way street.

Mr. Meyer lost control of his vehicle and tragically struck several bystanders, injuring two and killing two who were located at the Press on Monmouth restaurant. CCA concluded the officers were not in compliance with CPD policies, procedures, and training.

With respect to the officer's conduct following the termination of the vehicle pursuit, the BWC footage showed that Sergeant Lanter, Specialist Harper, and Officer Thomas had their firearms drawn and pointed (finger off the trigger) at Mr. Meyer's vehicle when they arrived at the scene. CPD Policy § 12.550 Discharging of Firearms by Police Personnel states: The most serious act in which a police officer can engage is the use of deadly force. The authority to carry and use firearms in the course of public service also carries with it the highest level of responsibility. Respect for human life requires that police officers exhaust all other reasonable means before resorting to the use of firearms and then only when an officer reasonably believes that such use of firearms is necessary to protect the officer or another from the risk of serious physical harm or loss of life. CCA concluded the officers were in compliance with CPD policies, procedures, and training.

21

    CITY_001036

## FINDINGS

**Original Allegations**

Sergeant Timothy Lanter
Specialist Michael Harper
Officer Brett Thomas

**Procedure Violation** - The allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper.  **SUSTAINED**

## OBSERVATIONS

After a tactical review of this incident, CPD revised §12.535 Emergency Operation of Police Vehicles and Pursuit Driving on June 17, 2021, to include the use of stop sticks. The policy was further revised on February 24, 2022; below is the update as it refers to vehicle pursuits to include those outside the jurisdiction.   The revisions highlighted, among other things, the importance of balancing public safety with the need to capture suspects, of correct communication during a vehicular pursuit, clarifying police conduct in the pursuit of known or suspected felons, and when a vehicular pursuit may leave the jurisdiction.

Dena Brown, Chief Investigator

Makiedah Messam, Interim Director

Confidential

CITY_001037



**PREVIOUS CONTACTS AND COMMENDATIONS**

### Sergeant Lanter

#### Previous Contacts with CCA

Sergeant Lanter had five previous contacts with CCA in the past three years.

| Case Number | Allegation | Finding |
|---|---|---|
| 20054 | Discourtesy | Exonerated |
| 18241 | Improper Search | Exonerated |
| 18228 | Lack of Service | No Finding |
| 18214 | Discourtesy | Not Sustained |
| 18214 | Search (Vehicle) | Exonerated |
| 18214 | Stop (Vehicle) | Exonerated |
| 18214 | Discourtesy | Not Sustained |
| 18214 | Search (Unauthorized Equipment) | Sustained |
| 18180 | Excessive Force (Physical) | Unfounded |

#### Previous Contacts with IIS

CCA is unaware of any additional previous contact by Sergeant Lanter with IIS.

#### Commendations

Sergeant Lanter received seven commendations in the past three years.

| Date | Source of Commendation Received |
|---|---|
| 04/10/2019 | Other Law Enforcement (OLE) |
| 07/20/2019 | CPD |
| 09/17/2019 | Civilian |
| 01/05/2020 | CPD |
| 03/24/2020 | CPD |
| 04/02/2020 | CPD |
| 04/02/2020 | CPD |

### Specialist Harper

#### Previous Contacts with CCA

Specialist Harper had three previous contacts with CCA in the past three years.

| Case Number | Allegation | Finding |
|---|---|---|
| 20092 | Improper Procedure (Contact Card | Sustained |
| 20092 | Improper Pointing of a Firearm | Not Sustained |
| 20092 | Improper Stop | Exonerated |

#### Previous Contacts with IIS

CCA is unaware of any additional previous contact by Specialist Harper with IIS.

Confidential

CITY_001038

## Commendations

Specialist Harper received 4 commendations in the past three years.

| Date | Source of Commendation Received |
|---|---|
| 09/06/2018 | CPD |
| 09/06/2019 | CPD |
| 08/19/2019 | CPD |
| 08/19/2019 | CPD |

### Officer Thomas

#### Previous Contacts with CCA/IIS

Officer Thomas had no previous contacts with CCA in the past three years.

CCA is unaware of any additional previous contact by Officer Thomas with IIS.

#### Commendations

Officer Thomas received 4 commendations in the past three years.

| Date | Source of Commendation Received |
|---|---|
| 05/13/2019 | CPD |
| 12/19/2019 | CPD |
| 12/19/2019 | CPD |
| 12/19/2019 | CPD |

24

Confidential