Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 1 of 358 - Page ID#: 1352

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF KENTUCKY
2                      AT COVINGTON

3      JASON LAIBLE,            :
       et al.,                  :
4                               :   CASE NO.
                                :   2:21-cv-00102
5        Plaintiffs,            :
                                :
6      vs.                      :   Judge David L.
                                :   Bunning
7      TIMOTHY LANTER,          :
       et al.,                  :   Magistrate Judge
8                               :   Candace J. Smith
                                :
9        Defendants.            :

10         Zoom and in-person deposition of

11     LIEUTENANT TIMOTHY LANTER, a defendant

12     herein, taken by the plaintiffs as upon

13     cross-examination, pursuant to the Federal

14     Rules of Civil Procedure and pursuant to

15     Notice of counsel as to the time and place

16     and stipulations hereinafter set forth, at

17     the offices of Taft Stettinius &  Hollister,

18     425 Walnut Street, Suite 1800, Cincinnati,

19     Ohio, at 10:01 a.m., Monday, April 28, 2025,

20     before Stacey J. Murrin, a Court Reporter and

21     Notary Public, within and for the State of

22     Ohio.

23

24                      - - -

25

```
 1        APPEARANCES:

 2          FOR THE PLAINTIFFS,    JACQUELINE GREENE, ESQ.
            ESTATES OF RAYMOND     ELIJAH HACK, ESQ.
 3          AND GAYLE LAIBLE:      Friedman, Gilbert &
                                   Gerhardstein
 4                                 35 East 7th Street
                                   Suite 201
 5                                 Cincinnati, Ohio 45202

 6                                 And

 7          FOR THE PLAINTIFFS,    ROULA ALLOUCH, ESQ.
            STEVEN AND MARIBETH    Bricker Graydon, LLP
 8          KLEIN:                 2400 Chamber Center Drive
                                   Suite 300
 9                                 Ft. Mitchell, KY 41017

10          FOR THE DEFENDANTS,    AARON HERZIG, ESQ.
            CITY OF CINCINNATI,    SPENCER S. COWAN, ESQ.
11          TIMOTHY LANTER and     Taft Stettinius &
            BRETT THOMAS:          Hollister
12                                 425 Walnut Street
                                   Suite 1800
13                                 Cincinnati, Ohio 45202

14          FOR THE DEFENDANT,     MATTHEW SLOVIN, ESQ.
            CITY OF CINCINNATI:    (Via Zoom.)
15                                 City Solicitor
                                   801 Plum Street
16                                 Cincinnati, Ohio 45202

17          FOR THE DEFENDANT,     TRISTAN PALMER, ESQ.
            TRAVELERS CASUALTY     (Via Zoom.)
18          INSURANCE COMPANY:     Casey Bailey & Maines
                                   3151 Beaumont Centre Circle
19                                 Suite 200
                                   Lexington, KY 40513
20
            FOR THE DEFENDANTS     KIMBERLY A. RUTOWSKI, ESQ.
21          TIMOTHY LANTER and     Lazarus Law, LLC
            BRETT THOMAS,          The Huntington Center
22          INDIVIDUALLY:          525 Vine Street
                                   Suite 2210
23                                 Cincinnati, Ohio 45202

24
          ALSO PRESENT: Maribeth Klein
25                       Steven Klein
                         Brett Thomas (Via Zoom.)
```

```
 1                    S T I P U L A T I O N S
 2            It is stipulated by counsel for the
 3       respective parties that the deposition of
 4       LIEUTENANT TIMOTHY LANTER, a defendant
 5       herein, may be taken at this time by the
 6       plaintiffs as upon cross-examination and
 7       pursuant to the Federal Rules of Civil
 8       Procedure and Notice to take deposition, all
 9       other legal formalities being waived by
10       agreement; that the deposition may be taken
11       in stenotype by the Notary Public-Court
12       Reporter and transcribed by her out of the
13       presence of the witness; that the transcribed
14       deposition was made available to the witness
15       for examination and signature and that
16       signature may be affixed out of the presence
17       of the Notary Public-Court Reporter.
18
19
20
21
22
23
24
25
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 4 of 358 - Page ID#:
1355
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                          INDEX

 2      WITNESS           DIRECT   CROSS   RE-      RE-
                                          DIRECT   CROSS
 3
        LIEUTENANT TIMOTHY LANTER
 4      BY MS. GREENE:                6

 5      EXHIBIT IDENTIFIED                          PAGE

 6      Exhibit 54                                   76
        Exhibit 55                                  282
 7      Exhibit 56                                  286
        Exhibit 57                                  290
 8      Exhibit 58                                  310
        Exhibit 59                                  318
 9      Exhibit 60                                  320
        Exhibit 61                                  324
10      Exhibit 62                                  346

11      OBJECTIONS                                  PAGE

12      MR. HERZIG:                                  51
        MR. HERZIG:                                  53
13      MR. HERZIG:                                  88
        MR. HERZIG:                                  90
14      MR. HERZIG:                                  90
        MR. HERZIG:                                  91
15      MR. HERZIG:                                  99
        MR. HERZIG:                                 115
16      MR. HERZIG:                                 138
        MR. HERZIG:                                 138
17      MR. HERZIG:                                 142
        MR. HERZIG:                                 147
18      MR. HERZIG:                                 148
        MR. HERZIG:                                 149
19      MR. HERZIG:                                 155
        MR. HERZIG:                                 197
20      MR. HERZIG:                                 202
        MR. HERZIG:                                 210
21      MR. HERZIG:                                 210
        MR. HERZIG:                                 211
22      MR. HERZIG:                                 214
        MR. HERZIG:                                 215
23      MR. HERZIG:                                 215
        MR. HERZIG:                                 228
24      MR. HERZIG:                                 265
        MR. HERZIG:                                 288
25      MR. HERZIG:                                 327
        MR. HERZIG:                                 353
```



| EXHIBIT REFERENCED | PAGE |
|---|---|
| Exhibit 1 | 153 |
| Exhibit 34 | 254 |
| Exhibit 2 | 277 |
| Exhibit 12 | 300 |
| Exhibit 17 | 302 |
| Exhibit 3 | 309 |
| Exhibit 30 | 344 |

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 6 of 358 - Page ID#: 1357

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                LIEUTENANT TIMOTHY LANTER,

 2      a defendant herein, of lawful age, having

 3      been first duly sworn as hereinafter

 4      certified, was examined and testified as

 5      follows:

 6                     THE WITNESS:  I do.

 7                     THE COURT REPORTER:  Thank you.

 8                      CROSS-EXAMINATION

 9      BY MS. GREENE:

10           Q.     Good morning.

11           A.     Good morning, ma'am.

12           Q.     My name is Jacqueline Greene, as

13      you k?

14           Q.     Now.  And I'm one of the

15      attorneys representing the plaintiffs in the

16      matter we're here today to discuss?

17                     Before we get going, could you,

18      please, state and spell your name for the

19      record.

20           A.     Timothy Lanter, T-I-M-O-T-H-Y,

21      L-A-N-T-E-R.

22           Q.     And what's your current rank?

23           A.     Lieutenant with the Cincinnati

24      Police Department.

25           Q.     Thank you.  So as we go out --
```

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    go throughout the day today, just so you

2    know, I know your rank is lieutenant, but

3    because of documents --

4         A.    Yep, that's fine.

5         Q.    -- where the reference is, I may

6    say sergeant at some point.  Okay?

7         A.    Yes, ma'am.

8         Q.    And I know you've probably gone

9    through some rules of the road with counsel,

10   and you've heard me say this before, but I'll

11   go through them here today --

12        A.    Yes, ma'am.

13        Q.    -- to help things run smoothly.

14   Okay?

15        A.    Yes, ma'am.

16        Q.    All right.  So, first, we're

17   gonna do our best to speak one at a time to

18   allow our court reporter to take down a clear

19   record.

20             So even if you know where I'm

21   going with my question, try to let me finish

22   it before you start your answer.  Okay?

23        A.    Yes, ma'am.

24        Q.    And, likewise, I'll try very

25   hard to make sure you're done giving your

1    answers before I start my next question.

2    Okay?

3              A.    Yes, ma'am.

4              Q.    All right.  And as you know,

5    nods, shakes of the head, uh-uh's, uh-huh's,

6    those are really hard to get clear in a

7    record.  So please give clear, verbal

8    answers, meaning yes, no, or other words to

9    answer the question.  Fair enough?

10             A.    Yes, ma'am.

11             Q.    And I will surely ask a question

12   that comes out poorly at some point, it's

13   unclear, you need me to rephrase it, clarify

14   or whatever, whatever it may be, just let me

15   know.  That's fine.

16                   I'll be happy to ask it another

17   way to make it more understandable.  But if

18   you do go ahead and answer my question, I'm

19   gonna assume you understood.  Fair enough?

20             A.    Yes, ma'am.

21             Q.    And as you know, if you need a

22   break at any time, no problem.  Let us know.

23   The only exception is if I've asked a

24   question that's pending, I'll ask that you

25   answer that before we go on a break.  Okay?

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

 1          A.    Yes, ma'am.

 2          Q.    All right.  Have you testified

 3   in court before?

 4          A.    I have.

 5          Q.    How many times?

 6          A.    Dozens, maybe.

 7          Q.    Okay.  And that's been in your

 8   capacity as a Cincinnati Police officer?

 9          A.    Yes, ma'am.

10          Q.    Have you testified in a

11   deposition before?

12          A.    No, ma'am.

13          Q.    Okay.  To prepare for your

14   deposition, did you review anything?

15          A.    I did.  I met with counsel and I

16   reviewed documents with them.  And I reviewed

17   recently my body cam, my MVR footage, the --

18   and notes that I had taken prior to my

19   interview with Internal, and with Kentucky

20   PD, referenced my interviews after the

21   incident occurred.

22          Q.    Okay.  And anything else that

23   you reviewed in preparation?

24          A.    I've seen a lot of the exhibits

25   that have already been put in.  As of

1    recently, I have not reviewed them, but over

2    the past five years I've seen and whatnot.

3              But as of late, just those the

4    main documents, the Internal report, the CCA

5    report, the CI -- CIRB report, my body cam,

6    my MVR.

7         Q.    Okay.  And I know you spoke with

8    counsel, I'm not gonna ask you about that --

9         A.    Yes, ma'am.

10        Q.    -- but did you speak with

11   anybody else in preparation for your

12   deposition?

13        A.    In preparation, no, ma'am.

14        Q.    Did you do anything else to

15   prepare for testifying that we haven't yet

16   discussed?

17        A.    No, just gone over those

18   documents, my notes, and the things that I

19   stated, things that I've done with counsel.

20        Q.    Okay.  What's your educational

21   history?

22        A.    Graduated from Elder High School

23   in 2001, graduated from Northern Kentucky

24   University with a Bachelor of Science in

25   criminal justice in 2005.

```
 1                    I began my Master's in criminal

 2      justice after that.  I then quit to attend

 3      the police academy.  And I completed my

 4      Master's in criminal justice from the

 5      University of Cincinnati, and I believe it

 6      was in the spring of 2010.

 7           Q.    And you said you started and

 8      then quit.  Did you start at UC as well, or

 9      did you start at another institution?

10           A.    Start my Master's?

11           Q.    Yes.

12           A.    Yeah, I started at UC.  They

13      have a -- their programs are year-round.

14                    So I got quarter one done,

15      quarter two done, and then I quit quarter

16      three because I entered the police academy in

17      the spring of '06, which I wouldn't have been

18      able to complete that quarter at UC.

19           Q.    And for your Master's at UC

20      then, did you start that in the fall of '05?

21           A.    Yes.

22           Q.    Okay.

23           A.    And completed quarter one and

24      quarter two back-to-back.  And then over the

25      course of the next five years, as I could fit
```

1   those classes in with employment, finished.

2              And I believe it was the spring

3   quarter of '10 when I graduated.  It was in

4   '10.  I can't remember if it was the fall or

5   spring.  I believe it was the spring quarter.

6        **Q.     Do you have any other**

7   **educational degrees?**

8        A.     No, ma'am.

9        **Q.     Do you have other certificates**

10  **or licensures other than your Peace Officer**

11  **Certification?**

12       A.     I may have attended trainings,

13  but nothing specific noteworthy

14  certification-wise that sticks out to me like

15  an educational thing.

16       **Q.     Okay.  When did you begin**

17  **working with the Cincinnati Police**

18  **Department?**

19       A.     April 2nd, 2006, was when I

20  began the academy.

21       **Q.     And how long was your academy**

22  **training?**

23       A.     Roughly, six months.

24       **Q.     And then when you finished the**

25  **academy -- well, strike that.**

1    That was a Cincinnati Police

2    Department Academy program, right?

3        A.    Yes, ma'am.

4        Q.    And when you finished that

5    academy training, you were a licensed peace

6    officer in the State of Ohio?

7        A.    That's correct.

8        Q.    And can you, please, walk me

9    through your history of posts, assignments,

10   and promotions with the Cincinnati Police

11   Department from April 2nd, 2006, to present?

12       A.    Sure.  April 6th to --

13   April 2nd, 2006, began the academy.

14   September 24th, 2006, was my first day in

15   uniform patrol.  It would have been on that

16   Sunday.  That's when we -- we graduated the

17   previous Friday.

18            Then from September '06 to

19   October 2008, I was in District 3, patrol.

20   October 2008 I was transferred to District 5,

21   patrol.  Then in January 2011, transferred to

22   the Downtown Services Unit, which is now

23   currently known as the Central Business

24   Section, which covers downtown.

25            Then in February 2013,

1    transferred back to patrol in District 3.  I

2    remained there until September of '15 when I

3    was promoted to sergeant.  On promotion of

4    sergeant, I went to District 5, patrol.

5                And then in March 2016, the

6    police department then took back over the

7    Emergency Communications Section, which is

8    now Emergency Communications Center, ECC, and

9    I was there from March of '16 -- technically

10   on paper, I was there until two thousand --

11   January 2018.

12                However, in November of '16, I

13   was detailed out for Bike Patrol for the

14   Ray Tensing trial, a contingent of bike

15   officers was created to monitor, patrol the

16   courthouse, and Over-The-Rhine during the

17   trials, the days prior and the days after.

18                Then -- I believe that was

19   probably a couple months, returned back to my

20   spot at Communications.  Like I said, I was

21   technically there for the two years.

22                Then in February or March of

23   2017, the Mountain Bike Squad was assembled,

24   which was a unit to deploy anywhere and

25   everywhere in the City to combat the gun

1  violence that we had an upsurge in.

2              I stayed with the bikes until --

3  let's see.  So that was in March of '17,

4  which I was still at Communications, but

5  detailed on that assignment.  And then

6  technically in January of 2018, I was

7  permanently transferred from Communications

8  to the Bike Section, but we had been detailed

9  that whole time.

10             And then in late 2018, I want to

11 say, maybe like October/November-ish, I was

12 then transferred to the Gang Unit.  And then

13 I remained in the Gang Unit until May 30th,

14 2021, when I was promoted to lieutenant.

15             Upon promotion of lieutenant, I

16 went to District 5, third relief, to where I

17 led that relief until January -- either

18 December of '22 or January of '23 I was

19 officially transferred.

20             I may have been detailed 30 days

21 prior, but January of '23, I believe, is when

22 I was technically transferred to where my

23 current assignment is, and that's the

24 District 4, Investigative Unit Commander,

25 which my responsibilities include the

1    District 4, Violent Crimes Squad, the

2    District 4, Investigative Unit, and the

3    District 4, Neighborhood Liaison Unit.  And

4    that's my current assignment.

5         Q.    Thank you.

6         A.    Yes, ma'am.

7         Q.    I have a few follow-up questions

8    for you.

9         A.    Of course.

10        Q.    You mentioned back in January of

11   2011, you transferred to what was then

12   Downtown Services, now CBS I think it's

13   called?

14        A.    Yes, ma'am --

15        Q.    You were on --

16        A.    -- Central Business Section.

17        Q.    You were on patrol at that time?

18        A.    I was.

19        Q.    And then you said you were

20   detailed to the Bike Patrol Unit for the

21   Ray Tensing trial, and that was November of

22   2016?

23        A.    Correct.

24        Q.    And how long did that stint with

25   the Bike Patrol last?

1     A.    So in that -- so I was --

2     technically, my assignment was the

3     Communications Section.  So throughout the

4     department -- we'll detail people throughout.

5     So it could be any number of things the

6     department needs.

7               Hey, you know, if we had

8     something where we needed drones for the next

9     month, we would detail, you know, maybe five

10    guys to operate drones for the next five

11    weeks for their assignment or something.

12              So the Tensing started, and I

13    think it was myself, another supervisor,

14    maybe ten guys throughout the department were

15    detailed for that trial.  And then whenever

16    that ended, then I went back to

17    Communications.

18              And then in March of '17, that's

19    when the Mountain Bike Squad was created, but

20    that was still a detailed assignment.  We

21    didn't become a permanent fixture in the

22    organization chart until I believe it was

23    January of '18 is when that happened.

24         Q.    Before that detail during the

25    Tensing trial, what was the purpose of that

Deposition of Lieutenant Timothy Lanter                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      **unit that was temporarily created?**

2              A.    The main purpose was just for

3      extra visibility of patrols around the

4      courthouse, the Over-The-Rhine area during

5      that trial in case of protests, civil unrest,

6      things of that nature that we would be there

7      firsthand and be the first kind of boots on

8      the ground.

9              **Q.    And then January of '18, you**

10     **were transferred to that Bike Section**

11     **permanently, you said, right?**

12             A.    Yeah.  That's when it became --

13     no longer a detailed assignment, that it

14     became a permanent assignment in the

15     organizational chart or structure of the

16     department.

17             **Q.    And that unit from the time you**

18     **were initially assigned at the Tensing trial**

19     **through when you were working on it as a**

20     **permanent section of the department, did that**

21     **section serve the same kind of function that**

22     **you just described?**

23             A.    So, yeah.  Initially, it was

24     just all Tensing kind of deal, just to have

25     that extra presence there.  And then I

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    believe after Tensing, we kind of broke back

2    down and went back to our normal assignments.

3              And then it was in that March of

4    '17, I believe we had had a major uptick in

5    violence.  And then at the time the patrol

6    bureau commander, Colonel Neudigate, with the

7    chief's approval, kind of assembled this

8    Mountain Bike Squad kind of like a hotspot

9    kind of group.

10             So if Evendale had eight

11   shootings over the weekend, like we would go

12   to Evendale for that next week.  And we would

13   just hammer in and focus on that kind of

14   neighborhood.

15             Or, you know, if there was an

16   uptick in Over-The-Rhine or the West End, or

17   wherever it was, it was kind of more we were

18   based on a hotspot to where the violence was

19   occurring in the City.  And we kind of

20   directed ourselves in that way based off of

21   like the morning shooting reports every day.

22        Q.   And then when you'd be going to

23   these hotspots, what type of policing

24   activities would be undertaken?

25        A.   It was a lot of visibility, just

```
 1      for the community to see us, the residents to
 2      see us, kind of for deterrence as well.
 3             And then it was also we would
 4      focus in if we knew violent offenders here,
 5      if we had talked with, hey, a district
 6      investigator here, they were looking for this
 7      person, like we would kind of put those
 8      people on our radar to see if we could make
 9      those arrests and whatnot to where we could
10      help.
11          Q.    And you had mentioned, I think,
12      something about civil unrest or civil
13      disturbance, or something like that.  Was
14      that --
15          A.    So that was mainly for Tensing
16      just because, you know, there was protests
17      going on, or stuff like that, and then just
18      to have that extra presence around the
19      courthouse.
20          Q.    Have you ever had other roles
21      associated with that particular type of
22      function, civil arrest, a or civil
23      disturbance response?
24          A.    There was, I guess, based on the
25      heels of us creating that Tensing -- we had
```

1    not like the SWAT team, but like the SWAT

2    team kind of, like a civil disturbance

3    response team.

4                So then we had two components of

5    that, the Bike Section, and then we had like

6    a foot platoon.  So the bikes would be the

7    first frontline on that to where say you had

8    a protest scheduled in Washington Park today

9    or you had one at Sawyer Point, or wherever

10   it would be and they thought, hey, there's

11   gonna be -- you know, if there's something

12   where there's ten people, we're probably not

13   gonna go to that.

14               But, you know, if there's

15   hundreds of thousands of people, then we

16   would get contacted, and then we would form

17   some sort of a contingent to where -- and the

18   bikes would be kind of like the front line.

19               Those would be the guys you

20   would see.  And then they would have like

21   uniformed guys kind of hidden off in the

22   shadows that we would call them.

23               So say 12th and Vine was being

24   taken over by protesters, like the bikes

25   would be there, control that.  And then as

1    the protesters maybe moved northbound on

2    Vine, the foot patrol guys would come in.

3              They would take over that

4    intersection and the bikes would travel kind

5    of with the protesters to just try to keep

6    the peace and the order, keep them on the

7    sidewalk, keep them on the street, keep them

8    contained, whatever, to avoid any sort of

9    violence or uptick that may occur.

10         **Q.    After that Bike Section then is**

11   **when you were transferred to the Gang Unit**

12   **you said, right?**

13         A.    Uh-huh.  So, yeah, the bikes was

14   officially created in January of '18.  And

15   then I want to say it was like October or

16   November of '18 that I was transferred to the

17   Gang Unit.  I don't recall the exact.

18         **Q.    And then you went from there**

19   **your promotion to lieutenant and had a couple**

20   **of other posts, right?  From the Gang Unit,**

21   **you said, I think you went to the District 5,**

22   **third relief, meaning third shift, correct?**

23         A.    Yeah.  So upon promotion, I was

24   transferred to District 5, third relief, in

25   May of '21.  And I was there until either

1    December of '22 or January of '23.

2                     Like I said, I may have been

3    detailed to District 4 for 30 days prior, but

4    I think my official transfer was January of

5    '23.

6         Q.    Okay.  And then you said your

7    current role is the District 4, Investigative

8    Unit Commander?

9         A.    Yes, ma'am.

10        Q.    And in that capacity, you

11   oversee the Violent Crimes Squad, the

12   Investigation Unit, and the Neighborhood

13   Liaison Unit, right?

14        A.    Yes, ma'am.

15        Q.    What's the Violent Crimes Squad?

16        A.    So the Violent Crimes Squad is

17   -- each district has their own.  It is a

18   plainclothes/uniformed contingent of officers

19   who deal with violent crimes, guns, drugs.

20                     They'll do plainclothes work to

21   do gun buys -- or not gun buys, observe

22   individuals carrying guns, illegal guns, try

23   to make those arrests.  They'll use CIs to do

24   dope work, do buys, to make their arrests.

25        Q.    And when you say "CIs," that's

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 24 of 358 - Page
ID#: 1375
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    confidential informants?

2            A.    Yes, ma'am.

3            Q.    And when you said

4    "plainclothes," that's detectives or are they

5    just --

6            A.    No.

7            Q.    -- patrol, or what would you

8    describe them as?

9            A.    Plainclothes would be like jeans

10    and a T-shirt guy or a hoodie and shorts, or

11    something like that.  You -- you're not

12    supposed to know they're cops.

13            Q.    Right.

14            A.    Right.

15            Q.    So they're plainclothes

16    patrol --

17            A.    I mean, I guess you could call

18    them detectives, but they're plainclothes.

19    Yeah, so they'll go out in a Chevy Malibu,

20    you know, whatever, not a regular marked

21    patrol car --

22            Q.    Uh-huh.

23            A.    -- so, yeah, plainclothes in

24    that aspect.

25            Q.    Okay.  The Investigation Unit,

1    what's that?

2           A.    Those are the investigators who

3    are responsible for all -- investigating all

4    crimes within this -- within the district

5    bounds.  The main focus, obviously, is the

6    violent crimes, the shootings, felonious

7    assaults.

8                So we have felony investigators.

9    Then we have misdemeanor investigators.  So

10   the misdemeanor investigator would be you get

11   assaulted when you work out -- walk out of

12   here today.  You go to Potbelly and steal the

13   tip jar.  Those kind of misdemeanor crimes.

14               And then we have the felony guys

15   who are burglaries, aggravated -- or

16   aggravated burglaries, there's shootings, is

17   their main focus, and they investigate those

18   cases.

19        Q.    I think we heard earlier

20   testimony about their being a separate

21   Homicide Unit, right?

22        A.    Yeah.  Yes, ma'am.

23        Q.    And then there's some other unit

24   that deals with, like, serious violent crime,

25   I forget what it's called; is that right?

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1         A.    No.

 2         Q.    No?

 3         A.    You want me to explain?

 4         Q.    Yes, please.

 5         A.    You want me to explain the

 6   different --

 7         Q.    Yes.

 8         A.    Okay.  So --

 9              MR. HERZIG:  And I'll just

10   remind, Lieutenant Lanter, not to give

11   away -- not to discuss specific tactical

12   information that the City would like to keep

13   confidential --

14              THE WITNESS:  Yes, sir.

15              MR. HERZIG:  -- which you have

16   not done yet.

17         A.    No.  So you walk out today and

18   somebody is shot laying on the sidewalk, that

19   would be investigated by the district.  You

20   walk out and that person is dead from that

21   shooting, they were assaulted, a knife, a

22   bat, whatever, that would then go to

23   Homicide.

24              You are raped tonight.  You get

25   out of a club, you get raped, that would go
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    to our Personal Crime Section, who

2    investigates those serious sexual assault

3    crimes.

4            You have a hundred thousand

5    dollars stolen from your bank account, that

6    would go to our Financial Crimes Section,

7    which is under the Criminal Investigative

8    Section.  So the Homicide, the Personal

9    Crimes, and the Financial Crimes all go under

10   that.

11           However, you get a $20 bogus

12   check, like the district would investigate

13   that.  So it's basically the threshold of the

14   different levels.  You get shot and you get

15   killed, they go to two separate things.

16           You get raped or I walk past you

17   and just brush and squeeze your butt, like

18   that could go to the district level.  You get

19   a hundred thousand dollars taken from you,

20   that would go downtown.  You get $20 taken

21   from you, that would go to the district

22   level.  So it's just based on the totality of

23   the offense involved.

24       Q.    And the level of felony --

25       A.    The level -- yeah.

Deposition of Lieutenant Timothy Lanter                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.      -- it sounds like?

2      A.      The level of felony essentially.

3      Q.      Okay.  The Neighborhood Liaison

4  Unit, what's the function of that one?

5      A.      So that unit is -- they're

6  basically -- they're there for the

7  neighborhood.  They -- they're basically kind

8  of the eyes and the ears and they're the

9  contact.

10           You own a bar in Roselawn or you

11  own a salon in Roselawn, kind of, and, hey,

12  you're having problems with kids hanging out

13  at their school or, hey, somebody spray

14  painted your building or something, you would

15  say, hey -- instead of just calling, like,

16  dispatch maybe, you may just call your

17  neighborhood officer.

18           Or, you know, the neighborhood

19  officers they -- whatever you -- whatever

20  neighborhood they're assigned, they each have

21  their own individual neighborhoods, like,

22  they'll go to their community meetings.

23           Or, if you're having a

24  back-to-school drive and giving backpacks

25  away this weekend, like that's an affair that

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 29 of 358 - Page
ID#: 1380
Deposition of Lieutenant Timothy Lanter
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    we may attend, you know, just engage with the

2    community and just be out there and be

3    present with them.

4              They kind of engage on a

5    different level than, like I said, you get

6    shot, you get raped, you get your bank

7    account withdrawn, you're calling us kind of

8    on a negative, to where that unit is a more

9    positive kind of interaction with the

10   community.

11        Q.    Okay.  Going back to the

12   Gang Unit, can you describe to me the

13   function of that unit?

14        A.    Yeah.  So the Gang Unit is made

15   up of -- let's see.  At that time, we had

16   probably half plainclothes, half uniformed

17   cars.  And they would be focused more --

18   their efforts are more kind of like on a

19   city-wide basis to where they can go

20   wherever.

21              So like my VCS in District 4,

22   their main focus is District 4.  However,

23   they stop you today, you have an illegal or a

24   stolen gun on you and you live in Lafayette

25   Apartments, which is District 3, or you live

1    in, you know, Westwood Northern Boulevard,

2    obviously, that investigation may take us

3    across boundaries.

4              And, you know, so then my VCS

5    would then call District 3, VCS would say,

6    hey, we're kind of working on this.  To where

7    the Gang Unit, they can go city-wide.  They

8    can do whatever they want kind of deal as to

9    -- to where their investigations take them.

10             And, you know, we have guys --

11    you know, say one of my guys in VCS, they

12    could get transferred to the Gang Unit.

13    Well, obviously, they've spent the past few

14    years working in District 4, so they may be

15    more linked and more likely to work in 4 on

16    Gang stuff.

17             Or, you know, we would also kind

18    of monitor those shootings and work with the

19    Bike Unit a little bit to say, hey, you know,

20    we see an uptick in here.  So then maybe

21    we'll go and do surveillance there, do some

22    controlled buys, use our confidential

23    informants.

24             So it's kind of like -- it's

25    VCS, but just exploded into a city-wide kind

```
 1    of unit.  And the Gang Unit, depending on who

 2    the investigator is, some of the

 3    investigators like the, you know, more

 4    short-term investigations and some of them

 5    like the longer-term ones.  So it's just a

 6    mixture of all that.

 7        Q.    And when you say "VCS," that's

 8    the Violent Crimes Squad?

 9        A.    Yes, ma'am.  I'm sorry.

10        Q.    That's all right.  I think -- I

11    generally know, but if I -- I may just ask

12    you things like that --

13        A.    No.

14        Q.    -- just to clarify for the

15    record?

16        A.    Yes, ma'am.

17        Q.    Okay.  Did you through your work

18    in the department when you were promoted to

19    sergeant, receive any special training for

20    that role?

21        A.    We went to -- I believe it was a

22    two-week sergeant training class that was

23    hosted at the academy based on, I guess, what

24    they believe is the curriculum, you know.

25              Because you're making that step
```

1    from a PO to a sergeant, now you have the

2    responsibilities, kind of, hey, this is what

3    you're gonna encounter kind of deal.

4              Q.    And in that training, did it

5    address what your new duties would be as

6    sergeant?

7              A.    Yes, ma'am.

8              Q.    And what kind of stuff was that?

9              A.    A lot of it was, you know, kind

10   of like the investigative-type stuff.

11              So you go out and you respond

12   and your guy tases somebody, your guy fights

13   with somebody, and there's a use of force

14   that involves, you know, the paperwork

15   associated with that and how those forms go.

16              And, you know, I know -- I

17   remember we had like role-play kind of things

18   to where, hey, I'm the supervisor, I'm

19   responding to this type of narrative for --

20   you know, fill in the blocks of the forms

21   that you have to do, kind of along those

22   lines.

23              Q.    Okay.  And then what about when

24   you were promoted to lieutenant, was there

25   special training for that promotion or

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 33 of 358 - Page
ID#: 1384
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    associated with it in anyway?

2          A.    No, ma'am.

3          Q.    For the Gang Unit, was there any

4    special training that you got from the

5    department or otherwise?

6          A.    Nothing special that I recall.

7          Q.    And then what about the civil

8    disturbance response, like bike control

9    stuff, was there special training for that?

10         A.    So that was kind of like a --

11   like when we did the Tensing, we kind of just

12   went on our own and kind of got it together

13   and, you know, formulated what we thought

14   would work for us, and then did that.

15                And then in April of 2017, I

16   went to Seattle, Washington for three to five

17   days -- I don't recall exactly how many,

18   maybe four or five days, and myself and a few

19   other supervisors went and worked with the

20   Seattle PD.

21                Because Seattle PD, they're

22   known for -- they have protests like daily,

23   if not every other day and, I mean, big

24   protests.  So we went -- it was actually this

25   week seven years ago.  Because every day

1    (sic), May 1st, they have like a May Day

2    protest.

3              So it was like a big-time

4    protest.  So we went out a couple days early,

5    met with their supervisors kind of, you know,

6    techniques that they did or, you know, bike

7    maneuvers that they did to -- like I said,

8    you know, hey, this group's trying to

9    takeover 12th and Vine, what do you do, how

10   do you block them, kind of things like that.

11             So we kind of went, and we found

12   that we were kind of doing a lot of those

13   things just based on us self -- kind of

14   teaching ourself to get this up and going and

15   getting started.  And that's kind of how the

16   whole civil disturbance team here started.

17   And like I said, it's still going today.

18        Q.    Okay.  So that team, does it

19   have any ongoing training, members of that

20   team you just --

21        A.    Yeah, so civil disturbance

22   training, and there's no rhyme or reason to

23   it.  I'm not on it any more that I know of.

24   So back then what we would do is there's -- I

25   mean, how many of us would there be?  I don't

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    know.

2                    Just say there's 60 people on

3    the team.  So for me to call and take 60 cops

4    off the street today is a lot.  So, like, we

5    would hold two training days a month and, you

6    know, these 30 guys would go and these 30

7    guys -- kind of like how a SWAT team does it.

8                    The SWAT team, we know they

9    train every Monday and Tuesday -- the second

10   Monday and Tuesday of every month.  So I know

11   those guys are there.

12                    So what CDRT would do, maybe

13   they would do the second and the fourth

14   Friday of the month, or the first and third

15   Friday of the month, whatever, they would

16   split it up.  So they would have those

17   ongoing monthly trainings.

18                    And then, you know, as you

19   get -- and this was more for like the foot

20   guys, like the beanbag shotgun guys, or the

21   guys that have the 40-millimeter firm round

22   (sic) guns, like they would have

23   certain training -- I think they call them

24   grenadiers.

25                    So like the grenadiers may just

1   have training this day of the month.  They'd

2   go over those things.  So they would kind of

3   all -- they're specialties, for lack of a

4   better -- say that they would train

5   differently from the rest of the team.

6              But, yeah, there was ongoing

7   trainings.  Like I said, it was usually one

8   day a month broken down into two to make sure

9   the whole team fits.  And I know currently,

10  like they will train with -- like I think

11  they just had a training with West Chester PD

12  last -- last week.

13             So different agencies will come

14  and they'll help train and just work together

15  just to keep that education going, and to see

16  what's working for somebody may work for us

17  or what's not.

18             So our goal of going to Seattle

19  was to say, hey, let's see what we're doing,

20  let's see what they're doing.  These guys

21  are -- they're experts at the time of it, and

22  just see what we could pick up kind of deal.

23        Q.    Okay.  Were you ever on SWAT

24  over the course --

25        A.    Never.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     Q.    -- of your career?

2     A.    Never.

3     Q.    All right.  All those various

4  posts, assignments, details you just

5  described, those were all CPD positions,

6  right?

7     A.    Yes, ma'am.

8     Q.    Okay.  Do you have any other

9  assignments or posts in the CPD that we

10  haven't talked about yet?

11     A.    I don't think so.  I mean, as

12  lieutenant, I fill in for night chief here

13  and there, but that wasn't an assignment that

14  I was permanently on.

15         Kind of how the night chief

16  rotation works is Monday through Friday, it's

17  an assigned captain.  So that may be your

18  post.  You are the night chief.  So every

19  Monday through Friday, that's you.

20         Saturday, it's a rotating

21  captain.  So the Internal captain could be

22  night chief this Saturday.  The District 1

23  captain could be night chief next Saturday,

24  and so on, and they just rotate.  And then

25  how it worked on Sundays, it was always a

1    third-shift patrol lieutenant.

2              So since I was third shift in

3    District 5, I got night chief duties a lot.

4    And when I went to District 5, I had met with

5    Colonel John at that time to where my

6    schedule -- because, you know, it rotates a

7    lot and they're always trying to fill it.

8              So I worked with Colonel John to

9    where I was working Sundays permanently.  So

10   I usually -- I used to just do it every

11   Sunday.  And now if I'm working Monday and

12   you called in sick, you may call and say,

13   hey, Lieutenant Lanter, can you do night

14   chief tonight?  I'm off sick.

15             And so we would fill in for

16   that.  But that was never a permanent

17   assignment, that's kind of like a filler when

18   needed when the captains aren't around.

19         Q.    Okay.

20         A.    But other than that, there's

21   nothing that I recall.

22         Q.    Okay.  Have you ever worked with

23   any other agencies as a law enforcement

24   officer other than the Cincinnati Police?

25         A.    Yes.

1   Q.   And what agencies are those?

2   A.   Probably too many to name.

3   With -- the thing with being in like the Gang

4   and the bikes and the VCSs -- you know, like

5   I said, I stopped you today and you live in

6   Colerain.

7        So then I'm like, okay, this guy

8   is in Colerain, so then I may call a

9   detective from Colerain.  So it's like I

10  probably have worked with, if not all, most

11  of the Hamilton County agencies kind of deal

12  to where -- and then, you know, when I worked

13  District 3, if I was in Price Hill or

14  Westwood, well, then I'm bordering Delhi and

15  Green Township.

16       When I worked District 5, I was

17  bordering Colerain, Green Township,

18  Springfield Township.  So, yeah, I worked

19  with -- like I said, probably most agencies,

20  you know.

21       And now with me being where I'm

22  at now, I may get a call from the detective

23  from Colerain or a detective from Springfield

24  Township, hey, do you guys have anything on

25  this person?  Do you guys have -- have you

1    guys seen a rash of burglaries?

2              You know, we may -- you know,

3    like Vine Street, it goes from the City to

4    Elmwood back to the City.  So Elmwood PD may

5    call and say, hey, we're getting hammered at

6    this car lot from theft from autos, have you

7    guys seen anything?  So I probably worked

8    with all of them --

9         Q.   No.  Fair enough.

10        A.   -- in the short answer.

11        Q.   Fair enough.  And my question

12   was worded poorly.

13        A.   No, you're good.  You're good.

14        Q.   Have you worked for any other

15   law enforcement agencies?

16        A.   I have never worked for another

17   law -- this is my sole job.  I came here when

18   I was 23, and this is the only job I've had.

19        Q.   Okay.  So as an officer in the

20   Cincinnati Police Department --

21        A.   Yes, ma'am.

22        Q.   -- you have a duty to follow all

23   CPD policies while engaging in duty

24   activities, right?

25        A.   Correct.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1           Q.    And that's true that even when
2    you're off duty, you still have to follow
3    department policies, right?
4           A.    Give me an example.
5           Q.    Well, you're still bound --
6           A.    I mean, I'm not going out --
7           Q.    -- by the Manual of Rules and
8    Regulations, for example, even when you're
9    off duty, correct?
10          A.    Correct.
11          Q.    And you're bound by the
12   department policies even when you're off
13   duty, right?
14          A.    Correct.
15          Q.    In complying with department
16   policies, you have to follow all parts of any
17   CPD policy that apply to whatever particular
18   policing activity you're engaged in, correct?
19          A.    Correct.
20          Q.    And the policies, you don't get
21   to pick and choose which ones apply to you as
22   an individual officer, right?
23          A.    Correct.
24          Q.    And you don't get to pick and
25   choose which parts of any department policy
```

1    apply to you either, right?

2            A.    Correct.

3            Q.    Where a policy in the department

4    says, for example, an officer must, that word

5    "must" means that you have to do what the

6    policy says, correct?

7            A.    Correct.

8            Q.    And same thing where policies

9    say words like "shall," you have to comply

10   with that provision in the policy, right?

11           A.    Correct.

12           Q.    And where a policy says an

13   officer "will," for example, will do this or

14   will do that, you have to comply with that

15   provision of the policy as well, right?

16           A.    Yes, ma'am.

17           Q.    And, likewise, where a policy

18   says an officer will not do X, Y, or Z, you

19   have to comply with those will not provisions

20   as well, right?

21           A.    Correct.

22           Q.    And that's mandatory, right?

23           A.    Correct.

24           Q.    Mandatory all the time, right?

25           A.    Correct.

1          Q.    And there are no exceptions to

2     those kinds of statements in the policies,

3     right?

4          A.    Incorrect.

5          Q.    Sorry?

6          A.    I would say that's incorrect.

7          Q.    And explain that to me, please.

8          A.    I would say that the policies

9     are put in place.  The policies, like the

10    procedure manual is a guidebook.  There are

11    times and there are places to where the

12    policies have been deviated from and it's not

13    followed to the letter of the law.

14              There are exigent circumstances,

15    emergency circumstances to where those

16    policies put in place can be further

17    explained or justified as to why those

18    deviations from that policy occurred and with

19    sufficient -- I would say with sufficient

20    knowledge and justification and explanation

21    that those policies may be able to be

22    deviated from.

23          Q.    And in order to engage in a

24    deviation like you described from the policy,

25    how did you get approval for that?

```
 1            A.    Can you rephrase that?

 2            Q.    Do you need approval to deviate

 3    from a policy?

 4            A.    Yes, you do.  But I have also

 5    seen to where the policy has been deviated,

 6    an approval was given after with the

 7    justification from maybe those parties

 8    involved.

 9            Q.    So either advance approval or

10    approval after the fact where there's a

11    justification recognized by the department?

12            A.    I'd say that's fair, yes.

13            Q.    In that -- well, strike that.

14            Okay.  So you went to academy

15    training you said for about six months back

16    in 2006, correct?

17            A.    April 2nd, '06 to September

18    22nd, I believe.  And then the 24th would

19    have been my first day, that Sunday, on the

20    streets, yes, ma'am.

21            Q.    And in academy training, you

22    received instruction on how to conduct

23    vehicle stops, right?

24            A.    Yes, ma'am.

25            Q.    You received instruction on what
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 45 of 358 - Page
ID#: 1396
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the traffic laws are in the City of

2    Cincinnati, right?

3         A.    Yes, ma'am.

4         Q.    And you were trained at the

5    academy on what the Ohio Revised Code says,

6    right?

7         A.    Yes, ma'am.

8         Q.    And what violations of the Ohio

9    Revised Code look like, correct?

10         A.    Correct.

11         Q.    And you were also trained on

12    violations of the Cincinnati Municipal Code,

13    correct?

14         A.    Yes, ma'am.

15         Q.    And you were trained on how to

16    determine when drivers are violating traffic

17    laws, right?

18         A.    Yes, ma'am.

19         Q.    You were trained on how to write

20    reports, right?

21         A.    Yes, ma'am.

22         Q.    And were you trained at all in

23    surveilling suspects in the academy?

24         A.    Would you further clarify that?

25         Q.    In the academy, did they train

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    **you on how to conduct surveillance of**

2    **suspects?**

3          A.    Can I ask a question back?

4          **Q.    Sure.**

5          A.    So do you mean like in a

6    plainclothes capacity, or do you mean like

7    while in uniform patrol or -- I'm just trying

8    to further clarity your question.

9          **Q.    That's fair.  So when I --**

10          A.    I think it's a two-part

11    question.

12          **Q.    When I ask did the academy**

13    **provide you with any training on surveillance**

14    **of suspects, if the answer is of any type of**

15    **surveillance, I'd ask for you to tell me what**

16    **that was.**

17          A.    I would say, yes, to the fact of

18    what your previous questions were, to me,

19    surveilling suspects committing those crimes

20    to which I was taught.

21                So if I'm out on routine patrol

22    today and you blow a red light right in front

23    of me, or if I see you jaywalking or like --

24    so I guess I would -- does that answer your

25    question as to surveilling?

1    Q.    Sure.  Have you ever received

2    any other specialized training on

3    surveillance practices?

4          A.    No official, formal.  I would

5    say like when I went to the Gang Unit, I

6    adapted myself with senior veteran officers

7    who had been in those positions for years

8    upon years to maybe gain some knowledge more

9    over to the plainclothes surveillance because

10   that was my first plainclothes assignment.

11         Q.    So you're describing what it

12   sounds like to be kind of an on-the-job

13   training?

14         A.    Correct.

15         Q.    In an informal version of that,

16   right?

17         A.    Correct.

18         Q.    Where you're working with more

19   experienced officers, asking them questions,

20   and watching what they do, right?

21         A.    Yes, ma'am.

22         Q.    Okay.  Have you received any

23   other training on surveillance other than

24   that kind of field training we just talked

25   about?

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 48 of 358 - Page
ID#: 1399
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

    1              A.    Not that I recall.

    2              Q.    Okay.  Did you receive training

    3    in the academy on contingency planning in law

    4    enforcement activities?

    5              A.    I mean, I think everything we do

    6    has a contingent.  You always have to -- I

    7    mean, a motto I kind of go by is I don't play

    8    checkers in life, I play chess in life to

    9    where you kind of got to think a step ahead.

   10              I don't know if there was an

   11    official class for that, but I think that

   12    there's always a contingency plan or we

   13    always plan for contingencies.

   14              Q.    And that involves thinking ahead

   15    to the things that could wrong, right?

   16              A.    Correct.

   17              Q.    And then trying to think about

   18    alternative approaches to avoid those

   19    potential bad outcomes, right?

   20              A.    Yes, ma'am.

   21              Q.    And contingency planning then

   22    also would include evaluating as you're going

   23    to switch approaches if the bad outcome seems

   24    like it might be on its way, right?

   25              A.    Correct.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              Q.    And it's impossible to plan for
 2   contingencies for the sake of safety reasons,
 3   right?
 4              A.    Rephrase that.
 5              Q.    It's important to plan and
 6   consider contingency options to -- to ensure
 7   safety of persons, whether officer or
 8   suspects or other parties, right?
 9              A.    Agreed.  I thought you said
10   something else.  That's why I asked you.
11              Q.    I may have.
12              A.    Yeah.  No --
13              Q.    Sometimes, you know, I think in
14   my head the words --
15              A.    -- yeah, it is important to
16   plan.  No, I thought you said a different
17   word.
18              Q.    Okay.
19              A.    So, yes, it is important to
20   plan.
21              Q.    Okay.  And contingencies are --
22   are critical for the sake of ensuring public
23   safety, right?
24              A.    Yes and no.  I would say they're
25   critical for ensuring everyone's safety, not
```

1    just the public, everyone involved, police,

2    suspect, bystanders in the public.  So, yeah,

3    I would expand on your answer, but I would

4    agree, yes.

5         Q.    And that requires officers as

6    they're engaging in their law enforcement

7    activities to be aware of when risks --

8         A.    (Coughing.)  I'm sorry.

9         Q.    -- that's okay -- risks of

10   danger to officers, suspects, and the public

11   are significant enough that a contingency

12   should be followed, right?

13        A.    That followed or -- I mean,

14   there should be a contingency, whether it be

15   followed or not, that's -- that's a

16   case-by-case basis, I would say.

17              You can't -- there's no blanket.

18   You can't say X equals Y.  I mean, that's

19   what I'm saying.  I get what you're saying,

20   but I think you can't broad stroke it.

21        Q.    I think my question is a little

22   different.

23        A.    Okay.

24        Q.    For the sake --

25        A.    Maybe I misunderstood it.

```
 1            Q.    And I may have asked it poorly,
 2      which is definitely gonna happen --
 3            A.    Okay.
 4            Q.    -- so I'm happy to -- to
 5      rephrase or clarify.
 6            A.    Okay.
 7            Q.    For officers when they're
 8      engaged in their law enforcement activities,
 9      it's important for them to be aware of rising
10      risk levels so that they can know when a
11      contingency path should be taken rather than
12      the original plan, right?
13            A.    Yeah.
14            Q.    And contingencies can be used to
15      avoid injury or harm to persons, correct?
16                  MR. HERZIG:  Objection.  You can
17      answer.
18            A.    Restate that, please.
19            Q.    Contingency plans can be used by
20      law enforcement officers to avoid harm to
21      persons that's posed by the original plan,
22      right?
23            A.    You can't say that.  You
24      can't -- I -- I don't agree that you can say
25      that.  I could -- you can always plan.  You
```

```
 1    can never necessarily know the outcome.

 2                 Because what if I'm on plan A

 3    and then I go to plan B, and that outcome is

 4    worse than what plan A was.  I don't -- like,

 5    I don't -- I think that's a broad-stroke

 6    response.

 7         Q.    In that instance, though, as an

 8    officer, it would be your duty to try to

 9    follow the plan, whether it's A or B, that

10    appears to present the least risk of injury

11    to persons, correct?

12         A.    100 percent.  I mean, my job is

13    to protect life at all cause.  It's kind --

14    kind of -- my job is to always ensure that

15    those lives are protected, police, suspects,

16    citizens, I would say, so, yes.

17         Q.    Okay.  In academy training, did

18    you receive any training on pursuit driving?

19         A.    Yes, ma'am.

20         Q.    And can you describe that

21    training for me, please?

22         A.    Oh, boy.  Where it was at then,

23    I honestly don't remember.  I think it was at

24    the Hamilton County Sheriff's Office up at

25    275 and Hamilton Avenue.  They have just like
```

1    a big, open lot, and you do various cone

2    courses and obstacle courses.

3              And some are just based on, you

4    know, like a timer -- and I don't even

5    remember all the requirements -- some may be

6    speed, some may be time, some may just be,

7    hey, don't knock over a cone, just different

8    type obstacle courses that you go through.

9              They have like a skid car, which

10   that you would have a trainer in the car with

11   you, and that's basically to account for like

12   weather or different traffic conditions and

13   stuff like that, evasive movements, and

14   things like that to try make you adapt to the

15   conditions or anything like that.

16        **Q.    And so it sounds like what**

17   **you're describing is field training designed**

18   **to develop emergency driving abilities?**

19        A.    Hands-on.

20              MR. HERZIG:  Objection.  Go

21   ahead.

22              THE WITNESS:  I'm sorry.

23        A.    Hands-on training.

24        **Q.    Okay.  Hands-on training.  So**

25   **when you describe it as a hands-on training,**

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    that was to aid you in developing emergency

 2    driving abilities?

 3            A.    Yes.

 4            Q.    And would you describe it as a

 5    hands-on training that taught emergency

 6    driving tactics?

 7            A.    Yes.  I learned those tactics

 8    there.

 9            Q.    And did that particular training

10    come with any sort of like classroom

11    component or lecture, or something like that?

12            A.    Yeah.  I would -- I mean, I

13    can't swear, but most of -- it's been

14    19 years, so I apologize, but most of what we

15    do is they're called SOPs.

16                 So from the State training

17    curriculum -- and things have probably

18    changed so much -- so at the end of the

19    academy, we have what's a State test and a

20    City test, and that State test is based on

21    those SOPs that you learned throughout the

22    course of the academy.

23                 So now what the SOPs for the

24    driving training -- normally, you would start

25    in with a classroom exercise, or a classroom

1   training, and maybe definitions of, hey, this

2   is pursuit driving, this is plainclothes

3   surveillance.

4             Like, I don't know what the

5   definitions would be, but most would have an

6   SOP with them that you would, nine times out

7   of ten, we would probably have a classroom,

8   or maybe when we met at the pad that morning,

9   we all kind of huddled up and was like, hey,

10  these are the SOPs as to what it was, but

11  there should have been some sort of

12  curriculum, I would say.

13        **Q.    Okay.  And when you say SOPs,**

14  **that's Standard Operating Procedures, right?**

15        A.    I believe that's what the State

16  calls it, but -- I believe that's what it is.

17             But they're SO -- they're just

18  like things you got to know or whatever or

19  however you -- like, if I take a test and you

20  say, hey, this is what's on it, those are

21  like the SOPs, I guess is what it's called.

22        **Q.    Okay.  And then that huddling up**

23  **at the pad or in a classroom at the**

24  **academy --**

25        A.    Uh-huh.

1      Q.      -- when you say you're talking

2   about SOPs, do you mean in relation to

3   pursuit driving that you'd be discussing the

4   CPD pursuit policy?

5      A.      Say that again.

6      Q.      Yeah.  You're talking about

7   either in the classroom or at the academy

8   you're maybe huddling up at the -- at the

9   pad, I think you said before --

10      A.      Uh-huh.

11      Q.      -- the driving, hands-on

12   training, that there would be discussion of

13   the SOPs, right?

14      A.      Okay.

15      Q.      And would that include going

16   through the CPD pursuit policy --

17      A.      Okay.

18      Q.      -- applied at the time?

19      A.      Okay.  So, yeah.  So like the

20   SOPs would be, hey, this is what the State

21   teaches, and then most classes would be

22   followed up with, hey, this is procedure X,

23   Y, Z, this is what it is.

24          So, yeah, our procedures

25   would -- so that's what I was stating that,

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 57 of 358 - Page
ID#: 1408
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    hey, we would take the State test and you

 2    would have to know all these SOPs, but then

 3    when I got to the City test, you would have

 4    to know the City policy kind of deals.

 5            Because, obviously, we

 6    differentiate on -- our policies aren't the

 7    same as necessarily with the SOPs.  Our

 8    policies may be a little more stringent or

 9    little less depending on what it is, I guess.

10    So it should include all that.

11        Q.    Okay.  And that kind of

12    dual-testing model, that's during the

13    academy, right?

14        A.    Yes, ma'am.

15        Q.    Okay.  In terms of pursuit

16    training, do you recall receiving pursuit

17    training at any other time other than at the

18    academy?

19            A.    I mean, I would say it's like an

20    ongoing everyday kind of thing.  We always

21    have, you know, staff notes updates,

22    procedure updates, Tactical Patrol Guide

23    updates.

24            There are also where we would go

25    and do pursuit training.  It's just kind of

Deposition of Lieutenant Timothy Lanter                           Jason Laible, et al., vs. Timothy Lanter, et al.,

1   like our firearms familiarization we do every

2   year.  When and how often I had those, I

3   couldn't tell you, to where like I know every

4   year I have to go to the academy -- I have to

5   go to the range for two days.

6               That's just standard to where --

7   I mean, I don't recall when the last

8   designated on hands (sic) training would have

9   been, but I'm sure that I've had them

10  throughout my career several times.

11              Because like I said, I just

12  think it's, you know, hey, you get a two-hour

13  block here, hey, we're doing four hours here,

14  hey, you need to watch this video, hey, you

15  need to read this procedure update, you know,

16  we get those weekly and monthly kind of

17  deals.

18       Q.    At any of the pursuit-related

19  trainings you've had over the course of your

20  time with CPD, were you ever required to read

21  in its entirety the pursuit policy?

22       A.    I can't say.  I mean, I would

23  imagine that it was -- I don't know if we

24  read it in the entirety, but I'm sure we hit

25  on it and touch bases, and, hey, this is,

1    this is, this is this, that it was explained

2    and kind of talked to us.  But I don't think

3    before I went or after I left they said, hey,

4    you have to read this.

5                    It's just you're responsible for

6    those and you do it.  Just like when a staff

7    note update comes out, I say, hey, Policy 1,

8    2, 3, Section A-4 changed, let me read that

9    and make sure I'm refreshed with that kind of

10    deal.

11        Q.     Other than -- well, strike that.

12               When you were in the academy,

13    did you have to read the CPD Policy Manual

14    front to back?

15        A.     Again, I don't know that it was

16    required and they said, hey, read this front

17    to back, but I'm sure that I've read most, if

18    not all of it, to kind of familiarize -- I

19    mean, you're responsible for that.

20               You have to -- now, obviously,

21    you can't remember every single thing in

22    there and that's why you have it, that you

23    can reference it and whatnot, but, yeah.

24        Q.     And then you said staff notes,

25    you mentioned a moment ago --

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 60 of 358 - Page
ID#: 1411
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.      Uh-huh.

 2              Q.      -- with policy updates, right?

 3              A.      Yes, ma'am.

 4              Q.      So when those come out, do you

 5      have to read the policy update?

 6              A.      So, yeah.  So it's every Friday

 7      now new staff notes come out.  And it may be

 8      nothing changes for six months, nothing

 9      changes for two months.  It could be every

10      Friday for the whole year there's a new

11      update.

12                      So those staff notes are

13      published on Fridays.  Normally, I don't see

14      them on Fridays.  It just depends what time

15      they get published.  So then Monday morning

16      when I come in, they're there.

17                      And then there's -- there used

18      to be a checkoff list and you would sign

19      those back in the old days.  And now it's all

20      in -- computer automated.

21                      So when I go in there and I read

22      it, then at the bottom, there's a check

23      block.  And then it says something to the

24      effect of I read and acknowledged, or I'm

25      taking note that I've seen this, or something
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 61 of 358 - Page
ID#: 1412
Deposition of Lieutenant Timothy Lanter
Jason Laible, et al., vs. Timothy Lanter, et al.,

1  to where you acknowledged that you have read

2  that policy update.

3       Q.    Are there any times, other than

4  what you've just described, where you were

5  required to read the pursuit policy that you

6  can recall?

7       A.    I don't know that there was ever

8  a time where I was told, hey, you have to sit

9  down and read this.  But like I said, you

10  know, if we had CPT, Continuing Professional

11  Training, I think it is, our in-service, like

12  they may have gone over it then, and they're

13  like, hey, this is an update, this is an

14  update.

15            I don't think they would ever

16  say, hey, before you leave this classroom,

17  you have to read this in its entirety.

18       Q.    Okay.

19       A.    But if changes come, it's kind

20  of like understood you have to read those

21  changes and know what those changes are, I

22  guess.

23       Q.    You're responsible for following

24  a policy whether or not you've read the full

25  thing, right?

```
 1            A.    Yeah.  I mean, I could go in
 2      every Friday and check the block and never
 3      even look at what's there, but then that puts
 4      me on the spot, you know.
 5                  So, yeah, I would -- and like I
 6      said, at the trainings, I don't -- like I
 7      don't think I'm gonna go to that training and
 8      they're gonna say, you have to read this
 9      before you leave today.  So -- but, yeah,
10      you're responsible for those updates as they
11      come.
12            Q.    Okay.  Fleeing vehicles, it's a
13      fairly common circumstance that officers in
14      the CPD encounter over the course of their
15      careers, right?
16            A.    I would say, yes, active
17      officers for certain.
18            Q.    And so officers who are on the
19      road, for example, have to know how to
20      respond to a fleeing vehicle, correct?
21            A.    Correct.
22            Q.    And that pursuit training that
23      we've talked about, that addressed the skills
24      and tactics associated with fleeing vehicles
25      and how to handle them, right?
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 63 of 358 - Page
ID#: 1414
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Correct.

 2              Q.    And for the training you

 3    received on pursuits from the department, did

 4    that -- did those trainings address when and

 5    how to conduct a vehicle pursuit?

 6              A.    Can you further clarify, I

 7    guess?

 8              Q.    Yeah.

 9              A.    I'm sorry.

10              Q.    Those trainings you received on

11    vehicle pursuits from the department, did

12    they address the circumstances that would

13    justify a vehicle pursuit?

14              A.    Do those trainings tell me when

15    I can engage in a pursuit --

16              Q.    Yes.

17              A.    -- is that what you're asking?

18              Q.    Yes.

19              A.    Yes, that's what the policy

20    tells me.

21              Q.    Okay.  And the trainings, did

22    they address when pursuits must be

23    terminated?

24              A.    Yes.  Those are in the policy as

25    well.  Those are guides.
```

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    And in your training from the

2    department, have you been trained on

3    evaluating whether to conduct arrests under

4    circumstances facing you in the moment?

5         A.    Further clarify, please.

6         Q.    Sure.  Have you been trained by

7    the department on evaluating the time and

8    place for assessing arrests -- or, excuse me,

9    conducting arrests?

10        A.    Specific like book/classroom

11   training.

12        Q.    Any training?

13        A.    I mean, I don't recall like a

14   certain lesson plan, but you make -- you

15   evaluate the situation to which you're in, I

16   would say.

17             I would say it's an everyday --

18   we're always making those evals to put the --

19   I would say to put the advantage to the

20   police officer to have the control in that

21   situation.  So I think you're always

22   evaluating that.

23        Q.    And did that training address

24   the importance of safety risks posed by a

25   potential arrest?

1    A.    I think safety is number one in

2    everything we do.

3    **Q.    And so when conducting an arrest**

4    **as an officer in this department, you're**

5    **required to evaluate any safety risks posed**

6    **to others in the vicinity if you were to**

7    **conduct an arrest of a suspect, right?**

8    A.    I'd say, yes, but then we go

9    back to the unknown.  You can't -- I can't

10   give you a book and tell you how to do

11   everything.  Like, there's too many unknown

12   factors, I guess.

13          So I can plan, plan, plan, and I

14   get what you're saying, yes, that safety is a

15   factor, but you just never know, I guess.

16   You have to evaluate -- you can know to a

17   certain degree, but you can't know for a

18   certainty, if that makes sense.

19   **Q.    But as an officer, you are**

20   **required to pursue an arrest if you're gonna**

21   **undertake one in a -- in a manner that limits**

22   **safety risks to the extent you're able to**

23   **foresee possible risks, right?**

24   A.    Say that --

25   **Q.    I can ask that a better way.**

```
 1              A.    Yeah.

 2              Q.    When you conduct an arrest,

 3      you're supposed to try to do it in the safest

 4      way possible, right?

 5              A.    Yeah.  I mean, every arrest, I

 6      don't want -- I mean, you see how I look, I

 7      don't want to use any of these if I don't

 8      have to.

 9                    I mean, obviously, the safest

10      route we can take on any arrest is what we

11      do, but, yeah, I would say, correct, the

12      safest route anytime we can.

13                    MS. GREENE:  Okay.  Let's take a

14      short break off the record.

15                    THE WITNESS:  Okay.

16         (Off the record.)

17      BY MS. GREENE:

18              Q.    All right.  We are recording and

19      we're back on the record.

20                    Lieutenant Lanter, have you ever

21      been trained by the department on

22      deescalation?

23              A.    Yes, ma'am.  I believe we've had

24      classes through the academy or just through

25      CPT classes.
```

1     Q.     The CPTs, that's your annual --

2     A.     Annual --

3     Q.     -- required training?

4     A.     Yeah, in-service training.  I'm

5  sorry.

6     Q.     And what's the purpose of

7  deescalation in police work?

8     A.     Just to evaluate the situation

9  and see if there's a different resolution or

10  maybe an easier resolution to come to an end

11  on whatever a situation or circumstance may

12  be.

13     Q.     When you say a different or

14  easier resolution in the context of

15  deescalation, what does that mean?

16     A.     Or maybe like -- I guess if I'm

17  dealing with a -- how do we classify them --

18  like a mental health call and, you know, I'm,

19  obviously, not a mental health professional.

20          I've been trained, you know,

21  we've had the courses to where we have

22  resources, like mental health experts that,

23  you know, we call, maybe have them come and

24  kind of deescalate that way and try to handle

25  it.

```
 1              Or, you know, if it's a run

 2      where I'm involved with somebody, just the

 3      different ways that you approach them and

 4      talk to them and try to -- if they're in a

 5      heightened state, to try to get them back

 6      down to a lower state, I guess.

 7              Q.    Is it fair to say that

 8      deescalation involves, in a high-risk

 9      situation, taking steps to decrease the

10      tension and the risk in the situation for the

11      purpose of engaging with that particular

12      suspect?

13              A.    Can you re-ask that in a

14      different frame?

15              Q.    Sure.  Is it fair to say that

16      deescalation tactics as a police officer, are

17      something that you would use in a high-risk

18      situation to try to decrease the tension and

19      the risk in your interaction with a suspect?

20              A.    If I'm dealing with that

21      suspect, yeah, I would say, yes.

22              Q.    And deescalation can be used to

23      increase the safety level of an encounter

24      with a suspect, right, meaning make it safer?

25              A.    Again, I mean, there's not an
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 69 of 358 - Page
ID#: 1420
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    absolute.  You could, and it may also

2    heighten it depending on the situation.

3              Like -- like I just said with

4    the mental health, I mean, we could take the

5    steps that we're going to maybe deescalate,

6    but then that may agitate the suspect more,

7    if that makes sense.

8         **Q.    The goal of deescalation?**

9         A.    The goal of deescalation is

10   always to go from ten to one if you're trying

11   to bring the situation -- but it's not always

12   the outcome, I would say.

13        **Q.    And when you say ten to one, you**

14   **mean?**

15        A.    Ten being a high scale, one

16   being low end.  I'm sorry.

17        **Q.    It's a decrease safety risk from**

18   **ten down to a Level 1; is that what you're**

19   **saying?**

20        A.    Yes, to where ten would be like

21   the very heightened, and then we're trying to

22   deescalate to calmer tensions at a one.

23        **Q.    And so this is -- deescalation**

24   **is a set of tactics or an approach, that's**

25   **something you've been taught about from the**

1      department?

2           A.    Correct.

3           Q.    **And did they teach you that in**

4      **the academy, you said?**

5           A.    I honestly don't recall.  If it

6      was just through academy, through CPT

7      training, or in-service training.  I'm sorry.

8           Q.    **Over the years, though, it's**

9      **come up?**

10          A.    Over the years, yeah, it's come

11     up.

12          Q.    **And in terms of your learning**

13     **from CPD trainings, whatever form they might**

14     **have taken --**

15          A.    Yes, ma'am.

16          Q.    **-- were you taught to use**

17     **deescalation tactics wherever feasible?**

18          A.    I would -- I mean, we try to

19     deescalate every situation that we're

20     involved in.  We try to make every situation

21     as safe as possible for the safest and the

22     best outcome.

23               I don't think that there's --

24     there's no rhyme -- you have to see it to

25     know it, I guess, if that makes sense.  I

1    mean, we may leave here today and I stop you

2    for speeding, and you're calm and cool as can

3    be.

4              But then I may pull you over and

5    you're yelling and screaming at me.  So, I

6    mean, you don't know the situation.  You

7    might need it in every situation.  You might

8    not.  I think it's a case-by-case kind of

9    basis, if that makes sense.

10         **Q.    It does.  And when I say**

11   **wherever feasible to use deescalation, what**

12   **I'm asking is are you, in terms of your**

13   **understanding of what the department asks of**

14   **you as an officer, to use deescalation**

15   **approaches and tactics wherever it is**

16   **possible for you to do so?**

17         A.    I would agree, yes.  We want to

18   do that.

19         **Q.    Okay.  And there's a specific**

20   **policy on deescalation in the policy manual;**

21   **isn't there?**

22         A.    I have to see it.  Do you have a

23   copy of it for reference?

24         **Q.    I don't.  So actually let me**

25   **just ask that then.  Do you -- because as I**

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    sit here, I don't have a copy.

2              Do you know whether you've seen

3    a policy from the department on deescalation?

4         A.    I don't recall if there's a

5    specific policy or if it came in a training

6    bulletin.  Here's what I will say, we have,

7    as I stated, you've seen our procedure,

8    thousands of pages, we have those readily

9    accessible and available to us when needed,

10   whether it'd be in our car or our computer,

11   whether it'd be at my computer at my desk, I

12   can get those.

13              But then, again, those are

14   like -- you kind of learn those tactics and

15   it's like riding a bike, you just jump on and

16   you do it.  And I won't answer that.  I don't

17   know.

18              Like I said, was it a training

19   bulletin?  Was it a policy?  Was it in CPT?

20   I don't -- I don't want to give you an answer

21   because I don't have a certain for you.

22        Q.    Fair enough.

23        A.    But, like I said, I think it's

24   one of those things when you see it, you know

25   it kind of deal, and you just do it, maybe.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    If there is a policy, you'd have

2    to comply with it, right?

3      A.    Correct.

4      Q.    Okay.  Were you ever trained by

5    the CPD on the use of stop sticks?

6      A.    Correct.

7      Q.    And tell me what your -- what

8    you were trained on for those?

9      A.    That's another one of those

10   things it was obviously in the academy.

11         But then I believe like whenever

12   we would go to pursuit driving or any type of

13   those driving courses, that you would then,

14   again, go over the stop sticks, the policies,

15   where to lay them, how to lay them, make sure

16   you take cover, things like that, along those

17   lines, and then follow within those that you

18   were taught at that training.

19     Q.    And do you recall how many

20   trainings you've had on the use of stop

21   sticks over the years?

22         A.    I couldn't tell you.  Like I

23   said, it may be every year at CPT.  It may

24   even be when we go to driver's training,

25   pursuit training.  I don't recall honestly.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    What's the purpose of using stop

2     sticks as far as what you've been trained

3     from the department?

4          A.    Stop sticks will be used to

5     deflate the tires on a motor vehicle to allow

6     the release of air to deflate those tires to

7     either prevent a pursuit or to slow a pursuit

8     or bring a pursuit to a -- a stop.

9          Q.    Okay.  And since you've been in

10    here before, you've heard me ask this

11    question in various forms trying to get at it

12    previously, but are you aware of any policing

13    tactic that involves using police vehicles to

14    position them in such a way that they prevent

15    the departure of a suspect vehicle?

16         A.    I am.

17         Q.    And is there a specific term

18    that you would use for that practice?

19         A.    You said pinning the vehicle?

20         Q.    Not necessarily.  Well, is

21    pinning --

22         A.    Well, rephrase your question, I

23    guess.  I'm sorry.

24         Q.    Sure.  So what term would you

25    use to describe the practice of using police

1    **vehicles and positioning them in such a way**

2    **that they prevent a suspect vehicle from**

3    **departing a particular area?**

4            A.    I don't have an answer.  I don't

5    know.  I would -- pinning, maybe.  I don't

6    know if there's a technical term.  It's not

7    something that's used in CPD.  I'll tell you

8    that.

9            We don't do that.  I've seen --

10   obviously, I've been around 19 years.  I

11   mean, you've seen training videos.  You've

12   seen stuff to where departments -- other

13   departments across the country, they may use

14   their police vehicles.

15           They may have push bumpers on

16   their vehicles to pin those.  So they're

17   plainclothes.  They're plainclothes or

18   they're uniforms that do that.  We don't do

19   that.  But I've heard and seen it before, but

20   not in Cincinnati, no.

21           MS. GREENE:  Okay.  All right.

22   We are going to mark an exhibit.  I believe

23   this is --

24           THE COURT REPORTER:  54.

25           MS. GREENE:  -- 54.  Okay.

1          (Exhibit 54 was marked.)

2                    THE WITNESS:  Thank you, ma'am.

3     BY MS. GREENE:

4          Q.    All right.  Lieutenant Lanter,

5     you have in front of you what we've marked as

6     Exhibit 54.

7          A.    Yes, ma'am.

8          Q.    And is this document familiar to

9     you?

10          A.    I've never seen this document,

11     but I know what it contains.

12          Q.    You're --

13          A.    I've never seen it printed like

14     this.

15          Q.    You're familiar with the

16     content?

17          A.    I'm familiar with the content,

18     yes, ma'am.

19          Q.    Okay.  And this -- the content

20     of this document reflects your training from

21     the department over the period of time from

22     March 31st, 2006, through September 16, 2024,

23     correct?

24          A.    Yes, ma'am.

25          Q.    And I'd like for you to take a

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    look through the document and point out to

2    me, please, where there are trainings listed

3    here that were for pursuit driving, if you

4    would?

5            A.    Can I mark on this?

6            Q.    If you want to, sure.  Here, you

7    can -- do you want to -- I'm gonna hand --

8            A.    Just so --

9            Q.    -- you a purple pen.

10           A.    -- if it get it.  You tell me.

11   I just don't want to --

12           Q.    Yeah.  And I'm using a color

13   just shows up in our copies later.

14           A.    Yeah, this is blue.

15           Q.    Oh, that's blue?

16           A.    Yeah.

17           Q.    Okay.  Feel free to use that

18   then.  So if you would put a star next to the

19   titles of the trainings that address pursuit

20   driving, please?

21           A.    Okay.  Give me a couple minutes.

22   (Witness complies.)

23                 MR. COWAN:  Let the record

24   reflect that Officer Thomas has joined by

25   Zoom.

1          A.     Okay.

2          Q.     Thank you.  Can you walk me

3    through and report to me which trainings

4    you've identified in this **Exhibit 54** that

5    were pursuit training?

6          A.     Okay.  Page 11 of 11, fourth

7    line down, Vehicle Pursuit Training,

8    1/29/2007.

9          Q.     Okay.  And that was a two-hour

10   training, correct?

11         A.     Yes, ma'am.

12         Q.     At the Hamilton County location

13   you described earlier?

14         A.     Yes, ma'am.  That's what it

15   says.  I would imagine that's what it was.  I

16   know we've used other locations, so I'm not

17   100 percent positive.

18         Q.     Okay.  And then what's the next

19   training you had regarding pursuits?

20         A.     Page 10, fourth one down,

21   Vehicle Pursuit Training, Coney Island,

22   11/11/08.

23         Q.     That's another two-hour

24   training, right?

25         A.     Yes, ma'am.

1   Q.   And the training you noted from

2   January of 2007 and this November 2008

3   training we're talking about now, those were

4   both hands-on trainings in the vehicle as you

5   described earlier, right?

6       A.   I would believe that they were,

7   yes.

8       Q.   Okay.  And what's the next

9   pursuit training you had?

10      A.   Page 9, Item 1, 11/9/10.

11      Q.   Okay.  So November 9th, 2010,

12  training that lasted two hours on pursuit

13  training listed there, right?

14      A.   Yes, ma'am.

15      Q.   Was that also a hands-on

16  training in a vehicle?

17      A.   I think it would be safe to say

18  all these were.  I can't recall the exacts,

19  but mainly that's what it is.

20      Q.   Okay.

21      A.   And based on these locations, it

22  makes me think yes.

23      Q.   Okay.  And then what's your next

24  training on vehicle pursuits?

25      A.   So there's a couple that I've

1    marked that I'm not sure.  So like on page 8,

2    Defensive Driving In-Service, I don't know if

3    that would have touched on it, maybe it did,

4    maybe it didn't.  I don't know.

5           Q.    Okay.

6           A.    That was on 3/2/12.

7           Q.    Okay.  And then what's the next

8    Vehicle Training Pursuit you saw?

9           A.    The same thing, page 7, one,

10   two, three, four, five -- seven down, Tactics

11   in Traffic Enforcement.  That was a class at

12   Butler Tech that maybe they talked about

13   pursuits, maybe it was -- I just don't

14   recall.

15          Q.    Okay.

16          A.    So that's a possible.  So those

17   ones that are possible, I put a question mark

18   and a star next to just for your reference,

19   ma'am.

20          Q.    Thank you.  And so that's in the

21   Exhibit 54 you marked with your blue --

22          A.    Yes, ma'am.

23          Q.    -- pen?

24          A.    Yes, ma'am.

25          Q.    And question marks were the ones

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    where they may or may not have addressed

2    pursuits, but it's possible?

3         A.    Yes, ma'am.

4         Q.    The one you just described,

5    Tactics In Traffic Enforcement, that was

6    April 15th, 2013, right?

7         A.    Yes, ma'am.

8         Q.    And then what was your next

9    training on pursuits?

10        A.    Page 6, second from the bottom,

11   12/17/13, another two-hour block.

12        Q.    Okay.  And what was your next

13   training on pursuits?

14        A.    Page 5, second from the top, the

15   Remedial Driving, UC Clermont.

16        Q.    Okay.

17        A.    12/21/17.

18        Q.    Did that definitely address

19   pursuits?

20        A.    I have a question next to that

21   one as well.  I'm not sure if that one did or

22   did not, so I can't say for certainty on that

23   one.

24        Q.    Okay.  What's the next pursuit

25   training?

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    Page 3, sixth one down, Stop

2   Stick Train The Trainer.  I put a question

3   mark next to that.  I believe that was when

4   Stop Stick came in and just kind of gave a

5   presentation about the stop sticks and the

6   uses of employment, so I don't think that we

7   addressed our pursuits.

8          It may have been addressed, hey,

9   this is how we prevent pursuits and use of

10  the stop sticks.  So I'm not positive if that

11  would have covered any CPD policy stuff that

12  you were asking about.

13      Q.    Understood.  Are there any other

14  pursuit trainings listed for you in the

15  training record?

16      A.    And then I have on the front

17  page, one, two, three, four -- seven from the

18  bottom, Stops & Approaches, and then a couple

19  above that, Motor Vehicle Offenses.  I have

20  questions next to those just because I don't

21  recall if those touched on that or not.

22      Q.    Okay.  So for the trainings

23  you're certain addressed pursuits, can you

24  just list the dates of those trainings for me

25  just so I'm clear?

```
 1              A.    Sure.  I'll start at the back.

 2              Q.    Okay.

 3              A.    1/29/07, 11/11/08, 11/9/10,

 4        12/17/13, and that is all, ma'am.

 5              Q.    Okay.  For the trainings you put

 6        the question marks next to that may have

 7        addressed pursuits, do you know whether there

 8        was any curriculum handouts, any type of

 9        documentary stuff associated with the

10        trainings that would indicate whether you

11        were talking about pursuits?

12              A.    I can't swear to it.  But like

13        on the front page, the ones that say 24CPT,

14        there may have been like a handout.

15                    That CPT is our in-service, so

16        there may have been a handout, or it may have

17        just been, hey, this is the class we're

18        talking about for the next -- it looks like

19        one was an hour and one was two hours.

20                    So I believe the two-hour one,

21        the Stops & Approaches, that was like a

22        hands-on, hey, we're making this stop because

23        we just -- they started teaching a different

24        way to make felony approaches on stops.

25                    So that was -- like, I
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 84 of 358 - Page
ID#: 1435
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    remember -- I recall that was a hands-on.  So

 2    there was probably some talk in the class

 3    beforehand, you know, showing diagrams, hey,

 4    this is how we're gonna do these stops.

 5              So that may not have touched on

 6    pursuits.  It may have just been the stop and

 7    approach style.

 8         **Q.    Okay.**

 9         A.    So that's just why I put the

10    question on those.

11         **Q.    Okay.  For the trainings with**

12    **the course number that start with S, does**

13    **that mean those are State trainings, if you**

14    **know?**

15         A.    I honestly don't know what those

16    mean.  I thought -- yeah.

17              MR. HERZIG:  No, no, don't

18    guess.

19         A.    Oh, no, now I see it.  I thought

20    that might be somebody's badge number that

21    put it in.  But, no, now that I look at it,

22    those aren't -- I honestly don't know what

23    that number means.

24         **Q.    Okay.  Outside of what we're**

25    **looking at here, are you aware of any other**

```
 1        trainings on pursuits that you received over

 2        your course of your time with CPD?

 3               A.    None come to mind.

 4               Q.    Okay.  All right.  So you are,

 5        of course, aware of a vehicle pursuit that

 6        you were engaged on on October 7th, 2020,

 7        correct?

 8                     MR. HERZIG:  August?

 9               A.    August?

10               Q.    Sorry.  What did I just say?

11               A.    October.

12               Q.    Thank you.

13               A.    August 7th, 2020.

14               Q.    Sorry about that.  So you -- you

15        are aware of a vehicle pursuit you were

16        engaged in on August 7th, 2020, correct?

17               A.    I am.

18               Q.    What was the model and make of

19        your car for that pursuit; do you know?

20               A.    2015 Ford Explorer.

21               Q.    Do you know the make and model

22        of Officer Thomas' vehicle during that

23        pursuit?

24               A.    I think he was still in a Ford

25        Crown Vic.  I can't swear to it, but I think
```

1    that's what he was in.

2         Q.    Do you know what year, or range

3    of years that Crown Vic would have been from?

4         A.    Oh, God.  They had Crown Vics

5    from when I started to just 2011, I think was

6    the oldest one we had in our fleet.  So maybe

7    somewhere in that range.  I'm not sure,

8    though.

9         Q.    And Officer Harper, do you know

10   the make and model of his vehicle during that

11   pursuit?

12        A.    I have no clue on that one.

13        Q.    During the course of that

14   pursuit, did you run any red lights?

15        A.    I cannot say for 100 percent

16   certainty, but I can say for certainty if I

17   did, I proceeded through all those

18   intersections with due care and caution as

19   required.

20        Q.    Required under the CPD policy?

21        A.    That's correct.

22        Q.    And when you say with due care

23   and caution, what does that mean?

24        A.    That means that I didn't enter

25   those intersections without first being able

1    to see those intersections, that I was able

2    to slow to the speeds needed, or I had a

3    clear and unobstructed view that I knew that

4    it was possible for me to enter those

5    intersections in a safe manner, and to be

6    able to clear those intersections in a safe

7    manner as to not create hazardous conditions

8    to myself, the suspect, or the public.

9         Q.   When you say slow to the speeds

10   needed, what does that mean?

11        A.   That you, obviously, as you're

12   approaching an intersection, you slow down

13   before you hit that intersection if you have

14   a red light.

15             So I wouldn't have stopped to a

16   zero mile an hour, maybe a five, maybe a ten,

17   maybe a 20, depending on where it would be

18   and what the intersection looked like and

19   what I saw and what I knew.

20        Q.   For any intersection with a red

21   light that you went through, did you slow to

22   speeds as needed, as you just described,

23   during that pursuit?

24        A.   Yes.

25        Q.   For every single intersection

1   that had a red light you went through, you

2   did that?

3          A.    Any intersection I would have

4   crossed, whether it was a red light or a stop

5   sign or...

6          Q.    And when you say "speeds as

7   needed," and you gave these numbers, five,

8   ten, 20 miles an hour, is there a maximum

9   speed at which you're permitted to go through

10  intersections that you're aware of under CPD

11  policies --

12         A.    No.

13         Q.    -- in a pursuit?

14         A.    No.

15         Q.    Are there any parameters that

16  you're aware of from CPD policies that

17  dictate your speed going through

18  intersections with red lights?

19         A.    No.

20         Q.    And did you run any stop signs

21  during this pursuit?

22              MR. HERZIG:  Objection to run.

23  You can answer.

24         Q.    Did you go through any

25  intersections with stop signs without

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 89 of 358 - Page
ID#: 1440

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     stopping prior to entering the

2     intersection --

3            A.     Yes.

4            Q.     -- during the pursuit?

5            A.     With due care and caution as

6     stated in the previous question.

7            Q.     And when you say due care and

8     caution with respect to the stop signs, does

9     that mean slow to speeds as needed as you've

10    just described already?

11           A.     Same answer that I gave for the

12    red light answer, ma'am.

13           Q.     Okay.  You are required to slow

14    through intersections with red lights or stop

15    signs under CPD policies, correct?

16           A.     Slow and enter them only when

17    safe with the due care and caution

18    requirement.

19           Q.     Okay.  And when you say you

20    would enter those intersections in a way to

21    not create hazardous conditions, what do you

22    mean by that?

23           A.     A hazardous condition would be

24    me causing an auto accident or me not having

25    the full view of the intersection, which

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    would cause me to maybe swerve or veer off

2    course, or something along those lines.

3         Q.    Or the possibility of third

4    parties being struck in the course of a

5    pursuit, that would be part of that as well,

6    right?

7              A.    Rephrase that, please.

8         Q.    Not creating hazardous

9    conditions would include avoiding pursuing in

10   such a way that you create or contribute to a

11   risk of third parties being hit in the course

12   of the pursuit, right?

13              MR. HERZIG:  Objection.  You can

14   answer.

15         A.    My actions?  I guess I'm asking

16   for -- I don't know.  Can you rephrase one

17   more time?  I'm sorry.

18         Q.    Not creating hazardous

19   conditions also includes driving in such a

20   way that you don't create conditions that

21   give rise to a risk that third parties could

22   be hit in the course of a pursuit by a moving

23   vehicle, right?

24              MR. HERZIG:  Objection.  You can

25   answer.

1    A.    By my moving vehicle, yes.

2    **Q.    What about a fleeing suspect?**

3    A.    I would say yes.  However, I

4    can't -- I'll say yes.

5    **Q.    Okay.  Did you slow down at all**

6    **intersections that had a stop sign where you**

7    **did not stop before you entered the**

8    **intersection?**

9    A.    One more time.  I'm sorry.

10   **Q.    Did you slow down as you entered**

11   **all intersections that had a stop sign where**

12   **you had not stopped prior to entering the**

13   **intersection during the pursuit?**

14   A.    Yes.  All intersections were

15   entered at a speed which was reasonable to --

16   for the due care and caution.

17   **Q.    When you say a speed that was**

18   **reasonable for the due care and caution, what**

19   **does that mean?**

20   MR. HERZIG:  Objection, asked

21   and answered.  You can answer it again.

22   **Q.    We haven't used the word**

23   **reasonable yet, so I'm asking him to define**

24   **what does that mean a reasonable speed.**

25   A.    Is the question -- or I don't

1  want to ask your question.

2       **Q.    Sure.**

3       A.    Go ahead.  I'm sorry.

4       **Q.    Can you explain to me what you**

5  **mean by a reasonable speed in this context**

6  **where you just used the term?**

7       A.    I would say yes and no.  So a

8  reasonable speed, you don't know until you're

9  there, I would say.  As I'm -- as you're

10  approaching that intersection, you have to

11  see what's at that intersection.

12       So what can I see as I'm

13  approaching that intersection, am I assured

14  there's nothing on the left, nothing on the

15  right, there's nothing coming ahead.

16       I think you slow to those speeds

17  that allow you to meet that requirement to

18  enter that intersection with providing that

19  due care and caution to ensure that you

20  clearly enter and clearly exit that

21  intersection.  I don't know if I can give you

22  a number, if that's what you're asking.

23       **Q.    Okay.  Did you at any time go**

24  **the wrong way on any one-way roadways of any**

25  **type during the course of the pursuit?**

1  A.    I did.

2  **Q.    Which areas did you do that?**

3  A.    It would have been across the

4  Roebling Suspension Bridge when I entered

5  into Covington.  We went to the left and came

6  around the left side of the roundabout.

7  And then I don't know the street

8  name.  I could reference my notes if you

9  would like to give you the street name.  It

10  was on -- I want to say it was Park and

11  Greenup by the Keystone into the gas station

12  lot, we kind of cut diagonal across.

13  The lot -- the stop sign to the

14  lot of the gas station.  And then coming out

15  of the gas station I believe that was

16  4th Street for half a block to Garrard, I

17  think was the name of that street.  And then

18  I believe that was it.

19  **Q.    So those wrong ways on the**

20  **one-way roads that you described, those were**

21  **all in Covington, Kentucky, correct?**

22  A.    I will say this, they were in

23  Kentucky.  I don't know the boundaries, if

24  it's Newport, Covington, if it's something

25  different, but, yes, in Kentucky.

1    Q.    Okay.  Had you received

2 authorization to go the wrong way on those

3 streets?

4    A.    I had not.  I had granted

5 authorization.

6    Q.    And who did you grant

7 authorization to?

8    A.    To myself and Officer Thomas.

9    Q.    Okay.  Over the course of the

10 pursuit, did you have your lights and sirens

11 on the whole time?

12    A.    Yes, ma'am.

13    Q.    Continuously throughout the

14 whole pursuit?

15    A.    The very, very beginning the

16 sirens may not have been continuous.  As I

17 stated in my interviews with Internal and

18 Newport, when I make a traffic stop, what is

19 my normal course and procedure is, is I will

20 activate my light bar, and then I will

21 intermittently hit my siren as to gain the

22 attention of the person to whom I am trying

23 to stop.

24         And then once it was known that

25 Mr. Meyer was not going to stop, then I would

1  have activated my siren fully and

2  continuously throughout that pursuit.  So,

3  yes and no is the answer to your question, I

4  believe.

5        **Q.    Over the course of the pursuit,**

6  **did you call out over the radio the speeds at**

7  **which you were traveling?**

8        A.    I did not.  At the beginning of

9  the pursuit, as required by the procedure, I

10  gave all the required elements of that.  I

11  did not list the speed because the speeds

12  were not established.

13            I was still making the stop, and

14  that was the only reason that I did not give

15  the speeds in the beginning of the pursuit.

16  I gave all the required elements.

17        **Q.    Did you report speed over the**

18  **duration of the pursuit at any other time?**

19        A.    I did not.

20        **Q.    When you say the speeds were not**

21  **established at the beginning of the pursuit,**

22  **what do you mean?**

23        A.    The same thing as the pursuit

24  not being established at that initial onset,

25  the intent was to make a traffic stop.  So as

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    you know, maybe you've been pulled over,

2    maybe you haven't, initially sometimes people

3    don't know that they're getting pulled over.

4              So that's why I intermittently

5    hit the horn to say, hey -- because some

6    people think, hey, maybe you're just trying

7    to go around them.  Some people think maybe

8    they're getting stopped.

9              So at the initial it was

10   vehicle, make, model, all that stuff, and

11   there were no speeds established because

12   initially the intent was to stop, not to

13   engage in a pursuit.

14        Q.    Wait, say that again.  What was

15   the last thing you just said?

16        A.    The intent was for the traffic

17   stop.  And then his failure to stop, then

18   initiated the pursuit.

19        Q.    Were speeds established at any

20   point during the pursuit?

21        A.    Define "established."

22        Q.    Well --

23        A.    Or, I guess, maybe re-ask it, if

24   you could, please?

25        Q.    Sure.  So you said at the

1  beginning of the pursuit speeds were not

2  established, right?

3          A.    Correct.

4          Q.    And so my question is, were

5  speeds established at any point during the

6  pursuit?

7          A.    Like, I think I know what you're

8  saying, but I'm not clear on what you're

9  100 percent asking.

10          Q.    So speeds weren't established at

11  the beginning of the pursuit because at the

12  time you were trying to make a stop and it

13  wasn't clear for a moment --

14          A.    Correct.

15          Q.    -- whether it was a pursuit or

16  not, right?

17          A.    Correct.

18          Q.    And then the pursuit commenced,

19  correct?

20          A.    Correct.

21          Q.    And then speeds are established

22  at some point thereafter, right?

23          A.    Once the pursuit engages, then

24  there's some sort of speeds established,

25  correct.

1    Q.    Okay.  And what were those

2  speeds?

3    A.    It depends where you're asking

4  about.  The pursuit went for six, seven

5  minutes.

6    Q.    Okay.  We'll get to that in a

7  moment then.

8    A.    Okay.

9    Q.    Did you call out speeds once

10  they were established over the radio at any

11  time?

12    A.    I did not.

13    Q.    And did you report conditions of

14  the pursuit over the radio at any time?

15    A.    I don't recall 100 -- I can look

16  at my notes, if you'd like.

17    Q.    Well, we can get to those later.

18    A.    Okay.

19    Q.    But as you sit here right now,

20  do you recall reporting conditions of the

21  pursuit over the radio at any time?

22    A.    I don't think I did.  I don't

23  recall.

24    Q.    Did you report anything about

25  dangers posed to third parties during the

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    course of the pursuit on the radio at any

2    time?

3              A.    No.

4                    MR. HERZIG:   Objection to that.

5    That's fine that you answered.

6         Q.    And did you authorize other

7    police vehicles to join the pursuit?

8              A.    I did.

9         Q.    And who was that?

10             A.    Specialist Harper and

11   Officer Brett Thomas.

12        Q.    And did you at any point in time

13   during the course of the pursuit exceed the

14   speed limit?

15             A.    Yes.   If you're engaged in a

16   pursuit and the speed limit is 25 or 35 miles

17   an hour, you're gonna exceed that speed

18   limit.

19        Q.    And did you exceed the speed

20   limit by more than 20 miles per hour at any

21   point during the pursuit?

22             A.    I do not believe I did, as I

23   testified in both my interviews with Internal

24   and Newport.

25        Q.    And what's the basis of that

1    **belief?**

2              A.    The basis of the belief is that

3    the pursuit was a very -- not a stop-and-go,

4    but turns to accelerate a burst to where

5    you're approaching intersections, you're

6    slowing down and then you're speeding up

7    again and then you're slowing down, then

8    you're speeding up again.

9              As I stated in that interview,

10   the only place to where I may have gone the

11   50, 60 miles an hour was on the 6th Street

12   Viaduct passing Mehring Way until I got to

13   the 5th Street Exit, 71/75 South Exit into

14   Kentucky.

15              Because of those side streets to

16   which I was on, like I said, those

17   accelerated bursts of making the turns, when

18   I entered the 6th Street Viaduct, traffic was

19   kind of -- just because cars were all

20   merging, it was a little congested for a

21   second.

22              And then I slowed, and then I

23   was able to get out of that.  And then that's

24   when I accelerated probably to 50, 60 miles

25   an hour.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    On 2nd Street?

 2          A.    No, that would have been on

 3   6th Street Viaduct at the Mehring Way Exit

 4   passing and continuing going eastbound.

 5          Q.    Are there any other points in

 6   the pursuit where you exceeded the speed

 7   limit more than 20 miles an hour that you

 8   recall as you sit here today?

 9          A.    Well, that wouldn't have been 20

10   miles an hour over the speed limit on Mehring

11   Way.  The speed limit is 50 miles an hour at

12   that point.

13          Q.    Okay.  Are there any parts of

14   the pursuit where you drove your vehicle at a

15   speed more than 20 miles over the speed

16   limit?

17          A.    No, not to my knowledge.

18          Q.    And did you look at your

19   speedometer while you were driving?

20          A.    I'm sure I did.

21          Q.    Do you recall looking at it?

22          A.    I don't recall getting --

23   engaging in a speed when I did, if I did look

24   at it.

25          Q.    And as you sit here right now,
```

1    do you have any specific memories of looking

2    at your speedometer during the pursuit?

3         A.    No.

4         Q.    And have you at any time

5    attempted to -- using any of the information

6    or materials available to you, evaluate your

7    speed over the course of the pursuit after

8    the fact?

9         A.    Can you further clarify that

10   question?

11        Q.    Yeah.  Have you at any time

12   after the pursuit ended on August 7th, 2020,

13   attempted to use materials, information

14   available to you, to go back and evaluate

15   what speeds you were driving during the

16   pursuit?

17        A.    What materials would you mean?

18        Q.    Well, for example, cruiser

19   camera, body-worn video camera, other

20   documentary sources of evidence of any kind.

21        A.    No.

22        Q.    And as you sit here today, do

23   you know for a fact whether you did or did

24   not go more than 20 miles over the speed

25   limit at any time during the pursuit?

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          A.    No.  And I don't think that fact
 2    has been established by anyone.
 3          Q.    During the pursuit, you were
 4    operating your police vehicle in emergency
 5    mode, right?
 6          A.    That's correct.
 7          Q.    During the course of the
 8    pursuit, did you see any pedestrians over any
 9    area -- or in any area during the pursuit?
10          A.    The one place that I do remember
11    seeing one or two people was when we turned
12    from Freedom Way, I think it's called Rosa
13    Parks and maybe Vine Street at The Banks
14    before we entered the Taylor Southgate -- or,
15    strike that -- the Roebling Suspension
16    Bridge.  I'm sorry.
17          Q.    And that's the only place you
18    recall seeing pedestrians over the course of
19    the pursuit?
20          A.    That's correct.
21          Q.    Do you recall seeing other
22    vehicles on the roadway during the pursuit?
23          A.    Of course.
24          Q.    And can you describe to me where
25    you saw those vehicles?
```

1    A.    I mean, there were vehicles

2   throughout the whole course of the pursuit,

3   whether they were parked on the side of the

4   street or whether they were driving on the

5   side streets, the bridge, but that vehicular

6   traffic was minimal to light at best at any

7   point in that pursuit.

8        **Q.    And what do you mean "minimal to**

9   **light"?**

10   A.    Minimal to light means that

11   there were very few cars that it wasn't

12   bumper-to-bumper traffic or it wasn't

13   traffic -- so there wasn't a lot of cars.

14   There wasn't a lot of pedestrians out.

15       **Q.    So you're saying there wasn't**

16   **bumper-to-bumper traffic over the entire --**

17   **at any point during the pursuit, right?**

18   A.    I will further clarify and say

19   this for you, during the course of the

20   pursuit, the route that we took, the traffic

21   was never so heavy or -- to a degree.

22        There were a few parts where

23   traffic was stopped and may have been

24   bumper-to-bumper, but that was because those

25   cars stopped and/or that they had traffic

Deposition of Lieutenant Timothy Lanter                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1     lights that they were stopped for.

 2             Q.    And then, otherwise, is it your

 3     testimony that traffic was very few cars on

 4     the other areas of the pursuit?

 5             A.    Traffic was light, yes.

 6             Q.    And can you just explain to me

 7     what you mean by that?  I mean, these other

 8     areas you say traffic was light, what did --

 9     what did it look like?

10             A.    I mean, do you want to go

11     turn-by-turn through the pursuit or what --

12             Q.    Yeah, during the pursuit.

13             A.    Well, the pursuit started at

14     Elberon and Mt. Hope, and the only traffic

15     that was there was cars parked on the street.

16     When we got to the top at 8th and Mt. Hope,

17     there was one vehicle that pulled to the

18     side.

19                   Then we turned outbound Price, I

20     don't recall seeing any vehicles.  As we came

21     and turned on Hawthorne and approached

22     Warsaw, there was one car that was stopped at

23     the traffic light.

24                   As we went inbound Warsaw, I

25     believe there was one or two cars stopped at

Deposition of Lieutenant Timothy Lanter                Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Grand and Warsaw in the left lane.  So then

2    the pursuit went to the right lane.  There

3    were cars parked down Warsaw going inbound

4    when we got to the 6th Street Viaduct.

5              That's where there were some

6    cars that created just a little bit of

7    congestion just based on cars all merging

8    from different thoroughfares.  And that

9    lasted literally two, three seconds, four

10   seconds, five seconds, maybe.

11             It was Mr. Meyer snaked through.

12   I backed off, had my lights and sirens going.

13   As cars acknowledged, then I was able to get

14   through.  Then as we approached the 2nd

15   Street, 71/75 split, traffic on the bridge

16   was stopped, which we didn't go that route.

17             That's just normal 75 South

18   traffic that was stopped.  He then cut across

19   to 2nd Street.  Then we came across Freedom.

20             And then as we were approaching

21   the suspension bridge, there were a few cars

22   which were stopped, which to my belief is

23   because they saw the lights and heard the

24   sirens, and they stopped as they were

25   supposed to, traveled across the bridge,

1    maybe one or two cars on the bridge that I

2    remember seeing.

3              Then came through the roundabout

4    to, I guess that's Court, and then turned

5    onto Park to get to Greenup to go to the gas

6    station, and there may have been one car

7    there.

8              And then when we came out on 4th

9    to Garrard, there were several cars stopped

10   at that stoplight.  And then we went down

11   Garrard to 3rd to the alley.

12             When we came back out the alley

13   back the 4th Street, there were a handful or

14   so of cars stopped, and that was because they

15   had the red light, and that was the only

16   reason.

17             When we came out of -- let's

18   see.  When we came out of Garrard onto the

19   bridge, there was a handful or so of cars

20   were stopped there because of the red light.

21             And then when we came across 5th

22   to the crash -- crash location, I remember

23   making note of there was a White Castle,

24   Family Dollar, The Syndicate all there, no

25   cars, the lots were empty, no traffic out at

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    that point.  And then the crash ended at 5th

 2    and Monmouth.

 3            Q.    Okay.

 4            A.    Before you ask the next one, can

 5    I run to the restroom real quick?

 6            Q.    Sure.

 7            A.    I'll make it real quick.

 8                  MS. GREENE:  Yep.  We'll go off

 9    the record.

10        (Off the record.)

11    BY MS. GREENE:

12            Q.    All right.  We're recording and

13    we are back on the record.

14                  Lieutenant Lanter, over the

15    course of the pursuit on August 7th, 2020,

16    did you see any vehicles swerving to get out

17    of the way of the pursuit?

18            A.    Swerving, no; pull over to get

19    out of the way of the pursuit, yes.

20            Q.    Did you see any near accidents

21    during the pursuit?

22            A.    Yes.

23            Q.    And where was that?

24            A.    That would have been eastbound

25    6th Street Viaduct to the approach to 71/75
```

Deposition of Lieutenant Timothy Lanter                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    South into Kentucky, there was a vehicle that

2    was in the lane to go onto the bridge.

3              And when they heard, what I

4    would assume, was heard the sirens or saw the

5    lights, they attempted to pull to the right,

6    as you're supposed to.

7              And when they did, I don't know

8    if a crash had occurred or Mr. Meyer slid

9    through before he made contact.  I'm not

10   certain as to what happened there.

11        Q.    Any other locations that you saw

12   any near accidents during the pursuit?

13        A.    When we went across the

14   4th Street Bridge, I wouldn't say that it was

15   necessarily a near accident.  The

16   motorcyclist kind of pulled to the right --

17   or did he pull to the left -- he pulled one

18   way to avoid the cars, so maybe that could

19   have been a near possible, but those are the

20   only two that stick out to me.

21        Q.    Did you see a vehicle get

22   sideswiped during the pursuit?

23        A.    Do you have a location where?

24        Q.    I'm just asking, did you see

25   that happen anywhere?

1    A.    No, I did not.  I didn't know if

2  you had a specific.  I'm sorry.

3    **Q.    The motorcyclist swerved not to**

4  **get hit, right?**

5    A.    I can't speak for what he did or

6  didn't do.  Maybe he was pulling to the side

7  based on seeing the lights and sirens as to

8  what most people do when they see the police

9  or a fire truck coming through.  So I can't

10  speak to his frame of mind.

11    **Q.    Okay.  When you first began to**

12  **follow Mason Meyer, what street were you on?**

13    A.    Where was I before the pursuit

14  started or --

15    **Q.    Yeah.  When you first started to**

16  **follow Meyer, where were you?**

17    A.    I was set up at Delhi and River

18  Road in the Meder T-shirt parking lot.  That

19  is where I staged prior to any events

20  occurring.

21    And that left me an easy exit

22  for an inbound or an outbound takeaway of

23  Mr. Meyer if he got in the car and left the

24  Steiner address.

25    **Q.    What's the speed limit on that**

1    stretch of River Road; do you know?

2         A.    I can't say for certainty.

3         Q.    Were you aware of it at the time

4    on that day?

5         A.    Yeah.  I believe it's 35 or 40,

6    but I don't -- River Road fluctuates based on

7    where you're at, but I think in that range,

8    it's 35, 40.

9         Q.    And then from River Road, you

10   turned onto what street?

11        A.    I came out Delhi, turned inbound

12   River Road.  And then as we approached, I

13   think it's State at that traffic light, it's

14   the connector there from Lower State, so I

15   think that's State, and then it branches off

16   into Elberon.

17        Q.    Do you know what the speed limit

18   on State was at the time?

19        A.    Just based on knowing that

20   street, I would say somewhere between 25 and

21   35.  I don't know if there's a sign

22   established right there at that lower end.

23        Q.    Do you know what the speed limit

24   on Elberon was?

25        A.    Again, I would say 35 in that

Deposition of Lieutenant Timothy Lanter                                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   section.
 2           Q.    Where did you go from there?
 3           A.    Once we turned onto Elberon, we
 4   came to Mt. Hope, and that's where I
 5   initiated the stop.
 6           Q.    And what's the speed limit on
 7   Mt. Hope?
 8           A.    Twenty-five, 35.
 9           Q.    And you said that's where you
10   initiated the stop?
11           A.    Correct, when he turned up
12   Mt. Hope.
13           Q.    And that's also where the
14   pursuit commenced, correct?
15           A.    That's correct.
16           Q.    While you were on Mt. Hope, did
17   you drive your cruiser left of the centerline
18   at any point?
19           A.    Say that again.
20           Q.    While you were on Mt. Hope, did
21   you drive your cruiser left of the centerline
22   at any point?
23           A.    There's not a centerline on
24   Mt. Hope, I do not believe.  I think there's
25   parking on both sides and there's just the
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   road.
 2          Q.    Did you drive your cruiser on
 3   the left side of the street on Mt. Hope?
 4          A.    I mean, I would say yes.
 5   It's -- there's parking on both sides of the
 6   street, then you would drive in the middle of
 7   the road unless a car was coming, then you
 8   would move to the right.  I don't believe
 9   that there's an established double yellow or
10   dotted yellow throughout Mt. Hope.
11          Q.    Did any other drivers have to
12   pull to the side to get out of your way while
13   you were on Mt. Hope?
14          A.    As I stated earlier at Mt. Hope
15   and 8th Street, a vehicle, to which I can
16   only assume they saw our lights or heard our
17   sirens, pulled to the right-hand side.
18          Q.    Did you see any debris fly off
19   of the vehicle Meyer was in at that location
20   on Mt. Hope?
21          A.    Did vehicle parts come off of
22   his car?
23          Q.    Any debris.
24                MR. HERZIG:  Off of Meyer's car?
25                MS. GREENE:  Correct.
```

```
 1              MR. HERZIG:   Okay.
 2         A.    Not off of his car, no, I did
 3    not.
 4    BY MS. GREENE:
 5         Q.    Did you see debris fly from
 6    anywhere on Mt. Hope?
 7         A.    I don't believe so.  There may
 8    have been something in the roadway that flew
 9    up, but nothing from his car --
10         Q.    Okay.
11         A.    -- that I know of.
12         Q.    All right.  Did you go through
13    any stop signs on Mt. Hope without stopping?
14         A.    Yes.
15         Q.    Where did you go from there --
16         A.    From Mt. Hope?
17         Q.    -- from Mt. Hope?
18         A.    Crossed over 8th.  And then it's
19    a short block and came to Price and turned
20    left on Price to a right on Hawthorne.
21         Q.    And do you know what the speed
22    limit on Price was?
23         A.    Twenty-five, 35.
24         Q.    Do you know what the speed limit
25    on Hawthorne was?
```

```
 1              A.    Same.

 2              Q.    Did you cross any school zone in

 3    that area?

 4              A.    I did, but it was summertime.

 5    There's no school in session.

 6              Q.    So you're saying you went

 7    through a school zone, the speed limits

 8    weren't in effect at the time you were there,

 9    is what you're saying; is that right?

10              A.    That is what I'm saying.  Even

11    if there was school, the zones would not have

12    been in effect.  It was past four o'clock.

13              Q.    Did you -- well, where did you

14    go from Hawthorne?

15              A.    Hawthorne, approached the

16    traffic light at Warsaw, turned inbound

17    Warsaw to the 6th Street Viaduct.

18              Q.    At that intersection of

19    Hawthorne and Warsaw, did you run the red

20    light?

21              MR. HERZIG:  Objection to run.

22    You can answer.

23              A.    I believe it was red, and, yes,

24    I slowed.  There was a car in the left lane,

25    so I had to slow enough to where I could
```

Deposition of Lieutenant Timothy Lanter                   Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    ensure that there was no traffic coming from

 2    the left, and entered that intersection with

 3    due care and caution, as I stated earlier.

 4    And then I proceeded, made the turn inbound

 5    Warsaw Avenue.

 6            Q.    Then on Warsaw, what's the speed

 7    limit?

 8            A.    I don't know if it splits there

 9    going down the hill, but I'll say 25, 35

10    again.

11            Q.    And then you said to the 6th

12    Street Viaduct from Warsaw?

13            A.    Correct.

14            Q.    And what's the speed limit on

15    the ramp onto the 6th Street Viaduct?

16            A.    I believe the ramp speed is 40.

17    And then when you hit Mehring Way, it

18    increases to 50.

19            Q.    And when you say Merian (sic)

20    Way, is that colloquially known as the

21    6th Street Viaduct also --

22            A.    No.

23            Q.    -- or no?

24            A.    No.

25            Q.    Okay.
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 117 of 358 - Page
ID#: 1468
Deposition of Lieutenant Timothy Lanter                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1              MR. HERZIG:  He's saying

 2   Mehring.

 3         Q.    Oh, you said -- I thought --

 4   yeah, I was gonna say Merian Way.  It wasn't

 5   familiar to me, but Mehring.  Okay.

 6         A.    Mehring Way, yes.

 7         Q.    So Mehring Way?

 8         A.    Correct.

 9         Q.    Thank you.  What's the speed

10   limit on Mehring Way?

11         A.    I don't know.  The pursuit never

12   entered Mehring Way.

13         Q.    Okay.  You went from the

14   6th Street Viaduct to where?

15         A.    Entered off of Warsaw Avenue,

16   came on Merian or -- now you got me saying

17   it, Warsaw Avenue to the 6th Street Viaduct

18   entrance connector, came onto 6th Street past

19   the Mehring Way Exit ramp from 6th Street

20   Viaduct.

21              Then went across 6th Street

22   Viaduct to the 5th Street, 71/75, 71 North

23   Fort Washington Way exchange there at the end

24   where you had to pick which route you were

25   going.

Deposition of Lieutenant Timothy Lanter                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.      Okay.    From the point in time
2  you got on the 6th Street Viaduct that moment
3  or that location you just described, what
4  were the speed limits?
5          A.      The entrance to 6th Street
6  Viaduct ramp from Warsaw is 40.    When you get
7  on 6th Street Viaduct, I believe it's right
8  at Mehring or just prior to Mehring the speed
9  limit sign is posted as 50 miles an hour.
10         Q.      And then at that split, what's
11 the speed limit there?
12         A.      It should still be 50 miles an
13 hour.    You're still on the expressway/viaduct
14 entrance or thoroughfare there because you
15 could go to 71 North, 75 South, you would
16 maintain those speeds.
17         Q.      And where did you go from the --
18 the area of the split next?
19         A.      The split went to 2nd Street,
20 Downtown Cincinnati, and took that exit ramp,
21 which would have been left at the split in
22 between the 71 and in between the 75.
23         Q.      And the 2nd Street ramp, what's
24 the speed limit there?
25         A.      I would maintain that the ramp

1    is still 50 until you get into downtown and

2    establish that you're in the Business

3    District.

4          Q.    And then what's the speed limit

5    there in the Business District, as you've

6    described?

7          A.    That right there would be 25,

8    35, since that's still kind of not highway,

9    but it's not -- it's not right here at 5th

10   and Vine.  You get what I'm -- it's coming

11   off of the highway exit, so it's 25, 35.

12   It's probably still 35 right there.

13         Q.    And when you came onto

14   2nd Street --

15         A.    Uh-huh.

16         Q.    -- what's the speed limit on

17   2nd Street?

18         A.    Well, we never established --

19   like we --

20         Q.    Did you go onto 2nd Street from

21   the 2nd Street ramp?

22         A.    At the end of the ramp, we

23   turned off.  So we never fully -- I mean, I

24   think you're splitting hairs.  Is it still

25   2nd Street or is it still the ramp?  I don't

```
 1    know.  But as soon as we came off the ramp,

 2    we did not fully enter 2nd Street.  We turned

 3    onto Elm Street.

 4              Q.    Okay.  What's the speed limit on

 5    Elm?

 6              A.    Twenty-five, 35.

 7              Q.    And then where did you go from

 8    Elm?

 9              A.    Eastbound Freedom Way.

10              Q.    When you were on Elm, did you

11    travel the wrong way?

12              A.    No.

13              Q.    Did you cross the centerline?

14              A.    Yes.

15              Q.    And then you went onto

16    Freedom Way, you said.  What was the speed

17    limit there?

18              A.    Twenty-five, 35.

19              Q.    And where did you go from

20    Freedom Way?

21              A.    I believe it's Rosa Parks.  It

22    may be Vine.  I'm not sure where the street

23    name breaks, but took the right to head

24    towards the Roebling Suspension Bridge.

25              Q.    And on Rosa Parks, what was the
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          speed limit there?
 2                   A.    Same, 25, 35.
 3                   Q.    And then you said you took a
 4          right toward the Roebling, correct?
 5                   A.    That's correct.
 6                   Q.    And that involved going through
 7          a traffic circle?
 8                   A.    A roundabout.
 9                   Q.    And what's the speed there?
10                   A.    Twenty-five, 35.
11                   Q.    And then you entered the
12          Roebling Bridge, right?
13                   A.    That's correct.
14                   Q.    And what's the speed on the
15          Roebling -- speed limit on the Roebling?
16          Excuse me.
17                   A.    I don't know that there's a
18          posted sign on that bridge.  One would
19          reasonably infer 35.
20                   Q.    And then did you cross over the
21          centerline on the bridge?
22                   A.    The double yellow, yes.
23                   Q.    And when you're on that
24          roundabout before you got onto the bridge,
25          did you travel in the wrong direction on that
```

1    traffic circle or roundabout, as you called

2    it?

3              A.    Wrong direction?  No.  Did I go

4    left of center and go in the left lane to go

5    around the car that was stopped for me?  Yes.

6              Q.    And when you exited the Roebling

7    Bridge, there's another roundabout, right?

8              A.    That's correct.

9              Q.    And you traveled the wrong way

10   on that roundabout, right?

11             A.    Wrong way, no.  Did I come from

12   the wrong direction?  The traffic flows that

13   way at the end of the roundabout.  So I came

14   left of center and went westbound and traffic

15   would have been flowing westbound if they

16   were coming north.

17                   So if you come north from

18   Covington, I guess it is, you could have

19   turned left and bypassed that roundabout, I

20   believe is how the traffic pattern is set up.

21                   So, yes, I did go left of center

22   and came around the roundabout, but traffic

23   would have been flowing in the direction --

24   traffic would have been coming towards the

25   bridge, but traffic at that roundabout would

```
 1    have been going westbound as well.
 2            Q.    Were you -- would you have been
 3    driving against the traffic in the
 4    roundabout?
 5            A.    For about two seconds, yes,
 6    prior -- prior to the roundabout, yes.  But
 7    then when I got to the roundabout, I would
 8    have been going the proper direction of
 9    traffic.
10            Q.    And then from the roundabout,
11    where did you go next?
12            A.    Without referencing my notes, I
13    may say the streets wrong, but I believe it
14    was -- we turned left on Court and then left
15    on Park.  That put us right at Greenup by the
16    Keystone, which would have been on our
17    left-hand side, if those are the right street
18    names.
19            Q.    And then did you turn right onto
20    Greenup?
21            A.    I don't know if you want to say
22    it was a turn or a diagonal move toward --
23    yes, but we went towards the right direction
24    to go into -- I don't recall the name of the
25    gas station right there.
```

1    Q.    On Court, what was the speed

2    limit, if you know?

3         A.    I can't say.

4         Q.    On Park, what was the speed

5    limit, if you know?

6         A.    I can't say.

7         Q.    On Greenup, what was the speed

8    limit?

9         A.    I can't say without referencing

10   any of my notes.

11        Q.    And then did you travel the

12   wrong way on any of those roads, Court, Park,

13   and Greenup?

14        A.    Court, no; park, no.  And

15   Greenup, I believe if that's the street that

16   Keystone and the gas station is on, I believe

17   that is, made that diagonal for two seconds

18   clear across their lane of traffic, so, yes,

19   right there.

20        Q.    And from Greenup, you went to

21   4th Street; is that right?

22        A.    Yes, came out of the gas

23   station, turned left, and then that should

24   have been 4th Street, I believe.

25        Q.    And I think earlier you said you

1    went the wrong way on that section of

2    4th Street, right?

3          A.    Yeah, half a block.  We came out

4    in two, three seconds at the most.

5          Q.    And what was the speed limit on

6    4th Street?

7          A.    I can't say.

8          Q.    And then from there, where did

9    you go?

10          A.    Approached the intersection, I

11    believe it's Garrard, turned northbound on

12    Garrard, went one block to 3rd Street, turned

13    right on 3rd Street, and I believed that it

14    was a dead end.

15               There's signs posted there that

16    say, no outlet, street ends, something to

17    that effect.  But at the end, there's an

18    alley on the right-hand side, and I believe

19    that was called Stanford or Sanford Alley,

20    Sanford, maybe, and we took that and

21    basically just circled back and came back out

22    to Garrard.

23          Q.    And on Garrard, 3rd, and Sanford

24    Alley --

25          A.    Yes, ma'am.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    -- do you recall the speed

2    limits of those roadways?

3          A.    I don't recall.  I would say all

4    speeds in Covington are 25 to 35.

5          Q.    And then did you go the wrong

6    way on any of those?

7          A.    No.

8          Q.    After coming back to Garrard,

9    where did you go?

10          A.    Came out on Garrard -- or came

11    out of the alley and made a left-hand turn

12    onto Garrard.

13          Q.    Okay.  And did you go the wrong

14    way on Garrard at that time?

15          A.    No.

16          Q.    Then from Garrard, where did you

17    go?

18          A.    Garrard and 4th was the

19    intersection there, and we turned left across

20    -- left or eastbound onto the 4th Street

21    Connector Bridge to take us to Newport.

22          Q.    And on the 4th Street Bridge,

23    did you cross the double yellow line there?

24          A.    Yes.

25          Q.    And what was the speed limit on

 1    that stretch of road?

 2          A.    I would reasonably think 25 to

 3    35.

 4          Q.    And then from the bridge, where

 5    did you go?

 6          A.    Came across the bridge and made

 7    a right at the end, couldn't tell you the

 8    name of that street, but we doubled back and

 9    made a hard left back to come to 5th Street.

10          Q.    Did you go through a roundabout

11    at that point?

12          A.    When?

13          Q.    After you crossed the 4th Street

14    Bridge?

15          A.    After we crossed the 4th Street

16    Bridge, we took the right and then doubled

17    back.  So, yeah, I believe that there was a

18    roundabout there.

19          Q.    Do you know the speed limit on

20    the roundabout?

21          A.    I don't, but I would reasonably

22    infer 25, 35.

23          Q.    And were you driving in the

24    correct lane of travel on that roundabout?

25          A.    I believe when we took that

1    right, yes, we were.  And then when he

2    doubled back, I can't say for certain, but it

3    was two, three seconds at the most.  It may

4    have been the right, but we jumped right on

5    the 4th -- or 4th turned into 5th at that

6    point.

7            **Q.    And then you traveled on**

8    **5th Street, right?**

9            A.    Yes, ma'am.

10           **Q.    And what was the speed limit on**

11   **5th?**

12           A.    I cannot say for certain, but,

13   again, would reasonably infer 25 to 35.

14           **Q.    And did you drive in the correct**

15   **lane of travel on 5th Street?**

16           A.    Yes.  I believe that it was --

17   it was initially a two-way, then it went to

18   one-way across 5th Street, if I recall

19   correctly.

20           **Q.    Did you have stop sticks in your**

21   **vehicle during this pursuit?**

22           A.    I can't say.

23           **Q.    You don't know?**

24           A.    I don't know.  That wasn't my

25   normal vehicle.

1    Q.    You, at the beginning of your

2    shift, perform a vehicle inspection, right?

3         A.    Correct.

4         Q.    And you note anything that's

5    wrong or missing or anything like that during

6    the inspection, right?

7         A.    The main note that you would

8    make is if your computer or your video

9    equipment is not working.  Not all CPD

10   vehicles are equipped with all the equipment.

11             Some cars have stop sticks, some

12   don't.  Some cars have a shotgun, some don't.

13   Some have an AR-15, some don't.  So I

14   wouldn't make note of that.  If my computer

15   wasn't working or my in-car camera was not

16   working, then those vehicles would -- I would

17   not use that vehicle.

18             If a car didn't have a rifle or

19   stop sticks, that would not impede me from

20   taking that vehicle for my tour of duty.

21        Q.    For a rifle or an AR-15, those

22   are car-issued weapons rather than

23   individually issued?

24        A.    Yes and no.  They are so -- and

25   I don't know this for a fact, I don't know if

```
 1    we have enough in our CPD stock to have every

 2    car outfitted.  Now, I am not an AR-15

 3    certified operator.

 4              If I was, and say I drove the

 5    same car every single day, like I could take

 6    that gun out or I could just say, hey, don't

 7    issue this car a gun, and then my AR-15 would

 8    be locked into that car under the lock cage

 9    every day.

10              So there may be a car that

11    doesn't have a shotgun.  There may be a car

12    that doesn't have an AR.  There may be a car

13    that doesn't have stop sticks.  It's not

14    required based on any policy or procedure.

15              But if you are certified, you

16    may carry your own department-issued weapon

17    as long as it's been cleared, calibrated,

18    certified from the range.  You need to

19    qualify it at the range.

20         Q.    CPD doesn't issue cars to

21    officers who -- strike that.

22              CPD doesn't issue cars to

23    officers with AR-15s strapped into the trunk

24    if those officers aren't AR-15 certified,

25    does it?
```

```
 1            A.    Yes, they do.  I could -- so --
 2            Q.    That's fine.  They do.  Okay.
 3     When you perform your vehicle inspection, you
 4     do a checklist of -- of equipment in the car,
 5     right?
 6            A.    No.
 7            Q.    No?  How do you --
 8            A.    You mean like --
 9            Q.    Go ahead.
10            A.    -- a checklist of equipment.  So
11     if I go and get in that car, and there's not
12     stop sticks, like I don't do anything.  I go
13     out and do my tour of duty.  I don't not
14     (sic).
15                 The only thing that would stop
16     me from taking that vehicle is if the MDC,
17     which is the Mobile Data Computer, which
18     allows me to run suspects, get my radio runs,
19     give me the information for my runs, if
20     that's not working based on the time of day,
21     you would leave that car in the lot or you
22     would go get it fixed.
23                 The same with your Mobile Video
24     Recorder, your MVR, you would leave that car
25     in the lot, put a note on it, or you would go
```

1    get it fixed.  If you're first, second shift,

2    you can probably go get it fixed.  If you're

3    third shift, you're not doing anything with

4    it.

5              If there's not a rifle, that

6    doesn't matter to me.  If there's not a

7    shotgun, that doesn't matter to me.  If

8    there's not stop sticks, that doesn't matter.

9    That wouldn't negate me from taking that

10   vehicle on patrol.

11         **Q.    Is there any documentation of**

12   **the equipment that is or is not present or**

13   **does or does not work that you complete at**

14   **the start of a shift?**

15         A.    Would I complete?  Yeah.  So if

16   I'm working -- like I just said, if I'm

17   working first or second shift, I will take my

18   car to Radcliff, which is where our

19   communications is and get a new computer.

20              I will take my car to Radcliff

21   if the MVR is not properly recording.  I will

22   go to Radcliff.  If I get in my car and I see

23   the front bumper is ripped off, I would go

24   back and look in the jacket and say, hey, oh,

25   this car was in wreck.  We can't drive this

```
 1    car.
 2              Or if there was a big dent on
 3    the side of the car door, I would go into the
 4    vehicle jacket in the office and see if
 5    someone was involved in an accident, see if
 6    somebody marked lot damage on that vehicle.
 7              Maybe I opened my car door and
 8    it dented the car next to me, you would
 9    document that on the file.  But if I don't
10    note something is not working, there's not
11    gonna be anything.
12         Q.   When you do that inspection at
13    the start of your shift with your vehicle, do
14    you have a list of things that you're looking
15    to see if they are or are not present in the
16    car?
17         A.    I'm looking to make sure my
18    electronics are working.
19         Q.    Is there any list of any kind
20    the department uses for those vehicle
21    inspections at the start of a shift?
22         A.    Not to my knowledge.  I don't --
23    there is like a monthly vehicle inspection
24    that is done once a month that an individual
25    officer does to say, hey, there's cones,
```

1    there's flares, there's a shotgun, but not

2    all cars are equipped with all those things.

3              We don't have ten cones to put

4    in 250 cars.  You know, I may have run out of

5    flares last night on the highway on an

6    accident and I forgot to restock them.  So

7    then I would go in the office and grab a

8    bunch of flares and throw them in the back.

9              So there's nothing -- like I

10   said, the main documented notes would be if

11   there's damage to the vehicle or if your

12   electronic equipment is not working.

13        Q.    So as you sit here today, you

14   don't know whether or not you had stop sticks

15   in that vehicle on the 7th of August, 2020?

16        A.    I cannot say one way or the

17   other, no.

18        Q.    Is there a place that you would

19   go to check if you want to know the answer to

20   that question?

21        A.    You won't get an answer to that

22   question.  There's nowhere to check.

23        Q.    Did you open the trunk at any

24   point that day?

25        A.    I would imagine that I did.

Jason Laible, et al., vs. Timothy Lanter, et al.,

 1          Q.    And do you recall whether or not

 2    you saw stop sticks?

 3          A.    I don't recall.  The only way

 4    you may is if some officers, and I usually do

 5    this, I don't recall if I did it on this day,

 6    some will walk around with their body cam and

 7    take a -- like a picture of the car to make

 8    sure there's no damage, but the main is you

 9    normally check your body cam in roll call,

10    but the main is you would check your

11    camera -- you would stand in front of the

12    in-car camera and say that.

13               But like if I did an in-car cam

14    inspection, I would say, hey, damage to the

15    front headlight, it's been noted in a case

16    jacket, or something to that effect, but

17    there's no documentation for me to say

18    whether there were stop sticks in that car or

19    not.

20          Q.    On August 7th, 2020, you knew

21    that you were being called out to assist in

22    an -- in an operation that may involve a

23    vehicle stop at a possible pursuit, correct?

24          A.    I mean, any day of the week

25    that's possible, but I know I was being

1    called out for that assignment, correct.

2            Q.    And given that assignment, did

3    it occur to you at any point that you might

4    want to have stop sticks with you?

5            A.    Yes.  But also given at that

6    point in time, I was the one that was gonna

7    be initiating the traffic stop, so I wouldn't

8    be the one placing the stop sticks.

9            Q.    Plans can change, though, right,

10   like we talked about earlier?

11           A.    They can.

12           Q.    And you knew you were gonna be

13   waiting for some time before that potential

14   vehicle stop, right?

15           A.    No.  That vehicle could have

16   been needed to be stopped immediately.  Based

17   on our surveillance from the day, we got to

18   that address later in the day, and I had to

19   change out of plainclothes to go back and get

20   a uniformed car based on the plan.

21           Q.    And you knew you were going to

22   be staged unless or until the time for the

23   traffic stop came, right?

24           A.    That's correct.

25           Q.    So you were gonna be waiting

1    during whatever length of time that turned

2    out to be, right?

3            A.    Potentially.

4            Q.    And did you consider making sure

5    there were stop sticks in your vehicle for

6    that aspect of the operation?

7            A.    I didn't, but I considered

8    asking for stop sticks from another car that

9    may be in the vicinity of the area, which I

10   did do.

11           Q.    Tell me about that.

12           A.    Once the pursuit started and I

13   gave the information that was needed, I

14   requested any unit with stop sticks in the

15   area to respond.

16           Q.    And why did you make that

17   request?

18           A.    As we stated earlier, it's a way

19   to end a pursuit, if needed, to decrease the

20   likelihood of the pursuit continuing.

21           Q.    And to decrease the risk to

22   officer, suspect, and the public, right?

23           A.    That's correct.

24           Q.    And it's a method that can be

25   used to terminate a pursuit in lieu of it

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 138 of 358 - Page
ID#: 1489
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    entering a heavily populated area, right?

2                   MR. HERZIG:  Objection.  You can

3    answer.

4         A.    Stop sticks are a method to stop

5    a pursuit at any point in time or even to

6    prevent a pursuit.

7         Q.    Okay.  So you asked, once the

8    pursuit started, for officers with stop

9    sticks to respond?

10        A.    I did.

11        Q.    And you had not made that

12   request before you attempted to conduct a

13   traffic stop, correct?

14        A.    No, there was no pursuit at that

15   point.

16        Q.    And -- but you -- you knew that

17   a pursuit was possible, correct?

18                  MR. HERZIG:  Objection.  You can

19   answer.

20        A.    Anything is possible.

21        Q.    Yeah.  When you knew that you

22   were the person tasked to conduct the traffic

23   stop if it became needed, you knew then that

24   a pursuit could evolve out of that traffic

25   stop, correct?

Deposition of Lieutenant Timothy Lanter                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        A.    That's correct.

2        Q.    Did other officers that were

3   part of the surveillance or traffic stop

4   aspects of the operation have stop sticks

5   with them?

6        A.    I can't say.

7        Q.    Did you ask anybody else before

8   you attempted the traffic stop if they had

9   stop sticks?

10       A.    I did not because the other two

11  cars that were with me, they would have been

12  utilizing their partners.  I wouldn't have

13  had them place stop sticks.

14              They would have been ready and

15  able to deploy their canine partners had a

16  suspect fled, so I wouldn't have tied them up

17  with that.

18       Q.    And when you say "the other

19  units," that's Thomas and Harper?

20       A.    Specialist Harper and

21  Officer Thomas, correct.

22       Q.    So you didn't know if Thomas or

23  Harper had stop sticks, you're saying?

24       A.    I did not know.  My thought

25  would be that they're Canine cars, they

```
 1      probably didn't.
 2              Q.    Did you know if anybody else
 3      involved in this operation had stop sticks?
 4              A.    I do not.
 5              Q.    During this pursuit, you had
 6      your body-worn camera activated, correct?
 7              A.    That is correct.
 8              Q.    And you also had your dash cam
 9      or cruiser camera/MVR --
10              A.    MVR, yes, ma'am.
11              Q.    -- right?  Those are all
12      synonyms for the same thing, correct, dash
13      cam, MVR --
14              A.    Yes.
15              Q.    -- cruiser cam?
16              A.    Yes, yes, yes.
17              Q.    That's the camera attached to
18      your police vehicle, right?
19              A.    Yes, ma'am.
20              Q.    And that camera went off at some
21      point?
22              A.    It did.
23              Q.    Do you know why that was?
24              A.    I don't.
25              Q.    Were you aware that it had gone
```

1      off while the pursuit was still ongoing?

2              A.    At that time?

3              Q.    Yeah.

4              A.    No.

5              Q.    What is the purpose of having an

6      MVR or cruiser camera running during that

7      pursuit?

8              A.    To capture the pursuit.

9              Q.    And that's required under the

10     policies of the department to have it on,

11     right?

12             A.    Correct, as long as it's

13     operational and functional.

14             Q.    Why would it be important to

15     have it on the whole time if it's operational

16     and functional?

17             A.    The same reason it's important

18     to have it on from the beginning, so you

19     capture the entirety of the incident to which

20     you're encountering.

21                   The same as your body cam,

22     that's why you turn your body cam on normally

23     as you're exiting your vehicle or when you

24     step -- if you're -- well, in a pursuit, you

25     would turn it on as you're initiating the

1    stop.

2              If you're going on a radio run,

3    you would initiate it as you're pulling up as

4    soon as you exit so you capture the totality

5    or the entirety of the incident.

6         **Q.    Okay.  Your police radio was**

7    **functional for the whole pursuit, right?**

8         A.    As far as I know, yes.

9         **Q.    Yeah.  You had no problems**

10   **transmitting the messages you needed to**

11   **convey?**

12        A.    No.  There may have been points

13   to where we were competing to get over, but

14   nothing to where we couldn't eventually get

15   out.

16        **Q.    And you didn't have any problems**

17   **receiving information that you needed as the**

18   **primary unit in the pursuit either, right?**

19             MR. HERZIG:  Objection.

20        **Q.    Go ahead.**

21             MR. HERZIG:  Yeah, you can go

22   ahead.

23        A.    Not to my knowledge.

24        **Q.    During the course of the**

25   **pursuit, you knew you were chasing a person**

1    called Mason Meyer, right?

2         A.    I knew that I was chasing a very

3    violent felon that was wanted by authorities,

4    that's correct.

5         Q.    You knew his name was

6    Mason Meyer?

7         A.    I did.

8         Q.    And his identity was known for

9    the duration of the pursuit, correct?

10        A.    It was.

11        Q.    And during this pursuit, you

12   were the primary unit, right?

13        A.    That's correct.

14        Q.    And what's the -- well, strike

15   that.

16             Did you violate Cincinnati

17   Police Department policy during the pursuit

18   at any time?

19        A.    There is documentation that I

20   did, yes.

21        Q.    And can you explain that to me,

22   please?

23        A.    Based off of the Internal

24   Investigations Section review, they issued me

25   a written reprimand for violations.

Deposition of Lieutenant Timothy Lanter                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    And what aspect of the
 2   Cincinnati department -- Police Department
 3   pursuit policy did you violate?
 4          A.    Do you have the reprimand that I
 5   could reference?
 6          Q.    I do.  But, I mean, as you sit
 7   here right now, what do you understand the
 8   actions that you took as -- let me ask that
 9   better.
10          As you sit here now in terms of
11   the actions you took during the course of the
12   pursuit, which of those actions, is it your
13   understanding, violated department policy?
14          A.    They stated that I authorized
15   going the wrong way on a one-way while not
16   acting as the pursuit OIC.
17          They stated that I exceeded the
18   speed limit by more than 20 miles an hour
19   with -- and I'm not sure how they came to
20   that without justification with how
21   Specialist Harper and Officer Thomas were --
22   their body cams got their speeds.
23          When I stated in my interview
24   what I believe my speeds were, no reasoning
25   in the reprimand doesn't make sense to me.
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 145 of 358 - Page
ID#: 1496
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    And I believe maybe not broadcasting speeds

2    in the pursuit.  Those three things, but I'd

3    have to have the reprimand to further

4    reference.

5        Q.    Were there any other aspects of

6    the policy that you violated that you didn't

7    just list?

8        A.    Not that I was charged with.

9        Q.    Are there any that you -- any

10   other violations that you're aware you

11   committed even if you weren't charged with

12   them during the pursuit?

13       A.    Yes.

14       Q.    And what are those?

15       A.    Authorizing multiple cars within

16   the pursuit.

17       Q.    Any others violations?

18       A.    Nope.

19       Q.    CPD pursuit policy and

20   procedures require officers who are

21   considering whether to pursue or who are

22   actively engaged in a pursuit to consider the

23   degree of risk created by that pursuit,

24   correct?

25       A.    Correct.

1    Q.    And they're required -- those

2    officers are required to be aware of the

3    degree of risk created by the pursuit as to

4    themselves, to the suspect, and also to the

5    public and third parties who are present in

6    the area of the pursuit, right?

7         A.    That's correct.

8         Q.    And department policy requires

9    officers engaged in a pursuit to be aware of

10   the location where the pursuit is taking

11   place, right?

12        A.    Yeah.  You're engaged so you

13   would know, yes.

14        Q.    And you're also required to be

15   aware of and paying attention to traffic

16   conditions during a pursuit, right?

17        A.    Yes.

18        Q.    And the policy requires you to

19   be aware of and pay attention to pedestrian

20   traffic during the pursuit, right?

21        A.    Yes.

22        Q.    The policy also requires you to

23   be aware of and pay attention to road

24   conditions and weather during the pursuit,

25   correct?

1    A.    Yes, ma'am.

2    Q.    Likewise, you have to be aware

3    of the time of day when the pursuit is taking

4    place, correct?

5    A.    Correct.

6    Q.    The policy also requires

7    officers engaged in pursuit to be aware of

8    the volume, type, speed, and direction of

9    vehicular traffic and the direction of the

10   pursuit, right?

11   A.    Yes.

12   Q.    And the policy requires officers

13   to be aware of and to pay attention to the

14   condition of their own police vehicle and

15   also the suspect's vehicle during the

16   pursuit, right?

17   A.    That's correct.

18   Q.    And that would include any

19   indication that the vehicle's integrity was

20   compromised in any way, correct?

21   MR. HERZIG:  Objection.  You can

22   answer.

23   A.    Rephrase.

24   Q.    That being aware of the

25   condition of the police vehicle and the

1    suspect vehicle, that would include being

2    aware of any indication that those vehicles'

3    safety is compromised in any way, right?

4          A.    That's correct.

5          Q.    And during the course of a

6    pursuit, the department policies require

7    officers to be aware of any circumstance that

8    could lead to a situation in which the

9    pursuing officer will not be able to maintain

10   control of the police vehicle, right?

11         A.    To which the pursuing officer

12   would not be able to maintain control of his

13   vehicle --

14         Q.    Yes.

15         A.    -- is that what you said?  Yes.

16         Q.    And, likewise, officers have to

17   be aware of any conditions that would

18   indicate that the fleeing suspect may lose

19   control of their vehicle, correct?

20               MR. HERZIG:  Objection.  You can

21   answer.

22         A.    That's correct.

23         Q.    And during the course of the

24   pursuit, as an officer engaged in that

25   pursuit, you have to be aware of the nature

1   and the seriousness of the suspected crime of

2   the fleeing person, right?

3        A.    Yes.

4        Q.    And you also have to be aware of

5   the likelihood of a successful apprehension

6   under CPD policies, correct?

7        A.    Yes.

8        Q.    And that would include being

9   aware of factors that may affect whether or

10  not that suspect could be apprehended if the

11  pursuit ended in some kind of stop when you

12  could actually attempt to take them under

13  arrest, right?

14            MR. HERZIG:  Objection.  You can

15  answer.

16       A.    I'm gonna ask you to rephrase

17  that question.

18       Q.    So being aware of the likelihood

19  of successful apprehension of a suspect, what

20  does that mean to you?

21       A.    Whether that I'll be able to

22  apprehend him in that moment; is that what

23  you're asking, I guess?

24       Q.    Yeah.  I mean, so the policy

25  requires you to be aware of this likelihood

1      of successful apprehension of the suspect,

2      correct?

3              A.    Yes.

4              Q.    And what does that mean to you?

5      Explain it to me in layman's terms?

6              A.    I mean, the likelihood that, you

7      know, if he would have stopped that vehicle

8      initially, he would have been taken into

9      custody right there.  That would have been a

10     successful apprehension.

11             Q.    And -- and so during a pursuit,

12     though, the person has not stopped, correct?

13             A.    Correct.

14             Q.    And so you have to be aware,

15     according to the policy of the department, of

16     the likelihood of being able to successfully

17     apprehend that person by way of the pursuit,

18     right?

19             A.    Yes.

20             Q.    And so what does that mean, the

21     likelihood of successfully apprehending them,

22     right?  How -- what's your understanding of

23     what that means when you're in the context of

24     a pursuit?

25             A.    Whether if we continue this

1    pursuit, that it will end in a way to which

2    we can apprehend him and place him in

3    custody.

4           Q.    Okay.  And you also, according

5    to the department policy, have to be aware of

6    whether the identity of the suspect who's

7    fleeing is known, right?

8           A.    That's correct.

9           Q.    And during the pursuit, the

10   policies the department also require officers

11   engaged in that pursuit to be aware of

12   whether if the identity of the suspect is

13   known, they could be apprehended at a later

14   time, right?

15          A.    I have to be aware of that; is

16   that what you said?

17          Q.    Yeah.

18          A.    That's one of the factors.

19          Q.    Are there any other factors that

20   you believe the pursuit policy requires

21   officers to be aware of and pay attention to

22   during a pursuit?

23          A.    I think you've hit them all.

24          MS. GREENE:    Okay.  Let's go off

25   the record and take a lunch break, if that's

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1     okay?

2                    MR. HERZIG:   Okay.

3          (Off the record.)

4     BY MS. GREENE:

5          Q.    All right.  We are recording

6     again.  We are back on the record.

7                    Lieutenant Lanter, we've been

8     talking about the CPD pursuit policy.  The

9     purpose of that pursuit policy is to ensure

10    that officers if they're engaged in a

11    pursuit, is that the pursuit is done as

12    safely as possible, right?

13         A.    Any aspect of our job that

14    policy -- any policy, that's the intent.

15         Q.    And so specifically for

16    pursuits, it's your understanding that the

17    pursuit policy is to guide officers so they

18    conduct pursuits in as safe a way as

19    possible, right?

20         A.    Correct.

21         Q.    And do you agree that the

22    pursuit policy for the department requires

23    officers to not commit traffic violations

24    during pursuits?

25         A.    No.

```
 1              Q.    You don't think that's what the

 2      policy says?

 3              A.    No.

 4         (Exhibit 1 was referenced.)

 5      BY MS. GREENE:

 6              Q.    All right.  Let's look at what

 7      was previously marked as Plaintiffs'

 8      Exhibit 1.  I'm gonna hand that to you now.

 9      This is the pursuit policy, right?

10              A.    Yes, ma'am.

11              Q.    And it's your understanding, you

12      said, that the pursuit doesn't require

13      officers to comply with traffic laws during

14      pursuits?

15              A.    Let me rephrase.  It does, and

16      then there are exceptions to where it

17      doesn't, such as going the speed limit.  It

18      doesn't say you have to go 35 in a 35 all the

19      time.

20                    The red lights, the stop signs,

21      the law says you have to stop.  The procedure

22      says you do not have to stop.  So if there

23      was confusion, I apologize.

24              Q.    No.  Fair enough.  So the

25      pursuit policy carves out specific exceptions
```

1    to traffic laws that officers don't have to

2    violate -- or, excuse me, don't have to

3    comply with as written in the policy, right?

4         A.    That's fair.

5         Q.    And then, otherwise, is it your

6    understanding that beyond those exceptions,

7    the policy requires that officers do not

8    commit traffic violations during the pursuit?

9         A.    Unless there are other

10   circumstances which would allow for that.

11        Q.    For the deviation from the

12   policy?

13        A.    Correct.

14        Q.    And deviation is allowed in the

15   way that we discussed earlier today, right?

16        A.    Correct.

17        Q.    Okay.  What's your understanding

18   as to why it's important for officers to not

19   commit traffic violations other than those

20   exceptions or with authorization?

21        A.    Why for them not to commit them?

22        Q.    Yeah.  Why is it important?

23        A.    I mean, I would say it's the

24   same for the officers or the citizens,

25   anybody in traffic, you don't want to commit

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      the violations or cause auto accidents.  You
 2      do it in as safe a manner as possible.
 3              Q.    Okay.  In -- earlier we talked
 4      about officers being required under the
 5      policy -- excuse me, required under the
 6      policy to be aware of the degree of risk
 7      created by the pursuit to others, themselves,
 8      the suspect, and the public, right?
 9              A.    That's correct.
10              Q.    And in terms of the degree of
11      risk, was your understanding under the CPD
12      policy and procedures, your training from the
13      department, as to what level of risk renders
14      a pursuit unacceptable to continue?
15                    MR. HERZIG:  Objection.  You can
16      answer.
17              A.    I think the question is vague.
18      Could you be maybe more specific as to what
19      you're getting at?
20              Q.    Yeah.  So in your training from
21      the department, your understanding of the
22      department policies --
23              A.    Yes, ma'am.
24              Q.    -- what is your understanding of
25      what the threshold is for where the degree of
```

1    **risk becomes too great for a pursuit to**

2    **continue?**

3          A.    I don't know that there's a

4    specific that I can say.  I think it's one of

5    those things when you see it or you know it,

6    you know one of those things, like you just

7    know, you know.  I don't know.

8                I get the guides are there and

9    the policies are there and they guide you.  I

10   think it's one of those when you see it, you

11   know it, maybe.

12         **Q.    So you're saying when you see**

13   **it, you know it, that's how you know when to**

14   **terminate a pursuit?**

15         A.    I mean, if I see you run a red

16   light, like that doesn't make me terminate a

17   pursuit.  So I don't know if you -- I guess

18   here's a hypothetical for you.

19                We're coming off the 6th Street

20   Viaduct.  We take the 5th Street Exit.  It's

21   Memorial Day weekend, the Taste of Cincinnati

22   is going on.

23                There's a hundred thousand

24   people downtown.  Like, I'm not continuing

25   that pursuit.  So does that make sense.

```
 1    Like, when you see one of those things, you
 2    know, I guess is kind of what I'm getting at.
 3            Q.    So --
 4            A.    And I get that's not probably
 5    the exact answer you want.
 6            Q.    Well, so in the example you just
 7    gave --
 8            A.    Uh-huh.
 9            Q.    -- that would be a circumstance
10    where it's clear, based on what you're seeing
11    from your car or pursuing the fleeing person,
12    that carrying on with the pursuit brings with
13    it an imminent risk of injury to persons,
14    right?
15            A.    Well, I think any pursuit brings
16    that, not specifically just that.
17            Q.    Okay.  So what makes that
18    circumstance different then, that you
19    described in your hypothetical?
20            A.    I would say that's it more
21    likely in that hypothetical that I gave you
22    that -- I mean, you have a pursuit at 2 a.m.
23    in the middle of winter when it's dark and
24    there's nobody out and there's no cars,
25    there's no traffic, there's no pedestrians,
```

1    that would be different than, you know, like

2    I said in that example, going into the Taste

3    of Cincinnati.  Does that make sense?

4         Q.    Those are kind of the two

5    extremes --

6         A.    Right.

7         Q.    -- right?

8         A.    Yes, I would say.

9         Q.    So on one hand you have

10   literally nobody around, it's the middle of

11   the night and nobody on the road --

12        A.    Yes, ma'am.

13        Q.    -- no one out and about?  And on

14   the other hand you have --

15        A.    Right.

16        Q.    -- thousands of people?

17        A.    So you just got to weigh, I

18   guess, the balance of the difference, you

19   know.  Like you said, the degree of risk, the

20   location, the traffic conditions, the road

21   conditions, the time of day.  You weigh all

22   those together to come up with that final.

23             So I don't -- like I said, I

24   don't know if I can give you an exact answer

25   to what you're asking.

1    Q.    Is it fair to say that when an

2    officer sees in front of him in the pursuit

3    an imminent meeting about to occur, risk of

4    injury to persons, that that would be a

5    circumstance where the pursuit should be

6    terminated?

7         A.    How would they know that, I

8    guess?

9         Q.    Well, I'm asking as a -- as a

10   concept if an officer is aware of that?

11        A.    I mean, if I knew that, I would

12   take -- yes, I would say, but I don't know

13   that you can know that.

14        Q.    If there were, for example,

15   people directly in the path of the fleeing

16   vehicle who suffer some injury over the

17   course of the pursuit, does that rise to the

18   level of a pursuit that should be terminated?

19        A.    Well, when -- what -- so you're

20   expecting me to know that before I do it?

21        Q.    No, I'm saying while you're in

22   the --

23        A.    While I'm in the pursuit, if I

24   think that someone is gonna get hurt, is that

25   what you're -- I'm confused.  Maybe rephrase

```
 1    it.  I don't --

 2            Q.     Sure.

 3            A.     I'm sorry.

 4            Q.     If you, as the officer engaged

 5    in a pursuit, see in front of you as you're

 6    driving a circumstance in which a third party

 7    is about to be imminently injured --

 8            A.     Uh-huh.

 9            Q.     -- or is -- yeah, in that

10    circumstance, is that a circumstance where

11    the pursuit should be terminated?

12            A.     It could be.  Like, the example

13    I gave you, take the 5th Street Exit and

14    you're coming into Fountain Square, I mean,

15    you would think that -- is he gonna stop or

16    just keep going through the crowd at Fountain

17    Square?

18            Q.     And let's say in that

19    circumstance, a fleeing vehicle causes some

20    minor injury to someone but keeps going, at

21    that point is it a pursuit that should be

22    terminated?

23            A.     Are you asking in that specific

24    instance, or are you asking if during the

25    course of a pursuit a minor injury occurs,
```

1    would that be cause -- grounds to terminate

2    that pursuit?

3         Q.    I guess, let's go with the

4    broader concept.  If in the course of a

5    pursuit an injury --

6         A.    No.

7         Q.    -- a minor injury occurs to some

8    third party along the way, is that a

9    circumstance that requires termination of the

10   pursuit?

11        A.    No.

12        Q.    Why not?

13        A.    I mean, I don't think you would

14   know at that point.  Take an example in this

15   case, if he did, in fact, sideswipe that car

16   at the 71/75 2nd Street Exit, you wouldn't

17   know if there was, but based on what you

18   saw -- I mean, any accident somebody could

19   say, oh, my head hurts, oh, my back hurts,

20   oh, I hit my hand on the door, I got a little

21   cut across my finger.

22              I mean, that's an injury that

23   you wouldn't know.  But that wouldn't, I

24   don't believe, cause you to terminate your

25   involvement in the pursuit.

```
1        Q.     In a circumstance where as an
2   officer you know there's some kind of minor
3   accident that's occurred, but you don't know
4   whether anyone was hurt or not, does that
5   impact your decision to continue the pursuit
6   in any way?
7        A.     In that circumstance that it
8   appeared to be minor, it would not impact --
9   I would not have terminated that pursuit at
10  that point.
11       Q.     If you don't know whether or not
12  an injury has resulted from a minor accident
13  along the course of the pursuit, are you as
14  an officer, permitted to continue the
15  pursuit?
16       A.     Yes.
17       Q.     So as we're talking here, I'm
18  gonna come back with the question I was
19  trying to ask before, which was what is the
20  threshold based on your training, your
21  understanding of the policy at which a
22  pursuit presents a safety risk that requires
23  termination of the pursuit?
24       A.     I mean, I know this isn't the
25  answer you want, but I'm going back to the,
```

1    like when you see it, you know it.  I mean, I

2    don't -- I don't know if I could give you a

3    correct answer.  I mean, I get that's not

4    what you're looking for, but...

5         Q.    When you say you see it, you

6    know it, that's based on the factors that are

7    outlined in the CPD pursuit policy, right?

8         A.    That and 19 years of training

9    and experience and hands-on in activities and

10   being placed in those circumstances, I guess.

11        Q.    And whatever it is when you see

12   it, you're required to terminate the pursuit,

13   right?

14        A.    If it crosses over, yes.

15        Q.    You mean if it crosses that

16   threshold?

17        A.    Yes, ma'am.  Sorry.

18        Q.    And that's under the policy at

19   the department, as you understand it,

20   crossing that threshold would require

21   termination of a pursuit?

22        A.    Correct.

23        Q.    What else can you tell me about

24   that threshold, how you characterize it?

25        A.    I mean, I think I've answered

```
 1    it.  I don't know.
 2         Q.    Does the department tell you
 3    when you see it, you know it, and that's when
 4    you terminate?
 5         A.    No.
 6         Q.    So what do they tell you about
 7    the degree of safety risk that requires
 8    termination of a pursuit?
 9         A.    I mean, you've said it, when the
10    degree to the officer or the suspect and the
11    citizen is maybe just such a grave extent.
12    But everything we do involves a chance of
13    injury, involves a chance of death, involves
14    a chance of someone being seriously injured.
15    I mean...
16         Q.    So I understand that risk of
17    injury --
18         A.    Right.
19         Q.    -- is present during the course
20    of police work generally, right?
21         A.    Correct.
22         Q.    But in this context of a pursuit
23    then --
24         A.    I would say the context of the
25    pursuit would be based on -- the main factor
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    would be the driving conditions of the

2    suspect being followed potentially.

3          Q.    So how the fleeing person is

4    driving?

5          A.    It could be one of the factors.

6          Q.    And how recklessly they are

7    driving, that's -- that's -- there's a

8    certain threshold across there that would

9    require termination of the pursuit?

10         A.    I mean, you gauge the -- that's

11   one of the factors you take in.  Like you

12   said, you know, you go back to this, the

13   traffic, the time of day, all that, their

14   driving, I think you look at all those

15   factors.

16         Q.    Well, then talk to me about -- a

17   little more about what you were just saying,

18   about the way the fleeing suspect is driving

19   and what the threshold for termination of a

20   pursuit looks like in association with that

21   factor?

22         A.    Let me think how to word this.

23   I mean, so you're -- obviously, you're

24   driving in a pursuit.  You're attempting to

25   evade the police.  You're going to be going

1    a little bit faster than normal driving, but

2    at the same time are you going off road?  Are

3    you driving through parking lots?

4              You know -- not a parking lot

5    because you can cut through a parking lot,

6    you're still on the roadway.  Are you driving

7    up and down the sidewalk?  Are you cutting

8    through backyards?  Are you doing things like

9    this that kind of like, I guess, that are

10   abnormal for driving conditions?

11             I mean, during the course of the

12   pursuit, you know this pursuit he continued

13   to, you know, use his turn signals or, you

14   know, he slowed at certain spots and made

15   certain turns, just like I did.

16             So there was no conditions in

17   this pursuit that rose to the level of to

18   what you're getting at, I believe.  I think

19   you're getting to was there actions based on

20   Meyer's that would necessitate to terminate

21   this pursuit?

22        Q.    Well, my question is not

23   specific to this instance, but in general

24   based on your training, your understanding of

25   the policies of the department, and the

1      **threshold at which the safety risks are too**

2      **great to carry on with the pursuit in**

3      **relation to the behavior of the fleeing**

4      **vehicle, what does that threshold look like?**

5             A.    I mean, like -- I mean, that's

6      not the answer you want.  But when you see

7      it, you know it.  Like I said, just, I mean,

8      is he making crazy erratic movements?  Is he

9      hitting every single car in the way?

10            Did he almost hit like ten

11     pedestrians?  Like, I don't know.  It's just,

12     like you said, it's a case-by-case basis.  If

13     I'm working and someone says, hey, I'm in

14     pursuit, I'm going 120 miles an hour down

15     Vine Street.

16            Like, that's probably not a safe

17     condition.  That's probably a condition where

18     the pursuit is gonna be terminated.  But you

19     don't know, until you're there, you don't

20     know what the circumstances are.  You don't

21     know what they're wanted for.  You don't know

22     like -- so I don't know.

23            I can't give you an absolute

24     answer.  And I know that's probably not

25     extremely helpful, but that's kind of where

1    I'm at.

2           Q.    Would it be fair to say that

3    that threshold where the safety risk is too

4    great is reached where more than one of the

5    factors listed in the policy that we've

6    talked about is present at the same time?

7           A.    Not necessarily, I don't think.

8           Q.    Can you explain that to me a

9    little further, please?

10          A.    I mean, you're saying if more

11   than one factor is present, that you should

12   terminate it?

13          Q.    That's what I'm asking.

14          A.    The answer is no.

15          Q.    Okay.  And so what do you need

16   to see, then, in order to be required to

17   terminate?

18          A.    I'm gonna just circle back.  I

19   mean, I can see we're both spinning wheels

20   here, and we're both kind of getting to

21   something.  But I -- if I can tell that

22   stopping a pursuit is as clear as the sky is

23   blue and you tell me the sky is blue, then I

24   would, but I can't do that.

25                Like, this is a guide.  This is

Deposition of Lieutenant Timothy Lanter                Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   what we're trained by and go by, but this
 2   isn't an absolute kind of deal.  And I know
 3   that that probably doesn't help the answer
 4   that you're looking.
 5        Q.    Is it fair to say then that the
 6   totality of the circumstances at a certain
 7   point cross the threshold creating too great
 8   of a risk of danger of others, that's when a
 9   pursuit has to be terminated?
10        A.    I would say that's probably a
11   fair assessment.
12        Q.    And is that --
13        A.    But what that looks like, I
14   don't know.
15        Q.    But at that point, there's no
16   choice, whenever that threshold is crossed,
17   you must, as an officer, terminate the
18   pursuit, right?
19        A.    If that's your belief.
20        Q.    Meaning that the threshold has
21   been crossed?
22        A.    Yes, ma'am.
23        Q.    And you're right, I'm trying
24   to --
25        A.    I know.
```

1    Q.    -- get at it.

2    A.    I'm sorry.

3    Q.    No.  No, it's fair.  Well, in
4    any case, the department doesn't grant
5    discretion to officers once that threshold is
6    crossed as to whether or not to carry on the
7    pursuit, right?

8    A.    The department is granting the
9    officers the discretion to make that
10    decision.

11    Q.    Once a threshold is crossed,
12    though, you have no choice, as an officer,
13    the department says you got to terminate,
14    right?

15    A.    But that's -- I think that
16    that's that officer's discretion as to when
17    that threshold is made.

18    Q.    Have you ever terminated any
19    pursuits over the course of your career at
20    the CPD?

21    A.    I honestly can't answer that.  I
22    don't -- I'm not gonna say I haven't because
23    I may have, but I don't recall every pursuit
24    that I've been in.

25    I don't recall every pursuit

1    that I've been an OIC in or that I've been a

2    part of, so I can't give a fair answer to

3    that.

4            Q.    As you sit here right now,

5    though, do you have any specific memory --

6            A.    I can't --

7            Q.    -- of terminating any pursuit

8    that you were involved in as a pursuing

9    officer?

10           A.    I can't.  I mean, like I said,

11   19 years.  I don't even -- I don't even know

12   if I could tell you the first pursuit I was

13   in.  I just -- I apologize.

14           Q.    Can you ballpark about how many

15   pursuits that you've been involved in as an

16   officer engaged in the pursuit?

17                 MR. HERZIG:  As opposed to an

18   OIC?

19                 MS. GREENE:  Correct.  Yeah.

20           A.    As an officer?

21           Q.    Yeah.

22           A.    Less than a dozen, maybe, five

23   to ten, ballpark.

24           Q.    And as an OIC, how many pursuits

25   have you been involved in?

1      A.   I would say probably a half a

2 dozen to less potentially.

3      Q.   **So for those five to ten**

4 **pursuits as an officer engaged in a pursuit,**

5 **do you have any specific memory, as you sit**

6 **here today, of terminating any of those**

7 **pursuits?**

8      A.   I'm trying to remember them,

9 honestly.  I honestly don't.  I mean, I'd

10 have to see them and then I could reference,

11 but I really couldn't tell you.

12      Q.   **Okay.  And then you said maybe**

13 **six or less as an OIC?**

14      A.   Same answer.

15      Q.   **Okay.  So as you sit here today**

16 **then, you don't have any specific memory of**

17 **terminating a pursuit as an OIC, correct?**

18      A.   I do not, ma'am.

19      Q.   **Okay.  Do you know of other**

20 **pursuits by CPD officers that have been**

21 **terminated?**

22      A.   By officers or by OICs?

23      Q.   **We'll start with officers.**

24      A.   I mean, I don't -- either case,

25 I don't recall specific examples that come to

1    mind right off the top of my head.  I mean, I

2    can't even remember my own, I'm not gonna

3    remember, unfortunately -- but it does

4    happen.

5              And I just -- I mean, you lose

6    sight of the vehicle, that's probably the

7    most common reason that a pursuit is

8    terminated, but I don't know.  I just...

9         Q.    So then as an OIC -- or, excuse

10   me, strike that.

11              With regard to pursuits by other

12   officers in the departments, as you sit here

13   right now, are you able to think of any that

14   you had heard about that had been terminated

15   by the officers engaged in the pursuit?

16        A.    A specific example, no.  But the

17   specific example I just gave you is what I

18   would probably consider to be the most common

19   is that, hey, I've lost sight or, you know --

20   and that happens.

21              I try to stop you at 75 and

22   Mitchell and you jump on the ramp, and you

23   take off, and I get to the top of the ramp,

24   and you're already gone or, you know,

25   something like that to where you lose sight,

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    or you get turned down off of a main street

2    on -- you know, there's a million streets off

3    Vine Street and you turn as I'm cresting the

4    hill or making my last turn, and I just lost

5    you.

6              I mean, that's probably the most

7    common reason that I would say why an officer

8    terminates a pursuit.  It's just on-sight

9    loss of that vehicle, but I can't say on

10    April 25th, yesterday, that this officer

11    terminated this pursuit because of this.

12          Q.    Okay.  And with respect to

13    pursuits you've heard about in the department

14    where OICs terminated the pursuit, do you

15    have any specific memory about learning the

16    reasons why an OIC terminated?

17          A.    Reasons why they did?

18          Q.    Yeah.

19          A.    I mean, like I said, it's one --

20    until you're there, you know.  And I don't

21    know, hey, did this officer say do this, did

22    this cop see this, did this boss, was he out

23    there, I don't know.  I wouldn't know what

24    those answers would be.

25          Q.    Okay.  Other than losing sight

1    **of the fleeing vehicle over the course of**

2    **your career, have you heard of any other**

3    **reasons for why officers or OICs terminated**

4    **pursuits?**

5         A.    I mean, I'm sure I have.  I

6    just -- like I said, I can't recall a

7    specific example, and I don't want to

8    speculate and guess as to why.

9              But I don't -- if you threw a

10   hundred pursuit reports in front me, I can

11   read and go, oh, this one this, this one

12   this.  I don't know.

13        **Q.    And that's fine.  As you sit**

14   **here right now --**

15        A.    And you know what I mean, in a

16   lot of pursuits, I'll tell you, stop sticks

17   end them.  And that's how pursuits terminate.

18   You know, we might start and then, hey, he

19   turned the corner, your four tires are down.

20             Okay.  And then you get to the

21   next one, you're like, I'm done.  So stop

22   sticks stop a lot of pursuits or stop sticks

23   prevent a lot of pursuits.

24        **Q.    Okay.  In the CPD, are you aware**

25   **of any other reasons that you've heard of**

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    over the years that pursuits ended?

2        A.    If the pursuit vehicle crashed,

3    that's another reason that it would end is.

4    As in this case, that caused the termination

5    of the pursuit.

6        Q.    Okay.  Any other reasons that

7    you've heard of over the years?

8        A.    I'm sure there's more, but I

9    can't say.

10       Q.    As you sit here right now you --

11       A.    Correct.

12       Q.    -- just don't recall any others?

13       A.    Yes, ma'am.  That's correct.

14       Q.    Okay.  So going back to those

15   factors in the policy we talked about

16   earlier, the location where the pursuit is

17   taking place --

18       A.    Okay.

19       Q.    -- why does an officer -- why

20   does it matter that an officer engaged in a

21   pursuit is aware of that factor?

22       A.    I mean, I think we've already

23   discussed kind of, you know, if a pursuit

24   starts on River Road at three o'clock in the

25   morning on a Tuesday morning, I mean, that's

1  a lot less likely than if it's 5:30 on a, you

2  know, Tuesday night as opposed to three in

3  the morning.  It just depends.

4              And, you know -- and you can

5  say, hey, rush hour this or that, but it all

6  depends on the day and the circumstances and

7  what may or may not be occurring at that

8  time.

9              You know, this was during COVID

10 and there's a lot less people on the road and

11 traveling those days.  So, I mean -- there's

12 no -- I mean, I know I've said this, but

13 there's no absolutes.  There's no 100 to

14 that.

15             And I think you take all those.

16 You know, you said something about a school

17 zone earlier, but if school is not in

18 session, then that's not a factor.  Yeah,

19 there's a school zone there, but it's not a

20 factor that's playing into that case, I

21 guess.

22        Q.    And so in terms of what the

23 officer observed or was aware of during the

24 pursuit as it's going on, that's what's

25 important to know about, right?

```
 1            A.    Yes.

 2            Q.    And so, you know, just going

 3      back to this question about location, as an

 4      officer is engaged in a pursuit, why does it

 5      matter as he's doing the pursuit where the

 6      pursuit is going; why is it important?

 7            A.    Because of those factors, that

 8      officer sees those factors and knows those

 9      factors as to where it's going and what it

10      may be leading to or what it may not be

11      leading to.  I don't --

12            Q.    When you say "leading to," you

13      mean whether --

14            A.    Like what -- like what's the

15      next street, what's -- you know, like I said,

16      you know, this pursuit, had he continued onto

17      the highway, okay, well, then he would have

18      been stuck in traffic and had nowhere to go,

19      or had he come in -- like I said, the Taste

20      of Cincinnati, you come into downtown,

21      there's all these -- it just -- I think just

22      knowing where you're going to be able to make

23      that -- as in your words, put it in the

24      totality of the circumstances of all those

25      factors combined.
```

1    Q.    And so location is important

2    because it can help an officer know, for

3    example, whether you were heading into a

4    highly congested area, right?

5         A.    Yeah, but you also see that.  So

6    you don't necessarily have to know, but you

7    would also see, maybe.

8         Q.    And you could anticipate before

9    you get there as well, right?

10        A.    Potentially.

11        Q.    And traffic conditions, road

12   conditions, time of day, I mean, those all

13   play into the same kind of consideration,

14   right?

15        A.    Kind of, yes, if you take each

16   one separately.

17        Q.    And those things matter to an

18   officer when engaged in a pursuit why?  Let's

19   start with traffic conditions, why do they

20   matter?

21        A.    I don't think you have to do it

22   separately.  I think like you said, you take

23   the totality of all of them together and make

24   your decision based off of that.

25        Q.    And those conditions can

1    indicate whether there is a greater or lesser

2    likelihood of injury to third parties, right?

3              A.    Potentially.

4              Q.    And they can also indicate where

5    there's a greater or lessor likelihood of

6    injury to the officer or the fleeing suspect,

7    right?

8              A.    Potentially.

9              Q.    The amount of pedestrian

10   traffic, why is that important for an officer

11   to be aware of during a pursuit?

12             A.    Just those same factors like you

13   stated, it could potentially lead to the

14   consequences or what -- I guess, those --

15   that's the factor, like I said, you know,

16   you're not gonna take the 5th Street Exit

17   into the Taste of Cincinnati.  I think that's

18   just another factor.

19             Q.    Okay.

20             A.    But if there's no pedestrians or

21   little-to-no pedestrians and there's

22   little-to-no traffic, those factors would be

23   in the favor of the officer, if that's what

24   he sees and that's what he's observing as

25   he's continuing in that pursuit.  Now --

1    Q.    Sorry.  Go ahead.

2    A.    No, you're good.

3    Q.    **The presence of pedestrians over**

4    **a pursuit path, that means if there are**

5    **pedestrians present, there are people who**

6    **could possibly be hurt, right?**

7    A.    Yes, but one or two -- I mean,

8    that's like saying if there's cars present.

9    There's always a potential that

10   there's gonna be one or two people here, one

11   or two cars here, that there was nothing --

12   if the officer believes that the traffic

13   conditions and the pedestrian conditions are

14   so light that it doesn't create that risk,

15   then there would be nothing to indicate that

16   that officer -- to call that pursuit off

17   based on those factors.

18   Q.    **So one or two cars, no need to**

19   **call it off; is that what you're saying?**

20   A.    I mean, I'm not -- I don't know

21   that I can give you a number.  And I don't

22   want to get into hypotheticals again.  It

23   just -- I mean, you just got to -- again, you

24   got to be able to see it to know it.

25   You know, if there's a few cars

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    here, a few cars there, if there's a

2    pedestrian here, a pedestrian standing there,

3    it's not -- like you said, you know, we're

4    not going through a school zone where kids

5    are out playing kickball and, you know,

6    they're playing in the middle of the street

7    or stuff like that, just that all that

8    factored together.

9        Q.    With respect to weather, why is

10   that a factor that matters?

11       A.    Well, I'm not going to engage in

12   a pursuit when there's two feet of snow and

13   icy conditions and those things on the

14   ground.

15            Rain, you got to take that into

16   account.  Maybe it's just a little spit mist,

17   or if it's pouring down buckets, you can't

18   even see in front of your face, you're not

19   gonna do that.

20            A clear, sunny day would,

21   obviously, be the optimal because there's no

22   rain on the ground, there's no snow on the

23   ground.  You can see where you're going and

24   what you're doing.

25            You have a clear unobstructed

1    visual of what you're engaging in, and you

2    see what's in front of you a lot easier than

3    if it's raining buckets of water and your

4    windshield wipers are going a hundred miles

5    an hour and you can't see, you wouldn't

6    engage in that kind of pursuit.

7        Q.    What about speed of the pursuit

8    and speed of surrounding vehicular traffic?

9        A.    I think that's two questions.

10       Q.    Okay.  Well, start with --

11       A.    Can you clarify --

12       Q.    Sure.

13       A.    -- exactly -- like can you

14   clarify exactly what you're asking?

15       Q.    Yeah.  So --

16       A.    Okay.

17       Q.    -- why does the speed of the

18   fleeing vehicle matter for an officer to be

19   aware of during a pursuit?

20       A.    I mean, that's gonna be a factor

21   based on -- that speed is gonna kind of,

22   maybe, potentially dictate your speed as

23   well.

24           But it also -- like I said, it

25   also depends as you're making turns and stops

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    and slows and approaches, for me to go from

2    zero to 35, 40 in a second or two, like that

3    isn't a speed factor.  Does that make sense?

4            Like if you're -- when you're

5    making the turns, you're going from zero to,

6    you know, 20, 30, 40, you're getting back up,

7    you're catching back up.  So those speeds

8    aren't a factor.

9            If you're on a straightaway and

10   you're going at 20 miles an hour, it depends

11   on whether it's an open road, whether there's

12   other cars around.  Those are all the factors

13   you take, I would say for the suspect and for

14   the other vehicles around.

15       Q.    Okay.  Why should an officer be

16   aware of the condition of his own vehicle and

17   of the suspect's vehicle during a pursuit?

18       A.    Well, I mean, my vehicle,

19   obviously, you want to know how it's gonna

20   operate or how -- has it been maintained?  Is

21   there any -- I'm sorry -- reasons, you know,

22   why it wouldn't work?  Was there any

23   mechanical issues?  I mean, you would know

24   those things about your vehicle.

25            The suspect vehicle, I can't

1    necessarily know what his vehicle is, but

2    what that would indicate to me the condition

3    of a suspect vehicle, when I first stop you,

4    I have no idea.

5                Like, I can see your car, maybe

6    it's a 2026 Mustang Convertible and I know,

7    hey, it's a brand new great car.  But to me,

8    the condition of their vehicle I would say is

9    gained through the course of what that

10   pursuit would be as to, you know, if we

11   deploy stop sticks and I can say, hey, he's

12   running on a -- the rim, hey, he's running on

13   the rubber, hey, three wheels are down, like

14   those then factors is how I would interpret

15   more that a requirement of knowing what the

16   suspect's vehicle is.

17        **Q.    And you're describing**

18   **circumstances where the condition of the**

19   **suspect vehicle because of its condition is**

20   **becoming more dangerous; is that right?**

21        A.    I wouldn't necessarily say that

22   it's becoming more dangerous.

23        **Q.    What would you describe that**

24   **then as, what you were just talking about?**

25        A.    So we pull out of the parking

1    garage, you make one turn and I throw stop

2    sticks out and hit all four of your tires, to

3    me, that would indicate that, hey, he's not

4    gonna be able to.

5                 Or, you come off the exit ramp

6    of the highway going 75 miles an hour.  You

7    hit all four sticks and all your tires are

8    gonna go down, okay.  Your tires are gonna

9    deflate.  That's gonna start causing your car

10   to lose speeds, and then the speeds of which

11   that pursuit are continuing are decreasing,

12   decreasing, decreasing.

13                 And that would be a factor in

14   the condition of that suspect's vehicle.  So,

15   yes, it may be -- obviously, cars aren't

16   built -- cars aren't built to ride on rims.

17                 But when you're stop-sticked and

18   you have rubber on one tire and you're riding

19   on three rims, you're not going -- you know,

20   your speeds are, obviously, decreasing,

21   decreasing, and decreasing, and then you're

22   eventually gonna stop and you're gonna have

23   to run out.

24                 So, yeah, your car may be in bad

25   condition, but when you're riding on three

1    rims and you're going ten miles an hour, I

2    don't -- that's not a bad condition for a

3    pursuit, I would say.

4              Q.    Okay.  What about --

5              A.    Because you're at a slow speed

6    at that point.

7              Q.    What about if a vehicle is

8    smoking, what impact does that have?

9              A.    Well, where's the vehicle

10   smoking from?  What caused it to smoke?  What

11   have you seen?  I can't answer -- I can't

12   give you an absolute.  I don't know.  I know

13   what you're talking about in this pursuit

14   probably, but it wasn't smoking from what I

15   saw.

16              It turned the corner and there

17   was gravel on the ground, and that's what

18   caused the little bit to come up from the

19   ground.  There was no smoke.  There was

20   nothing coming from the vehicle.  That's what

21   I saw.

22              Q.    In terms of an officer being

23   required to be aware of the nature and

24   seriousness of the suspected crime, why is

25   that important during a pursuit?

1        A.    Because not only are you taking

2    into account your safety and the precautions

3    that you're gonna take while trying to

4    apprehend this suspect, you're taking

5    precautions in trying to maybe control how

6    and where the stop takes place or where you

7    try to engage in that to maybe have the most

8    tactically advantageous outcome for you and

9    the people that are with you.

10        Q.    **What do you mean by "most**

11   **tactically advantageous outcome"?**

12        A.    So -- all right.  Here's where

13   we're at.  So this case, Mason Meyer, me

14   knowing what I know about him, hey, he's

15   engaged in drugs and gun transactions.  Hey,

16   he's pistol-whipped this person.  Hey, he's

17   shot this person.  Hey, he's got a brain

18   tumor.  Hey, he's not going back to prison.

19   Hey, he's gonna shootout with the police.  He

20   is not going back to jail.

21             We have to set ourself up in the

22   most tactically advantageous situation to

23   take those people into custody.  So me

24   knowing all these things about him, the bad

25   guy that he is -- and this is, I guess, a

1    rhetorical, police wear vests every day, but

2    you also see that there are heavy-plated

3    vests for police to wear.

4                So I have one of those

5    heavy-plated vests.  So that's like to stop

6    an AR round or a higher caliber-type-round

7    plate.  So on this day in question, I've been

8    a cop for 19 years, that's the only day that

9    I've put that vest on.

10                Based on what I know about him

11    and his criminal history and the weapons that

12    he's involved in, and based on the weapon

13    that was in that car when we saw him before

14    we made that stop, so that's a tactical

15    advantage for me to have that extra armor to

16    have that in there.

17                So then when I make that stop,

18    how many houses are around where I made that

19    stop?  One, maybe two, and those are in the

20    backdrop far off to the right.  So if we can

21    stop him in a position to where there's no

22    schools or no kids, no community, no

23    subdivision, we make those stops, and then I

24    key up and, you know -- and I authorize the

25    dogs to come with me.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Because when we get involved in

2     those situations, if he comes out shooting,

3     we're releasing those dogs.  And those dogs

4     are there to benefit us and to protect us and

5     to put us in that tactically advantageous

6     situation to where the cards are stacked in

7     our favor, for lack of a better saying, but

8     we have to put ourselves in those spots.

9          So could I have waited until he

10    got up Mt. Hope and stopped that car, or

11    could I have waited until he got up by the

12    school that you referenced?  Sure, but why --

13    I mean, we're putting ourself to set up.

14          And I keyed up and asked

15    Brett Thomas where he was before I made this

16    stop.  And he had indicated that he was two

17    or three cars behind me, which, okay, that's

18    perfect.  He rounds the bend.  He's there set

19    up next to me.  His dog's right there.  We

20    had Harper responding.

21          There were other units and

22    things available.  Nine Henry Ten had

23    acknowledged he could provide air support.

24    If something would happen, he would take off

25    running.  We would have those.

1    So those are -- we have to place

2    ourself in that situation if and when we can.

3    And maybe, your words, it's a contingency

4    plan.  I don't know that it's contingency.

5    It's maybe just a plan we make, but -- if

6    that answers, I guess.

7        **Q.    Yeah.  So waiting to arrest**

8    **him -- or, excuse me, to try to stop, for**

9    **example, at Mt. Hope or at the school, is --**

10   **is what you were saying -- is what you were**

11   **saying that those locations are not as ideal**

12   **as where you attempted to make the stop**

13   **initially?**

14       A.    I kind of look at it like the

15   ideal for that stop.  Like, if he took off

16   from that car and ran, like he's going right

17   into a wood line.

18        So like that makes it more

19   advantageous for me, to where if I stopped

20   him up by the school, there's a gazillion

21   houses, and he could have gotten into that

22   school.

23        He could have gotten into that

24   house.  He could have gotten into a business

25   to where then that makes it harder for me, if

```
 1      that makes sense.

 2                  So with Brett being there, that

 3      dog would have deployed immediately and shot

 4      to that wood line, if that's the route that

 5      he would -- so that's kind of what I mean.

 6                  So if we can put him in an

 7      element to where we kind of -- like I said,

 8      the wood line on all sides of Mt. Hope there,

 9      we would have kind of been able to more box

10      in, pin in with patrol cars, not like the car

11      but, you know, we set up a perimeter, hey,

12      you're on this side, you're on this side,

13      you're on this side, and kind of flush him

14      into a certain area is what I would say based

15      on making a stop in that location.

16          Q.    Okay.  And when you say that

17      location of the wood line, you're talking

18      about the location where you tried to

19      initially to stop --

20          A.    Yeah, at Mt. Hope and Elberon

21      Avenue, right there at the bend.

22          Q.    And that ability to set up that

23      perimeter, have the wood line, very few

24      houses, that is a safer circumstance and a

25      better circumstance then, for example, by the
```

1    **school or further up Mt. Hope, right?**

2            A.    I don't know if it's necessarily

3    safer.  It's a more -- I would say, like I

4    said, tactically advantageous to us as to you

5    get up there -- and it doesn't have to be the

6    course of this, it could be any pursuit, but

7    if you get into a neighborhood, you know,

8    like here, I'll use the west end, a high-rise

9    apartment, there's a hundred, two hundred

10   apartments there.

11            There's no telling where that

12   guy could end up.  To where, if I get you in

13   a wood line, and then we have air support

14   coming, and they can kind of get you.

15            And we have those dogs that we

16   can track you and have an un -- an

17   uncontaminated scent and source that, hey, we

18   know you jumped from this car, ran directly

19   across Mt. Hope and got into this wood line,

20   like, those dogs would deploy immediately

21   from there.

22            But if I stop you, say, up by

23   the school and by the business, and then I

24   have you as the witness that says, hey, he

25   ran this way and then this witness says, no,

```
 1    he ran this way, and then this witness says,

 2    hey, he double-backed.

 3              Well, then if -- you know,

 4    there's -- different people see different

 5    things to where it's more of our control, I

 6    guess.

 7         Q.   So easier to find someone in the

 8    location that you initially tried to stop

 9    Meyer, right?

10         A.   If his actions dictated that he

11    fled or if -- something along those lines.

12         Q.   And then in the areas, for

13    example, the school or further up Mt. Hope,

14    you talked about contamination of the scent

15    line, that's more likely to be the case in an

16    area like the school or Mt. Hope?

17         A.   Yeah.  It just gives him more

18    options to escape to a place to where we --

19    there's a hundred houses, a hundred

20    residents' apartments, multifamily buildings,

21    businesses, dumpsters, back doors to

22    businesses, rooftops, all those things that

23    we necessarily don't have.

24              And, I mean, I don't -- and, you

25    know, he could have bailed out right there
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   and we still might have lost him.  But if we
 2   can give ourselves a little more of an
 3   advantage, I think that's the advantage that
 4   we take.
 5          Q.    And where -- in areas where
 6   there are a lot more people, you lose some of
 7   that advantage, right, for example, by the
 8   school or Mt. Hope?
 9          A.    Yes and no.  I mean, if we have
10   air support, I don't necessarily think we
11   would.  Because if I say, hey, male, white,
12   five-ten, dark hair, orange shirt, red shoes,
13   they're gonna be able to pick him out.
14              The canine, that would -- we
15   probably lose an advantage there just based
16   on the different scents and making sure that
17   the dog picked the right scent.  But, again,
18   it's a case-by-case kind of basis as to where
19   you're at.
20          Q.    But you're always aiming to
21   accomplish the most tactically advantageous
22   outcome, as you called it, right?
23          A.    Well, I think we always aim to
24   do the safest and the most the tactically
25   advantageous situation for all parties
```

1    involved.

2         Q.    Now, once the pursuit begins and

3    you're taken out of that area where you had

4    that tactical advantage --

5         A.    Uh-huh.

6         Q.    -- you lose control over where

7    that vehicle may stop or that suspect may

8    ditch the car, right?

9         A.    Yes and no.  I would say you are

10   losing some of the advantage, but then no --

11   like I said, if you can get stop sticks

12   ahead, if you can kind of know the route,

13   or -- I mean, there's no way of knowing the

14   route, but if we could get cars ahead

15   potentially, if that makes sense.

16              Like, again, we're playing

17   chess.  We're trying to leapfrog to get ahead

18   to -- you know, when he took Warsaw and came

19   down the hill, you knew he had to turn down

20   Wilder or he had to get onto 6th Street.

21              So if we would have had cars

22   that could have been able to get ahead, then

23   we still gain and maintain some of that

24   strength and ability.  But, again, there's no

25   absolute.  There's no certainties to anything

 1    in which -- what we do on that.

 2          Q.    For a circumstance then where a

 3    fleeing suspect takes officers on a pursuit,

 4    though, you're likely to be taken out of

 5    those areas where you have the tactical

 6    advantage if an opportunity to arrest

 7    presents itself, right?

 8                MR. HERZIG:  Objection.  You can

 9    answer.

10          A.    Say that one more time, please.

11          Q.    Yeah.  If a fleeing suspect

12    takes officers on a pursuit --

13          A.    Okay.

14          Q.    -- you're likely to end up

15    leaving the area where you have the tactical

16    advantage, right?

17          A.    You probably don't -- I'll say a

18    yes and a no.  Because, yes, that's,

19    obviously, not where we intended to make that

20    stop.

21                But there's also times where

22    they lead us to where we want them to lead us

23    to to where -- and I'm not saying that they

24    are or they're not, but I've seen where

25    pursuits have ended where somebody lives or

```
 1    somewhere where their girlfriend lives, or
 2    places that we know that they frequent.
 3              So we may be ahead of them
 4    expecting them to come there, potentially.
 5    So it's a yes and a no question, I think.
 6         Q.    Okay.  And then as an officer
 7    following a fleeing vehicle, you're not
 8    controlling the route of the pursuit, are
 9    you?
10         A.    I'm not, no.  I mean, that's
11    his -- he's -- yeah, he's the one that's
12    leading that route, per se.
13              I mean, I'll take this back to
14    CDRT.  So if I have a crowd of people at 12th
15    and Vine and I want those people to go
16    northbound Vine, then I'm going to block --
17    you're going northbound, I'm gonna block you
18    here to force you to go northbound.
19              Now, has it been done, has it
20    happened to where I lay stop sticks somewhere
21    and that person sees them and they reroute
22    their path?  Sure.
23              But I can't control -- yeah, so
24    I mean, I would say that they have the main,
25    but there are things that we could do
```

1    something like that.  And that may not

2    prevent them from going that way kind of

3    deal.  I don't know.

4              Q.    Okay.

5              A.    It's just an unknown, I guess.

6              Q.    And in any case, if the fleeing

7    vehicle does ultimately end up in a crash,

8    that's -- that would be in a location that --

9    well, strike that.

10                   This factor of the likelihood of

11   successful -- successful apprehension, why is

12   that important for an officer to know during

13   a pursuit?

14             A.    I mean, it's based on whether

15   you know who the person is, what intelligence

16   you have on them, whether you know where they

17   live, who their girlfriend is, things like

18   that, whether you can find them again,

19   whether you have their phone number, whether

20   you're up on a phone ping.

21                   I mean, in this case, Mason went

22   through multiple phones.  And if you -- if

23   you lose that phone, you lose advantage.

24   There is 100 percent that you lose that

25   advantage.

```
 1                    If I have you on a ping now and
 2       then I lose you and you give that phone up,
 3       then you have -- there's no -- you don't have
 4       the upper hand, I guess, kind of, because
 5       you're losing a big factor.
 6                    So just because I know you, yes,
 7       that's a factor, but what factors play into
 8       me knowing you and what factors lead me to
 9       maybe successfully apprehend you again.
10                    And just because I do know you,
11       that doesn't mean that I'll be able to
12       successfully apprehend you at a later date.
13       It's just, I think, the totality of it all
14       together.
15            Q.    What's a successful
16       apprehension?
17            A.    I think placing them in custody
18       is what the apprehension would be.
19            Q.    And a successful apprehension,
20       would that be placing a person in custody
21       with the least amount of injury to anyone?
22            A.    I mean, ultimately the goal is
23       for no injuries to occur, but that's an
24       unknown in everything we do, whether it be an
25       injury to me, an injury to the suspect, an
```

1   injury to innocence.

2             I mean, there are times you see

3   people shoot at us, people fight us, we're

4   injured, they're injured.  I mean, are those

5   successful apprehensions?  Yes, they are, but

6   they came at a -- you know, those persons

7   were injured.  So I think a successful

8   apprehension, you can't broad stroke that.

9        **Q.    In the course of taking a person**

10  **into custody, if there's a possibility of**

11  **injury to the suspect or the officer or to**

12  **third parties, bystanders, is it correct to**

13  **prioritize the safety of third parties and**

14  **officers over the safety of the suspect?**

15       A.    Am I putting my safety and the

16  innocent civilian safety over the safety of

17  the suspect; is that what you're asking?

18       **Q.    Yeah.**

19       A.    I'm not sure that I'm

20  prioritizing any.  I mean, everybody's safety

21  is paramount and important.  I'm not -- I

22  don't think I'm necessarily picking one or

23  the other.  But all safety -- all safety of

24  all three of those parties is of utmost

25  importance.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    In relation to the factor that

2    officers need to be aware of during a pursuit

3    about whether the identity of the suspect is

4    known to the point that a later apprehension

5    is possible, is it the case that when later

6    apprehension is possible, a pursuit should

7    not be used as a tactic to take that person

8    into custody?

9                MR. HERZIG:  Objection.  You can

10   answer.

11         A.    No.

12         Q.    Why not?

13         A.    So if you're -- and correct me

14   if I'm wrong, if you're saying, hey, I know

15   who this person is and if I try to traffic

16   stop them and they take off, I shouldn't

17   pursue them; is that what you're asking?

18         Q.    No.  I'm saying if --

19         A.    I'm kind of confused on --

20         Q.    I'm saying if -- if a later

21   apprehension is possible, is that a

22   circumstance that dictates that a pursuit

23   should not be engaged in?

24         A.    No.

25         Q.    Why not?

1    A.    Let me ask you to rephrase then.

2   Because I think I got what you're saying, but

3   let me verify.

4    **Q.    So where an officer considering**

5   **a pursuit or engaged in a pursuit is aware**

6   **that a later apprehension of the fleeing**

7   **suspect is possible, should the pursuit be**

8   **continued?**

9    A.    Yes, it can.

10    **Q.    Should it?**

11    A.    That's an opinion question that

12   I'm not gonna answer.

13    **Q.    Under the policies and practices**

14   **of the Cincinnati Police Department based on**

15   **your training and your understanding of those**

16   **policies and practices, should the pursuit be**

17   **continued?**

18    A.    That's one of the factors it

19   considers, but, yes, you could continue that

20   pursuit.

21    **Q.    And what circumstances would**

22   **need to be present under the CPD policies and**

23   **practices that you're -- you're aware of and**

24   **have been trained on to permit the**

25   **continuation of a pursuit where it is known**

1    that a later apprehension of the fleeing

2    suspect is possible?

3         A.    The risk of harm that that

4    individual presents.

5         Q.    The risk of imminent harm?

6         A.    Yes.

7         Q.    So, for example, if the person

8    was known to have committed to engaging in a

9    violent act in the immediate future, then

10   that person presents an imminent risk of

11   harm?

12        A.    If I know someone is going to

13   commit a violent act in the future?

14        Q.    In the immediate future.

15        A.    Well, I guess it's a matter of

16   what your definition of immediate or imminent

17   is as opposed to what mine may be or how

18   that's interpreted as well.

19        Q.    How do you define imminent or

20   immediate threat?

21        A.    I think it's one of those,

22   again, on a case-by-case kind of basis.  In

23   this situation, all the factors that we knew

24   of Meyer and his criminal history and the

25   statements that he made and his refusal to

1    comply with police orders, and he said he was

2    gonna shoot police, and he wasn't going back

3    to jail, those to me, are imminent threats to

4    the safety of those officers.

5                    So when I made that stop, I knew

6    all those factors.  There's a chance I

7    couldn't be sitting here today because I knew

8    those factors, but there's also -- you can't

9    always know everything about somebody.

10                   That day, the information and

11   the knowledge that we had and the sources

12   that we had, we all believed we had a pretty

13   good understanding and knowledge, and here's

14   the imminent of it or the risk to the future

15   of which you don't know and you can't say and

16   you can't predict.

17                   And it's just to a fact where if

18   I stopped him, the knowledge was that he was

19   gonna shoot it out with me.  So I know that.

20                   Now, if I don't stop him and he

21   gets away and John Smith stops him tonight on

22   nightshift, John Smith has no knowledge of

23   who that person is.  He walks up and he gets

24   ambushed and is a sitting duck.

25                   To me, that's an imminent risk

1    on the safety of fellow officers, and that

2    that is a likely or potential course of

3    action that could occur.

4              So I don't know that imminent to

5    me means in five minutes.  It could be five

6    hours.  It could be five days.  But those

7    factors all combined, to me, put that in the

8    totality of it all.

9         Q.    So are you saying that where

10   there's a possibility that someone like

11   Mason Meyer may have a police encounter at

12   some point in the future and may in the

13   course of that possible encounter shooting an

14   officer, that indicates that a pursuit should

15   be continued even if he could later be

16   apprehended?

17        A.    What certainty do you have that

18   he could be later apprehended?  Just because

19   you know who he is, there's no certainty that

20   he could later be apprehended.

21              He could evade apprehension

22   forever.  He could have packed his bags and

23   moved to South Dakota, then bought a passport

24   and gone out -- I mean, those are unknowns.

25              You can't -- yes, because we do

Deposition of Lieutenant Timothy Lanter                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    know who he is, but there's no guarantee of a

2    later apprehension.  I mean, there's a

3    possibility of it.

4                    But based on the information and

5    the intel that we had and the phone pings

6    that we had, and we placed him at

7    Steiner Avenue and we placed him in that car,

8    and the threats that he made and the weapons

9    that he had on him that day, those threats

10    were real.  They weren't fake.

11                    So I'm not -- and I guess we're

12    maybe splitting hairs again, but I don't --

13    or maybe that's not the right answer that

14    you're -- answer to the question.

15          Q.    So are you saying that rather

16    than terminate the pursuit, the fact that

17    there was, in your eyes, the possibility that

18    Mason Meyer could be stopped by another

19    officer and that during that potential stop

20    or encounter with the officer, he may shoot

21    at the officer, that that is sufficient to

22    allow the continuation of a pursuit?

23          A.    No.  The fact -- the factors in

24    the pursuit allow the continuation of the

25    pursuit.  There was nothing based on -- the

```
 1        conditions created in that pursuit, the

 2        vehicle traffic wasn't a factor, pedestrian

 3        traffic wasn't a factor, those pursuit

 4        conditions continued on.

 5               There was nothing that would

 6        have made that pursuit be called off.  The

 7        fact that he's known and could have been

 8        later, that's a factor.  But you go back to

 9        all the other factors as well that, again,

10        create the totality of the whole picture of

11        it.

12        Q.    Meaning, what you --

13        A.    Meaning what I --

14        Q.    -- had heard about Meyer?

15        A.    Well, not only what I had heard

16        or what I knew about Meyer, but based on what

17        I'm seeing in front of me.  And his driving

18        didn't dictate or cause alarm or concern that

19        the outcome would be what it is.

20               The outcome is horrific and

21        terrible, but his actions, that's an unknown.

22        And, yes, the fact that he could have

23        ambushed another cop, or, yes, he could have

24        done that, yes, those were all other factors

25        continued in that, everything together.
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              Again, this is a guide.  You
 2    can't -- you just got to look at everything,
 3    so...
 4         Q.    I think we can agree that at
 5    some point this pursuit and Meyer fleeing
 6    from the officers did create imminent risk of
 7    harm to persons, right?
 8         A.    I'm not gonna agree to that.
 9         Q.    Well, two people did die and two
10    other people were seriously injured as a
11    result of this; weren't they?
12         A.    That's correct.
13         Q.    So there was at one point an
14    imminent risk of serious physical harm or
15    death to persons; wasn't there?
16         A.    It's an unknown, I will say.  I
17    mean, I know what the outcome was and I know
18    what the result was and it's absolutely
19    horrific and tragic, but I don't know that
20    you can say that you knew that that was what
21    the outcome was gonna be.
22              I mean, I know what the outcome
23    was, but I don't think -- and maybe I'm
24    misunderstanding the question -- but I don't
25    think you could have known that that's what
```

Deposition of Lieutenant Timothy Lanter                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1     the outcome would have been.

2          Q.    Do you believe that the deaths

3     of two people and serious injuries to two

4     other people were justifiable in light of the

5     information you had about Mason Meyer and the

6     factors you observed to continue this

7     pursuit?

8               MR. HERZIG:  Objection.  That's

9     an unfair question, but you can answer.

10         Q.    Go ahead.

11              MR. HERZIG:  I'll tell him when

12    he can go ahead.

13         A.    Can you rephrase that, please?

14         Q.    Based on your understanding of

15    Cincinnati Police Department policies and

16    practices and your training from the

17    department, do you believe that the deaths of

18    two people and the serious injuries to two

19    other people was justifiable in light of the

20    information you knew or had been told the

21    observations you had of Mason Meyer to

22    continue the pursuit in this instance?

23              MR. HERZIG:  Same objection.

24    You can answer.

25         A.    Again, I think it's an unknown

1    that you can't predict and know.

2          Q.    Do you believe that pursuits

3    carry with them inherent risk to third

4    parties when they're take -- undertaken?

5          A.    There can be.

6          Q.    That's a known issue in police

7    pursuits, right, that they pose a risk to the

8    community?

9          A.    They pose a risk to everybody

10   involved, the police, the suspect, and

11   potentially the community.

12         Q.    And so they should only be

13   undertaken when absolutely necessary, right?

14             MR. HERZIG:   Objection.   You can

15   answer.

16         A.    Again, that's a case-by-case

17   question and answer.   I mean -- is it

18   possible to take a break?

19             MS. GREENE:   Sure.   Let's go off

20   the record.

21      (Off the record.)

22   BY MS. GREENE:

23         Q.    All right.   We're back on the

24   record.

25             Lieutenant Lanter, under CPD

1    policy and practices and what you've been

2    taught from the department, is it your

3    understanding that officers are required to

4    avoid creating hazardous conditions in

5    pursuits wherever possible?

6          A.    Yes.

7          Q.    And is it true that the policy

8    and procedures for the CPD forbids officers

9    from pursuing vehicles the wrong way on

10   one-way roads?

11         A.    Unless authorized, correct.

12         Q.    By an officer in charge, right?

13         A.    Correct.

14         Q.    Who was the officer in charge of

15   the pursuit on August 7th, 2020?

16         A.    Sergeant Scalf.

17         Q.    And did you provide

18   authorization to other officers to go the

19   wrong way on a one-way?

20         A.    I did.

21         Q.    And you authorized, I believe

22   earlier you said, other officers to join the

23   pursuit as well, correct?

24         A.    That's correct.

25         Q.    Is a mandatory rule that

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    pursuing vehicles, meaning the officers'

2    vehicles, are forbidden from going the wrong

3    way on a one-way street unless they have that

4    authorization, right?

5            A.    That is correct.  And based off

6    of my interview and Sergeant Scalf's

7    interview, we discussed that topic.

8            Q.    It's true as well that under CPD

9    pursuit -- pursuit procedures, that officers

10   are forbidden from operating their vehicle in

11   emergency mode with reckless disregard for

12   the safety of other citizens, correct?

13           A.    That's correct.

14           Q.    And what does that mean,

15   reckless disregard for the safety of other

16   citizens?

17           A.    Another one of those things when

18   you see it, I mean, driving faster than the

19   allowable conditions, hitting a vehicle,

20   driving into a highly populated area in a

21   snowstorm, I mean, based on those factors.

22           Q.    And it's also true that CPD

23   pursuit procedures and the policy require

24   officers to maintain a vehicle speed that's

25   reasonable for the conditions, correct?

1     A.    Correct.

2          Q.    And the conditions, that

3    includes all of the factors we've been

4    talking about from the pursuit policy, right?

5          A.    Yes, ma'am.

6          Q.    Now, pursuits that don't comply

7    with department policy are noncompliant

8    pursuits, right?

9          A.    Correct.

10          Q.    And pursuits that don't comply

11    with CPD policy are not allowed by the CPD,

12    are they?

13              MR. HERZIG:   Objection.   You can

14    answer.

15          A.    Don't comply or not allowed, you

16    will be either given an ESL, which is a

17    corrective measure, or a reprimand, which can

18    be a disciplinary measure, or there can be

19    justification provided in that pursuit

20    report, which would allow those deviations

21    from the procedure.

22          Q.    And in that circumstance,

23    discipline would not be given by the

24    department, right?

25          A.    That's correct.

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 215 of 358 - Page
ID#: 1566
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              Q.    And then pursuits that don't
 2      comply with CPD policy are not permitted to
 3      continue under the department's rules and
 4      regulations, right?
 5                    MR. HERZIG:  Objection.  You can
 6      answer.
 7              A.    If they don't -- I'm sorry.
 8              Q.    Yeah.  Let me re-ask that --
 9              A.    Okay.
10              Q.    -- with better wording.  So for
11      pursuits that are in progress that don't
12      comply with the CPD policies, those pursuits
13      are, under the department rules, not
14      permitted to be continued, correct?
15                    MR. HERZIG:  Same objection.
16      You can answer.
17              A.    I would say those pursuits can
18      continue if you could provide sufficient
19      justification as to why those actions
20      occurred and what occurred based on those
21      actions.
22              Q.    Okay.  In the same way that we
23      just discussed a moment ago with the
24      justification --
25              A.    Correct.
```

Deposition of Lieutenant Timothy Lanter                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1     Q.    -- and the no discipline?

2     A.    Correct.

3     Q.    Okay.  Let's look at August 7th,

4  2020.

5     A.    Okay.

6     Q.    You mentioned the term air

7  support earlier.  Did you have it on that

8  day?

9     A.    Nine Henry Ten acknowledged that

10  he was responding to the area once the

11  pursuit initiated.

12           Nine Henry Ten would be the call

13  sign for Hamilton County Helicopter Unit,

14  which was staffed by a CPD member assigned to

15  our tactical -- Tactical Planning Unit

16  sourced out to the Hamilton County Sheriff's

17  Office.

18     Q.    And what was the name of that

19  individual?

20     A.    The name of Nine Henry Ten?

21     Q.    Yeah.

22     A.    I do not have knowledge of who

23  the pilot was.  The CPD member, I believe,

24  was Phil Stout, who was on assignment to

25  that -- or that was his assignment, I guess.

1    Q.    And so when you say air support,

2    you're specifically talking about helicopter?

3    A.    Yes, ma'am.

4    Q.    So the helicopter was on its way

5    once the pursuit commenced?

6    A.    That's correct, he acknowledged.

7    Q.    And do you know whether it ever

8    reached the vicinity of the pursuit?

9    A.    I do not know.  I do not believe

10   so.  Because if he would have, he would have

11   probably acknowledged or he would have said,

12   hey, I can call the pursuit, here's what I

13   would think, but I don't know that he ever

14   made it to the area.

15   Q.    Okay.  When you say Phil Stout,

16   he was staffed --

17   A.    He's a Cincinnati Police officer

18   assigned -- at that time, he was assigned to

19   the Tactical Patrol Section, which is a

20   branch of the SWAT team, per se, and that

21   assignment loaned him out to the assignment

22   with the joint cooperation of the Hamilton

23   County Sheriff's Office.

24   Q.    So a helicopter, as far as you

25   know, didn't make it before the crash

```
 1    occurred?

 2         A.    Yeah.  I can't say one way or

 3    the other for certainty.

 4         Q.    Okay.  Were there drones in CPD

 5    use at this time?

 6         A.    I don't know.  I don't remember

 7    when drones came on -- on the map.  I've

 8    never been a drone operator.  I've never been

 9    involved with the drones.  So I honestly

10    don't know when that came about.

11         Q.    Okay.  Earlier you talked about

12    pursuits where sometimes a suspect leads you

13    to where you wanted him to lead you, right?

14         A.    Wanted to or thought, maybe.

15    Maybe more or less thought that he may lead

16    you, not necessarily wanted.

17         Q.    Did Meyer lead you to where you

18    wanted him to lead you where you thought he

19    might lead you?

20         A.    No, because we knew where he was

21    already at.

22         Q.    In the course of the pursuit,

23    did he travel to a location that you

24    anticipated him going to?

25         A.    Me anticipating?  No.  Other
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    officers, I can't say.
 2              Q.    Okay.  How did you first become
 3    aware of the operation relating to
 4    Mason Meyer?
 5              A.    Sometime around the end of July,
 6    Sergeant Scalf had contacted me and asked if
 7    the Gang Unit would provide uniform support,
 8    and we provided that support on July 31st at
 9    the first attempt to apprehend Meyer.
10              Q.    Were you present for that event?
11              A.    Was I present on July 31st?
12              Q.    Yeah.
13              A.    Yes, ma'am.
14              Q.    Okay.  And so the Gang Unit,
15    what was your role in the unit at that time?
16              A.    I was the sergeant, one of them.
17              Q.    How many were there?
18              A.    Just myself and Sergeant Davis,
19    James Davis.
20              Q.    So you two were the supervisors
21    of the Gang Unit at the time?
22              A.    And then we had a lieutenant and
23    a captain.
24              Q.    Above you?
25              A.    Yes, ma'am.
```

1  Q.    But you were the two sergeant

2  supervisors of the unit, then?

3  A.    Yes, ma'am.

4  Q.    And did you have to clear this

5  providing of uniform support with the

6  lieutenant or the captain?

7  A.    No.

8  Q.    And -- so Scalf asked for CPD

9  Gang Unit to send some of its folks for this

10  July 31st event?

11  A.    They have no uniform support in

12  their section.  So they will normally reach

13  out to the Gang Unit to provide that support

14  based on the fact that the Gang Unit is a

15  City-wide operation, or they will reach out

16  to the district of the Violent Crimes Squad

17  and see if they want to provide uniformed

18  support for the operation based on what they

19  were the working on.

20  The Gang Unit -- because they

21  would have provided not only uniform but also

22  plainclothes support.

23  Q.    And so that request was for CPD

24  officer support?

25  A.    On July 31st, yes, that's

1    correct.

2          Q.    Okay.  And so what were you told

3    about what the support was needed for on

4    July 31st?

5          A.    That they were contacted by the

6    Northern Kentucky Strike Force in reference

7    to Mr. Meyer.  We were briefed on Mr. Meyer.

8    And I can't say for certainty when I learned

9    all the things about Meyer.

10          So I may have learned some on

11    the 31st.  I may have learned some leading up

12    to the 7th.  I just don't know in what short

13    order I learned all those things.

14          But we met on that morning.  I

15    believe it was down at the police academy

16    that morning, we met down at 800 Evans to

17    where CPD, my guys, meaning the Gang guys,

18    and the ATF guys kind of met and briefed

19    there, and we had some vehicle descriptions

20    of what Meyer may be driving.

21          And I don't recall if it was

22    maybe during while we were still briefing or

23    once we had broke up, that they had believed

24    they had spotted his car at the dead end of

25    Montrose, which is off the bottom side of

```
 1        Harrison Avenue and South Fairmont.

 2                    We responded to that area.  A

 3        traffic stop was conducted on the vehicle in

 4        question, and Meyer was not in that car.  I

 5        believe the intel gained from that stop is

 6        that he was in that car, and that he had just

 7        swapped out into a different car prior to

 8        being stopped by the police.

 9             Q.    I'm sorry.  Where did you say

10        that it was believed Meyer's car had been

11        spotted, what was the location?

12             A.    Montrose, M-O-N-T-R-O-S-E,

13        Avenue, bottom side of Harrison Avenue.  I

14        believe that was the street that they believe

15        they had saw his car on.

16             Q.    Okay.  And so you said it was

17        either during the briefing or just after?

18             A.    Yes.  I don't recall the exact

19        timeline, but it was sometime on that morning

20        that they saw that vehicle.

21             Q.    Who was involved with the

22        briefing?

23             A.    Oh, I mean, I couldn't tell you

24        everybody.  It was whatever Gang guys that I

25        bought in that morning, I couldn't tell you
```

1    who, the ATF agents.  There were some

2    Northern Kentucky Strike Force guys there, I

3    believe, as well.

4            Q.    And do you recall which of the

5    Gang Unit members you had there?

6            A.    I honestly don't.

7            Q.    But you were there?

8            A.    I was there, yes.

9            Q.    Do you remember anyone else

10   specific who was there?

11           A.    I mean, I'm sure Scalf was there

12   and Stratmann, the case agent, but I don't

13   recall exactly who all was there.

14           Q.    And then during the briefing,

15   you talked about vehicle descriptions of

16   vehicles Meyer might be driving, right?

17           A.    Yes, ma'am.

18           Q.    And what else was discussed in

19   that briefing?

20           A.    That's what I don't recall.  As

21   I stated, obviously, you know, his history

22   now, history on out, I've stated at others.

23   I don't recall, hey, we knew this on this

24   day, hey, this on this date, but I do know by

25   the 7th we knew everything.

```
 1                    So I just don't remember what
 2      was relayed on that day and what was relayed
 3      in the days coming up to the 7th.
 4            Q.    Okay.  In that briefing, do you
 5      know if you were told about an attempted
 6      pursuit of Meyer by a Boone County Kentucky
 7      Sheriff's deputy?
 8            A.    I don't recall if I knew at that
 9      point.  I think we may have.  But like I
10      said, everything I've learned, I know was
11      known by the 7th.  I just don't know, hey,
12      did I get this piece on the morning of the
13      31st, did I get this on the 1st, the 2nd, I
14      just don't recall the exact timeline of those
15      events.
16            Q.    Okay.  Do you remember what time
17      the briefing was on the 31st?
18            A.    I want to say it was earlier,
19      like maybe like a seven or an eight o'clock,
20      maybe even a nine.  I'm not sure, but I know
21      it was morning time.
22            Q.    And what was the plan for the
23      day?
24            A.    I believe they were up on one of
25      his phones at that point, and that's what
```

1    kind of what led us to that area.  And that

2    they were gonna try to stop him and place him

3    in custody on that day.

4              And then, as I stated, we

5    stopped the right car, just the wrong person

6    in the car.

7         **Q.    Were you involved in the stop of**

8    **that vehicle?**

9         A.    I don't think I made the initial

10   stop.  However, I believe once the stop was

11   made, as we would do with any stop, we

12   covered over on it, as did probably -- say I

13   had five uniforms, probably three or four of

14   us went.

15             I don't recall who all responded

16   over there.  But there were probably some of

17   the plainclothes cars that responded over as

18   well because there was a vehicle that they

19   had been looking for.  I just remember who

20   all showed up to it.

21        **Q.    Okay.  And do you know who ended**

22   **up being in that vehicle?**

23        A.    I did.  If I heard the name or

24   saw the name, I would know.  It was -- it was

25   friends or acquaintances of his or something.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    I don't 100 -- like, it wasn't my

2    investigation.

3                We were there for the support.

4    ATF, the Kentucky guys, they kind of took

5    over.  So I don't -- I know that -- I believe

6    there were two gentlemen in the car and that

7    they interviewed and talked to those guys.

8                And then I had departed based on

9    the fact that he had switched cars and was in

10   another car and we knew he was looking -- I

11   think the intel was kind of he was looking

12   for a different car to get.

13               So I remember specifically, I

14   road out to Harrison Avenue and Boudinot,

15   there's a used car lot there, just to --

16   maybe a shot in the dark, but he was trying

17   to exchange his car or something, so I didn't

18   stay on that.

19               Did I stay on that stop five

20   minutes, 20 minutes?  I don't know, but I

21   don't recall it being that long.  Because I

22   remember saying, hey, you know, we'll keep

23   whoever is needed here.

24               The rest of us kind of fanned

25   out to just see if he pops up somewhere

1    that -- you know, because Mason, obviously,

2    didn't know we had stopped him earlier, and

3    we knew he was in different car, that we just

4    were still trying to see what we could do.

5         Q.    Okay.  So can you walk me

6    through prior to the stop occurring what the

7    plan was for the officers involved on this

8    particular day?

9         A.    The plan I believe was just if

10   we could get him stopped, apprehend him,

11   place him in custody based off of his

12   warrants that he had out of Kentucky.

13        Q.    And what were those warrants

14   for?

15        A.    I believe it was failure to

16   comply and like a wanton endangering.  And I

17   believe it was from that -- what you stated

18   earlier, the Boone County or the Campbell

19   County or whoever, that stop, I believe it

20   kind of stemmed from that.

21        Q.    The Boone County Sheriff's

22   deputy attempted --

23        A.    I think that's what it stemmed

24   from.

25        Q.    And those, I want to say, were

Deposition of Lieutenant Timothy Lanter                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1   for basically the way Meyer was driving,

2   right?

3                  MR. HERZIG:  Objection.  You can

4   answer.

5          A.   I can't say.  Because

6   statutorily, I don't know what their

7   requirements is as opposed to our

8   requirements kind of deal.  Was there

9   something more involved to it?  I don't know

10   that.  I just know what the warrants were

11   classified as.

12          Q.    You mean Kentucky law versus

13   Ohio law?

14          A.   Yes, ma'am.  Yes.

15          Q.    What's your general

16   understanding of what wanton endangering is,

17   not holding you to the elements of Kentucky

18   law, but generally, what's your

19   understanding?

20          A.   My -- some sort of maybe failure

21   to comply or fleeing from the police, or

22   something along those lines.  And maybe it

23   includes more, maybe it doesn't, I just don't

24   know.

25          Q.    And then failure to comply just

1    is --

2          A.    Yeah --

3          Q.    -- what it says?

4          A.    -- what it says.  They initiated

5    a stop.  They tried to stop you.  You failed

6    to stop kind of deal.

7          Q.    Okay.  Was there any kind of

8    written plan for this particular day,

9    July 31st?

10         A.    I don't -- I don't recall if

11   there was.  There may have been.  And, again,

12   none of that would have been done by me or my

13   guys.

14               That would have all come from

15   ATF, what they would have drawn up on their

16   ops, or they may not have even, if it was the

17   Strike Force asking for help, so I honestly

18   don't recall if there was or not for that

19   morning.

20         Q.    For the request for CPD uniform

21   support from the Gang Unit, is there any kind

22   of written documentation memorializing the

23   request or the response of sending officers?

24         A.    No, it's -- I mean, it's a

25   daily.  I could walk out of this building

1    today and call District 1 VCS and say, hey, I

2    need three more plainclothes guys, we're

3    doing a drug buy force on Burnet, can you

4    come up?  And they would come up.  So we

5    don't document that.

6         **Q.    And then after the fact, is**

7    **there any documentation of that kind of**

8    **thing?**

9         A.    That I requested them?

10        **Q.    Or that --**

11        A.    That they were involved?

12        **Q.    -- they provided the officers?**

13        A.    No.  We don't have any

14   documentation.  The only thing maybe of note,

15   like supervisors do daily rounds, so if I

16   would have put, hey, we worked with ATF and

17   District 1 VCS today, or we worked on this

18   operation and this person and this unit

19   assisted, but there's nothing -- there's no

20   requirement.

21             So what one supervisor does on

22   their rounds could be completely opposite of

23   what another supervisor does on their rounds.

24   But there is no paper trail or required that

25   I say, hey, I asked for this unit's

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    assistance.
 2            Q.    And in this particular instance,
 3    you don't recall writing any kind of report
 4    or documentation about sending --
 5            A.    No.
 6            Q.    -- officers or what happened --
 7            A.    No.
 8            Q.    -- do you?
 9            A.    No, because I would have been
10    there with them, and I wouldn't have done --
11    like I said, it wasn't our case, so I
12    wouldn't have done anything with it.
13            Q.    Okay.  And do you recall about
14    what time it was that this vehicle that did
15    not contain Meyer was stopped?
16            A.    I want to -- like I said, if we
17    started at seven, it was probably shortly
18    after.  I don't recall what -- it was in the
19    morning hours.  I'll tell you that.
20            Q.    Okay.
21            A.    Seven, eight, nine, ten o'clock.
22    I just don't recall what time we started the
23    day.  Gang Unit usually starts at 9:30 and,
24    you know, we have a two-hour flex that we can
25    come in at 8:30 with no problems.
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                      If we need to come in earlier,
 2        we can.  We probably did a two-hour flex.  I
 3        don't know.
 4              Q.    Okay.  And then you said after
 5        this stop with this other person or
 6        persons --
 7              A.    Uh-huh.
 8              Q.    -- and Meyer's potential vehicle
 9        occurred, then you and your guys fanned out
10        to try to see if you could find Meyer
11        elsewhere?
12              A.    I know I did.  And I would
13        imagine maybe one or two of the uniforms
14        stayed, one or two of them fanned out, some
15        of the plainclothes would have fanned out,
16        because we all wouldn't have been needed on
17        that stop.
18                      If there was only two people in
19        the car, the uniforms would have stayed.  The
20        Northern Kentucky guys, Stratmann being the
21        case agent, a handful of those guys.  So if
22        there were 30 of us working, we probably left
23        five there.  I don't know.
24              Q.    And did anything come of those
25        later attempts to find Meyer on the 31st?
```

1    A.    We did not find him on that day.

2    Q.    And did you learn anything else

3    about Meyer during the course of that day?

4    A.    Again, I don't know the timeline

5    of when I learned what I learned.  I just

6    know I learned it all by the 7th.  I know

7    that they had interviewed the people in the

8    car and what all came from those interviews.

9    Maybe I learned that after the

10   fact, but I don't know if I learned it that

11   day, the 1st, the 2nd, the 3rd, what the

12   timeline of that was.

13   Q.    Okay.  Do you remember anything

14   else about that July 31st set of activities?

15   A.    No.  I mean, we probably worked

16   on it for a few hours, and then I guess when

17   we hit a roadblock and we -- they felt that

18   we were stalled for the day, we probably just

19   called it a day.  I don't really remember

20   what time we called it at.

21   Q.    What's the next thing that

22   occurred in relation to Meyer in your role as

23   an officer?

24   A.    Maybe -- me and Sergeant Scalf

25   had stayed in contact.  And I don't recall

```
 1    exactly, I want to say maybe that Wednesday

 2    or Thursday night, which would have been the

 3    5th or the 6th.

 4              He had called and kind of wanted

 5    our help again on Friday morning, which no

 6    problem, yes, we'll help again on Friday

 7    morning.  So I don't remember what day

 8    exactly he asked for that help, but it was in

 9    that week.

10         Q.    You said he called.  Was that on

11    his cell phone?

12         A.    I would imagine.  It could have

13    been my desk phone.  It could have been my

14    cell phone.  I don't remember which one it

15    was probably.

16         Q.    And for those requests, any

17    documentation by you or otherwise in your

18    unit relating to the request or

19    the commanding officers?

20         A.    My unit would have done no

21    documentation on any of this stuff.  Scalf,

22    the ATF agents, the case agents, Stratmann

23    from the CPD, they're the ones that would

24    have done all documentation paperwork-wise.

25    We were just provided for extra support for
```

1    them.

2          **Q.    When you were asked again to**

3    **provide Gang Unit personnel for this**

4    **particular investigation, what were you told,**

5    **if anything, about Meyer and/or the**

6    **operational plan?**

7          A.    At that point, like they had

8    known all the things that we had kind of

9    already talked about.  Mason was under

10   surveillance either by like the Kentucky guys

11   or other things to where they had known about

12   him purchasing these guns and selling the

13   guns.

14                There was a case he had that was

15   in Kentucky to where he pistol-whipped

16   someone and then a round fired off and he

17   shot -- they ended up being shot.

18                He told, I believe it was the

19   CI, that he thought he had killed him, and he

20   said that he would.  He knew he didn't, but

21   he would on the next time.  He had an

22   inoperable brain tumor, and that he was not

23   gonna go back to prison.

24                And that he would shootout with

25   the police if stopped or if they tried to

Deposition of Lieutenant Timothy Lanter                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    apprehend him.  And then there was someone

2    else to where I think the guy owed him money.

3              And then Meyer was watching his

4    mom and like called the guy maybe and said,

5    hey, pay me or else, or something along those

6    lines, I think, was kind of insinuated.

7              So just his pattern of conduct

8    and his violent history was all known to us

9    by that morning.  And their intention -- they

10   had phone pings on him.  The intention was to

11   set out to do the surveillance and to

12   apprehend him on that morning.

13        Q.    Were you aware of any specific

14   convictions of Meyer at the time of the

15   events on the --

16        A.    I am not aware.

17        Q.    As of the morning of the 7th,

18   you didn't know of any convictions from

19   Meyer?

20        A.    If I did, I don't recall.  They

21   may have told us, but, I mean, all the -- all

22   the elements or all the things that I knew, I

23   kind of just stated.

24        Q.    Okay.  And so then you didn't

25   know about any other warrants other than the

1    failure to comply and the wanton endangering

2    on the morning of the 7th either, right?

3            A.    I believe those were the only

4    two he had.  He could have had more, but I

5    knew those ones for sure.

6            Q.    Okay.  And then this

7    pistol-whipping incident, did you have

8    information at that time about when that had

9    occurred?

10           A.    Again, I don't have the

11   specifics.  I don't have the case and all

12   that.  Those are just all kind of, hey, this

13   is the picture that was painted of him.  Hey,

14   this is who we're dealing with kind of deal.

15   So I'm not positive when that occurred.

16           Q.    Okay.  So you weren't aware at

17   the time as to whether, for example, the

18   pistol-whipping happened yesterday or it

19   happened five months ago, right?

20           A.    That's correct, ma'am.

21           Q.    Okay.  And --

22           A.    I would say the same answer for

23   all the things that I just told you.

24           Q.    Okay.  You had no timeline for

25   any of those events?

```
 1            A.    I did not.  I just -- that was
 2       the info relayed to me.
 3            Q.    In terms of what you heard about
 4       the inoperable brain tumor situation, what
 5       kind of details were you given about that, if
 6       any?
 7            A.    That, what you just said.
 8            Q.    Okay.  So you didn't know, if it
 9       had been diagnosed, for example?
10            A.    No.  Basically, hey, this is
11       what he's got.  This is what he's saying.
12       He's not going back.  This is kind of what
13       he's been telling people or based on the
14       information -- that's the information they
15       had had.
16            Q.    Okay.  And the CI, did you know
17       who that was?
18            MR. HERZIG:  I should remind you
19       not to identify the person, but you can
20       answer that question.
21            A.    Yeah.  I don't have a name.  And
22       I don't know if it was one of the guys we
23       stopped in the car that day or not.  Again,
24       not our case.  We didn't get involved.  Some
25       of the info may have come from those guys.
```

Deposition of Lieutenant Timothy Lanter                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    It may not.  I honestly don't know.

2            Q.    Okay.  And so you didn't have an

3    indication in terms of what you were told

4    about the reliability of any information from

5    that CI, right?

6            A.    Say that one more time.  I'm

7    sorry.

8            Q.    In terms of what you were told,

9    you didn't know whether the CI was a reliable

10   source of information or not, right?

11           A.    If Officer Stratmann was working

12   with him, I fully, 100 percent believe that

13   he believed he was a reliable source.

14   Officer Stratmann may be the best detective

15   in this City.

16                He's very thorough and he

17   handles cases and does his stuff.  So with

18   that as being his case, he had that

19   information, and I would trust the

20   information that he gave me.

21                As to the exact reliability of

22   that source, I don't know that.  But based

23   off of his case, I would believe that that

24   was reliable and credible information at that

25   time given to me.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    Okay.  You said you had
 2   information about a phone ping at that point,
 3   too?
 4          A.    I believe that they were up on
 5   his phones that day, but I can't swear to it.
 6          Q.    The day you had this further
 7   conversation when you agreed to send your
 8   guys, is that what you're talking about, or
 9   are you talking about the 7th now?  Sorry.  I
10   just want to be clear.
11          A.    Yeah, that's what I was just
12   about to say.  The 7th is when I'm saying
13   they were -- they were up -- because I think
14   I stated earlier, he had one or two phones,
15   and I think that they had got the second
16   phone.
17                And I knew that they were back
18   and forth on it.  And I know the morning of
19   the 7th, those pings were down.  Now, what
20   causes that, I don't know.  But the carrier,
21   whoever it was through, they were not getting
22   them on that morning, and that's why we
23   started our surveillance on De Votie because
24   that was an address to where -- where they
25   got that, I don't know.
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                  That was then and we started
 2      there.  And when the pings came up, that's
 3      when we moved to the Steiner address.
 4           Q.    Okay.  Got it.  So other than
 5      what you've just described to me in the
 6      course of our conversation here, was there
 7      any other information that you knew about
 8      Meyer at the start of the operation on the
 9      morning of the 7th of August?
10           A.    I may have something different
11      in my notes, but nothing -- I don't think.  I
12      think I got pretty much everything --
13           Q.    Okay.
14           A.    -- based off of that.
15           Q.    Okay.  And who gave you all of
16      that information?
17           A.    I can't say.  I mean, some of it
18      may have come from Scalf.  Some of it may
19      have come from Stratmann.  Some of it may
20      have come from Eddie Schaub, who's an ATF
21      agent.  Some of it may have come from
22      Frank Occhipinti.
23                  I don't know who all gave it to
24      me.  Maybe some of them were at briefing,
25      some weren't.  I may have seen the briefing
```

1    plan.  I -- I just don't remember where it

2    all came from.

3         Q.    Okay.  So as you sit here right

4    now, you're not --

5         A.    A hodge -- a hodgepodge of those

6    different things, whether it was phone calls

7    with me and Scalf, whether it was phone calls

8    with me and Stratmann, whether it was when we

9    met in the parking lot and we discussed these

10   things, I just can't pinpoint exactly for

11   you.

12        Q.    Okay.  Well, in any case, you

13   brought some of your CPD Gang Unit guys to

14   assist in this operation, then, right?

15        A.    On the 7th?

16        Q.    Yeah.

17        A.    Yes, ma'am.

18        Q.    Okay.  And so did you

19   participate in any formal briefing prior to

20   the 7th?

21        A.    Not to my recollection.  The

22   31st we met in the academy parking lot, I

23   believe.  But any other briefings, I don't

24   recall.  I may have stopped at the ATF office

25   and we just talked about things, but I don't

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    know that there was anything formal set up.

2         Q.    Okay.  And as you sit here right

3    now, do you know whether you stopped at the

4    ATF office?

5         A.    I don't.  I mean, I've stopped

6    there times before on other cases and

7    different things, so I don't -- I wasn't

8    present at ATF for briefing.  Like, on the

9    morning of the 7th, I called Scalf that

10   morning before me and my guys headed out.

11        Q.    Okay.

12        A.    So I wasn't at that briefing.

13   But I don't recall any official briefings

14   prior that we attended.  Because, I mean, I

15   wouldn't take me and ten of my guys and all

16   trample into the Federal Building, and that

17   kind of deal.

18              That's why we met in the parking

19   lot at the academy because it was central and

20   it was just easier.  Everybody, hey, pull

21   off, get out, let's brief, and be done --

22        Q.    Okay.

23        A.    -- kind of deal.

24        Q.    So then on the 7th, there was a

25   briefing, but you did not attend; is that

1    right?

2         A.    If they had a briefing, I did

3    not attend a briefing on the morning of the

4    7th.

5         Q.    Did you have any kind of

6    briefing with your guys?

7         A.    I mean, I wouldn't -- if I did,

8    I probably wouldn't call it a briefing, you

9    know.  We probably all get there at six,

10   seven, whatever time we started and we said,

11   hey, mission is this.

12              This is -- you know, we're going

13   to this address.  We're going to this

14   address.  These guys are in plainclothes.

15   These guys are in uniforms.  Nothing -- like,

16   I wouldn't call it a briefing.

17              We just set out on what the task

18   for the day was probably, or, you know, those

19   guys, we may have even talked about it the

20   night before, and, hey, everybody get here in

21   the morning and we're rolling out.  I don't

22   recall one way or the other.

23        Q.    Okay.  For any of your guys,

24   meaning CPD guys --

25        A.    Uh-huh.

1  **Q.    -- who you brought into this**

2  **operation, did you tell them everything you**

3  **knew about Meyer and the investigation?**

4         A.    I'm sure I did.  I mean, I'm

5  sure I would have relayed whatever

6  information I had.  They would have gotten

7  that information on the 31st.  And as we

8  were -- and those guys -- I'll say this,

9  those guys are probably in more contact than

10  me.

11         Because, you know, Stratmann or

12  Schaub, they may have called and said, can

13  you help, can you help, can you help.  I

14  mean, like -- so they're -- it's a fluid

15  relationship.  So they work multiple cases,

16  different cases.

17         So they probably knew -- they

18  might have known more than me, honestly.  I

19  just don't know.  I'm sure I relayed

20  everything that I had to them, but they could

21  have had more intel.  They could have been in

22  on those CI interviews.  I just don't know.

23         **Q.    All right.  And then what about**

24  **Harper and Thomas, did you brief them?**

25         A.    Harper and Thomas, so Harper was

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    with us all day.  And I don't know when he
 2    was brief -- I don't recall if I talked to
 3    him.  I don't recall if Scalf or one of the
 4    other sergeants or -- you know, he had left
 5    later that day to go with Bode and Weigand
 6    to -- I think they went to somewhere in
 7    Westwood referencing a different case when we
 8    were down on the pings and we just weren't
 9    sure.  So they may have briefed them.  I
10    don't remember.
11              And then after the pings came
12    up, I don't know, and I don't recall did I
13    look at my computer in my car and see what
14    dogs were logged on, and then did I send him
15    a message and say, hey, can you meet me here?
16              Did I call him over the air and
17    say, can you meet me here?  I don't recall
18    how that -- that they got involved, but there
19    was some sort of communication.
20              And I believe I met with both of
21    them down on River Road and kind of was
22    like -- I feel like there was -- I feel like
23    Officer Reindl from Canine may have been
24    because Harper was still helping the other
25    guys, but I don't recall for certain -- I'm
```

Deposition of Lieutenant Timothy Lanter                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1    sorry, for certain if she was or not.

2              I think those were the three

3    working that day.  And I can't remember who

4    exactly I meet with.  But I remember pulling

5    over on the side of Speedway and meeting with

6    somebody.

7              And the plan kind of was that

8    they would be sitting there for -- and they

9    could have gone inbound or outbound on a

10   takeaway, and then I was -- I don't know,

11   what's Speedway, a quarter mile, two-tenths

12   of a mile from Steiner.

13             So I was on the other side of

14   Steiner in that Delhi parking lot, the Meder

15   T-shirt parking lot, so that I could have

16   been available for an inbound or an outbound

17   takeaway as well.

18        **Q.    Okay.  And so you did you say**

19   **you met with Thomas and Harper and maybe**

20   **Reindl on River Road at the Speedway?**

21        A.    I don't know if it was Thomas

22   and Reindl maybe, or if it was just Thomas

23   because I don't remember when Harper got

24   back.

25             Because like I said, I know when

Deposition of Lieutenant Timothy Lanter                           Jason Laible, et al., vs. Timothy Lanter, et al.,

1    we left De Votie in the Clifton area, him,

2    Body, and Weigand, I believe it was, they

3    went to somewhere else.  I think it was to

4    finish up something they had done the day

5    before.  So I know Harper was kind of out of

6    it for a little bit.

7              Q.    Okay.

8              A.    So I can't swear to who I met

9    with, but I kind of do remember pulling into

10   Speedway and talking to whoever.  Obviously,

11   Brett because he was one of the first ones

12   there.

13                  And I just don't remember if it

14   was Reindl or if it was Harper.  It could

15   have been both of them, but I don't think

16   Harper was back at that point.

17             Q.    Okay.  Well, whoever was

18   there --

19             A.    Yes.

20             Q.    -- you told them everything you

21   knew, right?

22             A.    Everything I knew, yes.

23   Exactly, yes.

24             Q.    Okay.  And did -- what

25   conversation did you have with them about

Deposition of Lieutenant Timothy Lanter                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    **their role in what you all were doing that**

2    **day?**

3            A.    So they know, just not an

4    unwritten but a common practice of Gang is,

5    you know, based on the person we're going

6    after or what the situation is, and it's not

7    just a Gang thing, it's different VCSs that

8    they'll allow a third car in a pursuit and

9    that car is the Canine car.

10           So normal course of action,

11   there would have been two Gang guys would

12   have been primary, secondary, and then we

13   have allowed that Canine to go as a third

14   car.

15           Based on the need, hey, they

16   run, they come in and shootout, they come in

17   tactic, whatever it would be to have that

18   tool right there accessible close to us.

19           So they knew that they would be

20   involved in that capacity in some point -- or

21   in some way, just didn't know how it would

22   play out until, obviously, it happens.

23           **Q.    Okay.  Anything else you**

24   **remember talking to them about at that**

25   **Speedway?**

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        A.    No.  I mean, that would have

2    just been, like I said, did I exactly say all

3    that stuff?  I don't know, but those were the

4    normal course of act and kind of things.

5             Because the Canine guys worked

6    with us a lot, worked with the VCSs, a lot of

7    them was just kind of -- you know, we would

8    know.  And, you know, sometimes they would

9    come on and say, hey -- Brett's 8102, hey,

10   I'm close, do you need another car in the

11   pursuit?

12            Whatever it would be based on

13   the thing to what we were working on.  But we

14   had had them kind of slated before anything

15   had happened.  And they were close on River

16   in case something happened on Steiner, that

17   they could move in real quick.

18        Q.    Okay.  That was in the

19   afternoon, that Speedway meeting, right?

20        A.    Yeah.  So we spent all day in

21   De Votie, and I want to say somewhere between

22   like two and three, maybe a little later, the

23   ping came up and that's what shifted us to

24   Steiner.  So it would have probably been

25   three, four o'clock that I met with him.

1    Q.    Okay.  So earlier in the day,

2    describe to me how the events unfolded for

3    you up until the point of that meeting?

4         A.    I mean, it was a pretty quiet,

5    normal day.  You know, we got to the office

6    whatever time we got there.  I don't recall

7    what time we started.  And I was in

8    plainclothes to start the day.

9              And I was normally in uniform,

10   but I don't know if we were short

11   plainclothes cars, or I don't know why that

12   day specifically.  I mean, I would rotate

13   between uniform or plainclothes.  It didn't

14   really matter.

15             And then we had all kind of

16   converged on -- I remember I talked to Scalf

17   on my way into work that morning and just

18   kind of confirmed, hey, we're still on pace,

19   hey, we're going to this De Votie address,

20   wherever.

21             They might have already had guys

22   set up on it.  I don't recall.  And then I

23   met at the office with my guys.  We got in

24   our cars, we kind of all headed out.

25             And then at some point, I

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    believe I met up with Scalf over towards the

2    location, like around Central Parkway, just

3    to kind of touch base on, hey, this is kind

4    of what the game plan is.  We think he might

5    be here.

6              We're not certain because the

7    pings were still down.  So my kind of role

8    was if one of my guys was set up on the house

9    or set up a block away or set up on another

10   street, they need to go to the bathroom,

11   food, they need to go to court or whatever,

12   we would kind of just ask Scalf, I think, us

13   as the boss, we would rotate in and help

14   those guys with those kinds of tasks.

15             And then we worked seven to

16   three that day.  And then it got to be -- and

17   it was a Friday and it was, obviously,

18   summer, so nobody wants to work late.

19             So we got, like I said, I want

20   to say the pings came up somewhere between

21   two and three.  Maybe it was a little after

22   three.  And Scalf was like, hey, who can

23   stay, or I asked who could stay.  And my

24   uniform guys, they had all left, and none of

25   them could stay, whatever the case was.

```
 1                    So I had contacted Scalf and
 2        said, hey, I'll run back to the office, I can
 3        switch.  I got my uniform and stuff there.
 4        So I can be at least one car, then we can
 5        make the initial stop.
 6                    And then that's probably when I
 7        requested the dogs, maybe, to help us, maybe
 8        Harper was still with Bode and Weigand and he
 9        was coming back.  I don't recall.
10                    And then I would have gone to
11        our office on Warsaw, switched uniforms,
12        grabbed a different car, and then I would
13        have probably set up on Steiner for
14        a little bit or in my spot and then went and
15        met him, or maybe I met him on the way down.
16                    I don't recall the exact
17        timeline of that, but it was within that
18        probably three to four o'clock range that I
19        met with those guys.
20             Q.    Okay.  So you had gone back, put
21        on your CPD uniform, got you CPD cruiser?
22             A.    Uh-huh.
23             Q.    That's a yes?
24             A.    Yes, ma'am.  I'm sorry.
25             Q.    No, that's okay.  And then you
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    went to the Steiner Avenue area after that?

2         A.    Yeah.  I set up in that Meder

3    T-shirt parking lot right at the corner of

4    Delhi, or -- no, I think it's Delhi and

5    River.  It might be Sedam, but I'm pretty

6    sure it's Delhi.

7         Q.    Okay.

8         A.    There's two little side streets

9    there.

10        (Exhibit 34 was referenced.)

11   BY MS. GREENE:

12        Q.    I'm going to give you what was

13   previously marked as Plaintiffs' Exhibit 34.

14   And give me one minute while I look for a new

15   color pen.

16        A.    Oh, you're good.

17        Q.    We don't have --

18             MS. ALLOUCH:  What color do you

19   need.

20        Q.    -- any -- we don't have any

21   green on there yet, do we?

22        A.    It's all blue.

23        Q.    I think it was blue and purple.

24   Okay.  I'm gonna give you this green pen.

25        A.    Copy green.

Deposition of Lieutenant Timothy Lanter                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    And do you see the lot where you

2    were talking about the -- what are you

3    calling it, the Delhi --

4          A.    Meder T-shirts.

5          Q.    Yeah.  Is that lot visible on

6    this map, on the first page of Exhibit 34?

7          A.    Lot, no; street, cross street,

8    yes.

9          Q.    Okay.  Can you --

10         A.    I mean, it's gonna be hard --

11   it's right under his initials.  So he put his

12   initials -- so that's when I said it's Sedam,

13   I couldn't -- because that's Fairbanks

14   because that's the baseball park, that runs

15   up off of -- so, yeah, it would have been

16   like right where this letter is.

17         Q.    The letter E?

18         A.    The letter E.  That -- that's

19   the closest I could give you.  So as soon as

20   you come out River, turn right onto Delhi,

21   the parking lot right there on the right.

22         Q.    Okay.

23         A.    And I -- and I remember that

24   because the old man that owned the store had

25   come out, so we had spoke.

1    Q.    Okay.  Can you put a green

2    circle at the location of that lot --

3         A.    Yes, ma'am.

4         Q.    -- on that first page of Exhibit

5    34, please?

6         A.    Yes, ma'am.  Would you like me

7    to initial it?

8         Q.    Sure.  Thank you.

9         A.    (Witness complies.)  Initials

10   are there for you.

11        Q.    Great.  Thank you.

12        A.    Yes, ma'am.

13        Q.    Perfect.  All right.  Okay.  So

14   that's where you were initially?

15        A.    That -- once I swapped to

16   uniform, that is where I went.  Now, did I

17   meet those guys at Speedway first and then go

18   there, or was I there and then went and met

19   the guys, I don't recall that sequence of

20   events, but that's where I was staged.

21        Q.    Okay.  And then did you -- were

22   you staged anywhere else other than that

23   location where you put the green circle or

24   the Speedway for that meeting?

25        A.    No, ma'am.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    And where were you -- well,
2   strike that.

3            So tell me then what else you
4   remember about these events after you got
5   your cruiser, your uniform, and before the
6   attempted stop commences?

7      A.    So I remember we operate -- and
8   this had been discussed on the TAC channel --
9   so we operate on TAC 3.  So there were
10  officers in plainclothes that were set up on
11  Steiner, and they gave positive confirmation
12  that they had laid eyes on Meyer.

13            They stated that they had also
14  seen, made a positive identification on his
15  girlfriend, Kirsten Johnson, and that they
16  were there.  There was chatter back and forth
17  about the gun box that they had saw, the
18  rifle box that they brought out of the house,
19  or they brought it out of the car.

20            I don't recall exactly where it
21  came from, but they brought it across the
22  street and they kind of opened it and it was
23  like a show-and-tell kind of deal.  They had
24  multiple people looking at it.

25            While they were doing that,

Deposition of Lieutenant Timothy Lanter
Jason Laible, et al., vs. Timothy Lanter, et al.,

1  there was another subject, and I couldn't

2  tell you if he was even identified to this

3  day, that they saw with a pistol in his

4  pocket, and it had a 30-round magazine

5  sticking out the bottom, which made it very

6  identifiable for the officers to see that a

7  gun was there.

8          And as I stated, I don't know

9  who that gentleman was, or if they identified

10 him.  So there was conversation about seeing

11 him, seeing the gun box, seeing Mason, seeing

12 Kirsten, and I believe there may have been

13 probably a couple other people there.

14         I don't think that they were

15 targets to us or people that we were

16 concerned about or that we had knowledge of

17 to be concerned about.  We were focused on

18 Mason and her.

19         And then at some point, a male,

20 white individual, I believe, is the one who

21 put the gun box in the rear of the car.  It

22 could have been Mason, but I believe it was

23 the back-seat passenger who did.

24         And then someone got in the back

25 seat of that car.  And then the officers that

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      had eyes kind of lost sight of Mason and
 2      Kirsten, and then the car left Steiner
 3      Avenue.
 4                  So at that point, the car was
 5      leaving.  And we couldn't say for 100 percent
 6      certainty if he was in that car, just because
 7      they had lost the eye based on how the car
 8      was maybe pulled in the driveway or how the
 9      house was, I don't know what made them lose
10      that eye.
11                  And then that's when the
12      decision was made, hey, let the car get away,
13      get it off of Steiner, let it get down a
14      little bit, and then we'll do what they
15      call -- and I don't know why -- they call it
16      a soft stop, which is just kind of like, oh,
17      hey, you ran that red light, hey, your
18      license plate light's out.
19                  Like, find a traffic violation
20      on them that you can say, hey, this is why
21      we're pulling you over.  And then that gets
22      you up to talk to that person to see, okay,
23      yeah, hey, Meyer is in the car, hey, he's not
24      in car.
25                  And if he wasn't in the car,
```

1    then would have done kind of the same thing

2    we did on the 31st, kind of talked -- because

3    we didn't -- because, you know, you don't

4    want to stop them on that street and then

5    he'd be looking down that street and be like,

6    oh, heck, they just tried to stop me or

7    something because you don't know what they're

8    thinking.

9            So that was why we kind of did

10   the soft stop.  I mean, what was that, two

11   miles, three miles away, I don't know.  But

12   it was well far enough away that nobody from

13   that location would have ever thought that he

14   traveled that path, or unless he called and

15   said, hey, I'm being stopped.  Hopefully he

16   had knowledge that that would have happened.

17       **Q.    Okay.  Now, at the point in time**

18   **that you hear over the radio that the vehicle**

19   **is leaving the house --**

20       A.    Uh-huh.

21       **Q.    -- where were you?**

22       A.    Still in my spot, in the green

23   circle.

24       **Q.    Okay.**

25       A.    Yeah.  I never -- I never left

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    this spot until Officer Bode picked up the

2    vehicle, meaning he laid eyes on it or

3    spotted the black Ford Fusion, I believe it

4    was.  It could have been a Focus, but I'm

5    pretty certain it was a Fusion.

6                    He would have come across TAC 3

7    and just said, hey, I got the car, inbound

8    River, passing the Speedway inbound River

9    here, wherever he picked it up at.

10                    Once he picked that up --

11   because I didn't want to pull out and then,

12   you know, he's here and I'm here and we're

13   just a half a block away and both see each

14   other kind of deal, so I didn't want to tip

15   my hand, I guess.

16                    So we let the plainclothes first

17   get eyes and then follow away, and then we

18   would have the uniforms move in to make a

19   stop.

20        Q.    Who all were those plainclothes

21   getting eyes at that point, if you know?

22        A.    I don't.  The two that were on

23   Steiner I believe were Chris Vogelpohl, who

24   was a CPD assigned to ATF Task Force, and

25   then Kevin Broering assigned to me in the

1      Gang Unit.

2                  Now, there could have been other

3      ATF agents there that I just don't recall,

4      but I believe that there were a couple of ATF

5      agents set up at the end of Steiner in a

6      parking lot.

7                  Because that was their initial

8      plan, was to stop him on Steiner, had they

9      confirmed he was in the vehicle and to get

10     him stopped there before he got to

11     River Road.

12                 So I couldn't say who all those

13     guys were.  I just know that Bode was my guy,

14     and he's the one that laid eyes on the car

15     when it got onto River Road.

16          Q.    Okay.  And now, at this point in

17     time, you hadn't been made aware of Meyer

18     having committed any crime of violence in the

19     immediate, like, 24 hours before, right?

20          A.    Again, he could have.  I just

21     don't know what that timeline of those

22     offenses are I spoke about was.  But --

23          Q.    As you sit -- yeah, sorry.  Go

24     ahead.

25          A.    Yeah.  But like I said, that

1    information was relayed to us, this is who

2    we're dealing with.  It could have all

3    happened on the 5th.  It could have all

4    happened on the 6th, I just -- and maybe at

5    that time I knew.  But sitting here today, I

6    don't recall.

7          Q.    Okay.  And so other than the

8    pistol-whip thing, is that what you're

9    referencing, that event?

10         A.    The pistol-whipped was the one

11   thing, and then when the guy got shot in the

12   face.  And then there was another one, I

13   believe it happened in a hotel in Florence to

14   where he maybe broke the guy's arm or leg or

15   something.

16               And then the other one where he

17   had spotted the guy's mom and had eyes on the

18   guy's mom and made him pay his debts off.  So

19   there were a couple different ones, and I

20   just don't know the course or the timelines

21   of those events.  They could have all

22   happened the same day, consecutive days, I

23   just don't know.

24         Q.    And you don't -- you don't know

25   how recent in time those were to this date,

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    August 7th, 2020?

2         A.    As I sit here today, no.  Did I

3    know that day?  It's possible.  But that's

4    four and a half years ago, I just don't

5    recall exactly.

6         Q.    And in terms of the shot in the

7    face thing, you weren't aware of any charges

8    that had been brought against Meyer for that,

9    right?

10        A.    I was not aware if there were

11   charges or -- again, I don't know how that

12   was reported, but that was the information

13   relayed to our guys, whether the CI or

14   Kentucky Strike Force guys gave it, I

15   honestly don't know.

16        Q.    And at the time the -- you said

17   something about an injury to an arm or a leg,

18   right?

19        A.    There was -- like I said, if I

20   could reference my notes, I believe there was

21   some sort of incident at a Kentucky hotel,

22   maybe in Florence, to where maybe a guy had a

23   broken arm or he beat somebody up, or

24   something along those lines happened, I just

25   don't recall fully right now.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Okay.  And at the time, you

2    didn't know how close in time that was or

3    wasn't to the August 7th date, right?

4        A.    On August 7th, I didn't know if

5    any other charges were pending on any of

6    these or what the proximity of the time of

7    the offenses occurring was --

8    Q.    Okay.

9        A.    -- as I sit here today.  I could

10   have known it then, but it's not jumping with

11   me right now.

12   Q.    Okay.  And at that time --

13       A.    At what time?

14   Q.    August 7th, 2020.

15       A.    Okay.  I'm sorry.

16   Q.    You weren't told about any plan

17   that Meyer had for some specific significant

18   or violent crime that he would absolutely be

19   committing in the next 24 hours or so, had

20   you?

21           MR. HERZIG:  Objection.  You can

22   answer.

23       A.    No.  Nobody would tell us that.

24   I mean...

25   Q.    Well, you hadn't heard any

 1    **reports about that either, right?**

 2            A.    But we -- we wouldn't -- I

 3    don't -- I get what you're saying, but nobody

 4    is gonna broadcast that, hey, I'm gonna go

 5    kill this person tomorrow, like, it kind of

 6    happens.

 7            **Q.    Okay.**

 8            A.    Does that make sense.

 9            **Q.    Sure.**

10            A.    Like, if you and your buddy --

11    you're not gonna go tell your buddy you're

12    gonna kill somebody tomorrow.  Like, I think

13    those are kind of events that we learn after

14    the fact after they occur.

15                Because, obviously, if we knew

16    beforehand, the game change -- the plans

17    would change and we would try to intervene as

18    cops in any situation.  So, yeah, I get

19    what you -- you get what I'm saying?

20            **Q.    Yeah.**

21            A.    Okay.

22            **Q.    All right.  So you're at this**

23    **parking lot --**

24            A.    Yes, ma'am.

25            **Q.    -- by Delhi --**

```
 1              A.    Yes.

 2              Q.    -- right?

 3              A.    Yes, ma'am.

 4              Q.    And you hear vehicles leaving

 5       the residence.  What happens next?

 6              A.    I hang tight, don't do nothing,

 7       whether -- I don't know if my car was started

 8       or not, but I was ready to move and I was

 9       waiting for that eye on a plainclothes car to

10       confirm, hey, inbound, hey, outbound.

11                    Because, you know, we want to

12       give him a second.  What if he had just

13       pulled into Speedway, got gas, and ran in and

14       got a pop?  It would have been an easy hit

15       for us right there, you know, because then we

16       would have had him contained in a store or

17       something like that.

18                    So maybe that would have changed

19       the course.  But we wanted to wait until we

20       kind of knew which -- what was gonna happen

21       before we pulled out and initiated that stop.

22              Q.    And then what do you remember

23       next after that?

24              A.    What we discussed earlier, when

25       I turned off of State Avenue and that's when
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the pursuit began -- or not when the pursuit

2    began, turned off of State avenue, got up to

3    Elberon and Mt. Hope, and then initiated the

4    stop, which then initiated the pursuit.

5         Q.    Okay.  I forgot to ask this

6    earlier.  Did you -- did you at any time

7    before pulling out to do the soft stop --

8         A.    Uh-huh.

9         Q.    -- were you ever shown or did

10   you see the ATF operational plan?

11        A.    Again, I may have got one that

12   morning when we met.  I just don't recall the

13   exact events of when I may have laid hands on

14   that.  So I could have, but I don't know.

15        Q.    Okay.  You talked about the

16   TAC 3 radio, that's the encrypted radio

17   channel, right?

18        A.    I believe it is.  That's what

19   all the VCSs use their TAC channel.  Gang has

20   their own TAC channel.  So, yeah, we all

21   have -- so we're not on primary.

22             So everybody -- I mean, anybody

23   in the CPD could listen on a TAC channel, but

24   I think it's blocked from public on like a

25   scanner.

```
 1              Q.    Okay.

 2              A.    So, yeah, we always operate on

 3     the TAC of the district that we're in for

 4     that operation.

 5              Q.    And then at some point, there's

 6     a switch to a different radio channel, right?

 7              A.    So I would have been TAC 3 --

 8     well TAC 5 to start the day because we're in

 9     District 5 on De Votie.  TAC 3, when I went

10     in uniform.

11              And then when I would have

12     initiated that stop, I would have switched to

13     1A to broadcast that on the main band so the

14     dispatch would get that.  And any cars in the

15     area would have got that information as well.

16              Q.    Okay.  All right.  So then tell

17     me what happens next.  You are doing the soft

18     -- attempting the soft stop, and then what?

19              A.    Everything I told you earlier.

20              Q.    Okay.

21              A.    I mean, do you want to walk

22     through it again?  It's up to you.  I mean,

23     we started there earlier and I gave you

24     everything I could.  Go through it again

25     or --
```

```
 1              Q.    Well, let me just ask you

 2      this --

 3              A.    Yeah.

 4              Q.    -- is there anything about the

 5      pursuit from the point that it began to the

 6      time of the crash that you believe is

 7      important that we address right now that you

 8      haven't talked about already?

 9              A.    I mean, I believe we did

10      everything within our power to maintain the

11      control, have things done appropriately.  I

12      think we made the right decisions.  I don't

13      think there was anything in his driving or --

14      behaviors that would have dictated we make --

15      we call that stop off.

16                    He, like I stated earlier, he

17      was using signals.  Yeah, he cut in and out

18      of traffic, but that's normal of any pursuit.

19      There was no actions that -- until that

20      crash, and obviously, you don't know that,

21      but nothing along that route that made myself

22      or Officer Thomas, once he caught up, think

23      that -- that the pursuit was too high risk or

24      that -- and, you know, again, we get back to

25      it was a stop and go, stop and go, based on
```

```
 1     all these turns and all those things.

 2                    So there was nothing to where it

 3     got out of control that his actions, the way

 4     he was driving would have forced us, or not

 5     forced, but made us think to stop that.

 6          Q.     During the pursuit, you were on

 7     the radio at times, right?

 8          A.     Yes, ma'am.

 9          Q.     Did you at any time give any

10     orders to terminate the pursuit over the

11     course of the time that it was ongoing?

12          A.     I did not.

13          Q.     And did you raise the

14     possibility of terminating the pursuit at any

15     time that it was ongoing?

16          A.     There was nothing that I saw,

17     observed that would have raised it at that

18     point for me.

19          Q.     During the course of the

20     pursuit, other than asking about going into

21     Kentucky, did you ask Scalf anything else?

22          A.     I don't think so.  But as I

23     stated in an Internal interview, me and Scalf

24     worked together, as we have for years, and

25     it's kind of we play off of each other.
```

Deposition of Lieutenant Timothy Lanter    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          If I say something that kind of

2     gives him the indication that, hey, it's kind

3     of where we're at.  And as I sit here today,

4     I still believe it, and I know it's not true,

5     I believe and I gave in my interview that I

6     authorized those cars -- to have multiple

7     cars, and then he came on and said he would

8     be the OIC.

9          Well, after I went back and

10    reviewed everything, he said that and then I

11    said that.  So at that point, I believe that

12    that's what I was doing, that I was doing

13    what I needed to do.

14          As I stated in that interview,

15    when I went to sergeant school,

16    Lieutenant Hoffbauer gave the class on

17    supervisors and pursuits and kinds of things,

18    and, yes, you can be the OIC, yes, you can be

19    involved.

20          Obviously, we -- that's not a

21    normal course, but it could happen.  So then,

22    you know, like I said, I believed that, and

23    that's the statement I gave in my interview.

24          And then after the fact, I was

25    like, whoa, it came in reverse order.  And

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 273 of 358 - Page
ID#: 1624
Deposition of Lieutenant Timothy Lanter                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    then the authorizing going the wrong way on

2    the one-way, we both acknowledged, hey --

3    and, you know, I think Sergeant Fink said

4    this, they're looking at a computer screen.

5              I'm looking at what I can see.

6    And we believed that that was done safely.

7    And Sergeant Scalf indicated, hey,

8    Sergeant Lanter's relaying this information

9    to me.  Based on our working history, and how

10   we know and how we play off of each other, I

11   tried to authorize that.

12              Those keys were ignored.  And

13   those were in the statements that we gave

14   that would have gave justification for those

15   actions at that point.

16        **Q.    So for the joining of additional**

17   **vehicles, we're talking about authorizing**

18   **that a moment ago, right?**

19        A.    Yeah.  When I said at the

20   beginning I would take the two Canines with

21   me, yes, ma'am.

22        **Q.    And were you saying that at that**

23   **time, you were acting under the impression**

24   **that there wasn't another officer in charge**

25   **of the pursuit?**

1    A.    That is what my belief was at

2    that time --

3        Q.    Okay.

4        A.    -- correct.  And then as I

5    stated, you know, yes, there's an identified

6    OIC.  However, I'm still a supervisor at that

7    point, and I don't -- I don't take this badge

8    off and say, hey, give me a PO badge.  I'm

9    faulting (sic) back to what I'm at.  Those

10   were responsibilities and decisions that I

11   make.

12          And like I said, the fact that

13   me and Sergeant Scalf have worked together

14   and we do these operations or, you know, just

15   that we kind of know each other, that if I

16   would have came on and said, hey -- or as I

17   said, I came on and said, hey, we can do this

18   that I saw -- that's what I believed and I

19   saw that it was safe.

20          And we cleared that -- we went

21   that one-way on a wrong way because we

22   cleared it and we knew that it was safe.  So

23   me coming on and saying that gives him that,

24   and he made that in his statement, and I made

25   that in my statement, that those were the

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    justifications for why those things occurred.

2          Q.    Okay.  Did you write any reports

3    of any kind about this pursuit after it

4    occurred?

5          A.    No.  I didn't -- I'm not

6    required to do any reports on this at all.  I

7    took notes of my involvement.  That is not

8    required by CPD.

9          Q.    When did you take your notes?

10          A.    Maybe the day after, two days

11    after within -- I will say my notes were

12    probably completed before my Internal

13    interview, which was mid to end of August.

14          Q.    Okay.

15          A.    Just to ensure that I had a

16    clear mind, knew things that I knew then,

17    reasons I did things, or just kind of for my

18    own benefit because I knew, hey, I'd be

19    interviewed, this thing would come.

20               I didn't know when the interview

21    would be, those kind of things.  As we call a

22    critical incident to where I wasn't

23    interviewed initially right away.  I didn't

24    know when the interview would be held.  So it

25    was kind of, hey, make sure that I take these

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1   notes and know what I knew then, so I have it

2   referenced.

3                MS. GREENE:  Okay.  Let's take a

4   quick break off the record.

5                THE WITNESS:  Okay.

6       (Off the record.)

7   BY MS. GREENE:

8        Q.    Okay.  We are recording again.

9              Lieutenant Lanter, during the

10  course of the pursuit, you were never aware

11  of any shots fired by Mason Meyer, right?

12       A.    No.

13       Q.    And not aware of -- you were not

14  aware of any shots fired by anybody in the

15  fleeing vehicle, correct?

16       A.    No.

17       Q.    And, of course, there were no

18  shots fired by Meyer or anyone else in the

19  vehicle during the course of their arrest

20  after the crash, correct?

21       A.    No, ma'am.

22       Q.    In relation to the Boone County

23  Sheriff's deputy pursuit that we talked about

24  earlier --

25       A.    Yes, ma'am.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    -- you were aware that that

2    pursuit had been terminated, right?

3        A.    Yes, ma'am.

4        Q.    On the 7th of August, you were

5    aware of that, correct?

6        A.    Yeah.  Well, I know they didn't

7    apprehend him, I don't -- meaning that it was

8    terminated at some point.  I don't know if I

9    knew then that they terminated it, or what

10   that cause of that termination was, but I

11   knew they did not arrest him on that day.

12       Q.    Okay.  And you hadn't been told

13   anything about any shots being fired in the

14   course of that pursuit, had you?

15       A.    I had not.

16       Q.    Okay.  All right.  So earlier I

17   asked you about reports --

18       A.    Yes, ma'am.

19       (Exhibit 2 was referenced.)

20   BY MS. GREENE:

21       Q.    -- and neglected to ask you

22   about this.  I'm handing you what's

23   previously marked as Plaintiffs' Exhibit 2.

24   Take a quick look at this.  And my question

25   is, are you familiar with this?

1    A.    This is Gang rounds from

2   August 7th, 2020.

3    Q.    And so this is an e-mail from

4   you to Paul Neudigate, Danita Pettis,

5   David Schofield, and James Davis, right?

6    A.    Yeah, that's what it says,

7   ma'am.

8    Q.    And you sent it on August 7th,

9   2020, right?

10   A.    Yes, ma'am.

11   Q.    Is this your -- the individuals

12   above you in the chain of command, the

13   recipients of this e-mail?

14   A.    Yes.  Now, James Davis is a

15   fellow sergeant with me in Gang.  Schofield

16   would have been our lieutenant.  Pettis would

17   have been our captain, and Paul Neudigate

18   would have been our patrol bureau commander

19   to which Gang falls under.

20   Q.    Okay.  Was it normal for you to

21   send an e-mail to them with your Gang Unit

22   supervisor rounds?

23   A.    Yeah.  So back then when I was

24   in bikes, we would send Neudigate -- I think

25   we sent them to Neudigate and our captain at

1    the time.  We initially started under

2    Neudigate, but Gang rounds would go to those

3    people every day, yes.

4         **Q.    Okay.  And so attached to your**

5    **e-mail then is your Gang Unit Supervisor**

6    **Rounds from August 7th, 2020, correct?**

7         A.    Maybe mine, maybe

8    Sergeant Davis, maybe a combination of

9    everybody's.  Normally we just work out of

10   one document, and who entered it depends on

11   the day.

12            Normally that was a

13   Sergeant Davis function.  And then maybe

14   since I was the last one in the office, I

15   sent it.  I don't know.

16        **Q.    Okay.**

17        A.    So, yeah, one of us could have

18   done it.  Now, some rounds, like in the

19   district, it will say -- a paragraph, then it

20   will say Lieutenant Lanter, and then the next

21   one will say -- a paragraph and then say

22   Sergeant John Doe, the next will say

23   Sergeant John Smith.

24            So everybody would do their own

25   individuals.  In Gang, we kind of did a

1    collective.  So if I was part of an arrest

2    with Sergeant Davis, we would just kind of

3    throw it in there at some point in the day.

4         Q.    So, functionally, it's a report

5    from you and Davis, right?

6         A.    Yeah, probably.  But nine times

7    out of ten, he would do it.

8         Q.    Okay.  And before you sent it

9    out, would you have read this, even if you

10   hadn't written it?

11        A.    On this day, I might have just

12   sent it.  It might have just -- I don't know.

13   Until you showed me this, I don't remember

14   sending it.

15        Q.    Okay.

16        A.    I mean, I remember going back to

17   the office, changing my clothes, and going

18   home.  I truly don't remember sending it out.

19        Q.    Okay.  And attached to the

20   supervisor rounds is a photograph of a weapon

21   and a magazine and some ammunition, correct?

22        A.    Yes, ma'am.

23        Q.    And that was from a different

24   suspect not associated with this pursuit,

25   correct?

1        A.    Let me read this real quick.

2        Q.    Sure.

3        A.    Yes, that was -- as I stated

4    earlier, Bode and Weigand, they pulled away.

5    And then this is what must have been going

6    on.  And that's the weapon that they found

7    based off that stop at Ferncroft and

8    Westwood.

9        Q.    Okay.  So than other than this

10    Exhibit 2, the collective report of you and

11    Davis, did you write any other reports

12    associated with the events of August 7th,

13    2020?

14        A.    No, ma'am.

15        Q.    Okay.  We can set that aside for

16    now.

17        A.    Yes, ma'am.

18        Q.    So earlier you referenced your

19    notes --

20        A.    Yes, ma'am.

21        Q.    -- right?  You said you wrote

22    those shortly after the pursuit, within a few

23    days?

24        A.    Probably.

25        Q.    All right.  We're gonna mark

1     this is as 55, I believe.

2              MR. HERZIG:  Yeah.

3         A.    Yes, ma'am.

4              MS. ALLOUCH:  Did you say 55?

5              MS. GREENE:  Yeah.

6         (Exhibit 55 was marked.)

7    BY MS. GREENE:

8         Q.    All right.  I'm showing you

9    what's been marked as Exhibit 55.  Are these

10   the notes you were referencing earlier?

11        A.    Yes, ma'am.

12        Q.    And so what was the purpose of

13   creating these notes when you made them?

14        A.    Knowing that I would have an

15   interview coming, unknown when that interview

16   would be, just to -- as you know, dealing

17   with had happened, if I had to go back and do

18   this today, there's no way.

19              So just as kind of a refresher

20   to myself so that when I went to that

21   interview -- and I remember I stated with the

22   Newport officers, hey, I made notes just so I

23   can make sure that I can relay everything,

24   remember everything that happened to make

25   sure I don't miss anything with you guys.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          And that was kind of it's my own
 2   personal.  This isn't a CPD document.
 3   Nothing that CPD makes me do it or tells me
 4   to do it.  It's just kind of for my own peace
 5   of mind and reference, I guess.
 6          Q.    Did you use any information from
 7   any source other than your own memory to
 8   create this document?
 9          A.    I don't recall if I would have
10   watched the body cam or my in-car cam or --
11   just to make sure I had everything right.  I
12   don't -- I don't think I did.
13               I don't think I saw those until
14   I went to Internal because those would have
15   been pulled and locked down at the scene --
16   well, a car would have been left at the
17   scene, and then they would have taken the
18   hard drive from there and the body cam.  I
19   don't recall if they took mine at the scene
20   or not.
21               But normally, unlike a
22   high-profile or like a police intervention
23   shooting, like CIS would lock those videos
24   down and so you wouldn't be able to watch
25   them.
```

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1   Q.   Okay.  So as you sit here, you

2   don't think there were other sources that you

3   at this moment can --

4        A.   Well, I may have -- I may have

5   looked at like Google Maps for like Kentucky

6   to make sure I had the right street name or

7   something just because, like I said, the

8   Cincinnati streets, yes, I know.

9             The Kentucky, I knew the path,

10  but I didn't know the exact street name,

11  per se, maybe.

12       Q.   And did you give a copy of this

13  to anybody?

14       A.   Uh-uh.

15       Q.   That's a no?

16       A.   No, ma'am.  I'm sorry.  I'm

17  sorry.

18       Q.   Prior to your Internal

19  interview, you didn't give a copy of this to

20  anybody?

21       A.   No, ma'am.  I haven't given a

22  copy of any, that I recall, except to my

23  attorneys.

24            MR. HERZIG:  You mean for the

25  purposes of discovery in this case, right?

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    THE WITNESS:  Yes.
 2        BY MS. GREENE:
 3              Q.    And when did you provide it in
 4        this case?
 5              A.    Last week, maybe.
 6              Q.    Okay.
 7              A.    I was unaware that I was
 8        discoverable.
 9              Q.    Okay.  Did you have any
10        handwritten notes before this typewritten
11        version?
12              A.    Probably, but they don't exist
13        any more.  I would have -- if I would have, I
14        would have scratched them down, typed it up,
15        and then got rid of those.
16              Q.    Okay.  And did you do this at
17        work or at home?
18              A.    I don't recall where I would
19        have done it.
20              Q.    Okay.  So other than your
21        counsel here, when you gave it to them, had
22        anybody seen this document before that other
23        than you?
24              A.    Not that I recall.  I didn't
25        even give it to the Internal investigators or
```

```
 1        the Newport investigators.  I just had them

 2        there during my interview.

 3                    MS. GREENE:  Okay.  Let's mark

 4        this as 56.  I'm sorry.

 5                    THE WITNESS:  My fault.  Thank

 6        you, ma'am.

 7            (Exhibit 56 was marked.)

 8        BY MS. GREENE:

 9            Q.    You have in front of you

10        Exhibit 56.

11            A.    Yes, ma'am.

12            Q.    Is this a document that you

13        created?

14            A.    It is.

15            Q.    And what are we looking at here?

16            A.    This is just some notes that I

17        created after my interview and

18        Sergeant Scalf's interview with Internal,

19        comments from that interview, statements made

20        during that interview.

21            Q.    So did you review the recorded

22        interviews of you and Scalf?

23            A.    Correct.

24            Q.    Did you review the recorded

25        interviews of anybody else?
```

 1          A.    No.

 2          Q.    And these are notes you took

 3    while listening to those interviews or --

 4          A.    After the fact when I had the

 5    interviews.

 6          Q.    So you received a copy and then

 7    made these notes?

 8          A.    Yes, ma'am.

 9          Q.    And about when was that?

10          A.    I couldn't even tell you.  I

11    would have imagined probably around the same

12    time after the interviews, but I honestly

13    don't know.

14          Q.    And what was the purpose of this

15    document when you created it?

16          A.    Just to, I guess, see the points

17    that he made, see the points that I made.

18    Like I stated earlier, we both, you know,

19    made the comments of, hey, we would have

20    allowed this or, hey, I said this, so we

21    would have known that made this person

22    acknowledge this kind of deal just to make

23    sure -- to see where we were at, to see just

24    what his statements were and I guess what my

25    statements were.

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 288 of 358 - Page
ID#: 1639
Deposition of Lieutenant Timothy Lanter
Jason Laible, et al., vs. Timothy Lanter, et al.,

 1     Q.    So you were comparing basically

 2   his statements with yours for whether they

 3   were consistent or inconsistent?

 4               MR. HERZIG:   Objection.  You can

 5   answer.

 6     A.    More along the lines for the

 7   consistency that was placed within the

 8   Internal report.  Because as I stated

 9   earlier, myself and Sergeant Scalf believed

10   that we provided the justifications for the

11   actions that we took, and those actions were

12   not noted in the report, per se.

13     Q.    Do some of your notes on these

14   pages reflect disagreement with things that

15   Scalf said?

16     A.    Say that -- disagreement --

17     Q.    Do some of your notes reflect

18   your disagreement with statements Scalf made

19   in his interview?

20     A.    I don't think I disagree with

21   anything he said.  Do -- are you pointing to

22   something specific?

23     Q.    Well, is there anything that

24   you've written here that indicates your

25   disagreement with Scalf's account of these

1    events in his interview?

2         A.    I don't think so.

3         Q.    Okay.  Did you discuss the

4    content of your interview with Scalf?

5         A.    I don't recall discussing any of

6    this with him at any point.

7         Q.    Did you talk with any of the

8    other officers involved in the pursuit prior

9    to giving your Internal interview?

10        A.    Not that I recall.

11        Q.    Did you talk with Scalf prior to

12   giving your Internal interview?

13        A.    Not that I recall, no.

14        Q.    And --

15        A.    Because I was out of town when

16   they scheduled me for it.  And then I came

17   back in town and had to give my interview,

18   like, the next day.  So I don't recall that

19   at all.

20        Q.    For this document, Exhibit 56,

21   did you give this to anybody at any time

22   prior to counsel?

23        A.    Not that I recall.  Again, I

24   had -- oh, I wouldn't have had this that day,

25   but, no, I do not recall giving this to

```
 1    anybody.
 2          Q.    Did you ever show it to anyone
 3    other than counsel?
 4          A.    Not that I recall.  Like I said,
 5    these were my own notes.  I don't know that I
 6    would have.
 7          Q.    And this review of the
 8    interviews, did you do this at home?
 9          A.    Probably at work, but I don't
10    recall one way or the other.
11          MS. GREENE:  Okay.  We're gonna
12    mark this next -- next exhibit as fifty --
13          A.    Seven.
14          Q.    -- 57.
15      (Exhibit 57 was marked.)
16          THE WITNESS:  Thank you, ma'am.
17    BY MS. GREENE:
18          Q.    So you have in front of you
19    Exhibit 57.  Take a moment to flip through
20    it.  And my question is, do you recognize
21    this document?
22          A.    Yes.
23          Q.    And what is this?
24          A.    It's a copy of the procedure,
25    the pursuit procedure of Cincinnati Police.
```

1    And it is notes that I added to ensure that I

2    address certain spots in my interview to make

3    sure that I conveyed everything I wanted to

4    convey while being interviewed by Newport and

5    by Internal.

6         **Q.    And when did you do this review**

7    **and notes writing?**

8         A.    It had to be before the Internal

9    interview.  I don't -- so two weeks after --

10   sometime in that time frame, two weeks after

11   the pursuit I think I was interviewed at

12   Internal.

13        **Q.    Okay.**

14        A.    I don't recall the exact day.

15        **Q.    So you did this before that**

16   **interview, though?**

17        A.    Yes, ma'am.  I took this with me

18   to that interview.

19        **Q.    And did you then give it to**

20   **anybody at the interview?**

21        A.    No, they didn't ask for it.

22        **Q.    They saw it in your possession,**

23   **though?**

24        A.    Yes.  When I walked in, I stated

25   that I brought the notes, that I wanted to

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 292 of 358 - Page
ID#: 1643
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    make sure that I conveyed everything that I

2    wanted to convey.  I don't think anybody

3    asked for it.

4            Q.    And did you show the contents of

5    this document to anybody at any time prior to

6    giving it to counsel?

7            A.    Not that I recall.

8            Q.    And did you create this document

9    at home?

10           A.    I probably would have created it

11   at work as well.

12           Q.    And what was the purpose of this

13   document?

14           A.    Just to make sure that I

15   conveyed the things that I wanted to convey,

16   and make sure that I didn't forget certain

17   things and kind of just put bullet points to

18   where I think they belonged in the pursuit

19   and add to that part of the policy.

20           Q.    Okay.  There are some highlights

21   in the original version of this.  And I

22   apologize, we printed this in black and

23   white.

24           A.    No, you're good.

25           Q.    But let me ask you, the red

```
 1   highlights, what does the red highlighting
 2   indicate?
 3         A.   I don't know if I had a meaning
 4   for the red and the yellow.  The red and the
 5   yellow, I believe, are all procedure manual
 6   things, and the blue was my notes that I
 7   added.
 8              I don't know if there was a
 9   differentiation that I thought at the time
10   between red and the yellow, but the blue is
11   my thoughts and what I know --
12         Q.   And then --
13         A.   -- if I recall correctly.
14         Q.   Okay.  And then if you would
15   turn to the page stamped at the bottom, 3326?
16         A.   3326, yes, ma'am.
17         Q.   And this page has at the top
18   titled Questions, and then five questions,
19   right?
20         A.   Yes, ma'am.
21         Q.   And what is this?
22         A.   Something that I made.  As a
23   supervisor when I'm reviewing things, I try
24   to think on both sides of things, thought of
25   maybe things that would have come up,
```

1    questions that would have came up, maybe

2    items presented in the policy that may have

3    been questioned or asked or that Internal or

4    the Newport guys would have asked, mainly

5    Internal, that just kind of responses to

6    things that I wanted to state, I guess.

7         **Q.    Okay.  You have a section here**

8    **about your record in pursuit and the pursuits**

9    **you've managed as Question 4.  Do you see**

10   **that?**

11        A.    I do.

12        **Q.    So you have notes here about one**

13   **discourtesy and one tactical review, right?**

14        A.    That is correct.

15        **Q.    And what are those relating to?**

16        A.    Issues that occurred after the

17   pursuit had ended and were in no way related

18   to the actual pursuit itself.

19        **Q.    Okay.  Meaning not the driving**

20   **of the pursuit or the continuation of the**

21   **pursuit?**

22        A.    That's correct, ma'am.

23        **Q.    All right.  And then on the last**

24   **page is this just --**

25        A.    Those --

1    **Q.    Yeah.  What is this?**

2    A.    I'm sorry.

3    **Q.    Go ahead.**

4    A.    Those are the -- pulled from the

5    procedure for the different way -- or

6    different comments or lines in the procedure

7    for termination of pursuits.

8    **Q.    Okay.  And this reflects the**

9    **policies you understood at the time of this**

10   **pursuit, right?**

11   A.    That's correct, ma'am.

12   **Q.    And that's true of all of your**

13   **highlights and notes throughout this**

14   **document?**

15   A.    Yes, ma'am.

16   **Q.    Okay.  And I know I asked this**

17   **about the other two, but I don't remember if**

18   **I asked it on this one.**

19          **Did you show this document to**

20   **anyone other than providing it to counsel?**

21   A.    I do not recall showing any of

22   these to anyone besides counsel.  And as I

23   stated, they didn't -- had they asked at the

24   interviews, I would have shown it to Internal

25   or to the Newport detectives.  But to my

1    knowledge, they didn't ask for any -- or ask

2    to see it or anything.

3          Q.    Okay.  All right.  So other than

4    these notes that we've just looked

5    Exhibits 55, 56, and 57, did you create any

6    other notes relating to these events?

7          A.    Not anything outside of counsel.

8    I mean, I might have done some notes with

9    counsel when I met with my attorney following

10   the pursuit, but nothing -- nothing like this

11   for my own reference for interviews and stuff

12   like that.

13               If I would have done anything

14   else, it would have been with counsel.

15         Q.    Okay.  And when you say

16   "counsel," are you talking about counsel in

17   the room here?

18         A.    No.  Well, yes and no.

19         Q.    Which counsel?

20         A.    Stew Mathews was also my counsel

21   at the time of the pursuit, and then

22   Steve Lazarus was there at the beginning of

23   the pursuit as well.

24         Q.    That's union-provided counsel?

25         A.    Yes, ma'am.

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    Before -- well, let me go back.

2                You're aware of investigations

3    relating to this pursuit, right?

4          A.    Investigations by who?

5          Q.    Well, are you aware of any

6    investigations relating to this pursuit?

7          A.    I'm aware of an investigation

8    that was conducted by the Internal

9    Investigations Section, Critical Incident

10   Review Board after, Citizens Complaint

11   Authority.

12               I don't know if it was Newport

13   or Campbell County or Boone County, I think

14   it was Newport, but I don't know with it

15   being in the county from the crash scene, and

16   those investigations.  So, yes, I'm aware of

17   some.

18         Q.    And you've just named all the

19   investigations you're aware of?

20         A.    I think I did.

21         Q.    Okay.  With respect to the

22   Internal investigation conducted by the

23   Cincinnati Police Department, you were asked

24   to provide a statement, right?

25         A.    I was.

1    Q.    And we talked about you giving a

2    statement before which you wrote your various

3    notes that we've talked about, right?

4         A.    Yes, ma'am.

5         Q.    You gave just one interview

6    statement for that investigation, correct?

7         A.    I do believe so.  I don't think

8    I ever had a recall interview.  I think it

9    was just that day.

10        Q.    And did you provide any written

11   material to Internal investigators in

12   relation to this case?

13        A.    Not to my knowledge, no.

14        Q.    And are you aware of the outcome

15   of the IIS investigation in this matter?

16        A.    I am.

17        Q.    And with respect to yourself,

18   what was the outcome?

19        A.    The report stated that I

20   authorized multiple cars, that I authorized

21   going the wrong way on a one-way, that I

22   exceeded the 20 miles an hour, and that I

23   failed to give the speed.  I believe those

24   were the four findings in the report.

25        Q.    And the policy cited as the

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    basis for those findings, do you recall what

2    those were?

3         A.    I'm sorry.  Say that again.

4         Q.    The policy cited for the basis

5    of those findings, do you recall what they

6    were?

7         A.    I guess I'm not -- I just stated

8    what they were.  Are you asking me something

9    different than what I just stated?

10        Q.    Yeah, yeah.

11        A.    I'm sorry.

12        Q.    So the -- you were found to have

13   committed specific violations of the pursuit

14   policy, right?

15        A.    Which I just stated, yes.

16        Q.    And --

17        A.    Okay.

18        Q.    -- that we looked at already

19   today --

20        A.    Yes.

21        Q.    -- as Plaintiffs' Exhibit 1,

22   right?

23        A.    Wait, no.  I don't think

24   that's -- the policy, yes.

25        Q.    Right.

1        A.    Those are the things that I just

2    stated.  Okay.

3        Q.    Okay.  And, ultimately, do you

4    know, were there other department policies

5    that were found to have been violated by you

6    in relation to this pursuit besides the

7    pursuit policy?

8        A.    No.

9        Q.    Do you recall a reference to the

10   Manual of Rules and Regulations, Rule 1.01,

11   Section B, as a violation that you committed

12   as found by the City?

13       A.    Yes.  So that -- I guess I

14   misunderstood your -- so here's -- the policy

15   are the violations.  Those are notated by the

16   rule and reg violation, which that policy

17   followed.  So, yes, I am aware of that.  I

18   apologize for the confusion on the question.

19       Q.    No, that's okay.

20       A.    But, no, I get what you're

21   saying.  Yes, 101(B) and a 103, I believe it

22   was.

23           (Exhibit 12 was referenced.)

24   BY MS. GREENE:

25       Q.    Okay.  I'm handing you what's

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 301 of 358 - Page
ID#: 1652
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1  marked previously as Plaintiffs'

2  **Exhibit 12** --

3       A.    Yes, ma'am.

4       Q.    -- this is the Manual of Rules

5  and Regulations --

6       A.    It is.

7       Q.    -- we were just talking about,

8  right?

9       A.    Yes, it is.  Yes.

10      Q.    And it contains the other rules

11 cited as violated by you by the City in

12 relation to this pursuit, correct?

13      A.    So, yeah, so that -- the

14 procedure is the actual rule violation to

15 what you've committed.  The rules and regs is

16 like the umbrella under which that rule was

17 violated, if that makes sense.

18           So I was confused on how you

19 asked the question.  But I get what you're

20 saying, yes.  There was a 101(B) and a 103 in

21 that Internal report.

22      Q.    And it's the pursuit policy and

23 the rules and -- Manual of Rules and

24 Regulations violations that were the basis

25 upon which the City ultimately decided to

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 302 of 358 - Page
ID#: 1653
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    discipline you, right?

2         A.    Yes.

3         Q.    And in relation to that

4    discipline, what was it?

5         A.    The discipline was a written

6    reprimand that was put in my file for three

7    years and then it's removed after that.

8         Q.    And what's your understanding of

9    that removal event; what is it?  How does it

10   work?

11        A.    What does it mean that they

12   remove it?

13        Q.    Yeah.

14        A.    So it always stays in your file,

15   but after -- it cannot be used as progressive

16   discipline after the three-year mark.  So if

17   I was found to violate a 101(B) today, they

18   can't go back and say, well, in 2020, you

19   violated, so this is your second occurrence.

20        Q.    And when you say "progressive

21   discipline," that means increasing discipline

22   over the course of time for violations within

23   the department, right?

24        A.    That's correct.

25        (Exhibit 17 was referenced.)

```
 1      BY MS. GREENE:
 2              Q.    Okay.  Returning to the
 3      discipline then, I'm gonna show you an
 4      exhibit that's not in the right location.
 5      Hang on one second.  Here we go.  I'm showing
 6      you Exhibit 17.
 7              A.    Yes, ma'am.
 8              Q.    I stacked those wrong last time.
 9      All right.
10              So Exhibit 17, this document is
11      your -- the discipline you were given in
12      association with this pursuit, right?
13              A.    That is correct.
14              Q.    It memorializes the violations
15      and the department's findings relating to
16      your conduct, right?
17              A.    That's correct.
18              Q.    Did you challenge this
19      discipline?
20              A.    I did.
21              Q.    And what happened with that?
22              A.    I was not successful.
23              Q.    What was the basis for your
24      challenge?
25              A.    The basis for my challenge was,
```

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1  as I stated, me and Sergeant Scalf gave

2  statements to Internal that would have

3  explained the circumstances to which those

4  said violations were given, and there was no

5  proof or factual evidence presented by

6  Internal that I exceeded the speed limit by

7  more than 20 miles an hour, as was presented

8  for Specialist Harper and Officer Thomas.

9          They did nothing to prove that

10  that occurred, and there was nothing in the

11  statement.  And in this reprimand it states,

12  While on the 6th -- if you want to look at

13  page 673, third paragraph, While on.

14          While on the 6th Street Viaduct,

15  Officer Brett Thomas, the secondary unit,

16  markedly exceeded the posted speed limit by

17  more than 20 miles an hour and only gained a

18  minimal distance on the pursuit, indicating

19  Sergeant Lanter also was driving more than

20  20 miles per hour in excess of the speed

21  limit.

22          I believe Sergeant Fink made the

23  statement that it was an assumption that was

24  given if -- my question back to them was if

25  Officer Thomas was going 100 and -- either

1    100 or 103, I'm not sure which one he did,

2    and he only gained minimally on me, then I

3    had to be going more.

4              If he gained and engages a

5    secondary unit, then there's no way that I

6    could have been going that speed.  He caught

7    up to the pursuit, indicated that he was a

8    secondary unit, indicated that he caught up,

9    and engaged in that pursuit.

10             So there's no way possible that

11   I could have been going 100-plus miles an

12   hour or in excess of that limit for them to

13   make that statement.  And Sergeant Fink used

14   the word of the assumption was made.  And I

15   don't want to quote him, but he made that

16   statement.

17        **Q.    Do you know what speed you were**

18   **driving at any point during this pursuit?**

19        A.    I made a guesstimation of what I

20   was driving.

21        **Q.    Do you know?**

22        A.    For a factual statement, I

23   cannot say.

24        **Q.    And your guesstimation, you**

25   **stated that in your interviews?**

1    A.    Fifty, 60 miles an hour based --

2    at the 6th Street Viaduct is where I

3    indicated that.

4    **Q.    Okay.  So your challenge to the**

5    **discipline the department gave to you was on**

6    **the basis of lack of evidence of your**

7    **specific speed on the 6th Street Viaduct; is**

8    **that fair?**

9    A.    I would say lack of evidence on

10    that, but also a lack of acknowledging the

11    justifications provided by myself and

12    Sergeant Scalf, if you will read -- per the

13    policy, the OIC is supposed to draft the

14    pursuit report.  That wasn't done in this

15    case.

16        And I've been a supervisor for

17    ten years.  So if I draft, I will go out to a

18    scene, whether it be a tasing, a pursuit, a

19    use of force, a dog bite, I will interview

20    the officers on scene.

21        I will then return and type the

22    statement of fact and give that to -- and

23    then review that, and I will sit down with

24    those officers and review that to make sure

25    that I didn't miss any facts or that I didn't

1    eliminate something that they said or that

2    I've missed something.

3            That right was not afforded to

4    myself and Sergeant Scalf or Officer Thomas

5    in this case to where the policy indicates

6    that the OIC should have drafted that form.

7            And Sergeant Fink, I believe,

8    also stated that that was uncommon practice

9    that it was given to him to do, which was not

10   of normal course.

11       Q.   What's your understanding as to

12   why that happened here, if you know?

13       A.   No one told me.  It was very

14   surprised, maybe.  I don't know if that's the

15   right word.  But we had -- I had no knowledge

16   that that was gonna be the way that it was

17   handled.

18           I would have assumed that

19   Sergeant Scalf and then Lieutenant Schofield,

20   then Captain Pettis, and then

21   Colonel Neudigate would have done it per the

22   normal course of action.

23           And then when that work product

24   was produced, that would have been handed

25   over to Sergeant Fink to put into his

```
 1      investigation.
 2              Q.    So you challenged your
 3      discipline here and were, ultimately,
 4      unsuccessful in your challenge, right?
 5              A.    That's correct.
 6              Q.    And so what was your discipline
 7      ultimately from the department for this
 8      pursuit?
 9              A.    Exactly what's in your hand,
10      ma'am.  That went into my file for a
11      three-year period.
12              Q.    Meaning the Notice of Official
13      Reprimand?
14              A.    Yes, ma'am.
15              Q.    Okay.  Do you have any basis to
16      challenge, or believe that it could be
17      challenged, further discipline of Thomas or
18      Harper?
19              A.    I'm not involved in those.  I
20      mean, I believe that they were cited for the
21      speeding, and if their body cams caught
22      them -- but, again, if they would have been
23      able to provide sufficient justification to
24      the pursuit OIC, the pursuit OIC may have
25      found that to be in compliance and wrote that
```

```
 1    in his narrative before it was submitted

 2    through the chain of command.

 3         (Exhibit 3 was referenced.)

 4    BY MS. GREENE:

 5         Q.    Okay.  I'm gonna show you

 6    Plaintiffs' Exhibit 3.

 7         A.    Yes, ma'am.

 8         Q.    So this is a copy of Internal

 9    investigation in this matter, right?

10         A.    Yes, ma'am.

11         Q.    And a final conclusion, an

12    approval of the discipline for this report

13    came from the chief of police, right?

14         A.    Ultimately, the chief signed off

15    on it.

16         Q.    And was it Chief Isaac also

17    who -- well, strike that.

18              In terms of your challenge to

19    the discipline, what was the mechanism or the

20    procedure that that followed?

21         A.    It's no longer in place.  What

22    we had at the time was called peer review

23    where you could -- a panel of your peers

24    would be picked.  You could present the

25    facts, and then they would make a decision as
```

1    to what they believed, and that was binding

2    at that point based on what our contract was

3    at that time.

4              Q.    Who was on your panel for the

5    peer review?

6              A.    I think -- I don't recall

7    100 percent, I think it was

8    Sergeant Beavers -- Sergeant Frank Beavers,

9    Sergeant Jason Scott, and

10   Sergeant Michelle Lehman, I think.

11             Q.    And, ultimately, those three

12   sergeants concluded that the discipline was

13   proper?

14             A.    That's what they said, yes.

15             Q.    Is there any subsequent review

16   above them in that peer review?

17             A.    No.  It's final and binding.  I

18   can't do anything further.

19                   MS. GREENE:  Okay.  All right.

20   I'm going to mark Exhibit 58.

21        (Exhibit 58 was marked.)

22   BY MS. GREENE:

23             Q.    All right.  You have in front of

24   you Exhibit 58.  Does this document look

25   familiar to you?

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 311 of 358 - Page
ID#: 1662
Deposition of Lieutenant Timothy Lanter
Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    It's an e-mail that I wrote to

2    Captain Snider, who was the Internal

3    Inspections Section Commander at that time.

4          Q.    **And you wrote that on March**

5    **29th, 2021, right?**

6          A.    Yes, ma'am.

7          Q.    **That was after the chief's final**

8    **review of the Internal Investigations Section**

9    **report and findings came out, right?**

10         A.    Yes.  It looks like March 1st

11   was when the chief signed off on it.

12         Q.    **And so you requested in this**

13   **e-mail a copy of all radio transmission and**

14   **body-worn camera for yourself and**

15   **Officer Thomas from your pursuit on**

16   **August 7th, 2020?**

17         A.    That's correct.

18         Q.    **What was the purpose of that**

19   **request?**

20         A.    I can't say for certain, but

21   based on the timeline, I would say that it

22   was to prepare for my peer review that I was

23   going to have potentially.

24         Q.    **And so you wanted to watch the**

25   **body-worn camera and listen to the radio**

1    before that?

2            A.    Probably.

3            Q.    Did you share -- well, did you

4    receive the radio and BWC?

5            A.    Yes.

6            Q.    And what did you do with it?

7            A.    Listened to it and took note --

8    or listened to it and made notes in the head

9    or thoughts that I wanted to convey in my

10   peer review.

11           Q.    Did you share that body-worn

12   camera or radio transmission with anybody

13   else?

14           A.    Not that I recall.  I remember

15   that I had reached out to -- I believe it was

16   Lieutenant Norris at the time.  He was the

17   Traffic Section Cap -- or Traffic Section

18   Commander.

19                 Because I brought him to be in

20   for my peer review to ask, hey, based on this

21   video of this footage, can you make any

22   reasonable response to the -- the speeds, or

23   was he consulted, as being the traffic

24   captain, by Internal about that?

25                 And I don't think that I showed

1  him that, but he -- I may have showed him the

2  video on that.  I don't recall.

3       Q.    And what was his name?

4       A.    He's now Captain Brian Norris.

5  He was a lieutenant up in the Traffic Unit at

6  that time.

7       Q.    And so you said you asked him to

8  come in for the peer review?

9       A.    You can bring witnesses in --

10      Q.    Okay.

11      A.    -- if you want for the panel.

12      Q.    Did he testify or provide

13  information to the panel?

14      A.    Yes, I believe he did.

15      Q.    And what did he say?

16      A.    He said that the Traffic Unit

17  was never consulted.  And based on the video

18  alone just watching it, you can't determine a

19  speed.

20      Q.    Did he ever write any kind of a

21  report --

22      A.    No.

23      Q.    -- or other documentation about

24  that?

25      A.    It's kind of just of like an

1    informal more than anything.

2         Q.    Did you call any other witnesses

3    during that peer review?

4         A.    I don't think so.  I think that

5    was the only one that I had.

6         Q.    Provide any other evidence in

7    the Internal interview?

8         A.    No, because Internal provides

9    everything you need, whether it'd be the

10    discipline, the Internal report, whatever,

11    they would provide all that stuff.  And

12    that's kind of why I just asked for the

13    audios and the videos to review that myself

14    before I went in.

15         Q.    Were you asked any questions by

16    the peer review panel?

17         A.    It's been so long, I honestly

18    can't recall if I was or was not.

19         Q.    Who else was in attendance at

20    that event?

21         A.    It would have been me, the

22    panelists, and an Internal representative.  I

23    believe it was Captain Snider that sat in on

24    that, but I don't recall if somebody else

25    did.

1    Normally, the lieutenant or the

2    captain will do it, but I think that

3    Captain Snider sat in on that one, and he

4    presented the Internal side.

5          Q.    Okay.  All right.  So when did

6    the peer review determination come out?

7          A.    That day.

8          Q.    What day was that?

9          A.    I couldn't even tell you,

10   honestly.  I have no clue.

11         Q.    Is there a report or something

12   that documents the finding?

13         A.    There is.  It's basically just a

14   sheet of paper like this says probably Peer

15   Review Panel, we have upheld, reversed,

16   overturned the decision, or they have a few

17   lines in there that they can write, we did

18   this because of this, we did this because of

19   this.

20         And then I believe all three

21   members that were on the panel their names

22   are listed and they signed their names next

23   to it, but that was it.

24         Q.    Okay.  You are also aware of the

25   Critical Incident Review Board review of this

1    matter, right?

2            A.    I am.

3            Q.    And you're aware of the outcome

4    of that as well?

5            A.    Yeah.  They concurred with

6    Internal and then we went back to the academy

7    for a refresher on the pursuit policy, I

8    believe, it was.

9            Q.    Did you challenge the CIRB

10   finding?

11           A.    You can't.

12           Q.    So you were then referred for

13   retraining -- refresher training as a result

14   of the CIRB findings?

15           A.    I believe that's what it was.

16   Yeah, we went back to the academy for a

17   four-hour or an eight-hour block, I think it

18   was.  I don't remember exactly what it was.

19           Q.    And what was taught in that

20   session?

21           A.    A review of the policy was

22   taught by I believe one of the law

23   enforcement instructors, one of the

24   civilians, but I don't recall exactly.  I

25   think it was Randy Rengering, but I could be

1    wrong on that.

2            Q.    And you're aware of the CCA

3    investigation of this matter as well?

4            A.    I saw it.

5            Q.    The Citizen Complaint Authority

6    that is?

7            A.    Uh-huh.  Yes, ma'am.

8            Q.    And you're aware of the outcome

9    of that report, or that investigation,

10   rather?

11           A.    Semi.  There -- I remember when

12   I read it like it's not -- their findings

13   kind of really aren't spelled out so much, I

14   don't think.

15                 I think like the final paragraph

16   said that there was a policy violation, but

17   then, you know, like the Internal report

18   specifically lists them and everything.

19                 So it was kind of -- but I know

20   that they found that we had a violation, but

21   there's nothing that comes of that report.

22           Q.    So there was no further action

23   taken by the department in response to the

24   CCA's findings in this case as far as you're

25   concerned, right?

1          A.    As far as I'm concerned, no.

2    Now, that report I think came out four years

3    after the fact, three years after the fact,

4    so I think it was all -- there was nothing

5    done.

6          Q.    **You were interviewed for that**

7    **investigation as well?**

8          A.    Yeah.  I don't recall when it

9    was, but I know it was a lengthy time after.

10         Q.    **Did you provide any other**

11   **interviews or statements of any kind in**

12   **association with this pursuit that we haven't**

13   **referenced today so far?**

14         A.    No.  I do not believe I did

15   interview with anybody else.

16               MS. GREENE:  Okay.  We're gonna

17   mark this as ==Exhibit 59==.

18        (==Exhibit 59== was marked.)

19   BY MS. GREENE:

20         Q.    **Lieutenant Lanter, have you seen**

21   **this document before?**

22         A.    This specific, no, but I know

23   what it is, yes.

24         Q.    **What is it?**

25         A.    This is the matrix which is

Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    found in ==Exhibit 12== for the Manual of Rules

 2    and Regulations.

 3         Q.    And does this reflect any

 4    discipline that you have received at any

 5    point in time from the department?

 6         A.    I can't answer that.  I mean, I

 7    see what's there and I see what's

 8    highlighted.  Is this specific to this case?

 9    I was given a 1.03(B), but I don't see

10    anything further.  You get what I'm saying?

11    It doesn't say that this -- this case

12    specifically.  I know what this chart says.

13         Q.    Okay.  Have you ever been

14    disciplined in association with any other

15    pursuits over the course of your career other

16    than the two events that you concluded in

17    your own notes relating to things you did

18    after the pursuit was over?

19         A.    For pursuit violations --

20         Q.    Yeah.

21         A.    -- is that what you're asking?

22         Q.    Yes.

23         A.    No.

24         Q.    Okay.

25         A.    Not that I recall.

```
 1                    MS. GREENE:  Okay.  We're gonna
 2       mark this as Exhibit 60.
 3            (Exhibit 60 was marked.)
 4                    THE WITNESS:  Before you ask,
 5       can I run to the restroom real quick?
 6                    MS. GREENE:  Yep.  Off the
 7       record.
 8            (Off the record.)
 9       BY MS. GREENE:
10            Q.    All right.  We're back on the
11       record, and you have been provided with
12       Exhibit 60.
13            A.    Yes, ma'am.
14            Q.    I'll represent to you that this
15       is a collection of documents produced to the
16       plaintiff by the defendants in this matter
17       relating to Vehicle Pursuit Reports
18       containing your name.
19            A.    Okay.
20            Q.    If you would take a moment to
21       flip through these, and then let me know if
22       there are other pursuits you've engaged in
23       that you can recall, as you sit here today,
24       that are not noted in these documents?
25            A.    Okay.  (Witness complies.)  It
```

1    looks pretty comprehensive.

2              **Q.    Okay.**

3         A.    I don't recall anything outside.

4              **Q.    Okay.  For these Vehicle Pursuit**

5    **Reports contained in this packet, who, in**

6    **terms of role, is the author of those?**

7         A.    The OIC.

8              **Q.    The OIC?**

9         A.    Yes, ma'am.

10             **Q.    Okay.  And then there's at least**

11   **one addendum to a pursuit report.**

12        A.    I saw that.

13             **Q.    I see that on City 2009?**

14        A.    2009.  Do you want me to

15   read this?  Yes, it's an addendum to it.

16             **Q.    And is that also written by the**

17   **OIC or somebody else?**

18        A.    Normal course of action would be

19   the OIC, but if there was something in review

20   that maybe the lieutenant saw when he was

21   doing his review, he may do an addendum to

22   it.

23             But if I was the supervisor, the

24   sergeant, and I was the pursuit OIC and I saw

25   something, I could get -- do that addendum to

1    that, or if there were two sergeants, myself

2    and Sergeant Davis, if we had something, we

3    may both work on that.

4              There's nothing that states the

5    addendum has to be done by one or the other

6    if there is something that's identified,

7    per se.

8         Q.    Okay.  Was there anything in

9    this packet, Exhibit 60, that you hadn't seen

10   before you sat down here today?

11        A.    I mean, I've seen all these

12   throughout the course of my career.  Like I

13   said, normally I probably would have seen

14   them that day, the next day, two days

15   following.

16             Most supervisors will let you

17   read it just to make sure that they didn't

18   miss something when they interviewed you in

19   the field or when you came back to the

20   district, or a lot of these are pre-body-worn

21   cameras.

22             So if there was something that

23   came up on the body camera or something, you

24   just make sure that all the facts were

25   presented in the document as presented when

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 323 of 358 - Page
ID#: 1674
Deposition of Lieutenant Timothy Lanter                      Jason Laible, et al., vs. Timothy Lanter, et al.,

1    done.

2         Q.    Okay.  And so you would have

3    done that for of these pursuit reports when

4    they were created?

5         A.    Would have talked to?

6         Q.    Reviewed them in that way you

7    just described.

8         A.    Yeah.  I mean, I probably would

9    have seen them that night, or these go into

10   what's called your ETS file is where they

11   create these.  Now, it's Axon.  So as your

12   boss creates it, I can go in and look at it

13   after that fact --

14        Q.    Okay.

15        A.    -- so you can see, or the boss

16   may say, hey, the narrative's in there, go

17   look and let me know.  Sometimes they just

18   type it on a Word document and give it to you

19   and look at it.  It just depends on who the

20   boss is and what the situation is, I would

21   say.

22        Q.    All right.  And in relation to

23   any of these reports in this packet,

24   Exhibit 60, do you recall any times that you

25   thought something was missing or wrong that

1    it wasn't updated based on your indications

2    about that?

3              A.    I don't believe.  I mean, if I

4    would have had an issue, I probably would

5    have spoke to a supervisor at that time.  And

6    if he would have had a different opinion or I

7    would have, we probably would have discussed

8    it right then and there.

9              I don't know if there was

10   something changed, something not changed, but

11   I think pretty much we would have discussed

12   it then and there.

13             Q.    And as you sit here, you don't

14   have any recollection of prior pursuits where

15   you thought something important was wrong or

16   missed in a report other than the August

17   2021, right?

18             A.    Not that I recall, no.

19             MS. GREENE:  Okay.  I'm gonna go

20   ahead and mark Exhibit 61.

21             THE WITNESS:  Thank you, ma'am.

22        (Exhibit 61 was marked.)

23   BY MS. GREENE:

24             Q.    You have Exhibit 61 in front of

25   you.  Are you familiar with the documents

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    contained here?

2            A.    Very.

3            Q.    And what are these?

4            A.    Performance evaluation reviews.

5            Q.    And these specific performance

6    evaluation reviews do reference some crashes

7    while you were on duty, right?

8            A.    Two of them I have crashes

9    indicated in the check box.  The last one was

10   not.

11           Q.    Okay.  And then the last one,

12   meaning the review that is on City 2120

13   through 2021, right?

14           A.    Yes, ma'am.

15           Q.    That review reflects your

16   eligibility for the Safe Driving Award,

17   right?

18           A.    Yes and no.

19           Q.    What do you mean?

20           A.    Yeah.  So some forms are

21   different, so that's why I had to look.  So

22   like my guys, if I do an evaluation on one of

23   my investigators, like they're not eligible

24   for that because it's for the patrol guys who

25   are patrolling and driving every day.

```
 1              So I wasn't sure until I looked
 2     at it.  So, yes, it does say that I'm
 3     eligible for that, correct.
 4          Q.    Okay.  And the date of that
 5     particular review it covered April 2nd, 2020,
 6     through April 2nd, 2021, right?
 7          A.    Yes, that's what it says, ma'am.
 8          Q.    And that Safe Driving Award
 9     eligibility, that's a department
10     determination?
11          A.    Yeah.  I don't know -- I'd have
12     to go back and look.  I don't know if it --
13     there's a certain time frame of crash freeze.
14     I don't know what the time -- I want to say
15     it's two years, but I could be wrong.  I'd
16     have to look it up.
17          Q.    (Coughing.)  Excuse me.  Were
18     you determined to be at fault for any of the
19     crashes contained in these reviews?
20          A.    I don't have the crashes in
21     front of me.  I'm sure that I wasn't -- I'm
22     sure there are some that I may have been in,
23     and some that I may not have been.  I just
24     don't know without seeing.
25          Q.    (Coughing.)  Excuse me.  With
```

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 327 of 358 - Page
ID#: 1678
Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    respect to the entirety of your career, have

2    any of the vehicle pursuits or crashes that

3    you've been involved in resulted in any

4    injuries to third parties other than the

5    August 7th, 2020, pursuit?

6            A.    Yes.

7                  MR. HERZIG:  Objection.  You can

8    answer.

9            A.    Yes.

10           Q.    Can you describe those to me,

11   please?

12           A.    March 16th, 2011, I was involved

13   in a vehicle pursuit, which resulted in two

14   fatalities caused by the fleeing vehicle.

15           Q.    Who were the people who died?

16           A.    I can't remember the female's

17   name.  I don't even know if I knew the

18   female's name at the time.  The male, his

19   last name was Sidi.

20           Q.    S-I-D-I?

21           A.    I think.  I can't swear to it.

22   I don't know if I ever knew the female's

23   name.  I knew his name.

24           Q.    Do you know whether you were

25   found to have violated any policies or

1    practices in the department in association

2    with that -- that pursuit?

3              A.    No.  In fact, I've been told

4    that that pursuit has been used at the

5    academy for training.

6              Q.    Any of the other crashes or

7    pursuits that you've been involved in in any

8    way, have they resulted in fatalities?

9              A.    No.

10             Q.    Have any of the other pursuits

11   or crashes you've been involved in resulted

12   in any other injuries to people?

13             A.    I can't say for certainty on

14   that.  Somebody may have had like a bruised

15   knee or an arm or something, but no

16   significant fatality injuries, or significant

17   injuries that I recall.

18                  You know, like if we were in a

19   pursuit of a juvenile, they would have to go

20   to the hospital just per 2020 policy, whether

21   they were injured or not.  So I don't recall

22   any that were injured or had injuries other

23   than the fatality.

24             Q.    For any of these pursuits or

25   crashes that you've been involved in, has

1    anyone at the department ever provided you

2    with any informal feedback on your driving?

3         A.    I mean, not that I recall.  I

4    mean, I'm sure people have made comments or

5    something.  I don't know.

6         Q.    Has any supervisor ever given

7    you informal feedback or response of any kind

8    in association with your commencing or

9    continuing in a pursuit?

10         A.    Not that I recall.

11         Q.    Have you talked about all of

12    your discipline at the department yet?

13         A.    Have you talked to me about it?

14         Q.    Have I asked you about it yet?

15    I don't think I have.

16         A.    You have not.

17         Q.    So let me ask you, outside of

18    the discipline we've referenced in

19    association with the August 2020 pursuit,

20    have you ever been disciplined otherwise by

21    the department?

22         A.    I have.

23         Q.    And tell me about that

24    discipline, please.

25         A.    Well, I was just recently

 1    disciplined for not arresting someone.  The

 2    patrol bureau commander felt that I was a

 3    victim of a robbery and I should have made an

 4    arrest on scene, to which I wholeheartedly

 5    disagreed.

 6              Me and him had conversations

 7    about that.  And I was given, I think, a

 8    reprimand for not making the arrest, and that

 9    was two years ago, maybe.

10        Q.    For that robbery, what was taken

11    from you?

12        A.    That's where the whole thing

13    comes into play.  So I'm a District 4

14    lieutenant for the Neighborhood Unit.  A big

15    part of the Neighborhood Unit is they deal

16    with parking complaints.

17              I don't know if you live in the

18    City or anybody lives in the City, but that's

19    like a major complaint in the neighborhoods,

20    which I didn't know until I took that job

21    over.

22              So if you ever go to a council

23    meeting, it's like a hot button.  It's major.

24    So when I would be out in just normal Monday

25    through Friday patrols, there's a system

1    called Cincy 311 where residents can go

2    online and put in parking complaints for junk

3    cars, abandoned cars, delinquent cars, cars

4    with expired tags over 30 days, whatever the

5    case may be.

6                    So I get out and help my guys

7    with that when I can, you know, just to make

8    sure that we don't get behind or we can get

9    up.  I responded to Michelle Fontay

10   (phonetic) Place, there were two vehicles

11   that were parked there, both, I believe, the

12   tags were expired.

13                   I think one was a couple months

14   and one might have been six months.  I don't

15   recall the exact, but I think that was the

16   violation.  So I went there.  I towed the one

17   car, and unbeknownst, the owner was the same

18   for both cars.

19                   I don't know if I knew that at

20   the time or if I knew that after the fact.

21   So the one car was on a tow truck already

22   pulling off.  A second tow truck showed up,

23   backed up and getting ready to hook the car,

24   and she came out very upset, very agitated.

25                   I said, ma'am, you know, the car

Deposition of Lieutenant Timothy Lanter                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1     is being towed.  I said this is the reason

 2     why.  She tried to justify why it shouldn't

 3     be and she tried to get inside her vehicle to

 4     drive away or to gain entry into the car.

 5                  I stepped in front of her door

 6     and kind of grabbed the keys when she tried

 7     to get in just so she could -- because the

 8     tow truck was already hooking the truck up.

 9                  So if she would have pulled

10     away, it could have been bad.  So then she

11     tried to grab the keys from me.  And my

12     patrol bureau commander said that she tried

13     to commit a robbery against a uniform

14     officer, and that I was disciplined for not

15     arresting her, which I didn't understand, and

16     I don't think I still understand at this

17     point.

18                  I use my discretion to not

19     arrest somebody.  When you tow somebody's

20     car, they're highly agitated.  Nobody wants

21     their car towed.  And I get the state that

22     she was in.

23                  And, you know, had I arrested

24     her at that scene, it could have gotten

25     worse.  It could have agitated to use of
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    force or something along those lines that it
 2    wasn't.
 3                I didn't feel that a robbery had
 4    been committed against me or that -- it was
 5    just an upset citizen who wanted their car,
 6    and that was the discipline that I received
 7    on that.
 8                I forget -- I want to say it was
 9    a 1.03, but I don't recall.  And he told me
10    take it, come back in a year, I've already
11    talked to the chief, will not make you wait
12    the three years, and it will be removed from
13    your file.  And I just never did.
14         Q.    Okay.
15         A.    It wasn't that pressing to me.
16         Q.    And what was -- sorry.
17         A.    Go ahead.
18         Q.    I was gonna say what was the
19    weapon or threat of violence associated with
20    that purported robbery?
21         A.    That's what I'd like to know.
22         Q.    All right.
23         A.    She grabbed it -- she tried to
24    grab the keys from my hand, and there was a
25    little cut on my knuckle, so maybe because
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        she injured me.  I don't know.
 2                    MR. HERZIG:  Let the record
 3        reflect that he used quote marks around
 4        injured.
 5             A.    I did not believe I was injured.
 6             Q.    Okay.  So other than that
 7        incident, any other formal discipline from
 8        the department over the course of your
 9        career?
10             A.    I'm sure there is.  I honestly
11        can't recall.  I've never been suspended.
12        I've never been without pay.  I've had a
13        reprimand or two before.  I truly and
14        honestly can't remember.
15                    There was -- the last thing that
16        I remember was I was brand new.  I was
17        working the desk at District 3, irate citizen
18        had called.  I was brand new.  I believe that
19        she said she was gonna shoot the officer if
20        he didn't let her go.
21                    I relayed that over the radio.
22        Two or three days later, they pulled the
23        tapes and it said -- it was determined that
24        she said sue.  So I received a reprimand, I
25        think, for that for -- because we couldn't
```

1    review the tapes that night and I -- like I

2    said, I was new.

3              I relayed what I believed I had

4    heard.  She was arrested and spent the

5    evening in jail, and I think I got a

6    reprimand for that, but I don't recall what

7    the rule or the procedure violation was on

8    that.

9              Other than that, I can't think

10   of any.  I'm not saying that there's not.  I

11   just -- nothing is coming to mind at this

12   point.

13        Q.    Have you ever received any ESLs

14   during your time at the department?

15        A.    I've received tons, positives, a

16   lot of positives, probably a couple

17   negatives, but like I said, it's been 19

18   years.  I've been a boss for ten years.  I

19   just -- I can't remember those.  Nine years

20   before, probably when I was a PO, when I

21   received them at that point.

22        Q.    Do you remember any negative

23   ESLs?

24        A.    The one for discourtesy that I

25   mentioned in my notes.  Yeah, I don't -- and

1    I mean, those are corrective actions.  Those

2    aren't considered discipline.

3         **Q.    Right.**

4         A.    So I'm sure I probably have a

5    couple, but I just honestly -- if you showed

6    me something, maybe, but I don't have

7    anything off the top of my head that I can

8    recall.

9              Like I said, those two

10   reprimands -- that reprimand was probably --

11   those last two were just the two that really

12   stick out to me.  The one was 2006, 2007, and

13   that robbery was I think in '23, or maybe '24

14   it was, '24 I think, maybe '23.  I don't

15   recall.

16        **Q.    Any other corrective actions**

17   **that you've received over the course of your**

18   **career of the department?**

19        A.    No.  I think on that second

20   instance that I told you, I think back then

21   you got -- they like gave you a -- like a

22   double dip, it was like an Administrative

23   Insight and a reprimand.

24              And back then the Administrative

25   Insight, those stayed in your file for your

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    career, but that policy has since changed to

2    where the reprimand would fall off after

3    three years.  So I honestly don't even know

4    if there's a reference of that any more.

5         Q.    What was -- you said reprimand,

6    and what was the other term you just used?

7         A.    Administrative Insight.  So

8    basically my understanding is they're the

9    same thing, but one couldn't be removed from

10   your file and one could be.

11            And I think the policy has since

12   changed on that.  I couldn't even tell you

13   the last time I've seen somebody get an

14   Administrative Insight.  I don't even know if

15   they do it anymore honestly.

16        Q.    Okay.  Any other corrective

17   actions that you can think of that we haven't

18   talked about so far today over the course of

19   your career?

20        A.    Not that I can think of.

21        Q.    Let's go back to Exhibit 54

22   briefly.

23        A.    Yes, ma'am.  The training?

24        Q.    Yes.

25        A.    Yes, ma'am.

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    And in that training document on

2    the page stamped at the bottom 1339 --

3      A.    1339, yes, ma'am.

4      Q.    -- I see the second entry from

5    the top says Remedial Driving.  Do you see

6    that there?

7      A.    Yes, ma'am.

8      Q.    Why were you made to take a

9    remedial driving course?

10     A.    Honestly, I don't have an

11   answer.  I would think maybe I was involved

12   in an auto accident at that time, but I will

13   also say sometimes -- so, and this occurred

14   in my unit, they'll send a driver's training

15   memo out, and like each district unit has to

16   send somebody, so maybe I was volunteered for

17   it.

18         Normally it goes to a patrol guy

19   to go.  I could have had an auto accident at

20   that time.  I think if -- I'd have to look at

21   like the matrix.

22         I think if you're involved in

23   one or two accidents within like the 24-month

24   period, you go.  So it could have been that.

25   It could have just been, hey, I was low man

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    on the shift and I got sent to it, I don't

2    know, honestly.

3         Q.    Did it have anything to do with

4    that 2016 fatal pursuit?

5         A.    That was 2011.

6         Q.    Excuse me.

7         A.    March 16th, 2011.

8         Q.    Thank you.

9         A.    I'm sorry.  Yes, ma'am.  No, I

10   didn't receive anything after that.

11        Q.    Okay.  What about on the same

12   page, 1339, three entries up from the bottom

13   In-Service Driver's Training at the academy

14   on September 16th, 2016.  Do you see that?

15        A.    Yeah.  To me, that's just

16   in-service.  Like I said, our mandatory CPT,

17   or in-service days.  I would assume that

18   that's what that is.  Maybe we had a whole

19   day of in-service.

20              Because it says it's at

21   800 Evans, and there's no driving pad or

22   pursuit course or anything there, so maybe it

23   was just part of CPT since...

24        Q.    If you don't know, that's okay.

25   I'm just asking.

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yeah, that's just -- that's my
 2       best guess is that it was part of the CPT,
 3       in-service training for that year.
 4              Q.    Understood.
 5              A.    That's what it is.
 6              Q.    And if you look at page 1341 at
 7       the bottom --
 8              A.    1341, yes, ma'am.
 9              Q.    -- we talked earlier about this
10       Tactics and Traffic Enforcement Course.  Did
11       that have anything to do with any sort of
12       remedial or retraining assignments?
13              A.    No.  Since that says Butler
14       Tech, that leaves me to believe that that was
15       like a training that I put in for to go.
16              Q.    Okay.
17              A.    So like I said, that's probably
18       like a -- you know, like, hey, this is where
19       traps are hidden in cars or, hey, this kind
20       of -- something like that, maybe, and then
21       traffic and the stops or something along
22       those lines.
23                    But that's why I put a question
24       mark next to that one, I don't think that had
25       anything to do with anything like that.
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.      And then same page second from
2    the bottom, RMS Crash Training.
3          A.      Yeah.
4          Q.      Did that have anything to do
5    with any remedial training?
6          A.      No.  So RMS is Records
7    Management System, so -- what's the date on
8    that?  2012.  I believe that's when we
9    transitioned from paper auto accident reports
10   to computer accident reports, and that's what
11   that training would have been.
12         Q.      Okay.  On the page stamped 1342,
13   you had put a question mark next to Defensive
14   Driver In-Service, right?
15         A.      Yes, ma'am.
16         Q.      Did that relate in any way to
17   any retraining or remedial training?
18         A.      No, not to my knowledge.  Like I
19   said, I have a question mark.  So eight hours
20   and it says in-service, so maybe that's what
21   we did for in-service that year.  I don't
22   recall.
23         Q.      If you go to the next page,
24   1343, there's a training at the bottom of the
25   page called Tactical Refresher, was that a

1    retraining?

2          A.    Tactical Refresher?  Not to my

3    knowledge.  I mean, that's another two-hour

4    one, like the pursuits or the driver's

5    training, so I would imagine that that's

6    probably tied into our driving.  But Tactical

7    Refresher, I don't recall what that would

8    have been.

9          Q.    Okay.  Are there any other

10   trainings listed in your training record that

11   could reflect a retraining or a refresher

12   training that you were assigned to take?

13         A.    Not to my knowledge.

14         Q.    Okay.  Are there other trainings

15   that you've taken that are not indicated here

16   that were taken as a result of a referral for

17   a refresher or a retraining?

18         A.    Not to my knowledge, ma'am.

19         Q.    And in relation to the pursuits,

20   the crashes we've talked about, and any other

21   thing about your driving as an officer, have

22   you had any discipline removed from your

23   personnel file associated with any of those

24   policing activities?

25         A.    I would say everything.  I --

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        just based on -- well, I guess let me
 2        rephrase.  If you get disciplined, like a
 3        reprimand, like that's supposed to be removed
 4        after three years.
 5                    Like, it always stays there, but
 6        I believe that it's -- it's there for
 7        reference, but it can't be used as further
 8        discipline.  So I would think -- so then I
 9        guess all the -- I misspoke.
10                    I guess those would all still be
11        there, but those can't be used in that
12        manner.  Does that make sense?  I guess I --
13            Q.    Yeah.
14            A.    -- misstated myself initially.
15            Q.    So is there any discipline
16        associated with driving or in any other law
17        enforcement activity that you've had over the
18        years that would be considered removed even
19        if it's present in your folder physically?
20            A.    No.  Like, just if -- if I would
21        walk out of here today and I would pull up to
22        a stoplight and rear-end you, you would get
23        an ESL for being at fault for a crash.  But
24        that's a corrective measure, that's not a
25        disciplinary measure --
```

1      Q.    Any -- sorry.

2      A.      -- until I think it exceeds so

3  many or whatever.

4      Q.    Do you have any corrective

5  measures removed from your own file in the

6  same way that we've discussed with

7  discipline?

8      A.    I don't think those ever get

9  removed, honestly.

10     Q.    Okay.

11     A.    I can't say, but I don't know if

12  they do.

13     (Exhibit 30 was referenced.)

14  BY MS. GREENE:

15     Q.    All right.  I'm gonna show you

16  very quickly, because I know we're headed

17  towards the end of the day, what we marked

18  previously as Exhibit 30.

19     A.    Yes, ma'am.

20     Q.    And I'll ask you just to take a

21  look at the index of the document --

22     A.    Okay.

23     Q.    -- and tell me which sections

24  would apply to the events at issue in this

25  case, meaning the investigation, stop,

1      **pursuit of Mason Meyer that you were involved**

2      **in.**

3              A.    So like my initial gut tells me

4      everything in here is -- I mean, I read the

5      first one, Uniform Patrol, Command Presence,

6      Awareness Spectrum, Reactionary Gaps,

7      Tactical Positioning, like those all -- like

8      I said, you know, the Tactical Positioning

9      and the Awareness Spectrum, you know, such a

10     heightened level of awareness.

11             And if you're speaking

12     specifically to the pursuit actions, or are

13     you speaking to everything combined?

14             I mean, if you're speaking -- I

15     would say the 16, the Vehicle Patrol

16     Techniques, 17, Defensive Driving, 17,

17     Vehicle Stop Tactics, 18, High-Risk Traffic

18     Stops, 19, Vehicle Pursuits, I would say

19     those are the pursuit-related things.

20             But I would say the things

21     closer to the top, you would take it in the

22     totality of everything in that those were

23     present at every step of everything we do

24     every day kind of.

25             **Q.    Okay.  And when you say the**

1    things closer to the top, can you tell me --

2            A.    Like -- yes, ma'am.  Like, 4,

3    like Uniform Patrol, 4, Command Presence, 4,

4    Awareness Spectrum.

5            Q.    Actually, let me just ask you a

6    different question.  Are there any sections

7    in this Table of Contents you would say do

8    not apply to your policing activity on

9    August 7th associated with the investigation,

10    stop, and pursuit of Mason Meyer?

11            A.    I would say 20 down really

12    don't.  Yeah, I mean, not directly into the

13    pursuit.  I mean, I guess something could

14    have happened to where one of those would

15    have popped, but I think 20 down, probably

16    not.

17            MS. GREENE:  Okay.  I'm gonna

18    show you what we're marked as Exhibit 62.

19        (Exhibit 62 was marked.)

20    BY MS. GREENE:

21            Q.    This Investigations Manual

22    marked as Exhibit 62, you're familiar with

23    this, right?

24            A.    Yes, ma'am.

25            Q.    Can you look at the index in

1    this document, and then I'll ask you the same

2    question as I did with the last exhibit.

3              Can you tell me which sections,

4    if any, don't apply to your policing

5    activities on August 7th, 2020, in relation

6    to the investigation, stop, and pursuit of

7    Mason Meyer?

8         A.    My gut tells me before I look

9    that it'd be more -- it will only be a few

10   that do as opposed that don't.  Would you

11   like me to do that?

12        Q.    Okay.  Well, then do you want to

13   tell me which ones that do apply?

14        A.    Okay.

15        Q.    Thanks.

16        A.    Yes, ma'am.  There's no

17   unredacted?

18        Q.    Sorry?

19        A.    There's no unredacted?

20        Q.    Very little.  That's why I asked

21   you to look at the index.

22              So are there any index sections

23   that appear to you to apply to --

24        A.    Here's what I'll say on this,

25   this isn't like the normal everyday course.

1    So there may be some things.  Like, I'm not

2    exactly sure what the district investigations

3    100 percent positively says.

4              But so I -- or, you know, like

5    the Special Investigations, which is what,

6    you know, OCIS was kind of under, so without

7    being able to further reference, it might be

8    a little harder.

9              Like that beginning part -- and

10   so like this Control and Termination of

11   Investigations, that's probably more of like

12   the actual investigation and not the

13   enforcement of the investigation as like the

14   traffic stop would be, if that makes sense.

15        Q.    Okay.  And just for simplicity's

16   sake --

17        A.    Yes, ma'am.

18        Q.    -- I know it's kind of hard to

19   evaluate when we don't --

20        A.    Right.

21        Q.    -- know exactly what we're

22   looking at.

23        A.    Yeah, that's why I'd rather have

24   full look so I can --

25        Q.    You and me both.

```
 1            A.    -- give you the full,

 2      comprehensive answer.  Because that's --

 3      yeah, it's just hard.  You know, like

 4      Interviewing Complainant/Witnesses, well,

 5      like events leading up to that we

 6      introduce -- well, not me, but we took those

 7      tactics and did those things.

 8                  So it's just hard to give you an

 9      absolute without seeing exactly what it's

10      saying.  Because, you know, this interview

11      could say something totally different and not

12      based on kind of like the interview that we

13      did.

14            Q.    Uh-huh.

15            A.    So that's just a little bit

16      harder.  I'm sorry.

17            Q.    So as you look at this document,

18      what we've marked as Exhibit --

19            A.    Sixty-two.

20            Q.    -- 62 --

21            A.    Yes, ma'am.

22            Q.    -- there are portions of it that

23      may apply, but we can't be sure because you

24      can't read the content right now, right?

25            A.    I will agree with that.
```

 1          Q.    Okay.  We can set that aside for

 2     now.

 3          A.    Yes, ma'am.

 4          Q.    And other than in this case,

 5     have you ever been the subject of any

 6     Internal investigation of the CPD?

 7          A.    Yeah.

 8          Q.    And what was that about?

 9          A.    March 16th, 2011, pursuit.

10          Q.    The CD case?

11          A.    Yes, ma'am.

12          Q.    What was the outcome of that

13     investigation?

14          A.    I was completely cleared by the

15     Internal Investigations Section.  I was

16     completely cleared by a summary judgment

17     ruling in Federal Court.

18          Q.    Any other Internal

19     investigations of you by CPD that you're

20     aware of?

21          A.    The one where I talked about a

22     phone call where the female was arrested, I

23     believe that was an Internal case.

24          Q.    Any others?

25          A.    I don't recall if my non-arrest

1    was Internal or not.  I think it might have

2    been, but I don't recall.  I'm sure there's

3    been more, but I can't recall.

4            Q.    Okay.  Have you ever at any time

5    discussed these events of August 7th, 2020,

6    with Officers Thomas, Harper, or Scalf after

7    the pursuit concluded?

8            A.    Honestly, I do not believe so.

9    I don't recall.  My conversations with them

10    probably would have been, somebody else

11    already stated this, hey, how are you?  Is

12    everything good?  Do you need anything?  But

13    the actual events, I don't believe outside of

14    counsel.

15            Q.    Have you ever had any

16    conversation with any member of CPD at any

17    time after the pursuit concluded about the

18    events of August 7th, 2020?

19            A.    I'm sure I have.  I mean, it's

20    been four and a half years ago.  I don't

21    remember all the conversations, all of what

22    was had.  I'm sure my lieutenant, my captain

23    at the time, we've probably discussed.

24            You know, the Internal captain,

25    the Internal lieutenants I'm sure I discussed

1    with based on that investigation based on my

2    peer review.  But to give you specific

3    people, dates, times, the details of

4    conversation, no, I couldn't tell you that.

5         **Q.    Do you have any conversation at**

6    **any time with any assistant chief about these**

7    **events?**

8         A.    The day it occurred,

9    Paul Neudigate.

10        **Q.    And what did you talk about with**

11   **Neudigate?**

12        A.    I had to call him to tell him

13   what had occurred and whatnot, to make proper

14   notifications that -- he was my bureau

15   commander, and just to say, hey, we're in a

16   pursuit, this is what happened, this is where

17   we're at.  And I don't recall if he responded

18   or not.

19             The same thing with my captain,

20   which was Danita Pettis at the time, the same

21   type of conversation that I know occurred

22   just to make the notifications, which were

23   needed in that situation.

24        **Q.    Any other conversations with Top**

25   **Brass in the department about this?**

Case: 2:21-cv-00102-DLB    Doc #: 135    Filed: 11/06/25    Page: 353 of 358 - Page
ID#: 1704

Deposition of Lieutenant Timothy Lanter

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    MR. HERZIG:  Objection.  What do
 2      you mean?
 3                    MS. GREENE:  He knows what I
 4      mean.
 5      BY MS. GREENE:
 6           Q.    Any other conversations with any
 7      high-level administrative commanding officers
 8      in the CPD?
 9           A.    At the time of that, no, I do
10      not believe so.  Like I said, that was my
11      chain of command.  Those are the ones that --
12      like, Lieutenant Norris, but he's not
13      brass -- he's not brass, quotes, but that was
14      for my case.
15                    But, yeah, I believe me and --
16      like I said, Captain Pettis, we talked all
17      the time after.  She would always call and
18      check on me, you know, stuff like that, but
19      in-depth details and stuff, no, not that I
20      recall.
21           Q.    Have you ever had any discussion
22      with any other people that we haven't yet
23      referenced today about the events of August
24      7th, 2020?
25           A.    I'm sure I have, but who those
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1     people, what the extent of those are, I mean,
 2     I couldn't say.
 3          Q.    Okay.  Have you ever been a
 4     defendant in any lawsuit related to your
 5     duties with the police?
 6          A.    Twice.
 7          Q.    And what were those cases?
 8          A.    March 16th, 2011.
 9          Q.    The CD pursuit?
10          A.    Yes, ma'am.  And the telephone
11     call to which I referenced.  I believe we
12     were sued over that, and I think that was
13     handled before anything ever occurred.  I
14     don't think anything else.
15          Q.    When you say --
16          A.    Nothing that I've been in court
17     or that I remember.
18          Q.    When you say the telephone call
19     matter was handled before anything occurred,
20     what do you mean?
21          A.    I don't think -- we had never
22     stepped into a courtroom on that.  I don't
23     know what happened.  I don't know if there
24     was a settlement done.  I don't know if it
25     was -- I don't recall what happened with
```

Deposition of Lieutenant Timothy Lanter                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    that.
 2                To where I remember the
 3    March 11th one, we won that in summary
 4    judgment.
 5         Q.    Have you ever been named as a
 6    criminal defendant in any matter?
 7         A.    Never.
 8         Q.    Have you ever been arrested?
 9         A.    Never.
10                MS. GREENE:  Let's just take a
11    couple minutes off the record.
12                THE WITNESS:  Yes, ma'am.
13       (Off the record.)
14                MS. GREENE:  All right.  We're
15    back on the record.  We are recording.
16                Lieutenant Lanter, barring the
17    production of any additional documents in
18    this matter, including unredacted or less
19    redacted versions of things already produced
20    or additional items produced, and additional
21    questions that those items may raise, I have
22    no further -- wait, I have one question for
23    you before I go off the record.
24    BY MS. GREENE:
25         Q.    You've attended every deposition
```

1    in this case to date; haven't you?

2            A.    No.

3            Q.    Which one did you miss?

4                  THE WITNESS:  Kim, Bode was the

5    only one.

6            A.    I don't know if there were any

7    prior to that, but I was not at Officer Mark

8    Bode's.

9            Q.    Okay.  There were no depositions

10   prior to the Bode deposition.  So other than

11   his, you've attended every deposition in this

12   matter, right?

13           A.    Yes, ma'am.

14           Q.    And you've heard the testimony

15   of all the other witnesses?

16           A.    That's correct.

17                 MS. GREENE:  All right.  So

18   other than the note I was making a moment ago

19   about additional production in this matter

20   and whether that may open additional areas of

21   questioning for us, I have no further

22   questions for you at this time.

23                 MS. ALLOUCH:  None for me.

24                 MS. GREENE:  Tristan, any from

25   you?

Jason Laible, et al., vs. Timothy Lanter, et al.,

1          MR. PALMER:  Just thank you.

2          MR. HERZIG:  Nothing for me.

3          MS. GREENE:  We are off the

4     record.

5

6                    _____
                     LIEUTENANT TIMOTHY LANTER

7

8

9                    *  *  *

10

11          (DEPOSITION CONCLUDED AT 5:20 P.M.)

12                    *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

358

1                C E R T I F I C A T E

2
    STATE   OF   OHIO
3                        :  SS
    COUNTY OF WARREN
4
                    I, Stacey J. Murrin, the
5   undersigned, a duly qualified notary public
    within and for the State of Ohio, do hereby
6   certify that LIEUTENANT TIMOTHY LANTER was by
    me first duly sworn to depose the truth and
7   nothing but the truth; foregoing is the
    deposition given at said time and place by
8   said witness; deposition was taken pursuant
    to stipulations hereinbefore set forth;
9   deposition was taken by me in stenotype and
    transcribed by me by means of computer; that
10  the transcribed deposition was made available
    to the witness for examination and signature
11  and that signature may be affixed out of the
    presence of the Notary Public-Court Reporter.
12  I am neither a relative of any of the parties
    or any of their counsel; I am not, nor is the
13  court reporting firm with which I am
    affiliated, under a contract as defined in
14  Civil Rule 28(D) and have no financial
    interest in the result of this action.
15      IN WITNESS WHEREOF, I have hereunto set my
    hand and official seal of office at
16  Cincinnati, Ohio this 13th day of May, 2025.

17

18                        _Stacey J. Murrin_

19  My commission expires:   Stacey J. Murrin
    August 17, 2025,   Notary Public - State of Ohio
20

21

22

23

24

25