1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF KENTUCKY
2                       COVINGTON

3    JASON LAIBLE, et        :
     al,                     :
4                            :   Case No.
          Plaintiffs,        :   2:21-cv-00102
5                            :
     vs.                     :   Judge David L.
6                            :   Bunning
     TIMOTHY LANTER, et      :
7    al,                     :   Magistrate Judge
                             :   Candace J. Smith
8         Defendants.        :

9

10       Deposition of FRANK OCCHIPINTI, a witness

11   herein, taken by the defendants as upon

12   cross-examination, pursuant to the Federal

13   Rules of Civil Procedure and pursuant to

14   notice of counsel as to the time and place

15   and stipulations hereinafter set forth, at

16   the offices of Mr. Herzig, Taft Stettinius &

17   Hollister, 425 Walnut Street, Suite 1800,

18   Cincinnati, Ohio, at 9:30 a.m., Monday,

19   April 14, 2025, before Deanne Cartwright, a

20   Court Reporter and Notary Public, within and

21   for the State of Ohio.

22                        - - -

23

24

25

```
 1                       APPEARANCES

 2

 3       FOR THE              JACQUELINE GREENE, ESQ.
         PLAINTIFFS,          Friedman, Gilbert &
 4       Estates of          Gerhardstein
         Raymond and          35 East 7th Street
 5       Gayle Laible:        Suite 201
                             Cincinnati, Ohio 45202
 6
                             ELIJAH HACK, ESQ.
 7                           Friedman, Gilbert &
                             Gerhardstein
 8                           35 East 7th Street
                             Suite 201
 9                           Cincinnati, Ohio 45202

10       FOR THE              ROULA ALLOUCH, ESQ.
         PLAINTIFFS,          Bricker Graydon
11       Steven and          312 Walnut Street
         Maribeth Klein       Suite 1800
12                           Cincinnati, Ohio 45202

13       FOR THE WITNESS:     BRANDI M. STEWART, ESQ.
                             U.S. Department of Justice
14                           221 E. Fourth Street
                             Suite 400
15                           Cincinnati, Ohio 45202

16                           TIFFANY K. FLEMING, ESQ.
                             (Via telephone)
17                           U.S. Department of Justice
                             260 W. Vine Street
18                           Suite 300
                             Lexington, KY 40507
19
         FOR THE              AARON M. HERZIG, ESQ.
20       DEFENDANTS, City    Taft Stettinius & Hollister
         of Cincinnati,       425 Walnut Street
21       Timothy Lanter      Suite 1800
         and Brett           Cincinnati, Ohio 45202
22       Thomas:
                             SPENCER S. COWAN, ESQ.
23                           Taft Stettinius & Hollister
                             425 Walnut Street
24                           Suite 1800
                             Cincinnati, Ohio 45202
25
```

```
 1
            FOR THE              KIMBERLY A. RUTOWSKI, ESQ.
 2          DEFENDANTS,          Lazarus Law
            Timothy Lanter      525 Vine Street
 3          and Brett Thomas    Suite 2210
            individually:        Cincinnati, Ohio 45202
 4
            FOR THE              TRISTAN PALMER, ESQ.
 5          DEFENDANT,           Casey Bailey & Maines
            Travelers            3151 Beaumont Centre Circle
 6          Casualty             Suite 200
            Insurance Co:        Lexington, KY 40513
 7


 8
         ALSO PRESENT:  Elise Marrinan, Taft
 9                      Officer Timothy Lanter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    S T I P U L A T I O N S

2          It is stipulated by counsel for the

3     respective parties that the deposition of

4     FRANK OCCHIPINTI, a witness herein, may be

5     taken at this time by the defendants as upon

6     cross-examination and pursuant to the Federal

7     Rules of Civil Procedure and notice to take

8     deposition, under notice all other legal

9     formalities being waived by agreement; that

10    the deposition may be taken in stenotype by

11    the Notary Public-Court Reporter and

12    transcribed by her out of the presence of the

13    witness; that the transcribed deposition was

14    submitted to the witness for examination and

15    signature and that signature may be affixed

16    out of the presence of the Notary

17    Public-Court Reporter.

18

19

20

21

22

23

24

25

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 5 of 233 - Page ID#:
1910
Deposition of Frank Occhipinti                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1                          INDEX

 2       WITNESS          DIRECT   CROSS   RE-       RE-
                                          DIRECT    CROSS
 3
         FRANK OCCHIPINTI
 4       BY MR. HERZIG:               9                230
         BY MS. GREENE:             181
 5
         EXHIBIT IDENTIFIED                           PAGE
 6
         Exhibit 18-2                                 24
 7       Exhibit 19                                   30
         Exhibit 20                                   35
 8       Exhibit 21                                   42
         Exhibit 22                                   53
 9       Exhibit 23                                   69
         Exhibit 24                                   77
10       Exhibit 25                                   79
         Exhibit 26                                   98
11       Exhibit 27                                  173
         Exhibit 28                                  194
12       Exhibit 29                                  215

13       OBJECTIONS                           PAGE  LINE

14       MS. STEWART:                          30    12
         MS. STEWART:                          33     5
15       MS. GREENE:                           33     6
         MS. STEWART:                          34    25
16       MS. STEWART:                          37     9
         MS. GREENE:                           39     3
17       MS. STEWART:                          39    18
         MS. GREENE:                           39    21
18       MS. STEWART:                          40     7
         MS. STEWART:                          40    17
19       MS. GREENE:                           40    18
         MS. STEWART:                          42    13
20       MS. GREENE:                           44    21
         MS. STEWART:                          46    19
21       MS. GREENE:                           48     3
         MS. STEWART:                          50    12
22       MS. STEWART:                          51     1
         MS. GREENE:                           51    11
23       MS. STEWART:                          51    12
         MS. GREENE:                           51    19
24       MS. STEWART:                          51    20

25                            -  -  -
```

```
 1                          INDEX CONTINUED

 2
            OBJECTIONS                          PAGELINE
 3
            MS. STEWART:                        51      23
 4          MS. STEWART:                        52       2
            MS. GREENE:                         52      22
 5          MS. STEWART:                        55      10
            MS. GREENE:                         55      13
 6          MS. STEWART:                        58       2
            MS. GREENE:                         58      13
 7          MS. STEWART:                        58      20
            MS. GREENE:                         59      18
 8          MS. STEWART:                        61      23
            MS. GREENE:                         63      18
 9          MS. STEWART:                        67      11
            MS. GREENE:                         76       9
10          MS. STEWART:                        78      11
            MS. STEWART:                        82       7
11          MS. GREENE:                         83      17
            MS. STEWART:                        84       5
12          MS. GREENE:                         84      18
            MS. STEWART:                        84      19
13          MS. GREENE:                         85       9
            MS. STEWART:                        86      21
14          MS. STEWART:                        88      20
            MS. STEWART:                        89       9
15          MS. GREENE:                         89      16
            MS. STEWART:                        90       4
16          MS. GREENE:                         90       5
            MS. STEWART:                        92      12
17          MS. STEWART:                        93       3
            MS. GREENE:                         94      24
18          MS. GREENE:                         96       2
            MS. STEWART:                        97      14
19          MS. GREENE:                        102      12
            MS. STEWART:                        106       1
20          MS. GREENE:                        106      23
            MS. STEWART:                        109       3
21          MS. STEWART:                        110       7
            MS. GREENE:                         113      18
22          MS. STEWART:                        113      19
            MS. STEWART:                        114       1
23          MS. STEWART:                        120      13
            MS. GREENE:                         120      14
24          MS. GREENE:                         122      13

25                              -  -  -
```

```
 1                        INDEX CONTINUED

 2

                OBJECTIONS                      PAGELINE
 3

 4          MS. STEWART:                     122      17
            MS. GREENE:                      123      11
 5          MS. STEWART:                     125      20
            MS. STEWART:                     126       2
 6          MS. GREENE:                      127       2
            MS. GREENE:                      127      13
 7          MS. STEWART:                     130       5
            MS. STEWART:                     131       7
 8          MS. GREENE:                      131       8
            MS. STEWART:                     131      13
 9          MS. GREENE:                      131      14
            MS. STEWART:                     134      24
10          MS. GREENE:                      139      14
            MS. STEWART:                     148      21
11          MS. GREENE:                      148      25
            MS. STEWART:                     149      18
12          MS. GREENE:                      150       1
            MS. STEWART:                     150       2
13          MS. GREENE:                      155       8
            MS. STEWART:                     162      12
14          MS. GREENE:                      169      19
            MS. GREENE:                      171      15
15          MS. STEWART:                     171      16
            MS. STEWART:                     173      14
16          MS. STEWART:                     176      18
            MS. STEWART:                     179       6
17          MS. STEWART:                     179      11
            MR. HERZIG:                      186       8
18          MR. HERZIG:                      187      23
            MR. HERZIG:                      203      24
19          MR. HERZIG:                      206      23
            MS. STEWART:                     207      25
20          MR. HERZIG:                      208       1
            MR. HERZIG:                      208       7
21          MR. HERZIG:                      209       4
            MS. STEWART:                     210       3
22          MR. HERZIG:                      212      14
            MR. HERZIG:                      220       5
23          MS. STEWART:                     220      10
            MR. HERZIG:                      220      16
24          MR. HERZIG:                      224       4

25                              -  -  -
```

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 8 of 233 - Page ID#: 1913

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1                        INDEX CONTINUED

 2
             OBJECTIONS                     PAGE   LINE
 3
             MR. HERZIG:                     224      19
 4           MS. STEWART:                    224      20
             MR. HERZIG:                     225       6
 5           MR. HERZIG:                     226       8
             MS. GREENE:                     231       6
 6           MS. STEWART:                    231      15
             MS. GREENE:                     232       3
 7

 8                          - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1                      FRANK OCCHIPINTI,

2            a witness herein, of lawful age, having

3       been first duly sworn as hereinafter

4       certified, was examined and testified as

5       follows:

6                      THE WITNESS:  I do.

7                      CROSS-EXAMINATION

8       BY MR. HERZIG:

9            Q.    Good morning.  My name is Aaron

09:31  10       Herzig.  I am the lawyer for the defendants

11       in this lawsuit:  The City of Cincinnati,

12       Brett Thomas, and Tim Lanter.  Are you

13       familiar -- well, why don't you -- I think

14       you've already told the court reporter your

15       name but why don't you state your name for

16       the record?

17            A.    Sure.  My name is a Frank

18       Occhipinti.

19            Q.    And what is your title with the

09:31  20       United States Government?

21            A.    My current title is acting

22       assistant special agent in charge of the

23       Columbus Field Division.

24            Q.    That's a lot of a title.  When

25       did you become acting assistant special agent

1    in charge?

2            A.    Beginning of February of this

3    year.

4            Q.    And before that what was your

5    title?

6            A.    Resident agent in charge of the

7    Cincinnati Field Office.

8            Q.    Okay.  And that was your title

9    at the time of the events that are involved

09:32  10    in this lawsuit on August 7th, 2020, correct?

11            A.    That is correct.

12            Q.    Okay.  And you're familiar with

13    the basic facts of this case.  This is a

14    lawsuit brought by the -- the estate of the

15    two individuals who were killed by Mason

16    Meyer during his escape from pursuit on

17    August 7, 2020 and the two individuals that

18    were injured on that day, and that suit is

19    being brought against the City of Cincinnati

09:32  20    and Officers Thomas and Lanter.  You're

21    familiar with that lawsuit?

22            A.    I am.

23            Q.    Okay.  You've actually -- you

24    gave a declaration in that lawsuit early on

25    when we were working out whether certain

1    officers would be within the scope of federal

2    employment, correct?

3            A.    I did.  Yeah.

4            Q.    Okay.  Great.  So let's start

5    with your last -- we're just gonna do some

6    background first.  What's your -- what's your

7    last degree, high school or college?

8            A.    My last degree is a bachelor of

9    arts.

09:33  10            Q.    From where?

11            A.    From -- I finished up at

12    Monmouth University.

13            Q.    Okay.  And when -- when was

14    that?

15            A.    That was in 2000.

16            Q.    Okay.  And did you go directly

17    into law enforcement after college?

18            A.    I was in the military, went

19    overseas, came back and went into law

09:33  20    enforcement in 2001.

21            Q.    Okay.  And where did you serve

22    in the military?

23            A.    Army.

24            Q.    And what -- what theaters were

25    you in while you were in the Army?

1      A.     Everywhere.  We were part of an

2    MP unit that traveled and followed generals

3    all around, so there was never one specific

4    theater.  All over Europe.

5           Q.     Okay.  So you were, like,

6    personal protection for the generals?

7           A.     Correct.

8           Q.     Okay.  And then in 2001 you

9    started in law enforcement.  What was your

09:33  10    first law enforcement job?

11           A.     I -- I'm sorry.  Was 2002.

12    Began with U.S. Customs Service.

13           Q.     And what did you do for U.S.

14    Customs?

15           A.     I was a special agent.

16           Q.     And what does a special agent

17    for U.S. Customs do?

18           A.     Criminal investigator, special

19    agent for the government.

20           Q.     Okay.

21           A.     They enforce narcotics

22    importation/exportation, drug trafficking

23    rings, money laundering.  Those are the main

24    areas.

25           Q.     What was your next law

1    enforcement job?

2            A.    ATF.

3            Q.    And when did that start?

4            A.    That began in 2006.

5            Q.    2006.  Okay.  And what was your

6    first position with ATF?

7            A.    Where?

8            Q.    What.

9            A.    Special agent.

09:34  10            Q.    Okay.  And where were you

11    stationed?

12            A.    New York City.

13            Q.    And what did you do as a special

14    agent for ATF in New York City?

15            A.    I've always been in violent

16    crime as a violent crime group.  Group four

17    of New York Field Division.  So, yeah,

18    those -- investigated violent crime

19    throughout the city.

09:35  20            Q.    Okay.  And obviously there's a

21    lot of state and local law enforcement that

22    does that.  What -- what was the federal

23    government's role in those kinds of

24    investigations?

25            A.    So it was two part.  We

| | |
|---|---|
| 1 | investigated firearms trafficking into New |
| 2 | York City.  New York City's a major -- not |
| 3 | source but where most of the guns from the |
| 4 | south end up.  So there's a firearms |
| 5 | trafficking piece to it and then there's also |
| 6 | the criminal use piece to it.  One group |
| 7 | split into two parts. |
| 8 | Q.    Okay.  And what kind of work did |
| 9 | you do on a daily basis in that job? |
| 09:35 10 | A.    Partnered up with task force |
| 11 | officers, followed up on -- we used to call |
| 12 | it Project Disarm back then.  It was |
| 13 | basically a felon in possession of a firearm, |
| 14 | we'd go talk to him and figure out whether |
| 15 | that firearm is trafficked into New York |
| 16 | City. |
| 17 | My specific role at the time was |
| 18 | to figure out if there's a trafficking |
| 19 | pattern from any of the Southern states. |
| 09:36 20 | Q.    Okay.  You mentioned talking to, |
| 21 | I think, task force officers -- |
| 22 | A.    Correct. |
| 23 | Q.    -- is that right?  Who -- who |
| 24 | were those? |
| 25 | A.    NYPD. |

| | |
|---|---|
| 1 | Q.    Okay. |
| 2 | A.    In New York City there's NYPD, |
| 3 | the county. |
| 4 | Q.    Local -- local law |
| 5 | enforcement -- |
| 6 | A.    Correct. |
| 7 | Q.    -- that was -- were they |
| 8 | specifically deputized to be part of a task |
| 9 | force? |
| 10 | A.    They were -- |
| 11 | Q.    When you say task force officer, |
| 12 | is that what you referred to:  Someone who |
| 13 | was specifically deputized for that purpose? |
| 14 | A.    Yes. |
| 15 | Q.    Okay.  And then there would be |
| 16 | other officers who were not specifically |
| 17 | deputized who would support operations as |
| 18 | well? |
| 19 | A.    That is correct. |
| 09:36  20 | Q.    Okay.  How -- how long were -- |
| 21 | and you've been with the ATF ever since 2006 |
| 22 | then? |
| 23 | A.    Correct. |
| 24 | Q.    All right.  What was your next |
| 25 | job within the ATF after special agent in New |

1    York City in both location and title?

2              A.    Bear with me.  I moved around

3    quite a bit.

4              Q.    That's all right.

5              A.    So in 2009 I was sent to Tucson

6    as part of the Southwest Border Initiative.

7    My job down there entailed cartel members,

8    firearms trafficking down in Mexico.  Those

9    are two main areas.

09:37  10              Q.    What do you mean when you say

11    cartel members?  What did you do in relation

12    to cartel members?

13              A.    Southern border is rife with

14    cartel activity.  There's -- on both sides of

15    the border and our group's responsible for

16    identifying and stopping the illicit

17    trafficking of firearms.

18              Q.    Okay.  Were you part of task

19    forces with local law enforcement during that

09:37  20    time?

21              A.    No.  I was part of the DEA

22    Strike Force which is comprised of mainly

23    federal agencies.

24              Q.    Okay.  D -- DEA?

25              A.    Correct.

1      Q.    Okay.  Okay.  So 2009 you're in

2    Tucson.  How long were you in Tucson?  Well,

3    better question.  What was your next job

4    within ATF in terms of location or title?

5          A.    2013 moved to Trenton, New

6    Jersey.

7          Q.    And what was your job in

8    Trenton?

9          A.    I was assigned to the U.S.

09:38 10    Marshals Task Force.

11          Q.    And what did you do with the

12    U.S. Marshals Task Force?

13          A.    Basically hunt down fugitives.

14    Federal fugitives.

15          Q.    Okay.

16          A.    Actually -- I'm sorry.  Federal

17    and state fugitives.

18          Q.    So did you work with task forces

19    made up in part of local officers?

09:38 20          A.    Yes.

21          Q.    Okay.  And were you involved in

22    any auto -- automobile pursuits during your

23    time in Trenton, New Jersey?

24          A.    No.

25          Q.    Okay.  How long were you in

1       Trenton, New Jersey?

2               A.      About a year and a half.

3               Q.      Okay.  So where did you go next?

4               A.      Cincinnati.

5               Q.      Okay.  So you got here in 2014

6       or 2015?

7               A.      2014.

8               Q.      2014 you get to Cincinnati and

9       what is your title when you get to

09:39  10       Cincinnati?

11               A.      Resident agent in charge.

12               Q.      Was that the first time you were

13       a resident agent in charge?

14               A.      That is correct.

15               Q.      Okay.  What does a resident

16       agent in charge do for the ATF?

17               A.      So you're basically the

18       supervisor responsible for the group in this

19       area of responsibility.  We call them AORs.

09:39  20               Q.      Okay.  And when you say the

21       group in the area of responsibility, what do

22       you mean?

23               A.      Our group encompasses or our

24       area encompasses most of -- well, Hamilton

25       County, Warren County, Clermont County,

```
 1    everything out east all the way up to West

 2    Virginia and up to Dayton.

 3              Q.    Okay.  And who is the group?

 4              A.    Do -- you want me to give you a

 5    makeup?

 6              Q.    Yeah.  I don't need names.  I

 7    just mean, like, how many people are we

 8    talking about?  What are their jobs?

 9              A.    So generally a group is

10    comprised of 15, 16 individuals --

11              Q.    Okay.

12              A.    -- law enforcement and that is

13    mix of special agents and task force

14    officers.

15              Q.    Okay.  In -- in the summer of

16    2020, how many special agents were -- were

17    you a supervisor for?

18              A.    I don't recall the exact number.

19    I think I averaged between eight and ten.

20              Q.    Okay.  And how many task force

21    officers were you -- did you supervise?

22              A.    Again, I don't recall the exact

23    number.  They fluctuate quite a bit but

24    between eight and ten as well.

25              Q.    Okay.  And where do -- where do
```

09:40 appears at lines 10, 20.

1    the task force officers come from in this

2    region?

3            A.    The majority of them come from

4    Cincinnati Police Department.

5            Q.    Okay.

6            A.    Hamilton County.

7            Q.    Hamilton County Sheriff?

8            A.    Parole.  And that is it.

9            Q.    Hamilton County parole?

09:41   10            A.    I'm sorry.  APA.

11            Q.    Oh, okay.  So your typical task

12    force is made up of -- your task force

13    officers are a majority Cincinnati Police and

14    a few sheriffs typically?

15            A.    Correct.

16            Q.    Okay.  Is that what it was in

17    July and August of 2020?

18            A.    Yeah.

19            Q.    Okay.  And Sergent Don Scalf was

09:41   20    one of the task force officers under your

21    supervision in July and August of 2020,

22    correct?

23            A.    That is correct.

24            Q.    Okay.  What -- what was

25    Operation Triple Beam?

1              A.     I have no idea.

2              Q.     What was the Northern Kentucky

3        Drug Strike Force?

4              A.     My understanding it's an agency

5        in Kentucky comprised of state, local,

6        perhaps some feds.

7              Q.     Okay.

8              A.     They investigate drug

9        trafficking.  We've had several contacts over

09:42  10        the last couple years but nothing that

11        would -- I wouldn't be able to tell you

12        exactly what they do.

13              Q.     Okay.  They were involved in the

14        investigation of Mason Meyer, correct?

15              A.     Correct.

16              Q.     Okay.  So you worked with them

17        in -- as part of that investigation, right?

18              A.     Myself?

19              Q.     Yes.

09:42  20              A.     No.

21              Q.     Okay.  ATF.  The ATF special --

22        your ATF group worked with them, correct?

23              A.     We assisted them on this

24        specific case.

25              Q.     Okay.  So getting back to your

1    background just a little bit.  So you -- you

2    get here in 2014 as the resident agent in

3    charge and tell me about your day-to-day

4    exactly as resident agent in charge from --

5    in that time period, 2014 to 2020.

6              A.    Gosh.  So on -- at the

7    supervisory level there's the administrative

8    side of the house where you review reports,

9    review operational plans, make sure the

09:43  10    office bills are paid, up and running, and

11    then there's also the operational piece of it

12    where I'm out there and I'm responsible for a

13    specific operation in terms of making sure

14    our personnel are in the right place, an

15    operational plan is submitted, and just

16    making sure that work within policy as far as

17    effecting the operation.

18              Q.    Okay.  And so you would be --

19    when you say operational, you would actually

09:44  20    be out in the field sometimes, correct?

21              A.    Sometimes.

22              Q.    Okay.  And you were for the

23    investigation of Mason Meyer, right?

24              A.    I was.

25              Q.    Okay.  Who was Mason Meyer?

1       A.    I don't understand your

2    question.  Can you rephrase that?

3       Q.    What do you know about Mason

4    Meyer?

5       A.    He was a convicted felon at the

6    time.  The strike force has, with many other

7    law enforcement agencies, they called us and

8    they -- they asked for our assistance in

9    helping locate Mr. Mason Meyer.

09:44 10            I -- I know that there was one

11    of our task force officers involved in

12    specifically handling the -- the op plan,

13    making sure that -- well, we obtained the --

14    they got his phone number.  Again, because --

15    from my understanding, he was a wanted

16    individual out of Kentucky and we were asked

17    to assist in apprehending him.

18       Q.    Okay.  Do you recall when you

19    first learned about Mason Meyer?

09:45 20       A.    No, I don't.

21       Q.    Okay.  We can go through some

22    documents in a little bit.  It looks to me

23    like it was -- it started in early July.

24    Does that -- will anything like that refresh

25    your recollection or should I just show you

1    some documents at some point?

2              A.    I would have to see the

3    documents.

4              Q.    Okay.  And the Northern Kentucky

5    Drug Strike Force is the agency that got in

6    touch with ATF; is that right?

7              A.    I believe so.

8              Q.    All right.  Did they not -- they

9    didn't contact you directly?

09:45  10              A.    No.

11              Q.    Okay.  Who was the agent that

12    was in charge of the investigation, the task

13    force officer that you mentioned?

14                   MS. STEWART:  I'm sorry.

15                   MR. HERZIG:  Do we need to go

16    off the record for a second?

17                   MS. STEWART:  If you don't mind,

18    yes.

19                   MR. HERZIG:  Okay.

20        (Break taken.)

21        (Exhibit 18-2 identified.)

22    BY MR. HERZIG:

23              Q.    Okay.  So who was the task force

24    officer that you mentioned who was in charge

25    of the Mason Meyer investigation?

1    A.    What do you mean by in charge?

2    Case agent?

3    Q.    However -- we can go back but

4    however you -- you described a particular

5    officer who was tasked with Mason Meyer and I

6    don't -- I'm not trying to quibble about the

7    specifics of the language.  You mentioned an

8    officer though, so I'm trying to find out who

9    that person is.

09:49    10    A.    That's fine.  So we refer to

11    them as case agents.

12    Q.    Case agent.  Okay.  Great.

13    A.    And that would be Task Force

14    Officer Brett Stratmann.

15    Q.    Okay.  And where was he assigned

16    from?

17    A.    Cincinnati Police Department.

18    Q.    Okay.  Okay.  So I'm -- I've

19    marked Exhibit 18 which the court reporter

09:49    20    will show you.

21    MR. HERZIG:  I hope we have

22    enough copies.  If I don't, we can get more

23    quickly.

24    MS. STEWART:  I have it here.

25    MR. HERZIG:  Okay.

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    BY MR. HERZIG:

2            Q.    Okay.  So, Agent Occhipinti, if

3    you could take a minute to review this and

4    let me know when you're ready to answer

5    questions about it.

6            A.    Sure.  I'm ready, sir.

7            Q.    Great.  So the United States

8    produced a number of documents to us in

9    response to discovery requests in this case.

09:50 10   They're almost all Reports of Investigation

11   or Report of Investigation.  I think people

12   call it ROI; is that right?

13           A.    Correct.

14           Q.    Okay.  This document starts with

15   the word, Summary of event:  Case opening and

16   receipt of records from Northern Kentucky

17   Drug Strike Force.  You see that?

18           A.    I do.

19           Q.    Okay.  And it says, from July 6,

09:51 20   2020 to the present.  What is this document?

21           A.    This would be an ROI.

22           Q.    Okay.  And what does it tell you

23   about -- would this tell you that July 6,

24   2020 is the date that the Mason Meyer

25   investigation started?

Deposition of Frank Occhipinti                Jason Laible, et al. vs. Timothy Lanter, et al.

1    A.    I'm not sure what you mean by

2    that because on our side from ATF here in

3    Cincinnati or from the Northern Kentucky --

4    I'm sorry.  From the strike force.

5    Q.    Well, do you know when the

6    Northern Kentucky Drug Strike Force first

7    started investigating Mason Meyer?

8    A.    I do not.

9    Q.    Okay.  When did ATF first get

09:51  10   involved?

11    A.    I would have to take a look at

12   the case opening.  I'm not sure this is it.

13   It -- it could be.

14    Q.    Okay.

15    A.    I -- I can't tell from this

16   document.  I'm sorry.

17    Q.    Okay.  But by -- would this tell

18   you that by July 20 -- July 6th, 2020 ATF was

19   involved in the investigation?  If you look

09:52  20   at the top, the end of the underlined section

21   says from July 6th, 2020 to present.  So by

22   July 6th, 2020 your office was involved,

23   correct.

24    A.    We may have been aware at that

25   point.  I'm just -- I'm not sure.

1      Q.    Okay.  Is there someone else who

2   would be sure if I need to talk to somebody

3   else?

4      A.    I'd have to take a look at our

5   case management system.  We go through

6   thousands of cases.  I -- I couldn't tell

7   you --

8      Q.    Okay.

9      A.    -- by looking at this document.

09:52   10      Q.    Okay.  Fair enough.  Other

11   than -- other than the conversations you had

12   with attorneys, what did you do to prepare

13   for today's deposition?

14      A.    That is it.

15      Q.    Okay.  So you haven't reviewed

16   any documents?

