UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 21-102-DLB-CJS

JASON LAIBLE, et al.                                                                PLAINTIFFS

v.          **DECLARATION OF FRANK OCCHIPINTI**

TIMOTHY LANTER, et al.                                                          DEFENDANTS

\*\*\* \*\*\* \*\*\* \*\*\* \*\*\*

1. I am the Resident Agent in Charge (RAC) of the Cincinnati Field Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF.) I have been with ATF since 2007 and have served as RAC since 2014. I was, therefore, the RAC on August 7, 2020, and was present for all the events described herein.

2. When ATF undertakes an operation, a written plan is prepared clearly detailing the various roles of the individuals involved, explaining what will take place and citing applicable ATF policies and procedures. This document is known as an Operations Plan, or "Op Plan."

3. Prior to beginning an operation, the Op Plan is reviewed page-by-page by participants as part of a tactical briefing.

4. The enforcement action giving rise to this litigation was no exception: there was a written Op Plan, and it was reviewed in the morning prior to beginning surveillance on August 7, 2020. Officer Scalf was present at the briefing. I do not recall specifically if any



uniformed Cincinnati Police Department ("CPD") officers, including but not limited to Officers Lanter and Thomas, were present at the briefing.

5. The plan to surveil and potentially apprehend Mason Meyer was a joint effort between CPD and ATF. ATF was assisting in the execution of state warrants; no federal warrant existed for Meyer at that time.

6. The United States Marshals Service (USMS) was not involved in any way in the operation on August 7, 2020. The operation was not part of or related to Operation Triple Beam. This operation was not "supported by" the USMS as was declared by Officer Lanter.

7. Officer Thomas is not now and was not on August 7, 2020, a deputized task force officer ("TFO") for ATF.

8. Officer Lanter is not now and was not on August 7, 2020, a deputized TFO for ATF. Officer Scalf was a deputized ATF TFO on August 7, 2020 and remained so until the end of that calendar year.

9. ATF policy allows for vehicle pursuits only in exigent circumstances. The Op Plan for this case specifically contemplates the possibility of pursuit, and states clearly that any pursuit will be handled pursuant to CPD policy. The plan reads in relevant part as follows: "CPD will utilize marked and unmarked vehicles to affect traffic stops. ATF Agents may be riding in vehicles utilized by CPD to affect a stop and will assist with interviews, searches, and security during a vehicle stop. ATF Agents will not initiate traffic stops without the presence of a CPD Detective/Officer. Any vehicle pursuits will be initiated and monitored by CPD pursuit policy. ATF will not initiate any pursuits. In the event the listed individuals are positively identified by ATF surveillance units, CPD

uniform vehicles will be advised and directed to conduct a traffic stop following CPD policy, ATF will assist as needed."

10. As a TFO, Scalf was well-versed in ATF policy. He was provided with a copy of the Op Plan prior to the operation and would have been expected to review and familiarize himself with it prior to commencement, in addition to participating in the pre-surveillance briefing.

11. Scalf's role, according to the written Op Plan, was surveillance. He was parked on the street, in an unmarked ATF vehicle, watching the subject residence.

12. Surveillance on August 7, 2020 revealed that Meyer was armed and outside the residence. A vehicle was then observed leaving the residence. It was unclear whether Meyer was in the vehicle at that time because the view of those surveilling was obstructed.

13. The Op Plan contemplated turning over the operation to CPD for any traffic stop. The belief that Meyer was in the vehicle leaving the residence activated this contingency. At that time, we switched radio frequencies from a joint ATF/CPD Tactical channel to a CPD Primary dispatch channel, to signify the turnover to CPD. I continued to listen to that channel during the pursuit.

14. It is my understanding that CPD policy requires an "officer in charge" for any pursuits. On the radio, Officer Scalf identified himself as that officer in charge on behalf of the CPD.

15. I confirmed on the CPD Primary channel that tracking revealed Meyer's cell phone was in the vehicle.

16. I did not at any time direct any actions of Scalf, Lanter, Thomas, or any other CPD officer.

17. I did not give permission for the CPD officers to travel into Kentucky. That is not within my authority. Rather, Lanter requested Scalf's permission and Scalf acquiesced. This is consistent with the understanding that CPD oversaw the pursuit of Meyer.

18. Officers Lanter and Scalf are correct that I did not instruct them to "stand down," nor were they instructed to do that or anything else by anyone at ATF. That would not have been within my authority as I did not supervise or have any control over Officers Lanter or Scalf.

19. Similarly, it is accurate that there was no ATF reprimand of Officer Scalf or any other individual for violation of ATF policy. That is because the applicable policy, according to the Op Plan, was CPD policy and any violation of CPD policy would be handled by CPD who employed Scalf, Lanter, and Thomas.

This the 21st day of March 2022.

_____
Frank Occhipinti
Resident Agent in Charge (RAC)
Cincinnati Field Office
Bureau of Alcohol, Tobacco, Firearms, and Explosives