```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF KENTUCKY
 2                      AT COVINGTON

 3      JASON LAIBLE,            :
        et al.,                  :
 4                               :     CASE NO.
                                 :     2:21-cv-00102
 5         Plaintiffs,           :
                                 :
 6      vs.                      :     Judge David L.
                                 :     Bunning
 7      TIMOTHY LANTER,          :
        et al.,                  :     Magistrate Judge
 8                               :     Candace J. Smith
                                 :
 9         Defendants.           :

10         Zoom and in-person deposition of

11      SERGEANT DONALD SCALF, a witness herein,

12      taken by the plaintiffs as upon

13      cross-examination, pursuant to the Federal

14      Rules of Civil Procedure and pursuant to

15      Notice of counsel as to the time and place

16      and stipulations hereinafter set forth, at

17      the offices of Taft Stettinius &  Hollister,

18      425 Walnut Street, Suite 1800, Cincinnati,

19      Ohio, at 9:36 a.m., Wednesday,

20      April 23, 2025, before Stacey J. Murrin, a

21      Court Reporter and Notary Public, within and

22      for the State of Ohio.

23

24                      - - -

25
```

Case: 2:21-cv-00102-DLB   Doc #: 138   Filed: 11/06/25   Page: 2 of 204 - Page ID#:
2185
Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        APPEARANCES:

 2        FOR THE PLAINTIFFS,    JACQUELINE GREENE, ESQ.
          ESTATES OF RAYMOND     ELIJAH HACK, ESQ.
 3        AND GAYLE LAIBLE:      Friedman, Gilbert &
                                 Gerhardstein
 4                               35 East 7th Street
                                 Suite 201
 5                               Cincinnati, Ohio 45202

 6                               And

 7        FOR THE PLAINTIFFS,    ROULA ALLOUCH, ESQ.
          STEVEN AND MARIBETH    Bricker Graydon, LLP
 8        KLEIN:                 2400 Chamber Center Drive
                                 Suite 300
 9                               Ft. Mitchell, KY 41017

10        FOR THE DEFENDANTS,    AARON HERZIG, ESQ.
          CITY OF CINCINNATI,    SPENCER S. COWAN, ESQ.
11        TIMOTHY LANTER and     Taft Stettinius &
          BRETT THOMAS:          Hollister
12                               425 Walnut Street
                                 Suite 1800
13                               Cincinnati, Ohio 45202

14        FOR THE DEFENDANT,     MARVA BENJAMIN, ESQ.
          CITY OF CINCINNATI:    (Via Zoom.)
15                               City Solicitor
                                 801 Plum Street
16                               Cincinnati, Ohio 45202

17        FOR THE DEFENDANT,     MATTHEW BOGGS, ESQ.
          TRAVELERS CASUALTY     Casey Bailey & Maines
18        INSURANCE COMPANY:     3151 Beaumont Centre Circle
                                 Suite 200
19                               Lexington, KY 40513

20        FOR THE DEFENDANTS     KIMBERLY A. RUTOWSKI, ESQ.
          TIMOTHY LANTER and     Lazarus Law, LLC
21        BRETT THOMAS,          The Huntington Center
          INDIVIDUALLY:          525 Vine Street
22                               Suite 2210
                                 Cincinnati, Ohio 45202

23

24        ALSO PRESENT: Maribeth Klein (Via Zoom.)
                         Jason Laible (Via Zoom.)
25                       Maggie Noble
                         Timothy Lanter
```

1                    S T I P U L A T I O N S

2          It is stipulated by counsel for the

3     respective parties that the deposition of

4     SERGEANT DONALD SCALF, a witness herein, may

5     be taken at this time by the plaintiffs as

6     upon cross-examination and pursuant to the

7     Federal Rules of Civil Procedure and Notice

8     to take deposition, all other legal

9     formalities being waived by agreement; that

10    the deposition may be taken in stenotype by

11    the Notary Public-Court Reporter and

12    transcribed by her out of the presence of the

13    witness; that the transcribed deposition was

14    made available to the witness for examination

15    and signature and that signature may be

16    affixed out of the presence of the Notary

17    Public-Court Reporter.

18

19

20

21

22

23

24

25

```
 1                          INDEX

 2        WITNESS          DIRECT   CROSS    RE-       RE-
                                             DIRECT    CROSS
 3
          SERGEANT DONALD SCALF
 4        BY MS. GREENE:                 6

 5        EXHIBIT IDENTIFIED                        PAGE

 6        Exhibit 50                                  49
          Exhibit 51                                 174
 7        Exhibit 52                                 181
          Exhibit 53                                 189
 8
          OBJECTIONS                                PAGE
 9
          MR. HERZIG:                                 35
10        MR. HERZIG:                                 37
          MR. HERZIG:                                 37
11        MR. HERZIG:                                 39
          MR. HERZIG:                                 43
12        MR. HERZIG:                                 47
          MR. HERZIG:                                 58
13        MR. HERZIG:                                 59
          MR. HERZIG:                                 63
14        MR. HERZIG:                                 67
          MR. HERZIG:                                 68
15        MR. HERZIG:                                 68
          MR. HERZIG:                                 69
16        MR. HERZIG:                                 80
          MR. HERZIG:                                 82
17        MR. HERZIG:                                 83
          MR. HERZIG:                                 90
18        MR. HERZIG:                                 91
          MR. HERZIG:                                 96
19        MR. HERZIG:                                105
          MR. HERZIG:                                106
20        MR. HERZIG:                                118
          MR. HERZIG:                                119
21        MR. HERZIG:                                119
          MR. HERZIG:                                121
22        MR. HERZIG:                                123
          MR. HERZIG:                                133
23        MR. HERZIG:                                150
          MR. HERZIG:                                151
24        MR. HERZIG:                                152
          MR. HERZIG:                                152
25        MR. HERZIG:                                155
          MR. HERZIG:                                157
```

```
 1        MR. HERZIG:                              160
          MR. HERZIG:                              160
 2        MR. HERZIG:                              185
          MR. HERZIG:                              185
 3        MR. HERZIG:                              194

 4        EXHIBITS REFERENCED                      PAGE

 5        Exhibit 1                                 11
          Exhibit 38                              139
 6        Exhibit 26                              153
          Exhibit 34                              162
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              SERGEANT DONALD SCALF,

2      a witness herein, of lawful age, having been

3      first duly sworn as hereinafter certified,

4      was examined and testified as follows:

5                   THE WITNESS:  Yes, ma'am.

6                   THE COURT REPORTER:  Thank you.

7                   CROSS-EXAMINATION

8      BY MS. GREENE:

9           Q.    **Good morning.**

10          A.    Good morning, ma'am.

11          Q.    **My name is Jacqueline Greene.**

12     **I'm one of the attorneys representing the**

13     **plaintiffs in matter we're here today to talk**

14     **about.**

15          A.    Okay.

16               MS. GREENE:  Before we get

17     going, I'll just ask that we do introductions

18     around the room.

19               MS. ALLOUCH:  Roula Allouch here

20     for Klein plaintiffs.  And my client,

21     Maribeth Klein, is also on Zoom.

22               MR. HACK:  Elijah Hack here for

23     the plaintiffs.

24               MS. NOBLE:  Maggie Noble.  I'm

25     part of the --

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    MS. GREENE:  She's our law
 2        clerk.
 3                    MR. BOGGS:  Matthew Boggs, I'm
 4        here with Travelers.
 5                    MR. LANTER:  Lieutenant Timothy
 6        Lanter, Cincinnati Police.
 7                    MS. RUTOWSKI:  Kim Rutowski I
 8        represent the defendant officers.
 9                    MR. COWAN:  Spencer Cowan for
10        the defendant officers and the City of
11        Cincinnati.
12                    MR. HERZIG:  Aaron Herzig for
13        the defendants, and I'm defending
14        Sergeant Scalf today.  We also have, I
15        believe, Marva Benjamin, from the City of
16        Cincinnati Law Department, who's on Zoom or
17        will be.
18                    MS. GREENE:  And I believe
19        Jason Klein -- or, excuse me, Jason Laible of
20        the Laible Estates plaintiffs is also on Zoom
21        today.
22        BY MS. GREENE:
23             Q.    All right.  Can you, please,
24        state your name for the record?
25             A.    Don Scalf.
```

```
 1            Q.    And your rank is sergeant right

 2      now?

 3            A.    Yes.

 4            Q.    All right.  Sergeant Scalf, have

 5      you testified in court before?

 6            A.    Yes, ma'am.

 7            Q.    A lot of times, I assume?

 8            A.    Yes, ma'am.

 9            Q.    Have you testified in a

10      deposition before?

11            A.    Yes, ma'am.

12            Q.    How many times?

13            A.    At least once, possible more,

14      but at least once.

15            Q.    Okay.  So testifying in a

16      deposition is just slightly different than

17      testifying the court.  I'm sure your counsel

18      has talked with you about this, but to make

19      sure we're on the same page going forward so

20      things run smoothly, I'll go over a few

21      ground rules.  Okay?

22            A.    Okay.

23            Q.    First, as in court, we do our

24      best for both of us to speak one at a time,

25      so our court reporter can take down a clear
```

```
 1            record.

 2                      And I'll ask that you give

 3            verbal answers, so yes, no, other verbal

 4            answers, because uh-huh's, uh-uh's, and nods

 5            and shakes of the head are difficult to put

 6            in the record.  Fair enough?

 7                 A.    Yes, ma'am.

 8                 Q.    And if I ask a bad question and

 9            you don't understand it, you need me to

10            rephrase, whatever it may be, that's fine,

11            just let me know.  I'll be happy to do that.

12                      However, if you do go ahead and

13            answer the question, I'll assume that you

14            understood.  Fair enough?

15                 A.    Yes, ma'am.

16                 Q.    And if at any point counsel

17            objects to any of my questions, which is

18            possible at some stage today, unlike in

19            court, just go ahead and let him finish

20            stating his objection.

21                      But when he's done, unless he

22            instructs you otherwise, you can just go

23            ahead and give your answer.  Okay?

24                 A.    Okay.

25                 Q.    And if you need a break, also no
```

1    problem, let me know.  The only exception

2    would be if I have a question pending, I'll

3    ask that you answer that first.  Okay?

4         A.    Okay.

5         Q.    All right.  Do you have any

6    medical, memory, or other circumstances

7    affecting you today that would impact your

8    ability to testify truthfully or accurately?

9         A.    No, ma'am.

10        Q.    What did you do to prepare for

11   your deposition?

12        A.    I kind of reviewed like one of

13   our procedures.  Of course, met with

14   attorneys, but that's it.

15        Q.    When you say one of your

16   procedures, which one was that?

17        A.    Pursuit policy from --

18        Q.    Okay.

19        A.    -- from that time frame.

20        Q.    And did you review any other

21   documents?

22        A.    In the last week or so, no.  I

23   think this was scheduled a few months ago, I

24   may have gone over something then, but

25   nothing that I remember.

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    Have you viewed any videos or
 2    other multimedia --
 3          A.    Not recently.
 4          Q.    -- materials?
 5          A.    Not recently.
 6                MR.  HERZIG:  Let her finish her
 7    question.
 8          Q.    And that's all right.  Everybody
 9    does it, and we'll get into a rhythm, though.
10                And did you speak with anybody
11    other than counsel in preparation?
12          A.    No, ma'am.
13          Q.    And since this litigation has
14    been ongoing, what other documents do you
15    remember reviewing associated with this case?
16          A.    I'm -- I'm not sure.  I don't
17    recall.  I know that I've looked at the
18    lawsuits and that type of stuff, but nothing
19    specific.
20          (Exhibit 1 was referenced.)
21    BY MS. GREENE:
22          Q.    Okay.  You mentioned a moment
23    ago that you reviewed the pursuit policy.
24    I'm handing you what was previously marked as
25    Plaintiffs' Exhibit 1.
```

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 12 of 204 - Page
ID#: 2195

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1              And my question to you would be,
2      is this the document that you had reviewed?
3              A.    Yes, ma'am.
4              Q.    Okay.  Other than looking at
5      this document then and meeting with counsel,
6      is there anything else you did to prepare?
7              A.    Not that I can recall.
8              Q.    How many statements have you
9      given about this matter?
10              A.    In what regards are you talking
11      about, official statements to, like, my
12      Internal Affairs?
13              Q.    Yeah.  Have you -- when I say
14      statements, I mean verbal or written
15      statements of any kind in an official manner
16      about this case, or about this matter.
17              A.    I know with Internal, and that's
18      the only official one that I can think of at
19      this point.  I could be incorrect.  That's
20      the one that's come to mind.
21              Q.    And that was with Sergeant Fink?
22              A.    Yes, ma'am.  He was one of
23      the -- one of the people in the interview.
24              Q.    Did you give any statements to
25      the Citizen Complaint Authority?

1      A.    I did.  See, I told you I could

2    have been -- it's been a long time ago.

3          Q.    That's okay.  Understandable.

4    Anything other than the Internal IIS and the

5    CCA interviews that you can remember giving

6    at this point?

7          A.    No, ma'am, I don't believe so.

8          Q.    Have you ever written any

9    reports or other documentary materials

10   relating to this matter?

11         A.    Not that I recall.

12         Q.    Okay.

13         A.    If you can show me something

14   that I did, but I'm just not thinking of

15   anything right now.

16         Q.    That's fine.  Thanks.  What's

17   your educational background?

18         A.    College degree.

19         Q.    And what degree was that?

20         A.    It's criminal justice with a

21   minor in sociology from Northern Kentucky

22   University.

23         Q.    And what year did you receive

24   that?

25         A.    A long time ago.  1998, I think

1    I graduated, I think.

2        Q.    When did you graduate high

3    school?

4        A.    '92, that one I remember.

5        Q.    And so you have a Bachelor's

6    degree then?

7        A.    Yes, ma'am.

8        Q.    Do you have any other degrees,

9    licensures, or certificates for educational

10   reasons?

11       A.    Definitely don't have any more

12   degrees.  OPOTA and that stuff, but besides

13   that type of thing, nothing, no.

14       Q.    And when did you begin working

15   with the Cincinnati Police Department?

16       A.    January of 1999, a long time

17   ago.

18       Q.    And did you have employment with

19   any other law enforcement agencies prior to

20   that?

21       A.    No, ma'am.

22       Q.    When did you attend academy?

23       A.    January of 1999.

24       Q.    And when did you complete your

25   academy training?

```
1          A.    It should have been June, I
2   believe, June or July.
3          Q.    And when you completed academy,
4   what was your assignment at CPD?
5          A.    District 3, patrol.
6          Q.    Can you walk me through,
7   briefly, your history of assignments and
8   promotions over the course of your tenure
9   with CPD?
10         A.    Yes, ma'am.  District 3, patrol
11  until 2004 when I became a supervisor,
12  transferred to District 1, was assigned
13  there, had a brief stint with our Safe
14  Streets is what it was called, now it's our
15  daytime VCS as well.
16         But official transferred in I
17  believe in '06 to Criminal Investigations
18  Section.  I was the Crime Stoppers and Rapid
19  Indictment program supervisor.  I went back
20  to District 1 -- I'm sorry, I went back to
21  Vortex Safe Streets in 2008, I believe.
22         And my -- my years may be
23  slightly skewed, but they're around the same,
24  right.  Then I went back to District 1, first
25  relief, I believe for 2009, and then left
```

Case: 2:21-cv-00102-DLB   Doc #: 138   Filed: 11/06/25   Page: 16 of 204 - Page
ID#: 2199
Deposition of Sergeant Donald Scalf                                                                Jason Laible, et al., vs. Timothy Lanter, et al.,

1    there in 2010.

2             This one I know is correct, I

3    spent five years, two months, and 15 days in

4    Internal Affairs.  Then I was assigned to the

5    ATF Task Force, then assigned to our

6    Inspections Section, then to our Criminal

7    Investigations Section as the administrative

8    supervisor.  Then the Officer Wellness Unit,

9    and then currently assigned to District 1,

10   first relief.

11        Q.    What's first relief mean?

12        A.    First shift.  So I go in at six

13   in the morning and get off at four in the

14   afternoon.

15        Q.    Okay.  You did, you said, Safe

16   Streets back in '04.  What was Safe Streets

17   at that time?

18        A.    It was the -- no, that was in

19   '06.

20        Q.    Oh, excuse me.  Thank you.

21        A.    And it was our -- I think we

22   called it Vortex as well, and it was the

23   precursor to our Gang Unit.  So it was more

24   of a uniform and plainclothes unit that would

25   travel from district-to-district whenever

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    there was hotspots or requests by

2    supervisors -- of captains.

3         Q.    And then you mentioned you were

4    the supervisor of the Crime Stoppers and

5    Rapid Indictment Section, is that right -- or

6    units?  Excuse me.

7         A.    Yes, ma'am, units.

8         Q.    What's the Crime Stoppers Unit?

9         A.    It's an anonymous tip line where

10   individuals will call that line to give

11   information on crimes that are put out there.

12   There were two officers assigned there then.

13   I don't believe we have -- I believe we have

14   one now.  It's changed quite a bit in 15,

15   20 years.

16        Q.    And then the Rapid Indictment

17   Unit, what's that?

18        A.    That was our -- where we had --

19   for felony cases, we had three officers who

20   would review those felony cases and then

21   present them to the grand jury.

22        Q.    So receive reports from other

23   officers --

24        A.    Yes.

25        Q.    -- and then present, you said,

1    to the grand jury?

2         A.    That's what they did.  I

3    supervised them.

4         Q.    Okay.  And so those were

5    officers not involved in those

6    investigations --

7         A.    Correct.

8         Q.    -- or arrests?

9         A.    Correct.

10         Q.    Does that unit still exist?

11         A.    Yes.  Yes.

12         Q.    And then you said back to Vortex

13    Safe Streets in '08?

14         A.    Yes.

15         Q.    And you said that that was the

16    precursor to the Gang Unit.  How is that --

17    how is the Vortex and Safe Streets different

18    from the Gang Unit?

19         A.    I've never been assigned to the

20    Gang Unit, so the Vortex, it was just the

21    original.  We had two shifts.  I don't know,

22    I believe they have one now.

23              We had more officers.  We

24    weren't as focused on the, like, CGIC, or

25    Crime Gun Intelligence Center that they are

```
 1    now.   We were more back then of a, like I
 2    said, kind of a hotspot suppression unit.
 3           Q.     When you say hotspot -- hotspot
 4    suppression, what do you mean by that?
 5           A.     Where there is upticks in crime
 6    in areas, we would go there and try to see
 7    what we could do to enforce what needed to be
 8    enforced.
 9           Q.     Then you said it was in 2010
10    that you went to IIS; is that correct?
11           A.     That's correct.
12           Q.     And you were there for five
13    years and some months and days that you know?
14           A.     Five years, two months, 15 days.
15           Q.     And you know that very
16    specifically.
17           A.     Yes, ma'am.
18           Q.     Why is that?
19           A.     It was a long time.
20           Q.     Okay.  And what was your role at
21    Internal Affairs?
22           A.     I was a sergeant and I was an
23    investigator.
24           Q.     So you investigated allegations
25    of police misconduct?
```

Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

 1              A.    Yes, ma'am.

 2              Q.    And did you ever in the course

 3    of that assignment evaluate pursuits?

 4              A.    Not as much, but, yes.

 5              Q.    And how many pursuits did you

 6    investigate at the time, if you remember?

 7              A.    I knew you were gonna ask me

 8    that, and I don't recall.  I'm better telling

 9    you I had, like, 50 criminal cases I had to

10    do because those were more -- a little more

11    memorable.  I would say a handful.  I don't

12    have a specific number to give you, ma'am.

13              Q.    Fewer than ten?

14              A.    Probably more than that.

15              Q.    Okay.  And, of course, you

16    investigated other types of misconduct

17    allegations as well?

18              A.    Yes, ma'am, use-of-force reviews

19    and, of course, criminal and everything else.

20              Q.    And in that capacity, you

21    engaged in investigatory fact-finding, right?

22              A.    Yes, ma'am.

23              Q.    You would find all of the

24    relevant evidence and information that you

25    could get to complete a thorough report about

1   what had occurred, right?

2         A.    Yes, ma'am.

3         Q.    And you would identify if

4   policies had been violated, and if so, which

5   policies, right?

6         A.    Yes, ma'am.

7         Q.    And would you make disciplinary

8   recommendations as well?

9         A.    Yes, ma'am.

10        Q.    And then you compiled all of

11  that into a single document you would hand

12  off to your lieutenant, right?

13        A.    Yes, ma'am.

14        Q.    And what was your understanding

15  of what happened after you gave your draft

16  report to the lieutenant?

17        A.    Usually it came back to me for

18  corrections.  But after that would occur, it

19  would go to -- just up the chain to our

20  captain.

21              And if they had any corrections,

22  it would come back down to the chief.  Then

23  eventually if there's discipline, to the city

24  manager, so forth and so on.

25        Q.    Okay.  So chain of command

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    review after you turned it in?

 2          A.    Yes, ma'am.

 3          Q.    And at every stage of that chain

 4    of command review, was it your understanding

 5    that those supervisory officers would

 6    evaluate the report to see if any changes or

 7    edits needed to be made?

 8          A.    Yes, ma'am.

 9          Q.    And they would identify, if

10    needed, additional facts that should be

11    added; is that right?

12          A.    I don't know if the additional

13    facts is correct.  They may have additional

14    words or something spoken differently, but

15    the facts are the facts.

16          Q.    Would they identify any changes

17    to disciplinary recommendations in the course

18    of that review?

19          A.    Yes, ma'am.

20          Q.    And when those changes were

21    made, in your experience, were they typically

22    to increase or reduce the type of discipline

23    recommended?

24          A.    50/50, it all depended.

25          Q.    And as far as the edits that

1    would come back to you at any stage of that

2    chain of command review, what types of edits

3    are we talking about?

4         A.    We're talking about commas all

5    the way up to, you know, this paragraph is

6    probably not needed for this allegation.  It

7    could be something very small.

8              When you're typing a lot, form

9    and from kind of get confused when you hit

10   that find and replace button.  So many of

11   those, but besides that, it could be just

12   about anything.

13        Q.    In terms of identifying the

14   types of policies that could form the basis

15   of a disciplinary action, that included the

16   Manual of Rules and Regulations, right?

17        A.    Yes, ma'am.

18        Q.    It included the policy and

19   procedure manual that includes, for example,

20   that pursuit policy you have in front of you,

21   right?

22        A.    Yes, ma'am.

23        Q.    Did it also include, for

24   example, the Tactical Patrol Guide?

25        A.    It could, yes, ma'am.

1      Q.     In your experience working in

2   IIS, did you ever personally use, for

3   example, the Tactical Patrol Guide, or did

4   you know of anyone else who used the Tactical

5   Patrol Guide as the basis for a policy

6   violation finding?

7          A.     I don't believe so.  I could be

8   incorrect.  I know that I used it when I was

9   enhancing or stating why an individual did

10   what they did, like using hard hands or

11   something to that effect.  But I don't -- I

12   could have, but I don't recall specifically

13   any cases that I did.

14      Q.     If it happened, it was rare?

15          A.     Yes, ma'am.

16      Q.     The Investigations Manual, is

17   that another set of policies you'd be aware

18   of in your role in the department?

19          A.     Yes, ma'am.

20      Q.     And would that be a manual that

21   could be used to identify policy violations

22   in IIS?

