Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 1 of 261 - Page ID#: 2414

Deposition of Chief Teresa Theetge                                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1                   IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF KENTUCKY
2                         AT COVINGTON

3        JASON LAIBLE,            :
         et al.,                  :
4                                 :    CASE NO.
                                  :    2:21-cv-00102
5          Plaintiffs,            :
                                  :
6        vs.                      :    Judge David L.
                                  :    Bunning
7        TIMOTHY LANTER,          :
         et al.,                  :    Magistrate Judge
8                                 :    Candace J. Smith
                                  :
9          Defendants.            :

10           Zoom and in-person deposition of

11      CHIEF TERESA THEETGE, a witness herein, taken

12      by the plaintiffs as upon cross-examination,

13      pursuant to the Federal Rules of Civil

14      Procedure and pursuant to Notice of counsel

15      as to the time and place and stipulations

16      hereinafter set forth, at the offices of Taft

17      Stettinius &  Hollister, 425 Walnut Street,

18      Suite 1800, Cincinnati, Ohio, at 9:32 a.m.,

19      Monday, April 30, 2025, before

20      Stacey J. Murrin, a Court Reporter and Notary

21      Public, within and for the State of Ohio.

22

23                         - - -

24

25

```
 1        APPEARANCES:

 2        FOR THE PLAINTIFFS,    JACQUELINE GREENE, ESQ.
          ESTATES OF RAYMOND     ELIJAH HACK, ESQ.
 3        AND GAYLE LAIBLE:      Friedman, Gilbert &
                                 Gerhardstein
 4                               35 East 7th Street
                                 Suite 201
 5                               Cincinnati, Ohio 45202

 6                               And

 7        FOR THE PLAINTIFFS,    ROULA ALLOUCH, ESQ.
          STEVEN AND MARIBETH    Bricker Graydon, LLP
 8        KLEIN:                 2400 Chamber Center Drive
                                 Suite 300
 9                               Ft. Mitchell, KY 41017

10        FOR THE DEFENDANTS,    AARON HERZIG, ESQ.
          CITY OF CINCINNATI,    SPENCER S. COWAN, ESQ.
11        TIMOTHY LANTER and     Taft Stettinius &
          BRETT THOMAS:          Hollister
12                               425 Walnut Street
                                 Suite 1800
13                               Cincinnati, Ohio 45202

14        FOR THE DEFENDANT,     MARVA BENJAMIN, ESQ.
          CITY OF CINCINNATI:    (Via Zoom.)
15                               City Solicitor
                                 801 Plum Street
16                               Cincinnati, Ohio 45202

17        FOR THE DEFENDANT,     TRISTAN PALMER, ESQ.
          TRAVELERS CASUALTY     (Via Zoom.)
18        INSURANCE COMPANY:     Casey Bailey & Maines
                                 3151 Beaumont Centre Circle
19                               Suite 200
                                 Lexington, KY 40513
20
          FOR THE DEFENDANTS     KIMBERLY A. RUTOWSKI, ESQ.
21        TIMOTHY LANTER and     Lazarus Law, LLC
          BRETT THOMAS,          The Huntington Center
22        INDIVIDUALLY:          525 Vine Street
                                 Suite 2210
23                               Cincinnati, Ohio 45202

24        ALSO PRESENT:  Timothy Lanter
                         Elise Marrinan
25                       Jason Laible (Via Zoom.)
          Maribeth Klein/Steven Klein (Via Zoom.)
```

1                    S T I P U L A T I O N S

2           It is stipulated by counsel for the

3      respective parties that the deposition of

4      CHIEF TERESA THEETGE, a witness herein, may

5      be taken at this time by the plaintiffs as

6      upon cross-examination and pursuant to the

7      Federal Rules of Civil Procedure and Notice

8      to take deposition, all other legal

9      formalities being waived by agreement; that

10     the deposition may be taken in stenotype by

11     the Notary Public-Court Reporter and

12     transcribed by her out of the presence of the

13     witness; that the transcribed deposition was

14     made available to the witness for examination

15     and signature and that signature may be

16     affixed out of the presence of the Notary

17     Public-Court Reporter.

18

19

20

21

22

23

24

25

```
1                              INDEX

2        WITNESS            DIRECT   CROSS   RE-       RE-
                                             DIRECT    CROSS
3
         CHIEF TERESA THEETGE
4        BY MS. GREENE:                 7

5        EXHIBIT IDENTIFIED                           PAGE

6        Exhibit 63                                     10
         Exhibit 64                                     90
7        Exhibit 65                                    109
         Exhibit 66                                    126
8        Exhibit 67                                    128
         Exhibit 68                                    130
9        Exhibit 69                                    133
         Exhibit 70                                    138
10       Exhibit 71                                    170
         Exhibit 72                                    174
11       Exhibit 73                                    176
         Exhibit 74                                    178
12       Exhibit 75                                    186
         Exhibit 76                                    187
13       Exhibit 77                                    192
         Exhibit 78                                    196
14       Exhibit 79                                    197
         Exhibit 80                                    220
15       Exhibit 81                                    226

16       OBJECTIONS                                   PAGE

17       MR. HERZIG:                                    10
         MR. HERZIG:                                    12
18       MR. HERZIG:                                    12
         MR. HERZIG:                                    21
19       MR. HERZIG:                                    22
         MR. HERZIG:                                    25
20       MR. HERZIG:                                    26
         MR. HERZIG:                                    32
21       MR. HERZIG:                                    32
         MR. HERZIG:                                    47
22       MR. HERZIG:                                    56
         MR. HERZIG:                                    57
23       MR. HERZIG:                                    59
         MR. HERZIG:                                    60
24       MR. HERZIG:                                    61
         MR. HERZIG:                                    62
25       MR. HERZIG:                                    64
         MR. HERZIG:                                    69
```

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 5 of 261 - Page ID#: 2418

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        MR. HERZIG:                              69
          MR. HERZIG:                              70
 2        MR. HERZIG:                              78
          MR. HERZIG:                             119
 3        MR. HERZIG:                             158
          MR. HERZIG:                             158
 4        MR. HERZIG:                             159
          MR. HERZIG:                             159
 5        MR. HERZIG:                             160
          MR. HERZIG:                             161
 6        MR. HERZIG:                             162
          MR. HERZIG:                             162
 7        MR. HERZIG:                             163
          MR. HERZIG:                             164
 8        MR. HERZIG:                             165
          MR. HERZIG:                             166
 9        MR. HERZIG:                             166
          MR. HERZIG:                             168
10        MR. HERZIG:                             173
          MR. HERZIG:                             178
11        MR. HERZIG:                             178
          MR. HERZIG:                             181
12        MR. HERZIG:                             188
          MR. HERZIG:                             194
13        MR. HERZIG:                             196
          MR. HERZIG:                             197
14        MR. HERZIG:                             209
          MR. HERZIG:                             210
15        MR. HERZIG:                             213
          MR. HERZIG:                             213
16        MR. HERZIG:                             215
          MR. HERZIG:                             215
17        MR. HERZIG:                             217
          MR. HERZIG:                             217
18        MR. HERZIG:                             219
          MR. HERZIG:                             225
19        MR. HERZIG:                             226
          MR. HERZIG:                             229
20        MR. HERZIG:                             231

21        EXHIBITS REFERENCED                PAGE LINE

22        Exhibit 1                          14    15
          Exhibit 3                          14    24
23        Exhibit 9                          15     6
          Exhibit 26                         15    12
24        Exhibit 40                         15    19
          Exhibit 16                         16    16
25        Exhibit 54                         70    19
          Exhibit 32                         73    22
```

| | | | |
|---|---|---|---|
| 1 | Exhibit 33 | 73 | 23 |
| | Exhibit 31 | 84 | 11 |
| 2 | Exhibit 36 | 87 | 8 |
| | Exhibit 61 | 91 | 22 |
| 3 | Exhibit 12 | 97 | 16 |
| | Exhibit 60 | 106 | 10 |
| 4 | Exhibit 17 | 140 | 6 |
| 5 | Exhibit 8 | 141 | 13 |

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1              CHIEF TERESA THEETGE,

2      a witness herein, of lawful age, having been

3      first duly sworn as hereinafter certified,

4      was examined and testified as follows:

5                    THE WITNESS:  I do.

6                    THE COURT REPORTER:  Thank you.

7                     CROSS-EXAMINATION

8      BY MS. GREENE:

9              **Q.    Good morning.**

10             A.    Good morning.

11             **Q.    Before we start, can you,**

12     **please, state and spell your full name and**

13     **also provide your rank with the Cincinnati**

14     **Police Department for the record?**

15             A.    Sure.  Teresa Theetge,

16     T-E-R-E-S-A, T-H-E-E-T-G-E, and I'm Chief of

17     Police for the City of Cincinnati.

18             **Q.    Thank you, Chief.  Have you been**

19     **deposed before?**

20             A.    Yes.

21             **Q.    How many times?**

22             A.    I think twice, if I remember

23     correctly.

24             **Q.    Okay.  So a couple depositions**

25     **and I'm sure a lot of court testimony; is**

1    that right?

2          A.    Correct.

3          Q.    Just when was the last time you

4    were deposed, actually how many years ago?

5          A.    Oh, it's been a long time,

6    probably over 15 years.

7          Q.    Okay.  Well, in that case, I'll

8    go over some guidelines to help things run

9    smoothy, since it's just a touch different

10   than in court.

11                I'm sure you've spoken about

12   these things with counsel before we began

13   today, but as we go forward, we'll, of

14   course, as always in testimony do our best to

15   speak one at a time.

16                So let me finish my question

17   before you begin your answer.  Likewise, I'll

18   let you finish your answers before I give my

19   next question.  Okay?

20          A.    Okay.

21          Q.    And at any point in time, if you

22   don't understand any of my questions, please

23   just let me know.  I'll be happy to rephrase,

24   clarify, whatever it is you need.

25                If you do go ahead and answer

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the question, I will assume that you

2    understood it however.  Fair enough?

3         A.    Okay.

4         Q.    And it's possible there may be

5    objections to my questions during the course

6    of the deposition.  This is where it's a

7    little different than court.

8              If counsel makes an objection to

9    my question, unless he specifically instructs

10   you not to answer afterward, when he's done

11   speaking, you can just go ahead and give your

12   answer.  Okay?

13        A.    Okay.

14        Q.    And if you need a break, also no

15   problem, just let us know.  Unless I've asked

16   a question already, then please answer it and

17   then we'll take a break.  Okay?

18        A.    Okay.

19        Q.    As we sit here today, are you

20   experiencing any circumstances, medical or

21   otherwise, that would affect your ability to

22   the testify truthfully and accurately?

23        A.    No.

24        Q.    All right.  You understand that

25   we're here today to discuss a matter relating

1     to a police-involved pursuit of a vehicle

2     from August 7th, 2020, correct?

3          A.    Correct.

4          Q.    And you were designated as the

5     witness for the City in relation to the

6     plaintiffs' 30 -- Federal Rules of Civil

7     Procedure 30(b)(6) Notice, correct?

8          A.    Correct.

9               MS. GREENE:  Okay.  We're gonna

10    go ahead and mark exhibit.

11         (Exhibit 63 was marked.)

12    BY MS. GREENE:

13         Q.    Okay.  So we're looking at

14    what's been marked as Exhibit 63.  And,

15    Chief, is this a document that you've seen

16    before?

17         A.    Yes.

18         Q.    And you are here in your

19    official capacity as a representative of the

20    City today, correct?

21              MR. HERZIG:  Objection.  She's

22    here as the City of Cincinnati, not in her

23    personal or official capacity.

24              MS. GREENE:  Thanks, Aaron.

25    BY MS. GREENE:

1   Q.    So you are here to provide

2   binding testimony on behalf of the City of

3   Cincinnati today, correct?

4        A.    Correct.

5        Q.    And in relation to the topics

6   contained in this Notice, you've had a chance

7   to review them before today, right?

8        A.    Correct.

9        Q.    And have you prepared yourself

10  or been prepared to testify about these

11  topics?

12       A.    Yes.

13       Q.    How much time did you spend

14  preparing?

15       A.    Approximately two and a half

16  hours.

17       Q.    And at the end of the Notice,

18  you'll see that there is a section titled

19  Requested Documents, starting on page 5.

20           And, Chief, my question about

21  this section of the Notice is, did you search

22  for any documents pursuant to this Notice

23  prior to coming here today?

24       A.    The City provided documents as

25  part of the request for discovery, yes.

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 12 of 261 - Page
ID#: 2425
Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Okay.  So is it then the City's

2    position that all documents responsive to the

3    requested documents listed in this Notice

4    have already been produced in this case?

5         MR. HERZIG:  Objection, subject

6    to the objections in the regular discovery

7    process.  Go ahead.

8         A.    Yes.

9    Q.    And is it the City's position

10   that the City has already produced all

11   documents responsive to all of plaintiffs'

12   discovery requests over the course of this

13   case prior to today?

14        MR. HERZIG:  With the same

15   caveat, you can answer.

16        A.    Yes.

17   Q.    Okay.  And so then for today,

18   you haven't brought any additional documents

19   with you, correct?

20        A.    Correct.

21   Q.    In your preparation for the

22   deposition, what did you do?

23        A.    I met with counsel from Taft Law

24   Firm and went over the document that you have

25   in front of me and other documents that were

1    provided through the discovery process.

2             Q.    Okay.  And what other documents

3    did you review?

4             A.    A list of them.  We went -- we

5    reviewed the Critical Incident Review Board

6    report.  We discussed the Internal report,

7    the procedure, vehicle pursuit procedure,

8    the -- I was provided the document for the

9    lawsuit itself.  I'm sorry I don't know what

10   you guys would title that.

11            Q.    The Complaint?

12            A.    The Complaint, yeah, but -- from

13   both parties, and some other administrative

14   documents, possibly.  I can't recall off the

15   top of my head.

16            Q.    Did you review any multimedia,

17   meaning, videos, audio, photographs,

18   et cetera?

19            A.    No.

20            Q.    Did you review any of the

21   interviews taken in the investigation of this

22   matter?

23            A.    No, not the interviews.  The

24   recap of interviews that would have been in

25   the Internal report.

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.     And did you review any other
 2   records from the Cincinnati Police Department
 3   pertaining to this pursuit, other than the
 4   CIRB report and the IIS report?
 5          A.     I'm trying to recall exactly
 6   what was in front of me.  Like I said, the
 7   vehicle pursuit procedure, policy and
 8   procedure, the Form 34, which was our vehicle
 9   pursuit reporting for administrative
10   purposes, and I think that was -- that was
11   all of them.
12          Q.     Okay.
13          A.     Some ATF paperwork work from the
14   Operational Plan for that day.
15      (Exhibit 1 was referenced.)
16   BY MS. GREENE:
17          Q.     All right.  So I'm handing you
18   what was previously marked as Plaintiffs'
19   Exhibit 1.
20          A.     Uh-huh.
21          Q.     Is this the pursuit policy and
22   procedure that you reviewed in preparation?
23          A.     Correct.  Yes.
24      (Exhibit 3 was referenced.)
25   BY MS. GREENE:
```

1    Q.    And now I'm handing you what was

2    previously marked as Plaintiffs' Exhibit 3.

3    Is this the Internal IIS report that you

4    reviewed?

5         A.    Yes.

6         (Exhibit 9 was referenced.)

7    BY MS. GREENE:

8         Q.    And now I'm handing you what was

9    marked as Exhibit 9.  Is this the CIRB report

10   that you referenced reviewing?

11        A.    Yes.

12        (Exhibit 26 was referenced.)

13   BY MS. GREENE:

14        Q.    And I'm not sure which -- here

15   we go.  I'm handing you what was marked as

16   Exhibit 26.  Is this the ATF document that

17   you referenced reviewing earlier?

18        A.    Yes.

19        (Exhibit 40 was referenced.)

20   BY MS. GREENE:

21        Q.    Okay.  And I'm handing you what

22   was marked as Plaintiffs' Exhibit 40.  I

23   believe is that the number at the bottom?

24   Sorry.

25             MR. HERZIG:  It is.

1     Q.    Thank you.  I'm handing you

2  Plaintiffs' **Exhibit 40**.  Is this the Form 34

3  that you referenced earlier?

4         A.    Yes.

5         Q.    Okay.

6         A.    Yes.

7         Q.    Other than these documents that

8  we've just looked at, are there any other

9  documents beyond the Complaint that initiated

10  the lawsuit that you reviewed for your

11  deposition?

12         A.    There were a couple of very

13  brief Form 17s corresponding back and forth

14  to the -- from the academy to the police

15  chief.

16       (**Exhibit 16** was referenced.)

17  BY MS. GREENE:

18         Q.    Okay.  I'm gonna hand you

19  Plaintiffs' **Exhibit 16**.  Is this one of the

20  Form 17s you looked at?

21         A.    Yes.

22         Q.    And then you said there were a

23  couple of them, right?

24             MR. HERZIG:  Sorry.  I may have

25  misheard that.  That's **Exhibit 16**, is that

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 17 of 261 - Page
Deposition of Chief Teresa Theetge                                    ID#: 2430
                                                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    what you said?
 2              MS. GREENE:  Yes.
 3              MR. HERZIG:  Okay.
 4              MS. GREENE:  But it's a Form 17.
 5              MR. HERZIG:  Okay.
 6              MS. GREENE:  So Exhibit 16,
 7    Form 17.
 8              MR. HERZIG:  That's what --
 9    sorry.
10              MS. GREENE:  There's a lot of
11    numbers and acronyms.
12    BY MS. GREENE:
13         Q.    So is that -- that's one of the
14    ones you looked at, right?
15         A.    Correct.
16         Q.    And then there was more than one
17    that you saw?
18         A.    Yes.
19         Q.    Okay.  Let's see here.  I'm
20    trying to locate where there maybe a second
21    one previously marked.  If not, we'll come
22    back to it in a moment if I can't find it for
23    now.
24              Okay.  Well, I'm not finding it
25    for now.  I'll take a look on a break and see
```

```
 1          if I can find it later.
 2                    But there was at least one other
 3          Form 17 you looked at relating to retraining
 4          for these officers; is that right?
 5                A.    Yes.
 6                Q.    Was it just one additional
 7          document?
 8                A.    To the best of my recollection,
 9          yes.
10                Q.    Okay.  So we'll try to find that
11          in a little bit and show it to you.  But any
12          other documents that you reviewed for your
13          deposition?
14                A.    I think this is all of them.
15                Q.    And then separate from your
16          preparation for the deposition, have you ever
17          reviewed over materials associated with these
18          events from August 7th, 2020?
19                A.    During -- back in 2021, I think
20          it was when the Internal report was
21          concluded, I read the draft of that before it
22          went to the police chief.
23                Q.    And that was part of the chain
24          of command review of that report?
25                A.    Yes.
```

1      Q.    And looking at, I believe that's
2   **Exhibit 3**, right?
3      A.    Uh-huh.
4      Q.    Looking at **Exhibit 3** then, on
5   the front page of that exhibit, your name is
6   listed along with your initials and a date,
7   correct?
8      A.    Yes.
9      Q.    And that indicates that you read
10  and reviewed the draft at that time?
11     A.    Yes.
12     Q.    And what was the date that you
13  reviewed the draft in this case and approved?
14     A.    January 28th, 2021.
15     Q.    And does that application of
16  your initials and the date indicate your
17  approval of the report?
18     A.    Yes.
19     Q.    And, likewise, the initials and
20  the dates of the other people listed in this
21  chain of command review indicates their
22  review and approval of the report, correct?
23     A.    Yes.
24     Q.    Now, when you said you reviewed
25  the draft before it was finalized, was it any

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    different in any way other than the

2    handwriting on the first page from the final

3    version that was approved by the chief?

4            A.    Not that I can recall.

5            Q.    Okay.  Did you offer any edits

6    or changes of any kind to the report when you

7    reviewed it?

8            A.    I always -- almost always have

9    some type of edit because I'm kind of anal

10   about even grammatical or punctuation, all of

11   that.  But as far as substance to the report,

12   I don't recall editing any of the substance.

13           Q.    For the other individuals in the

14   chain of command in this particular report,

15   did any of them provide any edits to the

16   substance of the report?

17           A.    I don't know that.

18           Q.    Did you undertake any steps to

19   investigate that before you came here today?

20           A.    I don't understand your

21   question.  To investigate what?

22           Q.    Did you take any steps to find

23   out if there had been any edits to the report

24   prior to its finalization?

25           A.    Oh, no.

```
 1        Q.    At the time this report was
 2   finalized, the chief of police was
 3   Eliot Isaac, correct?
 4        A.    Correct.
 5        Q.    And did -- do you know if the
 6   chief made any changes to the report before
 7   its finalization?
 8        A.    I do not know.
 9        Q.    Okay.  So you reviewed the IIS
10   report in 2021 as part of the chain of
11   command review prior to it being finalized.
12   Did you review it prior to preparation for
13   the deposition in its final form?
14        A.    Yes.
15        Q.    And was that in association with
16   any particular duties you had in the police
17   department at the time?
18             MR. HERZIG:  Objection.  She
19   answered that she did it for this deposition.
20        Q.    I'm sorry.  Let me ask it a
21   little more clearly.  That's not quite what I
22   meant to ask then.
23             What I was trying to ask and
24   failed to do was, did you review this report,
25   the IIS report, other than in preparation for
```

1   your deposition at the point in time it was

2   finalized or thereafter?

3        A.    No.

4        Q.    Okay.  So going back to your

5   review of documents associated with this

6   case, otherwise than what you did to prepare

7   for your deposition, are there any other

8   documents that you previously reviewed?

9             MR. HERZIG:  Objection.  Are we

10  talking about -- she's testifying as the

11  City.  So her personal review I don't think

12  is relevant, unless you can help me

13  understand why it is.

14       Q.    So at the time she was a -- you

15  were an assistant chief back in 2021,

16  correct?

17       A.    Yes.

18            MS. GREENE:  And she was part of

19  the chain of command review of this event.

20  One of our topics is -- or several of our

21  topics, actually in the Notice, pertain to

22  basically everything under the sun about this

23  case that includes facts relating to not only

24  her personal review, but also the roles of

25  other individuals over the course of the

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 23 of 261 - Page
ID#: 2436
Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    investigation and review of this matter.

2                    So the questions I'm asking

3    relate to that, and they're permissible and

4    relative to the topics.

5                    MR. HERZIG:  So you're -- so

6    you're asking what individuals in the chain

7    of command would have reviewed as part of

8    their process for finalizing -- for working

9    on this report in some way, not her

10   specifically, but in -- but what is the

11   process that they go through, what are they

12   supposed to do?  Is that --

13                   MS. GREENE:  No.  I asked her

14   specifically what she reviewed relating to

15   this matter other than in preparation for the

16   deposition at an earlier time.  And I'm

17   asking that question about her, and I would

18   ask that about other people --

19                   MR. HERZIG:  Yeah.

20                   MS. GREENE:  -- as well.

21                   MR. HERZIG:  I think if you ask

22   that broader question about what -- what

23   lieutenant -- what lieutenant colonels, and

24   sergeants and captains do as part of this

25   review, even the specific review, that

Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    question, I think, makes sense.

2                    I think her specific work on

3    that is for a personal deposition.  So that's

4    the distinction I would draw.

5                    MS. GREENE:  Let's take a break

6    off the record.

7        (Off the record.)

8                    MS. GREENE:  Okay.  We're

9    recording again.  We've just had a discussion

10   off the record relating to counsel for the

11   City's objections to the line of questions

12   I've been posing.

13                   I will just note that in the

14   Notice of Deposition, plaintiff included a

15   number of topics relating to the incidents at

16   issue in this case, specifically including,

17   for example, Topics 8, 9, 10, 11, 12, 13, 14,

18   15.

19                   In the context of these topics,

20   I'll note that Topic 8 specifically

21   designates all information reviewed or

22   considered by all findings of and all

23   outcomes from CPD's Internal Investigations

24   Section and/or CIRB relating to the pursuit

25   of Mason Meyer.

1    So I was specifically asking

2    questions of Chief Theetge in relation to her

3    role at the time.  I would expect to be able

4    to ask those kinds of questions relating to

5    every individual involved at the time.

6              I've been told by defense

7    counsel that he thinks I can only ask it in

8    broad terms as to the City.  Is that an

9    accurate representation?

10              MR. HERZIG:  I mean, I'll refer

11   to my earlier objection.  I think if you're

12   asking for what she personally did in her

13   individually capacity, that is different than

14   asking the questions you have listed here,

15   which is you're asking the City all

16   information reviewed or considered, for

17   example, in Item 8.

18              And if you ask her that

19   question, she will do her best to answer that

20   on behalf of the City, and I'm sure that will

21   include what she specifically did as well.

22   BY MS. GREENE:

23         Q.    Chief, you were, at the time of

24   August 7th, 2020, and thereafter, an employee

25   with the Cincinnati Police Department, right?

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 26 of 261 - Page
ID#: 2439
Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    A.    Yes.

2    Q.    And, in fact, you were an

3    assistant chief at the time I think we said

4    earlier; is that correct?

5    A.    Yes.

6    Q.    And so you personally engaged in

7    some of the review of this matter at issue in

8    this case, right?

9    A.    Yes.

10   Q.    There are other officials with

11   the City Police Department who also engaged

12   in the review of this matter, correct?

13   A.    Correct.

14   Q.    And are you prepared today to

15   testify not only about your review in that

16   capacity, but also about the review conducted

17   by others in the department?

18   A.    Yes.

19   MS. GREENE:  So to that end, I

20   can walk through each level of the chain of

21   command review and ask what each person

22   reviewed, if that's how you'd like me to do

23   it for the sake of posing the questions to

24   the City.  Counsel?

25   MR. HERZIG:  No.  Like I said, I

Deposition of Chief Teresa Theetge                           Jason Laible, et al., vs. Timothy Lanter, et al.,

1    think it's broader, but I've also not

2    instructed her not to answer at this point.

3    So subject to my objection, you can continue.

4    BY MS. GREENE:

5         Q.    All right.  Well, let's just

6    start with you then, Chief, what did you

7    review at the time -- or, excuse me, at any

8    time other than in preparation for your

9    deposition?

10        A.    Okay.  And just prior to me

11   answering that, I just want it on the record

12   correct it's pronounced Theetge.

13        Q.    Thank you.  I apologize.

14        A.    That's okay.  Nobody ever gets

15   it right, so...

16        Q.    Thank you.

17        A.    And, I'm sorry, can you repeat

18   your question, ma'am?

19        Q.    Yes.  So can you, please,

20   describe to me documents, communications,

21   you've reviewed associated with the August

22   7th, 2020 pursuit other than in preparation

23   for your deposition?

24        A.    So back in 2021, January of

25   2021, I reviewed the Internal report as part

1    of the chain of command review for the

2    report.

3                And with that, I reviewed the

4    body cam and the in-car camera footage at

5    that time?

6            Q.    That was the body camera footage

7    from then Sergeant Lanter, right?

8            A.    Correct.

9            Q.    Also Officer Thomas?

10           A.    Correct.

11           Q.    And did you also review body

12    camera from other officers at that time, if

13    you recall?

14           A.    I do not recall.

15           Q.    For the cruiser camera or MVR

16    recordings that you reviewed, did that

17    include MVR from both Officers Lanter and

18    Thomas, right?

19           A.    From Sergeant Lanter and

20    Officer Thomas.

21           Q.    And it also reviewed -- or,

22    excuse me, included review of

23    Officer Harper's cruiser camera; is that

24    correct?

25           A.    I do not recall.

1    Q.    Do you recall any other video

2    footage that you reviewed at the time?

3    A.    I think there may have been

4    video from an establishment at the site.

5    Q.    Okay.  And what -- was that

6    surveillance footage from a business nearby

7    the crash?

8    A.    It's some establishment.  I

9    don't know.

10    MS. GREENE:  And on the record,

11    I'll note we did discuss this at a previous

12    deposition as I believe not having been

13    produced to us.

14    And I'll note that -- it wasn't

15    in my e-mail this morning, but we have talked

16    about it before, and that is an item that

17    would be responsive to our request.  So we'll

18    come back to that as well, I guess, a little

19    bit later today.

20    BY MS. GREENE:

21    Q.    So did it appear to be some sort

22    of surveillance footage that you saw, though?

23    A.    Some sort of it.

24    Q.    Okay.  Any other multimedia that

25    you viewed previously?

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 30 of 261 - Page
ID#: 2443
Deposition of Chief Teresa Theetge                                  Jason Laible, et al., vs. Timothy Lanter, et al.,

 1      A.    Not that I can recall.

 2      Q.    **Did you review any audio**

 3  **recordings previously?**

 4      A.    Just what would have -- would

 5  have been included in the video footage.

 6      Q.    **And did you review any radio**

 7  **transmission recordings?**

 8      A.    No.  I think what I heard was

 9  through the -- captured on the body cam.

10      Q.    **Okay.  Did you review any other**

11  **reports of any kind?**

12      A.    I don't recall.  You're talking

13  about back in 2021, right?

14      Q.    **Well, 2020 to present other than**

15  **in preparation for your deposition?**

16      A.    No.

17      Q.    **Did you review any statements of**

18  **any kind?**

19      A.    Just what would have been in --

20  in the report.

21      Q.    **Okay.  Is there anything else**

22  **that you reviewed prior to your preparation**

23  **for your deposition associated with this case**

24  **that we haven't talked about so far?**

25      A.    Not that I can recall.

1    Q.    In preparation for your

2  deposition, did you speak with anyone other

3  than counsel?

4       A.    No.

5       Q.    Did you speak with any -- anyone

6  at the City?

7       A.    No.

8            MR. HERZIG:  Can we go off the

9  record for a second?

10           MS. GREENE:  Sure.

11     (Off the record.)

12           MR. HERZIG:  Can you ask those

13  two questions again, please?

14           MS. GREENE:  I'm sorry, Stacey.

15  Can you read that back?  I apologize.

16           MR. HERZIG:  Let's just do it

17  this way.  The Chief would like to amend her

18  answer briefly.

19  BY MS. GREENE:

20       Q.    Okay.  Chief, go ahead.

21       A.    Yes.  I did have via text a

22  question to our Emergency Communications

23  Center director about the retention period

24  for radio transmission.

25       Q.    Okay.  And was that more

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    recently?
 2            A.    Yes.
 3            Q.    I'm assuming it was in response
 4    to our request for recorded radio
 5    transmissions in this case; is that correct?
 6                  MR. HERZIG:  Objection.
 7            Q.    Go ahead.
 8                  MR. HERZIG:  It was in
 9    preparation for this deposition.
10            Q.    Okay.  What was the answer you
11    got for your question to the ECC?
12            A.    He believed it was 25 months,
13    but he was going to verify, and have not
14    gotten a response since then.
15            Q.    And which radio transmissions
16    were you attempting to find out whether
17    they've been preserved?
18                  MR. HERZIG:  Objection.  She was
19    preparing to answer questions about the
20    City's retention policies, which you've asked
21    about in your deposition Notice.
22                  MS. GREENE:  I see.
23    BY MS. GREENE:
24            Q.    All right.  Since we're on that
25    topic, I'll just ask now.  For retention of
```

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    radio transmissions, the period of time being

2    approximately 25 months, you said; is that

3    correct?

