1               IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF KENTUCKY
2                          AT COVINGTON

3        JASON LAIBLE,            :
         et al.,                  :
4                                 :   CASE NO.
                                  :   2:21-cv-00102
5           Plaintiffs,           :
                                  :
6        vs.                      :   Judge David L.
                                  :   Bunning
7        TIMOTHY LANTER,          :
         et al.,                  :   Magistrate Judge
8                                 :   Candace J. Smith
                                  :
9           Defendants.           :

10           Zoom and in-person deposition of

11       OFFICER BRETT THOMAS, a defendant herein,

12       taken by the plaintiffs as upon

13       cross-examination, pursuant to the Federal

14       Rules of Civil Procedure and pursuant to

15       Notice of counsel as to the time and place

16       and stipulations hereinafter set forth, at

17       the offices of Taft Stettinius &  Hollister,

18       425 Walnut Street, Suite 1800, Cincinnati,

19       Ohio, at 10:05 a.m., Monday, April 21, 2025,

20       before Stacey J. Murrin, a Court Reporter and

21       Notary Public, within and for the State of

22       Ohio.

23

24                          -  -  -

25

Case: 2:21-cv-00102-DLB    Doc #: 141    Filed: 11/06/25    Page: 2 of 285 - Page ID#:
2915
Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        APPEARANCES:

 2        FOR THE PLAINTIFFS,   JACQUELINE GREENE, ESQ.
          ESTATES OF RAYMOND    ELIJAH HACK, ESQ.
 3        AND GAYLE LAIBLE:     Friedman, Gilbert &
                                Gerhardstein
 4                              35 East 7th Street
                                Suite 201
 5                              Cincinnati, Ohio 45202

 6                              And

 7        FOR THE PLAINTIFFS,   ROULA ALLOUCH, ESQ.
          STEVEN AND MARIBETH   Bricker Graydon, LLP
 8        KLEIN:                2400 Chamber Center Drive
                                Suite 300
 9                              Ft. Mitchell, KY 41017

10        FOR THE DEFENDANTS,   AARON HERZIG, ESQ.
          CITY OF CINCINNATI,   SPENCER S. COWAN, ESQ.
11        TIMOTHY LANTER and    Taft Stettinius &
          BRETT THOMAS:         Hollister
12                              425 Walnut Street
                                Suite 1800
13                              Cincinnati, Ohio 45202

14        FOR THE DEFENDANT,    MARVA BENJAMIN, ESQ.
          CITY OF CINCINNATI:   (Via Zoom.)
15                              City Solicitor
                                801 Plum Street
16                              Cincinnati, Ohio 45202

17        FOR THE DEFENDANT,    TRISTAN PALMER, ESQ.
          TRAVELERS CASUALTY    Casey Bailey & Maines
18        INSURANCE COMPANY:    3151 Beaumont Centre Circle
                                Suite 200
19                              Lexington, KY 40513

20        FOR THE DEFENDANTS    KIMBERLY A. RUTOWSKI, ESQ.
          TIMOTHY LANTER and    Lazarus Law, LLC
21        BRETT THOMAS,         The Huntington Center
          INDIVIDUALLY:         525 Vine Street
22                              Suite 2210
                                Cincinnati, Ohio 45202

23

24        ALSO PRESENT:  Jason Laible (Via Zoom.)
                         Timothy Lanter
25                       Maribeth Klein (Via Zoom.)
```

S T I P U L A T I O N S

     It is stipulated by counsel for the
respective parties that the deposition of
OFFICER BRETT THOMAS, a defendant herein, may
be taken at this time by the plaintiffs as
upon cross-examination and pursuant to the
Federal Rules of Civil Procedure and Notice
to take deposition, all other legal
formalities being waived by agreement; that
the deposition may be taken in stenotype by
the Notary Public-Court Reporter and
transcribed by her out of the presence of the
witness; that the transcribed deposition was
made available to the witness for examination
and signature and that signature may be
affixed out of the presence of the Notary
Public-Court Reporter.

```
1                              INDEX

2       WITNESS          DIRECT   CROSS    RE-      RE-
                                          DIRECT   CROSS
3
        OFFICER BRETT THOMAS
4       BY MS. GREENE:                6

5       EXHIBIT IDENTIFIED                          PAGE

6       Exhibit 30                                   132
        Exhibit 31                                   147
7       Exhibit 32                                   153
        Exhibit 33                                   155
8       Exhibit 34                                   186
        Exhibit 35                                   269
9       Exhibit 36                                   279

10      OBJECTIONS                                   PAGE

11      MR. HERZIG:                                   11
        MR. HERZIG:                                   49
12      MR. HERZIG:                                   49
        MR. HERZIG:                                   63
13      MR. HERZIG:                                   66
        MR. HERZIG:                                   70
14      MR. HERZIG:                                   76
        MR. HERZIG:                                   77
15      MR. HERZIG:                                   78
        MR. HERZIG:                                   78
16      MR. HERZIG:                                   79
        MR. HERZIG:                                   82
17      MR. HERZIG:                                   82
        MR. HERZIG:                                   83
18      MR. HERZIG:                                   89
        MR. HERZIG:                                   91
19      MR. HERZIG:                                   97
        MR. HERZIG:                                   97
20      MR. HERZIG:                                  101
        MR. HERZIG:                                  101
21      MR. HERZIG:                                  104
        MR. HERZIG:                                  161
22      MR. HERZIG:                                  163
        MR. HERZIG:                                  163
23      MR. HERZIG:                                  176
        MR. HERZIG:                                  177
24      MR. HERZIG:                                  183
        MR. HERZIG:                                  224
25      MR. HERZIG:                                  242
        MR. HERZIG:                                  243
```

```
 1          MR. HERZIG:                              244
            MR. HERZIG:                              255
 2          MR. HERZIG:                              258
            MR. HERZIG:                              258
 3          MR. HERZIG:                              259

 4          EXHIBITS REFERENCED                      PAGE

 5          Exhibit 1                                 91
            Exhibit 12                               128
 6          Exhibit 15                               130
            Exhibit 3                                262
 7          Exhibit 9                                266
            Exhibit 8                                271
 8
```

Deposition of Officer Brett Thomas

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              OFFICER BRETT THOMAS,
 2      a defendant herein, of lawful age, having
 3      been first duly sworn as hereinafter
 4      certified, was examined and testified as
 5      follows:
 6                    THE WITNESS:  I do.
 7                    THE COURT REPORTER:  Thank you.
 8                     CROSS-EXAMINATION
 9      BY MS. GREENE:
10          Q.     Good morning.
11          A.     Good morning.
12          Q.     My name is Jacqueline Greene,
13      and I'm one of the attorneys who represent
14      the plaintiffs in the matter we're here today
15      to discuss.
16                    MS. GREENE:  If we could briefly
17      just go around the room and do introductions
18      for the record.  I'll start,
19      Jacqueline Greene for plaintiffs, Laible
20      Estates.
21                    MS. ALLOUCH:  Roula Allouch for
22      plaintiffs, Steven and Maribeth Klein.
23                    MR. HERZIG:  The witness is
24      Brett Thomas.  I'm Aaron Herzig, I represent
25      the defendants.
```

Deposition of Officer Brett Thomas

Jason Laible, et al., vs. Timothy Lanter, et al.,

1          MR. COWAN:  Spencer Cowan also
2     with defendants.
3          MS. RUTOWSKI:  Kim Rutowski, I
4     represent Officers Lanter and Thomas.
5          MR. LANTER:  Lieutenant
6     Timothy Lanter, Cincinnati Police.
7          MR. PALMER:  Tristan Palmer,
8     representing defendant Travelers.
9          MS. GREENE:  We'll be joined
10    momentarily by Attorney Elijah Hack also for
11    the Laible Estate plaintiffs, and present on
12    Zoom we have plaintiff Jason Laible and
13    also --
14          MS. ALLOUCH:  Maribeth Klein.
15    And it sounds like they can't hear us.
16          MS. GREENE:  Okay.  So, perhaps,
17    we should pause and go off the record and
18    resolve that issue and then get going.  Off
19    the record.
20       (Off the record.)
21          MS. GREENE:  Okay.  We're back
22    on the record.  And Mr. Herzig just noted
23    that Marva Benjamin from the City is also on
24    the Zoom link.
25    BY MS. GREENE:

```
 1            Q.    All right.  Before we get going,

 2     can you, please, state your name for the

 3     record?

 4            A.    Brett Thomas.

 5            Q.    All right.  And what's your

 6     current rank?

 7            A.    Police officer.

 8            Q.    All right.  Officer Thomas, I'm

 9     sure you've spoken about how depositions work

10     with your counsel.  We kind of have some

11     rules for the road to help things run

12     smoothly.  I'm gonna go through a few of them

13     before we get started --

14            A.    Okay.

15            Q.    -- just so that we're on the

16     same page.  Okay?

17            A.    Okay.

18            Q.    First, let me ask you, have you

19     testified in court before?

20            A.    In court, yes.

21            Q.    And how many times?

22            A.    Dozens.  I'm not sure I have a

23     number for it.

24            Q.    Okay.  So you have a pretty good

25     understanding of how testimony practices work
```

Deposition of Officer Brett Thomas

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1    then, right?

2              A.    Uh-huh.

3              Q.    So I'll ask that you for all of

4    your answers give clear, verbal answers, so

5    yes, no, other words, whatever they may be,

6    and avoid things like shaking or nodding your

7    head or saying uh-huh's or uh-uh's --

8              A.    Gotcha.

9              Q.    -- because those are -- those

10   are hard to take down on the record.  Okay?

11   Fair enough?

12             A.    Yes.

13             Q.    And then we'll all have to do

14   our best to speak one at a time.  So even

15   though you'll know where I'm going with my

16   question sometimes, please let me finish my

17   question before you begin your answer.  Okay?

18             A.    Okay.

19             Q.    And if counsel objects to any of

20   my questions at any point, let him go ahead

21   and finish his objection.  And unless he

22   instructs you otherwise, you can go ahead and

23   answer when he's done.  Okay?

24             A.    Okay.

25             Q.    At any point in time if I ask a
```

1    question you don't understand, you need me to

2    clarify, whatever it is, that's fine, just

3    let me know.

4              But if you do go ahead and

5    answer the question, I will assume that you

6    understood.  Fair enough?

7         A.    Yep.

8         Q.    And if you need any breaks, no

9    problem.  Also, just let us know, but if I

10   have a pending question, I'll ask that you

11   answer that first.  Okay?

12        A.    Yes.

13        Q.    And as you sit here today, are

14   you experiencing any medical, memory, or

15   other circumstances that would affect your

16   ability to testify truthfully and accurately?

17        A.    Nope.

18        Q.    Okay.  To prepare for your

19   deposition, did you review anything?

20        A.    Yes.

21        Q.    And what did you review?

22        A.    Just some of the documents that

23   relate to myself, MVR body camera and --

24        Q.    Okay.  Sorry.  Go ahead.

25        A.    That's it.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    The MVR, that's cruiser camera,

2    right?

3         A.    Yeah, just from own vehicle.

4    Q.    And was that a redacted or

5    unredacted version?

6         A.    I believe it was redacted

7    because I think at the very end there were

8    some -- some individuals that were,

9    obviously, blacked out on the -- on the

10   video.

11   Q.    Okay.  And that's people who

12   were injured from the accident; is that

13   right?

14        A.    No.  From what I recall, it was,

15   I believe, maybe some undercover agents and

16   so forth that maybe would not normally have

17   their identity revealed.

18   Q.    Understood.  Have you ever seen

19   a fully unredacted version of your cruiser

20   camera?

21        A.    No.

22   Q.    For your body camera video that

23   you watched in preparation, was that redacted

24   or unredacted?

25             MR. HERZIG:  Objection.  Did you

```
 1    say you -- did you look at the body camera?
 2                  THE WITNESS:  Uh-huh.
 3                  MR. HERZIG:  Okay.
 4         A.    It was unredacted.
 5         Q.    And then you said you also
 6    looked at documents?
 7         A.    Yes, just the normal, I don't
 8    know the normal -- the original lawsuit.  I
 9    reviewed the policy from that period, and
10    that's it.
11         Q.    Okay.  So when you say "the
12    lawsuit," do you mean the complaint?
13         A.    Yeah, the original complaint.
14         Q.    Okay.  And then when you say the
15    policy from that period --
16         A.    Just the pursuit policy.
17         Q.    -- which policy?
18                  THE COURT REPORTER:  Just the
19    what policy?
20                  THE WITNESS:  Pursuit.
21                  MR. HERZIG:  Let her finish her
22    question.
23    BY MS. GREENE:
24         Q.    Yeah.  And everybody does this
25    and in court sometimes it's a littler faster
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          too, but here -- I know sometimes it's
 2          obvious where I'm going, but do your best to
 3          let me finish.  Okay?
 4                 A.    I'm sorry.  What part of that?
 5                 Q.    Sorry.  Let me finish my
 6          question before you go on.  I know it's --
 7                 A.    Oh, she asked me something.
 8                 MR. HERZIG:  Go ahead.
 9                 A.    Okay.  Let's just go forward.
10                 Q.    All right.  Okay.  So did you
11          review any other documents besides the
12          pursuit policy and the Complaint from this
13          lawsuit?
14                 A.    No.
15                 Q.    Did you look at any CPD
16          investigation documents?
17                 A.    Yes.
18                 Q.    What were those?
19                 A.    I read the Internal Summary, and
20          the -- at some point, not recent, but I
21          reviewed the Critical Incident Review Board
22          document.
23                 Q.    Okay.  And when you say the
24          Internal Summary, is that the IIS report?
25                 A.    Yes.
```

1    Q.    And you said the CIRB report you

2    read as well?

3    A.    Yes.

4    Q.    Did you review any other CPD

5    documents in preparation for this deposition?

6    A.    Not that I recall.

7    Q.    And over the course of this

8    litigation, have you reviewed other documents

9    relating to this matter and your role in the

10   case?

11   A.    No.

12   Q.    Have you ever seen the CCA

13   report relating to this case?

14   A.    I don't believe I've seen the

15   report.

16   Q.    Have you been informed about the

17   report?

18   A.    I'm not sure.

19   Q.    Did anyone at CPD ever talk to

20   you about the report?

21   A.    No.

22   Q.    Are you aware that the CCA has

23   made findings relating to this case?

24   A.    Yes.

25   Q.    And how did you learn about

Case: 2:21-cv-00102-DLB    Doc #: 141    Filed: 11/06/25    Page: 15 of 285 - Page
ID#: 2928
Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    that?

2                    MR. HERZIG:  Other than from

3    conversations with a lawyer.

4            A.    Yes.

5            Q.    Okay.  So other than

6    conversations with a lawyer, have you learned

7    about the CCA findings about this case from

8    anybody else?

9            A.    I don't -- I don't recall,

10    ma'am.  I don't recall ever reviewing the CCA

11    finding.

12            Q.    Okay.  Have you at any time ever

13    reviewed any other CPD documentation

14    concerning this matter?

15            A.    Not that I recall.

16            Q.    Did you speak with anyone other

17    than counsel about your deposition?

18            A.    No.

19            Q.    And how many statements have you

20    given about this matter?

21            A.    After the incident, I gave a

22    statement to IIS, or Internal.  And on the

23    same date, I gave one to Newport, the

24    investigators that were, obviously,

25    investigating the incident.  And then I gave

1      a statement to CCA.

2               Q.      For the statement to Newport,

3      was that a written statement or a verbal --

4               A.      No --

5               Q.      -- statement?

6               A.      -- it was a verbal.

7               Q.      Do you recall who took that

8      statement?

9               A.      I do not.

10              Q.      Was it a detective, officer?

11              A.      There were at least two

12     investigators that came over and interviewed

13     us actually at our Internal Investigative

14     Unit.

15              Q.      At the CPD office?

16              A.      At the CPD office, yes.

17              Q.      Okay.  And you said that was on

18     the same day as the IIS interview?

19              A.      That's correct.

20              Q.      And do you recall what day you

21     gave the IIS and Newport statements?

22              A.      I do not.

23              Q.      Do you remember about how long

24     after the incident that occurred?

25              A.      I'm going to say approximately a

```
 1    couple weeks.  It was not right away, but I
 2    do not recall the date.
 3            Q.    And you mentioned a statement to
 4    CCA as well, right?
 5            A.    Yes.
 6            Q.    And when was that?
 7            A.    It was much later.  I would say
 8    a year plus but, of course, I don't recall
 9    the date.
10            Q.    In the time in between
11    August 7th, 2020, and the date that you gave
12    the IIS, CCA -- or, excuse me, Newport
13    statements, did you talk to anyone at CPD
14    about what had transpired in relation to this
15    pursuit?
16            A.    No.
17            Q.    Did anyone ask you any questions
18    about what had happened?
19            A.    On an official capacity?
20            Q.    In any capacity someone from
21    CPD.
22            A.    Well, I'm sure I spoke to
23    coworkers.
24            Q.    And tell me more about that,
25    would you?
```

Deposition of Officer Brett Thomas

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    A.    Well, they were just, obviously,

2    interested in what happened during the event,

3    so it was the same statement or the same

4    facts that were provided to Internal.

5    **Q.    Do you remember anyone specific**

6    **that you spoke with?**

7    A.    No.

8    **Q.    All right.  Let me move back.**

9    **Back in August of 2020, you were part of the**

10   **CPD's Canine Unit, correct?**

11   A.    That's correct.

12   **Q.    And did you have any other posts**

13   **or assignments within the agency?**

14   A.    Yes.

15   **Q.    What were those?**

16   A.    You mean responsibilities?

17   **Q.    Sure.  Yeah.  Tell me about**

18   **that, please.**

19   A.    Okay.  I'm assigned to the SWAT

20   team and the Canine Unit.  And I believe at

21   that point those were the only two.

22   **Q.    And did you do any normal patrol**

23   **duties at that time?**

24   A.    Well, as a Canine officer, I am

25   assigned -- I'm under the umbrella of patrol.

1    Q.    And so when you would come into

2    work for a shift on a given day, would you

3    have a standard patrol assignment as a member

4    of the Canine Unit?

5          A.    Yeah.  So the dog is utilized as

6    a, obviously, patrol asset or tool.  So I'm

7    not assigned specifically to anywhere in the

8    City.  I go -- excuse me, I go where we're

9    called, you know, to where the dog can be

10   utilized for assisting patrol functions.

11         Q.    So when you report for duty, and

12   we're talking about back in August of 2020,

13   where would you go to start your day?

14         A.    I just have to be in the City

15   when I log onto the computer at the start of

16   my shift.

17         Q.    And would you be in a cruiser

18   for that?

19         A.    Yes.

20         Q.    So you're reporting for duty is

21   basically getting in the cruiser then

22   somewhere within the City of Cincinnati?

23         A.    Yes, ma'am.  Generally speaking,

24   the SOP is that I log onto my computer, or I

25   have to be ready for dispatch at the start of

1    my shift inside the City limits.

2                    MS. GREENE:  And for the record,

3    Attorney Elijah Hack has arrived as present

4    at the deposition.

5                    THE WITNESS:  Hello.

6    BY MS. GREENE:

7        **Q.    Okay.  So you're then just**

8    **available for whatever calls are made for**

9    **Canine assistance?**

10       A.    Correct.

11       **Q.    And in an average shift, how**

12   **many calls do you get, ballpark?**

13       A.    That could vary enormously due

14   to the time of year, weather circumstances.

15   I mean, it's really hard to give an accurate

16   answer on that.

17       **Q.    Can you give me some example,**

18   **ranges of the different parts of the year?**

19       A.    I mean, summertime, you might

20   get called, you know, two to four times a

21   day.  The nature of work varies, too.  The

22   dog's trained for narcotic sniffs for

23   narcotic protection with, you know, vehicles,

24   buildings, whatever.

25                    But it's also trained in patrol

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1   work.  So, you know, we get called for

2   tracking, finding discarded evidence.  The

3   nature what the dog can do is pretty wide, so

4   it -- you know, when we get called, it

5   varies, too.

6            Q.    Okay.  You also mentioned you're

7   assigned to the SWAT team back in August of

8   2020?

9            A.    That's correct.

10           Q.    And can you describe to me your

11  typical responsibilities with SWAT?

12           A.    I'm essentially an operator on

13  the SWAT team.  So as an operator, you know,

14  we are just trained on a higher skill level

15  in tactics, shooting, and equipment, so that

16  we can essentially resolve bad scenarios

17  without incident and everybody is as safe as

18  possible.

19           Q.    With respect to your role on

20  SWAT, how often back in 2020, were you called

21  for SWAT duty?

22           A.    Hard to tell.  I really don't

23  recall, ma'am.  I'd have to pull up -- you

24  know, we'd have to pull up records.

25                 You know, 80 percent, and that's

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    an approximation, but 80 percent of what we

2    do is high-risk search warrants to where we

3    are the enforcement arm for, you know, an

4    affidavit on a residence.

5              The other, you know, 20 percent

6    or so is usually barricaded scenarios where

7    someone has done some act of violence and is

8    not wanting to surrender.

9         Q.    Okay.  So in an average month,

10   how much time do you spend on Canine versus

11   SWAT assignments back in 2020?

12        A.    Canine is my primary function.

13   It is what I come to work every day as a

14   patrolman with a dog do.  SWAT is kind of on

15   an as-needed basis.

16        Q.    On August 7th, 2020, in your

17   participation of the events at issues here,

18   you were involved in your Canine Unit

19   capacity, right?

20        A.    Correct.

21        Q.    All right.  So let's -- before

22   we go on and talk about the Canine Unit a

23   little bit more, I'm gonna back up and ask

24   you a few other questions.

25              What's your educational history?

 1          A.   I graduated high school from

 2    Northridge High School in Dayton, Ohio.  I

 3    went to -- I spent a year at Wright State

 4    University before transferring to Ohio

 5    University in 2001.

 6               I graduated there with a

 7    Bachelor's degree in criminal justice and a

 8    minors in psychology and sociology.

 9          Q.   And what year was that?

10          A.   2004.

11          Q.   So did you graduate from high

12    school in 2000?

13          A.   Yes, ma'am.

14          Q.   And after you earned your BA,

15    did you seek employment?

16          A.   I did.  Well, actually, my

17    senior year, or maybe my junior, the hiring

18    process then was pretty -- it was a long

19    duration, but I took a test for Cincinnati,

20    you know, somewhere in that 2003 probably

21    range.

22               And it just happened to work out

23    to where when I graduated from Ohio

24    University in the fall of 2004, I was already

25    slotted to enter the police academy like two

```
 1    weeks later.
 2            Q.    So would that have been in
 3    January of '04?
 4            A.    Yeah, so I started in -- in
 5    December of '04.
 6            Q.    Okay.  So December of '04, not a
 7    very long break after college to get to have
 8    a --
 9            A.    No.  Everybody -- everybody else
10    went on vacation, I went to work.
11            Q.    Yeah.  Not always the most fun
12    way to do it, but I guess it's efficient.
13                  So you went then directly into
14    the academy at CPD?
15            A.    That's correct.
16            Q.    And how long was your academy
17    training?
18            A.    Approximately six months.
19            Q.    During your academy training,
20    you take the standard curriculum?
21            A.    Yes.
22            Q.    And do you have any other
23    degrees or licensures or certificates other
24    than your Bachelor's and your Peace Officer
25    Certification?
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Not that come to mind, no.

2          Q.    And when were you officially a

3    peace officer for the State of Ohio?

4          A.    In June of 2005.

5          Q.    Okay.  So have you been with the

6    CPD then since June of '05?

7          A.    I have --

8          Q.    And can --

9          A.    -- well, since December.

10         Q.    I'm sorry?  December academy,

11   then.

12         A.    Yeah.

13         Q.    That's right.  Okay.  So after

14   academy, can you talk me through your history

15   of assignments or posts within the

16   department?

17         A.    Sure.  In June of '05, I was

18   assigned to District 3, which was a west side

19   patrol.  I stayed there running B2, which is

20   primarily west in East Price Hill until I

21   believe the fall of 2008.

22               And I was selected to go to a

23   Vortex Unit, which is a Violent Crimes

24   Over-The-Rhine Task Force.  And I stayed

25   there for -- well, in different capacities,

1    excuse me.

2              That kind of merged into a Safe

3    Streets Unit, and then eventually into the

4    Gang Unit.  And then in 2017 is when I left

5    the Gang Unit when I put in for and was

6    selected for a canine.  I have had the dog

7    since 2017, fall 2017.

8         Q.    **When did you start with SWAT?**

9         A.    2012, I believe.

10        Q.    **And that was when you were on**

11   **the Vortex Unit?**

12        A.    Actually, that's -- no, Vortex,

13   it just comes to semantics, name changes, if

14   that makes sense.  You know what I'm saying?

15   Sometimes the names change for the purpose or

16   the focus of the unit.

17             So Vortex lasted three or four

18   years, I'm not exactly sure, merged into Safe

19   Streets, was more of a long-term

20   investigative unit focusing on violent crime

21   throughout the City instead of being just in

22   one specific district.

23             So, yeah, it would have been

24   fall of 2012, I believe, is when I got on the

25   SWAT team.

1      Q.    And so was that when you were

2   part of the Safe Streets Unit?

3      A.    I believe it was Safe Streets.

4      Q.    And then you mentioned as well

5   the Gang Unit.  When did your role --

6      A.    Yes.

7      Q.    -- with the Gang Unit begin?

8      A.    I mean, let's say around the

9   same time.  It was more with different

10  administration.  The name changed to kind of

11  illustrate who the targeted audience was or

12  the mission of the investigation.

13     Q.    What do you mean by that, by who

14  the target audience was?

15     A.    Well, I mean, if we're -- Safe

16  Streets, obviously, was more violent crime

17  street level.  The Gang Unit, we were

18  supposed to be investigating more

19  gang-related-type investigations that were

20  involving, you know, with organized groups.

21     Q.    And so was the work at the Safe

22  Streets Unit and the Gang Unit different?

23     A.    Yes.

24     Q.    Okay.  And were you assigned to

25  those units then simultaneously; am I getting

```
 1        that right?
 2                A.    No, I was not.
 3                Q.    Okay.
 4                A.    So -- so Vortex merged
 5        eventually into Safe Streets.  It was just
 6        name changes with different administrations
 7        because we had different chiefs or so forth.
 8        Safe Streets eventually became the Gang Unit.
 9                Q.    Okay.  And so am I correct in
10        understanding then that the same group, or
11        core group of officers, I guess may be
12        a better --
13                A.    Not always.  No, that's not --
14        okay.  Vortex -- I'll try to be clear as I
15        can.  When I went to Vortex, it was -- it was
16        a Response Unit of lot of people.  There were
17        maybe 50 officers.  There was a dayshift and
18        a nightshift.
19                And through attrition, through
20        people going to other assignments or being
21        sent back to patrol because of personnel
22        management or needs, it shrunk to probably,
23        let's say, 15 people.
24                Then it became Safe Streets and
25        we worked with other agencies in the police
```

1    department.  It was almost like a liaison to

2    help with whatever street-level violent crime

3    they were having.

4              It was not a long-term

5    investigative unit really.  When we went into

6    the Gang Unit, we were doing more longer-term

7    investigations.

8         Q.    Okay.  And so when did the

9    Gang Unit aspect of your work begin?

10        A.    Ma'am, 2014.  I'm not sure.

11        Q.    Okay.

12        A.    It's somewhere around the time

13   that I told you, yeah, '13, '14.  I don't

14   know.

15        Q.    Okay.  And ballparking is fine.

16   I understand it's a while ago.  I'm just

17   trying to understand the general chronology.

18        A.    So, yeah.  So I essentially

19   stayed in relatively the same assignment, but

20   the same assignment around me kind of

21   changed, you know, the name, supervisors,

22   that kind of stuff.

23        Q.    Okay.  So then your role in the

24   Gang Unit ended in approximately 2017 when

25   you moved to the Canine Unit?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        A.    That's correct.

2        Q.    And your SWAT assignment

3    continued from 2012 through the present?

4        A.    Yes.

5        Q.    Okay.  So let's talk about the

6    Canine Unit for a moment.  Can you talk to me

7    about the unit's structure in August of 2020,

8    please, describe it?

9        A.    In terms of supervisor

10   structure?

11       Q.    Yeah.  Organizational structure?

12       A.    Organizational structure?  In

13   20 -- did you say in 2017?  Sorry.

14       Q.    2020, August.

15       A.    Oh, 2020.  I want to say there

16   were maybe -- if this is -- 15 canines

17   approximately.  At that point, I believe most

18   of the dogs were dual purpose, which means

19   the dogs are trained to do patrol work, which

20   would be like I kind of mentioned earlier,

21   tracking, evidence, which we call article

22   searching, assist with subject apprehension,

23   if somebody would run from a vehicle.

24             The other, when we say dual

25   purpose, that's one job.  The other job is

1    generally a scent discretion job, and my dog

2    is trained in narcotics detection.  Some of

3    the other dogs are trained in EOD, so they're

4    trained for, you know, bombs and odors.  We

5    don't cross those two.  It's either one or

6    the other.

7           Q.    Okay.  And so about 15 canines,

8    so it's also about 15 human officers as well

9    in the unit?

10          A.    Yeah, there's one -- there's one

11   dog assigned to each person.  It doesn't --

12   they don't really mesh well with trying to

13   cross over.

14          Q.    Understood.  And were those all

15   patrol-officer-level individuals?

16          A.    Positions, yes.  Yeah, there's

17   nobody above the rank of patrol or police

18   specialist, which is still a patrol-level

19   function that has a canine assigned to them.

20          Q.    And what is a police specialist

21   within the CPD?

22          A.    The rank -- the rank still

23   exists.  But it exists, but we're never gonna

24   have more of them.  They get rid of it

25   through a labor contract.

1          But, I mean, the simple -- my

2    understanding because I never took the test

3    is but the test was pretty challenging, and

4    it was a broad spectrum procedure, SOPs,

5    different things within the City, and it was

6    a very competitive test to show that you were

7    kind of a master with the knowledge of -- of

8    those topics.

9          And it comes -- and it came with

10   a good incentive.  There was an eight percent

11   pay increase.

12      Q.    And that exactly was gonna be my

13   next question.

14      A.    Yeah.  They got rid of -- they

15   got rid of that rank, I think, before I was

16   even able to take it.  You had to have like

17   three years, I believe.

18      Q.    And then in the Canine Unit

19   above the officers --

20      A.    We have -- we have -- and in

21   2020, we had one sergeant, one supervisor who

22   oversees, you know, three reliefs of dogs.

23      Q.    And who was that?

24      A.    At that time, it was

25   Chad Richter, Sergeant Chad Richter.  He has

 1    since retired.

 2            Q.    When did he retire; do you

 3    remember?

 4            A.    Maybe '21.

 5            Q.    And so now you have a new

 6    sergeant overseeing that unit?

 7            A.    Yeah.

 8            Q.    And who's that?

 9            A.    John Dotson, Sergeant

10    John Dotson.

11            Q.    Okay.  And the supervising

12    sergeant doesn't have a dog, does he?

13            A.    No.  He's in charge of

14    administrative work.

15            Q.    All right.  Okay.  So can you

16    briefly explain to me from your experience

17    what the Gang Unit does?

18            A.    The Gang Unit now?

19            Q.    Fair question.  Can you explain

20    to me what the Gang Unit did in 2020?

21            A.    The Gang Unit, I mean, we

22    essentially -- when I was a part of it?  So I

23    can't speak anything past 2017 to be honest

24    with you.

25            Q.    Okay.  When you were involved in

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    up to 2017, what did the Gang Unit do?

