**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON**

| | | |
|---|---|---|
| **JASON LAIBLE,** *et al.***,** | : | **Case No. 2:21-cv-00102** |
| | : | |
| **Plaintiffs** | : | **Judge David L. Bunning** |
| | : | |
| | : | |
| | : | |
| **v.** | : | **DEFENDANTS TIMOTHY LANTER** |
| | : | **AND BRETT THOMAS'S MOTION** |
| **TIMOTHY LANTER,** *et al.***,** | : | **FOR SUMMARY JUDGMENT** |
| | : | |
| **Defendants.** | : | |

Defendants Timothy Lanter and Brett Thomas (collectively, the "Officers") move for summary judgment under Federal Rule of Civil Procedure 56. The undisputed material evidence and applicable law confirm that the Officers are entitled to qualified immunity under both Ohio and Kentucky law and are entitled to judgment as a matter of law. A memorandum of law and a proposed order accompany this motion.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig, *pro hac vice*
Chad R. Ziepfel (93903)
Spencer S. Cowan, *pro hac vice*
Kenneth A. Foisy (97478)
Elise L. Marrinan (101353)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: 513-381-2838
Fax: 513-381-0205
aherzig@taftlaw.com
cziepfel@taftlaw.com
scowan@taftlaw.com
kfoisy@taftlaw.com
emarrinan@taftlaw.com
*Counsel for Defendants City of Cincinnati,*
*Timothy Lanter, and Brett Thomas*

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON**

| | | |
|---|---|---|
| **JASON LAIBLE,** *et al.*, | : | **Case No. 2:21-cv-00102** |
| | : | |
| **Plaintiffs** | : | **Judge David L. Bunning** |
| | : | |
| | : | |
| | : | |
| **v.** | : | **MEMORANDUM IN SUPPORT OF** |
| | : | **DEFENDANTS TIMOTHY LANTER** |
| **TIMOTHY LANTER,** *et al.*, | : | **AND BRETT THOMAS'S MOTION** |
| | : | **FOR SUMMARY JUDGMENT** |
| **Defendants.** | : | |
| | : | |

Defendant Mason Meyer murdered Gayle and Raymond Laible and injured Maribeth and Steven Klein when he drove recklessly and lost control of his car after fleeing a lawful traffic stop. That traffic stop was initiated by Cincinnati Police Department Lieutenant Timothy Lanter and the pursuit was joined by Officer Brett Thomas  (collectively, "Officers"), in support of an interstate joint task force of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Northern Kentucky Drug Strike Task Force ("NKYDSF"), and the Cincinnati Police Department ("CPD"). They were working together to apprehend Meyer because he was a senior member of an international drug-and-gun trafficking organization, and because Meyer was an immediate danger to the community. He had outstanding warrants, boasted of prior assaults, and was observed trafficking firearms in the moments before the traffic stop was attempted.

In deciding whether to initiate or continue a pursuit, police officers must weigh the threat that the fleeing felon poses to the public against the risk that the pursuit poses. That is a judgment call.

There is no dispute that Meyer is a violent and dangerous felon, who posed an imminent threat to the public. The only question here is whether the risk to the public of pursuing him on

August 7, 2020 outweighed the risk of allowing him to escape once again and continue his life of violent crime.

To determine the risk of the pursuit, the Officers and their supervisor must weigh in real time many factors: *Are there pedestrians nearby? How heavy is traffic? What is the weather? Is Meyer driving erratically? Are there alternatives to pursuit? What is the likelihood Meyer can be apprehended again?* And they did so under strenuous and complicated conditions—operating their police cruisers, updating police dispatchers on their location, and trying to keep an eye on Meyer, who had a history of violence toward those around him, told associates he planned to die in a suicide-by-cop shootout, and had just put a rifle case in the backseat of his car.

Meyer's collision in Newport, Kentucky, which caused the Laibles' deaths and the Kleins' injuries, is a tragedy for which Meyer is singularly responsible. Meyer has pleaded guilty to murdering the Laibles and injuring the Kleins, for which he was sentenced to life in a Kentucky prison. And he has separately been sentenced to 300 months in federal prison for his involvement in the drug-and-gun trafficking organization.

Plaintiffs ask this Court to find that the Officers contributed to Meyer's murder of the Laibles and injuries to the Kleins. But this Court should not pin Meyer's criminal conduct on the Officers, nor should it second-guess their inherently discretionary decision to pursue Meyer. Because the undisputed evidence reveals both Meyer's danger and the Officers' careful exercise of discretion, the Officers are immune—under both Ohio and Kentucky law—from liability on Plaintiffs' state law claims for wrongful death and personal injury.

Even if the Officers are not entitled to immunity, Plaintiffs still cannot prevail on their claims. Plaintiffs' personal injury and wrongful death claims are grounded in negligence, so Plaintiffs must establish that the Officers proximately caused their injuries. But Meyer's

intervening criminal conduct severs any causal connection—and his guilty plea for murdering the Laibles confirms as much. On the merits, too, Plaintiffs' claims fail.

For these reasons, this Court should grant the Officers' summary judgment motion.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.**     **The ATF Task Force targets Mason Meyer.**

This case arises from the criminal conduct of Mason Meyer, a leader of a violent drug-and-gun trafficking operation and a defendant in this lawsuit. (Doc. 58–1, ATF Operational Plan at Page ID 442–45.) In Summer 2020, a joint federal-state law enforcement task force of ATF, NKYDSF, and CPD (collectively, the "ATF Task Force"), set its sights on apprehending Meyer. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 112.) The ATF Task Force comprised ATF agents and CPD officers—including deputized ATF Task Force Agent and CPD Sergeant Donald Scalf. (Doc. 138, Scalf Dep., 16:4–5; 25:19–24 at PageID 2199; 2208.)

The ATF Task Force's primary goal is to investigate federal firearms offenses and to execute federal and state warrants—and Meyer fit the profile of the ATF Task Force's typical target. He had outstanding warrants for first-degree wanton endangerment, first-degree fleeing and evading from police, and a misdemeanor warrant for a probation violation. (Doc. 58–1, ATF Operational Plan at Page ID 442–45.) He also was a leader of an interstate and international criminal network that sold large quantities of methamphetamine and trafficked firearms. (*Id*. at PageID 443.) This was a sophisticated criminal organization: in 2020, it was using drones to help deliver drugs—something ATF leadership had never seen before. (Doc. 136, Occhipinti Dep., 96:25–97:17 at PageID 2001–02.)

## II.     Meyer's criminal behavior is extensive.

Meyer was known to use violence routinely against his subordinates, those who bought his drugs, and the public. Sources told law enforcement that Meyer had several subordinates selling crystal methamphetamine on his behalf, whom Meyer would assault or kidnap if they did not remit sales proceeds. (Doc. 58–1, ATF Operational Plan at PageID 443.) Meyer even surveilled the mother of a man who owed him money—and told the man about the surveillance as a threat. (Doc. 135, Lanter Dep., 236:3–6 at PageID 1587.)

