# Exhibit 3

1

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION


 3
                                - - -
 4   UNITED STATES OF AMERICA,       .   Case No. 1:20-cr-00085-1
                                     .
 5            Plaintiff,             .
                                     .   Cincinnati, Ohio
 6        - v -                      .
                                     .   Thursday, June 5, 2025
 7   MASON MEYER,                    .   11:00 a.m.
                                     .
 8            Defendant.             .
                                - - -
 9
                 TRANSCRIPT OF SENTENCING PROCEEDINGS
10            BEFORE THE HONORABLE JEFFERY P. HOPKINS
                 UNITED STATES DISTRICT COURT JUDGE
11
                                - - -
12

13   For the United States:     ASHLEY N. BRUCATO, ESQ.
                                 Assistant U.S. Attorney
14                               United States Attorney's Office
                                 221 East Fourth Street, Suite 400
15                               Cincinnati, Ohio  45202

16   For the Defendant:         TY L. FOSTER, ESQ.
                                 125 East Court Street, Suite 1000
17                               Cincinnati, Ohio  45202

18   Court Reporter:            LINDA S. MULLEN, RDR, CRR
                                 Official Court Reporter
19                               100 East Fifth Street
                                 Cincinnati, Ohio  45202
20

21   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
22

23

24

25
```

1       (Proceedings in open court, June 5, 2025, 11:00 a.m.)

2       COURTROOM DEPUTY:  Today is June 5th, 2025.  This is Case

3   Number 1:20-cr-85, United States of America versus Mason Meyer.

4       We're here today for a sentencing hearing, Your Honor.

5       THE COURT:  All right.  Let's have appearances of counsel,

6   please.

7       MS. BRUCATO:  Good morning, Your Honor.  Ashley Brucato

8   for the United States.

9       MR. FOSTER:  Ty Foster for Mr. Meyer, who is present.

10      THE COURT:  We'll also note for the record we have

11  Ms. Corra Lipscomb here and Ms. Jessica Shiepe from the

12  probation office.  Thank you for your appearance and your work

13  in preparing for the Court and the parties a PSR in this case.

14      So, Mr. Meyer, how this goes, as you know we're here for

15  your sentencing.  And I'm going to ask you a few mundane

16  questions to begin, and then I am going to get into some more

17  substantive issues.

18      You'll be given a chance at some point in this hearing to

19  address the Court, if you would like.  You don't have to do

20  that, but you'll be given that opportunity.  If one or two

21  members of your family would also like to address the Court,

22  we'll give them an opportunity as well.

23      So the first question I need to ask you, Mr. Meyer, is it

24  Meyer or Mayor?

25      THE DEFENDANT:  Meyer.

1      THE COURT:  Meyer?  Thank you, sir.

2      Are you the defendant in these proceedings, Mr. Meyer?

3      THE DEFENDANT:  Yes, sir.

4      THE COURT:  And you're represented by Mr. Foster, who is

5  seated to your right?

6      THE DEFENDANT:  Yes, sir.

7      THE COURT:  Mr. Foster, could you just acknowledge for the

8  record again you're here on behalf of Mr. Meyer?

9      MR. FOSTER:  That is correct.

10     THE COURT:  All right.  So on April 10th, 2024, the

11  defendant Mason Meyer entered into a plea of guilty to

12  Counts 1, 2, 3 and 4 of the second superceding indictment.

13     On January 23rd, 2025, the defendant requested to withdraw

14  his plea, but later indicated on February 21st, 2025 his intent

15  to proceed with his plea of guilty on all four counts.

16     Count 1 charges Mr. Meyer with conspiracy to possess with

17  intent to distribute and to distribute detectable amounts of

18  controlled substances, including methamphetamine, LSD, cocaine,

19  MDMA, DMT, marijuana, and Ketamine.  And a class -- all of

20  which are a Class A felony, in violations of Sections

21  841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C) of Title 22 -- 21,

22  and 21 846.

23     The statutory penalties for a sentence of a term of

24  imprisonment of at least ten years and up to life imprisonment,

25  at least five years and up to a lifetime of supervised release,

1    restitution in the amount of $10 million -- I'm sorry,

2    restitution and a fine in the amount of $10 million, and a

3    hundred dollar special assessment per count.

4         Count 2 charges the defendant with conspiracy to possess

5    firearms in furtherance of a drug trafficking offense, a

6    Class C felony, in violation of 18 U.S.C. Sections 924(c) and

7    (o).  The statutory penalties provide for a sentence of a term

8    of imprisonment of up to 20 years, up to three years of

9    supervised release, a $250,000 fine, and a $100 special

10   assessment.

11        Count 3 charges Mr. Meyer with possession with intent to

12   distribute 50 grams or more of methamphetamine, a Class B

13   felony, in violation of 21 U.S.C. Sections 841(a)(1) and

14   (b)(1)(B).  The statutory penalties provide for a sentence of

15   term of imprisonment of at least five years and up to 40 years,

16   a mandatory minimum of four years and up to a lifetime of

17   supervised release, a $5 million fine, restitution, and a $100

18   special assessment.

19        Count 4 charges Mr. Meyer with possession of a firearm in

20   furtherance of drug trafficking, a Class A felony, in violation

21   of 18 U.S.C. 924(c)(1).  The statutory penalties provide for a

22   sentence of imprisonment of at least five years and up to life

23   and to be served consecutive to any other sentence, up to

24   five years supervised release, a $250,000 fine, and a $100

25   special assessment.

1      Mr. Meyer pled guilty to these charges pursuant to a plea

2  agreement under Federal Rule of Criminal Procedure 11(c)(1)(A).

3  In that agreement, the parties agreed as follows:

4      Mr. Meyer is responsible for at least 1.5 kilograms but

5  less than 4 kilograms of methamphetamine under Sentencing

6  Guideline 2D1.1(c)(4).

7      The enhancement for reckless endangerment during flight

8  under Guideline 3C1.2 applies because Mr. Meyer recklessly

9  created a substantial risk of death and seriously bodily injury

10 to another person in the course of fleeing from law enforcement

11 officers.

12     Under Section 5G1.3(b), because a term of imprisonment

13 resulted from another offense that is relevant conduct in the

14 instant offense, the sentence -- the sentence in this case

15 shall run concurrently to the sentence imposed in the Campbell

16 County Circuit Court, Case Number 20-CR-440, and the defendant

17 is entitled to an adjustment for any period of imprisonment

18 already served on his undischarged term of imprisonment that

19 the Court determines will not be credited to the federal

20 sentence by the Bureau of Prisons.

21     Additionally, the government agreed to argue for a

22 sentence within the advisory sentencing guideline range and

23 agreed not to oppose certain reductions in the defendant's

24 offense level.

25     And under the *United States versus Phillips* decision from

1   the Sixth Circuit, the Court then construed this

2   Rule 11(c)(1)(A) plea agreement to include provisions of

3   Subsection (B) of that same rule because the parties made

4   certain recommendations in relation to the defendant's offense

5   level in the plea agreement, and because the parties further

6   agreed that the recommendations did not bind this Court.

7       At the plea hearing, the Court accepted the defendant's

8   guilty plea but deferred acceptance of the plea agreement.

9   Since then, the probation office, as the Court has noted, has

10  completed both the initial and the final presentence report.

11  The Court has received and reviewed both reports.

12      The Court has also received and reviewed the parties'

13  sentencing memoranda submitted in the case.

14      Let me ask then, has the government received copies of all

15  the aforementioned documents, Ms. Brucato?

16      MS. BRUCATO:  Yes, Your Honor.

17      THE COURT:  And has the defense, Mr. Foster?

18      MR. FOSTER:  Yes, Your Honor.

19      THE COURT:  All right.

20      Mr. Meyer, have you received copies of all of these

21  documents?

22      THE DEFENDANT:  Yes, sir.

23      THE COURT:  And you've had an opportunity to discuss them

24  in full with your counsel, Mr. Foster?

25      THE DEFENDANT:  Yes, sir.

1          THE COURT:  All right.  Let's briefly discuss the factual

2   findings I am going to use for sentencing today.

3          For purposes of sentencing, I intend to rely on the facts

4   as set forth in the final presentence investigation report.

5          Are any of the facts reported in the presentence

6   investigation report disputed by either the government or by

7   defense counsel?

8          Ms. Brucato?

9          MS. BRUCATO:  No, Your Honor.

10         THE COURT:  Mr. Foster?

11         MR. FOSTER:  Not the facts but the application of the

12  facts --

13         THE COURT:  Certainly.

14         MR. FOSTER:  -- is disputed.

15         THE COURT:  We'll give you an opportunity to make that

16  argument as well.

17         All right.  There being no objections to the facts, the

18  Court will adopt the factual statements contained in the final

19  presentence investigation report as its findings of fact for

20  purposes of sentencing in today's hearing.

21         Let's briefly describe the method for determining your

22  sentence, Mr. Meyer.

23         The Court must impose a sentence that is sufficient but

24  not greater than necessary to comply with the purposes of

25  sentencing as set forth in United States Code Section 3553.

