**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON**

| | | |
|---|---|---|
| **JASON LAIBLE,** *et al.*, | : | **Case No. 2:21-cv-00102** |
| | : | |
| **Plaintiffs** | : | **Judge David L. Bunning** |
| | : | |
| | : | |
| | : | |
| **v.** | : | **DEFENDANT THE CITY OF** |
| | : | **CINCINNATI'S MOTION FOR** |
| **TIMOTHY LANTER,** *et al.*, | : | **SUMMARY JUDGMENT** |
| | : | |
| **Defendants.** | : | |

Defendant City of Cincinnati ("City") moves for summary judgment under Federal Rule of Civil Procedure 56. The undisputed material facts and applicable law confirm that the City is entitled to immunity under either Ohio or Kentucky law and is entitled to judgment as a matter of law. A memorandum of law and proposed order accompany this motion.

Respectfully submitted,

/s/ Aaron M. Herzig
Aaron M. Herzig, *pro hac vice*
Chad R. Ziepfel (93903)
Spencer S. Cowan, *pro hac vice*
Kenneth A. Foisy (97478)
Elise L. Marrinan (101353)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: 513-381-2838
Fax: 513-381-0205
aherzig@taftlaw.com
cziepfel@taftlaw.com
scowan@taftlaw.com
kfoisy@taftlaw.com
emarrinan@taftlaw.com

*Counsel for Defendants City of Cincinnati,*
*Timothy Lanter, and Brett Thomas*

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON**

| | | |
|---|---|---|
| **JASON LAIBLE,** *et al.*, | : | **Case No. 2:21-cv-00102** |
| | : | |
| **Plaintiffs** | : | **Judge David L. Bunning** |
| | : | |
| | : | |
| | : | |
| **v.** | : | **MEMORANDUM IN SUPPORT OF** |
| | : | **THE CITY OF CINCINNATI'S** |
| **TIMOTHY LANTER,** *et al.*, | : | **MOTION FOR SUMMARY** |
| | : | **JUDGMENT** |
| **Defendants.** | : | |
| | : | |

There is one cause of the tragic August 2020 collision that resulted in the deaths of Raymond and Gayle Laible and injuries to Steve and Maribeth Klein—Mason Meyer. Meyer has pleaded guilty to the Laibles' murder due to his reckless driving and was sentenced to life in prison. He also has been sentenced by United States District Court Judge Jeffery Hopkins to 300 months in prison for his leadership role in a drug-and-gun trafficking organization with international reach.

Plaintiffs—the Laibles' executor and the Kleins—are justifiably outraged by this tragedy. But they are misguided in their attempt to impose liability on parties *other than* Meyer, including Cincinnati Police Department ("CPD"), Officer Brett Thomas, and Lieutenant Timothy Lanter (collectively, "Officers") and the City of Cincinnati ("City").[1]

---

[1] Lieutenant Lanter was elevated to his current rank in May 2021, having previously served as a sergeant. (Doc. 135, Lanter Dep., 6:22–24, at PageID 1357)

Plaintiffs' Amended Complaint alleges a direct claim against the City for the negligent training and supervision of the CPD Officers. This Court should grant summary judgment for the City for three reasons.

1.      A claim for negligent training and supervision requires a threshold finding that the employee committed a tort. Because the Officers are immune and otherwise entitled to judgment in their favor (as explained in their motion for summary judgment), the City cannot be liable.

2.      The City is entitled to immunity on Plaintiffs' negligent training and supervision claim. Under both Ohio's or Kentucky's immunity law, the outcome is the same. In Ohio, municipalities are generally immune from suits for tort claims. There is no exception to that general rule for claims against a municipality for negligent training or supervision of a police officer. And in Kentucky, a police department's training and staffing of police officers is an inherently discretionary function for which the police department is immune from liability. So under either state's immunity law, Plaintiffs' negligent training and supervision claim fails.

