

# Expert Report of David T. Sweeney

## August 1, 2025

*Laible Estates and Steven and Maribeth Klein*

*v.*

*City of Cincinnati, et al.*

## DT Sweeney Consulting, LLC

## 4616 25th Ave. NE Suite #156  Seattle, WA 98105

## INTRODUCTION:

I was retained by counsel for the plaintiffs to review the case *Estate of Laible v. City of Cincinnati* in order to offer opinions based on my experience and training as a law enforcement officer and as an expert witness.

## EXPERT'S QUALIFICATIONS:

I have 34 years of police experience, with 21 years as a police supervisor. I have seven years of experience as an expert witness in police practices.

From March 2021 to March 2022, I was the Patrol Commander for the Oregon State University Police Department.  I was second in command overseeing 3 sergeants, 4 police officers, and 11 public service officers. In this role I was the incident commander for any unusual occurrences such as high-profile arrests, mental health calls, sporting events with large crowds, fires, protest demonstrations, etc. I was also responsible for approving arrests, search warrants, investigations, use of force, collisions and reports written by patrol officers. Prior to working at OSU, I was a Watch Commander for the Seattle Police North Precinct. In this position, I was actively engaged in the direct supervision of eight (8) sergeants and sixty (60) officers. I was responsible for all patrol activities of my personnel in the SPD North Precinct. As the watch commander, I was responsible for incident command of unusual occurrences taking place in Seattle. In addition, I had overall command and control for search warrants, arrests, use of force, collisions, pursuits, or any other high-profile incident and/or arrest. I served as the incident commander for numerous large-scale protest marches, riots and crowd disturbances within the City of Seattle.

I previously served as an Operations Lieutenant, Administrative Lieutenant for East Precinct, and Acting Captain for the North Precinct of the Seattle Police Department. In all those assignments, I was responsible for supervision of staff under my command. This included traffic stops, arrests, reports, collisions, use of force, pursuits, and both emergency and general patrol response. After the conclusion of the incident, my responsibilities included incident after-action reports as well as command level review of high-profile incidents such as use of force, pursuits, collisions, complaints, etc. After completing the command level reviews and after-action reports, my responsibility included referrals for officers to training, to the Office of Professional Accountability, commendations or notations for improvement within subordinate's performance reviews.

As a member of the SPD Training Cadre, I have both received and provided hundreds of hours of training in all aspects of patrol work. As a trainer, I instructed SPD officers and sergeants on both team formation and tactical response to unusual occurrences, mental health calls, arrests of armed suspects, barricaded suspects, or any other type of high-profile situation requiring a multiple officer response team. Using both classroom instruction and role-playing scenarios, I trained both line level staff and command staff on proper situational assessment, methods of containment, less-lethal utilization, team formation, de-escalation, arrest procedures, etc. I have been through three 40-hour Crisis Intervention Training (CIT) certification classes.

I have completed approximately 15 pursuit reviews of officer's actions in the field during a pursuit. This involved evaluating the officer's actions during the pursuit, the reason for the pursuit, whether appropriate emergency equipment was used, whether Dispatch was given a proper description of the pursuit, radio broadcast protocols, actions of the offender, actions of the officer to stop the driver, use of pursuit deterrent equipment such as ramming, stop sticks, PIT, etc. I have been PIT trained while in SWAT. I then applied department policy and state law to the facts in order to determine if the pursuit met the standard of care for a Seattle Police Officer. I have called off approximately 30 pursuits where the reason for the pursuit did not rise to the level required in order to continue the pursuit. These situations might be because of the level of crime involved, the safety hazards involved, the actions of the offender, etc. Additionally, I completed my Master's Thesis at Oregon State University on police pursuits. Lastly, I have reviewed pursuits as an expert witness. I have worked with attorneys to examine the facts, and given attorneys an opinion if the pursuit was properly executed or not. I have worked with both defense and plaintiff's attorneys. I have also turned down pursuit reviews as an expert witness because my assessment of the case did not match the attorney's theory of the case.

Previously, as a sergeant I have worked with Seattle Police Department Human Resources, Internal Investigations, Patrol and SWAT. During my time as a sergeant in SWAT and Patrol, I was responsible for supervising teams of officers responding to high-profile serious incidents such as barricaded suspects, mental health calls, search warrants, arrests of dangerous felons, pursuits, dignitary protection, as well as situations requiring SWAT/sniper support due to armed suspect(s) threatening the public or police officers.  For the rest of my qualifications and work experience, please see my attached CV.

## FEE STRUCTURE:

My fee schedule is $400 per hour. My deposition fee is $2,500, with $550 per hour after the first 4 hours. I will require a reasonable time to review my reports and evidence prior to offering any deposition or trial testimony. Preparatory time is usually paid for by hiring counsel unless both sides make other arrangements.

## EXPERT'S HISTORY:

As an expert witness, I have assisted both plaintiff and defense attorneys with expert witness analysis and reports. The full list is on my CV. During the last 5 years, I have had my deposition taken and/or testified in twelve cases:

1.  *Woody v. Big Horn County, MT* – 2021. This was a police pursuit case that ended in a fatality. I was hired by plaintiff's counsel and testified in a deposition.
2.  *Delafuente vs. City of Nampa, ID* – 2021. This was a police pursuit case that ended in two fatalities. I was hired by plaintiff's counsel and testified in a deposition.
3.  *Richmond v. Spokane County* – 2022. This was a human resources EEO case which ended in separation of service. I was hired by plaintiff's counsel and testified in a deposition.
4.  *O'Brien v. City of Chicago* – 2022. This was an excessive force case. I was hired by plaintiff's counsel and testified in a deposition.

5. *Irving v. City of Raleigh* – 2022. This was a police misconduct case. I was hired by plaintiff's counsel and testified in a deposition.
6. *Delafuente vs. City of Nampa, ID* – 2022. I testified in court for plaintiff regarding this police pursuit case.
7. *Hartman v. State of Arizona* – 2023. This was a pursuit case. I was hired by plaintiff's counsel and testified in a deposition.
8. *Hennefer v. Yuba County* -  2024. This was a police procedure case. I was hired by plaintiff's counsel and testified in a deposition.
9. *Jacquelyn Moore v.* Jesse Patterson – 2025. This was a police pursuit case. I was hired by plaintiff's counsel and testified in a deposition.
10. *Kennedy v. Acree et al*. - 2025: This was use of force case. I was hired by plaintiff's counsel and testified in a deposition.
11. *Estate of Jesse Gardner v. Bullhead City, AZ* – 2025: This was policing standards case. I was hired by plaintiff's counsel and testified in a deposition.
12. *Palombi v. City of Orting,* WA – 2025: This was a human resources EEO case. I was hired by defense counsel and testified in a deposition.

I have been published on two occasions:

*The Need for Police De-Escalation,* published in the Defense News in Fall of 2021 by Washington Defense Trial Lawyers Association.

In 2023 my Master's defense, *The Effects of Restrictive Police Pursuit Policies in Washington State,* was published by Oregon State University.

## MATERIALS REVIEWED:

The attorney provided me with the following materials which I reviewed. I reserve the right to amend my report should additional materials become available.

**Body Worn Camera**
1. Laible - CITY_000287_Thomas BWC Confidential
2. Laible - CITY_000288_Lanter BWC Confidential
3. Laible - CITY_000289_Harper BWC Confidential

**Cruiser Cam Video**
1. Laible - CITY_000286_ Lanter Cruiser Cam Confidential
2. Laible - CITY_000297_Thomas Cruiser Cam Confidential Redacted

**Deposition Testimony**
1. Captain Amanda Caton
2. Chief Teresa Theetge
3. Frank Occhipinti
4. Lieutenant Timothy Lanter
5. Officer Brett Thomas
6. Officer Mark Bode
7. Sergeant Charles Fink
8. Sergeant Donald Scalf

**Marked Deposition Exhibits**
1. Ex 01 - CPD Pursuit Policy (GB000026-000038)
2. Ex 02 - Lanter Gang Unit Supervisory Rounds 8.7.2020
3. Ex 03 - IIS Investigation Report (City 000315-000337)
4. Ex 04 - Street Map of Steiner Ave - 6th St (Blank Copy - Bode Marked Original at Dep)
5. Ex 05 - Bode Unmarked Vehicle
6. Ex 06 - Steiner Ave River Rd Intersection
7. Ex 07 - State and River Intersection
8. Ex 08 - CCA Investigation Report (CCA PRR Resp. 000003-000026)
9. Ex 09 - Critical Incident Review Board (Signed) (City 001011-001015)
10. Ex 10 - Incident Detail Report (Unredacted) (City 000810-000825)
11. Ex 11 - Shell - Ohio River Scenic Byway
12. Ex 12 - CPD Manual of Rules and Regulations and Disciplinary Process (City 001471-001504)
13. Ex 13 - CPD Policy 12-545 - Use of Force (Rev. 2.17.22)
14. Ex 14 - CPD Policy 10.000 - Procedure Manual and Other Binding Written Directives
15. Ex 15 - CPD Investigations Manual (City 001357-001470)
16. Ex 16 - Caton-Isaac Order - 8.17.21 - Lanter-Thomas-Harper Refresher Training
17. Ex 17 - Lanter Notice of Formal Reprimand - Form 66-S
18. Ex 18 - Tactical Patrol Guide (Redacted) (City 001505-001534)
19. Ex 18-2  ROI - USDOJ Docs Combined
20. Ex 19 - USDOJ  Report No. 2
21. Ex 20 – Occhipinti to John [External Email]
22. Ex 21 - Email from Occhipinti Re Criminal Complaints and DNA
23. Ex 22 - Occhipinti to Bardua re: Haskamp
24. Ex 23 - USDOJ Report No. 29

25. Ex 24 - USDOJ Report No. 1
26. Ex 25 - USDOJ Report No. 2
27. Ex 26 – ATF Operational Plan (City 000794-000804)
28. Ex 27 - Application and Affidavit For Search Warrant
29. Ex 28 - KYIBRS Report 7.30.20
30. Ex 29 - Declaration of Occhipinti
31. Ex 30 - Email from Occhipinti Re News Release
32. Ex 30 - Tactical Patrol Guide and UOF
33. Ex 31 - Record of Training
34. Ex 32 - Vehicle Pursuit Training 2007 Agenda
35. Ex 33 - Vehicle Pursuit Training Nov-Dec 2008
36. Ex 34 - Street Map of Steiner Ave-6th St
37. Ex 35 - Thomas Notices to Appear
38. Ex 36 - Thomas Violation re `08 Pursuit
39. Ex 37 - Radio Transmissions 8310 BWC
40. Ex 38 - Radio Transmissions IIS Case
41. Ex 39 - Questions to Officers
42. Ex 40 - Injury To Prisoner
43. Ex 41 - Fink to Gabbard Re_ [External Email] Mason Meyer, (3)
44. Ex 42 - Fink to Gabbard Re_ [External Email] Mason Meyer,
45. Ex 43 - Fink to Snodgrass CPD Pursuit and arrest of Mason Meyer_Kirsten J…
46. Ex 44 - Fink to Snodgrass Re_ [External Email] Re_ CPD Pursuit and arrest…(3)
47. Ex 45 - Fink to Fox ATF _ CPD Pursuit
48. Ex 46 - Fink to Snodgrass Re_ [External Email] Re_ CPD Pursuit and arrest…
49. Ex 47 - Fink to Schrage CPD Pursuit of 8_7_20
50. Ex 48 - Fink to Drohan Re_ [External Email] Mason Meyer paperwork
51. Ex 49 - Fink to Drohan Re_ [External Email] Mason Meyer paperwork
52. Ex 50 - Laible-Klein - Scalf Record of Training
53. Ex 51 – Scalf to Bardua-VanHorn [External Email]
54. Ex 52 - Scalf to Occhipinti FW_ [External Email] Concerns about Pursuit(1)
55. Ex 53 - Scalf to Schofield RE_ [External Email] Concerns about Pursuit(1)
56. Ex 54 - Lanter Record of Training
57. Ex 55 - Lanter Summary of Events CITY_003328-003331
58. Ex 56 - Lanter and Scalf Justifying Actions CITY_003336-003337
59. Ex 57 - Emergency Operation of Police Vehicles and Pursuit Driving Highlighted
60. Ex 59 - Lanter Disciplinary Table (CITY_000660) Confidential
61. Ex 60 - Vehicle Pursuit Report
62. Ex 61 - Lanter Evaluations
63. Ex 62 – Investigations Manual
64. Ex 63 - FRCP 30(b)(6) Deposition Notice – City of Cincinnati
65. Ex 64 - Thomas Evaluation Supplement Log
66. Ex 65 - CPD Records Retention Schedule
67. Ex 66 - Lanter Pursuit Handwritten Notes
68. Ex 67 - Handwritten Notes from Interviews CITY_003338-003363
69. Ex 68 - IIS Investigation Determinations CITY_003332-003335
70. Ex 69 – Use of Force Policy
71. Ex 70 - Refresher Training Correspondence

72. Ex 71 - Addendum to Pursuit
73. Ex 72 - Lanter Performance Evaluation 4.24.14
74. Ex 73 - Lanter Evaluation Supplement Log
75. Ex 74 - Emails re Pursuit
76. Ex 75 – KYIBRS Report 8.7.20
77. Ex 76 - Investigation Notes 8.26.20
78. Ex 77 - CPD Staff Notes 3.26.20
79. Ex 78 - Redacted Briede Emails
80. Ex 79 - CPD PRR Resp 000213 Vehicle-Pursuits
81. Ex 80 – OPOTA & Procedure 12.535 Emergency Operation of Police Vehicles and Pursuit
    Driving 6.17.21
82. Ex 81 - CPD PRR Resp. - 10.9.2020 - Video - Pursuit Over Bridge (GB000315)
    a. GABP-2020-08-07_16h30min00s000ms.g64x
    b. Genetec Video Player.exe

**Other Evidence**
1.  721 Steiner affidavit for search warrant
2.  DALTON Interview
3.  ATF Reports of Investigation - Combined
4.  City 001635 Thomas Video Interview 2
5.  CITY_000289_Harper BWC Confidential
6.  CITY_000680 Miller BWC _Confidential
7.  CITY_000981_Hall BWC Confidential
8.  CITY_000981_Hall BWC Confidential
9.  CITY_001615 Lanter Interview
10. CITY_001616 Fox Interview
11. CITY_001617 Bode Interview
12. CITY_001618 Vogepohl Interview
13. CITY_001619 Shively Interview
14. CITY_001621 Broering Interview
15. CITY_001622 Stratmann Interview
16. CITY_001623 Kowalski Interview
17. CITY_001626 Scalf Interview
18. CITY_001627 Olthaus Interview
19. CITY_001628 Harper Video Interview 1
20. CITY_001629 Scalf Video Interview 1
21. CITY_001630 Thomas Video Interview 1
22. CITY_001631 Lanter Video Interview
23. CITY_001632 Harper Video Interview 2
24. CITY_001633 Lanter Video Interview
25. CITY_001634 Scalf Video Interview 2
26. CITY_001636 Dispatch 1
27. CITY_001637 Dispatch 2
28. CITY_001680 Bode Interview
29. CITY_001700 Thomas Interview
30. CITY_001701 Vogelpohl Interview
31. CITY_001709 Broering Interview
32. CITY_001710 Harper Interview

33. CITY_001711 Stratmann Interview
34. CITY_001717 Scalf Interview
35. CITY_001730 Lanter Interview
36. Affidavit of Mason Meyer
37. PC Statement for ATF
38. City 003407 - 79 - NPS NW Corner PTZ_20200807_163300.exe
39. CITY_003365 Intersection with Chase.avi
40. Steven Becker expert witness technical report

## METHODOLOGY

In order to render my findings and opinions for this case, I examined the above listed materials to understand what happened in this case and the facts that are demonstrated in records, statements, testimony, video and other evidence. Second, I reviewed relevant policies, standards, laws, and generally accepted practices and other sources defining the duties, obligations, and constraints of the Cincinnati Police Department (CPD) and the personnel involved in this case. Third, I reviewed and evaluated evidence of CPD's existing policies, practices, and procedures and the practices and conduct of CPD personnel in this case to determine whether they were deficient in relation to execution of those duties, obligations, and constraints, and their relationship to the injury at issue in the matter; namely, the deaths of Gayle and Raymond Laible and injuries to Steven and Maribeth Klein.