17      A.    Oh.  I'm sorry.  I have with the

18   attorneys.

19      Q.    Okay.  Typically -- and they --

09:52   20   they can tell you if they disagree but you're

21   allowed to tell me what documents you

22   reviewed in preparation for the deposition.

23          MS. STEWART:  You can tell him

24   what just not what we discussed.

25          THE WITNESS:  Sure.

1        A.    My declaration, --

2        Q.    Okay.

3        A.    -- our operational plan and I

4   believe one or two ROIs.

5        Q.    Okay.  But only one or two of

6   them?

7        A.    That is correct, sir.

8        Q.    Okay.  Do you remember which one

9   or two?

09:53   10        A.    I do not.

11        Q.    Okay.  They're numbered each

12   one, right?  This particular one isn't

13   because it's a summary is -- is my

14   understanding.

15        A.    They typically are.  Yes.

16        Q.    They typically are.  Right.

17   Okay.  Okay.  So just using this as kind of

18   our first example, it says that it's about

19   the criminal activity of Mason Meyer and

09:53   20   associates from July 6th, 2020 to the present

21   and it says, On August 6th, 2020, the

22   following records were obtained from Northern

23   Kentucky Drug Strike Task Force reference

24   search warrant executed at -- I assume the

25   blanked out part is an address.  Is that your

1    assumption as well?

2            A.    I don't know what that is.

3            Q.    Okay.  It says, reference an

4    assault, shots fired and drug trafficking

5    activity involving Mason Meyer and associates

6    that occurred on July 6th, 2020.

7                 Does that mean that Northern

8    Kentucky Drug Strike Task Force was telling

9    ATF that they were reporting about an

09:54  10   assault, shots fired and drug trafficking

11   activity by Mason Meyer and associates?

12            MS. STEWART:  Objection.  You

13   can answer.

14            A.    I don't know what that means.

15            Q.    If someone handed this document

16   to you -- do you see documents like this a

17   lot?

18            A.    No.  Case agents do.

19            Q.    Okay.  Okay.  Let's try a

09:54  20   different one.

21          (Exhibit 19 identified.)

22            Q.    So Agent Occhipinti, your name

23   is at the bottom left corner as authorized

24   by.  Do you see that?

25            A.    Yes.

1      Q.    Okay.  So -- and you are

2   listed -- your title is listed as resident

3   agent in charge, Cincinnati 1 Field Office.

4   What does it mean that you authorized this

5   Report of Investigation?

6      A.    I -- part of my job duties is to

7   review these and sign them once I've reviewed

8   them.

9      Q.    So wherever it says authorized

09:55  10   by, is that the same as you signing it?

11      A.    It would be in the signature

12   block.  Correct.

13      Q.    Okay.  Do you know if there's a

14   signed version of this?

15      A.    I -- I'd have to go back.  There

16   should be.

17      Q.    Have you seen this particular

18   Report of Investigation, which is in the top

19   right corner called report number two, have

09:56  20   you seen this ROI before?

21      A.    Yes.

22      Q.    Okay.  Why did you -- why did

23   you -- why have you seen this ROI before?

24      A.    So every report comes through me

25   as the supervisor, so I would have -- I would

1    have seen it at some point.  We typically

2    have five days to review reports.

3          Q.    Okay.  What did you learn in

4    this report?

5          A.    I'd have to take a look at it.

6          Q.    Please do.

7          A.    I'm ready, sir.

8          Q.    Okay.  Great.  So it starts

9    with, Title of investigation, Mason Meyer, et

09:57 10    al, so -- and -- and if you look at the end

11    of the underlined information it says that

12    this was related to activity on July 31,

13    2020, correct?

14          A.    That is correct.

15          Q.    Okay.  So by this point you have

16    an open investigation related to Mason Meyer

17    in your office, right?

18          A.    That is correct.

19          Q.    Okay.  And why are you

09:58 20    investigating Mason Meyer at this point?

21          A.    I'm -- my assumption -- well,

22    wrong word.  I think we were asked to assist

23    them in locating Mason Meyer.

24          Q.    And why did you decide to

25    assist?

1         A.    Based on his criminal history

2    and record and the information received from

3    the strike force.

4         Q.    He was a really bad guy, right?

5              MS. STEWART:  Objection.

6              MS. GREENE:  Objection.

7         Q.    You're still allowed to answer.

8         (Off the record discussion.)

9         A.    He had a criminal history that

09:58   10    would qualify him as a federal defendant or

11    federal candidate.

12         Q.    What was that criminal history?

13         A.    Oh, gosh.  I do recall him being

14    a felon, at some point convicted of a felony

15    which would make him a candidate for federal

16    prosecution and that we get those requests on

17    a routine basis from outside agencies to help

18    them out and we did in this case apparently.

19    That's it.

09:59   20         Q.    Do you think he was a really bad

21    guy?

22         A.    I -- I can't say that at this

23    point.

24         Q.    Okay.  Let's skip ahead a little

25    bit.  Do you -- I was gonna try and do this

1  in chron order but we won't.  Do you turn

2  down requests from agencies for assistance

3  from ATF?

4          A.    Yes.

5          Q.    Okay.  Why do you turn them

6  down?

7          A.    It all depends on lack of

8  manpower, whether we have the ability to

9  complete the tasks that they're asking us to

10:00  10  assist, whether they're federal candidates or

11  whether we have a federal nexus.

12          Q.    You said federal candidates or a

13  federal nexus, right?

14          A.    That is correct.

15          Q.    Okay.  What makes somebody a

16  federal candidate?

17          A.    Convicted -- so basically if we

18  know a person is armed or involved in

19  firearms trafficking and they've been

10:00  20  convicted of a felony in the past, especially

21  a violent felony, we would assist them in

22  that regard.

23          Q.    Okay.  Do you take every single

24  case that involves a federal candidate?

25          MS. STEWART:  Objection.

Deposition of Frank Occhipinti                     Jason Laible, et al. vs. Timothy Lanter, et al.

1      A.    I think I answered that

2    question.   No.

3      Q.    Sorry.   I'm just getting a few

4    things that hopefully will refresh your

5    recollection about how important this

6    investigation was to your office.   This will

7    be Exhibit No. 20.   I still got to find one

8    more.   Sorry.   Still will be Exhibit No. 20.

9      (Exhibit 20 identified.)

10:01   10      Q.    So we're jumping to the end of

11   the timeline a little bit or closer to the

12   end.   What I've handed you and marked as

13   Exhibit 20 is an exhibit that was produced by

14   the City of Cincinnati, bates labeled City 38

15   through 40.

16         Typically we'll read e-mails

17   from the bottom to the top, but I just want

18   to start at the top of this one.   It starts

19   as being from Francesco, Frank, Occhipinti.

10:02   20   That's you, correct?

21      A.    That is correct, sir.

22      Q.    Okay.   And you sent this e-mail

23   on August 31st, 2020, correct?

24      A.    That is correct.

25      Q.    And you sent it to Michael John

1    with the Cincinnati Police Department, right?

2         A.    That is correct.

3         Q.    Okay.  And you write to him,

4    Thank you, exclamation point, exclamation

5    point, right?

6         A.    Yes.

7         Q.    Okay.  And then there's a break

8    in there but just below that there is a

9    message that had been forward -- forwarded

10:02  10    from you or -- it's a little hard for me to

11    tell exactly, but you received a message from

12    Karl Kadon who at the time was an Assistant

13    United States Attorney, right?  Do you see

14    that message down there from Karl Kadon?

15         A.    I do.

16         Q.    To you, correct?

17         A.    Yes.

18         Q.    On August 31st, 2020 and AUSA at

19    the time.  Kadon says, Keep them comin,

10:03  20    exclamation point.  You see that?

21         A.    That is correct.

22         Q.    Okay.  And then if you flip to

23    the next page, the attachments to this -- the

24    attachment to this e-mail is a press release

25    put out by the Southern District of Ohio

1    United States Attorney at the time David M.

2    DeVillers.  Do you see that?

3            A.    I do.

4            Q.    Okay.  Do you recall that the

5    United States Attorneys' office issued a

6    press release announcing the indictment of

7    Mason Meyer as a result of the investigation

8    that your office was part of?

9                  MS. STEWART:  Objection.  You

10:03   10   can answer.

11           A.    You clearly have it in front of

12   you.  This is the press release.  Yes.

13           Q.    Do you -- okay.  Did you have no

14   recollection of this before now?

15           A.    No.  I did.

16           Q.    Okay.

17           A.    Yeah.

18           Q.    If you look at the press release

19   and you go down, the second paragraph --

10:04   20   well, first of all, we'll just start at

21   the -- at the top.  It says that, A federal

22   grand jury has charged two individuals

23   allegedly involved in an August 7th --

24   there's a missing word there.  I'm guessing

25   it's pursuit -- through Cincinnati that

1    resulted in the deaths of two bystanders in

2    Northern Kentucky.  Do you remember that

3    incident on August 7th, 2020?

4         A.    Yes.

5         Q.    Okay.  And then it says that

6    he -- that he was indicted on August 26th and

7    that indictment was unsealed today which is

8    August 31, 2020.  You see that, correct?

9         A.    Correct.

10:04  10         Q.    Okay.  Mason Meyer -- and this

11    isn't in here but his -- do you recall that

12    he had an associate named Kirsten Johnson?

13         A.    I do.

14         Q.    Okay.  And it says they were

15    charged with the federal crimes of possessing

16    with the intent to distribute methamphetamine

17    and possessing firearms in the furtherance of

18    drug trafficking crimes.

19              Your office was involved in the

10:05  20    apprehension of Meyer and Johnson that led to

21    their indictment for those crimes, correct?

22         A.    That is correct.

23         Q.    Okay.  And part of why he was

24    within the ambit of the ATF was because he

25    was distributing significant amounts of drugs

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    and possessing firearms in furtherance of

2    drug trafficking crimes, correct?

3              MS. GREENE:  Objection.

4         A.    Sir, I don't recall if that was

5    the specific reason.  I do recall being

6    requested and asked for assistance in

7    locating Mr. Mason Meyer.

8              Q.    Okay.  The United States

9    Attorney for the Southern District of Ohio

10:06  10    told the public in this press release -- if

11    you go down to what is the fifth paragraph --

12    quote, Cincinnati Police Officers attempted

13    to stop Meyer when he fled causing a police

14    chase through Cincinnati into Covington and

15    Newport, Kentucky.  Do you agree with the

16    U.S. Attorney that Mason Meyer caused the

17    police chase?

18              MS. STEWART:  Objection.

19              MS. GREENE:  Objection.

10:06  20         Q.    You can still answer.

21              MS. GREENE:  Object to form.

22         A.    You're asking me to assume what

23    the U.S. Attorney thought?

24         Q.    I'm asking if you agree with

25    what he wrote.

1      A.    I don't think I could answer

2   that at this point.

3      Q.    You think the U.S. Attorney for

4   the Southern District of Ohio would -- would

5   write something that he doesn't believe to be

6   accurate?

7           MS. STEWART:  Objection.

8      A.    I -- I don't know -- I don't

9   understand your question to be honest with

10:07  10  you.

11      Q.    My question is, when the United

12   States Attorneys for the Southern District of

13   Ohio issues a press release, do you believe

14   that he is doing his best to make sure that

15   everything in that press release is true and

16   accurate?

17           MS. STEWART:  Objection.

18           MS. GREENE:  Objection.

19           MS. STEWART:  That's outside of

10:07  20  his personal knowledge, Aaron.

21      A.    I can't get in his head.  I

22   don't know.

23      Q.    Okay.  The next sentence says,

24   Local court documents detail that Meyer's

25   vehicle struck and killed a couple on a

1   dining patio -- and, again, I apologize.

2   There's something missing -- in Newport,

3   Kentucky.  Two pedestrians were struck and

4   suffered minor injuries.

5          At the time of the chase,

6   federal -- the federal indictment alleges

7   Meyer and Johnson possessed 50 grams or more

8   of methamphetamine, two loaded handguns, and

9   a rifle.  You participated in the

10:07  10   apprehension of Meyer and Johnson on August

11   7th, 2020, correct?

12          A.    I did as supervisor.  Yes.

13          Q.    But you were -- you were

14   literally on the scene after the crash and

15   participated in the apprehension, --

16          A.    I was.

17          Q.    -- correct?

18          A.    Yeah.

19          Q.    You had a, if I remember from

10:08  20   the video, a rifle with you at the time,

21   right?

22          A.    I may have.  I'd have to take a

23   look at the video.

24          Q.    Okay.  Well, we'll look at the

25   operation plan which talks about the weapons

1    you carried that day.  When Mr. Kadon --

2    flipping back to the first page, there's -- I

3    think there's something missing in here.  Do

4    you -- so the e-mail from you to Michael John

5    says, Thank you.  Do you know what you were

6    thanking him for?

7          A.    I do not.

8          Q.    Do you know why Mr. Kadon asked

9    everyone to keep it coming -- keep em comin?

10:09   10          A.    I do not.

11          Q.    Okay.  Was the arrest of

12    Mr. Meyer important to you?

13              MS. STEWART:  Objection.

14          Q.    Just personal.

15          A.    Every arrest is important to me.

16          Q.    Okay.  We'll mark this as

17    Exhibit 21.

18        (Exhibit 21 identified.)

19          Q.    Exhibit 21, bates labeled City

10:10   20    one, 00001, and, Agent Occhipinti, it's an

21    e-mail from you on August 13, 2020 to a

22    number of people:  Roland H. Herndon, Jr.,

23    with a U.S. DOJ e-mail address.  Who is

24    Mr. Herndon?

25          A.    Mr. Herndon at the time was the

1    assistant special agent in charge of the

2    Columbus Field Division.  My boss.

3         Q.    Okay.  That's the title you now

4    have as an acting --

5         A.    That's correct.

6         Q.    -- capacity?  Okay.  Paul

7    Neudigate is with the Cincinnati Police

8    Department, correct?

9         A.    He was at the time.

10:10   10         Q.    Right.  And who -- it's also --

11    Michael John we've talked about and who is

12    Bridget Bardua?

13         A.    I believe at the time she was a

14    captain.  Yeah, I believe she was a captain

15    still of the Cincinnati Police Department.

16         Q.    Okay.  What were you

17    communicating to that group in your e-mail?

18         A.    You mind if I read it?

19         Q.    No.  I want you to read it.

10:11   20         A.    Okay.  What was your question

21    again?  I'm sorry.

22         Q.    I was -- just in general what

23    were you communicating to this group in this

24    e-mail and then I'll ask you some specifics.

25         A.    It looks like I was just

1    informing them of the charges that were filed

2    against Mr. Meyer.

3        Q.    Okay.

4        A.    And I'm sorry.  Ms. Johnson.

5        Q.    Okay.  In the fifth paragraph,

6    the one that says, we are working closely, do

7    you see that?

8        A.    I -- I do.

9        Q.    We are working closely with

10:12  10    Newport PD and the Boone County Prosecutor's

11    Office to ensure that the homicide case

12    against Meyer goes unimpeded.  What was the

13    homicide case against Mr. Meyer?

14        A.    So that is stemming from the

15    pursuit and where he ended up killing those

16    two people.  That is the homicide case I was

17    referring to.

18        Q.    Right.  So you're assisting in

19    bringing homicide charges against Mr. Meyer

10:12  20    for running over the Laibles, correct?

21            MS. GREENE:  Objection.

22        A.    I was assisting them with any

23    information they needed so that their case

24    can go forward.

25        Q.    As to the murder of the Laibles

1   by Mr. Meyer, correct?

2          A.    That is correct.

3          Q.    Okay.  And you know he's -- he

4   pled guilty to their murders, right?

5          A.    I do.

6          Q.    Okay.  Did you participate in --

7   strike that.  Two more paragraphs down.

8   Well, no.  The next paragraph says, Johnson

9   is expected to be extradited to Ohio within

10:13  10   the next few days.  Did your office

11   participate in efforts to get Ms. Johnson

12   extradited to Ohio?

13          A.    I don't recall.  I -- I don't

14   remember.

15          Q.    Do you remember why she was

16   being extradited to Ohio?

17          A.    I don't remember.

18          Q.    Okay.  The next paragraph,

19   Lastly, DEA, DART -- what does that acronym

10:13  20   DART stand for?

21          A.    Man, there's so many.  I don't

22   remember.  Some sort of drug task force in

23   our area.

24          Q.    Okay.  It's not -- it's not a

25   federal task force?

```
 1              A.    It may have some federal

 2       component to it but to be honest with you

 3       I -- I don't recall.

 4              Q.    Okay.  Lastly, DEA, DART, and

 5       Boone County.  Do you remember which

 6       component of Boone County government you were

 7       talking about there?

 8              A.    Their sheriff's office.

 9              Q.    Okay.  Lastly, DEA, DART, and

10:14   10       Boone County have joined this investigation

11       with us.  Their folks will be physically

12       located in our space until the culmination of

13       this case.

14              So even though you had -- you

15       were in the process of indicting Meyer and

16       Johnson, an investigation was continuing,

17       correct?

18              A.    Correct.

19              MS. STEWART:  Objection.  You

10:14   20       can answer.

21              A.    Sorry.  That is correct.

22              Q.    Why was an invest -- why was the

23       investigation continuing?

24              THE WITNESS:  Do you mind if I

25       talk to you?
```

```
 1              MR. HERZIG:  We'll go off the

 2        record.

 3            (Break taken.)

 4                    MR. HERZIG:  So Agent

 5        Occhipinti, you -- you wanted to consult with

 6        your lawyer about something before we

 7        proceeded.  Typically we won't take breaks

 8        while a question is pending unless it's for

 9        the purposes of you understanding the limits

10:23  10  of what you are allowed and not allowed to

11        say in your employment, so I assume that's

12        what you were consulting about.

13                    MS. STEWART:  That's correct.

14                    MR. HERZIG:  Okay.

15                    MS. STEWART:  Yes.

16        BY MR. HERZIG:

17            Q.    Are you prepared to answer my

18        last question if the court reporter would

19        read it back, please?

10:24  20        A.    Sure.

21            (Record read by Reporter.)

22            A.    So Mr. Meyer had -- and Kirsten

23        Johnson had associates in Cincinnati involved

24        in a drug trafficking ring and firearms

25        trafficking organization as well.
```

1          Q.    Was Mr. Meyer the leader of a

2    large criminal organization?

3                MS. GREENE:   Objection.

4          A.    He was not.

5          Q.    Was he a leader of a large

6    criminal organization?

7          A.    To the best of my knowledge, no.

8          Q.    How many people ended up getting

9    extradited as a result of the Mason Meyer

10:24    10    investigation?

11          A.    Gosh.  I don't recall the exact

12    number.  I want to say somewhere between five

13    and eight.

14          Q.    And was he the leader of that

15    group of five to eight people?

16          A.    He was not.

17          Q.    Who was?  Is it someone whose

18    name we've seen in these documents?

19          A.    I believe so, sir.

20          Q.    Is that --

21          A.    Mr. Haskamp.

22          Q.    Okay.  What was Mr. Meyer's role

23    in the -- is it fair if I call it a criminal

24    organization?  Is that a fair way to

25    characterize what they were?

1      A.    That's fair, sir.

2      Q.    Okay.  What was Mr. Meyer's role

3    in this criminal organization?

4      A.    I don't recall what his specific

5    role was.

6      Q.    Okay.  Did Mr. Haskamp end up

7    getting indicted as a result of this

8    investigation?

9      A.    Yes, sir.

10:25  10     Q.    So this investigation led to the

11    leader of this criminal organization being

12    indicted, correct?

13     A.    That is correct.

14     Q.    Okay.  And do you know whether

15    he was convicted of any crimes?

16     A.    He was.

17     Q.    And what were those crimes if

18    you recall?

19     A.    Drug trafficking and possession

10:26  20    of firearms.

21     Q.    Was the -- how did the

22    apprehension of Mr. Meyer fit into -- sorry.

23    Were those federal indictments?

24     A.    Yes, sir.

25     Q.    Okay.  Just generally, how did

1    the apprehension of Mr. Meyer fit into the

2    apprehension, indictment, and conviction of

3    Mr. Haskamp?

4        A.    I don't understand your

5    question.

6        Q.    Did it play any role -- did the

7    apprehension of Mr. Meyer -- the

8    investigation of Mr. Meyer play any role in

9    your ability to apprehend or indict or

10:26  10    convict Mr. Haskamp?

11        A.    Yes.

12            MS. STEWART:  Objection.  You

13    can answer.

14        A.    It did, yes.

15        Q.    Okay.  What role?

16        A.    It -- so from my

17    understanding -- and, again, I'm going back

18    four years so you'll have to forgive me if

19    I'm not...

10:27  20        Q.    Uh-huh.  Uh-huh.

21        A.    Arresting Mr. Meyer allowed us

22    to further look into this criminal

23    organization in Cincinnati and in Kentucky.

24        Q.    Okay.  Do you feel good about

25    the work?

1            MS. STEWART:  Objection.

2      A.    I'm sorry.  What work?

3      Q.    The work of breaking up this

4  criminal organization.

5      A.    Just like any other group we

6  break up over the course of my career, yes.

7      Q.    Is our community here in

8  Southwestern Ohio and Northern Kentucky safer

9  because you did the work to break up this

10:27  10  criminal organization?

11            MS. GREENE:  Objection.

12            MS. STEWART:  Objection.

13      A.    I can't answer that.  I -- I

14  don't know if the community's safer or not.

15      Q.    So -- okay.  I mean, I'm

16  basically just asking you if ATF is effective

17  at its job and makes the world a better

18  place.

19            MS. GREENE:  Objection.

10:28  20            MS. STEWART:  Objection:

21  Relevance.

22      Q.    I figure you do.

23            MS. STEWART:  Objection:

24  Argumentative.

25      Q.    Do you feel good about the job

1    you do every day?

2              MS. STEWART:  Objection.

3              MR. HERZIG:  Why?

4              MS. STEWART:  He's not had the

5    chance to answer what you've asked.

6              MR. HERZIG:  Well -- because he

7    thinks he can't answer when you object.  So

8    you can answer any question I object to

9    unless they instruct you not to.

10:28  10              THE WITNESS:  I wouldn't be in

11    this job if I didn't think I was making a

12    difference.

13    BY MR. HERZIG:

14        Q.    Yeah.

15        A.    Any police officer in this room

16    wouldn't be doing their job if they didn't

17    make their -- if they didn't think they were

18    making a difference.

19        Q.    Absolutely.  I respect that a

10:28  20    great deal and I would -- I'm glad to hear

21    you say that.

22              MS. GREENE:  Objection:  Form.

23              MR. HERZIG:  There was no

24    question there.  I'm just telling the witness

25    I'm glad to hear him say that.

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 53 of 233 - Page
ID#: 1958
Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
  1    BY MR. HERZIG:
  2          Q.     I'm going to skip kind of to the
  3    end to hopefully refresh your recollection
  4    more about the good work that you all did and
  5    then go back to specifics.  So this is
  6    Exhibit 22.
  7          (Exhibit 22 identified.)
  8          Q.     It's -- it's a three-page
  9    document that was produced to us by
10:29  10    plaintiffs I believe.
 11          MR. COWAN:  Yeah.
 12          Q.     And it is -- it starts at the
 13    top.  It's an e-mail from you to Officer
 14    Bardua copying Joshua Bricker; is that right?
 15          A.     Yes.
 16          Q.     Okay.  Subject is ATF rounds.
 17    What does that mean?
 18          A.     ATF rounds are basically a
 19    synopsis of either the week's events, the
10:30  20    day's events or a particular incident --
 21          Q.     Okay.
 22          A.     -- and that typically goes out
 23    to whoever needs to take a look at it.
 24          Q.     Got it.  And this was dated --
 25    this is dated December 3rd, 2020 and it has
```

1    an attachment called Ryan Haskamp, dot, DOCX,

2    correct?

3            A.    Correct.

4            Q.    Okay.  Do you recall sending

5    this e-mail and attachment?

6            A.    According to the e-mail I must

7    have sent it.  Yeah.

8            Q.    Okay.  It says, Captain Bardua,

9    Attached please find a brief synopsis of this

10:30  10    morning's operation.  The haul includes quite

11    the smorgasbord of illicit substances and

12    firearms.  DEA has indicated that the weight

13    of the drugs far exceed federal thresholds

14    and added that they will take some time to

15    get us exact weights of each.  Rather than

16    waiting, I decided to send you what I have.

17    Hope this helps.  Thanks again for your

18    support this morning.

19            Do you recall what the morning's

10:31  20    operation was?  And if you need to read

21    the -- the attachment, feel free to.

22            A.    Okay.  Yeah.  This is -- we

23    served five search warrants on that morning.

24            Q.    Okay.  You're looking at the

25    bottom of the first page of the attachment

1    and the top of the second where it lists five

2    different addresses; is that right?

3         A.    That is correct, sir.

4         Q.    Okay.  And -- okay.  So let's go

5    over the attachment.  Well, it sounded like

6    you felt good about the work you did that

7    day.  You call it a haul that includes quite

8    a smorgasbord of illicit drug -- illicit

9    substances and firearms.

10:32  10              MS. STEWART:  Objection.

11         Q.    So was that -- were you -- were

12    you pleased with that operation that day?

13              MS. GREENE:  Objection.

14         A.    Yeah, of course I was.

15         Q.    Okay.  So the first page of the

16    attachment is titled Mason Meyer, et al.  Do

17    you see that?

18         A.    Correct.

19         Q.    Okay.  So this is a report

10:32  20    related to the investigation of Mason Meyer,

21    correct?

22         A.    Correct.

23         Q.    Okay.  And this is December 3rd,

24    2020, so this is after the August 7th

25    incident, right?