23          A.     So let me kind of -- usually, if

24   I was going to do a violation, it's gonna be

25   a procedure violation or a rule violation.  I

1  might cite the Investigations Manual or the

2  Tactical Patrol Guide as something as -- like

3  just a basis for why I'm giving that

4  procedure or rule violation.

5          So neither one of those in and

6  of themselves were reasons to discipline

7  somebody.  However, they might be cited as a

8  basis or, like, a supporting fact.

9      **Q.    So going back to your time in**

10 **IIS and the number of police misconduct**

11 **allegations you reviewed, do you know,**

12 **ballpark, about how many cases you looked at**

13 **total over that five years and however many**

14 **months and days?**

15     A.    You mean if I tried to forget?

16 Ma'am, we're talking hundreds.  I was there

17 for five years, two months, 15 days, I did

18 quite a few cases.

19     **Q.    Okay.  After your time at IIS,**

20 **you were then assigned to the ATF Task Force?**

21     A.    Yes, ma'am.

22     **Q.    And how long were you there?**

23 **I'm sorry, I missed that.**

24     A.    Five years.

25     **Q.    And then from there, you went to**

1    the Inspections Section?

2         A.    Yes, ma'am.

3         Q.    And what's the Inspections

4    Section?

5         A.    Reviewing policy -- reviewing

6    uses of force is part of it.  During that

7    time, and everybody hold their laughter, it

8    was in the middle of COVID, I was the COVID

9    Czar.

10        I was making sure nobody was

11   violating COVID policies and mask wearing,

12   and that was pretty much what my niche was

13   there.

14        Q.    What -- how -- what were the

15   dates of your role as COVID Czar?

16        A.    I don't -- I tried to forget,

17   ma'am.  I got there probably, I want to say

18   probably December of 2020.  And I left maybe

19   '21.

20        Q.    Okay.  Then you were in the

21   Criminal Investigations Section, right?

22        A.    Yes, ma'am.

23        Q.    And what does that section do?

24        A.    So that section is where all

25   major crimes are investigated.  We have

1    our -- the Rapid Indictment is there, but

2    mainly it's our Homicide Unit, our Personal

3    Crimes Unit, our Financial Crimes Unit, but I

4    was the administrative sergeant.

5              So I was the one who was making

6    sure those units were getting what they

7    needed to do their job, making sure the

8    building didn't fall down, which was an

9    everyday occurrence with that City building,

10   but those -- those were the things that I was

11   working on.

12        **Q.    Okay.  So you didn't, for**

13   **example, supervise the detectives in the**

14   **Homicide Unit?**

15        A.    No, no.  What I would do is if

16   there was a -- if there was some type of

17   officer-involved incident, I would come in

18   and manage the building, for the most part,

19   and manage where the officers were going,

20   both the ones that were involved in the

21   incident and the investigators, if need be,

22   but for the most part, I was there as an

23   administrative function.

24        **Q.    And then from there, you went to**

25   **the Officer Wellness Unit?**

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Yes, ma'am.

 2              Q.    And when did that unit come to

 3     exist?

 4              A.    About then.

 5              Q.    So you were kicking it off?

 6              A.    So it was -- Tiphanie Galvez,

 7     who is a civilian with our department.  She's

 8     been around for years.  She started a peer --

 9     well, didn't start it, she got involved in

10     the Peer Support Program in 2015.

11                   Then it started more into an

12     officer wellness role.  She got assigned to

13     wellness full time probably '21-ish.  And

14     then I -- we had therapy dog that was

15     assigned to the department that we got from

16     grants.

17                   And that got assigned in April

18     of '24.  And then I was assigned with the

19     therapy dog for a little bit.

20              Q.    Okay.  And, actually, I'm sorry

21     I think I missed part of my timeline.  When

22     did you leave the ATF Task Force?

23              A.    When I went to Inspections, so

24     that's gonna be December-ish of 2020.

25              Q.    Okay.  Thank you.  Then from
```

1    Officer Wellness, you said you went back to

2    District 1 --

3            A.    Yes.

4            Q.    -- first shift?  And you're --

5    you're a supervising sergeant there?

6            A.    Yes, ma'am.

7            Q.    When did you get your promotion

8    to sergeant?

9            A.    2004.

10           Q.    Okay.

11           A.    April, I believe, but it may

12   have been past that.  It was in that area.

13           Q.    Are there any other assignments,

14   posts, titles you've held that we haven't

15   talked about so far?

16           A.    My goodness, ma'am.  I don't

17   know.  I don't think so, but it's been a long

18   time.

19           Q.    Fair enough.  Okay.  What's the

20   Organized Crime Investigations Squad?

21           A.    That is the ATF.  The ATF Task

22   Force was assigned to that, so it was just

23   another name for the ATF Task Force.

24           Q.    Okay.  So OCIS, another name for

25   the ATF Task Force?

1      A.    Yes, ma'am.

2      Q.    And that group includes

3    Cincinnati Police officers, right?

4      A.    Yes, ma'am.

5      Q.    Does it include anybody else?

6      A.    So OCIS itself is a Cincinnati

7    name, so that would be just the Cincinnati

8    officers assigned to Organized Crimes

9    Investigative Squad.  In the ATF Task Force,

10   you, of course, have ATF agents.

11          We had a county deputy.  We had

12   a parole officer.  I believe we had somebody

13   from Middletown.  So the ATF Task Force was a

14   little different than actual OCIS.

15     Q.    So the ATF Task Force, is it

16   fair to say it was an inner agency

17   organization?

18     A.    Yes, ma'am.

19     Q.    With a cooperative venture, so

20   to speak?

21     A.    Yes, ma'am.

22     Q.    And then OCIS was the contingent

23   of Cincinnati Police officers who worked in

24   that task force?

25     A.    Yes, ma'am.

1      Q.    Okay.  And in that task force,

2   was there any specific agency that directed

3   all of the agencies that were part of it?

4          A.   I would like to say that it was

5   pretty much a -- we collaborated, but the ATF

6   was the lead.  That's where we had our

7   office.

8          Q.    Okay.  So they were the lead

9   organization then, the ATF?

10         A.   I would think so.

11         Q.    But within the specific officer

12  contingents from various agencies, they had

13  their own chain of command within their

14  agencies?

15         A.   Yes, ma'am.

16         Q.    Okay.  Back in 2020, how many

17  Cincinnati officers were part of OCIS?

18              MR.  HERZIG:  Are you including

19  TFOs?

20         Q.    Whoever would be part of OCIS,

21  that's what I'm asking.

22         A.   So I don't -- in our task force

23  that we had that went over to the ATF, we

24  had -- and I've got to do names because

25  counting is kind of sad, I want to say six

1   plus myself or it could have been five plus

2   myself, Dan, Joe, Brad, Chris, Jason, me,

3   six.

4          Q.    Okay.  And then the Gang Unit

5   and Canine Unit, those were different from

6   OCIS, right?

7          A.    Yes, ma'am.

8          Q.    Those were units within the CPD

9   only, correct?

10         A.    Yes, ma'am.

11         Q.    So we talked about your academy

12  training back in '99, right?

13         A.    Yes, ma'am.

14         Q.    During academy training, were

15  you trained on vehicle stops?

16         A.    Yes, ma'am.

17         Q.    Were you trained on traffic laws

18  in the City of Cincinnati?

19         A.    Yes, ma'am.

20         Q.    Were you trained on what

21  constituted violations of the Ohio Revised

22  Code?

23         A.    Yes, ma'am.

24         Q.    Were you trained on what

25  constituted a violation of the Cincinnati

```
 1          Municipal Code?

 2                  A.     Yes, ma'am.

 3                  Q.     Were you trained on how to

 4      determine when drivers were violating Ohio or

 5      Cincinnati laws?

 6                  A.     Yes, ma'am.

 7                  Q.     And you were trained on how to

 8      write reports, of course, right?

 9                  A.     Yes, ma'am.

10                  Q.     Were you trained in academy on

11      surveillance practices?

12                  A.     To a degree, yes, ma'am.

13                  Q.     And you received subsequent

14      training on that as well?

15                  A.     Yes, I would say that that

16      was kind of learn-as-you-go-along type of a

17      thing.

18                  Q.     In conducting surveillance

19      operations, those were often done for the

20      purpose of arresting a suspect, right?

21                  A.     For one of many reasons.  It

22      could be to gain intelligence as well.

23                  Q.     And during surveillance

24      operations, officers must know of the

25      possible risks that may face them during the
```

```
 1        operation, right?

 2              A.    Anything we do, yes, ma'am.

 3              Q.    And officers also have to know

 4        about potential dangers that could arise

 5        during the operation, right?

 6              A.    Once again, anything we do, yes,

 7        ma'am.

 8              Q.    And in conducting any type of

 9        surveillance operation, officers have to plan

10        for contingencies, right?

11              A.    Yes, ma'am.

12              Q.    And that's for all aspects of an

13        operation, you have to have a contingency

14        plan in place, right?

15              A.    Yes, ma'am.

16              Q.    So for any possible law

17        enforcement action that could be part of an

18        operation, it's important for officers to

19        know what the contingency plans are for each

20        aspect of that operation, right?

21              A.    I mean, they can always change

22        as well.  I mean, nothing goes completely by

23        the book at any point.  So Contingency A may

24        be out the window, you may have to figure

25        something out as you go, but you try to have
```

1    all of your bases covered.

2          Q.    Okay.  In academy, were you

3    trained on pursuit driving?

4          A.    Yes.

5          Q.    And pursuits, of course, involve

6    officers going after fleeing vehicles and

7    suspects, right?

8                MR. HERZIG:  Objection.  You can

9    answer.

10         A.    I mean, yes.  I don't -- yes.

11         Q.    Pursuits, are those an event

12   that officers encounter over the course of

13   their careers in policing?

14         A.    Yes.

15         Q.    And would you agree that all

16   officers should know how to handle a fleeing

17   vehicle in a pursuit circumstance?

18         A.    Yes.

19         Q.    And that would include how to

20   safely engage in a pursuit, right?

21         A.    Yes.

22         Q.    And that would include knowing

23   when to terminate a pursuit, right?

24         A.    Yes.

25         Q.    And all officers at CPD are

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    trained on those topics, correct?

2         A.    Yes.

3         Q.    During your training regarding

4    vehicle pursuits, did you receive training on

5    the department policy on pursuits?

6         A.    Yes, ma'am.

7         Q.    And so that included, for

8    example, when and how to initiate a vehicle

9    pursuit, right?

10        A.    Yes, ma'am, but the -- just

11   pursuit, like any policy, changes over time.

12   So if you're asking me what I was trained on

13   in the academy, it's gonna be different than

14   what was in policy.

15             We get those through all our

16   staff notes and that type of thing.  So you

17   have to continually, you know, upgrade what

18   you're -- the way these things go.

19             So the training in the

20   academy -- I know you keep going back to

21   that -- it's gonna be completely different

22   than what we were dealing with in 2020.

23        Q.    Fair enough.  Is it -- is it

24   correct for me to understand that pursuit

25   practices have changed significantly since

1    **1999 to today?**

2              MR. HERZIG:  Objection.  Go

3    ahead.

4         A.    Oh, yes, ma'am.

5              THE WITNESS:  Sorry.  Sorry.

6              MR. HERZIG:  That's all right.

7    BY MS. GREENE:

8         **Q.    In terms of practices in the**

9    **CPD, that is true, right?**

10        A.    Yes, ma'am.

11        **Q.    And in terms of your awareness**

12   **of police practices on a broader scale, even**

13   **outside of the CPD, is that also true that**

14   **pursuits have changed over time in terms of**

15   **the way they're executed?**

16             MR. HERZIG:  Objection.  Go

17   ahead.

18        A.    The world has changed, ma'am.

19   Lots of things have changed since 1999.

20        **Q.    In terms of changes relating to**

21   **pursuits and your awareness of those, what do**

22   **you understand to be different now than when**

23   **you were first trained at the academy?**

24        A.    There's gonna be several things.

25   I don't -- I don't believe we used stop

```
 1   sticks as much as we did back then.  Ma'am,
 2   there are too much for me to sit here and --
 3   our procedures change so often that what's
 4   different from 1999, I don't believe we have
 5   time to go into all of that.
 6          Q.    And that's fair.  I'm not asking
 7   on a detailed basis.
 8                I guess my question is, are
 9   there any kind of big picture changes with
10   police approaches to pursuits that you're
11   aware of over the course of your career?
12          A.    I'm not sure what -- yeah, I
13   don't know how to answer that to be honest
14   with you.  Pursuits, in general, have
15   diminished.  That would be about the way that
16   I could answer that.
17          Q.    They're increasingly discouraged
18   by departments, right?
19          A.    I mean, I don't know if
20   discouraged is the correct term, but we do
21   have policies and procedures that limit them.
22          Q.    And they've been limited more
23   and more over the course of your career; is
24   that fair to say?
25          A.    Yes, ma'am.
```

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Do you understand that

2  limitation to have been made for the purpose

3  of safety reasons?

4            MR. HERZIG:  Objection.  Go

5  ahead.

6      A.    I believe there are several

7  reasons for that, and safety would be one of

8  them, financial would be one of them.  I

9  think they're numerous involved.

10     Q.    You were talking about policy

11 updates a moment ago coming through staff

12 notes, right?

13     A.    Yes, ma'am.

14     Q.    Staff notes, that's an

15 electronic means of conveying to the

16 department members changes in policy,

17 correct?

18     A.    Electronic now.  It used to be

19 on paper.  I can remember that.

20     Q.    About when did it switch to

21 electronic transmission?

22     A.    Oh, heck, ma'am, I don't know.

23     Q.    That's okay.

24     A.    A long time ago.

25     Q.    But staff notes essentially are

1    a department-wide communication that conveys

2    important updates that department members

3    need to know, right?

4        A.    Yes, ma'am.

5        Q.    That includes policy updates,

6    for example --

7        A.    Yes, ma'am.

8        Q.    -- correct?  When those policy

9    updates are transmitted to department

10    members, officers have a duty to read those,

11    right?

12        A.    Yes, ma'am.

13        Q.    And they have a duty to ensure

14    that they understand what they say, correct?

15        A.    Yes, ma'am.

16        Q.    And so with regard to training

17    on pursuits, whether in the academy or later

18    that you have received, that included when

19    and how to initiate a vehicle pursuit, right?

20        A.    Yes, ma'am.

21        Q.    And it would -- it included the

22    circumstances that would allow the

23    continuation of a pursuit once it has been

24    initiated, right?

25        A.    Yes, ma'am.

```
 1           Q.    And it included the
 2    circumstances that require when a pursuit
 3    must be terminated, right?
 4           A.    Yes, ma'am.
 5           Q.    And your training in the academy
 6    or otherwise from the department, did that
 7    also include direction on how to conduct
 8    arrests?
 9           A.    Yes, ma'am.  You're talking
10    about both handcuffing someone and charging
11    as well?
12           Q.    Sure.
13           A.    Yes, ma'am.  Yes, ma'am.
14           Q.    And then did that training on
15    arrest include officers being required to
16    evaluate the time and place to safely conduct
17    the arrest?
18           A.    Yes, ma'am.
19           Q.    And that assessment of safe
20    arrests, it includes the safety of the
21    officers, right?
22           A.    Yes, ma'am.
23           Q.    It includes the safety of the
24    suspect, correct?
25           A.    Safety when -- when available,
```

1   yes, ma'am.

2          Q.    And it includes safety of third

3   parties, bystanders, right?

4          A.    Yes, ma'am.

5          Q.    Why is that awareness of safety

6   during the course of an arrest important in

7   your understanding of the training you

8   received from the department?

9          A.    I don't think that's training

10  that you receive.  I think safety is always

11  important, so...

12         Q.    Well, and specifically during an

13  arrest, why is being aware of safety factors

14  for an officer or a suspect in the public

15  important?

16         A.    I don't know really how to

17  answer that because it seems kind of common.

18  You just don't want people injured.  You

19  don't want bad things to happen if you can

20  avoid them.

21         Q.    It's common sense.  You want

22  everyone to stay safe, right?

23         A.    Yes, ma'am.

24         Q.    If an injury can be avoided,

25  that should be done, right?

1          MR. HERZIG:  Objection.  You can

2    answer.

3          A.    If it can be avoided, yes,

4    ma'am.

5          Q.    And that's true of all policing

6    activities; isn't it?

7          A.    I would say that's just about

8    everything, yes, ma'am.

9          Q.    The term "emergency response

10   driving," does that mean anything to you?

11         A.    I don't know about the response

12   portion in there, but I know what you're

13   referring -- lights and sirens, emergency

14   pursuit driving, that type of thing, yes,

15   ma'am.

16         Q.    Okay.  And so is emergency

17   driving, is that the term you would use?

18         A.    Emergency operation of our

19   vehicles.

20         Q.    Okay.  So for emergency

21   operation of a vehicle, that includes having

22   lights and sirens on, you said?

23         A.    Yes, ma'am.

24         Q.    And anything else included in

25   that concept?

```
 1          A.    Not that I'm -- not that I can

 2    think of.  I'm not sure what you're -- what

 3    else there would be.  Lights and sirens are

 4    about all we have on our vehicle.

 5          Q.    Have you received training on

 6    the use of stop sticks over the course of

 7    your career from the department?

 8          A.    Yes, ma'am.

 9          Q.    And when did you get that

10    training?

11          A.    I've had it numerous times, more

12    than once, probably no more than five, but

13    enough on different types of stop sticks.

14          Q.    And what's the purpose of the

15    stop stick?

16          A.    To either stop the pursuit or --

17    before it starts, or to try to end it while

18    it's going on.

19          Q.    And to end it in a safe manner,

20    right?

21          A.    Yes, ma'am.

22          Q.    For the purpose of avoiding

23    injury to officers, the suspect, and the

24    public, correct?

25          A.    Yes, ma'am.
```

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    And stop sticks can be used when

2    a pursuit is already occurring, right?

3         A.    Before and after and during,

4    yes.  Yes, ma'am.

5         Q.    In terms of your training from

6    the department on use of stop sticks, can

7    they be used when a suspect is attempting to

8    leave an area where there's only one point of

9    ingress or egress?

10        A.    Yes, ma'am.

11        Q.    And is that an ideal place to

12   use stop sticks?

13        A.    Yes, ma'am.

14        Q.    And that's because the fleeing

15   suspect would certainly have to drive over

16   those stop sticks to get out, right?

17        A.    Well, certainly is never used in

18   our line of work, but, yes, you would hope.

19        Q.    Okay.  And when you use stop

20   sticks, what happens?

21        A.    Depending, but the air from the

22   tires should start to deflate.

23        Q.    And have you ever heard of --

24   well, strike that.

25              And the air from the tire start

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    to deflate and then the vehicle ends up

 2    stopping by necessity, right?

 3         A.    Not always.  You would hope

 4    eventually, but not always, no, ma'am.

 5         Q.    They can try and keep going, but

 6    it's not very easy, is it?

 7         A.    The sparks are kind of crazy to

 8    see from these tires.

 9         Q.    Because you're rolling on your

10    rims?

11         A.    Your rims, yes, ma'am.

12         Q.    Okay.  Have you ever heard of a

13    tactic that would involve positioning police

14    cruisers in such a way that the suspect

15    vehicle could not depart from an area where

16    it's parked?

17         A.    Are you speaking of a specific

18    tactical, like a roadblock, or are you

19    speaking of something else?  I mean, are you

20    asking me is there a way to position vehicles

21    to try to pin them into a certain area?

22         Q.    Yeah.  I actually --

23         A.    I don't know if there's a

24    tactic, per se.

25         Q.    So if there's a name for this
```

Deposition of Sergeant Donald Scalf

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    **tactic, I don't know what it is.**

2                     **But I have heard other officers**

3    **in the past describe to me positioning their**

4    **cruisers in such a way to prevent a suspect**

5    **attempting to flee an area; is that something**

6    **you've ever heard of?**

7                     MR. HERZIG:  Objection.  You

8    mean officers in other departments --

9                     MS. GREENE:  Yes.

10                    MR. HERZIG:  -- if I remembered

11   your last question?

12                    MS. GREENE:  Yes.

13                    MR. HERZIG:  Okay.

14        A.    It would depend.  We're not

15   allowed to do some of those in the Cincinnati

16   Police Department.  I'm not positive what

17   you're referring to.

18                    So if you're talking about a

19   roadblock, that is in our procedure.  We

20   don't do roadblocks.  If you're talking about

21   shutting your street down, like, before

22   anything gets started, yes.  But I'm still

23   not completely positive I understand what

24   you're saying.

25   BY MS. GREENE:

```
 1          Q.    Okay.  Well, cruisers can be
 2   used, you said, to shut a street down, right?
 3          A.    Yes, ma'am.
 4          Q.    And that means to block the
 5   points of ingress and egress with the
 6   cruiser, right?
 7          A.    Yes, but if a pursuit would
 8   occur, then you've got a roadblock, so you
 9   have to move your cruiser.
10          Q.    In your experience in the
11   department, are cruisers ever used to, for
12   example, block the areas that a parked
13   vehicle could use to depart from wherever
14   it's parked?
15          A.    They could be, yes, ma'am.
16          Q.    And what would you call that, if
17   there's a name for it?
18          A.    I don't know.
19          Q.    So you've learned a -- but you
20   don't know what it's called?
21          A.    Like the ATF does use like
22   pinning situations where they will take two
23   unmarked vehicles and, like, put them into a
24   street like this (indicating), and then get
25   out, so -- but that wouldn't be a marked
```

```
 1      vehicle pointing across.

 2                  That's more of to -- like,

 3      unmarked vehicles doing a pin maneuver so

 4      that it's a little less dangerous for

 5      everyone involved.

 6           Q.     And why is that?

 7           A.     Well, so instead of having a car

 8      like this (indicating) where somebody can hit

 9      right into the side of it, you have two cars

10      like this, you got to engine blocks and both

11      drivers can get out and get to safety.

12           Q.     And those vehicles with the

13      weight of the engine blocks would --

14           A.     Be safer for all involved.

15           Q.     Okay.  And they -- and they --

16      their weight would contribute to their

17      stopping abilities of the fleeing vehicle?

18           A.     Usually you would try to do that

19      before a vehicle was fleeing.  So I'm talking

20      about a stopped vehicle that I go ahead and

21      put these two cars out so that they look up

22      and they have a -- a visible deterrent.

23           (Exhibit 50 was marked.)

24                  MS. GREENE:  Okay.  I'm gonna

25      mark an exhibit.  I think we're on 51.  Does
```

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 50 of 204 - Page
ID#: 2233
Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    that sound right to everybody?

2                    MS. ALLOUCH:  Fifty.

3                    MS. GREENE:  I want to make sure

4    we're on the right number.

5                    MR. HERZIG:  Do you need a

6    break?

7                    THE WITNESS:  I'm probably gonna

8    need a 50-year-old bladder break here in the

9    next five, ten minutes.

10                    MS. GREENE:  Do you want to take

11    a break now?  Go ahead.  Yeah.  We can just

12    go off the record quick.

13                    THE WITNESS:  Yeah, that would

14    probably make more sense.

15                    MS. GREENE:  Yeah.  Off the

16    record.

17        (Off the record.)

18    BY MS. GREENE:

19            Q.    Okay.  We're back on the record.

20                  Sergeant Scalf, we are looking

21    at a document here that's been marked as

22    Exhibit 50.  Do you recognize this document?

23            A.    After looking at it, I do.  It's

24    a training record, I guess.

25            Q.    Yeah.  This is your training

1       record from the CPD, right?