4         A.    That's what the ECC director

5    believed it to be.

6         Q.    And does that include all radio

7    transmissions?

8         A.    I don't know.

9         Q.    In terms of your understanding

10   of the retention of radio transmissions,

11   what -- what is preserved pursuant to a City

12   policy or practice?

13        A.    I don't know.  That would be up

14   to the ECC director.

15        Q.    Is there a written policy that

16   you're aware of that governs the retention of

17   radio transmissions?

18        A.    Well, if there is, that would be

19   housed at ECC.

20        Q.    When you say "housed," you mean

21   the policy would be housed at the ECC?

22        A.    Correct.

23        Q.    In terms of the organizational

24   structure of the City, is the ECC a separate

25   organization than the police department?

```
 1          A.    Separate department.

 2          Q.    Thank you.  And what is the

 3   chain of command, so to speak, for the ECC

 4   upward through the City administration?

 5          A.    The ECC director reports to the

 6   City manager.

 7          Q.    Directly?

 8          A.    Yes.

 9          Q.    Okay.  All right.  So I think we

10   may have exhausted it at this point, but let

11   me just ask to be sure.

12                Is there anything else that you

13   recall reviewing associated with this matter

14   from the date it occurred, August 7th, 2020,

15   to present that we haven't talked about so

16   far?

17          A.    No.

18          Q.    What's your educational

19   background, Chief?

20          A.    Graduated from Western Hills

21   High School.  I have my Batchelor's degree

22   from Xavier University and my Master's degree

23   from Xavier University.  And I have a

24   multitude of law enforcement specialized

25   leadership courses I've completed.
```

1      Q.    When did you receive your

2    Bachelor's degree?

3      A.    I think it was in 2011, I

4    believe.

5      Q.    And what was your Bachelor's

6    degree in terms of area of study?

7      A.    It was liberal arts with a

8    concentration in organizational leadership.

9      Q.    And what about your Master's

10   degree, when did you receive that?

11     A.    That was approximately two years

12   later, 2013, and that was in human resources

13   development.

14     Q.    And then you said a variety of

15   law enforcement certificates and other

16   specialized -- specializations; is that

17   right?

18     A.    Yes.

19     Q.    Can you describe those for me,

20   please?

21     A.    Sure.  So the Southern Police

22   Institute at the University of Louisville,

23   it's an Administrative Officer's Course.  The

24   Senior Management Institute in policing

25   Harvard -- I'm sorry, Boston University, but

```
 1        it was put on by Harvard.

 2                    The FBI National's Executive

 3        Institute put on by the FBI.  The Police

 4        Executive Leadership College that is put on

 5        by the Ohio Association of Chiefs of Police.

 6        The Certified Law Enforcement Executive that

 7        is also put on by the Ohio Association Chiefs

 8        of Police.

 9                    Those are -- I think those are

10        the only ones focused solely on law

11        enforcement.

12             Q.    Do you have other licensures or

13        certifications outside of law enforcement?

14             A.    No.

15             Q.    And can you, please, walk me

16        through -- well, before I get there, when did

17        you first become employed by the City of

18        Cincinnati?

19             A.    October of 1990.

20             Q.    And can you -- was that with the

21        police department?

22             A.    Yes.

23             Q.    Can you walk me through your

24        history of positions and promotions over the

25        course of your career?
```

 1          A.    Okay.  It's gonna be quite

 2     lengthy.  So a recruit, October of '90,

 3     graduated, became police officer March of

 4     '91, was a patrol officer in District 1 for

 5     approximately two years, went to District 4,

 6     started as a patrol officer, then became a

 7     neighborhood liaison officer, was out there

 8     for approximately three years, went to

 9     District 3 as a patrol officer, was there for

10     a little while, became a canine handler in

11     1996, got promoted to sergeant in 1999.

12                Was a sergeant in patrol in

13     District 3, then went to Internal

14     Investigations as a sergeant, got promoted to

15     lieutenant early 2000s, maybe 2001, 2002,

16     somewhere around there, promoted to

17     lieutenant, went to District 4 as a relief

18     lieutenant, went to Inspections Section as a

19     lieutenant.

20                Went to special events as a

21     lieutenant, then Internal Investigations

22     Section as a lieutenant.  Got promoted to

23     captain in, I think, it was 2007, was the

24     night chief for a little while.

25                Then became the District 1

1    captain, then I went to Vice as the captain,

2    went back to Internal Investigations as a

3    captain, then went to Criminal Investigations

4    Section as a captain.

5            Got promoted to assistant chief

6    in February of '16, was assistant chief for

7    several years, then became the executive

8    officer, I think it was in February of '19,

9    became the interim police chief in March of

10    '21, I think it was '21 or '22.  They're all

11    running together, and then became the chief

12    in January of '23.

13        **Q.    Okay.  So over the course of**

14    **your career then, you've had a few stints in**

15    **the IIS Section, right?**

16        A.    Yes.

17        **Q.    When you were a sergeant, how**

18    **long did you spend there?**

19        A.    Approximately two years, two to

20    three, somewhere in there.

21        **Q.    And then when you were a**

22    **lieutenant, how long were you in IIS?**

23        A.    Again, between two to three

24    years.

25        **Q.    And were you a lieutenant**

1    overseeing IIS and other sections at the same

2    time?

3         A.    No, a lieutenant Internal only

4    oversees Internal.

5         Q.    Okay.  And the Inspections

6    section, I'm sorry, I forget what that is,

7    can you describe it for to me?

8         A.    Yeah.  So they are the arm of

9    the agency that does compliance type of

10   activity.  They do audits and they manage the

11   off-duty details for the City.

12              They manage our court control

13   and make sure the officers are in court when

14   they need to be, and a multitude of other

15   type of inspections and audits.

16        Q.    And how long were you in that

17   section as lieutenant?

18        A.    Maybe two years.

19        Q.    And when you say compliance and

20   audits, what topics are being audited or

21   checked for compliance?

22        A.    So there's a multitude of

23   audits.  We do overtime audits, the earnings

24   of officers.  We do court inspections, make

25   sure they're prepped for their cases.

1          We do random drug testing,

2     detail audits.  They'll go out and audit to

3     make sure the officers are where they're

4     supposed to be.  And anything that the chief

5     deems that they want audited would go to

6     them.

7          Q.    Did that ever include audits or

8     compliance reviews associated with particular

9     sets of practices or policies within the

10    department?

11         A.    I need you to be more specific

12    in your question.

13         Q.    Sure.  So what I'm trying to get

14    at is whether there -- in your experience in

15    the department, would the audits conducted

16    of, for example, how officers across the

17    department were complying with a particular

18    policy or provisions?

19         A.    Not the department as a whole.

20    A lot of what our audits are random.  We want

21    a sampling of the department.

22         Q.    Okay.  And so then was there

23    ever an audit conducted by way of a sample of

24    the department to evaluate compliance with

25    particular policies or practices of the

1    department?

2           A.    Yes.

3           Q.    And beyond these kind of what

4    looks like mostly employment sort of issues

5    over time, you know, detail, other things

6    like that, right, you know, can you describe

7    to me what those audits would have addressed

8    in terms of policy and practice?

9           A.    Are you saying the ones that --

10   such as an overtime audit, what do they look

11   for?

12          Q.    No.  Okay.  Yeah, no.  Sorry.

13   I'm not asking -- I need more coffee this

14   morning, I think.

15               But for the audits that you just

16   mentioned where you take a sampling and look

17   at the department that way, for policies and

18   practices, what types of policies and

19   practices are you aware of having been

20   audited, other than the kind of employments

21   that you already listed?

22          A.    So it wouldn't be done as an

23   audit, but one of the things Inspections is

24   also tasked with is they are kind of the

25   final reviewer of uses of force, all levels

Deposition of Chief Teresa Theetge                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1    of uses of force, and vehicle pursuits.

2         **Q.    Okay.  And in terms of vehicle**

3    **pursuit audits, can you describe to me how**

4    **those function?**

5         A.    So just for clarification, that

6    would be more of a review versus an audit.

7         **Q.    Okay.**

8              MR. HERZIG:  Just -- just real

9    quick.  Sorry.  Jason Laible and Steven Klein

10   have joined the Zoom for the record.

11              MS. GREENE:  Thank you.

12   BY MS. GREENE:

13        **Q.    Okay.  So what's the difference**

14   **between an audit and a review?**

15        A.    So a review, they review every

16   one of the vehicle pursuits, uses of force

17   that come through the department for overall

18   compliance with policy and procedure.

19              An audit is more of a randomized

20   sampling of what's going on in the

21   department, such as random drug testing,

22   overtime audit.  They do a sampling.

23        **Q.    Okay.  So in the context of a**

24   **review of vehicle pursuits, can you describe**

25   **to me those reviews, please?**

```
 1          A.    Yeah.  So when -- when a vehicle

 2    pursuit would occur, the first line

 3    supervisor would complete the vehicle pursuit

 4    form, review the body cam footage, in-car

 5    camera, speak to witnesses, speak to involved

 6    officers, and then it would go through its

 7    chain of command.

 8               So if it's an officer in patrol,

 9    the sergeant would look at it, would go to

10    the lieutenant, would go to their captain,

11    and then it goes to the Inspections Section.

12               The Inspections Section reviews

13    all four to make sure that City-wide,

14    department-wide, we are complying with the

15    standards that are in our policies and

16    procedures.

17          Q.    And in the context of those

18    reviews for pursuits, have there been

19    findings that there is not compliance with

20    the policies and procedures of the

21    department?

22          A.    Are -- are you asking in --

23    historically have they been?

24          Q.    Yes.

25          A.    Yes.
```

1    Q.    And can you describe to me the
2    circumstances resulting in those particular
3    findings?

4          A.    It could be anything from they
5    didn't come to a stop to clear an
6    intersection, they didn't turn their body
7    camera on.

8                Prior to the in-car cameras that
9    we have now, when you turn the lights and
10   sirens on, the technology all kind of comes
11   on by itself via Bluetooth, but prior to
12   that, it had to be done separately.

13               It could be were they wearing
14   their seat belt.  They look at a multitude of
15   things.  So to know which ones have actually
16   not been in compliance, historically would be
17   too large of an undertaking for me to answer
18   that question.

19         Q.    In terms of those reviews you
20   just described and the types of findings that
21   could result, are you describing violations
22   of the pursuit policy of the department?

23         A.    Potentially, yes.

24         Q.    With respect to the pursuit
25   policy, that's a mandatory policy that all

1    officers must follow when engaged in

2    pursuits, right?

3            A.    Correct.

4            Q.    And officers are bound by every

5    part of that policy, they can't pick and

6    choose which ones apply to them, correct?

7            A.    Correct.

8            Q.    And with respect to a

9    noncompliant pursuit, do you know that term?

10           A.    Yes.

11           Q.    What does that mean?

12           A.    That something within that

13   pursuit during the review was found to be not

14   in compliance with a part of our policy or

15   procedure.

16           Q.    Okay.  And let's maybe come back

17   to some more specifics on that in a moment.

18                 But I'll ask generally, officers

19   in the CPD have a duty to operate in

20   compliance with all applicable Ohio laws,

21   correct?

22           A.    I'm sorry.  Ask that question

23   again.

24           Q.    Officers in the department have

25   a duty to engage in their duties with

 1     compliance with all applicable Ohio laws,

 2     right?

 3          A.    In -- in the normal course of

 4     their duty, yes.

 5          Q.    And to the extent officers in

 6     the department are engaging in law

 7     enforcement activity outside of the State of

 8     Ohio, those officers also have a duty to

 9     comply with whatever local state laws would

10     apply, right?

11          A.    Again, under normal

12     circumstances, yes.

13          Q.    Officers in the department have

14     a duty to comply with all policies of the

15     department while they were engaged in law

16     enforcement activity, right?

17          A.    Correct.

18          Q.    And officers in the department

19     have a duty to comply with all training

20     provided to them by the City as well, right?

21          A.    Correct.

22          Q.    And they, likewise, have a duty

23     to comply with training provided to them even

24     if not by the City, all training provided to

25     them in association with their roles as

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    officers for the City, right?

2         A.   Can you -- can you ask that

3    again?

4         Q.   Yeah.  Let me break it up a

5    little bit.

6              So in some of the training

7    officers get is provided by other agencies

8    and organizations and not the City, right?

9         A.   Correct.

10        Q.   And officers are also obligated

11   to comply with the training they receive from

12   these other providers in the course of their

13   employment with the City, right?

14        A.   No.

15             MR. HERZIG:  Objection.  Go

16   ahead.

17        Q.   Okay.  And can you explain that

18   to me a little further, please?

19        A.   Yeah.  So officers are

20   encouraged to look for training outside of

21   the department if they believe it will help

22   their efforts in being a law enforcement

23   officer in Cincinnati.

24             We have had officers who have

25   found some training, gone to the training,

1    and come back and said, this wasn't good, and

2    they will -- because part of what we want

3    them to do when they come back is to evaluate

4    the training to see if we should be sending

5    others.

6           So if they go to a training that

7    they do not believe is a quality training or

8    not in alignment with our mission, I would

9    not want them to be obligated to follow that

10   training.

11          Q.    I understand.  Are you aware of

12   any trainings associated with pursuit driving

13   where that has been the case, meaning

14   officers come back and said, it's not a good

15   training?

16          A.    No.

17          Q.    Okay.  For policies in the

18   department, how are those provided to

19   officers?

20          A.    So whenever we have a revision

21   for a policy or procedure, excuse me, the

22   main communication method that we use is our

23   weekly staff notes.

24          So every Friday those are

25   published with any policy changes, procedure

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    changes along with other topics.  They are

2    required to read those staff notes, or

3    supervisors could sometimes read them, read

4    it to them during roll calls, but that's the

5    main mechanism to get that information out.

6         Q.    And those staff notes are used

7    to communicate any changes to policies or

8    additional new policies, right?

9         A.    Correct.

10        Q.    At the time of initial hire

11   through the academy, are officers provided

12   with a copy of all the policies in effect at

13   the time?

14        A.    You're saying, like, the

15   recruits, are they given all the policies --

16        Q.    Yes.

17        A.    -- and procedures?  They -- they

18   are.  I just don't know in what format.

19        Q.    So whether written or

20   electronic, they get a copy then --

21        A.    Yes.

22        Q.    -- when they're starting at the

23   academy?

24        A.    Yes.

25        Q.    Are they required at that time

1    to read the entity of the policy manual --

2            A.    No.

3            Q.    -- for the department?

4            A.    No.

5            Q.    Is there any requirement at any

6    point during an officer's employment with the

7    City that they are required to read the

8    entirety of the department's manual?

9            A.    Required to read it, no.

10           Q.    With respect to staff notes and

11   communications about updates to policies or

12   new policies, do those include the entirety

13   of the amended or new policy?

14           A.    Yes, it's usually in the staff

15   notes as an attachment.

16           Q.    Is there any -- what is the word

17   that I want?  Is there any mechanism in place

18   that tracks whether or not officers have, in

19   fact, reviewed these new or updated policies

20   over the course of their careers?

21           A.    Yes.

22           Q.    And what's that?

23           A.    So if we go back in time a bit,

24   it was a manual checkoff list that the

25   supervisors would check off that they've read

Case: 2:21-cv-00102-DLB   Doc #: 139   Filed: 11/06/25   Page: 51 of 261 - Page
ID#: 2464
Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1  it to them at roll call.

2             Now, we have an electronic

3  version, and it's called PowerDMS, and the

4  officers have to go in and acknowledge that

5  they read them.

6        Q.    And do you know remember when

7  PowerDMS was implemented, approximately?

8        A.    I'm gonna say between two --

9  approximately, two, two and a half years ago.

10  It may have been slightly longer.

11       Q.    Are you aware of any instances

12  where officers have been disciplined for the

13  failure to read and update a new policy?

14       A.    For failure to read it, no.

15       Q.    Okay.  Is there ever any

16  auditing or review conducted to evaluate

17  whether officers are, in fact, reading or

18  reviewing these new or updated policies?

19       A.    No.

20       Q.    Okay.  So you have Exhibit 1 in

21  front of you, the pursuit policy we looked at

22  earlier.

23       A.    Uh-huh.

24       Q.    And my question is, are there

25  any other policies that were in effect on

1  August 7th, 2020, that governed pursuit

2  driving for officers in the department?

3      A.    Not that I recall.

4      Q.    Are there any other policies,

5  besides this policy in Exhibit 1, which is

6  12.535, that govern the creation or use of

7  Form 34, Vehicle Pursuit Reports?

8      A.    Any other policy or procedure

9  pertaining to the Form 34?

10      Q.    Yes.

11      A.    There may be a cross-reference

12  in another procedure or something to that

13  effect where it just mentions it, but off the

14  top of my head, I can't -- I can't answer

15  that.

16      Q.    Okay.  What policies of the

17  department, other than this pursuit policy,

18  would govern car accidents involving CPD

19  officers engaged in law enforcement activity?

20      A.    Yeah.  So we have a procedure,

21  don't know the number off the top of my head,

22  reporting department vehicles being involved

23  in auto accidents.  That would be for most --

24  both marked vehicles and unmarked vehicles.

25      Q.    And that policy would address

1    when the police vehicle, whether marked or

2    unmarked, was itself involved in a crash,

3    meaning it contacted another vehicle or

4    someone -- something else or someone else,

5    right?

6            A.    Yes.

7            Q.    Are there any other policies

8    that would govern car accidents that were

9    associated with law enforcement activity

10   where the police vehicle itself did not

11   actually make contact with a car, a person,

12   or a thing?

13           A.    Not that I can recall.

14           Q.    Okay.  So turning to the topic

15   of training for a moment, can you describe to

16   me the training provided to officers,

17   generally, over the course of the career --

18   their career with the department about

19   pursuits, meaning would they receive training

20   and at what stages of their career?

21           A.    So during their recruit time,

22   their police academy time, they get defensive

23   driving and pursuit driving training.  Once

24   that is completed, they become a patrol

25   officer, we do not have a mechanism to

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 54 of 261 - Page
ID#: 2467
Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    continue to conduct vehicle pursuit training.

2                    However, if we deem somebody

3    needs remedial training, we will try to work

4    something out where we can get them back

5    sometimes with the recruit class for some

6    remedial.

7                    A bit of that is governed by

8    OPOTA, which is our governing body for the

9    State of Ohio for our certification on how we

10   can do that.

11        Q.    And when you say governed by

12   OPOTA, how would you do that?  Can you

13   explain what you mean, please?

14        A.    Yeah.  There are certain

15   stipulations in recruit training where we are

16   not allowed to intermingle veteran officers

17   with recruits.

18                    So we -- it would depend on what

19   the topic is that an officer may need

20   remedial training on whether or not we can

21   conduct that along with recruits.

22        Q.    Okay.  And for remedial training

23   for an officer in relation to pursuits, what

24   would be the reason an officer would be to --

25   or would be referred for that training?

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Most often, remedial training is
 2    due to the noncompliance with some part of
 3    the procedure of repeated noncompliance.
 4              Q.    So officers more than once
 5    engaging in pursuits improperly?
 6              A.    Correct.
 7              Q.    And would that include reckless
 8    driving during a pursuit?
 9              A.    It could.  It could.
10              Q.    Would it include anything else?
11              A.    It -- it would include anything
12    not -- it's very hard to decipher between
13    what an officer is deeming that they need to
14    do at the time, at the moment that the
15    pursuit is occurring versus when we are
16    reviewing it at a later date.
17                    So if we are able to take what
18    we know occurred and put it to our procedure
19    and say, that is a violation, that's when
20    remedial training is best suited.
21              Q.    Okay.  And so that could include
22    then any violation of the pursuit policy; is
23    that correct?
24              A.    It could.
25              Q.    So, like, failure to terminate a
```

1      pursuit when it should have been terminated,

2      for example?

3              A.    It could.

4              Q.    Or engaging in traffic

5      violations over the course of a pursuit that

6      are not specifically accepted in the language

7      of the policy?

8              A.    It could.

9              Q.    Putting the public at risk over

10     the course of a pursuit, would that be

11     included as on option?

12              MR. HERZIG:  Objection.  You can

13     answer.

14              Q.    Go ahead.

15              A.    Again, that would be an

16     officer's discretion at the time on what

17     they're seeing versus am I able to say that

18     absolutely occurred during my review process.

19              Q.    Okay.  Okay.  So we talked about

20     academy defensive driver training and the

21     possibility of remedial training relating to

22     pursuits, right?

23              A.    Yes.

24              Q.    Is there any other time over the

25     course of an officer's career that they would

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    be provided with pursuit training in the

2    department, generally speaking?

3            A.    No.

4            Q.    Okay.  For that remedial

5    training, are officers referred for that

6    every time they violate a pursuit policy?

7            A.    No.

8            Q.    What are the circumstances then

9    that would lead to that referral if not every

10   time the policy is violated?

11           A.    Chief's discretion.

12           Q.    And in the chief's discretion,

13   what factors are considered to determine

14   whether or not to send an officer for that

15   remedial driver training?

16                MR. HERZIG:  Objection.  Are you

17   asking her as Chief, or are you asking her

18   for what chiefs are told as their

19   discretion --

20                MS. GREENE:  I'm asking --

21                MR. HERZIG:  -- if there is such

22   a thing.

23                MS. GREENE:  I'm asking the

24   City's position on what factors are

25   considered by chiefs of police --

| | |
|---|---|
| 1 | MR. HERZIG:  Okay. |
| 2 | MS. GREENE:  -- as to whether or |
| 3 | not to refer an officer for remedial driver |
| 4 | training after a pursuit policy violation |
| 5 | occurs? |
| 6 | MR. HERZIG:  Thank you. |
| 7 | THE WITNESS:  Yeah.  The biggest |
| 8 | determination would be if it could improve |
| 9 | future behavior. |
| 10 | BY MS. GREENE: |
| 11 | Q.    Okay.  And how's that assessed? |
| 12 | A.    How is what? |
| 13 | Q.    You know, whether a remedial |
| 14 | training could improve future behavior, how |
| 15 | is that assessed or evaluated? |
| 16 | A.    Sometimes it is -- it is a |
| 17 | thought that training might improve behavior, |
| 18 | but there's no way to deem that as the |
| 19 | outcome.  That is -- that is the goal, but |
| 20 | there's no way to predict the outcome. |
| 21 | Q.    Okay.  So fair to say then that |
| 22 | when an officer is sent for remedial driver |
| 23 | training that the goal in sending them is |
| 24 | that it will improve their future behavior |
| 25 | while engaged in pursuits? |

```
 1          A.    That's the goal.

 2          Q.    Okay.  And improving behavior,

 3    does that mean compliance with the pursuit

 4    policy?

 5          A.    Yes.

 6          Q.    Does it mean anything else in

 7    addition to that?

 8          A.    Yes, the risk versus rewards.

 9          Q.    Can you explain that to me,

10    please?

11          A.    Yeah.  So the -- if you're

12    engaged in a vehicle pursuit, obviously it's

13    a risk -- risky endeavor.  And what -- what

14    is the person we are pursuing wanted for, and

15    the safety of the general public, is there a

16    reward in taking that person into custody for

17    the public safety.

18          Q.    And that reward evaluation, is

19    that based on an imminent risk posed by the

20    fleeing suspect in the pursuit?

21                MR. HERZIG:  Objection.

22          Q.    Go ahead.

23                MR. HERZIG:  You can answer.

24          A.    No.  It is -- you have to look

25    at the totality of the circumstances, what
```

1    the officer knows at that moment, what this

2    individual's history has been, and what you

3    think their future behavior would be, and is

4    it paramount to get them into custody for the

5    overall safety of the general public.

6         **Q.    And in terms of that question of**

7    **whether it's paramount to get the person into**

8    **custody, under what circumstances does that**

9    **condition exist, meaning what has to be**

10   **present for it to be paramount to get them**

11   **into custody?**

12        A.    Do you believe this person has

13   caused physical harm or will cause physical

14   harm, serious physical harm, if not

15   apprehended.

16        **Q.    And in terms of that belief, it**

17   **needs to be based on reliable information,**

18   **right?**

19        A.    Correct.

20        **Q.    And in terms of whether the**

21   **person will cause physical harm, that**

22   **consideration is looking at whether that**

23   **person will imminently cause physical harm,**

24   **right?**

25             MR. HERZIG:  Objection.  That's

Case: 2:21-cv-00102-DLB   Doc #: 139   Filed: 11/06/25   Page: 61 of 261 - Page
ID#: 2474
Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    not in the policy.  You can answer.
 2                MS. GREENE:  Well, I'm asking
 3    about the Chief's considerations right now in
 4    this line.
 5         A.    Can you ask it again?
 6         Q.    Sure.  That belief that a person
 7    will cause physical harm, that's in reference
 8    to the person presenting a risk of imminently
 9    causing physical harm, right?
10                MR. HERZIG:  Same objection.  Go
11    ahead.
12         A.    If you mean imminent by right
13    now, they're gonna cause harm right now
14    versus shortly thereafter, then, no.
15                And part of the decision would
16    be if I don't apprehend them now, are they
17    likely to cause serious physical harm
18    slightly after the end of the pursuit?
19    That's also a thought process they should
20    have.
21         Q.    And so when you say slightly
22    after, you don't mean like days or weeks
23    later, do you?
24         A.    It could be.
25         Q.    Would you say weeks later is
```

1    within that window?

2            A.    If their past behavior, what we

3    know about them, their past behavior has been

4    extremely violent, then, yes, weeks later is

5    just as important to apprehend them.

6            Q.    But, again, that information you

7    just referenced, it has to be reliable,

8    right?

9            A.    Yes.

10           Q.    And it needs to be known to be

11   reliable?

12                MR. HERZIG:   Objection.

13           Q.    Go ahead.

14                MR. HERZIG:   I'm not sure

15   what -- I'm not sure what that question

16   means.

17           Q.    Sure.  It needs to -- the

18   information needs to be known to the officers

19   engaging in that pursuit to be reliable,

20   right?

21           A.    Yes, but that information could

22   be known to them through a variety of

23   avenues.

24           Q.    Does whether a person's

25   identity -- and when I say "person," I mean

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the fleeing person, whether their identity is

2    known impact that evaluation at all in the

3    context of -- well, strike that.  Let me just

4    ask it a little more clearly.

5              Does whether the identity of the

6    fleeing person is known to the officers

7    engaged in the pursuit and others in the

8    department affect the necessity of -- or,

9    excuse me, whether or not it is paramount to

10   take that person into custody?

11        A.    Potentially.

12        Q.    And how would it affect it?

13        A.    Again, knowing who the

14   individual is, is one piece of information

15   the officer should be processing.  But,

16   again, I go back to what has their past

17   behavior been, and what do we think their

18   future behavior will be?  So it's not solely

19   based on knowing their identity.

20        Q.    When you say serious physical

21   harm, what kind of conduct are you

22   referencing?

23        A.    That's a term that -- from the

24   Ohio Revised Code that we use.  So a simple

25   assault versus a felonious assault, the

Deposition of Chief Teresa Theetge                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    degree of severity of injuries that the

2    person may cause.