2          A.    We tried to identify groups of

3    individuals that were -- that were, you know,

4    in cohorts or assisting each other in doing

5    violent crime.  Drugs and guns were mostly

6    the main target.

7          Q.    So trafficking operations, for

8    example, were part of that?

9          A.    Yes, drug trafficking, gun

10   trafficking.

11         Q.    And violent crime associated

12   with those trafficking operations?

13         A.    Yes.

14         Q.    Any other kind of major

15   categories of organizations that you were

16   looking at at the time?

17         A.    No.  We would get called in

18   frequently to sometimes assist other people

19   because if we had -- we had personnel and we

20   had people that were very talented and, you

21   know, knew a lot about investigations, so we

22   would often -- often get pulled in to assist

23   in the district of Violent Crimes Squad.

24         Q.    When you say the district, is

25   that -- you're talking about the CPD?

```
 1              A.    Yeah.
 2              Q.    Did you ever get pulled in to
 3     assist with joint operations between CPD and
 4     other agencies?
 5              A.    Yeah, sometimes the Federal.
 6     Uh-huh.
 7              Q.    Okay.  So -- and when you were
 8     called in to assist, you would go as a CPD
 9     canine officer and specifically --
10              A.    Not when you --
11              Q.    Go ahead.
12              A.    This is 2017 prior, I did not
13     have the dog then.  Does that make sense?
14              Q.    Yes.  Okay.  So the Gang Unit
15     role that you had --
16              A.    Yes.
17              Q.    -- you'd be called in in your
18     Gang Unit capacity under the CPD umbrella to
19     assist with whatever joint operations?
20              A.    Uh-huh.
21              Q.    That's a yes?
22              A.    Yes.  Yes, sorry.
23              Q.    Okay.  And in those
24     circumstances, you -- the work that you
25     performed was part of that CPD Gang Unit
```

1    function that you were assigned to, right?

2         A.   I'm not sure I understand.  If

3    we're called to -- if we're called to assist

4    somebody else, if it was under our umbrella?

5         Q.   Yeah.

6         A.   It could be, could not be.  It

7    depended who was calling for assistance.

8         Q.   Okay.  All right.  So above the

9    Canine Unit in 2020 organizationally speaking

10   within the CPD, can you describe the chain of

11   command, please?

12        A.   In 2020, I'm not sure, to be

13   honest with you.  We had some changes under

14   where we fell.

15             At one time, we fell under

16   Special Services Section, and then it changed

17   to we're under Special Services Section we

18   fell under Tactical Planning, which is also

19   the same lieutenant who would oversee SWAT.

20   And I'm not sure in 2020 which one we were

21   under.  It was five years ago.

22        Q.   All right.  Among those

23   approximately 15 officers, human officers --

24        A.   We call them -- we call them

25   Canine handlers.

Deposition of Officer Brett Thomas                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    Okay.  Among those approximately

2    15 Canine handlers, was there any seniority

3    in terms of, like, supervisory roles for

4    those officers?

5          A.    No.  We're all of the same rank.

6          Q.    Okay.  And you were trained

7    specifically to be part of the Canine Unit?

8          A.    Yes, or they trained me how to

9    handle the dog.

10          Q.    And when did you have that

11    training?

12          A.    That was from, I want to say

13    October of -- October of '17.  So the Canine

14    Training Course when we get the dogs,

15    they're -- they have essentially no training

16    on them, what we call green dogs, but it's

17    minimum four months.

18               And we're training the dog, but,

19    obviously, the dog trainers, the trainers

20    that oversee the dog trainer are training,

21    are also training the police officers to, you

22    know, be efficient at handling the animal.

23               So I think that was from like

24    October of '17 until January, maybe early

25    February of '18.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    And other than your academy

2  training and the Canine Unit training, did

3  you receive any other specialized training

4  from the CPD up until August of 2020?

5      A.    Define "specialized."  The

6  training is -- it's constant.

7      Q.    So you have annual training

8  requirements, right?

9      A.    We have annual.  Now, they call

10  it CPD in-service re-qualifications on, you

11  know, certain weapon systems, yes.

12      Q.    So annual firearms

13  re-qualifications is required, right?

14      A.    Uh-huh.

15      Q.    Yes?

16      A.    Yes.

17      Q.    And then there are other topics

18  the department trains officers on annually on

19  a department-wide basis as well, correct?

20      A.    Yes.

21      Q.    And some of those are dictated

22  by -- those topics are dictated by OPOTA,

23  right?

24      A.    Yes.

25      Q.    Others are selected specifically

1    by the agency, the CPD, correct?

2            A.    Yes.

3            Q.    And so outside of your annual

4    training and your academy training and this

5    Canine Unit training, do you have any other

6    training that was designed to prepare you for

7    any other special assignments or roles within

8    the agency?

9            A.    Not that I recall.

10           Q.    For your annual training, you're

11   not required to read through the entirety of

12   the CPD Policies and Procedures Manual,

13   correct?

14           A.    Say that again.

15           Q.    For your annual training, you're

16   not required to read the entirety of the CPD

17   Policies and Procedures Manual, right?

18           A.    No.  They don't make us review

19   it from front to back.

20           Q.    And you're also not required to

21   read the entirety of the Manual of Rules and

22   Regulations, are you, for that annual

23   training?

24           A.    Just clarification, are you

25   asking me if every year at training, they

1    require us to read that from front to back?

2          Q.    I am.

3          A.    The answer is no.

4          Q.    Okay.  And the reason I ask is

5    some departments do require that.  But it's

6    my understanding CPD does not, and you're

7    confirming that's correct, right?

8          A.    Yes.

9          Q.    Okay.  So in your academy

10   training, were you trained on how to conduct

11   vehicle stops?

12         A.    Yes.

13         Q.    Were you trained on how to

14   conduct vehicle pursuits?

15         A.    Yes.

16         Q.    And were you trained on how to

17   conduct investigations?

18         A.    Yes, very elementary, I would

19   say.

20         Q.    And in your academy training,

21   were you trained on how to conduct

22   surveillance?

23         A.    No.

24         Q.    Were you ever trained on that in

25   CPD?

```
 1          A.    Yes.

 2          Q.    And when did you receive that

 3   training?

 4          A.    Well, a lot of it just comes

 5   through experience with senior officers, but

 6   I do recall going to some training that was

 7   put on by the ATF years ago, I'm just gonna

 8   approximately say 2010, that focused on

 9   surveillance, body posturing.

10          It would was mostly about

11   identifying individuals who were carrying

12   firearms and trying to conceal them.

13          Q.    In your academy training, were

14   you trained on use of force?

15          A.    Yes.

16          Q.    Were you trained on traffic laws

17   within the City of Cincinnati at the academy?

18          A.    Yes.

19          Q.    And were you trained on what

20   constitute violations of the Ohio Revised

21   Code in the academy?

22          A.    Yes.

23          Q.    And were you trained on what

24   conduct would constitute a violation of the

25   Cincinnati Municipal Code in academy
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    training?
 2            A.    Yes.
 3            Q.    Were you trained on how to
 4    determine whether a driver is violating those
 5    laws in academy training?
 6            A.    If they're in violation of
 7    the -- yes.
 8            Q.    And were you trained on how to
 9    conduct a stop of a vehicle that's been
10    observed violating traffic laws in academy
11    training?
12            A.    How to conduct a traffic stop,
13    is that -- can you repeat -- can you repeat
14    your question?  I'm sorry.
15            Q.    Yeah.  In your academy training,
16    were -- did the department train you on how
17    to conduct a traffic stop for traffic law
18    violations?
19            A.    Yes.
20            Q.    And were you also provided
21    training at the academy for traffic stops for
22    other reasons beyond traffic laws?
23            A.    Can you give me an example,
24    please?
25            Q.    For example, were you trained in
```

```
 1          the academy on how to properly conduct a

 2          traffic stop when you're aware that an

 3          individual in the vehicle is subject to an

 4          arrest warrant?

 5                    A.    Yes.

 6                          THE COURT REPORTER:   Wait a

 7          minute.   Subject to a what?

 8                          MS. GREENE:   To an arrest

 9          warrant.

10          BY MS. GREENE:

11                Q.    Were you trained in the academy

12          on how to document your observations of

13          traffic law violations?

14                    A.    Yes.

15                Q.    And were you trained in the

16          academy on how to document suspect conduct?

17                    A.    Define "conduct," please.

18                Q.    Were you trained in the academy

19          on how to document your observations about

20          the actions of suspects during your policing

21          activities?

22                    A.    Yes.

23                Q.    Were you trained in the academy

24          on how to document your actions as a law

25          enforcement officer in the context of your
```

```
 1    work during your academy training?

 2          A.    Yes.

 3          Q.    And with -- in relation to

 4    documenting your observations of a suspect,

 5    were you trained to document the behavior

 6    that those individuals demonstrated that you

 7    saw?

 8          A.    Yes, if it was relevant, of

 9    course.

10          Q.    And were you trained to document

11    things like abnormal or erratic or dangerous

12    behavior?

13          A.    Yes.

14          Q.    And were you trained to document

15    their movements and locations as best as you

16    can?

17          A.    Yes.

18          Q.    Were you trained to document any

19    actions that indicate illegal activity or

20    possession of weapons or other illegal items?

21          A.    Yes.

22          Q.    Did you ever receive training in

23    the academy on emergency response driving?

24          A.    Yes.

25          Q.    And you were trained in the
```

1    academy as well on how to effect arrests,

2    right?

3        A.    Yes.

4        Q.    Were you trained in the academy

5    on planning for contingencies while carrying

6    out law enforcement operations?

7        A.    Planning for contingencies, no.

8        Q.    Were you taught in the academy

9    about the importance of assessing possible

10   risks and dangers while carrying out law

11   enforcement activity?

12       A.    Yes.

13       Q.    And were your trained in the

14   academy on assessing the likelihood of the

15   presence of weapons during law enforcement

16   activities?

17       A.    I'm sorry.  Can you repeat that

18   again?

19       Q.    Sure.  Yeah, that was a bad

20   question.

21            Were you trained on assessing

22   the likelihood of weapons in the possession

23   of non-officer individuals during the course

24   of law enforcement activities?

25       A.    Yes.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1        Q.    And were you trained in the
2   academy on how to interact with persons who
3   are known to be or likely to be dangerous?
4        A.    Yes.
5        Q.    And when you were in the
6   academy, were you trained on assessing the
7   time and place to conduct arrests?
8        A.    I'm sorry.  What do you mean by
9   that?
10       Q.    Sure.  In the academy, were you
11  trained on evaluating the appropriate time
12  and place to conduct an arrest?
13       A.    I'll say yes.
14       Q.    And were you trained in the
15  academy as well to include in that assessment
16  the safety of officers and others in the
17  area?
18       A.    Yes.
19       Q.    And why is that important in
20  assessing safety of officers and others in
21  the area during an arrest?
22       A.    I would say to minimize any
23  injury to the officers or any civilians in
24  the area.
25       Q.    And have you received training
```

1    subsequent to the academy on -- on conducting

2    a vehicle stop?

3          A.    Yes.

4          Q.    And tell me when, if you recall?

5          A.    I don't recall.

6          Q.    Okay.  More than once?

7          A.    Yeah, it's continued training.

8          Q.    Is that part of your annual

9    training?

10         A.    It depends where they fit it in,

11   where they have hours, but there's been times

12   where we've done additional, you know,

13   driver's training out of Coney Island years

14   ago or Blue Ash.  It's not every single year,

15   if that's what the question was, no.

16         Q.    But periodically over the course

17   of your employment with the agency?

18         A.    Yes.

19         Q.    What about training relating to

20   documenting your observations during your law

21   enforcement activities, receive training on

22   that after the academy?

23         A.    Yes.

24         Q.    Was it also periodic over the

25   course of your employment with the agency?

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Yes.    I mean, the only place

2     that comes to mind is maybe, well, like a

3     legal update class for the attorneys have

4     come in to go over, you know, what they're

5     seeing in court.

6                    MR. HERZIG:  You don't want to

7     talk about anything attorneys have told you.

8                    THE WITNESS:  Oh, okay.

9                    MS. GREENE:  Well, this is a

10    training not a -- not a --

11                   THE WITNESS:  I meant like a

12    prosecutor -- I meant like a prosecutor --

13                   MR. HERZIG:  Okay.  Got it.

14                   THE WITNESS: -- comes to teach a

15    class.

16                   MR. HERZIG:  Got it.  Okay.

17                   THE WITNESS:  Does that make

18    sense?

19                   MS. GREENE:  Yeah.

20                   THE WITNESS:  Where they --

21    where they might say the relevance of

22    documenting certain things.

23    BY MS. GREENE:

24          Q.    So, like, making sure you

25    document specific facts or observations?

Deposition of Officer Brett Thomas                Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    A.    Yes.

 2                    Q.    So you've had some update

 3    training for that topic over the years?

 4                    A.    I would call it, yeah.  Yes.

 5                    Q.    Targeting specific issues; is

 6    that fair?

 7                    MR. HERZIG:  Objection, vague.

 8                    A.    Yeah.

 9                    MR. HERZIG:  You can answer, if

10    you know.

11                    Q.    That's fine.  But that's not

12    been part of your annual training, correct?

13                    MR. HERZIG:  Objection.

14                    Q.    Am I right in understanding

15    that?

16                    MR. HERZIG:  Do you mean every

17    year or sometimes?

18                    MS. GREENE:  Yeah, the annual

19    training is yearly.

20    BY MS. GREENE:

21                    Q.    So you haven't received training

22    under documentation obligations as part of

23    the annual training every year, have you?

24                    A.    That's incorrect.  What I was

25    referencing was during annual training --
```

```
 1          Q.    Okay.

 2          A.    The one instance this comes to

 3    mind is during annual training, a prosecutor

 4    may come do legal updates and they articulate

 5    the importance of making sure that you're

 6    noting certain things like you asked.

 7          Q.    Okay.

 8          A.    That's for their own case

 9    preparation.

10          Q.    Okay.  And that's not every

11    year, but some years for annual training?

12          A.    Yes.

13          Q.    And emergency response driving,

14    have you received training on that after the

15    academy?

16          A.    Yes.

17          Q.    And when have you received that

18    training?

19          A.    I am not certain.  It goes back

20    to my answer a couple questions ago when I

21    said there have been driver's training at

22    certain locations.

23          Q.    The driver's training, what

24    topics have been included in that training?

25          A.    They would set up, like, mock
```

1    pursuits, coned roadways, street signs.

2    There would be, you know, you, along with an

3    instructor in a vehicle pursuing a fleeing

4    suspect.

5              Those type of scenarios that

6    require you to, you know, provide directions,

7    street names, those kind of things.

8         Q.    Okay.  So you're trained on, it

9    sounds like, making the proper announcements

10   about the course of the pursuit over the

11   radio; is that what you're just describing?

12        A.    Yes.

13        Q.    And were there any other aspects

14   of that training?

15        A.    Not that I recall.

16        Q.    For that mock pursuit training,

17   how many times have you gone through that?

18        A.    I'm not sure.

19        Q.    Do you remember approximately

20   when it was?

21        A.    It's been several years since

22   we've done it.

23        Q.    Before 2020?

24        A.    At least a couple years before

25   2020.

1      Q.    For conducting pursuits, other

2   than these mock pursuits that you just

3   described, have you had any other training

4   outside of the academy for pursuit driving?

5      A.    No.

6      Q.    Okay.  In your pursuit and

7   emergency response driving training, have you

8   received instruction about the CPD policies

9   on pursuit driving?

10      A.    Yes.

11      Q.    And was that at every pursuit or

12   emergency response training you received?

13      A.    I'm not sure.

14      Q.    For that specific policy, how

15   many times have you been required to read and

16   review it in its entirety over the course of

17   your employment with the agency?

18      A.    How many times have I been

19   required?  I don't know.

20      Q.    Can you think of any specific

21   instances where you were required to do so?

22      A.    After this pursuit, we were --

23   we had some remedial training.

24      Q.    When you say after this pursuit,

25   that's the 2020 --

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            A.    That's the 2020 pursuit, yes.
 2            Q.    Okay.  Can you think of any
 3    other instances where you're required to read
 4    the policy in its entirety?
 5            A.    Not exactly, no.
 6            Q.    And did you have to read the
 7    whole policy with that remedial training you
 8    just mentioned?
 9            A.    Yes.
10            Q.    And when you say "not exactly
11    no," can you explain to me what you mean by
12    that?  Earlier I said -- I asked you, could
13    you think of other times when you've been
14    required to read the entirety of the pursuit
15    policy?  And you said, not exactly, no.  Can
16    you explain to me what you mean?
17            A.    I don't recall a specific time
18    or date incident where I was required to read
19    it.
20            Q.    Okay.  Do you know what stop
21    sticks are?
22            A.    Yep.
23            Q.    And what are those?
24            A.    They're a tool that we use to
25    slowly deflate tires, you know, if the
```

```
 1    scenario is correct.
 2           Q.    And when are stop sticks used
 3    according to your training from the
 4    department?
 5           A.    Well, when are they used or
 6    training?  Well, say that again.
 7           Q.    What has the CPD trained you as
 8    far as when it would be appropriate to use
 9    stop sticks?
10           A.    It's appropriate to use stop
11    sticks, obviously, when the officer can get
12    into a situation or a place where they can be
13    deployed safely without -- obviously, with no
14    risk or minimizing risk for the fleeing car
15    to make contact or come near the officer.
16           Q.    And --
17           A.    But there are different types of
18    stop sticks.
19           Q.    Okay.  Can you explain that to
20    me, please?
21           A.    Well, the version I'm speaking
22    of now that where you would deploy them and
23    try to seek cover while they're deployed, we
24    would use on a moving car.
25                 We have other versions.  I can't
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    think of all the names right now, Terminator,

2    Barracuda.  Those are ones that we would put

3    in front, or let's say a vehicle is at a --

4    at rest, we would deploy that under the

5    wheels because the -- the deflation process

6    is a lot faster.

7                   It's not as slow and controlled

8    as the one we would use on a moving vehicle.

9         **Q.    For the ones you would use on a**

10   **moving vehicle, what are those called?**

11        A.    I'm not sure of the name.  I

12   think it's a stop -- just the basic Stop

13   Stick.  It's the one we've had forever.  The

14   other versions just kind of evolved over the

15   last ten years.

16        **Q.    And --**

17        A.    I'm not sure of the model name.

18        **Q.    And do officers have stop sticks**

19   **in their cruisers?**

20        A.    I think it depends on the

21   assignment.  I cannot speak if patrol

22   officers do or not.

23        **Q.    When you were in Gang Unit, did**

24   **you have them in your cruiser?**

25        A.    I was not in a cruiser.

Deposition of Officer Brett Thomas                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    How about in your unmarked

2    vehicle, did you have them there?

3          A.    No.

4          Q.    Do you know whether there were

5    officers who had them regularly stored in

6    their vehicles?

7          A.    Regularly, no.  They did exist.

8          Q.    And so what about other Canine

9    officers, do you keep stop sticks?

10         A.    I have them now.  I did not

11   for -- I don't think I had them until 2021.

12         Q.    So if you thought it might be

13   appropriate to use stop sticks in some law

14   enforcement activity you were involved in,

15   how did you go about getting them?

16         A.    Well, generally, I can't speak

17   to that.  We did not have them assigned when

18   I went back to patrol.  In Canine, I did have

19   them assigned.  They were sent to none of the

20   Canine cars.

21         Q.    What about when you were in the

22   Gang Unit?

23         A.    Whether the uniformed cars had

24   them?

25         Q.    If you thought they should be

1    used for some law enforcement activity or

2    engaged in having to go about obtaining them

3    or involving them in the activity?

4         A.    I remember a call there were

5    some in the office that would go out.

6         Q.    When you say in the office,

7    where's that?

8         A.    Our office then was at that

9    3201 Warsaw.

10        Q.    That's the Canine Unit?

11        A.    We got -- we got -- as I

12   mentioned earlier about how the name changes,

13   it also, a lot of times, the location

14   changes.

15        Q.    And that's the Canine Unit

16   office you're referencing?

17        A.    It was then.  It's no longer

18   there or in existence.

19        Q.    Okay.  So the Gang Unit had some

20   stop sticks in the office wherever the office

21   was in your experience?

22        A.    Yeah.

23        Q.    And they're available for

24   officers to use if it seems like they may

25   become necessary or helpful for a particular

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    operation?
 2            A.    I'm not -- I'm not sure how to
 3    answer that.  I knew where they were.
 4            Q.    How did you learn where they
 5    were?
 6            A.    I don't know.  I just remember
 7    where they were in the office.
 8            Q.    Somebody showed you at some
 9    point?
10            A.    Who knows.  I'm not sure.
11            Q.    Okay.  Was it your experience
12    that other members of the Gang Unit also knew
13    where they were?
14            A.    Sure.  Yes.
15            Q.    For circumstances where it
16    was likely that a suspect may flee
17    apprehension when you were in the Gang Unit,
18    were those circumstances where you would seek
19    involvement of stop sticks in the operation?
20            A.    Yes.
21            Q.    And why was that?
22            A.    We would try to disable the
23    vehicle, but the circumstances determined
24    whether it was plausible to even deploy them.
25            Q.    And what does that mean,
```

Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    **plausible to deploy?**

 2              A.    Well, the safety issues, like I

 3    mentioned earlier, like the stop stick sleeve

 4    that we would use on a vehicle that is

 5    mobile, you know, it's a huge timing issue to

 6    make sure that you're in front of the

 7    vehicle.

 8              Sometimes it's gamble because

 9    you don't know where the suspect is going to

10    turn or flee, so try and get ahead of the

11    vehicle and ensure that you have cover and

12    concealment to deploy them safely to minimize

13    any potential for harm to, obviously, the

14    officer that's deploying them.

15         **Q.    So in terms of getting ahead of**

16    **the vehicle, what types of locations would be**

17    **appropriate in your experience and training**

18    **in the department to deploy them?**

19              A.    Generally, we'd try to deploy

20    them on the back side of our own vehicle if

21    it was not a -- you know, a concrete

22    structure or, you know, something that was

23    going to completely prevent if the -- if the

24    suspect fleeing would try to evade or make a

25    movement to avoid the stop sticks, which does

1    happen, you know, frequently once they see

2    them, that you would make sure that you would

3    have complete cover and safety.

4         **Q.    And when you say "complete cover**

5    **and safety," what do you mean?**

6         A.    You want to be behind something

7    that is, you know, strong, that's gonna be

8    able to take the force of the vehicle if they

9    would choose to try to strike the deploying

10   officer.

11        **Q.    And so did you mention a cruiser**

12   **is one of those types of structures?**

13        A.    Yes.

14        **Q.    And you also mentioned concrete,**

15   **right, as one of those types of structures?**

16        A.    As an example, yes.

17        **Q.    Is that like a concrete road**

18   **barrier that you're describing, or something**

19   **else?**

20        A.    It was just an example.  Sure,

21   yes.

22        **Q.    Okay.  So any kind of structure**

23   **strong enough to protect an officer from**

24   **being impacted by a vehicle should the**

25   **vehicle strike it --**

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Well, you don't -- you don't
 2       want concealment.  Concealment would be like
 3       hiding behind a bush.  Do you know what I
 4       mean?
 5              Q.    I see.  So cover and concealment
 6       in this circumstance means not only being
 7       concealed, hidden, not visible but also being
 8       behind --
 9              A.    Having a safety barrier would
10       be -- yeah.
11              Q.    Okay.  And when you say
12       concealment, you mean concealment of the
13       officer as a person, or concealment of all
14       things that may indicate a police presence?
15              A.    No.  I mean, concealment of the
16       officer as a -- as a person, yes.
17              Q.    Okay.  All right.  So in order
18       to safely use stop sticks, you need to be
19       able to deploy them in a place where officers
20       can have both cover and concealment as we've
21       discussed, right?
22              A.    Ideally, yes.
23              Q.    It's not necessary, but it's
24       ideal; is that what you're saying?
25              A.    The cover is necessary for
```

```
 1    safety purposes.  The concealment, or a

 2    screen, to hide behind and not seen or

 3    visible is not completely necessary, no.

 4            Q.    Okay.

 5            A.    But to do it safely, yes, you

 6    would want cover.  Yes.

 7            Q.    And then --

 8                  MR. HERZIG:  If you a need

 9    break, just say so.

10                  THE WITNESS:  No, I'll be okay

11    for a few.

12    BY MS. GREENE:

13            Q.    And then with regard to safe

14    deployment of stop sticks other than cover

15    and concealment, are there any other

16    considerations an officer needs to take?

17            A.    No.

18            Q.    And in terms of identifying

19    locations that would be appropriate to use

20    stop sticks other than the cover and

21    concealment issues, what other factors are a

22    part of that?

23            A.    I'd say, you know, traffic

24    concentration, intersections, any kind of

25    roadway hazards.
```

Deposition of Officer Brett Thomas                                Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    So being aware of the likelihood

2     of the use of the stop sticks causing injury

3     to third parties, is that essentially what

4     I'm hearing you describe?

5                MR. HERZIG:  Objection.  You can

6     answer.

7          A.    No.

8          Q.    Okay.  Can you explain to me

9     then your answer?

10         A.    And if I accidentally stop stick

11    the wrong, all it's gonna do is cause them to

12    slowly not drive away.  So I wouldn't be

13    concerned about the safety of, you know,

14    accidentally stop sticks on the wrong car.

15         Q.    Okay.  When you set up stop

16    sticks, do you do so in such a way as to try

17    to minimize injury to third parties of any

18    kind?

19         A.    I would say we do it to minimize

20    accidentally stop sticking the wrong car.

21         Q.    Okay.  So is it --

22         A.    I would never -- I don't feel

23    like I would be -- am causing or potential

24    injury for another driver on the roadway.

25         Q.    For selecting a location to

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     deploy stop sticks, do officers try to find

2     areas where the fleeing vehicle you want to

3     target is gonna -- is gonna have to take that

4     path in order to flee?

5          A.    Yes.  That would -- I mean, that

6     would be ideal that the vehicle is gonna have

7     to go through, you know, a specific width of

8     roadway.

9          Q.    And so, for example, if there

10    was a roadway where a driver could flee in,

11    you know, one direction down the street or

12    the other direction down the street, there's

13    no other way out, could you do stop sticks in

14    that circumstance?

15         A.    You could try.

16         Q.    And where would you put them?

17         A.    Do you want me to go over how --

18    how we use the sleeve?

19         Q.    Well, I'm asking you, like,

20    where would you put them, if that were the

21    case?  You know, you have a suspect on the

22    road and they could go east or west, but

23    that's the only roadway out, for example.

24         A.    Which direction are they coming

25    from?

1    Q.    Well, let's say you don't know

2    yet.

3         A.    Well, you would know.  That's

4    why we have radio communication to try to

5    get -- if I didn't know where they were

6    coming from yet...

7         Q.    Yeah.  Let me see if I can ask

8    it in a better way.

9              So let's say, for example,

10   there's a vehicle at rest that you believe is

11   likely to flee if the suspect gets into it,

12   and there are only a couple of options in

13   terms of where that vehicle could drive if it

14   stays on the roadway to leave where it's

15   currently parked, is that a circumstance

16   where stop sticks could be used?

17        A.    Yes.

18        Q.    And where in that circumstance

19   would the stop sticks be appropriate to

20   place?

21        A.    I'd say one area of egress.

22        Q.    And could they be used at all of

23   the areas of potential egress out of that

24   stationary location?

25        A.    Potentially, yes.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    There are enough stop sticks
 2    available in the department for that, right?
 3               MR. HERZIG:  Objection.
 4          A.    Yeah.
 5          Q.    I mean, you're aware of there
 6    being more than one set of stop sticks in the
 7    department's --
 8          A.    Yes.
 9          Q.    -- possession, right?  There are
10    several sets at least, right?
11          A.    Yes.
12          Q.    And --
13               MS. GREENE:  Did you want a
14    break, or no?  You were checking earlier.
15               THE WITNESS:  I wouldn't -- I
16    wouldn't mind taking a break.
17               MS. GREENE:  Sure.  Let's go off
18    the record and we'll take a couple minutes
19    break.
20       (Off the record.)
21    BY MS. GREENE:
22          Q.    We're back on the record and
23    hopefully folks on Zoom can hear us, but let
24    us know if not.
25               Okay.  Officer Thomas, before we
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      took a brief break, we were talking about
 2      stop sticks.  You mentioned earlier in your
 3      testimony stop sticks that could be placed
 4      directly under the wheels of a stationary
 5      vehicle, right?
 6              A.      Uh-huh.
 7              Q.      That's a yes?
 8              A.      Yes.
 9              Q.      And when is it appropriate to
10      use those?
11              A.      Well, we use them a lot if a car
12      stops, okay, during a traffic stop and the
13      car actually stops, then we would place those
14      underneath in case they would try to flee
15      during the roadside interview.  It's the most
16      commonplace that I can think of.
17              Q.      Okay.  Are they ever used for
18      vehicles that are likely to be used by
19      suspects to flee during a surveillance
20      operation?
21              A.      Not in my experience.  They
22      would be -- they're -- they're big.  They
23      are -- like, the sticks themselves that go
24      underneath their tires, would be visible.
25              Q.      Okay.  So they're not used for
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    covert surveillance purposes then?

2         A.    I have -- my experience, I've

3    never seen them used in covert operation.

4         Q.    So in a surveillance

5    circumstance where a vehicle may flee, the

6    other type of stop sticks to be used when a

7    vehicle is in motion, that's the set that can

8    be used.

9         A.    Yes.

10        Q.    Okay.  Have you ever been

11   trained on pinning a fleeing vehicle?

12        A.    I have not.

13        Q.    Have you ever heard of a tactic

14   like that in the course of your work as an

15   officer?

16        A.    I don't know if I've heard that

17   term, no.

18        Q.    Have you ever heard of any kind

19   of tactical maneuver where police vehicles

20   are used in such a way that their position to

21   prevent the departure of a vehicle that's

22   attempting to flee?

23        A.    I have no first-hand knowledge

24   of that.  I've never participated in an

25   operation that that was ever utilized.

1          Q.    Were you ever trained at any

2     point in the course of your career on that

3     kind of tactic?

4          A.    No.

5          Q.    What about a vehicle that's

6     stationary that a suspect may attempt to flee

7     in, have you ever been trained to use police

8     vehicles to position them in such a way that

9     the vehicle cannot flee?

10         A.    No.

11         Q.    What about during a traffic stop

12    where the vehicle may flee, were you ever

13    trained to place your vehicle in such a

14    way as to -- in such a way as to prevent that

15    fleeing?

16         A.    No.

17         Q.    How were you trained by the

18    department about where to park your vehicle

19    during a traffic stop?

20         A.    I'm sorry.  Can you restate?

21         Q.    Yeah.  What training did the

22    department give you about where to park your

23    vehicle during a traffic stop?

24         A.    There was training that was

25    provided in the academy, obviously, on

1    vehicle positioning during a traffic stop.

2    That has been one of those progressive

3    training techniques that's changed even as of

4    recent.

5         Q.    And how has it changed?

6         A.    Just the angle where we would

7    stand, you know, in the threshold of the

8    door, whether we would seek cover to the

9    rear.

10         That's always an interesting

11    topic because it seems like the tactics

12    across the country continuously kind of

13    evolve from a mindset of positioning and

14    where you would be irrelevant to a suspect

15    vehicle and -- and your own.

16         Q.    In that evolution and your

17    understanding is that because it becomes

18    generally accepted that certain tactics are

19    more safe than others?

20              MR. HERZIG:  Objection.  Go

21    ahead.