The ATF also learned that Meyer pistol whipped a victim in July 2020, causing the firearm to discharge, and boasted of murdering a Dayton, Ohio man. (Doc. 58–1, ATF Operational Plan at PageID 443.) Several weeks later, Meyer discharged a gun outside a Newport, Kentucky home, and then forced several guests to hide the gun for him. (*Id.*) That same day, law enforcement searched the home and found a loaded pistol, a handgun, and a rifle, along with 62 grams of methamphetamine. (*Id.*)

Not only did Meyer have access to firearms, he planned to use them—including against police officers. Sources informed law enforcement that Meyer stated he was terminally ill with an inoperable brain tumor and thus had little concern for human life. (ECF No. 10–1, Ex. A, Critical Incident Review at PageID 113, 118.) Those same sources claimed that Meyer was suicidal, repeatedly threatened to kill police officers, and stated a desire to die in a police shootout rather than return to jail. (*Id*. at PageID 118.)

## III.    After an unsuccessful traffic stop, the ATF develops an operational plan to apprehend Meyer.

CPD and NKYDSF officers were trying to locate Meyer on July 31, 2020, and spotted him driving a Ford Escape. (Doc. 58–1, ATF Operational Plan at PageID 443.) The officers initiated a traffic stop, lost track of the vehicle, and then located it soon after. (*Id.*) But when they

4

finally stopped the vehicle, Meyer was not inside; working with members of his criminal enterprise, he had swapped cars during the time that law enforcement lost sight of the Ford in order to evade arrest. (*Id.*; *see also* Doc. 135, Lanter Dep., 222:2–8 at PageID 1573.)

About a week later, the ATF Task Force developed an operational plan ("ATF Operational Plan"), detailing how they would surveil and apprehend Meyer. (Doc. 58–1, ATF Operational Plan at PageID 442–43.) ATF anticipated that its agents "may be riding in vehicles utilized by CPD to affect a stop and will assist with interviews, searches, and security during a vehicle stop." (*Id.* at PageID 445.) The ATF Operational Plan also explained that if ATF agents positively identified Meyer, "CPD uniform vehicles will be advised and directed to conduct a traffic stop following CPD policy, [and] ATF will assist as needed." (*Id.*)

The ATF anticipated that Meyer might flee, so it authorized ATF Task Force members to pursue "under extraordinary circumstances," including, but not limited to, "the threat of serious bodily injury or death to an agent or other party." (*Id.* at PageID 448.) The ATF Operational Plan also called for CPD K-9 units to assist with any felony traffic stop—especially if Meyer fled on foot. (*Id.* at PageID 445; *see also* Doc. 135, Lanter Dep., 193:15–21 at PageID 1544.)

## IV.    The ATF Task Force executes the Plan.

On the morning of August 7, 2020, ATF Task Force members and CPD officers held a briefing to discuss the Meyer investigation and their plan to apprehend him that day. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 113.)  Lieutenant Lanter and Sergeant Scalf were among the law enforcement officers in attendance. They understood the danger that Meyer posed. As Lieutenant Lanter explained, "by the 7th we knew everything" about Meyer— including that he was a violent criminal.  (Doc. 135, Lanter Dep., 223:24–25; 224:8–15 at PageID 1574–75.) In fact, Lieutenant Lanter donned a "heavy-plated vest[ ]" designed to "stop

5

an AR round or a higher caliber-type round plate." (*Id.*, 189:5–7 at PageID 1540.) Lieutenant

Lanter had "been a cop for 19 years," and August 7, 2020, was "the only day that [he'd] put that

vest on." (*Id.*, 189:7–9 at PageID 1540.)

When the briefing ended, some ATF Task Force members travelled to a home on De

Votie Avenue in Cincinnati's Clifton neighborhood, where the Task Force believed Meyer was

located. (Doc. 135, Lanter Dep., 250:20–22 at PageID 1601.) They were wrong. Meyer had

deceived them again. The ATF Task Force had been tracking the location of a cellphone that

they believed belonged to Meyer. But Meyer "went through multiple phones," and that morning,

the phone they thought he was using was not sending "pings." (*Id.*, 199:21–200:5; 240:19–241:3

at PageID 1550–51; 1591–92.) So the ATF Task Force could not accurately locate Meyer.

Later that afternoon, the ATF Task Force began receiving pings from a cellphone

showing that Meyer was near 721 Steiner Avenue in Cincinnati's Price Hill neighborhood. (*Id.*,

250:20–24 at PageID 1601.) So the ATF Task Force moved its surveillance to that location.

(Doc. 138, Scalf Dep., 128:7–15 at PageID 2311; Doc. 135, Lanter Dep., 250:20–24 at PageID

1601.)

The ATF Task Force arrived heavily armed. Its members had to prepare for Meyer to use

violence to avoid arrest or to take other dangerous steps like barricading himself and others in the

residence. (Doc. 136, Occhipinti Dep., 117:25–118:4 at PageID 2022–23.) ATF Resident-Agent-

in-Charge Frank Occhipinti ("RAC Occhipinti"), the on-scene commander, brought his duty

firearm (a Glock 19), a Colt M4 carbine semiautomatic rifle, and about 60 rounds of

ammunition. (*Id.*, 118:13–119:14 at PageID 2023–24.) Ten ATF Task Force members brought

firearms, including six with semi-automatic rifles. (*Id.*, 119:19–25 at PageID 2024; Doc. 58–1,

ATF Operational Plan at Page ID 446.) They also brought breaching equipment to break down

doors—including a Halligan and bunkers—ballistic shields, and tasers. (Doc. 58–1, ATF Operational Plan at Page ID 446.)  And because the ATF Task Force was prepared for violence, a Task Force member brought a medical kit, and the ATF Operational Plan identified the nearest trauma center and a telephone number for a life-flight helicopter.  (*Id.*, 120:1–121:4; 131:17–132:7 at PageID 2025–26; 2036.)

Meanwhile, Officer Thomas and his  K-9 reported for duty around 1:00 p.m. (Doc. 141, Thomas Dep., 166:9–13 at PageID 3079.) Soon after his shift began, Officer Thomas responded to a request for a K-9 unit to assist with the surveillance and apprehension of Meyer. (*Id.*, 166:18–167:21 at PageID 3079–80.) Officer Thomas learned that Meyer was wanted for a felony offense and had "claimed that he was not gonna go down without a shootout with the police." (*Id.*, 168:24; 169:15 at PageID 3081–82.) He then drove his police cruiser to a staging location near a Speedway gas station on River Road and awaited further instruction. (*Id.*, 173:2–9; 187:8–25 at PageID 3086; 3100.)

Back at 721 Steiner Avenue, ATF Task Force members made a positive identification of Meyer and his girlfriend, Kirsten Johnson. (Doc. 135, Lanter Dep., 257:7–15 at PageID 1608.) Around 3:00 p.m., Meyer exited the residence, carrying a firearm case. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 113.) He walked across the street, displaying the case's contents to several individuals. (*Id.*) Meyer then placed the firearm case on the rear seat of a black Ford Focus parked in a driveway. (*Id.* at PageID 114–15.) The vehicle backed out of the driveway and pulled away, but the surveilling Task Force members' views were partially obstructed. They (including CPD personnel) decided that they could not be sufficiently certain that Meyer was in the vehicle. (*Id.* at PageID 114; *see also* Doc. 138, Scalf Dep., 129:12–21 at PageID 2312.) So they let the vehicle drive away.