```
 1   Making this determination requires the Court to consider a

 2   number of factors as set forth in Subsection (a) of 3553,

 3   including consideration of the advisory sentencing guidelines.

 4        Before discussing the sentencing factors, let's discuss

 5   any objections to the final presentence investigation report.

 6        As Mr. Foster has noted, the report indicates that there

 7   are at least four pending objections.  Before we proceed, let

 8   me ask, are there any additional objections that have not yet

 9   been raised that you would like to present today?

10        Ms. Brucato?

11        MS. BRUCATO:  No, none from the government.

12        THE COURT:  Mr. Foster?

13        MR. FOSTER:  No, Your Honor.

14        THE COURT:  Other than the four?  Very well.

15        As to the four pending objections outlined in the final

16   presentence investigation report, briefed in the parties'

17   sentencing memoranda, the Court will resolve each in turn.

18        Let me just ask, though, beforehand, would you like to

19   make any further argument, Mr. Foster, on these?

20        MR. FOSTER:  No.  I submitted, I think, a three- or

21   four-page outline of the arguments, and I think it accurately

22   portrays our situation.

23        THE COURT:  All right.

24        Ms. Brucato, would you like to have the opportunity for

25   the government?
```

1      MS. BRUCATO:  No, Your Honor.  I'm happy to any questions

2  the Court may have, but I have nothing additional outside of

3  the briefing and the objection response letter contained in the

4  PSR.

5      THE COURT:  Very well.

6      Okay.  Objection number one is for the application of

7  2D1.1(d)(1).  The defendant objects to the use of the cross

8  reference under Section 2D1.1(d)(1) and the resulting base

9  offense level calculation.

10     The defense asserts that the PSR ignored the agreed-upon

11  volume of contraband specified in the plea agreement and

12  erroneously calculated Mr. Meyer's offense level under

13  2D1.1(d)(1) rather than Section 2D1.1(c).

14     The defense avers that an intentional killing under

15  Section 2D1.1(d)(1), which cross references Section 2A1.2 for

16  second degree murder, must be related to the underlying offense

17  of trafficking drugs.

18     Thus, because the police chase preceding the deaths of the

19  two bystanders may or may not have been related to the drug

20  activity, and because Mr. Meyer did not intend to cause the

21  death of these two bystanders, the defense objects to the

22  application of the guideline's cross reference.

23     The defense does not alert this Court to any case law in

24  support of its contentions.

25     The probation office and counsel for the government,

1   Ms. Brucato, argue that Section 2D1.1(d)(1) is the appropriate

2   guideline here.

3       The Court agrees with the government and the probation

4   office.  Under Section 2D1.1(d)(1), an application of the cross

5   reference under Section -- under either Section 2A 1.1, murder,

6   or Section 2A1.2, second degree murder, is warranted if, quote,

7   a victim is killed under circumstances that would constitute

8   murder under 18 U.S.C. Section 1111, had such a killing taken

9   place within the territorial or maritime jurisdiction of the

10  United States, end of quote.

11      Here, the PSR applied this cross reference to

12  Section 2A1.2 for second degree murder.  Whether this cross

13  reference applies depends on, one, whether the defendant's

14  killing of two bystanders during the police pursuit is relevant

15  conduct; and two, where the killing constitutes second degree

16  murder under 18 U.S.C. Section 1111.

17      Sentencing Guideline 1. -- pardon me, 1B1.3, relevant

18  conduct, includes, quote, all acts and omissions committed,

19  aided, abetted, counseled, commanded, induced, procured or

20  willfully caused by the defendant that occurred during the

21  commission of the offense of conviction in preparation for that

22  offense or in the course of attempting to avoid detection or

23  responsibility for that offense.

24      The Court finds that the killing of the two bystanders

25  occurred while Mr. Meyer was attempting to avoid responsibility

1    for his offense, including his conspiracy to possess and

2    distribute drugs, his conspiracy to possess firearms in

3    furtherance of a drug trafficking crime, his possession with

4    intent to distribute methamphetamine, and illegal possession of

5    firearms, and his possession of firearms in furtherance of drug

6    trafficking crimes.  All of these are charges to which the

7    defendant pled guilty on the federal side.

8        As it relates to whether the killing constitutes second

9    degree murder, Section 2A1.2, second degree murder, and 18

10    U.S.C. Section 1111 guide this Court's consideration.

11        Second degree murder requires, quote, the unlawful killing

12    of a human being with malice aforethought, end of quote.

13        18 U.S.C. Section 1111, the Sixth Circuit has held that,

14    quote, recklessness may constitute malice aforethought where

15    the defendant acts with extreme disregard for human life, end

16    of quote.  Citing *United States versus Chevy*, 57 F.3d 1419 on

17    page 1429, a 1995 decision.

18        Here, the facts show that Mr. Meyer acted with extreme

19    disregard for human life, even counsel for the defendant

20    concedes that the Kentucky murder statute to which Mr. Meyer

21    pleaded guilty includes conduct where a person operated a motor

22    vehicle under circumstances manifesting extreme indifference to

23    human life, thereby causing the death of another.  This is

24    exactly what Mr. Meyer did in this instance.

25        The Court therefore will overrule the first objection.

1    Objection number two relates to grouping.  Defendant

2  objects to the PSR's failure to perform a proper, quote,

3  grouping analysis as required by Section D -- I'm sorry, 3D1.1.

4    Mr. Meyer claims that a proper grouping analysis of the

5  counts to which he pled guilty would reduce the offense level,

6  the total offense level.

7    The probation office and counsel for the government

8  maintain that the PSR correctly groups Counts 1 through 3 under

9  the Sentencing Guideline Section 3D1.2(d)., the guidelines

10  applicable to these offenses pursuant to Sections 2D1.1 and

11  2K1.1.

12    The Court agrees with the probation office and counsel for

13  the government.  Again, under Section 2K2.4, Count 4 cannot be

14  grouped because it carries a mandatory consecutive sentence.

15    For the remaining counts, Counts 1 through 3, Sentencing

16  Guideline 3D1.13(a) instructs that where counts are grouped

17  together pursuant to Section 3D1.2(a) through (c), the offense

18  level applicable to the group is the offense level for the most

19  serious of the counts comprising the group.  Here, Count 1,

20  drug conspiracy, represents the most serious of the counts

21  comprising that group.

22    Sentencing Guideline 3D1.2(c) instruct the counts --

23  instructs that the counts all shall be grouped together when

24  one of the counts embodies conduct that is treated as a

25  specific offense characteristic in, or other adjustment to, the

1    guideline application to another of the counts.

2         Count 2 represents a specific offense characteristic to

3    Counts 1 and 3, therefore Count 2 shall be grouped in

4    accordance with Sentencing Guideline 3D1.2(c).

5         The Court finds that there was no error in the grouping

6    procedure employed by the probation office.

7         The Court therefore overrules the objection number two.

8         Number three, the offense level pursuant to paragraph 102.

9    Mr. Meyer objects to the paragraph 102 of the PSR which results

10   in the increase of the offense level due to the defendant's

11   role in the offense.  Mr. Meyer advises that any increase in

12   the offense level related to his role is an offense -- in the

13   offense should be limited to Count 2.

14        The probation office and the government again maintain

15   that Mr. Meyer held a managerial or organizational role in the

16   offense, and a two-level increase is appropriate under

17   Sentencing Guideline 3B1.1(c).  The Court agrees.

18        The introductory commentary to Section 3B1.1 posits that,