3.      Even if the Officers and the City are not immune, Plaintiffs' claim fails on the merits. The record confirms that the Officers were exemplary law enforcement officers, who received rigorous academy training and ongoing field training on police pursuits and driving maneuvers. The Officers posed no risk to themselves and others related to their operation of police cruisers or engagement in police pursuits. And to be sure, the City did not disregard that (non-existent) risk.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The City incorporates by reference the Statement of Undisputed Material Facts in the Officers' Motion for Summary Judgment, filed contemporaneously with this Motion. The City supplements that with the following additional undisputed material facts.

2

I.      **The Cincinnati Police Department provided extensive training to its officers—including Officer Thomas and Lieutenant Lanter—on police pursuits.**

CPD provides extensive police-pursuit training to its officers that is "consistent with accepted practices" among law enforcement agencies. (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2910.) Officer Thomas and Lieutenant Lanter received that training. As Hamilton Township, Ohio police chief Scott Hughes—the City's expert—explained, Officer Thomas and Lieutenant Lanter were "highly experienced officers" who received "prior training related to high risk vehicle stops, pursuit policies, and use-of-force protocols." (*Id.* at PageID 2897–98.)

The City's training starts at the police academy. During their seven months of classroom training, officers receive defensive-driving and pursuit-driving training, which provides them with foundational instruction in vehicle pursuit techniques and emergency driving skills. (Doc. 139, City Rule 30(b)(6) Dep., 53:21–24; 66:9–11 at PageID 2466; 2479; Doc.135-1, Lanter Dep., Exhibit 54, Lanter Record of Training at PageID 1710-1720; Doc. 141–2, Thomas Dep., Exhibit 31, Thomas Record of Training.)

After the academy program ends, recruits spend three months with a field training officer ("FTO"). (Doc. 139, City Rule 30(b)(6) Dep., 66:12–20 at PageID 2479.) FTOs help recruits apply their academy-based knowledge to real-world situations—including police pursuits. (*Id.*, 66:14–16 at PageID 2479.)

Then, the training continues—both through on-the-job learning, mandatory continuing education, policy updates, and refresher trainings. CPD sends its officers to refresher trainings on police pursuits and driving maneuvers. (*See, e.g.*, Doc. 141, Thomas Dep., 150:14–151:3 at PageID 3063–64; Doc. 135, Lanter Dep., 78:2–11 at PageID 1429.) And when CPD modifies its policies and procedures, it shares this information to officers through weekly "Staff Notes" updates. CPD expects officers to review all policy updates—and supervisors sometimes read the

3

policies to officers at roll call.[2] (Doc. 135, City Rule 30(b)(6) Dep., 48:17–49:5 at PageID 2461–62.) CPD also expects officers to comply with all applicable Ohio laws and CPD policies and training instructions. (*Id.*, 45:24–46:4; 46:13–21 at PageID 2458–59.) There is no dispute that the City's training and policies comply with Ohio law, which governs the training that peace officers must obtain and maintain throughout their careers. *See* Ohio Rev. Code § 109.803; Ohio Admin. Code § 109:2-18-02. There is no dispute that Lanter and Thomas received all training required by the City and Ohio law.

## II. Officer Brett Thomas received extensive police pursuit training.

Officer Thomas, who holds a bachelor's degree in criminal justice, began his CPD career in December 2004 as a police academy cadet. (Doc. 141, Thomas Dep., 23:6–8; 24:4–6 at PageID 2936–37.) He continued his academy training through June 2005. (*Id.*, 24:18–25:4 at PageID 2937–38.) By August 2020, Officer Thomas had more than 15 years of law enforcement experience with CPD. He served on CPD's SWAT team beginning in 2012 and joined the specialized K-9 unit in 2017, where he served in August 2020. (*Id.*, 26:4–9 at PageID 2939.) Those assignments reflect Officer Thomas's skill and operational depth. (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2897.)

During his seven-month police academy training, Officer Thomas received defensive-driving and pursuit-driving training, which included specific instruction on: (1) conducting vehicle pursuits and stops; and (2) emergency response driving. (Doc. 141, Thomas Dep., 40:9–15; 44:23–24 at PageID 2953; 2957.) After completing the academy, he received four separate hands-on pursuit-driving trainings over the course of his career:

---

[2] City policy requires verification that all updated policies have been provided to officers. (Doc. 135, City Rule 30(b)(6) Dep., 50:16–51:10 at PageID 2463–64.)