The methodology I have used in this case is the same that I have utilized for several years, in combination with years of review of police activities as a supervisor with the Seattle Police Department and the Oregon State University Police Department. The methodology is consistent with the methodology utilized by other experts when analyzing police officer and department conduct, including the use of pursuits.

## INCIDENT RECAP

This incident involves an attempted arrest by a task force consisting of Alcohol, Tobacco and Firearms (ATF) agents, Cincinnati Police Department (CPD), and Northern Kentucky Drug Strike Force (NKDSF).

On July 6, 2020, Mr. Mason Meyer is alleged to have pistol whipped a victim causing the firearm to discharge one round at 423 W. 13th Street, Newport, Kentucky. Meyer was also wanted for Wanton Endangerment 1st degree and Fleeing and Evading from Police 1st degree. Meyer was also wanted for misdemeanor probation violation in Cincinnati. Mr. Meyer had multiple felony convictions.

On July 6, 2020, NKDSF conducted a search warrant at 423 W. 13th Street and recovered weapons and narcotics. An occupant said that Meyer was there earlier in the day. The occupant heard a gunshot and Meyer came in and asked people to hide a weapon for him.

On July 18, 2020, a CI contacted the NKDSF and stated that Meyer does not want to go back to jail and will end up getting in a shootout with police. [1]

On July 27, 2020, NKDSF attempted to stop Meyer. His phone showed him to be in the Northern Kentucky, Hebron area. Agents requested assistance from Boone County Sheriff's Office. A deputy attempted to stop Meyer and his girlfriend, Kristen Johnson. Meyer disregarded the marked vehicle and sped away. The Boone County deputy terminated the pursuit. Boone County Deputy Andrew Miller submitted for a warrant for Fleeing and Evading the Police and Wanton Endangerment. [2]

---

[1] Ex 26 - ATF Operational Plan  (City 000794-000804), pp. 1-2; this statement contradicts Meyer's affidavit.
[2] 721 Steiner Aff (Affidavit of CPD Officer Christopher Vogelpohl, pp. 1-3

On July 31, 2020, CPD and NKDSF attempted to locate Meyer, who was driving a Ford Escape. Officers attempted a stop, but Meyer was able to elude them. The vehicle was located later, but Meyer was not present. A Mr. Shawn Dalton was in the car and said he had a firearm on him. Another confidential informant (CI) said that Meyer gave the gun to Dalton during a vehicle swap.

On August 6, 2020, a CI informed the ATF that Meyer was selling large quantities of methamphetamine and was gun trafficking. Meyer had numerous people selling for him. Meyer would kidnap people for non-payment for narcotics transactions. Meyer's girlfriend, Kirsten Johnson, was a conspirator. They lived at 721 Steiner Avenue, Cincinnati, OH. The task force made a plan to arrest Mr. Meyer using surveillance, marked cars, and unmarked cars. The Operational Plan stated:

> "ATF Agents, CPD Detectives/Officers, and NKDSF will be identifying and investigating the listed offenders and any known associates. Agents will respond accordingly to situations which present themselves. CPD will utilize marked and unmarked vehicles to affect [sic] traffic stops. ATF Agents may be riding in vehicles utilized by CPD to affect [sic] a stop and will assist with interviews, searches, and security during a vehicle stop. ATF agents will not initiate traffic stops without the presence of a CPD Detective/Officer. Any vehicle pursuits will be initiated and monitored by CPD pursuit policy. ATF will not initiate any pursuits. In the event the listed individuals are positively identified by ATF surveillance units, CPD uniform vehicles will be advised and directed to conduct a traffic stop following CPD policy, ATF will assist as needed.
>
> Surveillance units will have a perimeter set up around the target residence. If Ihle or Lay Exit the residence and get into a vehicle, surveillance will allow the vehicle to leave the area and will be stopped to gain intelligence. If Meyer or Johnson Leave the residence and head toward the vehicle, Agents/TFO's [sic] will attempt an open air assault. If Meyer/Johnson Gain access to the vehicle, Agents/TFO's [sic] will attempt to conduct a vehicle stabilization pin. In the event Agents/TFO's are unable to pin the vehicle, CPD uniform officers will attempt to conduct a felony traffic stop with assistance from CPD K9's [sic] per there [sic] SOP." [3]

On August 7, 2020, Meyer was observed at 721 Steiner Avenue. He exited the house with a rifle case and crossed the street to a group of unknown people, who then examined what was in the case. They handed Meyer money, which he counted. He then handed the money back to the individuals and took the case back to the house. Another subject placed the gun case into the rear seat of a black Ford Focus, K760994/OH. The Ford Focus pulled out of the driveway and drove south on Steiner Avenue towards River Road. CPD officer Sgt. Timothy Lanter attempted a traffic stop, but the driver refused to stop. CPD Sgt. Lanter engaged in a pursuit as primary unit, with CPD PO Brett Thomas as secondary unit and CPD Specialist Michael Harper as third unit. The pursuit went into Kentucky where the driver lost control at E 5th Street and Monmouth Street, crashing into a building, killing two people and injuring two others. [4]

---

[3] Ex 26 - ATF Operational Plan  (City 000794-000804), pp. 2-4
[4] 721 Steiner Aff (Affidavit of CPD Officer Christopher Vogelpohl, p. 3

## ANALYSIS AND OPINIONS

In order to offer my expert witness opinions, I will be utilizing my education, police training I have received, years of experience training others, extensive experience handling high-profile police incidents as an officer and as an incident commander, years of completing command level review of police actions in the field such as pursuits, and several years of experience as an expert witness in policing. I also rely on my education at Oregon State University, where I wrote my thesis paper for my master's degree on the topic of police pursuits. For my thesis, I collected and analyzed over 1,600 police pursuits in the State of Washington between 2018 and 2022.

All the opinions below are further based on my review of the evidence, documentation, and other relevant information, such as laws and standards.  My opinions are held to a reasonable degree of professional certainty and I reserve the right to alter my opinions based on any new information that may be provided.  Not all instances of evidence reviewed are noted or referenced.

## Background on Police Pursuits

Historically, police pursuits are one of the most dangerous actions a police officer might take in the field. Statistical analysis shows that between 2017 and 2021, 4,415 people died in the United States as the result of a police pursuit. (Bather & Goodman, 2024). An earlier study showed that between 1994 and 1998, one law enforcement officer was killed every 11 weeks as the result of a police pursuit. Innocent third parties constitute 42 percent of the total fatalities, and on average, one person dies per day in the US as the result of a police pursuit. (Hill, 2002). Further research shows, "Vehicle pursuits, though usually short in duration, can result in significant injury, property damage and even death. From 1996 to 2015, police pursuits resulted in more than 6,000 fatal crashes in the United States, leading to 7,000 deaths, an average of 355 per year (or about one per day)" (National Institute of Justice, 2018).

Police pursuits are extremely dangerous. In my research, many police officers believe that they need to pursue offenders who refuse to stop, even though the danger level is quite high. As a police supervisor, I have reviewed approximately 15 police pursuits and terminated many more. For my Master of Public Policy degree, I collected and reviewed data on 1,635 police pursuits in Washington State that took place between 2018 and 2022. I have also reviewed several more police pursuits and policies as an expert witness. In my opinion, many police officers view themselves as trained drivers, capable of safely pursuing fleeing drivers, as long as roadways are dry, speeds are reasonable and traffic is light. However, in my experience many police officers forget about two other key components of the police pursuit. Namely, the eluding driver and the uninvolved citizen. The police officer might be highly trained and capable, and driving a police car equipped with lights and siren. It might be daylight with dry roads and no cars around. However, there is no way to account for the driving ability of the offender and the capabilities of their car. The offender's vehicle will not have a police siren and emergency lights. They have no way to warn uninvolved citizens of their driving behavior. They are often desperate enough to do anything in their car to avoid being stopped by a police officer.

In regard to the uninvolved citizen, they are the true innocent party from a crash involving a police pursuit. Speeds can be high. The suspect's driving can be erratic. The citizen may hear a police siren, but have little or no warning on the location of the offender and the police vehicle. In my experience, many officers described favorable conditions as part of the justification for continuing the pursuit. A common narrative theme then emerges, such as: Everything was fine... until it wasn't; the roads were clear... until the suspect struck the pedestrian; the traffic was light... until the suspect lost control and struck the uninvolved motorist; the pursuit speeds were only 60 in a 40... until the suspect crashed into the house. I could go on, but my summation on this topic is that no matter how much an officer believes they have control of the police pursuit, they are at best only in control of their own car and there is no way to account for the actions of the eluding driver or the uninvolved citizen. For this reason, I believe that the police officer should be the ultimate professional and be aware of all risk elements present in a police pursuit, then balance those risks against terminating the pursuit and letting the offender go. This can be difficult for officers who are trained to make arrests. However, discontinuing a police pursuit may be the best way for an officer to uphold their oath of office and protect the people they are sworn to serve.

## THE PLAN TO ARREST MASON MEYER

I read several documents, reviewed testimony, and listened to interviews from officers and agents about Mason Meyer and the serious nature of the crimes he was accused of committing. On August 6th, 2020, a CI at the ATF office in Cincinnati informed agents that Meyer sold guns and drugs. Meyer was alleged to have held a gun to the CI's head accusing him of stealing Methamphetamine (Meth). Meyer was said to have threatened to kill the CI because he owed Meyer $1000, so the CI paid him $500 so Meyer would not kill him. Meyer held a gun to his head accusing him of stealing Meth and strip-searched him. Meyer allegedly kidnapped another seller and knocked his teeth out with a pistol. Meyer was said to have kidnapped another person as well, broke his arm and nose and made him call his mother to pay his $2000 debt. Meyer allegedly acquires guns three to four times a week. Meyer was in a Ford Expedition with another seller and the CI heard a shot go off, potentially from Meyer. Meyer said he shot someone in the face and thought he had killed them. Meyer admitted shooting two other people. Lastly, Meyer was alleged to have said that he would shoot it out with police and that the police would have to kill him. [5] Other officers interpreted this as a suicide by cop death wish in which Meyer hoped to die in a shootout with the police. Most officers and agent interpreted it that he would not go back to jail and would shoot it out with the police, either to escape or to die trying.

I also noted that on July 30, 2020 at 2017 hours, Mason Meyer had an active DNA warrant out for his arrest. The NKDSF called the Boone County Sheriff's Office (BCSO) to make an attempt to locate Meyer in the area of 2006 Petersburg Road, Hebron, KY 41048 at a Shell gas station. The NKDSF said that Meyer was in a silver Ford Escape, Ohio temporary license plate L221459. The NKDSF said Meyer was armed and reportedly threatened to shoot it out with the cops. BCSO Deputy Miller located the vehicle northbound on North Bend Road and Litton Lane. The vehicle went eastbound onto I-275, followed by the NKDSF. When other deputies arrived to assist Miller, he initiated a traffic stop. Meyer began weaving in and out of heavy traffic, cutting off other vehicles causing them to swerve and slam on their brakes to avoid a collision. Deputy Miller was driving at 95 MPH and Meyer was still pulling away from him. Deputy Miller activated his siren, but Meyer still pulled away from him while driving recklessly. Deputy Miller terminated the pursuit with Meyer northbound on I-75 heading toward Cincinnati. Agents from the NKDSF positively identified Meyer as the eluding driver. Meyer's license was also suspended. Deputy Miller applied for an arrest warrant which was signed by District Court Judge J. Smith on July 30, 2020 at 2200 hours for Fleeing or Evading Police 1st degree, Wanton Endangerment 1st degree, Reckless Driving, and Operating a Vehicle with a Suspended License. [6] According to CPD officers, the NKDSF task force and the ATF agents, all of these warrants were active during the pursuit on August 7th, 2020.

I commend the CPD, NKDSF and ATF for gathering the right people in order to make the arrest of Mason Meyer. It is clear from the evidence and interviews that he was a threat to the community. This joint operation utilized undercover surveillance units. These units are trained in blending in and going undetected, so that they can relay important intelligence to the other members of the plan. They had a uniform presence. This can be important because marked cars and officers in uniform can assuage the public that law enforcement actions are being carried out by the local police department they are familiar with, not by a random, non-uniformed group that is not accountable to

---

[5] Ex 25 - USDOJ Report No. 2, pp. 1-3; compare with Meyer Affidavit which disputes these allegations.
[6] Ex 28 - KYIBRS Report 7.30.20, BCSO Incident #KY 20009737, pp. 1-6

the citizenry. By utilizing CPD, this also ensured cooperation in this joint operation between CPD, NKDSF and the ATF, so that if additional units were required, there was an immediate direct pipeline to CPD in order to obtain needed resources, personnel, equipment, etc. If there were to be a shootout, having uniformed officers and marked cars present also prevents suspects from claiming that they only shot because they were getting ripped off by another criminal. Marked cars and uniforms make it clear to any suspects that they are being given lawful orders by law enforcement, which can help gain compliance. The operation also had K-9 officers involved, which could be useful if Mason Meyer tried to escape on foot. Lastly, I also commend the operation for conducting a briefing for most of the personnel present, so that everyone is working off of the same information and intelligence.

In my opinion, the problem with this operation was that the plan to arrest Mason Meyer was flawed from the beginning. As I read more and more reports and listened to the interviews, everyone involved was committed to the conclusion that that Mason Meyer was a dangerous, wanted criminal that needed to be arrested. The plan was flawed not because Meyer needed to be arrested, but because CPD, and specifically, Sgt. Lanter, decided that getting in a pursuit was the planned course of action if Meyer were to leave in a vehicle. Under no circumstances should any police officer ever have chased Mason Meyer. This serious flaw put the public, police officers and the suspects in extreme danger. In my opinion, the pursuit plan was flawed for the following reasons:

1. The plan properly utilized undercover surveillance units. These trained officers had a variety of undercover cars and could observe and report Meyer's actions. The surveillance team could watch Meyer and direct officers to his whereabouts at any time. By switching out cars and agents, Meyer would have a difficult time recognizing that he was being followed. A pursuit negated the ability of surveillance units to continue to report on Meyer's whereabouts and to direct officers to locations where he might be arrested in a much safer, fixed location than a moving dangerous pursuit.

2. ATF agents were able to ping Meyer' phone, which showed them that he was at the house on Steiner, and that he was in the vehicle that was attempting to elude the police. This is extremely valuable information that would allow surveillance units to observe Meyer and provide further intelligence to officers when it was the right time to make an arrest. By engaging in a pursuit, Sgt. Lanter made the ability to ping much less valuable as Meyer obviously knew that the police were behind him in a marked unit with intent to arrest him. The best option would be to continue to ping the phone in order to detect where Meyer was in order to make the arrest at the safest time and location. Agent Occhipinti said in his deposition that he got on the radio and said that they were up on Meyer's phone, to let them know that if they ended up losing him, they have the capability of getting him at a later time.[7] Testimony also suggests that drones and/or helicopters may have been available to continue remote surveillance and location of Meyer. In my opinion, Sgt. Lanter should have considered this information prior to attempting a traffic stop and getting in a pursuit.