```
 1              A.     That is correct.
 2              Q.     Okay.  Because the investigation
 3     had continued because you were trying to
 4     break up this entire criminal organization,
 5     right?
 6              A.     Yes.
 7              Q.     Okay.  I'm just gonna walk
 8     through this to, like I said, hopefully
 9     refresh your recollection to make going
10     through the other documents easier as we go
11     throughout the date.
12                     You write, In July of 2020
13     the -- the Drug Enforcement Administration in
14     conjunction with Northern Kentucky Drug Task
15     Force.  Do you think that's the same as the
16     drug strike force?
17              A.     Perhaps.
18              Q.     Okay.  Initiated an
19     investigation into a violent armed narcotics
20     trafficking organization based in Cincinnati,
21     Ohio with operations throughout the State of
22     Ohio -- of Northern Kentucky, Southern Ohio
23     and Florida, and that violent armed narcotics
24     trafficking organization is the organization
25     in which Mr. Meyer was involved, correct?
```

1        A.    That is correct.

2        Q.    Okay.  The organization that

3   Mr. Haskamp ran, right?

4        A.    That is correct.

5        Q.    Okay.  Targets of the

6   investigation include convicted felons who

7   were known to regularly carry firearms and

8   use violence and threats to further their

9   illicit activities.

10:33   10            Mr. Meyer was one of the targets

11   of the investigation who was a convicted

12   felon who was known to carry firearms and use

13   violence and threats to further his illicit

14   activities, correct?

15        A.    That is correct.

16        Q.    During the investigation,

17   multiple individuals were identified as straw

18   purchasers for the DTO.  Does DTO stand for

19   drug trafficking organization?

10:34   20        A.    Yes.

21        Q.    Okay.  So that's what you called

22   this group was a DTO, a drug trafficking

23   organization.

24        A.    Yes.

25        Q.    Okay.  And you put them out of

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 58 of 233 - Page
ID#: 1963
Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    business, right?

2              MS. STEWART:  Objection.  You

3    can answer.

4         A.    We arrested them.  We -- yes.  I

5    hope we did.

6         Q.    Yeah.  Cooperating defendants

7    identified Mason Meyer and advised law

8    enforcement that Meyer had stated that he

9    would not go back to jail and would shoot it

10:34 10   out with police.

11             You believe that statement to be

12    truthful, right?

13             MS. GREENE:  Objection.

14        Q.    What you wrote there is the

15    truth that you knew it at the time, right?

16        A.    Just give me a second to read

17    it.

18        Q.    Sure.

19        A.    Yes.

10:35 20            MS. STEWART:  Objection.  You

21    can answer.

22        A.    Yes, sir.  I mean, I wrote it.

23    Yes.

24        Q.    Right.  I assume anything you

25    write to -- in the course of your job you

1    believe to be the truth at the time you write

2    it --

3         A.    Yes.

4         Q.    -- correct?

5         A.    That is correct, sir.

6         Q.    Okay.  As a result of the

7    investigation -- is the beginning of the next

8    paragraph -- ATF and Kentucky law enforcement

9    have charged Meyer and Kirsten Johnson for

10:35   10    federal firearm/narcotic violations and state

11    murder charges stemming from a vehicle

12    pursuit that killed two law-abiding citizens.

13           That -- that's accurate,

14    correct?  You -- I think we've already gone

15    over this but you helped Kentucky, the Boone

16    County Prosecutor's Office specifically,

17    bring murder charges against Meyer, correct?

18           MS. GREENE:  Objection.

19         A.    Sir, we assisted in their

10:36   20    prosecution.

21         Q.    Yeah.  So I get the sensitivity

22    around that and what you might or might not

23    have been advised is not my business.  United

24    States is not a party to this case.  It's

25    been dismissed.  And so I'm just trying to

1    get a clear understanding of what you all

2    knew about Mason Meyer, what the officers

3    involved in the chase knew about Mason Meyer

4    at the time, and what happened on that day,

5    and most of what I'm trying to do here this

6    morning in the first part of this is

7    understand just how bad a guy Mason Meyer

8    was.

9              And I know that's colloquial and

10:36  10    might not be the language you use in law

11    enforcement but that's all I'm trying to do

12    and so I'm -- I'm not concerned about

13    whether -- when I say you helped, you could

14    call it assist, whatever, those are all

15    synonyms.  That's fine.

16              I'm just trying to get an

17    understanding of how you helped put a bad guy

18    in jail and so I hope you take my questions

19    in that spirit.

10:37  20              The -- you say next, A search of

21    the vehicle involved the aforementioned --

22    involving the -- A search of the vehicle

23    involved in the aforementioned pursuit

24    yielded two handguns, one AR-style rifle, and

25    a quantity of methamphetamine.  It was also

1    identified that Meyer was purchasing and

2    selling firearms to Haskamp and others.

3                You're talking about the vehicle

4    that -- that he crashed into the -- the

5    Laibles and the Kleins on August 7th,

6    correct?

7         A.    Yes.  In that specific

8    paragraph, yes, sir.

9         Q.    Okay.  So in the car that he was

10:37  10   driving that day, two handguns, an AR-style

11   rifle, a quantity of methamphetamine.  Do you

12   remember -- you -- the indictment you talked

13   about in the e-mail, I think, was at least 50

14   grams of methamphetamine.  Is that what was

15   in the car?

16        A.    I'd have to take a look at

17   exactly what we got out of there.

18        Q.    We'll get there.  Okay.  And you

19   all knew at the time, meaning ATF, the strike

10:38  20   force, and CPD who was involved, knew at the

21   time that Meyer was purchasing and selling

22   firearms to Haskamp and others, correct?

23                MS. STEWART:  Objection.

24        A.    Can you rephrase that question

25   or repeat it?

1    Q.    Part of why you were attempting

2    to apprehend Meyer on August 7th, 2020 is

3    because he was involved in purchasing and

4    selling firearms to Haskamp and others,

5    correct?

6    A.    That is incorrect, sir.

7    Q.    Okay.  So why -- why do you

8    bring it up here in this -- in this document?

9    A.    Where do you see that?

10:38  10    Q.    The last sentence of the second

11    paragraph:  It was also identified that Meyer

12    was purchasing and selling firearms to

13    Haskamp and others.

14    A.    Let me see where it says -- so I

15    wrote this on December 3rd, we would have

16    known that information after the -- the crash

17    and pursuit.

18    Q.    Okay.  So you didn't -- okay.

19    Well, I think -- I think you may -- we'll get

10:39  20    some other documents that might refresh your

21    recollection of that.  On August 10th -- the

22    next paragraph.  On August 10th, 2020, the

23    Cincinnati ATF Task Force -- those are your

24    words, right -- formally joined the DEA

25    investigation.

1           Help me out there.  What -- what

2      was the DEA investigation that was going on

3      before August 10th, 2020?

4           A.    They were investigating

5      Mr. Haskamp's organization.

6           Q.    I see.  So DEA was investigating

7      Haskamp but that's not how you learned about

8      Mason Meyer, correct?

9           A.    That is correct, sir.

10:39   10           Q.    Okay.  So DEA on one level,

11      let's say the federal level, was trying to

12      get Haskamp who was leader of the drug

13      trafficking organization and it just so

14      happened that Northern Kentucky Drug Strike

15      Force and then -- and then ATF was trying to

16      get Mr. Meyer and it turns out those two were

17      connected --

18                MS. GREENE:  Objection.

19           Q.    -- is that fair?

10:40   20           A.    To the best of my knowledge,

21      sir, yes.

22           Q.    Okay.  So on August 10th -- so

23      tell me -- tell me about -- what does that

24      mean when the Cincinnati ATF Task Force

25      joined the DEA investigation?

1        A.    It's basically sharing

2    information, right?  So if I share

3    information with you, if you're federal

4    agency, law enforcement agency, and we work

5    together, then we call a joint investigation.

6        Q.    Okay.  Why was it important --

7    well, why did you join the investigations?

8    Why did the United States join the

9    investigations?

10:40  10        A.    Into Mr. Meyer?

11        Q.    Well, it says -- it says your

12    task force joined their investigation.  I

13    guess why -- why did you do that?

14        A.    So after we learned Mr. Meyer

15    was part of the Haskamp organization -- I'll

16    call it the Haskamp organization for purposes

17    of this proceeding.

18        Q.    Okay.

19        A.    I just answered your question.

10:41  20        Q.    So after you learned that -- I

21    asked why and you told me when.  So why did

22    you join those two -- why did you join their

23    investigation?

24        A.    So we realized that the

25    information we got from DEA that Mr. Haskamp

1    was involved in drug trafficking, firearms

2    trafficking, and then just the quantity of

3    firearms we recovered from Mr. Meyer's

4    vehicle at the time of his arrest, realized

5    that, hey, there's most likely -- more than

6    likely a larger group here in Cincinnati and

7    so it was our attempt to join -- join that

8    investigation and take part in it.

9         Q.    Okay.  The next sentence, it

10:41    10    says, ATF has since assisted with the

11    development of key informants and/or

12    cooperating sources, the identification of

13    the full organization, and the identification

14    of the interstate and international tentacles

15    of the organization.  Do you recall what the

16    interstate tentacles of the organization

17    were?

18         A.    That would refer to their drug

19    trafficking piece of it.

10:42    20    Q.    Okay.  In how many states?  You

21    list here -- I'm not trying to trick anybody.

22         A.    Yeah.

23         Q.    At the top you say Northern

24    Kentucky, Southern Ohio and Florida.  I know

25    there are references to an Arizona trip in

1    some of the documents, so that's four that I

2    can think of.  Do you recall those four?

3              A.    I do, sir.

4              Q.    Okay.  Are there others in their

5    interstate tentacles?

6              A.    Not that I recall.

7              Q.    Okay.  What were the

8    international tentacles of this drug

9    trafficking organization?

10:42  10             A.    So Mr. Haskamp was receiving,

11   from what I -- what I could remember, parcels

12   of narcotics from overseas and that's how DEA

13   was useful in helping us reach out to

14   those -- to those areas.

15             Q.    Okay.  Where -- where was he

16   receiving the parcels from?

17             A.    I do not recall.

18             Q.    Okay.  It then says, The case

19   involved the utilization of a Title III wire

10:43  20   inter -- of a Title III wire interception.

21   Did you have Title III wire interceptions

22   that included Mr. Meyer in the recordings?

23             A.    I don't know.

24             Q.    Okay.  As a result of the Title

25   III investigation, agents identified key

1    member -- key members of the organization

2    that were actively engaged in the illegal

3    distribution of firearms and narcotics in

4    Greater Cincinnati and Northern Kentucky.  Do

5    you recall that being true?

6              A.    That is correct, sir.

7              Q.    Okay.  Do you keep those Title

8    III recordings?  Do you still have them --

9    those are two questions.  Would ATF still

10:43  10    have those Title III recordings?

11                  MS. STEWART:  Objection.  You

12    can answer if you know.

13              A.    I don't have those.  This would

14    be DEA's.  They would keep those.

15              Q.    Okay.  You then go on to say

16    that, Beginning this morning, special agents

17    from ATF, the DEA, and officers from the

18    Cincinnati Police Department conducted a law

19    enforcement operation consisting of five

10:44  20    federal search warrants and four arrest

21    warrants, and then it goes on to list those

22    places.  Did you participate in the execution

23    of those warrants that day?

24              A.    I did.

25              Q.    Okay.  So you were personally on

1    hand to serve those warrants and arrest these

2    individuals?

3            A.    I was.

4            Q.    Okay.  On the next page -- I

5    believe on the first page you called what is

6    listed on -- in your e-mail you said there

7    was a haul that includes quite a smorgasbord

8    of illicit substances and firearms.  On the

9    last page of your attachment there is a list

10:44  10    of 11 firearms, a large number of narcotics,

11    thousands of rounds of ammunition,

12    counter-surveillance equipment, and a display

13    of fireworks/explosives.  Is that the haul

14    you were referring to in your e-mail?

15            A.    I would assume so.

16            Q.    Okay.  And on that day you

17    arrested Haskamp, Jenkins, Stauffer and Smart

18    it says at the bottom of your attachment,

19    correct?

10:45  20            A.    Correct, sir.

21            Q.    And those are all individuals

22    that were part of the drug trafficking

23    organization, correct?

24            A.    Yes.

25            Q.    And did all of them get

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    indicted?

2              A.    To the best of my knowledge, I

3    believe so.

4              Q.    Okay.  Were they all convicted?

5              A.    I don't recall.

6              Q.    Okay.  Is Mr. Haskamp in federal

7    custody right now?

8              A.    Yes.

9              Q.    Do you recall how long a

10:45   10    sentence he got?

11             A.    No.

12             Q.    All right.  Back to some

13    reports -- Report of Investigations.  Reports

14    of Investigations.  This'll be Exhibit 23 I

15    believe.

16          (Exhibit 23 identified.)

17             Q.    So a couple -- a couple of

18    things.  So this was produced by the United

19    States to us in response to discovery

10:46   20    requests.  In the top right corner it is

21    report number 29.  In the top left corner the

22    title of investigation is Mason Meyer, et al.

23    Do you see those?

24             A.    Yes.

25             Q.    Okay.  It says authorized by

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 70 of 233 - Page
ID#: 1975
Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    you, correct?

2              A.    Yes.

3              Q.    Okay.   The summary of events

4    says it's an interview of -- the name is

5    blacked out -- on January 26, 2021 and it

6    refers to the recovery of a Smith & Wesson

7    M&P 9 Shield EZ M 2.0 that the individual

8    purchased on July 1, 2020 which was recovered

9    by Northern Kentucky Police during a shooting

10:47  10    investigation on July 6th at -- 2020 at

11    Newport, Kentucky.

12              Do you recall that I showed you

13    earlier a summary ROI that talked about a

14    shooting on July 6th, 2020, right?

15              A.    I do.

16              Q.    This refers to the same

17    incident, correct?

18              A.    Yes.

19              Q.    Okay.   So in January of 2021 you

10:48  20    were still investigating the July 6th

21    shooting involving Mason Meyer, correct?

22              A.    Yes.

23              Q.    Okay.   Take a look at paragraph

24    three.   It says SA, which I assume is special

25    agent; is that right?

1    A.    Yes.

2    Q.    Okay.  Special agent -- name

3    blacked out -- explained to the interviewee,

4    quote, The reason why law enforcement wanted

5    to talk to her referenced the recovery of a

6    firearm purchased by her in the past which

7    was recovered during a shooting investigation

8    in Newport, Kentucky.  Were you -- were

9    you -- did you participate in this interview

10:48    10    of the individual?

11    A.    No.

12    Q.    You did not.  Okay.  So this is

13    a report to you.

14    A.    Yes, sir.

15    Q.    Okay.

16    A.    Well, let me rephrase that.  I

17    apologize.  It's not a report to me.  It's a

18    Report of Investigation which I review.

19    Q.    Okay.  Who -- who does the

10:49    20    report -- does the Report of Investigation go

21    to the file so to speak?

22    A.    The case file.

23    Q.    Okay.  And who is responsible

24    for the case file?

25    A.    The case sergeant.

1      Q.    Okay.  And that case agent is

2      responsible to you ultimately, correct?

3           A.    That is correct, sir.

4           Q.    Okay.  You expect your -- you

5      expect the special agents that report to you

6      to state only truthful information in a

7      report -- in a Report of Investigation,

8      correct?

9           A.    That is correct.

10:49  10          Q.    Okay.  So whatever they write

11     you would believe it to be true, right?

12          A.    That is correct.

13          Q.    Okay.  Do you recall generally

14     that part of Mason Meyer's criminal activity

15     was getting individuals who were allowed to

16     buy firearms to go to firearm's dealers and

17     purchase guns that he picked out so that he

18     could use them or sell them?

19          A.    Can you rephrase that?  I'm not

10:50  20     sure.

21          Q.    Sure.  I'm -- I'm trying to

22     shortcut things a little bit but -- but we

23     can go through it all if we have to.  One of

24     the things I've seen in these documents is

25     that Mason Meyer one of his criminal

Deposition of Frank Occhipinti                          Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1      activities was one way or another getting

 2      individuals, usually women, to go to lawful

 3      firearms dealers with him, he would pick out

 4      weapons, they would purchase them because he

 5      had a disability that prevented him from

 6      purchasing them, and then he would use those

 7      weapons either to sell them or for his own

 8      illicit purposes.  Do you recall that being

 9      part of Mason Meyer's activities?

10:50 10          A.    I do.

11                Q.    Okay.

12                A.    Forgive me.  I'm going back four

13      years so trying to break it down as to when

14      and where --

15                Q.    Okay.

16                A.    -- this information was learned.

17                Q.    Sure.  And I get it.  You

18      didn't -- you didn't -- you haven't thought

19      about this in a while apparently.  I -- I'm

10:51 20      trying to refresh your recollection about it,

21      so that's -- if we have to go through all the

22      documents to do that, we -- we will, which is

23      okay.

24                The -- take a look at paragraph

25      three.  Does that generally describe what I
```

1    was -- what I just described to you:  Someone

2    being used by Mr. Meyer to buy a gun because

3    he couldn't?

4            A.    So paragraph three does not

5    reference straw purchasing.

6            Q.    Okay.  What do you mean by straw

7    purchasing?

8            A.    What you just described where

9    Mr. Mason Meyer would direct people or

10:52 10   individuals with no criminal history to

11   purchase firearms for him.

12           Q.    Okay.  Take a look at paragraphs

13   five and six.  I have a few questions

14   specifically about paragraph six.

15           A.    Go ahead, sir.

16           Q.    Do you see anything about what

17   you would describe as straw purchasing in

18   paragraphs five and six?

19           A.    What I see is, Returned to the

10:53 20   lot, was upset that the, did not have weapons

21   in hand.

22           Q.    You know, you don't need to read

23   the whole thing.  I was asking for your

24   impression of it.

25           A.    Okay.

 1          Q.    Going -- going down about

 2     halfway down that paragraph it states, Meyer

 3     was armed with a handgun, possibly a

 4     revolver, and pointed it at -- blank, which I

 5     believe to be an individual.  Do you see

 6     that?

 7                MS. STEWART:  Aaron, I'm sorry.

 8     Do you mean five or six?

 9                MR. HERZIG:  I'm in six.  I

10:53 10     apologize.

11                MS. STEWART:  Paragraph six.

12     That's okay.

13                THE WITNESS:  What's -- are you

14     towards the bottom?

15     BY MR. HERZIG:

16          Q.    I'm in the middle,

17     unfortunately, of paragraph six.

18          A.    Pointed at -- yes, I see that,

19     sir.

10:53 20          Q.    When you went to apprehend Mason

21     Meyer on August 7th, was your task force

22     aware that Mason Meyer threatened people with

23     handguns?

24          A.    I don't recall that specific

25     information.  We were aware that he had

1    access to firearms and was possibly armed.

2         Q.    Okay.  The next sentence said,

3    Meyer made threats to his people -- that his

4    people weren't happy about not having

5    firearms so someone was going to be shot.

6    Does that sound consistent with something

7    that Mr. Meyer would have threatened based on

8    what you know?

9              MS. GREENE:  Objection.

10:54  10         A.    This is what the report says.

11         Q.    Okay.  And you've already told

12    me that anything in the report you would

13    believe to be truthful, correct?

14         A.    I sure hope so.

15         Q.    Paragraph seven.  This

16    individual -- about halfway -- the third

17    line.  This individual explained that she was

18    still worried -- this is back in July of

19    2020.  Explained that she was still worried

10:55  20    about people above Meyer -- I'm sorry.

21    Actually, I guess I don't know the time.

22    That's inaccurate.

23              This person explained that she

24    was still worried about people above Meyer

25    would still shoot up her house.  What do you

1    understand people above Meyer to mean?

2             A.    My understanding would be that

3    those people would be Meyer's or the Haskamp

4    organization.

5             Q.    Okay.  And were they known to --

6    was the Haskamp organization known to use

7    violence against individuals?

8             A.    I believe so.

9             Q.    Okay.  All right.  I promised

10:56  10    you we'd kind of go back to the beginning now

11    that we have a summary of what happened.

12    This is going to be Exhibit 24.

13        (Exhibit 24 identified.)

14             Q.    Let me know when you're ready to

15    answer questions about Exhibit 24.

16             A.    Go ahead.

17             Q.    Okay.  So this is titled, Mason

18    Meyer, et al investigation -- title of

19    investigation:  Mason Meyer, et al.  Report

10:56  20    number one.  Authorized by Agent Occ -- I'm

21    sorry -- Occhipinti, correct?

22             A.    Yes.

23             Q.    All right.  It says, On August

24    6th, 2020, the following records were

25    obtained from the Northern Kentucky Drug

```
 1    Strike Force, reference search warrant

 2    executed at -- I assume that's an address --

 3    reference an assault, shots fired, and drug

 4    trafficking activity involving Mason Meyer

 5    and associates that occurred on July 6th,

 6    2020.  I think you told me that you don't

 7    recall specifically whether there was an

 8    assault -- assault, shots fired, and drug

 9    trafficking activity by Mason Meyer on

10    July 6th, 2020, right?

11                 MS. STEWART:  Objection.

12          Q.    I mean, if you do recall now,

13    that's great.  I'd be happy to have you say

14    that, yes, you recall this now.

15          A.    So based on this, I would have

16    to -- yes.

17          Q.    Okay.  So the narrative

18    describes records obtained from Northern

19    Kentucky Drug Strike Force and it references

20    a search warrant.  Is it your

21    understanding -- and then the second

22    paragraph says that a search warrant was

23    executed at an address.  Do you -- do you

24    recall that search warrant being executed

25    that day?
```

10:57  10

10:58  20

Deposition of Frank Occhipinti                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1              A.     No.
 2              Q.     Okay.  Do you think ATF was
 3       involved in the execution of that search
 4       warrant based on what you read here?
 5              A.     No, sir.
 6              Q.      It was just Northern Kentucky
 7       Drug Strike Force?
 8              A.      That is correct.
 9              Q.     Okay.  The special agent who
10:58 10       wrote this up refers to the -- the
11       individuals who -- the law enforcement
12       individuals as agents but those are not ATF
13       agents?
14              A.     No.
15              Q.     Okay.  The last line says,
16       Agents recovered multiple firearms and drugs
17       from the residence.  You believe that to be
18       accurate -- an accurate statement, right?
19              A.     Yes, sir.
10:59 20              Q.     All right.  Mark this
21       Exhibit 25.
22          (Exhibit 25 identified.)
23              Q.      Sorry.  I'm gonna go back to 24
24       for just a second.  You can look at it if you
25       want.  What -- so your office received on
```

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 80 of 233 - Page
ID#: 1985
Deposition of Frank Occhipinti                              Jason Laible, et al. vs. Timothy Lanter, et al.

1    August 6th, 2020 records about the July 6th

2    2020 assault, shots fired and drug

3    trafficking and then records related to the

4    search warrant.  So by August 6th, 2020 your

5    office was aware of that July 6th, 2020

6    criminal activity and of the item -- the

7    multiple firearms and drugs recovered from

8    the residence in which the search warrant was

9    executed, right?

11:00  10        A.    Yes, sir.

11              Q.    So while you're reading that

12    I'll just say for the record that Exhibit 25

13    is titled Mason Meyer -- Title of

14    Investigation, Mason Meyer, et al, report

15    number two and authorized by Agent

16    Occhipinti, and let me know when you're ready

17    to answer questions about it and we can go

18    page by page if that's easier.

19              A.    Sure.  Let's do that.

11:00  20        Q.    Okay.  The summary is interview

21    of -- can you tell from this at all whether

22    this -- whether the interview was of a

23    cooperator or can you tell who the person

24    was?

25              A.    No, sir.  It's redacted.

1      Q.    Okay.  You had people -- well, I

2    believe in -- in your December 3rd report you

3    talked about having cooperators to help with

4    the investigation.  Do you recall having

5    cooperators involved in the invest -- not

6    even you.  Do you recall that cooperating

7    witnesses were involved in the investigation

8    before August 7, 2020?

9      A.    Yes, sir.

11:01  10      Q.    Okay.  So this is an interview

11    of an individual on August 6th, 2020 at your

12    offices here in downtown Cincinnati, correct?

13      A.    Yes.

14      Q.    And it's regarding the criminal

15    activities of Mason Meyer and associates

16    throughout Cincinnati and Northern Kentucky.

17    The interview was conducted by a special

18    agent meaning an ATF agent, correct?

19      A.    Yes, sir.

11:02  20      Q.    A task force officer and --

21    meaning someone assigned to the task force

22    from local law enforcement, and then an agent

23    which we think means someone from the

24    Northern Kentucky Drug Strike Force, correct?

25      A.    I believe so.

Deposition of Frank Occhipinti                                Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1          Q.    Yeah.  Paragraph one helps us
 2     with that.  Paragraph two, Interviewee stated
 3     that Mason Meyer had been driving a red Mazda
 4     SUV with heavy tint.  That is not the car
 5     that you stopped -- that you attempted to
 6     stop on August 7th, 2020, correct?
 7               MS. STEWART:  Objection.
 8          A.    I don't remember what -- what
 9     car we stopped.
```
11:02 10          Q.    We'll -- we'll get to that.
```
11     Interviewee said Meyer got out of the vehicle
12     from, blank, and that, blank, drives a black
13     SU -- BMW with tinted windows and goes on to
14     talk about this other individual, correct, in
15     paragraph two?
16          A.    Yes.
17          Q.    Okay.  Paragraph three,
18     Interviewee said Meyer and his girlfriend --
19     name redacted -- both carry guns.  Meyer --
```
11:03 20     it was illegal for Meyer to carry a gun,
```
21     correct?
22          A.    Yes, sir.
23          Q.    This person reports that Meyer
24     gave him a half ounce of methamphetamine and
25     cash in May 2020 and has been hanging out
```

1    with Meyer ever since, correct?

2              A.    Yes.

3              Q.    Okay.  This individual says that

4    Meyer was getting anywhere from a quarter

5    pound to a pound of methamphetamine from, a

6    redacted place or person named, blank, north

7    of, blank, daily.  Interviewee said Meyer

8    would use two cars to go to Dayton in the

9    early morning hours to bring back

11:04  10    methamphetamine for, blank.

11                   Meyer would use one car as the

12    load car and one car as a chase car to

13    distract law enforcement from the load car.

14    Tell me, what's the value of a quarter pound

15    to a pound of methamphetamine in August of

16    2020 if you recall?

17              MS. GREENE:  Objection.

18         A.    I -- I don't recall, sir.

19         Q.    Okay.  How -- I don't know a

11:04  20    better way to ask it other than how -- how

21    many individual hits of methamphetamine are

22    contained in a quarter pound of

23    methamphetamine?

24         A.    I am not a drug expert.  I

25    wouldn't be able to intelligently answer that

Deposition of Frank Occhipinti                        Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1    question.  I don't know.  I really don't.

 2              Q.    Okay.  Can you give me --

 3    understanding you're not an expert, can you

 4    give me a guess?

 5              MS. STEWART:  Objection.

 6              A.    It's a lot.

 7              Q.    It's a lot?

 8              A.    250 grams.  That's -- I'm

 9    sorry -- quarter --

11:05 10              Q.    Quarter pound to -- I asked you

11    only about a quarter pound at first.

12              A.    Okay.  I'm thinking quarter

13    kilo.  Again, I -- it's a lot of meth.

14              Q.    Okay.  I don't know

15    methamphetamine.  How much methamphetamine is

16    in one typical dose of methamphetamine that a

17    person might abuse?

18              MS. GREENE:  Objection.

19              MS. STEWART:  Objection.

11:05 20              A.    So if you break it down into

21    grams and kilograms, grams -- one gram is

22    considered, you know, enough for a few people

23    to use.

24              Q.    Okay.

25              A.    It all depends.  Look, I'm not
```

1    trying to be evasive.

2              Q.    No. No.

3              A.    I don't know.

4              Q.    That's fair.  Okay.  I -- help

5    me understand why someone like Mason Meyer

6    would use one car as a load car and one car

7    as a chase car.  How does that distract law

8    enforcement?

9                    MS. GREENE:  Objection.

11:06  10          A.    So typically the chase -- the

11   follow vehicle is the one that is -- if they

12   see police in the area, the follow vehicle

13   will commit some sort of infraction to get

14   the attention of law enforcement to draw them

15   away from the actual load vehicle.

16             Q.    Okay.  So the practice would be

17   to actually engage with law enforcement in

18   order to get them to stop the wrong car,

19   correct?

11:06  20          A.    Yes.  That's correct.

21             Q.    Okay.  So these individuals were

22   potentially -- well, I'll leave that.  It

23   then says in paragraph four, Mason -- excuse

24   me -- Meyer was observed keeping four to

25   five, quote, zips or ounces of

1    methamphetamine in a backpack.  Meyer's

2    girlfriend, name redacted, was observed

3    taking notes in a notebook referencing drug

4    transactions.  Again, interviewee stated

5    Meyer always has a gun.

6              It was illegal -- it's a

7    criminal violation for Meyer to have

8    methamphetamine, correct?

9         A.    Yes, sir.

11:07 10       Q.    It's a criminal violation for

11    him to have a gun, correct?

12        A.    Yes, sir.

13        Q.    Okay.  Let's go to the next

14    page, paragraph five.  The interviewee says

15    that they, in fact, sell methamphetamine for

16    Meyer.  Does that -- I would guess that

17    person's a cooperator if they are, in fact,

18    admitting that they are part of the drug

19    trafficking organization.  Is that a fair

11:07 20  guess on my part?

21              MS. STEWART:  Objection.

22        Q.    Reading this as a whole, do you

23    think this was a cooperator that the -- that

24    was being interviewed?

25        A.    Cooperating in terms of giving

1    the statement, yes.

2              Q.    The interviewee next says, Meyer

3    overdosed on heroin about a month ago -- so

4    in July of 2020 -- while driving a Subaru

5    Outback in Cincinnati and wrecked into a

6    Cincinnati Metro bus with -- Metro bus with

7    his girlfriend.  Do you see that?

8              A.    Paragraph six, sir?

9              Q.    Five.  Sorry.  At the very top

11:08  10    second page.

11             A.    Wrecked -- I do see that.

12             Q.    Do you -- you said you don't

13   recall what car he was -- that he crashed

14   into the Laibles and the Kleins with on

15   August 7th, correct?

16             A.    Not offhand.  If I --

17             Q.    Okay.

18             A.    -- take a look at some records.

19             Q.    Yeah.  So far we have him in a

11:09  20    Subaru Outlook, according to this

21   interviewee, and a red Mazda SUV from

22   paragraph two, right?

23             A.    Subaru Outback.

24             Q.    What did I say?

25             A.    Outlook.

Deposition of Frank Occhipinti                           Jason Laible, et al. vs. Timothy Lanter, et al.

1        Q.    You're right.  I'm wrong.

2    Interviewee said he owed Meyer money.  I'm in

3    paragraph six now.  Interviewee stated Meyer

4    was watching his mother and was going to

5    shoot him on, blank, so the interviewee paid

6    him $500 to prevent getting killed.  Do you

7    recall that Meyer used threats of violence in

8    order to get paid by his associates?

9        A.    Are you asking me do I recall

11:09  10    this now from reading this or at the time?

11        Q.    Either one.

12        A.    I do now.

13        Q.    Okay.

14        A.    I don't remember whether I knew

15    it at the time.

16        Q.    That's fair.  But, again, you

17    believe this to be truthful because it was

18    reported by a special agent in an ROI,

19    correct?

11:10  20                MS. STEWART:  Objection.

21        A.    It's written in a report, sir.

22    Yes, sir.

23        Q.    Okay.  And more importantly,

24    anyone who received this information before

25    August 7th on your task force would have no

```
 1    reason to doubt its accuracy, correct?