2               A.      Okay.

3               Q.      And I'll represent it was

4       produced to us by the City, and it spans

5       trainings for you starting in April of 2000

6       through September of 2024, right?

7               A.      Yes, ma'am.

8               Q.      Now, looking at this training

9       record, I would ask that you go to page --

10      it's marked 7 of 11 or City 1352 at the

11      bottom?

12              A.      Yes, ma'am.

13              Q.      So I see here a -- right about

14      just past the middle of the page a Vehicle

15      Pursuit Training that you took in December of

16      2008 at Coney Island.  Do you see that there?

17              A.      Yes, ma'am.

18              Q.      Do you recall that particular

19      pursuit training?

20              A.      I believe -- is that the only

21      one on there?  Because I do remember being at

22      Coney Island for skid-car training.  And

23      that's the -- the county had a car that would

24      mimic like you hitting a puddle or something

25      like that.  So I believe that's what this is.

```
 1          Q.    Okay.  And then looking through

 2    the training record here, I don't believe I

 3    see any other training specifically titled

 4    pursuit training.  I may have missed it.

 5               My question to you is, do you

 6    know of other pursuit trainings in this

 7    record that you took over the course of your

 8    career with the City?

 9          A.    I don't believe there's gonna be

10    anything else titled pursuit training.  I do

11    believe that, you know, it's -- it may not

12    have had its own class, but just things, like

13    you said, reviewing procedures and that type

14    of thing.

15          Q.    So --

16               MR. HERZIG:  Did you want him to

17    look through the document?

18          Q.    Yeah.  Sure.  Take a moment to

19    look through, and if there's anything else,

20    whether it's titled pursuit training or not,

21    can you indicate to me which trainings would

22    have covered pursuits that are listed here?

23          A.    Probably not, but I'll look.

24    (Witness complies.)  I'm not seeing anything,

25    ma'am, except that skid-car training in 2001.
```

```
 1            Q.    Skid-car training in '01.  Let

 2    me --

 3            A.    It's gonna be on page 10 of 11

 4    or 135 -- I can't see it because you've

 5    stapled on top of it.

 6            Q.    Sorry.  I see where you're

 7    talking about.  It's the Skid-Car Training

 8    that says HCSD, 4/19/2001 for the date,

 9    right?

10            A.    There would have been something

11    else that would be along the same line of

12    what I did at Coney Island.

13            Q.    Okay.  And so that was a

14    hands-on training --

15            A.    Yes.

16            Q.    -- in a specialized vehicle?

17            A.    Yes, ma'am.

18            Q.    And did you go over the pursuit

19    policy in those trainings, if you recall?

20            A.    I don't recall, ma'am.

21            Q.    And then other than those two

22    trainings in this training record, the one at

23    Coney Island, and then the one, the Skid-Care

24    Training that we've looked at, do you recall

25    any other trainings, whether classroom or, I
```

 1    **don't know, in the field, so to speak, about**

 2    **pursuit driving?**

 3         A.    I don't recall anything

 4    specific, I believe is what you're asking me.

 5    I know that I've sitting in classrooms and

 6    we've discussed pursuit driving.  We've gone

 7    over cases, that type thing.

 8              But I don't know if there's ever

 9    been -- I'm sure there has been, but I would

10    have to look at the actual agenda from the

11    academy for each class I've taken over the

12    last 26 years.

13         **Q.    Fair enough.  Those sitting in**

14    **the classroom policy trainings that you were**

15    **just mentioning a moment ago, do you recall**

16    **if those were part of annual training?**

17         A.    They would have been, yes,

18    ma'am.  It could -- I mean, let me rephrase

19    that.

20              I do believe we've done that

21    during our in-service or continued

22    professional trainings.  Could I have done

23    something else?  Possibly.  I don't recall at

24    this point.

25         **Q.    Okay.  For those classroom**

1    trainings that you're remembering, you said

2    those involved going over the policy, right?

3         A.    Yes, ma'am.

4         Q.    And that would include any

5    updates to the policy at that time?

6         A.    Yes, ma'am.  But they do get

7    updated more frequently, not all policies do,

8    so you have to, you know, review your staff

9    notes like we discussed earlier.

10        Q.    And then you said there was also

11   discussion of cases?

12        A.    So the one that I -- that I that

13   know that I set in a class is we had the

14   officer who was injured deploying stop

15   sticks, Bryce Bezdek was his name, on

16   Interstate 75 I believe it was.  I know I

17   know I sat in a training on that.

18             So that's just something that

19   kind of pops to my mind.  I'm sure we've gone

20   over other incidents pursuit related.  That

21   one just kind of hits the top of my mind.

22        Q.    So you remember that one

23   specifically and there may be others?

24        A.    Yes.

25   BY MS. GREENE:

1    Q.   All right.  We can set that

2  aside for now.  I would like direct you back

3  to **Exhibit 1**, the pursuit policy.

4          A.   Yes, ma'am.

5          Q.   It's fair to say that you've

6  been familiar with the pursuit policy over

7  the course of your employment with CPD?

8          A.   Yes, ma'am.

9          Q.   And I understand there may have

10 been some changes to this policy since 2020,

11 but I want to talk about the time period of

12 2020 for now.  Okay?

13         A.    Yes, ma'am.  And that's what

14 this is, correct?  Yes.

15         Q.   That's my --

16         A.    Yes, it is.

17         Q.   And that's my understanding.

18         A.    Yes, it is.

19         Q.    Okay.  In relation to this

20 policy and this version in **Exhibit 1**, what's

21 your understanding of the role of the primary

22 unit in a pursuit?

23         A.    Are you wanting me to turn the

24 page, or what are you asking me to do?

25         Q.    I'm asking you to generally

```
 1        describe what you understand the role to be.
 2        And if you need to reference anything
 3        specific, you can do that and let us know
 4        what you're looking at.  Okay?
 5              A.    The initiating officer.
 6              Q.    So the primary vehicle, the
 7        primary unit is the initiating officer.  That
 8        means the person who starts the pursuit,
 9        right?
10              A.    Yes, ma'am.
11              Q.    And what is the primary unit's
12        responsibility or responsibilities during the
13        course of the pursuit?
14              A.    I know that it's in here, but
15        it's to direct the pursuit.  I don't know
16        exactly.  It's to safely follow the vehicle
17        and attempt to have it stopped and keep it
18        within a -- within distance.
19              Q.    And are they required also to
20        call out over the radio the speed of the
21        pursuit as it goes?
22              A.    Yes, ma'am.
23              Q.    They're required to call out
24        over the radio the location of the pursuit,
25        correct?
```

```
 1            A.    Yes, ma'am.

 2            Q.    They're required to report back

 3     about over the -- over the radio about

 4     traffic conditions, right?

 5            A.    Yes, ma'am.

 6            Q.    And that includes both vehicle

 7     and pedestrian traffic, right?

 8            A.    Yes, ma'am.

 9            Q.    And they're required to report

10     about any -- any danger to civilian or third

11     parties that they're observing, right?

12            A.    Or themselves, yes, ma'am.

13            Q.    And they're required to just

14     generally keep other officers and the ECC

15     advised by radio of the conditions of the

16     pursuit as it occurs, correct?

17            A.    Yes, ma'am.

18            MR. HERZIG:  Just to be clear,

19     we've heard testimony about the second when

20     they're -- are you talking about only the

21     primary officer?

22            MS. GREENE:  Are you objecting?

23            MR. HERZIG:  Yes.

24            MS. GREENE:  Or are you asking

25     me to clarify a question?  Because I'm happy
```

```
 1    to do that.
 2                  MR. HERZIG:  I'm objecting to
 3    make sure that we have -- so and the same,
 4    I'm hoping that we get a clear record on all
 5    these things.
 6                  MS. GREENE:  Yeah.  So my
 7    question --
 8                  MR. HERZIG:  So are you talking
 9    about when there's only a primary car?  That
10    might be different than when there's a
11    secondary car based on other testimony we've
12    heard.
13                  MS. GREENE:  All right.  Thanks,
14    Aaron.  And if you have an objection, I'll
15    ask you to just state the objection, and then
16    we can carry on with the questions.  I'm
17    happy to clarify or rephrase where necessary.
18    BY MS. GREENE:
19          Q.    So the responsibilities you've
20    just described, do those change if there's
21    more than one vehicle involved in the
22    pursuit?
23          A.    Yes, they can.  The secondary
24    officer may be the one putting out the
25    information of location and speeds and that
```

1    type of thing.

2         Q.    Secondary unit can assist with

3    that, right?

4         A.    Yes, ma'am.

5         Q.    But it's nonetheless the

6    responsibility of the primary unit to ensure

7    that that information is made available

8    whether by that officer himself or by asking

9    the secondary unit to do so, correct?

10        A.    Can you repeat?  Because I'm not

11   sure --

12        Q.    Sure.

13        A.    You started that off with

14   responsible, I'm trying get what you're --

15        Q.    Yeah.  Sure.  So it's the

16   responsibility of the primary unit to ensure

17   that that information we just discussed is

18   reported back over the radio, whether he does

19   it -- the officer does it himself, or he

20   requests that the secondary unit does it,

21   right?

22        A.    I would say that it's the

23   responsibility of all involved.

24        Q.    So collective responsibility?

25        A.    Yes, ma'am.

1    Q.    And if the secondary unit is not

2    doing it, the primary unit must do it, right?

3        A.    Yes, ma'am.

4        Q.    If the primary unit is not doing

5    it, the secondary unit must do it, right?

6        A.    Yes, ma'am.

7        Q.    And either way, whoever is

8    involved in the pursuit, they have an

9    obligation, as primary and secondary unit, to

10   make sure that key information is

11   communicated over the radio by somebody?

12       A.    Yes, ma'am.

13       Q.    And if they notice it's not

14   happening, then either they should do it

15   themselves or ask the other guy in the

16   pursuit to do it, right?

17       A.    Yes, ma'am.

18       Q.    And that's based on your

19   training from the CPD, correct?

20       A.    Yes, ma'am.

21       Q.    Okay.  So in terms of the

22   primary unit, it's also the responsibility of

23   that person to be aware of various

24   circumstances while the pursuit is ongoing,

25   correct?  And I can go into some details

```
 1        about that in a moment.

 2              A.    Yes, because that's kind of --

 3              Q.    Sure.  So is it your

 4        understanding that the CPD Pursuit Policy

 5        requires officers engaged in a pursuit to be

 6        aware of the degree of risk created by the

 7        pursuit to others, the officer, and the

 8        suspect?

 9              A.    Yes.  I think that's everything

10        we do, but, yes, ma'am.

11              Q.    And the policy also requires

12        primary units in a pursuit to be aware of the

13        traffic conditions, both vehicular and

14        pedestrian, right?

15              A.    Yes, ma'am.

16              Q.    And the primary unit is required

17        under the policy to be aware of the location

18        where the pursuit is occurring, right?

19              A.    Yes, ma'am.

20              Q.    And the policy requires a

21        primary unit to be aware of the road

22        conditions, weather conditions at the time of

23        the pursuit, right?

24              A.    Yes, ma'am.

25              Q.    And the policy also requires the
```

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 63 of 204 - Page
ID#: 2246

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    primary unit to be aware of the time of day

2    and the likelihood of the presence of

3    bystanders and civilians during that time of

4    day during the pursuit, right?

5                    MR. HERZIG:  Objection.  You can

6    answer.

7            A.    Yes, ma'am.  You keep saying

8    primary unit.  I still, once again, I believe

9    all units involved are -- need to know these

10   information -- this information and be aware

11   of these situations.

12           Q.    And I'll come back to that in a

13   moment.

14           A.    Okay.

15           Q.    But for now, I'm just asking

16   about primary units.

17                   So primary unit does have to be

18   aware of the time of day and the presence of

19   third parties, right?

20           A.    Yes, ma'am.

21           Q.    The primary unit also during a

22   pursuit has to be aware of the nature or

23   seriousness of the suspected crime of the

24   fleeing suspect, right?

25           A.    Yes, ma'am.

1    Q.    And the primary unit has to be

2  aware of whether that suspected crime

3  involves some kind of imminent threat of harm

4  to others at that moment in time, right?

5    A.    Yes, ma'am.

6    Q.    The primary unit has to also be

7  aware of the condition of their own police

8  vehicle and the suspect's vehicle, correct?

9    A.    Yes, ma'am.

10    Q.    And the primary unit also has to

11  be aware of any circumstance that could lead

12  to a situation in which the pursuing officer

13  would not be able to maintain control of the

14  police vehicle, correct?

15    A.    Can you repeat that one for me?

16  I lost you there at the end.

17    Q.    Sure.  The primary officer also

18  has to be aware of any circumstance that

19  could lead to a situation in which the

20  pursuing officer, or officers, will not be

21  able to maintain control of their police

22  vehicles, right?

23    A.    Yes, ma'am.

24    Q.    The pursuing -- or, excuse me,

25  the primary unit also has to be aware of the

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 65 of 204 - Page
ID#: 2248
Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    likelihood of successful apprehension of the

2    suspect who is fleeing, correct?

3        A.    Yes, ma'am.

4        Q.    And the primary unit also has to

5    be aware of whether the identity of the

6    suspect is known to the point that a later

7    apprehension is possible, right?

8        A.    Can you repeat?

9        Q.    Yeah.  The primary unit has to

10   be aware of whether the identity of the

11   suspect is known such that that suspect could

12   be apprehended at a later time, right?

13       A.    We do have to know if the

14   suspect can be identified.  Apprehended at a

15   later time, that's a little bit of a

16   different type thing.  You don't always know

17   that.

18            If you believe that this is the

19   opportunity you have, I believe that's --

20   especially depending on who the suspect is

21   and the nature of what the investigation is.

22       Q.    All of these factors that we've

23   just gone through that the primary unit has

24   to be aware of, the secondary unit has to be

25   aware of as well, correct?

```
 1            A.    Yes, ma'am.

 2            Q.    And in terms of the OIC, that's

 3    an officer in charge, right?

 4            A.    Yes.

 5            Q.    And the pursuit policy talks

 6    about the OIC, correct?

 7            A.    Yes.

 8            Q.    What's the role of the OIC?

 9            A.    Do you want me to read it to

10    you?  Because it's right here.

11            Q.    I'm just asking for your

12    understanding of what that -- what the role

13    is.

14            A.    Maintain the -- maintain the

15    pursuit, determine, you know, from what you

16    can all those things that you just said to

17    try to ensure that it's not too dangerous, or

18    whatever you can, but to supervise for lack

19    of a better term.

20            Q.    And the OIC using information

21    provided from the primary or secondary units,

22    can aid in terminating a pursuit, right?

23            A.    Correct.

24            Q.    But that determination, it rests

25    on the information provided by the units
```

```
 1    engaged in the pursuit, right?

 2            A.    Yes.

 3            Q.    And so in order for an OIC to

 4    make a determination, they have to have

 5    accurate and adequate information from the

 6    pursuing units, right?

 7                  MR. HERZIG:  Objection.

 8            Q.    Go ahead.

 9                  MR. HERZIG:  You can answer.

10            A.    Umm, I think that's -- yes.

11    Yes.

12            Q.    And the primary unit is best

13    situated to evaluate all of those factors

14    that we've just gone through, right?

15            A.    I'm sorry.  Can you repeat that?

16            Q.    In your understanding and

17    experience on the force, is it accurate that

18    the primary unit is best situated in a

19    pursuit to be aware of all of the factors

20    that we discussed he must know about it?

21            A.    I'm not gonna put a

22    generalized -- generalization like that.  It

23    would depend.  Sometimes it's the secondary,

24    sometimes it's the primary.  It just depends

25    on the circumstances of the incident.
```

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    In any case, though, an officer

2  on the road in the pursuit is gonna better

3  situated than an off-site OIC to know what

4  the conditions of the pursuit are, right?

5              MR. HERZIG:  Objection.  You can

6  answer.

7      A.    More than likely, yes, ma'am.

8      Q.    And that's just common sense --

9      A.    Yes, ma'am.

10      Q.    -- because primary and secondary

11  units are there on the roads seeing the

12  actual conditions, right?

13              MR. HERZIG:  Objection.  A lot

14  of the factors are things that anyone would

15  know, like the weather, for example.

16      Q.    Go ahead.  Is that right, what I

17  said?

18      A.    Oh, I got confused.  I'm sorry.

19      Q.    That's okay.  I said that's

20  because the primary and secondary units are

21  on the road actually seeing the conditions in

22  front of them for the pursuit, right?

23      A.    Yes, ma'am.

24      Q.    And it's accurate that a primary

25  unit engaged in a pursuit has a

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 69 of 204 - Page
ID#: 2252

Deposition of Sergeant Donald Scalf                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    responsibility to terminate that pursuit if

2    it has become too unsafe to continue,

3    correct?

4              MR. HERZIG:  Objection.  You can

5    answer.

6         A.    To their belief, if it's unsafe,

7    yes.

8         Q.    And in order to reach that

9    conclusion that a pursuit is unsafe, what

10   factors should an officer consider?

11        A.    Many of what we've already

12   discussed.  There's numerous, traffic

13   conditions, the riskiness of the person

14   you're chasing.  All these things are --

15   there's -- there's a numerous list of things

16   to consider.

17        Q.    When you say the riskiness of

18   the person you're chasing, what does that

19   mean?

20        A.    I don't know, per se.  I'm not

21   even sure if riskiness is a word.  It's more

22   of those things that you have to judge the

23   actions that are in front of you, and if

24   they've become too dangerous in your mind.

25   Does that make more sense?

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Sure.  In a pursuit, am I

2 correct in understanding that if the pursuing

3 officer loses sight of the fleeing vehicle,

4 the pursuit must be terminated?

5      A.    I mean, if they -- if they lose

6 the vehicle, yes, ma'am.  If you're talking

7 about making a turn down the street and

8 you're falling behind and you lose sight for

9 a second and a half to two seconds, that's

10 not really losing sight.

11           But if you lose the location of

12 the vehicle, I think would be the better

13 terminology.

14      Q.    Okay.  If the fleeing vehicle is

15 causing near accidents with other vehicles on

16 the road, does that impact whether the

17 pursuit should continue?

18      A.    It can.

19      Q.    And can you explain how that

20 would work?

21      A.    In certain circumstances, the

22 apprehension of the subject may become so

23 dire that you need to continue the pursuit at

24 all -- if you can.

25      Q.    And what are the circumstances

1    that render a pursuit so dire that it must be

2    continued, even if near accidents or small

3    accidents are occurring?

4         A.    If you believe the individual is

5    in imminent risk of harm or death to others

6    if they elude apprehension.

7         Q.    And so that means if the suspect

8    gets away, that they're gonna imminently,

9    meaning --

10        A.    They could.

11        Q.    -- right away cause some

12   physical harm or death to others?

13        A.    They could or -- yes, if

14   imminent.

15        Q.    Okay.  So -- and my first

16   question to you is about causing near

17   accidents.  What about if a fleeing vehicle

18   is sideswiping other vehicles on the road,

19   does that impact whether a pursuit should

20   continue?

21        A.    With every pursuit is different.

22   And, once again, the nature of the pursuit,

23   the nature of the person that you're trying

24   to apprehend would come into play in the

25   decision-making.  It could be a factor in

Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    termination of a pursuit.
 2              Q.    And would it play into the
 3    termination decision in the same way that you
 4    just described in relation to near accidents
 5    and the imminent -- the presence of imminent
 6    risk if the person gets away?
 7              A.    I'm not sure what you're asking
 8    me.
 9              Q.    Well, strike that.  Let's see
10    here.
11                    During pursuits, fleeing
12    vehicles often commit traffic violations,
13    right?
14              A.    Yes.
15              Q.    And that includes violations of
16    the Ohio Revised Code or the Cincinnati
17    Municipal Code?
18              A.    Yes.
19              Q.    It could include, for example,
20    Kentucky law violations as well, right?
21              A.    I'm sorry, what you're asking me
22    because I don't know Kentucky law.
23              Q.    And that's fine.  And maybe you
24    can't answer that question.  That's okay.
25                    Violations of the law and
```

1    traffic violations, that would include

2    exceeding the speed limit, right?

3          A.    Yeah.   I think that is a traffic

4    violation, yes, ma'am.

5          Q.    And it would include running red

6    lights or stop signs?

7          A.    Those are traffic violations,

8    yes, ma'am.

9          Q.    Including going the wrong way on

10   a one-way street, right?

11         A.    Those are traffic -- that's a

12   traffic violation, yes, ma'am.

13         Q.    Would include endangering other

14   motorists on the road or bystander

15   pedestrians?

16         A.    Are you talking about a

17   specific -- what are you talking about when

18   you say that?

19         Q.    Would that --

20         A.    Are you talking about like a

21   reckless operation of a motor vehicle; is

22   that what you're referring to?

23         Q.    Yeah.

24         A.    That is a violation.   There

25   isn't a violation that says possibly being

```
 1      dangerous.

 2              Q.    Reckless operation is one

 3      example of it --

 4              A.    Yes.

 5              Q.    -- a traffic violation that

 6      would include endangering motorists or

 7      bystander pedestrians, right?

 8              A.    Yes.

 9              Q.    Are there any other traffic

10      violations that would include that type of

11      endangering conduct that you can think of?

12              A.    I think that all could to some

13      degree.  I'm -- going down a one-way could at

14      some point.

15              Q.    Going down a one-way could be a

16      reckless operation, right?

17              A.    It could be.

18              Q.    And what would make going down a

19      one-way street the wrong way a reckless

20      operation?

21              A.    It's been so long since I have

22      written a reckless operation, I'm not sure of

23      the necessary --

24              Q.    Elements?

25              A.    -- elements.  Thank you.  I
```

```
 1    could not think of it, elements to that.

 2    Could it be dangerous going down the wrong

 3    way?  Yes.

 4         Q.    Okay.  Causing an at-fault

 5    accident would be a traffic violation, right?

 6         A.    Yes.  If you have the crime,

 7    too, yeah, the Municipal Code that was

 8    violated, yes, ma'am.

 9         Q.    And I understand you said you

10    don't know Kentucky law, but these examples

11    we've just gone through, would it be your

12    understanding that they would be traffic

13    violations in Kentucky as well based on your

14    experience just traveling in the region?

15         A.    I don't want to say I think so

16    or I assume so, especially in this situation.

17    I know they are in Cincinnati.

18         Q.    Okay.  And you would expect that

19    traveling over the speed limit would be a

20    traffic violation in Kentucky if you were to

21    commit that act, right?

22         A.    I think I've been pulled over

23    before, so...

24         Q.    In Kentucky for speeding?

25         A.    Yes.
```

1    Q.    Okay.  And would you expect that

2    running red lights, stop signs in Kentucky

3    would also be a traffic violation based on

4    your experience driving?

5           A.    I would think so.

6           Q.    Likewise, going the wrong way

7    down a one-way street based on your

8    experience driving in Kentucky, you'd expect

9    that to be a traffic violation as well,

10   right?

11          A.    Once again, I would think so.

12          Q.    And the same thing for

13   endangering motorists and bystander

14   pedestrians, you would expect that to be a

15   traffic violation in Kentucky as well,

16   correct?

17          A.    Once again, I would think so.  I

18   don't know the actual codes or anything like

19   that.

20          Q.    And that's just based on common

21   sense as being a licensed driver in the State

22   of Ohio, right?

23          A.    Yes.

24          Q.    Okay.  So is it true that the

25   pursuit policy for the City in your -- the

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    City of Cincinnati and your understanding for

2    its officers requires officers to not commit

3    traffic violations during the course of a

4    vehicle pursuit?

5          A.    So that has changed over the

6    years.  I do believe this one says that they

7    try to avoid that.  I don't know if it says

8    specifically not, but I do know we've tried

9    to avoid that, and I'm gonna -- give me just

10   a second --

11         Q.    Sure.

12         A.    -- because I know what's in

13   here.

14         Q.    Absolutely.  Take your time.

15         A.    I'm not seeing anything that

16   says specifically, but I do believe there's

17   somewhere that they attempt to obey all

18   traffic laws, but I'm not seeing the wording.

19   And I'm trying to do it very quickly, so I

20   apologize.

21         Q.    Oh, that's okay.  Can we just

22   defer to the language of the policy then,

23   whatever it says, you would agree with --

24         A.    In regard for the safety of

25   others, we have that.  And I apologize.