3         Q.    Okay.  When you say the severity

4    of injuries a person may cause, what's the

5    baseline threshold --

6         A.    Yeah.

7         Q.    -- for making it paramount to

8    take them into custody?

9              MR. HERZIG:  Objection.  You can

10   answer.

11        A.    So if somebody is going to cause

12   somebody enough harm that they need to seek

13   medical attention, such as broken bones,

14   stitches, gunshot wounds, things like that,

15   serious physical harm.

16        Q.    Okay.  In terms of the education

17   provided to your officers in the department,

18   does the City adequately prepare its officers

19   to undertake pursuits in compliance with its

20   policies?

21        A.    Yes.

22        Q.    And does the City in relation to

23   the education provided to officers, enable

24   its officers to engage in pursuits that are

25   conducted safely?

```
 1        A.    Say that again.

 2        Q.    Through the education provided

 3  to its officers, does the City enable

 4  officers with the tools needed to engage in

 5  pursuits that are conducted safely?

 6        A.    Yes.

 7        Q.    And through its education to its

 8  officers, does the City provide officers with

 9  the tools to know when a pursuit must be

10  terminated?

11        A.    Yes.

12        Q.    And through its training to

13  officers, does the City provide department

14  officers with -- with enough information that

15  they understand when a pursuit has become too

16  dangerous to continue?

17        A.    Yes.

18        Q.    In relation to pursuits with the

19  goal of achieving an arrest, taking a person

20  into custody at the end, are Cincinnati

21  Police Department officers equipped through

22  their training and education from the

23  department to evaluate whether it is safe to

24  conduct arrests under the circumstances

25  presenting them -- presenting themselves --
```

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    presented to them?

2          A.    Yes.

3          Q.    What training do officers

4    receive about the use of stop sticks?

5          A.    Through the academy, the

6    recruits get training through that.  There is

7    also -- when you talk about training, you

8    need to understand.

9                So they have the recruit

10   training, which is seven months long,

11   classroom, a little bit more of a sterile

12   environment, and then they have three months

13   with a field training officer, an FTO.

14               That's when the FTOs take what

15   the recruits have learned in the academy and

16   put it into practice for them.  So there's a

17   lot of opportunities there for the FTOs to

18   expose them to the actual operational part of

19   deploying stop sticks, conducting a vehicle

20   pursuit, and things like that.

21               So some of that is also

22   conducted outside their recruit training.

23         Q.    So is it to fair to say then,

24   that all officers in the department have

25   training on stop sticks?

```
 1              A.   I would say police officers.  I
 2      think if you get the higher ranks, probably
 3      not, because they -- they -- a lot of them,
 4      we didn't have stop sticks when I was a new
 5      officer, so...
 6              Q.   When you say higher ranks, are
 7      you referencing people who started in the
 8      department before a certain year --
 9              A.   Correct.
10              Q.   -- or a time frame?
11              A.   Correct.
12              Q.   And what would be that time
13      frame, approximately, you would say if you
14      came in before this time, you probably didn't
15      learn about stop sticks?
16              A.   I don't know.  I can't remember
17      what year we got -- started getting stop
18      sticks.
19              Q.   Okay.  But at this point,
20      they're available to officers, right, across
21      the department?
22              A.   Yes.
23                   MR. HERZIG:  You mean today?
24              Q.   Yeah, in 2025.
25              A.   Yes.
```

```
 1          Q.    In 2020, was that also the case?

 2          A.    Yes.

 3          Q.    And so if an officer thinks

 4    there's a possibility stop sticks may be

 5    useful for whatever he's working on that day

 6    for his assignments, they're available to

 7    him, right?

 8          A.    Yes.

 9          Q.    Are they at the time in 2020 in

10    all police marked vehicles?

11          A.    I don't recall if they were in

12    every car.

13          Q.    Were they in most cars in 2020?

14          A.    I don't recall.

15          Q.    In any case, though, they were

16    available whether you were in a marked car or

17    not, right?

18          A.    Whether you're in a marked car

19    or not?

20          Q.    Yeah.  I mean, you could -- you

21    could ask for them and get them?

22          A.    Correct.

23          Q.    Where officers anticipate the

24    possibility of a pursuit arising in the

25    course of some law enforcement activity
```

```
 1    they're engaged in, would it be reasonable

 2    for them to obtain stop sticks in advance of

 3    that operation if the opportunity is

 4    available?

 5                    MR. HERZIG:  Objection.  What

 6    time frame?

 7         Q.    In 2020.

 8         A.    Potentially, yes.

 9         Q.    And would it be prudent to do

10    that at that time, right, in 2020, with the

11    stop sticks available if you need them?

12                    MR. HERZIG:  Objection.  You can

13    answer.

14         A.    Potentially, yes.

15         Q.    And when you say "potentially,"

16    what do you mean?

17         A.    Depends on the totality of the

18    circumstances at that moment.  They -- there

19    might be circumstances because every -- every

20    interaction is different.  There's never the

21    same set of circumstances twice.

22                    So it could be that they are

23    trying to remain as covert as possible for

24    the longest time as possible before engaging

25    in the attempt to stop an individual.
```

1          So if they're gonna call for

2    somebody with stop sticks, those are in

3    marked cars, they may not want them in the

4    area just yet.  So that could be a set of

5    circumstances.

6          **Q.   Okay.  But to the extent the**

7    **opportunity is available, it would be prudent**

8    **to request stop sticks if you anticipate a**

9    **pursuit, right?**

10              MR. HERZIG:  Objection.  You can

11   answer.

12          A.   Yes.

13              MS. GREENE:  Do you want to take

14   a break?

15              THE WITNESS:  Sure.

16              MS. GREENE:  Yeah, we can go off

17   the record.

18       (Off the record.)

19       (Exhibit 54 was referenced.)

20   BY MS. GREENE:

21          **Q.   All right.  We're recording and**

22   **we're back on the record.**

23              **All right.  Chief, for**

24   **Officer Lanter in terms of his prior**

25   **trainings in the department, I'm gonna share**

```
 1    with you an exhibit -- here it is.  This is
 2    Exhibit 54.  And are you familiar with this
 3    document?
 4              A.    A training record.
 5              Q.    It's a training record for now
 6    Lieutenant Lanter, right?
 7              A.    Correct.
 8              Q.    And from the City, are there any
 9    other trainings not listed here other than
10    any academy training for now
11    Lieutenant Lanter relating to vehicle
12    pursuits?
13              A.    I don't know.  You're saying
14    training that he has had that would not be on
15    this document?
16              Q.    Right.
17              A.    I don't know.
18              Q.    You don't know of any, do you?
19              A.    I don't know if there are any or
20    not.  I can explain to you our process for
21    training, how something comes onto the
22    training record, gets put on the training
23    record --
24              Q.    Sure.
25              A.    -- as long as that process is
```

1    followed, yeah.

2         Q.    Okay.  Yeah.  Please explain

3    that training, or that process, to me about

4    putting entries about training into the

5    training record.

6         A.    So there's two different,

7    internal training and external training.  The

8    internal training is what we conduct within

9    the department, and our academy is kind of

10   the keeper of the records for that.  So they

11   would enter that into everybody's training

12   record individually.

13              External training, there's a

14   process where an officer asks permission to

15   get approval to go to external training.

16   Once they do that external training, they are

17   then also sent a form asking to rate the

18   training.

19              Because one of the things that

20   we tell them is if we're gonna send you

21   outside training, there may be a time where

22   you're called upon to bring that training

23   information, the content, back and share it

24   with the department.

25              So when they come back from the

1    training, they are then sent a form to rate

2    the training and the content, and that is

3    then forwarded to the academy.  And that's

4    what they use to populate outside training

5    onto somebody's training record.

6              So as long as that process is

7    followed, as it should be, then everything

8    should be on this record.

9         Q.    And would you defer to the

10   officer's testimony about whether they

11   received additional training on pursuits in

12   lieu of knowing whether or not there's

13   training that wasn't in the record yourself?

14        A.    Say that question again.

15        Q.    Would you defer to the testimony

16   from the individual officers about whether

17   they had additional training on pursuits in

18   light of you not knowing whether there may be

19   other training that wasn't listed in that

20   particular record?

21        A.    Yes.

22        (Exhibit 32 was referenced.)

23        (Exhibit 33 was referenced.)

24   BY MS. GREENE:

25        Q.    Okay.  Thank you.  So I'm gonna

1    show you a couple of other exhibits in

2    concert with that one.  I'm gonna give you

3    what was previously marked as Plaintiffs'

4    Exhibit -- or, excuse me, Exhibits 32 and 33.

5              Here's 32.  And I'm going to do

6    little search for 33, it seems.  Hang on one

7    second.  Well, I don't know where the

8    official copy of 33 is, but I do have another

9    copy of it.

10             MR. HERZIG:  Isn't that --

11             MS. GREENE:  This is mine.

12             MR. HERZIG:  Oh, okay.

13             THE COURT REPORTER:  They should

14   be in there.

15             MS. GREENE:  Yeah, they should

16   be.  Let's just pause the record for one

17   second.

18      (Off the record.)

19   BY MS. GREENE:

20       Q.    All right.  We already had it

21   and I didn't realize it.  My apologies.

22   Okay.  So you have in front of you

23   Exhibits 32 and 33.

24       A.    Uh-huh.

25       Q.    These exhibits are both agendas

1    and outlines of topics provided to Cincinnati

2    officers relating to pursuits, correct?

3        A.    Correct.

4        Q.    And when you look at

5    Officer Lanter's training record, these

6    correspond to trainings he received from the

7    department; is that right?

8        A.    Are you asking if these two

9    trainings are on his training record?

10       Q.    Yes.

11       A.    I don't know.  I'd have to go

12   through his entire training record to

13   determine that.

14       Q.    Sure.  Okay.  So if you go to

15   the last page of **Exhibit 54**, which is

16   Lanter's training record, there's a Vehicle

17   Pursuit Training about halfway through the

18   list there from January 29th, 2007.  Do you

19   see that?

20       A.    Yes.

21       Q.    And so **Exhibit 32**, this Vehicle

22   Pursuit Training Agenda 2007, that

23   corresponds to this 2007 training that Lanter

24   had, right?

25       A.    I don't know that to be certain.

1    I mean, you're indicating on his training

2    record it shows he had Vehicle Pursuit

3    Training January 29th, 2007.  So, yes, if

4    this document here, the second page of your

5    Exhibit 32 was conducted on January 27th,

6    2007, then that would be accurate, if that's

7    what you're saying.

8            Q.      Okay.  Thank you.

9            A.      Uh-huh.

10           Q.      Looking at Exhibit 33, this

11   relates to training to officers in the

12   department on vehicle pursuits between

13   November and December 2008, correct?

14           A.      Correct.

15           Q.      And if you look at Exhibit 54,

16   again, Lanter's training record on the second

17   to last page stamped at the bottom 1344, just

18   a few entries down from the top of that page

19   is a training called Vehicle Pursuit Training

20   from November 11th, 2008.  Do you see that?

21           A.      Yes.

22           Q.      So this Exhibit 33 agenda, that

23   corresponds to this 2008 training that Lanter

24   had, correct?

25           A.      Yes, if that was conducted on

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      11/11/2008, that would be correct.

2              Q.    Okay.  Now, there are a few

3      other Vehicle Pursuit Trainings referenced in

4      Sergeant Lanter's training history.  I can

5      point those out.  He's got -- let's see here.

6                    It's on 6 of 11, stamped at the

7      bottom 1340, a Vehicle Pursuit Training in

8      December of 2013, just towards the bottom of

9      the page there.  Do you see that?

10             A.    Yes.

11             Q.    And does the City have any

12     training materials associated with that

13     training?

14             A.    I don't know.

15             Q.    Do you know whether anyone

16     attempted to search to find out?

17             A.    I know that we did our due

18     diligence to respond to your records request

19     through discovery.  So if that was on the

20     records request, somebody would have searched

21     for it.

22             Q.    For the training on that date,

23     would it have been substantially similar to

24     the topics covered in Exhibits 32 and 33?

25             A.    I do not know the answer to

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1         that.
 2                  Q.    Who would know the answer to
 3         that?
 4                  A.    The -- this is governed by
 5         OPOTA.  They would be the keeper of the
 6         records of what is mandated, and then we
 7         follow their mandates through our academy.
 8                  Q.    Meaning, OPOTA dictates the
 9         topics that have to be trained on, right?
10                  A.    They also dictate sometimes the
11         content of the topic.
12                  Q.    The City would have had
13         materials associated with that training at
14         the time it was provided, right?
15                  A.    It should have.
16                  Q.    And those would, like these
17         2007, 2008 trainings, be retained afterward,
18         right?
19                      MR. HERZIG:  Objection, subject
20         to policies.  Go ahead.
21                  A.    Yes, they should have.
22                  Q.    And so the City itself would
23         have had, for example, some kind of agenda,
24         outline, curriculum, handouts, et cetera,
25         associated with that 2013 training I just
```

1    mentioned, correct?

2          A.    Yes.

3          Q.    But as you sit here, you don't

4    know whether or not the City still has that

5    today?

6          A.    I do not know.

7          Q.    In terms of pursuit driving

8    training in 2013 at that time based on the

9    City's policies and practices for pursuit

10   driving, is there anything that would have

11   been substantially different about that

12   training than the policy in effect on

13   August 7th, 2020, for pursuit driving?

14         A.    Without having the two policies

15   in front of me to compare, I can't answer

16   that for certain.

17         Q.    Okay.  Do you have available to

18   you the policy that would have been

19   applicable at that time?

20         A.    In 2020?

21         Q.    In 2013.

22         A.    Ask that question again.

23         Q.    Do you have available to you the

24   policy that would have been applicable at the

25   time of the training in December of 2013 on

```
 1          pursuit driving?

 2                    A.    In front of me here today --

 3                    Q.    No, just --

 4                    A.    -- are you asking?

 5                    Q.    Just available to you,

 6          generally.

 7                    A.    Oh, I'd have to check records.

 8                    Q.    Okay.  If you would, please turn

 9          to page 9 of 11 stamped 1343 at the bottom in

10          Exhibit 54.

11                    A.    Uh-huh.

12                    Q.    And at the very top of that

13          page, there's another Vehicle Pursuit

14          Training referenced for now Lieutenant Lanter

15          from November of 2010, right?

16                    A.    Correct.

17                    Q.    And at the bottom -- or, excuse

18          me, strike that.

19                          For that training, does the City

20          possess any records about the topics

21          presented?

22                    A.    I'm not for certain.

23                    Q.    And is it the same circumstances

24          in that 2013 training, as of right now, you

25          don't know whether there are any retained
```

1    records for that training?

2          A.    That is correct.  But I do know

3    that, again, we did our due diligence to

4    supply through discovery the documents that

5    you requested.

6          Q.    At the time of that training,

7    there would have been some kind of City

8    documents relating to the agenda, topics

9    covered, outline, et cetera, right?

10         A.    Potentially.

11         Q.    And do you know whether the

12   Vehicle Pursuit Training offered on that date

13   would have been offered in accordance with

14   the terms of the pursuit policy of the City

15   at that time?

16         A.    Yes, it would have been.

17         Q.    And do you know as you sit here

18   now, were there any substantial differences

19   between the policy in effect in 2010 during

20   that training in comparison with the policy

21   in effect in August 2020?

22         A.    Again, without having them in

23   front of me to compare, I can't answer that.

24         Q.    Okay.  All right.  I want to ask

25   about a couple of other trainings contained

1    in this training record for

2    Lieutenant Lanter.

3              There is at the bottom of the

4    page of 9 of 11, 1343, a Tactical Refresher

5    Training noted from 2009.  Do you see that?

6         A.    Yes.

7         Q.    What did that cover?

8         A.    I don't know at this time.

9         Q.    Did it pertain in any way to

10   pursuit driving?

11        A.    I don't know the answer to that.

12        Q.    If you go to the pages before

13   that, 8 of 11, stamped 1342, in about the

14   middle of the page there's a Defensive

15   Driving In-Service from March of 2012.  Do

16   you see that?

17        A.    Yes.

18        Q.    Do you know whether that

19   training addressed pursuit driving?

20        A.    I do not know.

21        Q.    In the prior page, 7 of 11,

22   stamped at the bottom 1431, there is a

23   training maybe about a third of the way down

24   called Tactics in Traffic Enforcement from

25   April of 2013.  Do you see that one?

Deposition of Chief Teresa Theetge                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    Yes.

2          Q.    Did that training involve any

3    pursuit-related topics?

4          A.    I do not know.

5          Q.    If you would turn back to page 5

6    of 11, stamped 1339 at the bottom, there is a

7    training second from the top called Remedial

8    Driving from December of 2017.  Do you see

9    that?

10         A.    Yes.

11         Q.    And so Officer, or now

12   Lieutenant Lanter, was sent at this time in

13   2017 for Remedial Driving Training by the

14   department, correct?

15         A.    According to these records, yes.

16         Q.    And what was the cause for that

17   referral for remedial driving?

18         A.    I do not know.

19         Q.    Who would know the answer to

20   that?

21         A.    Individual person, I'm not

22   certain, because I don't know what

23   precipitated this Remedial Driver's Training.

24   So I don't know who would have recommended

25   this.

Deposition of Chief Teresa Theetge                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            Q.    Did you review any of the
 2     involved officers disciplinary or personnel
 3     histories before coming to testify?
 4            A.    No.
 5            Q.    Okay.  Here we go.
 6                  MR. HERZIG:  Can we go off the
 7     record for one second?
 8                  MS. GREENE:  Sure.  We'll go off
 9     the record.
10        (Off the record.)
11        (Exhibit 31 was referenced.)
12     BY MS. GREENE:
13            Q.    All right.  Chief, we are back
14     on the record.
15                  I am at this time gonna hand you
16     Exhibit 31 that was previously marked.  And,
17     Chief, this is the record of training for
18     Officer Brett Thomas, correct?
19            A.    Correct.
20            Q.    And in Officer Thomas' training,
21     just go to the last page and we'll start
22     there, 19 of 20 -- or, excuse me, not the
23     last page, the second to the last page
24     stamped at the bottom 1333.
25                  A little more than halfway down
```

 1    the page there's a Vehicle Pursuit Training

 2    noted there from January 22nd, 2007, right?

 3              A.    Yes.

 4              Q.    And that training, as with

 5    Lieutenant Lanter, related to the **Exhibit 32**

 6    Vehicle Pursuit Training Agenda document that

 7    we looked at earlier, right?

 8              A.    Yes.

 9              Q.    Then on the prior page of

10    **Exhibit 31**, Officer Thomas' training record,

11    there is a Vehicle Pursuit Training noted a

12    little more than halfway down the page from

13    December 4th, 2008.  Do you see that?

14              A.    December 4th, yes.

15              Q.    And that training corresponds

16    with the pursuit training document we looked

17    at in **Exhibit 33**, right?

18              A.    Yes.

19              Q.    If you would turn to the page

20    before that stamped at the bottom 1331,

21    Officer Thomas has a Vehicle Pursuit Training

22    noted in his records here from November 17th,

23    2010, right?

24              A.    Yes.

25              Q.    And do you know whether any

1    documents associated with the presentation of

2    that training still exist in the City's

3    possession?

4          A.    I do not know.

5          Q.    There would have at the time of

6    the training been some kind of documentation

7    about the topics presented, though, right?

8          A.    Potentially.

9          Q.    If you would go two pages back

10   to 15 of 20, or City 1329, towards the bottom

11   of the page, there's a Vehicle Pursuit

12   Driving from 2013 in October where

13   Officer Thomas was trained, right?

14         A.    Yes.

15         Q.    And do you know whether the City

16   has in its possession any materials

17   associated with that presentation today?

18         A.    I do not know.

19         Q.    And at the time of that

20   training, there would have been in the City's

21   possession some kind of documentation

22   associated with the topics presented, right?

23         A.    Potentially.

24         Q.    Okay.  And as with

25   Lieutenant Lanter, am I correct in assuming

```
 1      that you don't know whether Officer Thomas

 2      had additional trainings about pursuit

 3      driving that are not noted here?

 4              A.    I do not know.

 5              Q.    And you would defer to his

 6      testimony on that issue as well?

 7              A.    Yes.

 8          (Exhibit 36 was referenced.)

 9   BY MS. GREENE:

10              Q.    Okay.  I am now going to show

11      you what was previously marked as Exhibit 36,

12      and this is an Evaluation Supplement Log for

13      Officer Thomas, right?

14              A.    Yes.

15              Q.    What's an Evaluation Supplement

16      Log?

17              A.    It is a document that -- where

18      we can make notations in their personnel file

19      for several different reasons.  It could be a

20      verbal counseling.  It could be an

21      instructional ESL.  That's what -- an

22      Evaluation Supplement Log, we call it an ESL.

23              It could also be where they've

24      done something positive and we want it noted

25      in their personnel jacket.  So it can be used
```

1    for a multitude of reasons.

2           Q.    Okay.  And so for this

3    particular exhibit, this specific supplement,

4    it notes that Officer Thomas was involved in

5    a vehicle pursuit and he failed to activate

6    his microphone as required under the pursuit

7    policy, right?

8           A.    Yes.

9           Q.    And he was counseled for that

10   action?

11          A.    Yes.

12          Q.    And what's counseling?

13          A.    A verbal conversation, reminding

14   them the next time if they're in a vehicle

15   pursuit, reminding them to turn their

16   microphone on.

17          Q.    What's the purpose of having

18   their microphone on over the course of a

19   pursuit?

20          A.    To capture additional

21   information of the -- the event.

22          Q.    Okay.  And this related to a

23   pursuit on June 30th, 2008, correct?

24          A.    That's the date of the entry.

25          Q.    Okay.

Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    A.    I don't see in the narrative

2    here that it establishes the date of the

3    vehicle pursuit.

4         **Q.    Or is it the June 28th?**

5    A.    Oh, I'm sorry.  There it is,

6    June 28th, yes.  My bad.

7         **Q.    I'm sorry.  I missed that, too.**

8         **All right.  So the pursuit was**

9    **the 28th of June in 2008 and this**

10   **notification to Officer Thomas was July 30th,**

11   **2008?**

12   A.    Yes.

13        **Q.    And then on the end column, it's**

14   **a -- it's called Further Disposition.  Do you**

15   **see that?**

16   A.    Yes.

17        **Q.    What's that mean?**

18   A.    Again, you could put any kind of

19   a narrative in there.  This has Captain Frey,

20   a retired captain with us, has her name in

21   there.

22        **Q.    And what does it indicate, that**

23   **her name is there?**

24   A.    I have no idea.

25        **Q.    Okay.  So is counseling a form**

1    of reprimand in the department?

2            A.    No.  No.

3            Q.    It a form of discipline?

4            A.    No.

5            Q.    And so what is then exactly?

6            A.    It is just a conversation that,

7    you know, we are gonna point out where --

8    areas where we think you could do better.

9            Q.    Okay.  So it's formally noted in

10    a file, but it's not considered formal

11    discipline?

12            A.    Correct.

13            (Exhibit 64 was marked.)

14    BY MS. GREENE:

15            Q.    All right.  We're gonna mark

16    another document, this be Exhibit 64.

17            All right.  Chief, I provided

18    you with Exhibit 64.  And this is another

19    Evaluation Supplement Log for Officer Thomas,

20    correct?

21            A.    Correct.

22            Q.    And it notes that on

23    January 7th, 2010, he had a minor auto

24    accident on duty in a police vehicle, right?

25            A.    That is correct.

1    Q.    And this was an accident where

2    he was found to have been at fault, right?

3         A.    Yes.

4         Q.    And so he was counseled in this

5    event as well, correct?

6         A.    Correct.

7         Q.    And the counseling that was

8    provided told Officer Thomas that he should

9    drive more cautiously in the future, correct?

10        A.    Correct.

11        Q.    What were the underlying events

12   associated with this accident?

13        A.    I do not know.

14        Q.    In any case, this indicates that

15   there was a finding here by his direct

16   supervisor that he was not driving cautiously

17   enough, correct?

18        A.    Which resulted in a minor auto

19   accident.

20        Q.    So, yes?

21        A.    Yes.

22        (Exhibit 61 was referenced.)

23   BY MS. GREENE:

24        Q.    Okay.  All right.  We can set

25   that aside for now.  All right.  I'm gonna

 1      show you another exhibit.

 2                  I'm handing you Exhibit 61.

 3      And, Chief, are you familiar with the

 4      document you have in Exhibit 61?

 5          A.    Yes.

 6          Q.    And this is a compilation of

 7      supervisor performance reports for

 8      Lieutenant Lanter, right?

 9          A.    Is this just one?  Oh, it's more

10      than one --

11          Q.    Yes.

12          A.    -- stapled here.

13          Q.    Yeah, it's three of them.

14          A.    4/2 of '18, 4/2 and '19, and

15      then 4/2 of '21.

16          Q.    And so this first supervisor

17      performance report that begins on the pages

18      stamped at the bottom 146 through 148, this

19      relates to a review conducted on April 2nd,

20      2018, right?

21          A.    The review was conducted -- no,

22      his performance date it says 4/2 of '18, but

23      it looks like the review wasn't conducted

24      until June of '18.

25          Q.    Okay.  Does it address his

1    conduct over the preceding year?

2              A.    That is what these are

3    established to do, yes, but I haven't read

4    the narrative.

5              Q.    Okay.  Looking at the narrative

6    here, the third paragraph, if you could take

7    a moment to read that.

8              A.    (Witness complies.)  Okay.

9              Q.    So this particular review

10   addresses three auto accidents in which

11   Lanter was involved in the preceding year,

12   right?

13             A.    Correct.

14             Q.    And two of those accidents were

15   determined to have been at fault by Lanter,

16   right?

17             A.    According to this document, yes.

18             Q.    And it references one was

19   classified as a Category 1 accident, the

20   other as a Category 2 accident, right?

21             A.    Yes.

22             Q.    What are Category 1 and

23   Category 2 accidents?

24             A.    It can depend on the severity of

25   the accident and what mode they were in,

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    whether they were in emergency mode or not in
 2    emergency mode when the accident occurred.
 3          Q.   Okay.  And so what -- which is
 4    Category 1?
 5          A.   Without having the -- do you
 6    have the procedure on this at all --
 7          Q.   Which --
 8          A.   On the auto accidents?  I just
 9    haven't reviewed it in the recent past, so I
10    don't want to misstate.
11          Q.   I don't know that it's been
12    produced, so I don't believe I have a copy
13    with me.
14          A.   Okay.
15          Q.   So if you want to get one, I'm
16    happy to look at it, but...
17          A.   Yeah.  I just don't want to
18    misstate.
19               MS. GREENE:  Okay.  Well --
20    counsel, can we agree to produce that policy
21    at some point?
22               MR. HERZIG:  No.
23               MS. GREENE:  Why not?
24               MR. HERZIG:  Well, we can talk
25    about that.  I mean, if you want to take up
```

1    deposition time on that, we've produced

2    everything we believe is responsive and

3    relevant to the litigation at this point.

4                And we're here at the very end

5    of the discovery deadline that's been

6    extended many times, so, no, we have -- we

7    don't plan to do that without further

8    justification of why it's relevant to the

9    claims in this case.

10               MS. GREENE:  So the matters of

11   the examination today, for the record I'll

12   note, that Topics 1 includes the City's

13   written and unwritten policy, practices, and

14   customs in effect from January 2010 to the

15   present including various topics such as

16   Topic B, CPD, police vehicle operation, and

17   Topic C, car accidents involving CPD

18   officers.

19               To the extent that this policy

20   addresses those topics, they would have been,

21   I believe, responsive to our earlier request

22   for production.  And, likewise, would be

23   responsive to our requested documents in

24   association with the Notice as well.

25               MR. HERZIG:  Sure.

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1              MS. GREENE:  So I'll disagree

2      with you there, but we can carry on the

3      conversation off the record in a bit.

4      BY MS. GREENE:

5              Q.    In any case, Chief, you don't

6      remember off the top of your head which is

7      Category 1 and Category 2.

8                    But can you at least

9      differentiate for me kind of discretely what

10     one -- what a category is versus the other

11     even if you don't know which title applies to

12     which?

13             A.    Yeah, emergency mode and

14     non-emergency mode.

15             Q.    Okay.  And what's the difference

16     between those two things?

17             A.    Are they responding lights and

18     siren or not?

19             Q.    Okay.  This particular

20     performance report goes on to say that Lanter

21     was issued a Form 66 related to the 11/1/17

22     crash, correct?

23             A.    Correct.

24             Q.    What's a Form 66?

25             A.    That's a written reprimand.

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.     And that's a form of discipline,

2  right?

3      A.     Yes.

4      Q.     This 11/1/17 crash, what were

5  the events underlying that crash?

6      A.     I do not know.

7      Q.     Do you know whether there was a

8  pursuit involved?

9      A.     I do not.

10     Q.     For that particular crash, this

11  narrative notes that the Form 66 found

12  violations by Lanter of the CPD Manual of

13  Rules and Regulation, Rules 7.02 and 7.07,

14  right?

15     A.     That's what it states, yes.

16     (Exhibit 12 was referenced.)

17  BY MS. GREENE:

18     Q.     Okay.  And I'm gonna show you

19  the copy of Manual of Rules and Regulations

20  we have as Exhibit 12.

21     A.     Okay.

22     Q.     This particular copy is not the

23  version that was in effect in 2017, right?

24     A.     No.

25     Q.     But looking at Rules 7.02 and

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    7.07 here, which are located on pages 1486

2    and 1487 --

3        A.    Uh-huh.

4        Q.    -- are there any substantial

5    differences between the versions stated here

6    in this 2023 version versus the version that

7    would apply in 2017?

8        A.    I do not know without comparing

9    both of them.  But to the best of my

10    recollection, there has not been substantial

11    changes in those two rules.

12        Q.    Okay.  So 7.02, as far as you

13    recall, has -- did in 2017 relate to the

14    requirement that officers operate official

15    vehicles in a careful and prudent manner and

16    that they conform to department procedures

17    relating to operation, right?

18        A.    Yes.

19        Q.    And then 7.07 in 2017, related

20    to officers operating or riding as passengers

21    in vehicles owned or leased by the

22    department, and wearing their seat belts,

23    correct?

24        A.    Correct.

25        Q.    Okay.  What was the outcome of

1      **that discipline that Lanter received for**

2      **this -- by way of this Form 66 in relation to**

3      **the 11/1/17 crash?**

4              A.    What do you mean by the outcome?

5      He got a written reprimand.

6              **Q.    Okay.  And did that have any**

7      **impact on his -- in his pay, his days hours**

8      **worked, his employment, generally?**

9              A.    Not to my knowledge.

10             **Q.    And --**

11             MR. HERZIG:  I'll just -- we

12     have produced the policy you asked about,

13     12.035.

14             MS. GREENE:  Okay.

15             MR. HERZIG:  I'll hand to you --

16     it's at City 02448.  It's been a problem --

17             MS. GREENE:  Okay.  Thanks.

18             MR. HERZIG:  -- sometimes when

19     you guys keep asking us for documents that

20     you already have.  Some of the lists you sent

21     me this morning includes documents that you

22     have in the record.

23             MS. GREENE:  I think sometimes

24     what happens is we're not sure what certain

25     things are, and it's hard to figure it out,

```
 1            but I appreciate you pointing me to this.