22         Q.    Go ahead.

23         A.    Safety, yes.

24         Q.    So you mentioned vehicle

25    positioning during traffic stops at the

 1    **training academy, what did they teach you**

 2    **about that?**

 3         A.    When I was in the academy, they

 4    would teach us to actually, you know, if it's

 5    one vehicle stopping a suspect, you would

 6    kind of have the -- the front of the vehicle

 7    kind of out in the roadway a little bit to

 8    create a gapping space to where if you were

 9    making a safe approach, you were at the

10    driver's side of the vehicle speaking with

11    the driver, that there would be some kind of

12    safety window using your own vehicle from

13    other vehicles in the roadway if somebody

14    would lose control or something.

15         **Q.    Okay.  And so that's the purpose**

16    **of protecting the officer when he's outside**

17    **of his cruiser?**

18         A.    Yep.  And it protects,

19    obviously, the suspect -- or, I shouldn't say

20    the suspect, it could just be a traffic

21    violator, their vehicle, too, yes.

22         **Q.    Okay.  And as part of your**

23    **training about vehicle positioning during**

24    **traffic stops, were you ever provided with**

25    **any information about positioning a cruiser**

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    in any particular way that would make it

2    difficult for the stopped vehicle to attempt

3    to flee?

4         A.    No.

5         Q.    Have you ever talked with

6    officers from other agencies about a tactic

7    of that type?

8         A.    Can you describe the tactics, so

9    that we're clear?

10        Q.    Sure.  So what I'm trying to ask

11   about is using law enforcement vehicles,

12   whether they're marked or unmarked, to

13   position them in such a way that a vehicle

14   that may attempt to flee is unable to do so

15   because the law enforcement vehicles are

16   blocked?

17        A.    Creating a block, we don't do

18   roadblocks.

19        Q.    Well, not even in just a

20   roadblock scenario.  I'm asking about have

21   you ever received any --

22        A.    No.

23        Q.    -- or learned any --

24        A.    No.

25        Q.    -- information about doing that

```
 1        for a vehicle, for example, that's parked on
 2        a property?
 3              A.    No.
 4              Q.    And have you ever talked with
 5        anyone from other agencies about that kind of
 6        tactic?
 7              A.    A tactic where they would block
 8        in the vehicle?
 9              Q.    Yeah.
10              A.    It's very -- what you're asking
11        is very vague.  In what scenario?
12        Originally, we were talking about traffic
13        stops.
14              Q.    So --
15              A.    On a -- on a roadway, I assume,
16        or maybe I shouldn't assume.
17              Q.    Yeah.  Let me back up and ask a
18        different question.
19                    Have you ever heard in any
20        circumstance or situation about a law
21        enforcement tactic that involves using law
22        enforcement vehicles, whether marked or
23        unmarked, to position them in such a way that
24        a vehicle --
25              A.    I have never been trained on
```

```
 1          that.
 2                   Q.     That's not my question.  And let
 3          me finish the question, too.  Sorry.  I know
 4          it's long and I'm putting a lot into it, but
 5          thanks for your patience with me here.
 6                          So I depose a lot of police
 7          officers, and a number of them have told me
 8          about training they have received over the
 9          years about using law enforcement vehicles,
10          whether during traffic stops or surveillance
11          activities where they think somebody may flee
12          where they position their vehicles in such a
13          way that the suspect vehicle cannot or would
14          have a very difficult time fleeing from the
15          location that it is parked, have you ever
16          heard of anything like that?
17                   A.     Yes.
18                   Q.     And where have you heard about
19          that?
20                   A.     I don't -- some kind of training
21          curriculum, but it's nothing that I have ever
22          received.
23                   Q.     When you say some kind of
24          training curriculum, what do you mean?
25                   A.     You could look at videos, you
```

```
 1        know, nothing stands out --
 2                Q.    So --
 3                A.    -- specific or particular.
 4                Q.    So your awareness of that
 5        tactic --
 6                A.    That's --
 7                Q.    -- where did it come from?
 8        Like, how did you come to learn --
 9                A.    Twenty years of law enforcement,
10        ma'am.  You've seen a lot different training
11        techniques, but it's not something that I
12        have ever received training on here.
13                Q.    So CPD hasn't trained you on
14        that?
15                A.    No.
16                Q.    But you've heard about it
17        generally as a tactic out there in the realm
18        of law enforcement; is that fair?
19                A.    Yes.
20                Q.    Okay.  All right.  You're
21        familiar with the CPD's pursuit policy,
22        correct?
23                A.    I am.
24                Q.    And in August of 2020, were you
25        familiar with the pursuit policy at that
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    time?

2              A.    Yes.

3              Q.    Pursuits are events that are not

4    uncommon in the sense that they do happen

5    periodically on an annual basis in the City

6    of Cincinnati, right?

7              A.    Yes.

8              Q.    And fleeing vehicles, that's a

9    circumstance that officers generally

10   encounter over the course of their careers,

11   correct?

12             A.    Yes.  Excuse me.

13             Q.    Would you say that that's a

14   common occurrence in a police officer's work?

15                   MR. HERZIG:  Objection.

16             Q.    Can you say it's a common

17   occurrence in your experience as a member of

18   the Cincinnati Police?

19             A.    Of fleeing vehicles?

20             Q.    Yeah.

21             A.    In 2020 or in 2025?

22             Q.    In the course of your career.

23             A.    Yes.

24             Q.    And about how often does it

25   occur?

```
 1            A.    That's ridiculous to even come
 2     up with.  I don't know.  I haven't had it
 3     happen in a long time.
 4            Q.    But it has happened for you when
 5     you were engaged in law enforcement
 6     activities, right?
 7            A.    Yes, it has happened.
 8            Q.    And you're aware of it, of
 9     vehicles fleeing from other officers you work
10     with, correct?
11            A.    Yes.
12            Q.    On an average year, how often do
13     you hear about a vehicle fleeing from other
14     officers in your department?
15            A.    You want me to put a number to
16     it?
17            Q.    You can give me a ballpark.
18            A.    Twenty.
19            Q.    Okay.  And those circumstances
20     include situations where the fleeing vehicle
21     is occupied by a wanted person on occasion,
22     right?
23                  MR. HERZIG:  Objection.  You can
24     go ahead and answer.
25            A.    Yes.
```

1  Q.   And they include circumstances

2  where there's someone in the car with a

3  warrant for their arrest, right?

4        A.   Yes.

5        Q.   They include situations where

6  the individuals in a car maybe wanted for

7  violent crimes, correct?

8        A.   Yes.

9             MR. HERZIG:  Objection.

10       Q.   And those situations include

11  circumstances where people in the car may be

12  wanted for trafficking charges, right?

13            MR. HERZIG:  Objection again.

14  You can go ahead.

15       A.   Trafficking what?

16       Q.   Drugs or a weapon.

17       A.   Oh, yes.

18       Q.   And sometimes police officers

19  engage in vehicle pursuits to stop those

20  fleeing drivers, right?

21       A.   Yes.

22       Q.   Sometimes officers engage in

23  vehicle pursuits to arrest the person or

24  persons inside the car, right?

25       A.   Yes.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    And during pursuits, fleeing

2    vehicles often commit traffic violations,

3    correct?

4         A.    Yes.

5         Q.    Those include violations of the

6    Ohio Revised Code sometimes, right?

7         A.    Yes.

8         Q.    And they sometimes include

9    violations of the Cincinnati Municipal Code

10   as well, correct?

11        A.    Yes.

12        Q.    And examples of those violations

13   would include exceeding the speed limit,

14   right?

15            MR. HERZIG:   Objection.  Are you

16   talking about his specific experience, or

17   things he might have just heard of in passing

18   from other officers?

19   BY MS. GREENE:

20        Q.    I'm asking about your experience

21   as an officer in the City of Cincinnati

22   Police Department and what you're aware of as

23   far as fleeing vehicles that have fled

24   officers in the department.  Okay?

25            A.    (Nodding head affirmatively.)

1    Q.    So those circumstances and those

2    violations of the ORC or the Cincinnati

3    Municipal Code can include running red

4    lights, right?

5         A.    Yes.

6         Q.    And they can include running

7    stop signs, right?

8         A.    Yes.

9         Q.    And those violations can include

10   going the wrong way on a one-way street,

11   right?

12        A.    Yes.

13        Q.    The violations can include

14   endangering other motorists on the road,

15   right?

16        A.    Yes.

17        Q.    And the violations could include

18   endangering bystander pedestrians as well,

19   correct?

20        A.    Yes.  Violations can include

21   anything that that driver decides to do.

22        Q.    Any violation of the law, that

23   is a traffic violation, right?

24        A.    Yeah.

25        Q.    Or any other criminal act,

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    correct?
 2              A.    Yes.
 3              Q.    An at-fault accident is also a
 4    traffic violation -- or, excuse me, a law
 5    violation that occurred -- can occur during
 6    those pursuits, correct?
 7              A.    I'm sorry?
 8              Q.    Traffic violations -- sorry,
 9    strike that.
10              An at-fault accident is also a
11    violation that can occur during the course of
12    a pursuit, right?
13              A.    Yes.
14              Q.    In your understanding of
15    Cincinnati Police policy and procedures for
16    vehicle pursuits, what is -- what is the
17    purpose of the policies within the department
18    that govern how vehicle pursuits are supposed
19    to be undertaken?
20              A.    The purpose of the policies --
21              Q.    Yeah.
22              A.    -- of the pursuit is to,
23    obviously, weigh a suspect apprehension.
24              Q.    And by that, do you mean only
25    engaging in a pursuit or continuing a pursuit
```

1    when the apprehension of that suspect is

2    necessary at the time?

3                MR. HERZIG:  Objection.  That's

4    not what the policy says.  You can answer.

5        A.    Necessary or reasonable?

6        Q.    When it's necessary or

7    reasonable to apprehend; is that what you're

8    saying?

9        A.    No.  I guess, I wasn't sure what

10   you asked.

11       Q.    Sure.  When you said to weigh

12   apprehension, by that did you mean that

13   officers should only engage in pursuits or

14   continue pursuits when it is necessary to

15   apprehend the fleeing suspect at that time?

16       A.    Yes.

17       Q.    And does the policy and

18   procedure also serve the purpose of ensuring

19   the safety of citizens who are not part of

20   the fleeing suspect event?

21                MR. HERZIG:  Objection.  Did you

22   hear -- did you hear?

23                THE WITNESS:  I didn't hear the

24   question.  I'm sorry.

25   BY MS. GREENE:

```
 1          Q.    I said, was it also the purpose
 2    of the CPD pursuit policy and procedure to
 3    ensure the safety of citizens and officers
 4    during the course of the pursuit?
 5          A.    Yes.
 6                MR. HERZIG:  Objection.
 7          Q.    And in your experience,
 8    understanding of the policies and procedure
 9    of the department and based on your training
10    from the department, do you agree that
11    pursuit policy and procedure requires
12    officers to not commit traffic violations
13    during a vehicle pursuit?
14          A.    Say that again.  I'm sorry.
15          Q.    Yeah.  Based on your training
16    and experience as an officer in the
17    department, is it your understanding that the
18    pursuit policy and procedures require
19    officers to not commit traffic violations --
20          A.    No.
21          Q.    -- during pursuits?  Your answer
22    was no?
23          A.    Uh-huh.
24          Q.    Can you explain that, please?
25          A.    You're saying during a pursuit
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the pursuing officer is, obviously -- what

2    you're asking is during the pursuit, the

3    pursuing officer is not permitted to violate

4    any traffic laws?

5         Q.    Yeah.  Is that your

6    understanding of the policy and procedure of

7    the department?

8         A.    No.

9         Q.    And can you explain how your

10   understanding is different?

11        A.    Well, I mean, during a pursuit,

12   you have to weigh just the reasonableness of

13   that.  Like, there might be -- there's gonna

14   be stop signs that, you know, you might roll

15   as long as you can visually and guarantee

16   that the intersection is clear.  The same

17   thing with a stoplight.

18        Q.    What's your understanding of any

19   specific requirements in the policy in

20   relation to moving through intersections with

21   stop signs or red lights?

22        A.    You have to slow to a manner to

23   where you can visually clear the

24   intersection, and, obviously, you're

25   operating in emergency operation mode then.

Deposition of Officer Brett Thomas

Jason Laible, et al., vs. Timothy Lanter, et al.,

1          So, obviously, there's an

2    audible and visual notification there coming

3    through the -- through the intersection for

4    other vehicles and pedestrians.

5          Q.    And that's mandatory?

6          A.    Uh-huh.

7          Q.    That's a yes?

8          A.    Yes.

9          Q.    Why is that important?

10         A.    It's important -- why is it

11   important that you slow, for example?

12         Q.    Yeah.

13         A.    Is that you give due notice of

14   going through the intersection.

15         Q.    And how are you supposed to give

16   notice?

17         A.    You're -- you're supposed to

18   slow in the intersection.  And, obviously,

19   you have lights and sirens going through the

20   intersection, yes.

21         Q.    And is it your understanding of

22   the pursuit policy and procedure for the

23   department that officers are not permitted to

24   go the wrong way on one-way streets?

25         A.    Unless authorized by a

1    supervisor, yes.

2         Q.    And so it's mandatory that you

3    cannot go the wrong way on a one-way unless

4    you have explicit supervisor authorization?

5         A.    Yes.

6         Q.    And in terms of receiving that

7    authorization, how do you get it?

8         A.    It could be requested.

9         Q.    Like, over the radio?

10        A.    Yeah.  All the communication is

11   going to be taking place over the radio.

12        Q.    And are there any other ways to

13   receive that authorization?

14        A.    No.

15             MR. HERZIG:  Other ways than the

16   radio, you mean?

17             MS. GREENE:  Yeah.

18             MR. HERZIG:  Okay.

19   BY MS. GREENE:

20        Q.    And that's mandatory as well,

21   right, the necessity of the officer -- or,

22   excuse me, the supervisor authorization?

23        A.    Yes.

24        Q.    And with regard to a pursuing

25   officer's speed during a pursuit, what's your

```
1     understanding of CPD policy and procedure?
2            A.    That you're not supposed to
3     exceed 20 miles an hour.
4            Q.    And that's a mandatory
5     requirement?
6            A.    Yes.
7            Q.    And are there any other ways to
8     bypass or overcome that limitation that
9     you're aware of?
10           A.    No.
11           Q.    In terms of your understanding
12    of the policy and procedure for vehicle
13    pursuits in relation to pursuits that go into
14    areas that have pedestrian traffic, what's
15    your understanding of any policy provisions
16    on that issue?
17           A.    I mean, pedestrian traffic
18    should be taken into consideration when
19    pursuing, you know, through an area, yes.
20           Q.    And how does an officer do that
21    in terms of your understanding of the
22    policies and practices of the department?
23           A.    I think it would be on an
24    individual pursuit basis, whether there was
25    or was not pedestrian traffic that could
```

```
 1   result or that could be taken into

 2   consideration.

 3        Q.    And if there was pedestrian

 4   traffic, what does that mean for the officer

 5   engaging in the pursuit?

 6        A.    They just have to weigh that

 7   individually for the pursuit and the

 8   concentration of that street traffic on

 9   whether it's reasonable to be pursuing.

10        Q.    And under those circumstances

11   and your understanding of the policy, what

12   would make it reasonable to continue pursuing

13   with the presence of pedestrian traffic?

14        A.    If there was light pedestrian

15   traffic, it would be reasonable.  If there

16   was heavy pedestrian traffic in the roadway,

17   it would not be reasonable.

18             But if pedestrian traffic was

19   out of the roadway and was aware of the

20   pursuit, obviously, because of the lights and

21   sirens, it would be reasonable.

22        Q.    And so to be aware of the

23   pursuit because of lights and sirens, you're

24   describing a circumstance where pedestrians

25   on a sidewalk would have the ability to hear
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    and/or see those lights and sirens

2    significantly in advance of the pursuit

3    passing by their area?

4              MR. HERZIG:  Objection.  You can

5    go ahead.

6         A.    Ask me that, again, please.

7         Q.    Yeah.  When you say that it

8    would be reasonable to continue the pursuit

9    if pedestrians were aware of the pursuit

10   because of lights and sirens, can you

11   describe to me what that means?

12        A.    You asked about pedestrian

13   concentration.  I said, yes.  And also in

14   addition to that the light and sirens would

15   help make them aware of an incoming or, you

16   know, nearing pursuit would make it

17   reasonable, yes.

18        Q.    And so in terms of pedestrians

19   being aware of an incoming pursuit due to

20   lights and sirens, does that mean that the

21   pedestrians should be able to hear the sirens

22   and/or see the lights in advance of the

23   pursuit arriving at the area where they're

24   located on the sidewalk?

25        A.    No.  It's just a contributing --

1    I guess it's a contributing factor that the

2    pursuit is nearing from what distance they

3    could hear.  I'm not sure what you're asking.

4         **Q.    Yeah.  If there's pedestrian**

5    **traffic on sidewalks in an area that a**

6    **pursuit is going through, is it necessary for**

7    **the continuation of that pursuit that the**

8    **pedestrians know the pursuit is coming due to**

9    **lights and sirens?**

10        A.    No.

11        **Q.    It's not?**

12        A.    No.

13        **Q.    Can you explain why not?**

14        A.    Well, if -- if I can visually

15   tell that somebody is on a sidewalk from two

16   blocks away and we are nearing and I am aware

17   and can operate my vehicle, you know what I'm

18   saying, in their regard to their safety, at

19   what point they recognize that I am

20   approaching, I don't need to take into, you

21   know, consideration.

22        **Q.    Does an officer also need to**

23   **take into consideration pedestrian awareness**

24   **of the presence of a fleeing vehicle and the**

25   **ability to have those perceptions?**

```
 1              A.    Yes.

 2                    MR. HERZIG:  Objection.  Go

 3      ahead.

 4              A.    Yes.

 5          Q.    Okay.  Under CPD pursuit policy

 6      and procedure, what's your understanding of

 7      what constitutes an operational violation?

 8              A.    Can I see what you're referring

 9      to by chance?

10          (Exhibit 1 was referenced.)

11      BY MS. GREENE:

12          Q.    Yeah.  Sure.  I'm gonna give you

13      Plaintiffs' Exhibit 1.

14              A.    Okay.

15          Q.    So this was previously marked as

16      Plaintiffs' Exhibit 1, this is CPD Policy

17      12.535, Emergency Operation of Police

18      Vehicles and Pursuit Driving.

19                    And my question was about what's

20      your understanding of what constitutes an

21      operational violation?  And if you look at

22      page 1, there's a definition provided

23      there --

24              A.    Uh-huh.

25          Q.    -- for that term.
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.      Yes.

2          Q.      So what's your understanding of

3    what an operational violation is?

4          A.      It would be that during the

5    course of the pursuit, one of those things we

6    just discussed, as it gives an example,

7    one-way streets, if -- if one of those

8    occurred during the course of the entire

9    pursuit, it would be an operational violation

10   of the policy during the pursuit.

11         Q.      Okay.  And how is that different

12   from an administrative violation under the

13   policy, if you know?

14         A.      Okay.  So in an -- an

15   operational violation would occur during a

16   pursuit that has grounds to actually be

17   pursuing the subject vehicle.

18              By the way this reads,

19   obviously, an administrative violation would

20   be if you pursued a vehicle that did not meet

21   the current policy and procedure for why or

22   if you are allowed to pursue that vehicle.

23         Q.      Okay.  And so administrative

24   violations include then, for example, more

25   than two police vehicles in a pursuit, right?

```
 1              A.    That -- more than two police

 2       vehicles without authorization to have more

 3       than two.

 4              Q.    And that author --

 5       authorization, is that supposed to come from

 6       who?

 7              A.    Generally the OIC, the officer

 8       in charge.

 9              Q.    And then the administrative

10       violations would also include, for example,

11       failure to terminate a pursuit, right?

12              A.    Yes.

13              Q.    Okay.  In terms of your

14       understanding of the policies of the

15       department regarding pursuing vehicles, is it

16       required that officers who are considering or

17       actively engaged in pursuit, to observe the

18       degree of risk created by the pursuit to

19       others, meaning third parties --

20              A.    Yes.

21              Q.    -- the officer himself?

22              A.    Yes.

23              Q.    Injury to the degree of risk

24       created for the suspect as well; is that

25       required?
```

Case: 2:21-cv-00102-DLB    Doc #: 141    Filed: 11/06/25    Page: 94 of 285 - Page
ID#: 3007
Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    Yes.

2      Q.    And is it required under the

3   department policies for a pursuit that

4   officers who are considering or engaged in

5   pursuits evaluate the location where the

6   pursuit will take place?

7      A.    Yes.

8      Q.    Are they also required to

9   evaluate traffic conditions?

10     A.    Yes.

11     Q.    And are they required to

12  evaluate road conditions and weather?

13     A.    Yes.

14     Q.    Are they required to evaluate

15  the time of day?

16     A.    Yes.

17     Q.    Are they required to evaluate

18  the volume, speed, and type and direction of

19  vehicular traffic during -- or, excuse me, in

20  the location of the pursuit?

21     A.    Yes.

22     Q.    And they're required to evaluate

23  as well the direction of the pursuit, right?

24     A.    Yes.

25     Q.    And officers are also required

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1  to consider the nature or seriousness of the

2  suspected crime, right?

3          A.    Yes.

4          Q.    And they're required to consider

5  the condition of their own police vehicle and

6  the suspect's vehicle, right?

7          A.    Yes.

8          Q.    And they're required to consider

9  any circumstance that could lead to a

10  situation in which the pursuing officer would

11  not be able to maintain -- maintain control

12  of the police vehicle, right?

13          A.    Yes.

14          Q.    And they're required to consider

15  any circumstance that could lead to a

16  situation where the fleeing vehicle may not

17  be able to maintain control of their vehicle,

18  right?

19          A.    Yes.

20          Q.    And they're also required to be

21  aware of the likelihood of successful

22  apprehension while engaged in or continuing a

23  pursuit, right?

24          A.    Yes.

25          Q.    And officers are also required

Deposition of Officer Brett Thomas
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    to know whether the identity of the suspect

2    is known at the point the pursuit is going

3    on, right?

4         A.    Correct.

5         Q.    And officers are required to

6    consider whether later apprehension of that

7    suspect when their identity is known is

8    possible, right?

9         A.    Yes.

10        Q.    Is there anything else with

11   regard to the initiating or continuing a

12   pursuit that in your understanding of the

13   policies and practices of the department an

14   officer must be aware of?

15        A.    No.

16        Q.    Now, in a circumstance where a

17   suspect is fleeing and the identity of the

18   suspect is known, when is it appropriate to

19   carry on with the pursuit, as far as your

20   understanding of department policies and

21   procedures goes?

22        A.    When a suspect's apprehension at

23   that time is necessary.

24        Q.    And what does it mean that the

25   apprehension is necessary?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    That, you know, by not
 2    apprehending him during that course of action
 3    might subject other officers, other people,
 4    you know, in society or so forth, to another
 5    level of harm if he's not arrested at that
 6    date or apprehended on that date.
 7              Q.    And so when there's a known --
 8              A.    Potential risk.
 9              Q.    And -- strike that.
10              So when you say known potential
11    risk, that means --
12              MR. HERZIG:  Objection.  He said
13    potential risk.
14              Q.    Excuse me.  When you say
15    potential risk, does that mean the risk of
16    serious injury to persons that is likely to
17    come to pass at a later time if the person is
18    not apprehended now?
19              A.    Yes.
20              Q.    And that risk, it relates to an
21    imminent danger, right?
22              MR. HERZIG:  Objection.  You can
23    answer.
24              A.    Yes.
25              Q.    So it couldn't be enough, for
```

1      example, that the person might go do

2      something that would injure people a week or

3      two later, right?

4              A.    No.

5              Q.    You would have to have an event

6      that is imminent, very likely to happen in

7      the immediate future that would justify the

8      continuation of the pursuit, correct?

9              A.    Yes.

10             Q.    Okay.  All right.  In terms of

11     the time of day of the pursuit, why does an

12     officer need to be thinking about that when

13     he's engaging in or continuing a pursuit?

14             A.    All of the other things that you

15     just read off.  It could be, you know,

16     traffic density, whether there's the presence

17     of pedestrians.  Those are the two -- two

18     main ones.

19             Q.    So, for example, rush hour would

20     be a bad time to engage in a pursuit, right?

21             A.    Yes.

22             Q.    Or a sunny afternoon where

23     people are likely to be outside, bad time to

24     be engaged in a pursuit?

25             A.    Well, I think that's unfair.

```
1    The time of day necessarily, you're

2    generalizing -- you're generalizing the time

3    of day with traffic concentration or

4    pedestrian, you know, concentration.

5              I would say each pursuit is very

6    individual and unique in its own.  And that

7    during those pursuits is when those things

8    have to come into play, whether or not to

9    engage in a pursuit.

10        Q.    So if at the time of a pursuit,

11   the time of day and the weather conditions,

12   days of the week indicate that there's likely

13   to be pedestrian traffic on sidewalks, how

14   does that impact the decision to engage in

15   pursuit?

16        A.    Maybe I need to repeat myself.

17   I'm sorry.

18              Once a pursuit begins, or let's

19   say the pursuit starts and the conditions are

20   correct, the time of day or whether the

21   weather -- what the weather is like outside

22   in terms of, you know, if it's sunny, like

23   you just said, is not gonna be an underlying

24   factor to immediately terminate the pursuit

25   unless those complications present
```

```
 1    themselves.
 2            Q.    When you say "complications,"
 3    what do you mean?
 4            A.    If all of a sudden, you know,
 5    you start a pursuit in an area where there's
 6    not much traffic and then you do run into a
 7    lot of traffic or there is no pedestrian
 8    traffic, and then you do encounter a lot of
 9    pedestrian traffic, that would change the
10    complexity of it.
11            Q.    And so when, for example, a
12    pursuit goes from an area without a lot of
13    pedestrian traffic to an area with pedestrian
14    traffic, at that point the pursuit should be
15    terminated?
16            A.    No.  I'm not sure I understand.
17    It would -- it would be the decision of the
18    pursuing officers to take those factors into
19    consideration.  I don't think it's a black
20    and white as you're presenting the question.
21            Q.    Okay.  What level of risk is
22    unacceptable for the continuation of a
23    pursuit?
24            A.    What level?
25            Q.    Yeah.  Can you describe the
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   threshold?
 2            MR. HERZIG:  Objection.
 3        A.   Well, I don't -- ask me that
 4   again just so I can process this?
 5        Q.   Sure.  So in continuing a
 6   pursuit, officers must be aware of the degree
 7   of risk created by the pursuit to others, the
 8   officer, and the suspect, right?
 9        A.   Okay.  Yeah.
10        Q.   So what level of risk creates
11   circumstances that render a pursuit
12   unacceptable to continue?
13        A.   You know, if the risk to other
14   individuals outweighs or -- you know,
15   outweighs what might occur if the suspect is
16   not apprehended during the course of that
17   pursuit.
18        Q.   Okay.  And that's mandatory,
19   right, that the pursuit is terminated in that
20   circumstance, if the level of risk outweighs
21   the need to apprehend at that time?
22            MR. HERZIG:  Objection.  You can
23   answer.
24        A.   Oh, I think it's kind of -- I
25   don't think you're understanding that every
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    pursuit is so individual.  It's a fluid, very

2    fluid evolving thing.

3                So saying that something is

4    completely, you know, mandatory at a hard

5    line, I think is -- is not correct.

6         Q.    So the threshold, though, in

7    terms of --

8         A.    The threshold --

9         Q.    -- continuing a pursuit or

10   stopping a pursuit, you said is when the

11   risks to other individuals outweighs the need

12   to apprehend the suspect at the time, right?

13        A.    For me, yes.

14        Q.    And that's based on your

15   training by CPD, right?

16        A.    Uh-huh.

17        Q.    And that's a yes?

18        A.    Yes.  Sorry.

19        Q.    And that's based on your

20   understanding of CPD pursuit policy as well,

21   correct?

22        A.    Yes.

23        Q.    So as an officer, how do you

24   know when that level of risk is presenting

25   itself, that threshold level that you just

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    described?

2        A.    I mean, I don't know that I

3    could describe it for somebody else.  For

4    myself, it would just be a -- it would be a

5    personal assessment of all those

6    consideration that we just discussed.

7        Q.    But once those circumstance are

8    present, you must terminate the pursuit,

9    right?

10       A.    Yes.

11       Q.    You understand that to be

12   mandatory under CPD policy, correct?

13       A.    Yes.

14       Q.    In your training by the

15   department, were you ever taught about

16   whether pursuing vehicles the wrong way on

17   any roadway would be permitted in pursuit

18   driving?

19       A.    I would say -- ask that again.

20   I'm sorry.  Ask that again.

21       Q.    Yeah.  In your training from the

22   department, were you ever taught whether

23   driving or pursuing vehicles the wrong way on

24   any type of roadway is permitted in pursuit

25   driving?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1           A.    As we discussed earlier, it

2      would be permitted with preauthorization.

3      And then, you know, I can't think of a

4      specific date or time, but there's discussion

5      that, you know, that would occur, or it could

6      be acceptable to occur if -- you know, if the

7      officer can visually clear that the roadway

8      and there's no oncoming traffic.

9           Q.    Okay.  It's true that CPD

10     pursuit procedures mandate that officers are

11     forbidden from operating their vehicles in

12     emergency mode with reckless disregard for

13     the safety of other citizens, right?

14          A.    Yes.

15          Q.    And what does that mean,

16     "reckless disregard for the safety of other

17     citizens"?

18               MR. HERZIG:  Objection.  You can

19     answer.

20          Q.    In your -- and I can ask it

21     another way.

22               In terms of your training and

23     understanding of the policies of the

24     department, what does reckless disregard for

25     the safety of citizens mean?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    I mean, it's hard to even

2   imagine where that would be a reality.  I

3   mean, you'd have to be operating your

4   vehicle, you know, as it says, very

5   reckless -- anyway, in a manner that it was

6   obvious that were presenting, you know, harm

7   to others.

8          Q.    Would it also include engaging

9   in a pursuit and operating your vehicle --

10  strike that.

11          Would it also include operating

12  your vehicle in a pursuit while you followed

13  a suspect vehicle that was likely to cause

14  harm to others?

15         A.    Yes.

16         Q.    Under the policy of the

17  Cincinnati Police Department, officers are

18  required during pursuits to maintain a legal

19  speed that's reasonable for the conditions,

20  right?

21         A.    Yes.

22         Q.    And what does that mean as far

23  as your understanding of the policies and

24  your training from the department on speed

25  that is reasonable for the conditions?

Deposition of Officer Brett Thomas                       Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          A.    All of those factors that we've
 2    just discussed is what makes every pursuit
 3    very individual to its own, you know, the
 4    control of your own vehicle, of course, but,
 5    obviously, the factors of traffic density,
 6    you know, if there's pedestrians, et cetera.
 7          Q.    And also the behavior of the
 8    fleeing vehicle as well, right?
 9          A.    Yes.
10          Q.    Earlier when we were talking
11    about speed during pursuits, are there any
12    circumstances where officers are allowed to
13    go faster than that?
14          A.    No.
15          Q.    Are there any requirements as
16    far as your training from the department and
17    your understanding of the policies about the
18    use of radio channels during pursuits?
19          A.    I'm sorry.  Restate that again.
20          Q.    Yeah.  What's your understanding
21    of the department's policies and practices
22    relating to the use of radio channels during
23    pursuits?
24          A.    During the pursuit?
25          Q.    Yes.
```

1    A.    Okay.    So my understanding is

2    that, you know, whatever district the pursuit

3    starts in, would be the radio channel that

4    you would have operations on.

5              If the pursuit would cross over

6    into another district, which is, you know,

7    each district radio is mandated by a

8    different communication specialist, that you

9    would give notice that the pursuit was

10   getting near or entering that area.