7

They then executed the next step of the ATF Operational Plan: a traffic stop once the vehicle traveled away from Steiner Avenue. (Doc. 138, Scalf Dep., 129:18–21 at PageID 2312; Doc. 135, Lanter Dep., 259:12–14 at PageID 1610.)  CPD Officer Mark Bode trailed the Ford Focus as it drove away from Steiner Avenue. But Officer Bode was driving in an unmarked car, so he could not initiate the traffic stop. (Doc. 134, Bode Dep., 94:20–24; 135:1–3 at PageID 1076; 1117.)[1] Lieutenant Lanter was staged away from Steiner Avenue, waiting in his marked police cruiser in a parking lot near the intersection of Delhi Avenue and River Road.[2] (Doc. 135, Lanter Dep., 110:15–24 at PageID 1461.) When the Ford Focus passed Lieutenant Lanter, Officer Bode pulled aside, allowing Lieutenant Lanter to initiate a traffic stop. (Doc. 134, Bode Dep., 191:1–13 at PageID 1173.)

Lieutenant Lanter activated his lights and sirens behind Meyer's car. Meyer failed to pull over as required by law, and it became apparent that he was not going to stop immediately. (Doc. 135, Lanter Dep., 94:9–95:23 at PageID 1445–46.) So Lieutenant Lanter continued to follow Meyer, first on some secondary streets in Price Hill. (Doc. 10–1, Ex. A, Critical Incident Review, PageID 128.)

As the traffic stop turned into a pursuit because Meyer did not stop, Sergeant Scalf announced himself as the officer in charge ("OIC") of the pursuit. (Doc. 138, Scalf Dep., 140:5–14 at PageID 2323.) Officer Thomas advised that he would be the secondary pursuit vehicle—

---

[1] Under CPD policy, "[o]fficers wearing plainclothes or using unmarked vehicles will avoid making stops of suspected vehicles and will not engage in vehicle pursuits."  (Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1265.)

[2] This intersection is about one-third of a mile from 721 Steiner Avenue. *See* maps.google.com. This Court may take judicial notice of maps showing the distances between two points, including distances generated by Google Maps. *See Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017).

following Lieutenant Lanter. (ECF No. 10–1, Ex. A, Critical Incident Review at PageID 128.) And Specialist Michael Harper requested to join as the tertiary pursuit vehicle—following Officer Thomas. (*Id.*)

As the pursuit continued, RAC Occhipinti radioed the officers to let them know that—based on cellphone pings—Meyer's cellphone was inside the Ford Focus. (*Id.* at PageID 127.) Meyer continued onto the Sixth Street Viaduct, approaching downtown Cincinnati. (*Id.*) As Meyer drove south toward the Ohio River, Sergeant Scalf authorized the pursuit to continue into Kentucky. (Doc. 141, Thomas Dep., 235:8–11 at PageID 3148.) Around that same time, RAC Occhipinti "came over" the air and "repeated two communications . . . on several occasions, to ensure that [the Officers] were aware that the suspect was wanted for felony and he was armed." (*Id.*, 228:1–14 at PageID 3141.) RAC Occhipinti also broadcast that the pursuit was proceeding toward Kentucky and instructed CPD dispatch to alert local law enforcement in Kentucky that the pursuit was incoming. (Doc. 136, Occhipinti Dep., 157:20–158:24 at PageID 2062–63.)

Meyer crossed the Ohio River into Covington, Kentucky, and then into Newport. As Lieutenant Lanter explained, the pursuit was characterized by "turns to accelerate a burst to where you're approaching intersections, you're slowing down and then you're speeding up again and then you're slowing down, then you're speeding up again." (Doc. 135, Lanter Dep., 100:2–8 at PageID 1451.) Thomas, who maintained about 30 to 40 yards behind Lanter for much of the pursuit, corroborated that testimony, noting that the "speeds were not high" because "it was – it was a lot of turns. It was short bursts of acceleration." (Doc. 141, Thomas Dep., 215:3–11; 216:11–14; 227:15–17 at PageID 3128–29; 3140.)

Meyer engaged in some evasive maneuvers to try to break the Officers' visual contact. (*Id.*, 217:6–12 at PageID 3130.) But Lanter, who was trailing Meyer, never saw a vehicle swerve

to avoid colliding with Meyer. (Doc. 135, Lanter Dep., 108:14–19 at PageID 1459.) Meyer even continued to use his turn signals and slowed at various points to make turns. (*Id.*, 166:11–15 at PageID 1517). Prior to Meyer's collision, Lanter never observed "conditions in [the] pursuit that rose to the level of" requiring termination. (*Id.*, 166:16–18 at PageID 1517.)  It is undisputed that no CPD vehicle ever came in contact with Meyer's car.[3]

Lieutenant Lanter drove several car-lengths from Meyer as the pursuit continued into Newport. (*See generally* Doc. 133, Notice of Filing of Videos, Lanter Recording.) The pursuit ended when Meyer lost control of his vehicle and swerved into the outdoor-dining area of a Newport restaurant, killing Raymond and Gayle Laible and injuring Steven and Maribeth Klein. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 122.) Officers approached the Ford Focus and immediately apprehended Meyer, who appeared to be having "some kind of medical emergency." (Doc. 141, Thomas Dep., 238:21 at PageID 3151.)

## V.    Meyer pleads guilty to a host of crimes, including murdering the Laibles.

Since his apprehension, Meyer pleaded guilty to seven criminal counts related to his flight:

|  |  |
|---|---|
| (1) | Murder[4] |
| (2) | Murder |
| (3) | Wanton Endangerment, First Degree |
| (4) | Wanton Endangerment, First Degree |
| (5) | Fleeing or Evading Police, First Degree, Motor Vehicle |
| (6) | Criminal Mischief, First Degree |

---

[3] There is no evidence in the record that a CPD vehicle came into contact with Meyer's car during the pursuit, nor have Plaintiffs alleged that any such contact occurred.

[4] Meyer's indictment is attached as Exhibit 1. Meyer's Plea Offer is attached as Exhibit 2. His indictment highlights the relationship between his flight, the collision, and the murder charges: "Defendant committed the offense of MURDER, a felony, when he while operating a motor vehicle under circumstances manifesting extreme indifference to the value of human life, wantonly engaged in conduct that created a grave risk of death to another person and thereby caused the death of" Gayle and Raymond Laible. (Ex. 1, Meyer Indictment at 1–2.)

(7)    Persistent Felony Offender, First Degree.

(Ex. 2, Signed Plea Offer at 1.)  Meyer's signed plea offer states:

> Mason Meyer was fleeing from police during a high speed chase. The Defendant knowingly disregarded the obvious risk that his dangerous driving at extremely high speeds without regard for traffic laws through densely populated areas could result in death or serious physical injury to others. The Defendant lost control of his vehicle at the intersection of Monmouth Street and 5th Street and crashed into Press on Monmouth, a business located on the corner of that intersection. Two individuals who were dining at a patio table on the sidewalk outside Press were killed as a result of the crash. Two more individuals, pedestrians walking the sidewalk, were nearly struck by the Defendant's vehicle as it careened out of control. As a result of the near-death experience, the pedestrians sustained injuries that required medical treatment.