19   quote, the determination of a defendant's role in the offense

20   is to be made on the basis of all conduct within the scope of

21   Sentencing Guideline Section 1B1.3(a)(1) through (4), and not

22   solely on the basis of the elements and acts cited in the count

23   of conviction.

24        As evidenced by Mr. Meyer's signed statements of facts,

25   his firearms trafficking and drug trafficking behaviors are

1    inextricably intertwined. His leadership within the

2    firearm-related aspect of the offense as charged in Count 2 was

3    an essential part of the drug trafficking conduct in this case.

4        The Court therefore will overrule objection number three.

5        Objection number four, the offense level in particular

6    directed at paragraph 105 of the PSR. Mr. Meyer objects to the

7    reckless endangerment to the pedestrians injured but not killed

8    under section -- under paragraph 105.

9        Specifically, the defendant asserts that Mr. Meyer should

10   not have been assessed a two-level increase offense and a

11   level -- in accordance with Sentencing Guideline 3C1.2 for

12   reckless endangerment to pedestrians injured but not killed

13   during the flight from the authorities and the hot pursuit that

14   occurred on August 7, 2020, if his offense level was calculated

15   under Sentencing Guideline Section 2A1.2.

16       Because Mr. Meyer's conduct necessitated the cross

17   reference, the defense maintains this conduct was accounted for

18   under this guideline.

19       Counsel for the government supports the position of the

20   probation office. Pursuant to Section 3C1.2, a two-level

21   increase is warranted if the defendant's recklessness created a

22   substantial risk of death or serious bodily injury to another

23   person in the course of fleeing from law enforcement officers.

24       Here, Mr. Meyer led law enforcement on a high speed chase

25   which began in Ohio and ended tragically in Kentucky. The

1     duration and danger of the police chase presented substantial

2     risk of death or serious bodily injury to the persons in

3     Mr. Meyer's pathway -- all persons in his pathway during the

4     course of this flight, and to the persons ultimately injured

5     but not killed in the pursuit that occurred on that day.

6         The defense erroneously argues therefore that Sentencing

7     Guideline 2A1.2's cross reference has already taken -- had been

8     taken into account -- or taken into account the substantial

9     risk, that is not correct.

10        The basis for the cross reference to Sentencing

11    Guideline 2A1.2 and the resulting offense level covers only the

12    bystanders who were killed as this guideline accounts for the

13    second degree murder.

14        In other words, the two-level increase under Sentencing

15    Guideline 3C1.2 covers the risk of death and substantial bodily

16    injury to persons other than those who were killed as a result

17    of Mr. Meyer's flight from law enforcement.

18        On the other hand, Sentencing Guideline 2A1.2 applies to

19    the second degree murder of the innocent bystanders who

20    tragically lost their lives.

21        Additionally, the Court notes from the record the parties

22    agreed that this enhancement applies as is provided in the plea

23    agreement signed by both parties.

24        The Court therefore overrules the objection and finds the

25    calculation to be proper with respect to objection number four.

1      I need next to establish for the record the advisory

2  sentencing guidelines range that applies in this case.

3      While the Sentencing Guidelines are not binding on this

4  Court, Mr. Meyer, I am required to take them into consideration

5  in fashioning a sentence to be imposed.

6      The base offense level for the offense to which you pled

7  guilty is 38.  There are no applicable specific offense

8  characteristics or adjustments that need to be made.  However,

9  the reasons listed -- for the reasons listed above, a two-level

10  enhancement is applicable pursuant to Sentencing Guideline

11  3C1.2 because the defendant recklessly created a substantial

12  risk of death or serious bodily injury to another person in the

13  course of fleeing from law enforcement.

14      Furthermore, another two-level enhancement is applicable

15  under Sentencing Guideline 3B1.1(c) because the defendant acted

16  as an organizer, leader, manager or supervisor in the criminal

17  activity engaged in here.  Thus, the offense adjusted offense

18  level is 42.  A two-level decrease is appropriate under

19  Guidelines Section 3E1.1(a) based upon the defendant's

20  acceptance of responsibility.

21      I'll entertain a motion from the government for another

22  one-level decrease for the defendant's timely notification, if

23  that is your desire, Ms. Brucato.

24      MS. BRUCATO:  Yes, Your Honor.  The government orally

25  moves for the additional one-level decrease under the

1    guidelines.

2         THE COURT:  Very well.

3         Mr. Foster, I assume no objection from the defense?

4         MR. FOSTER:  Correct.

5         THE COURT:  Motion will be granted.  Therefore, the total

6    offense level is 39 with a deduction of those three points.

7         Mr. Meyer has an extensive criminal history, which

8    includes prior convictions for receiving stolen property,

9    trafficking with an inmate, tampering with physical evidence,

10   illegal use and possession of drug paraphernalia, possession of

11   heroin, identity theft, fleeing or evading police, wanton

12   endangerment, operating a motor vehicle under a revoked or

13   suspended license, possession of a handgun by a convicted

14   felon, murder -- and murder, I should say.

15        Under the guidelines, his total criminal history score is

16   20, which establishes a Criminal History Category of VI, which

17   I believe is the highest.

18        So based upon a total offense level of 39, Criminal

19   History Category VI, the advisory guideline imprisonment range

20   is 360 months to life.  Because this range falls in Zone D of

21   the sentencing table, the guidelines suggest that a minimum

22   term shall be satisfied by a sentence of imprisonment.

23        Because at least one count is a Class A felony, the

24   guidelines range for a term of supervised release is at least

25   five years and up to life.

1    The guidelines advise that the defendant is ineligible for

2 probation in this case, and suggests that a range of between

3 50,000 to $15 million in a fine should be imposed.

4    There is also a mandatory special assessment of $100 under

5 18 U.S.C. Section 3013, per count, for a total of $400, which

6 the Court understands at this time, Mr. Foster, has yet to be

7 paid; is that correct?

8    MR. FOSTER:  I think that's correct.

9    THE COURT:  So we'll need to make arrangements for the

10 payment on the special assessment.

11    So, next, when imposing a sentence, Mr. Meyer, the Court

12 must consider several additional factors under 18 U.S.C.

13 3553(a).

14    As to the nature of the offense, Mr. Meyer stands before

15 the Court for sentencing on one count of conspiracy with

16 possession -- conspiracy to possess with intent to distribute

17 and to distribute detectable amounts of controlled substances,

18 Count 1.

19    One count of conspiracy to possess firearms in furtherance

20 of a drug trafficking offense, Count 2.

21    And one count of possession with intent to distribute

22 50 grams or more of methamphetamine, Count 3.

23    And one count of possession of a firearm in furtherance of

24 a drug trafficking offense, Count 4.

25    While there is no identifiable victim associated with

1   these charges, the Court has taken into account the general

2   societal interest at issue when considering victim impact.

3       As to the history and characteristics of the defendant,

4   Mason Meyer is 32 years old.  He is the father of four

5   children.  He has an extensive criminal history we've gone

6   through, for which his personal responsibility is real, but was

7   nevertheless deeply influenced by an upbringing in poverty,

8   family dysfunction, and economic disadvantage.

9       Mr. Meyer was born and raised under very difficult

10  circumstances.  His mother suffered from chronic substance