- January 22, 2007:  Officer Thomas attended a training at the Hamilton County, Ohio Sheriff's Office headquarters, which included vehicle handling and scenario-based training in a large parking lot. (*Id.*, 150:14–20; 151:10–24 at PageID 3063; 3064.)

- December 4, 2008: Officer Thomas attended a training in the Coney Island amusement park parking lot, which included mock pursuit scenarios. (*Id.*, 151:5–9 at PageID 3064.)

- November 17, 2010: Officer Thomas attended a pursuit training course at Cincinnati's Blue Ash Airport. (*Id.*, 149:11–14; 151:25–152:6 at PageID 3062; 3064–65.)

- 2013: Officer Thomas attended another pursuit training course at Cincinnati's Blue Ash Airport. (*Id.*, 148:17–19; 151:25–152:6 at PageID 3061; 3064–65.)

The pursuit trainings Officer Thomas received involved mock pursuits, training on proper radio announcements, and fleeing-suspect scenarios with an instructor in the vehicle. (*Id.*, 50:25–51:12 at PageID 2963–64.) And he received instruction about CPD pursuit policies during his training sessions. (*Id.*, 52:8–10 at PageID 2965.)

Officer Thomas received real-world training, too. Before August 2020, he was involved in about 10 pursuits, serving as the primary unit in about four or five of them. (*Id.*, 137:21; 139:25–140:9 at Page ID 3050; 3052–53.) Of those pursuits, only one involved an accident: a pursuit in 2018 or 2019, when an occupant of a fleeing vehicle was injured (there were no other injuries). (*Id.*, 138:1–139:19 at PageID 3051–52.) Officer Thomas was the secondary unit. (*Id.*, 138:13 at PageID 3051.)

### III.    Lieutenant Timothy Lanter received extensive police pursuit training.

Lieutenant Lanter, who holds a bachelor's degree in criminal justice and a master's degree in criminal justice, began the CPD academy in April 2006. (Doc.135, Lanter Dep., 10:20–11:6; 12:16–23 at PageID 1361; 1363.) During the academy, he received policy instruction and hands-on pursuit-driving training at the Hamilton County Sheriff's Office. (*Id.*, 52:17–25; 53:1–19; 54:1–25 at PageID 1403; 1404; 1405.) That hands-on training included obstacle courses in a large, open parking lot and practice with a "skid car," designed to help officers learn how to

5

account for various weather and traffic conditions and develop experience with evasive

maneuvers. (*Id.*, 53:1–25; 54:1–7 at PageID 1404; 1405.)

Like Officer Thomas, Lieutenant Lanter also continued to receive training after

graduating from the academy, including four "hands-on" pursuit-related trainings[3]:

- January 29, 2007: Lieutenant Lanter received pursuit training at the Hamilton County Sheriff's Office headquarters. (*Id.*, 78:2–14 at PageID 1429.)

- November 11, 2008: Pursuit training at the Coney Island amusement park parking lot. (*Id.*, 78:18–25 at PageID 1429.)

- November 9, 2010: Additional hands-on pursuit training. (*Id.*, 79:8–19 at PageID 1429.)

- December 17, 2013: Additional hands-on pursuit training. (*Id.*, 81:8–11 at PageID 1432.)

Lanter received ongoing training throughout his career—in part through real-world

experience and also through formal training.

## IV.     Officer Thomas and Lieutenant Lanter have nearly unblemished disciplinary records.

Officer Thomas and Lieutenant Lanter have nearly unblemished disciplinary records. As

Chief Hughes stated in his expert report: "There is also no evidence of a pattern of similar

incidents involving unconstitutional pursuits that would suggest a widespread or tolerated

custom." (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2897)

### A.     Officer Thomas

Officer Thomas's personnel file reflects his "skill and operational depth" as a K-9

handler and SWAT operator. (*Id.*) Officer Thomas's only pursuit-related infraction occurred in

---

[3] Lieutenant Lanter attended several other training sessions between 2012 and 2017 that covered topics such as stop-stick deployment, motor vehicle stops and approaches, and motor vehicle offenses—and may have included pursuit-related training. (Doc. 135, Lanter Dep. 80:1–14; 81:14–23; 82:1–21 at PageID 1431; 1432; 1433.)