3. Meyer stated that he would not go back to jail and would shoot it out with the police. Under no circumstances should Sgt. Lanter provide an opportunity for a moving shootout with Meyer traveling in a vehicle. Shootouts between the police and suspects are inherently dangerous for the public, the police and for the suspects. Sometimes, it is necessary for an

---

[7] Occhipinti Deposition, p. 172

officer to utilize deadly force in order to protect themselves or others. The danger can be minimized by choosing when and where to make the arrest of Meyer. By allowing him to leave in a vehicle and then to engage in a pursuit meant that wherever Meyer went, the threat to the public went with him. Even if officers had the self-restraint not to shoot at a moving vehicle due to the threat of injuring or killing others, there would be nothing to protect the public from Meyer, who might shoot at police at any time. The safest thing to do would be to attempt the arrest in a confined area, thereby limiting the amount of danger to the public. Allowing Meyer to flee in a vehicle meant that danger existed at all points during the pursuit route, since he stated that he would shoot it out with police to avoid jail.

4. Sgt. Lanter detailed several danger factors alleged to have been present with Meyer:
   a. Meyer was dangerous.
   b. Meyer had a brain tumor.
   c. Meyer stated that he would not go back to jail.
   d. Meyer stated that he would not go easily and would shoot it out with police.
   e. Meyer had made threats to kill police.
   f. Meyer is always armed.
   g. Meyer buys and sells guns.
   h. A subject had to pay Meyer $500 so Meyer would not shoot him.
   i. Meyer held a gun to a subject's head and accused him of stealing drugs.
   j. Meyer had kidnapped someone and knocked his teeth out with a pistol.
   k. Meyer broke someone's arms and nose and made him call his mom to pay off a $2,000 debt.
   l. Meyer has been acquiring guns ever since he got out of jail.
   m. Meyer set up a subject named Collins to rob him. A CI heard a shot but did not see the assault. Meyer then fled after the shooting thinking that he had killed him by shooting him in the face. He stated he would kill him next time.
   n. Meyer said he would shoot it out with police and they would have to kill him.
   o. Meyer had to be apprehended to get him off the streets based on the threats he made.
   p. The consequences of Meyer's escape are his threats. Meyer's not going alive. Meyer was going to shoot it out with police.
   q. They had a plan and lots of police. Sgt. Lanter was worried that another officer would stop Meyer in front of a school which would endanger the police and the innocent civilians, depending on the location of the stop. Meyer created an imminent risk to the officers and to the community. [8]

Sgt. Lanter is correct that Meyer's arrest would serve to protect the public and the police. For all the reasons he detailed in his interview, Meyer was a threat. He is also correct that they had a plan and lots of police. Everything was in place. The thing that made the plan inoperable and dangerous was Sgt. Lanter's initiation of a pursuit of a person that he considered to be a very dangerous, wanted criminal who was armed, had threatened to shoot it out with police, and was potentially suicidal due to a brain tumor. Sgt. Lanter unreasonably believed that an attempted traffic stop and resulting pursuit was the best method to make the arrest. For all the reasons he detailed above, this arrest should have been made when the police

---

determined it was the best time and location. A high-speed moving pursuit was not the correct time and location.

5.  Using the previously authorized warrant to ping Meyer's phone, on July 30, 2020, the NKDSF attempted to arrest Meyer on his outstanding felony warrants in the Northern Kentucky, Hebron area. [9] NKDSF requested the assistance from the Boone County Sheriff's Office. Deputy Miller responded to assist and attempted to stop Meyer, who was driving a silver Ford Escape. Meyer began weaving in and out of heavy traffic and cutting people off to the point where other drivers had to swerve and slam on their brakes in order to avoid a collision. Deputy Miller reached a speed of 95 mph, and Meyer was still pulling away from him and driving recklessly. Deputy Miller shut off lights and siren and discontinued the pursuit as ordered by a supervisor, Sgt. DeMoisey. [10]

    All officers and agents present during the August 7, 2020 arrest attempt knew that Meyer had numerous alleged danger factors (felony warrants, threats to shoot police, brain tumor, felony history, use of weapons and felony crimes such as assault and kidnapping). The Boone County pursuit also told them that he would refuse to stop and would flee police if pursued. This is invaluable intelligence that confirms what they already knew about Meyer. With this information in mind, the plan to engage in a police pursuit was flawed from the start. It was unreasonable for Sgt. Lanter to engage in a dangerous police pursuit, hoping that Meyer would behave any differently than when he was pursued by Boone County. The thing they could not afford to do would be to give Meyer another opportunity to flee from pursuing police. Sgt. Lanter should never have tried to stop Meyer on the public streets, especially since he had plainclothes surveillance, plus possible helicopter and drones and the phone ping to tell where he was.

---

[9] 721 Steiner Aff., p. 2
[10] Ex 28 – KYIBRS Report 7.30.20 (Boone County Incident #KY 20009737, Bates Laible_Boone_County_000005

# Alternative Methods

Now that I have detailed all the reasons Sgt. Lanter and CPD officers should not have pursued Mason Meyer, I will address alternative means available for arresting Meyer for the purpose of containing the danger he presented to the community.

There are multiple recognized methods that could have been used in order to arrest Meyer. No police operation is 100% safe 100% of the time. However, I have used these methods numerous times when I was with the Seattle Police Department in order to apprehend and arrest homicide suspects, bank robbers, and those engaged in the sale of weapons and narcotics. These methods would be much safer for the general public than the police pursuit used by Sgt. Lanter and the CPD. The other advantage the team had is that 721 Steiner is a dead-end road. The team could have used this to their advantage while utilizing the operations described below. The ability to limit outside safety concerns and prevent egress/ingress would have been quite beneficial if used properly. The failure to consider, attempt, and/or use these methods was contrary to the duties of the officers involved in initiating and carrying out the pursuit of Meyer here.

## OPEN AIR TAKEDOWN

This method is described in the ATF Operational Plan. "If Meyer or Johnson leave the residence and head toward the vehicle, Agents/TFO's will attempt an open air assault. If Meyer/Johnson gain access to the vehicle, Agents/TFO's will attempt to conduct a vehicle stabilization pin. In the event Agents/TFO's are unable to pin the vehicle, CPD uniform officers will attempt to conduct a felony traffic stop with assistance from CPD K9's per there [sic] SOP." [11]

Again, the task force had a location for Meyer of 721 Steiner. They also had an authorized ping on his phone to show where he was. When surveillance units saw Meyer out in the open, "Agents/TFO's will attempt an open air assault" as shown in their operational plan. The arrest team would move in quickly, using the elements of surprise and an overwhelming police presence. A Noise-Flash Diversionary Device (NFDD) could be used to distract and overwhelm Meyer, hopefully rendering him unable to mount a counterassault against officers. Team(s) of officers, armed with lethal and less-lethal weapons could respond appropriately in order to make the arrest while keeping the team as safe as possible. The other benefit of this method is that the arrest could have been confined to a fixed location on a dead-end street with numerous officers present, as was the case with 721 Steiner. Certainly, there are risk elements with this method, but the risk is much lower than utilizing a vehicular pursuit in order to stop Meyer.

I have also used the vehicle stabilization pin described in the ATF Operational Plan. When a wanted subject is in a vehicle, if vehicles can be placed in front and behind the vehicle, there is the ability to limit the movement of the vehicle. The important thing is that both police vehicles need to maintain steady contact with the front and rear of the suspect vehicle. By maintaining contact, the suspect is unable to generate enough forward and reverse momentum to gain enough speed to force their way out. If both police vehicles maintain contact, the suspect can floor the accelerator, but will only succeed in spinning the tires. Officers could then take steps to disable the suspect's vehicle with

---

[11] Ex 26 – ATF Operational Plan (City 000794-000804), Bates CITY_000797

stop sticks, and make an arrest out of the car. There are certainly danger factors present with the vehicle pin, but at least the suspect is in a fixed location and less likely to injure or kill civilians. By choosing a smart location, the surveillance team can direct the arrest team when to move in. The surveillance team would also have the responsibility to delay the arrest if there are civilians present. Again, because surveillance was present and the phone ping was authorized, officers utilizing this method would still have the opportunity to make the arrest, but with a much greater chance of keeping civilians safe. This surveillance could and should have been used to avoid this deadly pursuit, and would have been considered compliant with nationally-accepted policing practices for maintaining safety.

Sgt. Lanter indicated that there was another form of surveillance that might have been useful. Hamilton County Helicopter Unit 9H10 had been dispatched to assist, but Lanter was unaware if he ever reached the pursuit. [12] In my opinion, the helicopter could have been used to observe the vehicle's location while driving from the scene and communicate that information to surveillance units who could discretely follow Meyer in order to find a suitable place to conduct a takedown. The traffic stop and resulting pursuit eliminated this covert intelligence from being used. This intelligence could and should have been used to avoid this dangerous and deadly pursuit, and would have reflected the use of a policing tactic and practice that is nationally accepted as a good and safe practice.

Testimony from CPD officers was consistent that CPD officers are not trained in nor do they use the vehicle stabilization pin tactic. There is no explanation for this, and failing to provide training and policy guidance to officers on how and when to use this tactic removes from officers a tool that can be used to avoid dangerous and potentially deadly pursuits. This is a failure of supervision, policy, and training by CPD that does not adhere to generally-accepted policing practices around the country.

---

[12] Lanter Deposition, pp. 217-218

**SURROUND AND CALLOUT/SEARCH WARRANT/CPD SWAT**

The second method that could be used which would be much safer than a pursuit would be for the surveillance team to make a positive determination that Meyer was inside 721 Steiner. Once again, having the ability to utilize plain-clothes surveillance and the phone ping would greatly help with this method of arrest. If Meyer was confirmed to be inside the residence, the surveillance team would call in CPD SWAT or another team of uniformed officers to surround the house in order to prevent Meyer from escaping. Once the house was surrounded, a PA system or phone could be used to notify Meyer that the house was surrounded and that he needs to give himself up. Whether Meyer gives up or refuses to come out, there are numerous benefits to this method of operation:

1. Meyer would be contained within the residence, and unable to escape past the uniformed officers. He would still be considered dangerous, but the only people that would be threatened would be associates inside the house or the police.

2. Other residents could be warned via PA that they are not the target and can safely exit the house at any time. I have extracted numerous people from situations like this. Limiting the number of people in the house makes the scene safer than if they remained in the house.

3. By containing Meyer in a house, the arrest team has the benefit of time. There would be no rush to complete the operation. Safety plans could be put in place. Armored vehicles, sniper support, SWAT and negotiators could be utilized. The CPD Risk Assessment Matrix would be used to determine if SWAT was needed at the scene. [13]

4. These additional resources help keep officers safe and assist in bringing a safe resolution for everyone involved.

5. An operational plan would be developed, utilizing the Incident Command System (ICS). This ensures command level support and review of all police actions, thereby limiting dangerous actions that might be taken by rogue officers acting on their own authority. The ability of police command to supervise all police actions presents a coordinated plan of action, based on intelligence, officer safety, as well as operational goals.

6. If Meyer refused to exit the house, nearby residents could be evacuated to safety.

7. By containing Meyer in the house, less lethal munitions could be used to encourage Meyer to exit the house. This could include a gas launch plan to force compliance.

8. Police drones and robots could be used to gain intelligence and provide real-time information on Meyer's actions inside the house. Police robots could also be used for communication, or to deliver a telephone.

---

[13] CPD Manual Section 12.700 SEARCH WARRANTS/CONSENT TO SEARCH, p. 7. Retrieved 7/27/2024 from:
https://public.powerdms.com/Cin3647/tree/documents/2571477

9.  Supervisors could evaluate the "risk vs. reward" when deciding if it would be a prudent investigative technique to disconnect or interrupt a power source or utility service. [14]

10. Detectives would have the opportunity to seek a search warrant for 721 Steiner, adding probable cause to the prior arrest warrants that had been issued for Meyer. Adding judicial authority to enter the house provides constitutional protection for suspects, can help limit liability for CPD, and can ensure evidence obtained is admissible in court.

11. Entering the house and forcing a confrontation would be the last resort to make this arrest. Negotiating a surrender would be preferred. At least with an authorized plan in place, steps could be taken to make the scene as safe as possible for officers and for the suspect, while providing plenty of opportunities for Meyer to give up. There are still danger factors present with this plan, but this will be safer than a vehicular pursuit.

---

[14] *Id,* at p. 7

## STOP STICKS BEFORE PURSUIT BEGINS

A third method that could be used which would be much safer than engaging in a pursuit would be the use of stop sticks to prevent any vehicles containing from departing Steiner Avenue or the nearby area of River Road. Maps show and testimony confirms that Steiner was a dead-end road. It emptied onto River Road, where vehicles could travel in only one of two directions: east or west. Lanter testified and Scalf confirmed that officers were staged in both directions on River Road from where Steiner intersected with River.  Lanter, Thomas, Scalf, and other officers present were trained in use of stop sticks.  They knew a dead-end road was an ideal place to use stop sticks.

Stop sticks were available to CPD officers, including the Gang Unit, of which Lanter was a member, on August 7, 2020. Stop sticks were available, for example, in the Gang Unit office and in various CPD vehicles.  Lanter himself testified about how useful stop sticks are to prevent pursuits:

> *"And you know what I mean, in a lot of pursuits, I'll tell you, stop sticks end them. And that's how pursuits terminate. You know, we might start and then, hey, he turned the corner, your four tires are down.  Okay. And then you get to the next one, you're like, I'm done. So stop sticks stop a lot of pursuits or stop sticks prevent a lot of pursuits."* [15]

Chief Theetge on behalf of the City testified that it would be prudent to request stop sticks in advance of an operation where officers anticipate a pursuit.[16]

Sgt. Scalf, after this deadly pursuit, wrote in an email about the department's placement of new restrictions on Gang Unit use of pursuits, including prohibiting Gang Unit members from engaging in vehicle pursuits unless they had successfully deployed a stop stick, the suspect had just committed a violent felony, or CPD had to assist another officer/agency, and only then with strict adherence to the speed limit and lights and sirens activated.  Scalf responded to an email detailing these restrictions and other related information as a "damn good response."[17] The City itself had no objection to the characterization of the steps taken to minimize risk in this email exchange, including calling it "excellent work" and "a great example of leadership."[18]

Lanter knew on August 7 he was being called out to an assignment that potentially involved a vehicle pursuit; he knew he was going to be staged and potentially waiting; yet he testified he did not consider making sure there were stop sticks in his vehicle for that period of the operation. However, he testified that he did consider asking for stop sticks from another car in the vicinity. But he did not actually ask other officers before he attempted the traffic stop if they had stop sticks.  He then testified that he actually made such a request once the pursuit started – asking for any unit with stop sticks in areas to respond. He testified that he did this to decrease the likelihood of the pursuit continuing, in order to decrease the risk to officer, suspect, and the public.[19]

The potential use and benefits of stop sticks were obvious here where Lanter anticipated a possible pursuit. But Lanter did not investigate whether or attempt to make sure stop sticks were at hand for use until after the pursuit began.