 2              A.    No, sir.

 3              Q.    Okay.  Do you know what -- maybe

 4    this happens all the time in drug trafficking

 5    organizations but the idea that Meyer was

 6    watching his mother seems an unusual fact to

 7    me.  Is that -- do you know -- do you have

 8    any idea what that means?

 9              MS. STEWART:  Objection.

10              A.    Not from that sentence.

11              Q.    Okay.  Do you have any -- not

12    just looking at that sentence but in general

13    do you -- if you were reading this for the

14    first time today, what do you think Meyer was

15    doing watching this person's mother?

16              MS. GREENE:  Objection:  Form.

17              A.    So if you read on in paragraph

18    six it says, Interviewee said a week prior

19    Meyer held a gun to his head accusing him of

20    stealing ice or crystal methamphetamine --

21              Q.    Uh-huh.

22              A.    -- at mom's house.  I'm assuming

23    Meyer was there to collect a debt and wanted

24    to collect some sort of debt.

25              Q.    Okay.  In your business do
```

11:10 (line 10)
11:11 (line 20)

| | |
|---|---|
| 1 | criminals like Mr. Meyer sometimes threaten |
| 2 | the family members of people they need money |
| 3 | from? |
| 4 | MS. STEWART:  Objection. |
| 5 | MS. GREENE:  Objection. |
| 6 | MS. STEWART:  I can't let him |
| 7 | answer that.  He's not been approved under 2E |
| 8 | to testify as an expert so if you want to |
| 9 | rephrase it, that's fine, but link it to his |
| 11:12   10 | profession. |
| 11 | BY MR. HERZIG: |
| 12 | Q.   All right.  Well, I just -- I |
| 13 | didn't mean you as an expert.  I meant you in |
| 14 | your day-to-day job as the, at the time, |
| 15 | resident agent in charge of the ATF.  Would |
| 16 | it have been unusual -- I'll skip it.  It's |
| 17 | not really that important. |
| 18 | Number seven -- paragraph seven, |
| 19 | the third sentence, Meyer kidnapped and |
| 11:12   20 | knocked -- Meyer kidnapped a person that is |
| 21 | blacked out and knocked his teeth out with a |
| 22 | pistol in someone else's house.  Meyer may |
| 23 | have had his white Mercedes Benz at his |
| 24 | sister's house in Florence.  Do you recall |
| 25 | Meyer being accused of knocking people's |

1   teeth out with a pistol?

2          A.    I do now.

3          Q.    And this now says that Meyer

4   was -- may have been driving a white Mercedes

5   Benz, correct?

6          A.    Yes, sir.

7          Q.    Okay.  So we got a white

8   Mercedes Benz, a Subaru Outback, and a red

9   Mazda SUV.  In a few places in here so far,

11:13  10   including in the next paragraph, it appears

11   that Mr. Meyer uses face -- used Facebook as

12   part of his drug trafficking organization.

13   Do you recall anything about his use of

14   Facebook for that purpose?

15          A.    I do not.

16          Q.    Okay.  Would you all have

17   records of that at ATF?

18          A.    I don't know.  I would have to

19   look at the case management system.

11:14  20          Q.    Okay.  So in paragraph seven he

21   talks about kidnapping somebody and knocking

22   their teeth out.  In paragraph eight

23   interviewee was present with Mason Meyer --

24   there's something blacked out -- when --

25   blacked out -- was kidnapped by Meyer from

1    the, blank, in Florence and transported back

2    to Cincinnati to a house on, blank, and

3    that -- on, blank, that has a blue BMW.

4    Kidnapping is a criminal activity, correct?

5        A.    Yes, sir.

6        Q.    And kidnapping someone and

7    transporting them across state lines would be

8    a federal crime, correct?

9        A.    Yes, sir.

11:14    10    Q.    Okay.  Is that the kind of thing

11    that would have brought him within ATF scope?

12            MS. STEWART:  Objection.

13        Q.    You talked earlier about there

14    being essentially at some point people --

15    there are federal thresholds that you look

16    for --

17        A.    That would be one of them.

18        Q.    -- is kidnapping people one of

19    them?

11:15    20    A.    Yes, sir.

21        Q.    Okay.  Thank you.

22            MR. HERZIG:  Did you get that?

23    I talked over him.  I apologize.

24        Q.    Paragraph eight.  If you just

25    read it real quick.  I think that again

Deposition of Frank Occhipinti                                  Jason Laible, et al. vs. Timothy Lanter, et al.

1    describes straw purchases of weapons; is that

2    right?

3                    MS. STEWART:   Objection.   Go

4    ahead.

5            Q.    Paragraph nine I think I said.

6    If I didn't say nine, I meant nine.

7            A.    Yes, sir.

8            Q.    Okay.  And the third to last

9    paragraph it says, Meyer has been acquiring

11:15  10   firearms three to four times a week since he

11   has been out of jail, correct?

12           A.    Yes.

13           Q.    Okay.  So at the bottom of the

14   page in paragraph 11, the last sentence it

15   says, Interviewee in, blank, arrived in the

16   Mercedes and Meyer and, blank, were in a Ford

17   Expedition.  Do you see that?  At the bottom

18   of the -- bottom of the second, top of the

19   third page.

11:16  20           A.    Yes.

21           Q.    Okay.  Interview -- interviewee

22   saw an AR-type rifle in the Expedition when

23   he then turned the head -- headlights off and

24   I just -- I don't know all the laws here

25   exactly.  In August of 2020, was anyone

1    allowed to own an AR-type rifle?  Just in

2    general was -- were -- was the assault

3    weapons ban still in effect?

4          A.    There is no assault weapons ban

5    in Ohio, sir.

6          Q.    Okay.  There used to be a

7    federal one is what I was referring to but I

8    think that's long gone.  But Mr. Meyer could

9    not possess an AR-type rifle because he was

11:17 10   under disability for criminal convictions,

11    right?

12          A.    Correct, sir.

13          Q.    Okay.  Later on in that

14    paragraph, The interviewee was told to move

15    the Expedition up the street.  Meyer had

16    another person move the Mercedes.

17    Interviewee heard a shot.  She heard the shot

18    but did not see the assault.

19          So this interviewee is reporting

11:17 20   that Meyer -- I'm gonna use the word --

21    tactically had -- had these individuals move

22    their cars and then there was a -- there was

23    a shot fired inside the building, correct?

24          MS. GREENE:  Objection.

25          A.    I'm -- reason why I'm taking a

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 95 of 233 - Page
ID#: 2000
Deposition of Frank Occhipinti                                      Jason Laible, et al. vs. Timothy Lanter, et al.

1    while is I'm not sure whether it was fired

2    inside the building or not.

3            Q.    Okay.  But he -- a shot was

4    fired.

5            A.    Yes, sir.

6            Q.    Okay.  And then in paragraph 12

7    the interviewee reports that Meyer told --

8    tells the interviewee he shot, blank, in the

9    face with the AR and thought he killed him

11:18  10    and said next time he would kill him.  Do you

11    recall that Meyer told people that he had

12    attempted to kill somebody?

13            A.    According to this report, sir,

14    yes.  Reading it now.

15            Q.    Meyer stated a couple -- two

16    sentence -- another sentence later, Meyer

17    stated he was going to skip town and not

18    going to have the, blank.  Meyer had stated

19    that he has shot two additional people.

11:19  20    Meyer had told the interviewee that he would

21    shoot it out with police and that police

22    would have to kill him.

23            Do you recall that one of the

24    concerns when the task force went to

25    apprehend Mr. Meyer was that he was

1  threatening to shoot it out with police?

2          MS. GREENE:  Objection.

3      A.    I don't recall that specific

4  verbiage --

5      Q.    Okay.

6      A.    -- used.

7      Q.    I'm going -- go to the very end.

8  Paragraph 15 they're talk -- this is talking

9  about the -- it says, Interviewee gave

11:19  10  multiple locations related to Meyer and,

11  blank, drug trafficking organization and then

12  it goes on at the end to say, Interviewee

13  stated that, blank -- was there -- don't tell

14  me what the name was but was there a specific

15  name that you used for the drug traffic

16  organization at this point?

17          Meaning, if you look at the

18  first sentence of paragraph 15, the first --

19  the first thing that's blacked out there

11:20  20  before drug trafficking organization, do you

21  think that was a name that had been given to

22  the drug trafficking organization?

23      A.    I don't know, sir.  I really

24  don't.

25      Q.    Okay.  The last sentence says,

Deposition of Frank Occhipinti                          Jason Laible, et al. vs. Timothy Lanter, et al.

1    The interviewee stated that, blank, has used

2    drones to deliver drugs in the past.  Do you

3    recall if the Haskamp drug trafficking

4    organization used drones in its operation?

5          A.    That I do, yes.

6          Q.    Yes, you do.  Tell me about

7    that.

8          A.    The reason why it stands out is

9    because I think that's the first time I've

11:20  10    seen drones being utilized in that manner.

11          Q.    Would you say this was a pretty

12    sophisticated drug trafficking organization

13    for its time?

14              MS. STEWART:  Objection.

15          A.    What I'm saying is that I've

16    never seen anybody use a drone to traffic or

17    deliver drugs to someone else.

18          Q.    Okay.

19              MR. HERZIG:  Where we at time

11:21  20    wise?

21              THE WITNESS:  Mind if I take a

22    quick break?

23        (Break taken.)

24              MR. HERZIG:  All right.  We are

25    moving to ==Exhibit 26==.

1          (Exhibit 26 identified.)

2          Q.    All right.  We're back on the

3    record.  I've handed you what's been marked

4    as Exhibit 26.  It's -- this version is

5    labeled Cincinnati 794 to 804 and it is

6    titled ATF Operational Plan.  Agent

7    Occhipinti, do you recognize this document?

8          A.    I do.

9          Q.    What is this?

11:33  10          A.    So this is our standard document

11    we prepare prior to an enforcement -- a

12    preplanned enforcement operation.

13          Q.    Okay.  And what -- so it's a

14    standard document but this one has been

15    modified specifically for the activities that

16    you were going to -- the task force was going

17    to undertake on August 7, 2020 in regard to

18    Mason Meyer, correct?

19          A.    Yes, sir.

11:34  20          Q.    Okay.  Did you review this

21    operational plan before it was finalized?

22          A.    No.

23          Q.    When did you -- when do you

24    recall first seeing the operational plan?

25          A.    After it was finalized.

1      Q.    Like, that -- like, did you see

2      it before the operation began on August 7th?

3             A.    Oh, yes.

4             Q.    Okay.

5             A.    I think your -- my meaning of

6      your finalized is something different.

7      Finalize to me is once they hand the document

8      over to me.

9             Q.    Did you review -- so the case

11:34  10   agent is, as you said before, TFO Brett

11     Strattman.  Does that -- do you know if he

12     prepared the operational plan for that day?

13            A.    Bear with me.

14            Q.    Uh-huh.

15            A.    Yeah.  The operational plan was

16     prepared by Special Agent Eddie Schaub.

17            Q.    Okay.  So he -- he is a -- he is

18     an ATF special agent?

19            A.    Yes, sir.

11:35  20            Q.    Okay.  So he reports -- reported

21     at the time to you?

22            A.    Yes.

23            Q.    Okay.  And just so we're all on

24     the same page, this is -- you were the

25     resident agent in charge of the Cincinnati

Deposition of Frank Occhipinti                                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    Field Office in -- on August 7th, 2020,

2    right?

3         A.    Correct.

4         Q.    Okay.  Would the special

5    agent -- I'm sorry.  What was his name again?

6         A.    Edward Schaub.

7         Q.    What -- what -- what page are

8    you on?

9         A.    Sir, that's City page 799.

10        Q.    Okay.

11        A.    Are they all individually

12   marked?  Yes.

13        Q.    Would Agent Schaub have gone

14   over this plan with you before sharing it

15   with the rest of the task force?

16        A.    Yes.

17        Q.    Okay.  And if you had -- if you

18   had corrections or changes to the plan, you

19   would have discussed those with Agent Schaub

11:36  20   in advance of him sharing it with the task

21   force?

22        A.    That is correct, sir.

23        Q.    Okay.  So when this goes to the

24   task force, you -- you are -- you are

25   comfortable with everything that's in the

1      document, right?

2              A.      That is correct.

3              Q.      Okay.   Just -- we'll start

4      generally.   Generally tell me what this

5      operational plan was created for.

6              A.      So the type of operation -- if

7      you go to the first page, 794 --

8              Q.      Uh-huh.

9              A.      -- those boxes are typically

11:37  10     reserved for the type of operation, so this

11     was a vehicle stop and surveillance

12     operation.

13             Q.      Okay.   Arrest warrant is checked

14     also.

15             A.      I apologize.   Arrest warrant.

16             Q.      So -- so AT -- ATF had

17     received -- was that -- was that a federal

18     arrest warrant or a state arrest warrant if

19     you know?

11:37  20             A.      Best of my recollection, it was

21     a state arrest warrant.

22             Q.      Okay.   And what was this -- what

23     do you -- do you call this an operation?

24     That the right way to --

25             A.      Yes, sir.

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1        Q.    Okay.  What were you gonna do --

2    what was the plan for this operation?

3        A.    So the 30,000-foot-view --

4        Q.    Uh-huh.

5        A.    -- plan is set up surveillance,

6    have positive identification of Mr. Meyer,

7    and then utilize our assets in place to

8    effect the arrest of Mr. Meyer.

9        Q.    So the goal for the day was to

11:37 10   arrest Mr. Meyer and bring him into custody,

11    correct?

12            MS. GREENE:  Objection.

13        A.    Correct.

14        Q.    If you look at the bottom of the

15    first page, operation objectives it says, The

16    Cincinnati field office will conduct

17    surveillance and employ both traditional and

18    nontraditional investigative techniques to

19    assist Northern Kentucky Drug Strike --

11:38 20   sorry -- Northern Kentucky Strike Force and

21    Cincinnati Police Department with the

22    apprehension of the listed occupants for

23    felony and misdemeanor warrants, correct?

24        A.    Yes.

25        Q.    So that was the objective for

1       the day, right?

2               A.     Correct.

3               Q.     Okay.  Page two of this

4       document, called -- labeled 795, gives case

5       background.  So the case background stated

6       here -- well, let me back up a little bit.

7       Who received the ATF operational plan on

8       August 7th, 2020?

9               A.     So those individuals would be

11:38 10      named on City page 798.

11               Q.     Okay.

12               A.     So these individuals on this --

13      named on this page would typically have been

14      there.

15               Q.     Okay.  Do you recall that

16      morning?  Like, as you sit here today, do you

17      recall the morning of August 7th, 2020 as you

18      were about to go out on this operation?

19               A.     I do recall that day.  Yes, sir.

11:39 20      Q.     Okay.  Was everyone listed --

21      all the specific names one through ten on

22      this list, were all of those individuals --

23      did they all meet that morning or -- or

24      before the oper -- not the morning but before

25      the operation started that day?

Deposition of Frank Occhipinti                          Jason Laible, et al. vs. Timothy Lanter, et al.

1          A.    For the most part, yeah, I -- I

2    believe they were all there.

3          Q.    Okay.

4          A.    And we typically do this before

5    every operation where we brief at either ATF

6    or some other police facility.

7          Q.    Okay.  Where did the -- where

8    did this meeting take place?

9          A.    This briefing took place at ATF.

11:40  10          Q.    Okay.  And do you specifically

11   remember Don Scalf being there?

12         A.    I do.

13         Q.    Okay.  Do you specifically

14   remember Brett Strattman being there?

15         A.    I do, sir.

16         Q.    Okay.  Chris Vogelpohl?

17         A.    Yes.

18         Q.    Okay.  All right.  Going back to

19   page -- the second page marked 795.  So all

11:40  20   of the people that -- those ten people -- oh,

21   sorry.  Sorry.  Sorry.  Before we get there.

22              Eleven and 12 and 13 on that

23   list on 798 doesn't list specific

24   individuals.  It talks about 11 is CPD marked

25   units, 12 is NKDSF unmarked units, and 13 is

1    CPD K9.  Do you recall whether any

2    individuals from any of those categories were

3    at the meeting at your offices?

4         A.    I -- I don't recall any

5    uniformed personnel being at our briefing at

6    ATF.  I --

7         Q.    Okay.

8         A.    I do remember Don Scalf,

9    Sergeant Scalf at the time, was going to

11:41 10    drive to a separate location to brief them

11    further on this operational plan.

12         Q.    Okay.  What was -- what was

13    Sergeant Scalf's role -- what was -- what was

14    his role with this -- with this task force?

15         A.    So a major contingent of our

16    task force officers, about 90 percent of

17    them, are Cincinnati police officers, so I

18    typically like to have a sergeant to kind of

19    be in charge of his people.  Sergeant Scalf

11:41 20    was the supervisor of the Cincinnati PD Task

21    Force officers on our task force.

22         Q.    Okay.  Would he have distributed

23    a copy of this operational -- was a part of

24    his job to deliver a copy of this operational

25    plan to whomever he was working with at CPD?

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1              MS. STEWART:  Objection.  You

2      can answer if you know.

3              A.    It's part of his job, yes.  He's

4      supposed to do that.  He received training

5      how to do that.

6              Q.    Okay.  Do you know if he did

7      that on that day?

8              A.    I do not.

9              Q.    Okay.  But would you expect that

11:42  10   he would have?

11             A.    That's correct, sir.

12             Q.    Okay.  So Sergeant Scalf would

13     have had all of the information in the case

14     background on -- on what is marked as page

15     795, correct?

16             A.    Yes, sir.

17             Q.    Okay.  And his job was to make

18     sure that the Cincinnati Police Department

19     officers that were going to help the task

11:42  20   force that day had all the information in the

21     operational plan including that case

22     background, correct?

23             MS. GREENE:  Objection:  Form.

24             A.    Can you rephrase that?

25             Q.    Sure.  So he was supposed to

1    give them the operational plan.  That would

2    have included the case background, right?

3            A.    Yes.  That's part of the

4    briefing.

5            Q.    Okay.  And so he was supposed to

6    brief the Cincinnati Police Department

7    officers and give them the information in

8    this case background, correct?

9            A.    Yes.  That would be his role --

11:42  10           Q.    Okay.

11           A.    -- in doing that.

12           Q.    And that's true for everything

13    in this operational plan:  He was supposed to

14    make sure they understood the entire

15    operational plan?

16           A.    Yes.

17           Q.    Okay.  So looking at that case

18    background, it goes over some of the

19    things -- most -- most everything that we've

11:43  20    talked about in those Reports of

21    Investigation, right?  The information that

22    everyone had as of August 7th included on

23    July 6th Meyer pistol whipping a victim

24    causing a firearm to discharge a single round

25    outside of a residence.

1           Meyer being wanted for wanton

2      endangerment and fleeing and evading

3      police -- first degree -- fleeing and evading

4      police.  Also wanted on misdemeanor probation

5      violation in Cincinnati.  Meyer has multiple

6      felony convictions.  Do you recall the -- why

7      he was wanted for fleeing and evading from

8      police?

9           A.    Yes.

11:44  10           Q.    What was that?

11           A.    I believe that stemmed from the

12      shooting incident, if you want to call it

13      that, where he pistol whipped somebody --

14           Q.    Uh-huh.

15           A.    -- and they tried to stop him

16      and he did not stop.  I believe there was a

17      warrant issued for that incident.

18           Q.    Okay.  So -- and that was --

19      that took place on July 6th to the best of

11:44  20      your recollection?

21           A.    Yes, sir.

22           Q.    Okay.  On July 6th Northern

23      Kentucky Drug Strike Force conducted a search

24      and found weapons and drugs in -- in -- at

25      the residence that Meyer was at earlier in

1    the day.  Is that a fair summation of the

2    second paragraph?

3                    MS. STEWART:  Objection.

4         A.    Give me a second.

5         Q.    Sure.  And feel free just to say

6    what the second paragraph means to you in

7    your own words.

8         A.    Yeah.  So it's basically talking

9    about a search warrant stemming from that

11:45   10    shots fired incident.

11        Q.    Okay.  And they -- and they

12   found guns and drugs?

13        A.    In that apartment.  That is

14   correct.

15        Q.    And that apartment was

16   affiliated -- was associated with Mr. Meyer,

17   correct?

18        A.    Yes.

19        Q.    Okay.  And an occupant of the

11:45   20   residence, on the last sentence, stated that

21   Meyer -- that Meyer had handed him a gun to

22   hide, correct?

23        A.    -- residence and Meyer ran out

24   and heard a gun shot.  The occupant stated

25   Meyer came back -- sorry for reading out

```
 1    loud.  Yes.
 2          Q.    Okay.  You can -- I'm tired of
 3    it.  You can.  All good.  July 31st, 2020 it
 4    says CPD and NKDSF was attempting to locate
 5    Mason Meyer.  ATF was involved in this
 6    investigation by July 31st, 2020, correct?
 7                MS. STEWART:  Objection.
 8          A.    No.
 9          Q.    Okay.  I thought you told me --
10    well, I thought the document showed us
11    earlier that you started -- that your office
12    got involved around July 6th, 2020.
13          A.    I apologize.  We may have
14    received information -- I misunderstood your
15    question.  I thought you were asking me
16    whether we were involved in this on the July
17    31st stop or attempted stop.
18          Q.    No. I meant more generally.  At
19    that point you had an open investigation --
20          A.    Yes.
21          Q.    -- against Mason Meyer, correct?
22          A.    Yes, sir.
23          Q.    Okay.  And then CPD and NKDSF
24    working across state lines attempt to locate
25    Mr. Meyer on July 31st, correct?
```

11:46    10

11:47    20

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1        A.    Yes.

2        Q.    Okay.  Agents/officers locate --

3    located Meyer driving a Ford Escape and

4    attempted to stop him.  Law enforcement lost

5    the vehicle and found him again a short time

6    later.  Officers conducted -- sorry.  I'm

7    going too fast.  Officers conducted a traffic

8    stop on the Escape that was occupied by Shawn

9    Dalton and Brian Rhodes and explains where

11:47  10    those people were seated in the car.

11    Officers located a Ruger LCP which is a

12    handgun, correct?

13        A.    Yes.

14        Q.    Okay.  Dalton is a convicted

15    felon who is prohibited from possessing a

16    firearm.  A cooperator told law enforcement

17    Meyers passed the gun off to Dalton when they

18    swapped vehicles.  Do you recall having that

19    information when you met to discuss the

11:48  20    August 7th operation?

21        A.    Yes, sir.

22        Q.    And then the day before this

23    operation -- and we just read some of those

24    Report of Investigations -- Reports of

25    Investigation.  On August 6th, 2020 ATFs --

Deposition of Frank Occhipinti                                           Jason Laible, et al. vs. Timothy Lanter, et al.

 1    ATF Task Force Officer Brett Strattman,

 2    Special Agent Schaub and Northern Kentucky

 3    Drug Strike Force Agent Chris Boyd met with

 4    an individual who provided information to

 5    assist in the investigation, and it

 6    summarizes what we learned in ==Exhibit 25== that

 7    we just went through, correct?

 8             A.    Yes, sir.

 9             Q.    All right.  Turning to the next

11:49 10    page of the operational plan, at the top it

11    says the suspect's name is Mason Meyer and

12    then if you look a few paragraphs down, there

13    is a description of him.  I believe -- is

14    that correct, that's a description of

15    Mr. Meyer?

16             A.    Yes, sir.

17             Q.    Okay.  And among other things it

18    says that on his back -- it says, Back,

19    colon, confederate flag.  That's a tattoo?

11:49 20             A.    Yes.  I assume so.

21             Q.    Okay.  And then it says, Chest,

22    colon, rebel pride.  Another tattoo?

23             A.    I believe so, sir.

24             Q.    Okay.  Another tattoo says

25    bridge.  Do you know -- do you know what --

Deposition of Frank Occhipinti                                Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1        what a tattoo of a bridge -- does that have

 2        any particular meaning in a drug traffic

 3        organization?

 4               A.    I don't know.

 5               Q.    Okay.  A tattoo of a clown, does

 6        that mean anything in a drug trafficking

 7        organization?

 8               A.    I don't know.

 9               Q.    Do you know what slim 714 means?

11:50 10          A.    No, sir.

11               Q.    Okay.  Rebel cause, do you know

12        what rebel cause means?

13               A.    No.

14               Q.    Okay.  I'll go back to rebel

15        pride.  Do you know what rebel pride means?

16               A.    I have my guesses.

17               Q.    What's your guess?

18                     MS. GREENE:  Objection.

19                     MS. STEWART:  Objection.

11:51 20          Q.    You're allowed to guess.

21               A.    Rebel flag?

22               Q.    Okay.

23               A.    Pride symbol.  I don't know.

24               Q.    Was -- was Mr. Meyer a white

25        supremacist in your view?
```

1              MS. STEWART:  Objection.

2         A.     I don't know that.

3         Q.     Okay.  There are a series of

4    other tattoos that I didn't read to you.  A

5    few of them look like names.  Do you know

6    what -- does a naked angel have any symbolism

7    that you're aware of for a drug trafficking

8    organization?

9         A.     I don't know.

11:51  10         Q.     Okay.  The next line down it --

11   it lists a home address of 721 Steiner

12   Avenue.  It lists other address as 63 -- 1637

13   Waverly Avenue.  Were those the only two

14   addresses that the task force was aware of

15   for Mr. Meyer?

16         A.     To the best of my recollection,

17   at the time of this briefing, yes.

18         Q.     Okay.  Later did you learn that

19   he used a number of other addresses?

11:52  20         A.     I believe so.  I don't remember

21   the specific addresses but I believe he was

22   bouncing around from place to place.

23         Q.     Okay.  The next line down it

24   says, Suspect known to be armed and the box

25   is checked yes meaning that, as we've seen

1    before, that he carried weapons on his

2    person, correct?

3            A.    Yes, sir.

4            Q.    Okay.  When you say -- when they

5    say armed here, does it mean with guns or is

6    it less specific than that?

7            A.    We typically reserve that for

8    firearms only.