```
 1            Q.      That's okay.
 2            A.      When driving in emergency mode,
 3     the operator will perform to all applicable
 4     traffic laws and regulations.  That's what I
 5     was looking for.
 6            Q.      And so that's a mandatory
 7     requirement under this policy, right?
 8            A.      It's -- that's exactly what it
 9     says.  It says, Operator will perform to the
10     applicable traffic laws and regulations.
11                   THE COURT REPORTER:  You have
12     to -- you have to slow down.
13                   THE WITNESS:  Oh, I'm sorry.
14                   THE COURT REPORTER:  I'm just
15     getting slurs.
16                   THE WITNESS:  Oh, I apologize.
17     Do you want me to repeat?
18                   THE COURT REPORTER:  That's
19     okay.
20     BY MS. GREENE:
21            Q.      Okay.  And I'm a fast talker,
22     too, so it doesn't help.
23            A.      I'm usually not, but...
24            Q.      It's because you're talking to
25     me.  Sorry about that.
```

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          So is it accurate in your

2    understanding that Cincinnati officers are

3    forbidden under this policy from operating

4    their vehicles in emergency mode with

5    reckless disregard for the safety of other

6    citizens?

7          A.    Yes.

8          Q.    And what does that mean as far

9    as the training and instruction you've

10   received from the department, reckless

11   disregard for the safety of other citizens

12   for operating a vehicle?

13         A.    I don't know if there is an

14   actual definition that I could give you.

15   Reckless disregard, I think is just that.  If

16   you're doing things without -- without any

17   regard for anyone else.

18              I'm not sure of an actual --

19   it's one of those things that can you see it,

20   you know what it is.  It's not something I

21   can really explain, I don't believe.

22         Q.    Would it include being aware of

23   risks of danger but undertaking the action

24   anyway?

25         A.    I believe it would be undue

```
 1   risk, something that's an undue risk, and
 2   then taking the action.
 3        Q.   Meaning there's not -- or,
 4   excuse me.
 5             When you say undue risk, that
 6   would be -- that would mean there's not a
 7   legitimate reason to do it?
 8        A.   Correct, I would think that
 9   would be more...
10        Q.   In relation to the traffic
11   violation being forbidden during pursuits
12   under the policy that we talked about a
13   moment ago, are you aware of any exceptions
14   to that rule under this policy?
15             MR. HERZIG:  Objection, vague.
16        A.   I believe all pursuits are
17   looked at as an individual thing.  When you
18   say is there an exception, I don't know if
19   there's anything in writing.
20        Q.   Okay.  I've seen this term
21   "noncompliant pursuit" in the policy.  Have
22   you heard that before?
23        A.   Yes.
24        Q.   What does that mean to you?
25        A.   That there would be a possible
```

```
 1    administrative or violation of the pursuit
 2    policy at some point, I believe is what
 3    you're asking me.
 4              Q.    Okay.  That's your understanding
 5    of what that term means?  That's all I'm
 6    asking.
 7              A.    Noncompliant can mean many
 8    things.  But I think that what you're asking
 9    me is a noncompliant pursuit, or are you
10    talking about a noncompliant individual?
11              Q.    Noncompliant pursuit.
12              A.    I believe there's noncompliance
13    with -- with applicable procedures and that
14    type of thing.
15              Q.    Okay.  Over the course of your
16    career -- how many years have you been with
17    the CPD now?
18              A.    Too long, 26, ma'am.
19              Q.    I was gonna say math is probably
20    too hard.  I need another coffee.
21                    So 26 years.  You've heard about
22    pursuits more than once over the course of
23    your employment with CPD, right?
24              A.    Yes, ma'am.
25              Q.    And in a given year, if you can
```

 1    give me a ballpark range, about how many

 2    pursuits do you hear about happening in the

 3    department over the course of your career?

 4          A.    So are -- they've gone down over

 5    the years.  If you're talking about just a

 6    regular pursuit, for years you could talk

 7    about more than one a day.

 8              If you're talking about a

 9    specific district, I mean, that's kind of a

10    broad statement.  There are several pursuits,

11    and they have gone down over time.  If

12    that -- there's no number.  I mean, a lot to

13    not as a lot.

14          Q.    Is it fair to say that pursuits

15    are an event that most -- most officers in

16    the department would encounter over the

17    course of their careers?

18          A.    I would think so, especially

19    those with my time -- my amount of time on.

20          Q.    And is it fair to say that

21    pursuits are an event that -- that officers

22    would encounter in their careers more than

23    once, generally speaking, in this department?

24              MR. HERZIG:  Objection.  You can

25    answer.

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1              A.     Newer officers, I have -- I

2     would not say that to.  Older officers, those

3     with 15 to 20 years on, I would think is

4     definitely.

5                     But, once again, I think they've

6     been aware of them.  They have been trained

7     in them, and we all know those trainings can

8     be -- you know, been taught about them.

9                     But newer officers, I don't know

10    how long it takes for a newer officer to get

11    into their first pursue -- that was English,

12    first pursuit.

13             Q.     Fair enough.  Even newer

14    officers in your experience working in the

15    department would have heard about pursuits

16    happening across the context of the entire

17    department, though, right?

18             A.     Pursuits happening, yes, ma'am.

19             Q.     And so would you in your

20    experience working in this department, is it

21    fair to say that over the course of your

22    career, all officers would encounter a

23    pursuit at some time or another during their

24    years on the force?

25                    MR. HERZIG:  Objection.  You can

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 84 of 204 - Page
ID#: 2267
Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    answer.
 2            A.    Once again, back to my -- what I
 3    originally stated, I don't know about the
 4    newer officers.  I would think so.  But I'm
 5    not a newer officer, I can tell you what I've
 6    experienced, and I have experience in
 7    pursuits.
 8            Q.    When you say "newer officer,"
 9    what are you talking about, how many years?
10            A.    I don't know, ma'am.  Our -- our
11    procedures have changed so much, and then I
12    would say last few years probably, maybe last
13    ten years.  I don't know.
14            Q.    Okay.  You've encountered
15    pursuits, though, right?
16            A.    Yes, ma'am.
17            Q.    Do you know how many?
18            A.    Oh, my goodness gracious.  No.
19    I've been a supervisor a long time.  I think
20    I was primary or secondary in less than five,
21    and I've probably investigated, I'm gonna
22    say, double digits.
23                  I wouldn't think we're getting
24    into triple digits, but I would think we're
25    definitely in the middle of the double digits
```

Deposition of Sergeant Donald Scalf                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    somewhere, I would think.
 2              Q.    Okay.
 3              A.    I could be incorrect, but that's
 4    where I'm guessing.
 5              Q.    Ballpark?
 6              A.    Yeah, that's what I'm guessing.
 7              Q.    And then as a supervisor, you've
 8    also, I assume, had to sign off on reports by
 9    other officers who have engaged in pursuits,
10    right?
11              A.    That's what I was referring to.
12              Q.    Okay.  The investigation then?
13              A.    Yes --
14              Q.    All right.  So --
15              A.    -- the supervisors do that, I
16    apologize.
17              Q.    Oh, that's okay.  I just want to
18    make sure I understand.
19                    So when you said
20    "investigation," you're not only talking
21    about your time at IIS, but you're talking
22    about signing off as a supervisor review on
23    subordinate officer's reports about pursuits?
24              A.    Correct.  And if you want to go
25    one step further, when I was in Inspections,
```

1    I reviewed them as well.

2         **Q.    Okay.  And when you include all**

3    **of that time as a supervisor of officers, as**

4    **an IIS officer, as an Inspections Unit**

5    **officer, is that still in that -- some are in**

6    **the double digits ballpark, or is it higher?**

7         A.    Probably go in the triple digits

8    when you put all that stuff together.

9         **Q.    Okay.  Have you ever terminated**

10   **a pursuit?**

11        A.    I have.

12        **Q.    And tell me about those events.**

13        A.    I don't remember specifics.  I

14   remember I did terminate one because the

15   officer said he was going, like, a 100 miles

16   an hour in the west end.  That's not good,

17   so...

18        **Q.    West end is like --**

19        A.    Like Lynn Street.

20        **Q.    -- a mix of residential and**

21   **commercial?**

22        A.    Yes.  Like, Lynn Street, it's

23   more residential, I would say.  I don't

24   remember the specifics.  That one pops into

25   my mind.

```
 1              Q.    And you said a hundred miles an
 2     hour in that area was not good, right?
 3              A.    Correct.
 4              Q.    And why is that?
 5              A.    That is extremely too fast.
 6     It's a residential street, a hundred miles an
 7     hour is getting reckless.
 8              Q.    And so when you heard that
 9     speed, you terminated that pursuit; is that
10     correct?
11              A.    Yes, ma'am.
12              Q.    Were you an OIC during that
13     pursuit?
14              A.    Yes, ma'am.
15              Q.    So you were not participating in
16     the pursuit, but listening to the radio
17     transmissions off-site?
18              A.    Correct.
19              Q.    Any other circumstances about
20     that particular pursuit that you recall?
21              A.    No, ma'am.
22              Q.    Have you terminated any other
23     pursuits?
24              A.    I'm sure, but I cannot think of
25     anything specifically at this time.
```

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     Q.    Do you know how many times
2  you've been an OIC for pursuits?
3         A.    I don't know.  I would say a
4  handful, and I couldn't tell you if that's
5  less than five or more than five.  When I was
6  a brand new supervisor, I probably am
7  forgetting a lot of those back in 2004, quite
8  busy back then.
9              But I know that I have been the
10  OIC of numerous, but there's no number I want
11  to put on that.
12     Q.    In terminating a pursuit, what
13  circumstances, as a supervisor, was -- was
14  your understanding would necessitate
15  terminating a pursuit?
16         A.    Things that we spoke about
17  earlier, the safety involved, the charges
18  that were being filed, speeds, everything
19  that we've discussed earlier.
20     Q.    So overall safety to officers,
21  the public, and the suspect?
22         A.    Yes, ma'am.
23     Q.    And where the circumstances were
24  no longer safe, that would be -- when you
25  would need to terminate?

```
 1          A.    They could outline -- they could

 2   outweigh the apprehension of the subject.

 3   You do have to look at what the initiating

 4   crime or the reason for the pursuit is, yeah.

 5          Q.    And so, for example, if someone

 6   just committed a murder and is now fleeing,

 7   would that be a circumstance where even if

 8   it's unsafe, the pursuit would be continued?

 9          A.    It would be all of the variables

10   involved, but, yes, I can see that as being

11   something where you may continue a pursuit.

12              Somebody that's a dangerous

13   felon, somebody that may harm somebody, those

14   are the type of things when we're trying to

15   weigh the risk of apprehending the subject.

16   And are they going to injure somebody in the

17   near future?

18          Q.    What about a circumstance where

19   someone is subject to warrant or felony

20   crimes, but at the time the pursuit is

21   initiated, has not just in the immediate

22   moment past committing any act of violence?

23          A.    There would be lots of things

24   involved.  Is the person armed?  Does the

25   person have a weapon?  What information do we
```

1    know about this person?  What information

2    during -- what do we know about it?

3            It's just -- it's not something

4    as simple as they just have a felony warrant,

5    so I'm not gonna chase them.  If the person

6    is armed or if there is a history of violence

7    or something like that, those could have

8    always change how a pursuit is -- is handled

9    by a supervisor.

10           **Q.    But all of those factors you**

11   **just described, if a -- if a pursuit has**

12   **reached the point where there is a danger to**

13   **third parties on the road or the sidewalks**

14   **and there's not an imminent threat of**

15   **violence to people at that moment posed by**

16   **the fleeing suspect, those factors would not**

17   **justify the continuation of a pursuit,**

18   **correct?**

19           MR. HERZIG:  Objection.  You can

20   answer.

21           A.    I think you'd have to define

22   everything that you just said.  Somebody who

23   is armed with a firearm or somebody who has

24   made threats, that could be an imminent when

25   that person stops.

1          So I think the justification of
2     a pursuit would come down to does -- do you
3     believe that this person is a threat to
4     others when -- if they were to elade -- evade
5     capture.
6          **Q.    An imminent threat to others,**
7     **right?**
8               MR. HERZIG:  Objection.  You can
9     answer.
10              THE WITNESS:  So I can answer,
11    right?
12              MR. HERZIG:  Yes.
13              THE WITNESS:  Sorry.  I got
14    confused there.
15          A.    I think -- when I say imminent,
16    I'm not talking about, like, in 12 seconds.
17    I'm thinking if this person is going to be a
18    threat to others, I hate to say the near
19    future, but that's about the only -- if this
20    person, if they evade capture, are they still
21    a threat to others?
22               Then I believe that you can --
23    you weigh the risks at that point.
24          **Q.    And you'd have to have**
25    **information establishing that that person**

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    posed a threat to others in the near

2    future --

3            A.    Yes.

4            Q.    -- in the way that you described

5    it, right?  All right.  Let's turn to August

6    of 2020.

7            A.    Okay.

8            Q.    On August 7th of 2020, you were

9    involved in an operation relating to a person

10   named Mason Meyer, right?

11           A.    Yes, ma'am.

12           Q.    Is that the first day you were

13   involved in an operation relating to Meyer?

14           A.    No, ma'am.

15           Q.    What was the first day you were

16   involved?

17           A.    Date, I'm not sure, the week or

18   so before.  We were involved in an operation

19   in, I believe, that same week before, maybe a

20   few days later, I had been given information

21   regarding Mason Meyer.

22           Q.    Was that information relating to

23   a pursuit by a Boone County Sheriff's deputy?

24           A.    I believe I found that out after

25   our first operation, but I did know that

1    there was a pursuit involving Mr. Meyer in

2    Northern Kentucky.

3         **Q.    And you were aware that that**

4    **pursuit had been terminated, right?**

5         A.    I was.  And I do believe that

6    after -- during Mr. Meyer's time free, we

7    gathered more information.

8              And I believe that we had

9    learned of an inoperable brain tumor, and

10   threats that Mr. Meyer had made as well as a

11   pistol-whipping that I think all occurred

12   after that pursuit.  I can't be certain.

13             But I know that -- I'm pretty

14   sure the information about the inoperable

15   brain tumor and the information that he was

16   homicidal and suicidal came after that

17   pursuit.

18        **Q.    Do you know the sources of that**

19   **information?**

20        A.    I -- I received this information

21   from my officers who were talking to their

22   sources of information.  So I rely on my

23   officers to do that portion.

24        **Q.    Which officers were those?**

25        A.    There was -- Officer Stratmann

1    was our lead officer on that case, but he was

2    also in communication with the Northern

3    Kentucky Strike Force and other -- other law

4    enforcement entities.

5         Q.    Various Kentucky law enforcement

6    agencies have been looking at Meyer for some

7    time before you were aware of him, right?

8         A.    I'm sorry?

9         Q.    Various Kentucky law enforcement

10   agencies had been looking at Meyer for some

11   time before you were aware of him?

12        A.    The one that I'm aware of is

13   Northern Kentucky Strike Force; that's who we

14   were talking to.  And that's who I know

15   that -- that's who I believe

16   Officer Stratmann was speaking to.

17        Q.    And the Northern Kentucky Drug

18   Strike Force, what officers comprised that

19   agency or organization, rather?

20        A.    I'm not positive.  I know -- I

21   believe there was a Newport officer in that.

22   Besides that, that's the one I had the most

23   contact with.  There may have been a Boone

24   County officer as well, but I'm not positive.

25        Q.    That's an inner agency

1    organization, right?

2            A.    I believe so, yes, ma'am.

3            Q.    **You understand that to involve**

4    **local and state Kentucky law enforcement**

5    **officials?**

6            A.    I believe there may have been

7    some Federal involvement as well from

8    possibly the DA, but I don't know that for

9    certain.

10           Q.    **Okay.  In any case, is it**

11   **your -- well, is it your understanding that**

12   **the Northern Kentucky Drug Strike Force is an**

13   **inner agency organization was a -- was a**

14   **cooperative effort among law enforcement**

15   **agencies?**

16           A.    In Northern Kentucky?

17           Q.    **Yeah.**

18           A.    Yes, ma'am.

19           Q.    **And so there wasn't one agency**

20   **that was in charge of all the officers**

21   **involved in the Strike Force, if you know?**

22           A.    I don't know.  I'm just gonna --

23   I don't know.

24           Q.    **That's okay.  All right.  So**

25   **about a week or so before August 7th, you**

1    became aware of Mason Meyer, right?

2           A.    At least a week, yes, ma'am.

3           Q.    And you learned about that Boone

4    County pursuit that was terminated, right?

5           A.    Yes, ma'am.

6           Q.    You learned that Meyer did not

7    stop, continued to flee over the course of

8    that pursuit, correct?

9           A.    Yes, ma'am.

10          Q.    And you said you also received

11   some information by way of officers you were

12   working with about Meyer in that interim

13   week, correct?

14          A.    Yes, ma'am.

15          Q.    And that information came from

16   various sources that you don't know the

17   identity of, right?

18          A.    Correct.

19          Q.    And in terms of the information

20   that you learned over the course of that week

21   before August 7th, you don't know the timing

22   of the events reported by those sources,

23   correct?

24                MR. HERZIG:  Objection.

25          A.    I'm not sure I know what you're

1  asking me.

2          Q.    Yeah.  Let me ask it more

3  clearly.  Sorry.

4                For the information reported by

5  those sources to officers who then reported

6  to you, you don't know when those specific

7  events that those sources reported occurred,

8  do you?

9          A.    I don't know specifically, but I

10  am -- I believe that some of the information

11  that we received was after the first time we

12  looked for him, so that week in between.

13                I believe we got -- we got --

14  English, once again -- we gathered more

15  information during that week that made the

16  apprehension of Mr. -- of Mason Meyer more,

17  I'm not sure if, more important.

18          Q.    You said you tried to find him

19  once before the 7th, right?

20          A.    Yes, I believe it was the week

21  before --

22          Q.    Can you --

23          A.    -- but I'm not positive.

24          Q.    Can you describe that event to

25  me, please?

1      A.    It was similar to the one that

2   occurred on the 7th.  We did surveillance.  I

3   had several officers out, just like we did on

4   the 7th.

5            I know there was a traffic stop

6   made of his vehicle.  He was not in it.  I

7   believe we had electronic surveillance at

8   that point as well, but I'm not -- I'm pretty

9   sure we did.

10           But we did not locate him that

11  day.  We located the vehicle that he had been

12  driving that he was -- he was not in it.

13      Q.    When you say electronic

14  surveillance, what do you mean?

15      A.    Like, phone pings and that type

16  of thing.

17      Q.    Who was doing the phone pings at

18  that time?

19      A.    I said I may -- we may have had

20  it.  I don't remember.  I think maybe Boone

21  County, but I'm not positive on that.

22      Q.    Okay.  When you said several

23  officers were out, what agencies were they

24  from?

25      A.    Northern Kentucky Strike Force

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    definitely was with us.  They were with us on
 2    both incidents, and that's who we were
 3    assisting.  There were officers from our
 4    Gang Unit, I believe.  I don't remember
 5    specifically everyone.
 6                I just -- I know that it was the
 7    normal players, those were huge.  If we were
 8    going out on something, we would usually
 9    contact our Gang Unit or anybody else that we
10    could.
11        Q.    When you say our Gang Unit,
12    that's CPD Gang Unit, right?
13        A.    Yes, ma'am.
14        Q.    Anybody else that you can think
15    of who was there?
16        A.    Our task force.  So the ATF Task
17    Force, the OCIS people, and I can't give you
18    a roll call or a spreadsheet of who was
19    there.  I don't recall.  It was five years
20    ago.
21                I do know that there were
22    participants from the ATF Task Force, from
23    the Gang Unit, from Northern Kentucky Strike
24    Force.  More than likely, I don't remember if
25    District 3's Violent Crimes Squad was
```

1    involved.  I think they were at least aware

2    of it.

3                   Because whenever I went to a

4    district, I would notify the Violent Crimes

5    Squad that we would be doing work in their --

6    in their areas.

7           Q.    And that's the Cincinnati Police

8    District 3 --

9           A.    Yes.

10          Q.    -- Violent Crimes Squad?

11          A.    Yes, ma'am.  Anywhere we went, I

12   would try to notify whatever home agency or

13   home district that was that we would be doing

14   operations.

15          Q.    And how would you make that

16   notification?

17          A.    Usually via telephone.

18          Q.    Do you remember who you talked

19   to at District 3?

20          A.    More -- I don't know

21   specifically, but I had contact with Sergeant

22   Frank Beavers when I did things.  He was the

23   Violent Crimes Squad supervisor back then.

24   I'm not sure if I called him that day or

25   another day or -- I know that he -- I believe

Deposition of Sergeant Donald Scalf

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    that he was aware we were looking for

2    Mr. Meyer.

3         Q.    And when you said task force

4    officers, that's the OCIS officers, right?

5         A.    Yes, ma'am.

6         Q.    And so that's the Cincinnati

7    Police officers who are in OCIS, correct?

8         A.    Yes, ma'am.

9         Q.    Okay.

10        A.    Also, ATF agents and Hamilton

11   County.  So the ATF Task Force would have had

12   our Cincinnati officers as well as ATF agents

13   as well as, like we discussed earlier, a

14   parole officer and a county officer.

15             And I don't remember if the

16   parole officer or the county officer were

17   there that day or not.

18        Q.    Who from the ATF was there?

19        A.    I don't recall.

20        Q.    Do you remember specifically if

21   any ATF officer or agent was on site?

22        A.    I believe the resident agent in

23   charge, Occhipinti, was there, I believe.  If

24   not, I was talking to him via the phone.  I

25   believe Agent Schaub was there because he

Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    and -- he and Officer Stratmann were

2    partners.  Besides that, it would be a

3    guessing game for me to tell you anybody

4    else.

5              Q.    Okay.  Have you ever completed

6    any reports relating to that event?

7              A.    I don't think so.

8              Q.    Do you know if anybody in CPD

9    has?

10             A.    Not to my knowledge.  I don't

11   remember reviewing any.  If there was, there

12   may have been an ATF report made, and that

13   could have been by a Cincinnati officer or an

14   ATF agent.

15             Q.    All right.  So this event about

16   a week before August 7th, what was the

17   outcome of that?

18             A.    We did not apprehend

19   Mason Meyer.  I do believe that we -- I

20   believe we recovered a weapon from somebody

21   else involved in the vehicle, but it was

22   Mason Meyer's vehicle, but Mason Meyer was

23   not in the vehicle.

24                   And I believe we may have made

25   an arrest of somebody in that vehicle.  I

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    don't remember names or anything like that.