 2                      MR. HERZIG:  Okay.

 3                      MS. GREENE:  Thank you.  I'll

 4            correct my statement that we didn't have it,

 5            but that's what it is.

 6                      MR. HERZIG:  You have the same

 7            responsibility to know the documents that we

 8            do.

 9                      MS. GREENE:  I understand that.

10            Thank you.

11            BY MS. GREENE:

12                 Q.   All right.  So getting back to

13            this particular performance report,

14            Exhibit 61, during the counseling -- or,

15            excuse me, not during the counseling -- it's

16            noted here that Sergeant Lanter is reminded

17            that, as a supervisor, he's considered a role

18            model for subordinate officers and is in a

19            powerful position of influence for those

20            officers under his supervision, right?

21                 A.   Yes.

22                 Q.   And that information was

23            conveyed to then Sergeant Lanter as a

24            remainder how, in writing, in some other

25            form?
```

Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Your -- your question was this
 2    what you just read conveyed to
 3    Sergeant Lanter at the time?
 4              Q.    Yes.
 5              A.    I can't say for certain.  I
 6    don't see his signature on here that he
 7    reviewed this document, and I don't know what
 8    would have occurred in a verbal conversation.
 9              Q.    Okay.  Would he have received a
10    copy of this performance report at some
11    stage?
12              A.    Potentially.
13              Q.    Okay.  All right.  So let's
14    carry on to the page stamped at the bottom 11
15    -- or, excuse me, 144.
16              A.    Okay.
17              Q.    And here we're looking at
18    another Supervisor Performance Report for
19    Lanter from April 2nd, 2018, to April 2nd,
20    2019, right?
21              A.    Yes.
22              Q.    And in this --
23              MS. GREENE:  Oh, did someone say
24    something?
25              MR. HERZIG:  No, I knocked a
```

1    bottle.  I apologize.

2                    MS. GREENE:  That's okay.

3    Sorry.  I just thought I heard a question.

4    BY MS. GREENE:

5          Q.    All right.  So in this

6    particular review, he was -- it's noted that

7    he was involved in two vehicle crashes,

8    right, at the very bottom in the last

9    paragraph there?

10         A.    Yes.  There's one sentence that

11   addresses that.

12         Q.    And for those crashes, was he

13   determined to have been at fault?

14         A.    I do not know.

15         Q.    Did he receive any discipline

16   for those events?

17         A.    I do not know.

18         Q.    And was he determined to have

19   violated any departmental policies for those

20   events?

21         A.    I do not know.

22         Q.    Was he given any counseling or

23   other informal response from the department

24   in association with those crashes?

25         A.    I do not know.

1    Q.    And who would know the answers

2    to those questions?

3         A.    I believe Lieutenant Lanter.

4         Q.    Beyond Lieutenant Lanter, who

5    else in the department would know?

6         A.    It would be in the department

7    records, but to ask -- to be able to answer

8    your question to what individual do I know

9    would know the answer to your questions, I

10   have no idea.

11        Q.    Okay.  All right.  Let's go

12   to -- well, strike that.

13             Before we move on, in any case,

14   this document does indicate that Lanter was

15   involved in two crashes during that calendar

16   year, correct?

17        A.    Yes.

18        Q.    And those are different from the

19   crashes we talked about in the earlier

20   evaluation, right?

21        A.    Potentially.  Again, I'd have to

22   look at the records in front of me to see to

23   verify.

24        Q.    Looking at the third performance

25   report included in this exhibit starting at

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    page 2120 stamped at the bottom --

2         A.    Uh-huh.

3         Q.    -- there is a section on the

4    right-hand side, some check boxes called

5    Service Award Status.  Do you see that?

6         A.    Yes.

7         Q.    And there's a -- something

8    called Safe Driving Award on the right-hand

9    column.

10        A.    Yes.

11        Q.    And Lieutenant Lanter for the

12   period of April 2nd, 2020, through April 2nd,

13   2021, was deemed eligible for the Safe

14   Driving Award, right?

15        A.    Yes.

16        Q.    And what is the Safe Driving

17   Award?

18        A.    Again, without having the

19   procedure in front of me to know it verbatim,

20   it is a period of time in which they've not

21   been involved in auto accidents and exhibited

22   safe driving habits while behind the wheel of

23   a department-issued vehicle.

24        Q.    Does that include pursuit

25   driving?

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    They could be involved in a

2    vehicle pursuit and still get a Safe Driving

3    Award, if that's your question.

4          Q.    You were mentioning a moment

5    ago, and I forget exactly how you put it, but

6    that behind the wheel of a department vehicle

7    they had been driving safely over the review

8    period, right?

9          A.    Correct.

10         Q.    So to make sure I'm clear then,

11   that safe driving determination, does that

12   include any pursuits the officer was involved

13   in?

14         A.    Again, your question, I think,

15   is a little vague.  They could be involved in

16   a vehicle pursuit, driven in that pursuit

17   safely, and still be eligible for the Safe

18   Driving Award.  So part of the answer is,

19   yes, to your question.

20         Q.    Okay.  Thank you.

21         A.    Uh-huh.

22         Q.    Is there any kind of recognition

23   associated with that eligibility for the Safe

24   Driving Award?

25         A.    Yes.  They have the ability to

```
 1   wear a ribbon.
 2            Q.    Okay.  Anything else?
 3            A.    No.
 4            Q.    All right.  So we can set that
 5   aside for now.  I'm going to hand to you
 6   Plaintiffs' Exhibit 60.
 7                 MR. HERZIG:  Sixty?
 8                 MS. GREENE:  Yes.
 9                 MR. HERZIG:  Thank you.
10        (Exhibit 60 was referenced.)
11   BY MS. GREENE:
12            Q.    All right.  And, Chief, I'll
13   represent to you this is a collection of
14   Vehicle Pursuit Reports produced in
15   association with this case as well as one
16   addendum, I believe just one addendum, to one
17   such report as well.
18                 Have you seen these documents
19   before?
20            A.    I don't think I've reviewed
21   these particular documents, no.
22            Q.    Okay.  Well, my question
23   relating to these documents would be, one, if
24   you know whether there are any other vehicle
25   pursuits that Lanter engaged in the course of
```

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 107 of 261 - Page
ID#: 2520
Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1  **his career that are not contained in the**

2  **packet; is that a question you would be able**

3  **to answer?**

4          A.    While I do not know for sure, I

5  know that we did, again, do our due diligence

6  in providing the records that were requested

7  of the City.

8          **Q.    Okay.  And for these pursuits,**

9  **was Lieutenant Lanter determined to have**

10 **violated any department policies, as far as**

11 **you're aware, outside of the violations**

12 **associated with the August 7th, 2020,**

13 **pursuit?**

14         A.    I'd have to review each one of

15 these in their entirety to be able to answer

16 that.

17         **Q.    Okay.  Do you defer to the**

18 **description of events contained in these**

19 **pursuit reports as being accurate?**

20         A.    Yes.

21         **Q.    Do you know whether there are**

22 **any IIS or CIRB reports associated with**

23 **Sergeant Lanter's pursuit driving other than**

24 **in this case?**

25         A.    I do not know.

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Do you know whether he was

2    investigated at any time by the department

3    for his actions during pursuits other than in

4    relation to this case?

5    A.    I am aware now.  I was not at

6    the time, but I am aware now.

7    Q.    And what do you mean?

8    A.    After the August '20 event, I

9    became aware of a prior vehicle pursuit that

10   Lieutenant Lanter was involved in that I did

11   not know about before the August '20 event.

12   Q.    And what was that pursuit?

13   A.    I don't know the specifics of

14   it.  I just know that there was another

15   vehicle pursuit I believe maybe it involved a

16   taxi.

17   Q.    Did it result in fatalities?

18   A.    I'm not a hundred percent

19   certain, but I believe so.

20   Q.    And for that earlier pursuit, do

21   you know whether there was any Internal

22   investigation?

23   A.    I do not know.

24   Q.    Was Lieutenant Lanter found to

25   have violated any department policies in

Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    association with that pursuit?
 2           A.    I do not know.
 3           Q.    All right.  Let's talk about
 4    document retention.  I'm going to provide you
 5    with another document.  We'll mark this as
 6    65.
 7          (Exhibit 65 was marked.)
 8    BY MS. GREENE:
 9           Q.    Okay.  Chief, you have in front
10    of you Exhibit 65.  Have you seen this
11    document before?
12           A.    Not this particular one, no.
13           Q.    Are you familiar with the
14    Records Retention Schedules of the City of
15    Cincinnati?
16           A.    Yes.
17           Q.    And are you familiar with the
18    Records Retention Schedules as applied to
19    police department documents?
20           A.    Yes.
21           Q.    Earlier we were talking about
22    the preservation of radio traffic by ECC,
23    does there -- is there a provision here that
24    you're aware of that would cover retention of
25    those recordings?
```

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.   I would have to go through this

2   list to see if there's one on there.

3      Q.   Yeah.  Sure.  Take a -- take a

4   moment and go ahead.

5      A.   (Witness complies.)  I do not

6   see one that specifies radio transmission.

7      Q.   Okay.  Is this a retention

8   schedule pertaining strictly to the

9   Department of Law, or does it also apply to

10   city-wide?

11      A.   Based on the title at the top of

12   this document, it says Department of Law.

13      Q.   Okay.  Let me ask you this,

14   what's the retention schedule for IIS or

15   Internal investigation documents?

16      A.   So some of that is governed by

17   FOP contract language, what stays in their

18   personnel jacket and for how long.  Other is

19   governed by the retention schedule and how

20   long we keep the file itself.  So there's a

21   difference in the keeping of the records.

22      Q.   So with respect to the IIS file

23   itself, how long are those retained?

24      A.   I believe, if my memory serves

25   me correctly, it's the current year plus ten.

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.     So the year of the event plus

2     ten --

3          A.     Plus ten.

4          Q.     -- years after?

5          A.     Uh-huh.  Well, you say year of

6     the event, so I'm saying, like, it'd be 2025

7     plus ten years prior.  Not -- we're talking

8     about an incident that occurred in 2020, that

9     year plus ten years prior --

10          Q.     I see.

11          A.     -- current year plus ten.

12          Q.     Okay.  Thank you.  And then that

13     includes everything that would be in the IIS

14     file, right?

15          A.     Yes.

16          Q.     So notes, drafts, Post-its,

17     e-mails, the whole nine yards, right?

18          A.     Potentially, yes.

19          Q.     And that includes the actual

20     file jacket to any physical file as well,

21     right?

22          A.     Yes.

23          Q.     Okay.  And when you say

24     potentially, do you mean that if notes,

25     drafts, et cetera, as I described earlier,

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    were placed in the file, then they would be
 2    subject to that retention schedule?
 3           A.    Yes.   If they're in the file.
 4    But based on my experience at Internal at
 5    different levels, if you put a Post-it note
 6    on saying, Captain, can I get your signature
 7    on this?  They may not keep that Post-it
 8    note.  They give you the report back with
 9    their signature on it.
10           Q.    Notes containing substantive
11    information, though, those should be
12    retained, right?
13           A.    Correct.
14           Q.    Then you said it depends on
15    whether it goes in the investigation file for
16    IIS or whether it goes in a personnel file as
17    to the length of retention?
18           A.    Correct.
19           Q.    So for the personnel file pieces
20    of this, what kinds of items from IIS would
21    go there?
22           A.    So if they -- if there is a
23    sustained finding and an officer gets a
24    discipline, if it is less than 56 hours, it
25    is retained in their file for three years.
```

1        If it's 56 hours or more, then

2   it is retained in their personnel file for

3   seven years.

4        Q.    Okay.  And when you say

5   "retained," does that mean that those

6   disciplinary findings are purged insofar as

7   whether they can be applied to future

8   evaluations of that employee's conduct?

9        A.    No.  What it means is they're no

10  longer -- longer accessible under -- if

11  somebody asked for a request for somebody's

12  personnel file, they've been purged based on

13  the collective bargaining.

14        And when you say for evaluation,

15  for their performance evaluation, we would

16  only look back the 12 months, as you

17  indicated on that previous exhibit.  We look

18  for that.  The evaluation, they're evaluated

19  on their 12 months of performance, not going

20  back into their file and evaluating them on

21  conduct outside that 12-month window.

22        Q.    Copies of those disciplinary

23  documents are also maintained in the IIS file

24  itself, right?

25        A.    Yes.

1    Q.    So those versions are accessible

2    from the date plus ten years, right?

3         A.    Yes.

4         Q.    And for the versions that go in

5    the personnel file that you said become no

6    longer accessible, are they destroyed, or are

7    they just not accessible?

8         A.    They are purged.  I'd have to

9    check with our personnel director to see

10   what -- what process they use for that.

11        Q.    Okay.  All right.  What about

12   CIRB reports and files, what's the retention

13   for those?

14        A.    Those are -- normally a CIRB is

15   conducted as a result of an Internal

16   investigation.  And so that once that is

17   completed, that would go into the Internal

18   file, and it would be the same retention

19   schedule as the Internal file.

20        Q.    And the same retention of notes,

21   as we discussed before with the Internal

22   file, those practices would apply to CIRB

23   documents and communications as well?

24        A.    Yes.

25        Q.    Okay.  For any discipline

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    associated with CIRB reports, do the same

2    practices we just discussed in relation to

3    IIS apply as well?

4          A.    Ask that question, again,

5    please.

6          Q.    For the disciplinary findings

7    associated with CIRB reports, do the same

8    practices that we discussed in association

9    with IIS or any discipline apply to CIRB or

10   any discipline as well?

11         A.    So CIRB would not recommend or

12   have discipline attached with it.  That would

13   be in an Internal report, not a CIRB.

14         Q.    So Internal reports only result

15   in discipline, not CIRB?

16         A.    Correct.

17         Q.    Okay.  Now, CIRB can refer for

18   refresher training, for example, right?

19         A.    Yes.

20         Q.    What else can CIRB do in

21   response to rules and policy violations?

22         A.    So the main purpose of a

23   Critical Incident Review Board is to look at

24   the event kind of holistically through the

25   department for best practices.

1              And so that's why there are --

2       certain people were in the room for the CIRB,

3       such as our -- our tactical planning

4       supervisor, our training supervisor,

5       Inspections, because they look at events to

6       see do we, as a whole as a department, need

7       to change something that we do in training,

8       something that we do tactically, something

9       with our equipment, so that we can improve

10      upon what this event was if we have one

11      similar in the future.

12              Q.    And the CIRB can as well find

13      that individual officers need more training

14      to comply with department standards, right?

15              A.    They can.

16              Q.    And for referrals for additional

17      training, are those maintained in the CIRB

18      file, which is then placed in the IIS file?

19              A.    Potentially.  Sometimes those

20      records are housed at the academy.  They may

21      not have made their way back into the

22      Internal file.

23              Q.    Okay.  For any such records, how

24      did the academy -- what would be the

25      retention schedule for those documents?

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            A.    I'd have to double-check.  I'm
 2    not certain.
 3            Q.    And that would be for refresher
 4    or remedial training, right?
 5            A.    Right.
 6            Q.    And are those terms
 7    interchangeable, refresher and remedial
 8    training?
 9            A.    It can be, yes.
10            Q.    Okay.  In your experience in the
11    department, has the CIRB made any
12    department-wide findings relating to pursuit
13    practices and policies in association with
14    any specific pursuit?
15            A.    We had one recently where the
16    recommendation was to clarify some wording in
17    some of the procedure defining lights and
18    sirens as establishing a vehicle pursuit
19    versus maybe an officer who is following the
20    pursuit but they are not in the pursuit, what
21    constitutes being in the pursuit versus just
22    monitoring and following it.
23            Q.    And when was that recommendation
24    raised?
25            A.    A few years ago.  I can't
```

1    remember the date.

2         Q.    Before this pursuit in August of

3    2020 or after?

4         A.    I think it was -- I think the

5    recommendation was a bit after, if I recall

6    correctly.

7         Q.    Are there any other

8    department-wide findings from the CIRB

9    relating to pursuits that you're aware of?

10        A.    Not that I can recall.

11        Q.    This recommendation about lights

12   and sirens and following versus participants

13   in pursuits, did that in any way relate to

14   the August 7th, 2020, pursuit?

15        A.    No.

16        Q.    Were there any changes in City

17   policies that were connected in any way to

18   the August 7th, 2020, pursuit?

19        A.    We had a revision to our vehicle

20   pursuit policy under Chief Isaac just before

21   his retirement, but I don't know that it was

22   directly related to this incident or just a

23   best practice.

24        Q.    And were there any changes --

25   well, actually, before I move on, let me ask.

1  What was the revision to the policy in

2  general terms?

3          A.    Yeah.  It restricted -- became

4  more restrictive on our policy that now they

5  can only engage in a vehicle pursuit for

6  violent felons only.

7          Q.    Was that to -- was that revision

8  a restriction put in place for safety

9  reasons?

10         A.    Again, I didn't have

11  conversation with Chief Isaac, so I don't

12  know why he made the revision.  However, that

13  current revision would have still allowed

14  this vehicle pursuit on August 7th to have

15  occurred.

16         Q.    Were there any other changes in

17  City -- or police department practices or

18  procedures that arose as a result of the

19  August 7th, 2020, pursuit accepting the

20  formal policy, the written policy piece, were

21  there any other practices or procedures I'm

22  asking about now?

23              MR. HERZIG:  Objection to the

24  word other, but you can answer.

25         A.    Not to my knowledge.

1    Q.    Okay.  Can you describe to me,

2    please, litigation filed against the City or

3    its agents from January 1st, 2010, to present

4    relating to police vehicle pursuits?

5         A.    Other than this one, I

6    personally am not aware of any.

7         Q.    Did you review any documentation

8    relating to litigation against the City

9    concerning pursuits prior to testifying

10    today?

11        A.    No.

12        Q.    Are you aware of any

13    litigation -- well, strike that.

14              Are you aware of any litigation

15    against Timothy Lanter, Brett Thomas -- or

16    Brett Thomas in association with the rules of

17    CPD officers other than this case?

18        A.    No.

19        Q.    And when you say no, does that

20    mean you don't know about any or --

21        A.    I'm not aware of any.

22        Q.    And did you review any

23    documentation associated with that question

24    before coming today?

25        A.    No.

1      Q.    Generally speaking for your

2   preparation for the deposition, other than

3   what you were provided or told by counsel,

4   did you undertake any other steps to prepare?

5          A.    Just what I mentioned earlier

6   about contacting ECC director to find out

7   about the retention for radio traffic.

8          Q.    Did anyone other than counsel

9   from within the City do anything to aid in

10   your preparation?

11         A.    No.

12               MR. HERZIG:  Can we go off the

13   record for one second?

14               MS. GREENE:  Off the record.

15      (Off the record.)

16               MS. GREENE:  We're back on the

17   record.

18               MR. HERZIG:  The Chief would

19   like to clarify her answer.

20   BY MS. GREENE:

21         Q.    Okay.  Go ahead.

22         A.    Just clarification that the

23   documents that were provided to me through

24   counsel, that I've read and reviewed those

25   documents.

1    Q.    Do you take the position that

2    the conversations with counsel are

3    privileged?

4              MR. HERZIG:  Let's go off for

5    just a second.

6              MS. GREENE:  Off the record.

7      (Off the record.)

8    BY MS. GREENE:

9    Q.    All right.  We're back on the

10   record.  Chief, with respect to how you were

11   prepared to testify in the topics designated

12   in our 30(b)(6) Notice, which we've marked

13   today as Exhibit 63, can you explain to me

14   what -- what preparation, other than the

15   documents that we've talked about, you

16   engaged in with counsel or otherwise?

17   A.    Yeah.  So one day last week I

18   met with -- excuse me, met with counsel.

19   They explained to me what was gonna be going

20   on here today at the deposition.  We went

21   over documents that they had provided to

22   yourself.

23              And we discussed some of them,

24   and then I walked away with the documents and

25   reviewed them outside of our meeting.

1    Q.    Okay.  And so those are

2    documents that counsel gave to you?

3    A.    Yes.

4    Q.    And those are the documents that

5    we have identified already today in the

6    deposition, right?

7    A.    Yes.

8    Q.    Were there any other documents

9    provided to you that we haven't identified

10   today?

11   A.    No, I don't think so.

12   Q.    And did you receive any

13   homework, so to speak, to go and look at, for

14   example, personnel or disciplinary files for

15   involved persons --

16   A.    No.

17   Q.    -- persons in this case?  Did

18   you receive any homework to learn about

19   earlier litigation against the City or these

20   officers for any topic noted in our 30(b)(6)

21   Notice?

22   A.    No.

23   Q.    Did you receive any instruction

24   to review the training of these --

25   specifically of Officers Lanter and Thomas

1    over the course of their careers?

2            A.    No.

3            Q.    And did you receive any homework

4    to review discipline proposed and imposed

5    upon those officers for any aspect of their

6    police and work over their careers?

7            A.    No.

8            Q.    And did you receive any homework

9    to review vehicle accidents that those

10   officers were involved in over the course of

11   their careers with the CPD?

12           A.    No.

13           Q.    Did you receive any homework to

14   review completed and proposed personnel

15   evaluations, investigations, cautions,

16   counseling, reprimands, training, retraining,

17   or discipline of any kind for the

18   Officers Thomas and Lanter in association

19   with your deposition preparation?

20           A.    No.

21           Q.    Did you receive any instruction

22   to review any IIS or CIRB investigations or

23   reports associated with pursuits that these

24   officers had previously been involved in?

25           A.    Previous to August 20th (sic)?

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            Q.    Yes.

 2            A.    No.

 3            Q.    Did you receive any homework to

 4     review IIS or CIRB investigations or reports

 5     relating to any -- any event after this

 6     August 7th, 2020, concerning Officers Thomas

 7     and Lanter?

 8            A.    No.

 9            Q.    Did you receive any homework to

10     identify -- or, excuse me, to review whether

11     the City had made efforts to identify or

12     investigate risks or officer misconduct

13     associated with police pursuits from

14     January 2010 to present?

15            A.    No.

16            Q.    Did you receive any instruction

17     to familiarize yourself with the IIS or CIRB

18     processes relating to this case outside of

19     the contents of the final official reports

20     and your personal involvement?

21            A.    No.

22            Q.    And outside of the text message

23     we've spoken about in relation to retention

24     of radio traffic recordings, did you receive

25     any homework to familiarize yourself with
```

 1    document retention policies pertaining to

 2    department documents prior to your

 3    deposition?

 4            A.    No.

 5            Q.    Did you receive any homework to

 6    familiarize yourself with the efforts by the

 7    City to locate and produce information and

 8    files responsive to plaintiffs' discovery

 9    requests in this case?

10            A.    No.

11            Q.    For all of these questions I

12    just asked you about, whether you received

13    homework or instruction to familiarize or

14    prepare yourself in association with various

15    topics, did you on your own accord undertake

16    any steps to familiarize yourself with those

17    topics?

18            A.    No.

19                  MS. GREENE:  All right.  Let's

20    mark a few more documents.  I think we're on

21    Exhibit --

22                  THE COURT REPORTER:  66.

23                  MS. GREENE:  -- 66.  Thank you.

24         (Exhibit 66 was marked.)

25    BY MS. GREENE:

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 127 of 261 - Page
ID#: 2540
Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    All right.  You've been handed

2  Exhibit 66.  Are you familiar with this

3  document?

4      A.    No.

5      Q.    I'll represent to you this was

6  produced to the plaintiff with a document

7  entitled that indicated these were notes from

8  Lieutenant Caton.  Does that sound familiar

9  to you?

10      A.    Notes from Lieutenant Caton?

11      Q.    Caton, yes.

12      A.    No.

13          MS. GREENE:  Can we stipulate

14  that these are Caton's notes from the CIRB in

15  this case?

16          MR. COWAN:  Let me -- let me

17  just check the Bates.

18          MR. HERZIG:  Likely, yes.

19          MS. GREENE:  Thank you.

20          MR. HERZIG:  There are -- there

21  are multiple personnel with the last

22  name Caton.  We're talking about

23  Amanda Caton, correct?

24          MS. GREENE:  Yes.

25          MR. COWAN:  We can stipulate.

```
 1              MR. HERZIG:  Yeah, we can
 2    stipulate.  Thank you.
 3              MS. GREENE:  Thank you.  So
 4    we're stipulating Exhibit 66 are
 5    Lieutenant Caton's notes associated with the
 6    CIRB review in this case, correct?  Right,
 7    counsel?
 8              MR. HERZIG:  Oh, yes.
 9              MS. GREENE:  Thank you.  I just
10    wanted to clarify the whole thing for the
11    record.
12         (Exhibit 67 was marked.)
13    BY MS. GREENE:
14         Q.    Okay.  We're gonna mark 67 now.
15    Okay.  Chief, you have in front of you
16    Exhibit 67.  And do you recognize the
17    documents contained here?
18         A.    I have not seen these before,
19    but it looks like they're questions in
20    prepping for an interview.
21         Q.    Okay.
22              MS. GREENE:  Counsel, I don't
23    have my computer up in front of me, but do
24    you happen to know the document title this
25    was produced by any chance offhand?
```

1           MR. COWAN:  The file name?

2           MS. GREENE:  Yeah.

3           MR. COWAN:  Handwritten.

4           MS. GREENE:  Just handwritten?

5           MR. COWAN:  And I don't -- I

6    wouldn't ascribe that title to the actual

7    creator of the document.

8    BY MS. GREENE:

9        Q.   So, Chief, are you able to tell

10   me whose handwriting appears on this

11   document?  I believe you I see maybe a few

12   sets --

13           MR. HERZIG:  Sorry.  Sorry.

14   Before you -- if you'd hold on.

15           MS. GREENE:  Sure.

16           MR. HERZIG:  So we'll stipulate

17   that Exhibit 67 is Sergeant Fink's -- is a

18   version of this document with handwriting

19   from Sergeant Fink.

20           MS. GREENE:  Okay.  And is all

21   the handwriting in the document Fink's?

22   Because it looks like there might be a couple

23   different people in here when I do it, but

24   I'm not a handwriting expert, so...

25           MR. HERZIG:  Yes.  Our -- our

1    understanding is these are all of his

2    handwritten notes from the IIS file.

3                    MS. GREENE:  Thank you.  And

4    this is the entirety of the IIS file outside

5    of the report, or are we just calling this

6    Fink's handwritten notes from the IIS file?

7                    MR. HERZIG:  Just to be safe, I

8    would call it the latter, but we don't think

9    there was anything else left to produce from

10   the IIS that you all haven't received.  I'm

11   not sure if this is everything, but we

12   believe you have everything.

13                   MS. GREENE:  Okay.  All right.

14   So for the record, the parties stipulate that

15   Exhibit 67 contains handwriting from

16   Sergeant Fink pertaining to the IIS review in

17   this case, right?

18                   MR. HERZIG:  Yes.

19                   MS. GREENE:  Thank you.  And

20   we're gonna go ahead and mark Exhibit 68.