11             And then the pursuit officers

12   involved in the pursuit and any assisting

13   would switch over to the new channel.

14   Q.    And when you say a district,

15   what does that include?

16   A.    The geographical lines.

17   Q.    So is that, like, within the

18   City of Cincinnati, there are different

19   districts?

20   A.    Yes.

21   Q.    And then so if you went from, I

22   don't know, District 1 to District 3, you

23   would have to switch radio channels?

24   A.    Yes.   Yes.

25   Q.    Then give notice that you're

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    entering District 3, for example?

2         A.    Ideally, yes, to give the

3    dispatcher.

4         Q.    And then what about traveling in

5    two different municipalities, the same rules

6    apply?

7         A.    No.

8         Q.    How does that differ?

9         A.    My experience is that if we were

10   traveling, let's say, into another

11   municipality, we would stay on the radio

12   channel of the district closest until maybe

13   the other municipality was able to assist

14   with the pursuit.

15        Q.    And when you say "district

16   closest," is that the Cincinnati district?

17        A.    The Cincinnati district.  Our

18   communications are not set up to make it

19   fluid to switch over.

20        Q.    And what about crossing state

21   lines, what rules for radio apply there?

22        A.    You would stay on the closest

23   district from when cross across state lines.

24   Sorry.

25        Q.    And you said until the local

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    agency could take over; is that what you said
 2    before?
 3              A.    I said if they were -- if they
 4    were able to assist, yes.
 5              Q.    Okay.
 6              A.    But -- but -- sorry.  But just
 7    to clarify, we -- the City officers would
 8    still stay on the radio for a district radio
 9    channel that was most appropriate and
10    geographically closest to where we crossed
11    the lines.
12              Q.    And what's the purpose of the
13    radio channels switching process during a
14    pursuit?
15              A.    So that -- excuse me, you know,
16    likely, if there's two -- I'm just gonna give
17    a quick example.
18                    If there were two vehicles that
19    were involved in pursuing a suspect in
20    District 3, they're likely going to be the
21    only two people or -- you know, crossing over
22    into another district.
23                    So you want to make the officers
24    that are on a separate radio channel in a
25    geographic area aware of the incoming
```

 1    pursuit.

 2            Q.    So it's primarily for the

 3    purpose of notice?

 4            A.    It's primarily in communication,

 5    fluid communication.

 6            Q.    Within the department?

 7            A.    Within the department.  I might

 8    have to take another break here sometime

 9    soon.  It's just whenever you have a good

10    stopping point.

11                MR. HERZIG:  If you need a

12    break, let's take a break.

13                MS. GREENE:  Yeah, we can take a

14    break.

15                THE WITNESS:  Are you sure?

16                MS. GREENE:  Yeah.  Let's go off

17    the record.  Off the record.

18        (Off the record.)

19    BY MS. GREENE:

20            Q.    We are back on the record.  I'm

21    gonna go back really briefly to our stop

22    stick conversation earlier.

23            A.    Okay.

24            Q.    Can stop sticks ever be used to

25    prevent pursuits from having to take place?

```
 1          A.    I don't think -- that's kind of
 2    a complicated question.  Can you give me a
 3    scenario?
 4          Q.    Well, I guess, in your
 5    understanding as to CPD policies and the
 6    training you received from the department,
 7    have you ever been told that stop sticks can
 8    be used to prevent pursuits from becoming
 9    necessary?
10          A.    Maybe, I wouldn't say prevent.
11    I would say maybe to limit the length of the
12    pursuit, just kind of what we discussed
13    earlier.
14          Q.    Because it will slow down the
15    vehicle?
16          A.    Yeah.  I mean, the minute --
17    even if stop sticks were in front of a
18    vehicle and they accelerated, they're still
19    making the initiative to flee.
20          Q.    And then at the point that the
21    stop sticks have been used and the tires will
22    deflate, then the pursuit will take place to
23    apprehend?
24          A.    Yeah.  Yeah, if they do.  Yeah,
25    that's one of those things, too.  Everyone is
```

1    a little different on the effectiveness of,

2    you know, versus what tire.

3         Q.    When a pursuit is ongoing, if --

4    if accidents involving third-party vehicles

5    occur during that course of that pursuit,

6    does that necessitate terminating a pursuit?

7         A.    No.

8         Q.    What about near accidents, do

9    those have any effect on continuation of a

10   pursuit?

11        A.    Well, both would have an effect

12   on the totality of the circumstances in

13   determining whether or not the pursuit

14   continues.

15        Q.    Both actual accidents and near

16   accidents?

17        A.    I would say the same.

18        Q.    And what effect do they have?

19        A.    They would, you know, have to

20   weigh into whether the driving behavior or

21   the risk versus reward, like we discussed

22   earlier, whether continuing the pursuit

23   should -- should happen.

24        Q.    Okay.  Over the course of a

25   pursuit, officers are required under CPD

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    policy to report their speed, right?

2         A.    Uh-huh.

3         Q.    That's a yes?

4         A.    Yes.  Sorry.

5         Q.    And how are they supposed to do

6    that?

7         A.    Over the radio communication.

8         Q.    And who are they telling over

9    the radio?

10        A.    They are telling, obviously,

11   dispatch and for, I guess, the officer or

12   commander to take that into consideration.

13        Q.    Whoever the supervising officer

14   is?

15        A.    Yeah, that's correct.  Sorry.

16        Q.    And why is that important?  The

17   reporting of speeds, why is that important?

18        A.    So that the OIC -- or the

19   supervising officer can take that into

20   consideration.

21        Q.    And to know if the speed has

22   crossed the thresholds that are permitted

23   under the policy?

24        A.    Correct.

25        Q.    All right.  I have some

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        questions about the pursuit policy.  If you
 2        could turn in Exhibit 1 to the page stamped
 3        at the bottom GB 31.  It's page 6 of the
 4        policy.  And, actually, before I ask that,
 5        I'll ask something else.
 6                      It's true that Cincinnati Police
 7        officers have a duty to comply with
 8        Cincinnati Police policies, right?
 9             A.    Yes.
10             Q.    And Cincinnati Police officers
11        also have a duty to comply with orders from
12        their superior officers, right?
13             A.    Yes.
14             Q.    And Cincinnati officers also
15        have a duty to comply with the training
16        provided to them from the City of Cincinnati,
17        right?
18             A.    Yes.
19             Q.    Okay.  So looking at this page
20        of the policy, page 6, the pursuit policy,
21        this Notification section, do you see that in
22        Number 2 at the top of the page?
23             A.    Yes.
24             Q.    This lists a number of pieces of
25        information that a pursuing officer has to
```

1    relay over the radio, right?

2         A.    Yes.

3         Q.    And Number 5 says the reason for

4    the pursuit, right?

5         A.    Yes.

6         Q.    So that's required to be relayed

7    over the radio?

8         A.    Yes.

9         Q.    Does that include the necessity

10   of apprehending the suspect at that time?

11        A.    No, I would not think that --

12   no.  It would just be the reason for the

13   pursuit.

14        Q.    Is there any point in time in

15   which officers engaged in pursuit are

16   required to convey over the radio the

17   necessity of apprehending the suspect at that

18   time?

19        A.    No.

20        Q.    But even if they don't have to

21   say it on the radio, an officer must be able

22   to articulate the reason that the suspect has

23   to be apprehended at that time, right?

24        A.    Yes.

25        Q.    Looking at Section 3, ECC

1    Responsibilities, ECC that's the

2    communications center, right?

3            A.    Yes, Emergency Communications

4    Center.

5            Q.    That's like the central

6    dispatch?

7            A.    Yes.

8            Q.    And this section talks about a

9    pursuit OIC, right?

10           A.    Yes.

11           Q.    And in your experience, who is a

12   pursuit OIC for pursuits by Cincinnati

13   officers?

14           A.    Can you ask that another way?

15   Like --

16           Q.    Yeah.

17           A.    -- it would not be a police

18   officer.

19           Q.    It could be someone with a

20   sergeant rank or above?

21           A.    Yes.

22           Q.    And is there any particular

23   individual, in terms of your experience in

24   the department, that must become the OIC for

25   a pursuit?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1       A.    No.

2       Q.    Can the OIC include an

3    individual who is participating in a pursuit?

4       A.    I don't know.

5       Q.    Have you ever been trained on

6    the -- by the City on that?

7       A.    No.

8       Q.    I see here that in Section 3(E),

9    it says, ECC will broadcast the pursuit on

10   all available channels.  Do you see that?

11      A.    Yep.

12      Q.    In your experience, is that

13   what's actually done during pursuits in

14   Cincinnati?

15      A.    Let me read it.  Give me one

16   minute, please.

17      Q.    Sure.

18      A.    Now ask your question again.

19   I'm sorry.

20      Q.    In your experience in Cincinnati

21   Police, is that what happens, that ECC

22   broadcasts the pursuit on all available

23   channels?

24      A.    Yes, but my interpretation while

25   reading that is that all available channels

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    that the pursuit may cross into is the way I
 2    read that.
 3           Q.    Okay.  And that's based on your
 4    experience and practices in the department?
 5           A.    Yeah.
 6           Q.    That's a yes?
 7           A.    Yes.
 8           Q.    Okay.  In terms of the
 9    supervision of a pursuit conducted by
10    Cincinnati officers, that's something that
11    falls within the chain of command of the
12    Cincinnati Police Department, right?
13           A.    Yes.
14           Q.    What's a Form 34, Vehicle
15    Pursuit Report?
16           A.    I'm not familiar with it.
17           Q.    Have you ever seen one?
18           A.    Not that I recall.  It's
19    something that would be -- it would not be
20    taken -- or I would not fill it out, if that
21    makes sense.  It would be an administrative
22    piece of paperwork that I have not seen.
23           Q.    Okay.  Can you describe to me
24    what a primary unit in a pursuit is?
25           A.    The primary unit in a pursuit
```

1    would be most likely the unit that initiated

2    the pursuit.  I guess --

3         Q.    And -- I'm sorry.  Go ahead.

4         A.    -- not -- not always, but they

5    would be the unit that has the most direct

6    line of sight on the vehicle that's being

7    pursued and first in line, if we're

8    discussing a pursuit as being linear.

9         Q.    First in line, meaning closest

10   to the suspect vehicle?

11        A.    Closest, yes.

12        Q.    And what's a secondary unit?

13        A.    The secondary unit is there to

14   support the primary units pursuing functions.

15        Q.    And what does that mean, to

16   support pursuing functions?

17        A.    Once there is a secondary unit

18   in the pursuit, the secondary unit is

19   responsible for -- you probably could read

20   them off here, couldn't you -- but

21   responsible for keeping, you know, the

22   primary unit in sight, providing information

23   to the ECC, and then to assist the primary

24   unit with the arrest of the fleeing suspect's

25   apprehension.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    For the providing information to

2    the ECC, is that a duty of just the secondary

3    unit?

4    A.    No, not always.  Like I said

5    before, it's very, very fluid.  You know, if

6    there was a turn or something that the

7    secondary unit did not have the initial line

8    of sight on, the primary unit could provide

9    that information.

10    So they can alternate back and

11    forth.  But the secondary unit tries to do as

12    much as possible so that the primary unit can

13    focus on the pursuit itself for pursuing a

14    suspect.

15    Q.    Is it fair to say then that it's

16    a collective duty of the primary and

17    secondary unit to ensure the required

18    information is communicated to the ECC?

19    A.    Yes.

20    Q.    And so if the primary unit can't

21    or isn't doing it, for whatever reason, the

22    secondary unit should do that?

23    A.    The secondary unit's focus

24    should be doing those -- those things we

25    discussed, would be communicated to ECC.

 1           But, you know, in the nature of
 2    it, sometimes the primary unit may have a
 3    better -- they may be able to do it more
 4    efficient -- more efficiently than the
 5    secondary.
 6           Q.    In that circumstance where it's
 7    more efficient, is that typically based on
 8    the ability of the primary unit to see the
 9    suspect vehicle?
10           A.    Yes, because they have the
11    direct line of sight.
12           Q.    Okay.  And so in a circumstance
13    where the secondary unit couldn't see what
14    the suspect vehicle was doing, is it the
15    primary unit's responsibility to engage in
16    this communication with ECC?
17           A.    I'll say yes.
18           Q.    And if the secondary unit is not
19    providing the necessary communications to the
20    ECC, is it the primary unit's responsibility
21    to make sure that they convey that
22    information?
23           A.    No.
24           Q.    Does it become anyone else's
25    responsibility at that point?

```
 1              A.    Say that again.

 2              Q.    So if the secondary unit --

 3              A.    Okay.

 4              Q.    -- does not provide the required

 5      information to the ECC, I asked is that then

 6      the primary unit's responsibility to make

 7      sure that that's done?

 8              A.    I'm gonna say no.

 9              Q.    And then my follow-up question

10      from that is, if it's not the primary unit's

11      responsibility, does it become someone else's

12      responsibility to ensure that that

13      information is conveyed?

14              A.    No, it should be the

15      secondary's.

16              Q.    It should be the secondary unit?

17              A.    Yes.

18              Q.    And if they're not doing it,

19      does it become somebody else's

20      responsibility?

21              A.    No.

22              Q.    It just doesn't happen; is that

23      right?

24              A.    Yes.

25              Q.    Okay.  And that's your
```

1    understanding of practices in the department

2    based on your experience over the years?

3              A.    Yes.

4              Q.    To terminate a pursuit, that's a

5    responsibility of the primary unit, right?

6              A.    Yes.

7              Q.    And if the primary unit is not

8    terminating a pursuit that should be

9    terminated, does the secondary unit have any

10   responsibility to initiate termination?

11             A.    No.

12             Q.    Who has responsibility to

13   initiate termination in that circumstance?

14             A.    Per policy, the -- the traffic

15   pursuit can be terminated, or should be

16   terminated by, if they chose to do so, by the

17   primary unit or the OIC.

18             Q.    And if the primary unit or the

19   OIC are not terminating the pursuit that

20   should be terminated per department policies

21   and practices, does the secondary unit have

22   any responsibility for that?

23             A.    I'm not sure what you're asking.

24   Would the secondary unit overstep the policy

25   or procedure requirements?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              Q.    Let me ask it a little
 2     differently.
 3                    In your experience working with
 4     a partner over the years in terms of
 5     practices that you're aware of in a pursuit,
 6     if the OIC and the primary unit are not
 7     terminating a pursuit that, based on your
 8     understanding of the policies and practices
 9     of the department should be terminated, do
10     you, as a secondary unit, have any
11     responsibility or duties to initiate the
12     termination of the pursuit?
13              A.    I'm gonna say no.  I don't ever
14     recall a secondary unit terminating a
15     pursuit.  That's kind of a foreign question.
16     Sorry.
17              Q.    So there would be no obligation
18     if that were you in that circumstance, as the
19     secondary unit, to say on the radio, hey,
20     guys, we should terminate this pursuit?
21              A.    That's not my responsibility per
22     the policy and procedure.
23              Q.    It's just the responsibility of
24     the primary unit or the OIC?
25              A.    The secondary is there as a
```

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    support function.
 2              Q.    And that's it?
 3              A.    (Nodded head affirmatively.)
 4              Q.    That's a yes?
 5              A.    Yes.
 6              Q.    If you flip with me on the next,
 7    page 8 --
 8              A.    Yes, ma'am.
 9              Q.    -- there's a section that talks
10    about Pursuits Leaving Cincinnati, that's
11    Section F.
12                    And in Section 1, Item B, the
13    policy notes that a pursuit that takes place
14    without unreasonable delay after an offense,
15    is a circumstance that would allow officers
16    if they were to pursue outside their
17    jurisdiction and arrest even without a
18    warrant, right?
19              A.    Okay.
20              Q.    Is that correct reading?
21              A.    Yes.
22              Q.    Okay.  And so what does that
23    mean "without unreasonable delay after the
24    offense"?
25              A.    Well, I think all of these are
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    individual points.  That would be, let's say,
 2    I mean, for example, a robbery offense just
 3    occurred and there was no unreasonable delay
 4    before the suspect vehicle was spotted and
 5    then fled, you know, out of state lines -- or
 6    leaving Cincinnati.  I'm sorry.
 7         Q.    Section 4 here talks about
 8    officers pursuing felony suspects beyond
 9    state boundaries and that new jurisdictions
10    will continue the pursuit as the primary
11    unit, if available.  Do you see that?
12         A.    Yes, ma'am.
13         Q.    And what does that mean in terms
14    of your understanding of pursuit practices?
15         A.    Just same kind of concept with
16    just leaving jurisdiction because we're in
17    Ohio.  If it went into another jurisdiction,
18    once -- once their resources would become
19    available, they would take over as the
20    primary unit in the pursuit.
21         Q.    And how do you learn if they're
22    available?
23         A.    Well, you know, we don't have
24    direct radio communications with a lot of
25    that, like we discussed earlier.  So the
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   notifications go through ECC.
 2              So they would become available
 3   probably if they physically saw them and they
 4   were able to get in the vehicle pursuit and
 5   take over as the primary pursuing vehicle.
 6        Q.    Okay.  Let's go to page 9,
 7   Section H in the middle of the page on
 8   Roadblocks.
 9        A.    Yep.
10        Q.    And what's your understanding of
11   the use of roadblocks in relation to
12   pursuits?
13        A.    Yeah.  We don't set up
14   roadblocks.  The term is there, but, you
15   know, the vehicle being pursued still has to
16   have an out, so it's a means of slowing them
17   down is my understanding.
18              And it's, obviously -- it's
19   reserved for the most violent of all
20   offenses.
21        Q.    So people known to have
22   committed murder?
23        A.    A violent -- a violent felony,
24   yeah, armed murder, yeah.
25        Q.    A roadblock can be used in a
```

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      pursuit involving a person who's known to
 2      have committed murder?
 3           A.    Yes.  As the policy reads,
 4      correct.
 5           Q.    And how would that -- how would
 6      a roadblock come to be put in place in your
 7      understanding and the practices in the
 8      department?
 9           A.    Well, in 20 years, I've never
10      seen this practice.
11           Q.    Okay.  But it would
12      theoretically be a practice available if
13      the fleeing suspect --
14           A.    Yeah, as -- as the policy reads,
15      yes.
16           Q.    Yeah.  If the fleeing suspect
17      had committed murder?
18           A.    Yes.
19         (Exhibit 12 was referenced.)
20      BY MS. GREENE:
21           Q.    All right.  We can put that
22      aside for right now.  I'm just gonna show you
23      a couple other exhibits.  This was what we
24      previously marked as Plaintiffs' Exhibit 12.
25      Are you familiar with this document?
```

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Yeah.

2          Q.    And what is it?

3          A.    It's the rules and regs.

4          Q.    The Manual of Rules and

5    Regulations and Disciplinary Process for the

6    Department, right?

7          A.    Yes, ma'am.

8          Q.    And this is a set of policies

9    that you, as an officer, have an obligation

10   to comply with, right?

11         A.    Yes.

12         Q.    And it lays out disciplinary

13   processes/procedures the department uses as

14   well, correct?

15         A.    Yes.

16         Q.    And in terms of disciplinary

17   processes in the department, what is your

18   understanding of what types of policies can

19   be used as the source of discipline for an

20   officer?

21         A.    I'd say you could open up the

22   entire policy and procedure manual.

23         Q.    So policy and procedure manual

24   like, for example, where the pursuit policy

25   came from, right?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1            A.    Correct.

2            Q.    Any other policy contained in

3    that manual could be a source of discipline

4    in the department?

5            A.    Correct.

6            Q.    Is there any other type of

7    policy that you're aware of that could be a

8    source of discipline for an officer in the

9    department?

10           A.    No, not that I'm aware.

11      (Exhibit 15 was referenced.)

12   BY MS. GREENE:

13           Q.    Okay.  I'm gonna show you what

14   was previously marked as Plaintiffs'

15   Exhibit 15.  This document, are you familiar

16   with it?

17           A.    Briefly, yes.

18           Q.    This is an Investigations Manual

19   of the Cincinnati Police Department, right?

20           A.    Yes.

21           Q.    Is this manual the type of thing

22   that could be the source of discipline for an

23   officer in the department?

24           A.    I'm not certain.

25           Q.    Okay.  And --
```

Deposition of Officer Brett Thomas                      Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            A.    Most of all these piggyback off

 2      the main policy and procedure manual.  These

 3      are just more in-depth.

 4            Q.    Okay.  So in your experience,

 5      you haven't seen a manual like this used as

 6      the source of a disciplinary finding --

 7            A.    I personally -- I personally

 8      have never experienced that, no.

 9            Q.    Okay.

10            MS. GREENE:  I just want to

11      briefly address on the record with counsel,

12      and we can talk more about this later.

13            We had asked for a less redacted

14      version of this to be produced, this

15      particular Exhibit 15, and what we received

16      was actually more redacted.

17            So let's talk about that later.

18      But to the extent that anything comes up in

19      the Investigations Manual that's relevant for

20      questioning in this deposition, I'll just

21      note that we would need to reopen.  Okay.  I

22      think we are at Exhibit 30.  Does that sound

23      right to everybody?

24            MS. ALLOUCH:  Yes.

25            MR. HERZIG:  Yes.
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1              (Exhibit 30 was marked.)

2                        MS. GREENE:  I will mark this as

3      Exhibit 30.  This one is for you guys.  I

4      have one more copy of this, but it has a

5      little extra stuff on there that I'm gonna

6      pull off, if somebody else needs it.  Yeah, I

7      think I only have a witness copy and the copy

8      I gave to counsel here.

9                        But give me just one more second

10     and I'll hand this over.  We'll put an

11     electronic version in the Dropbox later as

12     well.

13     BY MS. GREENE:

14          Q.    Okay.  Officer Thomas, have you

15     seen this document before?

16          A.    Yes, ma'am.

17          Q.    And what's this?

18          A.    It's the Tactical Patrol Guide.

19          Q.    And does this constitute another

20     set of policies that you, as an officer, have

21     an obligation to comply with?

22          A.    Yes.

23          Q.    Have you ever seen a document

24     like this Tactical Patrol Guide used as a

25     source of discipline for an officer in the

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    department?

2        A.    I personally have not, no.

3        **Q.    Have you ever heard of that?**

4        A.    No.

5        **Q.    Okay.  Have you ever been**

6    **trained on this document?**

7        A.    Yes.

8        **Q.    And when was that training?**

9        A.    Ma'am, I think, like I explained

10   earlier, it's continuous.  This document is

11   updated and constantly evolving.

12       **Q.    Okay. All right.  Are there**

13   **any -- if you look at the Table of Contents**

14   **here with me, which is marked City 2791,**

15   **page 3 of this particular guide --**

16       A.    Okay.

17       **Q.    -- for the topics listed here,**

18   **which of them would be relevant to your**

19   **understanding of conducting vehicle pursuits**

20   **and attempted traffic stops in Cincinnati?**

21       A.    Which one of these 30 topics?

22       **Q.    Yeah.  And just go down the list**

23   **and name the ones that you think would be**

24   **relevant.**

25       A.    I guess the Vehicle Stop

1   Tactics.  I'd have to look to see what the

2   substance of the title is, if that makes

3   sense.

4           Q.     Sure.

5           A.     Vehicle Pursuits, of course.

6           Q.     **What about High-Risk Traffic**

7   **Stop that's between --**

8           A.     Yeah, that could be.

9           Q.     **What about Defensive Driving?**

10          A.     Vehicle Stops, Defensive Driving

11  could be applicable.

12          Q.     **Anything else you're seeing here**

13  **that would be relevant to --**

14          A.     I mean, realistically, ma'am,

15  all of these things could be relevant

16  depending on how a scenario plays out or

17  evolves.

18          Q.     **Okay.  What is Tactical**

19  **Positioning at page 6?  Do you see that topic**

20  **towards the top of the list?**

21          A.     It's -- well, do you mind if I

22  go to it?

23          Q.     **Well --**

24          A.     It doesn't exist.

25          Q.     **Yeah.**

```
 1            A.    I'm assuming since Suspect
 2    Approach is right after Tactical Positioning
 3    is probably positioning when you have a
 4    suspect stopped, like face-to-face in person,
 5    probably discusses keeping distancing and --
 6    and those things for safety.
 7            Q.    So outside of the vehicle?
 8            A.    Yeah.  I don't think that has
 9    vehicle application here.
10            Q.    Okay.  What about at Vehicle
11    Patrol Techniques, it's about halfway down
12    above Defensive Driving?
13            A.    That probably does not.  That's
14    probably -- and here's the problem of it --
15    is that black, too?
16            Q.    Yeah.
17            A.    Yeah.  My assumption with that
18    title is that it's probably about using your
19    vehicle and while patrolling a beat, whether
20    it's the pattern in which you drive around
21    certain blocks, how you use your car, you
22    know, as a tool.
23            Q.    Okay.  Are there any other
24    aspects of this Table of Contents list that
25    you would think would be relevant to pursuit
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    driving?

2         A.    Not specifically.

3         **Q.    Okay.  Thanks.  We can set that**

4    **aside.**

5              MS. GREENE:  All right.  This is

6    another thing I'm just gonna note for the

7    record, and maybe we can even resolve this

8    one while we're here, but we had previously

9    marked Exhibit 13, which was a copy of Policy

10   12.545, the Use-Of-Force Policy.  And the

11   version that we had was effective February

12   17th, '22, and we asked for production of the

13   earlier version.

14              The version we got was marked

15   attorney-eyes-only and had significant

16   redactions.  I'm just gonna ask this entire

17   policy that was applicable at the time these

18   events be produced without redactions.

19              It has been generally publically

20   available, and we just don't happen to have

21   in my office the version applicable at this

22   time.  But I'll ask that you produce --

23   reproduce that with no redactions.  We can

24   discuss that on a break as well.

25   BY MS. GREENE:

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    But what I'll ask you,

2   Officer Thomas, is the Use-Of-Force Policy in

3   effect at any given time over the course of

4   your years as an officer, you understood that

5   to apply to your policing activity, right?

6        A.    Yes.

7        Q.    And you had a duty to comply

8   with it, right?

9        A.    I'm sorry?

10       Q.    You had a duty to comply with

11  it?

12       A.    I have a duty to comply with it,

13  yes.

14       Q.    Okay.  Thank you.  Over the

15  course of your career, how many pursuits have

16  you been involved with?

17       A.    Can I make a guesstimation?

18       Q.    Sure.

19       A.    Fifteen.  That would, actually,

20  probably be too many when I think about the

21  number of years a service, so let's say ten.

22       Q.    Okay.  Somewhere around ten,

23  give or take?

24       A.    Yeah.

25       Q.    How many of those have involved

1    an accident, a vehicle accident?

2             A.    At least -- at least two, at

3    least a couple.

4             Q.    And was one of them the

5    August 7th, 2020, pursuit that we're talking

6    about --

7             A.    Yes.

8             Q.    -- today?  And you have another

9    one in mind as well?

10            A.    Yes.

11            Q.    Can you tell me about that?

12            A.    Well, I was not the primary on

13   that one either, I was the secondary, but it

14   was a wanted felon for some firearms charges,

15   I think.  And I fell into the pursuit, so I

16   have no knowledge of what led up to it, as

17   just in a support role.

18                  And within -- it was on Spring

19   Grove Avenue, within 30 seconds of me being

20   in the pursuit, it was very short-lived, the

21   vehicle lost control going around the corner

22   at a fire station at Spring Grove just south

23   of Hopple, I can't think of the name of it,

24   and the vehicle crashed into the corner of

25   a -- the Family Dollar there.  That's the one

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    main one that sticks out.
 2            Q.    Do you remember when that one
 3    happened?
 4            A.    No.  I was in Canine, so
 5    maybe -- maybe 2017 or '18.  Or it would have
 6    had -- sorry, it had to have been '18 or '19,
 7    maybe.
 8            Q.    And was anybody injured in that
 9    crash?
10            A.    Yes, some occupants of the
11    vehicle were injured.
12            Q.    The fleeing vehicle?
13            A.    The fleeing vehicle, yes.
14            Q.    Were there any fatalities?
15            A.    No.
16            Q.    And were there any injuries to
17    others beyond the people in the fleeing
18    vehicle?
19            A.    No.
20            Q.    And as you're thinking through
21    the pursuits you've been involved in over the
22    years, have any of the other pursuits
23    resulted in any fatalities?
24            A.    No.
25            Q.    Have you ever been the primary
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    unit in a pursuit?

2            A.    I have.

3            Q.    How many times?

4            A.    Just a handful, maybe four or

5    five, I don't know.

6            Q.    And then the remaining pursuits

7    you've been involved in, were you the

8    secondary unit?

9            A.    Yeah, just in a support role.

10           Q.    Did any of those other pursuits

11   involve more than two police vehicles?

12           A.    Yes.

13           Q.    And how many?

14           A.    Generally, three.

15           Q.    Meaning they involved three

16   police vehicles?

17           A.    Yes.  So -- and the ones I can

18   think of where I was in a support role,

19   were -- they would authorize a third car --

20   for a Canine car for support if the suspect

21   would flee, you know, whenever the pursuit

22   could terminate or to assist with

23   apprehension.

24           Q.    When you've been authorized to

25   join a pursuit as a Canine officer --

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1        A.    Uh-huh.

2        Q.    -- has that been for the purpose

3   of providing support if a suspect would flee?

4        A.    Yes, or -- or if they didn't

5   flee.  You know what I mean?  If they

6   decided, which has happened, they decide to

7   abruptly just stop their car, the dog can

8   still be used as a barking deterrent, or so

9   forth, to try to assist with, you know, a

10  peaceful apprehension.

11       Q.    And then in the events where a

12  suspect might flee, the dog can be used

13  either to seize the person or to smell to

14  find them?

15       A.    Yes, that's fair to say.

16       Q.    Okay.  And when you were

17  authorized to join pursuits in those

18  circumstances as a Canine Unit officer, were

19  you ever authorized to join for purposes

20  other than this Canine support?

21       A.    Well, I would -- I would join

22  the pursuit with -- yes, I would just assist

23  as a support role, if that answers the

24  question.