(*Id.*)

The United States also indicted Meyer for possessing methamphetamine with the intent to distribute, possessing firearms in furtherance of a drug trafficking crime, narcotics conspiracy, possessing firearms in furtherance of a drug trafficking offense, and possessing firearms and ammunition as a known felon. (*United States v. Meyer*, 1:20-cr-00085 (S.D. Ohio July 14, 2021), ECF No. 163, Second Superseding Indictment.) Meyer pleaded guilty to these charges, and United States District Court Judge Jeffery Hopkins recently sentenced Meyer to 300 months in prison. *Id.* (ECF No. 517, Sentencing Tr. at PageID 2918, 2950).[5]

Meyer's federal sentence calculation included a guidelines enhancement for the second degree murder of the Laibles and for reckless endangerment for the injuries he caused to the Kleins. (*Id.* at PageID 2924–26, 2929–31). Meyer also received a sentencing enhancement for his leadership role in the criminal organization. (*Id.* at PageID 2928–29, 2931 (Meyer's

---

[5] A copy of the Sentencing Transcript is also attached as Exhibit 3.

"leadership within the firearm-related aspect of the offense … was an essential part of the drug trafficking conduct[.]").)

## VI.    CPD investigates the pursuit.

The circumstances of Meyer's collision were tragic, and CPD and the Officers took it seriously. CPD's Internal Investigation Section ("IIS") completed an administrative review of the pursuit and issued a report on its findings (the "IIS Report"). (*See generally,* ECF No. 10–1, Ex. A, Critical Incident Review.) IIS scrutinized Lieutenant Lanter's, Officer Thomas's, and Specialist Harper's conduct during the pursuit and did not find that the officers violated any CPD pursuit policy related to initiating or not terminating the pursuit.[6] (*See generally*, *id*.) The Officers cooperated fully.

According to the IIS Report, Lanter and Thomas "slowed as they approached stop signs and red lights and exercised due regard for safety when they entered each intersection at a speed which afforded drivers a reasonable opportunity to avoid a traffic crash," and "activated their emergency lights and siren, wore their seatbelt, and activated their [Body Worn Cameras]," all in compliance with CPD pursuit policy. (*Id.* at PageID 129.)

IIS found a few technical procedural violations by Lieutenant Lanter and Officer Thomas. First, it concluded that Lieutenant Lanter violated Rules 1.03 and 12.535, by authorizing Officer Thomas to drive the wrong way on a one-way street. (*Id*.) Under CPD policy, only Sergeant Scalf—the pursuit OIC—could authorize that conduct.[7] (*Id*.) Second, IIS

---

[6] Specialist Harper requested permission to join the pursuit as the tertiary officer. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 118.) He was too far away to actively engage in the pursuit—but when he arrived at the crash scene, he helped arrest the vehicle's occupants and provided first aid to injured persons. (*Id*.)

[7] The IIS Report noted that Sergeant Scalf "attempted several times to confirm approval of the action but was unable to transmit because Officer Thomas was providing updated pursuit

concluded that Lieutenant Lanter and Officer Thomas violated Rules 1.01 and 12.535(B)(3)(b) by exceeding the posted speed limit in excess of twenty miles per hour *while on the Sixth Street Viaduct in Cincinnati*—miles away from Meyer's crash in Newport, Kentucky. (*Id*. at PageID 129–32.)

Per IIS's recommendation, Officer Thomas received written counseling (distinct from a written reprimand), and Lieutenant Lanter received a written reprimand. (Doc. 141, Thomas Dep., 267:13–268:10 at PageID 3180–81; Doc. 135, Lanter Dep., 301:22–302:7 at PageID 1652–53.) Both Officers were retrained on the City's related policies. (Doc. 141, Thomas Dep., 268:11–269:2 at PageID 3181–82; Doc. 135, Lanter Dep., 316:12–317 at PageID 1667.) Since then, Lieutenant Lanter was elevated to his current position, having previously served as a sergeant. (Doc. 135, Lanter Dep., 6:22–24 at PageID 1357.)

## ARGUMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because there must be an issue of material fact, an "alleged factual dispute between the parties" as to a nonmaterial matter "will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

As the moving parties, the Officers bear "the initial burden of proving that no genuine issue of material fact exists and that [it] is entitled to judgment as a matter of law." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). If the moving party meets that burden, then

---

location and direction of travel." (Doc. 10–1, Ex. A, Critical Incident Review at PageID 119.) Sergeant Scalf testified that he was frustrated by his inability to give authorization via radio, given the cross-traffic on the radio. (Doc. 138, Scalf Dep., 145:19–146:8 at PageID 2328–29.)

"the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Id*. at 150. Put differently, a summary judgment motion "is a means by which to challenge the opposing party to put up or shut up on a critical issue." *Id*. at 149 (internal quotation marks and citation omitted).

## I.     The choice-of-law analysis favors applying Ohio immunity law.

This Court is exercising supplemental jurisdiction over Plaintiffs' state law claims and therefore must "apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). A federal court exercising diversity jurisdiction must apply the substantive law of the forum state, including its conflict of law rules. *Woods v. Standard Fire Ins. Co*., 411 F. Supp. 3d 397, 401 (E.D. Ky. 2019).

The key choice-of-law issue for the Court to resolve involves whether Ohio or Kentucky immunity law applies. Although Kentucky's choice-of-law rules favor applying Kentucky law, Kentucky law will not always apply, particularly when there are "overwhelming interests to the contrary." *Harris Corp. v. Comair, Inc*., 712 F.2d 1069, 1071 (6th Cir. 1983).

To be sure, some courts have applied Kentucky immunity law to resolve police-pursuit-related litigation with an interstate dimension. *See Brackens v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:12-cv-280-DJH-DW, 2015 WL 5786818, at *8 (W.D. Ky. Sept. 30, 2015), *aff'd sub nom. Est. of Brackens v. Louisville Jefferson Cnty. Metro Gov't*, 680 F. App'x 362 (6th Cir. 2017). In *Brackens*, the trial court applied Kentucky law to resolve claims arising from an interstate police pursuit, given that "[m]uch of the chase took place in Kentucky, and Kentucky is where the defendants' alleged wrongdoing and Brackens's injuries occurred." *Id*. at *8. Indiana law enforcement officers began the pursuit in Indiana; it then entered Kentucky, where

Kentucky law enforcement officers joined, and the pursuit ended without injury in Kentucky. *Id.* at *1–2.

This case is unlike *Brackens* because here, there are far more significant and substantive contacts outside Kentucky. *First*, there were no Kentucky officers involved in the pursuit, nor have any Kentucky officers been named in the litigation. Lieutenant Lanter and Officer Thomas are City of Cincinnati employees, and the City of Cincinnati, a municipal corporation formed under Ohio law, is a named defendant. *Second*, the case involves the Officers' compliance with CPD policy—designed in Ohio, under Ohio law—and the City of Cincinnati's training and supervision of the Officers—occurring in Ohio. *Third*, the pursuit covered six miles and lasted about six to seven minutes. Most of the pursuit occurred in Ohio—both in terms of miles covered and timing. And the IIS's findings about the Officers' speeds relates to their driving in Ohio. (Doc. 10–1, Critical Incident Review at PageID 129.)