11  abuse and his father was intermittently incarcerated for

12  offenses related to drugs and arson.

13      Mr. Mason Meyer, his siblings, and his half-siblings were

14  raised in a dangerous area and were constantly moving from

15  group home to group home.

16      When he was 13 years old, he personally witnessed the

17  fatal shooting of another individual in his neighborhood, a

18  traumatizing event for him and perhaps for anyone who had

19  witnessed that kind of thing.

20      Mr. Meyer's father played only a small role in his

21  upbringing, which mainly consisted of the defendant

22  occasionally visiting his father while he was in prison.  As

23  such, Mr. Meyer viewed his father as a role model and began to

24  idolize drug dealing and drug dealers, prison life from a very

25  young age.

1   Mr. Meyer explained that he was taught to sell drugs

2 before he even knew how to ride a bicycle.  By the time he was

3 15, Mr. Meyer had sold a variety of drugs to his own mother.

4   As he approached adulthood, Mr. Meyer left his mother's

5 residence and began a lifetime of crime.

6   Mr. Meyer was interviewed by the probation officer in this

7 case and provided a statement for which he admitted involvement

8 in the offense pursuant to the statement of facts attached to

9 his plea agreement.  This indicates that he has accepted

10 responsibility for his criminal conduct.

11   The Court considers the offense in this case to be

12 serious.

13   Beyond the nature of the offense and the defendant's

14 history and the characteristics, which I have referred, I have

15 also considered the need for just punishment that will promote

16 respect for the law, deter others, and protect the public from

17 future crimes by Mr. Meyer.

18   With respect to the need of educational, vocational

19 training, medical care or other treatment, Mr. Meyer reportedly

20 discontinued his education during his freshman year at Newport

21 High School.  He reportedly enrolled in courses at College in

22 Kentucky, but has not indicated that he ever received a degree.

23   He's also of limited employment history that would -- so

24 it appears that he would benefit from some vocational training

25 while at the Bureau of Prisons.

1          The Court also is aware of Mr. Meyer's use of illicit

2    drugs throughout his life beginning as a teenager.  As a

3    result, it would stand to benefit that he take some forms of

4    abuse -- substance abuse treatment while incarcerated.

5          The Court must further consider any pertinent policy

6    statements under 5 -- Subsection (a)(5) of 3553.

7          Beyond this, the Court considers the need to avoid

8    unwarranted sentencing disparities among defendants with

9    similar records who have been found guilty of similar conduct.

10   As such, the Court has reviewed the data available from the

11   United States Sentencing Commission.  That data reflects that

12   the average term of imprisonment for defendants like Mr. Meyer

13   with primary guidelines under Section 2A1.2 and a Criminal

14   History Category of VI is 292 months.  This includes data from

15   the fiscal years 2020 through 2024, but notably it excludes

16   defendants with a 924(c) consecutive mandatory minimum

17   adjustment, which Mr. Meyer has to contend with in this case.

18         Thus, if the Court were to impose the average term from

19   the United States Sentencing Guidelines for the offense of

20   conviction here, it would be 292 months.  We would tack on

21   another 60 months, for a total of 352 months of imprisonment,

22   approximately 29 years.

23         As to Section 3553(a)(7), due to the nature of the case,

24   the Court finds that restitution is not applicable here.

25         Finally, I have also taken into account the plea agreement

1    that the parties have tendered for the Court's review.

2        We are now, Mr. Meyer, at the portion of the sentencing

3    hearing which is called the allocution.  You'll be given an

4    opportunity now to address the Court in mitigation of any

5    sentence that the Court might impose.  I'm going to give first

6    that opportunity to your counsel, Mr. Foster.

7        Mr. Foster, you have the floor to advocate on behalf of

8    Mr. Meyer.

9        MR. FOSTER:  Thank you.  Should I remain here?

10       THE COURT:  Wherever you're comfortable, sir.

11       MR. FOSTER:  I think the Court has articulated a pretty

12   good understanding of Mr. Meyer and his history.  I think it's

13   also relevant that Mr. Meyer might have some mental health

14   issues in the form of perhaps ADHD or depression which may have

15   led him to become as involved with illegal drugs because, you

16   know, he is self medicating.

17       But I don't know that I've ever met a person who was as

18   hampered as he was right out of the gate the minute he was

19   born, he was born into a situation that was -- it was just

20   doomed for failure, it appears.

21       And yet through all of that, what I have -- what I've been

22   impressed with with Mr. Meyer is that he does have a deep

23   empathy and care, especially for his family.  He seems to be

24   closely bonded to his family.  His brother is here in court

25   today.  Also a mentor, Mr. Lee, is here.  I think Mr. Lee would

1    like to address the Court briefly.

2         And as the Court knows, by chance I met someone who knew

3    Mr. Meyer as a youth and gave us an example of some compassion

4    that he showed to a perfect -- to a stranger, another kid who

5    might have been in distress at that point.

6         So yeah, I realize he's got a long criminal history and

7    he's done a lot of bad things but he's also done some good

8    things in life and he does have life-long friendships and close

9    family ties.

10        The government has -- you know, in relation to other

11   defendants here, has articulated that he -- that Mr. Meyer is

12   not the worst in the group of people, he's -- of this

13   indictment.  They believe Mr. Haskamp would have that role and

14   so Mr. Meyer would be under that.

15        Mr. Meyer was sentenced to a life term in Kentucky for the

16   deaths, and I think the Court can take that into consideration

17   in the sense that he -- as he is apparently eligible for parole

18   after 20 years.  I don't practice in Kentucky and I have no

19   idea if he will ever get parole in Kentucky.  He doesn't

20   anticipate that he will get parole at 20 years, but if there's

21   a possibility it might come sometime after that.  But the Court

22   can also take that into consideration that, you know, he is

23   paying a price in Kentucky for his reckless behavior.

24        If he ever gets to a federal prison, he would like the

25   opportunity to be eligible for whatever programs for drug abuse

1   and employment, and he would like to be as close to Cincinnati

2   as possible so that he can maintain his family relationships.

3        And if the Court would entertain Mr. Lee, we would like to

4   ask Mr. Lee to address the Court.

5        THE COURT:  All right.  Very well.

6        Mr. Lee, you can come forward, please.  If you could state

7   and spell your last name?

8        THE WITNESS:  Lee, L-e-e.  Rick is the first name.

9        THE COURT:  All right, Mr. Lee.

10       THE WITNESS:  Yeah.  I would just like to confirm his

11  environment growing up.  I came into Mason's life when he was

12  three years old.  Me and his mother got together, and we had

13  been together for about four months.  Everything was going

14  really well.  It was spectacular, actually.  Got the kids and

15  the life, and things were going well.

16       But then I found out the issues his mother had.  She

17  confided in me that she was abused as a child and obviously

18  that affected her.

19       But then the trend that I had seen over the years is she

20  could get in a stable situation but only for a short time, and

21  then put the kids right back in a bad environment.  She seemed

22  to have a fascination with what I would call deadbeats and

23  wanna-be ganisters.

24       And I came back into Mason's life when he was 13 for a

25  short time as well.  Things looked like they was up and up.

 1   They had a home and she had a car.  And I thought, well, okay,

 2   she got her stuff together.  And come to find out that she was