2008, when he did not activate his external microphone. (Doc. 139, City Rule 30(b)(6) Dep., 88:2–11 at PageID 2501.) He received verbal counseling to remind him about the importance of turning on his microphone during a pursuit. (*Id.*, 88:12–16 at PageID 2501.) Separately, Officer Thomas received counseling for his role in a minor auto accident in 2010, and was instructed to drive more cautiously. (*Id.*, 90:22–91:21 at PageID 2503–04.) Neither infraction relates to his decision to initiate or continue a police pursuit.

### B.    Lieutenant Lanter

Lieutenant Lanter has had minimal disciplinary history over his nearly two-decade career.[4] Indeed, his personnel file "reflects consistent supervisory recognition and favorable evaluations for his leadership in tactical operations, including prior vehicle pursuits." (Doc. 140–1, Ex. A, S. Hughes Report at PageID 2896.)

Before August 2020, Lieutenant Lanter received no formal or informal discipline related to his involvement in a pursuit. In March 2011, Lieutenant Lanter was the secondary unit in a pursuit that ended when the fleeing suspect crashed into a taxicab in downtown Cincinnati, killing its two occupants. (Doc. 135, Lanter Dep., 327:10–20 at PageID 1678.); *see also Sidi v. City of Cincinnati*, No. 1:12-cv-242, 2014 WL 1276195, at *2 (S.D. Ohio Mar. 27, 2014) (granting summary judgment in favor of the City and Lanter). CPD's internal investigation unit investigated the pursuit and cleared Lieutenant Lanter of any policy violations. (Doc. 135, Lanter Dep., 350:4–17 at PageID 1701.) Relatedly, Lieutenant Lanter received no formal or informal

---

[4] Last year, Lieutenant Lanter received a reprimand for his decision to not arrest a woman whose car was being towed. (Doc. 135, Lanter Dep., 329:17–333:13 at PageID 1680–84.)

discipline for his role in the pursuit and was found to have committed no violations of CPD policy. (*Id.*, 327:24–328:5; 339:3–10 at PageID 1678–79; 1690.)[5]

Lanter could not recall being involved in any other pursuit that resulted in an injury. (*Id.*, 328:10–23 at PageID 1679). He took a remedial driving course in December 2017, but was unsure why he participated in this training. (Doc. 135, Lanter Dep., 338:2–12 at PageID 1689.)

## ARGUMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because there must be an issue of material fact, an "alleged factual dispute between the parties" as to a nonmaterial matter "will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

As the moving party, the City bears "the initial burden of proving that no genuine issue of material fact exists and that [it] is entitled to judgment as a matter of law." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). If the moving party meets that burden, then "the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Id.* at 150. Put differently, a summary judgment motion "is a means by which to challenge the opposing party to put up or shut up on a critical issue." *Id.* at 149 (internal quotation marks and citation omitted).

---

[5] Although Lanter was named as a defendant in *Sidi*, the federal court granted summary judgment in his and the City's favor. (Doc. 135, Lanter Dep., 350:12–17 at PageID 1701; *see also Sidi*, 2014 WL 1276195, at *7–8.)

## I.    The City is not liable for negligent training and supervision because the Officers are not liable.

This Court can quickly dispose of Plaintiffs' negligent training and supervision claim against the City if it holds that the Officers are immune from liability or not liable on the merits as a matter of law, per the Officers' Motion for Summary Judgment. Under Kentucky law, an employer is not liable for negligent training or supervision of their employees if there is no "finding that those employees committed a tort." *City of Paintsville v. Haney*, 718 S.W.3d 812, 839 (Ky. 2025). So if the employee is immune from liability, the plaintiff's claim against the governmental-entity employer for negligent hiring, training, retention, and supervision also fails. *Id.* ("If claims are properly dismissed against governmental employees based on qualified official immunity, it follows that the claims against their employers for negligent hiring, training, retention, or supervision are also properly dismissed.").