---

[15] Lanter Deposition, p. 175
[16] Theetge Deposition, p. 70.
[17] Scalf Deposition, pp. 184-185.
[18] Theetge Deposition, pp. 185-186.
[19] Lanter Deposition, pp. 135-136, 139.

In my opinion, stop sticks are frequently used to avoid police pursuits. Like the other methods I described, there are safety risks when using stop sticks. Namely, an officer has to place a small version of stop sticks under the tires of a parked car, or the larger version has to be thrown across a road which can place the officer in danger of being struck by a car. In either case, the limited access to and from 721 Steiner made stop sticks a superior option to subjecting the public to a dangerous police pursuit.

**ALTERNATIVE METHODS SUMMARY**

Despite these available and superior options, CPD agreed to carry out – and its officers responded and executed – this operation for the explicit purpose of performing an attempted stop and to initiate and monitor any potential pursuit. The Department's commitment, and the specific officers' commitment to and carrying out this approach was flawed and unreasonable for the reasons I state in this report.

To the extent Meyer escaped surveillance or arrest at any point during any of these processes, the surveillance and intelligence tactics and tools described above (helicopter, drone, phone ping, and so on) could be used to track Meyer to his next location and would allow police to adjust to the changing circumstances, make new contingency plans as needed, and prepare for a follow-up open air take down or surround and callout, search warrant, CPD SWAT approach. Though in either case there are still danger factors present, it would be safer than a vehicular pursuit.

## The Pursuit of Mason Meyer

Now that I have explained what should have happened to make the arrest of Mason Meyer rather than the initiation of a pursuit, I will now turn my attention to the unreasonable police pursuit that took place on August 7, 2020. This part of the review will cover the unsafe speeds, unsafe lane travel, the disregard for other motorists, the disregard for traffic control devices, and the crash. I will then cover CPD pursuit policy, policy violations, and training and supervision issues relating to the Cincinnati Police Department.

**THE PURSUIT OF MASON MEYER**

### Sgt. Lanter's Conduct in Pursuit of Meyer

Using Google Maps, I traced the route of Mason Meyer as he left 721 Steiner, followed by Officer Mark Bode.  Sgt. Tim Lanter caught up and began following as well. Meyer's route from 721 Steiner to Mt. Hope Avenue is 1.8 miles. [20] Officer Bode began following Meyer at Steiner Avenue and River Road. From this location to Mt. Hope and Elberon is 1.5 miles, non-pursuit.



---

[20] Google Maps, accessed 7/28/2025 at: https://maps.app.goo.gl/VS89mhHvCwWETy126

Sgt. Lanter attempted to conduct a traffic stop at Mount Hope and Elberon with lights and siren. The suspect refused to stop and Sgt. Lanter engaged in a police pursuit. [21]  Following the route of the pursuit. Elberon Ave and Mount Hope Ave to River Road and across the Ohio River to the Ohio/Kentucky State line is 4.7 miles. [22]



The pursuit crossed the Ohio River on the John A. Roebling Suspension Bridge, through the streets, wrong-way streets, alleys, roundabouts and bridge until it ended with a dual-fatality crash on E 5th Street, northeast of Monmouth Street. The portion of the pursuit from the Ohio/Kentucky state line to the collision at East 5th and Monmouth Street in Covington, KY was 1.7 miles. [23]

---

[21] Laible - CITY_001633 Lanter Video Interview
[22] Google Maps, accessed 7/28/2025 at: https://maps.app.goo.gl/vwzkbMR4wBNs8pX39
[23] Google Maps, accessed 7/28/2025 at: https://maps.app.goo.gl/CXf8BGU1wRrq7grD9. Note: I had to use a walking map because Google Maps does not allow the user to drive the wrong-way on a one-way streets. Also, walking is not allowed on Roebling Way from E 2nd Street to E 3rd Street. Roebling is 536 feet to E 3rd. Greenup is 636 feet to E 3rd, so the distances are reasonably close on the two side by side maps above.



Measurement of distance on Roebling Way and Greenup Street

 

The total distance of Sgt. Lanter's pursuit from Mount Hope and Elberon in Cincinnati to East 5th Street and Monmouth Street was 6.4 miles (4.7 miles in Ohio plus 1.7 miles in Kentucky). However, Sgt. Lanter's In-Car Video (ICV) shut off on West 5th Street at Central Avenue. The distance from the Kentucky state line to West 5th Street and Central Avenue is 1.4 miles. [24]  The total video distance of the pursuit captured on Sgt. Lanter's ICV is 6.1 miles (4.7 miles in Ohio plus 1.4 miles in Kentucky).



[24] Google Maps, accessed 7/28/2025 at: https://maps.app.goo.gl/bfiRNgqgAaA8R4mh8. Walking map used.

Sgt. Lanter said he started the pursuit on Elberon Avenue as Meyer turned right onto Mount Hope Ave. On Sgt. Lanter's ICV, the clock shows that the pursuit began at 16:34:22 (4:34:22 pm).



Sgt. Lanter's ICV shut off 4 blocks/.3 miles from the final crash site. This is a screenshot from West 5th Street and Central Avenue in Covington showing the end of video at 16:41:15 (4:41:15 pm).



According to Google Maps, his statement and his ICV, Sgt. Lanter's pursuit was 6.1 miles long. The clock started at 16:34:22 and ended at 16:41:15, for a total time of 6 minutes and 53 seconds.

Driving 6.1 miles in 6 minutes and 53 seconds equals an average speed of 53.17 miles per hour. [25]

# Speed Calculator

Please provide any two values in the fields below to calculate the third value in the speed distance time equation:

$$speed = \frac{distance}{time}$$



**Result**

speed = **53.17191283293 miles/hour**

**Steps:**

$speed = \dfrac{distance}{time}$

$= \dfrac{6.1 \text{ mi}}{413 \text{ sec}}$

$= 0.014769975786925$ mi/sec

$= 53.17191283293$ miles/hour

Find Speed | Find Distance | Find Time

| Speed | = ? | miles/hour [mph] |
| Distance | 6.1 | miles [mi] |
| Time | hour | 6 min | 53 sec |

Calculate ▶    Clear

---

[25] Calculator.net Speed Calculator, accessed 7/28/2025 at: https://www.calculator.net/speed-calculator.html?cspeed=&cspeedunit=mph&cdistance=6.1&cdistanceunit=mi&ctimeh=&ctimem=6&ctimes=43&ctype=s&x=Calculate

In this report, I previously opined that Sgt. Lanter should not have been in this unreasonable pursuit in the first place as Meyer could have been arrested at a fixed location via takedown, or surround/call-out, or stop sticks could have been used to prevent or cut short any attempt to flee. In my opinion, Sgt. Lanter unreasonably drove too fast for the conditions during this pursuit. Video and the Becker expert report confirmed what I saw on video. [26] Sgt. Lanter and Officer Thomas drove well above the speed limit during this pursuit, which was unreasonable and violated CPD policy, as I detail later. Though he said he had lights and siren on, as I watched the pursuit, I could see Sgt. Lanter unreasonably ignored the rules of the road in order to pursue Meyer. In my opinion, Sgt. Lanter often attempted to "wheel-track" the suspect by following Meyer's driving path on the roads. If Meyer crossed over a double yellow, Sgt. Lanter also crossed over the double yellow. If Meyer sped at excessive speed, Sgt. Lanter sped at excessive speed. If Meyer drove the wrong way on the road, Sgt. Lanter drove the wrong way on the road. If Meyer cut the corner through a parking lot, Sgt. Lanter cut the corner through a parking lot. There were an excessive number of times when Sgt. Lanter ignored traffic control devices/markings:

- Stop signs ignored: 16:34:55, 16:35:01, 16:35:14, 16:39:41
- Red lights ignored: 16:35:36, 16:38:21, 16:38:34, 16:38:42, 16:40:31. The last red light he ignored is visible on Ofc. Thomas' ICV at 02:15:05. Sgt. Lanter has a red light at 5th and Monmouth and drives straight through without slowing. He swerves to the left as a car with the right of way enters the intersection from his right. Officer Thomas then nearly strikes the second vehicle through the intersection.



---

[26] Steven Becker Report

- Wrong Way Streets: 16:39:25, 16:39:41, 16:39:50
- Speeding in alley filled with dust: 16:40:13
- Driving the wrong way on E 4th Street. A car comes toward the officer and has to swerve out of the way. 16:39:53
- Forcing a motorcycle to swerve out of the way because Sgt. Lanter drove at him across the double yellow and into the motorcyclist's lane. 16:40:41
- Improperly crossing lane markers: This occurred so often there are too many to count.
- A collision occurred between a civilian vehicle and the suspect's vehicle at 16:37:45 because the civilian was trying to pull to the right because of Lanter's lights and siren. Though Sgt. Lanter's vehicle did not impact the civilian's vehicle, the cause of the crash was the unreasonable police pursuit.
- Of course, the fatality collision occurred between Meyer and the victims at E. 5th and Monmouth Street. Again, though Sgt. Lanter was not directly involved in the crash, the cause of the crash was the unreasonable police pursuit.

Lanter also misrepresented traffic and pedestrian presence along the route of the pursuit. He testified that he remembered seeing only one or two pedestrians in the Banks area during the entire pursuit, and that "traffic wasn't a factor," "was light", and when asked if he saw vehicles swerving to get out of the way of the pursuit, he responded "Swerving; no; pull over to get out of the way of the pursuit, yes."[27]

For all of these reasons, in my opinion Sgt. Lanter unreasonably pursued Meyer, an identified suspect who was known to flee from police.  It is also my opinion that the manner in which Sgt. Lanter pursued Meyer was unreasonable, notwithstanding the issues of whether he should or should not have initiated or terminated the pursuit. The way Sgt. Lanter operated his cruiser during this pursuit was needlessly dangerous, and was unreasonable under the circumstances.

Further, Meyer had been tracked, could have continued to be tracked, and could have been arrested much more safely and easily through various alternative available methods. Though Meyer presented danger factors, there was no information that he had immediately prior to the pursuit committed an act of violence or that he was on his way to commit a violent crime at the time Lanter pursued him. There was, in my opinion and as outlined in CPD policy, no justification to pursue Meyer or to continue a pursuit of Meyer once the it began.  This is clear in the testimony of other officers: Thomas testified that at no point in time did anyone communicate to him that it was necessary to apprehend Meyer on August 7, 2020.[28] This is telling because Sgt Lanter also testified that he briefed PO Brett Thomas and another officer about the operation prior to the pursuit, and agreed that he "told them everything [he] knew."[29] PO Bode also testified that from the beginning of the pursuit to the point of the crash, there was no discussion or conversation that Meyer would be arrested no matter what on August 7.[30] ATF Occhipinti also testified that he was not concerned that if Meyer was not arrested on August 7 that he might get away for good, because he "remember[ed] specifically getting on the radio and saying that we're up on his phone to dispatch with – my intent

---

[27] Lanter Deposition, pp. 103, 105, 108, 208.
[28] Thomas Deposition, p. 232.
[29] Lanter Deposition, p. 248.
[30] Bode Deposition, p. 241.

let dispatch know that, hey, if we end up losing him, we're still on his phone, we still have – we still have the capability of getting him at a later time."[31]

Sgt. Lanter's pursuit put civilian's lives in danger as shown above because of Lanter's desire to catch Meyer at all costs which included ignoring traffic control devices/markings, driving at an excessively fast speed, and pursuing beyond when a reasonable officer would have terminated the pursuit. Sgt. Lanter repeatedly and explicitly violated CPD policy and his training during this pursuit through the manner he engaged in this pursuit, and he unreasonably both created and prolonged the danger posed to the public by the pursuit and the resulting ongoing flight by Meyer.

Dunham (1998), studied offenders who ran from the police. The research showed that 75% of the respondents would stop "Only when they feel safe," which meant that they did not see or hear police lights and siren. In town, this equated to a 2-block distance. On the freeway and rural roads, this meant not seeing or hearing a police officer for 2 to 2.5 miles.  67% of the respondents said that they would run if the police were aggressively pursuing them. 53% of the respondents said that they would run from the police at all costs. (Dunham, 1998) Meyer's affidavit confirms here that he would not have fled without the pursuit and would have stopped fleeing – and would have stopped posing a danger to the public – had the pursuit been terminated. This was already evident in Meyer's reaction to the Boone County attempt to stop and the pursuit one week earlier.  Therefore, the greatest benefit to the public would have been from discontinuing this unreasonable and unnecessary pursuit to keep people safe, even if it means Meyer might not be immediately captured. Continuing this police pursuit put people in danger and cost the Laibles their lives and the Kleins their health and wellbeing.

In my opinion, when Sgt. Lanter attempted the traffic stop, he gave up the two best tools that could have been used to help capture Meyer. He negated the ability to conduct plain-clothes surveillance on Meyer, and he rendered the phone ping fairly useless. If he had not attempted the traffic stop, Meyer could have been more safely arrested at a different time and location. Sgt. Lanter compounded his error by then engaging in a high-speed traffic pursuit, with unreasonable disregard of traffic control devices/markings, other motorists. This eventually cost the Laibles their lives and caused significant injury to the Kleins.

CPD officers are trained on the risks presented by pursuits to the public, including potential injury or death.[32] Such risks, according to Chief Theetge testimony on behalf of the City, are evident in a pursuit when accidents occur during the course of the pursuit.[33]  Sgt. Lanter knew that CPD Policy required officers to be aware of the degree of risk created by a pursuit to themselves, the suspect, and the public.  Sgt. Lanter also testified that his training from the department led him to the conclusion that when the danger to the public outweighs the benefits of apprehending the fleeing suspect in a pursuit, "when you see it, you know it."[34]  He also understood that CPD policy specifically mandated termination of pursuits when that threshold is crossed.[35] This mandatory termination per policy was confirmed by the City and was known by other officers, including PO

---

[31] Occhipinti Deposition, p. 172.
[32] Theetge Deposition, pp. 160-161.
[33] Theetge Deposition, pp. 161-162.
[34] Lanter Deposition, pp. 155-156.
[35] Lanter Deposition, p. 163.

Thomas.[36] Scalf also testified that he expected Lanter to terminate the pursuit should that threshold be reached.[37]

Here, Sgt. Lanter seems to have ignored his training and knowledge of CPD policy. Notably, no exceptions to CPD policy were granted for this pursuit other than those exceptions granted by Lanter himself, and Scalf's "affirmative" response to going into Kentucky, during the pursuit over the radio.[38]  CPD policy mandatory requirements were violated in this pursuit, and the facts and testimony of other officers show that a pursuit should not have been initiated or continued here. In my opinion, Sgt. Lanter should have terminated the pursuit, as the Boone County Sheriff's Office did during the prior police pursuit of Meyer. Instead, Sgt. Lanter contributed to Meyer's continued flight and was a cause of the ultimate crash that ended this pursuit.

---

[36] Thomas Deposition, p. 103.
[37] Scalf Deposition, p. 149.
[38] Theetge Deposition, pp. 168-169.

**Conduct of Other Officers Involved in Pursuit of Meyer: PO Brett Thomas and Specialist Michael Harper**

Two other officers were involved in this pursuit. K-9 officers Thomas (secondary) and Specialist Harper (tertiary) were called by Sgt. Lanter to engage in the pursuit. Sgt. Lanter authorized Thomas as the second car and Harper to be the third car in the pursuit. As I previously opined, Sgt. Lanter should not have attempted the traffic stop, should not have initiated the pursuit, and should have terminated the pursuit after it began.