9            Q.    Okay.  The next line is criminal

11:52  10    history.  The box felony arrest is checked,

11    felony conviction -- convictions is checked,

12    history of violence is checked, and then

13    there's an FBI number that's checked.

14    Does -- do you know why Mr. Meyer would have

15    an FBI number?

16            A.    So the FBI issues a unique

17    number to anyone with a criminal record.

18            Q.    Regardless of whether they were

19    -- it was a federal crime or a state crime?

11:53  20            A.    That is correct, sir.

21            Q.    Okay.  And then it says describe

22    right under all that.  That's describing more

23    specifically his criminal history; is that

24    right?

25            A.    Yes.  It's somewhat condensed

Jason Laible, et al. vs. Timothy Lanter, et al.

1    into what we could fit in here but yes.

2            Q.    Okay.  His criminal history is

3    much longer than what's in there?

4            A.    I -- I -- I don't know but, I

5    mean, sometimes it is and sometimes it's not.

6            Q.    Okay.  The next -- a couple down

7    from here it says, Suspect vehicle and it

8    lists a Mazda SUV red, correct?

9            A.    Correct.

11:54  10         Q.    Okay.  Go to the next page,

11   please.  It's titled Tactical Plan Synopsis.

12   What is that -- in general, what do you put

13   in the Tactical Plan Synopsis?

14           A.    So basically the tactical plan

15   covers the objectives and how we're gonna

16   reach a -- our objectives and the tactics we

17   would use to reach those objectives.

18           Q.    Do you recall if you had a Title

19   III wire on Meyer by this time?

11:54  20         A.    I do not.

21           Q.    Okay.

22           A.    But I can tell you the Title III

23   wire -- ATF very rarely goes up on Title

24   IIIs.  That would be a DEA --

25           Q.    Okay.  Right.  You told me on

```
  1        the December 3rd thing that that was probably

  2        a Title III from DEA.  And you do not believe

  3        DEA was up on him on August 7th, 2020?

  4              A.    I don't know that.

  5              Q.    Okay.  Describe for me generally

  6        in your own words what the plan was for

  7        August 7, 2020 to apprehend Mr. Meyer.

  8              A.    Establish surveillance on him,

  9        positively ID him, and then utilize our

11:55 10   tactics on ATF side to attempt to effect an

 11        arrest of Mr. Meyer.

 12              Q.    Okay.  What were the tactics

 13        that you intended to use?  And if you need to

 14        refer to something in the operational plan,

 15        feel free to flip to it.

 16              A.    I'm not sure I can discuss our

 17        tactics here in this setting, sir.

 18              Q.    Okay.  Well, I think I know a

 19        fair amount of -- I'll describe to you what I

11:56 20   think I know and we can go through this plan

 21        if we need to but you were prepared to -- to

 22        go into the residence with force that day,

 23        correct?

 24              A.    No.

 25              Q.    You were prepared for Mr. Meyer
```

 1    to barricade himself in the residence,

 2    correct?

 3          A.    That is always a contingency,

 4    yes.

 5          Q.    Okay.  Let's go to the next page

 6    for a second.  This is page 798 which we

 7    talked about before.  It lists you and it

 8    says OSC.  What does that mean?

 9          A.    On-scene commander.

11:56 10          Q.    Okay.  So you were in charge of

 11    the operation that day on scene?

 12          A.    Correct.

 13          Q.    Okay.  It says that your primary

 14    assignment was surveillance but it also says

 15    that you carried two -- two pieces of

 16    specialized equipment:  One is duty, the

 17    second is M4.  Those are both firearms,

 18    correct?

 19          A.    Yes, sir.

11:57 20          Q.    Okay.  Describe your duty

 21    firearm and what an M4 is, please.

 22          A.    Glock 19 is my duty and the M4

 23    is a Colt M4 carbine.

 24          Q.    Is the M4 an automatic weapon?

 25          A.    No, sir.  It's a semiautomatic

1    rifle.

2         Q.    Okay.  How much ammunition can

3    it shoot in a minute if you know?

4         A.    As fast as you can pull that --

5    that trigger.  Typically have 21-round

6    magazines or 30-round magazines.

7         Q.    How -- how much backup ammo did

8    you have on you that morning that day?

9         A.    I don't recall that day but my

11:57  10    typical load out is two magazines on my vest

11    and one in the firearm.

12         Q.    Okay.  So you had 60 rounds

13    approximately?

14         A.    Perhaps.  Yes.

15         Q.    Okay.  And then as we look down,

16    TFO Strattman had a sidearm, an M4, a taser,

17    and a camera, correct?

18         A.    I'm sorry.  I'm -- yeah.

19         Q.    And just -- just looking down it

11:58  20    looks to me, if I'm counting, one, two,

21    three, four, five, six of the members of the

22    task force had M4 semiautomatic rifles as

23    part of their specialized equipment for that

24    day, correct?

25         A.    Yes, sir.

1      Q.    And Agent Schaub was -- had a

2    med -- had a med kit; is that right?

3      A.    Yes.

4      Q.    And why did he carry a med kit?

5      A.    That is standard procedure for

6    every single one of our operations.

7      Q.    What for?

8      A.    In the event either one of us or

9    a member of the public or a suspect is

11:59  10   injured in any way.

11      Q.    You were prepared for the

12   possibility of violence that day, correct?

13          MS. STEWART:  Objection.

14          MS. GREENE:  Objection.

15      A.    We are always prepared for

16   violence, sir.

17      Q.    Why on this day were -- why --

18   why in the apprehension of Mason Meyer were

19   you prepared for violence?

11:59  20      A.    Any time you're taking

21   somebody's liberty away, whether it's through

22   a warrant or an operation of this sort, we're

23   always prepared for violence.  That's part of

24   law enforcement.

25          In this instance his criminal

Jason Laible, et al. vs. Timothy Lanter, et al.

1    history we knew him to be armed, we knew he

2    was a fairly violent individual and that's --

3    again, that is standard for every single one

4    of our operations.

5         Q.    Okay.  So you knew him to be

6    armed --

7         A.    Yes, sir.

8         Q.    -- was one thing.  You knew --

9    you said fairly violent individual?

12:00  10         A.    Yes.  Criminal history would

11    indicate that.

12         Q.    Okay.  You knew -- you knew at

13    least people -- people had told the ATF at

14    this point that he had pistol whipped

15    somebody, correct?

16         A.    We had that information.  Yes,

17    sir.

18         Q.    That he had threatened to shoot

19    it out with law enforcement, correct?

12:00  20         A.    I don't know if we knew at the

21    time of the briefing but we may have known

22    that afterwards.

23         Q.    Okay.  I believe it's in -- I

24    believe it's in 25 if we want to go back to

25    it.  You knew that he had threatened to kill

```
 1    individuals and their families, right?  So
 2    going back to 25, if you look at the bottom
 3    -- if you look at paragraph 11, this was
 4    taken on August 6th, 2020, so the day before.
 5                The bottom of the page,
 6    paragraph 11, it says he had made threats
 7    that -- sorry.  That was that someone was
 8    going to kill Meyer and his family.  If we
 9    look up a -- if we look up on paragraph six,
 10   the interviewee had said that Meyer was going
 11   to shoot the interviewee if he didn't pay him
 12   money, right?
 13               MS. GREENE:  Objection.
 14        A.    Right.
 15        Q.    So you knew that.  You knew that
 16   he was acquiring firearms on --
 17               MS. STEWART:  Objection.
 18        A.    Sir, this report --
 19        Q.    Yeah.
 20        A.    I don't know what the date of
 21   this report was.
 22        Q.    Oh, well --
 23        A.    It's dated August 6th.  Doesn't
 24   mean I get it that day.  ATF policy is that
 25   we typically have five days for -- I'm sorry
```

(Timestamps in left margin: 12:01 at line 10, 12:01 at line 20)

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    -- eight days, eight working days, for an

2    agent or a TFO to turn the report in.

3             This op took place on the

4    seventh, so I -- I can't tell you whether I

5    received this report before the operation and

6    I knew that information in this report.

7        Q.    Okay.  But whomever prepared

8    that report who would have been a special

9    agent would have had that information,

12:01  10    correct?

11             MS. GREENE:  Objection:  Form.

12        Q.    Well -- okay.  This is important

13    to clear up, the timing.  Going back to

14    Exhibit 25, paragraph one, so the summary of

15    the event is that the interview took place on

16    August 6th, 2020, correct?

17        A.    Yes, sir.

18        Q.    Okay.  Paragraph one says that a

19    special agent, a task force officer, and an

12:02  20    agent were involved in the interview,

21    correct?

22        A.    Yes.

23        Q.    So at least those three

24    individuals who were all part of the task

25    force of the investigation of Mason Meyer

Deposition of Frank Occhipinti                                   Jason Laible, et al. vs. Timothy Lanter, et al.

1        knew the information in ==Exhibit 25==, right?

2               A.     That's a fair assumption.

3               Q.     And would it have been their job

4        to report that information to everybody else

5        on the task force?

6               A.     Yes.

7               Q.     Okay.  So going back to page

8        marked 797 in the bottom corner, tactical

9        plan.  The third paragraph -- sorry.  I'm

12:03  10        going to go to the fourth paragraph.  It

11        says, Surveil -- surveillance units will have

12        a perimeter set up around the target

13        residence.  Is that what you did that day?

14               A.     Yes.

15               Q.     Okay.  If -- I don't know how to

16        pronounce that but if Ihle or Lay, two other

17        suspects, exit the residence and get into a

18        vehicle, surveillance will allow the vehicle

19        to leave the area and will be stopped to gain

12:03  20        intelligence.  Why would -- do you recall why

21        you were gonna let those two individuals

22        leave the area?

23               A.     I don't think they were wanted,

24        so we would use that stop to gain information

25        as to whether, in fact, Mr. Meyer was in that

1    residence that we were surveilling at that

2    time.

3          Q.    Okay.  The next sentence says,

4    If Meyer or Johnson leave the residence and

5    head toward the vehicle, agents/TFOs will

6    attempt an open air assault.  What does that

7    mean?

8          A.    That is a tactic we use, a fancy

9    word to say an arrest out in the open.

12:04  10          Q.    Okay.  If Meyer or Johnson gain

11    access to the vehicle, agents/TFOs will

12    attempt to conduct a vehicle stabilization

13    pin.  What is that?

14          A.    Again, that's a specific

15    tactic -- tactic that we use utilizing

16    vehicles and it's -- it is what it is.  I

17    mean, it's a stabilization technique.

18          Q.    What's -- describe it to me.

19    What -- what does it look like?

12:04  20              MS. STEWART:  Objection.

21          A.    It's one of the tactics that I

22    don't feel comfortable discussing out here in

23    this setting.

24          Q.    Okay.  Is it that two cars try

25    to pin somebody in and prevent them from

Case: 2:21-cv-00102-DLB   Doc #: 136   Filed: 11/06/25   Page: 126 of 233 - Page
ID#: 2031
Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    moving their car?

2                   MS. STEWART:  Objection.  I

3    think he's already said he doesn't feel

4    comfortable testifying --

5                   THE WITNESS:  I don't feel

6    comfortable.

7                   MS. STEWART:  -- qualify as a

8    tactic.

9                   MR. HERZIG:  That's fine.  But

12:05  10    why don't we make it subject to attorney's

11    eyes only and he can testify about it.

12                   MS. STEWART:  He didn't get 2E

13    approval to testify and the letter

14    specifically carves out investigative

15    techniques.

16                   MR. HERZIG:  Okay.

17    BY MR. HERZIG:

18        Q.    In the event agent/TFOS are

19    unable to pin the vehicle, CPD officers will

12:05  20    attempt to conduct a felony traffic stop with

21    assistance of CPD K9 per their SOP.  If he

22    gets away from the pin, then you would

23    attempt the traffic stop, right?

24        A.    CPD would.

25        Q.    Yes.  Sorry.  I meant the -- the

1    task force will attempt a traffic stop.

2                   MS. GREENE:  Objection.

3          A.     Stick to my answer.  CPD would,

4    sir.

5          Q.     Okay.  Let's go to 799.  The CPD

6    officers that were assisting the task force,

7    correct?

8          A.     Yes.

9          Q.     Okay.  And the CPD officers that

12:06  10   Sergeant Scalf specifically briefed in

11   advance of the operation, correct?

12          A.     That is correct, sir.

13                   MS. GREENE:  Objection:  Form.

14          Q.     Okay.  799 starts with a section

15   called contingency/abort plans.  What goes

16   into that section of the -- of an operational

17   plan?

18          A.     As it states there, they're not

19   all inclusive so basically they're

12:06  20   contingencies that we typically see in these

21   or could happen in these certain situations.

22   A compromise.  Any agent can call off.

23          Q.     So -- sorry.  So you're kind of

24   walking down these things.  What -- what

25   is -- what does -- what does compromise mean?

Jason Laible, et al. vs. Timothy Lanter, et al.

1    A.    So if there's anything that is

2    deemed unsafe or if our surveillance cover is

3    blown, any agent or any task force officer

4    can call off the operation for officer safety

5    reasons.  That's what basically that -- that

6    is.

7    Q.    Okay.  Abort says -- abort says,

8    At any time a team member may abort the

9    operation when information or activity

12:07   10    develops indicating that the operation has

11    been compromised and the safety of the

12    participating personnel, the public, or

13    suspect is at risk.  Is that -- it sounds

14    like you described that to me.

15    A.    Yeah.

16    Q.    I'm trying to understand the

17    difference between compromise and abort if

18    there is one.

19    A.    They're basically the same

12:07   20    thing.

21    Q.    Okay.

22    A.    That's -- compromise would be

23    the -- the verbal we would put out on the

24    radio and then the abort would follow shortly

25    thereafter.

1      Q.    Okay.  Who were the team members

2    that day?  Is it the ten people listed on the

3    prior page?

4           A.    To the best of my knowledge,

5    yes, sir.

6           Q.    Okay.  So anyone on the prior

7    page could have -- could have aborted the

8    operation, correct?

9           A.    Yes.

12:08  10           Q.    Okay.  And then you have

11    information about in the event of a hostage

12    situation.  Why was that included in this

13    contingency plan?

14           A.    That contingency is included

15    every single one of our operations --

16           Q.    Okay.

17           A.    -- that involves an arrest close

18    to a structure, a car.  I mean anywhere.

19           Q.    And barricade, what -- why is

12:08  20    that included?

21           A.    Again, that's standard language

22    we include as contingency for all arrest

23    operations.

24           Q.    Okay.  In the -- the last

25    sentence says, In the event a homicide

1    suspect or vehicle is spotted.  Does that

2    mean -- what does that -- what is a homicide

3    vehicle?  Is that a vehicle that a homicide

4    suspect is driving?

5              MS. STEWART:  Objection.

6         A.    I believe so.

7         Q.    Okay.

8         A.    It could be.

9         Q.    In the event -- okay.  In the

12:09 10   event a homicide suspect or vehicle is

11    spotted, CPD uniformed officers and Gang Unit

12    officers will be notified and will respond

13    according to their policy and procedures.

14    Did you -- is that included in every

15    operational plan?

16         A.    I'm not sure if that was a typo

17    or if they -- from another operational plan

18    but I don't recall seeing that in other op

19    plans.

12:09 20        Q.    Okay.  Well, Mr. Meyer had --

21    you at least -- the task force had

22    information that Mr. Meyer had shot somebody,

23    correct?

24         A.    I believe so.

25         Q.    Okay.  And that he had pistol

Deposition of Frank Occhipinti                                   Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1   whipped somebody, right?

 2          A.    That's correct.

 3          Q.    Okay.  So is it possible that

 4   Agent Schaub put this in there because Meyer

 5   would be legitimately suspected of a

 6   homicide?

 7                MS. STEWART:  Objection.

 8                MS. GREENE:  Objection:  Form.

 9          A.    I don't know.

10          Q.    Okay.  Do you think Meyer was a

11   homicide suspect on August 7, 2020 before he

12   killed the Laibles?

13                MS. STEWART:  Objection.

14                MS. GREENE:  Objection.

15          A.    According to his criminal

16   history, no, sir.

17          Q.    Okay.  Going down a little bit

18   it then talks about -- if you look at the --

19   the section called emergency information, you

20   list the nearest trauma center.  Is that

21   something you put in every operational plan?

22          A.    Yes.

23          Q.    Okay.  And then life flight

24   telephone number.  Is that -- is that like

25   a -- a medical transport helicopter?
```

12:10  10

12:10  20

```
 1              A.    Yes.

 2              Q.    Okay.  Going down a little bit

 3       more, it says command post and -- and the

 4       location is mobile.  It lists a phone number

 5       and then it says a radio frequency and then

 6       it lists you as the coordinator, correct?

 7              A.    Yes.

 8              Q.    Okay.  And is that your -- was

 9       that at the time your individual phone

10       number, in which case we'll want to make sure

11       this is redacted?

12              A.    Still is.

13              Q.    Okay.

14              MR. HERZIG:  So we're -- can

15       you -- let's -- can you just note this,

16       please, so I remember it that we're gonna

17       redact that information from this?  I think

18       you guys are gonna want to mark this version

19       attorney's eyes only at least for now of

20       Exhibit 26.

21              MS. STEWART:  Okay.

22              MR. HERZIG:  Okay.

23       BY MR. HERZIG:

24              Q.    And Agent Schaub prepares

25       this -- he digitally -- he digitally signs it
```

1    at 6:17 p.m. on August 6th, 2020; is that

2    correct?

3         A.    Yes.

4         Q.    Okay.  So you -- you had seen it

5    and made whatever changes you wanted to make

6    to it before 6:17 p.m. on August 6th, 2020,

7    correct?

8         A.    Yes.

9         Q.    Okay.  The next page, page 800,

12:12  10   describes -- well, what does -- what does --

11   what does this page describe?

12        A.    So this is something that would

13   be typically read out loud to everybody in

14   the briefing and it basically goes over our

15   use of force policy, emergency driving --

16   driving -- pursuit driving policy and then if

17   we were to utilize an informant, what our

18   policy for our informant would be.

19        Q.    Okay.  Let's look at emergency

12:12  20   driving and pursuit driving policy.  It says,

21   Except under extraordinary circumstances,

22   high -- high-speed pursuits are expressly

23   prohibited.  Circumstances that may

24   necessitate a high -- high-speed pursuit or

25   emergency response may include, but are not

1       limited to, the threat of serious bodily

2       injury or death to an agent or other party,

3       correct?

4               A.    That is correct, sir.

5               Q.    Okay.  And then there is a list

6       of factors that should be considered before

7       driving at high speed or engaging in

8       maneuvers that place anyone at risk of death

9       or injury and it says, number one, severity

12:13  10       of the offence or emergency; number two,

11       probability of apprehending the violator at a

12       later time; three, weather and road

13       conditions; four, availability of emergency

14       equipment, and then it summarizes, If the

15       potential outweighs the benefits, the pursuit

16       or response will not be initiated or will be

17       terminated; is that right?

18               A.    Yes.

19               Q.    If ATF were to engage in a

12:14  20       high -- high-speed pursuit, who would make

21       the judgment as to whether the potential

22       out -- I assume it's potential risks outweigh

23       the benefits?

24                     MS. STEWART:  Objection.

25               Q.    Is that -- is that what it

1    should say?  Should it say the potential

2    risks outweigh the benefits?

3           A.    I believe so, sir.

4           Q.    Okay.  In that hypothetical

5    situation, who makes the judgment as to

6    whether the potential risks outweigh the

7    benefits?

8           A.    That would be up to the agent

9    engaging or TFO engaging on behalf of ATF in

12:14  10    the pursuit itself.

11           Q.    Okay.  So -- and is that true of

12    all the factors in a high-speed pursuit:

13    They take all of that into account before

14    determining whether to engage in a high-speed

15    pursuit or not?

16           A.    That is correct, sir.

17           Q.    Okay.  Going to page 801, it

18    lists the next suspect, Kristen or Kirsten

19    Johnson at 99 Ridgeway Road and another

12:15  20    address at Steiner Avenue, correct?

21           A.    Yes.

22           Q.    Okay.  She also was a suspect

23    known to be armed, right?

24           A.    Yes.

25           Q.    And her criminal history was

1    possession of a controlled substance first

2    degree, first offense, correct?

3          A.    Yes.

4          Q.    So she didn't have a meaningful

5    criminal history; is that fair?

6          A.    Sure.

7          Q.    Okay.  The next person is Mark

8    Ihle or Ihle.  You indicated that you don't

9    think that he was -- well, I'll say it.  He

12:15  10    was not the subject of an arrest warrant that

11    day, correct?

12          A.    No, sir.

13          Q.    Okay.  Which is why if he had

14    left the house, you would have let him go and

15    tried to pull him over and gather

16    intelligence, right?

17          A.    Yes, sir.

18          Q.    Okay.  But he also was known to

19    be armed, correct?

12:16  20          A.    Yes.

21          Q.    And the box is checked for

22    felony arrest and history of violence,

23    correct?

24          A.    Yes.

25          Q.    Okay.  Were you prepared for the

1    possibility that he might try to help

2    Mr. Meyer and/or Ms. Johnson evade

3    apprehension?

4         A.    I'm not sure what you mean by

5    that.

6         Q.    Well, he -- he was at the

7    residence too, right?

8         A.    Yes.

9         Q.    And so -- and was he part of the

12:16  10    drug trafficking organization?

11         A.    I believe so, sir.

12         Q.    Okay.  Were you prepared for the

13    possibility that he would take action to help

14    Meyer and Johnson evade your task force --

15    evade the task force?

16         A.    Yes.

17         Q.    Okay.  Going to the last page of

18    803, there is additional information category

19    and the first one is shots fired, use of

12:17  20    deadly force.  Is that in every operational

21    plan?

22         A.    Yes.

23         Q.    Okay.  Rip off, assault,

24    distraction -- excuse me -- extraction.  Is

25    that in every plan?

1          A.    Yes.

2          Q.    Okay.  Downed agent or injury,

3      is that in every plan?

4          A.    Yes.

5          Q.    Okay.  And foot pursuit, is that

6      in every plan?

7          A.    Yes.

8          Q.    All right.  And we were in the

9      middle of COVID at the time, so you had a

12:17  10      whole COVID guidance policy.

11          A.    Fun times.  Yes.

12          Q.    Did you say fun times?

13          A.    Yes.

14          Q.    Yes.  Okay.  So you -- talk me

15      through -- you said you remembered that day.

16      Talk me through -- talk me through how your

17      day started.  We're just gonna talk through

18      the day.  August 7, 2020 you signed off on --

19      well, the report by Agent Schaub is completed

12:18  20      at 6 o'clock, 6:17, the night before.  You

21      know when you leave the office that night

22      that you're going to attempt an operation to

23      apprehend Mason Meyer the next morning or the

24      next day, correct?

25          A.    Typically, yes.  Typically, yes.

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1              Q.    Typically, yes.  Okay.  Well,

 2        you would have seen the operational plan

 3        before 6:17 p.m. on August 6th, 2020.  Had

 4        you decided that night to -- to try to get

 5        him the next day?

 6              A.    I believe so.  Yes.

 7              Q.    Okay.  So were you involved in

 8        attempting to apprehend anyone else that day?

 9              A.    No, sir.
```
12:19 10              Q.    Okay.  This was gonna be the
```
11        focus of the day on August 7th was getting

12        Mason Meyer?

13              A.    Yes.

14                    MS. GREENE:  Objection.

15                    MR. HERZIG:  What's your

16        objection?

17                    MS. GREENE:  (Indistinct.)

18                    THE REPORTER:  I can't hear you.

19        I'm sorry.
```
12:19 20                    MR. HERZIG:  I know if I -- if
```
21        I -- but I also am entitled to --

22                    MS. GREENE:  I think it

23        mischaracterizes earlier testimony.

24                    MR. HERZIG:  Okay.

25        BY MR. HERZIG:
```

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1       Q.    Okay.  So walk me through the

2    day to the best of your recollection.  You

3    get -- you get to the federal building with

4    the idea of apprehending Mr. Meyer.  What do

5    you do?

6       A.    What I would do typically -- I

7    don't recall doing it on this day whether I

8    did it or not -- meet with the case agent or

9    TFO, task force officer, on their specific

12:20  10    operation, go over the operational plan, go

11    over our resources, who we have, who we don't

12    have.

13          On this day I remember being in

14    a conference room briefing about this

15    specific operation, making sure we had all of

16    our equipment, our -- what I mean by that is

17    our vehicles and cameras and basically our

18    equipment, and then making sure that Don

19    Scalf was en route to brief our uniformed

12:20  20    personnel that we utilized on this day, and

21    then --

22          Gosh.  I remember driving to an

23    address not Steiner.  It was somewhere else.

24    I believe it was Waverly and --

25       Q.    Okay.  Let me stop you there.

1          A.    Yes.

2          Q.    Why did you drive to an address

3     that -- other than Steiner?

4          A.    We were up on Mr. Meyer's phone

5     pings, base -- basically receiving cell --

6     cell site data as to the approximate location

7     of where Mr. Meyer was.

8          Q.    When you say we, that was A --

9     ATF had that --

12:21  10          A.    Yes.

11          Q.    -- responsibility, correct?

12          A.    Correct.

13          Q.    Okay.  So when did you start

14     tracking Mr. Meyer's phone?

15          A.    I don't recall.

16          Q.    Okay.  But that day you were --

17          A.    Yes.

18          Q.    -- and it was indicating that he

19     was at -- at a different location maybe

12:21  20     Waverly?

21          A.    Yes.  If we were there, I would

22     assume that's what happened on that day.

23          Q.    Okay.  Whatever the other loc --

24     we'll call it Waverly just for the sake of it

25     but understanding it might not actually have

1    been Waverly.  At that other location, did

2    the entire task force arrive at that location

3    together?  Well, did the entire task force go

4    to that location?

5         A.    No.  We were split up at -- part

6    of the team was at -- I believe at Steiner

7    and a bulk of the team was at this -- gosh.

8    I wish I remembered but I don't -- at the

9    other location.

12:22  10        Q.    Okay.  And the -- so the

11   majority of the team was at the other

12   location?

13        A.    No.  With -- with us.  Where the

14   phone pings were, basically the area where we

15   thought he was going to be.

16        Q.    Sorry.  You said the bulk of the

17   team so I just want to make sure.  Was more

18   of the task force at Steiner or at the other

19   location?

12:22  20        A.    The other location.

21        Q.    Okay.  You went to the other

22   location?

23        A.    Yes, sir.

24        Q.    And who -- who was in the

25   vehicle with you?

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
         1              A.    Myself.  Just by myself.

         2              Q.    Okay.  And you were driving an

         3      ATF vehicle?

         4              A.    Yes.

         5              Q.    Okay.  And so the majority of --

         6      of the task force goes to the other location

         7      because that's where you think Meyer is more

         8      likely to be based on the phone pings?

         9              A.    Correct.

12:23   10              Q.    Okay.  What happened there?

        11              A.    We didn't see him.  I remember

        12      spending a few hours out there --

        13              Q.    Okay.

        14              A.    -- waiting to see him.  We

        15      didn't see him and then something happened

        16      with the phone pings where they became more

        17      accurate and they were pinging but were on

        18      Steiner and that's when we shifted all our

        19      resources over to Steiner Avenue.

12:23   20              Q.    Did something happen -- can you

        21      describe the something?