2              Q.    Okay.  What's the next thing you

3    know about any operations you were involved

4    with relating to Mason Meyer after that?

5              A.    I'm sorry?

6              Q.    What's the next thing that

7    happened with any operations you were

8    involved with relating to Mason Meyer after

9    that?

10             A.    Do you mean the -- after

11   August 7th or --

12             Q.    After this event about a week

13   before you were just describing.

14             A.    Probably August 7th would be my

15   guess.  And I hate to do this, but can I use

16   the restroom before we get into August 7th?

17             MS. GREENE:  Absolutely.  We'll

18   go off the record.

19             THE WITNESS:  Thank you.

20       (Off the record.)

21   BY MS. GREENE:

22             Q.    Okay.  We're back on the record.

23             So just before the break, we

24   were talking about some events relating to

25   Mason Meyer about a week or so before

```
 1      August 7th.

 2                  I have one -- or a couple

 3      follow-up questions relating to that.  I

 4      think you earlier said that you were at the

 5      time aware of a pursuit by Meyer by a Boone

 6      County Sheriff's deputy, right?

 7           A.    Yes.  I'm not sure when I became

 8      aware of that, if it was before the August

 9      7th or before the initial incident -- the

10      initial surveillance the week before.

11                  To be perfectly honest, a lot of

12      the dates are gonna blend together.  So I'm

13      not -- I know that, like, on a Wednesday

14      before the first time was when I first got

15      information that we were going to be looking

16      for him on Friday, and then it just all went

17      for the next ten days.

18           Q.    For that Wednesday --

19           A.    I believe it was a Wednesday.

20           Q.    Approximately before the first

21      time then --

22           A.    Yeah.

23           Q.    -- who did you get that

24      information from?

25           A.    Officer Stratmann, TFO.
```

Deposition of Sergeant Donald Scalf                                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Okay.  Okay.  In relation to the

2    Boone County Sheriff's deputy pursuit of

3    Meyer, Meyer did not stop for that -- that

4    deputy, correct?

5         A.    Correct.

6         Q.    And you were aware of that

7    before the August 7th event, correct?

8         A.    Correct.

9         Q.    Was there any reason to expect

10   different behavior from Mason on August 7th

11   in relation to fleeing police than what had

12   happened with that Boone County Sheriff's

13   deputy?

14        A.    So I don't know if there was

15   reason.  I know that we had several plans to

16   stop him prior to it getting to a vehicle

17   pursuit that we were unable to -- to come to

18   fruition, for lack of just not knowing he was

19   in the vehicle, and those type of things.

20             But did I think that he could

21   flee?  Yes.  Was that -- was that a

22   possibility that that would happen?  Yes,

23   ma'am.

24        Q.    And it was likely, right?

25             MR. HERZIG:  Objection.  Go

1    ahead.

2         A.    I'm not gonna make likely.  I

3    gonna say -- I don't like to put likely or it

4    was going to, or there was definitely a

5    possibility.  That was something that -- that

6    we had prepared for.

7         **Q.    Okay.  And, in fact, the fact**

8    **that Meyer may flee was prepared for with a**

9    **plan that the CPD would pursue Meyer, if**

10   **necessary?**

11        A.    Yes.  And there was -- if it got

12   to that point, but we also had a plan before

13   that with the ATF of trying not to get into a

14   pursuit.

15        **Q.    Okay.  But the pursuit, if it**

16   **was gonna occur, was gonna be a CPD**

17   **operation, right?**

18             MR. HERZIG:  Objection.  You can

19   answer.

20        A.    Yes.  The CPD had the marked

21   vehicles --

22        **Q.    Okay.**

23        A.    -- Cincinnati Police.  We have

24   marked vehicles, ATF does not.

25        **Q.    Okay.**

1          A.    And I don't believe we had any

2     County marked vehicles there either.

3          Q.    So for this August 7th event,

4     did preparations begin on the 6th?

5          A.    Yes, but they had been ongoing

6     since the week before.  And I don't know what

7     was done on each day, but I do know that

8     preparations had been going on between my

9     officers and the Boone Kentucky Strike Force.

10          A lot of that I was not involved

11     with due to I was the supervisor.  It wasn't

12     my investigation.  I was the supervisor to

13     supervise the investigation, and go from

14     there.

15          Q.    When you say your officers, who

16     were you referring to?

17          A.    The TFOs, Officer Stratmann and

18     possibly Agent Schaub was involved.  I don't

19     remember.  I'm just saying that because they

20     were partners.

21          I do -- I know as a unit, we

22     were aware of it.  And I'm not sure who did

23     the -- the bulk of the work.  I know that

24     Officer Stratmann was the one involved.

25          Q.    Was there radio chatter about

Deposition of Sergeant Donald Scalf                         Jason Laible, et al., vs. Timothy Lanter, et al.,

1    this Meyer planning prior to the 7th?

2          A.    What do you mean by radio

3    chatter?

4          Q.    Were there officers, including

5    Cincinnati officers, talking about Meyer on

6    the radio prior to the 7th?

7          A.    I would doubt it.

8          Q.    And why would you doubt it?

9          A.    I don't -- I don't know.  I

10   think I'm either not understanding what you

11   mean by radio chatter or -- I mean, are

12   people talking to each other?  They're using

13   cell phones and that type of thing.

14              But are you -- we usually didn't

15   get on our radios unless we're doing an

16   operation.  We wouldn't just come on a radio

17   and say, Northern Kentucky Strike Force, we

18   got this guy.  We're not -- that's not the

19   way you -- we would do an investigation.

20              We might call them.  And if we

21   had phone conversations regarding them, then,

22   yes, but radio chatter as something for an

23   operation, that's not something that we would

24   really -- like, even when you have -- you

25   keep referring to the pursuit beforehand, I

1    wouldn't have heard that on the radio because

2    that's a different radio channel, different

3    all together.

4         Q.    So as far as you're aware, there

5    was not discussion over the radio about Meyer

6    prior to August 7th?

7         A.    There would have been the week

8    before when we were doing an operation.

9         Q.    Would there have been any radio

10   discussion of Meyer or August 6th that you're

11   aware of?

12        A.    I'm not gonna be able to answer

13   that because I don't know.

14        Q.    Okay.

15        A.    None -- none that I was aware

16   of, but there could have been, but I'm not

17   sure.

18        Q.    All right.  So then on August

19   7th, 2020, at about seven in the morning,

20   members of the ATF, the Northern Kentucky

21   Drug Strike Force, Cincinnati Police

22   Gang Unit, and the OCIS met to discuss the

23   joint investigation of Meyer's activities,

24   right?

25        A.    We had a briefing, yes, ma'am.

1      Q.    And who attended that, if you

2    recall?

3          A.    If you're asking for names, I

4    don't recall.  I think I was going in and out

5    of the briefing room, if I remember

6    correctly.  I may have been sitting there for

7    a minute.

8              I couldn't tell you besides

9    myself, I know Agent Occhipinti was in there,

10   a couple of guys from the Strike Force that I

11   don't remember their names.

12   Officer Stratmann, I don't remember other

13   names that were involved.

14              I'm sure there were many more.

15   I couldn't tell you if this was a ten-man

16   brief or a 20-man brief.  It was a while ago,

17   and a lot has occurred -- a lot occurred that

18   day.  It turned into a very long day, so I

19   don't really remember.  I apologize.

20         Q.    Do you remember if then

21   Sergeant Lanter was in the briefing?

22         A.    I know that I spoke to

23   Sergeant Lanter once we were on site of the

24   first -- the first location that we thought

25   he might be at.  He probably was in that

1    briefing.

2            If he wasn't in that one, he may

3    have been in the one the week before.  Like I

4    said, I don't recall specifically.

5        Q.    There was a briefing the week

6    before?

7        A.    There was always a briefing when

8    we did any type of operation when we were

9    going out to look for somebody.

10       Q.    Would there have been any -- any

11   documentation relating to that briefing that

12   you know of?

13       A.    I don't know, more -- more than

14   likely.  But since it was Northern Kentucky

15   Strike Force, they may have done the -- their

16   documentation, but I don't know if we would

17   have had -- but I don't remember

18   specifically.

19       Q.    You remember being at that

20   briefing, though?

21       A.    I do remember us sitting in our

22   roll-call room -- in our office at the

23   Federal Building.

24       Q.    Was Officer Thomas at the

25   August 7th briefing?

```
 1            A.    I don't think so, but I can't
 2     guarantee that.  I'm not positive.
 3            Q.    Was Officer Harper at the
 4     August 7th briefing?
 5            A.    Once again, I'm not -- I'm not
 6     sure.
 7            Q.    You said you know you spoke to
 8     Lanter when you were on site at the first
 9     location, right?
10            A.    Correct.  We were in a parking
11     lot at the corner of Central Parkway.
12            Q.    And that was a location in
13     Clifton; is that right?
14            A.    I wouldn't call it Clifton.
15     It's Fairview, maybe.  I can't remember the
16     name of it.  It's now my district and I can't
17     even think of the name of it.  I think it's
18     Fairview or something.
19            Q.    Fairview?
20            A.    I don't know, something like
21     that.  I'm not sure.  De Votie was the
22     avenue -- De Votie was the address.
23            Q.    So you were waiting on Fairview?
24            A.    No, I was waiting at Central
25     Parkway --
```

Deposition of Sergeant Donald Scalf

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1          Q.     Okay.

2          A.     -- and Marshall, maybe, but I

3    moved around a few times.

4                 MR. HERZIG:  Just for clarity,

5    you were talking about the -- the area of

6    town that is called Fairview?

7                 THE WITNESS:  Correct.

8                 MR. HERZIG:  Okay.  Not a

9    street?

10                THE WITNESS:  Correct.

11   BY MS. GREENE:

12         Q.     And -- but De Votie Avenue is

13   the location --

14         A.     Yes.

15         Q.     -- that was being surveilled?

16         A.     Yes.

17         Q.     That's 588 De Votie; does that

18   sound right?

19         A.     Okay.

20         Q.     I mean, does it sound -- you

21   don't remember?

22         A.     I don't remember.

23         Q.     Okay.  That's fine.  Okay.  So

24   that was the location where you all believed

25   Meyer to be located at the time and you were
```

Deposition of Sergeant Donald Scalf
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    on Central Parkway during that surveillance,
2    correct?
3           A.    So I would move during
4    surveillance.  I'd also give breaks to
5    officers.  So I moved quite a bit.  That was
6    probably where I was at the majority.
7                 But, no, I would move around.
8    And when I was doing surveillance, I would
9    try not to stay in one area too long because
10   I'm kind of a big, white guy in a truck, I
11   would kind of stick out a little bit.
12          Q.    Okay.  So you -- was -- was
13   Lanter in that location at Marshall and
14   Central Parkway when you spoke with him?
15          A.    Yes.  And he wasn't -- once
16   again, he wasn't there for the duration
17   either.  I don't know where he would move off
18   to because I didn't need to know.
19          Q.    He was in a marked cruiser,
20   correct?
21          A.    I believe he was most of the
22   day, I believe so, yes.
23          Q.    And you had asked
24   Sergeant Lanter to assist, right?
25          A.    Yes.

1    Q.    And that was in his capacity as

2    a member of the Gang Unit at CPD, correct?

3         A.    Yes, he was a supervisor.

4         Q.    And you had also asked

5    Specialist Harper to assist on that day,

6    right, for the Canine?

7         A.    I don't recall if I did or not.

8    I know we asked for Canine.  I don't know if

9    it was me that specifically asked or my

10   officer, or if I asked him.  I don't remember

11   how the -- I could have called him.  I don't

12   recall.

13        Q.    Did you personally brief Lanter

14   on this operation?

15        A.    We spoke about it, yes.

16        Q.    And, please, tell me what you

17   both said during that conversation.

18        A.    I don't recall specifics.  I

19   know that -- I'm trying to remember.  I

20   believe he may have been with us the week

21   before.  I don't know.

22             But I know that I had spoken to

23   him about -- about Mason Meyer and how

24   Mason Meyer, his criminal history, the belief

25   that he -- this was specifically on that

Deposition of Sergeant Donald Scalf

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    date -- that apprehension was going to be a

2    high -- a high concern.

3            We really wanted him apprehended

4    due to threats he had made of violence.

5    There was information about a brain tumor

6    that we wanted to make sure -- that he had

7    said something to the effect, and I don't

8    remember exact words, that he was -- he would

9    have gotten into a fight with police or

10   gotten into a fight with others.

11           I know he had -- there was

12   information of him pistol-whipping somebody

13   who didn't pay him enough.  So I know that I

14   had spoken to Sergeant Lanter, lieutenant

15   now, regarding his -- Mr. Meyer's propensity

16   for violence and his danger to society.

17       **Q.    With regard to that information**

18   **you conveyed to Lanter, what did -- what did**

19   **you know at the time of the reliability of**

20   **it?**

21           A.    So my officers that worked for

22   me had gotten this information, and the

23   information they gave me was reliable.

24   They've always given me reliable information,

25   and that's what my officers did.

1      And they had conducted an

2  investigation and gave me the findings of

3  that investigation.  So I believe it to be

4  highly reliable.

5      **Q.    And that's because it came from**

6  **these officers that you'd been working with?**

7      A.    Not just that, that's -- yes,

8  these officers gave me this information.

9  They had done the interviews.  They had

10  spoken to who they needed to speak to, and

11  they had -- I don't know if any reports had

12  been done to that point.  I don't recall.

13      But I know that the officers had

14  done their due diligence to investigate the

15  matter.

16      **Q.    And you knew that how?**

17      A.    Well, I knew that the

18  information they were giving me was

19  information they had given me in the past and

20  they had always investigated it, so past

21  experience.

22      And there were reports.  Once

23  again, I don't remember if I had them.  I do

24  believe I had them prior that were -- listed

25  the -- the nature or the offenses that

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Mr. Meyer had been involved in in the past

2    and then very recent past.

3         Q.    Did you know the identity of the

4    sources of information?

5              MR. HERZIG:  Objection.  I'll

6    instruct you not to disclose the identity of

7    confidential informants if you know them.

8         Q.    Did you know the identities?

9         A.    No.

10         Q.    And did you know any information

11    about those individuals in terms of who they

12    were, their station in life, their relation

13    to Meyer, or anything like that?

14         A.    So the investigating officers

15    knew all of that.  I was the supervisor.

16    They relayed me the information that they

17    received from their interviews and from their

18    investigation.

19              And that's what I went on,

20    that's normally what I would go on from a

21    supervisory perspective.

22         Q.    With respect to this information

23    about Meyer would have gotten into a fight

24    with the police, that was something that had

25    been conveyed would happen if -- if he was

Deposition of Sergeant Donald Scalf                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    stopped and engaging in a stationary

2    encounter with police, right?

3              MR. HERZIG:  Objection.  You can

4    answer.

5         A.    I'm not sure what you're asking.

6         Q.    The pistol-whipping thing, do

7    you know when that was supposed to have

8    occurred?

9         A.    I believe it was either -- I

10   believe it was after Boone County's pursuit,

11   I believe, but I don't know an exact date.

12   That was the belief that I had at the time.

13        Q.    And then threats that he had

14   made, you weren't aware of any threats of

15   action, that was something he alleged would

16   happen imminently as of August 7th, correct?

17             MR. HERZIG:  Objection.

18        A.    Not correct.

19             MR. HERZIG:  You can answer.

20        A.    Not correct.  I'm not sure what

21   you're asking me again.  But I knew that he

22   had threatened on occasion to get into

23   shootouts with police.

24             I knew that he had

25   pistol-whipped an individual.  He -- the gun

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    went off.  There was a felonious assault

2    warrant for him.  The knowledge that I had

3    that Mason Meyer was a threat to society and

4    that he did not want to go to prison or to

5    jail.

6              And that he had an inoperable

7    brain tumor that made it even more dire for

8    officers that would come in contact with him

9    because he believed he was going to die

10   anyway.

11        Q.    You weren't aware at that time,

12   meaning August 7th or before, of Mason Meyer

13   having been charged with actually shooting

14   anyone, right?

15        A.    I don't -- I believe there was a

16   felonious assault for him, but actually

17   shooting, I believe there was a

18   pistol-whipping where the gun went off.

19        Q.    And a pistol-whip is hitting

20   someone with a part of the gun, right?

21        A.    Yeah, it could be.  Yes.

22        Q.    And you weren't aware of any

23   charges or convictions for Meyer of murder or

24   manslaughter at the time, right?

25        A.    I don't believe so, but I don't

1    believe he had anything like that.

2         Q.    You weren't aware of any -- any

3    verified allegations that he had killed

4    somebody, right?

5         A.    Did he kill somebody?  No.  A

6    felonious assault would be using a weapon,

7    so, no -- a death no, but violent, yes.

8         Q.    Was the felonious assault the

9    pistol-whipping incident?

10         A.    I believe so.

11         Q.    And at the time on August 7th,

12    were you aware of -- of any use of weapons by

13    Meyer against other persons that were

14    verified reports?

15              MR. HERZIG:  Objection.  You can

16    answer.

17         A.    Pistol-whipping, definitely.

18         Q.    Other than that, though?

19         A.    I don't recall.  I know that

20    there was new reports that I believe that

21    there were.  There was information that he

22    had shot, but I'm not sure if there was a

23    report filed.

24         Q.    And there was no charge or

25    pending cases associated with that allegation

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1  that he may have shot a weapon at some point,

2  right?

3          A.    Correct, I don't believe there

4  was a report filed to my knowledge.

5          Q.    And as far as you know, nobody

6  was hit, injured, or died as a result of that

7  allegation, right?

8          A.    As far as I know, I don't know.

9          Q.    And this inoperable brain tumor

10  thing, what was the source of information for

11  that?

12          A.    I received it from my officers.

13          Q.    And that was something they were

14  told not by a medical professional about

15  Meyer, correct?

16          A.    No, ma'am.  I believe this is

17  what he was telling individuals.

18          Q.    Do you know as you sit here

19  today, whether or not he, in fact, had this

20  inoperable brain humor?

21          A.    I don't believe he does.

22          Q.    And what -- well, strike that.

23                At the time, August 7th, other

24  than this pistol-whipping felonious assault

25  situation that you've described, you were not

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    **aware of any other verified allegations of**

2    **violence by Meyer, correct?**

3                     MR. HERZIG:  Objection.  What do

4    you mean by "verified"?

5         **Q.    I can ask it a different way.**

6         A.    I was gonna ask the same

7    question because I don't know what you mean.

8         **Q.    Sure.  As of August 7th, you**

9    **were not aware other than the**

10   **pistol-whipping, the felonious assault**

11   **situation that you've described, of any**

12   **confirmed by law enforcement acts of violence**

13   **by Meyer, correct?**

14        A.    I'm not sure.  I don't remember

15   his entire criminal history.  I don't

16   remember if there was violence previous,

17   maybe when he was younger.  So I'm not sure

18   about that, so I don't want to say yes or no

19   to that.

20        **Q.    But nothing comes to mind as you**

21   **sit here, right?**

22        A.    No.  The things that came to

23   mind, the reason that I believed that he was

24   such a danger was because of the threats he

25   had made to individuals, and the fact that he

```
 1    was using guns.

 2                    I believe there was also a

 3    threat to take out, for lack of a better

 4    term, other drug dealers, and that type of

 5    thing.  There was information -- the

 6    information was being given to me by my

 7    officers who had done several -- a lot work

 8    on this case.

 9         Q.    Those alleged threats by Meyer,

10    they were being reported by sources and not

11    directly from Meyer himself, right?

12         A.    I never spoke to Mason Meyer, if

13    that's what you're asking me.

14         Q.    And you didn't have any

15    recording of him saying any of those

16    purported threats, right?

17         A.    No, ma'am.

18         Q.    What, if any, criminal charges

19    against Meyer were you aware of within the

20    four years preceding August 7th, 2020, when

21    this operation commenced on that day?

22         A.    I'm not sure, ma'am.  I just

23    said that I don't remember his criminal

24    history.