21      (Exhibit 68 was marked.)

22   BY MS. GREENE:

23        Q.    Okay.  I'm showing you now

24   Exhibit 68.  Chief, is this familiar to you?

25        A.    It looks like it may be the

1    final, or some of the pages from the Internal

2    report, but not its entirety.

3                   MS. GREENE:  And, counsel, is

4    there any stipulation you'd like to offer on

5    this document?  It's also part of the most

6    recent production.

7                   MR. HERZIG:  We'll stipulate

8    that these are notes provided by

9    Lieutenant Lanter that you received in

10   that -- in that production right before his

11   deposition.

12                  MS. GREENE:  Okay.  So these are

13   Lanter's notes --

14                  MR. HERZIG:  Yes.

15                  MS. GREENE:  -- in Exhibit 68?

16   Okay.  All right.

17                  MR. HERZIG:  If it helps, we

18   believe we produced them last Friday morning.

19                  MS. GREENE:  Yeah, it was part

20   of the production from Friday the --

21                  MR. HERZIG:  Yeah.

22                  MS. GREENE:  -- 25th.  I just

23   wanted to check the title on it.

24                  MR. HERZIG:  All of that was

25   additional information from

Deposition of Chief Teresa Theetge                                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Lieutenant Lanter.

2             MS. GREENE:  Everything was from

3    Lanter?  I just -- for the record, this

4    document was titled at the time of production

5    as IIS Investigation Determination along with

6    the Bates range associated with these pages.

7             And so my question is, is this

8    Lanter's notes or is this an IIS document?

9             MR. COWAN:  So the metadata that

10   we produced this with has the file name IIS

11   Report and the custodian is Tim Lanter.

12            MS. GREENE:  Okay.

13            THE COURT REPORTER:  The

14   custodian is what?

15            MR. COWAN:  Custodian is

16   Tim Lanter.

17            THE COURT REPORTER:  Okay.

18            MS. GREENE:  All right.  So

19   Exhibit 68 are indeed Lanter notes, right?

20            MR. HERZIG:  Yes, stipulated.

21            MS. GREENE:  Okay.  Thank you.

22   BY MS. GREENE:

23        Q.    Okay.  So let's see here.  I

24   would briefly like to got back to the CIRB

25   report in this matter, which I believe you

1    have already in that -- the big stack of

2    papers we've got in front of you there.

3         A.    Exhibit 9?

4         Q.    Yes, Exhibit 9.  So the CIRB

5    findings in this matter, how did it come to

6    be that the CIRB was convened here?

7         A.    That would have been at

8    Chief Isaac's discretion.

9         Q.    And the CIRB in its

10   determinations flow from the use-of-force

11   policy of the department; is that right?

12        A.    No, not necessarily.  So we

13   have -- it's Critical Incident Review Board

14   because not every critical incident involves

15   a use of force.

16             So the chief can determine any

17   incident, whether it involves force or not,

18   if he thinks -- if he or she thinks could

19   be -- better the department by being reviewed

20   by the CIRB, they can send it there.

21             MS. GREENE:  Okay.  I'm gonna

22   mark Exhibit 69.

23        (Exhibit 69 was marked.)

24   BY MS. GREENE:

25        Q.    All right.  Chief, you have in

1    front of you **Exhibit 69**.  This is the

2    department's Policy 12.545 Use of Force that

3    was in effect in August of 2020, correct?

4                 A.    Yes.

5                 MS. GREENE:  And for the record,

6    in Lieutenant Caton's deposition, we had some

7    testimony associated with this policy.  At

8    the time, we didn't have the version

9    effective in August of 2020.  So I marked

10   this in association with that.

11   BY MS. GREENE:

12               **Q.    But, Chief, my question to you**

13   **is, does this policy contain information**

14   **indicating the authority of the CIRB to**

15   **review this matter of the August 7th, 2020,**

16   **pursuit?**

17               A.    Give me a moment to look through

18   it here real quick.

19               **Q.    Sure.**

20               A.    Is your question whether or not

21   the CIRB is noted in here, or are you -- are

22   you asking this is a use of force as outlined

23   in here as something that would go to the

24   CIRB?  I'm confused.

25               **Q.    My question is whether the CIRB**

1    and the authority under which it was convened

2    in this case, if there's anything in that

3    use-of-force policy that describes that

4    authority?

5            A.    I do not believe so.  I don't

6    believe their force as defined by us would be

7    in this -- we didn't use force as a

8    definition in here on that incident, that was

9    a vehicle pursuit.  However, a use-of-force

10   incident could end up with the CIRB.

11           Q.    Is there a separate policy that

12   describes the CIRB's authority to review

13   critical incidents such as the pursuit at

14   issue here?

15           A.    We have a procedure on CIRB.

16           Q.    Part of the policy manual, when

17   you say you have a procedure on CIRB, is that

18   what you're talking about?

19           A.    Yes.

20           Q.    Okay.

21           A.    It -- it might also be outlined

22   under the Firearms Discharge Review Board.

23           Q.    Okay.

24           A.    The titles can somewhat be

25   interchanged, but really they have separate

```
 1   roles.
 2          Q.    Thank you.  In any case, a
 3   Critical Incident Review Board was convened
 4   here at the chief's discretion, correct?
 5          A.    Yes.
 6          Q.    And what was the reason the
 7   chief convened the board here?
 8          A.    I do not know.  I didn't ask
 9   him.
10          Q.    Is it reported anywhere in a
11   document that you know of?
12          A.    I think on the front page of the
13   Internal report it simply indicates in
14   Chief Isaac's handwriting for it to go to the
15   CIRB.
16          Q.    Okay.
17                MR. HERZIG:  Tell her what
18   exhibit you're referring to.
19          A.    Oh, Exhibit Number 3.
20          Q.    Thanks.
21          A.    Uh-huh.
22          Q.    And for that indication in
23   Exhibit 3, are you talking about on the front
24   page of that report?
25          A.    Yes.
```

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Thank you.  And you don't have

2    any other knowledge other than the words

3    written on that page as to why the CIRB was

4    convened here?

5    A.    Correct.

6    Q.    But this was deemed -- this

7    pursuit was deemed a critical incident by the

8    department, correct?

9    A.    Yes.

10   Q.    Okay.  Let's talk about the IIS

11   report, which you have in front of you,

12   Exhibit 3.  How did it come to be that an IIS

13   investigation was initiated in this matter?

14   A.    All Internal reports -- or, I'm

15   sorry, Internal investigations are convened

16   at the chief's discretion.

17   Q.    So the chief decided to conduct

18   the Internal investigation here as well?

19   A.    Yes.

20   Q.    And what was the basis for that

21   determination?

22   A.    The vehicle pursuit that ended

23   in a fatality.

24   Q.    And why did the chief determine

25   an investigation was necessary?

```
 1          A.    I don't know.  I did not have a
 2    discussion with him at that time.
 3          Q.    As you sit here today based on
 4    your experience in the department, why do you
 5    believe an investigation was convened into
 6    this particular pursuit?
 7          A.    Because it's a critical incident
 8    of significant nature, and we investigate all
 9    of those.
10          Q.    Okay.  In association with the
11    CIRB and IIS findings here, officers involved
12    in this pursuit were referred for retraining,
13    correct?
14          A.    Correct.
15                MS. GREENE:  Okay.  And I'm
16    going to mark this as 70.
17         (Exhibit 70 was marked.)
18    BY MS. GREENE:
19          Q.    Okay.  Chief, you have
20    Exhibit 70 in front of you.  Earlier today
21    you testified about seeing some Forms 17
22    associated with this case, and we looked at
23    one of them.
24          A.    Uh-huh.
25          Q.    Does this exhibit contain the
```

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1     others that you saw?

2          A.    Yes.

3          Q.    Okay.  And there are two

4     Form 17s contained in this exhibit, right?

5          A.    Yes.

6          Q.    And so these records represent

7     that the department referred Officers Thomas,

8     Harper, and Lanter for retraining relating to

9     their pursuit driving, correct?

10         A.    Yes.  The first -- the top one

11    indicates that the training section

12    lieutenant was scheduling the date and time,

13    and they had to make sure that it works with

14    the officer's schedule.  And then the second

15    one is indicating that they attended.

16         Q.    And they attended on

17    October 25th, 2021?

18         A.    Correct.

19         Q.    And they were trained on the

20    department's pursuit policy, right?

21         A.    Yes.

22         Q.    Okay.  Was there any aspect of

23    their training that represented topics not

24    contained in the department pursuit policy?

25         A.    I do not know.

```
 1          Q.    Okay.  Are there any other

 2   Form 17s that you reviewed in association

 3   with this case that we haven't looked at

 4   today?

 5          A.    No, I don't think so.

 6        (Exhibit 17 was referenced.)

 7   BY MS. GREENE:

 8          Q.    Thank you.  I'm handing you that

 9   Exhibit 17.  Chief, are you familiar with

10   this document?

11          A.    I know what it is, but I'm not

12   familiar with this particular one, but I know

13   it's Form 66.

14          Q.    Form 66 is a disciplinary

15   document, right?

16          A.    It's a written reprimand, not

17   discipline.

18          Q.    Okay.  And this reprimand is

19   for now Lieutenant Lanter in association with

20   the August 7th, 2020, pursuit, correct?

21          A.    Yes.

22          Q.    And outside of the discipline

23   noted here, is there any other discipline --

24          A.    Again, this is not discipline.

25          Q.    Oh, excuse me.  Outside of the
```

1    reprimand noted here, is there any other

2    formal or informal response by the department

3    to Lieutenant Lanter's conduct during this

4    pursuit?

5         A.    Just the -- this written

6    reprimand and then the training.

7         Q.    Thank you.

8         A.    Uh-huh.

9         Q.    Are you aware of a Citizen

10   Complaint Authority investigation into this

11   matter?

12        A.    No.

13       (Exhibit 8 was referenced.)

14   BY MS. GREENE:

15        Q.    I'm handing you Exhibit 8.  And,

16   Chief, after you have a moment to look at

17   that, I'm gonna ask you if you have ever seen

18   this document before?

19        A.    I have not.

20        Q.    Does the City take any position

21   with respect to the findings by the CCA on

22   this matter in this report?

23        A.    So I see they have an entry on

24   here for the allegations, Lieutenant Lanter

25   Specialist Harper, Officer Thomas, and they

1    have a sustained finding, but what exactly

2    did they sustain, I have to read the report

3    in its entirety to understand that.

4              MS. GREENE:  All right.  I'm

5    gonna propose that we take a lunch break and

6    the Chief has an opportunity to read this

7    document and we can come back after that.

8              MR. HERZIG:  Okay.  We can go

9    off for a second.

10              MS. GREENE:  Okay.  We'll go off

11    the record.

12      (Off the record.)

13              MS. GREENE:  Okay.  We're back

14    on the record.  The parties have had an

15    off-the-record conversation about Exhibit 8,

16    the Citizen Complaint Authority report in

17    this matter.

18              And I believe the parties have

19    agreed to stipulate that the City of

20    Cincinnati has a Citizens Complaint Authority

21    that reviews complaints about police conduct

22    and that the report, Exhibit 8, is in fact, a

23    CCA, or Citizen Complaint Authority report

24    associated with this matter that the CCA

25    reaches findings in its review of police

1    matters including this one that the City

2    stands behind those; is that correct?

3              MR. HERZIG:  I mean, the City --

4    that is mostly correct.  The City doesn't --

5    the CCA report says what it says.  And the

6    City doesn't dispute that it says what it

7    says.

8              I don't think the City has a

9    system under which it formally endorses or

10   doesn't endorse what the CCA has done, so we

11   can't stipulate to that part of it.  But we

12   certainly are stipulating to the fact that

13   the CCA conducted its investigation and

14   reached its conclusions.

15             MS. GREENE:  Okay.  And with

16   that, we will take a break off the record.

17   Thank you.

18     (Off the record.)

19             MS. GREENE:  Okay.  We're back

20   on the record.  Counsel have had

21   off-the-record discussions relating to

22   various items and issues in this litigation,

23   and I'd just like to walk through them

24   briefly with counsel to make sure we're all

25   on the same page.

Deposition of Chief Teresa Theetge                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1              So, first, with respect to the

2     bank or business video and the street camera

3     video that have been referenced in testimony

4     in this case previously, it's my

5     understanding that the City believes it has

6     these videos and had to correct a technical

7     glitch issue and has done so and will produce

8     these items; is that right?

9              MR. HERZIG:  Yes.  Those videos

10    were corrupted files.  We have finally fixed

11    them and will produce them.

12              MS. GREENE:  And with that

13    production, will also come a stipulation as

14    to what those videos are insofar as the City

15    is aware of purported sources of those

16    videos.

17              MR. HERZIG:  Yeah.  We'll

18    stipulate that we received the videos in

19    connection with the August 7th, 2020,

20    incident, and won't dispute their

21    authenticity to that degree.

22              MS. GREENE:  Then we also

23    discussed the Manual of Rules and Regulations

24    and the Policy 12.035 on reporting police

25    vehicular accidents and damages, which

versions of those have been produced in the

case, but they are subsequent versions and

not the ones applicable on August 7th, 2020.

It's my understanding that the

City will produce those policies applicable

on August 7th, 2020, and stipulate to the

authenticity of those documents and their

effective time frame; is that right?

MR. HERZIG:  Yes.  If we -- if

we have them, we will produce them and

stipulate to their authenticity.

MS. GREENE:  And to the extent

you say if we have them, you mean if the City

maintains a copy of those formally effective

policies?

MR. HERZIG:  Yeah.  If after a

diligent search, we -- we locate -- we locate

them, then we will produce them to you.

MS. GREENE:  With regard to the

retraining to Officers Lanter, Harper, and

Thomas after the pursuit in this case, it's

my understanding, also, that the City will

stipulate that the training materials for

that particular training are the items Bates

stamped City 3280 through 3310; is that

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    correct?

2                    MR. COWAN:  Yes.

3                    MR. HERZIG:  Yeah.  Yes.

4                    MS. GREENE:  Thank you.  Then

5    with respect to prior pursuits and crashes,

6    plaintiffs have previously requested

7    documents associated with pursuits and

8    crashes concerning a Mr. Sidi and a

9    Mr. Feltner, and have specifically asked for

10   the CIRB and IIS reports associated with

11   those events from the CPD.

12                   And it's my understanding that

13   the City takes the position that those are

14   not relevant and will not be producing them

15   in this case; is that right?

16                   MR. HERZIG:  Yes.

17                   MS. GREENE:  For the record,

18   plaintiff disagrees with that position and

19   contends, in fact, that they are relevant to

20   the issues of the City's noticed supervision

21   training and negligence in this case.

22                   Then, finally -- well, a couple

23   of other things, the parties previously

24   e-mailed with each other and discussed

25   earlier today concerning stipulations of

1    specific materials associated with this

2    pursuit including the CCA interviews of

3    involved individuals, the City interviews of

4    involved individuals, and radio traffic

5    recordings.

6              It's my understanding that the

7    Bates range is identified for those items by

8    the plaintiff earlier today and the e-mail

9    conversation and proposed stipulation

10   relating to those items are accurate and the

11   City will stipulate for those three

12   categories; is that right?

13             MR. HERZIG:  Yes.  And so just

14   to be -- just to add a little specificity,

15   you e-mailed me at 8:44 this morning with a

16   list and the items under Category CCA

17   Interviews, City Interviews, and Radio

18   Traffic, the City will stipulate to all of

19   those.

20             MS. GREENE:  And then --

21             MR. HERZIG:  Go ahead.

22             MS. GREENE:  -- to follow on

23   that, there were two other categories in the

24   same e-mail relating to body-worn camera and

25   MVR cruiser camera, and that parties are

```
 1    discussing which specific versions of those

 2    videos would be stipulated to, as described

 3    in the e-mail.

 4                And we have agreed to continue

 5    to work together to try to identify the least

 6    redacted versions of those specific videos

 7    relating to the body-worn camera from Lanter,

 8    Thomas, and Harper, and then cruiser cam from

 9    Lanter and Thomas as well, and that we'll

10    identify those Bates ranges together and the

11    stipulation will be agreed to; is that

12    correct?

13                MR. HERZIG:  Yes.  We stipulate

14    to the authenticity of those once they're --

15    once we work out the specific ones.

16                MS. GREENE:  And then beyond

17    authenticity to the other specific pieces of

18    information, we asked for stipulations to an

19    e-mail as well also contemplating the agreed

20    stipulation --

21                MR. HERZIG:  Let me -- let me

22    look real quick.  Authentic, yeah, they're

23    the City's business records maintained in the

24    regular course of business and they are --

25    they are -- they identify the -- the
```

1    individuals that you've identified are

2    associated with those videos.

3                 MS. GREENE:  Thank you.  And

4    then, finally, the parties have been working

5    together to arrange the date and time of the

6    deposition of Mason Meyer in this matter and

7    due to scheduling issues with counsel and the

8    detention facility where he's currently

9    housed, we're aware that that deposition will

10   not be able to be scheduled until at the

11   earliest May 20th, possibly later.

12                 And the parties have agreed to

13   work together to set that date on a day

14   agreeable and available for all counsel.  And

15   also that if that date and the availability

16   of the transcript are later than then, it

17   would be possible to have expert disclosures

18   completed pursuant to the current timeline,

19   we have agreed to jointly envoy for an

20   extension, right?

21                 MR. HERZIG:  Yes.  Yes, I think

22   that's everything.  I mean, I think --

23   isn't your -- is your disclosure deadline May

24   15th?

25                 MS. GREENE:  No.

1          MR. HERZIG:  Or do I have that
2     wrong?
3          MS. GREENE:  I think it's --
4          MS. ALLOUCH:   That is right.
5          MS. GREENE:  Yeah.
6          MR. HERZIG:  So we're gonna have
7     to.
8          MS. GREENE:  Yeah.  We're gonna
9     have to.
10          MR. HERZIG:  We're gonna have
11     to.
12          MS. GREENE:  Yeah, we're gonna
13     have to.
14          MR. HERZIG:  Okay.  And, yeah,
15     just to be clear, the City will not object to
16     taking Mr. Meyer's deposition outside of the
17     date of the end of discovery because of the
18     scheduling issues that were mentioned or to
19     the use of that deposition later, we have no
20     issue with that.
21          And then, yes, we're fine with
22     the joint motion extending the expert
23     disclosure deadlines on that basis.
24          MS. GREENE:  Okay.  All right.
25     With that business taken care of, we can move

1    on for now.

2    BY MS. GREENE:

3         **Q.    So -- all right.  Chief, are you**

4    **ready?**

5         A.    Ready.

6         MR. HERZIG:  Sorry.  Give me

7    one -- give me one quick second.

8         MS. GREENE:  Sure.  You want us

9    to go off the record?

10        MR. HERZIG:  No, you can get

11   started.  Yeah, just -- it appears to me,

12   just real quick, that I have received the

13   applicable version of 12 -- well, no, go

14   ahead.

15        MS. GREENE:  Okay.  Let's just

16   go off the record for a second.

17      (Off the record.)

18   BY MS. GREENE:

19        **Q.    We're back on the record and**

20   **we're ready to continue with questions at**

21   **this point.  So, Chief, thank you for your**

22   **patience as we work out these logistics.**

23        **Okay.  So before the break, we**

24   **were talking about the CCA report associated**

25   **with the pursuit in this case, correct?**

1          A.    Correct.

2          Q.    And the CCA, the Citizens

3    Complaint Authority, is a City agency, right?

4          A.    Correct.

5          Q.    And it's separate from the

6    police department?

7          A.    Correct.

8          Q.    And the CCA reviews complaints

9    about police action and egregious findings

10   about those complaints, correct?

11         A.    Correct.

12         Q.    Now, when the CCA issues

13   findings where complaints are sustained, does

14   that result in any CPD review of the findings

15   by the CCA?

16         A.    Yes.

17         Q.    And what's that process?

18         A.    So the CCA has a monthly board

19   meeting.  That's where they present their

20   investigations with their findings to the

21   board members for approval or whatever else

22   determination.

23               Just prior to that board

24   meeting, they send us to our Internal

25   investigations commander a copy of the

1    reports of the investigations that they are

2    taking to the board.

3              That is our opportunity to

4    review them and kind of compare them because

5    we almost always have parallel investigations

6    going on.

7              So that's our opportunity to

8    know what they're taking to the board and

9    just be prepared if we have any disagreements

10   and findings and such to be able to work

11   through those.

12        Q.    If there are disagreements in

13   findings, what, if anything, is the CPD's

14   standard response to that event?

15        A.    Usually, we can discuss with the

16   CCA director, you know, we have this finding,

17   you have this one, you know what -- what

18   interviews or material did you have that

19   maybe we didn't or vice-versa, how did you

20   come to that finding, and so they can -- they

21   can talk through it.

22        Q.    And does the CPD receive in

23   those instances the investigation materials

24   and evidence compiled by the CCA?

25        A.    No.  Typically, it's the other

1    way around.  CCA gets their material from us.

2          Q.    Does the CPD ever seek copies of

3    the investigation materials or evidence

4    gathered by CCA?

5          A.    Just what culminates into the

6    written report.

7          Q.    And so --

8          A.    Nothing beyond that.

9          Q.    Sorry.  So those materials are

10   then received by the department at some

11   stage.

12         A.    The -- their report, their final

13   report.

14         Q.    Oh, just the report.  So, for

15   example, the CCA conducts interviews of

16   individuals.  Does the CPD seek copies of

17   those?

18         A.    No.  We receive what's

19   summarized in their report from those

20   interviews.

21         Q.    Is that also true for any other

22   evidence considered by the CCA in reaching

23   its findings.

24         A.    If they have something that is

25   pertinent that we don't have, we may request

1    that from them, but it's typically the other

2    way around.   We have information and material

3    that they don't have, and we provide it to

4    them.

5         Q.    Okay.  For the CCA report,

6    **Exhibit 8**, associated with the pursuit we're

7    talking about in this case, are you aware of

8    the findings of that report now that you've

9    had a chance to read through it?

10        A.    I am.

11        Q.    And do you take a position on

12   any of the findings reached by the CCA

13   related to this matter?

14        A.    The only position --

15             MR. HERZIG:  Does the City?  Go

16   ahead.

17        A.    The only position I have with it

18   is they have a very one -- one sentence in

19   their finding, and it says it's determined --

20   allegations supported by sufficient evidence

21   to determine the incident occurred and the

22   actions of the officer was improper, and it

23   says sustained.

24             But nowhere in here does it

25   really call out what is improper, what is

Deposition of Chief Teresa Theetge                           Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    sustained.

 2              Similar to an Internal report,

 3    where we would say this is what they did or

 4    didn't do, this is the violation, this is the

 5    finding.  I think this leaves their -- leaves

 6    their very broad.

 7         Q.    Okay.  So in relation to

 8    Internal reports you just mentioned, in

 9    general those result in identification of

10    policy violations if violations did occur by

11    officers, right?

12         A.    Right.

13         Q.    In the Internal reports, they

14    don't necessarily document every policy

15    violation that occurs in the event at issue

16    for that particular investigation, does it?

17         A.    So I guess -- I guess I'm not

18    clear on your question.

19         Q.    Yeah.  Let me ask that better.

20              So for Internal reports, or IIS

21    reports, they don't necessarily document

22    every single policy violation that occurred

23    during the event at issue, do they?

24         A.    If there is something that the

25    Internal investigator becomes aware of

1    through their investigative process that is a

2    violation of policy or procedure, yes,

3    there's an expectation that they would call

4    that out.

5              And that is what we would call a

6    finding of a sustained other.  It wasn't part

7    of the original allegation, but it's

8    something that they became aware of.

9         Q.    Are there ever times when the

10   Internal Investigations Section report does

11   not address every policy violation that

12   occurred in a particular event?

13        A.    I'm unsure.  It -- it should

14   call out every one that they are made aware

15   of.  Now, could there be a policy or

16   procedure violation that occurs that the

17   investigator is not aware of, then,

18   obviously, they would not be able to call

19   that out.

20        Q.    Okay.  Is it true that not all

21   pursuit policy violations result in

22   discipline at the CPD?

23        A.    That's correct.

24        Q.    And is that true even in

25   relation to pursuits that were determined to

1      be unnecessary?

2              A.    Such as?  Like, again, I'm not

3      clear exactly what you're asking.

4              Q.    Sure.  So is it true that there

5      have been pursuits that were not necessary

6      under the CPD policies, but there was not any

7      discipline for the officers involved?

8                   MR. HERZIG:  Objection.  You can

9      answer.

10             A.    Yes, because not all of them

11     rise to the level based on our disciplinary

12     matrix to call for discipline.

13             Q.    Is it the case that there are

14     pursuits that were unnecessary under the

15     policies but that the officers did not

16     receive any other type of response from the

17     department outside of formal discipline?

18                  MR. HERZIG:  Objection.  You can

19     answer.

20             A.    I think we would have to agree

21     on the definition of unnecessary before I

22     could answer that.

23             Q.    Well, under the pursuit policy

24     is specifically what I'm talking about, any

25     pursuits that were not necessary pursuant to

1    the CPD policy, is it the case there have

2    been unnecessary pursuits where CPD officers

3    did not receive some other kind of response

4    from the department even if not formal

5    discipline?

6              MR. HERZIG:  Objection.  You can

7    answer.

8         A.    Yes.  If it -- if it comes -- if

9    a supervisor becomes aware that something was

10   not in compliance, there is an expectation

11   that that should be addressed at whatever

12   level is deemed appropriate.

13        Q.    So it should result -- a policy

14   violation should result in some kind of

15   follow up from the department is what you're

16   saying?

17        A.    Yes.

18             MR. HERZIG:  Objection.  Go

19   ahead.

20             THE WITNESS:  Sorry.

21             MR. HERZIG:  That's all right.

22   BY MS. GREENE:

23        Q.    But is it the case that there

24   have been pursuits that under the policy were

25   unnecessary where the officers involved were

1    not given an ESL or counseling or some other

2    informal nondisciplinary response?

3                    MR. HERZIG:  Objection.  Go

4    ahead.

5          A.    None that I'm aware of.

6          Q.    Okay.  Do police vehicle

7    pursuits involve inherent danger?

8          A.    Yes, as does most of our work.

9          Q.    And pursuits present risk to the

10   officers involved, right?

11         A.    Yes.

12         Q.    And they present risk to the

13   subjects as well, or the suspects, right?

14         A.    Yes.

15         Q.    And pursuits present a risk to

16   the public, right?

17         A.    Yes.

18         Q.    And that includes a risk of

19   injury or death, correct?

20         A.    It could.

21         Q.    And CPD officers are trained on

22   the fact that pursuits present such a risk to

23   the public, right?

24         A.    And how to manage those risks.

25         Q.    Okay.  So, yes, that are trained

```
 1    on that?

 2            A.     Uh-huh.

 3            Q.     That's a yes?

 4            A.     Yes.

 5            Q.     And that risk is recognized in

 6    the CPD policy as well, correct?

 7            A.     Yes.

 8            Q.     And that training on the risk to

 9    the public, Officers Thomas and Lanter are

10    trained about it, right?

11            A.     Yes.

12            Q.     Now, in pursuits, accidents

13    occurring during the pursuit show that risk

14    to the public; don't they?

15                   MR. HERZIG:  Objection.  You can

16    answer.

17            A.     Say that again.  The accidents

18    show the risk?

19            Q.     Yeah.  So in the course of a

20    pursuit, accidents sometimes occur, right?

21            A.     (Nodding head affirmatively.)

22            Q.     Yes?

23            A.     Yes.

24            Q.     And when those accidents occur

25    during a pursuit, they show the risk to the
```

1    public posed by the pursuit, right?

2              MR. HERZIG:  Objection.  Go

3    ahead.

4         A.   Yes.  And some of those risks

5    are actually a result of public's action, not

6    just the officer's.

7         Q.   Is it true that pursuits are one

8    of the most dangerous activities that CPD

9    officers can engage in?

10        A.   One of many.

11        Q.   And is it true that it's a

12   dangerous activity not only for the officers

13   themselves, but also for the public at large?

14        A.   Yes.

15        Q.   Is it true that under the CPD

16   policy that unless the greater hazard would

17   result, pursuits should not be undertaken if

18   the subjects can be identified with enough

19   certainty that they can be apprehended at a

20   later time?

21             MR. HERZIG:  Objection.  You can

22   answer.

23        A.   Not necessarily.

24        Q.   Why not?

25        A.   As I stated earlier, sometimes

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    we have to weigh the risk of the individual

2    if left to be at large presents a greater

3    danger to the society than apprehending them

4    during a pursuit.

5         Q.    You're aware of the

6    International Association of Chiefs of

7    Police, right?

8         A.    I am.

9         Q.    Are you familiar with their

10   standards on pursuits?

11        A.    No, not off the top of my head.

12        Q.    Do those standards have any

13   bearing on Cincinnati Police practices or

14   policies?

15        A.    Sometimes we will review IACP as

16   well as Major Cities Chiefs best practices

17   guidelines to see if they are something we

18   want to follow if it works for us because

19   every agency and every city is different.