25       Q.    Yeah.  And tell me what does a
```

Deposition of Officer Brett Thomas                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1    support role involve?

2            A.    Well, the same things we spoke

3    about earlier.  You know, it's gonna be --

4    you know, direction of travel, those kind of

5    things.

6                  That generally would be in the

7    secondary's unit, but direction of travel to

8    assist with apprehension of the -- or assist

9    with the arrest of the suspect once the

10   pursuit, you know, does -- if it does

11   successfully terminate.

12           Q.    Okay.  And for the pursuits that

13   you've been involved in, have they all been

14   since you were in the Canine Unit?

15           A.    No.

16           Q.    Some were before?

17           A.    Uh-huh.

18           Q.    That's a yes?

19           A.    Yes, sorry.

20           Q.    How many offenses were in the

21   Canine Unit?

22           A.    I would say the one that we're

23   speaking, obviously, we're here of August,

24   probably just three total that come to mind.

25           Q.    And the other two, when did they

Deposition of Officer Brett Thomas

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    occur?

2         A.    The one that I just told you

3    about either in '18 or '19, and the other one

4    was in the same time frame, too.

5         Q.    **Have you been involved in any**

6    **pursuits since August 7th, 2020?**

7         A.    I have not.

8         Q.    **And when you were authorized to**

9    **join those pursuits that was by -- strike**

10   **that.**

11                **When you were authorized to join**

12   **a pursuit as a secondary vehicle --**

13        A.    As a secondary -- go ahead.

14        Q.    **Excuse me, secondary unit,**

15   **right, is that the way to say it?**

16        A.    No.  You can go ahead, though.

17        Q.    **Okay.  Well, how should I say**

18   **it?  What's the right terminology for the**

19   **department?**

20        A.    You wouldn't need authorization

21   to join as the secondary unit.

22        Q.    **But you would need authorization**

23   **to join in other capacities?**

24        A.    No.  I would need -- they

25   would -- you would need authorization to add

Deposition of Officer Brett Thomas                                       Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      more units than to.
 2             Q.    And that authorization comes
 3      from?
 4             A.    A supervisor that's overseeing
 5      it, yes.
 6             Q.    Okay.  All right.  In terms of
 7      the process of joining a pursuit in policies
 8      and practices of the department, how does
 9      that work?  So there's already a primary unit
10      involved and you're joining, how does it
11      work?
12             A.    You try to, obviously, get to
13      the -- pursuing the primary -- let's say
14      pursuing the suspect vehicle.  You just try
15      to get yourself in a position to fall in or
16      to become a secondary so that you can provide
17      that support.
18             Q.    Do you need to communicate with
19      anyone involved in the pursuit?
20             A.    Ideally, yes.
21             Q.    And what are you communicating?
22             A.    You'd be communicating that you
23      will become the secondary unit in the
24      pursuit.
25             Q.    Is it a notification or a
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    permission seeking?

2         A.    No, it would be a notification.

3    Permission would be like the third, like we

4    talked about a moment ago.

5         Q.    Okay.  And to join a pursuit, do

6    you need to have been involved in whatever

7    the law enforcement activity was prior to the

8    commencement of the pursuit?

9         A.    No.

10        Q.    What are the circumstances that

11   would allow an officer to join?

12        A.    That there's a primary unit in a

13   pursuit that needs assistance.

14        Q.    So if you're just on patrol and

15   you hear on the radio --

16        A.    That there's a pursuit coming

17   into your jurisdiction -- or let's say it

18   wouldn't be jurisdiction because we're all

19   the same jurisdiction, but into your area of

20   responsibility and you have no knowledge of

21   the investigation except for what's taking

22   place, yes, you're the first available unit

23   to get there to provide support to the

24   primary pursuing officer.

25        Q.    And, ideally, you'll say on the

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1    radio, I'm joining?

 2            A.    Yeah.  Yes, you would notify

 3    communications.

 4            Q.    Is that required?

 5            A.    Yes.

 6            Q.    And by communications, you mean

 7    the ECC?

 8            A.    ECC, yes.

 9            Q.    And let me ask this, it's

10    a little bit of a different topic, but --

11            A.    Okay.

12            Q.    -- I've heard this term

13    non-compliant pursuit, have you heard that

14    before?

15            A.    Non-compliant pursuit?

16            Q.    Yeah.

17            A.    Would that be after they

18    evaluate the pursuit itself?  Where did the

19    term come from, I guess is my question?

20            Q.    From the pursuit policy and

21    other CPD documents, I've seen this term

22    non-compliant pursuit.  Have you heard it in

23    the context of your work as an officer in the

24    department?

25            A.    I don't know that I've heard

 1    that term.
 2            Q.    Okay.  I was gonna ask you if
 3    you knew what it meant?
 4            A.    Well, I mean, it sounds like it
 5    makes sense if there was some violation in
 6    the pursuit.  And if during the pursuit there
 7    was a violation of the policy, to what
 8    degree, I don't know, but...
 9            Q.    Okay.  All right.  I'm want to
10    talk a little bit about your training.  We'll
11    mark this -- we can mark this Exhibit 31.
12                  THE WITNESS:  Thank you.
13        (Exhibit 31 was marked.)
14    BY MS. GREENE:
15            Q.    Officer Thomas, have you seen
16    this document before?
17            A.    I have not seen it in this
18    format, no.
19            Q.    Seen it in some other format?
20            A.    This is my personal training
21    record, correct?
22            Q.    I believe so.
23            A.    I'm just asking.  Like, I've --
24    I've only seen it on a computer at work.  The
25    format just looks different.

Deposition of Officer Brett Thomas                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Okay.  But you've seen the

2  information contained in this document

3  before?

4      A.    Yes.

5      Q.    All right.  And you've seen on a

6  computer screen.  This is a printout version,

7  right?

8      A.    Yeah.  I just meant the format

9  looked different, so...

10      Q.    Okay.  There are in this set of

11  training records for you, a few trainings I

12  just want to ask you brief questions about.

13      A.    Okay.

14      Q.    If you could turn to the page

15  that's marked at the bottom 15 of 20 or

16  City 1329.  Three lines up from the bottom

17  there is a training called Vehicle Pursuit

18  Driving 2013.  Do you see that?

19      A.    I do.

20      Q.    Do you recall that particular

21  training?

22      A.    Nope.  I don't know -- I mean,

23  was it 12 years ago?

24      Q.    It's been a while.

25      A.    Yeah.  I don't know which --

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    without have any specifics, I don't recall
 2    which training scenario that was.
 3            Q.    Okay.  Well, do you remember
 4    having a Vehicle Pursuit Training sometime
 5    around 2013 from the department?
 6            A.    Not specifically, no.
 7            Q.    Okay.  If you will turn to
 8    page 17 of 20 or City 1331 at the bottom, in
 9    the middle of that page, or just below it,
10    there's a Vehicle Pursuit Training noted from
11    November 17th, 2010.  Do you see that?
12            A.    I do.
13            Q.    And do you recall having a
14    Vehicle Pursuit Training at that time?
15            A.    Well, if I can go back earlier
16    when I said there were two that stood out,
17    I'm sure it's these two.  I just can't keep
18    order of it, you know, it's so long ago.
19            Q.    And that's fair.
20            A.    I just remember one of them was
21    at Coney Island where they were able to
22    utilize the massive parking lot to set up
23    some pursuit driving scenarios.
24                  And then another one, and I'm
25    guessing it's either of those because
```

1  they're -- you'll notice they're very short

2  in terms of course hours, it's only two

3  hours.

4          Q.     Uh-huh.

5          A.     So you would go during the

6  course of your shift to allocate people, you

7  know, to go essentially around.  So one of

8  them was there.  And the other one I believe

9  was up at the -- when Cincinnati still owned

10  the Blue Ash Airport.

11         Q.     And you had a mock pursuit

12  driving training there as well?

13         A.     Yes.

14         Q.     Okay.  If you could go to

15  page 19 of 20, or City 1333, and just a

16  little more than halfway down the page,

17  there's another Vehicle Pursuit Training

18  noted there from January 22nd, 2007.  Do you

19  see that one?

20         A.     Yeah.  And see that one actually

21  makes notes of where the location was.  So if

22  we back up even to page 18, see where that

23  one says Coney Island?

24         Q.     Yes.

25         A.     And then we go to 19, Hamilton

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    County, that would be -- that would be where

2    we were utilizing the Sheriff's Department's

3    vehicle training area.  And that wasn't -- it

4    was so long ago, I don't want to speak...

5         Q.    Okay.  But this Coney Island

6    training you remember, is that the one that

7    we see on page 18 City 1332 from

8    December 4th, 2008?

9         A.    Yeah, 2008.  Uh-huh.

10        Q.    Okay.  And then the Hamilton

11   County one, the 2007 training that we saw

12   noted on page 19, do you remember anything

13   about that?

14        A.    Yes.  I believe the county still

15   had what they called a skid car, I don't

16   know, you're probably not familiar with that,

17   but they had a vehicle that an instructor

18   riding along with you could manipulate

19   traction and so forth.

20             So it wasn't a -- there wasn't a

21   training where you were actually doing

22   scenario-based stuff in a pursuit.  It was

23   more about vehicle handling under road

24   conditions.

25        Q.    Okay.  And then these other two

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        we saw later, the 2010 and 2013 trainings, do

 2        you remember, as you sit here then, one of

 3        them was at --

 4              A.    I --

 5              Q.    -- Blue Ash Airport?

 6              A.    I believe so.

 7              Q.    And the other one, do you

 8        remember anything about?

 9              A.    No.

10              Q.    Okay.  You also had retraining

11        after this August 2020 pursuit, right?

12              A.    Yes.

13              Q.    Other than those four trainings

14        contained in the record that we're looking at

15        here, Exhibit 31, and the retraining after

16        the August 2020 pursuit, do you recall

17        receiving other Vehicle Pursuit Training from

18        the department?

19              A.    Not hands-on applicable

20        training, no.

21              Q.    And when you say "not hands-on

22        applicable training," is there some other

23        kind of training you have in mind?

24              A.    No, other than when procedure

25        updates come out, if that makes sense.
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Procedure, you know, if they come out in, you

2    know, staff notes or something like that, you

3    can always review the procedure.  But not

4    physically going to a location and performing

5    applicable driving scenarios, no.

6              MS. GREENE:  Okay.  I'm gonna

7    mark Exhibit 32.

8         (Exhibit 32 was marked.)

9              THE WITNESS:  Thank you.

10              MR. HERZIG:  Thank you.

11    BY MS. GREENE:

12         Q.    So giving you Exhibit 32, and

13    you can look at this in conjunction with

14    Exhibit 31.  We have here a document titled

15    Vehicle Pursuit Training 2007 Agenda.  It was

16    produced to us by the City.  Does this look

17    familiar to you at all?

18         A.    No.  I mean, it's been so long

19    ago.

20         Q.    We saw in your training record

21    that you had a January 22nd, 2007, Vehicle

22    Pursuit Training at Hamilton County, right?

23         A.    Yep.

24         Q.    And if you take a moment just to

25    flip through Exhibit 32, my question to you

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    will be, does this appear to be the topics --

2         A.    This is the one that aligns with

3    the date for Hamilton.

4         Q.    Yes.  And does this appear to be

5    the topics you learned during that training

6    you recall from the Hamilton County Sheriff's

7    Office location?

8         A.    Yes.

9         Q.    Okay.  Do you remember any other

10   presentation materials, handouts, videos, any

11   sort of --

12        A.    No.  The training was literally

13   done in a parking lot.  That's where all the

14   briefing and scenarios were.

15             But now that mention this, I do

16   remember we did do some -- we did some stop

17   stick deployment, which was essentially just

18   a classroom ensuring that your -- your

19   positioning wasn't exposing you too much to

20   the fleeing vehicle to where you're gonna,

21   you know, make the risk of yourself getting

22   hurt.

23        Q.    Okay.  And so then this training

24   in the parking lot, the topics we see here,

25   were they just verbally presented to you at

```
 1          that training?

 2                  A.    Yeah.  I think they had

 3          stations.

 4                  Q.    And you didn't have any handouts

 5          or, you know, PowerPoints, or anything that

 6          you saw?

 7                  A.    No.

 8                  Q.    Okay.  All right.  We can set

 9          that aside.

10                  MS. GREENE:  We're gonna mark

11          Exhibit 33.

12              (Exhibit 33 was marked.)

13                  THE WITNESS:  Thank you.

14          BY MS. GREENE:

15                  Q.    And, again, we can look at this

16          in conjunction with Exhibit 31.  And you had

17          the December 4th, 2008, training, Vehicle

18          Pursuit Training, noted on page 18 of your

19          training record.

20                  My question to you would be,

21          does this Exhibit 33 look familiar in

22          association with that training?

23                  A.    Ma'am, this has been so long ago

24          just, you know, to be brutally honest.  This

25          does line up with what I, you know, do
```

1    recall.

2            Q.    **From the Coney Island training?**

3            A.    From the location training, yes.

4            Q.    **Okay.  And was this the same**

5    **kind of structure as what we just looked at**

6    **for the county location training where you**

7    **were not in a classroom, but you were instead**

8    **in the training --**

9            A.    Yes.  You left -- you left your

10   relief for your current role or assignment on

11   patrol, and you went to this location, as it

12   says, for a two-hour block where you

13   received -- a portion of that was a briefing.

14            And then you did some

15   scenario-based training prior to heading back

16   to your tour of duty.

17            Q.    **Okay.  And you don't recall any**

18   **handouts or other presentations?**

19            A.    No, I don't.

20            Q.    **And do you remember anything**

21   **else specific about this training now that**

22   **you're looking through this training outline?**

23            A.    No, nothing specific.

24            Q.    **Okay.  The other two trainings**

25   **for pursuits that you had were the 2010 and**

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    2013.  Do you remember any presentation

2    materials, handouts, PowerPoints, anything

3    like that in those trainings?

4         A.    No.

5         Q.    Do you recall whether those were

6    also trainings on site with -- but not in a

7    classroom?

8         A.    They were on site.

9         Q.    Okay.  And they involved --

10        A.    Well, the only -- so we've

11   eliminated two of the four, correct?

12        Q.    Yes.

13        A.    Yes.  So the other one that I'm

14   thinking of was in Blue Ash.  And then the

15   fourth -- the fourth training that's on the

16   record, I do not recall where it was or what

17   the substance of the material was.

18        Q.    Okay.  All right.  We can set

19   that aside for now.

20             MS. GREENE:  Sorry, I have

21   another copy of 33.  Does anyone else need

22   it?

23   BY MS. GREENE:

24        Q.    All right.  This is a general

25   question about your understanding of your

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    duties as an officer in the department.

2              Do you, as an officer for the

3    Cincinnati Police, have a duty to do anything

4    if it becomes known to you that another

5    officer is violating Cincinnati Police

6    policies?

7         A.    Say that -- say that again.

8         Q.    Do you, as a Cincinnati officer,

9    have a duty to do anything if it becomes

10   known to you that another officer is

11   violating Cincinnati Police policies?

12        A.    As it relates to pursuits?

13        Q.    In general, period.

14        A.    Yes.

15        Q.    And what is it that you have a

16   duty to do?

17        A.    I would say make note of it,

18   depends on the scenario.

19        Q.    When you say "make note of it,"

20   what do you mean?

21        A.    Like, it would -- it would go --

22   it would not go unnoticed or undocumented.

23        Q.    Are there times when you would

24   have a duty to document that violation if you

25   became aware of it?

```
 1              A.    Yes.

 2              Q.    And what circumstances would

 3    give rise to the duty to document the

 4    violation?

 5              A.    Well, this is, like you said,

 6    very general.  And at what point would the

 7    documentation, would something be documented?

 8              Q.    Yeah.  Let me walk back.  A

 9    moment ago I think you said you would take

10    note of it, right, if there was a violation?

11              A.    Yeah, like a personal note in my

12    head.

13              Q.    So you at least would recognize

14    and acknowledge it internally in your own

15    mind, right?

16              A.    Yes.

17              Q.    And then to follow on is

18    sometimes you would have to document it,

19    right?

20              A.    Well, if it needed reported, of

21    course.

22              Q.    And so that's my question is

23    what -- what circumstances give rise to the

24    need to report a policy violation by another

25    officer?
```

Deposition of Officer Brett Thomas

Jason Laible, et al., vs. Timothy Lanter, et al.,

1       A.    I guess it would be based off

2   the scenario.  I mean, if somebody is in the

3   wrong, there is a right and wrong in certain

4   scenarios, it would need to be documented.

5       Q.    And what form would that

6   documentation take?

7       A.    I am at the lowest rank in the

8   police department, ma'am, so it would,

9   obviously, reporting to a supervisor.

10      Q.    A verbal or a written report?

11      A.    Probably verbal.

12      Q.    And to report to a supervisor,

13  how would you go about doing that?

14      A.    You would report to your direct

15  supervisor if you thought that there was an

16  act that was, you know, so egregious that it

17  went outside policy and procedure.

18      Q.    So either tell a supervisor in

19  person next time you see him, or call him up?

20      A.    Well, you would -- you would not

21  allow there to be a time delay.

22      Q.    So as soon as you're aware of

23  the violation, you would need to tell the

24  supervisor?

25      A.    I wouldn't say as soon as you're

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    aware of the violation.  It depends what

2    you're actively doing.  Do you know what I

3    mean?  If it would create more of a

4    hindrance, then no.

5         Q.    As soon as practical?

6         A.    Yeah, that's fair.

7         Q.    Okay.  And when you tell a

8    supervisor that you're aware of another

9    officer violating the department policy, do

10   you expect that supervisor to make any

11   documentation of the report?

12              MR. HERZIG:  Objection.  You can

13   answer.

14        A.    I don't -- I don't think I have

15   an answer for that.  I don't know that it

16   would be -- at that point, it would be left

17   up to that supervisor to decide how they want

18   to proceed.

19        Q.    And what's your understanding of

20   what the possibilities are for how to

21   proceed?

22        A.    I'm sure -- it would be -- it

23   could be written up and documented, of

24   course.  It could go directly to that person,

25   but we're speaking in such hypotheticals,

1       that it's...

2              Q.     And they could go have a verbal

3       counseling session with that officer

4       violating the policy, right?

5              A.     Yeah.

6              Q.     They could write an incident

7       report documenting the activity that violated

8       policy, right?

9              A.     Yes.

10             Q.     They could write some kind of

11      memo to their supervising officers as well?

12             A.     Yes, their supervisor above

13      them, correct.

14             Q.     They could complete

15      documentation that would initiate

16      disciplinary proceedings, right?

17             A.     Yes, but I'm not a supervisor so

18      I'm not really well versed in -- in how that

19      goes.

20             Q.     Understood.  Are there times

21      when you, as an officer, could become aware

22      of another officer violating policies, but

23      not have an obligation to report it to your

24      supervisor?

25             A.     No.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    And in a circumstance where law

2    enforcement activity leads to an Internal

3    investigation of some time -- some kind, you

4    would be obligated in any interview taken of

5    you to report any policy violations you're

6    aware of by other officers, right?

7         A.    Yes.

8              MR. HERZIG:  Objection.  Go

9    ahead.

10   Q.    And you, likewise, would be

11   obligated to report any policy violations

12   that you yourself committed at that time,

13   right?

14             MR. HERZIG:  Objection.

15        A.    Yes.

16   Q.    And --

17        A.    When you're -- when you're

18   speaking about going to an Internal

19   investigation, I mean, lying is not

20   acceptable, so it's a matter of business.

21   Q.    You got to tell the truth?

22        A.    Yeah, tell the truth.

23   Q.    If an Internal investigation is

24   conducted and you're asked to give an

25   interview and you participate in that

Deposition of Officer Brett Thomas                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    interview and you report conduct by yourself

2    or any other officer that could be deemed a

3    policy violation, is providing that interview

4    sufficient to satisfy your duty to report the

5    policy violation?

6            A.    By being honest about something,

7    yes.

8            Q.    And would you need to do

9    anything other than just participate in the

10   interview in that circumstance?

11           A.    What else could I do?

12           Q.    I'm just asking.  Is there

13   anything else that you would or could do?

14           A.    No.

15                 MS. GREENE:  Okay.  All right.

16   Let's go off the record for one moment.

17      (Off the record.)

18   BY MS. GREENE:

19           Q.    Okay.  We're back on the record.

20   Officer Thomas, at some point in time you

21   came to be aware of a person named

22   Mason Meyer, right?

23           A.    That's correct.

24           Q.    Can you tell me how you came to

25   be aware of him?

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    On that date, I was asked to

2  assist with an investigation that involved

3  him.

4      Q.    You're -- and who were you asked

5  by?

6      A.    I believe it was -- well, now

7  Lieutenant Lanter, but Sergeant Lanter at the

8  time.

9      Q.    And what did he ask you?

10      A.    He actually came over

11  communications requesting for any available

12  Canine.  And I don't know if I called him

13  directly or if it was, you know, to an

14  encrypted channel, we switched.

15      Q.    You say came over

16  communications, is that over the radio?

17      A.    Over the radio.  I'm sorry.

18  Yeah.

19      Q.    And where were you at the time

20  that you heard him?

21      A.    I was at our police target

22  range, which is kind of the north end.  It's

23  out of the City.

24      Q.    What were you doing there?

25      A.    I don't recall why I stopped up

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    there, to be honest with you.  That's where

2    our -- our main Canine training grounds were

3    there.  It's on the same facility.

4              So I don't recall exactly why I

5    was there, but it was near the start of my

6    shift, and so I had ran up there and just

7    happened to be there when the request came

8    over communications for an available dog.

9          Q.    And you said near the start of

10   your shift.  What time did you start working

11   that day?

12         A.    One o'clock, I believe, 1300

13   hours.

14         Q.    Okay.  So you were on shift at

15   1 p.m., and was that training center the

16   first place you went to?

17         A.    Yes, I believe so.

18         Q.    And so you heard the request for

19   available Canine officers?

20         A.    Officer.

21         Q.    Officer?

22         A.    Yes.

23         Q.    He wanted one officer?

24         A.    If I recall correctly, yes.

25         Q.    And did you respond to that

Deposition of Officer Brett Thomas

 1    **request?**

 2            A.    I did.

 3            **Q.    When he made the request, did**

 4    **he -- what other information did he provide?**

 5            A.    Well, I was told that, you know,

 6    I didn't know because I don't know

 7    Mason Meyer, but I was told that they were

 8    investigating somebody, and that -- the

 9    reason that I came into the picture was

10    because they had a -- I work second shift.

11            There was a dog that worked

12    first shift.  Mike Harper had been on standby

13    assisting, and he was in the process of --

14    the end of his tour of duty was nearing.  I

15    think it was -- he probably got off at three

16    or four.

17            So they were trying to allocate

18    and ensure that the resources were in place

19    so there wasn't a time lapse to where there

20    wasn't a dog to be utilized as a resource, if

21    needed.

22            **Q.    And did then Sergeant Lanter**

23    **say, and I'm just referring -- for the**

24    **record, I'm just gonna say Sergeant Lanter**

25    **since the records say sergeant, but --**

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          A.    Okay.  That's fine.
 2                MS. GREENE:  When I'm addressing
 3      you, Lieutenant Lanter, we'll call you
 4      lieutenant.
 5                MR. LANTER:  No worries.
 6      BY MS. GREENE:
 7          Q.    Okay.  So did Sergeant Lanter,
 8      when he came on the radio, explain those
 9      circumstances as to why he was requesting the
10      Canine officer?
11          A.    Yes.  I don't know if the
12      conversations occurred over the radio or if
13      we spoke personally, but we -- we spoke
14      directly about the investigation that they
15      were working on.
16          Q.    And what all did he tell you
17      about the context of the investigation?
18          A.    That -- and I'm kind of
19      generalizing here, of course, but that this
20      individual they were trying to successfully
21      arrest, Mason Meyer, was wanted for some
22      offenses, that the guy had claimed that he
23      was not gonna go down without a shootout with
24      the police, that he had -- you know, I was
25      told, you know, that he had active felony
```

1   warrants out of Kentucky.

2            There was also the information

3   that was most likely in the company of his

4   girlfriend.  And I apologize, I don't

5   remember her full name.  It's obviously in

6   the reports, Kristen (sic), or whatever, who

7   also had -- had warrants.

8       **Q.   With regard to Mr. Meyer's**

9   **history, was there any other information that**

10  **you learned at the time the request for the**

11  **Canine officer was made?**

12       A.   No.  I just -- what I recall is

13  that he was wanted for a shooting of some

14  sort or some kind of offensive -- you know,

15  felony offense of violence out of Kentucky,

16  and that he, obviously, was on our side of

17  the river at this time.

18       **Q.   And were you told at the time**

19  **that Mr. Meyer was imminently gonna engage in**

20  **a violent act?**

21       A.   Well, yeah, I was told when he

22  was stopped that he was going to try to

23  essentially kill law enforcement or other

24  people.

25       **Q.   And what specifically were you**

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     told about that?

2              A.     Just what I told you.

3              Q.     **No other information or context**

4     **given?**

5              A.     Yeah, it was -- yeah, it was --

6     the briefing literally involved that

7     information.  And then I was provided what we

8     call control numbers to where I'm able to

9     pull up that information on our databases in

10    our in-car computer.

11                    I just remember seeing what he

12    looked like and what she looked like, and

13    that they had active warrants.

14             Q.     **Were you provided any**

15    **information about the reliability of that,**

16    **the allegation about the shootout?**

17             A.     No.  I know nothing about --

18    like I said, I did not know anything about

19    the investigation prior to being contacted.

20             Q.     **And even as you sit here today,**

21    **do you know anything about where that**

22    **information came from?**

23             A.     Nope.

24             Q.     **Do you know anything about its**

25    **reliability?**

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    No.

2          Q.    And this alleged possibility of

3    a shootout, that was possible to occur if he

4    was stopped by police?

5          A.    It made it sound like to me that

6    it -- wherever the information came from,

7    what was relayed to me was that it was -- it

8    would happen, like Mason Meyer guaranteed

9    that this would occur.

10         Q.    If he was stopped by police?

11         A.    Yes.

12         Q.    All right.  So you mentioned a

13   briefing, did that occur over the radio?

14         A.    There was -- when I say

15   "briefing," it was just a direct

16   conversation.  So there wasn't an established

17   briefing like people sitting in this room as

18   we are today.

19         Q.    But it's a direct conversation

20   between you and Sergeant Lanter on the radio?

21         A.    I think it was on a cell phone,

22   but regardless, it was some communication

23   device, yes.

24         Q.    Okay.  So on a cell phone.  Was

25   anybody else on the call?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            A.    Nope.

 2            Q.    Just the two of you then?

 3            A.    Uh-huh.

 4            Q.    Yes?

 5            A.    Yes.

 6            Q.    And was that on a

 7   department-issued cell phone?

 8            A.    Mine wasn't, no.

 9            Q.    Your personal cell phone?

10            A.    Uh-huh.  Yes.

11            Q.    Okay.  And what about

12   Sergeant Lanter, do you know if that was a

13   personal or a department-issued phone?

14            A.    I have no idea, ma'am.

15            Q.    How many calls did you have with

16   him about this matter?

17            A.    I believe it was just the one.

18            Q.    And about how long did it last?

19            A.    Just very -- it was very brief.

20   It was, this is what we are investigating,

21   this is what we are standing by trying to

22   locate this individual.

23                 If you can respond because I was

24   obviously north and out of the City, you can

25   respond into the City and await further
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    direction.
 2              Q.    Where were you told to respond
 3    to?
 4              A.    You know, I think initially I
 5    was told to respond to somewhere in Clifton,
 6    but the information changed.  Like even
 7    before I got there, the information changed.
 8    And then I was told to respond down to
 9    River Road and essentially stage there.
10              Q.    Did you make it to the Clifton
11    area before you were told to respond to
12    River Road?
13              A.    I don't believe so.
14              Q.    In terms of the respond to River
15    Road instruction, who did that come from?
16              A.    I don't recall.
17              Q.    And do you remember how you
18    received that instruction?
19              A.    No.  At that point, I had
20    switched over to -- there was an encrypted
21    radio channel that those actively involved in
22    this investigation had been utilizing.  I
23    don't even recall which channel it would have
24    been at this time, but -- so I was monitoring
25    that.
```

Deposition of Officer Brett Thomas                      Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    And that is where I believe I
 2     received the information that -- that the
 3     suspect's potential location had changed.
 4            Q.    Okay.  This encrypted radio
 5     channel, what channel was that?
 6            A.    I just told you I don't recall,
 7     ma'am.
 8            Q.    Okay.  Sorry.
 9            A.    There's -- there's several
10     different ones that they use.
11            Q.    When you said it was being used
12     by those actively involved in the
13     investigation, who did that include?
14            A.    In terms of the officers, I'm
15     not even sure I can go through a list.  I
16     know it was a collection of some people or
17     personnel from the City's Gang Unit.
18                    A lot of the chat on the radio
19     was ATF agents.  And I believe the only
20     people, and I was -- I wasn't talking, I was
21     more listening -- but I think the only people
22     that weren't associated with either Gang or
23     ATF were just myself and Mike Harper, the
24     other Canine officer who was still on
25     standby.
```

1    Q.   Were there any Northern Kentucky

2   Drug Strike Force members on that channel?

3        A.   I'm not -- I don't know.  I

4   don't.

5        Q.   You don't remember hearing any

6   of them speak?

7        A.   I wouldn't have -- I wouldn't

8   have been familiar with them, you know, to

9   recognize that they were from a different

10   agency.

11        Q.   You knew who the individuals

12   from the CPD Gang Unit were, though?

13        A.   Generally.  You know, I couldn't

14   recognize everybody's voice.  But like I

15   said, I was obviously responding in a support

16   role and I was just monitoring, listening.  I

17   wasn't actively engaged to where I would know

18   who was actually working the case.

19        Q.   And in that support role, you

20   were responding as part of the CPD, right?

21        A.   Yes.

22        Q.   And so then you were acting

23   under CPD chain of command at that point?

24        A.   Yes.

25        Q.   Okay.  And so you heard various

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    officers on the radio who you didn't
 2    necessarily know or recognize their voices,
 3    right?
 4              A.    Correct.
 5              Q.    Were there any people you
 6    remember hearing that you did recognize who
 7    it was?
 8              A.    Other than -- I mean, I just
 9    recall maybe Kevin Broering, I shouldn't --
10    maybe Chris Vogelpohl.  There were some
11    people that, once we got down there, that
12    were doing active surveillance where they
13    believed the suspect was.
14                    So I remember their voices.  At
15    some point, you know, during it I remember
16    Sergeant Scalf's, obviously, Sergeant Lanter.
17              Q.    Okay.  So Lanter, Scalf,
18    Vogelpohl, Broering, those were CPD officers
19    that you heard on the radio?
20              A.    And -- and --
21                    MR. HERZIG:  Objection.  Go
22    ahead.
23              A.    And I recall, you know, the ATF
24    rep Frank Occhipinti.
25              Q.    Okay.  But Broering, Vogelpohl,
```

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

 1      Scalf, and Lanter, those were CPD officers?

 2                    MR. HERZIG:   Objection.

 3            A.    Yes.

 4            Q.    And then you remember hearing

 5      one ATF agent in particular?

 6            A.    Yeah.  And there were -- but

 7      I'm -- what I'm trying to explain to you is

 8      there were other voices, but individuals that

 9      I was not familiar with on a face-to-face or

10      a working relationship.

11            Q.    Okay.  So going back to your

12      first involvement, this call out of the radio

13      from then Sergeant Lanter and the phone call

14      that followed, was there any other CPD

15      personnel involved in that initial set of

16      exchanges?

17            A.    Not that I recall.

18            Q.    And do you remember talking with

19      Harper before you arrived at the Steiner

20      Avenue vicinity?

21            A.    No, not prior to.

22            Q.    Okay.  Did you talk with any

23      other CPD personnel before you arrived in the

24      Steiner Avenue vicinity?

25            A.    No.

Deposition of Officer Brett Thomas                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    What time did you start
2   listening to that encrypted radio channel?
3          A.    I don't know.  You'd have to --
4   we'd have to go back and, honestly, review
5   the timeline, but I'm gonna say two,
6   three o'clock in the afternoon.  I'm not
7   exactly sure.
8          Q.    That was after Lanter came out
9   with the request for the Canine officer?
10         A.    Yeah.  I -- I didn't switch to
11  that encrypted until the request was made for
12  a Canine officer to assist, yes.
13         Q.    That encrypted channel, had you
14  listened to it at any point earlier in the
15  day on the 7th?
16         A.    No.
17         Q.    Had you listened -- were you on
18  duty on the 6th?
19         A.    I don't know.  I had no
20  involvement with this or any knowledge of it
21  prior to the 7th.
22         Q.    Okay.  And not prior to
23  Sergeant Lanter requesting the Canine
24  officer?
25         A.    Correct.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    All right.  And then from the

2   time you first heard Sergeant Lanter to the

3   time you arrived in the vicinity of Steiner

4   Avenue, did you receive any additional

5   information about the investigation or

6   surveillance operation?

7      A.    No.

8      Q.    And you heard voices on that

9   radio channel during that interim period,

10  right?

11     A.    Correct.

12     Q.    What do you remember about what

13  they were saying?