Indeed, the only tie to Kentucky is that the final moments of the pursuit occurred there, and while those events are tragic, they do not outweigh the overwhelming interests of Ohio. Because the Court's analysis involves a review of CPD policy—and the Officers' compliance with that policy—this Court should apply Ohio immunity law.

## II.     The Officers are entitled to immunity under Ohio law.

Ohio's Political Subdivision Tort Liability Act governs liability against the City of Cincinnati and its employees. *See generally* Ohio Rev. Code. § 2744; *see also, e.g.*, *Williams v. Cincinnati*, No. C-210146, 2021 WL 4978711, at *3 (Ohio Ct. App. Oct. 27, 2021). Under Ohio Revised Code § 2744.03(A)(6), the Officers are immune from liability unless one of the following applies:

(a)     The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

15

      (b)      The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

      (c)      Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Ohio Rev. Code § 2744.03(A)(6)(a)–(c).

There are strong public policy reasons to confer statutory immunity on police officers involved in pursuits. For one, police officers have "statutory duties to arrest and detain individuals violating the law" so the "burden necessary to deny immunity to those officers is onerous." *Argabrite v. Neer*, 75 N.E. 3d 161, 169 (Ohio 2016). As the Ohio Supreme Court explained:

> We expect law-enforcement officers to protect the public, but that expectation need not mean that an officer must sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further. The danger of a high-speed chase alone is not enough to present a genuine issue of material fact concerning whether an officer has acted with a malicious purpose, in bad faith or in a wanton or reckless manner.

*Id.* at 166.

Here, there can be no dispute that (1) the Officers have acted within the scope of their employment; and (2) no civil liability is imposed on the Officers under the Ohio Revised Code. Thus, the Court's immunity analysis turns on whether the Officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner. The undisputed material facts confirm that the Officers did no such thing—and that they are entitled to immunity.

16

### 1.    The Officers did not act with malicious purpose or in bad faith.

The Officers did not act with a malicious purpose or in bad faith. Ohio courts define malicious purpose as "the willful and intentional design to injure or harm another, generally seriously, through unlawful or unjustified conduct." *Clements v. Brimfield Twp. Police Dep't*, 92 N.E.3d 37, 41 (Ohio Ct. App. 2017) (citation omitted). And "bad faith" means "more than bad judgment or negligence; it is conduct that involves a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Anderson v. City of Westlake*, 182 N.E.3d 1225, 1233 (Ohio Ct. App. 2021).

The Officers did not willfully or intentionally injure Plaintiffs. To the contrary, the Officers were executing their law enforcement duties to surveil and apprehend Meyer—a violent criminal who posed a considerable danger to the community. There is no evidence that the Officers acted with an ulterior motive or had an objective other than to arrest Meyer.

### 2.    The Officers did not act in a wanton manner.

"Wanton misconduct" is the "failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted); *see also Tighe v. Diamond*, 80 N.E. 2d 122, 126 (Ohio 1948) (wanton misconduct is the "entire absence of all care for the safety of others and an indifference to consequences").

Courts have broken the wanton-misconduct determination into a two-part test. *See generally Matkovich v. Penn Cent. Transp. Co.*, 431 N.E.2d 652, 654 (Ohio 1982). First, courts consider whether "there is a failure to exercise any care whatsoever by those who owe a duty of care to the appellant." *Id.* That inquiry requires the court to determine the duty that the defendant

17

owed to the plaintiff and the extent of care. *Id.* Second, courts consider whether the failure to exercise any care "occurs under circumstances in which there is great probability that harm will result." *Id.* This requires courts to "consider the nature of the hazard created by the circumstances." *Id.* Finally, a party can overcome allegations of wanton misconduct by engaging in "minimal efforts to warn." *Id*.

As CPD's IIS Report noted, the Officers displayed care for the safety of others throughout the pursuit. The Officers "slowed as they approached stop signs and red lights and exercised due regard for safety when they entered each intersection at a speed which afforded drivers a reasonable opportunity to avoid a traffic crash." (ECF No. 10–1, Ex. A, Critical Incident Review at PageID 129.) Lanter and Thomas also made more than minimal efforts to warn others of the pursuit. (*Id.* (finding that both officers "activated their emergency lights and siren, wore their seatbelt, and activated their [Body Worn Cameras]").)

### 3.    The Officers did not act in a reckless manner.

The Officers did not engage in reckless conduct, which is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson*, 983 N.E. 2d at 273; *see also O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008) ("The actor must be conscious that his conduct will in all probability result in injury."). By contrast, an officer's "mere negligence" in the performance of official duties does not "give rise to personal liability." *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 36 (Ohio 1994).

In *Argabrite*, the Ohio Supreme Court applied this immunity analysis in the context of a police pursuit and underscored that "wanton or reckless manner" sets a "rigorous standard[] that will in most circumstances be difficult to establish, especially with respect to a law-enforcement

officer carrying out the statutory duty to arrest and detain a person violating the law." *Argabrite*, 75 N.E.3d at 164. The court acknowledged that police pursuits are inherently risky, but that risk, by itself, should not deter law enforcement from engaging in pursuits: officers cannot "sit idly by" while criminals try to evade arrest. *Id* at 166. The "danger of a high-speed chase alone" is not enough to create a genuine issue of material fact that a law enforcement officer acted recklessly. *Id*.

Here, the Officers' decision to pursue Meyer is not evidence that they acted in a "wanton or reckless manner." For one, there is no evidence that the dangers created by this pursuit were any different from those created by any other police pursuit. And both Officers believed the pursuit was necessary to apprehend Meyer, who they knew was a violent criminal. (Doc. 135, Lanter Dep., 235:2–236:12 at PageID 1586–87; Doc. 141, Thomas Dep., 168:16–170:13 at PageID 3081–83.) Lieutenant Lanter, in particular, testified that the ensuing crash was not a *known* risk of harm when they initiated and continued the pursuit. He explained:

> It's an unknown, I will say. I mean, I know what the outcome was and I know what the result was and it's absolutely horrific and tragic, but I don't know that you can say that you knew that that was what the outcome was gonna be.

(Doc. 135, Lanter Dep., 209:16–29 at PageID 1560.)  Sergeant Scalf agreed that it was impossible to predict the consequences of Meyer's actions—including whether something even worse would happen if the Officers did not apprehend Meyer. He explained: "There is no crystal ball that would have told me that more deaths didn't occur if we didn't apprehend him." (Doc. 138, Scalf Dep., 151:9–13 at PageID 2334.)

Ohio courts consider a non-exhaustive set of factors to assess whether police officers acted recklessly during pursuits. *City of Westlake*, 182 N.E. 3d at 1234. These factors guide the immunity analysis:

19

(1)     The officer's speed;

(2)     whether the officer was traveling in the correct lane of travel;

(3)     whether the officer had the right-of-way;

(4)     the time of day;

(5)     the weather;

(6)     the officer's familiarity with the road;

(7)     the road contour and terrain;

(8)     whether traffic was light or heavy;

(9)     whether the officer made invasive maneuvers (*i.e.*, attempting to force the vehicle from the road) or evasive maneuvers (*i.e.*, attempting to avoid a collision);

(10)    the nature and seriousness of the offense that prompted the emergency;

(11)    whether the officer possessed a safer alternative;

(12)    whether the officer admitted to disregarding the consequences of his actions;

(13)    whether the officer activated the vehicle's lights and siren[ ]; and

(14)    whether the officer violated any applicable departmental policy.