 3   on housing, that's fine, but the car belonged to her

 4   ex-husband.  And come to find out that she was really ready to

 5   jump off the edge again, and she did.

 6       And other times, she would get with a decent gentleman,

 7   had a good job and put a roof over her head, and had the kids

 8   all in a place again, and right smack in the middle of it, she

 9   would get with, I guess his cousin, I don't know what he is,

10   another deadbeat, wanna-be gangster, and that was just -- that

11   was just a pattern that I want to confirm.  That is how Mason

12   group grew up.

13       Any time there is any possibility of stability, you know,

14   his mom always took the low road when she could have took the

15   high road.  But it was not a very good environment.  Hopefully

16   that will be some consideration.

17       Just hoping there's sometime -- that he can, sometime in

18   the future, get parole and at least spend time with his kids.

19       I know everything is really bad, but yeah, I just think

20   he's a product of his environment.  Some people rise above it

21   and some people fall into it.

22       And to be honest with you, I don't want to drag this out

23   too far, I grew up in a really good environment.  Asked for a

24   motorcycle, I got four.  Six-bedroom house, seven acres.

25   Grandma and grandpa.  Everything is fine.

1    At 15 years old, my father was murdered.  I had no idea,

2  no idea what was going on.  So over the course of time, being

3  older, my mom started explaining to me what happened.  My

4  father grew up in Louisiana.  His mom was a sheriff and he got

5  away with everything, including murder, as a child and he

6  screwed up bad.

7    And by the time he got his family together, he was trying

8  to get away from that environment, and -- which ended up

9  getting him killed.

10    The moral of the story is, I wasn't around wanna-be

11  gangsters, I was around ganisters.  I had no idea.  You know,

12  my mother put me in that environment, I don't know why, but it

13  didn't break through to us.  So I didn't know the environment

14  even existed.

15    From then, it became I'm a veteran, college graduate, I

16  lived a normal life.  So to me, the core thing is the mother.

17  My mother kept me away from it and his mother dragged him into

18  it.  I would just like for you to take that into consideration

19  in sentencing.

20    Hopefully someday he would be able to hold his kids and,

21  you know, continue on.  He's got a wonderful heart, he just --

22  he was robbed as a child.

23    THE COURT:  All right.  I appreciate it, Mr. Lee.  Thank

24  you for your comments.

25    THE WITNESS:  Thank you.

1      MR. FOSTER:  Jodi Meyer, his brother, would like to

2  address the Court.

3      THE COURT:  So, Mr. Meyer, if you'll spell your last name.

4      THE WITNESS:  Meyer, M-e-y-e-r.

5      THE COURT:  All right.  Very well.

6      THE WITNESS:  Everything that's been said about our

7  childhood, it's there, it's true.  I've been in prison myself,

8  been out, straightened my life up.  He couldn't do it.  I don't

9  know what else much to say.

10      THE COURT:  All right.  Anything more, Mr. Meyer?

11      THE WITNESS:  No.

12      THE COURT:  Thank you, sir.  Appreciate your comments.

13      MR. FOSTER:  Thank you, Your Honor.

14      THE COURT:  So, Mr. Meyer, it's your opportunity to

15  address the Court, if you would like.  Again, you don't have to

16  make a statement, but if you would like, it's your time.

17      THE DEFENDANT:  No, sir.

18      THE COURT:  All right.  Very well.

19      Mr. Foster, can you tell me, when the state imposes a

20  sentence in the Commonwealth of Kentucky, are the sentences

21  similar to what we see here in Ohio?  Are they really a life

22  sentence?  20-year sentence in Ohio may result in much less

23  time.  What's the pattern over there, if you know?

24      MR. FOSTER:  I do not know.  I don't practice in Kentucky.

25  I was assigned to represent Mr. Meyer shortly after he was

1    arrested, but he was over in Kentucky.  So I've had a lot of

2    conversations with his attorneys over there.  And what they

3    tell me is a life sentence with a chance of parole is just

4    that, he's not going to do anything until 20 years and then

5    he'll have a chance to meet a parole board.

6        THE COURT:  All right.  Very well.  So there is a board

7    and they make a decision based upon his conduct in prison?

8        MR. FOSTER:  That's correct.

9        THE COURT:  All right.  Very well.  Thank you, Mr. Foster.

10       Ms. Brucato, does the government have anything they want

11    to offer?

12       MS. BRUCATO:  Your Honor, I will keep it brief.  I know

13    the Court is intimately familiar with the facts of this case as

14    laid out in the presentence investigation report and the

15    arguments of the government in its sentencing memorandum.

16       I do think it's helpful, especially in a conspiracy case,

17    to frame the defendants in terms of culpability.  And I think

18    as I laid out in the government's sentencing memorandum,

19    Mr. Meyer's culpability is similar to that of Mr. Haskamp.

20    They are different in some ways, and this also goes directly to

21    the harm to the community.

22       As it relates to the drug trafficking conspiracy, we

23    understand that Mr. Meyer was primarily supplied by

24    Mr. Haskamp, but that often he would get methamphetamine from

25    other sources.  But he was not the leader at the very top of

1    the drug conspiracy, but he was still distributing a

2    significant amount of methamphetamine.   And because he was

3    arrested in August, the drug conspiracy continued after his

4    arrest.

5         As it relates to the firearms conspiracy, which again is a

6    different type of societal harm, Mr. Meyer was in fact the

7    leader of that conspiracy and was deeply involved with

8    procuring firearms and would trade firearms with Mr. Haskamp

9    for drugs, and was arming a variety of people with firearms.

10   And he was using individuals to acquire those firearms.

11        And then a third type of societal harm was the defendant's

12   conduct as it relates to fleeing from law enforcement.   And it

13   was not his first time in this investigation fleeing from law

14   enforcement.

15        At the same time, Your Honor, we do understand that

16   Mr. Meyer did have a difficult upbringing and that that

17   presents some mitigation for the Court to consider.   And we

18   certainly don't dispute that the Court should consider that

19   mitigation.

20        Finally, Your Honor, I would note as the Court describes

21   the average sentence for this type of offender based on the

22   Court's research is 292 months, I just want to explain to the

23   Court where the parties thought we were at the time that we

24   entered the plea agreement.

25        As the plea agreement suggests, we thought that the base

1  offense level was 32, with the enhancement, that would put him,

2  after acceptance of responsibility, at 33.  And with a Criminal

3  History VI, that's 235 to 293 months, and then plus the

4  60 months for his 924(c) count.  So 293 would be the top end of

5  what the parties anticipated his guidelines would likely be.

6       293 plus 60 would take us into about 353 -- but please

7  don't solely trust my math that I was doing by hand -- I'm just

8  framing this for the Court to understand where the parties were

9  at as it relates to the guidelines that came out.

10      But I do think a helpful place to start is the sentence

11 that Mr. Haskamp received, in putting these two co-conspirators

12 in context as nearly equals in this drug trafficking and

13 firearms conspiracy as you combined the conduct.

14      Other than that, I would submit on the government's

15 sentencing memorandum, and I am happy to answer to any

16 questions that the Court may have.

17      THE COURT:  So the Court has a chart of all the offenders

18 related to this drug conspiracy and gun conspiracy.

19      And Ryan Haskamp, who we have acknowledged is at the head

20 of the drugs portion of the conspiracy, has received 324

21 months, I believe; is that correct, Ms. Colyer?

22      COURTROOM DEPUTY:  Yes, Your Honor.