That black-letter rule holds true in Ohio, too: "an underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939, 944 (Ohio 2009) (citation omitted). So if "no action can be maintained against [the agent]," then "any imputed actions against the [principal] are also untenable." *Id.* at 945 (internal alterations in original; citation omitted).

The Officers are immune from liability, and they are not liable on the merits. So under either Kentucky or Ohio law, Plaintiffs' lone claim against the City for negligent training and supervision fails.

9

II.     **The City is immune from liability under Ohio or Kentucky law.**

If this Court declines to grant the Officers' summary judgment motion, it should still grant the City's summary judgment motion because the City is immune from liability on Plaintiffs' negligent training and supervision claim.

This Court must first decide which state's law to use. This case has an obvious interstate dimension: Meyer instigated the chain of events in Ohio when he unlawfully fled a traffic stop that Lieutenant Lanter attempted in Cincinnati's Price Hill neighborhood. Meyer fled into Kentucky, and the pursuit ended in Newport, where Meyer murdered the Laibles and injured the Kleins. So to resolve Plaintiffs' negligent training and supervision claim, this Court must first determine whether Ohio or Kentucky law applies.

This Court has supplemental jurisdiction over Plaintiffs' claims and therefore "is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). And a federal court exercising diversity jurisdiction applies the substantive law—and the conflict-of-law rules—of the forum state. *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4 (1975). So this Court must apply Kentucky's choice-of-law rules to determine whether Ohio or Kentucky immunity law applies.

This Court resolved an analogous choice-of-law conflict and applied Ohio immunity law to decide state tort claims against an Ohio governmental entity. *See Pittman v. Rutherford*, No. 19-36-DLB-CJS, 2020 WL 6386489 (E.D. Ky. July 7, 2020), *adopted by* 2020 WL 6384726 (E.D. Ky. Oct. 30, 2020) (Bunning, J.). Filed in Bracken County, Kentucky, and removed to this Court, *Pittman* involved state law tort claims against the Brown County, Ohio, Department of Job and Family Services. *Pittman*, 2020 WL 6386489, at *1. Brown County moved to dismiss

10

based on political subdivision immunity, teeing up a choice-of-law conflict between Kentucky and Ohio law.

The Magistrate Judge found that Kentucky law promotes comity: "Kentucky is not quick to disregard another State's law that implicates an immunity analysis" and "[r]ecent caselaw from the Kentucky Supreme Court suggests that Kentucky would defer to Ohio's immunity law on comity grounds." *Id.* at *3–4 (citing *Ohio v. Great Lakes Mins., LLC*, 597 S.W.3d 169 (Ky. 2019)). So the Court's "best 'guess' is that Kentucky would defer to Ohio's immunity analysis rather than apply its own immunity law." *Id.* at *4.

This Court agreed with the Magistrate Judge that Kentucky courts have "long recognized the value and importance of comity in maintaining harmonious relations between the states." *Pittman*, 2020 WL 6384726 at *3. Ohio's immunity law is "sufficiently aligned with that of Kentucky's such that Kentucky courts would honor Ohio immunity law." *Id.*[6] This Court should use its same common-sense approach here and apply Ohio immunity law to resolve Plaintiffs' claim against the City.

### A.    The City is immune under Ohio immunity law.

The City is immune from liability on Plaintiffs' claim for negligent supervision and training under Ohio law. Ohio's Political Subdivision Tort Liability Act, Ohio Revised Code § 2744, governs liability against the City. There are three relevant components of Ohio's immunity statute.

*First*, the statute creates a general immunity rule. A political subdivision *generally*:

---

[6] As explained below, Ohio and Kentucky provide statutory-based immunity to municipalities. *See generally* Ohio Rev. Code Chapter 2744 (Ohio's Political Subdivision Tort Liability Act); Ky. Rev. Stat. § 65.2003(3)(d) (Kentucky's Claims Against Local Governments Act).

is not liable in damages in a civil action for injury, death, or loss to person or
property allegedly caused by any act or omission of the political subdivision or an
employee of the political subdivision in connection with a governmental or
proprietary function.