However, PO Thomas' and Specialist Harper's participation in this pursuit was also unreasonable. Harper effectively did not catch up to the pursuit and therefore was not immediately visible to Meyer behind his vehicle. But PO Thomas did catch up to the pursuit and was in the line of speeding vehicles fronted by Meyer as they drove through the streets of Cincinnati, Covington, and Newport. PO Thomas, like Lanter, was aware of the mandatory policy requirement to terminate pursuits when the danger to the public outweighs the benefits of apprehending the fleeing suspect.[39]  Thomas understood that the policy prohibition on going the wrong way on a one-way street could only be breached if explicit supervisor authorization was provided.[40] Yet, for example, Thomas testified that he did not recall anyone authorizing him to go the wrong way on the roundabout and that Lanter did not implicitly authorize it.[41] Thomas knew that CPD officers are not permitted to exceed 20 MPH over the speed limit per policy, and that there are no ways to bypass or overcome that specific limitation in the policy.[42] Yet he exceeded the speed limit by more than 20 MPH at multiple points in the pursuit.[43] Video and the Becker expert report confirmed what I saw on video. Sgt. Lanter and Officer Thomas drove well above the speed limit during this pursuit, which was unreasonable and violated CPD policy, as I detail later.

In my opinion, PO Thomas, like Sgt. Lanter, unreasonably drove too fast for the conditions during this pursuit. PO Thomas also unreasonably ignored the rules of the road in order to remain part of the pursuit and to pursue Meyer. In my opinion, PO Thomas also attempted to "wheel-track" Meyer and Lanter; Thomas crossed double yellow lines, drove at excessive speeds, went the wrong way on one-way streets, and engaged in other dangerous driving tactics, mirroring the driving of Lanter and Meyer.  Thomas also ignored traffic control devices/markings:

- Stop signs ignored: 02:08:38, 02:08:44, 02:08:58 which shows a car crossing right in front of the patrol car, 02:09:02, 02:13:38.
- Red lights ignored: 02:09:18, 2:11:52, 02:12:06, 02:12:13, 02:14:06, 02:15:08, where Officer Thomas nearly strikes a dark colored vehicle at the intersection of 5th and Monmouth. The other vehicle clearly had the right of way as the light is red for Officer Thomas.

---

[39] Thomas Deposition, p. 103.
[40] Thomas Deposition, p. 86.
[41] Thomas Deposition, p. 225.
[42] Thomas Deposition, p. 87.
[43] Steven Becker Report



- Wrong Way Streets: 02:12:56, 02:13:14, 02:13:21
- Speeding in alley filled with dust: 02:13:46,
- Improperly crossing lane markers: This occurred so often there are too many to count.

Though PO Thomas was not directly involved in the crash, the cause of the crash was the unreasonable police pursuit.

For all of these reasons, in my opinion PO Thomas unreasonably pursued Meyer, an identified suspect who was known to flee from police.  It is also my opinion that the manner in which PO Thomas pursued Meyer was unreasonable. The way PO Thomas operated his cruiser during this pursuit was needlessly dangerous and was unreasonable under the circumstances. PO Thomas, like Sgt. Lanter, violated CPD policy and his training. PO Thomas contributed to Meyer's continued flight and was a cause of the ultimate crash that ended this pursuit.

Even with Sgt. Lanter acting as de facto officer in charge of this pursuit[44], and despite any obligation PO Thomas may have had to follow Lanter's orders or back him up in the pursuit, each officer involved – including Thomas - still has the duty to drive in a reasonable manner and to comply with department policies and training. The IIS Investigation reports that Officer Thomas' BWC footage showed his speed on the Sixth Street Viaduct to be 103 mph.[45] The investigation also reports that

---

[44] Fink Deposition, p. 140; Caton Deposition, pp. 116-117; IIS Report, Deposition Ex 03. Lanter also testified, "And then as I stated, you know, yes, there's an identified OIC. However, I'm still a supervisor at that point, and I don't -- I don't take this badge off and say, hey, give me a PO badge. I'm faulting (sic) back to what I'm at. Those were responsibilities and decisions that I make." Lanter Deposition, p. 274.
[45] See also Steven Becker Report.

Specialist Harper's BWC showed him operating his police vehicle at 100 mph on the Sixth Street Viaduct. In my opinion, these are unreasonable speeds which put other motorists in danger due to the lack of reaction time due to focus on driving, as well as increased stopping and turning distances due to the extreme speed.

**Supervisory Role of Sgt. Lanter in Pursuit**

Notwithstanding PO Thomas' individual violations of his duties, training, and policies, as a police supervisor, Sgt. Lanter had a duty to execute his duties in a reasonable manner, and not require or implicitly encourage other officers to drive recklessly or to travel at such high rates of speed in order to keep up with him. A supervisor must think of the big picture during high-profile dangerous incidents like this pursuit. The supervisor needs to have the ability to be aware of the danger factors present for a police pursuit, including the threat to innocent civilians. Sgt. Lanter had a duty to act reasonably, within policy and training, and within the bounds of common sense, to acknowledge the obvious risks present in this pursuit, and to know when the threshold had been reached where the benefit of apprehending Meyer was not greater than the threat posed by the pursuit. As he testified, "when you see it, you know it" – and terminating the pursuit is mandatory under those circumstances. In this case, the danger to the community was much greater than the benefit of apprehending Meyer, as evidenced by the deaths of Raymond and Gayle Laible and the injuries to Steven and Maribeth Klein. The Laibles did not have to die and the Kleins did not have to be injured in order to make the police arrest of Meyer. Sgt. Lanter's failure to respond appropriately to the obvious factors here was unreasonable and ended up in a preventable and tragic crash, causing the deaths of the Laibles and injuries to the Kleins. A reasonable police officer and reasonable supervisor would have  engaged differently, driven differently, led his fellow officers differently, and terminated the pursuit.

**THE ROLE OF CPD: CINCINNATI POLICE DEPARTMENT'S FAILURES TO SUPERVISE AND TRAIN ITS OFFICERS**

**CPD's Failure to Properly Supervise Sgt. Lanter Generally and This Pursuit Specifically.**

As noted in the interviews of Sgt. Scalf and Sgt. Lanter and in the IIS investigation, Sgt. Scalf tentatively identified himself as the officer in charge (OIC) of this pursuit after it began, saying "If you don't have an OIC, I'm it."[46] But Sgt. Lanter began the pursuit before Scalf's transmission, and Lanter continued to act after the transmission, as de facto officer in charge of this pursuit.[47] In my opinion, it was unreasonable and improper for Sgt. Lanter to take and to retain this role as de facto OIC.  Sgt. Lanter also expressly broadcasted that he did not want to hear other police units on the radio, as he was in pursuit and wanted the two K-9 officers with him. This shut down other potential communications which could have been helpful.

Though Sgt. Scalf claimed that he could not get on the air, he should have broadcasted immediately that he was the OIC. Scalf, or another CPD supervisor, should have actually acted as an OIC here, by executing the role and duties of the OIC. Lanter should not have continued to execute those duties and role. Those roles and duties include, for example, the authorization or non-authorization of the 3rd car to be in the pursuit; authorizing or implicitly authorizing wrong-way travel on one-way streets; authorizing or implicitly authorizing speeds greater than 20 MPH over the speed limit; and other policy violations or exceptions used here. If a pursuing officer is not broadcasting driving speed, the OIC should immediately get on the air and inquire as to the speed of the pursuit. Sgt. Scalf unreasonably failed to act as the OIC.

The OIC should not be an officer directly involved in the pursuit; instead the OIC – both pursuant to CPD policy and to generally-accepted policing practices – should be a police supervisor who is removed from the pursuit and able to look at the big picture and think clearly in order to make objective observations, which permits accurate perception of the benefits of apprehending a subject in comparison with the risks posed by the pursuit. In my experience and in relevant research, officers in police pursuits have shown themselves to become singularly focused on the police pursuit, and sometimes lose the ability to think and behave rationally and reasonably. They therefore compromise their abilities to protect innocent people from harm in the context of pursuits. As a supervisor, Sgt. Lanter should have known this or been trained on the OIC role.

Nonetheless, Lanter acted as de facto OIC; Scalf did not step in to actually manage the pursuit, and no other CPD officers stepped in to fulfil the role or remind Lanter of his limitations while in pursuit. These circumstances – and Lanter's explicit testimony that "I don't take this badge off and say, hey, give me a PO badge. I'm faulting (sic) back to what I'm at" – indicate a permissive departmental culture which led Lanter to utilize and exercise authority and dangerous policing practices that pose a risk to others.  In my experience, this type of conduct does not occur in a vacuum and is not typically an isolated incident.

---

[46] Deposition Ex 37 and 38, Radio Traffic Transcription by Sgt. Fink.
[47] Fink Deposition, p. 140; Caton Deposition, pp. 116-117; IIS Report, Deposition Ex 03. Lanter also testified, "And then as I stated, you know, yes, there's an identified OIC. However, I'm still a supervisor at that point, and I don't -- I don't take this badge off and say, hey, give me a PO badge. I'm faulting (sic) back to what I'm at. Those were responsibilities and decisions that I make." Lanter Deposition, p. 274.

Here, CPD IIS investigated and, in my opinion, properly sustained complaints against Sgt. Lanter for violation of CPD Manual section 1.03 for violating the job duties of a Patrol Bureau Sergeant. [48] However, CPD did not discipline or counsel Scalf for his failure to act as a supervisor here. Though CPD did send Lanter to remedial driving instruction after this pursuit, he was not sent for remedial supervisor training. In my opinion, Lanter's conduct here represents a failure by the Department to supervise and train him properly with respect to his supervisory role and the role of officers actively involved in pursuits.

**Violations of Cincinnati Police Department's Pursuit Policy**

The CPD pursuit policy in effect at the time of the collision was revised May 30, 2019 and would have been in effect during this incident. I reviewed the policy [49] and found that the August 7, 2020 pursuit by Sgt. Lanter and Officers Thomas and Harper violated policy as stated below.

CPD Pursuit Policy mandates that:

> ***"Policy:*** *Officers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspects escape."* [50]

In my opinion, this pursuit should have been terminated because the deaths of two innocent bystanders and injuries to two other people outweighed the consequences of the suspect's escape. Sgt. Lanter said, "... when the degree to the officer or the suspect and the citizen is may just such a grave extent. But everything we do involves a chance of injury, involves a chance of death, involves a chance of someone being seriously injured." [51] In my opinion, Sgt. Lanter is confused about the need for termination. Just because "everything" is dangerous does not mean that he should not have weighed the consequences of a high-speed pursuit against the consequences of escape. If Meyer were to escape, he would probably continue his criminal activity of weapons and narcotics dealing. True, other criminal associates could still be threatened by Meyer's use of violence in running his operation. However, Meyer was not an immediate threat to innocent citizens who were not buying guns and narcotics from Meyer. Sgt. Lanter confirmed that there was no specific significant or violent crime that Meyer would absolutely be committing in the next 24 hours. [52] Also, ATF, NKDSF and CPD had surveillance units, the ability to ping Meyer's phone, and locations where Meyer might be located. By engaging in an unreasonable pursuit, Sgt. Lanter ruined the ability of the surveillance team to use the phone ping to locate Meyer and make a plan to arrest Meyer. Sgt. Lanter explained that the decision was made to conduct a soft stop on the vehicle for a traffic violation as a sort of ruse to check and see if Meyer was in the vehicle. [53] As I explained earlier, this was an unreasonable decision. The only thing that would make things worse, given what Sgt. Lanter has testified he believed to be true about Meyer at the time, was to engage in a pursuit, thereby activating Meyer's alleged suicidal tendencies, desire not to be taken alive, potential shootout, high-speed flight from law enforcement, and the fatality crash. If Lanter had let Meyer go to catch him later, the Laibles would not have been killed and the Kleins would not have been injured.

---

[48] Ex 03 –IIS Investigation Report (City 000315-000337, p. Bates CITY_000333
[49] Ex 01 - CPD Pursuit Policy, pp. Bates GB000026-000038
[50] *Id.,* at p. Bates GB000027
[51] Lanter Deposition, p. 164
[52] *Id.,* at p. 265
[53] *Id.,* at p. 259

CPD Policy further requires:

> *"Policy: While operating a police vehicle in emergency mode, entry into an intersection against a stop sign or signal poses a heightened level of risk to both sworn personnel and the public, and thus requires an increased level of caution to meet the due regard to safety standard. In order to show due regard when approaching intersections against a stop sign or red traffic signal, sworn personnel shall slow down as necessary for the safety of traffic and shall only proceed into the intersection at a speed which would allow for themselves and or other drivers and pedestrians are reasonably sufficient opportunity to avoid a traffic crash."* [54]

After watching Sgt. Lanter's ICV, I previously identified four times when Sgt. Lanter proceeded past a stop sign without stopping and six times when he proceeded through a red light intersection without stopping, and one visible near-collision. In my opinion, during all of these occurrences, Sgt. Lanter barely slowed, if at all. He unreasonably proceeded through the intersections at such a speed that would not have allowed him or other drivers or pedestrians a reasonable sufficient opportunity to avoid a traffic crash. In my opinion, Sgt. Lanter asserts inaccurately that he entered those intersections in a safe manner and slowed to zero, five, ten or twenty miles per hour, depending on the intersection. [55] In regard to stop signs, he said that all intersections entered at a speed which was reasonable for due care and caution. [56]

After watching PO Thomas' ICV, I previously identified five times he proceeded through a stop sign without stopping and six times when he proceeded through a red light intersection without stopping. In my opinion, during all of these occurrences, PO Thomas barely slowed, if at all. He unreasonably proceeded through the intersections at such a speed that would not have allowed him or other drivers or pedestrians a reasonable sufficient opportunity to avoid a traffic crash.

CPD Policy further mandates:

> *"During the emergency operation of police vehicles, and prior to and during a pursuit, officers must weigh the following factors:*
> - *Degree of risk created by pursuit to others, officer and suspect.*
> - *Location where pursuit will take place.*
> - *Traffic conditions and amount of pedestrian traffic.*
> - *Road conditions.*
> - *Time of day.*
> - *Weather.*
> - *Volume, type, speed and direction of vehicular traffic and direction of pursuit.*
> - *Nature/seriousness of suspected crime.*
> - *Condition of police vehicle and suspect's vehicle.*
> - *Any circumstance that could lead to a situation in which the pursuing officers will not be able to maintain control of the police vehicle.*
> - *Type of vehicle being pursued.*
> - *Likelihood of successful apprehension.*

---

[54] Ex 01 - CPD Pursuit Policy, pp. Bates GB000026-000038) at p. Bates GB000027
[55] Lanter Deposition, pp. 86-87
[56] *Id.*, at p. 91

- *Whether the identity of the suspect is known to the point that later apprehension is possible.* [57]

For these factors, in my opinion, both Sgt. Lanter and PO Thomas did not acknowledge the degree of risk that this pursuit created. They engaged in unreasonable actions which ultimately resulted in the deaths of two innocent bystanders. During the pursuit, there were numerous vehicles and pedestrians on the roadways that Sgt. Lanter and PO Thomas put in harm's way due to their unreasonably high speed, the disregard of traffic control devices/markers, the wrong-way driving, the collisions which occurred during the pursuit. Ultimately, two people lost their lives, which did not need to happen.

In regard to the condition of the suspect's vehicle, video shows that the right front tire of Meyer's vehicle was smoking. The ability of the tire to grip the roadway might have been compromised. The brakes might have faded. [58] The vehicle condition could have led to the fatality collision. In regard to the inability to control the police vehicle, speeds of 100+ miles per hour would certainly be a factor that could lead to the inability of any of the three officers to control their vehicle or Meyer. Reaction times are shorter. Tunnel vision occurs. Stopping distances are greater. According to the officers, they were unable to look at their speedometers or broadcast speed.