        22              A.    No.  Again, I'm going off of

        23      memory here four years ago.  We were

        24      basically shifted to Steiner Avenue because

        25      we knew he was gonna be there based on phone
```

Deposition of Frank Occhipinti                                          Jason Laible, et al. vs. Timothy Lanter, et al.

1    activity and phone pings.

2              Q.    Okay.  So for whatever reason it

3    was -- it had you in the wrong place for a

4    while and then moved --

5              A.    The way these phone pings work

6    is they -- they give a radius of sometimes

7    1,000 meters, sometimes 3,000 meters,

8    sometimes 12 meters and it all depends on the

9    geography, topography, just where the cell

12:24  10   towers are, so sometimes they're narrowed and

11   sometimes they're very, very broad.

12             Q.    Okay.  Was the other location

13   the location that you might have expected him

14   to be?

15             A.    On Steiner?

16             Q.    No.  The -- the other -- what

17   we're calling --

18             A.    Yes.

19             Q.    -- the capital O, other

12:24  20   location.

21             A.    Yes.

22             Q.    Okay.  So that was another place

23   where -- where Meyer operated from, correct?

24             A.    That is correct, sir.

25             Q.    Okay.  How many locations, if

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
        1      you recall, that -- did Meyer operate from?

        2            A.    I don't recall.  It was

        3      multiple.

        4            Q.    You said earlier he moved around

        5      a lot.

        6            A.    Yes.

        7            Q.    Okay.  And I think we heard of

        8      at least three:  One in Northern Kentucky,

        9      Steiner, and this other location maybe

12:24  10      Waverly.

       11            A.    Yes.

       12            Q.    But it's more -- you think it's

       13      more than that?

       14            A.    Yes.

       15            Q.    Okay.  Okay.  So you're there

       16      waiting for several hours and then the pings

       17      get more accurate and then you move to

       18      Steiner.  Do you remember about what time you

       19      moved over to Steiner?

12:25  20            A.    Sometime in the afternoon.

       21      Early afternoon.

       22            Q.    Okay.  And then take me through

       23      what happened next.  So the entire -- the

       24      entire task force is now at Steiner or

       25      focused on Steiner; is that right?
```

Deposition of Frank Occhipinti                    Jason Laible, et al. vs. Timothy Lanter, et al.

1              A.     That is correct.

2              Q.     Okay.   What happens?

3              A.     I made sure we had our assets in

4        place to effect our arrest according to our

5        operational plan.   Surveillance was set in

6        place and then I -- I believe a few hours

7        later our surveillance observed what they

8        believed to be a male -- the top of a head

9        just based on where they were on the hill --

12:26  10        exit the residence.

11              He could see a firearm sticking

12        up or the muzzle of a rifle sticking up.   I

13        do remember asking him for confirmation as to

14        whether it was Mason Meyer or not.   The

15        surveillance couldn't tell just based on

16        where he was sitting on a hill and the way

17        the driveway's cut into the hill.

18              And so the plan for an open air

19        arrest kind of went away when I couldn't --

12:26  20        we couldn't identify who he was.   We're not

21        going move on an unknown subject.   He -- I do

22        recall the eye, the person on surveillance,

23        putting out that there's another individual

24        getting in a car.   I think it's Mason but I'm

25        not a hundred percent sure.

1          I do remember him putting out

2     that the vehicle was backing up, backed up

3     out of the driveway and started coming down

4     to where we were staged at.  As, again, we

5     still didn't have confirmation as to whether

6     Mr. Meyer was in there or not.  Once the

7     vehicle drove by our location, we started to

8     see the phone pings move with it.

9          Q.    Okay.  Hold on right there.  Who

12:27  10     else was at your -- do you recall where you

11     were and then who else was with you?

12          A.    I was parked next to two other

13     agents at a church parking lot down the

14     street.

15          Q.    Okay.  Was Don Scalf one of

16     those individuals?

17          A.    I don't recall where he was

18     specifically.

19          Q.    Okay.  And you were in your own

12:27  20     vehicle?

21          A.    Yes.

22          Q.    Okay.  So this car drives past

23     you.  Were you able -- you were not able to

24     identify who was in the car at that time?

25          A.    Not at that time.  A very short

1    distance, seconds -- not -- less than that,

2    and we were not able to effect our vehicle

3    stabilization technique as he was in the

4    vehicle or we didn't know who was in the

5    vehicle and it was moving at that time at a

6    pretty high rate.  Well, when I say high

7    rate, faster than our policy allows us to

8    effect that technique.

9         Q.     Uh-huh.

12:28  10         A.     Phone pings started to move with

11    it.  At that time I remember getting on a

12    radio with Sergeant Scalf and asking him --

13    it's yours basically.  We can't do anything

14    with it.  Whether you guys want to stop the

15    vehicle for us or not, that's within your

16    policy, and then I remember Don taking over.

17         Q.     Okay.  So you -- if he had just

18    driven away that day, you would have packed

19    things up and gone home.  That was -- that

12:29  20    would have been okay with you?

21              MS. STEWART:  Objection.

22         A.     No, of course not.

23         Q.     So you wanted CPD to pursue and

24    try to identify him, correct?

25              MS. GREENE:  Objection.

```
 1          A.    By that time I already knew he

 2     was in the vehicle because the device

 3     associated with Mr. Meyer was in the vehicle.

 4          Q.    Okay.  So -- so the task force

 5     was confident that Meyer was in the vehicle

 6     and that's when you say --

 7          A.    To Don, it's yours.

 8          Q.    Okay.  But you wanted him to

 9     pursue, right?

12:29  10          A.    I wanted him to stop the

11     vehicle --

12          Q.    Yeah.

13          A.    -- and arrest Mr. Meyer.

14          Q.    Okay.  And Mr. Meyer was driving

15     away at a high rate of speed.  You just told

16     us that he was driving at a high rate of

17     speed, correct?

18                MS. STEWART:  Objection:

19     Mischaracterization.

12:29  20          A.    It's my understanding after the

21     PD units got behind him --

22          Q.    Not -- not yet.  I'm pretty sure

23     you used the term high rate of speed but did

24     you -- did you feel like he was going fast

25     when he passed you?
```

```
 1                      MS. GREENE:  Objection.

 2                      MS. STEWART:  If I may, Aaron, I

 3       think he mentioned for them to effectuate the

 4       technique, he was going faster than the

 5       policy allowed.  That's what -- during that

 6       line of --

 7                      MR. HERZIG:  Okay.

 8                      MS. STEWART: -- testimony, so I

 9       just wanted to clarify --

10                      MR. HERZIG:  No.

11                      MS. STEWART: -- that for the

12       record.

13                      MR. HERZIG:  I appreciate that.

14                      MS. STEWART:  No problem.

15       BY MR. HERZIG:

16            Q.    Okay.  Is that -- is that

17       accurate?  Is that -- what Ms. Stewart said,

18       is that what you intended?

19            A.    That's very accurate.  Yeah.

20            Q.    Okay.  So he was going faster

21       than -- than would allowed you to use the

22       stabilization and pin technique so the next

23       option was to try to effect a vehicle stop,

24       correct?

25            A.    Correct.
```

12:30 (line 20)

1   Q.    Okay.  And -- and where -- are

2   you still in the church parking lot at this

3   time?

4   A.    I may have been.  I don't recall

5   specifically where I was at that time.

6   Q.    Okay.  At some point you

7   start -- you begin moving your car to follow

8   Mr. Meyer, right?  And if that's too -- if

9   that's too much of a characterization, at

12:31   10   some point you leave the church parking lot,

11   right?

12   A.    Yes.

13   Q.    When did you -- approximately

14   when did you do that in the -- in the course

15   of events?

16   A.    Once PD units got behind him,

17   attempted to stop and a pursuit was called.

18   Q.    Okay.  So you start moving after

19   Mr. Meyer flees the Cincinnati Police

12:31   20   officers?

21   A.    Correct.

22   Q.    Okay.  Where do you drive?  Is

23   anyone in the car with you?

24   A.    No.

25   Q.    Okay.  Where do you drive?

1    A.    I was basically following the

2    dispatch and the units that were behind

3    Mr. Meyer.

4        Q.    Okay.

5        A.    Following their -- you know,

6    where they were going.  The street -- they

7    were calling out streets.  So basically

8    trying to track my way through the streets

9    that were called out.

12:31  10        Q.    Okay.  Were there other task

11   force members in the church parking lot with

12   you when you left it?

13       A.    Yes.

14       Q.    Did they proceed with you to

15   follow the pursuit?

16       A.    I believe everyone did at my

17   instruction with the exception of one or two

18   that remained on the residence in the event

19   that was not Mr. Meyer.

12:32  20        Q.    Okay.  Why did you instruct

21   everyone other than those two to follow the

22   pursuit?

23       A.    One, it was a pursuit.  Two, if

24   the PD ended up arresting him, we wanted to

25   make sure that we were in a position to

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    assist them in effecting that arrest.

2         Q.    Okay.  So you said one, it's a

3    pursuit.  Tell me -- tell me more about what

4    you mean.

5         A.    We wanted to be involved in the

6    arrest of Mr. Meyer.  We are just not going

7    to sit there idle while they're chasing him

8    through Cincinnati.

9         Q.    Okay.  Did -- do you recall how

12:33  10  fast you went during your following the

11   pursuit?

12        A.    No, sir.

13        Q.    Do you think you exceeded the

14   speed limit as you were following the

15   pursuit?

16        A.    I don't know that.

17        Q.    Okay.  Were you attempting to

18   catch up with the officers who were in the

19   pursuit?

12:33  20       A.    Yes.

21        Q.    Okay.  And among the folks that

22   left the church parking lot with you, were

23   you the lead car?

24        A.    I don't recall.

25        Q.    Okay.  How many -- how many

1    unit -- how many -- how many vehicles left

2    the church parking lot with you to --

3            A.    I don't know.

4            Q.    -- to follow the pursuit?

5            A.    I really don't know.

6            Q.    Okay.

7            A.    And there is no lead car.

8            Q.    Okay.

9            A.    We don't have a lead car.

12:33  10            Q.    That's okay but I'm trying to

11    figure out, like, were there three cars?  Was

12    it you and two other cars?  Was it you and

13    ten other cars?  Do you remember?

14            A.    I don't remember.

15            Q.    Okay.  But it was more than just

16    you?

17            A.    Yes.

18            Q.    Okay.  Of the ten people listed

19    on the -- in the operational plan, once the

12:34  20    -- once the pursuit started -- of the ten

21    people in the operational plan, how many of

22    them are supposed to follow your instructions

23    and orders?  The nine other than you I guess.

24    Is it all of them?

25            A.    If they're part of my team, yes.

1     Q.     Are all these people part of

2     your team?

3          A.     Yes.  At the time, yes.

4          Q.     Okay.  So if you had instructed

5     any of those other nine people stop following

6     the pursuit, their job would have been to

7     stop following the pursuit, correct?

8               MS. GREENE:  Objection.

9          A.     If that was an order I gave,

12:35 10     yes.

11          Q.     Okay.  And you continued to

12     monitor the location of Mr. Meyer's phone

13     throughout the pursuit, right?

14          A.     Correct.

15          Q.     Did that help you help the

16     Cincinnati Police officers track Meyer?

17          A.     Is that during their pursuit?

18          Q.     Yes.

19          A.     No.

12:35 20          Q.     So what did the -- what did the

21     pings during the pursuit tell you?

22          A.     Initially once he left the

23     residence we got one ping and the ping was

24     consistent with the vehicle moving.

25          Q.     Okay.  And you were able to --

1    did you track throughout the pursuit where

2    the vehicle was moving?

3          A.    No, sir.  We get -- we receive

4    pings -- call them pings --

5          Q.    Uh-huh.

6          A.    -- every 15 minutes.

7          Q.    Okay.

8          A.    So there's a 15 minute time

9    period where dead air for us as far as pings

12:36  10   are concerned.  It's not a live event.

11         Q.    Got it.  Okay.  So we're just

12   gonna stick with -- with you for now.  You --

13   you're following the pursuit.  You're

14   attempting to catch up because you wanted to

15   be part of the pursuit and help with the

16   arrest of officer -- of Meyer and Johnson.

17   Do you follow the exact course that the

18   pursuit is following?

19         A.    I -- I don't recall if I did or

12:36  20   if I took shortcuts, other streets that would

21   get me there faster, but --

22         Q.    Okay.

23         A.    -- I followed generally the

24   direction that they were going.

25         Q.    Okay.  And you followed them

1    across the bridge into Kentucky, correct?

2         A.    Yes.

3         Q.    Okay.  Do you -- is there a

4    different field office for Northern Kentucky?

5         A.    Yes.

6         Q.    For ATF?  Okay.  Are you -- is

7    there any limitation on your ability to

8    pursue or to -- to pursue a suspect into an

9    adjacent state?

12:37  10         A.    No.  We have federal

11   jurisdiction.

12        Q.    Okay.

13        A.    My only responsibility is to

14   notify the local field office of our presence

15   in their area.

16        Q.    Okay.  Did you do that during

17   the -- as you were -- as you were trying to

18   catch up to the pursuit?

19        A.    I had no time to do that.

12:37  20         Q.    Okay.  I do recall seeing -- and

21   we can maybe go into it if you want but I --

22   I recall that you -- if I recall this right.

23   You can tell me if you don't or if I'm wrong.

24   That -- that you were -- that you said let's

25   make sure we -- paraphrasing -- notify local

1      law enforcement that the pursuit is coming to

2      Kentucky.

3              A.     Yes.

4              Q.     Okay.  And did you do that or

5      did someone else actually make that

6      communication?

7              A.     I did.

8              Q.     Okay.  So you notified who in

9      Kentucky?

12:38  10             A.     I -- if I recall correctly, I

11     got on the radio with main dispatch to let

12     them know that -- to notify Northern Kentucky

13     authorities that Mr. Meyer was headed in

14     their area and he was armed at that time.

15             Q.     Okay.  Who's main dispatch?

16             A.     Cincinnati Police dispatch.

17             Q.     Okay.

18             A.     Communication center.

19             Q.     Got it.  So you were on the

12:38  20     Cincinnati radio channel, Cincinnati Police

21     radio channel, and you told Cincinnati's

22     dispatch to let Kentucky know that the

23     pursuit was heading its way?

24             A.     Yes.

25             Q.     Okay.  What -- do you know -- do

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    you know who they -- who Cincinnati's

2    dispatch communicated with?

3            A.    I don't recall.  I don't

4    remember.

5            Q.    Okay.  And did you ask them to

6    communicate that there was a pursuit ongoing?

7            A.    No.  My sole reason for getting

8    on PD radio was to make sure that Kentucky

9    authorities were notified of a pursuit that

12:39  10   was taking place with an armed individual in

11    their area and that's strictly done for

12    officer safety reasons.

13            Q.    Okay.  Explain why that's

14    important for off -- officer safety.

15            A.    It's my responsibility as the

16    on-scene commander if there's an armed

17    individual who's obviously acting in

18    irrational behavior just to let them know for

19    the safety of the public and for safety of

12:39  20   law enforcement in that area.  Officer

21    safety.  Just awareness.

22            Q.    Okay.  Did you ever tell

23    anyone -- you were alone in the car, correct?

24            A.    Correct.

25            Q.    Okay.  Did you ever get over the

1    radio -- over the CPD radio and suggest to

2    anyone that they break off the pursuit?

3          A.    No.  That's not my

4    responsibility, sir.

5          Q.    Did you ever communicate

6    during -- as you were following the pursuit,

7    as the pursuit was going on, did you ever

8    communicate over ATF channels that the

9    pursuit should break off?

12:40  10          A.    No, sir.  We were communicating

11    on PD radios at the time.

12          Q.    Okay.  So if you wanted to

13    communicate with your own agents, you would

14    have done that over -- when you -- when you

15    said everyone let's follow the pursuit, you

16    did that on the CPD channel?

17          A.    Yes.

18          Q.    Okay.  So if you were gonna

19    communicate to your ATF agents to break off

12:40  20    the pursuit, you would have done that on a CP

21    channel?

22          A.    Correct.

23          Q.    Okay.  You did not do that,

24    correct?

25          A.    Again, it's not my

1    responsibility to call off a pursuit.

2         Q.    Right.  So no because it's not

3    your responsibility.

4         A.    Correct.

5         Q.    Okay.  How close were you -- how

6    close did you end up getting to the pursuit

7    before Mr. Meyer crashed his vehicle?

8         A.    Can you rephrase that?  I'm

9    sorry.

12:41  10         Q.    Yeah.  I'm just trying to figure

11    out as the pursuit was going on you were

12    trying to catch up.  Did you ever see any of

13    the marked police cars in your field of

14    vision as you were trying to catch up?

15         A.    No, sir.  Not the ones that were

16    actively engaged in the pursuit, no.

17         Q.    Okay.  Okay.  So you didn't --

18    you didn't see them at all during the course

19    of the pursuit?

12:41  20         A.    No.

21         Q.    Okay.  So you didn't see anyone

22    go the wrong way down a street?

23         A.    I don't recall.  No.

24         Q.    Okay.  You didn't -- did you see

25    anyone going in the wrong lane on --

 1    during -- any of the marked police officers

 2    going in the wrong lane during the pursuit?

 3            A.    No, sir.

 4            Q.    Okay.  Did you see any -- did

 5    you see anyone involved in the pursuit or

 6    following the pursuit that went in the wrong

 7    lane?

 8            A.    No.

 9            Q.    Okay.  Or went the wrong way

12:42 10    down a one-way street?

11            A.    No.

12                  MS. STEWART:  Objection.

13            Q.    Okay.  Did any of the -- any of

14    the special agents, the ATF agents, as far as

15    you know, go the wrong way down a one-way

16    street?

17            A.    No.

18            Q.    Okay.  Or go -- or go into the

19    wrong lane?

12:42 20            A.    No, sir.  I --

21            Q.    Okay.  You were pretty far away.

22            A.    Yeah.

23            Q.    Okay.  How long did it take you

24    to get -- after -- so at some point you hear

25    a call come over the radio that he has

1    crashed, correct?

2           A.    Yes.

3           Q.    How long did it take you to get

4    to the scene after that?

5           A.    So I -- I remember being lost in

6    Kentucky.  I'm -- I'm not from the area.

7    Myself and another officer from CPD were

8    trying to figure out exactly where the crash

9    occurred.

12:43  10           Q.    Who was the other officer?

11           A.    Officer Harper.

12           Q.    Okay.  So you got a little bit

13    lost.  How long did it take you -- do you

14    remember how long it took you from that?

15           A.    My best guess is perhaps 30

16    seconds, 45 seconds after.

17           Q.    Okay.

18           A.    Maybe a little longer.  Again,

19    it was four years ago.

12:43  20           Q.    But it didn't -- it didn't feel

21    like minutes.  It felt like less than a

22    minute?

23           A.    When you hear that kind of

24    traffic on the radio, everything feels like

25    minutes but, you know, in looking back and

1    trying to jog my memory, it must have been

2    maybe less than a minute.

3            Q.    Okay.  Did you -- did you

4    accelerate and try to get there faster when

5    you heard about the crash?

6            A.    I don't know if you've ever

7    driven Newport.  It's kind of hard to do

8    that, so I was trying my best to get there as

9    safely as possible.

12:44  10            Q.    It's hard to go fast in -- on

11    the streets of Newport is what you're saying?

12            A.    Yes.

13            Q.    You didn't see Mr. Meyer crash

14    into the Laibles and the Kleins, correct?

15            A.    No.  No, sir.

16            Q.    You arrive at the scene and what

17    do you do?

18            A.    So arrive at the scene and I

19    remember making sure that Lieutenant Lanter

12:44  20    was okay.  Officer Thomas was shaken up.  I

21    remember seeing the two bodies and the shape

22    that they were in.

23                My initial thing was when I

24    first got there helped take Mason Meyer into

25    custody.  Sorry.  I kind of jumped around and

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    I apologize.  As soon as I got there,

2    stopped.  Mason Meyer and girlfriend were

3    taken into custody.

4              I remember glancing over and

5    there were two bodies about 40 yards down the

6    street.  Walked up to the first body.  Her

7    head was split open, her brain was laying out

8    on the side of the street.  I remember

9    walking up to the gentleman, took his pulse,

12:45    10    and we had a false reading.

11              We -- we know that now he was

12    already deceased but his head was in between

13    a pole, a metal pole, and we thought we had a

14    pulse so we called -- tried to call for a

15    heavy rescue to come in.  The pulse was from

16    his pacemaker.  That's what a doctor was

17    telling us.

18              I then remember trying to

19    process exactly what was going on.  It was

12:46    20    still very, very hectic at that time.  Walked

21    over to a young female and her leg was

22    clearly bruised.  She was stumbling across

23    the street and she was hit by one of the

24    flying bodies.

25              So how much more do you want to

1    know?

2              Q.    So going back to the -- so the

3    first thing you do you is help place the

4    people in the vehicle under arrest, correct?

5              A.    Correct.

6              Q.    And it was Meyer and Johnson and

7    there was a driver, right?  There -- there

8    was a third individual in the -- in the --

9              A.    Yes.

12:46  10              Q.    -- car.

11              A.    Apologize.  Yeah.  I believe a

12    male was in the back.

13              Q.    Okay.

14              A.    Backseat.

15              Q.    And AT -- did ATF take them into

16    custody?

17              A.    Once we all got there, yes, we

18    assisted.  Yeah.

19              Q.    Okay.  And Mr. Meyer, he was

12:47  20    having a seizure at the time?

21              A.    He claimed he -- he was having a

22    seizure.

23              Q.    You don't believe him.  You

24    don't -- did you see -- did it appear to you

25    that he was having seizure?

1          A.    There's a trick that probably

2     Mr. Lanter knows we do is if somebody claims

3     to be having a seizure, we -- pretty rough

4     chest rub --

5          Q.    Okay.

6          A.    -- and if somebody's really

7     having a seizure they don't react to the

8     pain.

9          Q.    Okay.

12:47 10          A.    He -- he reacted.

11          Q.    Who gave him the chest rub?

12          A.    One of our agents.

13          Q.    Okay?  And you -- you saw him

14     react in a way that is inconsistent with

15     someone having a seizure?

16          A.    That is correct, sir.

17          Q.    Okay.  So you believe he was

18     faking having a seizure in order to some way

19     claim that he had a medical emergency that

12:48 20     caused him to crash?

21          A.    I don't know why he choose to

22     behave in that manner but I can only tell you

23     what I saw and was not his symptoms -- his

24     outward symptoms were not consistent with

25     having a seizure.

1           MR. HERZIG:  Why don't we take a

2      break there.

3          (Off the record discussion.)

4           MS. STEWART:  With respect to

5      ==Exhibit 26==, the ATF operational plan, the

6      United States is going to review and

7      recommend redactions from the copy currently

8      that's been submitted into evidence and

9      plaintiff's counsel indicated that they may

12:50  10      also take a look just to make sure there's no

11      information there that is necessary for the

12      case.

13           MS. GREENE:  I would put on the

14      record for the purposes of this deposition

15      today we don't object to the redaction the

16      United States is proposing; however, should

17      we encounter circumstances later that

18      indicate any of the redactions in terms of

19      the unredacted version removed important

12:51  20      information that's relevant to litigation in

21      this case, then we would challenge the

22      redactions at a later time.

23           THE REPORTER:  So is it only the

24      exhibit that's being redacted, nothing yet in

25      the transcript?

Deposition of Frank Occhipinti

Jason Laible, et al. vs. Timothy Lanter, et al.

 1          MS. STEWART:  That's correct.

 2   And namely the phone -- the cellphone numbers

 3   that are listed.

 4          THE REPORTER:  Okay.  I just

 5   wanted to make sure.

 6          MR. HERZIG:  I think I was

 7   pretty careful not to put that on the record.

 8          THE REPORTER:  No, you didn't.

 9          MS. STEWART:  The second matter

12:51  10   that I would like to note is to potentially

11   designate for attorney's eyes only any

12   conversation about the phone pings and, you

13   know, the frequency with which those pings

14   come through and any other testimony relating

15   to just how the pings are read by law

16   enforcement.  Don't know how you all feel

17   about that.  We can discuss it later but I'd

18   like to at least preserve it for the record.

19          MS. GREENE:  We would object to

12:52  20   that.

21          MS. STEWART:  Fair enough.

22          MR. HERZIG:  I think the ping

23   has been settled.  The fact -- the fact that

24   they were being tracked is in the record.  I

25   don't think some of the specifics are but it

1    may become relevant and then -- we can go off

2    the record.

3        (Lunch break taken.)

4    BY MR. HERZIG:

5        Q.    All right.  So after you leave

6    the scene that day, do you -- what do you --

7    what do you do next after you've left the

8    scene of the car crash?

9        A.    I went back to the office, made

01:18  10    some calls to my bosses.

11        Q.    Do you recall what you told

12    them?

13        A.    Basically what I just told you:

14    Pursuit, two possible fatalities, another few

15    more people injured, and that was it.

16        Q.    Okay.  Did you tell them you had

17    apprehended Meyer and Johnson?

18        A.    I -- I may have.  That would

19    have been appropriate.

01:18  20        Q.    Okay.  What did you -- did the

21    invest -- did the investigation continue that

22    day?

23        A.    I think that day was just trying

24    to handle that day.  I don't think we did

25    anything as far as furthering the

1    investigation that very same day.

2              Q.    Okay.  Do you recall what the

3    road conditions were like as you were

4    following the pursuit?

5              A.    I think I remember being partly

6    sunny.

7              Q.    Okay.

8              A.    That's about it.

9              Q.    No -- no weather that would

01:19 10   cause you -- in the hypothetical situation

11   where you were following ATF's high-speed

12   pursuit policy, the weather conditions would

13   not have prevented you from proceeding with

14   the high-speed pursuit, correct?

15              MS. GREENE:  Objection.

16              MS. STEWART:  Objection.

17              A.    Can you ask that question again?

18              Q.    Sure.  We talked earlier about

19   the -- in the operations plan -- we can go

01:19 20   back to Exhibit 26 and one of the -- on -- on

21   the number -- page number 800, item number

22   three is weather and road conditions.

23              A.    Yeah.

24              Q.    In the hypothetical world where

25   you were following the ATF pursuit policy,

Jason Laible, et al. vs. Timothy Lanter, et al.

1    would the weather condition -- weather and

2    road conditions have been a factor that

3    caused you to think about stopping a pursuit?

4            A.    From what I do remember,

5    clear -- weather was fairly or partly cloudy,

6    clear.  I -- I don't think -- just going back

7    four years ago, I don't think those

8    conditions would have prevented -- in your

9    hypothetical situation would have prevented a

01:20  10    pursuit.

11            Q.    Okay.  Were you concerned -- was

12    the -- was -- were you concerned that if you

13    didn't get Meyer this time you might not get

14    him again?

15            A.    No.

16            Q.    Why not?

17            A.    I remember specifically getting

18    on the radio and saying that we're up on his

19    phone to dispatch with -- my intent let

01:21  20    dispatch know that, hey, if we end up losing

21    him, we're still up on his phone, we still

22    have -- we still have the capability of

23    getting him at a later time.

24            Q.    Okay.  Up on his phone until he

25    has a different phone, right?

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1              A.    Yes.

 2              Q.    Yeah.  And you had trouble --

 3       you were in the wrong place that morning

 4       based on his phone pings, correct?

 5              A.    That's correct.

 6              Q.    Okay.  So -- so --

 7              A.    However we ended up at the right

 8       place once the phone pings narrowed down.

 9              Q.    Right.  But how long did you

01:21 10       spend at the wrong place?

11              A.    A few hours.

12              Q.    With all those resources for how

13       many hours?

14                    MS. STEWART:  Objection.

15              A.    I don't know.

16              Q.    How many hours were you there?

17              A.    I don't recall.

18              Q.    Okay.  This is Exhibit 27.

19         (Exhibit 27 identified.)

01:22 20              Q.    Before we look at Exhibit 27,

21       what's a halligan?

22              A.    That is a tool we use.  It's

23       like a crowbar for lack of a better term.