25         Q.    At the time -- strike that.
```

```
 1                    Okay.  So on August 7th then,
 2     you said you spoke to Lanter.  You did that
 3     in person at Marshall and Central Parkway?
 4          A.    I believe so, yes, ma'am.
 5          Q.    You talked to him any other
 6     times that day?
 7          A.    (Coughing.)  I apologize, that
 8     came out of nowhere.
 9          Q.    You're fine.  That happens to
10     all of us.
11          A.    I apologize.  I'm sorry, ma'am,
12     what were you asking?
13          Q.    Did you speak to Lanter any
14     other time on August 7th before the pursuit
15     began other than that conversation at
16     Marshall and Central Parkway?
17          A.    I know we spoke on the phone.
18     We probably passed each other again.  And
19     when Sergeant Lanter -- or Lieutenant Lanter
20     and I would try to touch base with each
21     other, especially on a long day like that.
22               I know at one point he was
23     contemplating letting his people go.  And I
24     asked him to keep them there, at least for a
25     little bit longer.  We hadn't had the
```

Deposition of Sergeant Donald Scalf                                      Jason Laible, et al., vs. Timothy Lanter, et al.,

1    phone -- the phone warrant up yet.

2                    And we did -- so we didn't have

3    a location from the phone yet.  And I asked

4    him to stick around to -- at least to see if

5    that was going to -- to work, and eventually

6    it did.

7          Q.    And when you say his people, is

8    that members of the Gang Unit?

9          A.    Yep.

10         Q.    And so you said you asked him to

11   stick around, right?

12         A.    Yes.

13         Q.    You didn't order him to do that,

14   did you?

15         A.    Oh, no, ma'am.

16         Q.    And that's because he wasn't a

17   person you could give orders to, right?

18         A.    Well, no, ma'am.  And -- no,

19   ma'am.

20         Q.    Okay.  So do you recall the

21   topics of your conversations during those

22   phone calls or otherwise touching base in

23   person over the course of August 7th?

24         A.    Mainly, they're gonna be about

25   the incident.  Have we heard anything?  Do we

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    know when the ping's getting up?  I had asked

2    him who he's got there.  He'd tell me who's

3    leaving.

4                I don't remember actual names

5    that were given or answers to things, but it

6    was all general information regarding the

7    operation itself.

8            Q.    And did you convey to him any

9    additional information about Mason Meyer's

10   character or history?

11           A.    I'm sure we discussed it, but I

12   don't remember specifics.

13           Q.    Okay.  Did you talk to Harper or

14   Thomas on August 7th?

15           A.    I don't recall.  I really don't.

16   And I've been racking my brain on that one,

17   but I don't remember if I spoke to them or if

18   him or sergeant -- or Lieutenant Lanter did.

19           Q.    All right.  So walk me through

20   where you were starting from the morning of

21   August 7th up until the point the pursuit

22   began?

23           A.    You mean once we were in the

24   field?

25           Q.    Yes.

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    We started off on the De Votie

2    location.  I would have been on -- on

3    Marshall at Central Parkway.  I would -- I

4    remember going up and around the house.  I

5    remember going on the side streets.  Of

6    course, took breaks here and there.

7                I want to say it was 2:30 or

8    three o'clock when we actually got

9    information that the -- the ping had been --

10   was up and that it was -- it was showing a

11   location over on -- over in Lower Price Hill,

12   Steiner -- I believe on Steiner.

13               So we then moved our

14   surveillance and everything to Steiner

15   Avenue.  I think we may have kept somebody on

16   De Votie just in case.

17               I believe this was a new phone,

18   if I'm remembering correctly.  So we wanted

19   to keep somebody either near De Votie or

20   close just in case this was somebody.

21               When we got there, I believe I

22   took position.  I took a couple of different

23   positions when I was on the side streets.  I

24   believe I ended up in a parking lot near

25   State -- State and I believe that's

1    Fairbanks.  And that's -- I mean, what else

2    are you asking me?

3         Q.    Were you at that location you

4    said near State and Fairbanks --

5         A.    Uh-huh.

6         Q.    -- when the pursuit began?

7         A.    So I was there -- no.  So I was

8    there for a while, and then we got the

9    information that somebody resembling Meyer

10   was out.  We heard the information on the

11   radio regarding a possible rifle.

12              I believe we got confirmation

13   that it looked like there was a rifle in the

14   vehicle, that somebody that looked like

15   Mason Meyer had -- was around the vehicle.  I

16   don't believe we knew who got into the

17   vehicle.

18              Therefore, we were unable to

19   stop the car before it got off of Steiner

20   because we could not confirm that Mason Meyer

21   was in the vehicle.

22              And then Sergeant Lanter -- I

23   began to try to follow on State Avenue, but I

24   was a little bit behind.  So then I kind of

25   followed the pursuit from a distance.  I

Deposition of Sergeant Donald Scalf

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    couldn't see the pursuit, but I was --

2    started off on State.

3         Q.    Okay.  And so you were on State

4    at the time the pursuit began?

5         A.    When the traffic stop was

6    initiated, yes, ma'am.

7         Q.    At the time that there was this

8    report that someone resembling Meyer had come

9    out of the house and it was possible he had a

10   rifle, were there reports of any other

11   firearms visible at that time?

12        A.    I don't know if there were any

13   visible.  I know that we had had reports that

14   his girlfriend who -- there was a female near

15   the car that was always armed.  And we were

16   also getting reports that there were -- that

17   he was always armed with a handgun as well.

18             Do I recall if we saw a handgun

19   on him?  I don't -- I know that we saw the

20   rifle and there was a third individual.

21        Q.    The rifle, you didn't actually

22   see the rifle itself, did you?

23        A.    I didn't see anything.  I know

24   one of my officers did.  He saw him open it

25   up like he was attempting to sell it to

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    another individual, and I believe that he

2    came over and said he saw a rifle.

3         Q.    And that rifle was initially

4    inside a case and then back in the case after

5    it was viewed, right?

6         A.    Yes.

7         Q.    And no other firearms were

8    actually seen at this time, correct?

9         A.    Not to my knowledge.

10         Q.    And you said you were on State

11    at the time the pursuit began.  Where exactly

12    on State were you, if you recall?

13         A.    Fairbanks.

14         Q.    So at State and Fairbanks is

15    where you were?

16         A.    There's a parking lot.  I can't

17    remember where it was.  It's right there.

18    And it may not even be Fairbanks, but there's

19    a parking lot right there at the corner of

20    State and Fairbanks, which is gonna be west

21    of Steiner.

22         Q.    And so you were very close to

23    the residence where Meyer had been, correct?

24         A.    A couple streets over, but, yes,

25    close enough.

1   Q.    Okay.  Do you know if any

2   officers present during this operation had

3   stop sticks in their vehicles?

4        A.    We all did, at least the TFOs

5   did.  I know I did as well.

6        Q.    And do you know if any of the

7   other CPD officers present had stop sticks?

8        A.    Are you talking about the task

9   force officers?

10       Q.    No, just Cincinnati officers.

11       A.    I'm not sure.  I know that my

12  task force officers did, who were Cincinnati

13  Police officers.  I would -- I would assume

14  that they -- the other officers did as well.

15  I wasn't able to deploy mine due to the fact

16  that we couldn't confirm who was in the

17  vehicle.

18       Q.    Stop sticks can be used on any

19  roadway, right?

20       A.    Yes, ma'am.

21       Q.    And they can be laid across any

22  roadway that a vehicle that should be stopped

23  is traveling on, right?

24       A.    I'm not sure what you're asking

25  me.  But, I mean, can we put them on any

Deposition of Sergeant Donald Scalf

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    road?  Yes.

2           Q.    And it's true the River Road has

3    long stretches where there are not side

4    streets that can be turned onto, right?

5           A.    I mean --

6                 MR. HERZIG:  Objection.  You can

7    answer.

8           Q.    In your opinion, is that

9    accurate?

10          A.    I'm not sure what you're --

11   does -- from Steiner to -- is there a long

12   stretch?  So there's a couple little side

13   streets, but not many.

14          Q.    And that's a location where stop

15   sticks could theoretically be used, right?

16          A.    You'd have to be in front of the

17   vehicle.

18          Q.    Okay.  So you didn't order this

19   pursuit to commence, did you?

20          A.    What do you mean?

21          Q.    You didn't issue an order saying

22   commence pursuit, correct?

23          A.    That's not the way it works,

24   but, no, ma'am, I did not.

25          Q.    And during the course of the

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      pursuit, where were you?

 2              A.    I was behind the pursuit trying

 3      to travel in a similar -- similar route that

 4      Sergeant Lanter was -- or Lieutenant Lanter,

 5      not -- very, very far behind.

 6              Q.    And you were following the

 7      locations being communicated over the radio,

 8      right?

 9              A.    Yes.

10              Q.    And when you say not very far

11      behind, what do you mean?

12              A.    No, I said very far behind.

13              Q.    Oh, you were very far behind?

14              A.    Yes, ma'am.

15              Q.    So you couldn't see Lanter's

16      vehicle during the pursuit?

17              A.    No, ma'am.

18              Q.    Could you see Thomas' vehicle

19      during the pursuit?

20              A.    No.

21              Q.    Did you see Harper's vehicle

22      during the pursuit?

23              A.    No, ma'am.

24              Q.    And so, of course, then you

25      couldn't see Meyer's vehicle, right?
```

```
 1          A.    No, ma'am.

 2          Q.    And so over the course of the

 3   pursuit, officers who were involved in the

 4   pursuit were communicating over a CPD radio

 5   channel, right?

 6          A.    Yes, ma'am.

 7          Q.    And what channel was that?

 8          A.    Three, and then we may have

 9   changed to 1, maybe.

10          Q.    Okay.

11          A.    I believe that's correct.

12          Q.    Three, is that the encrypted

13   channel?

14          A.    No, that's 3C.  I believe we had

15   started off on 3C for the operation.  And

16   then moved over to 3 for the traffic stop for

17   the subseq -- yeah, English -- pursuit.

18          Q.    And you said you switched to 3

19   for the traffic stop?

20          A.    Yes.

21          Q.    And so it was Lanter who

22   initially followed the vehicle to conduct the

23   traffic stop, right?

24          A.    Yes.  I believe there was

25   another car with him, but I don't recall who
```

Deposition of Sergeant Donald Scalf

Jason Laible, et al., vs. Timothy Lanter, et al.,

1 it was, if it was Officer Thomas or not.  I

2 was close enough when they started to try to

3 initiate the pursuit that I could see them.

4     And then as soon as they

5 initiated the pursuit, I could no longer see

6 them going up the hill.

7   **Q.    And where was that specifically,**

8 **you said going up the hill?**

9   A.    I believe -- so they took a left

10 onto State, and then I think they went up

11 Maryland.  I lost them when they left --

12 turned left on State.  I don't know where he

13 tried to initiate the stop.  I don't recall.

14   **Q.    During that period of time from**

15 **the time the vehicle with Meyer left that**

16 **house on Steiner to when the pursuit began,**

17 **do you know where the other officers present**

18 **for this operation were located?**

19   A.    We had some on Steiner still

20 and -- maybe, I'm not sure.  We had others on

21 River Road in both directions.  I'm trying to

22 remember.  I'm sure we had a few on side

23 streets, like where I was to start with.

24     We tried to have the street kind

25 of surrounded, for lack of a better term.

Deposition of Sergeant Donald Scalf                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    But because we couldn't confirm who was in
 2    the vehicle, we were unable to stop the --
 3    stop the vehicle once it got onto River Road
 4    from Steiner.
 5         Q.    And why did that prevent you
 6    stopping the vehicle?
 7         A.    I mean, it didn't prevent us
 8    from stopping.  We were able -- we were
 9    unable to stop it on Steiner.  At that point,
10    we had to make a decision.  We were gonna let
11    it off Steiner.
12              We were trying to get
13    information on whether or not he was -- who
14    the driver was.  We knew the case was in the
15    car, so we wanted to be as safe as possible.
16    Because we didn't know if we would have, say,
17    stopped at that point, it could have been a
18    safety issue as well.
19              So at this point, if he was not
20    in the vehicle, we were hoping to make a soft
21    stop down the street, kind of away from the
22    house.  So if Mr. Meyer was at the house, he
23    wouldn't have known that we had stopped that
24    vehicle when it left.
25         Q.    When you say a soft stop down
```

1    the street, you mean down Steiner?

2         A.    No, no, no.  Down River Road,

3    away from the house.

4         Q.    Okay.  So going back to the

5    radio then, Lanter was active on that

6    Channel 3 at the point in time that the stop

7    was going to be commenced, correct?

8         A.    Okay.  We're talking about --

9    okay.  On Channel 3 or 3C, which one are we

10   referring to, 3?

11        Q.    Three.

12        A.    Yes.  I believe he flipped over

13   to 3 and began saying that he was following

14   the vehicle and was gonna try to stop it.

15        Q.    And so Lanter initiated the

16   pursuit then?

17        A.    He tried to initiate the traffic

18   stop and then the pursuit, yes.

19        Q.    And during that pursuit, Thomas

20   joined as a secondary vehicle, right?

21        A.    Yes, at some point.  I'm not

22   sure if it was immediate or not.

23        Q.    And Lanter authorized Harper to

24   join as well?

25        A.    Yes.

```
 1          Q.    And during this pursuit, Lanter

 2   also authorized wrong way driving on a

 3   one-way streets for the officers, right?

 4          A.    That is correct.

 5        (Exhibit 38 was referenced.)

 6   BY MS. GREENE:

 7          Q.    Okay.  So I'm gonna show you

 8   what was previously marked as Exhibit 38.

 9              MR. HERZIG:  Thirty-eight?

10              MS. GREENE:  Yes.

11   BY MS. GREENE:

12          Q.    Okay.  I'm handing that to you

13   now.  Have you ever seen this document

14   before?

15          A.    I'm not sure.  I don't believe

16   I've seen it, but they may have shown it me

17   during my interview at Internal.  I don't

18   recall.

19          Q.    Okay.  Well, I'll represent that

20   this a document produced to the plaintiffs in

21   this case by the City.

22          A.    Okay.

23          Q.    And this is a write-up of the --

24   the radio traffic --

25          A.    Okay.
```

Deposition of Sergeant Donald Scalf                        Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    -- as I understand it during the
 2    pursuit.  Does that look accurate to you as
 3    you review this document?
 4          A.    I believe so, yes.
 5          Q.    Okay.  And so during the course
 6    of this pursuit, I see about five bullet
 7    points down a statement, 7650, if you don't
 8    have an OIC, I'm on it.  Do you see that?
 9          A.    7650, yes, ma'am.
10          Q.    Is that something you said on
11    the radio during the pursuit?
12          A.    Sounds like something I would
13    say, and I do remember saying that I was
14    gonna be the OIC.
15          Q.    And when you were saying this,
16    you were talking to Lanter, right?
17          A.    No, ma'am, I was talking to the
18    dispatcher.
19          Q.    Who was -- okay.  The dispatcher
20    at Cincinnati Police?
21          A.    Yes.
22          Q.    Okay.  And then as I view this
23    document, it looks as though a handful of
24    lines later there's a question to you,
25    Don Scalf, we're going to Kentucky if he
```

Deposition of Sergeant Donald Scalf
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    goes.  And you say, Affirmative, right?

2          A.    Correct.

3          Q.    And then another handful of

4    lines down, Lanter says, He's in the

5    three-lane, 5th Street Exit, I'll advise

6    which way he's gonna go.  Cutting to 71

7    North.  He's going to Kentucky.

8          A.    Sorry.  I cannot find that one.

9          Q.    Yeah.

10         A.    I'm really not seeing what you

11   just said.  Is it written on here?

12               MR.  HERZIG:  It says he's in

13   lane three, you said --

14               THE WITNESS:  Okay.

15   BY MS. GREENE:

16         Q.    And in response then, the next

17   thing you say is, Kentucky has been advised,

18   correct?

19         A.    Yes.

20         Q.    And so you're asking that

21   question at that point, right?

22         A.    Yes.

23         Q.    And then carrying on through

24   this, right, about the radio traffic, I don't

25   see any other statements from you on the

1    radio until the next page; is that correct?

2         A.    Didn't know there was a next

3    page, so that sounds right.  That looks

4    right.

5         Q.    And then it looks to say that

6    the next thing you do is ask the question, Do

7    we have any District 1 or traffic cars who

8    can get up on the Big Mac Bridge, right?

9         A.    Okay.

10        Q.    And that is, as far as this

11   record goes, the entirety of your statements

12   on the radio during this pursuit, right?

13        A.    Okay.

14        Q.    Is that what you remember?

15        A.    That seems accurate.

16        Q.    And, of course, we can compare

17   this to the actual recording of the radio

18   transmissions.

19              But as far as you sit here

20   today, you don't remember saying anything

21   else other than what we've looked at here and

22   identified as your statements in Exhibit 38,

23   right?

24        A.    That's correct.  I tried to get

25   on the radio a few times, several times.

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    When two people are trying to talk at the
 2    same time, you get a sound.  We call it
 3    bonking.  It's a really annoying sound.
 4              So I know that happened.  And at
 5    that point, I was going -- I decided to just
 6    lay off and listen and try not to interfere
 7    with the officers who were -- actually had
 8    sight of the vehicle.
 9         Q.    And that was Officer Lanter,
10    right?
11         A.    Uh-huh.
12         Q.    And that's a yes?
13         A.    Yes, ma'am.  I'm sorry.  I
14    apologize, ma'am.
15         Q.    And was that also
16    Officer Thomas?
17         A.    I don't believe -- yeah, it
18    could have been.  I knew that we had a
19    primary and a secondary.  I just wanted to
20    listen to them speaking.
21              And then I knew that we had two
22    channels going, I don't remember if we had an
23    ATF channel going or not, but I do know that
24    at some point -- it's in here, 7660, We have
25    a device we're tracking.  It's moving along
```

```
 1    with this vehicle in the pursuit, copy?

 2                    That was on another radio

 3    channel as well.  So I was wanting that to

 4    get over to -- to Channel 3.  I believe that

 5    was either on the encrypted channel or it may

 6    even have been on ATF.

 7                    Because I had two channels going

 8    and an ATF radio, and I don't remember which

 9    ones did what.  But I know that I was trying

10    to limit my -- my traffic on air.  So that

11    those who were actually involved in the

12    pursuit had more.

13            Q.    Had more --

14            A.    More freedom.

15            Q.    Yeah.  Their dead air that they

16    could communicate what they needed to?

17            A.    Yes.

18            Q.    That they could convey important

19    factors about the circumstances of the

20    pursuit?

21            A.    Correct.

22            Q.    They could relay safety risks or

23    danger -- dangerous events if they occurred?

24            A.    Yes.

25            Q.    And that they could convey
```

1    information that would be essential to

2    maintaining the safety of the pursuit, right?

3         A.    Right.  Any information.  Any

4    information that they needed, that they

5    deemed important at that time.  And that's

6    why I usually try to lay off the air, when

7    I -- if I can.

8         Q.    And that's to allow those

9    officers engaged in the pursuit to

10   communicate on the radio all of those factors

11   we talked about earlier as being necessary

12   and required to report by officers in

13   pursuits, right?

14        A.    Yes, ma'am.

15        Q.    During a pursuit, you didn't

16   give any orders, correct?

17        A.    I believe I had a couple

18   questions, but I gave no orders, no, ma'am.

19        Q.    And you didn't authorize any

20   particular type of driving, right?

21        A.    So that specific one I know for

22   a fact that I went to come over and I was

23   unable to.  And that was for the one-way once

24   Lieutenant Lanter came over and said that

25   he's going down the one-way, I tried to come

1    over and say that's approved.  But I believe

2    that as I was doing that, he even said he was

3    giving permission, I believe, something to

4    that effect.

5              But I do know that I was trying

6    to give permission for that, but I couldn't,

7    and I was started to get a little frustrated

8    with that.

9         Q.    You didn't authorize driving at

10   any particular speed, right?

11        A.    I'm sorry?

12        Q.    You didn't authorize driving at

13   any particular speed, right?

14        A.    No.

15        Q.    And, in fact, you weren't aware

16   of speeds during this pursuit, were you?

17        A.    I don't remember him

18   broadcasting them, no, ma'am.

19        Q.    And you didn't ask about speeds,

20   did you?

21        A.    I didn't.  And, once again, once

22   I was the having issues from the beginning of

23   getting on the air, I kind of just laid low.

24   And I have worked with Lieutenant Lanter

25   several times, and I trusted him to give me

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the information that was needed.

2           Q.    At the point in time that you

3    said you just started laying low, where was

4    that in the pursuit?

5           A.    Probably going to be --

6    definitely when I got -- it's gonna be after

7    I got the Kentucky has been advised because

8    at that point, felt like he might going into

9    Kentucky.  We had had -- I believe at some

10   point we had confirmed that he was -- yes.

11          Q.    Okay.  So when you asked that

12   question, Kentucky has been advised, correct,

13   it's after the fact that you were laying low?

14          A.    Yeah.  And at no point during it

15   was I trying to be -- trying to have my voice

16   heard on the radio.  That's not the time or

17   place for that.  I tried to allow the

18   officers to do what's needed.

19               But once that -- and I believe

20   that the radio traffic became fairly

21   continuous after that.  I don't remember any

22   real long stretches of silence.  And like I

23   said, I was listening to two different

24   radios.

25          Q.    You did not order the

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    termination of the pursuit while it was

2    ongoing, correct?

3          A.    No, ma'am.

4          Q.    And you didn't raise the

5    possibility of terminating it, did you?

6          A.    No, ma'am.

7          Q.    You trusted Lanter to make that

8    determination?

9          A.    Not just that.  Like I've told

10   you before, this was an individual that

11   apprehension was of a very high importance.

12         Q.    Did you trust Lanter to

13   terminate the pursuit if it became necessary?

14         A.    I did.

15         Q.    You expected him to do that,

16   right?

17         A.    If it was necessary.

18         Q.    And if it the became dangerous

19   to the point where continuing the pursuit and

20   the benefits of that did not outweigh the

21   risks of safety to the public, you expected

22   Lanter to terminate the pursuit, right?

23         A.    I got most of your question in

24   the beginning.  I just didn't understand.  I

25   couldn't -- I couldn't hear you.  So if you

1   could just re-ask the question, again, I'd

2   appreciate it.

3        Q.   Sure.  You expected Lanter to

4   terminate the pursuit if the risks to the

5   safety of -- of persons outweighed the need

6   to apprehend Meyer, right?

7        A.   Yes.  The safety -- I believe

8   that Mason Meyer was a safety risk, no matter

9   what.  So, yes, I believe he would have

10  terminated the pursuit if they outweighed it,

11  yes.

12       Q.   Was there a commitment by any

13  agency to arrest Meyer no matter what

14  happened on August 7th?

15       A.   There's never a no matter what,

16  ma'am.  We do want to make sure everybody is

17  the safest as humanly possible.  That being

18  said, he was -- what we could do to put him

19  in custody that day was going to be done as

20  safely as possible.

21            He was -- he was a man who we

22  knew was dangerous.  At this point, we knew

23  he was in the vehicle.  At this point, he --

24  we knew there was a rifle.  We believed there

25  may have been other -- other guns in the

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    vehicle.
 2              Therefore, at any time could he
 3    have stopped and began to open fire on police
 4    or other innocent people, so, yeah.
 5         Q.    Arresting Meyer, was it worth
 6    the death of two people and injuries to two
 7    others?
 8         A.    Ma'am, I'm never gonna say
 9    something like that.  I'm not even gonna --
10    the death of anybody is tragic.
11         Q.    And if on that day you had been
12    faced with the prospect of the death of two
13    people and injuries of two others versus
14    letting Meyer get away, based on your
15    understanding of the CPD pursuit policies and
16    practices, what would have been the correct
17    decision?
18              MR. HERZIG:  Objection.  That's
19    not even a fair question.  You can answer it
20    if you want.
21         Q.    Go ahead.
22         A.    Ma'am, my belief was -- can you
23    ask it again?  Because I had an answer and
24    then my brain got fried.  Can you ask it
25    again, ma'am?
```

Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Sure.  If you'd been faced with

2    the death of two people and injury to two

3    others versus letting Meyer get away and

4    apprehending him at a later time, based on

5    your understanding of CPD policies and

6    procedures, what is the correct decision?

7              MR. HERZIG:  Same objection.  Go

8    ahead.

9      A.    And, ma'am, there is no crystal

10   ball that would have told me that more deaths

11   didn't occur if we didn't apprehend him.  So

12   that question, I'm not gonna say --

13   apprehending him, compared to death,

14   that's -- ma'am, no.

15     Q.    What you all knew about him --

16   about Meyer at the time, did not justify

17   arresting him even if other people were

18   likely to die or be seriously injured, right?

19     A.    I'm not gonna agree with that,

20   ma'am.

21     Q.    You had no information at the

22   time establishing that Meyer presented an

23   imminent threat of physical harm to any other

24   person if he was not apprehended during this

25   specific pursuit, correct?

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            A.    No, ma'am.

 2                  MR. HERZIG:  Objection.

 3            Q.    The ATF Operational Plan

 4      associated with these events, you were aware

 5      of it prior to the beginning of the pursuit,

 6      right?

 7            A.    Yes, ma'am.

 8            Q.    It included a contingency that

 9      would lead to terminating the operation if

10      dangerous circumstances arose, right?

11            A.    What do you mean?

12            Q.    If the ATF plan contemplated

13      terminating the operation if there was a

14      danger to rather -- strike that.

15                  The ATF plan included a

16      contingency for aborting the operation if

17      circumstances changed to make the arrest too

18      difficult or too dangerous, right?

19                  MR. HERZIG:  Objection.  Do you

20      want him to take a look at it?

21            Q.    I'm asking are you aware of

22      that?

23            A.    If you want me to look at it, I

24      will.