20        Q.    Are you aware of any IACP

21   policies or practices that that organization

22   publishes that the CPD has rejected as not

23   applicable to the Cincinnati Police

24   Department?

25             MR. HERZIG:   Objection.   Go

1    ahead.

2          A.    I do know that there is dialogue

3    going on now with CCA's recommendation that

4    we follow IACP's definition of harassment,

5    which we have chosen not to do.

6          Q.    Has there ever been a time when

7    the department has rejected IACP standards

8    relating to these pursuits?

9          A.    I do --

10          MR. HERZIG:    Objection.    Go

11    ahead.

12          A.    I do not know off the top of my

13    head.

14          Q.    You've never heard of that,

15    though, right?

16          A.    No.

17          Q.    How do you characterize your

18    familiarity with the CPD pursuit policy from

19    2020 applicable at that time?

20          A.    Pretty well.    Pretty well,

21    because it hadn't changed tremendously over

22    the years leading up to that.

23          Q.    Okay.    In the policy, which is

24    Exhibit 1 in the stack of things you got

25    there --

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.      Uh-huh.

2      Q.      -- it requires officers to

3  terminate pursuits when they become too

4  dangerous based on the factors outlined in

5  the policy, right?

6      A.      Correct.

7      Q.      And engaging in a pursuit that's

8  too dangerous under the policy is reckless,

9  right?

10              MR. HERZIG:  Objection.  You can

11  answer.

12      A.      Engaging in the pursuit that is

13  too dangerous in the eyes of the officer at

14  the moment, would be reckless to continue.

15      Q.      Is it reckless for an officer to

16  engage in a pursuit that's too dangerous

17  under the terms of the CPD policy?

18      A.      Again, in the eyes of the

19  officer who is engaging in the pursuit at the

20  moment, if it is too dangerous and they

21  continue, that would be reckless.

22      Q.      The CPD's pursuit policy lays

23  out specific factors that an officer needs to

24  be aware of during the course of a pursuit,

25  right?

1          A.    Correct.

2          Q.    And the CPD policy lays out

3    specific conditions that prohibit pursuits as

4    well, right?

5          A.    Correct.

6          Q.    And those factors are subject to

7    objective truth, right?

8          A.    Yes.

9          MR. HERZIG:  Objection.

10         Q.    And so this idea of the officer

11   engaged in a pursuit and in his eyes, how

12   does that square with the objective truth of

13   those factors under the policy?

14         MR. HERZIG:  Objection.  That's

15   not what the policy says, but you can go

16   ahead and answer.

17         A.    So I think what people need to

18   realize -- what needs to be recognized is the

19   officer, based on their training and their

20   experience and the totality of the

21   circumstances in front of them, should be

22   able to make a decision to continue or

23   discontinue a vehicle pursuit knowing all the

24   parameters that are outlined in the policy

25   and procedure.

1      Q.    And we've heard other people in

2  this case say, you know it when you see it,

3  in relation to conditions requiring

4  termination of a pursuit.

5           Is that consistent with what you

6  just described, the knowledge of officers and

7  their training and the policy and everything

8  you just said?

9      A.    Yes, to some degree.  Such as we

10  say weather, you know, we're not gonna say if

11  it's raining or if it's 50 percent cloudy or

12  if this, if that, then you cannot continue.

13           What that says is as an

14  experienced officer with training, you need

15  to take weather conditions into consideration

16  during a vehicle pursuit.

17      Q.    Okay.  And when those -- well,

18  strike that.

19           In this -- in this case, you're

20  aware of body-worn camera and MVR cruiser

21  camera recording the events during the

22  pursuit and the crash, right?

23      A.    Yes.

24      Q.    And does the City defer to what

25  those video recordings show as to the events

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    occurring during the pursuit and its

2    aftermath?

3              A.    Yes.

4              Q.    Were there any exceptions to

5    existing policies granted here in relation to

6    the pursuit in this case?

7              A.    Yes.  I believe, if my memory

8    serves me correct, a third vehicle, a third

9    officer was permitted to partake in the

10   event, going over to Kentucky was permitted,

11   and there were some activity, such as driving

12   left of center in order to stay up with the

13   suspect.

14             Q.    Okay.  And so those exceptions

15   were the ones granted by Lieutenant Lanter

16   during the course of the pursuit, right?

17             MR. HERZIG:  Objection.

18             Q.    Go ahead.

19             MR. HERZIG:  I mean, going into

20   Kentucky was Scalf, so...

21             A.    Yeah.  I was just gonna say

22   that.

23             Q.    Go ahead.

24             A.    No.  I was gonna say, similarly,

25   I believe Sergeant Scalf actually approved a

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          portion of those as well.
 2                  Q.    Were there any exceptions after
 3          the fact granted under the existing policy
 4          for the ways in which the pursuit was
 5          conducted?
 6                  A.    You need to be a little bit more
 7          specific for me.
 8                  Q.    So other than those
 9          authorizations over the radio, during the
10          course of the pursuit --
11                  A.    Uh-huh.
12                  Q.    -- that's what you were just
13          referencing, right?
14                  A.    Correct.
15                  Q.    So other than those, were there
16          any other exceptions to existing policies
17          that were granted by the department here for
18          the way the pursuit was conducted?
19                  A.    The only ones that I'm aware of
20          are the ones that were granted verbally.
21                  Q.    In the radio transmissions?
22                  A.    Correct.
23                  Q.    Okay.
24                  MS. GREENE:  All right.  We're
25          gonna mark a few more documents and we are
```

```
 1          now at Exhibit 71.

 2              (Exhibit 71 was marked.)

 3          BY MS. GREENE:

 4              Q.    Chief, you have in front of you

 5          Exhibit 71.  Is this a document you're

 6          familiar with?

 7              A.    No, it is not.

 8              Q.    What type of document is this?

 9              A.    This is what we call a Form 17,

10          inter-departmental memo.

11              Q.    And is Form 17 any type of

12          supplemental report or addendum to existing

13          reports?

14              A.    It's used for a large variety of

15          things.

16              Q.    Okay.  In any case, this is a

17          Form 17 from Sergeant James Perkins to then

18          Police Chief Jeffrey Blackwell from

19          March 26th, 2014, right?

20              A.    Yes.

21              Q.    And if you will look to the --

22          well, strike that.

23                    Let me just represent this

24          document in some discusses a pursuit that

25          occurred back in 2014, right?
```

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    Apparently based on the date, I

2    believe so.  I don't think anywhere in the

3    body does it say when the pursuit occurred,

4    but the date at the top of the form is 2014.

5          Q.    Okay.  And in the middle of the

6    first paragraph, it notes Police Officer

7    Timothy Lanter, Badge P707, District 3, and

8    Police Officer Eric Schaible, Badge P291,

9    District 3, entered the vehicle pursuit when

10   secondary unit -- unit terminated their

11   involvement because he lost sight of the

12   primary unit, right?

13         A.    Correct.

14         Q.    And the person authoring this

15   particular Form 17 then goes on to say, I

16   terminated the vehicle pursuit when the

17   pursuit vehicle was involved in a traffic

18   crash with an occupied vehicle and

19   information broadcasted indicated the pursued

20   vehicle almost struck a police vehicle,

21   right?

22         A.    Correct.

23         Q.    And so this termination of the

24   pursuit here was compliant with department

25   policy, right?

Deposition of Chief Teresa Theetge                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1       A.    That the pursuit OIC could

2  terminate the pursuit, yes.

3       Q.    And if you look down to the

4  second paragraph, this Form 17 continues, I

5  reviewed the video captured on the officers'

6  digital video recorder.  During the vehicle

7  pursuit, the driver of the pursued vehicle

8  operated his vehicle with reckless disregard

9  for the safety of other citizens.

10            Officer Zucker had the authority

11  to terminate the pursuit and it was his

12  responsibility as the primary unit to end the

13  vehicle pursuit when it was determined the

14  level of danger superseded the necessity for

15  immediate apprehension, right?

16       A.    Correct.

17       Q.    So here Sergeant Perkins was the

18  off-site OIC, right?

19       A.    He was the OIC, yes.

20       Q.    And Zucker was the officer who

21  was primary unit in the pursuit, right?

22       A.    According to this, yes.

23       Q.    And he here had the authority to

24  terminate the pursuit, but failed to do so,

25  correct?

Deposition of Chief Teresa Theetge                                  Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                   MR. HERZIG:  Objection to
 2        failed.  You can go ahead.
 3             A.    Yes.
 4             Q.    And the next paragraph goes on
 5        to discuss how the pursuit vehicle went the
 6        wrong way on a one-way street and the
 7        response of Officer Zucker to that, right?
 8             A.    Yes.
 9             Q.    The paragraph towards the
10        bottom -- at the bottom of the page says,
11        Officer Lanter entered the pursuit and
12        observed the vehicle crash into an occupied
13        vehicle.  And then Officer Lanter exited his
14        marked police equipment and ran toward the
15        pursued vehicle.  Officer Lanter exercised
16        poor judgment when he approached the fleeing
17        vehicle which placed him at a tactical
18        disadvantage, right?
19             A.    Correct.
20             Q.    In relation to this particular
21        event, do you know, as you sit here right
22        now, whether Officer Lanter received any
23        discipline or other response from the
24        department?
25             A.    I do not know.
```

1    Q.    Okay.

2    A.    Well, I stand corrected.  If --

3    the second to last sentence, Officer Zucker

4    and Lanter were receptive to the discussions

5    and the entries were made into their Employee

6    Tracking Solution via ESL, which documented

7    our discussion of best practices in

8    high-risk/low-risk (sic) frequency incidents.

9    Q.    Okay.  And what's a

10   high-risk/low-frequency incident?

11   A.    High risk is the gauge of how

12   risky is the activity the officers are

13   involved in.  Low frequency, how often does

14   it occur.

15   MS. GREENE:  Okay.  All right.

16   We're gonna mark another exhibit.  This will

17   be 72.

18   (Exhibit 72 was marked.)

19   BY MS. GREENE:

20   Q.    And, Chief, are you familiar

21   with this document?

22   A.    I know what the document is.

23   I'm not familiar with the content of it.

24   Q.    It's a Patrol Performance Report

25   for officer -- then Officer Lanter, right?

1    A.    Correct.

2    Q.    **From April 24th, 2014?**

3    A.    Correct.

4    Q.    **And if you look down to the**
5  **Narrative section, it describes then**
6  **Officer Lanter's conduct over the review**
7  **period as February 3rd, 2013, to April 2nd,**
8  **2014, right?**

9    A.    Down in the Narrative here?

10    Q.    **The Narrative addresses that**
11  **time period?**

12    A.    Oh, yes.

13    Q.    **And in the Narrative section,**
14  **the middle paragraph notes that during that**
15  **period, Officer Lanter had one citizen**
16  **complaint.  Do you know what that complaint**
17  **was about?**

18    A.    I do not.

19    Q.    **It also notes that he had three**
20  **vehicle pursuits during that period, right?**

21    A.    Correct.

22    Q.    **And it notes that he had two**
23  **use-of-force investigations, correct?**

24    A.    Yes.

25    Q.    **Then this paragraph goes on to**

```
 1        state about a sentence later, that the
 2        vehicle pursuits on May 21st, 2013, and
 3        October 30th, 2013, Officer Lanter was found
 4        to be in compliance during those incidents,
 5        but during the pursuit on March 26th, 2014,
 6        he was given the ESL for proper use of
 7        tactics, right?
 8              A.    Correct.
 9              Q.    Okay.  We can set that aside for
10        now.
11              MR. HERZIG:  Just, is this also
12        in the other packet, or is this not in the
13        packet; do you know?
14              MS. GREENE:  That's a different
15        one.
16              MR. HERZIG:  Okay.
17              MS. GREENE:  We're gonna mark
18   Exhibit 73.
19       (Exhibit 73 was marked.)
20   BY MS. GREENE:
21              Q.    Okay.  Chief, you have
22   Exhibit 73, an Evaluation Supplement Log for
23        Officer Lanter from 2024, right?
24              A.    The date up here?  This says
25        '14.  You talking this date or this date
```

1    (indicating)?

2          Q.    Yeah.  Actually, I'm -- I'm a

3    little confused.  So if you look on the top

4    right date/year line at the top of that

5    document, it says October 15th, 2024, right?

6              MR. HERZIG:  I believe that's

7    been true on a number of these.

8          A.    Do you have the other ones?

9    Yeah, I'm almost thinking that's an automatic

10   generated date --

11         Q.    Okay.

12         A.    -- when it's printed.

13             MR. HERZIG:  Yeah.

14         Q.    Okay.  So then -- I see.

15   Referring back to Exhibit 64, the

16   Officer Thomas document also says

17   October 30th, '24?

18         A.    Uh-huh.

19         Q.    And so that's, we understand to

20   be, not an accurate date for the document,

21   but instead the date of printing?

22         A.    Possibly.  I don't know for

23   certain.

24         Q.    Something like that.  All right.

25   So turning back then to the date of entry,

```
 1        it's April 2nd, 2014, right?

 2              A.    April 2nd, 2014, yes.

 3              Q.    And this document describes the

 4        ESL that Officer Lanter received relating to

 5        the pursuit we just discussed, correct?

 6              A.    Correct.

 7                    MR. HERZIG:  Objection.  Go

 8        ahead.

 9              Q.    Okay.

10                    MR. HERZIG:  I'm sorry.  My

11        objection is that the discipline -- I mean,

12        there was a pursuit, but the discipline was

13        related to tactics after the pursuit.

14                    MS. GREENE:  Associated with it

15        I think is what I said.  But in any case, the

16        document speaks for itself on that stuff.

17                    All right.  Well, let's move on

18        and let's mark Exhibit 74.

19           (Exhibit 74 was marked.)

20        BY MS. GREENE:

21              Q.    Okay.  So you have in front of

22        you, Chief, Exhibit 74.  Have you seen this

23        before?

24              A.    No.

25              Q.    And I'll just note for the
```

 1    record, and I'll hand it to you, we've marked

 2    another version of this e-mail in Exhibit 52.

 3    You can have those both in front of you, but

 4    I'm gonna ask you about Exhibit 74.  Okay?

 5         A.    Okay.

 6         Q.    So take a moment to flip through

 7    this and let me know when you've had a chance

 8    to do that, please.

 9              MR. HERZIG:  Off the record real

10    quick.  It's easier to start at the back.

11              THE WITNESS:  That's what I --

12    yeah.  So start with the last one.  (Witness

13    complies.)  Okay.

14    BY MS. GREENE:

15         Q.    Okay.  Thanks for reviewing

16    that, Chief.  This e-mail thread began with

17    an e-mail from Mike Bloemer -- or Bloemer,

18    the Assistant Chief of Operations and

19    training for the Covington Fire Department,

20    right?

21         A.    Yes.

22         Q.    And he e-mailed former

23    Lieutenant Colonel Paul Neudigate about his

24    concerns about the pursuit at issue in this

25    case, correct?

```
 1            A.    Correct.

 2            Q.    And Neudigate then passed that

 3    information on to Michael John, right?

 4            A.    Correct.

 5            Q.    Who is Michael John?

 6            A.    He -- at this time, he was the

 7    assistant chief that took over patrol bureau

 8    commander responsibilities from Lieutenant

 9    Colonel Neudigate when he retired.

10            Q.    Okay.  And Lieutenant

11    Colonel John then responded to Bloemer laying

12    out various responses from the department in

13    association with the pursuit, right?

14            A.    Correct.

15            Q.    And he said that Bloemer's

16    concerns were valid, correct?

17            A.    Correct.

18            Q.    And he acknowledged that vehicle

19    pursuits are inherently a risk to all

20    involved, right?

21            A.    Correct.

22            Q.    And with respect to everything

23    that's stated in Michael John's e-mail from

24    October 15th, 2020, at 8:25 a.m., do you, as

25    the City, dispute or disagree with anything
```

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    he states there?

2                    MR. HERZIG:   Take your time and

3    go through it all.

4            A.    Yeah.  I do not dispute any of

5    it.

6            Q.    He notes that the department

7    hosted a forum recently on best practices

8    relating to pursuits.  Do you see that?

9            A.    I see where that's noted in

10   here.

11           Q.    And, please, tell me about that

12   forum.

13           A.    I'm not familiar with that

14   forum.

15           Q.    You've never heard about it

16   before?

17           A.    No.  I don't know if there was

18   an Internal forum or an external.  I'm not

19   the aware of it.

20           Q.    In any case, is it accurate

21   based on my understanding of Lieutenant

22   Colonel John -- or John's e-mail here that

23   this forum occurred after the August 7th,

24   2020 pursuit?

25                    MR. HERZIG:  Objection.  There's

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    no evidence of that.
 2                MS. GREENE:  I'm asking if
 3    that's correct or not based on -- we don't
 4    need a speaking objection.
 5    BY MS. GREENE:
 6          Q.    Go ahead, Chief.
 7                MR. HERZIG:  Your question
 8    assumes facts that are not in evidence.
 9          Q.    Go ahead, Chief.
10          A.    It says, We recently hosted.
11    This e-mail is dated October 15th.  I don't
12    know if by recent he meant in the two months
13    since it had only been two months since the
14    August 7th, or does he mean recent that it
15    could have occurred prior to October -- I'm
16    sorry, August 7th.
17          Q.    You don't dispute that the forum
18    was held by the department, though, right?
19          A.    I don't know.  It's in the
20    e-mail, but I'm not aware of it.
21          Q.    And when it says -- when he
22    writes, We recently hosted a forum, does that
23    mean "we," the CPD recently hosted a forum?
24          A.    I'm uncertain.  I'm not aware of
25    the forum.
```

1    Q.    Okay.  It appears as though then

2    Lieutenant Colonel John must have passed the

3    information on to Captain Pettis as well,

4    right?

5         A.    Correct.

6         Q.    And added her to the e-mail

7    chain, right?

8         A.    Correct.

9         Q.    And then a David Schofield is

10   also added to the chain, right?

11        A.    Correct.

12        Q.    And who's he?

13        A.    At this time, he was a

14   lieutenant over the Gang Unit.

15        Q.    And Lieutenant Schofield in his

16   October 15th, 2020, e-mail describes

17   restrictions that had been -- that he had

18   placed on the Gang Unit's and Gun Crimes

19   Unit's engagement in pursuits, right?

20        A.    According to this e-mail, yes.

21        Q.    And he said he did that due to

22   the tragic outcome of the August 7th, 2020,

23   pursuit?

24        A.    That's what's indicated in the

25   e-mail.

1    Q.    And was this decision by

2    Lieutenant Schofield at the direction of any

3    superior officer in his chain of command?

4         A.    I don't know that.

5         Q.    If we wanted to find that out,

6    how would we do that?

7         A.    I guess it would have to -- his

8    direct supervisor would have been

9    Captain Pettis, who is no longer with us or

10   Colonel Neudigate, who is no longer with us.

11        Q.    But other --

12        A.    And Colonel John -- I'm sorry --

13   and Colonel John, who is no longer with us.

14        Q.    So other than talking to those

15   three either resigned or retired employees

16   formerly of the CPD, you're not aware of

17   another way to find out?

18        A.    Lieutenant Schofield.

19        Q.    Is he still with the department?

20        A.    Yes, he's a captain with us now.

21        Q.    Okay.

22        A.    He may know.

23        Q.    In any case, these restrictions

24   they had placed on the Gang Unit at the time,

25   the department had no objection to those,

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      right?

2            A.    We had no objection to them at

3      the time --

4            Q.    Right?

5            A.    -- is your question?

6            Q.    Yes.

7            A.    I don't know.  I don't know who

8      he conversed with on these.

9            Q.    Did Lieutenant Schofield have

10     the authority to -- to enact restrictions

11     such as the restrictions he describes here?

12           A.    As the lieutenant in charge of

13     the unit, he could set parameters for his

14     unit.

15           Q.    Okay.  And is there anything in

16     his e-mail that the City objects to?

17           A.    No.

18           Q.    Then going to the first page of

19     this exhibit, there's an e-mail from

20     Lieutenant Colonel John to

21     Lieutenant Schofield from October 16th, 2020,

22     at 11:16 a.m., right?

23           A.    Correct.

24           Q.    And Lieutenant Colonel John

25     states to Lieutenant Schofield, Many thanks

Deposition of Chief Teresa Theetge                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    for the steps you've set in place to minimize

2    risk, right?

3            A.    Yes.

4            Q.    And he calls that a great

5    example of leadership, correct?

6            A.    Correct.

7            Q.    He says this is excellent work,

8    which I will share, right?

9            A.    Yes.

10           Q.    Who and how did he share that

11   excellent work with?

12           A.    I don't know.  I was an

13   assistant chief at this -- at this time, and

14   he did not share it with me.

15           Q.    Does the City have any objection

16   to his e-mail?

17           A.    No.

18           Q.    Okay.

19               MS. GREENE:  Okay.  We are gonna

20   mark another exhibit.  This will be 75.

21         (Exhibit 75 was marked.)

22   BY MS. GREENE:

23           Q.    All right.  Chief, you have in

24   front of you a KYIBRS report from Kentucky.

25   Have you seen this document before?

Deposition of Chief Teresa Theetge
Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        A.    No.  It looks like it's
 2   associated with the vehicle pursuit from
 3   August 7th.
 4        Q.    With regard to the contents of
 5   this report, and specifically the synopsis on
 6   the last page, does the City have any
 7   objection into the Narrative provided by the
 8   Commonwealth of Kentucky here?
 9        A.    No.
10        Q.    And this information
11   Sergeant Fink, I believe, had at the time of
12   his review of the case; is that right?
13        A.    He probably would have it in the
14   Internal file.
15             MS. GREENE:  Okay.  We're gonna
16   mark Exhibit 76.
17        (Exhibit 76 was marked.)
18   BY MS. GREENE:
19        Q.    Okay.  Chief, you have in front
20   of you Exhibit 76, which we'll represent to
21   you is an excerpt of discovery productions in
22   this matter relating to a vehicle pursuit
23   involving a Mr. Feltner, who was injured in
24   the pursuit.  Are you familiar with that
25   particular pursuit?
```

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 188 of 261 - Page
ID#: 2601
Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    No, I'm not.

 2              Q.    Are you aware of a pursuit from

 3    August 26th, 2020, involving then

 4    Sergeant Lanter?

 5              A.    No.

 6                    MR. HERZIG:  Objection.  Go

 7    ahead.

 8              A.    No.

 9              Q.    I guess this vehicle pursuit,

10    was it a critical incident?

11              A.    Not to my knowledge.  A critical

12    incident as something that would be referred

13    to the Critical Incident Review board?

14              Q.    Maybe my question is a little

15    broader than that.

16                    Would the crash involved here

17    have been -- was it considered a critical

18    incident by the department?

19              A.    I don't -- I don't know.  I'd

20    have to look at this to see.

21              Q.    And was there an IIS report

22    created in association with this crash?

23              A.    I do not know.

24              Q.    Was there a CIRB report created

25    in association with this crash?
```

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          A.    Not to my knowledge.
 2                MR. HERZIG:  The City will
 3     stipulate that there was not an IIS with
 4     regard to Feltner.
 5                MS. GREENE:  What about a CIRB?
 6                MR. HERZIG:  No.  I don't
 7     believe there was one of those either.
 8                MR. COWAN:  I don't know the
 9     answer to that.
10                MR. HERZIG:  Okay.
11     BY MS. GREENE:
12          Q.    Do you know whether this pursuit
13     resulted in any findings of violations of CPD
14     policies?
15          A.    I do not know.
16          Q.    And do you know whether this
17     pursuit resulted in any discipline,
18     reprimand, counseling, ESL, or other --
19     retraining, or any other response from the
20     department?
21          A.    I do not know.
22          Q.    Did this pursuit involve any
23     member of the Gang Unit?
24          A.     I would have to look through to
25     see what names are in here.
```

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1              MR. HERZIG:  Go ahead.

2         A.    Yeah.  So Mike Adamson, they're

3    saying -- the name does not ring a bell to me

4    as being in the Gang Unit.

5         Q.    **What about the Gun Crime Unit?**

6         A.    So the Gun Crime was a task

7    force that was created in 2020 because of the

8    sheer volume of guns that were showing up on

9    our streets.

10             I would have to compare this to

11    some type of a roster for who was in those

12    units at the time.  Simply by looking at the

13    names does not indicate to me -- because like

14    this name on here Shook, but back here it

15    indicates he's in -- in the traffic unit, not

16    that he was one of the officers that traffic

17    was investigating as being involved.

18             MR. HERZIG:  I see names on one

19    page 2385.  I don't know if that helps.

20         A.    Like, this up here, Adamson.

21         Q.    **If you go to the next page,**

22    **2386, there's reference to the Gang Unit**

23    **attempting to make a stop of the black Kia**

24    **Rio.**

25             **So does that indicate then where**

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1     this document says on the same page, The
 2     vehicle refused to stop, and the -- Gang then
 3     pursued the vehicle.
 4                 I believe that indicates the
 5     Gang Unit pursued the vehicle; is that right?
 6          A.    Correct.
 7          Q.    And as you sit here, you have no
 8     other knowledge about this event, right?
 9          A.    No.
10          Q.    Do you defer to the content of
11     these reports from the CPD about the events
12     at issue in that particular pursuit?
13          A.    Yes.
14          Q.    Was there a CCA report
15     associated with this event?
16          A.    I do not know.
17          Q.    Do you know whether if there was
18     a CCA report, it would have triggered any
19     further review by the CPD?
20          A.    Through our Internal
21     investigations, as were discussed earlier.
22          Q.    All right, Chief, we're gonna go
23     ahead and mark Exhibit 77 at this time.
24                 MS. GREENE:  This one is not
25     stapled.  Sorry.
```

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    MR. HERZIG:  Okay.
 2           (Exhibit 77 was marked.)
 3   BY MS. GREENE:
 4           Q.    All right.  Chief, so you have
 5   Exhibit 77 in front of you now.  Are you
 6   familiar with this document?
 7           A.    Yes.
 8           Q.    And so here we have -- sorry, on
 9   the first page, March -- March 26th, 2020,
10   Staff Notes from the department, right?
11           A.    Correct.
12           Q.    And attached to the staff notes
13   are various documents that the department
14   provided to its officers, correct?
15           A.    Correct.
16           Q.    So when we looked at this first
17   page, we see that there was an item in these
18   staff notes relating to the Police Chief's
19   Directing Vehicle Pursuits, right?
20           A.    Correct.
21           Q.    And if you'll turn to the fifth
22   page of this document stamped 3235, you'll
23   see there at Item 7 the Police Chief's
24   Directive Regarding Vehicle Pursuits.  Do you
25   see that?
```

1    A.    Yes.

2         Q.    And this document notes that

3    Chief Isaac has ordered a temporary change of

4    the pursuit policy.  Effective immediately

5    officers will only engage in vehicle pursuits

6    for serious/violent felonies.

7              And pursuits for stolen cars or

8    low-level warrants are no longer authorized

9    at that time.  This directive will remain in

10   effect for the foreseeable future until

11   officially rescinded, right?

12        A.    Yes.

13        Q.    And what -- what are low-level

14   warrants?

15        A.    It could be if something is a

16   petty theft, maybe a disorderly conduct where

17   somebody did not take care of their -- their

18   business through the judicial system.  It

19   could be a multitude of low-level offenses

20   that have a warrant associated with them.

21        Q.    Would it include misdemeanor

22   charges?

23        A.    It could.

24        Q.    Would any felonies be considered

25   low-level warrants?

1          A.    You could have like --
2    potentially like a passing of a bad check,
3    which is a felony offense.
4          **Q.    So some felonies might qualify**
5    **for that?**
6          A.    Correct.
7          **Q.    Why was this directive issued?**
8          A.    I do not know.  It was a
9    decision by Chief Isaac.
10         **Q.    Do you recall something**
11   **happening with officers from the department**
12   **related to pursuits prior to this directive**
13   **coming out that might have a connection to**
14   **it?**
15         A.    No, I don't recall.  And this
16   was dated before the August 7th incident, so
17   it wasn't triggered by that.
18         **Q.    It was triggered by some earlier**
19   **event, right?**
20               MR. HERZIG:  Objection.
21         A.    I don't know.
22         **Q.    In any case, it's true that the**
23   **chief determined that pursuits should be**
24   **limited, at least as of this date,**
25   **March 26th, 2020, only for serious and**

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    violent felonies, right?

2         A.    Correct.

3         Q.    Are you aware of any other

4    restrictions on pursuits put in place by the

5    department over the period of ten years prior

6    to August 7th, 2020?

7         A.    No, not without going back and

8    looking at historical files, nothing of

9    substantive.  It may have been something

10   minor based on new equipment or something to

11   that effect.

12        Q.    Okay.  Do you know how long this

13   particular restriction was in effect?

14        A.    This restriction?

15        Q.    Yeah.

16        A.    As Chief Isaac was retiring, one

17   of the last things he did before he left was

18   he implemented the current policy for violent

19   felons only, and that is still in place

20   today.

21             So this was in place.  And then

22   approximately one year later when he left, he

23   formalized that.

24        Q.    Okay.  Thank you.

25             MS. GREENE:  I'm gonna mark for

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the record another exhibit.  This will be 78.