14     A.    Well, I should say, it wasn't

15  until I got down there that I recall the

16  conversation being conclusive that they were

17  even on Steiner.  I know I was just told to

18  respond to a specific kind of block of

19  River Road.

20          The only things that stand out

21  while on Steiner was -- and I'm not sure, I

22  couldn't tell you who on the radio, whether

23  it was an ATF agent or a City Police officer,

24  I'm not sure, but they confirmed visually

25  during their convert surveillance that the

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1         target, Mr. Meyer, was there.

 2                    I believe he exited a house with

 3         a rifle case.  They were giving dialog about

 4         how he was showing the rifle case and it

 5         looked like presented the rifle as if he was,

 6         you know, showing other people outside it.

 7                    And that the rifle, I recall the

 8         rifle was eventually placed in the car that

 9         was eventually pursued -- the rifle case.

10         Sorry.

11              Q.    Okay.  Do you remember any other

12         information?

13              A.    That the girl was there also.

14         They identified that, you know, the female

15         party that they thought would be in the -- in

16         his company or be accompanied by was also

17         confirmed to be there on Steiner.

18              Q.    Okay.  Anything else you

19         remember?

20              A.    No.

21              Q.    And that was as you were making

22         your way to River Road or after you were

23         there?

24              A.    No.  I think -- I think that's

25         when I -- I think I was on scene.  I was on
```

Deposition of Officer Brett Thomas                                      Jason Laible, et al., vs. Timothy Lanter, et al.,

1    scene for a very short period of time.  It

2    was not long after that I went on scene there

3    that this information got relayed over the

4    radio.

5         Q.    Do you remember exactly where on

6    River Road you had responded to?

7         A.    No.  It was a parking lot.  I'd

8    have to look at a map.  I don't even know if

9    it still exists down there because they've

10   done so much construction.  There was a small

11   parking lot on the north side of River Road

12   east of Steiner.

13        Q.    Okay.  Do you remember

14   whether -- well, let me ask another question.

15   Were you in a marked vehicle?

16        A.    Yes.

17        Q.    And you were in uniform?

18        A.    Yes.

19        Q.    You had your Canine officer with

20   you?

21        A.    Uh-huh.

22        Q.    Yes?

23        A.    Yes.

24        Q.    And what's the name of your

25   canine?

```
 1              A.    Drago.

 2              Q.    And so you and Drago, you're in

 3    your cruiser in a parking lot, right?

 4              A.    It was like a pull-off area, not

 5    necessarily an established parking lot, if

 6    that makes sense.

 7              Q.    Were there any other police

 8    vehicles near you?

 9              A.    Yes.  So when I got there,

10    Mike Harper was already there, and I believe

11    Sergeant Lanter was there.

12              Q.    Anybody else?

13              A.    No.

14              Q.    Did anyone else arrive there

15    before you departed that location?

16              A.    Not that I recall.

17              Q.    And about how long were you

18    there before you heard this chatter about the

19    rifle case?

20              A.    Like, just several minutes, just

21    a few minutes.  It was like literally right

22    after I arrived.  I just went and had a short

23    conversation with Officer --

24    Specialist Harper, who reiterated the same

25    information that Sergeant Lanter had.
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              It was very brief, but it was
 2      this is the subject, this is the target, his
 3      girlfriend.  They both have active warrants
 4      and, you know, the intel that I told you that
 5      was passed along about him wanting or him
 6      saying he would shootout the police and
 7      others if stopped.
 8              Q.    And did Harper tell you anything
 9      about the source of that information?
10              A.    No.
11              Q.    Did he tell you anything about
12      the reliability of it?
13              A.    No.  I think he was like me, he
14      wasn't involved with the investigation.  He
15      was just asked -- he was asked to be there as
16      a support role.
17              Q.    So the access for both of you to
18      background information about Meyer was
19      limited?
20                    MR. HERZIG:  Objection.  You can
21      answer.
22              A.    Limited to what I could see on
23      my screen, which is just gonna show whether
24      there's active warrants and provide a
25      criminal history, so nothing in terms of
```

```
 1        intelligence.

 2               Q.    And then you're relying on what

 3        Sergeant Lanter told you about him?

 4               A.    Yes.

 5               Q.    And as far as you understood it,

 6        the same was true for Specialist Harper?

 7               A.    Where he got that information, I

 8        don't know.

 9               Q.    Okay.  I just want to kind of go

10        moment-by-moment here.  So up until the point

11        that you arrived at that River Road location

12        where Harper and Lanter are located, is there

13        any other information that you received,

14        heard, or otherwise became aware of about

15        this investigation?

16               A.    No.

17               Q.    So then you arrive, and are

18        Lanter and Harper in separate vehicles at

19        that location?

20               A.    Yes.

21               Q.    And at the River Road pull-off

22        spot, are they both, Lanter and Harper both

23        in marked vehicles?

24               A.    Yes.

25               Q.    Are they both in uniform?
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1        A.    Yes.

2        Q.    And are they speaking to each

3   other when you arrive?

4        A.    Oh, I don't recall that.

5        Q.    Tell me what you recall seeing

6   when you first pulled up.

7        A.    I just recall pulling into the

8   lot.  I think maybe I got out of my car.

9   Mike Harper got out of his car, and he just

10  reiterated the same information.

11            And then literally it was a

12  matter of just a few minutes later, Mr. Mason

13  (sic) was off the road.

14       Q.    Did Lanter come and talk to you

15  when Harper was there talking to you?

16       A.    I don't recall.

17       Q.    Do you recall talking to Lanter

18  at that pull-off location on River Road?

19       A.    No.  I know he was there, but I

20  do not recall.

21       Q.    Was there anything Harper said

22  to you at that pull off that was different

23  than what Lanter had said to you on the

24  phone?

25       A.    No.
```

1      Q.    And then you heard the chatter

2  about the gun case -- or, excuse me, the

3  rifle case?

4      A.    That's correct.

5      Q.    You guys talk about anything

6  else while you were there prior to the rifle

7  case information coming on the radio?

8      A.    No, not that I recall.

9              MS. GREENE:  All right.  I'm

10  gonna mark this batch of documents.  We are

11  on Exhibit --

12              THE COURT REPORTER:

13  Thirty-four.

14      (Exhibit 34 was marked.)

15              MS. GREENE:  -- 34.  Oh, here.

16  Sorry.  Here's a copy for you.  I'll take

17  one.  Here's some more copies, though.

18              THE WITNESS:  Thank you.

19  BY MS. GREENE:

20      Q.    Okay.  So you have in front of

21  you what's been marked as Exhibit 34.

22  Earlier you mentioned if you had a map in

23  front of you, you might be able to mark where

24  the pull-off area was.

25              Do you see that pull-off area on

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      the map you're looking at here, the first

2      page of Exhibit 34?

3              A.    No, I mean, I don't see it

4      marked.  I don't know if it was as far down

5      as the Shell or not, to be honest with you,

6      but it was -- it was east of Steiner on

7      River.

8              Q.    Okay.  So somewhere off River

9      Road between Steiner Avenue and the Shell?

10             A.    No, I said I think it was

11     somewhere around the Shell, but I'm not sure.

12     And, of course, these aren't satellite

13     images, so this really doesn't help.

14             Q.    If you flip to the second

15     page --

16             A.    Oh, there you go.

17             Q.    -- there is a satellite image

18     there.

19             A.    It might be that lot just

20     northeast of the Speedway.

21             Q.    Okay.  So the Speedway area,

22     that seems like perhaps where this pull off

23     was that you were --

24             A.    Yeah.  It was right there in

25     that vicinity, ma'am.

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    Okay.  And I'm gonna give you

2    this purple pen, unless someone has a pen

3    that might show up better on this image.

4              MS. ALLOUCH:  Is blue better?

5        Q.    Maybe.  Sorry.  Because the

6    image is so dark, but I was gonna say on that

7    second page if you would be able to just

8    circle the approximate area where the

9    pull-off was located?

10       A.    (Witness complies.)  I think it

11   was right here (indicating).  I might be

12   wrong by a hundred yards or something.

13       Q.    Okay.  But give or take a bit,

14   around that area --

15       A.    Yeah, I mean, it's similar.

16   This Shell has been in and out of business it

17   seems like for a while, so sometimes it's

18   completely vacant or -- but I think it was a

19   lot right in here.

20       Q.    Okay.  And that's where you've

21   made a circle with a purple pen, right?

22       A.    That's correct.

23       Q.    Okay.  So you're waiting in that

24   pull-off area, and then the radio traffic

25   mentions this rifle case.  What else is said

1    on the radio at that time?

2         A.    I just remember the rifle case.

3    The rifle case got placed into the vehicle,

4    and then Mr. Meyer and -- can you remind me

5    of her last name, please?

6         Q.    Johnson.

7         A.    Is it Kristen (sic) Johnson?

8         Q.    Yes.

9         A.    Okay.  And Ms. Johnson were in

10   the vehicle and the vehicle became mobile.

11        Q.    Okay.  When you heard that on

12   the radio, were you in your vehicle?

13        A.    Yes.

14        Q.    Were Harper and Lanter in their

15   vehicles?

16        A.    I -- I don't recall.

17        Q.    Did you at any point see them

18   talking with each other at that pull-off

19   location?

20        A.    Not that I recall.

21        Q.    Okay.  So you had gone back into

22   your vehicle after talking with Harper before

23   the rifle case info came -- information came

24   on?

25        A.    Ma'am, I think, like I said,

```
 1    this thing was evolving pretty quick.  It all
 2    was literally in the same several minutes.
 3    You know, so where I was standing or where he
 4    was standing, you know, I don't recall.
 5         Q.    Okay.  So what else do you hear
 6    on the radio at that point after the rifle
 7    case stuff?
 8         A.    I just recall that the vehicle
 9    became mobile and was heading towards
10    River Road.
11         Q.    And was it your understanding
12    that the vehicle was heading towards River
13    Road driving on Steiner Avenue?
14         A.    Yes.  Steiner is a one way in
15    and one way out, as far as I recall.
16         Q.    Okay.  And so it's a dead-end
17    street?
18         A.    Dead end, yeah.
19         Q.    And the only street that Steiner
20    Avenue intersects with is River Road,
21    correct?
22         A.    Yes.
23         Q.    And at that point in time, what
24    happened next?
25         A.    The car got out on River Road,
```

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    obviously heading inbound.  And I think there
 2    was some just delay with the radio traffic,
 3    this was before -- before I realized it, the
 4    car had already passed us.
 5           Q.    Okay.  So --
 6           A.    Sorry.  Or maybe I should say, I
 7    was delayed in understanding in -- you know,
 8    understanding that the car had already passed
 9    us.
10           Q.    So the car then had come down
11    Steiner and turned left onto River Road,
12    right?
13           A.    Yes.
14           Q.    And was heading in your
15    direction?
16           A.    That's correct.
17           Q.    And you said the car had already
18    passed us by the time you understood and/or
19    heard what the radio --
20           A.    Yeah, before I comprehended that
21    the car was already on River Road just
22    because of -- because of the radio
23    transmissions.  It was actually already
24    passing us on River Road.
25           Q.    At the time that you were
```

 1    hearing about it --

 2          A.    Yes.

 3          Q.    -- on its way?

 4          A.    Yes, that it was confirmed that

 5    it was on River.

 6          Q.    And was your car already -- the

 7    ignition turned on at that point?

 8          A.    I'm assuming it was.  It was

 9    August.  I got a dog in the back.

10          Q.    So the AC had to be on?

11          A.    Yeah.

12          Q.    What about Harper and Lanter,

13    were there cars like on and ready to go?

14          A.    I have no idea what the

15    condition of their vehicle was.

16          Q.    But they were still sitting in

17    that pull off with you at the point in time

18    that the suspect vehicle drove past, right?

19          A.    Well, yes.  We were still all in

20    the lot.  Sergeant Lanter was able to get

21    out.  You know, I think he, maybe, picked up

22    on what happening or evolving really quick.

23    I think he picked up on it quicker, and he

24    was able to get out of the lot, you know,

25    before I was.

1      Q.    And was Lanter the first one out

2    of the lot?

3      A.    Yes.

4      Q.    And who was -- did anyone follow

5    him?

6      A.    I was second.  Not in specific

7    order, if that makes sense.  Like, he didn't

8    pull out and I pulled out right behind him.

9    He pulled out, and then there was a delay

10   before I got out of the lot.

11     Q.    And Harper was still in the lot

12   when you pulled out?

13     A.    Yes.

14     Q.    So do you recall any of the

15   three of you, you, Harper, or Lanter, saying

16   anything on the radio at the point in time

17   that you heard the suspect vehicle is heading

18   your way?

19     A.    Do I recall anything I said?

20     Q.    Anything you, Lanter, or Harper

21   said on the radio.

22     A.    No.

23     Q.    And was there any communication

24   among the three of you, Lanter, Harper, and

25   you as you are exiting this lot?

1    A.    No.

2    Q.    So Lanter makes his way out

3    first, what do you remember -- what do you

4    remember as he's leaving the parking lot?

5    A.    Well, I got delayed.  And some

6    of that was because of I think the

7    surveilling vehicles that were doing convert

8    surveillance had fallen in behind

9    Sergeant Lanter.

10   So there was a gap, you know

11   what I mean, to where I could not be the

12   secondary if a pursuit ensued right away.

13   So -- yeah, so the vehicle went inbound

14   River Road.

15   Q.    And when you say "inbound," you

16   mean?

17   A.    Towards the city, east or

18   west -- or west to east.

19   Q.    And those surveillance vehicles,

20   who was in those?

21   A.    I don't know.

22   Q.    You couldn't tell from where you

23   were sitting?

24   A.    No.  I mean, their -- you know,

25   due to the nature of surveillance, the

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    windows are tinted and that kind of stuff.  I

2    have no idea who was operating which vehicle.

3         **Q.    Okay.  Was there any**

4    **identification of who was in which vehicle**

5    **over the radio at that point?**

6         A.    No.

7         **Q.    All right.  So do you remember**

8    **how many surveillance vehicles followed**

9    **Lanter before you were able to get out of the**

10   **pull out?**

11        A.    Yeah, I don't.  It was just a --

12   it was a spacing issue because of that.  So I

13   don't recall how many there were there.

14        **Q.    Was it ten, two, do you have any**

15   **kind of general guess?**

16        A.    No.  I mean, it was -- it

17   created enough of a gap to me getting out

18   that Sergeant Lanter, you know, they were

19   providing an update of where Mr. Meyer's

20   vehicle was.

21             And, you know, I didn't see

22   Sergeant Lanter for a while because of the

23   delay.  And, obviously, he went through some

24   intersections there that, you know, had to

25   be -- you know, took time with traffic just

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    to get through before the traffic pursuit was

2    even -- traffic pursuit was even initiated.

3            Q.    Okay.  So were you able to see

4    Lanter's vehicle at the time you became aware

5    the pursuit had been initiated?

6            A.    No.

7            Q.    All right.  So walk me through

8    what happens from the time you pull out of

9    the lot until the time you're aware a pursuit

10   is gonna be initiated?

11           A.    We pulled out of the lot.  We

12   went down River Road.  The vehicle made a

13   left going up the hill on Elberon.  I

14   believe -- and I believe that Sergeant Lanter

15   initiated or tried to initiate a traffic stop

16   on the vehicle near Mt. Hope and Elberon.

17               And the vehicle went northbound

18   Mt. Hope.  I believe -- do you have a map

19   there?  I believe he took Price.

20           Q.    I mean, and if you want to go

21   back to the first page, we have that map

22   that --

23           A.    It's got a little bit on there,

24   but not much of it.

25           Q.    Right.  So do you want to

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    identify there, if you could, with a purple

2    pen the intersection where you believe the

3    pursuit began?

4         A.    Do you want me to circle it?

5         Q.    Sure.

6         A.    (Witness complies.)

7         Q.    Okay.

8         A.    I think it's somewhere -- I

9    think he was -- I think he was going up

10   Elberon to where he finally positioned

11   himself to where he was able to initiate a --

12   or try to initiate the -- at least the lights

13   and sirens activated to initiate a stop.

14        Q.    And at the point in time that

15   Sergeant Lanter -- well, strike that.

16              Was it Sergeant Lanter who

17   indicated that he was beginning a pursuit at

18   that location?

19        A.    Yeah, he was the primary person.

20   He was essentially trying to initiate the

21   stop, which, obviously, Mason Meyer did not,

22   you know, follow that direction.

23        Q.    Did you personally observe prior

24   to the initiation of the pursuit Mason Meyer

25   commit any traffic infractions?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    No.  I never saw his car.
 2              Q.    And then at the point in time
 3      that you heard over the radio that
 4      Sergeant Lanter was attempting to effect a
 5      traffic stop, where were you?
 6              A.    I was probably just coming onto
 7      Elberon Avenue, so there was a significant
 8      spacing gap.
 9              Q.    And if you could go back to that
10      map on page 1 of Exhibit 34, you say just
11      coming onto Elberon Avenue, can you mark that
12      with a star?
13              A.    Sure.  (Witness complies.)
14              Q.    Okay.
15              A.    And, obviously, with the contour
16      of the hill and stuff here, I don't know if
17      you're familiar with area, it's very -- but
18      you can't -- there's no direct line of sight.
19              Q.    It's an uphill kind of curving
20      drive, right?
21              A.    Yeah.
22              Q.    Were the surveillance vehicles
23      in your line of sight at that time that you
24      had -- were coming onto Elberon?
25              A.    There was one.  And I don't
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    recall without watching some MVR or

2    something, there was one there that

3    eventually pulled over that was in the way,

4    and that was when I was going up Mt. Hope

5    Avenue.

6            Q.    Do you know who happened to be

7    in that vehicle?

8            A.    I have no idea.

9            Q.    Did you come to learn at any

10   point in time after the fact?

11           A.    No.

12           Q.    Did you see any of the other

13   surveillance vehicles that had followed

14   Lanter down River Road?

15           A.    Not in that stretch of it, no.

16           Q.    Based on your understanding of

17   surveillance vehicles involved in these

18   events, do you know whether they had carried

19   on behind Lanter up Elberon towards Mt. Hope?

20           A.    I'm sorry.  Can you ask that --

21           Q.    Yeah.  Do you know whether any

22   of the surveillance vehicles had turned onto

23   Elberon and toward Mt. Hope behind Lanter?

24           A.    No.  I think I told you --

25   behind Lanter, directly behind Lanter or

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    actively with Lanter?

2              Q.    Yes.

3              A.    No, I do not know.

4              Q.    And you just saw the one

5    vehicle, the one surveillance vehicle that

6    you mentioned a moment ago --

7              A.    Yes.

8              Q.    -- when you were going up to

9    Mt. Hope?  Yes?

10             A.    Yes.

11             Q.    Did you see any of the

12   surveillance vehicles that had pulled out --

13   or, sorry, that were behind Lanter when you

14   were trying to pull out at any other time

15   during the events in this pursuit?

16             A.    No, not that I could identify,

17   no.

18             Q.    Okay.  So tell me what you

19   remember hearing over the radio from the

20   point in time you pulled out of that pull off

21   to the point in time that you hear that

22   Sergeant Lanter is attempting a traffic stop?

23             A.    It was just updates on where the

24   vehicle was and the turns it was making.  I

25   don't recall if it was Sergeant Lanter or if

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    it was one of those unmarked surveillance

2    vehicles that were giving the immediate

3    updates or not.

4         Q.    And what other police activity,

5    if any, did you see in between pulling out

6    and hearing that Lanter was attempting this

7    stop?

8         A.    None -- nothing that wasn't...

9         Q.    Okay.  So you then hear that

10   Lanter was trying to effect a stop.  Tell me

11   exactly what it is that you hear.

12        A.    I heard him come over and say

13   that he was involved in a pursuit, that -- I

14   don't know if he gave -- but he essentially

15   started off with -- direction is the most

16   important thing, you know, for us.

17             Because if other responding

18   officers have no idea where you are, the

19   other things, you know, aren't immediately as

20   important, especially when you need

21   assistance.  So he provided -- sorry.  I

22   thought you were cutting me off.

23        Q.    Oh, no, no.  Go ahead.

24        A.    Yeah, so he provided his

25   location.  I remember him saying that he was

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    northbound Hawthorne and making a right onto

2    when I say inbound Warsaw, I mean eastbound.

3         Q.    Do you remember hearing anybody

4    else on the radio during that time?

5         A.    I remember -- yes.  I remember,

6    well, myself.  I came over and acknowledged

7    that I -- you know, if I was able to align

8    myself and get into the pursuit, I would be

9    the secondary, which at that time, you know,

10   was not close.

11             And I remember Scalf -- I

12   remember Sergeant Scalf, who, obviously, was

13   assigned as a TFO or liaison with the ATF,

14   came over an acknowledged that he would be

15   the OIC.

16        Q.    And were you hearing anybody

17   else?

18        A.    No.  I think that I remember

19   Sergeant Lanter being very direct, which was

20   good, but very direct in telling dispatch and

21   acknowledging or telling the other officers

22   that he didn't want to hear anybody else on

23   the radio to keep communications open.

24        Q.    And what do you understand the

25   purpose of that to be?

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        A.    Because this was a rapidly

2   evolving event, and, obviously, the

3   information that, you know, that I knew of

4   this guy, there was a good likelihood that

5   there was gonna be some level of violence,

6   you know, associated with this pursuit

7   towards us or others.

8              And, you know, we don't want to

9   have -- the problem -- the way our radios

10  work is if somebody is on the radio, you

11  can't override them.  Does that make sense?

12             So we try to limit radio

13  communications when we have something

14  actively evolving like this so that those

15  engaged in the event can have the airspace

16  they need, whether it's for help, a big

17  direction, and/or assistance.

18       **Q.    So you have to leave dead air so**

19  **that if it's necessary to communicate**

20  **something --**

21       A.    Yeah.  We try to keep

22  communication to a minimum and that only the

23  important things come over the air.

24       **Q.    And was that successful that --**

25  **keeping dead space open for officers to**

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1     communicate necessary information?

2          A.    I believe so.

3          Q.    Okay.  All right.  So when you

4     heard Lanter talk about attempting to stop,

5     can you walk me through what you remember

6     hearing about the stop up until the point of

7     hearing that there's a pursuit?

8          A.    I don't recall anything specific

9     other than, you know, I don't think he -- I

10    don't think there was a relay that I'm

11    attempting a stop.

12              I think that it just -- I think

13    he never -- Mr. Meyer never afforded that

14    opportunity.  Once he saw the lights and

15    sirens, you know, he immediately started to

16    flee.

17         Q.    And is that your understanding

18    based on what you heard on the radio?

19         A.    Yeah, that would be what I

20    would -- yes, that would be my assumption

21    based off of what I heard on the radio.

22         Q.    And then did you hear that a

23    pursuit was announced on the radio?

24         A.    Yes.

25         Q.    And tell me what you remember

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     about that?

2            A.    I think we just went over that.

3     If I -- it may be a little redundant, but so

4     I knew that he was actively in pursuit when

5     Sergeant Scalf came over and said that he

6     would be the officer in charge.

7            Q.    Okay.

8            A.    Okay.

9            Q.    So there was a Scalf statement

10    on the radio that indicated to you that there

11    was a pursuit?

12           A.    Yes.

13           Q.    All right.  So you understood,

14    though, that Lanter was the primary unit for

15    that pursuit?

16           A.    Correct.

17           Q.    And you knew that from the

18    moment Scalf said he was OIC?

19           A.    Well, I knew it from the moment

20    that he was providing radio transmissions

21    that he was in pursuit.

22           Q.    Okay.  And what do -- what do

23    you remember next?

24           A.    The pursuit went down to --

25    there's an exit off of Warsaw, it's the

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    6th Street Viaduct.  I remember

2    Sergeant Lanter asking Scalf, they were

3    communicating about if the pursuit

4    potentially went into Kentucky, whether we

5    would continue the pursuit.  And Scalf's

6    response was yes.

7              And then it was just because, as

8    we discussed earlier about kind of formations

9    in pursuits, Lanter was still the primary and

10   he was by himself, so he was providing the

11   direction of the vehicle and location.

12        Q.    So Lanter was the primary unit,

13   you said?

14        A.    Yes.

15        Q.    Do you know whether Scalf was

16   also following in the pursuit at that time?

17        A.    I have no idea.

18        Q.    As far as evaluating the factors

19   we talked about earlier during pursuits as

20   required by the policy, who did you

21   understand that responsibility to belong to

22   at that time?

23        A.    The pursuit for what, for which

24   portion of it?  I'm sorry.

25        Q.    The factors we talked about

Deposition of Officer Brett Thomas                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1    earlier about -- no, strike that.

2                Earlier we talked about various

3    factors that an officer needs to be aware of

4    during the course of a pursuit, right?

5         A.    (Nodding head affirmatively.)

6         Q.    Yes?

7         A.    Yes.

8         Q.    And at the time that this

9    pursuit had begun and Lanter was the primary

10   unit and he's by himself, who do you

11   understand to have the responsibility to be

12   aware of those factors in association with

13   the pursuit?

14        A.    Sergeant Lanter.

15        Q.    And what else do you remember

16   about radio traffic during that period of

17   time while Lanter is by himself?

18        A.    That's it.  I mean, like I said,

19   it was -- traffic was restricted for the

20   purpose we just discussed.  So he was

21   providing updated locations of Mr. Meyer's

22   vehicle.

23        Q.    And at some point in time, were

24   you eventually able to see Sergeant Lanter's

25   again?

1          A.    I was, on -- on 6th Street.

2    When I entered the 6th Street Viaduct, he was

3    off in the distance.  And they were, I guess,

4    it would be nearing kind of downtown.

5          Q.    Okay.  But in that interim

6    period from River Road to the 6th Street

7    Viaduct area, you were not actually able to

8    see Lanter's cruiser?

9          A.    No.

10          Q.    And you were not able to see

11    Meyer's car?

12          A.    No.

13          Q.    But you were following the route

14    that Lanter was communicating over the radio,

15    right?

16          A.    Correct.

17          Q.    And what do you recall about

18    that route?

19          A.    I mean, traffic was

20    exceptionally light.  The roadway was open.

21    I remember them coming down Warsaw onto

22    6th Street.  It was clear.

23                And then I think it was at

24    the -- at when I got on 6th Street is when I

25    saw him off in the distance when the -- the

1    car eventually got off, I guess it would be

2    off on the 2nd Street exit.

3          Q.    Heading into that area,

4    6th Street Viaduct to the 2nd Street Exit,

5    did the traffic conditions change?

6          A.    No.

7          Q.    Do you remember seeing other

8    vehicles on the road?

9          A.    Yeah.

10         Q.    And --

11         A.    It was -- it was just light.  It

12   was exceptionally light for what would be in

13   that portion of the highway.

14         Q.    What about the 2nd Street Exit

15   area, that -- that goes into The Banks area,

16   correct?

17         A.    Well, yeah, it goes into --

18   well, it goes into 2nd Street, yes.  Correct.

19         Q.    And what do you remember about

20   traffic on the --

21         A.    Traffic -- traffic was light

22   there, too.

23         Q.    On 2nd Street?

24         A.    Yeah.

25         Q.    Describe for me the path from

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    what intersection you entered 2nd Street and

2    what intersection --

3           A.    When I acknowledged -- I don't

4    know --

5           Q.    -- you exited 2nd Street?

6           A.    When I acknowledged that I was

7    going to be trying to take over as the

8    secondary when I caught up to the pursuit,

9    excuse me, was as we were making the -- I

10   think the exit onto 2nd Street.

11          Mr. Meyer, the first -- the

12   first light you come to there is Elm Street,

13   and he made a right there, and then a left

14   on, I want to say it's Freedom Way.  I don't

15   know if you map of that here to look at or

16   not.

17          Q.    I know that I do, but Freedom

18   Way runs right along the Ohio River, right?

19          A.    Yeah, it's the main, I guess,

20   ground-level concourse above the river basin.

21          Q.    Runs along Smale Park; is that

22   right?

23          A.    No, it doesn't.  That's Mehring.

24          Q.    Oh, that's Mehring.  Okay.  So

25   Freedom Way --

Deposition of Officer Brett Thomas                      Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Freedom Way is up above, yeah,
 2       it's by the -- the Bengals stadium.  It's
 3       not -- it's not by the park or any park.
 4              Q.    Okay.  And then Freedom Way --
 5       well, let's walk back a little bit.
 6                    So do you recall seeing any
 7       pedestrians on the road in the period of time
 8       that you pulled out of the parking lot up to
 9       the point that you get to the 6th Street
10       Viaduct and you can see Lanter off in the
11       distance?
12              A.    No.
13              Q.    How fast were you driving during
14       that stretch?
15              A.    I don't know at the time.
16              Q.    When you get to the 6th Street
17       Viaduct, you head down toward 2nd Street, do
18       you recall seeing any pedestrians there?
19              A.    Down towards 2nd Street, no.
20              Q.    Did you see any pedestrians on
21       2nd Street?
22              A.    I -- I do not recall any
23       pedestrians on 2nd Street.
24              Q.    Do you recall any pedestrians on
25       Freedom Way?
```

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          A.    I think on Freedom Way, there
 2    was somebody standing off to the right before
 3    we hit the roundabout onto the Roebling
 4    Bridge.  But as a described before, it was
 5    light, there weren't pedestrians in the
 6    roadway or anywhere else.
 7          Q.    And what do you recall about the
 8    traffic on Freedom Way to the roundabout to
 9    the Roebling Bridge?
10          A.    It was light.
11          Q.    Do you recall seeing other
12    vehicles?
13          A.    I think there were vehicles near
14    the roundabout I do recall.
15          Q.    And when you say "light," what
16    do you mean?
17          A.    Not congested, traffic was
18    flowing normally.  And that's an area, too,
19    where because of the contour in the roadway
20    or, you know, with the roundabout, and a
21    roundabout is designed to slow traffic down,
22    so nobody was moving at, you know, any crazy
23    speeds or anything like that.
24                It was -- it was very slow and
25    controlled.  And when we pulled through
```

Deposition of Officer Brett Thomas                      Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   there, I mean, I recall that I thought that
 2   everybody was well aware that we were there.
 3        Q.    What do you mean by that?
 4        A.    With lights and sirens and the
 5   vehicular traffic leading up to that
 6   roundabout is moving, you know, probably five
 7   miles an hour.
 8        Q.    And people were pulling over to
 9   get out of the way?
10        A.    Yes.  I'd say slowing to the
11   side.
12        Q.    So when you say "light," it
13   doesn't mean that there were only one or two
14   cars, does it?
15        A.    No.  Maybe it's just a statement
16   based off of experience when things are
17   congested down there.
18        Q.    And when you say "congested,"
19   we're talking about?
20        A.    Gridlock.
21        Q.    Bumper-to-bumper traffic?
22        A.    Yeah.
23        Q.    Cars just stopped in the road
24   with nowhere they can go, right?
25        A.    Uh-huh.
```

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1         Q.    That's a yes?

2         A.    Yes.

3         Q.    And so when you say "light," are

4    you describing instead just that traffic was

5    able to flow without --

6         A.    No.  I would say that it's not

7    congested.  It's not gridlocked.  There were

8    openings in the roadway.

9         Q.    Okay.

10         A.    All lanes of traffic were not,

11    you know, occupied.

12         Q.    So you said you remember seeing

13    a pedestrian somewhere down towards

14    Freedom Way, right?

15         A.    Yeah, I believe so.

16         Q.    You just remember the one?

17         A.    Yeah.  I mean, it's a -- you

18    know, it's a long time ago, but I, for some

19    reason, I believe I remember somebody just

20    standing off the right side of the sidewalk

21    near the intersection of, like, Freedom and

22    whatever it leads to that roundabout.

23         Q.    Okay.  You passed the carousal

24    on the way down there?

25         A.    Was it still there?
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    I think so.

 2          A.    Yeah.

 3          Q.    Okay.  So at the point in time

 4    that you're coming onto 2nd Street, how far

 5    behind Lanter are you?

 6          A.    At that point, I was relatively

 7    close.  I mean, I might have been 30, 40

 8    yards, obviously, adequate spacing and

 9    gapping.  But I was -- I was close enough,

10    obviously, to see him, and that was my

11    priority, was to keep him within sight.

12          Q.    So is it fair to say then that

13    from the time that you exited the pull off on

14    River Road to the point in time that you are

15    30, 40 yards behind Lanter, you were driving

16    in a way to attempt to catch up to him?

17          A.    Yes.

18          Q.    And so to do that, you had to be

19    on average going at least a little bit faster

20    than he was, right?

21          A.    Depending on his conditions,

22    yes.

23          Q.    And then once you caught up to

24    him, were you driving approximately the same

25    speeds?
```

1       A.    As Lanter?

2       Q.    **Yeah.**

3       A.    As Sergeant Lanter?  Yeah.  Like

4  I tried to explain to you, you try to keep

5  adequate safety spacing between as the

6  secondary and the primary vehicle.