*City of Westlake*, 182 N.E. 3d at 1234.[8] Weighing those factors confirms that the Officers did not act recklessly.

For starters, Meyer posed a considerable risk to the community—hence the ATF Task Force's significant allocation of resources to surveil and apprehend him. Meyer was not a

---

[8] Whether an officer violated a department policy does not resolve the immunity analysis: "the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct." *Anderson*, 983 N.E.2d at 274. And in any event, the policy violations here did not relate to the decision to start or continue the pursuit.

misdemeanor offender with a broken tail light; he was contributing to a greater societal harm by trafficking drugs—itself a violent and dangerous crime—and guns throughout the region. *See United States v. Castellanos*, No. 3:16-cr-080, 2022 WL 2306863, at *4 (S.D. Ohio June 27, 2022) ("drug trafficking in general is a danger to the community"); *United States v. Green*, 532 F.3d 538, 549 (6th Cir. 2008) ("[s]ociety as a whole is the victim when illegal drugs are being distributed in its communities"); *United States v. Thomas*, No. 23-1706, 2024 WL 1672371, at *2 (6th Cir. Apr. 18, 2024) (noting that firearms trafficking "created a danger to the community"); *United States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004) (the "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit dispute."). As Defendants' expert and Hamilton Township police chief Scott Hughes put it, the Officers' decision to pursue Meyer "align[ed] with CPD policy" and reflected their concern for "officer safety, threat assessment, and [the] public interest." (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2890–91.)

The Officers were not dead-set on pursuing Meyer either. The ATF Task Force planned to attempt an open-air assault on Meyer, once he left the residence. (Doc. 58–1, ATF Operational Plan at Page ID 445.) If that was not feasible and Meyer gained access to his vehicle, the ATF Task Force planned a vehicle stabilization pin. (*Id.*) Only if the ATF Task Force could not pin the vehicle would it rely on CPD officers to conduct the third step in the plan—a felony traffic stop.  (*Id.*)

And even then, CPD officers considered alternatives to a vehicle pursuit. Sergeant Scalf testified that the ATF Task Force members had stop sticks in their vehicles—but that the Task Force Officers could not deploy them on or near Steiner Avenue because they could not initially confirm that Meyer was in the Ford Focus. (Doc. 138, Scalf Dep., 132:4–17 at PageID 2315.)

Separately, Lieutenant Lanter would be initiating the traffic stop and therefore could not deploy the stop sticks himself, and other CPD officers could not get ahead of Meyer's car in time to safely deploy the stop sticks. (*Id.*, 133:16–17 at PageID 2316; Doc. 135, Lanter Dep., 136:2–8 at PageID 1487.) The decision to not use stop sticks ultimately "reduced risks to bystanders," given the urban environment. (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2893.)

So when Meyer refused to obey the traffic stop, the Officers pursued him, activating their lights and sirens and body worn cameras, slowing at stop signs and intersections, and exercising "due regard for safety," which "afforded drivers a reasonable opportunity to avoid a traffic crash." (Doc. No. 10–1, Ex. A, Critical Incident Review at PageID 129.) The Officers never disregarded the consequences of their actions.

The pursuit itself occurred on a summer afternoon, with clear visibility. (Doc. 136, Occhipinti Dep., 172:4–6 at PageID 2077.) School had not yet resumed, and because the pursuit occurred during pandemic lockdowns, the traffic was light, and there were few pedestrians. (Doc. 135, Lanter Dep., 104:8–14; 115:2–5; 177:9–11 at PageID 1455; 1466; 1528; *see also* Doc. 141, Thomas Dep., 208:19–20 at PageID 3121 ("[T]raffic was exceptionally light.").) Likewise, the Officers were familiar with the roads (particularly in Ohio), and they radioed their locations during the pursuit. (Doc. 141, Thomas Dep., 207:18–21 at PageID 3120.)  There is no evidence that the Officers attempted (or even considered) any invasive maneuvers; CPD does not even train its officers on how to conduct a vehicle pin or vehicle roadblock. (*Id.*, 68:10–69:16 at PageID 2981–82; *see also* Doc. 140–1, Ex. A, S. Hughes Report at PageID 2892.)

To be sure, IIS determined that the Officers exceeded the posted speed limit by greater than 20 miles per hour, in violation of CPD pursuit policy. But that finding is not outcome determinative. *Anderson*, 983 N.E.2d at 274. Even more, the Officers' speeding violation

occurred on the Sixth Street Viaduct, before the Officers even reached downtown Cincinnati and miles away from the site of Meyer's collision. (Doc. No. 10–1, Ex. A, Critical Incident Review at PageID 124.)  Meantime, the Officers "adjusted speeds at intersections, showing due regard for safety, consistent with policy and constitutional standards." (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2891.)

IIS also faulted the Officers for traveling the wrong way down Greenup Street in Covington without receiving proper authorization. (Doc. No. 10–1, Ex. A, Critical Incident Review at PageID 129–30.) But that procedural violation—which occurred nearly a mile from Meyer's collision in Newport—did not cause Meyer to crash, nor did it put any motorists at risk. For that matter, Meyer was driving with the flow of traffic on Fifth Street in Newport when he swerved and crashed. Both of the violations (speed and wrong-way driving) were "tactical responses to Meyer's dangerous driving, reflecting an effort to balance immediate public safety concerns against the risks of pursuit." (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2886.) The Officers violated no other pursuit policies.

Finally, Plaintiffs may argue that the Officers should be stripped of immunity because they acted recklessly by not terminating the pursuit. In particular, Plaintiffs may fault the Officers for not terminating the pursuit because they knew Meyer's identity. But the record and the law refute that argument. Meyer had evaded arrest before. (*Id.* at PageID 2892.) Just because the Officers knew Meyer's identity does not mean they could apprehend him at a later date—and more importantly, his "known identity did not negate [his] immediate threat." (*Id.*) Moreover, IIS never faulted the Officers for engaging in the pursuit—or for not terminating it before Meyer's collision. And a federal trial court has already found this argument to be a "non-starter" in a case involving CPD's pursuit policy:

23

under the [CPD pursuit] policy, the officer is required to terminate the pursuit when the pursuit OIC or the primary unit makes the discretionary determination that the level of danger created by the pursuit outweighs the necessity for immediate apprehension. As neither the OIC nor the primary unit made that determination, there is not a plain violation of the policy.

*Sidi v. City of Cincinnati*, No. 1:13cv242, 2015 WL 9269440, at *5 (S.D. Ohio Dec. 21, 2015).[9]

The same is true here. In real time, Sergeant Scalf—the OIC—and Lieutenant Lanter balanced the danger that Meyer posed to the community against the risk of the pursuit and determined that the former risk outweighed the latter risk. This Court should not second-guess that discretionary exercise.