23      THE COURT:  And if we were at 353, that would place him

24 above that of Mr. Haskamp.

25      MS. BRUCATO:  That's right, Your Honor.  That would be the

1   top end of the guideline range that the parties anticipated.

2   But I also understand that there is mitigation in this case,

3   and that in fashioning an appropriate and just sentence in this

4   case, the Court may want to consider the sentence that

5   Mr. Haskamp received and perhaps adjust the sentence of

6   Mr. Meyer accordingly.

7        And, again, would note that at the bottom end of what the

8   parties thought that the guidelines range would be would be

9   235 plus 60, which I think would put us at about 295.  So

10  that's the range that the party considered.  Obviously, his

11  guidelines are higher than that.  But those are just points

12  that I wanted to make to kind of frame the issues for the

13  Court.

14       THE COURT:  What's your recommendation here?

15       MS. BRUCATO:  Your Honor, I would recommend that the Court

16  would sentence Mr. Meyer comparative to Mr. Haskamp, perhaps

17  slightly lower that Mr. Haskamp given -- given the context.

18  He's slightly less culpable in the drug trafficking conspiracy,

19  more culpable in the firearms conspiracy.

20       I understand there is a disparity in how those guidelines

21  would come out for the firearms conspiracy, as well as maximum

22  penalties in the drug conspiracy.  The drug conspiracy

23  obviously being the more significant and serious crime to which

24  the defendant has pled guilty.

25       But also understanding that there is other conduct in this

1    case, the two individuals who tragically lost their lives as a

2    result of the defendant's conduct.  But certainly I don't

3    think -- from the government's perspective, I don't think a

4    sentence more than Mr. Haskamp would be a just sentence in this

5    case.

6         THE COURT:  Very well.

7         Mr. Foster, having heard from the government, is there

8    anything more the defense would like to offer here?

9         MR. FOSTER:  One second.

10        THE DEFENDANT:  Do you want me to say -- may I say

11   something, Your Honor?

12        THE COURT:  Absolutely.

13        THE DEFENDANT:  Okay.  When she stated that Haskamp was my

14   supplier and that I supplied him with guns, she's getting this

15   information by third party.  Haskamp still denies to this day

16   and I still deny to this day that we conspired together.  Like

17   we didn't -- like he wasn't my drug dealer, I wasn't his drug

18   dealer.

19        So like that's being put in the statement of facts, but

20   then there's no evidence that proves that's literally -- like

21   it's a couple of people that gave federal officers whatever

22   they needed to give them to make sure they didn't go to prison.

23   So they became federal informants, so they are going off of

24   what other people said in this whole thing.

25        But I'm not arguing the sentence, if it's 352 or 292,

1    whatever.  I just want it to be on record and that, you know,

2    me and him's never agreed to her, any marshals, our lawyers,

3    nothing, that we bought drugs from each other or sold drugs to

4    each other or anything.

5         THE COURT:  They have wiretap, as I recall, Ms. Brucato.

6         THE DEFENDANT:  The defendant was wiretapped after I was

7    incarcerated.

8         MS. BRUCATO:  Your Honor --

9         THE COURT:  Text messages and the like, which show that

10   you were involved heavily in a drug conspiracy with

11   Mr. Haskamp.

12        Go ahead, Ms. Brucato.

13        MS. BRUCATO:  Yes, Your Honor.  So certainly there are

14   individuals who did provide information to the government, but

15   that information is corroborated by other evidence that was

16   collected in this case.

17        In particular, as it relates to the firearms trafficking,

18   there were photographs that Mr. Meyer -- and this evidence came

19   from his phone -- where he was sending guns to Mr. Haskamp,

20   pictures of guns that were straw purchased at different

21   firearms stores.  And these two were certainly working

22   together, whether there's a dispute over who was supplying who,

23   they were working together to distribute drugs, and that's what

24   the investigation unveiled and that is what the statement of

25   facts suggests.  And the defendant pled guilty to conspiring

1    with Mr. Haskamp and others to traffic in methamphetamine.

2          These two were certainly work together, whether they had a

3    common supplier at times, they were getting meth from a variety

4    of different sources.

5          Now, I will say that the wiretap was in fact after the

6    defendant, this defendant was arrested; however, we did have

7    toll records, and Mr. Haskamp and Mr. Meyer were in

8    communication consistently throughout this time period of the

9    charged conspiracy.

10         And that's how the investigation started, was that they

11   were looking at Mr. Meyer, understanding that Mr. Haskamp and

12   him were involved in drug trafficking and that Mr. Meyer was

13   involved in firearms trafficking.

14         THE COURT:  Anything more, Mr. Foster?

15         MR. FOSTER:  No, Your Honor.  Thank you.

16         THE COURT:  All right.  So I'm going to announce then the

17   Court's proposed sentence, and I'll give the parties an

18   opportunity to object on a legal basis afterwards.

19         So after considering all of the points that have been

20   mentioned, and again, only by a preponderance of evidence the

21   Court has to believe or disbelieve what the facts are in this

22   case.  And clearly, I think with the corroborating evidence

23   here, it seems to suggest that there was at least a conspiracy

24   that existed between you and Mr. Haskamp to both buy and sell

25   drugs and guns.

1    So considering the factors under 3553, the sentencing

2    guidelines, the plea agreement, it's the duty of the Court to

3    sentence you at this time, Mr. Meyer.

4    And as I note, you'll be given an opportunity to object,

5    both sides, to any sentence the Court would announce before

6    it's actually imposed.

7    So pursuant to the Sentencing Reform Act of 1984,

8    18 U.S.C. 3553(a), it's the judgment of the Court that the

9    defendant, Mason Louis Meyer, is hereby committed to the

10   custody of the United States Bureau of Prisons to be imprisoned

11   for a term of 240 months as to Count 1, 2 and 3, to run

12   concurrently to each other, and 60 months as to Count 40 to run

13   consecutively with Counts 1, 2 and 3.  The total term of

14   imprisonment therefore being 300 months with credit for time

15   served.

16   Pursuant to Sentencing Guideline 5G1.3(b), the imposed

17   sentence shall therefore be 242 months, adjusted for the total

18   offense of 300 months in order to account for Mr. Meyer's

19   confinement from August 7th, 2022 to June 5, 2025 in relation

20   to Docket Number 20-CR-440 and 21-CR-065 through Campbell

21   County, Kentucky, which would not otherwise be credited by the

22   Bureau of Prisons.

23   Importantly, the sentence shall run concurrently with the

24   sentence imposed in the Campbell County Circuit Court cases

25   20-CR-440, the murder, and 21-CR-65, the possession of a

1    handgun by a convicted felon.

2        The Court notes for the record the operative plea

3    agreement only references a concurrent sentence with section --

4    with Case Number 20-CR-440; however, the sentence from Case

5    Number CR-440 itself runs concurrently with the sentence from

6    Case Number CR-2165 -- or 21-CR-65 as determined by the

7    sentencing judge in Campbell County, Kentucky.

8        So those two state court charges, in other words, and

9    convictions, are to run concurrently.  All we're doing here is

10   having them run concurrent in terms of the sentencing hearing.

11   So the federal sentence shall run concurrently with each of the

12   two underlying concurrent state court sentences, the bottom

13   line.

14       This sentence reflects the seriousness of the offense,

15   promotes respect for the law, and provides a just punishment

16   for the offense while deterring any future criminal conduct.

17       The sentence is sufficient but not greater than necessary

18   to satisfy the purposes of sentencing as outlined in the