Ohio Rev. Code § 2744.02(A)(1).

*Second*, it creates an exception to the general immunity rule specific to motor vehicles:

political subdivisions are liable for injury, death, or loss to person or property
caused by the negligent operation of any motor vehicle by their employees when
the employees are engaged within the scope of their employment and authority.

Ohio Rev. Code § 2744.02(B)(1).

*Third*, it creates an exception-to-the-exception. Liability *does not attach* to a:

member of a municipal corporation police department or any other police agency
[who] was operating a motor vehicle while responding to an emergency call and
the operation of the vehicle did not constitute willful or wanton misconduct.

Ohio Rev. Code § 2744(B)(1)(a).

The Ohio Supreme Court applied that three-part framework in a police-pursuit case and
held that an Ohio township and its police department were immune from liability on the
plaintiff's claims for negligent supervision. *McConnell v. Dudley*, 144 N.E.3d 369, 371 (Ohio
2019). The plaintiff in *McConnell*, an injured motorist, sued Coitsville Township and its police
department, alleging that they were negligent in "establishing policies and procedures for
'pursuit training.'" *Id.* at 373. But the Ohio Supreme Court analyzed the Chapter 2744's plain
language and determined that there was no "additional exception that imposes liability on the
political subdivision for its actions in **hiring, training, or supervising an employee or
entrusting him or her with a vehicle**." *Id.* at 377 (emphasis added). *McConnell* creates a
simple, brightline rule: a city cannot be held liable for "consequences arising from an employee's
training or the supervision of that employee in operating the motor vehicle." *Id.* at 371.

12

The City is immune from Plaintiffs' negligent supervision and training claim under *McConnell*. There is no dispute that "operating a police cruiser in response to an emergency call is a governmental function," but there is no exception to Chapter 2744's general immunity rule that would permit liability here. *Id.* at 376. Plaintiffs claim that the City is liable for negligent supervision and training because it "failed to adequately train, supervise, and discipline its employees to ensure that they followed CPD pursuit policies." (Doc. 79, First Am. Compl., ¶ 164, Page ID 676.)  But *McConnell* forecloses liability against the City for this exact claim. *McConnell*, 144 N.E.3d at 371. Under Ohio Revised Code § 2744.02, the City is immune from liability for claims of negligent supervision and training for operation of a motor vehicle.

### B.     The City is immune if the Court applies Kentucky immunity law.

The result is the same under Kentucky's immunity law, the Claims Against Local Governments Act ("CALGA"). Under CALGA, a local government is immune from liability for claims "arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government."  Ky. Rev. Stat. § 65.2003(3).

CALGA provides a non-exhaustive list of scenarios in which a local government is immune:

(a)     The adoption or failure to adopt any ordinance, resolution, order, regulation, or rule;

(b)     The failure to enforce any law;

(c)     The issuance, denial, suspension, revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization;

(d)     The exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources; or

13

(e)      Failure to make an inspection.

Ky. Rev. Stat. § 65.2003(3)(a)–(e).

Applying that framework, the Kentucky Supreme Court held that the City of Georgetown, Kentucky, was immune from liability on a plaintiff's state law claims for negligent hiring and training of a police officer. *Morales v. City of Georgetown*, 709 S.W.3d 146, 165 (Ky. 2024). The plaintiff, a Georgetown police officer, was paralyzed by a stray bullet when he and several other officers tried to apprehend a suspect.[7] The officer then sued the City of Georgetown and its police department, alleging that they: (1) negligently trained the other police officers; and (2) should not have placed the police officers on the Response Team. *Id*. at 164.

The Court grounded its holding in two components of CALGA's text. First, CALGA specifically immunizes municipalities from liability arising from their adoption of "any ordinance, resolution, order, regulation, or rule" and likewise from their alleged failure to enforce any of the laws they have adopted. *Morales*, 709 S.W. 3d at 164 (quoting Ky. Rev. Stat. § 65.2003(3)(a)-(b)). And second, CALGA immunizes municipalities from liability arising from their "exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources." *Morales*, 709 S.W. 3d at 164 (quoting Ky. Rev. Stat. § 65.2003(3)(d)).