In regard to the likelihood of successful apprehension, Sgt. Lanter unreasonably attempted a traffic stop and then unreasonably initiated pursuit when Meyer refused to stop. Given what Sgt. Lanter asserts he believed about Meyer. I cannot determine what type of successful apprehension Sgt. Lanter envisioned. The only way this pursuit could have been successful is if Meyer were to run out of gas, or if he were to crash his vehicle into something. Lanter himself testified to this:

> A. And you know what I mean, in a lot of pursuits, I'll tell you, stop sticks end them. And that's how pursuits terminate. You know, we might start and then, hey, he turned the corner, your four tires are down.  Okay. And then you get to the next one, you're like, I'm done. So stop sticks stop a lot of pursuits or stop sticks prevent a lot of pursuits.
>
> Q. Okay. In the CPD, are you aware of any other reasons that you've heard of over the years that pursuits ended?
>
> A. If the pursuit vehicle crashed, that's another reason that it would end is. As in this case, that caused the termination of the pursuit.
>
> Q. Okay. Any other reasons that you've heard of over the years?
>
> A. I'm sure there's more, but I can't say.
>
> Q. As you sit here right now you –
>
> A. Correct.
>
> Q. -- just don't recall any others?

---

[57] Ex 01 - CPD Pursuit Policy, pp. Bates GB000026-000038) at pp. Bates GB000027-000028
[58] Brake Fade occurs during heavy brake use where the brake components heat up to a high temperature and do not work properly.

*A. Yes, ma'am. That's correct.*

Lanter Deposition, pp. 175-176.

Since he did not use stop sticks, Sgt. Lanter knew that the other obvious manner for ending this pursuit would be a crash. But Sgt. Lanter had no ability to tell if Meyer were going to crash into a telephone pole, or two people dining at an outdoor café. Tragically, it was the latter. Sgt. Lanter and PO Thomas both unreasonably failed to account for the unlikelihood of successful apprehension — without needless injury to innocent bystanders — via pursuit.

Meyer's identity was known. Plainclothes officers had locations for him and could ping his phone. For all these reasons, this unreasonable traffic stop and pursuit should never have taken place for this known suspect, and it was unreasonable to continue, and to fail to terminate, this increasingly dangerous pursuit.

Sgt. Lanter was asked in his deposition if a pursuit should be continued if the identity of the fleeing suspect was known. He said, "Yes, it can." The attorney asked him, "Should it?" Sgt. Lanter said, "That's an opinion question that I'm not gonna answer." [59] In my opinion, he should have considered this during the pursuit. Refusing to answer tells me that he did not consider the consequences of continuing the pursuit. Later, the attorney asked if he agreed that Meyer fleeing from the officers created an imminent risk of harm to persons. Sgt. Lanter said, "I'm not gonna agree to that." [60] He also added that there was no way to know that the outcome of the pursuit would be that two people would die and two other people would get injured. [61] In my opinion, I agree with his statement, but it is apparent that he never considered the possibility that the pursuit could end in death. Any officer engaged in a high-speed pursuit must consider the possible outcomes, and weigh them against the consequences of terminating the pursuit.

In my opinion, Sgt. Lanter did not acknowledge the degree of risk that his pursuit created. He engaged in unreasonable actions which ultimately resulted in the deaths of two innocent bystanders and injury to two others – needlessly and without justification.

---

[59] Lanter Deposition, p. 203
[60] Lanter Deposition, p. 209
[61] *Id.* at pp. 209-210

CPD Pursuit Policy also requires:

> *"Officers will not pursue vehicles the wrong way on the Interstate or other controlled access highway, divided roadways, or one-way streets unless specifically authorized by the pursuit officer in charge (OIC)."* [62]

During this pursuit, Sgt. Lanter and PO Thomas failed to follow CPD policy. Lanter was not the designated OIC. Sgt. Lanter unreasonably took it upon himself to travel, and to authorize other vehicles in the pursuit to travel the wrong way on one-way streets. These actions unreasonably placed other citizens in danger, such as the motorist visible at 16:39:53 in Lanter's MVR.

The Pursuit Policy also requires:

> *"When driving in emergency mode, the operator will conform to all applicable traffic laws and regulations."* [63]

As I explained previously, Sgt. Lanter failed to stop at four stop signs, six red lights, and proceeded the wrong way on three one-way streets. PO Thomas failed to stop at five stop signs and six red lights. Both nearly hit vehicles at 5th and Monmouth. In addition, Lanter, Thomas, and Harper greatly exceeded the marked speed limit throughout the pursuit. Sgt. Lanter routinely failed to drive in his lane. He frequently drove over yellow and white lane markers. The most egregious was at 16:40:42 where he went into the opposite lane of travel on the bridge, causing a motorcyclist to swerve to the right as Sgt. Lanter drove at him. In my opinion, this was unreasonable driving behavior. PO Thomas also displayed unreasonable driving behavior by ignoring lane travel markers, and not stopping at the stop signs and red lights.

CPD Pursuit Policy further requires:

> *"When driving in emergency mode, the operator must maintain a vehicle speed which is reasonable for the conditions, including but not limited to colon's time of day, road conditions, pedestrian and vehicle traffic, and weather; The operator will not exceed the posted speed limit by more than 20 miles per hour."* [64]

As explained previously, all three CPD officers exceeded the posted speed limit by more than 20 miles per hour. The unreasonable speeds (100+ mph), placed innocent bystanders and motorists in danger.

Officer Thomas said in his 2020 video interview that he was unaware of his speed and was not sure if he went over the 20 mph speed limit. [65] In his deposition, he said that he did not know how fast he was driving, [66] but would contest that his speeds were excessive. [67] Officer Harper was asked about his speed. He said that his speed wasn't excessive. He wasn't paying attention to his speed. He said he tried to catch up, but the others were pulling away from him.[68] IIS investigator Sgt. Fink

---

[62] Ex 01 - CPD Pursuit Policy, pp. Bates GB000026-000038) at p. Bates GB000028
[63] *Id.,* at p. Bates GB000029
[64] *Id.,* at p. Bates GB000029
[65] Laible - City 001635 Thomas Video Interview 2
[66] Thomas Deposition, p. 211
[67] *Id.,* at pp. 254-255
[68] Laible - CITY_001632 Harper Video Interview 2

confirmed that Officer Thomas' BWC showed him driving 103 miles per hour, and Officer Harper's BWC showed him driving 100 miles per hour. [69] Sgt. Lanter was asked if he was cognizant of his speed. Lanter said that for 100% certainty, no. He said that near Price Hill and Hawthorne and Warsaw, his speeds were within conditions of the posted speed limit which was 30 miles per hour. He said that was not his regular car and it was bogging down. If he were in his normal car, he would know more. He said that his speed never exceeded unsafe speeds or was over the limit. He was going 50 to 60 miles per hour on 6th Street because he was pinned in by traffic flow. [70] However, his ICV shows him clearing the traffic, then greatly increasing his speed to catch up to Meyer. Watching the video showed numerous times that he markedly exceeded the speed limit at many points throughout the pursuit. My visual observation of the video matched the Steven Becker Report. [71]

In my opinion, the three involved officers avoided the issue of speed during this pursuit. No one announced the speed conditions, even though they are required to by CPD Policy. No one asked them to announce speeds, including the officers in pursuit, Scalf, and other CPD officers involved in the operation. None of the three would acknowledge that they were aware of how fast they were going, other than Sgt. Lanter's estimate of 50 to 60 mph on 6th. In my experience, police officers are experts at speed limits, speeds, pacing, time between locations, and following speeding drivers. Officers are also trained to look at the speedometer when following a speeding driver, in order to later testify as to the driver's speed. I find it quite incredible that no one glanced down at their speedometer and broadcasted that information, especially with the high speeds visible on video. In his deposition, Sgt. Lanter said that he was sure he looked at his speedometer, but did not remember doing so. Sgt. Lanter also said that he might have driven 50 or 60 miles per hour on the 6th Street Viaduct when passing Mehring Way. [72] Sgt. Charles Fink stated that since officers only made minimal gains on Sgt. Lanter, this meant that Sgt. Lanter was driving in excess of 100 miles per hour as well. [73] Officer Mark Bode was driving a plain car without lights and siren. He said he tried to keep the pursuit in sight, but lost them in the Covington/Newport area. [74] He too said that he did not know if he exceeded the speed limit and he never looked at his speedometer because he was focused on the pursuit. [75]

In my opinion, if an officer is going so fast that all they can do is look at the car ahead of them, then they are moving at speeds well above their ability to drive, navigate, and control. During a pursuit, an officer has to operate the gas pedal, the brake pedal, the steering wheel, turn signals, lights, siren, and broadcast conditions on police radio. They need to watch the car they are pursuing and other vehicular and pedestrian traffic. They need to navigate through and around traffic, obstacles and turns. They also need to be able to look at their speedometer for speeds, and to recognize street signs for their locations. They need to be aware of how their police vehicle is operating and how the suspect vehicle is operating. They need to be aware of the dangerousness of the suspect's driving behavior and their own driving behavior. They need to know when they reach or cross the threshold, and to understand the consequences of crossing that threshold, where the risks posed by the pursuit outweigh the benefit of apprehending the suspect. If an officer is going so fast that they cannot accomplish these tasks, they have outdriven their ability to drive at high speed and

---

[69] Fink Deposition, p. 129
[70] Laible - CITY_001633 Lanter Video Interview; Lanter Deposition, p. 99
[71] Becker Report.
[72] *Id.*, at pp. 100-102
[73] Fink Deposition, p. 129
[74] Bode Deposition, p. 221
[75] *Id.*, at p. 247

need to slow down to a speed where they can accomplish these necessary tasks, or terminate the pursuit. Failure to do so is unreasonable.

CPD Pursuit Policy also mandates:

*"A pursuing officer(s) will immediately relay the following information to ECC:... 6) Speeds involved."* [76]

I did not hear Sgt. Lanter or any other officer, including Thomas, broadcast the speeds involved in this pursuit. [77] In addition, the IIS investigation stated, "...Sgt. Lanter failed to transmit speeds while involved in the pursuit and drove the wrong way on a one-way street." [78] In his deposition, Sgt. Lanter said that he did not broadcast speeds during the pursuit. He also said that he did not believe he exceeded the speed limit by more than 20 miles per hour over the speed limit. [79] Evidence here is mixed as to whether transmitting speeds was solely the responsibility under CPD Policy of the primary or secondary unit; but neither Lanter nor Thomas broadcast speeds.

Requirements to broadcast speeds are meant to permit a remotely-located OIC to understand risks posed by the ongoing pursuit. With no speeds broadcast, and no request for a report of speeds from anyone else on the radio channel, no officers other than Lanter and Thomas were in a position to understand the risk posed by their and Meyer's excessive speed. This was dangerous, and unreasonable.

CPD Pursuit Policy mandates that:

*"5. Number of Units a. Unless authorized by the pursuit OIC, no more than two police vehicles will become actively involved in the pursuit." b. The primary unit will be responsible for... 2) Advise the supervisor if more than two police units are needed for the pursuit."* [80]

Again, Sgt. Lanter unreasonably over-extended his supervisory authority by acting as the OIC. While engaged in the pursuit, he authorized Thomas and Harper to join the pursuit. This violation of policy was referenced in the IIS investigation, but not sustained. [81] As explained above, this was unreasonable.

In sum, the policy violations here by Lanter and Thomas are extensive. What I detail above is only a selection of violations of CPD's pursuit policy. These policy violations were not authorized, they were unreasonable, and they were recklessly and needlessly dangerous.

---

[76] *Id.,* at p. Bates GB000031
[77] Laible - CITY_000288_Lanter BWC Confidential
[78] Ex 03 - IIS Investigation Report (City 000315-000337), p. Bates CITY_000334
[79] Lanter deposition, pp. 95-99
[80] Ex 01 - CPD Pursuit Policy, p. Bates GB0000232
[81] Ex 03 – IIS Investigation Report (City 000315-000337), pp. Bates CITY_000331-000335

**CPD's Failure to Supervise Officers in Relation to Pursuit Policy; and CPD's Failure to Train Officers Adequately on Pursuit Policy**

Notably, despite the many policy violations by both Lanter and Thomas, CPD's disciplinary findings are extraordinarily limited. Many of the violations I describe above are not cited as the basis for discipline for Lanter or Thomas here. CPD's failure to discipline its officers for obvious and dangerous policy violations in what turned out to be a fatal pursuit constitutes a failure to adequately and appropriately supervise officers. In this failure, CPD perpetuates the very risk to the public that killed the Laibles and injured the Kleins. When officers are not disciplined for policy violations, the whole department receives a message that those types of violations will not result in being held accountable. This, in turn, breeds and perpetuates those same reckless policing tactics. It is my opinion that the lack of probing on the issue of speeds during the pursuit from IIS investigators illustrates this messaging to the Department's officers and calls into question the Department's commitment to safe emergency vehicle operation. The idea of a police officer not knowing how fast they were going should be concerning. IIS should have also probed further on CPD officers estimating driving at legal speed when they were well above the speed limit. This should be investigated with further discussion and questions. In my opinion, it takes skill and nerve to drive a police car 100+ mph with lights and siren on while in a police pursuit. The act of engaging in a high-speed pursuit would be memorable enough for a trained police officer, allowing them to provide a better description of speed when asked in an official investigation. Lastly, IIS should have calculated the high speeds visible on ICV and shown the video and calculations to the CPD employees and asked for an explanation or revision of their earlier statements. Why speeds were only determined via BWV, and how the investigating officer, Sgt. Fink, only noticed speeds in the BWV after another supervisor pointed this out to him [82], illustrate the Department's lackluster and disinterested investigation of the pursuit driving in this case.

**Training and Evaluations**

In my opinion, there appears to be a lack of police pursuit training in the Cincinnati Police Department. I noted the following training sessions/dates:
- Sgt. Lanter: Remedial Driving 12/21/2017, In Service Driver's Training 9/16/2016, Vehicle Pursuit Driving 12/17/2013, 11/9/2010, 11/11/2008, 1/29/2007. [83]
- Sgt. Scalf: Vehicle Pursuit Training 12/2/2008. [84]
- Officer Thomas: Vehicle pursuit training 10/24/2013, 11/17/2010, 10/04/2008, 01/22/2007.[85]

On October 25, 2021, Sergeant Lanter and Officers Thomas and Harper were ordered to respond to the police academy for refresher training on risk versus reward and pursuit driving, based upon the Ohio Peace Officer Training Academy curriculum and CPD Procedure 12.535, Emergency Operation of Police Vehicles and Pursuit Driving. [86] Sgt. Lanter also received a written reprimand. [87]

---

[82] Fink Deposition, pp. 71-72, 106-107.
[83] Ex 54 - Lanter Record of Training, pp. Bates CITY_001335-001345
[84] Ex 50 - Scalf Record of Training, pp. Bates CITY_001346-001356
[85] Ex 31 - Record of Training (Thomas), pp. Bates CITY_001315-001334
[86] Ex 70 - Refresher Training Correspondence, pp. Bates CITY_001987-001988
[87] Ex 17 - Lanter Notice of Formal Reprimand - Form 66-S

In my opinion, Sgt. Lanter had four training classes on Vehicle Pursuit Driving between 2007 and 2013 and a remedial class for Driving in 2017. He had not received any scheduled pursuit training in the seven years prior to the August 7, 2020 fatality collision. OIC Sergeant Scalf's only pursuit driving class took place 12 years prior to the fatality collision. Like Sgt. Lanter, Officer Thomas started with four pursuit training classes between 2007 and 2013, but he had not received any scheduled pursuit training in the seven years prior to the August 7, 2020 fatality collision. In my opinion, regular pursuit training did not appear to be the focus of CPD prior to the fatality collision. The only time it became required after 2013 was because of the unreasonable police pursuit by Sgt. Lanter and Officers Thomas and Harper in August of 2020.