24              Q.    And you had -- you had a

25       halligan available to you on that day when
```

1    you got to Steiner Avenue, correct?  We can

2    look at.  It's back on -- it's back on

3    Exhibit 26.  It's in the list of equipment

4    that people had with them that day.

5         A.    That would be consistent with

6    our normal standard equipment during these

7    types of operations.

8         Q.    Okay.  And what would you --

9    what would you -- what would you use a

01:23 10    crowbar a for?

11         A.    Those -- I mean, there are

12    multiple uses for them.  A halligan would be

13    used to gain entry into a residence or a car.

14         Q.    Okay.

15         A.    Again -- but those are just two

16    very specific uses for them.  There are

17    plenty of other uses.

18         Q.    What else?

19         A.    Breaking a car window.  Car's on

01:23 20    fire you need to pull somebody out, you can

21    use that.  There are other tools for that

22    more appropriate, but that's certainly one of

23    the uses.

24         Q.    Okay.  What's a ballistic

25    shield?

1    A.    That is a -- just what it is.

2    It's a shield used -- it's about

3    four-by-three (gesture), three and a half.

4    Q.    Uh-huh.

5    A.    We typically use to carry when

6    we're dealing with high-threat situations.

7    Q.    Okay.  So this was a high-threat

8    situation that required a ballistic shield?

9    A.    Every situation is.  That's

01:24  10    standard equipment.

11    Q.    Okay.  Was anyone -- were all

12    ten of your team members wearing body armor?

13    A.    Yes.

14    Q.    What's a bunker?  You had two of

15    them on site.  Three of them on site.

16    A.    That is another word for

17    ballistic shield.  It's the same thing.

18    Q.    Okay.  And what is breaching

19    equipment?

01:24  20    A.    That is either a ram or at the

21    time we had what's called a rabbit and it's

22    basically -- a ram is what it is.  It's a

23    ram.  A rabbit is a hydraulic press that we

24    utilize to gain entry into structures.

25    Q.    Okay.  Is it, like, for opening

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1    doors or busting down walls or both?

 2         A.    Doors.

 3         Q.    Okay.  All right.  Exhibit 27 I

 4    believe was produced to plaintiffs and then

 5    to us in response to a subpoena.  Have you

 6    seen Exhibit 27 before?

 7         A.    I have not, sir.

 8         Q.    Okay.  It says that it is an

 9    application and affidavit in support of a

01:25 10    search warrant for -- and if you look down it

11    says the following property:  Number one, a

12    black 2014 Ford Focus with temporary Ohio

13    plates, potentially containing firearms,

14    controlled substances, and paraphernalia as

15    defined in Kentucky law and more information

16    there.  Does that describe the car that Mason

17    Meyer was driving?

18              MS. STEWART:  Objection.

19         A.    I don't recall.

01:25 20         Q.    Okay.  Take a look.  So it's --

21    if you go back up, on or in the premises

22    numbered 113-115 East Fifth Street, Newport,

23    Kentucky.  Is that where the accident took

24    place?

25         A.    I -- I believe so. I'm not --
```

Deposition of Frank Occhipinti

Jason Laible, et al. vs. Timothy Lanter, et al.

1    Q.    Okay.

2         A.    I don't remember the exact

3    numerics.

4         Q.    More particularly described as

5    on the north sidewalk of Fifth Street in

6    Newport, Kentucky between Monmouth Street and

7    Saratoga Street.  Are we in the right

8    place --

9         A.    Yes, sir.

01:26  10    Q.    -- for where the -- where the

11   crash occurred?  Okay.  Do you recall that on

12   that day Mr. Meyer was driving a black Ford

13   Focus?

14        A.    It was -- I remember it was a

15   dark vehicle.  I don't remember the make and

16   model.

17        Q.    Okay.  It wasn't a Subaru

18   Outback, correct?

19        A.    No, sir.

01:26  20    Q.    Okay.  It wasn't a red Mazda SUV

21   like it said in the operational plan, right?

22        A.    No, sir.

23        Q.    It wasn't a Ford Expedition,

24   correct?

25        A.    No.

1          Q.    Do you have any reason to

2    believe that this affidavit and application

3    has the identification of the car incorrect?

4          A.    I don't know.

5          Q.    Okay.  It's signed in the back.

6    It's an affidavit from a Agent Michael E.

7    Rowland.  Do you know who that is?

8          A.    No, sir.

9          Q.    Okay.  If you look at the second

01:27  10    page of the affidavit for the search warrant,

11    the second paragraph it says, When the

12    vehicle Meyer was believed to be operating

13    was leaving the surveilled location,

14    Cincinnati Police and ATF attempted to

15    initiate a stop of the vehicle.  The vehicle

16    fled from police at a high rate of speed and

17    a pursuit ensued.

18               The suspect's vehicle traveled

19    from Cincinnati over the river into

01:27  20    Covington, Kentucky.  Cincinnati police

21    reported that, as they traveled through

22    Covington, the defendant was disregarding

23    traffic laws, traveling in the wrong

24    direction down one-way streets, running red

25    lights and speeding.

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1                    Did you observe any of those --
 2        any of those conditions that the defendant
 3        was disregarding traffic laws, traveling in
 4        the wrong lane, running red lights or
 5        speeding?
 6                    MS. STEWART:  Objection.
 7             A.    No.
 8             Q.    Do you have any reason to
 9        believe that that's -- those statements are
10        inaccurate?
11                    MS. STEWART:  Objection.
12             A.    No.
13             Q.    In the next paragraph about
14        halfway down, As he, Meyer, passed through
15        the intersection, Meyer's vehicle left the
16        roadway and traveled onto the sidewalk
17        crashing into an exterior wall of Press on
18        Monmouth and the outdoor seating area,
19        careening out of control down the sidewalk
20        and knocking down a tree.  It then goes on to
21        describe the injuries that you discussed.  Is
22        that an accurate understanding of what you
23        believe to have happened?
24             A.    Yes.
25             Q.    Going down into the next
```

01:28  10

01:28  20

1    paragraph, the third sentence.  It was

2    learned that Meyer or -- excuse me.  It was

3    learned that the suspect had an active

4    warrant out of Boone County, Kentucky for

5    fleeing from police under dangerous

6    circumstances a week prior.  You were aware

7    on August 7th that he had attempted to flee

8    from police about a week earlier, correct?

9           A.    Yes, sir.

01:29  10           Q.    It says, The suspect -- in the

11    next paragraph says, The suspect is known to

12    carry guns.  In the backseat of the wrecked

13    vehicle, officers could visibly see an

14    assault rifle and its case.  You were on the

15    scene of the wrecked vehicle.  Did you see

16    the assault rifle and the case in the car?

17           A.    Yes.

18           Q.    What else did you see in the

19    car?

01:29  20           A.    Car was a mess but I remember

21    seeing the firearm and a holster.  That kind

22    of stood out because there was no gun in

23    there.  Found the gun later.

24           Q.    Where was the gun?

25           A.    Somewhere within the car.

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    Q.    Okay.

2    A.    Some part of the vehicle.

3    Q.    It was still in the car but

4    not --

5    A.    Yeah.

6    Q.    I got it.  Did you find illegal

7    drugs in the car?

8    A.    Not me personally but I know

9    they did.

01:30   10    Q.    Okay.  Give me just one minute.

11    I think that's all I have.

12         MR. HERZIG:  Do you want to

13    switch seats?

14         MS. GREENE:  That might work.

15    (Off the record discussion.)

16             CROSS-EXAMINATION

17    BY MS. GREENE:

18    Q.    Good afternoon.  My name is

19    Jacqueline Greene.  I'm one of the attorneys

01:37   20    representing the estates of Raymond and Gayle

21    Laible in this matter.  With me are Elijah

22    Hack, an attorney in my office, as well as

23    Attorney Roula Allouch who represents the

24    Kleins in this case.

25             We thank you for being here with

Deposition of Frank Occhipinti                     Jason Laible, et al. vs. Timothy Lanter, et al.

1    us this afternoon but I have a few follow-up

2    questions.  I don't think it'll take too long

3    but there's some various areas to touch on --

4         A.    Sure.

5         Q.    -- to follow up on Mr. Herzig's

6    questions.  Okay?

7         A.    Okay.

8         Q.    So earlier you testified that

9    the ATF receives requests to assist other

01:37   10   agencies on a regular basis, right?

11        A.    Yes.

12        Q.    Can you explain what you mean by

13   that?

14        A.    So we service roughly -- just in

15   Hamilton County alone, we service 52

16   jurisdictions, law enforcement jurisdictions,

17   within Hamilton County and there are many

18   more.  Warren County.  Sometimes Kentucky

19   will reach out to us because there's only --

01:38   20   we have a few agents that work up here, ATF

21   agents, so there's not a strong presence.

22             Cincinnati is the strongest ATF

23   presence in our region.  And they'll reach

24   out to us for technical assistance, for

25   resource assistance and in this case it was

1      to help them find or locate and arrest

2      Mr. Meyer and, again, we get those all the

3      time.

4           Q.    And so it's just basically a

5      request from another agency for ATF to come

6      and help them out?

7           A.    Yes.

8           Q.    Okay.  And that's because you

9      have specific technical skills or resources

01:38  10     available to you that those other agencies

11     may not have?

12          A.    Correct.

13          Q.    When you do assist an agency, do

14     you direct the actions of that agency?

15          A.    No.

16          Q.    That's up to the decision and

17     the chain of command on the agency itself,

18     correct?

19          A.    The only actions I can direct

01:38  20     are on ATF's side.

21          Q.    Now, there are some officers who

22     are, to use kind of a colloquial term, on

23     loan to ATF from other agencies, right?

24          A.    Task force officers, yes.

25          Q.    And so task force officers when

```
 1        they are -- well, strike that.  Let me ask,

 2        is it fair to use the term on loan as a kind

 3        of colloquial term to describe that

 4        relationship?

 5             A.    No, ma'am.  On loan would

 6        indicate that they're here on a temporary

 7        basis.  Task force officers are more

 8        permanent basis.  They undergo training.

 9        There's also a Memorandum of Understanding

10        that is signed by both agencies -- respective

11        agencies and the MOU, short for Memorandum of

12        Understanding, covers basically ATF policy

13        and their respective agency policy.

14             Q.    And so during that period of

15        time that the MOU is in effect, those

16        officers can work for the ATF, right?

17             A.    That is correct, ma'am.

18             Q.    They can also still work for

19        their home agency, correct?

20             A.    Yes.

21             Q.    And so not all work that an

22        individual officer does during that period of

23        time the MOU covers will be for the ATF,

24        right?

25             A.    No.
```

1          Q.      Some of it will still be for

2     their home agency?

3          A.      Correct.

4          Q.      All right.  I'd like to turn to

5     what was marked as Exhibit 26.  Okay.  And

6     so -- you got that in front of you now?

7          A.      Yes.

8          Q.      And this is the operational plan

9     relating to the events at issue in this

01:40  10     matter, right?

11          A.      Yes.

12          Q.      And this operational plan it was

13     written out by an ATF agent, correct?

14          A.      Yes.

15          Q.      But was it written for the

16     benefit of all the organizations involved?

17          A.      No.  This is a Department of

18     Justice ATF Operational Plan which covers our

19     actions.

01:40  20          Q.      And it's written so that ATF is

21     clear on where -- what its role is; is that

22     right?

23          A.      What our roles and boundaries

24     are.

25          Q.      And so the boundaries defined in

1    this operational plan are an essential part

2    of operational planning, right?

3         A.    Yes.

4         Q.    And that would include

5    boundaries relating to what the various

6    agencies involved in an operation may or may

7    not have the ability to engage in, right?

8              MR. HERZIG:  Objection.

9         A.    Yes.

01:41 10       Q.    With respect to this particular

11   operational plan I have some follow-up

12   questions.  I'm not gonna go through

13   everything because Mr. Herzig spoke about a

14   lot of it with you, but with this particular

15   plan I believe earlier you said that the

16   individuals listed on what is page 798 in

17   items -- or excuse me -- not items but lines

18   one through ten, those individuals received a

19   copy of this plan; is that correct?

01:41 20       A.    They would have, yes.

21        Q.    And for these 11, 12, 13

22   placeholder entries for CPD:  Marked units,

23   K9s, and then Northern Kentucky Drug Strike

24   Force, did the officers associated with those

25   groups receive copies of this as well?

1          A.    I am not sure.  I'm really not.

2          Q.    That wasn't your responsibility?

3          A.    If they were -- let me rephrase

4    that.  Typically everybody's under the same

5    roof and gets briefed and is handed -- in

6    this instance they were briefed elsewhere, so

7    I'm not sure if they received a physical copy

8    of this.

9          Q.    So CPD officers who were part of

01:42 10    the marked units or the K9 units referenced

11    here were briefed elsewhere separate from the

12    ATF team.

13          A.    Yes.

14          Q.    And so it was not the ATF's

15    responsibility to ensure under those

16    circumstances that they got a copy of it, was

17    it?

18          A.    It was Mr. Scalf's

19    responsibility.

01:42 20          Q.    Okay.  And that was part of his

21    responsibility because of his role in the CPD

22    chain of command, right?

23          MR. HERZIG:  Objection.

24          A.    I would say that would be his

25    responsibility as his role as a task force

1    officer with ATF and his role as a PD chain

2    of command.

3            Q.    Okay.  So both?

4            A.    Yes.

5            Q.    Excuse me.  So turning to the

6    second page of this operation plan, I want to

7    start at the very top of this case background

8    section.  It reads, ATF units have received

9    information from Northern Kentucky Drug

01:43  10    Strike Force and Cincinnati Police Department

11    regarding an ongoing investigation into a gun

12    and drug trafficking organization operating

13    in Northern Kentucky and Southern Ohio.  Who

14    are the units referenced in that sentence?

15            A.    Okay.  So that would typically

16    mean Cincinnati Field Office agents.

17            Q.    And when you say field office

18    agents, is that special agents or task force

19    agents?

01:43  20            A.    That'll encompass both task

21    force officers and special agents.

22            Q.    And with regard to the

23    information referenced here, do you know,

24    based on this document, when that information

25    was received?

Deposition of Frank Occhipinti                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1              A.      No.
 2              Q.      Okay.  Going through the rest of
 3       this case background section, the third
 4       paragraph states that, On July 6, 2020, the
 5       Northern Kentucky Drug Strike Force conducted
 6       a search warrant at 423 West 13th Street,
 7       Newport.  That particular event ATF was not
 8       part of it, correct?
 9              A.      No, ma'am.
10              Q.      And in the following paragraph
11       begins, On 7/31/20, so July 31st, CPD and
12       NKDSF -- so that's the Cincinnati Police
13       Department and Northern Kentucky Drug Strike
14       Force -- were attempting to locate Mason
15       Meyer, right?
16              A.      That's correct.
17              Q.      And ATF was not involved in that
18       operation, correct?
19              A.      We were not.
20              Q.      And then the following paragraph
21       begins on August 6th, 2020, ATF Task Force
22       Officer TFO Brett Strattman, ATF Special
23       Agent Edward Schaub, and NKDSF Agent Chris
24       Boyd met with an individual who wanted to
25       provide information to assist the
```

01:44   10
01:44   20

1    investigation.

2               This event described here on

3    August 6th, 2020, is this when ATF undertook

4    its first activity in relation to this case?

5         A.    Yes.  I would assume so, yeah.

6         Q.    So that information received and

7    then this meeting with the individual on

8    August 6th, 2020, that's the first ATF action

9    relating to Mason Meyer, right?

01:45   10         A.    Ma'am, again, it's four years

11   ago so unless I go back to our case

12   management system to see when that case was

13   opened but according to this paragraph, yes.

14        Q.    And as far as you aware -- as

15   you're aware, as you sit here today, there

16   was no other ATF action in relation to Mason

17   Meyer prior to August 6th, 2020?

18        A.    No.

19        Q.    Okay.  So for this August 6th,

01:46   20   2020 meeting with the individual who wanted

21   to provide information to assist in the

22   investigation, do you know how that meeting

23   came to be set up?

24        A.    I do not.

25        Q.    Do you have any knowledge about

1    how this individual came to the attention of

2    these ATF Task Force officer and special

3    agent and the drug strike force Agent Boyd?

4         A.    I do not.

5         Q.    If we wanted to find that out,

6    do you know where we could go to look?

7         A.    I would start with Agent Boyd.

8         Q.    Agent Boyd in the drug strike

9    force?

01:46 10         A.    Yes.

11         Q.    And is he a Kentucky law

12    enforcement officer?

13         A.    Yes.

14         Q.    Okay.  Do you know what agency

15    he's with outside of his drug strike force

16    assignment?

17         A.    Gosh.  If I tell you an agency,

18    I'd probably be wrong.  Somewhere down there.

19    I don't know.

01:46 20         Q.    That's okay.  In any case,

21    you're aware he's a part of the Northern

22    Kentucky Drug Strike Force, right?

23         A.    Yes.

24         Q.    And you know he's part of some

25    local law enforcement agency in Kentucky but

1    you just don't remember which one?

2          A.    Yes.

3          Q.    Okay.  Fair enough.  I know you

4    work with a lot of officers from various

5    agencies.  Okay.  So I want to briefly turn

6    to what was marked as Exhibit 24 earlier

7    today.  Okay.  So you have Exhibit 24 in

8    front of you?

9          A.    Yes.

01:47  10          Q.    And this report is not dated,

11    right?

12          A.    No.

13          Q.    It reflects events occurring on

14    August 6th though, right?

15          A.    Yes, ma'am.

16          Q.    Okay.  And this Report of

17    Investigation we know from your earlier

18    testimony that ultimately it came to you for

19    review and signing, right?

01:47  20          A.    Yes.

21          Q.    And this notes here -- this

22    document notes here at the bottom that there

23    are two attachments with the -- with the

24    report, correct?

25          A.    Yes.

```
 1            Q.    When you received this report

 2      for review and signing, would you have also

 3      received copies of the attachments?

 4            A.    I would have, yes.

 5            Q.    And so you would have looked at

 6      those as well in your review of the report?

 7            A.    Yes.

 8            Q.    Excuse me.  And so the narrative

 9      states that it was on August 6th, 2020 when

01:48  10      records were obtained from the Northern

11      Kentucky Drug Strike Force referencing a

12      search warrant and an assault, shots fired,

13      drug trafficking activity, right?

14            A.    Yes.

15            Q.    And then there's also reference

16      to the execution of the search warrant in the

17      second paragraph, correct?

18            A.    Yes.

19            Q.    And that -- was that -- we

01:48  20      looked earlier at Exhibit 27.  Is that the

21      document or the information, rather,

22      referenced in that narrative?

23            A.    Bear with me.  Okay?

24            Q.    No.  You know, strike that.

25      This would have been a later document I
```

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1    believe, wouldn't it?  Never mind.

 2    Disregard.  Sorry.  I do want to show you

 3    what we're --

 4              MS. GREENE:  What number are we

 5    on?  Twenty-eight?

 6              THE REPORTER:  Yes.

 7              MS. GREENE:  Okay.  I'm going to

 8    mark this exhibit as 28.

 9       (Exhibit 28 identified.)

01:49  10    BY MS. GREENE:

11       Q.    Okay.  Take a moment to look

12    this over if you would and I'll have some

13    questions for you.

14       A.    I'm ready.

15       Q.    Okay.  Is this K-Y-B-R-S --

16    K-Y-I-B-R-S report that you received in

17    association with Exhibit 24, that Report of

18    Investigation?

19       A.    I believe so, yes.

01:50  20    Q.    Okay.  And so this is a report

21    then that you would have reviewed at the time

22    that the operational plan was being put

23    together and events were prepared for

24    August 7th?

25       A.    Yes.
```

1    Q.    And if you will turn with me

2    to what is -- let's see here.  One, two,

3    three, four -- the fifth page which is the

4    synopsis investigation page.  This report

5    here details an attempt to stop and then a

6    pursuit of Mason Meyer, correct?

7         A.    Yes, ma'am.

8         Q.    And the synopsis notes that, The

9    male suspect, who was Meyer, began weaving in

01:50  10    and out of traffic as he engaged in conduct

11    that created substantial danger of death or

12    serious physical injury to other motorists,

13    correct?

14        A.    Yes.

15        Q.    And this synopsis and

16    investigation summarized below relate to

17    events on July 30th, 2020, right?

18        A.    Correct.

19        Q.    So just about a week before the

01:51  20    operation plan was put together and seven

21    days before the actual events at Steiner,

22    right?

23        A.    Yes.

24        Q.    And I want to go down to the

25    third paragraph in the investigation section

1    and if you'll just follow along with me for a

2    moment.  The third sentence begins that, At

3    this point, this deputy was approaching the

4    county line and made the decision to attempt

5    a traffic stop.  The above vehicle, which the

6    report indicates was Mason Meyer, was in the

7    far left lane and then began switching over

8    to the far right lane weaving in and out of

9    heavy traffic and cutting them off to the

01:51  10    point that other motorists were swerving and

11    slamming on their brakes to avoid a

12    collision.

13              So that information was

14    available in advance of the operation at

15    Steiner on the seventh of August, correct?

16          A.    I believe so.

17          Q.    The investigation report goes on

18    to say about a sentence later that deputy was

19    traveling approximately 95 miles per hour at

01:52  20    one point and the above vehicle, meaning the

21    Meyer vehicle, was pulling away from the

22    deputy and the deputy put his sirens on for a

23    brief moment but the vehicle continued to

24    pick up speed and evade this deputy while

25    still the operating the vehicle in a reckless

1   manner and at that point the deputy reported

2   that he shut off his lights and sirens and

3   the traffic stop pursuit were terminated,

4   correct?

5          A.    Yes, ma'am.

6          Q.    So this information contained in

7   this report, was this part of the briefing

8   discussion with any officers that you're

9   aware of relating to the August 7th Steiner

01:52   10   events?

11          A.    So to the best of my recoll --

12   recollection, we knew that Kentucky law

13   enforcement attempted to stop him at an

14   earlier date and he fled.  As far as the

15   specifics as to what's in this paragraph, I'm

16   not sure we shared that information or I

17   would have been made aware.

18          Q.    With regard to any discussion

19   about the earlier fleeing of Mr. Meyer, was

01:53   20   it made known during the briefing that he had

21   engaged in dangerous flight response to the

22   officer's attempt to stop him?

23          A.    As best I can remember, what was

24   discussed was that they couldn't stop him,

25   they called off the pursuit.  So I'm not --

1       I -- I don't remember what the specifics of

2       that calling off or the reason why they

3       called it off but he was driving at a high

4       rate and they were unable to get to him and

5       called off the pursuit.

6            Q.    Okay.  All right.  We can set

7       that aside for a moment.  Well, let me just

8       actually ask one more question about it.  So

9       this report, what we just marked as

01:54 10     Exhibit 28, was this handed out in any way to

11      any -- anyone associated with the joint

12      operation at Steiner?

13           A.    No, ma'am.

14           Q.    Okay.  All right.  So turning

15      back to the operational plan, if we could go

16      down to the page stamped 796, there's the

17      section -- sorry.  You have that -- the

18      operational plan in front of you again?

19           A.    I do now.

01:54 20     Q.    Thanks.  All right.  Feel free

21      to, you know, flag me down if I'm going too

22      quick at any time.  So at the bottom of this

23      page stamped 796 there's a section called

24      bust signals.

25           A.    Yes.

1    Q.    And what are bust signals?

2         A.    So that is in the event there's

3    a -- we involved a confidential informant or

4    an uncover agent in an operation -- in a

5    sting operation.  What you see here would be

6    a primary audible signal given by the -- a

7    noninvolved -- I'm sorry -- a non-CI or

8    confidential informant or a UC.

9              This would be the person with

01:55 10    the direct view of the operation would call a

11    bust or initiate, initiate, initiate.  The

12    secondary would be the visual is given by the

13    confidential informant or the undercover.

14    Those are visuals:  Waving their arms over

15    their heads.  Third would be the audible:

16    Help, help, help, and, again, the fourth

17    would be the trouble/rip off visual, hand in

18    the air.

19         Q.    Okay.  And were there any

01:55 20    confidential informants involved in this

21    particular operation?

22         A.    No.

23         Q.    With regard to the individual

24    who provided information to Agents Schaub,

25    Boyd, and Strattman, or officers rather, was

1    that person Lance Bailey by any chance?

2           A.    I don't recall.

3           Q.    Do you -- you don't know who

4    that person was as you sit here?

5           A.    No, ma'am.

6           Q.    Okay.  Does the name Lance

7    Bailey ring any bells for you?

8           A.    No.

9           Q.    Do you know anything about the

01:56  10    third person who was in the vehicle with

11    Meyer and Johnson when it was ultimately

12    involved in the crash?

13           A.    I don't remember who it was.  I

14    do remember there was a male in the backseat.

15    Have to look at my records.

16           Q.    That's okay.  And I -- you know,

17    I understand it's a while ago.  Do you know

18    whether that person was involved in any --

19    any of the trafficking organizations that we

01:56  20    discussed earlier today in your deposition?

21           A.    He may have been.  I -- I don't

22    know.

23           Q.    Okay.  All right.  So let's turn

24    then to -- let's see here -- the next page of

25    the operational report, 797.  Excuse me.  I'd

```
 1    like to go to -- let's see here.  We'll start
 2    at the second paragraph which states:   In
 3    order to facilitate the development of
 4    intelligence, ATF agents, CPD detectives and
 5    officers, and NKDSF will conduct vehicular
 6    and/or visual surveillance on the identified
 7    target location.
 8              So with respect to the agencies
 9    described here and the surveillance that the
 10   sentence references, these multiple agencies
 11   are engaging in surveillance, right?
 12        A.   Yes.
 13        Q.   And they're doing that in
 14   concert, working with each other, right?
 15        A.   Yes.
 16        Q.   But they are all also engaging
 17   that surveillance under their own
 18   organizational authority, correct?
 19        A.   Yes.
 20        Q.   And then -- excuse me.  Turning
 21   to the next paragraph which starts, ATF
 22   agents, CPD detectives and officers, and
 23   NKDSF will be identifying and investigating
 24   the listed offenders and any known
 25   associates.
```

01:57  (line 10)
01:58  (line 20)

1                    My question about that sentence,

2           again, is these agencies, these

3           organizations, were working in concert for

4           that purpose of investigating the offenders

5           and known associates, right?

6                    A.    Yes.

7                    Q.    But ultimately they all also

8           were engaging in those law enforcement

9           activities under the authority of their own

01:58   10           agency authority, right?

11                    A.    Yes, ma'am.

12                    Q.    And then the paragraph continues

13           that -- moving to the next sentence -- CPD

14           will utilize marked and unmarked vehicles to

15           effect traffic stops.  Do you see that?

16                    A.    Yes.

17                    Q.    So this sentence refers only to

18           activities undertaken under the chain of

19           command of CPD, Cincinnati Police, correct?

01:59   20           A.    Yes, ma'am.

21                    Q.    And it refers specifically to

22           actions taken by officers who are acting

23           under the authority of the Cincinnati Police

24           Department, right?

25                    A.    Yes.

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

```
 1              Q.    And it does not refer to

 2       officers acting under the authority of any

 3       other agency, correct?

 4              A.    No.

 5              Q.    That -- no, I'm correct?  You

 6       agree with me?

 7              A.    Yes.  So it's strictly for --

 8       this sentence is strictly for Cincinnati PD.

 9       I'm sorry.

01:59 10              Q.    That's okay.  Just making sure I

11       understand your answer.  The next sentence

12       reads that, ATF agents may be riding in

13       vehicles utilized by CPD to effect a stop and

14       will assist with interviews, searches, and

15       security during that vehicle stop.  Do you

16       see that?

17              A.    Yes.

18              Q.    So does that mean that ATF

19       agents may be in a CPD vehicle but will not

01:59 20       be actually engaging in activity to effect

21       the stop itself?