25            Q.    Sure.  Let's look at the
```

```
 1   Operational Plan --
 2          A.    Sure.
 3          Q.    -- which I believe you may have.
 4          A.    This is the procedure, and then
 5   this my training record.
 6          Q.    Okay.
 7          A.    And then this is the radio
 8   transmissions.
 9       (Exhibit 26 was referenced.)
10   BY MS. GREENE:
11          Q.    All right.  I'm handing you what
12   has been previously marked as Exhibit 26.
13              Okay.  The plan included a
14   contingency to abort the operation if at any
15   time information or activity developed
16   indicating that the operation ha been
17   compromised and/or safety of the
18   participating personnel or the public was at
19   risk, right?
20          A.    Oh, what page are you looking
21   at, ma'am?
22          Q.    This is the one that's stamped
23   799 at the bottom.
24          A.    Okay.  Yeah, I see at the top,
25   Contingency Plans.
```

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.      In the section called Abort?

2      A.      Okay.  Here we go.  That's

3  usually -- that's usually related to if

4  information gets out that puts -- puts

5  officers in more of a -- if you're talking

6  about -- I believe you're asking would it be

7  more -- if it gets too dangerous, yes.  But

8  this is more referring to if the operation

9  itself becomes compromised.

10     Q.      And was it your understanding at

11 the beginning of this operation that if it

12 became dangerous to the public, that it

13 should be aborted?

14     A.      The danger level, when you say

15 if the operation itself was dangerous, so the

16 level of danger we have to weigh on the

17 apprehension of Mr. Meyer.

18     Q.      Did you ever hear anyone from

19 the ATF say we have to arrest this guy today,

20 no matter what?

21     A.      That's not the way this works,

22 ma'am.

23     Q.      Well --

24     A.      The way that we try to do it is

25 if we have an opportunity to arrest an

Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   individual, as dangerous as he was, then
 2   that's what we're gonna try to do.
 3           Q.    Did you hear anyone at the ATF
 4   say at any time something along the lines of
 5   communicating that we have to arrest
 6   Mason Meyer today, no matter what?
 7           A.    I've never heard anybody say
 8   that, ma'am.
 9           Q.    And you've never heard anybody
10   at the Northern Kentucky Drug Strike Force
11   say that to you -- that either, right?
12           A.    I've never heard that said about
13   any individual, even a homicide suspect.
14           Q.    And that's because that
15   commitment to arrest somebody on that day at
16   that time can only be necessary if they're
17   about to commit some act of violence against
18   other people, right?
19           A.    Even in --
20                 MR. HERZIG:   Objection.   Go
21   ahead.
22           A.    I'm sorry.   Even in the
23   situations you just -- you can't say that I
24   would do that no matter what.   You can't work
25   and we don't -- the generalization of this
```

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    has to happen or this must do this, we

2    can't -- that's not the way we work.

3              We have to continuously weigh.

4    And, unfortunately, this was a -- this was a

5    very tragic incident that -- that we had to

6    make decisions with.

7         **Q.    Meyer had been under**

8    **surveillance for some time before August 7th,**

9    **correct?**

10        A.    What do you mean by some time,

11   ma'am.

12        **Q.    Going back into at least July of**

13   **2020, he had been surveilled by various law**

14   **enforcement agencies, correct?**

15        A.    I know that we had done it the

16   week before, so I guess that was July.  And

17   we lost him that day.  And then I believe he

18   committed crimes during the week -- during

19   that week as well.

20              So I know that at this point, we

21   garnered the new information that he had the

22   inoperable brain tumor, all the information

23   that we received made him very dangerous in

24   our minds.

25        **Q.    Law enforcement agencies have**

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     been able to continually locate and relocate

2     Meyer over the course of at least a week, if

3     not longer by the time of the August 7th

4     operation, right?

5              MR. HERZIG:  Objection.  You can

6     answer.

7         A.    I don't know.

8         Q.    Well --

9         A.    I know that we didn't locate him

10    on the week before.  We thought we had him in

11    a car, and he wasn't there.  And I know that

12    we thought that he was on De Votie Avenue

13    that afternoon -- that morning and afternoon,

14    and he wasn't there.

15              So we had been unable to locate

16    him twice.  Once the ping came through is

17    when we moved, and we weren't even confirmed

18    it was Meyer until we actually had a car

19    stopped and the vehicle was moving with a

20    phone in it.

21        Q.    His identity was known, right?

22        A.    Yes, ma'am.

23        Q.    And he had been seen at various

24    locations over the course of the preceding

25    weeks by law enforcement agencies, right?

```
 1              A.    Don't know.   Not by me -- not by

 2     us.   I know that during the week that we

 3     looked for him up until that following

 4     Friday, I don't believe anybody had any

 5     contact with him.

 6              Q.    When you say "us," does that

 7     include all the agencies involved in the

 8     operation on August 7th?

 9              A.    Specifically, my officers and

10     the ATF agents.

11              Q.    What about other agencies, were

12     you aware --

13              A.    Not to my knowledge.

14              Q.    -- that they had had --

15              MR.  HERZIG:  Let her finish.

16              THE WITNESS:  I know.  I know.

17              Q.    Were you aware that other

18     agencies had been surveilling and

19     investigating Meyer in July of 2020?

20              A.    Now I'm gonna answer.  Yeah, I

21     know that we -- there had been other places

22     who -- or other agencies, including the

23     Northern Kentucky Strike Force, but what

24     other agencies had contact with him or saw

25     him, I'm not sure.
```

1      Q.    Northern Kentucky Strike Force

2   was involved in the August 7th events, too,

3   right?

4      A.    Yes.

5      Q.    And given what you knew about

6   those events prior to August 7th and Meyer's

7   contact with law enforcement over that time,

8   there was nothing indicating to you that he

9   couldn't have been found again on a

10   subsequent day, right?

11      A.    That's not right.  No, ma'am.  I

12   know that we didn't locate him on that Friday

13   before.  I don't know if he had any contact

14   with anybody in between there.

15           I know that we had located him

16   that day, and we had heard that he was

17   committing violent felonies, that he was a

18   violent individual.  And so I don't know if

19   he could have been located after that day or

20   not.

21      Q.    There was nothing indicating to

22   you that it would not be possible, right?

23      A.    There was nothing indicating

24   that it would be possible, ma'am.  I don't

25   know.

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Do you recall any statement by

2   Frank Occhipinti about the possibility of

3   him -- of Meyer being located on a later day

4   or time?

5      A.    No.  I don't recall one.

6      Q.    You don't dispute that he made

7   such a statement if he says he did, do you?

8              MR. HERZIG:  Objection.  It's

9   not in the record, but you can answer.

10      A.    He didn't make that statement to

11   me, if that's what you're asking.  I don't

12   recall him making that statement to me.

13      Q.    If he says he made a statement

14   along those lines, would you dispute the

15   truthfulness of that?

16              MR. HERZIG:  Same objection.

17   You can answer.

18      A.    If you're saying that he said

19   that to me, yes, I dispute that.  I don't

20   recall that, ma'am.

21              MS. GREENE:  Let's go off the

22   record for a few minutes.

23              MR. HERZIG:  Okay.

24     (Off the record.)

25   BY MS. GREENE:

1    Q.    Okay.  We're back on the record.

2          Earlier you testified that prior

3    to the pursuit, there were officers staged in

4    both directions on River Road from where

5    Steiner meets River Road, right?

6          A.    I believe so, yes, ma'am.

7          Q.    And do you recall where they

8    were staged?

9          A.    I believe we had one at the

10   Speedway, which would be east of Steiner, and

11   then I think we had one on the other side of

12   Fairbanks, but I'm not positive exactly

13   where, but that's gonna be west of Steiner.

14         Q.    And do you remember who was at

15   the Speedway?

16         A.    I know that Officer Bode was

17   somewhere west.  I'm not sure where he was.

18   He possibly could have been at the Speedway,

19   but I don't recall exactly.

20         Q.    Do you remember who was on the

21   other side of Fairbanks?

22         A.    I do not.  I knew you were gonna

23   ask that and I had no clue.  I cannot

24   remember.  I'm driving -- racking my brain.

25         Q.    That's okay.  Was it a CPD

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1    officer?
2         A.    I'm not positive.  It could have
3    been one of the ATF agents.  I'm not -- just
4    I'm not positive.
5         (Exhibit 34 was referenced.)
6    BY MS. GREENE:
7         Q.    Okay.  I'm gonna hand you what's
8    previously been marked as Exhibit 34.
9         A.    Okay.
10        Q.    I'm gonna give you this blue pen
11   here for a moment.  For the Speedway you just
12   referenced, could you draw a blue square
13   approximately where that's located on the map
14   on page 1 of this exhibit?
15        A.    (Witness complies.)  Like, where
16   the little dot is, right?  Draw a blue square
17   where the dot is?
18        Q.    Yeah.  Where -- where the
19   officer would have been staged at the
20   Speedway?
21        A.    Oh, it's just gonna be somewhere
22   in that lot.  I'm not for sure.
23        Q.    Okay.  And you made a blue
24   square there?
25        A.    I did, right below the dot.
```

1        Q.    Okay.  And then for the other

2  side of Fairbanks, is that area visible on

3  the map that you have in front of you as

4  well?

5        A.    So I'm gonna -- if I could, this

6  was a while ago, but I believe that I was --

7  I told you that I was at Fairbanks and River

8  Road, I believe I was in a parking lot at

9  Delhi and River Road, now that you showed me

10  this.

11        I think the parking lot is right

12  here (indicating), if that matters.

13        Q.    Okay.  You just made a tiny X,

14  right?

15        A.    Yep.  I just made a little V

16  right there (indicating).

17        Q.    Oh, a little V.  Can you write

18  your name next to that mark?

19        A.    Sure.  (Witness complies.)  How

20  about we make the V, DHS.  Does that work,

21  DHS?

22        Q.    Sure.  As in your initials,

23  right?

24        A.    And then I believe that it's

25  gonna be on the other side.  There's a park

1    here, and I believe there was some type of --

2    I think it was like in this area here

3    (indicating), but I'm not positive exactly

4    where the other car was.  It's gonna be

5    somewhere in this park.

6              **Q.    Okay.**

7              A.    Does that help you?

8              **Q.    Okay.  So you drew another blue**

9    **square --**

10             A.    I did.

11             **Q.    -- around the area of the park**

12   **to the west of Steiner Avenue --**

13             A.    Yes, ma'am.

14             **Q.    -- on River Road, right?**

15             A.    Yes, ma'am.

16             **Q.    And that's where the other**

17   **officer, or officers --**

18             A.    Yeah, I can't -- yes, ma'am.

19             **Q.    -- would have been staged?**

20   **Okay.  All right.  Thanks.**

21             **Do you know where -- whether**

22   **there were any other officers staged on**

23   **River Road at that time?**

24             A.    We had officers staged every --

25   all over the place.  We had several on

```
 1    Steiner.  We had several on Delhi.  I believe
 2    we had a few more on River, but I'm not
 3    exactly sure where those were.
 4             On that day, I probably could
 5    have given you a little more accurate, but
 6    I'm not positive.
 7        Q.    You said there were also some on
 8    some other side streets; is that right?
 9        A.    So we have Steiner here, so
10    that's where we absolutely had people.  I
11    know that we had somebody on Delhi because I
12    was there for a minute.
13             I think we had somebody on
14    Sedam.  I'm not positive on who it was on
15    Sedam, but I'm pretty sure we had somebody.
16    And I don't know who the -- we had going west
17    of Fairbanks.  I don't remember who they
18    were, but we had people.
19        Q.    Okay.  Were there any side
20    streets where officers were stationed at that
21    time?
22        A.    Nothing up in the Galvin -- I
23    can't remember what the name of the street
24    is, but there was -- not that I know of was
25    anybody up this far, not to my knowledge.
```

1    Q.    Okay.  And when you say up this

2  far, you mean in the area of --

3    A.    Shoot.  I'm sorry.

4    Q.    That's okay.  -- of Galvin

5  Avenue --

6    A.    Right.

7    Q.    -- eastbound on River Road,

8  right?

9    A.    Right.  I don't believe we had

10  anybody that far, and I believe that is just

11  the Shell lot.  I don't recall there being

12  streets there.  There might be, but I don't

13  remember what they are.

14         And I don't remember if we had

15  anybody in the Shell lot.  I would doubt we

16  did, just because it's gonna be difficult to

17  get across River.

18    Q.    Okay.  All right.  I'll take

19  that pen back.  Thanks.

20    A.    Yes, ma'am (handed).

21    Q.    In order to figure out where all

22  these officers were located at the time the

23  pursuit began, how could we do that through

24  documentation, if you know?  Meaning, is

25  there any documentation that would have

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    **established or recorded that information?**

2           A.    I would think it would be the

3    interviews.  Do we have -- the Internal

4    report would be my only question.

5           **Q.    Okay.**

6           A.    Besides that, I wouldn't know.

7    It would having to ask the people that were

8    there --

9           **Q.    Okay.**

10          A.    -- where they were located.

11          **Q.    During this operation, were**

12   **there any -- were there helicopters in use at**

13   **all?**

14          A.    I'm not sure we still had a

15   helicopter back then.  I know we no longer

16   had Nine Henry Ten.  I'm not sure if we even

17   had Nine Henry Ten in there.  If we did now,

18   we'd all have helicopters designed to.

19               The City does not have

20   helicopters.  And I'm pretty sure that the

21   County already got rid of theirs.  But if

22   not, no, we didn't.

23          **Q.    What about drones, did the CPD**

24   **have drones at that time?**

25          A.    They weren't as -- as utilized

1    and as frequent, but I do know that we tried

2    to get one there.  I don't remember what

3    happened with that.

4             But I remember speaking to our

5    drone operator, and he was there, but I don't

6    believe he was able to get his drone up, and

7    I don't know why and I don't remember why.

8         Q.    Who's the drone operator?

9         A.    We have several.  I believe

10   Matt Martin was there.

11        Q.    That's a CPD officer?

12        A.    Yes.

13        Q.    And so you said he was there

14   meaning --

15        A.    I believe he was on scene either

16   at De Votie or on -- on River or Steiner, but

17   I don't recall exactly what time or where I

18   just kind of -- pretty sure I remember seeing

19   him there.

20        Q.    And the request to get a drone

21   there, how is that made?

22        A.    You -- back then, there was

23   several different ways, you could call.  Now,

24   you go over the radio.  Usually going over

25   the radio back then wouldn't have worked

 1    because you never knew when those officers

 2    were working.

 3              Back then, I believe we only had

 4    one or two drones, maybe even one, and

 5    usually had to ask for their help in advance.

 6         Q.    And you said you tried to get a

 7    drone there?

 8         A.    Yes.  And I can't remember if we

 9    did that on that date only, or if it was the

10    day prior.  I don't remember.  I just know

11    that at some point we requested a drone --

12         Q.    And --

13         A.    -- and I don't remember which

14    day.

15         Q.    And what was the purpose you

16    wanted the drone there for?

17         A.    For surveillance purposes.  I

18    would be able to get a better look on Steiner

19    itself, maybe be able to confirm when he

20    exited the vehicle -- I mean, exited the

21    house, I apologize, and out to the vehicle.

22         Q.    And could the drone have been

23    used to follow the vehicle as it departed the

24    Steiner property as well?

25         A.    It could have.

Deposition of Sergeant Donald Scalf                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    You didn't end up with a drone

2   there, though, right, or did you?

3      A.    I don't know.  I don't remember.

4      Q.    Martin was there, though?

5      A.    Yes.

6      Q.    Was his assignment at the

7   time --

8      A.    He was --

9      Q.    -- drone operations?

10      A.    He was in our Intelligence Unit,

11   so he did all types of things.

12      Q.    Would there be any

13   documentation, reports, anything that would

14   have captured any of this communication about

15   drones?

16      A.    Only if you put the drone in

17   flight.  They have to have a flight log, but

18   if he didn't put the drone in flight, then

19   not to my knowledge.

20      Q.    The request wouldn't be written

21   anywhere?

22      A.    (Shaking head negatively.)

23      Q.    Matt Martin, he's not an OCIS

24   officer, is he, at that time?

25      A.    No.  He did some stuff with the

Deposition of Sergeant Donald Scalf                                Jason Laible, et al., vs. Timothy Lanter, et al.,

1    ATF, but I don't believe he was in -- he was

2    not assigned to my unit, no, ma'am.

3         Q.    He was with CPD, right?

4         A.    A CPD officer.

5         Q.    And how was it that he came to

6    be involved in this operation?

7         A.    I don't recall if I called him

8    or somebody else called him.  I don't recall

9    ma'am.

10        Q.    Okay.

11        A.    I apologize.

12        Q.    Okay.  Okay.  Were there any

13   other types of aerial surveillance available

14   at that time?

15        A.    OSP has a plane, but we couldn't

16   have used that for this.  They don't get --

17   they wouldn't have been able to get the view

18   that we need, so, no.

19        Q.    And as you sit here today, you

20   just don't remember whether or not the drone

21   was actually on site, right?

22        A.    Yes, ma'am.  I apologize.  I

23   just don't remember.

24        Q.    That's okay.  I'm just making

25   sure I understand.

Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    Would any of the agencies
 2      involved have helicopter access?
 3              A.     No, ma'am.
 4              Q.     Does Northern Kentucky have one?
 5              A.     Not to my knowledge, but I --
 6      they could, but we didn't use it and I
 7      don't -- I don't know.
 8              Q.     Do you know if they had drones
 9      at that time?
10              A.     I don't know.
11              Q.     Okay.
12              A.     They were fairly new for us at
13      that time.
14              Q.     All right.  At any point in time
15      after the pursuit occurred, did you ever
16      listen to the radio traffic from that day,
17      August 7th?
18              A.     I did.
19              Q.     And what was the context of that
20      listening?
21              A.     I believe to prepare for my
22      Internal investigation.
23              Q.     Who gave it to you to listen to?
24              A.     I believe I listened to it in
25      the Internal office.  It wasn't per se given
```

1      to me.

2                    Those are the type of things

3      that we kind of allow when you're doing an

4      investigation, at least when I was doing

5      them, I would allow the officers to listen or

6      watch anything they needed to watch or listen

7      to.

8           Q.    And did you then view any

9      body-worn camera or cruiser camera?

10          A.    Yes.

11          Q.    And that was before your IIS

12     interview?

13          A.    Yes.  Some of it I saw on the

14     news, too.  That's always fun.

15          Q.    What do you recall seeing on the

16     news?

17          A.    Just the beginning of it, and I

18     remember hearing some of the radio

19     transmissions on the news.

20          Q.    And after that listening to the

21     radio and viewing the BWC and the MVR for

22     your Internal interview, did you view or

23     listen to those items again?

24          A.    I don't believe so.  I don't

25     recall doing it, listening or watching it

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    again.
 2           Q.    Are you aware of any events or
 3    gatherings where this pursuit was used as a
 4    discussion topic or teaching tool within the
 5    CPD?
 6           A.    No, ma'am, I don't know of any.
 7                 MS. GREENE:  Okay.  All right.
 8    I want to go through and mark a few
 9    documents.  And we'll start with Exhibit, is
10    it 51, I think?
11           A.    Do you need these back, ma'am?
12                 MR. HERZIG:  Just leave them
13    there.
14                 MS. GREENE:  You can leave them
15    right there.
16         (Exhibit 51 was marked.)
17    BY MS. GREENE:
18           Q.    All right.  Sergeant Scalf, you
19    have Exhibit 51 in front of you.  Are you
20    familiar with this document?
21           A.    This is gonna be the -- let's
22    see here.  It's gonna be an e-mail that I
23    sent, correct?
24           Q.    And it's an e-mail you sent to
25    Bridget?
```

Tackla Court Reporting, LLC          PH: 216.241.3918                    Page: 174

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Captain Bardua and

 2    Lieutenant Van Horn.

 3              Q.    Okay.  And what units or

 4    sections were they with?

 5              A.    That was my supervisor, so that

 6    was the captain of our -- at the time, she

 7    was the captain of our Special Investigations

 8    Section.  And Lieutenant Van Horn would have

 9    been the lieutenant of our Intelligence

10    Section, which OCIS was a portion of.

11              Q.    Okay.  And the Special

12    Investigations Section and Intelligence

13    Section, those are both CPD sections, right?

14              A.    Yes, ma'am.

15              Q.    And so you're e-mailing them on

16    July 31st, 2020, very early in the morning,

17    right?

18              A.    Too early, yes, ma'am.

19              Q.    And what are you sending to them

20    here?

21              A.    Just that I've always tried to

22    give both of them a heads-up when we would be

23    out in the field because we weren't always

24    out in the field.

25                    That way if we had go do an
```

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 176 of 204 - Page
ID#: 2359
Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    operation or if we were out doing

2    surveillance, or doing anything like that, we

3    would -- we would always notify supervisors

4    just so they knew what we were doing.

5          Q.    Okay.  And here are you

6    describing that event that you talked about

7    earlier about a week or so before the

8    August 7th surveillance operation?

9          A.    Yes, ma'am, I guess the week

10   before was July 31st.

11         Q.    Okay.  And so you've attached a

12   document to this e-mail called

13   Mason Meyer.pdf, right?

14         A.    Uh-huh.

15         Q.    Now, behind the first page of

16   this exhibit is what was attached to that

17   e-mail as far as the way it was produced to

18   us, it's fully redacted, as you can see, but

19   this was given in a public records request.

20              So I'm gonna ask you, do you

21   recall what this Mason Meyer.pdf document

22   was?

23         A.    I was gonna ask you what it was.

24   I'm gonna guess --

25              MR. HERZIG:  I don't want you to

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 177 of 204 - Page
ID#: 2360
Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    guess.

2            A.    Well, I can't -- I don't want to

3    guess, but usually I would send op plans like

4    this.

5                    THE COURT REPORTER:  Send what?

6                    THE WITNESS:  Op, operational

7    plans.

8                    THE COURT REPORTER:  Oh, great.

9    Thank you.

10           A.    But I don't know what this is.

11   BY MS. GREENE:

12           **Q.    Okay.**

13           A.    I can't see it.

14                   MS. GREENE:  Okay.  To counsel,

15   I would request that this attachment be

16   produced unredacted.

17                   MR. HERZIG:  Okay.  I've heard

18   your request.

19                   MS. GREENE:  Thank you.

20                   MR. HERZIG:  This came through a

21   public records request?

22                   MS. GREENE:  Yeah, I believe so

23   pre-litigation.

24                   THE WITNESS:  Is this from my

25   ATF account or from my City account; do we

```
 1    know?

 2                    MR. HERZIG:  I don't know.

 3                    MS. GREENE:  Yeah.  And,

 4    unfortunately, I don't know the answer to

 5    that either.  I just have what we have here.

 6    BY MS. GREENE:

 7         Q.    But in any case, you write here

 8    that Mason Meyer, I believe you're talking

 9    about, right, as quote, our guy, you're

10    calling him?

11         A.    Yes.

12         Q.    And so you say Mason Meyer does

13    have a little bit of a history over here,

14    correct?

15         A.    Correct.

16         Q.    And that's in reference to what

17    you knew about his criminal history at the

18    time, right?

19         A.    The criminal history in Ohio.

20         Q.    Okay.

21         A.    There was more of a history in

22    Kentucky.

23         Q.    You say, Things have not gotten

24    off to the best start this morning.  What was

25    that about?
```

```
 1          A.     I'm gonna assume it had
 2   something to do with the ping ended, but I
 3   don't recall.
 4          Q.     And at the time, you're writing
 5   about Newport's ping ending and T-Mobile in
 6   the process of getting it back up.
 7                 So was it Newport Police who
 8   were pinging Mason's phone at that time?
 9          A.     I know that Newport had an
10   officer on the Strike Force, so I'm -- I
11   don't know if it was Newport, per se, or if
12   it was the Strike Force.
13          Q.     And then you say, I have them
14   and Brett out on Steiner in Lower Price Hill
15   right now trying to lay eyes on him.  Him is
16   Meyer, correct?
17          A.     Yes, ma'am.
18          Q.     And when you say "them," are you
19   talking about the Northern Kentucky Strike
20   Force folks?
21          A.     I believe so.
22          Q.     You say, The rest of my group
23   will be in around 6:30.  Who was the rest of
24   your group?
25          A.     The rest of -- you call them
```

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    OCIS and ATF agents and that type of thing.

2    Those type of officers.

3         Q.    You say, I have a couple of GES

4    cars starting at seven as well, correct?

5         A.    That's gonna be Gang, yes,

6    ma'am.