2    It is unstapled, but I'll put a paperclip on

3    it.

4         (Exhibit 78 was marked.)

5              MS. GREENE:  For the record,

6    what we've just marked as Exhibit 88 (sic) is

7    what plaintiff understands to be an e-mail

8    from Christine Briede with a Subject line,

9    Follow up.  Re: Report on CM Pastor Motion on

10   Police Reform dated 9/22/2020 at 7:12:51 a.m.

11   with one attachment.

12              It's my understanding in this

13   case that defense has held production of this

14   particular e-mail on the basis of a privilege

15   claim; is that correct, counsel?

16              MR. HERZIG:  Yes.  We've also

17   determined that it's not -- it was not

18   responsive to any requests.  So two -- two

19   objections.

20              MS. GREENE:  And for the record,

21   the plaintiffs have requested that an

22   unredacted version be produced.

23   BY MS. GREENE:

24         Q.   What you have in front of you,

25   Chief, is a redacted version produced in

 1   response to a pre-litigation public records

 2   request.

 3              And my question to you will be

 4   is -- do you know anything about City Council

 5   member Pastor's Motion on Police Reform on

 6   September of 2020?

 7        A.    No.

 8        Q.    And do you know whether it has

 9   anything to do with pursuits or with the

10   events at issue in this case?

11        A.    I do not know.

12        Q.    And you don't know what the

13   attachments to this e-mail were, do you?

14              MR. HERZIG:  Objection.  I'll

15   ask you not to answer based on privilege.

16        Q.    Okay.  Chief, we're gonna mark

17   79.

18         (Exhibit 79 was marked.)

19   BY MS. GREENE:

20        Q.    Okay.  Chief, you have in front

21   of you an excerpt from a spreadsheet produced

22   in this litigation by the City, which has

23   previously been shared in this form with

24   counsel for the City, and it contains data

25   from the City relating to pursuits.

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1              **Have you ever seen any of the**
2      **contents of this spreadsheet before?**
3              A.    No.
4              **Q.    Are you --**
5              MR. HERZIG:  This is a -- this
6      is a printout of a native of a -- something
7      we produced in native form, correct?  So it
8      doesn't have a Bates label on it.
9              MS. GREENE:  Yeah.  It was
10     produced in native form as an Excel sheet --
11             MR. HERZIG:  Okay.
12             MS. GREENE:  -- and then we
13     basically limited it, right?  It was much
14     bigger than this because this is an excerpt
15     of what was produced to us, and we sent it
16     back to you all in an e-mail when we were
17     seeking some follow-up documentation.  It was
18     an e-mail from January 10th, 2025, at
19     2:48 p.m. --
20             MR. HERZIG:  Okay.
21             MS. GREENE:  -- sent by
22     plaintiffs' counsel to you all.
23             MR. HERZIG:  I just wanted to
24     make sure I understood why the Bates numbers
25     weren't there.

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          MS. GREENE:  Yeah.  There's just
2     no Bates in there --
3          MR. HERZIG:  Okay.
4          MS. GREENE:  -- but that -- this
5     is that spreadsheet from that e-mail.
6          MR. HERZIG:  Thank you.
7     BY MS. GREENE:
8          Q.    So, Chief, are you aware of the
9     City tracking pursuits conducted by officers
10    in the department?
11         A.    I know that our -- the way we
12    collect the data involving a vehicle pursuit
13    can get us this type of information.  But to
14    say that we're tracking it, I don't think is
15    accurate.
16         Q.    Okay.  Can you describe to me
17    then how that data is aggregated if it's not
18    through a tracking mechanism?
19         A.    So our -- our vehicle pursuits,
20    just like our use of force and all that, is
21    entered electronically.  The supervisors
22    preliminary investigations enter it
23    electronically.
24              What I'm referring to is that
25    data can then be pulled out, which I believe

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1  is what this document is.  I can't confirm,

2  but I believe that's what this document is.

3          So we capture all of the data,

4  but your reference to tracking, I took it

5  as for purposes of unrelated to just simply

6  gathering the data as required.

7          Q.    I understand.  Okay.  So for the

8  column here called Case Number, that's an

9  internal CPD case number associated with the

10  pursuits --

11          A.    Yes.

12          Q.    -- reflected here, right?

13          A.    Yes.

14          Q.    And then the column called

15  Pursuit Reason, what data does that reflect?

16          A.    The reason the pursuit began,

17  what caused the officer to -- to engage in

18  it.

19          Q.    And is that the reason that it

20  would be stated in the Form 34 completed by

21  the supervisor?

22          A.    Yes.

23          Q.    And then the next column is

24  PstTermReason, is that short for pursuit

25  termination reason?

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    I believe so.
 2              Q.    And does that also reflect the
 3    information entered in the Form 34 by the
 4    supervisor about why the pursuit was
 5    terminated?
 6              A.    Yes.
 7              Q.    And then the next column is the
 8    date the pursuit occurred, right?
 9              A.    Yes.
10              Q.    And then the beginning time is
11    the time the pursuit occurred, right?
12              A.    Yes.
13              Q.    And then the end time is the
14    time the pursuit ended, right?
15              A.    Yes.
16              Q.    And that would include if it was
17    terminated, the time that it was terminated,
18    right?
19              A.    Yes.
20              Q.    Now, in terms of determining the
21    date -- or, excuse me, strike that.
22                    We have here quite a long list
23    of pursuits spanning over a significant range
24    of time.  My question to you about the
25    pursuits reflected here is which of them
```

```
 1    resulted in fatalities?

 2            A.    I do not know.

 3            Q.    So as you sit here, you're not

 4    able to identify the case numbers for

 5    pursuits that resulted in fatalities; is that

 6    right?

 7            A.    That's correct.

 8            Q.    And are you able to identify

 9    case numbers associated with pursuits that

10    resulted in serious physical injury to any

11    parties?

12            A.    No.

13            Q.    And are you able to identify the

14    case numbers associated with pursuits that

15    resulted in an adverse outcome of any kind

16    for innocent bystanders?

17            A.    No.

18            Q.    Are you able to identify whether

19    any of these case numbers associated with

20    pursuits resulted in Internal or IIS

21    investigations or reports?

22            A.    No.

23            Q.    Are you aware to identify

24    whether any of these case numbers associated

25    with pursuits are associated with any CIRB
```

1    report or findings?

2             A.    No.

3             Q.    And are you able to identify

4    whether any of these pursuits with the case

5    numbers reflected here have any CCA

6    investigations or reports associated with

7    them?

8             A.    No.

9             Q.    Are you aware able to identify

10   whether any of these pursuits reflected in

11   the spreadsheet resulted in any formal

12   discipline to any officer?

13            A.    No.

14            Q.    Are you able to identify whether

15   any pursuit reflected in the spreadsheet

16   resulted in any other type of response from

17   the department, including but not limited to,

18   reprimands, counseling, retraining, or other

19   responses?

20            A.    No.

21            Q.    Over the course of your career,

22   you're aware of pursuits having happened in

23   the CPD's ranks, right?

24            A.    Correct.

25            Q.    And just based on your knowledge

about those events, how many fatalities are
you aware of relating to pursuits?

    A.   I would estimate three or four.

    Q.   Can you describe those to me,
please?

    A.   The first one in my career that
I recall was one happened in the Queensgate
area.  I don't recall any of the -- the
person being pursued's name or circumstances
of the incident, but I recall that being the
first one.

    Obviously, the one we're
discussing here from August 7th.  The one
that you referenced earlier that
Lieutenant Lanter was involved in earlier in
his career.

    I think those are the only
fatality ones that I can recall off the top
of my head.

    Q.   And did they resolve in
fatalities to third parties or to -- to whom?

    A.   Obviously, this one is third
party.  I don't know the circumstances of the
other one Lieutenant Lanter was involved in.
And the one in Queensgate, I do not recall if

1    that was a third-party or the pursued

2    suspect.

3          Q.    And do you know whether any of

4    those pursuits that you've just described

5    resulted in any formal discipline for any

6    officer?

7          A.    I believe the officer that was

8    involved in the Queensgate area resigned

9    prior to any discipline.

10          And then, obviously, I know the

11    results from the August 7th incident.  I do

12    not know what the outcome was of the other

13    one from Lieutenant Lanter.

14          Q.    And maybe you said this, but the

15    Queensgate pursuit, who was the officer who

16    resigned; do you know?

17          A.    I don't remember his first name,

18    but his last name was Birding (phonetic).

19          Q.    Birding.  And do you remember

20    approximately when that occurred?

21          A.    That would have been a long time

22    ago, over 15 years, probably closer to 20.

23          Q.    Okay.  Are you aware of other

24    pursuits that resulted in serious injury?

25          A.    I mean, I don't remember

1    specific ones.  I know we've had them, but I

2    do not -- excuse me, do not remember very

3    specific details of them.

4        Q.    So periodically over the years,

5    is it fair to say there have been CPD

6    pursuits that have resulted in serious injury

7    to persons?

8        A.    Yes.

9        Q.    And some of those have resulted

10   in serious injury to bystanders, right?

11       A.    I do not know.

12       Q.    For any of those pursuits, the

13   three with fatalities or the serious injury

14   pursuits that happened over the years, do you

15   know whether any of them resulted in any kind

16   of response from the City outside of formal

17   discipline, meaning reprimand, counseling,

18   retraining, any other kind of response?

19       A.    Did it -- a response outside of

20   what you just said?

21       Q.    Outside of formal discipline,

22   meaning, you know, these things we've been

23   talking about that are lesser than --

24       A.    Okay.

25       Q.    -- discipline?

Deposition of Chief Teresa Theetge                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.   Okay.  I do not know.

 2              Q.   And for the pursuits resulting

 3      in serious injury, have any of those resulted

 4      in actual discipline?

 5              A.   I do not know.

 6                   MR. HERZIG:  If you're at a good

 7      spot, let's take a short break.

 8                   MS. GREENE:  Sure.  We'll go off

 9      the record.

10         (Off the record.)

11      BY MS. GREENE:

12              Q.   All right.  We're back on the

13      record.

14                   Chief, while engaged in

15      pursuits, do the CPD policies and practices

16      require officers to avoid creating hazardous

17      conditions?

18              A.   If you give me a minute, let me

19      go back to the procedure we had earlier.  I

20      just want to refresh my memory on -- there it

21      is.

22              Q.   And for the record, you pulled

23      Exhibit 1, right?

24              A.   Correct.

25              Q.   Okay.
```

```
 1          A.    Correct.

 2          Q.    All right.

 3          A.    And, I'm sorry, what was your

 4    question, again?

 5          Q.    Yeah.  While engaged in

 6    pursuits, do CPD policies and practices

 7    require its officers to avoid creating

 8    hazardous conditions?

 9          A.    I'm sorry.  I'm just taking a

10    cursory look at this real quick.

11          Q.    Sure.

12          A.    You're talking about in the

13    policy portion of the procedure, right?

14          Q.    Well, I'm asking about policies

15    and practices.

16          A.    Okay.  Because there's a --

17    there's a definite difference between the

18    policy section and the procedural section of

19    each one of these.  And can you repeat your

20    question one more time?  Sorry.

21          Q.    While engaged in pursuits, do

22    CPD's policies and practices require

23    department officers to avoid creating

24    hazardous conditions?

25          A.    I don't see that that is spelled
```

Deposition of Chief Teresa Theetge                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    out here in our policy and procedure.

2              Q.    As a matter of practice, is it

3    accurate that CPD requires its officers

4    during pursuits to avoid creating hazardous

5    conditions?

6              A.    If you're asking for us -- for

7    the officer to create that hazardous

8    condition, yes.  But that's not always --

9    it's not always -- the hazardous condition is

10   not always created by the officer.

11             Q.    Can hazardous conditions include

12   perpetuating -- an officer perpetuating

13   reckless driving by a fleeing suspect?

14             A.    What do you mean by

15   perpetuating?

16             Q.    Is it true that sometimes the

17   simple act of continuing a pursuit

18   perpetuates reckless driving by a fleeing

19   suspect where otherwise the suspect would

20   cease the reckless driving?

21                   MR. HERZIG:  Objection.  You can

22   answer.

23             A.    Yeah, I think that's -- I'm

24   unable to answer that.  I can't determine

25   what a suspect would or wouldn't do if the

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    officer stopped the pursuit.

2            Q.    Is it fair to say that officers

3    in terms of the practices in the department

4    are -- are required to not engage in activity

5    that would perpetuate reckless conduct by a

6    fleeing suspect?

7            A.    I think that's the same question

8    you just asked.

9            Q.    It's a little different, but...

10           A.    There's no way for us to

11   determine, again, what the suspect would or

12   wouldn't do if we terminated a pursuit.

13           Q.    As chief of police over the

14   course of your career with the department,

15   what's your understanding of whether fleeing

16   suspects cease fleeing at some point if

17   pursuits are terminated?

18                 MR. HERZIG:  Objection.  She's

19   not here as the Chief.  She's here as the

20   City.  You can answer as the City.

21           Q.    Go ahead.

22           A.    Okay.  Ask that again.

23           Q.    What's your understanding of --

24   of -- I have to remember my question.

25                 What's your understanding of

1    whether in the context of pursuits when

2    pursuits are terminated that suspects do

3    cease fleeing from the police?

4        A.    I don't -- I don't think I could

5    answer that.

6        Q.    Okay.  Are you aware of any

7    conversation around the state or across the

8    country among leadership in law enforcement

9    agencies relating to risks posed by pursuits?

10       A.    To what kind of risks?

11       Q.    Just risks posed in pursuits.

12       A.    I think every law enforcement

13   executive recognizes it is a risky activity

14   that sometimes police are obligated to

15   conduct for public safety reasons.

16       Q.    Are you aware of any shifts in

17   what have has been considered to be best

18   practices over the past 15 years or so

19   relating to pursuits by law enforcement

20   agencies?

21       A.    I'm aware that agencies -- some

22   agencies have chosen to put restrictions on

23   vehicle pursuits while also recognizing there

24   are times when they are necessary.

25       Q.    The restrictions you just

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    referenced, those have by and large increased

2    and become more comprehensive over the last

3    15 years, right?

4              A.    I'm not sure about that.

5              Q.    In your awareness?

6              A.    Probably.

7              Q.    Okay.  So going back to

8    Exhibit 79, which is the spreadsheet, in

9    relation to this spreadsheet, the information

10   reported -- or, strike that -- the data

11   reported by the City captured here, it is an

12   accurate reflection of the City's

13   understanding of the data points for the

14   pursuits that are noted in the spreadsheet?

15             A.    So if you're asking is this

16   spreadsheet the data that we collect when

17   somebody -- when a supervisor is completing a

18   Form 34, yes.

19             Q.    And then in terms of that source

20   data that then is pulled into the

21   spreadsheet?

22             A.    Uh-huh.

23             Q.    -- does it represent an accurate

24   reflection of the City's understanding of

25   those specific data points?

1    A.    Yes.

2    **Q.    And the reasons stated here then**

3    **for termination of pursuits, as they're**

4    **stated in the table, those reasons comport**

5    **with CPD policy for required termination of**

6    **pursuits, right?**

7              MR. HERZIG:  Objection.

8    A.    I would have to go through each

9    and every page to be able to answer that

10   accurately.

11   **Q.    Are you aware of any pursuit**

12   **over the course of your career at CPD that**

13   **was terminated for a reason that did not**

14   **comply with CPD policy requirements about**

15   **termination?**

16             MR. HERZIG:  Objection.

17   A.    So in your question, you're

18   asking if the pursuit was terminated for a

19   reason that is not in the policy as a reason

20   to terminate a pursuit, is that --

21   **Q.    Yes.**

22   A.    I'm not aware.

23   **Q.    You're not aware of any such**

24   **pursuits?**

25   A.    No.

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    This document as a pursuit

2   termination reason notes in some of the

3   entries excessive speed or speed, does that

4   more than 20 miles over the speed limit,

5   miles per hour over the speed limit?

6      A.    Not necessarily.

7      Q.    What else might it mean?

8      A.    Maybe the streets were wet and

9   they terminated it because of the speed on

10  road conditions other than a dry road

11  condition.  It might only be five miles over

12  the speed limit, so speed could be a varying

13  reason.

14     Q.    So as you sit here right now,

15  you're not sure exactly what the entries

16  relating to speed or excessive speed

17  indicate; is that what you're saying?

18     A.    Correct.

19     Q.    For the entry in the pursuit

20  reason where it says Other Felony, does that

21  mean a felony that is not one of the other

22  categories reflected otherwise in the column?

23     A.    Yes.

24     Q.    Okay.  Am I correct in

25  understanding that you're not aware of

1    efforts from the City from January 2010 to

2    present to identify or investigate CPD

3    officers who improperly initiated pursuits?

4                MR. HERZIG:  Objection.

5        A.    So your -- you're saying --

6        Q.    Did I word that poorly?  I don't

7    know how it came out.  I can ask it again,

8    maybe it will address the objection.

9                So am I right in understanding

10   based on what I've heard you testify to

11   earlier today that, as you sit here, you're

12   not aware of efforts by the City from

13   January 2010 to present to identify or

14   investigate CPD officers who improperly

15   initiated pursuits?

16               MR. HERZIG:  Objection.  You can

17   answer.

18       A.    Okay.  I think the way you're

19   asking that question leads me to believe

20   you're asking whether or not the City was

21   trying to investigate a -- gather names of

22   officers for some reason that, to the rest of

23   your question, violated the pursuit policy.

24               I think that's different than we

25   always investigate every vehicle pursuit and

1    try to determine if it's compliant or not

2    with policy.

3        Q.    Is it accurate that every

4    vehicle pursuit is investigated?

5        A.    Yes.

6        Q.    And it's accurate that every

7    vehicle pursuit is evaluated for compliance

8    with policy?

9        A.    Yes.

10        Q.    And that's done how?

11        A.    By the supervisor of the

12    officers involved in the vehicle pursuit.

13    That's where it starts.

14        Q.    But you don't have any specific

15    knowledge about the investigations associated

16    with individual pursuits, right?

17        A.    Right.

18        Q.    So what you're talking about is

19    a general practice that you believe the

20    department engages in; is that correct?

21        A.    Yes.

22        Q.    That's not based on review of

23    specific incidents or pursuits that you could

24    identify, for example, by case number or

25    participants, right?

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 217 of 261 - Page
ID#: 2630
Deposition of Chief Teresa Theetge                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Correct.

 2              Q.    So then are you able, as you sit

 3     here now, to identify any investigation

 4     relating to improper initiation of a pursuit?

 5                    MR. HERZIG:  Objection.  You can

 6     answer.

 7              A.    Say that again.

 8              Q.    Are you able, as you sit here

 9     today, to identify any investigation by the

10     CPD for improper initiation of a pursuit?

11              A.    No.

12              Q.    And as you sit here today, are

13     you able to identify any investigation by the

14     CPD relating to improper continuance of a

15     pursuit, meaning once it's begun, that it was

16     continued and not terminated?

17                    MR. HERZIG:  Objection.  Go

18     ahead.

19              A.    I guess your question, do I

20     think those -- that happens?  Yes.  Are you

21     asking me about a specific one?  I'm not

22     certain what you're asking.

23              Q.    Yeah.  I mean, you know, I'd

24     love to hear about specific ones, if you know

25     about them, and that's what I'm trying to get
```

1    to right now, right?

2              So are you able to tell me about

3    any specific investigations of officers who

4    were continuing pursuits when that should

5    not -- when they should have been terminated?

6         A.    No, I'm not aware.  But that is

7    part of the process for the supervisor when

8    they start the investigation, that is

9    something they have to look at.

10             But I'm not aware of a

11   particular incident right now that's being

12   investigated for that -- that reason.

13        Q.    Okay.  Or that has been in the

14   past investigated for that reason?

15        A.    I mean, have we had vehicle

16   pursuits that have been investigated in the

17   past?  Yes, but I don't know specific ones.

18   I mean, we talked earlier about the ones that

19   I now know of involving fatals.  Were those

20   investigated?  Yes.

21             So I guess, if you're asking me,

22   am I aware of any?  Yes, I am, because we

23   talked about them.

24        Q.    Do you know about any police

25   pursuits by CPD officers where it was

1    determined that pursuits should have been

2    terminated but were not?

3        A.    Specific ones that I can

4    identify, no.  Does it happen?  Yes.

5        Q.    And when you say does it happen,

6    yes, can you describe to me the basis of your

7    knowledge for that statement?

8        A.    I think just over the years

9    knowing that we have had officers who have

10   been disciplined or corrective action issued

11   for not terminating a pursuit.

12       Q.    And what can you point to, if

13   anything, about the officers who were

14   disciplined for those reasons?

15            MR. HERZIG:  Objection, vague.

16   You can answer.

17       A.    Again, I can't point to specific

18   officers, specific vehicle pursuits.  But do

19   I -- do I think that every pursuit we've had

20   for over 15 years has been 100 percent

21   compliant?  Probably not.

22       Q.    Okay.  Okay.  I know we

23   stipulated to this earlier, but since we

24   don't have a copy of it, so I'll just enter

25   it as an exhibit.  We're gonna mark this

Deposition of Chief Teresa Theetge                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      as --

 2                     THE COURT REPORTER:  82.

 3                     MS. GREENE:  -- sorry, 82.

 4             (Exhibit 80 was marked.)

 5      BY MS. GREENE:

 6             Q.    And, Chief, I'm presenting you

 7      with a training document --

 8                     THE COURT REPORTER:  Oh, no.

 9      That's not right.

10             (Discussion amongst everyone.)

11             (Off the steno record.)

12                     MS. GREENE:  We have Exhibit 80

13      on the table.

14                     MR. HERZIG:  Do you have a copy?

15                     MS. GREENE:  I don't have a

16      second.  But just for the record, we earlier

17      stipulated to the Bates range of pages

18      associated with the retraining for Officers

19      Lanter, Thomas, and Harper --

20                     MR. HERZIG:  Okay.

21                     MS. GREENE:  -- in this case,

22      and that's what this document is that we've

23      marked as 80.

24                     MR. HERZIG:  Got it.  Thank you.

25                     MS. GREENE:  Okay.  All right.
```

| | |
|---|---|
| 1 | MR. HERZIG:  Thank you. |
| 2 | MS. GREENE:  Oh, yeah, it's 3280 |
| 3 | through 3310. |
| 4 | BY MS. GREENE: |
| 5 | Q.    Okay.  Chief, I do have one |
| 6 | follow-up question. |
| 7 | THE WITNESS:  There's a gap in |
| 8 | here. |
| 9 | MR. HERZIG:  Yeah, there's a |
| 10 | gap, but go ahead. |
| 11 | BY MS. GREENE: |
| 12 | Q.    I have a follow-up question for |
| 13 | you in relation to a couple of things we |
| 14 | looked at earlier today? |
| 15 | I'm handing you -- you have |
| 16 | Exhibit 70, sorry, in front of you in your |
| 17 | stack and -- |
| 18 | MR. HERZIG:  Exhibit 70? |
| 19 | MS. GREENE:  Yeah. |
| 20 | BY MS. GREENE: |
| 21 | Q.    And I want to look at that in |
| 22 | conjunction with 80. |
| 23 | MR. HERZIG:  Which one is 70? |
| 24 | MS. GREENE:  Seventy is -- |
| 25 | THE WITNESS:  Got it. |

Case: 2:21-cv-00102-DLB    Doc #: 139    Filed: 11/06/25    Page: 222 of 261 - Page
ID#: 2635
Deposition of Chief Teresa Theetge                            Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    BY MS. GREENE:
 2         Q.    Okay.  So you have Exhibit 70
 3    and these documents reflect that the police
 4    academy training that was the refresher
 5    training for the officers in this case was
 6    scheduled for October 25th, right?
 7         A.    Correct.
 8         Q.    And, in fact, that is when the
 9    training went forward, correct?
10         A.    Correct.
11         Q.    Now, the IIS report was
12    completed in March of 2021, March 1st, I
13    believe; is that right?
14         A.    Yes.
15         Q.    And my question would be why did
16    as many months pass in between the completion
17    of this report and the retraining?
18         A.    I do not know.
19         Q.    Okay.  And just going back, I
20    suppose I should also put into consideration
21    there the CIRB report, which you also have in
22    your stack is Exhibit --
23         A.    Nine.
24         Q.    -- 9.  The date of that report
25    you have in front of you, right?
```

Deposition of Chief Teresa Theetge                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1       A.    June 16th.

2       Q.    And so that recommendation, or

3  rather order, for retraining came out

4  June 16th, right?

5       A.    Correct.

6       Q.    And it didn't happen until

7  October?

8       A.    Correct.

9       Q.    And you don't know why that is?

10      A.    No, I don't know what the

11 scheduling was.

12      Q.    Okay.  Okay.  So

13 Lieutenant Lanter was promoted to lieutenant

14 after the pursuit at issue in this case,

15 right?

16      A.    Correct.

17      Q.    Was this pursuit considered in

18 his promotion review?

19      A.    What do you mean by promotion

20 review?

21      Q.    Well, in the process to

22 become -- to receive a promotion, there is a

23 determination made by superior officers about

24 whether the promotion should be granted,

25 right?

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1          A.     No.

2          Q.     Okay.  How's it work?

3          A.     No.  A Civil Service Exam is

4    administered.  And once the list is certified

5    by Civil Service, we have to promote straight

6    down the list as vacancies occur.

7          Q.     Is there any effect on those

8    promotions by, for example, discipline that

9    the officer has received prior to the

10   promotion occurring?

11         A.     No.

12         Q.     Why is that?

13         A.     Civil Service rules and FOP

14   contract.

15         Q.     FOP contract.  So there's no

16   consideration of prior discipline in the

17   promotion of officers in the CPB -- or CPD?

18   Excuse me.

19         A.     No.  Once the list is certified

20   and I'd have to reference -- go back, but

21   there is certain degree of discipline prior

22   to the administration of an exam, they could

23   be not able to take the exam.

24         Q.     What's the degree of discipline

25   required for that?
```

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    I can't -- I can't remember off

2  the top of my head.

3      Q.    Do you know when

4  Lieutenant Lanter took that Civil Service

5  Exam?

6      A.    I do not.

7      Q.    Do you know if it was before or

8  after this pursuit?

9      A.    I think it was before, but I'm

10  not -- I'm not certain on that.  Only because

11  that can be a lengthy process.

12      Q.    And so this pursuit and any

13  other pursuits that he was involved in, those

14  were not considered in evaluating him for

15  promotion; is that correct?

16      A.    That's correct.

17          MR. HERZIG:  Objection.  Go

18  ahead.

19      A.    That's correct.

20      Q.    Okay.  Thank you.  During the

21  course of this pursuit, it's true there were

22  no shots fired, right?

23      A.    Correct.

24      Q.    And there was no -- there were

25  no shots fired prior to the pursuit earlier

Deposition of Chief Teresa Theetge                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    in that day by Mason Meyer, right?

2         A.    Correct.

3         Q.    And there were no shots fired by

4    Mason Meyer even the day before the pursuit,

5    right?

6              MR. HERZIG:  Objection, to the

7    extent the City knows.

8         A.    He -- he had a history of firing

9    shots.  I don't know when the last one was

10   prior to the day of the vehicle pursuit.

11        Q.    Okay.  You're not aware of any

12   information indicating that there were shots

13   fired by Mason Meyer on the day prior to the

14   pursuit, though, right, like specifically on

15   that day prior?

16        A.    I do not know.

17        (Exhibit 81 was marked.)

18              MS. GREENE:  Okay.  We're gonna

19   mark an electronic exhibit.  We're gonna show

20   it on this laptop over here.  This will be

21   81.  Okay.  And I'm gonna turn this around

22   for you and try to operate it upsidedown.

23   Let me actually get that --

24              MR. HERZIG:  And you'll identify

25   it for us?

```
 1              MS. GREENE:  Yes.
 2    BY MS. GREENE:
 3         Q.    So this, Chief, is a video
 4    produced in discovery in this matter --
 5              MR. HERZIG:  Do you need to
 6    answer that?
 7              THE WITNESS:  Yeah.  Let me just
 8    text her.
 9              MS. GREENE:  Yeah.  We can go
10    off the record.
11       (Off the record.)
12    BY MS. GREENE:
13         Q.    All right.  So for the record,
14    what we're marking as Exhibit 81 is stamped
15    as City 807, and it is a video.  I'm gonna go
16    ahead and click play on this for you.  And my
17    question to you, Chief, will be, one, have
18    you seen this before?
19              (Video playing.)
20         A.    Yes, not too long after the
21    occurrence.
22         Q.    And what do you understand the
23    source of this video to be?
24         A.    I'm not sure.  Obviously, it's
25    not body camera or in-car camera.  I'm not
```

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    sure, maybe drone or a camera, stationary
 2    camera somewhere.
 3          Q.    Did CPD have drones in August of
 4    2020?
 5          A.    We may have had a couple of
 6    specialized units that had one or two, but we
 7    didn't have a drone program.
 8          Q.    The CPD does now have a drone
 9    program, right?
10          A.    Well, we're getting ready to
11    kick one off.
12          Q.    Drones at the time in August of
13    2020 were available on request by officers,
14    right?
15          A.    In specialized units like the
16    Traffic Unit had one, SWAT.
17                MR. HERZIG:  Sorry.  Is the fact
18    that we're about to have a drone program
19    something that's public or should be mark
20    that as confidential?
21                THE WITNESS:  We've been
22    speaking about it.
23                MR. HERZIG:  Okay.  Sorry.  Go
24    ahead.
25    BY MS. GREENE:
```

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    So if a unit, other than the two
 2    you just named thought a drone would be
 3    useful for what they were engaging in that
 4    day, they could request drone operators,
 5    right?
 6                MR. HERZIG:   Objection.   Go
 7    ahead.
 8          A.    Yes.
 9          Q.    Okay.   Do you know whether any
10    drones were requested for the surveillance or
11    pursuit of Mason Meyer?
12          A.    I do not know.
13          Q.    Do you know whether any
14    helicopters were requested for surveillance
15    or pursuit of Mason Meyer?
16          A.    We don't have helicopters.
17          Q.    Am I correct in understanding
18    that there was an operator who was assigned
19    and able to use a county helicopter at the
20    time?
21          A.    I know the county has gotten rid
22    of their helicopter.   I don't recall if they
23    had it in 2020, or if they had already gotten
24    rid of it.
25          Q.    To the extent they had it at the
```

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    time, is that a request that officers could

 2    make if it was prudent for their particular

 3    operation?