7             So, yeah, we were probably

8  driving in similar speeds once I caught up

9  and was actively in the vehicle pursuit as

10 the secondary.

11      Q.    **And that adequate safety space,**

12 **about how big is that?**

13      A.    Like I just said, maybe 30,

14 40 yards.

15      Q.    **Okay.**

16      A.    Sometimes closer depending on

17 the speed.  You know, if you're doing five

18 miles an hour or ten miles an hour, you don't

19 need to be 30 yards off the bumper.

20      Q.    **But, generally speaking then,**

21 **from the point in time on 2nd Street where**

22 **you caught up 30, 40 yards behind Lanter, you**

23 **were going, for the most part, around the**

24 **same speed as Lanter?**

25      A.    Yes.

Deposition of Officer Brett Thomas
Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    Were there any times when he

2    pulled away from you and he was going faster

3    than you?

4        A.    I don't know, but that's --

5    that's hard to gauge because when we got over

6    on to -- into Kentucky, you know, Mr. Meyer's

7    driving habits were like short bursts of

8    acceleration with evasive maneuvers.

9              He was just trying to,

10   essentially, get us out of sight.  So there

11   was no long, you know, period where he was

12   really speeding.

13             So if -- you know, if I came

14   around a corner and Sergeant Lanter was

15   pulling away from me, that was because I had

16   to abruptly slow down, and then I would

17   accelerate the same.

18       Q.    Okay.  And then you said when

19   you got into Kentucky, that Meyer was trying

20   to engage in evasive driving; is that right?

21       A.    Yeah.

22       Q.    And so he was just trying to get

23   away from you guys at that stage?

24       A.    Sure.

25       Q.    Trying to drive away so that you

1    guys would have to give up the pursuit?

2        A.    Oh, I don't know what his

3    intentions were.

4        Q.    All right.  So let's go back

5    then to the roundabout towards the Roebling

6    Bridge.  How far in front of Lanter, if you

7    remember seeing it, was the suspect vehicle

8    that Meyer was in?

9        A.    I don't recall.  It was within

10   sight, you know.  That was one of the first

11   times, you know, that we were all

12   collectively together, and even I had a line

13   of sight even on the suspect vehicle.

14       Q.    Had you been able to see the

15   suspect vehicle before that roundabout?

16       A.    I had once we got off on

17   2nd Street.

18       Q.    You could see it up ahead?

19       A.    I could see it ahead, but, of

20   course, I'm focused on Lanter's vehicle and

21   not his.

22       Q.    Why's that?

23       A.    Well, because the primary

24   responsibility of the primary pursuing

25   officer is to focus on them.

```
 1              I'm focusing on Lanter to ensure

 2     that I'm following and keeping a safe

 3     distance.  And, like I said, you know, I'm

 4     there in a support role.

 5         Q.    Okay.  So you could see Meyer's

 6     vehicle on 2nd, and then could you see

 7     Meyer's vehicle on Freedom Way?

 8         A.    I'm gonna say yes, you know, but

 9     I don't recall.  I just remember those were a

10     couple quick turns that he made.

11         Q.    What do you remember about

12     Meyer's driving during that stretch on

13     2nd Street and Freedom Way?

14         A.    Nothing particularly.  I mean,

15     Lanter was, you know, obviously, following

16     him, so I didn't have, like I said, a direct

17     line of sight on his driving behavior or how

18     he was handling his vehicle or anything.  You

19     know, I couldn't see that.

20         Q.    Coming onto -- or, excuse me,

21     off of that roundabout and onto the Roebling

22     Bridge, do you remember about how far you

23     were behind Lanter?

24         A.    The same thing.  I mean, it

25     was -- all of those depending on speed is,
```

Deposition of Officer Brett Thomas                           Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    you know, it was probably within, you know,

 2    20, depending on the speed, you know, 20, 30,

 3    40 yards, so anywhere from 60 to 120 feet

 4    probably.

 5          Q.    Do you remember what your speeds

 6    were on the Roebling Bridge?

 7          A.    I do not.

 8          Q.    Do you recall anything about how

 9    you felt about the security of your control

10    of your vehicle when you were going over that

11    bridge?

12          A.    No.  I had no reservation at

13    all.

14          Q.    Do you remember at any point in

15    time up until the Roebling Bridge passage,

16    any accidents or near accidents during the

17    pursuit?

18          A.    No.

19          Q.    Do you remember any accidents or

20    near accidents on the Roebling Bridge?

21          A.    No.

22          Q.    But you could see Lanter and

23    Meyer while you were on the Roebling, right?

24          A.    Yes.

25          Q.    And when you get off on the
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    other side of the Roebling Bridge, you're

2    entering Covington, Kentucky, right?

3         A.    That's correct.

4         Q.    So let's talk until the point in

5    time that you exited the Roebling Bridge into

6    Covington.  What else do you remember about

7    radio traffic that has happened during this

8    pursuit?

9         A.    Can you repeat that from what

10   point to what point?  Sorry.

11        Q.    Well, let's just say from the

12   point in time that you are coming down the

13   6th Street Viaduct until the point in time

14   you're exiting the Roebling Bridge, what do

15   you remember about radio transmissions during

16   the pursuit?

17        A.    It was primarily, from what I

18   recall, and maybe it's just because, you

19   know, I recall what I said, but it was

20   primarily me acknowledging that I was -- you

21   know, that I had caught up and I would take

22   over radio transmit -- or transmissions.

23             And then it was a little back

24   and forth I was giving updates onto -- onto

25   Elm, onto Freedom Way towards Roebling.  And

1    then once, you know, once he was committed,

2    or the vehicle we were pursuing was committed

3    to the Roebling Bridge into Covington.

4        Q.    Okay.  Do you remember Lanter

5    saying anything over the radio during that

6    time?

7        A.    I think he confirmed at one

8    point like -- he probably just because in the

9    roundabout he realized that he was committing

10   to going onto the Roebling Bridge, he might

11   have said it before me or something, but, you

12   know, nothing significant.

13       Q.    Do you remember at any point in

14   time Lanter authorizing other vehicles to

15   join the pursuit?

16       A.    Yes, but that was farther back

17   now that I think about it.

18       Q.    Where was that?

19       A.    That was probably still up in

20   Price Hill when -- well, I think -- I don't

21   know if he requested authorized, I'm not

22   sure.  I don't recall.

23             But when I said that I'd be

24   secondary, Mike Harper also asked if he could

25   be involved in the pursuit, and that, I

1    believe, was author -- it could have been

2    authorized with Scalf.  I'm not sure.

3                One of -- somebody, a sergeant

4    of some magnitude authorized that there could

5    be a third vehicle in the pursuit, you know,

6    if we were able to get into it.

7         Q.    Okay.  Do you remember Lanter

8    authorizing anything else during the pursuit

9    up to this point in time when you all are

10   exiting into Covington?

11        A.    No.

12        Q.    And do you remember him making

13   any other requests?

14        A.    No.

15        Q.    And at this point in time, you

16   still consider him to be the primary unit,

17   right?

18        A.    Correct.

19        Q.    And he is the person responsible

20   for keeping track of all the factors relating

21   to safety of the pursuit, right?

22        A.    Correct.  He and the OIC,

23   correct.

24        Q.    And that carried on as well once

25   the pursuit was in Kentucky, right?

Deposition of Officer Brett Thomas                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Yes.

2          Q.    At any point in time based on

3     your understanding of the policy and practice

4     of the department, did any officer besides

5     Lanter become responsible for keeping track

6     of the factors indicating the safety or

7     non-safety of the pursuit?

8          A.    Did any --

9               MR. HERZIG:  Objection.  He said

10    Lanter and OIC, but go ahead.

11         A.    Yeah.  Yeah, Lanter and Sergeant

12    Scalf.

13         Q.    So both of them?

14         A.    Yes.

15         Q.    Anybody else?

16         A.    No.

17         Q.    Okay.  So entering into

18    Covington, tell me what you remember from

19    that point.

20         A.    We crossed over into Covington,

21    and I recall that we went -- there's a

22    roundabout over there, and the pursuing

23    vehicle went the wrong direction on the

24    roundabout, which Officer -- or

25    Sergeant Lanter followed, and then I followed

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    Lanter.
 2            Q.    Did anyone authorize that wrong
 3    way on the roundabout?
 4            A.    Not that I recall.
 5            Q.    Would you say Lanter implicitly
 6    authorized that wrong way in the roundabout
 7    for you?
 8            A.    No.
 9            Q.    And then what happened next?
10            A.    I'd have to look at a map of the
11    roadways over there, ma'am, just because, you
12    know, I know where Covington and Newport are,
13    but I've never lived there.
14                  I do know the roadways and that
15    kind of stuff and the names.  But we went
16    around the roundabout clear, the same thing
17    over there, and it was largely, I think, due
18    to just the COVID scare, you know, there was
19    light vehicular traffic.
20                  And so we went through the
21    roundabout about, no cars or vehicles
22    anywhere.  And I don't remember what road
23    that we went onto next.
24            Q.    Okay.  When you say light
25    traffic coming out of the roundabout, does
```

1    that mean the same thing as you described on

2    the Cincinnati side?

3          A.    There was -- there were -- there

4    was -- as I recall, there was like on the

5    Cincinnati side, because there's a roundabout

6    on each end -- now that, you know, I'm

7    thinking about it -- the Cincinnati side

8    there were a few cars that were slowed to a

9    stop as we cleared the intersection.  In

10   Covington, I don't recall a single car.

11         Q.    And then describe, and I

12   understand you don't remember all the street

13   names, but describe to me what you remember

14   about the pursuit from the roundabout coming

15   off the Roebling Bridge onward?

16         A.    It was, as I was trying describe

17   earlier when you were asking about the speed

18   or something, it was -- he was making just

19   evasive very -- he was doing a lot of

20   turning.  I think just he was probably

21   hoping, too, that we were not gonna be

22   familiar with the area, you know, to try to

23   avoid us.

24         Q.    And to get away?

25         A.    I'm sorry?

```
 1          Q.    And to get away?

 2          A.    Yes.

 3          Q.    And to avoid being stopped by

 4     the police?

 5          A.    I believe that's why he was

 6     fleeing.

 7          Q.    And during that period of time

 8     driving around on the Kentucky side of the

 9     river, you said Meyer was doing a lot of

10     turning and evasive driving?

11          A.    Uh-huh.

12          Q.    What do you recall about the

13     speeds that this pursuit was traveling at

14     that time?

15          A.    The speeds were not high.  And I

16     say that because it was -- it was a lot of

17     turns.  It was short bursts of acceleration,

18     and then he was just trying to make another

19     evasive turn to keep us -- I think he tried

20     to create a break visually so we would lose

21     sight of him.

22          Q.    Okay.  Did it work, his attempts

23     to evade and create a visual break to lose

24     sight?

25          A.    It did not.
```

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    What do you remember about radio

2   traffic from the Roebling Bridge and into

3   Covington?

4      A.    I know the traffic was open.  I

5   do recall Frank Occhipinti -- is it

6   Occhipinti?

7           MR. HERZIG:  It's Occhipinti.

8      A.    Occhipinti.  Okay.  I slaughter

9   it every time.  But I recall him having some

10  radio transmission about the suspect and

11  he -- he came over and repeated two

12  communications, I think on several occasions,

13  to ensure that we were aware that the suspect

14  was wanted for felony and he was armed.

15          And the other communications

16  between, whether it was myself or Lanter, and

17  I was doing most of the directional, you

18  know, changes, those were pretty

19  straightforward.  I don't remember anything

20  being...

21      Q.    During this period of time, down

22  into the 6th Street Viaduct, The Banks,

23  2nd Street, over the Roebling into Covington,

24  were Sergeant Lanter's requests for only

25  necessary use of the radio to leave dead

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1     space for necessary communications

2     successful?

3          A.    I believe so.

4          Q.    So there was time to communicate

5     necessary information?

6          A.    Yes.

7          Q.    And what do you remember then

8     about the pursuit?  You were describing the

9     evasive maneuvers that Meyer was attempting.

10    What else do you remember?

11         A.    That was -- I mean, that was it.

12    I mean, my focus when we got across, because

13    I told you I was not familiar -- like I've

14    been to Covington for, you know, a show or

15    something or Newport, but my focus was really

16    on trying to recognize street signage, you

17    know, while making these turns, so that I

18    could accurately communicate the

19    communications exactly where we were.

20              Because, obviously, they were in

21    the process of trying to notify Newport,

22    Kentucky that we were in their jurisdiction.

23    So my focus was mainly on just trying to

24    establish -- recognize location and establish

25    direction.

1    Q.    And do you remember hearing any

2    other specific information communicated to

3    you about the pursuit or the investigation?

4        A.    No.

5        Q.    What else do you remember about

6    the pursuit from that point on?

7        A.    The pursuit went over the

8    4th Street Bridge.  We went around a small

9    roundabout there, and then, obviously,

10   Mr. Meyer, I guess he was on 5th Street was

11   where he lost control and caused the

12   accident, the crash.

13       Q.    At the corner of 5th Street

14   Monmouth?

15       A.    Monmouth, yes.

16       Q.    That's in Newport, right?

17       A.    Yes, I think it's in Newport.  I

18   think once you go over the 4th Street Bridge

19   you're in Newport and not Covington.

20       Q.    And during that last stretch

21   from Covington through to Newport, and the

22   location of the crash, what do you remember

23   about radio transmissions at that time?

24       A.    I don't until the crash.  Once

25   we came out of that roundabout, it happened

```
 1    pretty sudden.
 2            Q.    What do you remember about the
 3    speed of the pursuit at that time, that
 4    stretch?
 5            A.    That stretch, I really don't.  I
 6    mean, I was far enough back that, you know,
 7    when the accident occurred, I was -- I might
 8    have been a city block away.  I didn't
 9    witness the accident itself.
10            Q.    What do you recall about traffic
11    conditions in Covington and Newport?
12            A.    They were the same.  There was
13    some traffic on the 4th Street Bridge.  I do
14    recall that, but it was slowed.  I think
15    mostly because there was a red light there
16    when we came around, or they were -- you
17    know, they were waiting on the bridge.
18            But the center of the bridge
19    lanes, which is where the pursuit went
20    through, was wide open.
21            Q.    Do you remember seeing any
22    pedestrians on that portion of the pursuit?
23            A.    No, I don't.
24            Q.    And do you remember how fast you
25    were driving when you were in Covington and
```

```
 1      Newport?

 2              A.    I do not.

 3              Q.    Do you know how fast anybody

 4      else in the pursuit was driving during that

 5      time?

 6              A.    I do not.

 7              Q.    At any point in time, did anyone

 8      make any communication to you that it was

 9      necessary to apprehend Mason Meyer on this

10      specific date?

11              A.    Say that again.  Let me process

12      that.

13              Q.    Did anyone prior to or during

14      the pursuit make any communication to you

15      that it was necessary to apprehend

16      Mason Meyer on this specific date,

17      August 7th, 2020?

18              A.    I don't -- no.  You know, it was

19      relayed that they wanted to apprehend him,

20      yes, but I don't know if that answer is any

21      better.

22              Q.    Yeah.  No one ever said we got

23      to get him today no matter what?

24              A.    No.  Like I said, ma'am, I -- I

25      showed up as a support -- a support role in
```

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the pursuit and to provide assistance.

2            Q.    And at any point in time, did

3    you become aware of information that

4    indicated to you it was necessary to

5    apprehend Mason Meyer on August 7th, 2020?

6            A.    No.

7            Q.    Okay.  So you said that at the

8    time of the crash, you were at least a city

9    block back; is that right?

10           A.    Approximately.

11           Q.    And could you see Meyer's car

12   leading up to the moment of the crash?

13           A.    No.  When we came out of that

14   roundabout and, you know, I -- obviously,

15   must have been to a zero or to a dead stop,

16   and I come around, all I could see was

17   Lanter's vehicle, and he was ahead of me.

18                So I went to catch up is when,

19   you know, like a block away there was just a

20   plume and then there was a radio transmission

21   from Sergeant Lanter that the vehicle had

22   crashed.

23           Q.    And the information you were

24   provided before you exited that pull-out area

25   back on River Road, was it your understanding

Deposition of Officer Brett Thomas                                      Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        that you had been told everything that was
 2        essential for you to know about this
 3        operation?
 4              A.    Essential for me to function
 5        within the operation, yes.
 6              Q.    And -- all right.  Thanks.
 7        Okay.  At any point in time, did anyone make
 8        you aware of any contingency plans in the
 9        event that attempting to apprehend
10        Mason Meyer didn't go well?
11              A.    Contingency plans, ma'am?
12              Q.    Yeah.
13              A.    No.
14              Q.    Was it your understanding that
15        if an attempted apprehension occurred and was
16        not successful, that an attempt to apprehend
17        Meyer could be made at another time?
18              A.    None of that was relayed to me.
19        I never had any discussions about any of
20        that.
21              Q.    Okay.  Do you know anything
22        about how the CPD became involved in the
23        investigation of Mason Meyer?
24              A.    No.
25              Q.    In terms of your participation
```

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    in this pursuit, you were receiving orders

2    and directions from Sergeant Lanter, right?

3         A.    Yes, well, and the OIC.

4         Q.    And who was that?

5         A.    Don Scalf.

6         Q.    And what orders or directions

7    did he give you?

8         A.    Well, he just provided the -- I

9    shouldn't say order, by order, he provided

10   the authorization to pursue over into

11   Kentucky.  I guess that would be the extent

12   of it.

13        Q.    So nothing else from Scalf other

14   than that?

15        A.    No.

16        Q.    At the time you participated in

17   this pursuit, you were doing that as a

18   Cincinnati Police officer?

19        A.    Correct.

20        Q.    Did anyone ever tell you about

21   Meyer fleeing from police about a week before

22   this?

23        A.    Not that I recall.

24        Q.    Have you at any time -- or,

25   strike that.

Deposition of Officer Brett Thomas                                     Jason Laible, et al., vs. Timothy Lanter, et al.,

1              Before or during this pursuit,
2        were you ever given the opportunity to see
3        any operational plan associated with
4        Mason Meyer?
5              A.    No.
6              Q.    Did you ever receive any orders
7        from an ATF officer during this pursuit?
8              A.    No.
9              Q.    So you're about a block or so
10       back when the crash occurred, what do you
11       remember from there?
12             A.    As I came through the
13       intersection, obviously, the crash occurred
14       on that southwest corner of 5th and Monmouth.
15       I made it through the intersection, and
16       Sergeant Lanter was exiting his vehicle.
17              The driver's side portion of the
18       fleeing vehicle was pretty heavily damaged,
19       and I could tell that Sergeant Lanter had
20       visual contact and was in direct
21       communications with the occupants that was
22       out of my, you know, view at the moment.
23              And so I came around to assist
24       him.  And when I came around the car, the --
25       Mason Meyer was, like, hanging out of the

1    front passenger seat.  The female,

2    Kristen Johnson, she was on the ground kind

3    of at the floorboard of the passenger seat.

4            And then there was a third

5    occupant that I -- the only rear occupant, a

6    male, white.  I do not even recall his name.

7    I never had any communication with him, but

8    he was partially exiting the rear passenger

9    side with the door cracked just ensuring that

10   his hands were visible.

11        Q.    Okay.  Let me actually just go

12   back briefly before we carry on from that

13   point.  At any point in time, did you hear

14   any ATF officer give any orders to

15   Sergeant Lanter?

16        A.    Over the radio?

17        Q.    Yeah.

18        A.    Well, that would have been the

19   only way.  No.

20        Q.    Okay.  And -- all right.  So

21   when you -- you said, you came around, you

22   saw Meyer, you saw Johnson, you saw this

23   other male.  Where was Lanter?

24        A.    He was off to my right.  So he

25   kind of triangulated the car a little bit.

```
1    He kind of flared out almost to a 90, and I

2    was just off of the rear passenger side

3    bumper.

4              Q.    You guys have your firearms

5    drawn?

6              A.    Yep.

7              Q.    Pointed at the individuals in

8    the suspect's vehicle.

9              A.    Yes.

10             Q.    Did you see any other people

11   around?

12             A.    Not behind them.  There were

13   some people to the right.  They were off

14   to -- you know, off the right down the

15   sidewalk.  There was nobody in their backdrop

16   or in the vehicle's backdrop.

17             Q.    Okay.  And when you said you saw

18   Meyer hanging out of the passenger side of

19   the vehicle, can you describe that to me?

20             A.    He -- I mean, he appeared that

21   he was having some kind of medical emergency.

22   The -- Ms. Johnson was saying, you know, that

23   he needed help.  That he's an epileptic.

24             I don't know.  I never had any

25   direct contact with him.  So I don't know how
```

1    long that episode lasted other than I stood

2    there until more personnel, mostly from the

3    ATF arrived, to assist with securing people.

4         Q.    And from the point in time that

5    you became aware of the crash to the point in

6    time that you stopped your vehicle, about how

7    much time transpired?

8         A.    Oh, it was five to ten seconds.

9    It was really quick.

10         Q.    And you got out of your vehicle

11    immediately upon arriving?

12         A.    Yeah.  Like I said, when I got

13    out, Sergeant Lanter was -- was already out

14    and kind of rounding the crash suspect

15    vehicle.  So I got out and ran up to assist.

16         Q.    And other law enforcement

17    arrived soon after?

18         A.    Yeah, but it might have been 30

19    plus seconds, you know, it wasn't immediate.

20         Q.    Was it your understanding that

21    they were further away, I mean, that was why

22    it took 30 seconds or more for them to

23    arrive?

24         A.    I don't -- I don't know.  I'm

25    assuming that some of that -- some of that

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    personnel was trying to parallel or, you

2    know, stay in the vicinity of the pursuit.

3              Most -- most of the vehicles

4    that showed up right away were, you know,

5    unmarked vehicles that were ATF agents.

6         Q.    Do you remember seeing any other

7    Cincinnati officers arriving after you?

8         A.    Yeah, Mike Harper, who I

9    mentioned that he was never actively involved

10   in the pursuit, but he must have been

11   following from a distance and he did show up.

12             My focus was -- was forward.  So

13   it was on the -- the three occupants of the

14   vehicle.  And I'm not sure, I know people

15   tactically weren't going to run in front of

16   my field of fire until we had them secured.

17             So who arrived and went behind

18   me, I'm not sure, but I remember seeing

19   Mike Harper there.

20        Q.    Okay.  Do you remember any other

21   CPD personnel arriving?

22        A.    There were some plainclothes

23   individuals.  I think Chris Clarkson.  And

24   then other than that, I think it was just the

25   members of that ATF, the guys -- the TFOs,

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Task Force Officers, that are assigned in the

2    ATF.

3         **Q.    Do you remember Bode showing up?**

4         A.    I don't if I recall Bode.  I

5    remember seeing Brett Stratmann.  Yeah, I

6    can't say with certainty anybody else.

7    Sorry.

8         **Q.    Okay.**

9         A.    There was -- there were multiple

10   people there, I'm sure you can see.

11        **Q.    So then you and Lanter had your**

12   **firearms drawn pointed at Meyer, Johnson, and**

13   **the other male in the vehicle.  What happens**

14   **next?**

15        A.    Assistance showed up

16   realistically.  I mean, some ATF agents

17   showed up.  I kind of went around the front

18   of the car, just to kind of look into the

19   windshield to make sure that those were the

20   only two occupants coming around.

21             And then out of my field of

22   view, because I was focused on them, a couple

23   of the ATF agents had started to bring the

24   occupants out.  I ended up kind of getting

25   handed off or focused on the female, and I

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1     handcuffed her.

2                    And the other responding

3     officers dealt with the other two males, or

4     the two males that were in their car.

5          Q.    Was it your understanding that

6     only CPD officers were -- had undertaken the

7     pursuit leading to this crash?

8                    MR. HERZIG:  Objection.  You can

9     answer.

10         A.    Yes.

11         Q.    And then -- so you took the

12    woman into custody and other officers took

13    the two men into custody.  What else do you

14    remember from there?

15         A.    I just -- I remember I was

16    putting her into custody, and just -- I had

17    her sit on the ground, and you can imagine,

18    the scene was pretty hectic and chaotic.

19                    And I her sitting on the ground

20    and stayed with her, you know, to make sure I

21    could control her movement.  And they started

22    trying to address Mr. Meyer by getting him in

23    cuffs.

24                    And they got the guy in the back

25    out.  And then I was kind of removed for a

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    short period of time because I had to go find
 2    a car to secure her in.  I, obviously,
 3    couldn't do it in my own car because I have a
 4    dog in the back.
 5         Q.    Were there any CPD supervisors
 6    on the scene that you remember?
 7         A.    Well, Scalf did arrive
 8    relatively quick, but, obviously, he was --
 9    or, I shouldn't say obviously because you're
10    asking a question, but he was in -- he was in
11    plainclothes, so he must have been operating
12    in unmarked vehicle, I'm assuming.
13               Then there were -- yeah, then
14    there were -- there were multiple, I think,
15    you know, everybody that could come across to
16    assist came.
17         Q.    Oh, everybody, meaning from CPD
18    more supervisors came?
19         A.    Yes.
20         Q.    And in terms of what you had
21    heard from Scalf during the pursuit, you
22    understood him to be a CPD officer at that
23    time, right?
24               MR. HERZIG:  Objection.  You can
25    answer.
```

 1          A.    He's CPD sworn but assigned to

 2     and also sworn as a task force officer for

 3     the ATF.

 4          Q.    In terms of any role you had in

 5     the pursuit, you understood that be part of

 6     the CPD capacity?

 7          A.    Yes.

 8          MR. HERZIG:  Objection.

 9          Q.    And in terms of your

10     understanding of the chain of command during

11     the course of the pursuit, you understood

12     that to be operating pursuant to CPD chain of

13     command, right?

14          A.    Yes.

15          Q.    Okay.  So what else do you

16     remember about the aftermath of the pursuit?

17          A.    I remember, obviously, the

18     deceased.  At -- you know, at some point

19     within a few seconds, the focus was on the

20     car.  And then you realized that they were on

21     the sidewalk.

22               You know, I was the one that

23     originally -- when I recognized that,

24     immediately requested at least three rescue

25     units because there were pedestrians that had

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    been struck.  To the extent of their

2    injuries, I had no idea at the time.

3              But we, obviously, couldn't

4    start to even address them until we made sure

5    that the people in the car were secured

6    because of the threat that they posed.  You

7    know, we still believe they posed to

8    ourselves and other people that were in the

9    vicinity.

10         Q.    Did you have any part in

11   providing any first aid or rescue measures?

12         A.    I did not.

13         Q.    Because you had Johnson in

14   custody?

15         A.    I had Johnson in custody and I

16   came back and I was present while the fire

17   department showed up.  And it was -- it was

18   obvious that the female, you know, was not --

19   there was no ability to resuscitate her.  So

20   I stood with her and eventually put a sheet

21   on her.

22         Q.    Okay.  What else do you remember

23   from the aftermath on the scene?

24         A.    Nothing else particularly.

25   Other than, you know, once things calmed

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    down, it was -- it was created, obviously, as

2    a crime scene, so we had to leave all our

3    vehicles and that kind of stuff there until

4    they could process it.

5         Q.    Did you have any participation

6    in processing of the scene?

7         A.    No, no, no.  When something

8    happens like that, that they consider a

9    critical incident, you immediately get

10   partnered up with a supervisor who is an

11   objective party, somebody that was not on

12   scene or involved in the incident, so that

13   they keep all -- all witnesses separate, you

14   know, that kind of thing.

15         So they can conduct an objective

16   interview and investigation.

17        Q.    And so this was a critical

18   incident then, right?

19        A.    Yes.

20        Q.    And you said when that happens,

21   officers are partnered with a supervisor?

22        A.    Yeah.

23        Q.    And who were you partnered with?

24        A.    My sergeant, my actual Canine

25   sergeant at the time arrived on scene, and I

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    was with him for a short duration, which was

2    Chad Richter.

3        Q.    And what did -- at what point

4    did Richter arrive on the scene based on the

5    other events you're describing?

6        A.    I don't -- I mean, it might have

7    been 15 minutes later.  They were still

8    trying to sort through -- there was a lot

9    going on, you can imagine.  It doesn't get

10   resolved in a matter of minutes.

11            The ambulance is coming, fire

12   apparatus all over the place.  A sea of

13   police cars at that point blocking the entire

14   intersection.  So it might have been 15,

15   20 minutes before my direct supervisor showed

16   up that -- that he went ahead and took me,

17   you know, to the side.

18            There's no discussion.  It's

19   just a matter of making sure that you're okay

20   and that you're, you know, just removed, I

21   guess, from the initial scene.

22        Q.    And so where did Richter remove

23   you to?

24        A.    We just -- we just hung out on

25   the side like in a parking lot off of, like,

 1    5th Street for a while.  And then at some

 2    point, and I don't know how long I had been

 3    there, I had to make arrangements -- I had to

 4    make arrangements for someone to get my

 5    personal truck and bring it down, so that I

 6    could -- because the dog didn't need to stay

 7    on scene.

 8              So once I got those arrangements

 9    met and, you know, the chief of police at

10    that time had shown up, a lot of the command

11    staff, and at some point, I remember

12    Paul Neudigate, who was the assistant chief

13    at the time came over and told me that they

14    wanted -- you know, just they wanted me to

15    just to go home until I was contacted in a

16    short bit.

17              And so Captain Doug Snider is

18    the one who gave me and -- transported me to

19    my house.

20         Q.    So prior to Captain Snider

21    transporting you to your house, did anyone

22    ask you anything about what had transpired

23    leading to this crash?

24         A.    No, just asked if you're okay.

25         Q.    And what about Captain Snider,

1    **did he ask you anything?**

2         A.    No, nothing specific about the

3    event.

4         **Q.    And in relation to the event,**

5    **then what's the next thing that happened?**

6         A.    Well, there was a big gap.  I

7    mean, if that's what you're asking.  So I

8    went home that day.  And initially, or most

9    of the time with something like that, they'll

10   give you seven days off, whether you have to

11   go speak to a psychologist or something, it's

12   usually, you know, whatever they deem

13   necessary by, I guess, someone in

14   administration.

15            It didn't happen.  But I was

16   actually off for a significant period of time

17   because that was, like I had mentioned

18   earlier about the traffic conditions and so

19   forth with COVID.

20            Doug Snider, my -- my control

21   and transport officer, three days after he

22   took me home tested positive for COVID.  So

23   then on top of my, you know, seven days of

24   critical incident leave, I had a ten-day day

25   quarantine period.  So I didn't go back to

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    work for a while.

2              Q.    Okay.  And in the meantime while

3    you were off for those 17 days --

4              A.    It wasn't 17 days, so -- it was

5    probably like 12 to 14 because there was an

6    overlap from -- I can't remember the

7    protocols there, but now when we think back,

8    it's probably hard to remember.

9                    When you had contact with

10   somebody ten days ago, and then you had from

11   that point on, so I don't recall the number

12   of days.

13             Q.    Okay.  Well, during that period

14   of time, did anyone contact you to ask you

15   questions what had happened here?

16             A.    No, not questions about what

17   happened, just random -- random coworkers,

18   like I couldn't even tell you who.  People

19   that were not involved reached out just to

20   make sure everything was all right.

21             Q.    And did you talk with any of the

22   folks about what had happened during the

23   pursuit?

24             A.    No, not the specifics.

25             Q.    In any general terms?

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        A.    I mean, other than, you know,
 2   there was a pursuit and, unfortunately, there
 3   were deceased at the end because of the
 4   suspect crashed.
 5        Q.    All right.  So then you end up
 6   back at work.  What's the next thing you
 7   remember relating to this pursuit event?
 8        A.    I don't recall -- I don't recall
 9   how quick we interviewed for Internal.  I
10   don't know if it occurred in that first two
11   weeks.  It was relatively soon.
12             They had some logistics they
13   tried to work out.  And so, essentially, they
14   made it to where we knocked some interviews
15   in the same day.  So I think I mentioned
16   earlier that when I went for my IIS
17   interview, we actually first interviewed with
18   Newport's, I think, traffic and criminal
19   investigators to -- were like a probable
20   cause hearing for them to conduct it.
21             I don't know whatever their form
22   of grand jury is in Kentucky, I don't know
23   what it's called, but we met with them and
24   then we met with the -- with the IIS
25   investigators for an interview.
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          Q.    Okay.  The Newport interview,

2    was that recorded?

3          A.    Yes.

4          Q.    Audio or video, or both?

5          A.    Yep.  I think I told you

6    earlier, I'll just remind you, but they were

7    done at Cincinnati Police headquarters in one

8    of the Internal interview rooms, which I

9    believe -- I don't work there, but I believe

10   they were both audio and video recorded.  I

11   know they can be monitored.

12         Q.    And then same is true for the

13   IIS interview, right?

14         A.    That's correct.

15         Q.    And did you do those

16   back-to-back?

17         A.    They were in the same after --

18   or same day.  I don't recall.  I don't think

19   I walked from one interview room to the next,

20   but they were in the same -- same day.

21         Q.    Okay.  Do you remember any other

22   vehicles that you knew to be law enforcement

23   vehicles in the pursuit once you were on the

24   Kentucky side of the river?

25         A.    To be involved in the pursuit --

Deposition of Officer Brett Thomas                Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        Q.    Yeah.

 2        A.    -- is that what you mean?

 3        Q.    Just in -- in following behind

 4   Lanter?

 5        A.    No.

 6        Q.    Okay.  And so going back to

 7   these interviews then, what did you

 8   understand the outcome of the Newport

 9   investigation interview to be?

10        A.    Are you asking me what the

11   outcome of my interview with Newport?

12        Q.    Yes.

13        A.    I don't know that I know of one.

14        Q.    Okay.  What do you understand

15   the purpose of the Newport interviews to be?

16        A.    I think it was a probable cause

17   hearing on determining who was at fault for

18   the death of a couple.

19        Q.    Okay.  And then what do you

20   understand the purpose of your IIS interview

21   to be?

22        A.    Mostly -- well, that too, but

23   they were administrative policy/procedure in

24   terms of, you know, that during the pursuit.

25        Q.    So the IIS interviews included
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    evaluation of whether there had been any

2    policy or procedure violations during the

3    pursuit?

4         A.    Well, the interviews were

5    conducted and then it was up to the Internal

6    investigators to determine whether there had

7    been any -- whether there had been any was

8    not discussed during the course of the

9    interview.

10        Q.    Do you believe that any of the

11   officers involved in this pursuit violated

12   Cincinnati Police Department policy?

13        A.    Yes.

14        Q.    And can you describe what those

15   violations were for me, please?

16        A.    Well, I received a violation for

17   exceeding the 20 mile-an-hour speed limit,

18   which I would contest.  That portion of it

19   occurred in that stretch when I told you that

20   I was not actively involved in the pursuit

21   yet, but I was trying to catch up to it, it

22   was on that straightaway on the 6th Street

23   Viaduct.

24             It was clear.  There was no

25   problems negotiating traffic, and I was

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    trying to put myself in a position to -- as
 2    the secondary to be a support role for
 3    Sergeant Lanter.
 4            Q.    And you said you would contest
 5    that, what do you mean?
 6            A.    Well, I think at what point am
 7    I -- am I in the pursuit.  Once we were in
 8    the pursuit -- I would say this in contrast,
 9    once we were in the pursuit, I don't believe
10    our speeds were excessive.
11            And I don't think my speed was
12    excessive getting there to provide support to
13    Sergeant Lanter.
14            Q.    Beyond the violation that you
15    were charged with that you just described, do
16    you believe there are any other violations of
17    CPD policy that occurred in the course of
18    this pursuit?
19            MR. HERZIG:  Objection to
20    charged.  You can answer.
21            A.    No.
22            Q.    Okay.  When you had your IIS
23    interview, were you told anything about what
24    it would be used for?
25            A.    No.
```