## III.     The Officers are entitled to qualified immunity under Kentucky law.

If the Court decides that Kentucky law applies, the Officers are still entitled to immunity. Under Kentucky law, "[t]he immunity that an agency enjoys is extended to the official acts of its officers and employees." *Autry v. Western Kentucky Univ.*, 219 S.W.3d 713, 717 (Ky. 2007). "[W]hen such officers or employees are sued for negligent acts in their individual capacities, they have qualified official immunity." *Id.* Public officials may enjoy qualified immunity from tort actions, but their qualified immunity entitlement is "determined based on the function performed, not by the status or title of the officer or employee." *Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 831 (Ky. 2021). "The defense applies to the negligent performance of '(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id*.

---

[9] Plaintiffs no doubt will offer their expert to try to create a disputed issue of material fact that forecloses summary judgment. But in *Sidi*, the trial court noted that an expert's opinion that a pursuit should have been terminated or that officers violated policy does not create a genuine issue of material fact. *Id*. at *5.

## 1.    Discretionary Acts

When determining whether an individual is entitled to qualified immunity, the court will first consider whether the individual's acts were discretionary or ministerial. "[F]ew acts are ever purely discretionary or purely ministerial," so courts will look to the "*dominant* nature of the act" to determine whether the act was discretionary or ministerial. *Haney v. Monsky*, 311 S.W. 3d 235, 240 (Ky. 2010) (emphasis in original).

"Discretionary acts or functions are 'those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment.'" *Sholar v. Turner*, 664 S.W. 3d 719, 723 (Ky. Ct. App. 2023) (citation omitted). As the Kentucky Supreme Court explained, discretionary acts:

> require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed.

*Upchurch v. Clinton Cnty.*, 330 S.W. 2d 428, 430 (Ky. 1959) (citation omitted).

Conversely, a ministerial act "requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero v. Davis*, 65 S.W. 3d 510, 522 (Ky. 2001).

## 2.    Good Faith

"Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Meinhart*, 627 S.W.3d at 835 (citation omitted). To establish that an officer acted in bad faith, "the complainant must demonstrate the officer '*knew or reasonably should have known* that the action

25

he took within his sphere of official responsibility would violate' the complainant's rights or that the officer 'took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury.'" *Id.* (emphasis in original; citation omitted).

### 3.    Scope of Authority

In general, if an individual is at work or on duty at the time of the alleged negligent or tortious act and they are not otherwise prohibited from the actions taken, they will be found to be acting within the scope of their authority. *See, e.g.*, *Sholar*, 664 S.W. 3d at 725 ("It is also clear the Officers were acting within the scope of their authority. They were uniformed officers, on duty, in marked patrol cruisers, responding to a report of a motor vehicle accident."); *Wilson v. England*, 705 S.W. 3d 35, 46 (Ky. Ct. App. 2024), *review denied* (Feb. 13, 2025) (volunteer firefighter was acting within the scope of his authority when he drove an ambulance; he was not expressly forbidden from doing so and did not have to participate in a particular training program before being allowed to drive the ambulance); *Crowe v. Steward,* No. 5:20-CV-203-REW, 2022 WL 4291331, at *7 (E.D. Ky. Sept. 16, 2022) ("A police officer's use of deadly force plainly falls within the scope of a police officer's [discretionary] authority.").

### A.    The Officers are entitled to immunity because they engaged in discretionary acts in good faith and within the scope of their authority.

Here, there is no evidence the Officers acted with malicious intent, nor is there any dispute that they were acting within the scope of their authority as law enforcement officers. This Court's immunity analysis turns on whether the Officers' actions were discretionary—and the undisputed material facts confirm that their engagement in the pursuit was a discretionary act.

In *Meinhart*, the Kentucky Supreme Court held that an officer's "decision to initiate, continue, or terminate a pursuit" was discretionary and that the officer therefore was entitled to immunity. 627 S.W3d at 834. Whether an officer's acts are discretionary "necessarily begins

26

with an examination of the applicable [Standard Operating Procedures] related to pursuits." *Meinhart*, 627 S.W.3d at 832. The court examined the relevant procedures and recognized that an officer must weigh many factors when determining whether to initiate and continue a pursuit—including the weather, time of day, traffic conditions, and alternatives to pursuit. *Id*. at 834. Not only that, the officer must weigh all those factors on the spot. The court remarked: "[i]t is difficult to imagine a situation in which the exercise of significant, independent professional judgment would be more necessary." *Id*.

*Meinhart* is no outlier. In *Browning v. Edmonson County*, the Sixth Circuit reversed the trial court's denial of qualified immunity to a police officer who engaged in a police pursuit. 18 F.4th 516, 533–35 (6th Cir. 2021). The Sixth Circuit explained that the governing pursuit policy did not "absolutely mandate when a pursuit must be initiated or when an officer must discontinue pursuit." *Id.* at 533. Instead, "the only requirement with respect to the decision to discontinue the pursuit is that the officer *use his or her discretion* to see if the danger to human life is greater than the need to continue the pursuit." *Id.* at 534 (emphasis added); *see also Sholar*, 664 S.W. 3d at 724 (Although driving *in general* may be ministerial, "decisions in emergencies, *such as high-speed pursuits*, cross the line into discretion.") (emphasis added).

CPD's pursuit-related policy and procedures underscore that the decision whether to initiate and continue a pursuit is discretionary.[10] The decision involves a "weighing" of subjective factors—real time judgment and balancing of important considerations, including the degree of risk to the public, versus the nature of the suspected crime. There is no bright-line rule.

---

[10] So, too, does relevant case law. *Sidi*, 2015 WL 9269440, at *5 ("Under the [CPD pursuit] policy, the officer is required to terminate the pursuit when the pursuit OIC or the primary unit makes the discretionary determination that the level of danger created by the pursuit outweighs the necessity for immediate apprehension.").

As for the initiation and continuation of a pursuit, CPD Policy 12.535 (in effect as of August 7, 2020) states:

> During the emergency operation of police vehicles, and prior to and during a pursuit, officers must weigh the following factors:
>
> - Degree of risk created by pursuit to others, officer and suspect.
>
> - Location where pursuit will take place.
>
> - Traffic conditions and amount of pedestrian traffic.
>
> - Road conditions.
>
> - Time of day.
>
> - Weather.
>
> - Volume, type, speed and direction of vehicular traffic and direction of pursuit.
>
> - Nature/seriousness of suspected crime.
>
> - Condition of police vehicle and suspect's vehicle.
>
> - Any circumstance that could lead to a situation in which the pursuing officer(s) will not be able to maintain control of the police vehicle.
>
> - Type of vehicle being pursued.
>
> - Likelihood of successful apprehension.
>
> - Whether the identity of the suspect is known to the point that later apprehension is possible.

(Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1264–65.)

As for termination of a pursuit, CPD Policy 12.535(E)(1) policy states:

> Officers will terminate pursuits under any of the following conditions:
>
> a.    The pursuit OIC or the primary unit determines the level of danger created by the pursuit outweighs the necessity for immediate apprehension.

      b.      Establishment of the suspect's identity allowing for apprehension at a later time and there is no longer a need for immediate apprehension.

      c.      Location of the pursued vehicle is no longer known.

      d.      The pursued misdemeanor violator crosses the Hamilton County line (Refer to Section F.3.)