19   statute.

20       Here the sentence is below the guideline range and below

21   the range of sentencing imposed upon defendants with similar

22   records found guilty of similar conduct.

23       The Court finds the sentence to be imposed to be

24   appropriate for several reasons.  But first, Mr. Meyer, let me

25   just say that the offense you committed in this case was deadly

 1   serious.

 2        While selling narcotics and running drugs does not reveal

 3   any identifiable victim in this case, by no means is your

 4   conduct victimless.

 5        First, it behooves you to think of your own children

 6   throughout your path towards rehabilitation.  Just as

 7   importantly, I urge that you not forget -- never forget the

 8   children and the relatives of those who have been victimized by

 9   the steady stream of guns and drugs literally invading our

10   communities, marginalized and underserved, under resourced

11   neighborhoods like the ones that you were forced to grow up in.

12        A steady stream of drugs grows exponentially, and guns,

13   because of selfish acts by offenders like yourself who choose

14   to exploit those who are most vulnerable in our society, people

15   who you grew up with.

16        By most measures, your conduct warrants a life sentence;

17   however, balanced against the seriousness of the offense and

18   your criminal history, Mr. Meyer, I have also taken into

19   consideration, as the parties have argued, your personal story,

20   including the early disruptions to your childhood due to your

21   father's incarceration and your mother's substance abuse, your

22   condition of poverty as a child, your early exposure and

23   life-long dependency on controlled substances yourself, your

24   acceptance of responsibility as it relates to the present

25   offense, and to some degree, your level of remorse and regret

1   for why we are here today.

2        Separately, Mr. Meyer, it may not appear to you now

3   because you're facing an extensive prison term, but you will

4   have the opportunity to decide whether the cycle you were

5   forced to grow up in goes unbroken.

6        The life you have lived, which stems in part from the

7   dysfunction of your own childhood, your own father's

8   imprisonment and your addiction to illicit drugs, need not be

9   the same life your children should be destined to repeat.  It's

10  incumbent upon you and you alone to help break that cycle.

11       You will have the chance, believe it or not, to have -- to

12  be a positive force in your children's lives even as you're

13  facing multiple years behind bars.

14       First off, Mr. Meyer, you need to make a decision to

15  educate yourself while you are in prison.  Time can be an enemy

16  but it can also be an ally.  Use the prison library and the

17  learning resources wisely; in other words, read.  Enroll in

18  classes to improve your critical thinking skills and your

19  knowledge and information base so you will have something to

20  impart, something to say to others, especially to your own

21  kids.

22       And if your children elect to visit you in prison, talk to

23  them about your mistakes and aspirations, their aspirations as

24  well as yours, and encourage them to strive towards better

25  decision-making, more legitimate goals for their lives based

1   not just upon your experiences and your missteps in life, but

2   also based upon what you have learned from the books and the

3   classes you are taking.

4       Even if they do not visit you, write them, Mr. Meyer.

5   Encourage them along these same lines, face the reality that

6   they may not write you back.

7       But I believe that at some point in their lives, they may

8   read those letters that you write to them.  And that may make

9   all the difference in the world on whether they do right or

10  they do wrong.  Ultimately, whether the cycle of drug abuse and

11  making bad choices like you've made continues in your family or

12  is broken, finally.

13      Mr. Meyer, we are here today because of your heinous and

14  irresponsible acts which culminated in the deaths of two

15  elderly couples enjoying a meal together on a summer afternoon

16  at a sidewalk café, seemingly without a care in the world, and

17  undoubtedly hoping to spend the twilight of their lives

18  together never expected to die on August 7th, 2020 because of

19  your criminality.

20      If we took a poll among people, most might say, "Lock him

21  up and throw away the key."  But I am a firm believer that each

22  of us is more than the worst thing that we have ever done.  And

23  you, Mr. Meyer, are more than the worst thing that you have

24  ever done.  And even though you may be absent from the lives of

25  your children physically, you can still potentially present --

1    be present in their lives in a positive way, and perhaps the

2    lives of their children.

3        While serving your term of imprisonment, the Court

4    recommends that you participate in substance abuse treatment,

5    mental health treatment as Mr. Foster, your attorney, has

6    advocated on your behalf, as well as some vocational

7    programming.

8        Mr. Meyer, you shall serve a term of supervised release of

9    five years on Count 1, three years as to Count 2, five years as

10    to Count 3, and five years as to Count 4, all to run

11    concurrently with each other.

12        While on supervision, Mr. Meyer, you must not commit

13    another federal, state or local crime.

14        You shall be prohibited from possessing a firearm,

15    ammunition, destructive device or dangerous weapon.

16        And you must not unlawfully possess a controlled

17    substance.  The defendant must refrain from any unlawful use of

18    a controlled substances.

19        And you shall have to submit to a drug test within 15 days

20    of being released on supervised release, and at least two

21    periodic drug tests thereafter as determined by the Court or

22    your probation officer.

23        You must cooperate in the collection of DNA as directed by

24    your probation officer.

25        And you must comply with the standard conditions of

1   supervision that have been imposed by this Court, as well as

2   the following special conditions:

3        You will have to participate in a program of testing and

4   treatment or medication compliance for alcohol and controlled

5   substance abuse as directed by your probation officer until

6   such time as are you released from that program by your

7   officer.

8        You must make a copayment for that treatment and those

9   services not to exceed $25 per month, which is determined by

10  your ability to pay.

11       You will have to participate in a program of mental health

12  assessment and counseling as directed by your probation officer

13  until such time again as you are released by your officer from

14  the program.  You will have to make another copayment for those

15  treatments not to exceed $25 a month, which again will be

16  determined by your ability to pay.

17       You'll have to disclose all financial information as

18  requested by your probation officer to ensure your financial

19  earnings are through legitimate means.

20       And you will have to participate in a vocational services

21  program as directed by your probation officer.  The program

22  should include on-the-job training, job readiness skills and

23  skills development.

24       I talk to people at this time, Mr. Meyer, about what the

25  probation office can offer.  It should not be something that

1  you view as a chore or as something you are required to do,

2  because you are required to do it, but the probation office is

3  actually a great resource for you to be able to get the kind of

4  training, and perhaps the kind of job placement, that will put

5  you on a path towards a life without crime.  So take advantage

6  of that once you get out.

7      A fine is not warranted in this case due to your inability

8  to pay.

9      I'm going to order that you pay that special assessment of

10  $400, which is due immediately.  You'll need to make

11  arrangements with the clerk of the court so that that gets

12  paid.  It's mandatory.  I don't have any control over that.

13      I'll note for the record that you have consented to