Like any municipality, the City of Georgetown had limited resources and made policy choices to allocate those resources—be that for training or staffing. Those choices "are inherently discretionary in nature, and therefore cannot be a basis for liability in this instance

---

[7] Just like this case, *Morales* involved city officers' participating in a joint task force with federal law enforcement, called the Joint Special Response Team ("Response Team").

because it is not a tort for government to govern." *Morales*, 709 S.W.3d at 165 (internal quotation marks and citation omitted).

Plaintiffs' negligent training and supervision claim challenges the City's adoption (or decision not to adopt) specific policy related to pursuits or training. Under *Morales*, Plaintiffs' challenge to the City's policy choices fails. The City's policy choices are an "inherently discretionary" exercise of municipal power that cannot form the basis for liability. *Id.* CALGA specifically immunizes municipalities from liability arising from their adoption of "any ordinance, resolution, order, regulation, or rule." Ky. Rev. Stat. § 65.2003(3)(a).

Plaintiffs' attempt to claim that the nature and amount of training that the City required of the Officers was insufficient also fails. Whether the Officers should have received additional police pursuit training—be that in a classroom setting or a field setting; annually or less often; with a skid car or stationary devices—is a matter of discretion. The City must weigh those training decisions against competing interests, including the costs of diverting a limited pool of officers away from their active law enforcement duties. That, too, is a discretionary function for which the City is entitled to immunity. *See* Ky. Rev. Stat. 65.2003(3)(d) ("The exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources.").

This Court should grant summary judgment in favor of the City because it is immune from suit under Kentucky law.

## III.    Plaintiffs' claim for negligent training and supervision fails, even if no immunity applies.

Even if the City did not have immunity, Plaintiffs' negligent supervision and training claim still fails because there is no evidence that the City disregarded a risk posed by Officer

Thomas or Lieutenant Lanter. There is no evidence that the Officers were incompetent or had harmful propensities.

The Court need not perform a formal choice-of-law analysis because the elements of negligent supervision and training are functionally identical in Ohio and Kentucky. *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010) ("The Court only needs to go through the choice of law analysis when a conflict occurs between two states' laws.").

To prove a claim for negligent supervision or negligent training in Ohio, a plaintiff must establish:

(1)     [t]he existence of an employment relationship;

(2)     the employee's incompetence;

(3)     the employer's actual or constructive knowledge of such incompetence;

(4)     the employee's act or omission causing the plaintiff's injuries; and

(5)     the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.

*Evans v. Akron Gen. Med. Ctr.*, No. 28340, 2018 WL 3650791, *5 (Ohio Ct. App. Aug. 1, 2018).

And to prove a claim for negligent training and supervision in Kentucky, the plaintiff must establish that:

(1)     the employer knew or had reason to know of the employee's harmful propensities;

(2)     the employee injured the plaintiff; and

(3)     the hiring, supervision, or retention of the employee proximately caused the plaintiff's injuries.

*Grand Aerie Fraternal Ord. of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005).

In either state, the plaintiff must establish that: (1) the employee posed a risk of incompetence or harmful propensities that the employer knew about; (2) the employee injured the plaintiff; and (3) the employer's hiring, supervision, or retention of the employee was the proximate cause of the plaintiff's injuries. Plaintiffs cannot prove these elements.

### A.      The Officers did not pose a risk that the City disregarded.

Summary judgment is proper when the record lacks evidence that an employer had notice that its employees posed a risk of harm. *Tollison v. City of Independence*, No. 13-55-DLB-CJS, 2015 WL 5684030, at *17 (E.D. Ky. Sept. 25, 2015) (Bunning, J.) ("[A]n employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created."). In *Tollison*, this Court granted summary judgment to the City of Independence on a claim for negligent supervision—arising from the training of two police officers—because there was no evidence that the City "knew or had reason to know of a risk created by employing" the officers. *Id.*

Here, the record also lacks any evidence that would have put the City on notice that Lieutenant Lanter or Officer Thomas posed any risk of incompetence or harmful propensities related to pursuit conduct. (*See* Doc. 140–1, Ex. A, S. Hughes Report at PageID 2898 ("In my professional opinion, there is no factual basis to support a claim of negligent supervision or training.").) To the contrary, the evidence establishes that these were exemplary officers with outstanding service records.