In my opinion, CPD did not provide regular pursuit training prior to this collision. Failure to regularly train officers on pursuit driving is unreasonable for a modern police department. Here, where so many policy violations went undisciplined, combined with the historic lack of training on pursuit driving prior to this fatal crash, it is my opinion that the Cincinnati Police Department does not appropriately acknowledge or address the risks posed by police pursuits. The Department has failed to meet its duty to ensure that its officers are prepared and monitored for safe emergency and pursuit driving. The Department's failure to adequately train its officers also demonstrates another aspect of its failure to supervise its officers.

In my experience, these types of failures lead to officers engaging unreasonable and dangerous police pursuits which can lead to injuries and deaths to officers, suspects, and innocent bystanders. In my experience, when officers and supervisors do receive regular training on department policy, operations and procedures, they are more likely to operate properly and within the training expectations of the police department. In addition, it was important for CPD to provide training to Scalf and Lanter as police supervisors, as there are different roles and expectations for supervisors during a police pursuit. This is vital because officers are told to follow supervisory orders. As I mentioned previously, Officers Thomas and Harper followed the orders of Sgt. Lanter. If Sgt. Lanter had been properly trained on police pursuits and risk vs. reward prior to the fatal August 7 2020 crash, his understanding of the risks posed by pursuit conditions like those in the crash at issue here more likely than not would have improved. Sgt. Lanter more likely than not would have been equipped to respond to Meyer's flight reasonably.

I also noted in the evidence that Sgt. Lanter had remedial driving training on 12/21/2017. In my experience, remedial driving training is usually ordered for employees who are involved in preventable collisions. For his part, Sgt. Lanter did not know why he was sent to remedial training. It could have been for an auto accident or because he was volunteered to go. [88]

I also noted that Sgt. Lanter was involved in questionable tactics and responses as an officer, including in other pursuits. On March 26, 2014, there was a police pursuit of a narcotics suspect. The report indicates that Officer Lanter showed poor judgment by exiting his patrol car and running on foot toward the crashed suspect vehicle. He was counseled on distance and contact/cover. [89] On October 25, 2016, Sgt. Lanter did not activate his siren during the pursuit of a stolen vehicle. This pursuit involved Sgt. Lanter clearing an intersection, which needs to involve both lights and

---

[88] Lanter Deposition, p. 338

[89] Ex 60 - Vehicle Pursuit Report, pp. Bates CITY_002004-002005 and
   Ex 71 - Addendum to Pursuit, Bates CITY_002009-002010

siren. CPD did not hold him accountable for not using his siren, but they should have in my opinion. The other problem with this 2016 pursuit is that Sgt. Lanter broadcasted that Sergeant Hall would be the OIC if the situation evolved into a pursuit. Similar to the August 7, 2020 pursuit, Sgt. Lanter should not be broadcasting information as an OIC, nor informing Dispatch who the OIC should be. This is the responsibility of a supervisor not involved in the pursuit. Sgt. Hall should have broadcasted that he was OIC. If Sgt. Lanter had time to broadcast information about another supervisor being the OIC, he would have had time to activate his siren. [90] This is another example of failure to provide remedial training.

Lanter testified that had participated in five to ten pursuits as an involved officer and six or fewer as an OIC.[91] Records show that in Lanter was involved in  a total of at least thirteen pursuits prior to the pursuit ending in the deadly crash here—including once in 2007, 2009, twice in 2011, twice in 2013, three times in 2014, twice in 2015, once in 2016, and in May 2020.[92] Notably, many of the CPD vehicle pursuit reports detailing Lanter's pursuits reflect a departmental finding that there was "no pattern requiring intervention" into Lanter's pursuit driving—even though the May 2013 pursuit where Lanter was a secondary unit was deemed to have violated policy[93] and despite having been sent for remedial driving training in 2017 as noted above.

Lastly, Sgt. Lanter's 2018 performance evaluation references three auto accidents. Sgt. Lanter was at fault in two of the crashes. The rater echoed my thoughts above that as a supervisor, Sgt. Lanter is placed in authority over officers and he needs to be a role model. [94] His 2019 evaluation shows that Sgt. Lanter was involved in two more vehicle crashes. [95]

In my opinion, Sgt. Lanter's record of collisions is fairly high, especially for a police sergeant. His record shows that he sometimes does not use reasonable policing tactics in high-stress situations like police pursuits.

The Department's failure to identify any pattern of problems or need for retraining is concerning in light of these factors. The training and supervision problems noted above, taken together with Sgt. Lanter's driving and pursuit history, further illustrates the Department's failure to adequately and reasonably supervise Sgt. Lanter specifically.

---

[90] Ex 60 - Vehicle Pursuit Report, pp. Bates CITY_002022-002023
[91] Lanter Deposition, pp. 171-172.
[92] Ex. 60 – Vehicle Pursuit Reports for Lanter.
[93] Id., p. Bates 1999.
[94] Ex 61 - Lanter Evals, p. Bates, Laible_CPDPRRResp_000146
[95] Id., at p. Bates, Laible_CPDPRRResp_000144

**CONCLUSIONS**

All of my opinions are based on my review of the evidence, documentation, and other relevant information, such as laws and standards.  My opinions are held to a reasonable degree of professional certainty and I reserve the right to alter my opinions based on any new information that may be provided.

Based on the information available in this case record and for the reasons stated above, it is my opinion that:

1. Sgt. Timothy Lanter's and PO Brett Thomas' conduct in the pursuit of Mason Meyer violated CPD policies.
2. Sgt. Timothy Lanter's and PO Brett Thomas' conduct in the pursuit of Mason Meyer violated applicable traffic laws.
3. Sgt. Lanter's and PO Thomas' conduct in the pursuit of Mason Meyer violated pursuit practices that are generally accepted as appropriate policing tactics across the U.S.
4. Sgt. Lanter's and PO Thomas' conduct in the pursuit of Mason Meyer posed a serious and unreasonable risk of harm to the public, including the Laibles and Kleins.
5. Sgt. Timothy Lanter unreasonably and recklessly initiated, continued, and failed to terminate the pursuit of Mason Meyer.  His failures were more likely than not a cause of the deaths of the Laibles and the injuries to the Kleins.
6. PO Brett Thomas unreasonably and recklessly participated in the pursuit of Mason Meyer. His failures were more likely than not a cause of the deaths of the Laibles and the injuries to the Kleins.
7. Sgt. Lanter's and PO Thomas' conduct in the pursuit of Mason Meyer breached their duties to preserve and serve the interests of public safety, including the safety of the Laibles and Kleins.
8. CPD unreasonably and recklessly failed to supervise and train its officers generally with respect to pursuits, and specifically failed to supervise and train Sgt. Timothy Lanter and PO Brett Thomas. These failures contributed to the reckless and unreasonable initiation and continuation of the pursuit of Mason Meyer on August 7, 2020, and more likely than not were a cause of the deaths of the Laibles and the injuries to the Kleins.
9. The unnecessary traffic stop and unreasonable pursuit of Meyer led directly to the crash in this case. If the pursuit had been properly terminated, it is more likely than not that the crash would not have happened, and therefore that the Laibles would not have been killed and the Kleins would not have been injured.

*David S. Sweeney*

_____                    August 1, 2025_____

David T. Sweeney, DT Sweeney Consulting                    Date

# Appendix A: References

## Bibliography

Bather, J. R., & Goodman, M. S. (2024, November 4). National and Regional Trends in Police Pursuit Fatalities in the US. *JAMA Netw Open*. Retrieved 06 17, 2025, from https://doi.org/10.1001/jamanetworkopen.2024.46415

Dunham, R. (1998). High-speed Pursuit: The Offender's Perspective. *Criminal Justice and Behavior*.

Hill, J. (2002, July). High-Speed Police Pursuits: Danger, Dynamics, and Risk Reduction. *FBI Law Enforcement Bulletin, 71*(7), pp. 14-18.

National Institute of Justice. (2018). Vehicle Stoppage and Pursuit Management.

# APPENDIX B: CURRICULUM VITAE OF DAVID T. SWEENEY

# David T. Sweeney

## Expert Witness & Consultant



**206.883.6238 david@policeexpert.com**
**https://PoliceExpert.com**
**4616 25th Ave. NE Ste. #116 Seattle, WA 98105**

## Professional Profile

34-year veteran police leader with a mission to improve best practices in policing by offering expert witness and police consultation services for both plaintiff and defense.

## Core Skills

- Use of Force
- Crowd Control
- Pursuits
- Human Resources
- Training

- De-Escalation
- Legal Standards
- SWAT
- EEO
- Less Lethal

## Career Summary

**Sep 2017 - Present DT Sweeney Consulting, LLC, Seattle, WA**
**Expert Witness**

*Outline*

Expert witness/consultant on policing issues including pursuits, training, SWAT, use of force, early intervention, liability, complaints, EEO, human resources, performance reviews, etc. I have assisted attorneys 41 different times which included 16 defense cases and 25 plaintiff cases. I have been deposed 8 times and testified once at trial. In my police career, I testified in trial approximately 100 times.

*Key Responsibilities*
- I assist attorneys with expert witness reports, consultation, evidence and case review and deposition/trial testimony.
- I enjoy using my expertise to assist both plaintiff's attorneys and defense attorneys.
- I provide a review of the facts, including both strengths and weaknesses of the case.

**May 2022 - Present Northwestern University, Evanston, Illinois**
**Adjunct Faculty**

*Outline*

Faculty, Northwestern University School of Police Staff and Command. I teach a variety of police executive disciplines to police leaders from across the U.S. Topics include Training, Employee Relations, Leadership, Decision-making, Performance Appraisals, Media Relations, Public Speaking, etc.

**Feb 2021 - Feb 2022 Oregon State University Police Department, Corvallis, Oregon**
**Lieutenant**

*Outline*

2nd in command, overseeing sergeants, officers and public safety officers as we developed a brand-new police department to serve the students, faculty and staff at Oregon State University. I supervised and trained all employees in all areas of policing, force, procedures, etc. I helped build a sense of community between the university and their police department.

**Feb 2005 - Feb 2022 King County ADR and Oregon Federal Executive Board, Seattle,**
**WA and Corvallis, OR**
**Mediator**

*Outline*

Trained mediator, specializing in conflict resolution in the workplace.

*Key Responsibilities*
- Mediator for workplace conflict, landlord/tenant issues, labor conflict and human resources complaints.
- Assisted employees with conflict resolution.
- Identify differences and similarities in power structure, race, sex and equality in the workplace in order to promote communication and cooperation.

*Key Achievements*
- Led employees in conflict resolution in order to heal relationships and increase work productivity.
- Provided a sounding board for employees and made outside referrals when appropriate.

**Aug 2019 - Feb 2021 Seattle Police Department North Precinct, Seattle, WA**
**Watch Commander**

*Outline*

Supervised 8 sergeants and 60 officers. I was responsible for all patrol activities of my personnel in the SPD North Precinct, a community of 235,000 people. I coordinated and directed staff during routine and emergency responses. I conducted use of force, collision, complaint and pursuit reviews for my staff.

**Feb 2005 - Feb 2021 Seattle Police Department, Seattle, WA**
**Training Cadre**

*Outline*

I have trained thousands of SPD employees from all ranks in the following disciplines: Equal Employment Opportunity (EEO), Performance Reviews, Early Intervention for Police Officers and Supervisors, Supervision of Police Personnel, Tactical De-Escalation, Care Under Fire, Integrated Tactics, Use of Force, Active Shooter/Rapid-Intervention, Crisis Intervention, Post-Academy Training for New Officers, Taser Instructor, CPR, Emergency Vehicle Operations Course, & Legal Standards for police.

*Key Achievements*
- I have trained and/or demonstrated training tactics to personnel from the Department of Justice as well as other local and federal police departments in Crisis Intervention, Tactical De-escalation and Use of Force.

**May 2016 - Jul 2019 Seattle Police Department East Precinct, Seattle, WA**
**Force Investigations Lieutenant**

*Outline*

Responsible for analysis of officer's use force during arrests. I gathered evidence from reports, statements, photos, recordings, and in-car video (ICV). I evaluated the officer's legal authority and lawful purpose when detaining suspects. I formed opinions on whether or not the officer made proper efforts at de-escalation prior to use of force.

*Key Responsibilities*
- Precinct Compliance Lieutenant, responsible for employee training attendance and records.
- I received specialized force review training approved by the U. S. Department of Justice.

**May 2015 - Apr 2016 Seattle Police Department North Precinct, Seattle, WA**
<b>Operations Lieutenant</b>

*Outline*

Responsible for reviewing use of force, pursuits, collisions, and misconduct investigations. Supervised the Community Police Team (CPT) and the Anti-Crime Team (ACT). Served as Acting Captain, in charge of the precinct. Responded to unusual occurrences in the precinct.

*Key Responsibilities*
- Delivered both written and oral communication in SeaStat, SPD's community crime reduction through data-driven policing.
- Spoke to community members and groups about North Precinct police activities.
- Responsible for staffing the precinct's 3 patrol shifts.

*Key Achievements*
- Reduced precinct budget expenditures through reduction of overtime and identifying extraneous activity.
- Reduced crime through analysis of criminal activity trends and deployment of key personnel to precinct hot spots.

**Jan 2015 - Apr 2016 Seattle Police Department North Precinct, Seattle, WA**
<b>Patrol Sergeant</b>

*Outline*

Responsible for squad's response to 911 emergency and routine calls (assault, robbery, theft, burglary, alarms, collisions, etc.).

*Key Responsibilities*
- Analyzed and reviewed use of force by officers in the field.
- Guided, directed, motivated and trained a patrol squad of 6 – 12 officers.

**Aug 2010 - Jan 2014 Seattle Police Department, Seattle, WA**
<b>SWAT Sergeant</b>

*Outline*

Responsible for tactical response to hostage situations, barricaded persons, high-risk search warrants, riot control, and other high-risk 911 calls.

*Key Responsibilities*
- Dignitary protection.
- Supervised 6-24 officers during full-team callouts to high profile incidents.
- Led a group of subject matter experts and published the SPD SWAT Manual.
- Created a tracking database for all SWAT callouts, training, and qualifications.
- Provided administrative response to public disclosure requests.

**Jan 2005 - Jul 2010 Seattle Police Department, Seattle, WA**
<b>Detective Sergeant - Human Resources</b>

*Outline*

Equal Employment Opportunity (EEO) investigator, Early Intervention Coordinator, Performance Review Coordinator.

*Key Responsibilities*
- Investigated complaints of misconduct, harassment, and/or hostile work environment based on race, creed, color, national origin, age, sexual orientation, etc.
- Handled a high caseload, investigating with care and confidentiality.
- Advised the Chief and other high-ranking administration on investigations, key data, and recommendations on how to improve the workplace for employees.
- Attended 300 hours of training. Completed 60 EEO investigations.

- System administrator and analyst for On-Target Performance Tracking System.
- Trained department supervisors on proper methods of creating performance reviews for employees.