22              A.    That is correct.

23              Q.    And that --

24                    MR. HERZIG:  Objection.  Go

25       ahead.
```

1          Q.    And instead, that's a role the

2     ATF agents would be to assist CPD with

3     interviews, searches, and security during

4     that vehicle stop.

5          A.    That is correct.

6          Q.    And so the vehicle stop -- if

7     any stop was undertaken pursuant to this

8     particular sentence in the operational plan

9     would be conducted strictly by CPD under the

02:00    10     authority of Cincinnati Police.

11          A.    Correct.

12          Q.    Carrying on, this plan states

13     that ATF agents will not initiate traffic

14     stops without the presence of a CPD detective

15     or officer and does -- can you explain what

16     that means to me in relation to the sentence

17     we just read a moment ago?

18          A.    Yes.  So we are not in uniform,

19     a traditional police uniform.  We don't have

02:00    20     marked police units.  Our vehicle are

21     undercover vehicles.  We have do covert light

22     packages in them but we are strictly

23     prohibited from taking part in traffic stops

24     where we initiate.

25               We can assist as our policy

1    dictates but, again, we are not allowed or

2    according to our policy we're not allowed to

3    effect any traffic stops on our own.

4          Q.    Okay.  And so any stops, again,

5    would be, under this plan, undertaken by CPD?

6          A.    Yes.

7          Q.    The next sentence reads, Any

8    vehicle pursuits will be initiated and

9    monitored by CPD pursuit policy.  So am I

02:01  10    correct in reading this to mean that any

11    pursuit that would occur in association with

12    this operation would be initiated pursuant to

13    CPD policies?

14          A.    Yes.

15          Q.    And that any monitoring of that

16    pursuit would be conducted pursuant to CPD

17    policies?

18          A.    That is correct.

19          Q.    And am I correct in

02:02  20    understanding that any vehicle pursuit

21    initiation or monitoring in relation to this

22    operation would be undertaken strictly by

23    Cincinnati Police Department officers?

24          A.    Yes, ma'am.

25          Q.    And is it correct as well that

1    any vehicle pursuit initiated or monitored in

2    the -- in relation to this operation would be

3    conducted under the chain of command -- chain

4    of command of the Cincinnati Police

5    Department?

6            A.    Yes, ma'am.

7            Q.    And it would be conducted only

8    with the authority of the Cincinnati Police?

9            A.    Correct.

02:02    10            Q.    So for this reference to CPD

11    pursuit policy, this means that initiating

12    and monitoring a pursuit would be done

13    pursuant to CPD policies and their standard

14    operating procedures, correct?

15            A.    Yes.

16            Q.    And that would include the

17    termination of a pursuit that happened in

18    association with this operation, right?

19            A.    Yes.

02:02    20            Q.    Any termination of the pursuit,

21    if it occurred, was to be conducted by

22    Cincinnati Police officers, right?

23                MR. HERZIG:    Objection.

24            Q.    Go ahead.

25            A.    Yes, ma'am.

1        Q.    And any termination of pursuit

2    associated with this operation would be

3    conducted under the authority and chain of

4    command of the Cincinnati Police, correct?

5        A.    Correct.

6        Q.    And it was Cincinnati Police

7    Department's responsibility to terminate the

8    pursuit if it became necessary, right?

9        A.    I -- look, I'm not comfortable

02:03  10    answering that question.

11        Q.    That's fair.  You don't have to

12    speculate as to what their policies would

13    require.  Carry on here.  With respect to the

14    statement in this paragraph that says ATF --

15    or let me read it first I guess.  ATF will

16    not initiate any pursuits is the sentence

17    that follows the one we were just talking

18    about, right?

19        A.    Yes.

02:04  20        Q.    And this sentence that ATF will

21    not initiate any pursuits, this means that

22    ATF is not involved in association with this

23    operation in any kind of command capacity in

24    the initiation of a pursuit, right?

25              MS. STEWART:  Objection.

1                        MR. HERZIG:  Objection.

2              Q.    I'll reask it in a different

3      way.  Is it true that ATF was not involved in

4      any chain of command capacity in the

5      initiation of the pursuit in this case?

6              A.    That is correct.

7                        MR. HERZIG:  Objection.

8              Q.    And is it true that ATF was not

9      involved in any chain of command capacity in

02:04  10     the monitoring of the officers' conduct

11     during this pursuit in this case?

12             A.    That is correct.

13             Q.    And is it true that ATF is not

14     involved in any chain of command capacity in

15     any termination of the pursuit?

16             A.    That is correct.

17             Q.    Okay.  Carrying on, the next

18     sentence reads, In the event the listed

19     individuals are positively identified by ATF

02:05  20     surveillance units, CPD uniformed vehicles

21     will be advised and directed to conduct a

22     traffic stop following CPD policy.  ATF will

23     assist as needed.

24                        For that sentence where it says

25     that CPD uniformed vehicles will be advised

Case: 2:21-cv-00102-DLB    Doc #: 136    Filed: 11/06/25    Page: 209 of 233 - Page
ID#: 2114
Deposition of Frank Occhipinti                                        Jason Laible, et al. vs. Timothy Lanter, et al.

1    and directed to conduct the traffic stop,

2    that's pursuant to CPD chain of command,

3    right?

4              MR. HERZIG:  Objection.

5         A.    Yes.  Again, it's following CPD

6    policy.

7         Q.    You earlier talked about the

8    vehicle stabilization pin tactic and that

9    there was an upward limit to the speed the

02:05  10    fleeing vehicle could be going in order to

11    use that tactic, right?

12         A.    Yes, ma'am.

13         Q.    What's that upward speed limit?

14         A.    I --

15              MS. STEWART:  This may fall

16    outside of what he's approved to testify

17    because it involves law enforcement

18    techniques.

19              MS. GREENE:  Okay.

20    BY MS. GREENE:

21         Q.    This is a tactic used by

22    agencies other than ATF as well, right?

23         A.    Yes.

24         Q.    A commonly used police --

25    policing tactic in relating -- in relation to

1  vehicles that are attempting to flee; fair

2  enough?

3            MS. STEWART:  Objection.

4       A.    It's a tactic we use.

5       Q.    Okay.  All right.  The last

6  sentence of the third paragraph reads that,

7  In the event agents or TFOs are unable to pin

8  the vehicle, CPD uniform officers will

9  attempt to conduct a felony traffic stop with

02:06  10  assistance from CPD K9s per their SOP.

11            That sentence, again, relates to

12  the authority to try to stop Meyer's vehicle

13  coming from the Cincinnati Police Department

14  agency only, right?

15       A.    That is correct.

16       Q.    And there's reference here to

17  the CPD K9 units.  There were uniformed

18  officers and K9 units from Cincinnati police

19  that were part of this, right?

02:07  20       A.    Yes.

21       Q.    And then where it says per their

22  SOP, that's Cincinnati police Standard

23  Operating Procedures, correct?

24       A.    Yes.  And pardon the butchering

25  of the English language.

Jason Laible, et al. vs. Timothy Lanter, et al.

1          Q.    We all have typos once in a

2     while.  Okay.  All right.  So let's turn to

3     the next page.  On this page we have the list

4     of various officers and agencies involved,

5     correct?

6          A.    Yes.

7          Q.    And there's this column about --

8     well, before I get to that let me ask this.

9     You earlier referenced team members and I

02:07 10     think we clarified that was individuals one

11     through ten, right?

12          A.    Yes, ma'am.

13          Q.    And then we also heard this term

14     task force.  Is that the same group of

15     people:  Individuals one through ten?

16          A.    It can be.  In this case, yes,

17     or others that are not listed on this op plan

18     but yes, ma'am.

19          Q.    Okay.  And let's see here.  So

02:08 20     based on some questions I asked you earlier

21     then, is it fair to say that some of the

22     individuals listed here in items one

23     through -- or lines one through ten, could

24     have engaged in law enforcement action

25     pursuant to their home agency chains of

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    command on August 7th, 2020?

2           A.    That is correct.

3           Q.    And Sergeant Don Scalf was one

4    of those people, right?

5           A.    Yes.

6           Q.    Other Cincinnati Task Force

7    agents are included in that list as well,

8    correct?

9           A.    Yes.

02:08  10          Q.    Okay.  And those individuals

11   would be acting according to Cincinnati

12   Police Department authority, right?

13          A.    Yes.

14                MR. HERZIG:  Objection.

15          Q.    Okay.  Actually, let me just

16   ask.  I see here radio frequency 3C.  What's

17   that mean?

18          A.    That is the specific channel we

19   were operating on that day.

02:09  20          Q.    At that time?

21          A.    That day.  Yes.

22          Q.    Okay.

23          A.    That time.

24          Q.    During this --

25          A.    Operation.

1      Q.     This is the radio frequency plan

2    to be used for the operation?

3           A.     Yes.

4           Q.     Okay.  So looking at the next

5    page, 799, the section about

6    contingency/abort plan.  I just want to look

7    at the last sentence there, which you

8    discussed with Mr. Herzig, that notes that,

9    CPD uniform officers and Gang Unit officers

02:09   10   would be notified and would respond according

11   to their policies and procedures in the event

12   a homicide suspect or vehicle was spotted,

13   right?

14          A.     That is correct.

15          Q.     And so the action anticipated in

16   this sentence by CPD uniform officers and

17   Gang Unit officers, that would have been

18   under the Cincinnati Police Department chain

19   of command, right?

02:10   20          A.     Yes.

21          Q.     And would be pursuant to CPD

22   standard operating procedures, policies, and

23   practices, right?

24          A.     Correct.

25          Q.     Okay.  Turning to the next page,

 1    800, these are the policies you discussed a

 2    little bit earlier with Mr. Herzig.  These

 3    are ATF policies outlined here, correct?

 4           A.    Yes.

 5           Q.    And so these ATF policies apply

 6    only to ATF officers, right?

 7           A.    ATF agents and ATF task force

 8    officers on ATF operations.

 9           Q.    They apply to actions undertaken

02:10  10    by individuals who are subject to ATF policy,

11    right?

12           A.    Correct.

13           Q.    And Cincinnati officers

14    operating under Cincinnati Police Department

15    chain of command are not subject to ATF

16    policies, right?

17           A.    No.

18           Q.    You agree with me?

19           A.    Yes, ma'am.

02:11  20           Q.    Okay.  All right.  And so the

21    pursuit policy that applied to the events at

22    issue in this particular case was not the ATF

23    policy but instead was the Cincinnati policy,

24    correct?

25           A.    That is correct.

```
 1            Q.    All right.  Let's -- all right.
 2     We can set this document aside for now and I
 3     would like to mark Exhibit 29.
 4            (Exhibit 29 identified.)
 5            Q.    Okay.  So you should have in
 6     front of you now Exhibit 29.  Are you
 7     familiar with this document?
 8            A.    Yes.
 9            Q.    And what is it?
02:12 10            A.    It is my declaration.
11            Q.    Okay.  And you provided this
12     declaration in this matter back in 2022 in
13     relation to events occurring in this case,
14     right?
15            A.    Yes.
16            Q.    And I have just a couple of
17     questions -- clarifying questions I have
18     about some of the things that you state here,
19     so I want to go directly to start with -- to
02:12 20     paragraph two.  You say here, When ATF
21     undertakes an operation, a written plan is
22     prepared clearly detailing the various roles
23     of the individuals involved, right?
24            A.    Yes.
25            Q.    And the operation written plan
```

1    also details the role of the various

2    organizations involved, correct?

3            A.    Yes.

4            Q.    All right.  Looking then at the

5    next paragraph, paragraph three, it reads,

6    Prior to beginning an operation, the op plan

7    is reviewed page by page by participants as

8    part of a tactical briefing.  We may have

9    already addressed or exhausted your knowledge

02:13  10    on this but I'll ask, do you know which CPD

11    personnel reviewed page by page the operation

12    plan, Exhibit 26?

13            A.    I do not.

14            Q.    Okay.  Then as you sit here

15    today -- well, strike that.  Let's go to

16    paragraph 25 or -- sorry -- five.  Did I say

17    25?  I need another coffee.  All right.

18    Paragraph five reads, The plan to surveil and

19    potentially apprehend Mason Meyer was a joint

02:14  20    effort between CPD and ATF and that ATF was

21    assisting in the execution of state warrants,

22    no federal warrant existed for Meyer at the

23    time.  It's also true that the Northern

24    Kentucky Drug Strike Force was part of this

25    as well, right?

Jason Laible, et al. vs. Timothy Lanter, et al.

1    A.    Yes.

2    Q.    But the joint effort, that means

3    that no one agency was controlling the other

4    agencies involved in this particular

5    operation, correct?

6    A.    That is correct.

7    Q.    If you look at the next

8    paragraph it reads, United States Marshals

9    Service or USMS was not involved in any way

02:14  10  in the operation on August 7th, 2020.  The

11   operation was not part of or related to

12   Operation Triple Beam.  This operation was

13   not, quote, supported by, end quote, the USMS

14   as was declared by Officer Lanter.  Do you

15   see that there?

16   A.    Yes.

17   Q.    Earlier today you were asked

18   about Operation Triple Beam and I believe at

19   the time you didn't remember what that was,

02:15  20  right?

21   A.    No.

22   Q.    Now that you see this paragraph,

23   does that refresh your recollection at all?

24   A.    Yes.

25   Q.    Okay.  And so do you know what

1    Operation Triple Beam is or was?

2          A.    To the best of my recollection,

3    it was a U.S. Marshal led operation that

4    occurred a few years prior to August 2020

5    that involved the arrest of federal fugitives

6    in our area.

7          Q.    Okay.  It had nothing to do with

8    the joint operation or Mason Meyer, right?

9          A.    No.  Completely different

10   agency.

11         Q.    And if Officer Lanter was task

12   force officer for USMS at the time, he did

13   not have any -- any connection to the ATF as

14   any kind of task force or deputized officer

15   during the Steiner Avenue events, right?

16         A.    No.

17         Q.    In the next paragraph you write

18   that, Officer Thomas is not now and was not

19   on August 7, 2020 a deputized task force

20   officer for the ATF, correct?

21         A.    Yes.

22         Q.    And you stand by that today,

23   right?

24         A.    Correct.

25         Q.    You also write in the following

1    paragraph eight that, Officer Lanter is not

2    now and was not on August 7, 2002 a deputized

3    TFO or task force officer for the ATF,

4    correct?

5            A.    Correct.

6            Q.    And you stand by that today,

7    right?

8            A.    Yes.

9            Q.    You also write there that,

02:16  10    Officer Scalf was a deputized ATF TFO or task

11    force officer on August 7, 2020 and remained

12    so until the end of the calendar year, right?

13            A.    Correct.

14            Q.    But Officer Scalf did still have

15    separate authority to act under the CPD chain

16    of command outside out of that task force

17    role, right?

18            A.    Yes, ma'am.

19            Q.    Okay.  So going to the following

02:16  20    page, let's look at paragraph 11.  You wrote

21    here that, Scalf's role, according to the

22    written op plan, was surveillance.  That was

23    his ATF role in the op plan, right?

24            A.    Yes.

25            Q.    And the operation plan did not

1    specifically address his role in relation to

2    any CPD chain of command activities he would

3    undertake, right?

4         A.    No.

5              MR. HERZIG:  Objection.

6         Q.    And it did not address his role

7    in relation to serving as an officer in

8    charge of a CPD pursuit policy bound pursuit,

9    correct?

02:17  10              MS. STEWART:  Objection.

11         A.    No.

12         Q.    And Officer Scalf's role did not

13    include any role as an officer in charge of a

14    CPD pursuit as far as the ATF's role was

15    concerned, right?

16              MR. HERZIG:  Objection.

17         A.    No.

18         Q.    So anything Scalf did relating

19    to the pursuit was outside of his role with

02:17  20    the ATF, right?

21         A.    That is correct.

22         Q.    Okay.  So paragraph 13 then

23    talks about, The op plan contemplated turning

24    over the operation to CPD for any traffic

25    stop, and so that meant if any traffic stop

1    was gonna be attempted, that was a CPD

2    action, right?

3        A.    Yes.

4        Q.    You carry on to say that, The

5    belief that Meyer was in the vehicle leaving

6    the residence activated this contingency.  At

7    that time, we switched radio frequencies from

8    the joint ATF/CPD tactical channel to a CPD

9    primary dispatch channel to signify the

02:18   10   turnover to CPD, and you continued to listen

11   to the channel during pursuit.  What were the

12   two channels you were referencing here?

13       A.    So if you go back to the

14   operational plan, 3C is the tactical channel

15   referenced in my declaration and the primary

16   dispatch channel for that particular district

17   that we were in at the time would have been

18   3A.

19       Q.    Okay.  And so the switching of

02:19   20   frequencies, do you remember exactly when

21   that happened?

22       A.    I don't remember the exact time

23   but under normal circumstances it would occur

24   once the PD units are behind him and the

25   pursuit takes place, we would switch over to

1    primary dispatch so that everybody's on the

2    same page.

3            Q.    Okay.  And you -- you write here

4    that the changing of frequencies signify the

5    turnover to CPD.  Can you explain what you

6    meant by that?

7            A.    Yeah.  So the primary dispatch

8    channel is not normally a channel that I

9    would communicate on a -- on an operation

02:19  10    like this nor would anybody else with --

11    that -- that is basically for CPD and their

12    dispatcher to radio calls and mainly a

13    communication channel.

14            The way we typically did things

15    is if -- if we ever switched over to a main

16    channel that would indicate to the PD that we

17    would relinquish control whether it's a

18    barricade, a hostage situation, or a pursuit

19    in this case, when that happens, I no longer

02:20  20    have control.  It's no longer under ATF's

21    purview to maintain control over a pursuit

22    and that's when that change happened.

23            Q.    Okay.  And then when you note

24    here that you continued to listen to the

25    channel during the pursuit, during that time

1    you gave no orders to the officers who are

2    pursuing Meyer's vehicle, correct?

3            A.    That is correct.

4            Q.    And, in fact, at no time did you

5    give any orders to the officers pursuing

6    Meyer's vehicle, right?

7            A.    Nor would I ever.

8            Q.    And no ATF officer, special

9    agent, gave -- or any agent of any type gave

02:20  10    any orders to the officers who were pursuing

11    Meyer's vehicle, right?

12            A.    No.

13            Q.    You agree with me on that?

14            A.    Yes.   I apologize.

15            Q.    With respect to the paragraph

16    15, you say, I confirmed on the CPD primary

17    channel that tracking revealed Meyer's

18    cellphone was in the vehicle.   I believe you

19    talked about this earlier that this was --

02:21  20    this was the ping that indicated, in fact,

21    he's in the car that's moving, right?

22            A.    Yes.

23            Q.    And during the course of the

24    pursuit in terms of contributing to the

25    investigation or any attempt for law

1    enforcement to take Meyer into custody, this

2    was the only activity that you engaged in,

3    right?

4                   MR. HERZIG:  Objection.

5         A.    Are -- are you referencing to me

6    getting on the radio?

7         Q.    Yeah.

8         A.    I got on the radio one other

9    time to let them know that Meyer was heading

02:21  10    into Kentucky to alert Northern Kentucky law

11    enforcement.

12        Q.    Okay.  So other than this note

13    that Northern law -- Northern Kentucky law

14    enforcement should be notified and that it

15    appeared Meyer was in the vehicle, those were

16    the only two actions of yours that were --

17    that you undertook during the pursuit,

18    correct?

19                   MR. HERZIG:  Objection.

02:22  20                   MS. STEWART:  Objection.

21        Q.    Go ahead.  It wasn't a great

22    question, I worded it poorly but go ahead.

23        A.    I did get on the radio one other

24    time and that was after the crash occurred.

25        Q.    Okay.  The pursuit at that point

Deposition of Frank Occhipinti

Jason Laible, et al. vs. Timothy Lanter, et al.

1    was ended, right?

2         A.    Yes, ma'am.

3         Q.    But other than that, you didn't

4    do anything else?

5         A.    That's it.

6              MR. HERZIG:   Objection.

7         Q.    Paragraph 16 you say, I did not

8    at any time direct any actions of Scalf,

9    Lanter, Thomas, or any other CPD officer.

02:22  10    You stand by this, correct?

11         A.    I do.

12         Q.    And you were not the person who

13    gave anybody permission to travel into

14    Kentucky for this pursuit, right?

15         A.    No.

16         Q.    And then paragraph 18 you say,

17    Officers Lanter and Scalf and correct that I

18    did not instruct them to stand down nor were

19    they instructed to do that or any -- anything

02:23  20    else by anyone at ATF.  That would not have

21    been within my authority as I did not

22    supervise or have any control over Officers

23    Lanter or Scalf.  That also applied to

24    Officer Thomas as well, right?

25         A.    That is correct.

1      Q.    And you stand by that paragraph

2    today as well, correct?

3           A.    That is correct.

4           Q.    Okay.  For all the officers who

5    were actually engaged in the pursuit in this

6    matter, they did not do so on behalf of ATF,

7    right?

8           MR. HERZIG:  Objection.

9           A.    Ma'am, the pursuit is not

02:23 10    governed by ATF.  It would never be governed

11    by ATF.  Any action that they would take part

12    in would be governed by their own agency.

13          Q.    Thank you.

14          MS. GREENE:  All right.  Let's

15    just take a couple minutes off the record.

16    Thank you.

17       (Break taken.)

18    BY MS. GREENE:

19          Q.    I just have a couple quick

02:28 20    questions for you.  Earlier on August 7th

21    prior to everybody -- all of the agents and

22    officers and the various agencies being at

23    the Steiner Avenue house, was there

24    communication by radio during the course of

25    the day?

1              A.    Yes.

2              Q.    And after everybody was at

3    Steiner and nearby, was there continued

4    communication by radio at that time?

5              A.    Yes.

6              Q.    And on August 6th, the day

7    before this, was the ATF involved in any law

8    enforcement activity relating to Meyer other

9    than the interview and receipt of information

02:29   10    that we saw and talked about earlier?

11             A.    Not that I recall.

12             Q.    Are you aware of Cincinnati

13   officers engaging in activity relating to

14   Meyer on the sixth?

15             A.    Yes.

16             Q.    Can you tell me about that?

17             A.    I need to -- I'm sorry.

18             Q.    No.   That's fine.   Whatever you

19   need to look at, feel free.

02:29   20             A.    Ma'am, I'm not sure what you're

21   asking.

22             Q.    Sure.   It might -- well, hang on

23   one second.   So I don't know if this is

24   necessarily in any of the records that we

25   looked at today.   I know that we're aware of

1    information coming to ATF, an interview of a

2    person, on August 6th, right?

3         A.    That is correct.

4         Q.    But my -- and I don't -- again,

5    I don't know that this is in the records

6    we've looked at today.  So let me ask

7    something separate.  But are you aware of any

8    law enforcement activity by Cincinnati Police

9    on August 6th relating to Meyer?

02:31 10        A.    No.

11        Q.    Have you ever heard any radio

12   traffic from that day, August 6th, relating

13   to Meyer?

14        A.    No.  No, ma'am.

15        Q.    Okay.  With relation to the

16   radio traffic on the seventh prior to the

17   commencement of the pursuit, have you since

18   this day, August 7th, listened to any audio

19   recordings of the radio traffic?

02:31 20        A.    Of that day?

21        Q.    Yeah.

22        A.    Yes.

23        Q.    And at what point in time did

24   those recordings start that you listened to?

25   Meaning, like, how far in advance of the

1    pursuit?

2              A.    So the radio communication or

3    recording would only capture communications

4    that occurred on primary dispatch channel.

5              Q.    And so that would be the

6    Cincinnati primary dispatch?

7              A.    Yes, ma'am.

8              Q.    And so this 3C channel, are you

9    saying those would not be captured --

02:32  10              A.    That is --

11              Q.    -- by the recording?

12              A.    -- not recorded.  No.

13              Q.    And is that -- do you know why

14    that is?

15              A.    So those are typically private

16    channels we reserve for tactical units or

17    specialized units and we speak freely meaning

18    names, date of births, criminal histories, we

19    put that information out there and that would

02:32  20    not be a monitored channel, per se.

21              Q.    When you say monitored channel

22    what do you mean?

23              A.    Monitored by Cincinnati police

24    dispatch or -- or communication center.

25              Q.    And so are you aware of any

1    recordings of those conversations on 3C prior

2    to the switch to primary dispatch?

3          A.    No.

4          Q.    Do you know whether there were

5    conversations about this matter, this

6    operation, on primary dispatch prior to the

7    pursuit commencement?

8          A.    I don't recall.

9          Q.    All right.  I have no further

02:33  10    questions at this time.  Thank you.

11              MR. PALMER:  I don't have any

12    questions.

13              RECROSS-EXAMINATION

14    BY MR. HERZIG:

15          Q.    Agent Occhipinti, I do -- you

16    were directed to ==Exhibit 28== which describes

17    the fact that -- it describes a Kentucky

18    report about Mr. Meyer driving recklessly and

19    you indicated that you would -- that specific

02:34  20    information wasn't made aware to the ATF task

21    force, correct?

22          A.    So in terms of the attachment,

23    we would be made aware.

24          Q.    Okay.  But it wasn't in the

25    operational plan.

1          A.    No, sir.

2          Q.    Okay.  Is that because the fact

3    that someone drives recklessly is not

4    considered important when you're deciding

5    whether or not to arrest somebody?

6                MS. GREENE:  Objection.

7          A.    There are many other factors

8    that -- that play into us including certain

9    information or not and I'm not -- I'm not

02:34   10    sure if this would have been relevant at that

11    point.

12          Q.    It isn't the case that because

13    someone has fled from police before that you

14    would not seek to arrest them, right?

15                MS. STEWART:  Objection.

16          Q.    There were a lot of negatives in

17    there.

18          A.    Yeah.

19          Q.    A suspect who has fled before is

02:35   20    still a suspect that you would seek to

21    arrest, correct?

22          A.    That is correct.

23          Q.    In fact, the fact that they are

24    a reckless driver makes them a danger to the

25    public that makes you -- that I would think

Deposition of Frank Occhipinti                                    Jason Laible, et al. vs. Timothy Lanter, et al.

1    makes it more likely that you would want to

2    get that person off the street, right?

3              MS. GREENE:  Objection.

4         A.    Like I said, there are many

5    factors that play into us targeting a certain

6    individual.

7         Q.    All right.  I have nothing

8    further.  Thank you.

9              MS. GREENE:  All right.  Nothing

02:35 10   from us either.  Thank you.

11             MS. STEWART:  Thank you.

12

13

14              _____

15              FRANK OCCHIPINTI

16

17

18                    *  *  *

19        (DEPOSITION CONCLUDED AT 2:35 p.m.)

20                    *  *  *

21

22

23

24

25

233

1                    C E R T I F I C A T E

2
     STATE  OF  OHIO
3               :  SS
     COUNTY OF CLERMONT

4

5          I, Deanne Cartwright, the undersigned,
     a duly qualified notary public within and for
6    the State of Ohio, do hereby certify that
     FRANK OCCHIPINTI was by me first duly sworn
7    to depose the truth and nothing but the
     truth; foregoing is the deposition given at
8    said time and place by said witness;
     deposition was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
     by me in stenotype and transcribed by me by
10   means of computer; that the transcribed
     deposition was submitted to the witness for
11   examination and signature and that signature
     may be affixed out of the presence of the
12   Notary Public-Court Reporter. I am neither a
     relative of any of the parties or any of
13   their counsel; I am not, nor is the court
     reporting firm with which I am affiliated,
14   under a contract as defined in Civil Rule
     28(D) and have no financial interest in the
15   result of this action.

16          IN WITNESS WHEREOF, I have hereunto set
     my hand and official seal of office at
17   Cincinnati, Ohio this 30th day of April,
     2025.

18

19                            _Deanne Cartwright_

20   My commission expires:  Deanne Cartwright
     August 5, 2028    Notary Public - State of Ohio
21

22

23

24

25