7         Q.    What's GES?

8         A.    Gang.

9         Q.    The Gang Unit?

10        A.    Yes, ma'am.

11        Q.    CPD --

12        A.    Gang Enforcement.

13        Q.    Sorry.

14        A.    Yes.  Yes, ma'am.

15        Q.    CPD Gang Enforcement Unit?

16        A.    Yes.

17        Q.    Thank you.  Would there be any

18   reports associated with any of these

19   activities generated within the CPD report

20   system?

21        A.    Not to my knowledge.

22        Q.    You say on the last sentence,

23   Sorry, this is a little on the cluster side

24   of things and not the way we like to do

25   stuff.  What are you talking about?

Case: 2:21-cv-00102-DLB   Doc #: 138   Filed: 11/06/25   Page: 181 of 204 - Page
ID#: 2364
Deposition of Sergeant Donald Scalf
Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    I'm guessing a five in the

2     morning e-mail, I probably was supposed to do

3     it the night before.  I usually like to do

4     stuff the night before, so that's what I'm

5     assuming, and the fact the ping wasn't up

6     yet.

7          Q.    Okay.

8          (Exhibit 52 was marked.)

9                MS. GREENE:  All right.  Let's

10    mark this as 52.  Thank you.

11               MS. RUTOWSKI:  Jacqueline, did

12    you mark the training record as 51?  Are

13    we -- are we on the right numbers here?

14               MS. GREENE:  Am I messing up?

15          (Discussion amongst everyone.)

16    BY MS. GREENE:

17          Q.    Okay.  All right.  So you have

18    in front of you Exhibit 52.  Are you familiar

19    with this document?

20          A.    It looks like an e-mail --

21          Q.    E-mail --

22          A.    -- that I sent to

23    Agent Occhipinti.

24          Q.    And you were forwarding him an

25    e-mail from within CPD, correct?

```
 1            A.   Yes.  Yes, I was.  I'm sorry,
 2      but, yes.
 3            Q.   And the e-mail thread that you
 4      forwarded concerns changes, or rather
 5      restrictions, as they're characterized in
 6      this e-mail, on the Gang Unit and the Gun
 7      Crimes Task Force personnel that were put
 8      into place after this August 7th pursuit,
 9      right?
10            A.   I'm just confirming this.
11            Q.   That's fine.  Take your time.
12            A.   Can you ask your question again,
13      just so I know what you're asking?
14            Q.   Yeah.  You're forwarding an
15      e-mail chain to Occhipinti here, right?
16            A.   Yes, ma'am.
17            Q.   And that chain includes an
18      e-mail from David Schofield to Danita Pettis
19      and Michael John, right?
20            A.   Yes, as well as many other -- it
21      looks like there was one from Colonel John as
22      well.
23            Q.   Who's David Schofield at this
24      time?
25            A.   Lieutenant Schofield --
```

1      Q.    Schofield.   Thank you.

2      A.    -- at the time -- at the time,

3  he was the lieutenant of the Gang Unit.

4      Q.    So he oversaw the CPD's

5  Gang Unit?

6      A.    Yes, ma'am.

7      Q.    And then who's Danita Pettis?

8      A.    At the time, she was the

9  captain, I don't know if it was of the

10  Gang Unit, but she was a captain and she had

11  the Gang Unit assigned to her.

12      Q.    And then who's Michael John?

13      A.    He was our colonel at the time,

14  colonel in charge of investigations, I

15  believe, possibly patrol.  I don't remember.

16  He flip-flopped a couple times.

17      Q.    When you say "investigations,"

18  do you mean like detective sections, or do

19  you mean like Internal Investigations?

20      A.    Detectives and stuff like that.

21  Internal Investigations is a different --

22  different area.

23      Q.    Okay.  And so the top e-mail in

24  this chain under your forwarding to

25  Occhipinti is an e-mail from Schofield

1    stating various temporary additional

2    restrictions that he had placed on the

3    Gang Unit and Gun Crime Task Force personnel

4    after the pursuit on August 7th, 2020, right?

5        A.    It looks like I'm sending it

6    just to give Frank a heads-up and saying that

7    Lieutenant Schofield had a good response.

8        Q.    And you're describing the

9    response of Schofield, meaning the e-mail he

10   sent on Thursday, October 15th, 2020, at

11   6:41 p.m. that's included in this exhibit,

12   right?

13       A.    Yes.

14       Q.    And Schofield's response

15   included temporary restrictions on the

16   Gang Unit and Gun Crime Task Force that he

17   had placed after the pursuit on August 7th,

18   2020, right?

19       A.    I'm not going -- I'm just

20   reading.

21       Q.    That's fine.  Take your time.

22       A.    Yes.

23       Q.    And so those additional

24   restrictions included that the Gang Unit and

25   Gun Crime Task Force were not allowed to

Deposition of Sergeant Donald Scalf                                   Jason Laible, et al., vs. Timothy Lanter, et al.,

1    engage in vehicle pursuits unless, 1, they

2    had successfully deployed a stop stick, or

3    the suspect had just committed a violent

4    felony, or we have to assist another officer

5    or agency, and when driving in emergency

6    mode, we will activate our lights and sirens

7    and maintain strict adherence to the speed

8    limit, right?

9              MR. HERZIG:  Objection.  It

10   says also not and, but go ahead.

11        A.    It's just what you read, yes,

12   ma'am.

13        Q.    Okay.  And you thought that was

14   a good response?

15              MR. HERZIG:  Objection.  Go

16   ahead.

17        Q.    That's what you wrote; isn't it?

18        A.    I believe.

19        Q.    In fact, you wrote, damn good

20   response, right?

21        A.    Yes, ma'am.  That's what I said.

22   I believe I'm talking about the entire e-mail

23   in itself.

24        Q.    Okay.

25        A.    And I think that -- I mean,

1    because the response was actually to a

2    Covington chief, I believe, complaining.

3         Q.    Mike Bloemer, the Assistant

4    Chief of Operations and Training --

5         A.    Yeah.

6         Q.    -- for the City of Covington's

7    Fire Department?

8         A.    And I think -- what I'm saying

9    is that Lieutenant Schofield had an excellent

10   response in regards to that complaint that

11   was filed, and I believed, like you said, I

12   said damn good response.

13        Q.    Okay.  Who -- I'm looking down

14   at the next e-mail in the thread, who is

15   James Davis?

16        A.    He is a sergeant within the --

17   he was a sergeant within the Gang Unit at the

18   time.

19        Q.    Okay.  And going to the next

20   e-mail, who's Paul Neudigate?

21        A.    He is retired.  He was a colonel

22   at the time.  He's now the chief of police

23   for Newport, Virginia, Newport Beach, I

24   believe.

25        Q.    At any point in time, did you

Case: 2:21-cv-00102-DLB   Doc #: 138   Filed: 11/06/25   Page: 187 of 204 - Page
Deposition of Sergeant Donald Scalf
ID#: 2370
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    have any conversations with Paul Neudigate

2    about these events at issue in this case?

3          A.    He was in charge of patrol at

4    the time.  I believe he may have been on

5    scene of the accident.  I don't believe I

6    actually had long conversations with him

7    about it, but nothing that I recall.

8          Q.    Did he ever ask you any

9    questions about it?

10         A.    I don't recall him asking me

11   questions about it.

12         Q.    Did he ever provide any

13   information about the facts or circumstances

14   of this operation and pursuit?

15         A.    And he was a -- he was a colonel

16   with us that I -- I could have spoken to him.

17   I don't know.  I would have reported to him.

18         Q.    As you sit here today, do you

19   recall any conversations with him about this

20   matter?

21         A.    I don't.

22         Q.    Were you aware of any meetings

23   he convened among assistant chiefs and/or

24   captains about this matter?

25         A.    I don't -- no, not specifically.

1    He -- that's what they did.  That's what they

2    do, they convene meetings.  That's

3    supervising.  So I don't -- I don't know of

4    anything specifically.

5         Q.    Had you heard about any meetings

6    specifically about this pursuit among chiefs,

7    assistant chiefs, and/or captains?

8         A.    I don't recall, ma'am.

9         Q.    What about Michael John, did you

10   ever talk to him about this matter?

11        A.    He was my supervisor, so I'm

12   sure I did.

13        Q.    And what do you recall talking

14   to him about?

15        A.    I don't recall.

16        Q.    Did you provide him any

17   information about the circumstances of the

18   operation or the pursuit that followed?

19        A.    He would have been in the chain

20   of command with my lieutenant and my captain,

21   so I'm sure that he got the same information

22   that I gave them.

23        Q.    Did he ask any questions of you?

24        A.    I don't recall, ma'am.

25        Q.    What about Danita Pettis, have

1    you ever talked to her about this operation

2    or pursuit?

3        A.    I don't believe so.  She was not

4    within my chain of command.

5        Q.    And then what about James Davis,

6    did you ever talk to him about the operation

7    or pursuit?

8        A.    I don't recall if he was on

9    scene or either of those days.  He was a

10   supervisor.  We worked with him quite often.

11           MS. GREENE:  Okay.  I'm gonna

12   mark this as Exhibit 53.

13       (Exhibit 53 was marked.)

14   BY MS. GREENE:

15       Q.    Okay.  You have Exhibit 53 in

16   front of you.  Do you recognize this -- the

17   contents of this document?

18       A.    It looks like the same e-mail as

19   before with me just telling

20   Lieutenant Schofield excellent response.

21       Q.    And did you talk to Schofield

22   about these events?

23       A.    He wasn't working the day of

24   the -- of the pursuit.  I'm sure at some

25   point we did speak because he was my boss

```
 1    prior to going to the Gang Unit.  He was in

 2    charge of the ATF Task Force.

 3              So I don't believe we discussed

 4    in-depth, but -- any of it of what occurred,

 5    but I do know that I'm sure we spoke, but I

 6    don't recall at what length.

 7         Q.    Do you recall any topics of

 8    conversation with him relating to this

 9    matter?

10         A.    No, ma'am.

11         Q.    Did you ever talk with him about

12    these restrictions that he described in his

13    e-mail?

14         A.    No, ma'am.

15         Q.    Do you know how long those

16    restrictions lasted?

17         A.    I don't.  And it looks like --

18    I'm not -- I left the ATF shortly around this

19    area, it may have even been prior to this, so

20    I'm not certain where I was even assigned at

21    this time.

22         Q.    In October of 2020?

23         A.    Yes, ma'am.

24         Q.    Where were you -- or, strike

25    that.
```

1    **When did you leave the task**

2    **force?**

3          A.    I don't remember the exact date.

4    It was either the end of October or the

5    beginning of November, and I can't remember

6    if it was that early.

7                I'm gonna guess that I wasn't

8    working on that date because that was my

9    youngest son's birthday on the 15th, so I

10   don't know about the 16th.  I may have just

11   been sending out an e-mail from home.  I

12   don't recall.

13         Q.    **Did Schofield talk to you about**

14   **this response before you sent it?**

15         A.    I don't believe so.

16         Q.    **He notes that as a result of the**

17   **restrictions since August 7th, CPD have**

18   **declined to pursue 47 separate vehicles**

19   **despite procedural provisions that would have**

20   **allowed a vehicle pursuit, right?**

21         A.    That's what he says, yes, ma'am.

22         Q.    **And do you recall any discussion**

23   **about that going on in this time,**

24   **August/September/October 2020?**

25         A.    I don't.  That was a different

Deposition of Sergeant Donald Scalf                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   unit.  That was the Gang Unit, and I was
 2   still assigned to ATF or possibly getting
 3   ready to be assigned to Intelligence.  So,
 4   no, I don't recall.
 5          Q.    Okay.  Did you ever hear about a
 6   forum hosted by Cincinnati about best
 7   practices related to vehicle pursuits?
 8          A.    I'm not sure what you're talking
 9   about.
10          Q.    If you go to the e-mail from
11   Michael John to Paul Neudigate from
12   October 15th, 2020, he notes towards the
13   bottom of the third page of this exhibit --
14   excuse me, toward the bottom -- yeah, the
15   bottom of the third page of that exhibit
16   that, quote, We recently hosted a forum on
17   best practices related to vehicle pursuits,
18   which included compelling testimony from a
19   father who lost his son, the result of such
20   action.  We strive for continuous
21   improvement.  Do you see that?
22          A.    I see it.
23          Q.    Did you know about the forum?
24          A.    Nope.
25          Q.    So you don't know who was in
```

1    attendance or anything like that?

2           A.    Nope.

3           Q.    Did anyone in the department at

4    any time convey anything to you that gave you

5    the impression that this pursuit was not well

6    executed in any way?

7           A.    No, ma'am.

8           Q.    Were you aware of the IIS

9    investigation into this manner?

10          A.    Yes, ma'am, I was interviewed.

11          Q.    Are you aware of the outcome of

12   that investigation?

13          A.    Yes, ma'am.

14          Q.    Do you know what the findings

15   were?

16          A.    What do you mean?

17          Q.    Do you know --

18          A.    There's probably several

19   findings.  What finding are you looking for?

20          Q.    You were aware that there were

21   policy violations identified in this pursuit,

22   right?

23          A.    Yes, ma'am.

24          Q.    So you're aware that discipline

25   was handed down to Lieutenant, then

1    Sergeant Lanter?

2             MR. HERZIG:   Objection.   Go

3    ahead and answer.

4        A.    Yeah, I believe so.  Yes, ma'am.

5        Q.    And were you aware that there

6    were ESLs designated for Officers Thomas,

7    Harper, and Gabel?

8        A.    Yes, ma'am.

9        Q.    And at any point in time --

10   well, how did you become aware of that?

11       A.    I was also interviewed.   I

12   believe my -- my name is also in that same

13   report, if you have it.

14       Q.    I do, yeah.  But how did you

15   become aware of the outcome of the

16   investigation?

17       A.    I don't know.  Somebody told me,

18   and I don't know who it was.  I may -- I may

19   have gotten a copy of it as well since I was

20   involved.  I don't recall.

21       Q.    Were you aware that the Critical

22   Incident Review Board was convened in

23   association with this pursuit?

24       A.    I did kind of know that, but I

25   don't know the outcome, and I don't know much

```
 1      about that.  I don't remember.
 2              Q.      Did you provide any information
 3      for the CIRB's consideration of this case?
 4              A.      Not to my knowledge.  I don't
 5      believe so.  I don't remember doing so.
 6              Q.      No one contacted you from CIRB?
 7              A.      I don't believe.  So what they
 8      usually do is they take their Internal
 9      investigation and then they over it from
10      there, so I wouldn't think so.
11              Q.      Are you aware of the CCA's
12      review of this pursuit, meaning the Citizen
13      Complaint Authority?
14              A.      I know I was interviewed.  I
15      don't believe I ever saw their final report.
16              Q.      Were you aware of their
17      findings?
18              A.      I don't recall.
19              Q.      Other than the interviews for
20      the IIS and CCA investigations, did you
21      provide any other information to any City
22      agency relating to this pursuit or operation
23      and the aftermath of it?
24              A.      I don't believe so.  I don't
25      recall anything.
```

Case: 2:21-cv-00102-DLB    Doc #: 138    Filed: 11/06/25    Page: 196 of 204 - Page
ID#: 2379
Deposition of Sergeant Donald Scalf                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    And --
 2          (Zoom ding.)
 3          A.    That's scares the heck out of
 4    me.  I had my eyes closed and everything.
 5          Q.    I know.  It's startling.
 6                Have you ever at any time after
 7    the pursuit on August 7th, 2020, discussed
 8    any aspect of these events with now
 9    Lieutenant Lanter?
10          A.    We -- yes, with -- along with
11    counsel.
12          Q.    Okay.  Other than in
13    conversations with counsel, have you ever
14    spoken to him about this matter?
15          A.    I don't believe we've ever
16    discussed it without -- without counsel.  I
17    don't believe.
18          Q.    Have you ever at any time after
19    the pursuit on August 7th, 2020, discussed
20    this matter with Officer Thomas?
21          A.    Not to my knowledge.
22          Q.    Have you ever at any time after
23    the pursuit on August 7th, 2020, discussed
24    these events with any other persons involved
25    in the operations on August 7th?
```

Deposition of Sergeant Donald Scalf                Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Can you repeat that for me one

2     more time?  I just want to --

3          Q.    Sure.  Have you ever at any time

4     after the pursuit was concluded on August

5     7th, 2020, discussed these events with any

6     other persons involved in the operations on

7     August 7th?

8          A.    Besides counsel and Federal

9     counsel as well, no.

10         Q.    Have you ever at any time had

11    discussions with any other persons in the

12    Cincinnati Police Department relating to the

13    August 7th events after the conclusion of the

14    pursuit on that day?

15         A.    Not to my recollection.

16         Q.    Do you know Officers Thomas,

17    Harper, or Lanter outside of work at all?

18         A.    Yes.

19         Q.    Do you socialize with them?

20         A.    Not in a long time.  I did

21    Officer Harper more when he was fairly new,

22    so this is 20 years ago.  I think I've seen

23    Officer Thomas out before, but we're not like

24    buddies or anything.

25         Q.    What about Lanter?

1      A.    He lives too far away.

2      Q.    **Within those out-of-work or**

3   **in-work contexts, do you know of -- do you**

4   **know of any nicknames for Lanter?**

5      A.    I think he has several.

6      Q.    **And what are they?**

7      A.    Turbo is the one that comes to

8   mind.

9      Q.    **Any others?**

10      A.    Not to my knowledge.  I'm sure

11   somebody will come up with something.

12      Q.    **When did you first come to know**

13   **the nickname Turbo for him?**

14      A.    I used to -- his dad worked for

15   me -- I'm sorry, let me rephrase that, I

16   worked for his father.  His father was my

17   lieutenant in District 1.

18           And I believe I remember him

19   saying something about it or something or --

20   I'm not sure, but I do remember him calling

21   him Turbo.

22      Q.    **Okay.  So many years ago?**

23      A.    Oh, yes, ma'am.

24      Q.    **And are you aware of pursuits**

25   **that any -- any of these officers, Lanter,**

1    Thomas, or Harper have engaged in other than

2    this August 7th pursuit?

3         A.    I know that Lieutenant Lanter

4    had a pursuit when I was in Internal Affairs

5    that was a fatality.

6         Q.    Did you investigate that

7    pursuit?

8         A.    I was on scene.  I did not

9    investigate it.  And I don't recall what

10   my -- I really don't recall what my party was

11   to it.  I know that I was there and I was

12   sitting in traffic.

13            I think I may have assisted with

14   some periphery interviews, but nothing for

15   Sergeant Lanter -- or Lieutenant Lanter.

16        Q.    Are you aware of the outcome of

17   that Internal investigation?

18        A.    I really -- I don't -- I can't

19   say with a hundred percent confidence.  I

20   know there was -- I don't remember if it was

21   found to be good, bad, or indifferent.  I

22   just don't.

23            THE COURT REPORTER:  Found what?

24            THE WITNESS:  Good, bad or

25   indifferent.  I'm sorry, ma'am.

```
 1    BY MS. GREENE:
 2         Q.    Any other pursuits that Lanter
 3    participated in that you're aware of?
 4         A.    Not off the top of my head, no,
 5    ma'am.
 6         Q.    And that one that you mentioned,
 7    do you remember about when that occurred?
 8         A.    Had to have been between 2010
 9    and 2015 --
10         Q.    Okay.
11         A.    -- because that's when I was in
12    Internal for five years, two months, and 15
13    days.
14         Q.    What about Thomas and Harper,
15    are you aware of any other pursuits they've
16    participated in?
17         A.    Nothing comes up.  I mean, they
18    could have been.  I'm sure they have been.
19    Nothing enters my mind.
20         Q.    Are you aware of any accidents
21    involving police vehicles for any of those
22    three officers?
23         A.    No, ma'am.
24         Q.    Have you ever been the subject
25    of an Internal investigation at CPD?
```

```
 1            A.    I'm sure I have.  I'm just
 2    trying to remember what for.  I think I was
 3    listed as a target on this as well, I'm not
 4    sure, but, yes.
 5            Q.    To the extent there were other
 6    investigations, as you sit here right now,
 7    you don't know what they were?
 8            A.    Correct.  And I don't believe I
 9    have received any discipline for anything.
10            Q.    Is that over the course of your
11    career, you haven't received any formal
12    discipline?
13            A.    From an Internal Investigations
14    case, no, ma'am.
15            Q.    Okay.  Have you received any
16    other formal discipline?
17            A.    Oh, yes, ma'am.
18            Q.    And for what?
19            A.    I've been a supervisor for a
20    long time, I miss commas and stuff like that
21    all the time.
22            Q.    So other than the perfection of
23    your grammar and poor writing a review, any
24    other discipline that you can recall?
25            A.    I've probably missed a court
```

1    case or something.  I don't recall.  It's

2    been a long time since I've done anything

3    with too -- too much of an ES -- more than an

4    ESL.

5         Q.    No allegations of misconduct

6    that you're aware of?

7         A.    No, ma'am.

8         Q.    Have you ever been a defendant

9    in a lawsuit relating to your duties with CPD

10   other than this matter?

11        A.    I don't believe so.  I was the

12   defendant -- defendant in a lawsuit, but it

13   was something that occurred off duty.  So I

14   don't believe it had anything to do with the

15   CPD.

16        Q.    Have you been a defendant in a

17   lawsuit relating to -- in relation to any law

18   enforcement role?

19        A.    I don't believe so.

20        Q.    And then the off-duty event,

21   what was that?

22        A.    It was an auto accident on my

23   way home from work.

24             MS. GREENE:  Okay.  All right.

25   So barring future production of any

Deposition of Sergeant Donald Scalf                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      unredacted documents or other documents in

 2      this case that bring to light further

 3      questions we need to ask you, we have no --

 4      or I have no more questions for you at this

 5      time.

 6                    THE WITNESS:  Okay.

 7                    MR. BOGGS:  Nothing for me.

 8                    MR. HERZIG:  Nothing here.

 9      Thank you.

10                    MS. GREENE:  We're off the

11      record.

12

13                    _____
                      SERGEANT DONALD SCALF

14

15

16                          *   *   *

17
              (DEPOSITION CONCLUDED AT 1:25 P.M.)
18                          *   *   *

19

20

21

22

23

24

25
```

204

1                    C E R T I F I C A T E

2
        STATE   OF   OHIO
3              :  SS
        COUNTY OF  WARREN

4
            I, Stacey J. Murrin, the undersigned, a
5       duly qualified notary public within and for
        the State of Ohio, do hereby certify that
6       SERGEANT DONALD SCALF was by me first duly
        sworn to depose the truth and nothing but the
7       truth; foregoing is the deposition given at
        said time and place by said witness;
8       deposition was taken pursuant to stipulations
        hereinbefore set forth; deposition was taken
9       by me in stenotype and transcribed by me by
        means of computer; that the transcribed
10      deposition was made available to the witness
        for examination and signature and that
11      signature may be affixed out of the presence
        of the Notary Public-Court Reporter. I am
12      neither a relative of any of the parties or
        any of their counsel; I am not, nor is the
13      court reporting firm with which I am
        affiliated, under a contract as defined in
14      Civil Rule 28(D) and have no financial
        interest in the result of this action.
15          IN WITNESS WHEREOF, I have hereunto set my
        hand and official seal of office at
16      Cincinnati, Ohio this 15th day of May, 2025.

17

18

19  My commission expires:   Stacey J. Murrin
        August 17, 2025,    Notary Public - State of Ohio

20

21

22

23

24

25