 4            A.    They could.

 5            Q.    And drones and helicopters can

 6    be useful in the course of pursuits, right?

 7            A.    Yes.

 8            Q.    So just briefly going back to

 9    this Exhibit 81 that we just watched.  You

10    don't know where that came from then?

11            A.    No.

12            MS. GREENE:  Counsel, any

13    representations you can make about that?

14            MR. HERZIG:  Okay.  So why

15    don't you -- why don't you just put it on the

16    record what we know from the metadata?

17            MR. COWAN:  So we have metadata

18    one just describes it as Twitter video, and

19    there's another video that we've also

20    produced that appears to be identical, and I

21    believe is referred as WCPO.  Let me just

22    double-check that, but...

23            MS. GREENE:  Okay.  And so then

24    for the record, 81 is the Bates 807 Twitter

25    video and the WCPO metadata you're

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    referencing pertains to a different Bates

2    number, correct?

3                    MR. COWAN:  Yeah.  And let me

4    look into this so we can revisit it a next

5    break.

6                    MS. GREENE:  Okay.  All right.

7    Thank you.

8    BY MS. GREENE:

9        Q.    So going back to drones and

10   helicopters, how can they be useful for

11   pursuits and surveillance?

12       A.    Because they are eyes in the

13   sky.  They can follow the vehicle until we

14   can probably apprehend the suspect in a

15   different way.

16       Q.    And they don't require officers

17   on the ground to pursue at high speeds

18   where -- to keep the vehicle in sight where

19   they can be seen through eyes in the sky,

20   right?

21                   MR. HERZIG:  Objection.  You can

22   answer.

23       A.    That depends.  It doesn't -- it

24   doesn't alleviate the necessity to have

25   officers on the ground.  We would not just

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    leave a drone following a car without having

2    uniform presence there as well.

3            Q.    But in circumstances where, for

4    example, it becomes too unsafe to continue a

5    pursuit, drones and helicopters can be used

6    to keep eyes on the fleeing vehicle until a

7    safer moment arrives to apprehend the

8    suspect, right?

9            A.    Potentially.

10           Q.    Okay.  In this case, it's our

11   understanding that then Assistant

12   Chief Neudigate convened meetings to watch

13   video footage associated with this pursuit in

14   the period of time shortly following the

15   pursuit; is that correct?

16           A.    I heard that that occurred.  I

17   was not in attendance.

18           Q.    What do you know about those

19   meetings?

20           A.    All I know is that he held the

21   meetings.  I believe he was the patrol bureau

22   commander at the time, so I believe he had

23   his patrol captains.

24           Q.    And what about assistant chiefs,

25   were they invited to the meetings as well?

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    A.    I was not.  I don't know if
 2       Colonel John was.  And in '20, I don't
 3       remember who was assistant chief at the time.
 4                    Q.    But the captains of the patrol
 5       division were invited?
 6                    A.    I believe so.
 7                    Q.    Are they required to attend?
 8                    A.    I do not know.
 9                    Q.    What was discussed at those
10       meetings?
11                    A.    I have no idea.
12                    Q.    Do you know about documents
13       associated with those meetings?
14                    A.    I do not.
15                    Q.    Do you know about communications
16       associated with those meetings?
17                    A.    No.
18                    Q.    Yeah.  How do you know that it
19       occurred then?
20                    A.    I just heard people speaking
21       about it after the fact.
22                    Q.    And who did you hear speaking
23       about it?
24                    A.    I don't remember.
25                    Q.    What were they saying?
```

Deposition of Chief Teresa Theetge                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    Just that there was a meeting --

2      **Q.    And did --**

3      A.    -- that Colonel Neudigate had

4  conducted a meeting.

5      **Q.    And did they say they watched**

6  **videos from the pursuit?**

7      A.    I don't know.

8      **Q.    Did they say what they saw in**

9  **any materials presented at the meeting?**

10      A.    No.

11      **Q.    Did they offer any reactions to**

12  **what they learned at the meeting?**

13      A.    No.

14      **Q.    Are you aware of any reactions**

15  **from within the department about the pursuit**

16  **at issue here where supervisors thought this**

17  **was an improper pursuit outside of what was**

18  **reflected in the IIS or CIRB reports?**

19      A.    The only thing I know is the

20  discussions internally, such as internal --

21  internal communications at Internal, there's

22  often dialogue about cases and people's

23  opinion on them.  And I know they had some

24  conversations about this.

25      **Q.    And tell me about those**

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1  conversations, please.

2      A.    Just that some of them thought

3  it was okay, and some of them thought it was

4  not.  Different perspectives.

5      Q.    Who were the individuals who

6  thought it was not?

7      A.    I do not remember.  It was just

8  general conversation.

9      Q.    How did you hear about that

10  general conversation?

11      A.    I think it was at the time when

12  the Internal commander was reporting to me at

13  that time, and it was during the

14  investigation.

15      Q.    And who was the commander at

16  that time?

17      A.    Deb Snider.

18      Q.    Thank you.  And what else did

19  Snider tell you about this matter?

20      A.    Nothing specific.

21      Q.    Do you remember any general

22  statements he gave to you about this matter?

23      A.    No.

24      Q.    For those meetings with

25  Assistant Chief Neudigate, individuals were

1    invited by camera e-mail; is that right?

2           A.    I have no idea.

3                 MS. GREENE:   And I'll just

4    reflect for the record that we've had

5    testimony about e-mails relating to these

6    meetings, and I have not yet received a

7    production of those, and counsel and I have

8    discussed that matter as well.

9    BY MS. GREENE:

10          Q.    For the people who thought the

11   pursuit was not okay, I understand you don't

12   necessarily remember specifically who it was,

13   but what rank of officer are we talking

14   about?

15          A.    Internal is comprised of

16   sergeants, a lieutenant, and a captain, six

17   sergeants, one lieutenant, one captain.

18          Q.    So it was individuals within

19   that -- those categories?

20          A.    Yes.

21          Q.    What --

22          A.    Which is not uncommon as they're

23   discussing cases and officer's actions.  Some

24   of them think that an officer's actions may

25   be okay, where other ones are more cautious

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    and think it's not.

2           Q.    Okay.  At the end of the day,

3    though, the IIS report that came out in this

4    case reflects the final findings of IIS,

5    right?

6           A.    Correct.

7           Q.    All right.  I'd like to actually

8    go back to that exhibit, which is Exhibit --

9           A.    Three.

10          Q.    -- 3.  Thank you.  Let me find

11   my copy.  Just one moment.  Here we go.

12               Okay.  So the chain of command

13   review conducted pursuant to this

14   documentation was a supervisory review of

15   officer conduct here, right?

16          A.    Do you mean by -- like, it was a

17   sergeant that conducted the investigation, so

18   it's a supervisor.

19          Q.    And then it went all the way up

20   through the chain of command, right?

21          A.    Right.

22          Q.    All the way to the chief?

23          A.    Yes.

24          Q.    And the chief approved the

25   findings in this report, right?

1    A.    Correct.

2    Q.    **He approved the discipline**

3  **recommended in this report, right?**

4    A.    None of it is discipline.  He

5  approved the corrective actions.

6    Q.    **Is a written reprimand**

7  **discipline?**

8    A.    Oh, I'm sorry, correct.  It used

9  to be corrective action, now it's discipline.

10  Sorry.

11    Q.    **Okay.  So the chief did approve**

12  **the discipline for Sergeant Lanter**

13  **recommended by this report, right?**

14    A.    Correct.

15    Q.    **And the chief also approved the**

16  **ESLs for the other officers as reflected in**

17  **this report, right?**

18    A.    Correct.

19    Q.    **And you're not -- and the City**

20  **has never taken the position that this**

21  **discipline was improper, right?**

22    A.    Correct.

23    Q.    **And the City has never taken the**

24  **position that these ESLs were improperly**

25  **handed down either, right?**

```
 1              A.    Correct.

 2              Q.    Likewise, the City has never

 3    walked back any of the findings in this IIS

 4    report, right?

 5              A.    Correct.

 6              Q.    And with regard to the CIRB

 7    then, the same thing applies, right, which is

 8    Exhibit 9 --

 9              A.    Correct.

10              Q.    -- the chief reviewed that

11    report as well, correct?

12              A.    Yes.

13              Q.    And he approved the findings of

14    the CIRB in this matter, right?

15              A.    Yes.

16              Q.    And he approved the issuing of

17    the retraining here, right?

18              A.    Yes.

19              Q.    And at no time has the City

20    walked back any of the findings contained in

21    the CIRB report, right?

22              A.    Correct.

23              Q.    And the City stands by those

24    findings today?

25              A.    Yes.
```

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        Q.    And the City stands by
 2   Captain Caton's findings in relation to this
 3   matter, correct?
 4        A.    Correct.
 5             MR. HERZIG:  And you mean in
 6   that report?
 7             MS. GREENE:  What did I say?
 8             MR. HERZIG:  I was more general
 9   than that.  You're still referring to
10   Exhibit 9, right?  The moral of that question
11   was referring to Exhibit 9?
12             MS. GREENE:  Sure.
13             MR. HERZIG:  Okay.
14   BY MS. GREENE:
15        Q.    Are you aware of anything
16   Captain Caton has ever communicated in any
17   other context that the City would take issue
18   with relating to this -- this pursuit and the
19   department's view of it?
20        A.    No.
21        Q.    So regarding to Officers Thomas
22   and Lanter, were there any prior efforts by
23   the City at any time before August 7th, 2020,
24   to disallow them from undertaking pursuits?
25        A.    I do not know.
```

Deposition of Chief Teresa Theetge                                Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    You're not aware of any in the

2     context of your knowledge about this case,

3     right?

4          A.    No.

5          Q.    And were there any efforts to

6     disallow them from undertaking pursuits after

7     this August 7th, 2020, pursuit?

8          A.    I do not know.

9          Q.    And you haven't heard of any,

10    have you?

11         A.    No.

12         Q.    Were either of them ever put on

13    desk duty or otherwise taken off active duty

14    after this pursuit?

15         A.    I do not know.

16         Q.    Would that be reflected in the

17    documentation if it had occurred?

18         A.    No, not necessarily.  It could

19    have been a conversation.

20         Q.    Who would make the decision to

21    pull them from active duty?

22         A.    The chief.

23         Q.    Lanter left the Gang Unit in

24    2020, right?

25         A.    I do not know.

1  Q.    Do you know whether when he

2  departed the Gang Unit that was in any way

3  connected to this pursuit?

4         A.    I do not know.

5         Q.    Who would know that?

6         A.    Again, the chief, or

7  Colonel Neudigate, who was there at the time.

8         Q.    Had Lanter been removed from any

9  units at any time during his employment with

10 the department?

11        A.    I do not know.

12        Q.    Are there any other documents or

13 communications associated with this case that

14 you're aware of that you've seen or know

15 about that we haven't talked about today?

16        A.    Not to my knowledge.

17        Q.    Is it accurate that the City

18 contends that its 30(b)(6) witness is

19 adequately prepared pursuant to the Notice in

20 this matter?

21        A.    I'm sorry.  I didn't hear all of

22 your question.

23        Q.    Is it accurate that the City

24 contends that its 30(b)(6) is adequately

25 prepared pursuant to the Notice in this

1    matter?

2        A.    Yes.

3            MS. GREENE:  All right.  Just

4    take a couple minutes off the record.

5       (Off the record.)

6    BY MS. GREENE:

7        Q.    All right.  We're back on the

8    record.

9            Chief, we just have a few quick

10   followups for you.  What are the duties of

11   the chief when a critical incident involving

12   a CPD officer occurs?

13       A.    Well, it's dependent upon what

14   type of critical incident are we talking

15   about?  We could have a firearms discharge by

16   an officer, and the police chief is

17   responsible for starting the coordination of

18   resources.

19            We could have an officer shot,

20   you know, potentially killed, and there's a

21   whole different set of responsibilities for

22   the police chief to start with that.  And

23   then you could have any other type of

24   critical incident -- critical incident is a

25   very, very broad definition.

1    And so at the onset, it's really

2    get the resources rolling, get things

3    started.  And then it's to monitor and bring

4    the investigation, if that's what's going on,

5    to a culmination.

6        **Q.    And since you said that's a**

7    **broad question.  I guess, maybe, I'll ask**

8    **specifically in relation to a critical**

9    **incident involving a vehicle pursuit with a**

10   **fatality or serious physical injury.  What**

11   **are the chief's duty in that circumstance?**

12       A.    So, again, dependent upon where

13   it is, if it -- if the vehicle crash,

14   fatality occurs in our city, it's to also get

15   the City resources, start -- Traffic Unit

16   started, our Criminal Investigation Section,

17   Internal Investigations, most likely, Citizen

18   Complaint Authority.

19       Make sure that they're all

20   notified and they are starting their work as

21   soon as possible.  In this case, because it

22   did happen in Kentucky that, obviously, our

23   Traffic Unit wouldn't have the involvement

24   for that part of the investigation, but we've

25   got to make sure that we allocate all the

```
 1    resources that are needed to get done what we
 2    need to get done for our department.
 3              I mean, we owe that to the
 4    community.  We owe that to the City
 5    leadership.  We owe that to the department.
 6         Q.    And so that includes initiating
 7    investigations and assigning officers
 8    to those purposes?
 9         A.    Correct.
10         Q.    And then at the culmination of
11    the investigation, what's the duties of --
12    what are the duties of the chief?
13         A.    To review the facts as presented
14    to the chief, to determine -- so, first and
15    foremost, if there's criminal conduct, we've
16    got to let that run its course before we can
17    start looking at -- at anything through the
18    administrative lens.
19              So you've got to let the
20    potential for any criminal investigation to
21    conclude first.  Once that's concluded, you
22    start the administrative process.  So you're
23    reviewing all the facts that are presented to
24    you in comparison with the rules,
25    regulations, policies, procedures, all of
```

1     that to determine what, if anything, is

2     warranted after that, discipline, corrective

3     action, remedial training.

4                 And you have -- if there's

5     discipline, there is another process that has

6     to run its course that the officer is

7     entitled to, so a pre-disciplinary hearing.

8            Q.     Okay.  And so at the end of the

9     day, the responsibility for ensuring

10    discipline is handed down where necessary is

11    the chief's responsibility; is that right?

12           A.     That's right.

13           Q.     And it's also the chief's

14    responsibility to ensure that investigations

15    are conducted in an adequate and thorough

16    manner for a critical incident involving

17    pursuits, right?

18           A.     Yes.

19           Q.     Now, what about assistant chiefs

20    in a critical incident relating to a pursuit,

21    do they have any specific duties?

22           A.     Yeah.  So our department is

23    divided into bureaus.  Each bureau is headed

24    by an assistant chief.  So depending on what

25    bureau the assistant chief is responsible

1  for, determines what their responsibility is

2  during a critical incident.

3              So, again, if we have a critical

4  incident that is a discharge of a firearm,

5  our Criminal Investigations Section, the

6  Homicide Unit investigates all of those.

7              And so that would be under the

8  Investigations bureau commander.  Most likely

9  just because of the sheer numbers, the

10  officer involved in that would probably be a

11  patrol bureau officer.

12              So the patrol bureau commander

13  would have a different set of

14  responsibilities to ensure what is done with

15  that officer after the incident, the

16  resources that they -- they think that they

17  have to do.

18              They have to go out and qualify.

19  They have to see the police psychologist,

20  things like that.  So that would be the

21  patrol bureau commander's responsibility,

22  ensuring coverage in the district of

23  occurrence because a lot of their resources

24  will be pulled away.

25              So the administration bureau

 1    commander usually has Internal Investigations

 2    assigned to them, and so they have a

 3    different set of responsibilities to ensure

 4    that those resources get deployed and start

 5    their investigation and keep them moving

 6    along the way.

 7          **Q.    In the event of a pursuit**

 8    **involving Gang Unit and Canine Unit officers,**

 9    **what role would any assistant chief have?**

10          A.    So we no longer have the

11    Gang Unit, but at that time, it was under the

12    patrol bureau commander.  So just as I

13    described, they would -- the patrol bureau

14    commander would be responsible to ensure that

15    whatever administrative process needs to

16    occur with the officer involved, that that is

17    completed.

18               The Canine, the same thing.

19    Canine was assigned -- is assigned to the

20    patrol bureau commander.

21          **Q.    Okay.  And that process would be**

22    **both for investigations and discipline; is**

23    **that right?**

24          A.    Well, because this one did not

25    happen in the City, so there was not an

```
 1    investigation by CPD as far as the auto
 2    accident.  The investigation by CPD was for
 3    the administrative side of the vehicle
 4    pursuit.
 5         Q.   Okay.  And does the assistant
 6    chief and of the patrol bureau, the commander
 7    of that bureau then have a role in the
 8    investigation that you described on the
 9    administrative side?
10         A.   No.
11         Q.   That -- so then in this case,
12    specifically it just rests with the chief; is
13    that what you're saying?
14         A.   Internal Investigations.  So at
15    this -- at this time I had Internal
16    Investigations, I was the assistant chief
17    that they reported to.  And then it,
18    ultimately, then goes to the chief, as you
19    can tell by the approval process.
20         Q.   Okay.  And so you had mentioned
21    this executive officer role earlier.  What's
22    that in relation to assistant chief?
23         A.   Yeah.  So it's just a -- it's
24    just an elevated assistant chief.  You still
25    are responsible for a bureau, just like the
```

1    other assistant chiefs are, but it is really

2    just a title that is given to the person who,

3    in essence, is in charge as the acting chief

4    when the chief is not available or out of the

5    office.

6           **Q.    Okay.  So then is the executive**

7    **officer and assistant chief overseeing IIS at**

8    **that time, what are duties in that role?**

9           A.    Yeah.  So, again, it would have

10   been to make sure that Internal personnel and

11   their resources are deployed to start their

12   investigation.

13           They are also the liaison with

14   the Citizens Complaint Authority.  So

15   whenever Internal goes out on something, one

16   of their requirements is they have to contact

17   CCA to let them know what they're going out

18   on.

19           And then CCA determines if

20   they're gonna send somebody out, or if

21   they'll just work off of our investigation.

22   So that was the role.

23           **Q.    Okay.  And did you do that then**

24   **in this case?**

25           A.    I did not.  The date that this

Deposition of Chief Teresa Theetge                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1    happened, August 7th of 2020, I was actually
2    on vacation.  I was out of state.  I got a
3    phone call, pretty much immediately after it
4    happened by the Internal assistant commander.
5              And she told me what little that
6    she knew at the time of what had happened.
7    She told me what resources were going out,
8    and then I just monitored it from a distance.
9         Q.    And what did that monitoring
10   from a distance involve?
11        A.    Just making sure that our
12   Internal investigators got out there, got
13   started with knowing what they had to do,
14   knowing that the Kentucky Department, Law
15   Enforcement Department, was the investigating
16   body for the vehicle accident.
17             And then Internal just does what
18   they do, they start gathering what documents
19   they can at that moment.  And then as certain
20   documents get completed, they then gather
21   those as well.
22        Q.    For oversight of the
23   investigation itself, did you or anyone above
24   Sergeant Fink in the chain of command review,
25   provide instruction to Fink on what
```

1    information should be gathered?

2         A.    I did not.  Like I said, I was

3    out of town.  He has the chain of command

4    that has that responsibility.

5         Q.    Okay.  So going back to

6    **Exhibit 3**, then, the IIS report here --

7         A.    Uh-huh.

8         Q.    -- well, strike that.  Let me

9    actually walk back just a little bit further.

10        Is it fair to say that the

11   supervisory officers in a chain of command

12   share responsibility for initiating

13   investigations into officer misconduct of any

14   kind?

15        A.    Of any kind, is that what you

16   said?

17        Q.    Yeah, by an officer under their

18   chain of command.

19        A.    I guess your question is not

20   clear.

21        Q.    Is it fair to say that officers

22   in -- or, excuse me.

23        Is it fair to say that

24   supervisors in the chain of command over a

25   particular officer are responsible for

1  ensuring investigations of any misconduct by

2  that officer?

3          A.    Not necessarily.  So what I mean

4  by that is, for example, if a patrol officer

5  has done something or there's an allegation

6  that they've done something, their chain of

7  command depending on the severity of the

8  alleged misconduct, their chain of command

9  can start the investigation and complete

10  it -- and this is all outlined in our

11  procedure of what they can investigate --

12  versus documenting the allegation when it

13  comes in and referring it to Internal for the

14  actual investigation to occur.

15          Q.    Okay.  The officers in the chain

16  of command, though, would have the

17  responsibility to either conduct the

18  investigation or refer it to Internal; is

19  that right?

20          A.    Normally.

21          Q.    And is it fair to say that the

22  officers in the chain of command have a

23  responsibility to identify policy violations

24  by officers under their supervision?

25          A.    Sometimes.

```
1          Q.    And why is it only sometimes?

2          A.    Because if they are referring an

3    allegation of misconduct to Internal, then

4    they do not have a responsibility to

5    determine any violations.  That is left up to

6    Internal.  That's completely taken out of

7    their chain of command -- the hands of their

8    chain of command.

9          Q.    The ones that made the referral

10   to Internal, then it is Internal's

11   responsibility to identify those violations?

12         A.    Yes.

13         Q.    Okay.  For the assistant chiefs

14   overseeing the various bureaus of the

15   department, they're responsible for oversight

16   of all the officers in that department,

17   right?

18         A.    Yes.

19         Q.    And that includes the --

20         A.    -- in that bureau.

21         Q.    Or, excuse me, in that bureau

22   they're responsible for that?

23         A.    Yes.

24         Q.    And that includes disciplinary

25   matters, right?
```

1      A.    They would not suggest the

2  discipline.  There is a process for that in

3  the pre-disciplinary hearing.  But once the

4  discipline is determined, then they are

5  responsible to see that it's carried out.

6      **Q.    And the assistant chiefs**

7  **overseeing the various bureaus, they're**

8  **responsible for ensuring that the officers,**

9  **including lower-level supervisors under their**

10 **command, comport and comply with department**

11 **policies, right?**

12     A.    Yes.

13     **Q.    And, likewise, it's the**

14 **responsibility of each officer to ensure that**

15 **his conduct on duty complies with department**

16 **policies, right -- department policies,**

17 **right?**

18     A.    Yes.

19     **Q.    Thank you.  And it's the**

20 **responsibility of each bureau commander to**

21 **ensure that the officers under their**

22 **supervision are receiving adequate guidance**

23 **through their chain of command to execute**

24 **their duties in compliance with department**

25 **policies, right?**

Deposition of Chief Teresa Theetge

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    A.    Yes.

2    Q.    **And it's the responsibility of**

3  **those bureau commanders as well to ensure**

4  **that the officers under their command are**

5  **equipped with the appropriate training to**

6  **execute their duties in compliance with**

7  **department policies, right?**

8    A.    Not necessarily.  We have a

9  Training Section that is responsible for

10  ensuring that the department -- all

11  department members get the training that is

12  required.

13        Like I said earlier, a lot of

14  that is mandated by OPOTA, but if we have an

15  incident, such as this, where the outcome is

16  recommended additional training, then the

17  bureau commander has a role in ensuring the

18  chain of command sees that that gets done.

19        But they are not responsible for

20  training overall for everybody in their

21  bureau.  That's the Training Section.

22    Q.    **And the Training Section is**

23  **under the chief's supervision, right?**

24    A.    No.

25    Q.    **Whose supervision is the**

1    Training Section under?

2         A.    It currently is under the

3    Administrative Bureau.  We've some name

4    changes over the years of the different

5    bureaus, so right now it's under the

6    administration or Administrative Bureau.

7         Q.    Is it fair to say then in 2020

8    and before that the department and it's chain

9    of command structure overall is responsible

10   for ensuring that all officers in the

11   department receive the training necessary to

12   execute their duties in compliance with

13   department policies?

14        A.    Yes.

15        Q.    And is it also the

16   responsibility of the department overall

17   through it's provision of training and

18   supervision to ensure that all officers are

19   provided with the -- the training and the

20   knowledge necessary to execute their duties

21   as officers safely?

22        A.    Yes, to the best of their

23   ability.

24        Q.    You mentioned the Administrative

25   Bureau, Chief, that's a newer thing; is that

1  **right?**

2          A.    No.  We've had that title

3  before -- excuse me, over the last several

4  years we've had, because of retirements and

5  other things, assistant chiefs who have

6  retired/resigned, gone on to be chiefs

7  elsewhere, and so we have newly promoted

8  ones.

9              And with that, took an

10  opportunity to kind of reorganize the

11  department based on some of those assistant

12  chiefs, their strengths, and put them in

13  areas of responsibility where I know they're

14  strong.

15              So we have Administration --

16  Administrative Bureau is still in existence,

17  but now we have the Investigations Bureau,

18  Patrol Bureau, and Strategic Innovations

19  Bureau.

20          **Q.    In 2020 and 2021 the Training**

21  **Section, what umbrella was that under in the**

22  **department?**

23          A.    I think that was, again, because

24  things changed a bit when I became executive

25  officer, I think that was under me because I

 1    had Administration Bureau.  There was also a

 2    time in there where we were below our

 3    complement of assistant chiefs, so we kind of

 4    took on a double duty.

 5              I did.  So I had Support Bureau

 6    and Administration Bureau.  I do not remember

 7    under which of those two bureaus the Training

 8    Section fell at that time.

 9         **Q.    Okay.  In any case, ultimately,**

10    **up through the chain of command, the chief**

11    **supervised?**

12         A.    Absolutely.

13         **Q.    When did you say you became**

14    **interim chief?**

15         A.    Let's see.  I became chief in

16    January of '23, so it would have been March

17    or April of '22.

18         **Q.    Okay.**

19         A.    I was interim for ten months

20    before I became Chief.

21              MS. GREENE:  Okay.  All right.

22    Well, barring the production of anything that

23    has not yet been produced or otherwise comes

24    to us in a form or format that reveals more

25    information in the previously redacted

1    versions and additional areas of questioning

2    that would arise under those productions, at

3    this point in time, I have no further

4    questions for you.

5              MS. ALLOUCH:  Nothing from me.

6    Thank you.

7              THE WITNESS:  Thank you.

8              MS. GREENE:  Tristan?

9              MR. PALMER:  Nothing for me.

10             MR. HERZIG:  Nothing from us.

11   Thank you all very much.

12             MS. GREENE:  Thank you.  We'll

13   go off the record.

14

15                      _____
                         CHIEF TERESA THEETGE

16

17

18                    *  *  *

19
          (DEPOSITION CONCLUDED AT 4:51 P.M.)
20                    *  *  *

21

22

23

24

25

261

1                  C E R T I F I C A T E

2
         STATE   OF   OHIO
3                          :  SS
         COUNTY OF WARREN
4
                        I, Stacey J. Murrin, the
5        undersigned, a duly qualified notary public
         within and for the State of Ohio, do hereby
6        certify that CHIEF TERESA THEETGE was by me
         first duly sworn to depose the truth and
7        nothing but the truth; foregoing is the
         deposition given at said time and place by
8        said witness; deposition was taken pursuant
         to stipulations hereinbefore set forth;
9        deposition was taken by me in stenotype and
         transcribed by me by means of computer; that
10       the transcribed deposition was made available
         to the witness for examination and signature
11       and that signature may be affixed out of the
         presence of the Notary Public-Court Reporter.
12       I am neither a relative of any of the parties
         or any of their counsel; I am not, nor is the
13       court reporting firm with which I am
         affiliated, under a contract as defined in
14       Civil Rule 28(D) and have no financial
         interest in the result of this action.
15           IN WITNESS WHEREOF, I have hereunto set my
         hand and official seal of office at
16       Cincinnati, Ohio this 19th day of May, 2025.

17

18                                _____

19  My commission expires:   Stacey J. Murrin
         August 17, 2025,    Notary Public - State of Ohio
20

21

22

23

24

25