1    Q.    And --

2    A.    I mean --

3    **Q.    Sorry.  Go ahead.**

4    A.    -- for an administrative

5    evaluation.  I mean, that's the assumption,

6    but no one told me directly, you know, come

7    here and tell the truth about what occurred

8    during the scenario.

9    **Q.    Did you ever write any reports**

10   **about this event?**

11   A.    No.

12   **Q.    Did anyone ever ask you to write**

13   **any reports?**

14   A.    No.

15   **Q.    Do you find that at all unusual?**

16   A.    No.

17   **Q.    And do you know whether any of**

18   **the officers involved in the pursuit wrote**

19   **reports?**

20   A.    I do not know.

21   **Q.    Have you ever seen any reports**

22   **relating to the pursuit?**

23   A.    I have seen the IIS report.

24   **Q.    Have you seen other reports?**

25   A.    We mentioned -- we talked about

1    the Critical Incident Review Board report, I

2    saw that, that's the only two I know of that

3    exist.  That could be false, but...

4           Q.    Okay.  And did anyone instruct

5    you not to write a report about this event?

6           A.    No.  Who would I write the

7    report to, I guess?

8           Q.    What types of circumstances in

9    the course of your work as an officer lead to

10   the necessity of creating incident reports?

11          A.    Just that, it wouldn't be in

12   incident, offense reports.  Maybe I can just

13   clear this up, but generally when something

14   happens like this that another party is going

15   to be doing an investigation because there's

16   either been damage or injury, then the report

17   would be taken over by another party.

18          Q.    Meaning a supervisor?

19          A.    Yes, it could be a supervisor.

20   Just like you said, the Internal investigator

21   report was produced because of it.

22          Q.    But the officers involved don't

23   have to write their own reports?

24          A.    No, I did not write a report.

25          Q.    And that's been your experience

 1    working in the department in general with any

 2    kind of critical incident?

 3              MR. HERZIG:  Objection, but if

 4    you know, you can answer.

 5         A.    Yes.

 6         Q.    And have you been working in

 7    connection with any critical incidents that

 8    occurred other than this one?

 9         A.    Yes.  I've been present when

10    things have occurred, but never -- never one

11    that I was as closely directly involved in

12    that would warrant, you know, having seven

13    days off administrative leave like forced.

14    You know what I mean?

15         Q.    Regarding these other critical

16    incidents, have you ever had to write a

17    report?

18         A.    No.  I've been interviewed.

19         Q.    So the interview is in lieu of

20    the report --

21              MR. HERZIG:  Objection.

22         Q.    -- as far as your understanding

23    goes.

24         A.    Yeah.  Can you repeat that?  I'm

25    sorry.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Yeah.

2      A.    I missed you for a second.

3      Q.    I'll just withdraw the question.

4            Is it your understanding that

5      during any interview with the department,

6      you're required to provide all information

7      you have about the events you're being asked

8      about?

9      A.    Yeah.

10           MR. HERZIG:  Objection.

11     Q.    Okay.

12     A.    Would you not object to a break

13     sometime soon?

14           MS. GREENE:  Oh, yeah.  We can

15     go off the record.  Off the record for a

16     break.

17        (Off the record.)

18     BY MS. GREENE:

19     Q.    All right.  I've started the

20     recording again and we are back on the

21     record.  All right.  We just turned on the

22     microphone for the Zoom participants.  We're

23     back on the record.

24           For your interview with IIS, the

25     Internal Investigations, who was present

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        during that interview?

 2               A.    Just myself, Sergeant

 3        Charles Fink, and I'm trying to think who

 4        assisted him, I think it was Sergeant Fox.

 5               Q.    Did you have any union

 6        representative present?

 7               A.    I did.  I had Steve Lazarus.

 8               Q.    Did you have any counsel

 9        present?

10               A.    No.

11               Q.    For the interview, we talked

12        about --

13               A.    Oh, Steve Lazarus is counsel.

14               MR. HERZIG:  Yeah.

15               Q.    Okay.

16               A.    I'm sorry.  Just to clarify.

17               Q.    Thanks.

18               MR. HERZIG:  He was a union

19        lawyer.

20               A.    Yeah, he was my union lawyer.

21               Q.    Understood.  So you didn't have

22        like an officer union representative, did

23        you?

24               A.    No, no, no.

25               Q.    All right.  For the interview we
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    talked about earlier as the Newport

2    interview, who all was present for that?

3        A.    Myself, Steve Lazarus, and I do

4    not know the investigator's names.

5        Q.    And do you know whether that was

6    an interview by Newport City or Campbell

7    County?

8        A.    My understanding was that it was

9    Newport investigators.  I don't believe it

10   was county.

11       Q.    But your understanding was that

12   it related to possible criminal prosecution

13   relating to the accident?

14       A.    Yes, it related to -- yes,

15   prosecution since the incident ended in their

16   jurisdiction.

17       Q.    And in terms of who conducted

18   those interviews, did you understand -- or,

19   strike that.

20            In terms of who conducted that

21   interview, do you understand that person to

22   be or persons to be law enforcement officers

23   or lawyers?

24       A.    Law enforcement was my

25   understanding.

Deposition of Officer Brett Thomas                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    Okay.  Do you know whether any
 2    lawyers other than Mr. Lazarus were present?
 3          A.    No.
 4          (Exhibit 3 was referenced.)
 5    BY MS. GREENE:
 6          Q.    All right.  I'm gonna present
 7    you what was previously marked as Plaintiffs'
 8    Exhibit 3.  I'm handing that to you now.  And
 9    you've seen this document before, right?
10          A.    Yes, I've seen it prior.
11          Q.    This is the Internal
12    Investigation report, right?  Yes?
13          A.    Yes.  Sorry.
14          Q.    And I understand, based on your
15    testimony earlier, that you had challenged
16    the disciplinary determination here, but do
17    you dispute any of the facts as recited in
18    this report?
19          A.    Anywhere specific, ma'am?
20          Q.    Well, just throughout.
21          A.    The only thing in this report
22    that I can -- that I can say is factual is my
23    portion of it.  Where am I?  Towards the end,
24    maybe.
25          Q.    If you're looking for the
```

```
 1          section that describes your conduct --
 2               A.    Yeah.  I'm sorry.
 3               Q.    -- there is a summary relating
 4          to you on pages 5 to 6 of this report.  Do
 5          you see that?
 6               A.    Yes, ma'am.
 7               Q.    Is there anything in that
 8          summary that you dispute?
 9               A.    Can you give me a quick moment?
10               Q.    Sure.
11               A.    This paragraph towards the
12          bottom I had a problem with where it says
13          that I was on my way to Steiner Avenue.
14          Well, I was staging down there.  I was
15          staging on River Road.  I had just arrived,
16          but I wasn't responding to River -- I wasn't
17          responding to Steiner.
18               Q.    Okay.
19               A.    No, ma'am.
20               Q.    Okay.  And if you'll turn to
21          page 12, there's the section of report here
22          that addresses your body-worn camera, right?
23               A.    Yes, ma'am.
24               Q.    And is there any aspect of the
25          bullet point facts recited there relating to
```

1   you under that heading, Police Officer

2   Brett Thomas, EID Number 23449, Canine Squad

3   that you dispute?

4          A.    No.

5          Q.    If you'll turn to page 14,

6   there's a section relating to MVC Equipment

7   Number 09321 Police Officer Brett Thomas, the

8   EID Number 23449, Canine Squad, that relates

9   to you, right?

10         A.    Uh-huh.

11         Q.    And is there any aspect of the

12  bullet point or facts there that you dispute?

13         A.    I think we spoke earlier about

14  this, but I didn't recall seeing Lanter in

15  the distance of those two points in the first

16  bullet point.

17         Q.    Okay.  Anything else?

18         A.    No.

19         Q.    And then if you'll turn to

20  page 15, there's a Conclusion section that

21  carries on for a few pages, and you

22  previously read that before you came here

23  today, right?

24         A.    If I read this, it was not any

25  time in the recent past.

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Okay.  Well, are there any

2  facts, factual allegations as stated here in

3  the Conclusion aside from this disciplinary

4  policy violation determinations that you

5  would dispute?

6      A.    Here, let me to get to the part

7  about me.  The rest of it I can't speak to

8  accurately, obviously, especially when it

9  comes to the investigative work leading up to

10  it.

11      There is one thing that I --

12  well, I shouldn't say I dispute it, I didn't

13  know it to be accurate.  I did not know that

14  he -- that he sideswiped a car merging onto

15  2nd Street.  That wasn't something I

16  witnessed.

17      Q.    Okay.  Anything else?

18      A.    Do you want me to go ahead and

19  read the whole thing?

20      Q.    Sure.

21      A.    Okay.  (Witness complies.)  No,

22  ma'am, that's correct.

23      Q.    Okay.  Did anyone ever talk to

24  you about this IIS report after it was

25  issued?

```
 1          A.    Not after it was issued, no.
 2          Q.    Did anyone talk to you about it
 3   prior to it being issued other than being
 4   interviewed?
 5          A.    No.  Other than the interview,
 6   no.  Eventually, I guess, it came out.
 7        (Exhibit 9 was referenced.)
 8   BY MS. GREENE:
 9          Q.    Okay.  I'm going to show you
10   what was previously marked as Plaintiffs'
11   Exhibit 9.  Earlier you mentioned the CIRB
12   review of this matter, right?
13          A.    Yep.
14          Q.    And is Exhibit 9 the review by
15   the CIRB that you referenced?
16          A.    Yes.
17          Q.    And did anyone ever talk to you
18   about this review?
19          A.    No.  I just was made aware of it
20   afterwards.
21          Q.    And how did that come to be?
22          A.    I don't think I saw it until
23   there was an e-mail.  I remember this because
24   I was kind of bothered by it, I would have
25   expected that I would have been made aware to
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    at least review it.

2              But there was just an e-mail or

3    a link for -- when they do these, they do

4    them for like a full 12-month period.  So it

5    would be every incident that occurred within

6    that 12-month calendar year that is deemed a

7    critical incident.

8              The review board panel, from my

9    understanding, puts out a report.  And I

10   think I saw it collectively just in that

11   report.  So no one actually contacted me to

12   say that it was complete to review.

13        Q.    Okay.  In association with the

14   IIS review and the CIRB review, were you

15   disciplined by the department for your

16   conduct in this pursuit?

17        A.    Was I what?

18        Q.    Disciplined by the department.

19        A.    I did not receive disciplinary

20   measure.  I received a corrective measure,

21   which is the D01(A) (phonetic), it's an ESL.

22   So discipline, it wasn't discipline.

23        Q.    Okay.  What's an ESL?

24        A.    I can't remember exactly what

25   the short of it stands for.  It's like a

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    notation that something -- something occurred

2    in an event.

3                    There was a notation of a policy

4    violation.  This is the notation to mark that

5    it did occur, and it's essentially a

6    preventive measure so that you're made aware

7    of the policy violation so that it does not

8    lead to disciplinary action.

9            Q.    Like a written counseling?

10           A.    Yes.

11           Q.    Did you have any retraining as a

12   result of this event?

13           A.    Yes.

14           Q.    And what do you recall about

15   that?

16           A.    I think it was all three of us

17   that received some level of notation or

18   discipline, or corrective measure or went to

19   the police academy, myself, Mike Harper, and

20   Sergeant Lanter.  LEI Law Enforcement

21   Specialist, essentially, retired guy,

22   Randy Rendering went over the policy with us.

23                    I don't recall, I think it was a

24   PowerPoint.  So he went through the -- the

25   pursuit policy, which by that point may have

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    even changed.  And then there was some risk

 2    versus reward training.

 3            Q.    Okay.  And did you attend that

 4    at the same time --

 5            A.    It was --

 6            Q.    -- as Lanter and Harper?

 7            A.    Yes, it was all three of us

 8    together, ma'am.

 9            Q.    Okay.  Any other outcomes that

10    you are aware of from the department

11    associated with the IIS or CIRB review other

12    than that retraining and the ES -- ESL?

13            A.    No, ma'am.

14            Q.    Okay.  You were also interviewed

15    by the Citizens Complaint Authority, correct?

16            A.    I was.

17         (Exhibit 35 was marked.)

18    BY MS. GREENE:

19            Q.    And I'm gonna mark this -- we

20    are on --

21            A.    I'm sorry.  I got a pile here.

22            Q.    You have what's in front of you

23    what's been marked as Exhibit 35.  And just

24    take a quick look through those documents and

25    tell me --
```

Deposition of Officer Brett Thomas                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            A.    This is -- okay.  The first one
 2     is mine.  Sorry.  Yeah, I'll look through it
 3     real quick.
 4            Q.    But you recognize these, right?
 5            A.    Yeah.  I don't know that I
 6     remember -- remember I told you earlier I
 7     recall going there for the interview, but I
 8     don't know that I ever saw the finished
 9     report.  If I did, I just don't recall, so
10     just let me look at it real quick.
11            Q.    Okay.
12            A.    Are these just repeats?
13            Q.    Yeah.  I mean, have you seen
14     these before?
15            A.    Yeah.  I mean, I just -- I don't
16     go to CCA often.  So is there -- is there
17     a -- it's just a summary?
18            Q.    Yeah.  I'll look at that in just
19     one second.
20            A.    Okay.
21            Q.    My question to you is you were
22     noticed to appear for an interview by CCA,
23     correct?
24            A.    Yes.
25            Q.    And I see that you had a few
```

Deposition of Officer Brett Thomas                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1   notices here with interviews set for

2   different dates and times.  Do you know why

3   that was?

4          A.    They kept -- I was on nightshift

5   and they kept scheduling at the wrong time,

6   not taking that into consideration, so it

7   kept having to get rescheduled.

8          Q.    Okay.  Understood.  All right.

9   I'm gonna show you what was previously marked

10  as Plaintiffs' 8.

11         MR. HERZIG:  I think it's just

12  Exhibit 8 just for the record.

13     (Exhibit 8 was referenced.)

14  BY MS. GREENE:

15         Q.    Okay.  Here's Exhibit 8.

16         MR. HERZIG:  Just to make the

17  record clean.

18  BY MS. GREENE:

19         Q.    And Exhibit 8 is in front of you

20  now.  Have you seen this document before?

21         A.    I don't recall that I've seen

22  this.

23         Q.    Okay.

24         A.    This is a summary -- you can

25  tell me what it is.

1    Q.    Yeah.  I mean, I'll represent to

2    you that this is the Citizen Complaint

3    Authority report relating to the events at

4    issue in this matter.

5         A.    Okay.

6         Q.    But you've never seen this

7    document before today?

8         A.    I do not recall seeing this, no.

9         Q.    And have you ever had any

10   discussions with anyone at the City about

11   this report before?

12        A.    No.

13        Q.    All right.  We can go ahead and

14   set that aside.  But do you know whether the

15   CCA reached any findings relating to your

16   conduct in this -- in these events?

17        A.    No.

18        Q.    And do you know anything about

19   whether the CCA reached any findings about

20   the conduct of other officers in association

21   with these events?

22        A.    I do not.

23        Q.    And no one at the department has

24   ever talked to about CCA findings about these

25   events, right?

 1          A.    No.   If I can say, this is

 2    obviously a long time ago, but generally

 3    these will get e-mailed to you.   And I don't

 4    know if I just somehow skipped over it, but I

 5    don't -- I don't recall seeing this finished

 6    product.

 7          Q.    Okay.  And there was no --

 8          A.    And this is just the last year,

 9    so...

10          Q.    Yeah.  And there was no review

11    of this report or anything in it with any of

12    your supervisors in your chain of command,

13    right?

14          A.    No.

15          Q.    Okay.  Other than the interviews

16    that we've discussed, did you provide any

17    information to any other investigating

18    officer or unit?

19          A.    No.

20          Q.    Are you aware of any changes to

21    any CPD policy relating to the pursuit or

22    suspects following these events on August

23    7th, 2020?

24          A.    The pursuit policy has changed.

25    Now, whether it was a direct result of this

 1    pursuit, I can't say from an administrative

 2    standpoint.

 3         Q.    What's your understanding of how

 4    it's changed?

 5         A.    Well, at that time, who we were

 6    allowed to and permitted to pursue, you know,

 7    even in 2020, we could pursue offenses that

 8    were misdemeanors.

 9              Any felony was on the table for,

10    you know, to be pursued, and then it just

11    became more restrictive.  The current policy

12    does not allow misdemeanors and it has to be

13    felony or violence.

14         Q.    Okay.  Are you aware of any

15    meeting of any kind within the CPD where this

16    pursuit was discussed or analyzed?

17         A.    No.

18         Q.    And have you ever heard about

19    this pursuit being used as a training example

20    to officers in any way?

21         A.    I don't know how to answer that.

22    The only time that I've been reached out to

23    about this pursuit potentially being used was

24    more of an officer wellness scenario.

25              The supervisor, I can't think of

1    his last name, but he's not here anymore, and

2    he would do critical incident reviews and he

3    contacted me a couple years ago.

4                   It was not long before he

5    retired, and asked me if I was willing to

6    come in and speak with the recruits about the

7    scenario from, I think, more of mental health

8    and wellness perspective.

9                   I did not go.  And it wasn't

10   that I wouldn't have been happy to do it, but

11   he asked me at, like, six o'clock and it was

12   9 a.m. the next day and I had a doctor's

13   appointment.  So it was very short notice.

14          **Q.    Understood.  Are you aware of**

15   **any other gatherings of any kind by CPD**

16   **personnel where this pursuit was discussed or**

17   **analyzed?**

18          A.    No.

19          **Q.    Other than the investigations**

20   **we've looked at here in association with this**

21   **case, have you ever been the subject of any**

22   **other Internal investigation of the**

23   **department?**

24          A.    Twenty years ago in 2005 was the

25   only time I've been the subject.  And it was

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      for an off duty -- or, I was not on duty, but
 2      off duty, I was arrested for a OVI offense in
 3      October 2005.
 4              Q.     Were you convicted of that OVI?
 5              A.     Yes, I pled guilty, ma'am.
 6              Q.     Any other convictions that you
 7      have?
 8              A.     No, nothing.
 9              Q.     And have you ever discussed this
10      pursuit with now Lieutenant Lanter?
11              A.     Not the specifics of it.
12              Q.     What did you discuss with him
13      about it?
14              A.     Well, I shouldn't say not the
15      specifics, but I guess why we're here today.
16                     I mean, you know, we've
17      discussed what occurred during the pursuit
18      that, you know, Mason Meyer was a bad, bad
19      dude from, you know, the intelligence that I
20      was provided.  And that at the time, it
21      seemed to warrant pursuing him into Kentucky.
22              Q.     And what did Lieutenant Lanter
23      tell you about any reasons to pursue Meyer in
24      those discussions after the fact?
25              A.     I think he was in agreeance.
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    Did he add any facts or
2    information that you didn't know before?
3        A.    No.  No.
4        Q.    Have you ever talked to
5    Sergeant Scalf about this matter after the
6    fact?
7        A.    Not specifically.
8        Q.    Have you ever had any --
9        A.    I never really worked with Scalf
10   directly much, if that makes sense, so...
11       Q.    That's what I was gonna ask.  So
12   you've never had him as your direct
13   supervisor?
14       A.    Never.
15       Q.    Did you know Lieutenant Lanter
16   prior to this August 7th, 2020, event?
17       A.    Yeah.
18       Q.    Had you guys been in the
19   Gang Unit together?
20       A.    I don't believe so.  I think he
21   might have came -- I could be speaking wrong,
22   but if it was, it would have been a short,
23   short period of time, but I think he came to
24   the Gang Unit after I left.
25       Q.    Were you in any other units

```
 1    together?

 2            A.    No.

 3            Q.    What about Vortex or SWAT?

 4            A.    No, he's never been a member of

 5    SWAT, and Vortex was kind of before his time.

 6            Q.    Do you know each other well?

 7            A.    In passing.  It's a work

 8    relationship.  We don't hang out outside of

 9    work or anything like that.

10            Q.    Okay.  And do you know whether

11    he has any nicknames in the department?

12            A.    Nicknames?

13            Q.    Yeah.

14            A.    No.

15            Q.    Have you ever heard him called

16    Turbo?

17            A.    I actually have, yes.

18            Q.    And tell me about that.

19            A.    I mean, it's been years since I

20    heard that, but I thought Turbo was

21    associated with the fact that he's a

22    hardworking guy that never wants to quit.

23            Q.    Okay.  And who gave you that

24    information?

25            A.    Oh, I don't know, it was just an
```

 1    assumption.  It was, you know, he can stay at

 2    work all day long.

 3          Q.    Okay.  Do you remember hearing

 4    that from anyone specific?

 5          A.    No.

 6          Q.    And have you ever been involved

 7    in any deadly force incidents during your

 8    tenure at the CPD?

 9          A.    I have not.

10          Q.    Have you ever been a defendant

11    in any lawsuit during your time at the CPD

12    other than in this case?

13          A.    I have not.

14          (Exhibit 36 was marked.)

15    BY MS. GREENE:

16          Q.    I'm gonna go ahead and mark

17    Exhibit 36.

18          A.    Thank you.

19          Q.    We're just gonna look at the

20    first page of this.  Officer Thomas, are you

21    familiar with this document?

22          A.    No.  Oh, it's from 2008, that

23    could be part of the reason.

24          Q.    This document references a

25    vehicle pursuit that you were counseled for

```
 1          from 2008, right?

 2               A.    Yes.

 3               Q.    And that relates to a failure to

 4          activate your external microphone, correct?

 5               A.    Yeah.

 6               Q.    Is that your MVC or your cruiser

 7          camera?

 8               A.    They were so -- it's hard to

 9          make a comparison now to what we have

10          technology-wise.

11                    The -- the cameras were so old,

12          they did not operate like in conjunction.

13          Like, the ones we have now, you turn on the

14          sirens and the light activates, it activates

15          the audio.  These had to be both done

16          manually.

17               Q.    Okay.  But you were counseled in

18          this particular event?

19               A.    Yeah.  Apparently, I was

20          counseled for -- I don't even remember what

21          that pursuit was.

22               Q.    Is that an ESL --

23               A.    Yes.

24               Q.    -- the term counseled?

25               A.    Yes.  Yes, ma'am.
```

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.    Do you have any other discipline

2  over the course of your employment with the

3  department?

4      A.    Discipline, no.

5      Q.    Do you have any other counseling

6  or ESL-type responses from the department

7  over the course of your employment there?

8      A.    Let me just read the second one.

9  Oh, that's a commendation.  Never mind.

10      Q.    Yeah, you know, for the sake

11  of --

12      A.    No.

13      Q.    Sorry.  Go ahead.

14      A.    For -- for -- you were asking

15  discipline or notation of ESL, which one did

16  you ask?  I'm sorry.

17      Q.    Did you have any other

18  counseling or ESL-type responses from the

19  department --

20      A.    The only other one that comes to

21  mind --

22      Q.    -- over the course of your

23  career?

24      A.    -- was one time I was tardy to

25  court.

 1              MS. GREENE:  Okay.  And just for

 2      the record, I know I gave you guys two pages,

 3      but I'm just really intending to mark this

 4      first page.  Okay.  Can you guys just give us

 5      one minute off the record, please?

 6              MR. HERZIG:  Sure.

 7         (Off the record.)

 8  BY MS. GREENE:

 9         Q.    All right.  We are back on the

10  record and I have turned on the speaker for

11  our Zoom participants as well.

12              Officer Thomas, have you been

13  involved in any other vehicular accidents

14  while in a law enforcement vehicle other than

15  the events associated with this case?

16         A.    No.

17         Q.    And have you ever received any

18  other e-mails from the City about these

19  events other than the e-mail with the CIRB

20  report that you referenced earlier?

21         A.    No.

22              MS. GREENE:  Okay.  Well, then

23  in that case, I'm just gonna put briefly on

24  the record that to the extent further

25  unredacted versions of the various documents

1    that we've talked about and counsel and I

2    will talk about some more after we go off the

3    record here, to the extent those come to

4    light and there are additional questions we

5    need to ask based on the unredacted versions,

6    I reserve the right to reopen the deposition

7    for that purpose.

8                    And I'll also just note that,

9    for the record, we've talked about that we

10   will have further conversations about

11   possibly stipulating to the authenticity of

12   the various multimedia files with the

13   interviews and radio traffic featuring

14   Officer Thomas that we'll come back to that

15   as well.

16                   But other than that, as of right

17   now, I have no further questions at this

18   time.

19                   MR. PALMER:  I don't have any

20   questions.

21                   MR. HERZIG:  Yeah.  Send me an

22   e-mail about the stipulation to the other

23   things, and we'll work on it.

24                   MS. GREENE:  Sounds good.

25                   MR. HERZIG:  Nothing for me.

Deposition of Officer Brett Thomas                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Thank you.

2

3                                    _____
                                     OFFICER BRETT THOMAS

4

5

6
                              *  *  *

7
                    (DEPOSITION CONCLUDED AT 3:52 P.M.)

8
                              *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

285

```
 1                 C E R T I F I C A T E

 2
        STATE   OF   OHIO
 3                        :  SS
        COUNTY OF WARREN
 4
                    I, Stacey J. Murrin, the
 5      undersigned, a duly qualified notary public
        within and for the State of Ohio, do hereby
 6      certify that OFFICER BRETT THOMAS was by me
        first duly sworn to depose the truth and
 7      nothing but the truth; foregoing is the
        deposition given at said time and place by
 8      said witness; deposition was taken pursuant
        to stipulations hereinbefore set forth;
 9      deposition was taken by me in stenotype and
        transcribed by me by means of computer; that
10      the transcribed deposition was made available
        to the witness for examination and signature
11      and that signature may be affixed out of the
        presence of the Notary Public-Court Reporter.
12      I am neither a relative of any of the parties
        or any of their counsel; I am not, nor is the
13      court reporting firm with which I am
        affiliated, under a contract as defined in
14      Civil Rule 28(D) and have no financial
        interest in the result of this action.
15          IN WITNESS WHEREOF, I have hereunto set my
        hand and official seal of office at
16      Cincinnati, Ohio this 14th day of May, 2025.

17


18                          _____

19  My commission expires:   Stacey J. Murrin
        August 17, 2025,    Notary Public - State of Ohio
20

21

22

23

24

25
```