(*Id*. at PageID 1269.)

The pursuit policy in *Meinhardt* is substantially similar to CPD's pursuit policy. Both policies require the law enforcement officer to weigh factors and "exercise [] significant, independent professional judgment." *Meinhart*, 627 S.W.3d at 834. Just as the law enforcement officer exercised discretion in *Meinhardt*, so, too, did the Officers here. Indeed, the City's and the Officers' understanding of the CPD policy confirms as much. As Chief Theetge, the City of Cincinnati's Rule 30(b)(6) witness, explained:

> I think what people need to realize -- what needs to be recognized is the officer, based on their training and their experience ***and the totality of the circumstances in front of them***, should be able to make a decision to continue or discontinue a vehicle pursuit knowing all the parameters that are outlined in the policy and procedure.

(Doc. 139, City Rule 30(b)(6) Dep., 166:17–25 at PageID 2579.)

Likewise, the Officers underscored the discretionary nature of the decision to engage or terminate a pursuit. Lieutenant Lanter explained: "The department is granting the officers ***the discretion to make that decision*** [whether to terminate a pursuit]….that's the officer's discretion as to when that threshold is made." (Doc. 135, Lanter Dep. 170:8–17 at PageID 1521.) And Officer Thomas testified: "It would be the decision of the pursuing officers ***to take those factors into consideration***. I don't think it's a black and white as you're presenting the question.…[I]t would be a personal assessment of all those consideration that we just discussed." (Doc. 141, Thomas Dep., 100:16–20 at PageID 2981.)

Not only did the Officers believe that Lieutenant Lanter (as the primary unit) and Sergeant Scalf (as the OIC) had the discretion to initiate and terminate the pursuit, they also believed that there was no point during the pursuit at which the factors favored terminating the pursuit. Officer Lanter testified that he thought he made the right decision to continue the pursuit, that there were no factors that would have required him to terminate the pursuit, and that "nothing along that route…made myself or Officer Thomas…think that…the pursuit was too high risk." (Doc. 135, Lanter Dep., 270:21–23 at PageID 1621; *see also* Doc. 138, Scalf Dep., 151:1–20 at PageID 2334 (testifying that he believed they were justified in pursuing and arresting Meyer).) Because the undisputed facts establish that the Officers exercised the type of discretion that both *Meinhart* and CPD policy require, and because they reasonably believed their decisions throughout the pursuit were appropriate, they are entitled to qualified immunity.

**IV.    Plaintiffs cannot prove proximate cause**.

Even if no immunity doctrine applies, Plaintiffs still cannot prevail on their claims because they cannot establish proximate cause. Plaintiffs assert two tort claims against the Officers, premised on negligence law: (1) wrongful death; and (2) personal injury. Proximate cause is an element to both claims. *Patton v. Bickford*, 529 S.W.3d 717, 730 (Ky. 2016). But Plaintiffs cannot establish a causal connection between the Officers and their injuries, because Meyer's criminal conduct is the intervening, superseding cause of that harm. Indeed, Meyer has pleaded guilty to murdering the Laibles and injuring the Kleins.

The intervening or superseding cause is "a legal issue for the court to resolve." *Id.* at 731. To find that there has been a superseding or intervening cause, a court must determine "whether the chain of causation applicable to a defendant's conduct has been broken by 'facts [that] are legally sufficient to constitute an intervening cause.'" *Id.* at 731 (quoting *Montgomery Elevator*

*Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984)). "Facts sufficient to constitute a superseding intervening cause are facts of such extraordinary rather than normal, or highly extraordinary, nature, unforeseeable in character, as to relieve the original wrongdoer of liability to the ultimate victim." *Id.* As for criminal acts specifically, an "intervening criminal act does not relieve one for liability for his or her negligent acts or omissions, where the criminal act is a reasonably foreseeable consequence of the defendant's negligent act.'" *Waldon v. Housing Auth. of Paducah*, 854 S.W.2d 777, 779 (Ky. Ct. App. 1991).

The same is true under Ohio law: "When a third person's criminal act intervenes between a defendant's conduct and a plaintiff's injuries, the defendant's negligence is the proximate cause of the plaintiff's injuries only where the defendant could have reasonably foreseen the intervening act." *Herndon v. Torres*, 249 F. Supp. 3d 878, 889 (N.D. Ohio 2017) (finding that a defendant truck driver's employer could not be found liable to the plaintiff for the truck driver's assault); *see also Sitton v. Massage Odyssey, LLC*, 158 N.E.3d 156, 161 (Ohio Ct. App. 2020) (finding that a massage parlor was not liable for the sexual assault perpetrated against a client by one of its employees).

The record establishes that Meyer's decision to flee—not the Officers' conduct—set in motion the chain of events leading to the crash. Meyer's own dangerous and evasive driving caused the crash that killed the Laibles and injured the Kleins. Throughout the pursuit, Meyer drove with "short bursts of acceleration with evasive maneuvers" in an attempt to lose the Officers. (Doc. 141, Thomas Dep. 217:7–12 at PageID 3130.) Meyer engaged in "a lot of turning" and evasive driving to try to "create a break visually so we would lose sight of him." (*Id.*, 226:16–23; 227:13–21 at PageID 3140–41.) And ultimately, Meyer "lost control and caused the accident, the crash" in Newport, Kentucky. (*Id.*, 230:10–12 at PageID 3143.)

31

But the Officers kept their distance from Meyer. They never made physical contact with Meyer's vehicle—there were no PIT maneuvers, no ramming, or attempts to run him off the road. Thomas maintained about 30 to 40 yards behind Lanter, and Lanter maintained a following distance behind Meyer. (*Id.*, 215:6–11; 216:13–19 at PageID 3128–29.) Meyer's own criminal recklessness—his choice to flee at high speeds through city streets, his evasive maneuvers, his loss of control and swerve onto the curb—killed the Laibles and injured the Kleins. That criminal conduct is the superseding cause, which severs any causal connection between the Officers' conduct and Plaintiffs' injuries.

## CONCLUSION

For these reasons, this Court should grant summary judgment to the Officers.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig, *pro hac vice*
Chad R. Ziepfel (93903)
Spencer S. Cowan, *pro hac vice*
Kenneth A. Foisy (97478)
Elise L. Marrinan (101353)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: 513-381-2838
Fax: 513-381-0205
aherzig@taftlaw.com
cziepfel@taftlaw.com
scowan@taftlaw.com
kfoisy@taftlaw.com
emarrinan@taftlaw.com

*Counsel for Defendants City of Cincinnati, Timothy Lanter, and Brett Thomas*

32

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, the foregoing was filed through the Court's

CM/ECF system, which will serve notice of the filing on all counsel of record, and was served

by regular mail upon the following:

Mason Meyer                                Austin Lagory
Little Sandy Correction Complex            9626 Shane Lane
505 Prison Connector                       Union, KY 41091
Sandy Hook, KY 41171

                                           *Defendant*

*Defendant*

                                           */s/ Aaron M. Herzig*
                                           _____