14  forfeiture of property involved in the commission of the

15  offense to which you have pled guilty and have been adjudged

16  guilty in Counts 1 through 4 of the second superceding

17  indictment, and certain rights related to the constitutional

18  and statutory challenges have been waived.

19      You also consented to administrative forfeiture of three

20  firearms, including a loaded Ruger model LC9s, a nine

21  millimeter handgun bearing serial number 329-74778 with

22  attachments and ammunition.

23      A loaded Springfield Armory model 1911-A1, a .45 caliber

24  handgun bearing serial number NM342515 with any attachments and

25  ammunition.

1      A loaded Mag Tactical Systems LLC model MG-G4,

2  multi-caliber rifle bearing serial number MTS30445 with

3  attachments and ammunition.

4      The Court considers this sentence, Mr. Meyer, to be just

5  and reasonable in light of your conduct and the applicable

6  sentencing factors that we've gone through.

7      I'm going to ask, Mr. Meyer, your counsel first,

8  Mr. Foster, do you have any objections to the sentence as the

9  Court has announced?

10      MR. FOSTER:  None other than what we already stated

11  before.

12      THE COURT:  Very well.  They are preserved for appeal if

13  you would like to make that, and we'll talk about that

14  momentarily.

15      Mr. Meyer, do you have any objections to the Court's

16  sentence?

17      THE DEFENDANT:  No, sir.

18      THE COURT:  Very well.

19      Ms. Brucato, any objections from the government?

20      MS. BRUCATO:  No, Your Honor.

21      THE COURT:  All right.  The sentence that I have announced

22  is thus imposed.

23      Mr. Meyer, would you like for this Court to make

24  recommendations as to which prison facility you would like to

25  be sent to specifically?  I know that you would like to be

1    close to Cincinnati, but is there one in mind that you have?

2          THE DEFENDANT:  I have a question, sir.

3          I'm on a writ from the state, but since my state sentence

4    is concurrent, are you able to recommend for me to go to

5    federal prison?  Because federal prison has more programs that

6    are going to suit to help me than state prison is, so I would

7    rather go to federal prison to do my time.

8          THE COURT:  Understood.  I don't know the answer to that.

9    Maybe, Ms. Brucato, you can help with that?  Ms. Lipscomb?

10         MS. BRUCATO:  I think it is likely that he will be

11   incarcerated in the state, but I am not sure on that.  So I,

12   like the Court, am not able to provide a clear answer.

13         THE COURT:  All right.  I'll tell you what, the deal I'll

14   make with you, Mr. Meyer, I'll make the recommendation.  I

15   don't have any control over that.  It may be first in time,

16   first in right.  The state system prosecuted you first, you

17   might need to go back there to serve your time, but I'll make

18   the recommendation as you've asked.

19         THE DEFENDANT:  The prison would be Big Sandy then because

20   it's the closest one to home.

21         THE COURT:  Very well.  All right.  Would you like for, if

22   you are ultimately transferred to the Bureau of Prisons, the

23   Court to make a recommendation with respect to any

24   apprenticeship programs or vocational training?

25         THE DEFENDANT:  Sir?

1        THE COURT:  What would you like to do if I'm able to get

2   you into a federal prison?

3        THE DEFENDANT:  Every program they offer.

4        THE COURT:  All right.  Is there one in particular,

5   carpentry, HVAC?

6        THE DEFENDANT:  Vocational and parenting classes, the

7   parenting programs.

8        THE COURT:  That may be part of what you're going to get

9   in terms of your counseling.  What I mean now is vocations,

10  like carpentry, like --

11       THE DEFENDANT:  Yeah, put me down for carpentry.

12       THE COURT:  -- or HVAC is there --

13       THE DEFENDANT:  I don't know if they do HVAC at Big Sandy.

14       THE COURT:  All right.

15       THE DEFENDANT:  I'm not sure which ones they offer there.

16       THE COURT:  So we'll advise the Bureau of Prisons to put

17  you in some form of vocational training, whatever is offered.

18       All right.  I have to, as one of the last things we do is

19  advise on your rights to appeal.

20       Under some circumstances, Mr. Meyer, the defendant has the

21  right to appeal a sentence; however, the defendant may waive

22  that right as part of a plea agreement.  As you know, you have

23  entered into a plea agreement which waives some or all of your

24  rights to appeal the sentence itself.

25       So subject to the waivers contained in your plea

1    agreement, I hereby notify both parties that you have the right

2    to appeal the sentence I have imposed.  Such appeal waivers are

3    generally enforceable, but if you believe, for example, the

4    waiver itself is not valid, you can present that theory to the

5    Court of Appeals.

6        Mr. Meyer, if are you indigent and cannot afford to retain

7    a lawyer, you may apply and one will be appointed to represent

8    you in your appeal.

9        You are further advised that in accordance with the

10   provisions of Rule 4(b) of the Rules for Appellate Procedure,

11   you must file your notice of appeal with the clerk of the

12   United States District Court within 14 days of the filing of

13   the judgment in your case here.

14       The Court does hereby advise that if you request, the

15   clerk of the court will prepare immediately and file a notice

16   of appeal on your behalf.  If you request, the clerk of court

17   will file that notice of appeal immediately after the judgment

18   is entered in your case.

19       So I'm going to ask for you to state on the record,

20   Mr. Meyer, would you like for this court to file a notice of

21   appeal your behalf?

22       THE DEFENDANT:  No, Your Honor.

23       THE COURT:  Mr. Foster, if Mr. Meyer does change his mind,

24   I assume you'll be there to advise on that.

25       MR. FOSTER:  That is correct.

1      THE COURT:  All right.  Very well.

2      All right.  So because you've been detained without bond,

3  I suppose consideration for voluntary surrender is out of the

4  question.

5      Would you like to be heard on that, though, Mr. Foster?

6      MR. FOSTER:  No.  I think he's under -- we've got him on a

7  writ from Kentucky.  It's moot.

8      THE COURT:  All right.  So you'll be remanded to the

9  custody of the United States Marshal pending whatever happens

10  in terms of where you have to serve first, whether it's in the

11  Commonwealth of Kentucky or if it's in the federal system,

12  Mr. Meyer.

13      Again, I'll make a recommendation but I won't have control

14  over that.  That will be something that the Bureau of Prisons

15  decides, along with the officials in the Commonwealth.

16      Is there anything further before we adjourn that the

17  parties wish to put on the record, Ms. Brucato?

18      MS. BRUCATO:  No, Your Honor.  Thank you.

19      THE COURT:  Mr. Foster?

20      MR. FOSTER:  Thank you for your kind words of support for

21  Mr. Meyer.

22      THE COURT:  Very well.

23      Okay.  Mr. Meyer, I've given you the best advice I could

24  come up with.  Please take advantage of the resources in the

25  prison, again, to help with your critical thinking and your

1  reading, and help control some of the urges to do things that

2  are not lawful so that you can have a relationship with your

3  children and others.

4      It will help to have a knowledge base and make that

5  knowledge base based upon the kinds of thing you read, not the

6  kind of things you hear while you're incarcerated.  So take

7  advantage of those.  Hopefully you'll be out in time that you

8  can enjoy some life with your children after your

9  incarceration.

10      We're adjourned.

11      (Proceedings concluded at 12:05 p.m.)

12

13                    C E R T I F I C A T E

14          I, Linda S. Mullen, RDR, CRR, do hereby certify that

15  the foregoing is a correct transcript from the record of

16  proceedings in this above-entitled matter.

17

18  /s/Linda S. Mullen                June 13, 2025
    Linda S. Mullen, RDR, CRR        Date of Certification
19  Official Court Reporter

20

21

22

23

24

25