Officer Thomas was involved in just one pursuit that led to any counseling—a 2008 pursuit during which he did not activate his microphone. (Doc. 139, City Rule 30(b)(6) Dep., 88:2–16 at Page ID 2501.)  That minor, procedural infraction—which occurred more than a decade before Meyer's collision—had nothing to do with Officer Thomas's operation of his

17

police cruiser or his judgment on whether to engage in and continue a police pursuit. *Cf. Tollison*, 2015 WL 5684030, at *17 (one negative evaluation from "fifteen years ago" is "insufficient to establish any persistent issues with [the officer's] performance").

And Lieutenant Lanter *never* before received discipline or counseling—formal or informal—for his role in any police pursuit, even when his role in a pursuit fell under close scrutiny. Lieutenant Lanter was the secondary unit in a 2011 pursuit, during which the fleeing suspect crashed into a taxicab. That pursuit triggered an investigation by CPD's internal investigation unit, which determined that Lanter committed no policy violation. (Doc. 135, Lanter Dep., 350:4–17 at PageID 1701.) The Court also reviewed Lanter's actions in that matter and granted summary judgment in his favor.  *See Sidi v. City of Cincinnati*, No. 1:12-cv-242, 2014 WL 1276195, at *2 (S.D. Ohio Mar. 27, 2014).

Because no evidence can be "presented to show that [the Officers] had any 'harmful propensities,' much less that the City knew or should have known about," this Court should grant the City's summary judgment motion on Plaintiffs' negligent training and supervision claim. *Carroll v. Young*, No. 1:19-CV-00153-GNS-HBB, 2023 WL 6151233, at *9 (W.D. Ky. Sept. 20, 2023), *aff'd*, No. 23-5884, 2024 WL 2852085 (6th Cir. June 5, 2024) (granting summary judgment to police officer's employer).

**B.    The Officers were not the proximate cause of the injuries.**

Plaintiffs' claim for negligent supervision and training fails at the first element. But even if Plaintiffs could establish the City had knowledge of a risk posed by the Officers—they cannot—the claim nonetheless fails because it was not the Officers who injured Plaintiffs, it was Meyer. The Officers were not the proximate cause of the injuries (*see* Officers' Motion for Summary Judgment), so the City was not the proximate cause of the injuries. Similarly, if the

18

City was not aware of a risk created by the Officers, they cannot be found to have been the proximate cause of the injury. *See Herndon v. Torres*, 249 F. Supp. 3d 878, 889 (N.D. Ohio 2017) ("An act is reasonably foreseeable only if the employer knew or should have known of the employee's propensity to engage in similar criminal, tortious, or dangerous conduct."). Here, the City's acts or omissions were not the proximate cause of the injuries.

## CONCLUSION

For these reasons, this Court should grant summary judgment to the City of Cincinnati.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig, *pro hac vice*
Chad R. Ziepfel (93903)
Spencer S. Cowan, *pro hac vice*
Kenneth A. Foisy (97478)
Elise L. Marrinan (101353)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: 513-381-2838
Fax: 513-381-0205
aherzig@taftlaw.com
cziepfel@taftlaw.com
scowan@taftlaw.com
kfoisy@taftlaw.com
emarrinan@taftlaw.com

*Counsel for Defendants City of Cincinnati,*
*Timothy Lanter, and Brett Thomas*

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, a copy of the foregoing was filed through the Court's CM/ECF system, which will serve notice of the filing on all counsel of record, and was served via regular mail upon the following:

Mason Meyer                                  Austin Lagory
Little Sandy Correction Complex              9626 Shane Lane
505 Prison Connector                         Union, KY 41091
Sandy Hook, KY  41171
                                             *Defendant*

*Defendant*

                                             */s/ Aaron M. Herzig*
                                             _____