*Key Achievements*
- Trained all new employees and department supervisors in EEO law, issues, and on how to keep SPD a safe place for all employees to work.
- Implemented a brand new program within SPD designed to identify and assist officers potentially involved in at-risk behavior in their professional and/or personal life.
- Trained and advised department supervisors on performance reviews for 1600 employees of SPD.
- Created a performance review tracking system to keep SPD on track with all performance reviews.

**May 2003 - Dec 2004 Seattle Police Department, Seattle, WA**
**Detective Sergeant - Internal Affairs**

*Outline*

Internal Investigator responsible for handling complaints of misconduct made against police personnel.

*Key Responsibilities*
- Internal Investigations.
- Complaint intake.

*Key Achievements*
- Handled 80 internal investigations of some of the most complex and sensitive complaints within SPD.
- Prioritized competing work demands.
- Practiced confidentiality and thoroughness while interacting with a diverse group of citizens and employees.

**Jun 2001 - Apr 2003 Seattle Police Department West Precinct, Seattle, WA**
**Patrol Sergeant**

*Outline*

Responsible for leading, motivating and training a group of patrol officers. We were responsible for 911 calls in the downtown precinct at nighttime.

*Key Responsibilities*
- Responsible for supervision and review for officer's use of force, arrests, reports, and other calls for service.
- Handled citizen complaints against officers.
- Responsible for downtown nightlife scene with numerous people and incidents on Friday and Saturday nights

*Key Achievements*
- Engaged with bar owners/operators in downtown Seattle to develop the precinct violence reduction plan.

**Jun 1987 - Apr 2001 Seattle Police Department, Seattle**
**Police Officer**

*Outline*

Police Officer, responsible for a variety of law enforcement activities within the City of Seattle.

*Key Responsibilities*
- Special Deployment Officer: responsible for large scale staffing plans for SPD (Y2K, WTO, Parades, Sporting events, etc.
- Movie Officer: Assisted with police involvement for movie, TV and commercials filmed in Seattle, including permits and hiring officers.
- DUI Officer: 500 DUI arrests, thousands of traffic stops, drinking lab, numerous reports and courtroom testimony.

- Field Training Officer (FTO): Guided, directed and trained new officers on becoming an effective police officer.
- Patrol Officer: Handled 911 calls for service, felony and misdemeanor investigations, collisions, mental health issues, detected and deterred criminal activity.
- Crisis Intervention Team (CIT): Well-trained within SPD to respond to community members with mental health issues, suicidal ideation, drug dependency, etc.

*Key Achievements*
- Designed and participated in an SPD drinking lab in order to test and evaluate people under the influence of alcohol.
- MADD Officer of the Year, 1998.
- Numerous commendations and citizen thank-you reports.
- Took on additional responsibilities as an FTO for officers in need of specific competence training.
- Regular presenter to the community on patrol enforcement for criminal hot spots, drug houses, etc.

**Aug 1983 - May 1987 Seattle Pacific University, Seattle, WA**
**Security Officer**

*Outline*

Lead supervisor, responsible for detecting and deterring criminal activity on campus in order to keep students, faculty and staff safe. Conducted safety and security assessments for university buildings.

# Education

- **Master of Public Policy** | Oregon State University
- **Bachelor of Arts** | University of Washington
- **Associate in Arts/Sciences** | Shoreline Community College
- **Certificate, School of Police Staff and Command** | Northwestern University

# Additional

**Publications**

• The Need for Police De-Escalation. The Defense News, published by Washington Defense Trial Lawyers Association, Fall 2021.

• The Effects of Restrictive Police Pursuit Policies in Washington State. Published by Oregon State University, EMPP Defense - 2023.

**Expert Witness Cases: 21 defense cases and 36 plaintiff cases.**

1. 10/2017: Deposition-Defendant.
Skyler Morrison v. Seattle School District, NO. 18-2-00464-1 SEA.
WA State Court of Appeals.

2. 11/2017: Arbitration – Defendant.
Zachary Smalls v. USAA, 003254247-040, Arbitration.

3. 11/2017: Case Review – Defendant.
Estate of Jessica Ortega v. Pierce County, 17-2-11836-8.
Superior Court for the State of WA, in and for the county of Pierce.

4. 11/2020: Case Review – Plaintiff.
Ghodsee v. City of Kent, 20-2-09383-1.
SEA Superior Court for the State of WA, in and for the county of King.

5. 3/2021: Case Review – Defendant.

Steven Morse v. Oregon Patrol Service, 19CV35949.
Circuit Court of the State of Oregon for County of Multnomah.

6. 4/2021: Deposition – Plaintiff.
Estate of Kenneth Woody v. Big Horn County, 2016 MT-180.
Supreme Court for the State of Montana.

7. 7/2021: Deposition – Plaintiff.
Estate of Delafuente v. City of Nampa, CV14-20-01023.
Idaho District Court, 3rd District.

8. 8/2021: Written Declaration – Plaintiff.
Alexsey Predybaylo v. Sacramento County, 2:19-CV-01243-MCE-CKD.
U.S. District Court, Eastern District of California.

9. 8/2021: Case Review – Plaintiff.
Hempel v. City of Grass Valley.

10. 10/2021: Written Declaration – Plaintiff.
Estate of Gabriel Strickland v. Nevada County.
2:21-CV-000175-MCE-AC, U.S. District Court, Eastern District of California.

11. 12/2021: Deposition – Plaintiff.
Richmond v. Spokane County, 2:21-CV-00129-SMJ.
U.S. District Court Eastern District of WA.

12. 1/2022: Written Declaration – Plaintiff.
Estate of Nicholas Rapp v. King County, 3:21-CV-05800.
U.S. District Court, Western District of WA at Tacoma.

13. 4/2022: Case Review – Plaintiff.
Sanchez V. City of Eugene, 6:21-cv-00142-MC.
U.S. District Court, State of Oregon Eugene Division.

14. 4/2022: Case Review – Plaintiff.
Ramirez v. City of Chandler.
U.S. District Court for the Eastern District of California.

15. 4/2022: Case Review – Plaintiff.
Hartman v. State of Arizona.

16. 5/2022: Deposition – Plaintiff.
O'Brien v. City of Chicago, 20-CV-2260.
U.S. District Court, Northern District of Illinois, Eastern Division.

17. 7/2022: Expert Report – Defendant.
Thompson v. City of Fairbanks, 4FA-21-02496 C.
Superior Court for the State of Alaska, Fourth Judicial District at Fairbanks.

18. 7/2022: Expert Report – Plaintiff.
Perkins v. City of Des Moines, 4:21-cv-00248-RGE-HCA.
U.S. District Court for the Southern District of Iowa, Central Division.

19. 7/2022: Deposition – Plaintiff.
Irving v. City of Raleigh, 5:22:V-068-BO.
U.S. District Court for Eastern District of North Carolina.

20. 8/2022: Expert Report – Plaintiff.
Reid v. West Virginia State Police, #2:21-cv-00647.
U.S. District Court for the Southern District of West Virginia at Charleston.

21. 9/2022: Case Review – Plaintiff.

Estate of Hennefer v. Yuba County.

22. 10/2022: Expert Report – Defendant.
Payne v. City of Tukwila, 22-2-06475-7 KNT.
Superior Court of the State of WA in the County of King.

23. 12/2022: Trial Testimony – Plaintiff.
Estate of Delafuente v. City of Nampa, CV14-20-01023.
Idaho District Court, 3rd District.

24. 1/2023: Case Review – Defendant.
State of Idaho v. George Dixon, 2022-216528.
Idaho Superior Court.

25. 1/2023: Case Review – Defendant.
Estate of Killsnight v. U.S., 4:22-cv-00018-BMM-JTJ.
U.S. District Court for the District of Montana, Great Falls Division.

26. 2/2023: Preliminary Expert Report – Defendant.
Estate of Justin Schaffer v. Thurston County. Tort claim against Thurston County.

27. 3/2023: Expert Report – Defendant.
Yamindi and Gordon v. Cameron Osmer and WSP. 2:22-cv-00961-LK Matter #10956640.
US District Court for the Western District of WA.

28. 4/2023: Expert Opinion – Plaintiff.
Estate of Jones v. Franklin Co., et al., 4:22-cv-05138-SAB.
U.S. District Court Eastern District of WA.

29. 8/2023: Preliminary Review – Plaintiff.
Rebekah Fitzgerald v. Yellowstone Co., DV 56-2023-0011.
Montana 13th District Court, Yellowstone County.

30. 9/2023: Deposition – Plaintiff.
Hartmann v. State of Arizona, CV2022-010880.
Arizona Superior Court, County of Maricopa.

31. 10/2023: Expert Report – Defendant.
Henry v. City of Tacoma.
3:22-CV-05523-LK, U.S. District Court, Western District of WA.

32. 11/2023: Expert Review – Plaintiff.
Estate of Manzanares v. 3 Denver PD Officers, 2023-CV-31683.
District Court, City and County of Denver, State of CO.

33. 11/2023: Expert Review – Defendant.
State of Nevada v. Robert Telles, C-22-368935-1 Dept. XII.
District Court Clark County, Nevada.

34. 12/2023: Expert Review – Plaintiff.
Estate of Su v. City of Seattle.

35. 12/2023: Expert Review – Defendant.
Stallone v. Roberts, Whidbey Animals Improvement, 23-2-00285-1.
Superior Court State of WA, Island County.

36. 1/2024: Expert Review – Plaintiff.
Foss v. Alspach, et al., 2:22-CV-01728-JHC.
U.S. District Court, Western District of WA.

37. 12/2024, Expert Report – Defendant.
Velasco-Ortega v. Okanogan County, 4:22-cv-05138-SAB.

U.S. District Court Eastern District of WA.

38. 1/2024, Expert Report – Defendant.
Estate of Dante Jones v. Franklin Co., 4:22-cv-5138-JAG.
U.S. District Court Eastern District of WA.

39. 3/2024: Expert Report – Plaintiff.
Estate of Jesse Gardner v. Bullhead City, 3:2023cv08078.
U.S. District Court in and for the District of Arizona.

40. 4/2024: Expert Report – Plaintiff.
Estate of Arlin Bordeaux v. U.S. of America, 1:23-cv-00047-SPW.
U.S. District Court for the District of Montana Billings Division.

41. 4/2024: Expert Review – Defendant.
Burney v. Snohomish County, et al., 24-2-05395-6 KNT.
In the Superior Court of WA, For the County of King.

42. 5/2024: Expert Review – Plaintiff.
McKinzie Rees v. City of Edgewater, 1-23-CV-01626-PAB-NRN.
U.S. District Court for the District of Colorado.

43. 5/2024: Expert Report – Defendant.
Anderson v. City of Soldotna, AK.3:23-cv-000119SLG.
In the United States District Court for the District of Alaska at Anchorage.

44. 6/2024: Expert Review – Plaintiff.
Todd v. United States of America. 1:23-ccv-00047-SPW.
U.S. District Court for the District of Montana Billings Division.

45. 8/2024: Expert Review – Plaintiff.
Ortiz v. Sioux City, IA.

46. 1/2024: Deposition – Plaintiff.
Hennefer v. Yuba County, CA. 2:22- cv- 000389-TLN-CSK. U.S. District Court for the Eastern District of California.

47. 11/2024: Expert Witness Report – Defendant.
Jeremy Jones v. Safariland. 4: 23- cv - 05154-JAG.
U.S. District Court for the Eastern District of Washington at Richland.

48. 1/2025: Expert Witness Report – Plaintiff.
Kennedy v. Acree, et al. 5:21-cv-00134-GNS-LLK.
U.S. District Court, Western District of Kentucky Paducah Division.

49. 3/2025: Expert Witness Report – Plaintiff
Moore v. Patterson, et al. 1:24 -cv-01600
U.S. District Court for the District of Maryland, Northern District

50. 3/2025: Expert Witness Report – Defendant
Callandret v. Jackson Investors, et al. 23-2-21189-8 SEA
Superior  Court for the State of Washington, in and for King County

51. 3/2025: Expert Witness Review – Plaintiff
Estate of Berryman v. Cowlitz County, WA

52. 3/2025: Expert Witness Report – Plaintiff. Estate of Erica Horne v. King County, WA. 24-2-16341-7 KNT. In the Superior Court for the State of Washington in and for the County of King.

53. 4/2025  Expert Witness Review - Defense. Comas v. Valley Medical.

54 . 4/2025: Expert Witness Review – Plaintiff.  Beatz v. City of Escondido, et al.,
37-2023-00004381- CA-PA-CTL
Superior Court for the State of California,  County of San Diego


55. 4/2025: Expert Witness Rebuttal –  Plaintiff.
Estate of Jess Gardner v. Bullhead City, et al. 3:23-cv-08078-GMS-CDB.
In the United States District Court for the District of Arizona


56. 5/2025: Deposition –  Plaintiff.
Kennedy v. Acree, et al. 5:21-cv-00134-GNS-LLK
In the United States District Court for Western District of Kentucky, Paducah Division


57. 6/2025: Expert Report - Defendant.
Gina Palombi; Joseph Palombi v. City of Orting. 23-2-10521-0
In the Superior Court for the State of Washington in and for the County of Pierce

**Court History: I have testified in nine depositions and once at trial.**

Woody v. Big Horn County, MT – 2021. This was a police pursuit case that ended in a fatality. I was hired by plaintiff's counsel and testified in a deposition.

Delafuente vs. City of Nampa, ID – 2021. This was a police pursuit case that ended in two fatalities. I was hired by plaintiff's counsel and testified in a deposition.

Richmond v. Spokane County – 2022. This was a human resources EEO case which ended in separation of service. I was hired by plaintiff's counsel and testified in a deposition.

O'Brien v. City of Chicago – 2022. This was an excessive force case. I was hired by plaintiff's counsel and testified in a deposition.

Irving v. City of Raleigh – 2022. This was a police misconduct case. I was hired by plaintiff's counsel and testified in a deposition.

Delafuente vs. City of Nampa, ID – 2022. I testified in court for plaintiff regarding this police pursuit case.

Hartman v. State of Arizona – 2023. This was a pursuit case. I was hired by plaintiff's counsel and testified in a deposition.

Hennefer v. Yuba County - 2024. This was a police procedures case. I was hired by plaintiff's counsel and testified in a deposition.

Jacquelyn Moore v. Jesse Patterson  - 2025. This was a police pursuit  case. I was hired by plaintiff's counsel and  testified  in  a deposition.

Kennedy v.. Acree et al. - 2025. This was a use of force case. I was hired by plaintiff's counsel and testified  in  a  deposition.

**Media Consultations: Interviews, reviews, commentary, expertise:**

1/2025: Estelle Atkinson, Las Vegas Review-Journal. Discussion about Tasers and other less lethal weapons.

3/2025: Ryan J. Foley, Associated Press. Discussion about Tasers and use of force, which led to a death of a subject being taken into custody.

8/2024: Jeff Domenick, WTAE Pittsburgh. Review of police officer's use of a police vehicle against a fleeing suspect.

6/2022: Susan Samples, WOOD TV/ABC 4 Michigan. Discussion about accidental discharges of firearms.

3/2022: Dan Morse, Washington Post. Review of police pursuit practices.

1/2022: Tania Sims, Live Now Fox. Discussion about violence and threats directed at the police as a result of recent shootings.

2/2022: Frank Mitchell, Close Up Radio. Discussion of police practices.

2/2024: Katie McDowell, KCPQ. Review of an officer involved shooting.

6/2021: Angelica Relente, Tacoma News Tribune. Discussion about police jurisdictions within Washington State.