# Jason Laible, et al.,

# vs.

# Timothy Lanter, et al.,

In the United States District Court
For the Eastern District of Kentucky
at Covington
2:21-cv-00102

# **Captain Amanda Caton**

Thursday, January 16, 2025





Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918   fax: 216-241-3935

1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland, OH 44114

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 2 of 217 - Page ID#: 3504

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF KENTUCKY
 2                       AT COVINGTON

 3      JASON LAIBLE,              :
        et al.,                    :
 4                                 :    CASE NO.
                                   :    2:21-cv-00102
 5         Plaintiffs,             :
                                   :
 6      vs.                        :    Judge David L.
                                   :    Bunning
 7      TIMOTHY LANTER,            :
        et al.,                    :    Magistrate Judge
 8                                 :    Candace J. Smith
                                   :
 9         Defendants.             :

10         Zoom and in-person deposition of

11      CPD CAPTAIN AMANDA CATON, a witness herein,

12      taken by the plaintiffs as upon

13      cross-examination, pursuant to the Federal

14      Rules of Civil Procedure and pursuant to

15      Notice of counsel as to the time and place

16      and stipulations hereinafter set forth, at

17      the offices of Taft Stettinius &  Hollister,

18      425 Walnut Street, Suite 1800, Cincinnati,

19      Ohio, at 9:47 a.m., Thursday,

20      January 16, 2025, before Stacey J. Murrin, a

21      Court Reporter and Notary Public, within and

22      for the State of Ohio.

23

24                         - - -

25
```

```
 1        APPEARANCES:

 2

 3        FOR THE PLAINTIFFS,    JACQUELINE GREENE, ESQ.
          ESTATES OF RAYMOND     REBECCA P. SALLEY, ESQ.
 4        AND GAYLE LAIBLE:      Friedman, Gilbert &
                                 Gerhardstein
 5                               35 East 7th Street
                                 Suite 201
 6                               Cincinnati, Ohio 45202

 7                               And

 8        FOR THE PLAINTIFFS,    ROULA ALLOUCH, ESQ.
          STEVEN AND MARIBETH    Bricker Graydon, LLP
 9        KLEIN:                 2400 Chamber Center Drive
                                 Suite 300
10                               Ft. Mitchell, KY 41017

11        FOR THE DEFENDANTS,    SPENCER S. COWAN, ESQ.
          CITY OF CINCINNATI,    Taft Stettinius &
12        TIMOTHY LANTER and     Hollister
          BRETT THOMAS:          425 Walnut Street
13                               Suite 1800
                                 Cincinnati, Ohio 45202
14
          FOR THE DEFENDANT,     MATTHEW SLOVIN, ESQ.
15        CITY OF CINCINNATI:    MARVA BENJAMIN, ESQ.
                                 City Solicitor
16                               801 Plum Street
                                 Cincinnati, Ohio 45202
17
          FOR THE DEFENDANT,     TRISTAN PALMER, ESQ.
18        TRAVELERS CASUALTY     Casey Bailey & Maines
          INSURANCE COMPANY:     3151 Beaumont Centre Circle
19                               Suite 200
                                 Lexington, KY 40513
20
          FOR THE DEFENDANTS     KIMBERLY A. RUTOWSKI, ESQ.
21        TIMOTHY LANTER and     Lazarus Law, LLC
          BRETT THOMAS,          The Huntington Center
22        INDIVIDUALLY:          525 Vine Street
                                 Suite 2210
23                               Cincinnati, Ohio 45202

24
          ALSO PRESENT:  Jason Laible (Zoom.)
25                       Timothy Lanter
                         Maysa Constandinidis
```

S T I P U L A T I O N S

It is stipulated by counsel for the
respective parties that the deposition of
CPD CAPTAIN AMANDA CATON, a witness herein,
may be taken at this time by the plaintiffs
as upon cross-examination and pursuant to the
Federal Rules of Civil Procedure and Notice
to take deposition, all other legal
formalities being waived by agreement; that
the deposition may be taken in stenotype by
the Notary Public-Court Reporter and
transcribed by her out of the presence of the
witness; that the transcribed deposition was
made available to the witness for examination
and signature and that signature may be
affixed out of the presence of the Notary
Public-Court Reporter.

```
 1                        INDEX

 2       WITNESS          DIRECT  CROSS  RE-      RE-
                                        DIRECT   CROSS
 3
         CPD CAPTAIN AMANDA CATON
 4       BY MS. GREENE:                    5

 5       EXHIBIT IDENTIFIED                      PAGE

 6       Exhibit 12                              16
         Exhibit 13                              27
 7       Exhibit 14                              77
         Exhibit 15                              80
 8       Exhibit 16                             154
         Exhibit 17                             165
 9       Exhibit 18                             180

10       OBJECTIONS                             PAGE

11       MR. COWAN:                              15
         MR. COWAN:                              42
12       MR. COWAN:                              55
         MR. COWAN:                              59
13       MR. COWAN:                              69
         MR. COWAN:                             108
14       MR. COWAN:                             116
         MR. COWAN:                             118
15       MR. COWAN:                             122
         MR. COWAN:                             129
16       MR. COWAN:                             150
         MR. COWAN:                             152
17       MR. COWAN:                             156
         MR. COWAN:                             172
18       MR. COWAN:                             173
         MR. COWAN:                             175
19       MR. COWAN:                             176
         MR. COWAN:                             177
20       MR. COWAN:                             177
         MR. COWAN:                             178
21       MR. COWAN:                             178

22       EXHIBITS REFERENCED                    PAGE

23       Exhibit 9                               34
         Exhibit 3                               45
24       Exhibit 1                               72

25
```

1        CPD CAPTAIN AMANDA CATON,

2    a witness herein, of lawful age, having been

3    first duly sworn as hereinafter certified,

4    was examined and testified as follows:

5                THE WITNESS:  I do.

6                THE COURT REPORTER:  Thank you.

7                 CROSS-EXAMINATION

8    BY MS. GREENE:

9        Q.    **Good morning.**

10       A.    Good morning.

11       Q.    **I'm Jacqueline Greene.  I'm one**

12   **of the attorneys representing the plaintiffs**

13   **in the matter we're here today to discuss.**

14       A.    Okay.

15       Q.    **Before we get started, can you,**

16   **please, state and spell your name for the**

17   **record?**

18       A.    Amanda Caton, A-M-A-N-D-A,

19   C-A-T-O-N.

20       Q.    **And what's your current rank?**

21       A.    Captain.

22       Q.    **Captain.  Okay.  I'll call you**

23   **Captain Caton then?**

24       A.    (Nodding head affirmatively.)

25       Q.    **Okay.  Have you been deposed**

1    before, Captain Caton?

2         A.    Yes.

3         Q.    And how many times?

4         A.    One other time.

5         Q.    And have you testified in court?

6         A.    Yes.

7         Q.    How many times?

8         A.    Umm --

9         Q.    An estimate would be fine.

10        A.    Pardon?

11        Q.    An estimate would be fine.

12        A.    Less than a hundred, yeah.

13        Q.    Okay.  So you've offered

14   testimony before, so you're probably familiar

15   with the general flow of the events here

16   today, and I'm sure you spoke about this with

17   counsel.

18             But before we get started, I'll

19   go over a few -- a few rule ground rules to

20   help things rule smoothly.  Okay?

21        A.    Yes.

22        Q.    So first I ask that we do our

23   best -- and I am as bad about this as anyone,

24   but just speak one at a time so that our

25   court reporter, Stacey, can take down clearly

 1    what we all say.  Okay?

 2              A.    Okay.

 3              Q.    So if there are any objections

 4    stated by counsel, unless you're specifically

 5    instructed not to answer, go ahead, let the

 6    objection be stated, and then give your

 7    answer.  Okay?

 8              A.    Okay.

 9              Q.    And make sure that for all

10    questions you answer orally because gestures,

11    nods, shakes of the head, et cetera, cannot

12    be taken down on the record.  Okay?

13              A.    Okay.

14              Q.    If I ask a question that's

15    unclear or you need me to rephrase it, it's

16    totally fine, just let me know.  Otherwise,

17    if you answer a question, I'm going to assume

18    that you've understood it.  Fair enough?

19              A.    Okay.

20              Q.    If you need a break at any point

21    in time, also no problem.  The only exception

22    would be if I have a pending question, you'll

23    need to answer that before we take a break.

24    Okay?

25              A.    Okay.

1    Q.    Otherwise, just let us know if

2  you need one?

3    A.    Yes.

4    Q.    There are no medical or other

5  circumstances today that affect your ability

6  to testify truthfully and accurately, right?

7    A.    Right.

8    Q.    And you understand that you've

9  been identified as a person who has knowledge

10  relevant to the events of this case, but

11  you're not named as a defendant in the case,

12  right?

13    A.    Correct.

14    Q.    Before you came today, did you

15  review any materials to prepare for your

16  deposition?

17    A.    Yes.

18    Q.    What did you review?

19    A.    The C -- Critical Incident

20  Review Board report and the Internal report.

21    Q.    That's the IIS report?

22    A.    Yes.

23    Q.    Okay.  Anything else?

24    A.    No.

25    Q.    And did you do anything to

1    prepare other than looking at those

2    documents?

3            A.    Met with counsel.

4            Q.    Okay.  And you don't need to

5    tell me what you spoke about with counsel --

6            A.    Uh-huh.

7            Q.    -- but other than meeting with

8    counsel, anything else to prepare?

9            A.    No.

10           Q.    And at the meeting with counsel,

11   who was present?

12           A.    Spencer and Aaron.

13           Q.    So just the lawyers?

14           A.    Yes.  Yeah.

15           Q.    Any other people?

16           A.    No.

17           Q.    Okay.  Did you speak with any

18   other person about your deposition before you

19   came today?

20           A.    Just to let people know that I

21   was not gonna be at work.  I'd be here.

22           Q.    Okay.  Can you briefly give me

23   an overview of your educational background?

24           A.    I got my Bachelor's from Miami

25   University and my Master's from Xavier

1    University.

2          Q.    And when did you get your

3    Bachelor's?

4          A.    I graduated I think in '87.  And

5    then Xavier probably would have been around

6    '91 when I graduated, but I'm not for sure.

7          Q.    And your Bachelor's degree, what

8    was that in?

9          A.    Political science.

10          Q.    And what was your Master's in?

11          A.    Education.

12          Q.    Okay.  When did you begin

13    working for the Cincinnati Police Department?

14          A.    I was hired in March of 2004

15    when I went -- entered the academy.  And then

16    I graduated from the academy, it would have

17    been August of 2004.

18          Q.    So prior to starting with the

19    police department, you had another career, it

20    seems like; is that correct?

21          A.    I stayed home with my kids, and

22    I worked part-time at nighttime.

23          Q.    And what work at nighttime did

24    you do?

25          A.    I worked at a restaurant.

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Okay.  Did you ever have any

2    employment in education outside of any roles

3    with the police?

4           A.    No, just my student teaching,

5    which is part of my education, so...

6           Q.    Okay.  And so then in 2004, you

7    joined the department.  And did you start as

8    a patrol officer?

9           A.    Yes.

10          Q.    And can you go over for me your

11   history of promotions or rank changes?

12          A.    2004, I was a police officer.

13   And then I think -- and these dates might not

14   be completely accurate because I don't

15   remember, but around 2010, I was promoted to

16   police specialist, which is a rank we no

17   longer have.

18                And then I think later that same

19   year I was promoted to police sergeant.  And

20   then around 2015, promoted to lieutenant.

21   And then I think it was summer of 2018 I was

22   promoted to captain.

23          Q.    Okay.  What led you to want to

24   join the police department?

25          A.    Just it was something that came

1   across my radar and it interested me and I

2   needed a job where I could have a decent

3   salary and benefits for my kids.

4          And if I wanted to teach, I

5   would have had to have gone back and renewed

6   my teaching certificate, so this is just what

7   interested me.

8          Q.   And then since 2018, you've held

9   the rank of captain?

10          A.   Yes.  That date might not be

11   accurate, but I'm pretty sure it is, yeah.

12          Q.   Approximately then.  Throughout

13   your employment with the department, can you

14   walk me through what units or divisions or

15   other assignments you had?

16          A.   Yes, as a police officer, I was

17   on patrol in Districts 2, 3, and 5.  I got

18   promoted to sergeant out of 5 and I went to

19   work in District 1 as a patrol sergeant.

20          After about a year, I went to

21   our Internal Investigation Section as a

22   sergeant, as an investigator.  I got promoted

23   out of that assignment to lieutenant, and I

24   went back to patrol as a lieutenant in the

25   downtown Special Central Business Section.

1           And then from there, I went

2      to -- as a patrol lieutenant to District 5.

3      And then I went to work for the chief's

4      office as kind of the -- as -- as the

5      emergency communications liaison.

6                And then I was promoted from

7      there and -- to captain and went to our

8      Records Section.  And then from there, I went

9      as the captain to our Inspections Section.

10               And at that time Inspections and

11     Planning were two different sections, but

12     then I think after almost a year they

13     combined them, so I was then the captain of

14     Planning and Inspections.

15               And then after that, I went to

16     be the captain of our Internal Investigations

17     Section.  And then I went to be the captain

18     of -- a patrol captain at District 5.

19               And then when they closed

20     District 5, I went to be the captain of our

21     Collaborative Policing Section.  And then in

22     August of this year -- oh, I'm sorry, of last

23     year, '24, I went to be the patrol captain at

24     District 4, which is where I am currently.

25          Q.     Approximately what years were

1    you the captain of the IIS?

2         A.    I was in Inspections from 2 of

3    '20 to 5 of '21, I think.  And then I went to

4    Internal in 5 of '21 to January of '23, I

5    think, approximately.

6         Q.    And between those two time

7    periods that -- most of 2020 and part of '21

8    to the Internal role that you started in May

9    of 2021, what were the differences in those

10   roles that you held?

11        A.    In two different roles.

12   Inspections, you were responsible for audits

13   of the department, whatever the police chief

14   feels is necessary, responsible for property

15   destruction, responsible for department-wide

16   drug testing.

17             And then also the -- the

18   Inspection captain is a coordinator of -- it

19   used to be the Firearms Discharge Board, and

20   now they changed it to the Critical Incident

21   Review Board.

22        Q.    And then when you went Internal,

23   what were your roles there?

24        A.    Internal as a captain, you're

25   over the investigators who investigate

1      allegations of serious police misconduct.

2              Q.    Okay.  So investigations

3      undertaken by the Internal Investigations

4      Section, those are related to allegations of

5      serious police misconduct?

6              A.    Yes.

7              Q.    And so any findings in those

8      investigations would reflect if the officers

9      found to have committed some violation, an

10     act of serious police misconduct; is that

11     fair?

12             A.    Say that again.

13             Q.    Sure.  If the -- if the Internal

14     Investigations Section investigates a police

15     officer's misconduct --

16             A.    Uh-huh.

17             Q.    -- if that section makes a

18     finding that the officer violated department

19     policies or otherwise engaged in

20     misconduct --

21             A.    Uh-huh.

22             Q.    -- that reflects a finding of

23     serious police misconduct; is that right?

24                   MR. COWAN:  Objection.

25             A.    Well --

1          MR. COWAN:  You can answer.

2          A.    Well, any -- any allegations of

3    say just like discourtesy, lack of police

4    service, anything like that would be

5    investigated at the district level.

6                Anything involving a law

7    violation -- a law violation, sexual

8    misconduct, or anything like that would be

9    investigated by Internal.

10         Q.    And Internal then, if they find

11   that the officer has committed misconduct,

12   that would be a finding of a serious police

13   misconduct?

14         A.    It depends on what -- what --

15   you know, we have a discipline matrix.  So it

16   goes from entry into your personnel jacket to

17   anywhere up to termination.  So it depends on

18   what -- what policy is violated.

19         (Exhibit 12 was marked.)

20   BY MS. GREENE:

21         Q.    Okay.  And just to clarify, when

22   you say there's a matrix -- I'm gonna mark

23   this as Plaintiffs' Exhibit 12, and I have to

24   apologize to counsel because I only have two

25   copies of this, but we can e-mail you ones

```
 1        right now if you want.
 2                    This is -- and I'll hand you
 3        this just to take a look at it if you want
 4        it -- I'll read the Bates range and the name
 5        of the document in the record in a second.
 6        Thanks.
 7                    So for the record, this is the
 8        Manual of Rules and Regulations and
 9        Disciplinary Process for the Cincinnati
10        Police Department.
11             A.   Yes.
12             Q.   The Bates range on this document
13        is City 001471 to 1504.
14                    MS. GREENE:  And we're gonna
15        e-mail to counsel copies of this right now so
16        you have it available to you as well.
17        BY MS. GREENE:
18             Q.   But, Captain Caton, this is
19        the -- what is in front of you as Exhibit 12,
20        does this contain that matrix you just
21        referenced?
22             A.   Yes.
23             Q.   Okay.  And what is this Manual
24        of Rules and Regulations for Disciplinary
25        Process?  Can you describe the function it
```

```
 1    serves?

 2            A.    This is the department's

 3    guidelines for officer conduct.  As you can

 4    see, there's several, you know, subsections

 5    in the Table of Contexts -- Contents.

 6            Q.    Okay.  And so this addresses

 7    types of actions that could lead to

 8    discipline and then the disciplinary process;

 9    is that right?

10            A.    Yes.

11            Q.    As well as appeals to the

12    discipline findings that may arise, is that

13    right, that describes that process?

14            A.    Yes.  Yes.

15            Q.    And then this manual also lays

16    out the types of discipline that --

17            A.    Yes.

18            Q.    -- can arise?

19            A.    Correct.

20            Q.    Okay.  Thank you.  We can set

21    that aside for now.  So going back to your

22    role in the Internal Investigations

23    Section --

24            A.    Uh-huh.

25            Q.    -- are there any other duties
```

1    that you had at the time you served in that

2    capacity?

3              A.    Just I'm over the -- the

4    investigators, and then review the reports

5    and then submit them to the police chief.

6              Q.    Okay.  And so you said you began

7    that role in May of 2021, right?

8              A.    Yes, I believe so.

9              Q.    But prior to that, you were in

10   the Inspection Section and you -- in 2020,

11   right?

12             A.    Yes.

13             Q.    And so then you were a captain

14   in the Inspection Section in August of 2020,

15   correct?

16             A.    Yes, because I went -- I went

17   there in 2 of '20, yes.

18             Q.    All right.  And I apologize, I

19   just -- oh, sorry, strike all that.

20                   You then went from Internal to

21   patrol captain again, right?

22             A.    Yes.

23             Q.    And you said you are at

24   District 4 now?

25             A.    Yeah.  At the time, I went to

1    District 5, but now I'm at District 4.

2          Q.    Okay.  And what are the duties

3    as patrol captain?

4          A.    You're responsible for the

5    personnel in the district, review any reports

6    that come through as far as uses of force,

7    citizen complaints, anything like that.

8                Just responsible for the

9    day-to-day operations of the department of

10   the -- of the -- of the district, yeah.

11         Q.    And so in the course of your

12   time at the department, you've been in

13   various patrol-related roles as well as in

14   supervisory roles more in the Central

15   Administration Department; is that fair to

16   say?

17         A.    Yes.

18         Q.    Have -- have you ever had any

19   specific assignment or duties related to any

20   of the specialized units such as, for

21   example, the Gang Unit or other -- or the

22   Vortex Unit or other specialized units in

23   the department?

24         A.    Have I ever had any of those

25   assignments?

1      Q.    We'll start with assignments,

2  sure.

3      A.    No.  No.  I laid out all my

4  assignments.

5      Q.    In your capacity as a captain in

6  Inspections or in Internal Investigations,

7  did you become familiar with the operation of

8  those units?

9      A.    Yes, as far as when the reports

10  came across my desk.

11      Q.    Can you describe to me the chain

12  of command in 2020 of the Gang Unit?

13      A.    No, I can't.  I don't -- yeah, I

14  don't remember -- know what that was.

15      Q.    Okay.  Is it fair to say that

16  was a unit under the organizational structure

17  of the CPD at the time --

18      A.    Yes.

19      Q.    -- in 2020?

20      A.    Yeah.

21      Q.    And so it operated in the CPD

22  chain of command?

23      A.    Yes, but I don't remember who or

24  anything like that, yeah.

25      Q.    And so as members when they were

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        undertaking duties and tasks associated with
 2        their Gang Unit --
 3              A.    Uh-huh.
 4              Q.    -- assignments, they were doing
 5        so in the context of CPD chain of command?
 6              A.    Yes.
 7              Q.    And the same would be true of --
 8        well, strike that.
 9                   And are you familiar with
10        something called the Gun Task Force?
11              A.    They -- you mean the one we have
12        now, the CGIC, the central guns, CGIC,
13        central guns -- I can't even remember what it
14        stands for, yeah.
15              Q.    Let me ask a different question.
16              A.    Yeah.
17              Q.    Have you heard of the Gun Crime
18        Task Force?
19              A.    Yes.
20              Q.    And you're familiar with the
21        operation of that particular unit?
22              A.    Not really.  I've never been
23        there.  I've toured the building, but that's
24        about it.
25              Q.    In terms of your work with
```

```
 1        Inspections and Internal Investigations --
 2             A.    Yes.
 3             Q.    -- do you ever review conduct by
 4   Gun Crime Task Force members?
 5             A.    If any complaints came through
 6   against any of those members, then we review
 7   those.
 8             Q.    And I have the same kind of
 9   question for chain of command for that Gun
10   Crime Task Force --
11             A.    Uh-huh.
12             Q.    -- are you familiar with it?
13             A.    I -- it would -- just the same
14   as in any unit, it would go from police
15   officer to sergeant to lieutenant to captain
16   to the bureau commander to -- who is
17   assistant chief to the chief.  So that's the
18   chain of command for any unit that we have.
19             Q.    And so then would it be fair to
20   say that any action undertaken by officers in
21   the Gun Crime Task Force would be undertaken
22   under the control of the CPD chain of
23   command?
24             A.    Yes.
25             Q.    Okay.  You mentioned the
```

 1    building, you've toured the building.  What

 2    are you talking about?

 3          A.    It's the building on Central

 4    Parkway that houses our CGIC Unit.

 5          Q.    And you said it has its own

 6    building --

 7          A.    Yes.

 8          Q.    -- for that unit?

 9          A.    Yes.

10          Q.    And what happens in that

11    building?

12          A.    They do their investigations.

13          Q.    Okay.

14          A.    Yeah.

15          Q.    Do you know the parameters of

16    the types of investigations they conduct?

17          A.    No.

18          Q.    Okay.  And when you say CGIC, is

19    that different from the Gun Crime Task Force?

20          A.    It's undergone some name

21    changes.  I can't remember what it was called

22    back in 2020.  I just know that now it's

23    called CGIC.  And for the life of me, I can't

24    remember what that stands for, so...

25          Q.    That's all right.  So getting

1    back to your role in Inspections -- I'm gonna

2    talk about that a little bit --

3        A.    Yes.

4        Q.    -- you conducted in that role

5    some investigations, right?

6        A.    What investigations?

7        Q.    You conducted investigations in

8    that role as part of your job?

9        A.    No.  No.  We kind of were the

10   final housing for any uses of force or

11   anything like that.  They -- the sergeants

12   there would review any reports.

13       Q.    Okay.  And when you say "final

14   housing," what do you mean?

15       A.    It's kind of the final resting

16   place for any reports after it's been through

17   the chain of command.

18       Q.    And is there a review of reports

19   conducted in Inspections?

20       A.    Yes.

21       Q.    And what did that review entail?

22       A.    They review any reports that --

23   again, they've already been through the chain

24   of command, but then they review any kind of

25   low-level things like a tasing, an injury to

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    a prisoner, a noncompliant suspect, things
 2    like that.
 3              Q.    And uses of force that occur in
 4    those types of instances; is that right?
 5              A.    They don't review the use of
 6    force, that goes up through the patrol bureau
 7    commander.
 8              Q.    Okay.  And so when you say
 9    they're reviewing the reports, what exactly
10    are they looking for?
11              A.    Just for accuracy and
12    completeness, yeah.
13              Q.    Okay.  So that's like a quality
14    control check --
15              A.    Yes.
16              Q.    -- to make sure that officers
17    and their supervisors are --
18              A.    Yeah.
19                    MR. COWAN:  Just let her finish.
20              Q.    -- thoroughly completing their
21    reports?
22              A.    Correct.
23              Q.    And I will probably talk over
24    you at some point, so I apologize.  And a lot
25    of times you'll know where I'm going.
```

1              Try to let me get there, but

2      we'll both end up doing it at some point.  So

3      I apologize in advance, but we'll both do our

4      best.

5              Okay.  So in your role and in

6      Inspections then you also, you said, worked

7      with the -- what became known as the Critical

8      Incident Review Board, right?

9          A.    Correct.

10         Q.    And can you describe to me what

11     the CIRB, or Critical Incident Review Board,

12     is?

13         A.    That is outlined in our

14     use-of-force procedure.  It's at the request

15     of the police chief any incident that he

16     wants to be -- have reviewed.

17         Q.    Okay.  And that includes

18     instances that are not just use of force,

19     right?

20         A.    Correct.

21         (Exhibit 13 was marked.)

22     BY MS. GREENE:

23         Q.    Okay.  And just for the sake of

24     keeping track, I will go ahead and mark this

25     as Exhibit 13.

```
 1                  MS. GREENE:  I'm handing to you
 2      and I'm gonna hand out -- there should be
 3      five, one for you and one for Tristan and
 4      then one for -- over here for Roula.
 5      BY MS. GREENE:
 6           Q.   Okay.  All right.  So you have
 7      in front of you what's been marked as
 8      Exhibit 13.
 9           A.   Yes.
10           Q.   And for the record, this
11      document is titled at the top 12.545, Use of
12      Force.  And at the bottom, the document notes
13      revised, 2/17/22.  It replaces a version from
14      10/7/21.
15                Captain Caton, is this the
16      use-of-force report -- or use-of-force policy
17      you just referenced?
18           A.   Yes.
19           Q.   Okay.  And so this is the
20      document that describes when and how the CIRB
21      will review a critical incident, right?
22           A.   Currently, yeah.  This -- I
23      mean, as you can see, it undergoes revisions,
24      so back in 2020 it would have been a
25      different -- I don't know what changed about
```

1    it, but it would have been, you know...

2           Q.    Yeah.  And I will just -- I'll

3    turn to that portion of the policy in a bit

4    and we can talk about it.

5           A.    Okay.

6           Q.    If there's anything that was

7    different from 2020, I'll ask you to lay it

8    out for me then.

9           A.    Okay.

10          MS. GREENE:  But just -- I'll

11   ask counsel if you could produce the 2020

12   applicable version of this -- the one --

13   well, I guess August 7th, 2020, through

14   June 16th, 2021, whatever the version would

15   have been at that time, that would be great.

16   Thanks.

17   BY MS. GREENE:

18          Q.    Okay.  So we'll come back to

19   this in a bit.

20          A.    Okay.

21          Q.    But in any case, the CIRB is

22   defined in the use-of-force policy 12.545 --

23          A.    Yes.

24          Q.    -- right?  And then can you talk

25   to me about what your role specifically in

1    the CIRB was in August of 2020 through June

2    of '21?

3            A.    Yes.  As outlined in this under

4    the CIRB, the Inspections captain serves as

5    the coordinator for the Critical Incident

6    Review Board, meaning when the chief said I

7    want you to look at a certain case, then I

8    would get the board, coordinate them with

9    time, places, get any relevant material, make

10   sure they had it, and then kind of coordinate

11   the meeting.

12           Q.    Okay.  So I'll probably have

13   some more questions about the particulars of

14   that in a bit, but let me move to the case

15   we're here to talk about today and some of

16   the facts at issue there.

17                 So, Captain, you are aware of

18   the vehicle pursuit involving Sergeant Lanter

19   and Officer Brett Thomas and other CPD

20   officers on August 7th, 2020, right?

21           A.    Yes.

22           Q.    And did you come to be involved

23   in the review of that incident?

24           A.    Say that again.  How did I --

25           Q.    Did you come --

```
 1              A.    Yes.

 2              Q.    -- and how did you come to be

 3      involved in that?

 4              A.    Because I was the captain of

 5      Inspections at the time.

 6              Q.    And so did the chief ask you to

 7      convene the CIRB?

 8              A.    Yes.

 9              Q.    And tell me about how you

10      received that directive from the chief?

11              A.    I can't remember exactly how.  I

12      just know that on the front of the Internal

13      report he wrote the notes.

14              Q.    Okay.  So as you sit here today,

15      you don't recall if you talked to him or got

16      an e-mail or something else?

17              A.    No, I don't remember.

18              Q.    Okay.  Do you remember, however

19      you were informed, what information you were

20      given at the time you were told to convene

21      the board?

22              A.    The Internal Investigations

23      report.

24              Q.    Okay.  Anything other than that

25      report?
```

```
 1              A.    I don't remember.  I'm sure --

 2    because I don't remember for sure, but I

 3    would say probably the -- the video.

 4              Q.    When you say "the video," what

 5    do you mean?

 6              A.    Of the pursuit.

 7              Q.    Okay.  And, specifically, which

 8    video?  Can I ask that?

 9              A.    I don't remember.

10              Q.    Was it a dash-cam video?

11              A.    It would have been -- and I'm

12    just going on for what was typical, it would

13    have been the -- yeah, the MV -- dash cam,

14    MVR, and the body-worn camera.

15              Q.    Okay.  So, generally speaking,

16    when you're given a critical incident to

17    review --

18              A.    Yes.

19              Q.    -- you would be given, if there

20    is, MVR dash-cam video, right?

21              A.    Yes.

22              Q.    And you would be given body-worn

23    camera, right?

24              A.    Yes.

25              Q.    In this specific case, do you
```

1  know if you were given either of those,

2  meaning the August 7th, 2020, pursuit?

3       A.   I don't remember, but I'm sure

4  we were probably.

5       Q.   Okay.  So you got the IIS

6  report, possibly some video.  Any other

7  information given to you at the time you were

8  told to convene the board?

9       A.   Not that I remember.

10       Q.   Did you have any conversation

11  with the chief prior to convening the board?

12       A.   No.

13       Q.   Did you have any conversation

14  with any other CPD members prior to convening

15  the board about this pursuit?

16       A.   No, only just the logistics of

17  convening.

18       Q.   And when you convened this CIRB

19  in this case, what was the purpose of doing

20  that?

21       A.   I outlined the purpose in my

22  report.  If -- if I could, if you have that.

23       Q.   Yes, absolutely.  I'm gonna

24  provide that to you.  It was previously

25  marked as Plaintiffs' Exhibit 9.  Here you

1   go.

2        (Exhibit 9 was referenced.)

3             MS. GREENE:  I didn't bring

4   additional copies of the stuff we already

5   marked.  So hopefully you guys have that with

6   you from last time.

7   BY MS. GREENE:

8        Q.    So I'm showing you what was

9   previously marked as Exhibit 9,

10  Captain Caton.  Is this your report?

11       A.    Yes.

12       Q.    And so this is the report that

13  you generated in your capacity as the

14  coordinator of the Critical Incident Review

15  Board relating to the August 7th, 2020,

16  pursuit of Mason Meyer, right?

17       A.    Yeah.

18       Q.    And so the question I asked you

19  a moment ago was what was the purpose of

20  convening the board in this case; can you

21  describe that for me?

22            A.    Yeah.  It's outlined here, which

23  is taken directly from our use-of-force

24  policy.  The purpose of the CIRB is to

25  determine whether all uses of force in the

1    incident were consistent with department

2    policy and training; the officers involved

3    employed proper tactics; lesser force options

4    were available; changes to protocols,

5    procedures, and training may be appropriate.

6              And then the CIRB would also

7    address any issues of appropriateness of

8    department policies and procedures; member's

9    judgment; and training adequacies with

10   respect to the member's knowledge, skill, and

11   resources.

12             And then we reviewed the

13   Internal Investigations report for accuracy

14   and completeness.

15        **Q.    Okay.**

16        A.    So that's the purpose of it.

17   And I don't know what this signature is right

18   here (indicating).

19        **Q.    I was just gonna ask you that**

20   **question.**

21        A.    Yeah.

22        **Q.    The signature on the bottom**

23   **left, you don't know the purpose of the**

24   **signature?**

25        A.    No, I don't.  I've never seen

```
 1        that before.

 2                Q.    Okay.  So you've never seen this

 3        signature?

 4                A.    No.

 5                Q.    And so it doesn't look familiar

 6        in any way?

 7                A.    No.

 8                Q.    Okay.  All right.  So just to

 9        talk about some specifics of your report, you

10        issued this report on June 16th, 2021, right?

11                A.    Yes.

12                Q.    And you issued it at that time

13        to Police Chief Isaac, right?

14                A.    Correct.  Yes, I submit it

15        directly to the police chief.

16                Q.    Do you hand deliver this report

17        to him?

18                A.    Yes, I probably put it right in

19        his in bin.

20                Q.    And when you provided it to the

21        chief, did you have any conversation with him

22        at that time about it?

23                A.    I don't remember, but I don't

24        think he was -- if I -- he probably wasn't in

25        his office.  I probably just put it in his
```

```
 1    in bin.
 2                MR. COWAN:  Jacqueline, do you
 3    mind if we go off the record for just two
 4    minutes and I'll grab the exhibits?
 5                MS. GREENE:  Sure.  I'm gonna
 6    pause the recording and we'll go off the
 7    record.
 8        (Off the record.)
 9    BY MS. GREENE:
10        Q.    I started the recording again
11    and we're back on the record.  Before we come
12    back to your report, earlier, Captain, we
13    were talking about some units in the CPD.
14    Are you familiar with the Canine Unit?
15        A.    Yes.
16        Q.    And is it fair to say that
17    officers in the Canine Unit when they were
18    undertaking any police action in their role
19    in the Canine Unit, that they were governed
20    by the CPD chain of command?
21        A.    Yes.
22        Q.    Okay.  And would they also be
23    engaging in policing action and furtherance
24    of CPD goals?
25        A.    Yes.
```

```
 1            Q.    And the same would be true for
 2    the Gun Crime Task Unit and Gang Unit
 3    members, right?
 4            A.    Yes.
 5            Q.    Thanks.  So going back to
 6    your -- your report, Exhibit 9 --
 7            A.    Uh-huh.  Yes.
 8            Q.    -- that you were talking about
 9    before the break, so we talked about the
10    purposes outlined here for your report for
11    convening the board, right?
12            A.    Correct.
13            Q.    And you noted that the board met
14    on April 19th, 2021, correct?
15            A.    Yes.
16            Q.    And did all of the people who
17    met for that board meeting include the
18    individuals listed here on this first page,
19    City 1011 where it says, FDB Members
20    Included?
21            A.    Yes.  All the people listed were
22    the ones attended.
23            Q.    Okay.  Was there anybody else in
24    the room?
25            A.    No.
```

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    And so Lieutenant Colonel

2    Michael John, Patrol Bureau Commander, was

3    present, right?

4         A.    Yes.

5         Q.    What was his role in the CIRB

6    for this case?

7         A.    He was the Patrol Bureau

8    Commander.

9         Q.    And then you were present,

10   right?

11        A.    Yes.

12        Q.    You also list

13   Captain Aaron Jones as present, right?

14        A.    Yes.

15        Q.    What was Jones -- Captain Jones'

16   role?

17        A.    He was the captain of the police

18   training at the time.

19        Q.    And then you also have

20   Captain Dennis Swingley listed here, right?

21        A.    Yes.

22        Q.    And he was Special Services

23   Section?

24        A.    Yes.

25        Q.    And then Captain Doug Snider was

```
 1        present?

 2             A.    Yes.

 3             Q.    And he's from Internal

 4        Investigations?

 5             A.    Yes.

 6             Q.    Then you have Lieutenant Brian

 7        Bender from SWAT and Tactical?

 8             A.    Yes.

 9             Q.    And Lieutenant Donna Robinson

10        from Inspections?

11             A.    Yes.

12             Q.    Okay.  And I have one question,

13        if you could pull Exhibit 13 in front of you,

14        the use-of-force policy --

15             A.    Yes.

16             Q.    -- and if you would turn to

17        page 10?

18             A.    Yes.

19             Q.    I understand this is a slightly

20        later version of the policy not applicable in

21        June of '21, but in terms of the board

22        members listed here to participate in a CIRB

23        convening --

24             A.    Yes.

25             Q.    -- I note that there were seven
```

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        individuals who were required, and likewise
 2        you had seven people at your board meeting
 3        here, right?
 4                A.    Yes.  Yes.
 5                Q.    I do see this one includes an
 6        assistant city solicitor in the -- in the
 7        use-of-force policy.
 8                A.    Correct.
 9                Q.    Was that policy different at the
10        time in 2020?
11                A.    I don't believe so.
12                Q.    Okay.  But there wasn't a city
13        solicitor?
14                A.    Correct.
15                Q.    And do you know why that was?
16                A.    I do not remember.
17                Q.    Okay.  You had convened other
18        CIRB cases --
19                A.    Yes.
20                Q.    -- other than this one, of
21        course, right?
22                      MR. COWAN:  Just let her finish.
23                      THE WITNESS:  Okay.
24        BY MS. GREENE:
25                Q.    Other than this case, you
```

1    convened other CIRBs?

2          A.    Yes.

3          Q.    And have you had any city

4    solicitors in those CIRBs compositions?

5          A.    Yes.

6          Q.    And what role did they play,

7    general speaking?

8          A.    Any input that they may have

9    concerning the incident.

10         Q.    In this case, were you in any

11   way disadvantaged by not having an assistant

12   city solicitor on the board?

13               MR. COWAN:  Objection.

14         A.    I don't think so.  I would have

15   invited them.  So I cannot remember if they

16   just couldn't make it, or I just don't

17   remember.

18         Q.    Okay.  In any case, you had from

19   your understanding the full complemented

20   personnel available and participating for the

21   purposes of your CIRB here, right?

22         A.    Yes.

23         Q.    Okay.  In -- going back to your

24   board, Exhibit 9.  So I want to talk about

25   the purposes you went through a little bit

1    ago.

2              And you mentioned in your report

3    and when you were reciting for us here today

4    that the CIRB purpose was to determine

5    whether use of force was consistent with

6    policy and training, right?

7         A.   Correct.

8         Q.   And whether officers employed

9    proper tactics, right?

10        A.   Yes.

11        Q.   And whether lesser force options

12   were available, right?

13        A.   Right.

14        Q.   So in this particular instance,

15   were you reviewing the use of force?

16        A.   No.

17        Q.   What were you reviewing in this

18   instance, meaning the August 7th, 2020,

19   pursuit?

20        A.   The pursuit.

21        Q.   And so you were reviewing the

22   pursuit as a critical incident as determined

23   by the chief, right?

24        A.   Correct.

25        Q.   And the ability of the CIRB to

1    do that is outlined in the CIRB section of

2    the use-of-force policy, right?

3           A.    Yes.

4           Q.    So you weren't reviewing, for

5    example, whether lesser force options were

6    available here?

7           A.    No.

8           Q.    Okay.  You were reviewing,

9    however, whether the officers involved in

10   this particular pursuit employed proper

11   tactics, correct?

12          A.    Correct.

13          Q.    And you also reviewed in this

14   specific case the training adequacies with

15   respect to the officers at issue in this

16   pursuit, right?

17          A.    Yes.

18          Q.    And you evaluated as well their

19   knowledge, skill, and resources in relation

20   to the conduct at issue in the pursuit,

21   right?

22          A.    Yes.

23          Q.    With -- okay.  You also looked

24   at whether the IIS, or Internal

25   Investigations Section report, was accurate

Case: 2:21-cv-00102-DLB   Doc #: 151   Filed: 12/10/25   Page: 46 of 217 - Page
ID#: 3548
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    and complete, correct?

 2          A.    Yes.

 3          (Exhibit 3 was referenced.)

 4    BY MS. GREENE:

 5          Q.    Okay.  And just to make sure we

 6    are all on the same page about what we're

 7    talking about for the IIS report, I'm handing

 8    you what was previously marked as Plaintiffs'

 9    Exhibit 3.  This is the IIS report we've been

10    referencing, right?

11          A.    Yes.

12          Q.    Okay.  So you reviewed -- the

13    board reviewed this document for accuracy and

14    completeness?

15          A.    Yes.

16          Q.    Okay.  In terms of that review,

17    how did you evaluate accuracy and

18    completeness here?

19          A.    Just reviewing it.

20          Q.    Does that mean reading it?

21          A.    Yes.

22          Q.    Anything other than reading it?

23          A.    No.

24          Q.    So when you read it, were you

25    looking at it for things that appeared to be
```

1    missing or other things that you would expect

2    that were not present?

3              A.    Yeah.    That's fair to say, yeah.

4              Q.    Any other way you would

5    characterize your review for completeness?

6              A.    No, and then everyone would have

7    reviewed it.

8              Q.    Okay.

9              A.    Yeah.

10             Q.    Everyone on the board?

11             A.    Yes.

12             Q.    And then in terms of your review

13   for accuracy and the board's review for

14   accuracy --

15             A.    Yes.

16             Q.    -- how is that evaluated?

17             A.    Just accuracy as far as the

18   facts.

19             Q.    And so in reviewing for

20   accuracy, does the board compare the report

21   to other sources of information or evidence?

22             A.    No, I don't think so.

23             Q.    Okay.   All right.   Now, if you

24   would, turn back to your report, Exhibit 9.

25             A.    Yes.

Deposition of Captain Amanda Caton

Jason Laible, et al., vs. Timothy Lanter, et al.,

1      Q.     And turn to the second page at

2  the top is a section titled Incident

3  Description, and there's some text in italics

4  there.  Do you see it?

5      A.     Yes.

6      Q.     And it reads, This incident

7  description is based on the statements of the

8  involved officers and others as included in

9  the executive summary report prepared by the

10  department's Internal Investigation Section.

11          Can you explain what that means

12  to me?

13      A.     The -- we took the -- this

14  incident description that's in this report,

15  took it from this report.

16      Q.     Okay.  So your summary and your

17  report in Exhibit 9 is a summary of the facts

18  that's reported in the IIS report, Exhibit 3?

19      A.     Yes.

20      Q.     And when you say the statements

21  of the involved officers and others, does

22  that reference the statements as represented

23  in the IIS report, Exhibit 3?

24      A.     Yes.

25      Q.     And does that reflect

1  consideration of any other representations of

2  those statements such as audio or video

3  recordings or other reports?

4        A.    I do not remember if we listened

5  to the interviews.  I mean, it's been so

6  long, I don't remember if we listened to the

7  interviews or not.

8        Q.    If you had listened to the

9  interviews, would that be noted in this

10 report?

11       A.    In this one?

12       Q.    In your report, Exhibit 9?

13       A.    In mine.  Well, I mean, it's

14 based on the statements of the involved

15 officers, so not necessarily.  We would have

16 said that we actually listened to the

17 interviews that IIS conducted.

18       Q.    Okay.

19       A.    But I can't remember.  I don't

20 remember it all.

21       Q.    Okay.  In terms of what is

22 transmitted to board members, CIRB members

23 for a review of a particular case --

24       A.    Uh-huh.

25       Q.    -- is there some kind of record

1    of the packet of information provided to

2    them?

3              A.    No.

4              Q.    Are there e-mails or something

5    like that that would indicate what they were

6    provided?

7              A.    Like I said, all I remember is

8    really what's in the report, but I just know

9    what I normally would have done and e-mailed

10   the report to the board members.

11             Q.    Okay.  And so when you say the

12   report, you mean the Internal Investigation

13   Section report --

14             A.    Yes.

15             Q.    -- **Exhibit 3**?

16             A.    Yes.

17             Q.    So your normal practice would be

18   to send that IIS report to the board members?

19             A.    Yes.

20             Q.    And would your normal practice

21   also include sending anything other than

22   that?

23             A.    I can't remember if I sent the

24   videos or not or gave them a copy of the

25   videos.  I just can't remember.

```
 1          Q.    Okay.  As you sit here today, do
 2    you have any recollection of viewing any
 3    videos, or the content of any videos relating
 4    to this matter?
 5          A.    The only recollection I have is
 6    when I first saw the video.
 7          Q.    Okay.  And tell me about that.
 8          A.    At the time, it was Assistant
 9    Chief Paul Neudigate called all the captains
10    into the chief's conference room to watch the
11    video.
12          Q.    And what happened at that
13    meeting?
14          A.    He just played the video.
15          Q.    And when was that?
16          A.    I do not remember.
17          Q.    Was it before you wrote your
18    report in Exhibit 9?
19          A.    Yes.
20          Q.    Was it before the CIRB was
21    convened in this case?
22          A.    Yes.  It would have been --
23    because I think it was probably after it
24    first happened.
25          Q.    Within a month of the pursuit?
```

```
 1        A.    I don't remember, yeah.

 2        Q.    Do you know whether it was

 3   before the IIS report was completed?

 4        A.    I don't remember that either.  I

 5   just wanted -- I know that he wanted to make

 6   us aware of it.

 7        Q.    How did you learn that all the

 8   captains were being called to watch the

 9   video?

10        A.    I don't remember, but they

11   probably sent an e-mail, but I'm not for

12   sure.

13        Q.    And how many people were present

14   for that meeting -- or, strike that.

15             Do you recall generally who was

16   present for that meeting?

17        A.    I don't remember if any captains

18   were missing or not, but it would have been

19   the captains and the assistant chiefs.

20        Q.    Was the chief there?

21        A.    I can't remember.

22        Q.    Was there some kind of, like,

23   roll call done at the start of that meeting?

24        A.    No.

25        Q.    How many captains were there at
```

1    the time?

2          A.    I don't remember how many were

3    there at the time.  The complement is 15, so

4    I don't know whether we were at complement or

5    not.

6          Q.    Okay.  So you went to the

7    conference room with some or all of the

8    captains --

9          A.    Uh-huh.

10          Q.    -- some or all of the assistant

11    chiefs --

12          A.    Uh-huh.

13          Q.    -- possibly the chief --

14          A.    Uh-huh.

15          Q.    -- and the video was played?

16          A.    Yes.

17          Q.    And what do you remember about

18    that?

19          A.    Just watching the video.

20          Q.    Was there discussion about the

21    video?

22          A.    I don't remember.

23          Q.    Were there comments made about

24    the video by anybody?

25          A.    I don't remember.

1    Q.    What were you told was the

2    purpose of viewing the video?

3         A.    Just to let us know that this

4    had happened.

5         Q.    And who said that?

6         A.    I don't recall who specifically

7    said it, but it was Paul Neudigate that

8    called us all in to watch it.

9         Q.    Okay.  After the video was

10   played, was anything said in the meeting?

11        A.    I don't remember.  I honestly

12   don't remember, yeah.

13        Q.    And with regard to the video,

14   we're talking about one video that was shown;

15   is that right?

16        A.    I don't remember if they showed

17   the MVR and the body cam.  I can't remember

18   exactly what was showed.

19        Q.    Okay.  Do you remember that

20   there -- let me ask a different question.

21   Strike that.

22             Do you know whether you saw an

23   MVR or dash-cam video related to this

24   pursuit?

25        A.    I think.  Yeah, I think, because

1   that what shows the main pursuit is the MVR,

2   yeah.

3          Q.   Okay.  And then you're not sure

4   if you saw a body-worn camera or not?

5          A.   Correct.

6          Q.   Okay.  And was there discussion

7   about the pursuit in this meeting?

8          A.   I don't remember.  I'm sure

9   there was comments made, but I couldn't tell

10  you what they were.

11         Q.   Do you remember any general

12  notions of those comments?

13         A.   No.

14         Q.   Was there a discussion of

15  pursuit tactics used in this particular case

16  in that meeting?

17         A.   I don't remember.

18         Q.   Was there any discussion about

19  what review should or shouldn't be done?

20         A.   I don't remember.

21         Q.   Was there a discussion about

22  whether or not there ought to be discipline

23  for any of the officers involved?

24         A.   I don't remember.

25         Q.   Okay.  Do you remember anything

1    else about that meeting that you haven't

2    mentioned?

3         A.    No.

4         Q.    Was there any discussion about

5    communicating with the department members,

6    officers, or the public about the pursuit in

7    that meeting?

8              MR. COWAN:  Objection.

9         A.    I don't remember.  That

10   wouldn't...

11        Q.    Okay.  Do you recall at any time

12   being part of or hearing any discussion about

13   how to communicate with members of the

14   department about the pursuit?

15        A.    No.

16        Q.    And do you remember being part

17   of any discussion or hearing any discussion

18   about or being aware of any discussion about

19   how to communicate with the public about the

20   pursuit?

21        A.    No.

22        Q.    Okay.  So then in this

23   particular case -- actually, you know what,

24   let me -- before I move on, let me go back to

25   the use-of-force policy, if you would.

```
1            A.     Yes.
2            Q.     And it's Exhibit 13, and I want
3    to ask you some questions just generally
4    there.  If you'll go back to page 10 where
5    the CIRB section begins.
6            A.     Yes.
7            Q.     Okay.  So you convened the board
8    in this case as outlined in this policy,
9    right?
10           A.     Yes.
11           Q.     And if you go down to the second
12   to last paragraph on this page, it ends with
13   a sentence that says, The coordinator is also
14   responsible for submitting a written report
15   to the police chief within established
16   timelines.
17                  For the report, do you as the
18   coordinator, draft that on your own?
19           A.     Yes.
20           Q.     Are there any contributions from
21   the members of the board for the generation
22   of that report?
23           A.     Yeah.  I draft it based on --
24   based on the board's discussion.  And then
25   once I draft it, my normal practice is to
```

1   mail -- e-mail it to all the board members

2   and ask them if they have any

3   additions/deletions/contributions, you know,

4   anything that they would add or subtract or

5   change or whatever.

6         Q.   In this particular case, were

7   there any edits offered by board members

8   after you sent the draft out?

9         A.   I don't think so, but I don't

10   remember for sure.

11         Q.   Okay.  Then if you go to the

12   next page of the policy for the Content to be

13   Reviewed --

14         A.   Are you on page 11?

15         Q.   Yes.  -- the Content to be

16   Reviewed section it says, Criminal

17   Investigations Section, CIS, and Internal

18   Investigations Section, IIS, investigative

19   files and interviews of the principle CIS and

20   IIS investigators --

21         A.   Uh-huh.

22         Q.   -- right?  So what does that

23   mean in practice for the CIRB in terms of

24   what is reviewed?

25         A.   Just all the -- all CIS, which

1    wouldn't have been applicable in this case,

2    and Internal's investigative files and

3    interviews of the -- the investigators.

4            Q.    Okay.  And you said the CIS, or

5    Criminal Investigation Section, file would

6    not have been applicable here?

7            A.    I don't remember them having a

8    role in this, but I can't -- I don't remember

9    because I wasn't involved in the actual

10   investigation.

11               So I don't remember what they

12   would have done or if we reviewed anything

13   from them.

14           Q.    In your role as coordinator of

15   CIRB --

16           A.    Yes.

17           Q.    -- if you could give a rough

18   percentage of how many cases included CIS and

19   IIS investigation files, how many would that

20   be?

21           A.    That would be more of the

22   discharge of firearms by a police officer

23   because CIS does those investigations with

24   Internal Investigations kind of monitoring.

25           Q.    In your role as coordinator of

1   CIRB, how many non-use of force critical

2   incidents did you review?

3          A.    If I remember correctly -- say

4   it again, how many non --

5          Q.    Non-use --

6          A.    -- not involving shots fired by

7   police?

8          Q.    Non-use of force critical

9   incidents.

10         A.    I remember doing some shootings

11  and a tasing and then this.

12         Q.    How many CIRB meetings and

13  reviews did you convene over the course of

14  your time in Inspections?

15         A.    I think it was six.

16         Q.    Okay.  So was this the only

17  other critical incident category of review

18  that you conducted?

19               MR. COWAN:  Objection.

20               MS. GREENE:  What's the basis?

21               MR. COWAN:  It was just vague.

22  Category?  I just want to make sure I

23  understand what you're getting at.

24  BY MS. GREENE:

25         Q.    Was this the only, quote, other

1    critical incident, unquote, as defined in the

2    policy review that you conducted during your

3    time in Inspections?

4          A.    I reviewed some shootings, a

5    tasing, and this pursuit.  So if that's what

6    you...

7          Q.    So every other CIRB that you

8    convened related to a use-of-force event

9    other than this one?

10         A.    That I did, yes, a tasing or a

11    shooting.

12         Q.    Understood.  Okay.  And the

13    review of the CIRB is supposed to be

14    conducted within 90 days of commencement; is

15    that right?

16         A.    If that's what it says in the

17    timeline, yes.

18         Q.    And the date of commencement, is

19    that the date that the chief decides CIRB

20    should be convened?

21         A.    Yes, when this has been signed

22    off on.

23         Q.    Okay.  And in this particular

24    case looking at Exhibit 3, that starting date

25    or that commencement date would be March 1st,

```
 1        2021, right?
 2              A.    Yeah, or -- or whenever it
 3        reached me after that.
 4              Q.    Do you know when the IIS report
 5        reached you?
 6              A.    No.
 7              Q.    Okay.  All right.  Then the
 8        Purpose and Authority section on the same
 9        page of the policy says that the CIRB will
10        act as a quality control mechanism for the
11        instant -- incident being reviewed?
12              A.    Yes.
13              Q.    Can you define what that is in
14        practice for the CIRB?
15              A.     Well, quality control is just
16        what is outlined in -- in the quality control
17        as far as reviewing all these incidences
18        or -- determine our purpose and what issues
19        we have to address.
20              Q.    Okay.  In this section of the
21        use-of-force policy pertaining to CIRB,
22        Exhibit 13, down at the bottom of page 11,
23        there's a section titled Investigative Format
24        and Report.
25              A.    Yes.
```

```
 1          Q.    Do you see it?

 2          A.    Yes.

 3          Q.    So I'm looking at the paragraph

 4   in the version we have here in Exhibit 13.

 5   Can you take a look at that and tell me does

 6   that reflect your understanding of the

 7   process in 2020?

 8          A.    That seems like it would be the

 9   same.

10          Q.    Okay.  And so here the policy

11   says that the chairperson, that was you,

12   right?

13          A.    Yes.

14          Q.    So you will determine what

15   evidence is relevant and reliable, right?

16          A.    Yes.

17          Q.    And you, as the chairperson,

18   will determine the need to call witnesses,

19   right?

20          A.    Yes.

21          Q.    So how do you make those

22   evaluations in your role as coordinator of

23   the CIRB?

24          A.    Just what it says there.

25   What -- what -- what I -- what evidence we
```

```
 1    have that we can look at to identify any --

 2    any issues with regard to policies, training,

 3    and things like that.

 4            Q.    And so have you in any of the

 5    CIRBs you convened sought or included

 6    evidence outside of the written IIS or CIS

 7    reports for review?

 8            A.    And that's including any

 9    interviews or videos and stuff?

10            Q.    Yes.

11            A.    I don't remember.  I don't think

12    so.

13            Q.    So, generally speaking, then,

14    your practice was to rely on the summary of

15    evidence as provided by IIS or CIS?

16            A.    Yes.

17            Q.    And in this case, did you seek

18    any evidence outside of the summary by IIS?

19            A.    I don't remember.

20            Q.    If you did, would there be a

21    record of that somewhere?

22            A.    No.

23            Q.    Would it be reflected in your

24    report that you included additional evidence

25    or sought additional evidence?
```

1    A.    Yes, I would think so.  Yeah.

2    Q.    Okay.  In terms of calling

3  witnesses --

4    A.    Uh-huh.

5    Q.    -- how did you make the

6  determination whether or not to do that in

7  your role as CIRB coordinator?

8    A.    I don't remember how I

9  determined it.  I think we felt that the

10  report was complete and accurate, so...

11    Q.    Okay.  So you didn't call any

12  witnesses in this case?

13    A.    I don't think so, no.  I don't

14  remember.

15    Q.    Okay.  All right.  So let's turn

16  to the next page of the policy, if you would,

17  which is page 12.

18         And at the top there's a

19  paragraph there that talks about the

20  coordinator preparing the final report to the

21  chief that will become part of the

22  investigation file.  Do you see that?

23    A.    Yes.

24    Q.    What is the investigation file?

25    A.    That is just we have files for

1    each investigation that we do.  It used to be

2    paper, but we're now electronic.

3               So I can't remember what it was

4    at that time.  So it would have been added

5    with -- with this report and any other things

6    that Internal had.

7         Q.    And when you say "this report,"

8    you mean the IIS report --

9         A.    Yes.

10        Q.    -- Exhibit 3?

11        A.    Yes.

12        Q.    So your report is then put in

13   the same folder, electronic or hardcopy, with

14   the IIS report and that's what it means to

15   become part of the investigation file?

16        A.    And we also kept it as part of

17   the Critical Incident Review Board --

18        Q.    Okay.

19        A.    -- and Inspections, that file.

20        Q.    Okay.  And the term

21   "investigation file," where does that

22   particular file reside in the department?

23        A.    With Internal.  And then -- or,

24   I'm not sure whether there's two separate

25   files, there's CIS and Internal, but Internal

```
 1    has their own files.
 2              Q.    Okay.  And then for the Internal
 3    Investigation file, what all comprises that
 4    file, if you know, based on your experience
 5    in Internal?
 6              A.    Yeah.  The -- the -- all the
 7    audio copies of the interviews -- are you
 8    talking about this particularly or just in
 9    general for --
10              Q.    Let's talk in general and then
11    I'll ask about this.
12              A.    All the audio files and
13    interviews and the final report any
14    photographic evidence, anything that the
15    investigators used to investigate their case.
16              Q.    And in this particular case, do
17    you know what was contained in the
18    investigation file?
19              A.    I do not know.  I didn't --
20    never saw the file.
21              Q.    Okay.  All right.  And so then
22    at the end of that paragraph, the policy
23    states that the board will determine whether
24    the officers involved employed proper
25    tactics, right?
```

```
 1              A.    Wait, let me see.  The summary
 2        in particular the board will determine -- is
 3        that where you are?
 4              Q.    Yeah.
 5              A.    -- whether all uses of force
 6        during the encounter were consistent with
 7        policy and training.  Is that where you are?
 8              Q.    I read Item B, but, sure.
 9              A.    Oh.
10              Q.    So we'll just walk back.
11              A.    Okay.
12              Q.    In particular, the board will
13        determine that your -- this policy says, A,
14        whether all the uses of force during the
15        encounter were consistent with department
16        policy and training; B, whether the officers
17        involved employed proper tactics; C, whether
18        lesser force options were available; and D,
19        whether changes to protocols, procedures, and
20        training may be appropriate.  Right?
21              A.    Yes.
22              Q.    So in an instance where you're
23        reviewing a critical incident that is not a
24        use of force even though it's not
25        specifically written here, it's your
```

1  understanding that the practice of the

2  department is to determine whether the

3  conduct of the officers was consistent with

4  department policy and training, right?

5          A.     Whether the -- whether the --

6  well, whether all uses of force encounters

7  are consistent with department policy and

8  training and whether the officers involved

9  employed proper tactics.  Is that what you

10  mean?

11         Q.    Let me ask it -- let me ask a

12  different question.  So in an instant --

13  strike that.

14              CIRB reviews critical incidents

15  that do not involve use of force as well,

16  right?

17         A.     Yes.

18         Q.    And so in those circumstances

19  even though it's not explicitly written here,

20  it is the department's practice that the CIRB

21  reviews whether those officers acted in

22  compliance or consistent with department

23  policy and training regardless of whether

24  we're looking at the use-of-force policy or

25  not, right?

```
 1                    MR. COWAN:  Objection.

 2                    MS. GREENE:  Basis?

 3                    MR. COWAN:  You're trying to

 4        misconstrue what's written there.

 5                    MS. GREENE:  That's not true.

 6        I'm asking about practice -- or a question

 7        about practice.  I'll ask it another way.

 8        BY MS. GREENE:

 9            Q.    So CIRB looks at non-force

10        cases, correct?

11            A.    Yes.

12            Q.    And CIRB in those non-force

13        cases determines whether the officers acted

14        consistent with department policy and

15        training, right?

16            A.    Yes.

17            Q.    And that involves policy and

18        training other than policy and training

19        related to use of force, correct?

20            A.    Well, it would be all our

21        policies and -- policies, procedures, and

22        training.

23            Q.    Great.  Thank you.  Okay.  So

24        can you define for me what are proper

25        tactics?
```

1    A.    Depending on what the situation

2  was, just appropriate tactics used.

3          Q.    And appropriate tactics, does

4  that mean tactics that comply with the

5  policies and procedures of the department?

6          A.    Yes.

7          Q.    And CPD officers have a duty to

8  use appropriate or proper tactics as defined

9  by the department, right?

10          A.    Yes.  They're supposed to follow

11  all policies and procedures.

12          Q.    It's mandatory for officers to

13  follow those policies and procedures, right?

14          A.    Yes.

15          Q.    Sorry.  Yes?

16          A.    Yes.

17          Q.    And not using the proper

18  tactics, this would be a failure to perform a

19  duty as an officer, right?

20                I can ask it differently.  You

21  looked -- it sounded like it came out a

22  little confusing.

23                If an officer fails to use

24  proper tactics, as defined by the department,

25  does that constitute a failure by that

 1    officer to perform his duties?

 2         A.    That would constitute a failure

 3    to follow policies and procedures, if that's

 4    what you mean.

 5         Q.    And following policies and

 6    procedures is a duty of an officer, right?

 7         A.    Yes.

 8         Q.    And failing to follow the

 9    training that the department provides would

10    also be a failure to fulfill an officer's

11    duties, right?

12         A.    Yes.

13         Q.    And in terms of the tactics

14    taught by the department in its training,

15    those are tactics determined by the

16    department to be proper, right?

17         A.    Yes.

18         Q.    Okay.  Is it fair to say that

19    CPD officers driving their police cruisers

20    requires reactive decisions?

21         A.    I'm not quite following what

22    you -- what you mean.  I mean, they better be

23    proactive and reactive.

24         Q.    In terms of being proactive and

25    reactive, is it fair to say that an officer's

1    conduct during a pursuit must be -- must be

2    executed in compliance with the officer's

3    training from the department?

4              A.    Yes.

5              Q.    And must be executed in

6    compliance with the department's policies and

7    procedures?

8              A.    Yes.

9              Q.    And is it fair to say that when

10   a CPD officer initiates or continues a

11   pursuit, that those actions are governed by

12   the specific directions and rules contained

13   in CPD's policies?

14             A.    Yes.

15        (Exhibit 1 was referenced.)

16   BY MS. GREENE:

17             Q.    Okay.  So I would like to show

18   you what was previously marked as Plaintiffs'

19   Exhibit 1.  And are you familiar with this

20   document?

21             A.    The emergency operation of

22   vehicles, yes.

23             Q.    So this is CPD Policy 12.535,

24   Emergency Operation of Police Vehicles and

25   Pursuit Driving, correct?

1      A.    Yes.

2           Q.    This is the version that was

3      effective in 2020 during the pursuit at issue

4      here, right?

5           A.    Unless there's -- unless there

6      was one that was revised prior to that, but I

7      don't know.

8                 MS. GREENE:  Counsel, will you

9      stipulate to that?

10                MR. COWAN:  No.  I don't know

11     that I can stipulate to that, but you can ask

12     her about this document.

13                MS. GREENE:  All right.  I'll

14     ask the 30(b)(6) witness.

15     BY MS. GREENE:

16          Q.    To the extent that this version

17     of the policy was effective in August of

18     2020, this would have been then the policy

19     that applied to police pursuits --

20          A.    Yes.

21          Q.    -- correct?

22          A.    Yes.

23          Q.    And it's mandatory that CPD

24     officers comply with all aspects of this

25     policy when engaged in pursuits, right?

 1          A.    Yes.

 2          Q.    And the policy contains

 3   mandatory procedures for pursuit driving?

 4          A.    Yes.

 5          Q.    The policy contains specific

 6   directives dictating how pursuit driving may

 7   or may not occur, right?

 8          A.    Yes.

 9          Q.    And there's no part of this

10   policy that's not mandatory for CPD officers

11   to follow, correct?

12          A.    Well, there's always exigent

13   circumstances.  I mean, policy and procedure

14   can't govern every little thing, and so we

15   call it exigent circumstance if something

16   happens.

17          Q.    Okay.  So notwithstanding the

18   presence of exigent circumstances, then

19   there's no part of this policy that's not

20   mandatory for officers --

21          A.    Right.

22          Q.    -- to follow?  And you said

23   right?

24          A.    Yes.

25          Q.    Okay.  Can you explain to me

1    what are exigent circumstances?

2            A.    If say our policy says that only

3    two cars are allowed in a pursuit, but that

4    the circumstances are such that -- like

5    circumstances that would warrant more cause

6    in the pursuit, then we would allow it.

7            Q.    Okay.  And when you say "we" --

8            A.    Well, the -- it would be up to

9    the -- the pursuit OIC.  They -- they would

10    have to get permission to allow that.

11            Q.    Okay.  If you would flip to

12    page 6 of this policy, which is stamped at

13    the bottom GB 31, when you said a moment ago

14    the -- the supervisor or the OIC the

15    responsibilities of that person are addressed

16    in the policy here at Sections 3 and 4 on

17    this page; is that right?

18            A.    Number 4 is Supervisory

19    Responsibilities.  Is that what you're

20    looking at?

21            Q.    Well, sure.  Number 4,

22    Supervisory Responsibilities reflects the

23    responsibilities of that supervisor you just

24    referenced, right?

25            A.    Yes.

1    Q.    Going up above that to

2    Section 3 --

3        A.    Uh-huh.

4    Q.    -- the EEC (sic)

5    Responsibilities, what's the EEC?

6        A.    Emergency Communications Center.

7    Q.    And in this Section 3 here it

8    references a dispatcher as that person in the

9    EEC?

10        A.    Yeah, the dispatcher works at

11    the EEC.  It's the 911 call center.

12    Q.    And then 3(a) says, The

13    dispatcher will immediately notify the

14    initiating pursuit unit's supervisor, right?

15        A.    Yes.

16    Q.    And so that's the supervisor

17    within the unit of the officer who is

18    engaging in the pursuit, right?

19        A.    Well, not necessarily or just

20    one that's in -- like, in the area that --

21    just a supervisor.  It might not necessarily

22    be in their direct chain of command, you

23    know, it just might be a supervisor that's

24    there --

25    Q.    Okay.  So --

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    -- present on the air when the
 2      pursuit is happening, if that makes sense.
 3              Q.    Yes.  That supervisor, whoever
 4      they may be --
 5              A.    Uh-huh.
 6              Q.    -- they are then supervising the
 7      pursuit within the CPD chain of command even
 8      if they're not the direct supervisor, right?
 9              A.    Yes.
10              Q.    Okay.  And so that supervision
11      then, notwithstanding the unit assignment of
12      the officer who's doing the pursuit, that
13      supervision exists within the chain of
14      command of the police department?
15              A.    Yes.
16              Q.    Okay.  And -- okay.  So --
17      all right.  We can set this aside for now,
18      and we'll come back to that in a bit.
19                    But let me ask -- I'm gonna ask
20      something a little bit more general.  I'm
21      gonna walk back just a little bit further.
22                    We are gonna mark this as
23      Exhibit -- what are we on 14?  Is that right?
24                    THE COURT REPORTER:  Yes.
25              (Exhibit 14 was marked.)
```

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 79 of 217 - Page
ID#: 3581
Deposition of Captain Amanda Caton                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1                    MS. GREENE:  Okay.  Here's
 2   Exhibit 14.  And then can you pass these
 3   down?  Thanks, guys.
 4   BY MS. GREENE:
 5          Q.    Okay.  So I am showing what
 6   we've marked as Exhibit 14.  Are you familiar
 7   with this document?
 8          A.    I have not seen it in a long,
 9   long time, but, yes.
10          Q.    Okay.  What is it, if you
11   recall?
12          A.    I think it's part -- the first
13   section of our procedure manual.
14          Q.    I believe that's correct.
15          A.    Yes.
16          Q.    So this Exhibit 14, it's titled
17   10.000 --
18          A.    Uh-huh.
19          Q.    -- Procedure Manual and Other
20   Binding Written Directives, right?
21          A.    Uh-huh.
22          Q.    And this is the very first
23   policy of the CPD's Policy and Procedure
24   Manual?
25          A.    Yes.
```

1        Q.    And it states that its purpose

2  relating to the manual and other binding

3  written directives is to provide an official

4  guide outlining the way to do many of the

5  routine operations which confront the

6  Cincinnati Police Department, right?

7        A.    Yes.

8        Q.    And the purpose of the manual

9  and other binding directives, according to

10  this specific policy also is to provide

11  efficient methods and high standards for

12  procedures, rules, regulations, policies, and

13  directives recognized as official policy and

14  applied on a department-wide basis, right?

15        A.    Yes.

16        Q.    And then down at the Procedure

17  section, the policy defines Department

18  Binding Directives, right?

19        A.    Yes.

20        Q.    And this list of various

21  documents and document types here, those

22  pursuant to this policy are binding

23  directives on all members of the department,

24  right?

25        A.    Yes.

1    Q.    And what does it mean to be a

2    binding directive?

3         A.    Directives that the department

4    members must follow.

5         Q.    Is there a duty to follow them?

6         A.    Yes.

7         Q.    All right.  We can set that

8    aside.  All right.  I want to go back to your

9    work in the CIRB here.

10         I want to show you one more

11    document before we get further into your

12    report, however, this is the gonna be marked

13    as Exhibit --

14         THE COURT REPORTER:  Fifteen.

15         MS. GREENE:  Fifteen.  Thank

16    you.  I should remember now, but apparently

17    it's not sticking in my brain today.

18    (Exhibit 15 was marked.)

19    BY MS. GREENE:

20         Q.    I'm giving you a copy of

21    Exhibit 15.

22         MS. GREENE:  For counsel, we'll

23    e-mail this one to you, too.  It's really

24    long.  And just for the record to note, this

25    document on its face is titled Investigations

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 82 of 217 - Page
ID#: 3584
Deposition of Captain Amanda Caton                        Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    Manual, Cincinnati Police Department, and the
 2    Bates stamps applied here are City 001357
 3    through 1470.
 4              I'll just note for the record
 5    that this is one of the documents that we've
 6    requested be produced in an unredacted
 7    format.  The version I'm marking today
 8    currently contains a large number of
 9    redactions.  But just for the purposes of
10    some limited conversation today, we'll use
11    this version.
12    BY MS. GREENE:
13        Q.    Captain, are you familiar with
14    this document in front of you?
15        A.    Yes.
16        Q.    Okay.  And what is it?
17        A.    It's our Investigations Manual,
18    just the guidelines for officers to conduct
19    investigations.  I admit I haven't read it
20    since I studied for promotion, so...
21        Q.    So it's been a few years?
22        A.    Yes.
23        Q.    Well, I don't have any real
24    specific questions for you about it --
25        A.    Okay.
```

1    Q.    -- so don't worry about that.

2    In terms of the manual policies contained

3    here for investigations --

4         A.    Yes.

5         Q.    -- do they also pertain to

6    investigations conducted by IIS?

7         A.    I think there is a section in

8    there for IIS just designating what kind

9    of -- if I remember, what kind of

10   investigations IIS will conduct, I think.  I

11   know it mentions IIS somewhere, but I'd have

12   to look.

13        Q.    Okay.  And that would be

14   referenced in the Table of Contents likely or

15   if not by some section heading within the

16   policy manual, right?

17        A.    Actually, it's here on page 8.

18        Q.    Page 8?

19        A.    Yeah.

20        Q.    And then are there additional

21   portions beyond this page 8 section that

22   reflect IIS-related investigations?

23        A.    I don't remember.

24        Q.    Okay.  In terms of the general

25   instructions about how to conduct

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 84 of 217 - Page
ID#: 3586
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    investigations in this manual even if not

2    written specifically for IIS, do they also

3    govern the tactics used by IIS to engage an

4    investigation?

5         A.    I wouldn't -- I don't know.  I

6    wouldn't -- I don't quite know what you mean.

7         Q.    Sure.

8         A.    You mean the tactics used by

9    IIS.

10        Q.    So let's go back to the Table of

11   Contents, if you would, which starts on the

12   page stamped at the bottom 1358.

13        A.    Yes.

14        Q.    So, for example, here section

15   titled Control and Termination of

16   Investigation, Investigator's

17   Responsibilities, Records Management -- going

18   onto the next page -- Interviewing

19   Complainant or Witness, et cetera, these

20   types of tactics used in investigations,

21   would those tactics also apply to the way IIS

22   is supposed to conduct its investigations?

23        A.    I would say IIS investigations

24   are investigations, so it probably falls

25   under this umbrella.

1    Q.    Okay.  And then if you'll flip

2    with me to page 16 of this manual, there's a

3    section here titled Administrative

4    Investigations.  Do you see that?

5    A.    Yes.

6    Q.    And this section pertains to

7    IIS, or Internal Investigations, right?

8    A.    Okay.  Yes.

9    Q.    And for the record, that section

10   is redacted at this point in time and --

11   okay.  All right.

12        Well, for now the tactics

13   generally prescribed by this Investigations

14   Manual, they apply to investigations

15   conducted throughout the department, correct?

16   A.    Well, IIS are administrative

17   investigations, so it's not necessarily, but

18   I don't, you know -- but as far as

19   interviewing and the way you interview, yes.

20   Q.    So interviewing, using

21   informants, investigator responsibilities,

22   control and termination of investigation,

23   records management, and standard case

24   preparation, dealing with suspects, I mean,

25   et cetera, right, there are a number of --

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 86 of 217 - Page
ID#: 3588
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    A.    Whatever is applicable to an

2    administrative investigation.  And some might

3    be -- and I don't -- I don't remember what

4    the specific tactics are, but some may only

5    be applicable to criminal investigations.

6        Q.    Okay.

7    A.    Yeah.

8        Q.    All right.  When you were in the

9    Internal Investigations Section --

10    A.    Yes.

11        Q.    -- were there any specific

12    provisions in this Investigations Manual that

13    you did not believe applied to the conduct of

14    the officers you supervised in that section

15    when they investigated?

16    A.    Say that again.  If I --

17        Q.    Were there any sections of this

18    Investigations Manual that you did not

19    believe applied to the work of your

20    subordinate officers in the Internal Section,

21    Investigation Section?

22    A.    I wouldn't think so.

23        MS. GREENE:  Okay.  All right.

24    So what time is it?  Should we take a quick

25    break?  We've been going for a little while.

```
 1              MR. COWAN:  That's fine.
 2              MS. GREENE:  All right.  Let's
 3      just take a couple minutes off the record for
 4      a bathroom break.  Off the record.
 5         (Off the record.)
 6      BY MS. GREENE:
 7         Q.    Okay.  We are recording and
 8      we're back on the record.  Captain Caton, if
 9      you could pull Exhibit 1, the pursuit policy
10      12.535?
11         A.    Yes.
12         Q.    Thank you.  When the CIRB
13      considered this August 7th, 2020, pursuit,
14      this policy in Exhibit 1, 12.535, the pursuit
15      policy, did the CIRB consider whether the
16      officers in the pursuit complied with this
17      policy?
18         A.    Yes.
19         Q.    All right.  Let's look at --
20      well, strike that.
21              Before I move on, are there any
22      other policies that the CIRB looked at to
23      determine officer compliance in this case?
24         A.    I don't remember, but I'm --
25      this is probably the only one.  None of those
```

1    come to mind that would be relevant.

2        Q.    If there were others -- sorry,

3    go ahead.

4        A.    In this case, yeah.

5        Q.    If there were others that the

6    CIRB looked at, would they be noted in your

7    report?

8        A.    I did not have a section in

9    there as to what we looked at.  So, I mean, I

10   didn't include a section as to what we looked

11   at because this one is not in it, so...

12       Q.    This one meaning the pursuit

13   policy?

14       A.    The pursuit policy, yes.

15       Q.    Okay.  But in any case, the CIRB

16   did consider the pursuit policy?

17       A.    Yes.

18       Q.    All right.  So going back to

19   your report then, which is marked as

20   Exhibit 9, let's talk about that in some more

21   detail.  Looking, again, on the second page

22   in the Incident Description section --

23       A.    Yes.

24       Q.    -- your first non-italicized

25   paragraph starts, On August 7th, members of

1   the Gang Unit, Organized Crime Investigative

2   Squad, or OCIS, and the Bureau of Alcohol,

3   Tobacco, Firearms and Explosives, or ATF,

4   established physical and electronic

5   surveillance of Mr. Mason Meyer.  Do you see

6   that?

7        A.    Yes.

8        Q.    So we -- well, strike that.

9              The Gang Unit and the Organized

10  Crime Investigative Squad, or OCIS, those are

11  the units of the CPD, correct?

12       A.    The Gang Unit is the Organized

13  Crime Investigative Squad.  I am not sure

14  whether there's outside, like, federal agents

15  in that or not.  I don't know.

16       Q.    What is OCIS?

17       A.    What do you mean what is it?

18       Q.    Yeah.  What purpose does that

19  particular squad serve?

20       A.    I have never been in that

21  bureau.  I've never been in that unit, so all

22  I can look at is the title Organized Crime.

23       Q.    Have you heard of it for writing

24  it in your report here?

25       A.    Yes.  I think it's in our, what

1  do we call that, the table organization

2  chart.

3      Q.    Okay.  So you've seen it in the

4  org chart?

5      A.    Yeah.

6      Q.    Do you have any knowledge of the

7  function of the squad?

8      A.    No.

9      Q.    Do you have any knowledge of who

10  its members are?

11      A.    No.

12      Q.    Do you have any knowledge of how

13  officers come to be assigned to it?

14      A.    All I know is that for any unit,

15  a specialized unit, they have to -- if

16  there's an opening, officers have to apply.

17      Q.    And that's CPD officers have to

18  apply?

19      A.    Yes.

20      Q.    Okay.  And -- all right.  So

21  with respect to the law enforcement

22  activities occurring on August 7th, 2020, in

23  relation to Mason Meyer --

24      A.    Yes.

25      Q.    -- the CPD was involved in an

1    assistive capacity to other agencies, right?

2         A.    Yes.

3         Q.    And the CPD was going to assist

4    with a search for Mr. Meyer; is that correct?

5         A.    Yes.

6         Q.    And the CPD specifically had the

7    responsibility to undertake any pursuit, if

8    necessary, of Mr. Meyer, right?

9         A.    I don't -- I wasn't in the

10   meeting, so I'm not sure what was discussed.

11        Q.    In your review of this matter,

12   was that your understanding?

13        A.    It was -- it was in the city, so

14   it would have been our units.

15        Q.    Meaning CPD units?

16        A.    Yes.

17        Q.    And CPD units conducting the

18   pursuit?

19        A.    Yes.

20        Q.    And conducting that pursuit

21   under the CPD chain of command?

22        A.    Yes.

23        Q.    And conducting that pursuit

24   pursuant to CPD policy, right?

25        A.    Yes.

```
 1              Q.    And under the control of the
 2    Cincinnati Police Department, correct?
 3              A.    Correct.
 4              Q.    Okay.  So this operation
 5    involved more than one law enforcement agency
 6    beyond CPD, right?
 7              A.    Yes.
 8              Q.    And were you aware, or are you
 9    aware, of any operational plans associated
10    with this particular investigation?
11              A.    No.
12              Q.    Did you review any as part of
13    your CIRB function?
14              A.    No.
15              Q.    You only reviewed CPD documents
16    for this CIRB?
17              A.    Yes.  We were reviewing the
18    pursuit, not the investigation.
19              Q.    Okay.  And the review of the
20    pursuit -- strike that.
21                    In pursuits under CPD policy the
22    OIC designated in the pursuit policy that we
23    talked about earlier, they're in the CPD
24    chain of command?
25              A.    Yes.
```

```
 1            Q.    And that was true in this case

 2     as well?

 3            A.    Yes.

 4            Q.    Okay.  So for the summary of

 5     facts that is contained in your report, this

 6     is a summary of information contained in the

 7     IIS report, Exhibit 3, right?

 8            A.    Correct.

 9            Q.    Let's turn to page 4 of your

10     report, which is stamped at the bottom 1014,

11     and let me ask generally just a question

12     about the factual summary you provided in

13     your report.

14                  Was there information that you

15     wished you had but didn't have available to

16     you for any reason when you were writing up

17     this summary?

18            A.    I don't remember, but I wouldn't

19     think so.

20            Q.    If that were the case, would you

21     have noted it in your report?

22            A.    If -- if there was other

23     information that we wished we would have had?

24            Q.    Yes.

25            A.    If -- if there was other
```

1   information that we needed, we would have

2   gone and got it.

3       Q.    Okay.  So the CIRB convenes on

4   April 19th, 2021, with you as the coordinator

5   and discussed the facts and issues of this

6   particular pursuit?

7       A.    Yes.

8       Q.    Please describe for me the

9   discussion during that meeting.

10      A.    Again, it was in April of '21.

11  I do not remember the discussion at all.  All

12  I remember is what is in the report.

13      Q.    Is there a recording of those

14  meetings taken?

15      A.    No.

16      Q.    Are there notes of any kind

17  during the meeting that was taken?

18      A.    I don't remember if I took notes

19  or not.

20      Q.    Okay.  Do you know if any of the

21  other CIRB members took notes?

22      A.    No, I don't know.

23      Q.    Is there any practice to retain

24  or preserve those notes if they are taken?

25      A.    No.

```
 1              Q.    Did you personally have a
 2    practice of keeping notes from these
 3    meetings?
 4              A.    Only to write the report.
 5              Q.    And then what would you do with
 6    them after the report was done?
 7              A.    They would be in my folder that
 8    I kept for doing these board reviews.
 9              Q.    And so you stuck them in the
10    file for the CIRB for that particular case?
11              A.    Yes.
12              Q.    And that was your general
13    practice?
14              A.    Yes.
15              Q.    And so if you did take notes in
16    this case, they would have been placed into
17    the file for this case?
18              A.    Probably, yes, but I don't
19    remember.
20              Q.    And are you aware of any
21    destruction, schedule, or practice for notes
22    of that type?
23              A.    No.
24              Q.    Would you expect if you went
25    back to that file today, that the notes would
```

1      be there?

2              A.    I don't know.  I've moved quite

3      a few times since.

4              Q.    While you were the captain in

5      the Inspections section, would you have

6      expected that the notes you took during any

7      CIRB convening would have remained in that

8      file?

9              A.    Yes.

10             Q.    And are you aware of any reason

11     why a subsequent captain or other supervisor

12     over that particular section would have

13     destroyed any such notes?

14             A.    That was my personal file, so it

15     would have come with me.

16             Q.    Oh, it would have come with you

17     to your next role?

18             A.    Yes.

19             Q.    Do you still have a file related

20     to the CIRB?

21             A.    I don't know.

22             Q.    Would you be able to go and

23     check?  Not right now, but at some point in

24     the near future?

25             A.    Yes.

```
 1              Q.    Okay.  And would you be able to

 2     produce the contents of that to counsel for

 3     the defendants?

 4              A.    Yes.

 5              Q.    Okay.  All right.  So as you sit

 6     here today, you don't recall the discussion

 7     during that CIRB for this case?

 8              A.    No.

 9              Q.    Do you know how long the meeting

10     was?

11              A.    I don't remember.

12              Q.    Over an hour?

13              A.    We didn't put the time in this

14     when we met, so it would probably be done

15     before lunch was usually...

16              Q.    What was your customary starting

17     time?

18              A.    It just -- it just depended on

19     when everyone could get together.  It could

20     have been 10 or 10:30.  I don't know.

21              Q.    Okay.  So fair to say one- or

22     two-hour meeting?

23              A.    One to two hours, I would say to

24     be fair.

25              Q.    And does anything at all about
```

1    that meeting at all stand out in your mind?

2          A.    We did have another one.  I

3    think we -- I think we discussed another

4    incident, too --

5          Q.    Okay.

6          A.    -- during the same time.

7          Q.    Okay.

8          A.    If that's -- that just came to

9    me, but, yeah.

10          Q.    All right.  What else do you

11    recall about the meeting?

12          A.    Nothing else.

13          Q.    Other than what's memorialized

14    in your report?

15          A.    Correct.

16          Q.    Okay.  Well, then let's look at

17    your report here.  In the section titled

18    Tactics -- so, first, you have a sentence

19    that reads, The CIRB determined the decision

20    to stop the vehicle and initially engage in

21    the pursuit was proper?

22          A.    Yes.

23          Q.    What's the basis for that

24    conclusion?

25          A.    The subject that they're looking

```
 1   at, he had warrants.  The information that

 2   CPD had on him and the information from the

 3   outside agencies.

 4          Q.    So that information available,

 5   is that information you were aware of because

 6   it was summarized in the IIS, Exhibit 3?

 7          A.    Correct.

 8          Q.    Is there any information outside

 9   of what was in IIS, Exhibit 3, that

10   contributed to this particular conclusion?

11          A.    No.

12          Q.    And so that information formed

13   the legitimate basis to stop or attempt to

14   stop Mason Meyer's vehicle; is that right?

15          A.    Yes.

16          Q.    And you said that information

17   also formed the basis of the finding that it

18   was appropriate to initially engage in the

19   pursuit; is that right?

20          A.    Yes.

21          Q.    And why was that?

22          A.    Because they had a reason to

23   stop him.  They had a legitimate reason to

24   stop him; therefore, they had a legitimate

25   reason to engage in the pursuit.
```

```
 1              Q.    Okay.  Anything else?

 2              A.    No.

 3              Q.    The second paragraph reads,

 4      However, Sergeant Lanter's, Officer Thomas'

 5      and Specialist Harper's tactics and judgement

 6      after the initial engagement of the pursuit

 7      come into question.  Can you explain that,

 8      please?

 9              A.    The fact that they, as

10      identified in the IIS report, that they

11      violated parts of the pursuit procedure.

12              Q.    Okay.  So the IIS finding

13      that the pursuit policy that was violated,

14      that's the basis of this finding that after

15      the initial beginning of the pursuit that

16      then there were problems; is that right?

17              A.    Yes.

18              Q.    Okay.  And so anything other

19      than the finding of policy violations by the

20      IIS, that contributed to that conclusion of

21      the CIRB?

22              A.    And our review of the pursuit

23      pertaining to our pursuit violation -- our

24      pursuit emergency operation pursuit driving

25      procedure.
```

```
 1        Q.    Okay.  So the CIRB independently
 2   considered the pursuit policy in light of the
 3   factual information available --
 4        A.    Yes.
 5        Q.    -- to the board?
 6        A.    Yes.
 7        Q.    And that also contributed to
 8   this finding about the continuation of the
 9   pursuit?
10        A.    Yes.
11        Q.    Okay.  Now, next you write, The
12   pursuit took place on a Friday afternoon at
13   approximately 4:30 p.m.  Traffic conditions
14   were heavy.  From the outset of the pursuit,
15   Mr. Meyer, a known suspect, was driving in
16   erratic -- in an erratic manner.
17              What is the relevance of that
18   information to your or the CIRB's findings
19   here?
20        A.    Factors to consider in a pursuit
21   are outlined in our pursuit policy.
22        Q.    And so we're looking now at
23   Exhibit 1, the pursuit policy 12.535, right?
24        A.    Yes.
25        Q.    And when you say "factors to
```

```
 1      consider," are you talking about the factors

 2      listed starting on page 2 of that policy onto

 3      page 3 at the bullet pointed section?

 4              A.    Yes.

 5              Q.    Starting with, Degree of risk

 6      created by pursuit to others and ending with

 7      whether the identity of the suspect is known

 8      to the point where later apprehension is

 9      possible?

10              A.    Yes.  Those and just the pursuit

11      driving.

12              Q.    The pursuit driving, Section D

13      of the procedure?

14              A.    Yeah, the whole procedure.

15      Yeah, the whole procedure.

16              Q.    Okay.  Meaning the entirety of

17      this document, Exhibit 1?

18              A.    Yes.

19              Q.    Okay.  All right.  So in terms

20      of factors present here, this last sentence

21      you wrote, Mr. Meyer, a known suspect, what's

22      the important of that here?

23              A.    What's the what of that?

24              Q.    What's the importance of that?

25              A.    One of the factors is whether
```

1    the identity of the suspect is known to the

2    point that lead to apprehension is possible.

3         Q.    So in this case, Mr. Meyer's

4    identity was known to the point where later

5    apprehension of him was possible?

6         A.    His -- his identity was known,

7    so --

8         Q.    So it would have been --

9         A.    -- I can't speak to the latter

10   part, who knows, you know, he could have been

11   caught later or not.

12        Q.    In terms of your understanding

13   of the pursuit policy in this -- this factor

14   to consider whether the identity of the

15   suspect is known to the point that later

16   apprehension is possible, what does that mean

17   in your understanding?

18        A.    That his -- they knew who he is.

19   And if they know who he is, can they get him

20   at a later date?

21        Q.    Or try to?

22        A.    Or try to, yeah.

23        Q.    And in this particular case,

24   that was the circumstance.  They knew who

25   Meyer was and they could get or try to get

1  him at a later date?

2         A.    I don't know about this

3  particular case, but I just do know that the

4  identity was known.

5         Q.    Were you aware --

6         A.    So that's part of it.

7         Q.    Sure.  In your review of this

8  matter, and the information available to you

9  in the CIRB, was there any indication that it

10  would not be possible on a later date to

11  attempt to apprehend or to apprehend

12  Mr. Meyer?

13         A.    I don't know.

14         Q.    You don't recall anything like

15  that, do you?

16         A.    No.

17         Q.    Do you recall having any

18  information at all that would establish that

19  arresting Mr. Meyer on this specific date,

20  August 7th, 2020, was necessary?

21         A.    I don't know.

22         Q.    You don't recall having any

23  information to that effect, do you?

24         A.    Uh-uh.

25         Q.    That's a no?

1       A.    No.

2       Q.    And in any of your conversations

3   with anybody about this matter over the

4   course of time that you were working on it or

5   afterward or before, was there ever any

6   information provided to you that suggested

7   that it was absolutely necessary to apprehend

8   Mr. Meyer on August 7th, 2020?

9       A.    The only information we had was

10  in the IIS at that summary of Mr. Meyer.

11      Q.    And in your understanding of

12  that information from IIS, was there any

13  indication that Meyer had to be apprehended

14  on August 7th?

15      A.    I don't know.  I don't know.

16      Q.    In your review of the documents

17  in preparation for your deposition, did you

18  see anything that indicated to you that he

19  had to be apprehended on August 7th?

20      A.    It was just in reviewing this,

21  the IIS report, just in the IIS summary that

22  listed all his past behaviors and his

23  warrants.  And that was all we had on him.

24      Q.    And so was there any

25  information --

1    A.    And that was he was suicidal and

2    homicidal.  I think they put that in here,

3    too.

4    Q.    Was there any information

5    conveyed to you at any time that established

6    for you that Mr. Meyer had to be taken into

7    custody on August 7th, 2020, and that no

8    other date would be suitable?

9    A.    Was any information given to the

10    board about that saying that, that he had to

11    be taken into custody; is that what you're

12    saying?

13    Q.    You, was the --

14    A.    Uh-huh.

15    Q.    -- you, not just the board,

16    but...

17    A.    No.

18    Q.    Okay.  And was there any

19    information that you're aware of available to

20    the board that established that he had to be

21    taken into custody on the 7th and that no

22    other date was suitable?

23    A.    No.

24    Q.    In terms of -- going back to

25    your report, Exhibit 9, looking at the

```
 1        Tactics section again, you note in that

 2        paragraph we were reviewing a moment ago that

 3        the pursuit was on a Friday afternoon about

 4        4:30 p.m., right?

 5              A.    Yes.

 6              Q.    Traffic was heavy?

 7              A.    Yes.

 8              Q.    And it was rush hour on a

 9        Friday, right?

10              A.    Yes.

11              Q.    Beautiful summer day, right?

12              A.    Yes.

13              Q.    Lots of pedestrian traffic

14        generally on a day like that?

15              A.    Yes.

16              Q.    And in your review of this

17        particular case, there were, in fact, heavy

18        pedestrian presences in many of the areas the

19        pursuit traveled through, right?

20              A.    Pedestrian and vehicle, yes.

21              Q.    And so the pursuit when

22        traveling through those pedestrian-heavy

23        areas, put the pedestrians at risk, right?

24              A.    Can you rephrase that?

25              Q.    Yes.  When the pursuit traveled
```

1    through the pedestrian-heavy areas, did it

2    place those pedestrians at risk of injury?

3         A.    That's kind of a hard question

4    to answer because up until the final -- you

5    know, when they hit the -- Mason Meyer hit

6    the people, no one else had been struck.

7              I believe, maybe -- if I

8    remember a correctly, a car had been

9    sideswiped by Mason Meyer.  So all I have is

10   that, what's in the report, that the traffic

11   conditions were heavy.

12        Q.    Okay.  In your experience as an

13   officer, as a captain in the department, is

14   it your view that pursuits through

15   pedestrian-heavy areas pose a risk of

16   potential injury to pedestrians in the area?

17        A.    Yes.

18        Q.    And as a captain in the

19   department with all of your experience, what

20   is your view about whether when pursuits

21   should occur or continue in pedestrian-heavy

22   areas?

23        A.    It is on a case-by-case basis.

24   There's no general answer to that, so you'd

25   have to look at each pursuit.

```
 1            Q.    Is it fair to say that in a
 2    pursuit where the driving of the fleeing
 3    vehicle and/or of the pursuing police
 4    vehicles create circumstances that could
 5    cause any kind of collision with a pedestrian
 6    that that would present a risk of injury to
 7    the pedestrian?
 8                  MR. COWAN:  Objection.
 9            Q.    Go ahead.
10            A.    Well, I mean, that -- that would
11    be speculating.
12            Q.    Okay.
13            A.    Like I said, it depends on
14    the -- the pursuit, the actual pursuit.
15            Q.    All right.  Talk to me about
16    traffic conditions and why those are relevant
17    here.
18            A.    There's more potential for
19    something to happen if there's more cars out
20    on the road.
21            Q.    And, in fact, there was a
22    collision in this pursuit prior to the
23    collision that ended the life of the Laibles
24    and seriously injured the Kleins, right?
25            A.    Yes.
```

1    Q.    During the course of a pursuit

2    if a collision, even if not fatal occurs,

3    what do CPD practices require of an officer

4    who is engaged in a pursuit?

5         A.    Say that again, if --

6         Q.    During the course of a pursuit

7    by a CPD officer --

8         A.    Uh-huh.

9         Q.    -- following a suspect vehicle,

10   if a collision occurs in the course of that

11   pursuit, what are the policies and procedures

12   the department require the officer to do in

13   the aftermath of that while the pursuit is

14   occurring?

15        A.    If -- if it's -- if it's part of

16   the pursuit you mean, as --

17        Q.    I just mean if one happens.

18        A.    -- like a collision of the

19   suspect car or --

20        Q.    I'm sure I can phrase it another

21   way.  That's a good point.

22             While a CPD officer is

23   undertaking a pursuit of a fleeing suspect,

24   if there was a collision involving a

25   third-party bystander, what do CPD policies

```
 1    and practices require of the pursuing
 2    officer?
 3         A.    I don't think our policies
 4    address that specifically, but any collision,
 5    we would address it and take care of it, do
 6    an -- do an accident report.  It could be by
 7    another officer that's -- it's not addressed
 8    specifically in the procedures.
 9         Q.    In terms of the practices of the
10    department concerning pursuits and is taught
11    to officers in their training, are they
12    supposed to continue a pursuit after a
13    collision occurs involving a bystander
14    vehicle?
15         A.    Again, it would depend on the
16    specific circumstances.  I know there have
17    been circumstances where that's happened and
18    it's just the collision is addressed by other
19    officers.
20         Q.    Where traffic conditions are
21    heavy, that is a circumstance that indicates
22    the pursuit should not be continued, right?
23         A.    It's one of the factors to
24    consider.
25         Q.    So that's a yes?
```

 1          A.    Well, it's subjective.  It's one

 2    of the factors to consider.

 3          Q.    **And where traffic conditions are**

 4    **heavy, that is a factor that weighs against**

 5    **the initiation or continuation of a pursuit,**

 6    **right?**

 7          A.    Yes.  Among all these -- all

 8    these factors, yes.

 9          Q.    **Okay.  You note here that from**

10    **the outset of the pursuit, Mr. Meyer, a known**

11    **suspect, was driving in an erratic manner.**

12                **Are you aware of how Mr. Meyer**

13    **was driving prior to the initiation of the**

14    **pursuit?**

15          A.    I know that he was not -- well,

16    I mean, he was in the house and then he got

17    into a car, and then I don't know what the

18    time frame -- I can't remember what the time

19    frame was between when he started driving or

20    when they initiated the pursuit.

21          Q.    **If Mr. Meyer --**

22          A.    And I can't remember whether the

23    MVR captured that or not.  I don't remember.

24          Q.    **If Mr. Meyer was driving in**

25    **compliance with traffic laws up until the**

1    point the pursuit was initiated, is that a

2    factor that should be considered by an

3    officer in determining whether or not to

4    initiate or continue a pursuit?

5         A.    If he was following traffic

6    laws?

7         Q.    Yes.

8         A.    I wouldn't necessarily say so.

9    It's not -- like, again, it's on a

10   case-by-case basis.

11        Q.    In your next paragraph, you

12   write, During the pursuit, Sergeant Lanter,

13   Officer Thomas, and Specialist Harper

14   committed operational and administrative

15   violations.

16             Sergeant Lanter authorized

17   operation of police vehicles the wrong way on

18   one-way streets while actively involved in

19   the pursuit and not acting as the pursuit

20   OIC.

21             Can you explain to me the bases

22   of those findings?

23        A.    This -- that sentence about the

24   operational/administrative violations, then

25   it goes on to say what they are, the

Deposition of Captain Amanda Caton

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    operation of the police vehicle on a one-way
 2    street, which it goes against policy unless
 3    authorized by the OIC, and then the speeds,
 4    which are against policy.
 5         Q.    How are the speeds against
 6    policy?
 7         A.    I don't remember the exact
 8    wording.
 9         Q.    And for the record, you picked
10    up Exhibit 1, pursuit policy?
11         A.    Yes.  In A-3(b), When driving in
12    emergency mode, the operator must maintain a
13    vehicle speed, which is reasonable for the
14    conditions, including, but not limited to the
15    time of day, road conditions, pedestrian and
16    vehicle traffic, and weather, the operator
17    will not exceed the posted speed limit by
18    more than 20 miles an hour.
19         Q.    Okay.  And so your sentence at
20    the end of page 4 of your report in Exhibit 9
21    about the speeds that Officer Thomas and
22    Sergeant Lanter and Specialist Harper, that
23    analysis is based on this Section 3(b) in the
24    pursuit policy that you just recited?
25         A.    Yeah.  Officer Thomas' BWC
```

1   captured his speed at 103, and

2   Specialist Harper's BWC captured his speed at

3   100 miles an hour.  Yeah, those are the --

4   the facts that we had.

5        Q.    And it was your understanding

6   that Sergeant Lanter was driving around the

7   same speeds?

8        A.    That would be speculating only

9   that Officer Thomas attempted to catch up

10  with Sergeant Lanter.

11       Q.    Okay.

12       A.    We don't know what his speeds

13  were.

14       Q.    If Thomas was attempting to

15  catch up, is it fair to say, then, that

16  Lanter was going the same or faster speed?

17       A.    I can only speak to what -- what

18  their speeds were.

19       Q.    In terms of what you recall from

20  the video, would that have been the case?

21       A.    I -- I don't know.  I haven't

22  seen the video in a long time.

23       Q.    Okay.  In any case, these speeds

24  you've listed here, Thomas going 103, Harper

25  going 100, those speeds were not, under the

1    policy, reasonable for the conditions at the

2    time; is that right?

3           A.    Well, they were -- we went more

4    on that they were over the 20 miles an hour

5    of the posted speed limit.

6           Q.    In your experience in the

7    department, were those speeds reasonable for

8    the conditions at the time?

9           A.    For -- for the location and

10   pedestrian and vehicle, no.

11          Q.    Going back to the paragraph

12   above that, you note that Sergeant Lanter

13   authorized operation of police vehicles the

14   wrong one on one-way streets while actively

15   involved in the pursuit and not acting as the

16   pursuit OIC.  Why was that important?

17          A.    Only the OIC can authorize

18   one-way.

19          Q.    Would -- would it be fair to

20   say -- well, no, strike that.

21                Was Sergeant Lanter engaging in

22   decision -- or, no, strike that, too.  Sorry.

23   Give me a second, it will come out.  I need

24   more coffee today.

25                In terms of your understanding

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        of Sergeant Lanter's conduct during this
 2        pursuit, is it accurate that he was engaging
 3        in activities that were reserved for the OIC
 4        of the pursuit?
 5             A.   Yes, that was one of the
 6        findings by Internal.
 7             Q.   And you and the CIRB agreed with
 8        that finding?
 9             A.   Yes.
10             Q.   And so was he effectively acting
11        as de facto supervisor of the pursuit?
12                  MR. COWAN:  Objection.
13             Q.   Go ahead.
14             A.   I don't really have an answer to
15        that, since he is a supervisor, so...
16             Q.   And what do you mean by that?
17             A.   Well, he -- he was not the OIC,
18        but he is a supervisor, so...
19             Q.   Okay.  So in this pursuit then,
20        he was acting in a supervisory role; is that
21        right?
22             A.   Yes.
23             Q.   And in that role, he was
24        engaging in actions that were meant to be
25        managed by the OIC?
```

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 118 of 217 - Page
ID#: 3620
Deposition of Captain Amanda Caton                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1      A.    Yeah, because I think at one

2   point he authorized something.  I can't

3   remember.  I have to look at the -- the

4   report again.  I have to look at the IIS

5   report.

6          Q.    If you'd like to look at the IIS

7   report, it's Exhibit 3.

8      A.    Yeah.  Yeah.  It says, The IIS

9   investigation determined Sergeant Lanter

10   authorized operation of police vehicles the

11   wrong way on a one-way street while actively

12   involved in the pursuit and not acting as the

13   pursuit OIC.

14          Q.    Okay.  So why is that a problem

15   under the department policies and procedures?

16      A.    Because in the policies and

17   procedures, only the pursuit OIC can

18   authorize that.

19          Q.    And is the purpose of an officer

20   -- or, excuse me, strike that.

21              Is the purpose of an OIC who's

22   not actively engaged in the pursuit to have

23   someone to monitor the pursuit from an

24   objective position?

25      A.    Yes, and getting the

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    information.  It says, Supervisory

2    Responsibilities, The pursuit OIC will retain

3    control and continually monitor and assess

4    the situation.

5              The pursuit OIC will direct

6    specific units in or out of the pursuit,

7    reassign primary or secondary units, set

8    posts, authorize roadblocks, and terminate

9    the pursuit.  The final decisions rests with

10   the OIC.

11        Q.    Okay.  In this specific case,

12   was there a breakdown in the chain of command

13   pursuing officers to the OIC?

14        A.    I don't know.  I don't know what

15   was going on in between.

16        Q.    Well, from your perspective in

17   reviewing the matter --

18        A.    Uh-huh.

19        Q.    -- would that be a fair

20   assessment to reach that there was a

21   breakdown in the chain of command from

22   pursuing officers to OIC?

23              MR. COWAN:  Objection, vague.

24        A.    Yeah, I'd be speculating.

25        Q.    Well, that's not what I'm asking

Deposition of Captain Amanda Caton                      Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   you to do.
 2              As the CIRB coordinator, as an
 3   officer with many years of experience both in
 4   the Inspections and the Investigation Unit,
 5   and applying your knowledge of this case and
 6   your knowledge of the policies and practices
 7   of the department, when you look at the facts
 8   here, do you see a breakdown in the command
 9   structure from the pursuing vehicles and the
10   officers involved in the pursuit to the
11   designated OIC?
12        A.   All I can speak to are the facts
13   that there was a pursuit OIC and then
14   Lieutenant Lanter were both making OIC
15   decisions.
16        Q.   And the person designated as the
17   OIC was not making those OIC decisions; is
18   that right?
19        A.   I don't know.  I can't remember
20   what he did.
21        Q.   Do you remember seeing any
22   information or evidence that suggested to you
23   that the designated OIC was making OIC-type
24   decisions during this pursuit?
25        A.   I think if I remember correctly,
```

1    he came over and identified himself as the

2    OIC.

3            Q.    And --

4            A.    I don't remember the radio

5    transmissions after that.

6            Q.    I note here that your

7    evaluation, or the CIRB's evaluation, looks

8    at Lanter, Thomas, and Harper, right?

9            A.    What?

10           Q.    Sorry.  It's in your report,

11   **Exhibit 9**, in the evaluation of the CIRB in

12   this case, the conduct evaluated --

13           A.    What page?

14           Q.    Just generally the report and

15   the findings of the report.

16           A.    Okay.

17           Q.    The CIRB in its evaluation

18   examined the conduct of Sergeant Lanter,

19   Officer Thomas, and Specialist Harper, right?

20           A.    Yes.

21           Q.    Were there any other officers or

22   department members that the CIRB considered

23   their conduct during these proceedings?

24           A.    It would have been noted in the

25   report if we had.

1    Q.    And how was the determination

2    made to limit the review to Lanter, Thomas,

3    and Harper?

4            A.    I think because they were the

5    ones engaged in the pursuit, actively in the

6    pursuit.

7            Q.    Okay.  Was it your understanding

8    that CIRB was to evaluate the conduct and

9    tactics of all officers involved in the

10    pursuit in this case?

11            A.    Again, we just went by these

12    guidelines that are laid out in our

13    use-of-force policy.

14                 The officers involved proper

15    tactics, so to us that meant that the

16    officers involved Lanter, Thomas, and Harper.

17            Q.    To the extent there were other

18    officers following Meyer's vehicle beyond

19    Lanter, Thomas, and Harper, were those

20    individuals meant to be reviewed by the CIRB

21    in this case?

22            A.    They followed them -- are you

23    saying they followed them the whole pursuit?

24    I don't remember.

25            Q.    Were you ever aware of any other

1    officers following Meyer and Lanter, Thomas,

2    and Harper in this?

3          A.    I don't remember that, yeah.

4          Q.    If there were other officers

5    involved, would it have been your

6    understanding that the CIRB was to examine

7    their tactics as well?

8                MR. COWAN:  Objection.

9          A.    Yes.

10         Q.    And is the OIC considered an

11   involved officer?

12         A.    Not -- he's not involved in the

13   actual pursuit.  He's monitoring --

14   monitoring the pursuit, so it -- yeah.

15         Q.    For the purposes of CIRB review,

16   is the OIC an officer that the CIRB would be

17   tasked with reviewing?

18         A.    We didn't review the OIC.  We

19   just reviewed the ones actively engaged in

20   the pursuit.

21         Q.    And why was that?

22         A.    I don't remember.  Like I said,

23   I only remember what's -- what's in the

24   report.

25         Q.    Okay.

1    A.    And those were the only three in

2    the report, so...

3         **Q.    Do you have any knowledge of**

4    **whether or not the OIC in this particular**

5    **matter violated any department policy or**

6    **procedures?**

7         A.    I don't have any knowledge.

8         **Q.    Okay.  Other than the OIC**

9    **actions engaged by Sergeant Lanter, right?**

10        A.    Right.

11        **Q.    Whose -- whose responsibility is**

12   **it to make the decision about which officers**

13   **are reviewed in a particular matter for CIRB?**

14        A.    I would -- I would say the whole

15   board just because the officer's involved in

16   the actual pursuit, so that's what we would

17   go by.

18        **Q.    What about the decision to**

19   **review a supervisor or not, whose**

20   **responsibility is it to make that decision?**

21        A.    That would be the board as a

22   whole looking at the incident, you know,

23   who -- who to include.

24        **Q.    Okay.  All right.  Looking back**

25   **at your discussion in your report about the**

1    speeds of Officer Thomas and Harper that you

2    recorded here --

3         A.    Uh-huh.

4         Q.    -- you referenced in the pursuit

5    policy, the Section 3(b) about not exceeding

6    the posted limit by more than 20 miles an

7    hour.  That's right, earlier today you

8    referenced that?

9         A.    Say it again.  Sorry.  I was

10   looking for what you were talking about.

11        Q.    Sorry.  I know we have a whole

12   pile of papers over here.  So let's -- let's

13   put in front of you your report and then also

14   the pursuit policy, **Exhibit 1**.

15        A.    Okay.

16        Q.    So in relation to Section 3(b),

17   you referenced earlier that the CIRB

18   considered this portion of that policy about

19   an operator not being permitted to exceed the

20   posted speed limit by more than 20 miles an

21   hour, right?

22        A.    Yes.

23        Q.    Is it the case under Cincinnati

24   Police Department policy and procedures that

25   it is never permitted to go more than

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   20 miles over the speed limit in a pursuit?
 2        A.    Say it again.  Is it -- I want
 3   to make sure I understand it.
 4        Q.    Is it accurate that Cincinnati
 5   police officers are not permitted to go more
 6   than 20 miles over the posted speed limit
 7   during any pursuit?
 8        A.    No.  I would say that's not
 9   necessarily true.  Because, again, if there's
10   exigent circumstances if an officer can
11   articulate why they go above 20 miles an hour
12   above the posted speed limit, then it would
13   be permissible.
14        Q.    Okay.  Without the exigent
15   circumstances present then, it is accurate
16   that CPD officers are not permitted to go
17   faster than 20 miles over the posted speed
18   limit during a pursuit, right?
19        A.    Correct.  If there's no exigent
20   circumstances.
21        Q.    And in that circumstance, can
22   you define what exigent circumstances are?
23        A.    If someone goes above 20 miles
24   an hour, is that what you're saying?
25        Q.    You said absent exigent
```

1    circumstances where an officer can articulate

2    why they went more than 20 miles more --

3          A.    Uh-huh.

4          Q.    -- than the posted speed, what

5    circumstances would it constitute exigent

6    circumstances permitting that type of speed?

7          A.    It would be severity of the

8    crime at hand, the reason they're pursuing.

9          Q.    Anything else?

10         A.    If it's -- if they -- if the

11   traffic conditions would -- would permit it

12   and coupled with -- with, you know, the

13   severity of the crime, the reason for the

14   pursuit.

15         Q.    And when you say "severity of

16   the crime," what do you mean?

17         A.    If it's something that we need

18   to go above 20 miles an hour to -- to catch a

19   suspect.

20         Q.    Okay.  In this case, though, the

21   CIRB determined that going over 20 miles an

22   hour over the posted speed limit was an

23   improper tactic, right?

24         A.    Yeah, IIS had that in their

25   report and we agreed with it.

1    Q.   Okay.  And in the pursuit policy

2   itself --

3    A.   Yes.

4    Q.   -- I don't see, and correct me

5   if I'm wrong, any definition explaining this

6   exigent circumstances term or concept.  Are

7   you aware of an explanation of that in this

8   particular policy?

9    A.   I don't -- no, I don't think

10   there's any.  It kind of stands on its own,

11   exigent circumstances.

12    Q.   Okay.  But there's no explicit

13   authorization or even reference to discretion

14   for officers to go greater than 20 miles an

15   hour under exigent circumstances in the

16   policy, right?

17    A.   Right.

18    Q.   Okay.  All right.  Let's turn to

19   the next page of your report, please.

20    A.   What page now, number 5?

21    Q.   Yeah.  We're on the -- the fifth

22   page, the bottom should be stamped 1015 in

23   the bottom right corner.

24    A.   Yes.

25    Q.   Okay.  And so then on this page

1    you excerpt a portion of the pursuit policy,

2    right?

3            A.    Yes.

4            Q.    And it says policy in part is

5    what you wrote at the top of that, right?

6            A.    Yes.

7            Q.    And does that mean that you're

8    putting part of the policy here, but there

9    are other parts of the policy that are also

10   relevant to your findings?

11           A.    I put in part because I'm not

12   quoting the whole procedure, just part of the

13   procedure.

14           Q.    And other parts of the procedure

15   that are not quoted in your report are also

16   relevant to the CIRB findings here, right?

17           A.    Yes, because I didn't quote

18   the -- the 20 miles an hour and things like

19   that and one-way.

20           Q.    Okay.  Let's go down to your

21   Conclusion section and there you write, The

22   CIRB determined that the protocols,

23   procedures, and training of the Cincinnati

24   Police Department are proper and recommend no

25   changes are needed to protocols, procedures,

1    and training as a result of this incident.

2                    Can you explain that to me?

3         A.    Just as it says, that our

4    protocols, procedures, and training were all

5    appropriate when it comes to pursuits.

6                    So, therefore, there was no

7    necessary changes that we -- because part of

8    our purpose is to determine whether there

9    needs to be changes to protocols, procedures,

10   and trainings.

11                   And we were determining, no,

12   there was no need to change any of those.

13        Q.    Okay.  And so then the CIRB

14   found that the policy, the pursuit policy as

15   it was written at the time, reflected

16   practices that were responsible with

17   managing -- with respect to managing risk to

18   -- to people in light of a pursuit occurring;

19   is that fair?

20                   MR. COWAN:  Objection.

21        A.    We determined that there was no

22   need to, the pursuit policy was appropriate.

23        Q.    And what does it mean that the

24   policy is appropriate?

25        A.    It sets up guidelines for a

 1    pursuit to operate in a -- in a procedural --

 2    procedurally right manner and a safe manner.

 3         Q.    Okay.  And then when you write

 4    protocols and procedures in this paragraph of

 5    your report in your conclusion, does that

 6    mean the policy, 12.535, and the policy and

 7    the procedures defined there, or does that

 8    include anything else?

 9         A.    When I write -- say that again,

10    when I write policy?

11         Q.    Sorry.  Yeah.  In your

12    conclusion paragraph --

13         A.    Yeah.

14         Q.    -- you say no changes needed to

15    protocols, procedures.

16         A.    Right.

17         Q.    My question is protocols,

18    procedures, what does that pertain to?

19         A.    Any -- any of our police

20    directives or -- or protocols.

21         Q.    Okay.  And so in this instance,

22    does that then reference Exhibit 1, the

23    pursuit policy?

24         A.    Yes.

25         Q.    It doesn't reference anything

1    else?

2         A.    Well, I mean, that would be also

3    the manuals of laws and regulations, just

4    anything that we have, any directives.

5              But for this instance, it would

6    be mainly this one that was in there because

7    that's one of our purposes to determine if

8    there needs to be any changes.  And that's

9    taken right out of the use of force, changes

10   to protocol, procedures, and training.

11        Q.    Okay.  In evaluating the

12   protocols and procedures, does the CIRB look

13   to any outside resources or agencies for

14   guidance or evaluation purposes?

15        A.    I don't think so.

16        Q.    In terms of the CIRB's review of

17   training and whether it was proper in this

18   instance, please tell me what that entailed?

19        A.    All police officers undergo

20   training in the police academy.  And once a

21   year we have to -- to keep up our OPOTA

22   certification, undergo various training.  So

23   that's what I'm referring to.

24        Q.    Okay.  And so when you evaluate

25   the training, as you described here, does

1    that mean you evaluate the training of the

2    particular officers that you are examining in

3    your report?

4          A.    All our officers have the same

5    training when it comes to pursuit, and

6    they're all guided by their pursuit policy.

7          Q.    Okay.  What are the expectations

8    in the department for officers in relation to

9    their knowledge of the policies, the manual

10   of rules and procedures of the department?

11         A.    They're expected to know them.

12         Q.    And so when you say they have

13   the same training, the academy, OPOTA,

14   continuing certification hours, annual

15   inservice, that's what you're talking about?

16         A.    Yes.

17         Q.    And did the CIRB look at the

18   training specific to Sergeant Lanter or

19   Officers Thomas or Harper in this particular

20   review?

21         A.    I don't think so.  I don't

22   remember.

23         Q.    So in reaching this finding, it

24   was based on the general training provided to

25   the department; is that right?

```
 1        A.    Yes.

 2        Q.    Okay.  And so your next

 3   paragraph then reads, The CIRB determined the

 4   officers involved have the knowledge, skills,

 5   and resources necessary to perform their

 6   duties and they have full knowledge of the

 7   department's protocols, procedures, and

 8   training.

 9              How did the CIRB come to that

10   conclusion?

11        A.    The officers involved -- because

12   our training and procedures and policies and

13   protocols are all appropriate, they have full

14   knowledge of that and they've had the

15   training.

16        Q.    Meaning from the department's

17   perspective, the policy is adequate and they

18   are -- the officers are expected to know it,

19   right?

20        A.    Yes.

21        Q.    And from the department's

22   perspective, what training did they have that

23   was appropriate?

24              And maybe I'm not really being

25   clear about that.  I'm trying to
```

1  understand -- let me ask this in a better

2  way.

3              How did the CIRB determine that

4  the officers had full knowledge of the

5  department's protocols and procedures?

6        A.    Because they've -- they've got

7  the policies that are in place and they've

8  had the training and they're expected to know

9  the policies and procedures.

10       Q.    Okay.  And in terms of the

11 officers having the knowledge, built-in

12 resources necessary to perform their duties,

13 is that based on the same circumstances?

14       A.    Yes.  Yeah, there was nothing

15 lacking in our procedures, policies, and

16 training.

17       Q.    Okay.  And so then here, as far

18 as you and CIRB were aware, the officers had

19 access to the policies that were relevant to

20 pursuit driving, right?

21       A.    Yes.

22       Q.    They had access to all of the

23 practices and procedures of the department

24 related to pursuit driving, right?

25       A.    Right.

1    Q.    And they were expected to have

2    and, in fact -- well, they're expected to

3    have full knowledge of the department

4    policies including pursuit driving during

5    their time on duty, right?

6        A.    Correct.

7        Q.    And, in fact, it's a duty of

8    officers in the department to know and

9    understand all of the policies of the

10    department, right?

11        A.    Yes.

12        Q.    And in terms of the training,

13    the academy training that the officers had,

14    was that sufficient to ensure that they

15    were -- the officers were adequately trained

16    by the department on pursuit driving?

17        A.    Yeah.    There was no -- there

18    was -- they had the adequate training.

19        Q.    Okay.

20        A.    If that's what you're asking.

21        Q.    In terms of pursuit driving

22    specifically, do you know for the department

23    when that training is offered over the course

24    of an officer's career?

25        A.    It is -- from what I know, it is

1    offered -- it's addressed in the academy.  We

2    have specific driving training.  We have --

3    if needed, we have refresher driving

4    training.

5        Q.    Okay.  And the driving training

6    that you just referenced, is that in the

7    academy or separate?

8        A.    It's in the academy.  And then

9    also we have refresher driving training, if

10   it's needed.

11       Q.    And when and how does refresher

12   driver training come to be a part of an

13   officer's experience?

14       A.    For example, if -- and it's --

15   this is in our matrix, the disciplinary

16   matrix, if an officer has a certain number of

17   on-duty auto accidents, they're required to

18   go to refresher driver training.

19       Q.    And what does the refresher

20   driver training address?

21       A.    I've never been to it, so I

22   don't know.

23       Q.    Okay.  Do you know if there's

24   curriculum associated with that?

25       A.    Pardon?

1   Q.   Is there curriculum associated

2   with that program?

3   A.   That would be the academy,

4   not -- not in my realm.

5   Q.   Okay.  All right.  So you note

6   here in your -- the Conclusion paragraph,

7   However, during this incident, the officers

8   chose to disregard the department's

9   protocols, procedure, and training, right?

10  A.   Yes.

11  Q.   And what does that mean?

12  A.   Because they had pursuit

13  violations.

14  Q.   So since the officers violated

15  the pursuit driving policy, that indicated

16  that they chose to disregard the department's

17  protocols, procedures, and training?

18  A.   Yeah.  They had full knowledge

19  of what our procedures and they had the

20  training and everything, but they still

21  committed some pursuit violations.

22  Q.   In CIRB review of officer

23  knowledge of policies, procedures, and

24  training, if there's information available of

25  the department that would suggest the

1  officers didn't have full knowledge, would

2  that be presented to you or available to you

3  as the board?

4      A.    Yes.  Yeah.

5      Q.    And in this instance, then, with

6  Sergeant Lanter, Officer Thomas,

7  Specialist Harper, there was no such

8  information or evidence, right?

9      A.    No.

10     Q.    Okay.  In the end, you have

11 Recommendations that you write stating, The

12 CIRB recommends the officers undergo

13 refresher training focusing on risk versus

14 reward, and pursuit driving.  Can you explain

15 that?

16     A.    We have a pursuit policy in

17 place, that's a guideline, and that during

18 emergency operation of a police vehicle and

19 prior to and during the pursuit officers must

20 weigh the following factors.  And then all

21 the factors are listed in my report and then

22 in the pursuit report, pursuit procedure.

23          And they -- so there's that.

24 And the -- and the part of the procedure

25 about one-way and the OIC and the speeds.

1    Q.    Okay.  And so refresher training

2    was recommended for these officers, meaning

3    Lanter, Thomas, and Harper, right?

4          A.    Correct.

5          Q.    And that's their refresher

6    driver training we just talked about a moment

7    ago?

8          A.    That -- that could have been --

9    it could be any kind of training focusing on

10   driving and the procedures.  It just --

11   training can be tailored toward a specific

12   incident by the academy.

13         Q.    I see.  So were you, the board,

14   recommending training for these three

15   officers tailored to them and the issues that

16   arose in this matter?

17         A.    Well, just -- just what I put,

18   recommends they undergo refresher training

19   focusing on risk versus reward, and pursuit

20   driving.

21         Q.    Okay.  What does that mean "risk

22   versus reward"?

23         A.    That's -- that's outlined in --

24   in this -- the part that I quoted in my

25   report.  The degree of risk created by

1    pursuit to others, officer, and suspect, and

2    then all those other factors that they have

3    to take into account when they are pursuing.

4          Q.    Okay.  And so then just to make

5    sure I understand, in the board's review of

6    these officers' conduct, the degree of risk

7    created by the pursuit to others, officer,

8    and suspect, that degree of risk was too high

9    to carry on the pursuit; is that right?

10         A.    We didn't say that.  It's not a

11   conclusion we came to because that's --

12   that's -- only the pursuing officers can

13   weigh that.  You know what I mean?

14         So it's -- they have to have

15   taken into account all these things in their

16   decision when they're pursuing.  So our

17   conclusion is only that even though they have

18   full knowledge of all this, they still made

19   pursuit violations.

20         Q.    And they had information

21   available to them in the pursuit and the

22   after pursuit that would indicate the pursuit

23   should not have been continued; is that

24   right?

25         A.    I don't -- I don't know what...

1    Q.    Let me walk this back.

2    A.    Yeah.

3    Q.    So CIRB recommends refresher

4    training for these three officers, right?

5    A.    Correct.

6    Q.    Why do they need it?

7    A.    Because even though they have

8    all the -- all the training and they know --

9    they have the knowledge and they know we have

10   our procedures in place that guide a pursuit,

11   or a pursuit to operate in those guidelines,

12   they didn't operate within those guidelines

13   because they made pursuit violations, it

14   would be a noncompliant pursuit.

15            So that's why they need that

16   refresher training to revisit our guidelines.

17   Q.    And in terms of the violations

18   of the policies and procedures that these

19   officers made, is it the case that the CIRB

20   board agreed with all the violations found by

21   IIS in its report?

22   A.    Yes.

23   Q.    Okay.  So outside of what's

24   written in your report here, are there any

25   other findings of the CIRB for these officers

1      in this particular pursuit?

2              A.    No.

3              Q.    And what happens to this report

4      once you write it and issue it on June 16th,

5      2021?

6              A.    It goes directly to the police

7      chief.  Well, I mean, I have the other board

8      members because this is a collective work,

9      I'm just the coordinator, so I author it,

10     send it to them for their review, see if they

11     have any additions, deletions, suggestion.

12             From what I can remember, no one

13     did.  I don't really remember that part,

14     but -- and then I would have given it or put

15     it in the police chief at the time,

16     Eliot Isaac's in bin.

17             And then he -- it looks like he

18     approved it.  This is his signature on the

19     bottom.  He approved it on 7/26/21.

20             Q.    Okay.  When you say "on the

21     bottom," you're talking about this fifth

22     page --

23             A.    Yes.

24             Q.    -- stamped 1015 at the bottom?

25             A.    Yes.

1    Q.    Okay.  And so did you at any

2    time before, during, or after this report

3    have any conversations with the chief about

4    this pursuit?

5         A.    No.

6         Q.    Did you at any time before,

7    during, or after this report, have

8    conversations with anyone else other than the

9    CIRB about this pursuit?

10        A.    I don't think so, just -- I

11   can't remember.

12        Q.    Okay.  And outside of the CIRB

13   convening on this matter that we already have

14   talked about --

15        A.    Uh-huh.

16        Q.    -- did you at any time have any

17   other conversations with CIRB members about

18   this pursuit?

19        A.    I don't -- I don't remember.

20        Q.    And in reviewing the pursuit

21   here, did the CIRB consider any prior

22   disciplinary history of the officers

23   involved?

24        A.    I don't think so because that

25   would have been addressed in the Internal

1    when they're making recommendations for

2    discipline.

3                    It's a progressive discipline

4    matrix, so that would have been included as

5    part of the discipline recommended.

6            Q.    Okay.  In this case, did

7    Sergeant Lanter, in terms of the supervisory

8    actions he was taking, authorize other

9    vehicles to join the pursuit?

10            A.    Was that a question?

11            Q.    Yeah.  Yeah.  In

12    Sergeant Lanter's engagement in this pursuit

13    in relation to the supervisory actions he was

14    taking that we discussed earlier, was one of

15    those authorizing other vehicles to join the

16    pursuit?

17            A.    I think so.

18            Q.    Okay.

19            A.    I can't remember who authorized

20    that.

21            Q.    Did anyone come and talk to you

22    or any other member of the CIRB that you know

23    about the findings of the CIRB at any time?

24            A.    No.

25            Q.    What happens as a result of a

1    report like yours, this **Exhibit 9**, with

2    recommendations for refresher training?

3          A.    Well, because we convened for

4    this CIRB on April 19th, '21, and then I

5    moved -- I changed assignments to Internal,

6    and I must have authored this while I was at

7    Internal, since it was during the changeover,

8    so I didn't have anything to do with it after

9    that.

10          Q.    Okay.  All right.  I want to

11    look briefly back again at **Exhibit 1**, the

12    pursuit policy.  I see you've got that in

13    front of you.  And I just have some questions

14    about the policy for you.

15                In terms of the bulleted factors

16    to consider that start on page 2 and carry

17    onto page 3, the policy requires officers to

18    consider all of these factors in deciding

19    whether to initiate or continue a pursuit,

20    right?

21          A.    Yes.

22          Q.    And that's mandatory, right?

23          A.    Yeah.  It's a guideline, yes.

24          Q.    Okay.  But it's required, it's

25    mandatory that the officers consider all

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 147 of 217 - Page
ID#: 3649
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1  these factors?

2       A.    They must consider these

3  factors.

4       Q.    And then in terms of the policy,

5  it specifically forbids officers from

6  pursuing vehicles the wrong way without

7  authorization from the OIC, right?

8       A.    Where is that?  Where are you

9  at?

10      Q.    I'm not at the moment

11 referencing a particular page, but I will --

12      A.    I know it's in there somewhere,

13 but I'd just like to see it.  Okay.  On

14 page 3.

15      Q.    Is that accurate that the

16 policy --

17      A.    Officers will not pursue

18 vehicles the wrong way on the interstate or

19 other controlled access highway, divided

20 roadways, or one-way streets unless

21 specifically authorized by the pursuit OIC.

22      Q.    And why is it necessary that the

23 OIC authorize that particular type of driving

24 tactic?

25      A.    Because he -- he has the -- he's

```
 1    the sole -- I can't remember where it says
 2    it, but he's the sole -- how do they word
 3    it -- final decisions will rest with the
 4    pursuit OIC per our procedure.
 5            Q.    Okay.  Could you go back to
 6    page 4 of this policy for me?  I want to look
 7    at Section 2 on that page.  Section 2 starts,
 8    When operating a police vehicle in the
 9    emergency mode -- pursuits are operating in
10    the emergency mode, right?
11            A.    Yes.
12            Q.    Okay.  So when an officer is
13    doing that they -- Section A, Will not
14    operate with reckless disregard for the
15    safety of citizens.  Do you see that?
16            A.    Uh-huh.  Yes.
17            Q.    Is that a -- that's a mandatory
18    provision of this policy, right?
19            A.    Yes.
20            Q.    What does that mean, to operate
21    with reckless disregard for the safety of
22    other citizens?
23            A.    Just as it says, just they will
24    not operate their police vehicle in a
25    reckless manner that could put the public at
```

```
 1    risk.

 2          Q.    And what does that mean, to

 3    operate in a reckless manner that could put

 4    the public at risk?

 5          A.    An example would be like if they

 6    have a red light and just going through the

 7    red light without stopping when there could

 8    be cars coming.

 9          Q.    Or going through a red light

10    without slowing down?

11          A.    We can go through red lights,

12    but you've got to do it with -- do so with

13    due regard.  If you can see that the

14    intersection is clear, then you can go

15    through the red light and a stop sign.

16          Q.    What other examples can you

17    think of that would constitute reckless

18    disregard for the safety of citizens in the

19    operation of a pursuit?

20          A.    Going too fast for the

21    conditions outlined with these factors.  You

22    know, it's just weighing -- again, it always

23    goes back to these factors, weighing all

24    these factors.

25          Q.    And the likelihood that a
```

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    pursuit would end with an injury to officers
 2    or bystanders, if it's likely that that's the
 3    case, would that constitute a circumstance
 4    where it would be reckless to pursue?
 5              A.    Well, this -- this particular
 6    thing is -- will not operate with reckless
 7    disregard for the safety of others.
 8                    So if -- if conditions are such
 9    that it could harm the public or the
10    officers, then, yeah, that's a factor they
11    have to consider in pursuit.
12              Q.    Are there any circumstances
13    where -- when it is likely that a pursuit
14    will end with harm to officers or bystanders
15    that is nonetheless appropriate for officers
16    to pursue a fleeing vehicle under CPD
17    policies and procedures?
18              A.    Say that first part again.
19              Q.    Yeah.  Are there any
20    circumstances where when it is known that it
21    is likely that a pursuit will end with injury
22    to officers or bystanders, that it is
23    nonetheless appropriate for officers to
24    engage in the pursuit?
25              A.    I don't think you can ever
```

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    know -- I mean, you never know what's gonna
 2    happen.  You know what I mean?  So I don't --
 3    you would never have knowledge beforehand
 4    that a pursuit is gonna end in injury.
 5         Q.   Well, I'm not asking for
 6    absolute knowledge, but I'm saying it's
 7    likely that, right?  So let me ask it maybe a
 8    little differently.
 9              If officers have information
10    that indicates to them it's likely that a
11    pursuit will end with injury to the officers
12    or bystanders, is it appropriate for the
13    officer to engage in a pursuit under the
14    department policy and procedures?
15              MR. COWAN:  Objection.
16         Q.   Go ahead.
17         A.   I wouldn't know what that
18    information would be, could possibly be that
19    they would have.  You know what I mean?
20         Q.   Well, I'm not -- I'm just saying
21    if such information was known?
22              MR. COWAN:  Same objection.
23         Q.   Go ahead.
24              MR. COWAN:  You can answer.
25         A.   Yeah.  I wouldn't -- how could
```

1    they possibly have any information.  I don't

2    know what that information would be.

3        Q.    Well, I'm not asking --

4        A.    I can't even think of an example

5    because I don't think there is any

6    information that they would know that it

7    could --

8        Q.    Sure.  Well, let me give you a

9    couple of examples.  If, for example,

10   officers undertaking a pursuit are aware that

11   the fleeing suspect has previously indicated

12   that he will get in a shoot-out with police,

13   he is homicidal, and the officers also know

14   that the fleeing vehicle has already collided

15   with other vehicles along the pursuit path,

16   does that constitute a circumstance where the

17   officers should continue the pursuit under

18   the policies and procedures of the

19   department?

20       A.    That's one of the factors, the

21   degree of risk, that they have to consider.

22       Q.    Can you explain that to me a

23   little more, like what you mean by that?

24       A.    Just like I said, all these

25   factors you consider them all, the officer

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    who's in the pursuit has to consider while

2    they're pursuing.

3         Q.    And so information that a

4    fleeing suspect would get into a shoot-out,

5    is possibly homicidal, has collided with

6    other vehicles, how do -- how does that

7    information correspond to the risk that you

8    just mentioned?

9         A.    I just don't think that if a

10   suspect is known to be homicidal or suicidal,

11   it doesn't -- I would say it doesn't

12   necessarily mean that this pursuit is gonna

13   end that way.  You know, that's all I can --

14   that's the best I can do.

15        Q.    So I'm not asking you to predict

16   the future.  I'm saying if an officer has

17   information that suggests outcomes that would

18   involve harm to officer or others and

19   those -- that information suggests such an

20   outcome is likely, then should they pursue or

21   continue pursuing under the department

22   policies and procedures?

23             MR. COWAN:  Objection.

24        Q.    Go ahead.

25        A.    I just don't get the -- you

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    know, I mean, there's no way to know.  So it
 2    doesn't really make -- that question doesn't
 3    really make sense to me.
 4            Q.    All right.  We'll come back to
 5    it.  All right.  How does the department
 6    define reckless disregard for the safety of
 7    others?
 8            A.    Reckless, is that from -- is
 9    that from -- what page was that?
10            Q.    Yeah.  Page 4 of the pursuit
11    policy, that's Section 2(a).
12            A.    I don't think it is defined
13    anywhere.  It's just --
14            Q.    Okay.
15            A.    Yeah.
16            Q.    Okay.  So I'm gonna mark another
17    exhibit.
18                  MR. COWAN:  It's almost
19    one o'clock.  Do you want to take --
20                  MS. GREENE:  Oh, yeah.  Sorry.
21    I didn't realize the time.  We can go off the
22    record and take a break.
23                  MR. COWAN:  Twenty minutes or
24    so?
25                  MS. GREENE:  Sure.  Off the
```

Deposition of Captain Amanda Caton                           Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    record.  We'll stop recording now.
 2        (Off the record.)
 3    BY MS. GREENE:
 4            Q.    Okay.  We're recording and we
 5    are back on the record.  Captain Caton, I'm
 6    gonna show you another exhibit, and I should
 7    have checked the number on this before I
 8    started.
 9                MS. GREENE:  Are we at --
10                MR. COWAN:  Sixteen.
11                MS. GREENE:  Sixteen.  Thank
12    you.
13        (Exhibit 16 was marked.)
14    BY MS. GREENE:
15            Q.    Here's Exhibit 16.
16                MS. GREENE:  There are copies
17    for all the defense folks.
18    BY MS. GREENE:
19            Q.    Okay.  And, Captain Caton, what
20    is this that we're looking at here in
21    Exhibit 16?
22            A.    I'm sorry?
23            Q.    What are we looking at?  What is
24    this?
25            A.    This is -- I do not remember
```

```
 1    this at all, but I wrote it so -- because I'm
 2    guessing it was because I was at Internal --
 3    by then in transition to Internal.
 4              Based on the Critical Incident
 5    Review Board, the police chief has ordered
 6    refresher training for the listed personnel.
 7    The training should focus on --
 8              THE COURT REPORTER:  Can you
 9    slow down.
10         A.   Sorry.  -- risk versus reward,
11    and pursuit driving.
12         Q.   So this is -- what would you
13    call this, a memo, or what?
14         A.   Yeah, we call it a Form 17.
15    That is basically a memo, so -- or because
16    Aaron Jones was the training commander, I had
17    completely forgotten that I had sent this.
18    Okay.
19              So, yeah.  So I was sending it
20    to him, letting him know because then the
21    academy would coordinate training.
22         Q.   I see.  So this is effectively
23    the written documentation of the chief's
24    order for refresher training?
25         A.   Correct.
```

1      Q.    And that was refresher training

2    for at that point in time then

3    Lieutenant Lanter, Specialist Harper, and

4    Officer Thomas, right?

5      A.    Yes.

6      Q.    Okay.  And so you wrote this

7    according to the date on your Form 17 here on

8    August 17th, 2021?

9      A.    Uh-huh.

10      Q.    So a little bit over a year

11    after the pursuit at issue had occurred,

12    right?

13      A.    Yes.  Yeah.

14      Q.    Do you know what occurred

15    between the time that you submitted your

16    report, which was in June of '21, and this

17    refresher training order coming out in August

18    of 2021?

19            MR. COWAN:  Objection.

20      A.    I have no idea, yeah.

21            MS. GREENE:  And what was the

22    objection?  Sorry.

23            MR. COWAN:  Just vagueness as

24    far as what occurred.

25    BY MS. GREENE:

Case: 2:21-cv-00102-DLB   Doc #: 151   Filed: 12/10/25   Page: 158 of 217 - Page
ID#: 3660
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    You have no knowledge about any

2    events pertaining to the review of this

3    matter in between the end of your review with

4    CIRB and this order coming out on

5    August 17th?

6         A.    No.  I just can go by -- by the

7    dates that he signed -- Chief Isaac signed

8    off on it on 7/26/21.  It would have made its

9    way back to me, I think.  And then in August,

10   I wrote this.

11        Q.    Okay.  And so you're

12   memorializing the chief's order about

13   refresher training here?

14        A.    Yes.

15        Q.    And in terms of the training,

16   you note here, as you did in the report for

17   the CIRB, that it should focus on risk versus

18   reward, and pursuit driving, right?

19        A.    Yes.

20        Q.    And so as far as the chief then

21   issuing this order, did you have conversation

22   or any other communication with him about

23   this order in order to write this Form 17?

24        A.    No.  No, I'm just strictly going

25   off the recommendations of the board writing

```
 1        this.  So then they -- then they get --
 2        sending this to the academy, so they get --
 3        they can reach out to them for the training.
 4              Q.    How would you have learned the
 5        chief ordered the refresher training?
 6              A.    Because on my report, he put
 7        approved FNA, which means For Necessary
 8        Action, so that would have been for the
 9        refresher training.
10              Q.    I see.  So that approved For
11        Necessary Action means, I order and authorize
12        the recommended outcome here?
13              A.    Correct.
14              Q.    Okay.  Got it.  All right.  So
15        can I actually just ask a really quick
16        question since we're talking about
17        handwriting.  Can you pull out Exhibit 3 for
18        a moment, that IIS report?
19              A.    Yes.
20              Q.    This handwriting on the top of
21        this page --
22              A.    Uh-huh.
23              Q.    -- who's that, if you know?
24              A.    That would have been
25        Eliot Isaac's.
```

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 160 of 217 - Page
ID#: 3662
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Chief Isaac at the time?

2    A.    Chief Isaac, yeah.

3    Q.    Okay.  And then if you would

4    flip to the very last page of that.

5         MR. COWAN:  Is this the

6    Plaintiffs' Exhibit --

7         MS. GREENE:  No, we're talking

8    about Exhibit 3 right now.

9         MR. COWAN:  Yeah.  Because she

10   had my copy.

11        MS. GREENE:  Oh, I see.  Okay.

12   I see.

13   BY MS. GREENE:

14   Q.    If you look at the last page of

15   Exhibit 3, there are some circles and some

16   more handwritten words, do you know whose

17   that -- excuse me, whose handwriting that is?

18   A.    Well, those are his initials, so

19   that would be Eliot Isaac's also.

20   Q.    Okay.  Thank you.  And then

21   going back to this first page for the IIS

22   report, the investigator was Charles Fink,

23   according to this cover page, right?

24   A.    Yes.

25   Q.    And then in terms of the names

 1     **beneath Sergeant Fink, what does that**

 2     **signify?**

 3          A.    Well, traditionally in Internal

 4     it gets -- a case gets assigned to the

 5     investigator, which in this case would be

 6     Sergeant Fink.

 7               And then he completes his

 8     investigation and submits it to his

 9     lieutenant, which according to this was

10     Colin Vaughn.  The lieutenant would make

11     any -- have any conversations with him or --

12     or corrections that he sees that the report

13     needs.

14               So after the report is

15     satisfactory with the lieutenant, then he

16     gives it to the captain, which was in this

17     case Doug Snider.

18               And then he kind of does the

19     same thing, just reviews it for any

20     corrections needed, or if he has any

21     questions about it, he can clarify or -- and

22     then -- so then the report is completed to

23     his satisfaction.

24               And then at that time, it went

25     to Lieutenant Colonel Theetge, who she was --

1    I can't remember whether she was -- she was

2    one of the assistant chiefs at that time.

3                    And same thing, review -- just

4    the review process.  If she has any

5    corrections, she'll send it back.  And then

6    when it's to her satisfaction, she'll submit

7    it to the police chief for final review.

8            Q.    And you know about that because

9    you later served in the IIS, right?

10           A.    Correct.

11           Q.    And for any changes added,

12   suggestions that anyone in this chain of

13   command review made along the way, are there

14   versions of the earlier written report for

15   IIS that would be kept?

16           A.    I don't know.  I don't know

17   whether the investigators keep -- I think

18   it's really up to the individual

19   investigators if -- if they keep versions.  I

20   never kept any as a captain.

21           Q.    When those edits or suggestions

22   are provided by these various people in the

23   chain of command, does that come by e-mail?

24           A.    I don't know when they

25   switched -- when I was a sergeant, when I was

1   in Sergeant Fink's spot, it was all paper.

2                    We switched to electronic

3   sometime in between my absence from Internal.

4   Because I think when I came back in May of

5   '21, it was electronic.

6        Q.    Okay.  And that wasn't a new

7   **change when you came back in, was it?**

8        A.    No.  No, I think they -- I don't

9   know how long they had been doing it that way

10  since I'd left before.

11       **Q.    Okay.  And any electronic**

12  **version then that was in place when you came**

13  **back in -- back in as captain for Internal,**

14  **did that involve the transmission of edits,**

15  **comments, et cetera, by e-mail?**

16       A.    No.  I would always print them

17  out, and -- and -- because I'm more of a

18  paper -- so I would -- you know, if I had

19  just little spelling corrections or something

20  or grammar or something, I would just do it.

21                    But if it was something that

22  needed to be addressed, that I felt wasn't

23  addressed or anything like that, then I would

24  print it out and circle it or go to the

25  investigator and say, hey, did you ask this,

```
 1    this, and this, you know, something like

 2    that.

 3            Q.    So like a physical markup of a

 4    copy is how you would do it?

 5            A.    Yes.

 6            Q.    Do you know about the practices

 7    of any of the people listed here in the chain

 8    of command on the Exhibit 3?

 9            A.    I don't know, you know, how they

10    each individually do it.

11            Q.    Okay.  All right.  So going back

12    to this Form 17, which we've marked as

13    Exhibit 16 --

14            A.    Yes.

15            Q.    -- here the Form 17 ends with

16    the statement that the CIRB board report is

17    attached, right?

18            A.    Yes.

19            Q.    So your report, Exhibit 9, would

20    have been attached to this Form 17 when it

21    was given to Captain Jones?

22            A.    Correct.

23            Q.    And then since this was the

24    order for refresher training, do you know

25    anything about what happens with refresher
```

```
 1        training after you issue this Form 17?

 2              A.    No.

 3              Q.    Do you know, as you sit here

 4        today, whether or not refresher training

 5        happened in this case?

 6              A.    I have no idea.

 7              Q.    And so do you have any idea

 8        about the content of the training or

 9        materials used --

10              A.    No.

11              Q.    -- presentation?

12              A.    No idea.

13              Q.    Okay.  Do you know whether there

14        was any reprimand or discipline issued in

15        relation to the pursuit at issue here?

16              A.    Referencing back to the

17        number 3, the IIS report, it says on here,

18        reprimand for Sergeant Lanter for violations

19        of these two rule violations and ESL, which

20        is that electronic -- ESL, employee -- I

21        can't remember what ESL stands for now, but

22        it's an entry into the employee's jacket that

23        it's a kind of a counseling, written

24        counseling, for a violation for Thomas,

25        Harper, and then Gabel.
```

```
 1         Q.    Okay.  With respect to the

 2   written reprimand for Sergeant -- then

 3   Sergeant Lanter, have you ever seen that?

 4         A.    I don't think so.  I can't

 5   remember.

 6         (Exhibit 17 was marked.)

 7   BY MS. GREENE:

 8         Q.    All right.  I'm gonna mark and

 9   hand to you Plaintiffs' Exhibit 17.

10         MS. GREENE:  Sorry, I only have

11   two copies of this one.  Sorry about that,

12   guys, but we will distribute electronic

13   copies later.

14   BY MS. GREENE:

15         Q.    Have you -- are you familiar

16   with this Exhibit 17?

17         A.    I'm familiar with the form for

18   reprimand.  Is that what you're asking?

19         Q.    So you're familiar with the type

20   of document that this is?

21         A.    Yes.

22         Q.    And what is it?

23         A.    It's a Notice of Official

24   Reprimand.

25         Q.    For then Sergeant Lanter related
```

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 167 of 217 - Page
ID#: 3669
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

| | |
|---|---|
| 1 | to the pursuit at issue in this case, right? |
| 2 | A.    Yes. |
| 3 | Q.    And have you seen this specific |
| 4 | reprimand before? |
| 5 | A.    I don't remember if I have or |
| 6 | not. |
| 7 | Q.    Okay.  And looking back at the |
| 8 | handwritten notes from the chief on the front |
| 9 | page of the IIS report, Exhibit 3, and |
| 10 | looking at the reprimand here in |
| 11 | Exhibit 17 -- |
| 12 | A.    Yes. |
| 13 | Q.    -- Sergeant Lanter was |
| 14 | repremented -- reprimanded for violations of |
| 15 | 1.01(B) and 1.03, correct? |
| 16 | A.    Yes. |
| 17 | Q.    And what do those numbers |
| 18 | reference? |
| 19 | A.    In our manuals and rules and |
| 20 | regs, which I don't know what happened to my |
| 21 | copy. |
| 22 | Q.    That -- let me find it.  We |
| 23 | marked it earlier.  The Exhibit 12 would have |
| 24 | been the one.  I've got my copy, but... |
| 25 | A.    Oh, here it is. |

Case: 2:21-cv-00102-DLB   Doc #: 151   Filed: 12/10/25   Page: 168 of 217 - Page
ID#: 3670
Deposition of Captain Amanda Caton                Jason Laible, et al., vs. Timothy Lanter, et al.,

1         MR. COWAN:   Yep.

2    **Q.    Okay.**

3         A.    So, yeah, so that's referenced,

4    these numbers in here.  If you go to 1.016 --

5    I'm sorry that's not 1.016, that's 1.01(B),

6    sorry, 1.01(B), so that would be the Failure

7    of Good Behavior, and then the wording is

8    specific in the rules and regs.

9    **Q.    Okay.  And then the 1.03?**

10        A.    Yeah.  You just go down to 1.03,

11   and then that's what we call the job spec

12   rule.  You would put this, and then you would

13   reference -- there's a list of job

14   specifications for each, like patrol

15   officers, patrol sergeants, you know, for

16   every job in the department, there's a list

17   of job specifications.

18             So then you would reference --

19   and then they referenced from the job --

20   sorry, job description for the police

21   classification of a patrol or a sergeant and

22   they reference the duties shall include, but

23   not limited to the following and then that

24   paragraph after that.

25        **Q.    Okay.  So it's your**

1      understanding that that paragraph is the

2      violation of the job description --

3              A.    Yes.

4              Q.    -- that Sergeant Lanter at the

5      time engaged in?

6              A.    Yeah.

7              Q.    Okay.  And that's the violation

8      of 1.03, right?

9              A.    Yes.

10             Q.    And then I want to go back to

11     the violation of 1.01, Section B.  So this

12     reprimand represents then a finding that then

13     Sergeant Lanter engaged in an act or omitted

14     an act that constitutes a violation of the

15     rules, regulations, procedures, directives,

16     or orders of the department, and that the

17     violation was a negligent violation, which

18     may lead to risk of physical injury to

19     another or financial loss to the City; is

20     that right?

21             A.    Yes.

22             Q.    Okay.  And so just to be clear

23     on this Exhibit 17 reprimand and the

24     violations listed there pertain to violations

25     of Exhibit 12, Manual Rules and Regulations

1    of Disciplinary Process for the Cincinnati

2    Police Department, right?

3         A.    Yes.

4         Q.    Okay.  All right.  In terms

5    of -- and I don't know if you know, but in

6    this case, the risk of physical injury, whose

7    risk was that in terms of the violation at

8    issue here?

9         A.    What are you referring to, the

10   procedure?

11        Q.    Oh, I'm sorry.  I'm referring at

12   this point to Exhibit 17, which quotes the

13   procedure from the Exhibit 12 rules and regs,

14   that 1.01, Section B.

15        A.    I'm a little lost.  Where you

16   are you looking at?

17        Q.    Sure.

18              MR. COWAN:   (Showing.)

19        A.    Oh, okay.  Oh, okay, yeah.  So

20   from 1.01(B).

21        Q.    Uh-huh.

22        A.    A negligent violation which may

23   lead to risk of physical injury to another or

24   financial loss to the City.  Yeah.

25        Q.    And so in this case, who's risk

1      of physical injury was at issue for this

2      finding here, if you know?

3              A.    That specifically, I don't know.

4      I mean, in general, it would be anyone's

5      physical injury.

6              Q.    Okay.

7              A.    You know, I wasn't the Internal

8      investigator.

9              Q.    And that's why I was just

10     wondering.

11             A.    Yeah.

12             Q.    That's fine.  Thank you.  Okay.

13     So let's set that aside for now and let me

14     ask you, earlier you were talking about this

15     concept of risk and reward in pursuits,

16     right?

17             A.    Uh-huh.

18             Q.    Is that a yes?  You said uh-huh.

19             A.    Oh, I'm sorry.  Yes, yes.

20             Q.    And that's a concept that CPD

21     officers are taught in their training, right?

22             A.    Correct.

23             Q.    And in their training, they're

24     taught how to assess factors that affect risk

25     and reward, right?

```
 1              A.    Yeah, it's a weigh-in would be a
 2       better way that we would probably phrase it.
 3              Q.    Okay.   But they're taught that
 4       in their training from the department?
 5              A.    Yes.
 6              Q.    And the training, it teaches
 7       officers when the risk is greater than the
 8       reward, right?
 9              A.    Again, it's factors to weigh in.
10       You know what I mean?   Because every -- it's
11       a case-by-case basis.   So there's no -- it's
12       not black and white, if that makes sense.
13              Q.    There is a threshold, though,
14       that once you cross it, the risk is greater
15       than the reward, right?
16              A.    Again, it's not -- that's a gray
17       area.   It's -- there's no set -- you know,
18       it's a concept, I guess, and you can't really
19       put like a number on it or whatever, if -- if
20       that makes sense.
21              Q.    The training the department
22       gives its officers, does it teach the
23       officers when they've crossed that line into
24       the area where the risk is greater than the
25       reward for a pursuit?
```

1          MR. COWAN:  Objection.

2          A.    I don't know whether you can

3    actually teach that because it's on an

4    individual case-by-case basis.  Only -- only

5    the officer knows.

6          **Q.    All right.**

7          A.    You know, it's on the -- on the

8    spot, only the officer would know that.

9          **Q.    So does the CPD equip its**

10   **officers with the ability to determine risk**

11   **versus reward in a pursuit?**

12         A.    As far as laying out the factors

13   that they have to consider, so...

14         **Q.    Does it teach its officers how**

15   **to evaluate risk versus reward in initiating**

16   **or engaging in a continued pursuit?**

17         A.    By evaluating, by considering

18   all these factors.

19         **Q.    And when you say the factors,**

20   **you're talking about the bulleted list of**

21   **factors --**

22         A.    Yes.

23         **Q.    -- and these other items --**

24         A.    Yeah.

25         **Q.    -- contained in the pursuit**

```
 1          policy, right?

 2               A.    Yes.

 3               Q.    And so my question is, you know,

 4          I think we've established, right, the

 5          officers have to consider the factors and the

 6          other aspects of the pursuit policy while

 7          engaging in a pursuit, right?

 8               A.    Correct.

 9               Q.    And does the department teach

10          its officers when to recognize and how to

11          recognize that they are engaging in a pursuit

12          where the risk is greater than the reward?

13               A.    I don't think specifically.  I

14          mean, there's -- I just don't think there's

15          any way to teach that.

16               Q.    Nonetheless, all of the

17          prohibitions in the pursuit policy exist to

18          ensure that officers don't engage in certain

19          pursuit actions that present more risk than

20          is appropriate, right?

21                    MR. COWAN:  Objection.

22               Q.    Go ahead.

23               A.    Say it again.  Sorry.

24               Q.    The pursuit policy --

25               A.    Uh-huh.
```

1      Q.    -- and its many prohibitions on

2   specific tactics or actions by officers

3   represents for officers clear statements of

4   circumstances where the risk is greater than

5   the reward, and therefore, the conduct is

6   prohibited, right?

7          A.    Well, I don't think -- it's not

8   clear because it's not saying what exact road

9   conditions are.

10         Q.    When I'm not just talking

11  about --

12              MR. COWAN:  Just let her finish.

13         A.    You know what I mean?  So it's

14  not saying exactly what the road conditions

15  must be, you know, when -- when you reach the

16  point where it's risk versus reward or it's

17  not -- not -- you're not given a time of day.

18              They have to take the totality

19  of everything into consideration, so there's

20  no -- how did you put it -- clear markers.

21         Q.    So right now I'm talking about

22  areas where the policy makes specific

23  prohibitions.

24              MR. COWAN:  And just to be

25  clear, can you identify --

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 176 of 217 - Page
ID#: 3678
Deposition of Captain Amanda Caton                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              MS. GREENE:  Yeah.
 2              MR. COWAN:  -- so that we're
 3     talking about the same policy document?
 4     BY MS. GREENE:
 5          Q.    So I'm talking now about
 6     Exhibit 1, policy 12.535, Emergency Operation
 7     of Police Vehicles and Pursuit Driving.
 8          A.    Uh-huh.
 9          Q.    And in this policy, in its
10     entirety, right, there are multiple acts,
11     tactics, approaches, that are specifically
12     prohibited for officers to use, right, in
13     pursuits?
14          A.    If you mean like going --
15     prohibiting going over 20 miles an hour, yes,
16     or going the wrong way, yes.
17          Q.    Anywhere that the policy says
18     will not, right, that's a prohibition on the
19     officers, right?
20          A.    Where does it say that?
21              MR. COWAN:  Objection to that.
22          Q.    So, for example -- let's see.
23     Let's see.  Well, let me just -- here we go.
24              Okay.  For example, page 4,
25     Section 2(a), When operating a police vehicle
```

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    in the emergency mode, officers will not

2    operate with reckless disregard for the

3    safety of other citizens.  Do you see that?

4              A.    Yes.

5              Q.    And where the policy says will

6    not, right, in that instance there it's a

7    prohibition on a particular action by the

8    officers, right?

9              A.    Where it says will not?

10             Q.    Yes.

11             A.    Yes.

12             Q.    Okay.  And so where the policy

13   says officers will not X, Y, or Z, whatever

14   that is, it's a prohibition on officer

15   conduct, right?

16                   MR. COWAN:   Objection.

17             Q.    Go ahead.

18             A.    Yes.  It tells them they will

19   not operate in whatever...

20             Q.    And that is -- that's, as we

21   established earlier, a mandatory duty of the

22   officers to comply with those prohibitions in

23   the policy, right?

24             A.    Yes.

25             Q.    And where the policy says an

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 178 of 217 - Page
ID#: 3680
Deposition of Captain Amanda Caton                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    officer will do X, Y, or Z, that is also a

2    mandatory provision in the policy commanding

3    officers to do certain things, right?

4                    MR. COWAN:  Objection.

5        Q.    So, for example, I don't know,

6    look at page 6, Section 4(a), Supervisory

7    Responsibilities, The pursuit OIC will retain

8    control and continually monitor.  Do you see

9    that?

10       A.    Yes.

11       Q.    So that is a mandatory provision

12   that the officers to whom this particular

13   term of the policy is applicable, they have

14   to comply with it, right?

15       A.    Yes.

16       Q.    It's a mandatory --

17       A.    Directive.

18       Q.    -- directive?  Thank you.  And

19   so where throughout this policy we see the

20   officer will, that's a directive for the

21   officer to follow, right?

22                    MR. COWAN:  Objection.

23       Q.    Go ahead.

24       A.    Correct.

25       Q.    And it's mandatory that officers

1    follow those directives, right?

2                    MR. COWAN:  Objection.

3         Q.    Go ahead.

4         A.    With the exception of exigent

5    circumstances.

6         Q.    As we discussed earlier?

7         A.    Yes.

8         Q.    Okay.  So then for the

9    prohibitions in the policy, meaning the

10   officer will not, shall not, must not

11   language --

12        A.    Yes.

13        Q.    -- those prohibitions, do they

14   outline tactics the department has determined

15   create risk if they are used in a pursuit?

16                    MR. COWAN:  Objection.

17                    MS. GREENE:  Basis?

18                    MR. COWAN:  You're asking about

19   a number of different prohibitions.  It would

20   be helpful if you identified specific ones.

21   You're asking about will or will not, and I'm

22   not gonna have her address nonspecific

23   questions.

24                    MS. GREENE:  Okay.  I understand

25   your objection.  I don't agree with it, but I

Deposition of Captain Amanda Caton                        Jason Laible, et al., vs. Timothy Lanter, et al.,

1    will rephrase.

2    BY MS. GREENE:

3        Q.    The policy contains prohibitions

4    on particular officer tactics, right?  We

5    already agreed to that earlier?

6        A.    Okay.

7        Q.    Right?

8        A.    Yes.

9        Q.    And why are those prohibitions

10   in the policy in your experience as a

11   high-level supervisor in the department?

12       A.    All our procedures are in place

13   as a guideline for -- for officers to operate

14   safely and within -- within the law.

15       Q.    And to not operate negligently,

16   right?  To ensure that they don't operate

17   their vehicles negligently?

18       A.    Correct.

19       Q.    And to ensure that they don't

20   operate their vehicles recklessly?

21       A.    Correct.

22       Q.    And to ensure that they don't

23   operate their vehicles in reckless disregard

24   of the risk to others?

25       A.    Correct.

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 181 of 217 - Page
ID#: 3683

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    Okay.  All right.  I would like
 2    to show you an exhibit, and this one
 3    unfortunately is the one that I don't have a
 4    physical copy of, so we're gonna put it on
 5    the screen for you.
 6               If you need to -- it's gonna be
 7    up there on the big screen at the end of the
 8    room.  If you need to get up and go down and
 9    look at it or whatever, that's fine.
10          A.    Okay.
11          Q.    But I'm not gonna ask a lot of
12    detail about it, so hopefully we can manage,
13    but we'll get that up.
14          (Exhibit 18 was marked.)
15    BY MS. GREENE:
16          Q.    Yeah.  And this we're gonna mark
17    as Exhibit 18.  And -- there we go.  Okay.
18    So you should see it on your screen here.
19               MS. GREENE:  Actually, if you
20    could zoom out a little bit?  Sorry.
21    Actually, do you mind if I just hop in?
22               MS. SALLEY:  Sure.
23               MS. GREENE:  Okay.  So get this
24    out of the way, so I can manipulate this
25    document a little bit better.  All right.
```

| | |
|---|---|
| 1 | There we go.  Okay. |
| 2 | BY MS. GREENE: |
| 3 | Q.    Okay.  So you see on your screen |
| 4 | a document entitled the Cincinnati Police |
| 5 | Department Tactical Patrol Guide, right? |
| 6 | A.    Yes. |
| 7 | Q.    And this for the record is Bates |
| 8 | stamped City 001505 through 1534, and this |
| 9 | we're marking as **Exhibit 18** and we will |
| 10 | produce an electronic copy to everybody. |
| 11 | My apologies about that.  I'm |
| 12 | trying to get this back up to the top of the |
| 13 | doc here.  Technology is not our friend |
| 14 | today.  Okay.  Here we are.  So this Tactical |
| 15 | Patrol Guide, do you know what this is? |
| 16 | A.    Yes. |
| 17 | Q.    And what is it? |
| 18 | A.    It's one of our directives. |
| 19 | Q.    It's one of those binding |
| 20 | directives earlier -- that we talked about |
| 21 | earlier today? |
| 22 | A.    Yes. |
| 23 | Q.    Along with the policies and |
| 24 | procedures -- |
| 25 | A.    Yeah -- |

 1      Q.    -- and the other manuals?

 2      A.    Yes.

 3      Q.    Okay.  And this Tactical Patrol

 4  Guide like those other binding directives

 5  represents the policy that's mandatory for

 6  officers to comply with, right?

 7      A.    Right.

 8      Q.    And it's their duty to comply

 9  with the policies in this particular Tactical

10  Patrol Guide?

11      A.    Yes.  Yeah.

12      Q.    And this Tactical Patrol Guide,

13  I'm gonna go down to the Table of Contents

14  here.  It's page 3 of the report.  I have a

15  couple sections highlighted here.  One is

16  called Vehicle Patrol Techniques.

17            We have one called Defensive

18  Driving, one called Vehicle Stop Tactics, one

19  called High-Risk Traffic Stop, and one called

20  Vehicle Pursuits.  Do you see those in the

21  Table of Contents?

22      A.    Yes.

23      Q.    And so this Tactical Patrol

24  Guide contains policies governing those

25  specific tactics, right?

```
 1            A.    Yes.

 2            Q.    And those tactics govern the

 3    conduct of the officers engaged in the

 4    pursuit at issue in this case in August 7th,

 5    2020, right?

 6            A.    Yes.

 7            Q.    And did the CIRB consider any of

 8    the policies contained in this Tactical

 9    Patrol Guide in its review of this matter?

10            A.    I don't remember.  I don't

11    remember.  It's been a while since I've

12    looked at the Tactical Patrol Guide.  I don't

13    remember what it says about vehicle pursuits,

14    but anything in there would be pretty much

15    the same as the procedures.

16                  So if they violated anything in

17    there, then Internal would have in their

18    findings, they would have referenced that,

19    too.

20            Q.    Okay.  So the policies contained

21    in the Tactical Patrol Guide applied to the

22    pursuit on August 7th, 2020, right?

23            A.    Yes.

24            Q.    Okay.

25            A.    These are guidelines, but the
```

1    best way for officers to operate.

2         Q.    Okay.  All right.  And, you

3    know, to the extent that there are other

4    aspects of the Tactical Patrol Guide that

5    discuss the kinds of police action that

6    occurred on August 7th, 2020, in relation to

7    Mason Meyer and the pursuit, then the

8    Tactical Patrol Guide policies would apply to

9    all of that, right?

10        A.    Yes.

11        Q.    Okay.  All right.  And I just

12   want to go briefly to the pages for the

13   record's sake where these specific

14   sections -- just to note.  Let me see if I

15   can get there.

16             So, for example, 16 is where we

17   started, and I believe the portion we were

18   looking at goes through page 19.

19             MS. GREENE:  These pages in the

20   version we currently have are redacted, so we

21   would request, as we've discussed with

22   defense earlier, that an unredacted version

23   of this document be made available to us in

24   this case.

25             And that we can ask further

1    questions, if necessary, based on that.  And

2    we can go ahead and take that exhibit down.

3    BY MS. GREENE:

4         Q.    All right.  So what else do you

5    know about this pursuit that we haven't

6    talked about yet today?

7         A.    I don't have anything further to

8    add than what was in the report.

9         Q.    And what else do you know about

10    the investigation or surveillance of

11    Mason Meyer that we haven't talked about

12    today?

13         A.    I don't know anything else.

14         Q.    Have you had any conversations

15    with any member of the department about Meyer

16    or the pursuit or the officers involved in

17    the pursuit that we haven't discussed yet

18    today?

19         A.    No.

20         Q.    Do you know anything about a

21    community survey about pursuit practices by

22    the department?

23         A.    I don't think so.  I'm not sure.

24    I don't know.

25         Q.    So you were never provided by

1    the department with any, I don't know,

2    outcomes, feedback, or other response from

3    the community about pursuit driving in the

4    aftermath of this particular pursuit?

5          A.    Not that I remember.

6          Q.    Did you take part in any forums,

7    public comment events, or other public

8    meetings relating to the events at issue in

9    this case?

10          A.    Related to what?

11          Q.    The events at issue in this

12    case.

13          A.    I don't think so, not that I

14    remember.

15          Q.    Okay.  And the CIRB's review of

16    Sergeant Lanter and Officer Thomas,

17    Specialist Harper, that review contemplated

18    their actions as Cincinnati police officers,

19    right?

20          A.    I'm sorry.  Say that again.  I

21    zoned out a little bit.

22          Q.    Yeah.  The CIRB -- I know it's

23    getting late and after lunch it's hard.  The

24    CIRB review --

25          A.    Uh-huh.

1    Q.    -- of this event --

2    A.    Yes.

3    Q.    -- reflected a review of

4  Sergeant Lanter, Officer Thomas, and

5  Specialist Harper's actions as CPD police

6  officers, right?

7    A.    Correct.

8    Q.    Okay.  And do you know of any

9  other pursuit cases that were examined by the

10  CIRB at any time?

11    A.    This was the only one that we

12  did in my time.

13    Q.    Are you aware of any outside of

14  your time in the Inspections Unit?

15    A.    I'm not -- not that I remember.

16  I don't know.

17    Q.    Are you aware of any other

18  pursuit cases that were examined by IIS

19  whether or not during your period of time

20  working in that section?

21    A.    I can't think of any specific

22  ones, but pursuits would -- cases would come

23  through that involved pursuits, if that --

24  yeah.

25    Q.    Do you remember when,

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    approximately, any of those were reviewed?

2         A.    No idea.

3         Q.    Do you remember any information,

4    details, anything about any of those other

5    pursuits?

6         A.    Not -- not really.

7         Q.    When you say "not really" --

8         A.    I mean, just that cases would

9    come through where a pursuit might be part of

10   whatever it was, and it would be just part of

11   the case, but I could -- I could not tell you

12   any specific.

13        Q.    Do you recall a case relating to

14   a pursuit that resulted in an injury of a

15   person named Travis Feltner?

16        A.    No, I don't know that name.

17        Q.    Okay.  Did you create any other

18   documentation relating to Mason Meyer and/or

19   the pursuit and its aftermath other than what

20   we've looked at already today?

21        A.    No.

22        Q.    Are you aware of any other CIRB

23   documentation relating to this case that we

24   haven't looked at today?

25        A.    I'm not aware of any, no.

1      Q.    Okay.  And I have to ask these

2   questions of everyone, so it's not personal,

3   but have you ever been the subject yourself

4   of an Internal investigation at CPD?

5      A.    Yes.

6      Q.    And what was that about?

7      A.    When I was a police officer, we

8   were transporting a suspect and he complained

9   that my partner said something about him and

10   so that was investigated, and I was part of

11   that.

12      Q.    Were you a witness or a subject

13   in that investigation?

14      A.    Well, they call it, like if

15   you're a target of the investigation, like my

16   partner would have been the target that I

17   would have been called there because I was a

18   witness, yeah.

19      Q.    So you had to --

20      A.    Not the target of the

21   investigation, but subject to questions.

22      Q.    Like a mandatory statement?

23      A.    Well, just an interview.

24      Q.    Okay.

25      A.    Yeah.

```
 1          Q.    What was it that your partner
 2   was alleged to have said?
 3          A.    You got skinny girl hands --
 4   arms, or skinny girl arms.
 5          Q.    Okay.  Did he say it?
 6          A.    No.  I don't think so, no.
 7          Q.    Okay.  Any other Internal
 8   investigations of you that you're aware of?
 9          A.    No.  I don't think I've been --
10   maybe been, again, witnesses to -- I think
11   there was one other one I can think of but,
12   again, was not the target.
13          Q.    Okay.  And what was that one
14   about?
15          A.    A guy -- I think it was an
16   accident.  He may have been on a bike.  I
17   can't remember, but he complained that the
18   first officer on scene -- I can't remember
19   what he said.
20                He pushed -- I can't remember
21   exactly what the -- pushed him or something.
22   It was a long time ago probably -- probably
23   it was when I was in District 5, so it would
24   have been back in like 2010 or something like
25   that.
```

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              Q.    Okay.  Some kind of
 2      force-related investigation?
 3              A.    Allegation of force, yeah.
 4              Q.    And was the investigation, or
 5      the allegation rather, substantiated, if you
 6      remember?
 7              A.    I -- I don't remember.
 8              Q.    Okay.  I want to ask one quick
 9      question just going back to your report,
10      Exhibit 9, the CIRB report.
11                    Just to be clear, the Conclusion
12      section on the last page, this paragraph, the
13      second paragraph in the Conclusion section
14      that the CIRB determined the officers
15      involved had the knowledge, skills, and
16      resources necessary to perform their duties
17      and they had full knowledge of the
18      department's protocols, procedures, and
19      training.  However, during this incident, the
20      officer chose to disregard the department's
21      protocols, procedures, and training.
22                    The officers, as referenced in
23      that paragraph, means Lanter, Thomas, and
24      Harper, right?
25              A.    Yes.
```

1    **Q.    And where the report says, the**
2    **officers chose to disregard, that reflects**
3    **the department's understanding that those**
4    **officers knowingly disregarded the policies**
5    **and procedures and training of the**
6    **department?**
7    A.    Yeah.   They had -- they had the
8    training and knowledge necessary, and they
9    disregarded those.
10    **Q.    Okay.  Did you ever at any point**
11    **in time have any discussion with then**
12    **Sergeant Lanter/Lieutenant Lanter about this**
13    **matter?**
14    A.    No, I don't think so, because I
15    was never in the same district or assignment.
16    He now works directly for me.  So I did -- it
17    came up that I wouldn't be at work today, so
18    I told him that I was being deposed.
19    **Q.    Okay.  You said he works for you**
20    **now directly?**
21    A.    Yes.
22    **Q.    And explain that to me, please.**
23    A.    At District -- I'm the captain
24    at District 4, and there's four lieutenants,
25    an investigative lieutenant, and then a

1   lieutenant for each shift of the three

2   shifts, and he's the investigative

3   lieutenant.  So the other lieutenants report

4   directly to me.

5          **Q.    What are his duties in that**

6   **role?**

7          A.    The Investigative Unit, he's in

8   charge of the investigators that investigate

9   misdemeanors and they investigate everything

10  except homicides, sexual assaults.  So they

11  investigate like everything else.

12         **Q.    And homicides are reserved for a**

13  **homicide detective unit, I assume?**

14         A.    Yes, and a criminal

15  investigation section investigates any kind

16  of sexual assaults.

17         **Q.    Any other types of specific**

18  **crimes reserved to the detectives in that**

19  **unit?**

20         A.    Are any other --

21         **Q.    Yeah.  Beyond homicides and**

22  **sexual assaults, are there any other crimes**

23  **that are reserved for investigations for**

24  **detectives in that unit?**

25         A.    In the Criminal Investigations

1    Section?

2              Q.     Yeah.

3              A.     I might be forgetting, but I

4    think the biggies are the homicides and the

5    sexual assaults and any -- they do any

6    child-related -- I would include that in

7    sexual assaults, any child-related -- it's

8    called personal crimes, so any rapes, sexual

9    assaults, anything pertaining to child abuse.

10             Q.     What about like narcotics, drug

11   stuff, is there a special unit -- a type of

12   unit for that?

13             A.     Yeah, that would be our -- they

14   keep changing names, but it's our Vice --

15   it's essentially our Vice Unit, Special

16   Investigations Section.

17             Q.     And beyond Vice, Special

18   Investigation, whatever it may be called

19   right now --

20             A.     Uh-huh.

21             Q.     -- and the -- sorry, what is

22   the --

23             A.     Criminal Investigations Section.

24             Q.     -- Criminal Investigations

25   Section, other than those, are there any

1    other specialized detective units that would

2    investigate specific crimes that are reserved

3    for them rather than the investigative --

4        A.    In the Criminal Investigations

5    Sections, which is called CIS, they also have

6    financial crimes, too.  I just thought of

7    that one.

8        Q.    Okay.  But then all other felony

9    crimes and misdemeanors are reserved to the

10   investigations in the districts?

11       A.    Yes.  I may be forgetting one or

12   two, but I don't think so...

13       Q.    That's okay.  Just generally

14   speaking, that's accurate?

15       A.    Yes.

16       Q.    All right.  Have you ever been

17   involved in a deadly force incident during

18   your tenure at the CPD?

19       A.    Not directly.  Only as the --

20   being in Internal Investigations, we would

21   respond out to any officer-involved shooting

22   or anything like that.

23       Q.    Okay.  And have you ever been a

24   defendant in a lawsuit -- in any lawsuit

25   relating to your police capacity?

1        A.    Related to police capacity,

2    defendant, in like a civil suit, you mean?

3        Q.    Yeah.  Well, any kind of case,

4    civil or criminal?

5        A.    I don't think -- I don't think

6    so.

7        Q.    Have you ever been a defendant

8    in a criminal case?

9        A.    In a criminal case?  Yes.

10        Q.    And tell me about that.

11        A.    I was defendant in an OVI case.

12        Q.    And when was that?

13        A.    When the trial was?

14        Q.    Sure.

15        A.    I think April of '21.

16        Q.    And what was the outcome of the

17    trial?

18        A.    Not guilty.

19        Q.    Was that Hamilton County?

20        A.    Clermont County.

21        Q.    Clermont.  Any other criminal

22    defendant cases in your history?

23        A.    No.

24        Q.    No.  Okay.  Any other lawsuits

25    that you're a party to in your history?

1        A.    Any other what?

2        Q.    **Lawsuits.**

3        A.    I'm currently in a lawsuit

4    against the City of Loveland.

5        Q.    **And what's that about?**

6        A.    The OVI case.

7        Q.    **I see.  A Civil Rights matter?**

8        A.    Yes.

9              MS. GREENE:  Okay.  All right.

10   I don't have any further questions for you at

11   this time.

12              I do want to note that in

13   relation to the documents we looked at today

14   that were redacted, in relation to the

15   documents we noted in our deficiency --

16   discovery deficiency communications that I

17   believe are hopefully gonna be produced at

18   some point not so far from now and in

19   relation to the production of some materials

20   we discussed at the last deposition produced

21   two days ago, which we have not due to the

22   recency of the production been able to fully

23   evaluate, I will state that we will have to

24   keep this deposition open in case there's

25   something we have to revisit in light of what

1      may arise from any of that evidence.  But for

2      now, I have no further questions for you.

3                      All right.  Anything else from

4      anybody?

5                      MR. COWAN:  No.

6                      MS. GREENE:  And so do you want

7      to instruct your client then?

8                      MR. COWAN:  Yeah.  You'll get a

9      deposition transcript you'll want to review

10     and sign.

11                     THE WITNESS:  Okay.

12                     MR. COWAN:  So we'll take

13     signature.

14                     MS. GREENE:  All right.  We'll

15     go off the record.

16

17                     _____
                       CPD CAPTAIN AMANDA CATON

18

19

20                         *  *  *

21

22             (DEPOSITION CONCLUDED AT 2:22 P.M.)

23                         *  *  *

24

25

199

```
 1                C E R T I F I C A T E

 2
        STATE   OF   OHIO
 3                  :  SS
        COUNTY OF WARREN
 4
              I, Stacey J. Murrin, the undersigned, a
 5      duly qualified notary public within and for
        the State of Ohio, do hereby certify that
 6      CPD CAPTAIN AMANDA CATON was by me first duly
        sworn to depose the truth and nothing but the
 7      truth; foregoing is the deposition given at
        said time and place by said witness;
 8      deposition was taken pursuant to stipulations
        hereinbefore set forth; deposition was taken
 9      by me in stenotype and transcribed by me by
        means of computer; that the transcribed
10      deposition was made available to the witness
        for examination and signature and that
11      signature may be affixed out of the presence
        of the Notary Public-Court Reporter. I am
12      neither a relative of any of the parties or
        any of their counsel; I am not, nor is the
13      court reporting firm with which I am
        affiliated, under a contract as defined in
14      Civil Rule 28(D) and have no financial
        interest in the result of this action.
15           IN WITNESS WHEREOF, I have hereunto set my
        hand and official seal of office at
16      Cincinnati, Ohio this 28th day of April,
        2025.

17

18

19     _____
       My commission expires:   Stacey J. Murrin
20      August 17, 2025,   Notary Public - State of Ohio

21

22

23

24

25
```

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 201 of 217 - Page
ID#: 3703
Deposition of Captain Amanda Caton                          Jason Laible, et al., vs. Timothy Lanter, et al.,

## WORD INDEX

**< 0 >**
**001357** 81:2
**001471** 17:13
**001505** 181:8

**< 1 >**
**1** 4:24 12:19 72:15, 19
86:9, 14 100:23 101:17
113:10 124:14 130:22
145:11 175:6
**1.01** 168:11 169:14
**1.01(B** 166:15 167:5, 6
169:20
**1.016** 167:4, 5
**1.03** 166:15 167:9, 10
168:8
**10** 40:17 56:4 96:20
**10.000** 78:17
**10/7/21** 28:14
**10:30** 96:20
**100** 114:3, 25
**1011** 38:19
**1014** 92:10
**1015** 127:22 142:24
**103** 114:1, 24
**108** 4:13
**11** 57:14 61:22
**116** 4:14
**118** 4:14
**12** 4:6 16:19, 23 17:19
64:17 166:23 168:25
169:13
**12.535** 72:23 86:10, 14
100:23 130:6 175:6
**12.545** 28:11 29:22
**122** 4:15
**129** 4:15
**13** 4:6 27:21, 25 28:8
40:13 56:2 61:22 62:4
**1358** 83:12
**14** 4:7 77:23, 25 78:2, 6,
16
**1470** 81:3
**15** 4:7, 11 52:3 80:18, 21
**150** 4:16
**1504** 17:13
**152** 4:16
**1534** 181:8
**154** 4:8
**156** 4:17
**16** 1:20 4:6, 8 84:2
154:13, 15, 21 163:13
184:16
**165** 4:8
**16th** 29:14 36:10 142:4
**17** 4:8 155:14 156:7
157:23 163:12, 15, 20

164:1 165:6, 9, 16 166:11
168:23 169:12 199:20
**172** 4:17
**173** 4:18
**175** 4:18
**176** 4:19
**177** 4:19, 20
**178** 4:20, 21
**17th** 156:8 157:5
**18** 4:9 180:14, 17 181:9
**180** 4:9
**1800** 1:18 2:13
**19** 184:18
**19th** 38:14 93:4 145:4
**1st** 60:25

**< 2 >**
**2** 12:17 14:2 19:17
101:2 145:16 147:7
**2(a** 153:11 175:25
**2/17/22** 28:13
**2:21-cv-00102** 1:4
**2:22** 198:17
**20** 14:3 19:17 113:18
115:4 124:6, 20 125:1, 6,
11, 17, 23 126:2, 18, 21
127:14 128:18 175:15
**200** 2:19
**2004** 10:14, 17 11:6, 12
**201** 2:5
**2010** 11:15 190:24
**2015** 11:20
**2018** 11:21 12:8
**2020** 14:7 19:10, 14
21:12, 19 24:22 28:24
29:7, 11, 13 30:1, 20 33:2
34:15 41:10 43:18 62:7
73:3, 18 86:13 89:22
103:20 104:8 105:7
183:5, 22 184:6
**2021** 14:9 19:7 29:14
36:10 38:14 61:1 93:4
142:5 156:8, 18
**2025** 1:20 199:16, 20
**21** 14:3, 4, 7 30:2 40:21
93:10 145:4 156:16
162:5 196:15
**2210** 2:22
**23** 14:4
**24** 13:23
**2400** 2:9
**27** 4:6
**28(D** 199:14
**28th** 199:16

**< 3 >**
**3** 4:23 12:17 45:3, 9
47:18, 23 49:15 60:24
65:10 75:16 76:2, 7 92:7
98:6, 9 101:3 117:7

145:17 146:14 158:17
159:8, 15 163:8 164:17
166:9 182:14
**3(a** 76:12
**3(b** 113:23 124:5, 16
**30(b)(6** 73:14
**300** 2:9
**31** 75:13
**3151** 2:18
**34** 4:23
**35** 2:5

**< 4 >**
**4** 13:24 19:24 20:1
75:16, 18, 21 92:9 113:20
147:6 153:10 175:24
192:24
**4(a** 177:6
**4:30** 100:13 106:4
**40513** 2:19
**41017** 2:10
**42** 4:11
**425** 1:18 2:12
**45** 4:23
**45202** 2:6, 13, 16, 23

**< 5 >**
**5** 4:4 12:17, 18 13:2, 18,
20 14:3, 4 20:1 127:20
190:23
**525** 2:22
**55** 4:12
**59** 4:12

**< 6 >**
**6** 75:12 177:6
**69** 4:13

**< 7 >**
**7/26/21** 142:19 157:8
**72** 4:24
**77** 4:7
**7th** 2:5 29:13 30:20
33:2 34:15 43:18 86:13
87:25 89:22 103:20
104:8, 14, 19 105:7, 21
183:4, 22 184:6

**< 8 >**
**8** 82:17, 18, 21
**80** 4:7
**801** 2:16
**87** 10:4

**< 9 >**
**9** 4:23 33:25 34:2, 9
38:6 42:24 46:24 47:17
48:12 50:18 87:20
105:25 113:20 120:11

145:1 163:19 191:10
**9:47** 1:19
**90** 60:14
**91** 10:6
**911** 76:11

**< A >**
**a.m** 1:19
**A-3(b** 113:11
**Aaron** 9:12 39:13 155:16
**ability** 8:5 43:25 172:10
**able** 95:22 96:1 197:22
**absence** 162:3
**absent** 125:25
**absolute** 150:6
**absolutely** 33:23 104:7
**abuse** 194:9
**academy** 10:15, 16
131:20 132:13 135:13
136:1, 7, 8 137:3 139:12
155:21 158:2
**access** 134:19, 22 146:19
**accident** 110:6 190:16
**accidents** 136:17
**account** 140:3, 15
**accuracy** 26:11 35:13
45:13, 17 46:13, 14, 17, 20
**accurate** 11:14 12:11
44:25 64:10 116:2 125:4,
15 146:15 195:14
**accurately** 8:6
**act** 15:10 61:10 168:13,
14
**acted** 68:21 69:13
**acting** 112:19 115:15
116:10, 20 117:12
**action** 23:20 37:18, 23
158:8, 11 176:7 184:5
199:14
**actions** 18:7 72:11
116:24 123:9 144:8, 13
173:19 174:2 186:18
187:5
**actively** 112:18 115:14
117:11, 22 121:5 122:19
**activities** 89:22 116:3
**acts** 175:10
**actual** 58:9 108:14
122:13 123:16
**add** 57:4 185:8
**added** 65:4 161:11
**additional** 34:4 63:24, 25
82:20
**additions** 142:11
**additions/deletions/contrib
utions** 57:3
**address** 35:7 61:19
110:4, 5 136:20 178:22

Case: 2:21-cv-00102-DLB　　Doc #: 151　　Filed: 12/10/25　　Page: 202 of 217 - Page ID#: 3704

Deposition of Captain Amanda Caton

Jason Laible, et al., vs. Timothy Lanter, et al.,

addressed 75:15 110:7, 18 136:1 143:25 162:22, 23
addresses 18:6
adequacies 35:9 44:14
adequate 133:17 135:18
adequately 135:15
Administration 20:15
Administrative 84:3, 16 85:2 112:14
admit 81:19
advance 27:3
affect 8:5 170:24
affiliated 199:13
affirmatively 5:24
affixed 3:16 199:11
aftermath 109:13 186:4 188:19
afternoon 100:12 106:3
afterward 104:5
age 5:2
agencies 90:1 98:3 131:13
agency 91:5
agents 88:14
ago 34:19 43:1 75:13 106:2 139:7 190:22 197:21
agree 178:25
agreed 116:7 126:25 141:20 179:5
agreement 3:9
ahead 7:5 27:24 87:3 108:9 116:13 150:16, 23 152:24 173:22 176:17 177:23 178:3 185:2
air 77:1
al 1:3, 7
Alcohol 88:2
Allegation 191:3, 5
allegations 15:1, 4 16:2
alleged 190:2
ALLOUCH 2:8
allow 75:6, 10
allowed 75:3
AMANDA 1:11 3:4 4:2 5:1, 18 198:17 199:6
A-M-A-N-D-A 5:18
analysis 113:23
and/or 108:3 188:18
annual 132:14
answer 7:5, 7, 10, 17, 23 16:1 107:4, 24 116:14 150:24
anybody 38:23 52:24 104:3 198:4
anyone's 170:4
apologies 181:11
apologize 16:24 19:18

26:24 27:3
apparently 80:16
appeals 18:11
APPEARANCES 2:1
appeared 45:25
applicable 29:12 40:20 58:1, 6 85:1, 5 177:13
applied 73:19 79:14 81:2 85:13, 19 183:21
apply 83:21 84:14 89:16, 18 184:8
applying 119:5
apprehend 103:11 104:7
apprehended 104:13, 19
apprehension 101:8 102:2, 5, 16
approaches 175:11
appropriate 35:5 67:20 70:2, 3, 8 98:18 129:5, 22, 24 133:13, 23 149:15, 23 150:12 173:20
appropriateness 35:7
approved 142:18, 19 158:7, 10
Approximately 12:12 13:25 14:5 100:13 188:1
April 38:14 93:4, 10 145:4 196:15 199:16
area 76:20 107:16 171:17, 24
areas 106:18, 23 107:1, 15, 22 174:22
arms 190:4
arose 139:16
arresting 103:19
articulate 125:11 126:1
aside 18:21 77:17 80:8 170:13
asked 34:18
asking 69:6 118:25 135:20 150:5 151:3 152:15 165:18 178:18, 21
aspects 73:24 173:6 184:4
assaults 193:10, 16, 22 194:5, 7, 9
assess 118:3 170:24
assessment 118:20
assigned 89:13 160:4
assignment 12:23 20:19 77:11 192:15
assignments 12:15 20:25 21:1, 4 22:4 145:5
assist 90:3
assistant 23:17 41:6 42:11 50:8 51:19 52:10 161:2
assistive 90:1
associated 22:1 91:9

136:24 137:1
assume 7:17 193:13
ATF 88:3
attached 163:17, 20
attempt 98:13 103:11
attempted 114:9
attempting 114:14
attended 38:22
attorneys 5:12
audio 48:2 66:7, 12
audits 14:12
August 10:17 13:22 19:14 29:13 30:1, 20 33:2 34:15 43:18 73:17 86:13 87:25 89:22 103:20 104:8, 14, 19 105:7 156:8, 17 157:5, 9 183:4, 22 184:6 199:20
author 142:9
authored 145:6
Authority 61:8
authorization 127:13 146:7
authorize 115:17 117:18 118:8 144:8 146:23 158:11
authorized 112:16 113:3 115:13 117:2, 10 144:19 146:21
authorizing 144:15
auto 136:17
available 3:14 17:16 35:4 42:20 43:12 44:6 67:18 92:15 98:4 100:3 103:8 105:19 137:24 138:2 140:21 184:23 199:10
aware 30:17 51:6 55:18 91:8, 9 94:20 95:10 98:5 103:5 105:19 111:12 121:25 127:7 134:18 151:10 187:13, 17 188:22, 25 190:8

< B >
Bachelor's 9:24 10:3, 7
back 12:5, 24 18:21 24:22 25:1 28:24 29:18 37:11, 12 38:5 42:23 46:24 55:24 56:4 67:10 77:18, 21 80:8 83:10 86:8 87:18 94:25 105:24 115:11 123:24 141:1 145:11 147:5 148:23 153:4 154:5 157:9 159:21 161:5 162:4, 7, 13 163:11 164:16 166:7 168:10 181:12 190:24 191:9

background 9:23
bad 6:23
Bailey 2:18
based 4:7 48:14 56:23, 24 66:4 113:23 132:24 134:13 155:4 185:1
bases 112:21
basically 155:15
basis 59:20 69:2 79:14 97:23 98:13, 17 99:14 107:23 112:10 171:11 172:4 178:17
Bates 17:4, 12 81:2 181:7
bathroom 86:4
Beaumont 2:18
Beautiful 106:11
began 19:6
beginning 99:15
begins 56:5
Behavior 167:5
behaviors 104:22
believe 19:8 41:11 78:14 85:13, 19 107:7 184:17 197:17
Bender 40:7
beneath 160:1
benefits 12:3
BENJAMIN 2:15
best 6:23 27:4 152:14 184:1
better 71:22 134:1 171:2 180:25
beyond 82:21 91:6 121:18 193:21 194:17
big 180:7
biggies 194:4
bike 190:16
bin 36:19 37:1 142:16
Binding 78:20 79:2, 9, 18, 22 80:2 181:19 182:4
bit 25:2 29:3, 19 30:14 42:25 77:18, 20, 21 156:10 180:20, 25 186:21
black 171:12
Board 8:20 14:19, 21 27:8, 11 30:6, 8 31:21 33:8, 11, 15 34:15, 20 38:11, 13, 17 40:21 41:2 42:12, 24 45:13 46:10, 20 48:22 49:10, 18 56:7, 21 57:1, 7 65:17 66:23 67:2, 12 94:8 100:5 105:10, 15, 20 123:15, 21 138:3 139:13 141:20 142:7 155:5 157:25 163:16
board's 46:13 56:24 140:5
body 53:17
body-worn 32:14, 22 54:4

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 203 of 217 - Page ID#: 3705

Deposition of Captain Amanda Caton

Jason Laible, et al., vs. Timothy Lanter, et al.,

**bottom** 28:*12* 35:*22*
61:*22* 75:*13* 83:*12* 92:*10*
127:*22, 23* 142:*19, 21, 24*
**brain** 80:*17*
**break** 7:*20, 23* 38:*9*
85:*25* 86:*4* 153:*22*
**breakdown** 118:*12, 21*
119:*8*
**BRETT** 2:*12, 21* 30:*19*
**Brian** 40:*6*
**Bricker** 2:*8*
**briefly** 9:*22* 145:*11*
184:*12*
**bring** 34:*3*
**building** 22:*23* 24:*1, 3, 6,*
*11*
**built-in** 134:*11*
**bullet** 101:*3*
**bulleted** 145:*15* 172:*20*
**Bunning** 1:*6*
**bureau** 23:*16* 26:*6* 39:*2,*
*7* 88:*2, 21*
**Business** 12:*25*
**BWC** 113:*25* 114:*2*
**bystander** 109:*25* 110:*13*
**bystanders** 149:*2, 14, 22*
150:*12*

**< C >**
**call** 5:*22* 51:*23* 62:*18*
64:*11* 74:*15* 76:*11* 89:*1*
155:*13, 14* 167:*11* 189:*14*
**called** 22:*10* 24:*21, 23*
50:*9* 51:*8* 53:*8* 182:*16,*
*17, 18, 19* 189:*17* 194:*8,*
*18* 195:*5*
**calling** 64:*2*
**cam** 32:*13* 53:*17*
**camera** 32:*14, 23* 54:*4*
**Candace** 1:*8*
**Canine** 37:*14, 17, 19*
**capacity** 19:*2* 21:*5* 34:*13*
90:*1* 195:*25* 196:*1*
**CAPTAIN** 1:*11* 3:*4* 4:*2*
5:*1, 21, 22, 23* 6:*1* 11:*22*
12:*9* 13:*7, 9, 13, 16, 17, 18,*
*20, 23* 14:*1, 18, 24* 17:*18*
19:*13, 21* 20:*3* 21:*5*
23:*15* 28:*15* 30:*4, 17*
31:*4* 34:*10* 37:*12* 39:*13,*
*15, 17, 20, 25* 81:*13* 86:*8*
95:*4, 11* 107:*13, 18* 154:*5,*
*19* 160:*16* 161:*20* 162:*13*
163:*21* 192:*23* 198:*17*
199:*6*
**captains** 50:*9* 51:*8, 17, 19,*
*25* 52:*8*
**captured** 111:*23* 114:*1, 2*
**car** 107:*8* 109:*19* 111:*17*

**care** 110:*5*
**career** 10:*19* 135:*24*
**carry** 140:*9* 145:*16*
**cars** 75:*3* 108:*19* 148:*8*
**CASE** 1:*4* 8:*10, 11*
29:*21* 30:*7, 14* 32:*25*
33:*19* 34:*20* 39:*6* 41:*25*
42:*10, 18* 44:*14* 48:*23*
50:*21* 54:*15* 55:*23* 56:*8*
57:*6* 58:*1* 60:*24* 63:*17*
64:*12* 66:*15, 16* 84:*23*
86:*23* 87:*4, 15* 92:*1, 20*
94:*10, 16, 17* 96:*7* 102:*3,*
*23* 103:*3* 106:*17* 114:*20,*
*23* 118:*11* 119:*5* 120:*12*
121:*10, 21* 124:*23* 126:*20*
141:*19* 144:*6* 149:*3*
160:*4, 5, 17* 164:*5* 166:*1*
169:*6, 25* 183:*4* 184:*24*
186:*9, 12* 188:*11, 13, 23*
196:*3, 8, 9, 11* 197:*6, 24*
**case-by-case** 107:*23*
112:*10* 171:*11* 172:*4*
**cases** 41:*18* 58:*18* 69:*10,*
*13* 187:*9, 18, 22* 188:*8*
196:*22*
**Casey** 2:*18*
**CASUALTY** 2:*18*
**catch** 114:*9, 15* 126:*18*
**category** 59:*17, 22*
**CATON** 1:*11* 3:*4* 4:*2*
5:*1, 18, 23* 6:*1* 17:*18*
28:*15* 34:*10* 86:*8* 154:*5,*
*19* 198:*17* 199:*6*
**C-A-T-O-N** 5:*19*
**caught** 102:*11*
**cause** 75:*5* 108:*5*
**Center** 2:*9, 21* 76:*6, 11*
**Central** 12:*25* 20:*14*
22:*12, 13* 24:*3*
**Centre** 2:*18*
**certain** 30:*7* 136:*16*
173:*18* 177:*3*
**certificate** 12:*6*
**certification** 131:*22*
132:*14*
**certified** 5:*3*
**certify** 199:*5*
**cetera** 7:*11* 83:*19* 84:*25*
162:*15*
**CGIC** 22:*12* 24:*4, 18, 23*
**chain** 21:*11, 22* 22:*5*
23:*9, 18, 22* 25:*17, 23*
37:*20* 76:*22* 77:*7, 13*
90:*21* 91:*24* 118:*12, 21*
161:*12, 23* 163:*7*
**chairperson** 62:*11, 17*
**Chamber** 2:*9*
**change** 57:*5* 129:*12*
162:*7*

**changed** 14:*20* 28:*25*
145:*5*
**changeover** 145:*7*
**changes** 11:*11* 24:*21*
35:*4* 67:*19* 128:*25* 129:*7,*
*9* 130:*14* 131:*8, 9* 161:*11*
**changing** 194:*14*
**characterize** 46:*5*
**charge** 193:*8*
**Charles** 159:*22*
**chart** 89:*2, 4*
**check** 26:*14* 95:*23*
**checked** 154:*7*
**chief** 14:*13* 19:*5* 23:*17*
27:*15* 30:*6* 31:*6, 10*
33:*11* 36:*13, 15, 21* 43:*23*
50:*9* 51:*20* 52:*13* 56:*15*
60:*19* 64:*21* 142:*7, 15*
143:*3* 155:*5* 157:*7, 20*
158:*5* 159:*1, 2* 161:*7*
166:*8*
**chiefs** 51:*19* 52:*11* 161:*2*
**chief's** 13:*3* 50:*10*
155:*23* 157:*12*
**child** 194:*9*
**child-related** 194:*6, 7*
**chose** 137:*8, 16* 191:*20*
192:*2*
**Cincinnati** 1:*18* 2:*6, 11,*
*13, 15, 16, 23* 10:*13* 17:*9*
79:*6* 81:*1* 91:*2* 124:*23*
125:*4* 128:*23* 169:*1*
181:*4* 186:*18* 199:*16*
**CIRB** 27:*11* 28:*20* 29:*21*
30:*1, 4* 31:*7* 33:*18* 34:*24*
35:*6* 39:*5* 40:*22* 41:*18*
42:*21* 43:*4, 25* 44:*1*
48:*22* 50:*20* 56:*5* 57:*23*
58:*15* 59:*1, 12* 60:*7, 13,*
*19* 61:*9, 14, 21* 62:*23*
64:*7* 68:*14, 20* 69:*9, 12*
80:*9* 86:*12, 15, 22* 87:*6,*
*15* 91:*13, 16* 93:*3, 21*
94:*10* 95:*7, 20* 96:*7*
97:*19* 99:*21* 100:*1* 103:*9*
116:*7* 119:*2* 120:*11, 17,*
*22* 121:*8, 20* 122:*6, 15, 16*
123:*13* 124:*17* 126:*21*
128:*16, 22* 129:*13* 131:*12*
132:*17* 133:*3, 9* 134:*3, 18*
137:*22* 138:*12* 141:*3, 19,*
*25* 143:*9, 12, 17, 21*
144:*22, 23* 145:*4* 157:*4,*
*17* 163:*16* 183:*7* 186:*22,*
*24* 187:*10* 188:*22* 191:*10,*
*14*
**CIRBs** 42:*1, 4* 63:*5*
**CIRB's** 100:*18* 120:*7*
131:*16* 186:*15*

**Circle** 2:*18* 162:*24*
**circles** 159:*15*
**circumstance** 74:*15*
102:*24* 110:*21* 125:*21*
149:*3* 151:*16*
**circumstances** 8:*5* 68:*18*
74:*13, 18* 75:*1, 4, 5* 108:*4*
110:*16, 17* 125:*10, 15, 20,*
*22* 126:*1, 5, 6* 127:*6, 11,*
*15* 134:*13* 149:*12, 20*
174:*4* 178:*5*
**CIS** 57:*17, 19, 25* 58:*4,*
*18, 23* 63:*6, 15* 65:*25*
195:*5*
**citizen** 20:*7*
**citizens** 147:*15, 22*
148:*18* 176:*3*
**CITY** 2:*11, 15* 17:*13*
38:*19* 41:*6, 12* 42:*3, 12*
81:*2* 90:*13* 168:*19*
169:*24* 181:*8* 197:*4*
**Civil** 1:*14* 3:*7* 196:*2, 4*
197:*7* 199:*14*
**clarify** 16:*21* 160:*21*
**classification** 167:*21*
**clear** 133:*25* 148:*14*
168:*22* 174:*3, 8, 20, 25*
191:*11*
**clearly** 6:*25*
**Clermont** 196:*20, 21*
**client** 198:*7*
**closed** 13:*19*
**coffee** 115:*24*
**Colin** 160:*10*
**Collaborative** 13:*21*
**collective** 142:*8*
**collided** 151:*14* 152:*5*
**collision** 108:*5, 22, 23*
109:*2, 10, 18, 24* 110:*4, 13,*
*18*
**Colonel** 39:*1* 160:*25*
**combined** 13:*13*
**come** 20:*6* 29:*18* 30:*22,*
*25* 31:*2* 37:*11* 77:*18*
87:*1* 89:*13* 95:*15, 16*
99:*7* 115:*23* 133:*9*
136:*12* 144:*21* 153:*4*
161:*23* 187:*22* 188:*9*
**comes** 129:*5* 132:*5*
**coming** 148:*8* 156:*17*
157:*4*
**command** 21:*12, 22* 22:*5*
23:*9, 18, 23* 25:*17, 24*
37:*20* 76:*22* 77:*7, 14*
90:*21* 91:*24* 118:*12, 21*
119:*8* 161:*13, 23* 163:*8*
**commander** 23:*16* 26:*7*
39:*2, 8* 155:*16*
**commanding** 177:*2*

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 204 of 217 - Page
ID#: 3706
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

**commencement** 60:*14, 18, 25*

**comment** 186:*7*

**comments** 52:*23* 54:*9, 12* 162:*15*

**commission** 199:*19*

**committed** 15:*9* 16:*11* 112:*14* 137:*21*

**communicate** 55:*13, 19*

**communicating** 55:*5*

**communication** 157:*22*

**communications** 13:*5* 76:*6* 197:*16*

**community** 185:*21* 186:*3*

**COMPANY** 2:*18*

**compare** 46:*20*

**Complainant** 83:*19*

**complained** 189:*8* 190:*17*

**complaints** 20:*7* 23:*5*

**complement** 52:*3, 4*

**complemented** 42:*19*

**complete** 45:*1* 64:*10*

**completed** 51:*3* 160:*22*

**completely** 11:*14* 155:*17*

**completeness** 26:*12* 35:*14* 45:*14, 18* 46:*5*

**completes** 160:*7*

**completing** 26:*20*

**compliance** 68:*22* 72:*2, 6* 86:*23* 111:*25*

**complied** 86:*16*

**comply** 70:*4* 73:*24* 176:*22* 177:*14* 182:*6, 8*

**compositions** 42:*4*

**comprises** 66:*3*

**computer** 199:*9*

**concept** 127:*6* 170:*15, 20* 171:*18*

**concerning** 42:*9* 110:*10*

**CONCLUDED** 198:*17*

**conclusion** 97:*24* 98:*10* 99:*20* 128:*21* 130:*5, 12* 133:*10* 137:*6* 140:*11, 17* 191:*11, 13*

**conditions** 100:*13* 107:*11* 108:*16* 110:*20* 111:*3* 113:*14, 15* 115:*1, 8* 126:*11* 148:*21* 149:*8* 174:*9, 14*

**conduct** 18:*3* 23:*3* 24:*16* 44:*20* 68:*3* 72:*1* 81:*18* 82:*10, 25* 83:*22* 85:*13* 116:*1* 120:*12, 18, 23* 121:*8* 140:*6* 174:*5* 176:*15* 183:*3*

**conducted** 25:*4, 7, 19* 48:*17* 59:*18* 60:*2, 14* 82:*6* 84:*15*

**conducting** 90:*17, 20, 23*

**conference** 50:*10* 52:*7*

**confront** 79:*5*

**confusing** 70:*22*

**consider** 86:*15* 87:*16* 100:*20* 101:*1* 102:*14* 110:*24* 111:*2* 143:*21* 145:*16, 18, 25* 146:*2* 149:*11* 151:*21, 25* 152:*1* 172:*13* 173:*5* 183:*7*

**consideration** 48:*1* 174:*19*

**considered** 86:*13* 100:*2* 112:*2* 120:*22* 122:*10* 124:*18*

**considering** 172:*17*

**consistent** 35:*1* 43:*5* 67:*6, 15* 68:*3, 7, 22* 69:*14*

**Constandinidis** 2:*25*

**constitute** 70:*25* 71:*2* 126:*5* 148:*17* 149:*3* 151:*16*

**constitutes** 168:*14*

**contain** 17:*20*

**contained** 66:*17* 72:*12* 82:*2* 92:*5, 6* 172:*25* 183:*8, 20*

**contains** 74:*2, 5* 81:*8* 179:*3* 182:*24*

**contemplated** 186:*17*

**content** 50:*3* 57:*12, 15* 164:*8*

**Contents** 18:*5* 82:*14* 83:*11* 96:*2* 182:*13, 21*

**context** 22:*5*

**Contexts** 18:*5*

**continually** 118:*3* 177:*8*

**continuation** 100:*8* 111:*5*

**continue** 107:*21* 110:*12* 112:*4* 145:*19* 151:*17* 152:*21*

**continued** 110:*22* 140:*23* 172:*16*

**continues** 72:*10*

**continuing** 132:*14*

**contract** 199:*13*

**contributed** 98:*10* 99:*20* 100:*7*

**contributions** 56:*20*

**control** 23:*22* 26:*14* 61:*10, 15, 16* 83:*15* 84:*22* 91:*1* 118:*3* 177:*8*

**controlled** 146:*19*

**convene** 31:*7, 20* 33:*8* 59:*13*

**convened** 33:*18* 41:*17* 42:*1* 50:*21* 56:*7* 60:*8, 20* 63:*5* 145:*3*

**convenes** 93:*3*

**convening** 33:*11, 14, 17* 34:*20* 38:*11* 40:*23* 95:*7* 143:*13*

**conversation** 33:*10, 13* 36:*21* 81:*10* 157:*21*

**conversations** 104:*2* 143:*3, 8, 17* 160:*11* 185:*14*

**conveyed** 105:*5*

**coordinate** 30:*8, 10* 155:*21*

**coordinator** 14:*18* 30:*5* 34:*14* 56:*13, 18* 58:*14, 25* 62:*22* 64:*7, 20* 93:*4* 119:*2* 142:*9*

**copies** 16:*25* 17:*15* 34:*4* 66:*7* 154:*16* 165:*11, 13*

**copy** 49:*24* 80:*20* 159:*10* 163:*4* 166:*21, 24* 180:*4* 181:*10*

**corner** 127:*23*

**Correct** 8:*13* 10:*20* 18:*19* 19:*15* 26:*22* 27:*9, 20* 36:*14* 38:*12, 14* 41:*8, 14* 43:*7, 24* 44:*11, 12* 45:*1* 54:*5* 69:*10, 19* 72:*25* 73:*21* 74:*11* 78:*14* 84:*15* 88:*11* 90:*4* 91:*2, 3* 92:*8* 97:*15* 98:*7* 125:*19* 127:*4* 135:*6* 139:*4* 141:*5* 155:*25* 158:*13* 161:*10* 163:*22* 166:*15* 170:*22* 173:*8* 177:*24* 179:*18, 21, 25* 187:*7*

**corrections** 160:*12, 20* 161:*5* 162:*19*

**correctly** 59:*3* 107:*8* 119:*25*

**correspond** 152:*7*

**counsel** 1:*15* 3:*2* 6:*17* 7:*4* 9:*3, 5, 8, 10* 16:*24* 17:*15* 29:*11* 73:*8* 80:*22* 96:*2* 199:*12*

**counseling** 164:*23, 24*

**County** 196:*19, 20* 199:*3*

**couple** 86:*3* 151:*9* 182:*15*

**coupled** 126:*12*

**course** 20:*11* 41:*21* 59:*13* 104:*4* 109:*1, 6, 10* 135:*23*

**COURT** 1:*1, 21* 5:*6* 6:*5, 25* 77:*24* 80:*14* 155:*8* 199:*13*

**cover** 159:*23*

**COVINGTON** 1:*2*

**COWAN** 2:*11* 4:*11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21* 15:*24* 16:*1* 26:*19* 37:*2* 41:*22* 42:*13* 55:*8* 59:*19, 21* 69:*1, 3* 73:*10* 86:*1* 108:*8* 116:*12* 118:*23* 122:*8* 129:*20* 150:*15, 22, 24* 152:*23*

**conversation** ...

153:*18, 23* 154:*10* 156:*19, 23* 159:*5, 9* 167:*1* 169:*18* 172:*1* 173:*21* 174:*12, 24* 175:*2, 21* 176:*16* 177:*4, 22* 178:*2, 16, 18* 198:*5, 8, 12*

**CPD** 1:*11* 3:*4* 4:*2* 5:*1* 21:*17, 21* 22:*5* 23:*22* 30:*19* 33:*14* 37:*13, 20, 24* 70:*7* 71:*19* 72:*10, 23* 73:*23* 74:*10* 77:*7* 88:*11* 89:*17, 25* 90:*3, 6, 15, 17, 21, 24* 91:*6, 15, 21, 23* 98:*2* 109:*3, 7, 22, 25* 125:*16* 149:*16* 170:*20* 172:*9* 187:*5* 189:*4* 195:*18* 198:*17* 199:*6*

**CPD's** 72:*13* 78:*23*

**create** 108:*4* 178:*15* 188:*17*

**created** 101:*6* 139:*25* 140:*7*

**Crime** 22:*17* 23:*4, 10, 21* 24:*19* 38:*2* 88:*1, 10, 13, 22* 126:*8, 13, 16*

**crimes** 193:*18, 22* 194:*8* 195:*2, 6, 9*

**Criminal** 57:*16* 58:*5* 85:*5* 193:*14, 25* 194:*23, 24* 195:*4* 196:*4, 8, 9, 21*

**Critical** 8:*19* 14:*20* 27:*7, 11* 28:*21* 30:*5* 32:*16* 34:*14* 43:*22* 59:*1, 8, 17* 60:*1* 65:*17* 67:*23* 68:*14* 155:*4*

**CROSS** 4:*2* 171:*14*

**crossed** 171:*23*

**cross-examination** 1:*13* 3:*6* 5:*7*

**cruisers** 71:*19*

**current** 5:*20*

**currently** 13:*24* 28:*22* 81:*8* 184:*20* 197:*3*

**curriculum** 136:*24* 137:*1*

**custody** 105:*7, 11, 21*

**customary** 96:*16*

**< D >**

**dash** 32:*13*

**dash-cam** 32:*10, 20* 53:*23*

**date** 12:*10* 60:*18, 19, 24, 25* 102:*20* 103:*1, 10, 19* 105:*8, 22* 156:*7*

**dates** 11:*13* 157:*7*

**David** 1:*6*

**day** 106:*11, 14* 113:*15* 174:*17* 199:*16*

**days** 60:*14* 197:*21*

**day-to-day** 20:*9*

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 205 of 217 - Page
ID#: 3707

Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

**de** 116:*11*
**deadly** 195:*17*
**dealing** 84:*24*
**decent** 12:*2*
**decides** 60:*19*
**deciding** 145:*18*
**decision** 97:*19* 115:*22*
123:*12, 18, 20* 140:*16*
**decisions** 71:*20* 118:*9*
119:*15, 17, 24* 147:*3*
**DEFENDANT** 2:*13, 16*
8:*11* 195:*24* 196:*2, 7, 11, 22*
**Defendants** 1:*9* 2:*11, 19*
96:*3*
**defense** 154:*17* 184:*22*
**Defensive** 182:*17*
**deficiency** 197:*15, 16*
**define** 61:*13* 69:*24*
125:*22* 153:*6*
**defined** 29:*22* 60:*1* 70:*8, 24* 130:*7* 153:*12* 199:*13*
**defines** 79:*17*
**definition** 127:*5*
**degree** 10:*7* 101:*5*
139:*25* 140:*6, 8* 151:*21*
**deletions** 142:*11*
**deliver** 36:*16*
**Dennis** 39:*20*
**Department** 10:*13, 19*
11:*7, 24* 12:*13* 14:*13*
15:*18* 17:*10* 20:*9, 12, 15, 23* 35:*1, 8* 55:*5, 14* 65:*22*
67:*15* 68:*2, 4, 7, 22* 69:*14*
70:*5, 9, 24* 71:*9, 14, 16*
72:*3* 77:*14* 79:*6, 17, 23*
80:*3* 81:*1* 84:*15* 91:*2*
107:*13, 19* 109:*12* 110:*10*
115:*7* 117:*15* 119:*7*
120:*22* 123:*5* 124:*24*
128:*24* 132:*8, 10, 25*
134:*23* 135:*3, 8, 10, 16, 22*
137:*25* 150:*14* 151:*19*
152:*21* 153:*5* 167:*16*
168:*16* 169:*2* 171:*4, 21*
173:*9* 178:*14* 179:*11*
181:*5* 185:*15, 22* 186:*1*
192:*6*
**department's** 18:*2* 47:*10*
68:*20* 72:*6* 133:*7, 16, 21*
134:*5* 137:*8, 16* 191:*18, 20* 192:*3*
**department-wide** 14:*15*
79:*14*
**depend** 110:*15*
**depended** 96:*18*
**Depending** 70:*1*
**depends** 16:*14, 17* 108:*13*
**depose** 199:*6*
**deposed** 5:*25* 192:*18*

**deposition** 1:*10* 3:*3, 8, 10, 13* 8:*16* 9:*18* 104:*17*
197:*20, 24* 198:*9, 17*
199:*7, 8, 10*
**describe** 17:*25* 21:*11*
27:*10* 34:*21* 93:*8*
**described** 131:*25*
**describes** 18:*13* 28:*20*
**Description** 47:*3, 7, 14*
87:*22* 167:*20* 168:*2*
**designated** 91:*22* 119:*11, 16, 23*
**designating** 82:*8*
**desk** 21:*10*
**destroyed** 95:*13*
**destruction** 14:*15* 94:*21*
**detail** 87:*21* 180:*12*
**details** 188:*4*
**detective** 193:*13* 195:*1*
**detectives** 193:*18, 24*
**determination** 64:*6* 121:*1*
**determine** 34:*25* 43:*4*
61:*18* 62:*14, 18* 66:*23*
67:*2, 13* 68:*2* 86:*23*
129:*8* 131:*7* 134:*3*
172:*10*
**determined** 43:*22* 64:*9*
71:*15* 97:*19* 117:*9*
126:*21* 128:*22* 129:*21*
133:*3* 178:*14* 191:*14*
**determines** 69:*13*
**determining** 112:*3* 129:*11*
**dictating** 74:*6*
**differences** 14:*9*
**different** 13:*11* 14:*11*
22:*15* 24:*19* 28:*25* 29:*7*
41:*9* 53:*20* 68:*12* 178:*19*
**differently** 70:*20* 150:*8*
**DIRECT** 4:*2* 76:*22* 77:*8*
118:*5*
**directions** 72:*12*
**directive** 31:*10* 80:*2*
177:*17, 18, 20*
**directives** 74:*6* 78:*20*
79:*3, 9, 13, 18, 23* 80:*3*
130:*20* 131:*4* 168:*15*
178:*1* 181:*18, 20* 182:*4*
**directly** 34:*23* 36:*15*
142:*6* 192:*16, 20* 193:*4*
195:*19*
**disadvantaged** 42:*11*
**Discharge** 14:*19* 58:*22*
**Disciplinary** 17:*9, 24*
18:*8* 136:*15* 143:*22*
169:*1*
**discipline** 16:*15* 18:*8, 12, 16* 54:*22* 144:*2, 3, 5*
164:*14*
**discourtesy** 16:*3*

**discovery** 197:*16*
**discretion** 127:*13*
**discuss** 5:*13* 184:*5*
**discussed** 90:*10* 93:*5*
97:*3* 144:*14* 178:*6*
184:*21* 185:*17* 197:*20*
**discussion** 52:*20* 54:*6, 14, 18, 21* 55:*4, 12, 17, 18*
56:*24* 93:*9, 11* 96:*6*
123:*25* 192:*11*
**dispatcher** 76:*8, 10, 13*
**disregard** 137:*8, 16*
147:*14, 21* 148:*18* 149:*7*
153:*6* 176:*2* 179:*23*
191:*20* 192:*2*
**disregarded** 192:*4, 9*
**distribute** 165:*12*
**DISTRICT** 1:*1* 12:*19*
13:*2, 18, 20, 24* 16:*5*
19:*24* 20:*1, 5, 10* 190:*23*
192:*15, 23, 24*
**Districts** 12:*17* 195:*10*
**divided** 146:*19*
**divisions** 12:*14*
**doc** 181:*13*
**document** 17:*5, 12* 28:*11, 12, 20* 45:*13* 72:*20* 73:*12*
78:*7* 79:*21* 80:*11, 25*
81:*14* 101:*17* 165:*20*
175:*3* 180:*25* 181:*4*
184:*23*
**documentation** 155:*23*
188:*18, 23*
**documents** 9:*2* 79:*21*
81:*5* 91:*15* 104:*16*
197:*13, 15*
**doing** 22:*4* 27:*2* 33:*19*
59:*10* 77:*12* 94:*8* 147:*13*
162:*9*
**Donna** 40:*9*
**Doug** 39:*25* 160:*17*
**downtown** 12:*25*
**draft** 56:*18, 23, 25* 57:*8*
**Drive** 2:*9*
**driver** 136:*12, 18, 20*
139:*6*
**driving** 71:*19* 72:*25*
74:*3, 6* 99:*24* 100:*15*
101:*11, 12* 108:*2* 111:*11, 13, 19, 24* 113:*11* 114:*6*
134:*20, 24* 135:*4, 16, 21*
136:*2, 3, 5, 9* 137:*15*
138:*14* 139:*10, 20* 146:*23*
155:*11* 157:*18* 175:*7*
182:*18* 186:*3*
**drug** 14:*16* 194:*10*
**due** 148:*13* 197:*21*
**duly** 5:*3* 199:*5, 6*
**duties** 18:*25* 20:*2, 19*
22:*1* 71:*1, 11* 133:*6*

134:*12* 167:*22* 191:*17*
193:*5*
**duty** 70:*7, 19* 71:*6* 80:*5*
135:*5, 7* 176:*21* 182:*8*

< E >
**earlier** 37:*12* 91:*23*
124:*7, 17* 144:*14* 161:*14*
166:*23* 170:*14* 176:*21*
178:*6* 179:*5* 181:*20, 21*
184:*22*
**East** 2:*5*
**EASTERN** 1:*1*
**edits** 57:*7* 161:*21* 162:*14*
**Education** 10:*11* 11:*2, 5*
**educational** 9:*23*
**EEC** 76:*4, 5, 9, 11*
**effect** 103:*23*
**effective** 73:*3, 17*
**effectively** 116:*10* 155:*22*
**efficient** 79:*11*
**either** 33:*1* 51:*4*
**electronic** 65:*2, 13* 88:*4*
162:*2, 5, 11* 164:*20*
165:*12* 181:*10*
**Eliot** 142:*16* 158:*25*
159:*19*
**e-mail** 16:*25* 17:*15*
31:*16* 51:*11* 57:*1* 80:*23*
161:*23* 162:*15*
**e-mailed** 49:*9*
**e-mails** 49:*4*
**emergency** 13:*5* 72:*21, 24* 76:*6* 99:*24* 113:*12*
138:*18* 147:*9, 10* 175:*6*
176:*1*
**employed** 35:*3* 43:*8*
44:*10* 66:*24* 67:*17* 68:*9*
**employee** 164:*20*
**employee's** 164:*22*
**employment** 11:*2* 12:*13*
**encounter** 67:*6, 15*
**encounters** 68:*6*
**ended** 108:*23*
**ends** 56:*12* 163:*15*
**enforcement** 89:*21* 91:*5*
**engage** 83:*3* 97:*20* 98:*18, 25* 149:*24* 150:*13* 173:*18*
**engaged** 15:*19* 73:*25*
109:*4* 117:*22* 121:*5*
122:*19* 123:*9* 168:*5, 13*
183:*3*
**engagement** 99:*6* 144:*12*
**engaging** 37:*23* 76:*18*
115:*21* 116:*2, 24* 172:*16*
173:*7, 11*
**ensure** 135:*14* 173:*18*
179:*16, 19, 22*
**entail** 25:*21*

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 206 of 217 - Page
ID#: 3708

Deposition of Captain Amanda Caton                          Jason Laible, et al., vs. Timothy Lanter, et al.,

entailed 131:18
entered 10:15
entirety 101:16 175:10
entitled 181:4
entry 16:16 164:22
equip 172:9
erratic 100:16 111:11
ESL 164:19, 20, 21
ESQ 2:3, 8, 11, 13, 15, 16, 19
essentially 194:15
establish 103:18
established 56:15 88:4 105:5, 20 173:4 176:21
ESTATES 2:3
estimate 6:9, 11
et 1:3, 7 7:11 83:19 84:25 162:15
evaluate 45:17 121:8 131:24 132:1 172:15 197:23
evaluated 44:18 46:16 120:12
evaluating 131:11 172:17
evaluation 120:7, 11, 17 131:14
evaluations 62:22
event 60:8 187:1
events 6:15 8:10 157:2 186:7, 8, 11
everybody 181:10
evidence 46:21 62:15, 25 63:6, 15, 18, 24, 25 66:14 119:22 138:8 198:1
exact 113:7 174:8
exactly 26:9 31:11 53:18 174:14 190:21
examination 3:14 199:10
examine 122:6
examined 5:4 120:18 187:9, 18
examining 132:2
example 20:21 44:5 83:14 136:14 148:5 151:4, 9 175:22, 24 177:5 184:16
examples 148:16 151:9
exceed 113:17 124:19
exceeding 124:5
exception 7:21 178:4
excerpt 128:1
excuse 117:20 159:17
executed 72:2, 5
executive 47:9
EXHIBIT 4:5, 6, 7, 8, 9, 23, 24 16:19, 23 17:19 27:21, 25 28:8 33:25 34:2, 9 38:6 40:13 42:24 45:3, 9 46:24 47:17, 18, 23 48:12 49:15 50:18

56:2 60:24 61:22 62:4 65:10 72:15, 19 77:23, 25 78:2, 6, 16 80:13, 18, 21 86:9, 14 87:20 92:7 98:6, 9 100:23 101:17 105:25 113:10, 20 117:7 120:11 124:14 130:22 145:1, 11 153:17 154:6, 13, 15, 21 158:17 159:6, 8, 15 163:8, 13, 19 165:6, 9, 16 166:9, 11, 23 168:23, 25 169:12, 13 175:6 180:2, 14, 17 181:9 185:2 191:10
EXHIBITS 4:22 37:4
exigent 74:12, 15, 18 75:1 125:10, 14, 19, 22, 25 126:5 127:6, 11, 15 178:4
exist 173:17
exists 77:13
expect 46:1 94:24
expectations 132:7
expected 95:6 132:11 133:18 134:8 135:1, 2
experience 66:4 107:12, 19 115:6 119:3 136:13 179:10
expires 199:19
explain 47:11 74:25 99:7 112:21 129:2 138:14 151:22 192:22
explaining 127:5
explanation 127:7
explicit 127:12
explicitly 68:19
Explosives 88:3
extent 73:16 121:17 184:3

< F >
face 80:25
fact 99:9 106:17 108:21 135:2, 7
facto 116:11
factor 102:13 111:4 112:2 149:10
Factors 100:20, 25 101:1, 20, 25 110:23 111:2, 8 138:20, 21 140:2 145:15, 18 146:1, 3 148:21, 23, 24 151:20, 25 170:24 171:9 172:12, 18, 19, 21 173:1
facts 30:16 46:18 47:17 92:5 93:5 114:4 119:7, 12
factual 92:12 100:3
failing 71:8
fails 70:23
failure 70:18, 25 71:2, 10 167:6

Fair 7:18 15:11 20:15 21:15 23:19 37:16 46:3 71:18, 25 72:9 96:21, 24 108:1 114:15 115:19 118:19 129:19
falls 83:24
familiar 6:14 21:7 22:9, 20 23:12 36:5 37:14 72:19 78:6 81:13 165:15, 17, 19
far 20:6 21:9 46:17 61:17 84:18 134:17 156:24 157:20 172:12 197:18
fast 148:20
faster 114:16 125:17
fatal 109:2
FDB 38:19
Federal 1:13 3:7 88:14
feedback 186:2
feels 14:14
felony 195:8
felt 64:9 162:22
Feltner 188:15
Fifteen 80:14, 15
fifth 127:21 142:21
file 58:5 64:22, 24 65:15, 19, 21, 22 66:3, 4, 18, 20 94:10, 17, 25 95:8, 14, 19
files 57:19 58:2, 19 64:25 65:25 66:1, 12
final 25:10, 13, 15 64:20 66:13 107:4 118:9 147:3 161:7
financial 168:19 169:24 195:6 199:14
find 16:10 166:22
finding 15:18, 22 16:12 98:17 99:12, 14, 19 100:8 116:8 132:23 168:12 170:2
findings 15:7 18:12 100:18 112:22 116:6 120:15 128:10, 16 141:25 144:23 183:18
fine 6:9, 11 7:16 86:1 170:12 180:9
finish 26:19 41:22 174:12
Fink 159:22 160:1, 6
Fink's 162:1
Firearms 14:19 58:22 88:3
fired 59:6
firm 199:13
first 5:3 6:22 38:18 50:6, 24 78:12, 22 87:24 97:18 149:18 159:21 190:18 199:6
five 28:3

fleeing 108:2 109:23 149:16 151:11, 14 152:4
flip 75:11 84:1 159:4
flow 6:15
FNA 158:7
focus 159:7 157:17
focusing 138:13 139:9, 19
folder 65:13 94:7
folks 154:17
follow 70:10, 13 71:3, 8 74:11, 22 80:4, 5 177:21 178:1
followed 121:22, 23
following 71:5, 21 109:9 112:5 121:18 122:1 138:20 167:23
follows 5:4
forbids 146:5
force 20:6 22:10, 18 23:4, 10, 21 24:19 25:10 26:3, 6 27:18 28:12 34:25 35:3 43:5, 11, 15 44:5 59:1, 8 67:5, 14, 18, 24 68:6, 15 69:19 131:9 191:3 195:17
force-related 191:2
foregoing 199:7
forgetting 194:3 195:11
forgotten 155:17
Form 155:14 156:7 157:23 163:12, 15, 20 164:1 165:17
formalities 3:9
Format 61:23 81:7
formed 98:12, 17
forth 1:16 199:8
forums 186:6
found 15:9 129:14 141:20
four 192:24
frame 111:18, 19
Friday 100:12 106:3, 9
Friedman 2:4
friend 181:13
front 17:19 28:7 31:12 40:13 81:14 124:13 145:13 166:8
Ft 2:10
fulfill 71:10
full 42:19 133:6, 13 134:4 135:3 137:18 138:1 140:18 191:17
fully 197:22
function 17:25 89:7 91:13
further 77:21 80:11 184:25 185:7 197:10 198:2
furtherance 37:23

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 207 of 217 - Page
ID#: 3709
Deposition of Captain Amanda Caton                                Jason Laible, et al., vs. Timothy Lanter, et al.,

future 95:24 152:16

< G >
Gabel 164:25
Gang 20:21 21:12 22:2
38:2 88:1, 9, 12
GAYLE 2:4
GB 75:13
general 6:15 42:7 54:11
66:9, 10 77:20 82:24
94:12 107:24 132:24
170:4
generally 32:15 51:15
56:3 63:13 84:13 92:11
106:14 120:14 195:13
generated 34:13
generation 56:21
Gerhardstein 2:4
gestures 7:10
getting 24:25 59:23
117:25 186:23
Gilbert 2:4
girl 190:3, 4
give 7:6 9:22 58:17
115:23 151:8
given 31:20 32:16, 19, 22
33:1, 7 105:9 142:14
163:21 174:17 199:7
gives 160:16 171:22
giving 80:20
go 6:19 7:5 11:10 23:14
27:24 34:1 37:3, 6 55:24
56:4, 11 57:11 80:8
83:10 87:3 95:22 108:9
116:13 123:17 124:25
125:5, 11, 16 126:18
127:14 128:20 136:18
147:5 148:11, 14 150:16,
23 152:24 153:21 157:6
162:24 167:4, 10 168:10
173:22 175:23 176:17
177:23 178:3 180:8, 17
181:1 182:13 184:12
185:2 198:15
goals 37:24
goes 16:16 26:6 112:25
113:2 125:23 142:6
148:23 184:18
going 7:17 18:21 26:25
32:12 38:5 42:23 76:1
83:17 85:25 87:18 90:3
105:24 114:16, 24, 25
115:11 118:15 126:21
148:6, 9, 20 157:24
159:21 163:11 175:14, 15,
16 191:9
gonna 9:21 16:22 17:14
25:1 28:2 33:23 35:19
37:5 77:19, 21, 22 80:12
150:1, 4 152:12 153:16

154:6 165:8 178:22
180:4, 6, 11, 16 182:13
197:17
Good 5:9, 10 109:21
167:7
govern 74:14 83:3 183:2
governed 37:19 72:11
governing 182:24
grab 37:4
graduated 10:4, 6, 16
grammar 162:20
gray 171:16
Graydon 2:8
great 29:15 69:23
greater 127:14 171:7, 14,
24 173:12 174:4
GREENE 2:3 4:4 5:8,
11 16:20 17:14, 17 27:22
28:1, 5 29:10, 17 34:3, 7
37:5, 9 41:24 45:4 59:20,
24 69:2, 5, 8 72:16 73:8,
13, 15 78:1, 4 80:15, 19,
22 81:12 85:23 86:2, 6
153:20, 25 154:3, 9, 11, 14,
16, 18 156:21, 25 159:7,
11, 13 165:7, 10, 14 175:1,
4 178:17, 24 179:2
180:15, 19, 23 181:2
184:19 185:3 197:9
198:6, 14
ground 6:19
guess 29:13 171:18
guessing 155:2
guidance 131:14
guide 79:4 141:10 181:5,
15 182:4, 10, 12, 24 183:9,
12, 21 184:4, 8
guided 132:6
guideline 138:17 145:23
179:13
guidelines 18:3 81:18
121:12 129:25 141:11, 12,
16 183:25
guilty 196:18
Gun 22:10, 17 23:4, 9, 21
24:19 38:2
guns 22:12, 13
guy 190:15
guys 34:5 78:3 165:12

< H >
Hamilton 196:19
hand 17:2 28:2 36:16
126:8 165:9 199:15
handing 28:1 45:7
hands 190:3
handwriting 158:17, 20
159:17
handwritten 159:16 166:8
happen 108:19 150:2

happened 50:12, 24 53:4
110:17 164:5 166:20
happening 77:2
happens 24:10 74:16
109:17 142:3 144:25
163:25
hard 107:3 186:23
hardcopy 65:13
harm 149:9, 14 152:18
Harper 112:13 113:22
114:24 120:8, 19 121:3,
16, 19 122:2 124:1
132:19 138:7 139:3
156:3 164:25 186:17
191:24
Harper's 99:5 114:2
187:5
head 5:24 7:11
heading 82:15
heard 22:17 88:23
hearing 55:12, 17
heavy 100:14 106:6, 17
107:11 110:21 111:4
held 12:8 14:10
help 6:20
helpful 178:20
hereinafter 1:16 5:3
hereinbefore 199:8
hereunto 199:15
hey 162:25
high 79:11 140:8
high-level 179:11
highlighted 182:15
High-Risk 183:2
highway 146:19
hired 10:14
history 11:11 143:22
196:22, 25
hit 107:5
Hollister 1:17 2:12
home 10:21
homicidal 105:2 151:13
152:5, 10
homicide 193:13
homicides 193:10, 12, 21
194:4
honestly 53:11
hop 180:21
hopefully 34:5 180:12
197:17
hour 96:12 106:8 113:18
114:3 115:4 124:7, 21
125:11, 24 126:18, 22
127:15 128:18 175:15
hours 96:23 132:14
house 111:16
houses 24:4
housing 25:10, 14
hundred 6:12

Huntington 2:21

< I >
idea 156:20 164:6, 7, 12
188:2
IDENTIFIED 4:5 8:9
99:10 120:1 178:20
identify 63:1 174:25
identity 101:7 102:1, 4, 6,
14 103:4
IIS 8:21 14:1 33:5
44:24 45:7, 9 47:18, 23
48:17 49:18 51:3 57:18,
20 58:19 61:4 63:6, 15,
18 65:8, 14 82:6, 8, 10, 11
83:2, 3, 9, 21, 23 84:7, 16
92:7 98:6, 9 99:10, 12, 20
104:10, 12, 21 117:4, 6, 8
126:24 141:21 158:18
159:21 161:9, 15 164:17
166:9 187:18
IIS-related 82:22
immediately 76:13
importance 101:24
important 101:22 115:16
improper 126:23
incidences 61:17
Incident 8:19 14:20 27:8,
11, 15 28:21 30:5, 23
32:16 34:14 35:1 42:9
43:22 47:2, 6, 14 59:17
60:1 61:11 65:17 67:23
87:22 97:4 123:22 129:1
137:7 139:12 155:4
191:19 195:17
incidents 59:2, 9 68:14
include 38:17 49:21
87:10 123:23 130:8
167:22 194:6
Included 38:20 47:8
58:18 63:5, 24 144:4
includes 27:17 41:5
including 63:8 113:14
135:4
independently 100:1
INDEX 4:1
indicate 49:5 140:22
indicated 104:18 137:15
151:11
indicates 110:21 150:10
indicating 35:18
indication 103:9 104:13
individual 161:18 172:4
INDIVIDUALLY 2:22
163:10
individuals 38:18 41:1
121:20
informants 84:21
information 31:19 33:7
46:21 49:1 92:6, 14, 23

93:1 98:1, 2, 4, 5, 8, 12, 16
100:3, 18 103:8, 18, 23
104:6, 9, 12, 25 105:4, 9,
19 118:1 119:22 137:24
138:8 140:20 150:9, 18,
21 151:1, 2, 6 152:3, 7, 17,
19 188:3
**informed** 31:19
**initial** 99:6, 15
**initially** 97:20 98:18
**initials** 159:18
**initiate** 112:4 145:19
**initiated** 111:20 112:1
**initiates** 72:10
**initiating** 76:14 172:15
**initiation** 111:5, 13
**injured** 108:24
**injury** 25:25 107:2, 16
108:6 149:1, 21 150:4, 11
168:18 169:6, 23 170:1, 5
188:14
**in-person** 1:10
**input** 42:8
**inservice** 132:15
**Inspection** 14:18 19:10,
14
**Inspections** 13:9, 10, 14
14:2, 12 21:6 23:1 25:1,
19 27:6 30:4 31:5 40:10
59:14 60:3 65:19 95:5
119:4 187:14
**instance** 43:14, 18 67:22
130:21 131:5, 18 138:5
176:6
**instances** 26:4 27:18
**instant** 61:11 68:12
**instruct** 198:7
**instructed** 7:5
**instructions** 82:25
**INSURANCE** 2:18
**interest** 199:14
**interested** 12:1, 7
**Internal** 8:20 12:21
13:16 14:4, 8, 22, 24 15:3,
13 16:9, 10 18:22 19:20
21:6 23:1 31:12, 22
35:13 40:3 44:24 47:10
49:12 57:17 58:24 65:6,
23, 25 66:2, 5 84:7 85:9,
20 116:6 143:25 145:5, 7
155:2, 3 160:3 162:3, 13
170:7 183:17 189:4
190:7 195:20
**Internal's** 58:2
**intersection** 148:14
**interstate** 146:18
**interview** 84:19 189:23
**Interviewing** 83:18 84:19,
20

**interviews** 48:5, 7, 9, 17
57:19 58:3 63:9 66:7, 13
**investigate** 14:25 66:15
193:8, 9, 11 195:2
**investigated** 16:5, 9
85:15 189:10
**investigates** 15:14 193:15
**Investigation** 12:21 47:10
49:12 58:5, 10, 19 64:22,
24 65:1, 15, 21 66:3, 18
83:4, 16 84:22 85:2, 21
91:10, 18 117:9 119:4
160:8 185:10 189:4, 13,
15, 21 191:2, 4 193:15
194:18
**Investigations** 13:16 15:2,
3, 8, 14 18:22 21:6 23:1
24:12, 16 25:5, 6, 7 31:22
35:13 40:4 44:25 57:17,
18 58:23, 24 80:25 81:17,
19 82:3, 6, 10, 22 83:1, 20,
22, 23, 24 84:4, 7, 13, 14,
17 85:5, 9, 12, 18 190:8
193:23, 25 194:16, 23, 24
195:4, 10, 20
**investigative** 57:18 58:2
61:23 88:1, 10, 13 192:25
193:2, 7 195:3
**investigator** 12:22 84:21
159:22 160:5 162:25
170:8
**investigators** 14:25 19:4
57:20 58:3 66:15 161:17,
19 193:8
**Investigator's** 83:16
**invited** 42:15
**involve** 68:15 152:18
162:14
**involved** 30:22 31:3
35:2 44:9 47:8, 21 48:14
54:23 58:9 66:24 67:17
68:8 89:25 91:5 112:18
115:15 117:12 119:10
121:9, 14, 16 122:5, 11, 12
123:15 133:4, 11 143:23
185:16 187:23 191:15
195:17
**involves** 69:17
**involving** 16:6 30:18
59:6 109:24 110:13
**Isaac** 36:13 157:7 159:1,
2
**Isaac's** 142:16 158:25
159:19
**issue** 30:16 44:15, 20
73:3 142:4 156:11 164:1,
15 166:1 169:8 170:1
183:4 186:8, 11
**issued** 36:10, 12 164:14

**issues** 35:7 61:18 63:2
93:5 139:15
**issuing** 157:21
**italics** 47:3
**Item** 67:8
**items** 172:23
**its** 24:5 71:14 79:1
80:25 83:22 89:10
120:17 127:10 141:21
157:8 171:22 172:9, 14
173:10 174:1 175:9
183:9 188:19

**< J >**
**jacket** 16:16 164:22
**JACQUELINE** 2:3 5:11
37:2
**January** 1:20 14:4
**JASON** 1:3 2:23
**job** 12:2 25:8 167:11, 13,
16, 17, 19, 20 168:2
**John** 39:2
**join** 11:24 144:9, 15
**joined** 11:7
**Jones** 39:13, 15 155:16
163:21
**Judge** 1:6, 7
**judgement** 99:5
**judgment** 35:9
**June** 29:14 30:1 36:10
40:21 142:4 156:16

**< K >**
**keep** 131:21 161:17, 19
194:14 197:24
**keeping** 27:24 94:2
**KENTUCKY** 1:1
**kept** 65:16 94:8 161:15,
20
**kids** 10:21 12:3
**KIMBERLY** 2:19
**kind** 13:4 23:8 25:9, 15,
24 30:10 48:25 51:22
58:24 82:8, 9 93:16
107:3 108:5 127:10
139:9 160:18 164:23
191:1 193:15 196:3
**kinds** 184:5
**KLEIN** 2:9
**Kleins** 108:24
**knew** 102:18, 24
**know** 7:16 8:1 9:20
16:15 18:4 21:14 24:15,
22 26:25 28:25 29:1
31:12 33:1 35:17, 23
41:15 49:8 51:2, 5 52:4
53:3, 22 55:23 57:3 61:4
66:4, 17, 19 73:7, 10
76:23 82:11 83:5, 6
84:18 88:15 89:14 93:20,

22 95:2, 21 96:9, 20
102:10, 19 103:2, 3, 13, 21
104:15 107:5 110:16
111:15, 17 114:12, 21
118:14 119:19 123:22
124:11 126:12 132:11
133:18 134:8 135:8, 22,
25 136:22, 23 140:13, 25
141:8, 9 144:22 146:12
148:22 150:1, 2, 17, 19
151:2, 6, 13 152:13 153:1
155:20 156:14 158:23
159:16 161:8, 16, 24
162:9, 18 163:1, 6, 9, 24
164:3, 13 166:20 167:15
169:5 170:2, 3, 7 171:10,
17 172:2, 7, 8 173:3
174:13, 15 177:5 181:15
184:3 185:5, 9, 13, 20, 24
186:1, 22 187:8, 16
188:16
**knowingly** 192:4
**knowledge** 8:9 35:10
44:19 89:6, 9, 12 119:5, 6
123:3, 7 132:9 133:4, 6,
14 134:4, 11 135:3
137:18, 23 138:1 140:18
141:9 150:3, 6 157:1
191:15, 17 192:8
**known** 27:7 100:15
101:7, 21 102:1, 4, 6, 15
103:4 111:10 149:20
150:21 152:10
**knows** 102:10 172:5
**KY** 2:10, 19

**< L >**
**lack** 16:3
**lacking** 134:15
**LAIBLE** 1:3 2:4, 23
**Laibles** 108:23
**laid** 21:3 121:12
**language** 178:11
**LANTER** 1:7 2:12, 21,
25 30:18 112:12, 16
113:22 114:6, 10, 16
115:12, 21 117:9 119:14
120:8, 18 121:2, 16, 19
122:1 123:9 132:18
138:6 139:3 144:7 156:3
164:18 165:3, 25 166:13
168:4, 13 186:16 187:4
191:23 192:12
**Lanter/Lieutenant** 192:12
**Lanter's** 99:4 116:1
144:12
**large** 81:8
**late** 186:23
**Law** 2:1 16:6, 7 89:21

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 209 of 217 - Page
Deposition of Captain Amanda Caton                                    ID#: 3711
Jason Laible, et al., vs. Timothy Lanter, et al.,

91:5  179:14
lawful  5:2
laws  111:25  112:6  131:3
lawsuit  195:24  197:3
lawsuits  196:24  197:2
lawyers  9:13
lay  29:7
laying  172:12
lays  18:15
Lazarus  2:21
lead  18:7  102:2  168:18
169:23
learn  51:7
learned  158:4
led  11:23
left  35:23  162:10
legal  3:8
legitimate  98:13, 23, 24
lesser  35:3  43:11  44:5
67:18
letting  155:20
level  16:5
Lexington  2:19
liaison  13:5
lieutenant  11:20  12:23,
24  13:2  23:15  39:1  40:6,
9  119:14  156:3  160:9, 10,
15, 25  192:25  193:1, 3
lieutenants  192:24  193:3
life  24:23  108:23
light  100:2  129:18  148:6,
7, 9, 15  197:25
lights  148:11
likelihood  148:25
likewise  41:1
limit  113:17  115:5  121:2
124:6, 20  125:1, 6, 12, 18
126:22
limited  81:10  113:14
167:23
line  171:23
list  39:12  79:20  167:13,
16  172:20
listed  38:18, 21  39:20
40:22  101:2  104:22
114:24  138:21  155:6
163:7  168:24
listened  48:4, 6, 8, 16
little  25:2  42:25  70:22
74:14  77:20, 21  85:25
150:8  151:23  156:10
162:19  169:15  180:20, 25
186:21
LLC  2:21
LLP  2:8
location  115:9
logistics  33:16
long  48:6  78:8, 9  80:24
96:9  114:22  162:9

190:22
longer  11:17
look  17:3  30:7  36:5
62:5  63:1  82:12  86:19
88:22  97:16  107:25
117:3, 4, 6  119:7  131:12
132:17  145:11  147:6
159:14  177:6  180:9
looked  44:23  70:21
86:22  87:6, 9, 10  183:12
188:20, 24  197:13
looking  9:1  26:10  45:25
60:24  62:3  68:24  75:20
87:21  97:25  100:22
105:25  123:22, 24  124:10
154:20, 23  166:7, 10
169:16  184:18
looks  69:9  120:7  142:17
loss  168:19  169:24
lost  169:15
lot  26:24  180:11
Lots  106:13
Loveland  197:4
low-level  25:25
lunch  96:15  186:23

< M >
Magistrate  1:7
mail  57:1
main  54:1
Maines  2:18
maintain  113:12
making  119:14, 17, 23
144:1
manage  180:12
managed  116:25
Management  83:17  84:23
managing  129:17
mandatory  70:12  73:23
74:3, 10, 20  145:22, 25
147:17  176:21  177:2, 11,
16, 25  182:5  189:22
manipulate  180:24
manner  100:16  111:11
130:2  147:25  148:3
Manual  17:8, 23  18:15
78:13, 19, 24  79:2, 8  81:1,
17  82:2, 16  83:1  84:2, 14
85:12, 18  132:9  168:25
manuals  131:3  166:19
182:1
March  10:14  60:25
MARIBETH  2:8
mark  16:22  27:24  77:22
153:16  165:8  180:16
marked  16:19  27:21
28:7  33:25  34:5, 9  45:8
72:18  77:25  78:6  80:12,
18  87:19  154:13  163:12

165:6  166:23  180:14
markers  174:20
marking  81:7  181:9
markup  163:3
MARVA  2:15
Mason  34:16  88:5  89:23
98:14  107:5, 9  184:7
185:11  188:18
Master's  9:25  10:10
material  30:9
materials  8:15  164:9
197:19
matrix  16:15, 22  17:20
136:15, 16  144:4
matter  5:13  50:4  90:11
103:8  104:3  118:17
123:5, 13  139:16  143:13
157:3  183:9  192:13
197:7
MATTHEW  2:13
Maysa  2:25
mean  22:11  25:14  28:23
32:5  45:20  48:5, 13
49:12  57:23  65:8  68:10
70:4  71:4, 22  74:13  80:1
83:6, 8  84:24  87:9  88:17
102:16  108:10  109:16, 17
111:16  116:16  126:16
128:7  129:23  130:6
131:2  132:1  137:11
139:21  140:13  142:7
147:20  148:2  150:1, 2, 19
151:23  152:12  153:1
170:4  171:10  173:14
174:13  175:14  188:8
196:2
meaning  30:6  33:2
43:18  87:12  90:15
101:16  133:16  139:2
178:9
means  47:11  65:14
158:7, 11  191:23  199:9
meant  116:24  121:15, 20
mechanism  61:10
medical  8:4
meeting  9:7, 10  30:11
38:17  41:2  50:13  51:14,
16, 23  53:10  54:7, 16
55:1, 7  90:10  93:9, 17
96:9, 22  97:1, 11
meetings  59:12  93:14
94:3  186:8
member  144:22  185:15
members  21:25  23:4, 6
33:14  38:3, 19  40:22
48:22  49:10, 18  55:5, 13
56:21  57:1, 7  79:23  80:4
87:25  89:10  93:21
120:22  142:8  143:17

member's  35:8, 10
memo  155:13, 15
memorialized  97:13
memorializing  157:12
mentioned  23:25  43:2
55:2  152:8
mentions  82:11
Met  9:3  38:13, 17  96:14
methods  79:11
Meyer  34:16  88:5  89:23
90:4, 8  100:15  101:21
102:25  103:12, 19  104:8,
10, 13  105:6  107:5, 9
111:10, 12, 21, 24  122:1
184:7  185:11, 15  188:18
Meyer's  98:14  102:3
121:18
Miami  9:24
Michael  39:2
miles  113:18  114:3
115:4  124:6, 20  125:1, 6,
11, 17, 23  126:2, 18, 21
127:14  128:18  175:15
mind  37:3  87:1  97:1
180:21
mine  48:13
minutes  37:4  86:3
153:23
misconduct  15:1, 5, 10, 15,
20, 23  16:8, 11, 13
misconstrue  69:4
misdemeanors  193:12
195:9
missing  46:1  51:18
Mitchell  2:10
mode  113:12  147:9, 10
176:1
moment  34:19  75:13
106:2  139:6  146:10
158:18
monitor  117:23  118:3
177:8
monitoring  58:24  122:13,
14
month  50:25
morning  5:9, 10
move  30:14  55:24  86:21
moved  95:23  145:5
multiple  175:10
Murrin  1:20  199:3, 19
MV  32:13
MVR  32:14, 20  53:17, 23
54:1  111:23

< N >
name  5:16  17:4  24:20
188:16
named  8:11  188:15
names  159:25  194:14

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 210 of 217 - Page
ID#: 3712
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

narcotics 194:*10*
near 95:*24*
necessarily 48:*15* 76:*19,
21* 84:*17* 112:*8* 125:*9*
152:*12*
necessary 14:*14* 90:*8*
103:*20* 104:*7* 129:*7*
133:*5* 134:*12* 146:*22*
158:*7, 11* 185:*1* 191:*16*
192:*8*
need 7:*15, 20, 23* 8:*2* 9:*4*
62:*18* 115:*23* 126:*17*
129:*12, 22* 141:*6, 15*
180:*6, 8*
needed 12:*2* 93:*1* 128:*25*
130:*14* 136:*3, 10* 160:*20*
162:*22*
needs 129:*9* 131:*8*
160:*13*
negligent 168:*17* 169:*22*
negligently 179:*15, 17*
neither 199:*12*
Neudigate 50:*9* 53:*7*
never 22:*22* 35:*25* 36:*2*
66:*20* 88:*20, 21* 124:*25*
136:*21* 150:*1, 3* 161:*20*
185:*25* 192:*15*
new 162:*6*
nighttime 10:*22, 23*
Nodding 5:*24*
nods 7:*11*
non 59:*4*
noncompliant 26:*1*
141:*14*
non-force 69:*9, 12*
non-italicized 87:*24*
nonspecific 178:*22*
non-use 59:*1, 5, 8*
normal 49:*17, 20* 56:*25*
normally 49:*9*
Notary 1:*21* 3:*11, 16*
199:*5, 11, 20*
note 40:*25* 80:*24* 81:*4*
106:*1* 111:*9* 115:*12*
120:*6* 137:*5* 157:*16*
184:*14* 197:*12*
noted 38:*13* 48:*9* 87:*6*
92:*21* 120:*24* 197:*15*
notes 28:*12* 31:*13* 93:*16,
18, 21, 24* 94:*2, 15, 21, 25*
95:*6, 13* 166:*8*
Notice 1:*15* 3:*7* 165:*23*
notify 76:*13*
notions 54:*12*
notwithstanding 74:*17*
77:*11*
Number 75:*18, 21* 81:*8*
84:*25* 127:*20* 136:*16*
154:*7* 164:*17* 171:*19*

178:*19*
numbers 166:*17* 167:*4*

< O >
objection 7:*6* 15:*24*
42:*13* 55:*8* 59:*19* 69:*1*
108:*8* 116:*12* 118:*23*
122:*8* 129:*20* 150:*15, 22*
152:*23* 156:*19, 22* 172:*1*
173:*21* 175:*21* 176:*16*
177:*4, 22* 178:*2, 16, 25*
OBJECTIONS 4:*10* 7:*3*
objective 117:*24*
occur 26:*3* 74:*7* 107:*21*
occurred 156:*11, 14, 24*
184:*6*
occurring 89:*22* 109:*14*
129:*18*
occurs 109:*2, 10* 110:*13*
OCIS 88:*2, 10, 16*
o'clock 153:*19*
offered 6:*13* 57:*7* 135:*23*
136:*1*
office 13:*4* 36:*25* 199:*15*
officer 11:*8, 12* 12:*16*
15:*18* 16:*11* 18:*3* 23:*15*
30:*19* 58:*22* 70:*19, 23*
71:*1, 6* 72:*10* 76:*17*
77:*12* 86:*23* 99:*4* 107:*13*
109:*3, 7, 12, 22* 110:*2, 7*
112:*3, 13* 113:*21, 25*
114:*9* 117:*19* 119:*3*
120:*19* 122:*11, 16* 124:*1*
125:*10* 126:*1* 136:*16*
137:*22* 138:*6* 140:*1, 7*
147:*12* 150:*13* 151:*25*
152:*16, 18* 156:*4* 172:*5, 8*
176:*14* 177:*1, 20, 21*
178:*10* 179:*4* 186:*16*
187:*4* 189:*7* 190:*18*
191:*20*
officer-involved 195:*21*
officers 15:*8* 23:*20*
26:*16* 30:*20* 35:*2* 37:*17*
43:*8* 44:*9, 15* 47:*8, 21*
48:*15* 54:*23* 55:*6* 66:*24*
67:*16* 68:*3, 8, 21* 69:*13*
70:*7, 12* 71:*19* 73:*24*
74:*10, 20* 81:*18* 85:*14, 20*
86:*16* 89:*13, 16, 17*
110:*11, 19* 118:*13, 22*
119:*10* 120:*21* 121:*9, 14,
16, 18* 122:*1, 4* 123:*12*
125:*5, 16* 127:*14* 131:*19*
132:*2, 4, 8, 19* 133:*4, 11,
18* 134:*4, 11, 18* 135:*8, 13,
15* 137:*7, 14* 138:*1, 12, 19*
139:*2, 15* 140:*6, 12* 141:*4,
19, 25* 143:*22* 145:*17, 25*
146:*5, 17* 149:*1, 10, 14, 15,

22, 23* 150:*9, 11* 151:*10,
13, 17* 167:*15* 170:*21*
171:*7, 22, 23* 172:*10, 14*
173:*5, 10, 18* 174:*2, 3*
175:*12, 19* 176:*1, 8, 13, 22*
177:*3, 12, 25* 179:*13*
182:*6* 183:*1* 184:*1*
185:*16* 186:*18* 187:*6*
191:*14, 22* 192:*2, 4*
officer's 15:*15* 71:*10, 25*
72:*2* 123:*15* 135:*24*
136:*13*
offices 1:*17*
official 79:*3, 13* 165:*23*
199:*15*
oh 13:*22* 19:*19* 67:*9*
95:*16* 153:*20* 159:*11*
166:*25* 169:*11, 19* 170:*19*
Ohio 1:*19, 22* 2:*6, 13, 16,
23* 199:*1, 5, 16*
OIC 75:*9, 14* 91:*22*
112:*20* 113:*3* 115:*16, 17*
116:*3, 17, 25* 117:*13, 17,
21* 118:*2, 5, 10, 13, 22*
119:*11, 13, 14, 17, 23*
120:*2* 122:*10, 16, 18*
123:*4, 8* 138:*25* 146:*7, 21,
23* 147:*14* 177:*7*
OIC-type 119:*23*
Okay 5:*14, 22, 25* 6:*13,
20* 7:*1, 2, 7, 8, 12, 13, 19,
24, 25* 8:*23* 9:*4, 17, 22*
10:*12* 11:*1, 6, 23* 15:*2*
16:*21* 17:*23* 18:*6, 20*
19:*6* 20:*2* 21:*15* 23:*25*
24:*13, 18* 25:*13* 26:*8, 13*
27:*5, 17, 23* 28:*6, 19* 29:*5,
9, 18, 20* 30:*12* 31:*14, 18,
24* 32:*7, 15* 33:*5* 35:*15*
36:*2, 8* 37:*22* 38:*23*
40:*12* 41:*12, 17, 23* 42:*18,
23* 44:*8, 23* 45:*5, 12, 16*
46:*8, 23* 47:*16* 48:*18, 21*
49:*11* 50:*1, 7* 52:*6* 53:*9,
19* 54:*3, 6, 25* 55:*11, 22*
56:*7* 57:*11* 58:*4* 59:*16*
60:*12, 23* 61:*7, 20* 62:*10*
64:*2, 11, 15* 65:*18, 20*
66:*2, 21* 67:*11* 69:*23*
71:*18* 72:*17* 74:*17, 25*
75:*7, 11* 76:*25* 77:*10, 16*
78:*1, 5, 10* 81:*16, 25*
82:*13, 24* 84:*1, 8, 11* 85:*6,
23* 86:*7* 87:*15* 89:*3, 20*
91:*4, 19* 92:*4* 93:*3, 20*
95:*1, 21* 97:*5, 7, 16*
99:*1, 12, 18* 100:*1, 11*
101:*16, 19* 105:*18* 107:*12*
108:*12* 111:*9* 113:*19*
114:*11, 23* 116:*19* 117:*14*

118:*11* 120:*16* 121:*7*
122:*25* 123:*8, 24* 124:*15*
125:*14* 126:*20* 127:*1, 12,
18, 25* 128:*20* 129:*13*
130:*3, 21* 131:*11, 24*
132:*7* 133:*2* 134:*10, 17*
135:*19* 136:*5, 23* 137:*5*
138:*10* 139:*1, 21* 140:*4*
141:*23* 142:*20* 143:*1, 12*
144:*6, 18* 145:*10, 24*
146:*13* 147:*5, 12* 153:*14,
16* 154:*4, 19* 155:*18*
156:*6* 157:*11* 158:*14*
159:*3, 11, 20* 162:*6, 11*
163:*11* 164:*13* 165:*1*
166:*7* 167:*2, 9, 25* 168:*7,
22* 169:*4, 19* 170:*6, 12*
171:*3* 175:*24* 176:*12*
178:*8, 24* 179:*6* 180:*1, 10,
17, 23* 181:*1, 3, 14* 182:*3*
183:*20, 24* 184:*2, 11*
186:*15* 187:*8* 188:*17*
189:*1, 24* 190:*5, 7, 13*
191:*1, 8* 192:*10, 19* 195:*8,
13, 23* 196:*24* 197:*9*
198:*11*
omitted 168:*13*
once 56:*25* 131:*20* 142:*4*
171:*14*
on-duty 136:*17*
ones 16:*25* 38:*22* 121:*5*
122:*19* 178:*20* 187:*22*
one-way 112:*18* 113:*1*
115:*14, 18* 117:*11* 128:*19*
138:*25* 146:*20*
open 197:*24*
opening 89:*16*
operate 130:*1* 141:*11, 12*
147:*14, 20, 24* 148:*3*
149:*6* 176:*2, 19* 179:*13,
15, 16, 20, 23* 184:*1*
operated 21:*21*
operating 147:*8, 9* 175:*25*
operation 21:*7* 22:*21*
72:*21, 24* 91:*4* 99:*24*
112:*17* 113:*1* 115:*13*
117:*10* 138:*18* 148:*19*
175:*6*
operational 91:*9* 112:*14*
operational/administrative
112:*24*
operations 20:*9* 79:*5*
operator 113:*12, 16*
124:*19*
OPOTA 131:*21* 132:*13*
options 35:*3* 43:*11* 44:*5*
67:*18*
orally 7:*10*

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 211 of 217 - Page
ID#: 3713
Deposition of Captain Amanda Caton                Jason Laible, et al., vs. Timothy Lanter, et al.,

order 155:24 156:17
  157:4, 12, 21, 23 158:11
  163:24
ordered 155:5 158:5
orders 168:16
org 89:4
organization 89:1
organizational 21:16
Organized 88:1, 9, 12, 22
ought 54:22
outcome 152:20 158:12
  196:16
outcomes 152:17 186:2
outline 178:14
outlined 27:13 30:3
  33:21 34:22 38:10 44:1
  56:8 61:16 100:21
  139:23 148:21
outlining 79:4
outset 100:14 111:10
outside 11:2 63:6, 18
  88:14 98:3, 8 131:13
  141:23 143:12 187:13
overview 9:23
OVI 196:11 197:6

< P >
p.m 100:13 106:4 198:17
packet 49:1
PAGE 4:5, 10, 22 38:18
  40:17 45:6 47:1 56:4, 12
  57:12, 14 61:9, 22 64:16,
  17 75:12, 17 82:17, 18, 21
  83:12, 18 84:2 87:21
  92:9 101:2, 3 113:20
  120:13 127:19, 20, 22, 25
  142:22 145:16, 17 146:11,
  14 147:6, 7 153:9, 10
  158:21 159:4, 14, 21, 23
  166:9 175:24 177:6
  182:14 184:18 191:12
pages 184:12, 19
PALMER 2:16
paper 65:2 162:1, 18
papers 124:12
paragraph 56:12 62:3
  64:19 66:22 87:25 99:3
  106:2 112:11 115:11
  130:4, 12 133:3 137:6
  167:24 168:1 191:12, 13,
  23
parameters 24:15
Pardon 6:10 136:25
Parkway 24:4
part 11:5 14:7 25:8
  55:12, 16 64:21 65:15, 16
  74:9, 19 78:12 91:12
  102:10 103:6 109:15
  128:4, 8, 11, 12 129:7
  136:12 138:24 139:24

142:13 144:5 149:18
  186:6 188:9, 10 189:10
participate 40:22
participating 42:20
particular 22:21 43:14
  44:10 48:23 54:15 55:23
  57:6 60:23 65:22 66:16
  67:2, 12 88:19 91:10
  93:6 94:10 95:12 98:10
  102:23 103:3 106:17
  123:4, 13 127:8 132:2, 19
  142:1 146:11, 23 149:5
  176:7 177:12 179:4
  182:9 186:4
particularly 66:8
particulars 30:13
parties 3:3 199:12
partner 189:9, 16 190:1
parts 99:11 128:9, 14
part-time 10:22
party 196:25
pass 78:2
path 151:15
patrol 11:8 12:17, 19, 24
  13:2, 18, 23 19:21 20:3
  26:6 39:2, 7 167:14, 15,
  21 181:5, 15 182:3, 10, 12,
  16, 23 183:9, 12, 21 184:4,
  8
patrol-related 20:13
Paul 50:9 53:7
pause 37:6
pedestrian 106:13, 18, 20
  108:5, 7 113:15 115:10
pedestrian-heavy 106:22
  107:1, 15, 21
pedestrians 106:23 107:2,
  16
pending 7:22
people 9:15, 20 38:16, 21
  41:2 51:13 107:6 129:18
  161:22 163:7
percentage 58:18
perform 70:18 71:1
  133:5 134:12 191:16
period 187:19
periods 14:7
permissible 125:13
permission 75:10
permit 126:11
permitted 124:19, 25
  125:5, 16
permitting 126:6
person 8:9 9:18 75:15
  76:8 119:16 188:15
personal 95:14 189:2
  194:8
personally 94:1
personnel 16:16 20:5
  42:20 155:6

perspective 118:16
  133:17, 22
pertain 82:5 130:18
  168:24
pertaining 61:21 99:23
  157:2 194:9
pertains 84:6
photographic 66:14
phrase 109:20 171:2
physical 88:4 163:3
  168:18 169:6, 23 170:1, 5
  180:4
picked 113:9
pile 124:12
place 1:15 25:16 100:12
  107:2 134:7 138:17
  141:10 162:12 179:12
  199:7
placed 94:16
places 30:9
Plaintiffs 1:5, 12 2:3, 8
  3:5 5:12 16:23 33:25
  45:8 72:18 159:6 165:9
Planning 13:11, 14
plans 91:9
play 42:6
played 50:14 52:15
  53:10
please 5:16 93:8 99:8
  127:19 131:18 192:22
Plum 2:16
point 7:20 26:24 27:2
  84:10 95:23 101:8 102:2,
  4, 15 109:21 112:1 117:2
  156:2 169:12 174:16
  192:10 197:18
pointed 101:3
Police 10:13, 19 11:3, 12,
  16, 19, 24 12:16 14:13
  15:1, 5, 10, 14, 23 16:3, 12
  17:10 19:5 23:14 27:15
  36:13, 15 37:18 39:17
  56:15 58:22 59:7 71:19
  72:24 73:19 77:14 79:6
  81:1 91:2 108:3 112:17
  113:1 115:13 117:10
  124:24 125:5 128:24
  130:19 131:19, 20 138:18
  142:6, 15 147:8, 24
  151:12 155:5 161:7
  167:20 169:2 175:7, 25
  181:4 184:5 186:18
  187:5 189:7 195:25
  196:1
policies 15:19 35:8 63:2
  69:21 70:5, 11, 13 71:3, 5
  72:6, 13 79:12 82:2
  86:22 109:11, 25 110:3
  117:15, 16 119:6 132:9
  133:12 134:7, 9, 15, 19

135:4, 9 137:23 141:18
  149:17 151:18 152:22
  181:23 182:9, 24 183:8,
  20 184:8 192:4
Policing 13:21 37:23
policy 16:18 28:16 29:3,
  22 34:24 35:2 40:14, 20
  41:7, 9 43:6 44:2 55:25
  56:8 57:12 60:2 61:9, 21
  62:10 64:16 66:22 67:7,
  13, 16 68:4, 7, 23, 24
  69:14, 17, 18 72:23 73:17,
  18, 25 74:2, 5, 10, 13, 19
  75:2, 12, 16 78:23 79:10,
  13, 17, 22 82:16 86:9, 14,
  15, 17 87:13, 14, 16 90:24
  91:21, 22 99:13, 19 100:2,
  21, 23 101:2 102:13
  113:2, 4, 6, 10, 24 115:1
  121:13 123:5 124:5, 14,
  18, 24 127:1, 8, 16 128:1,
  4, 8, 9 129:14, 22, 24
  130:6, 10, 23 133:6
  133:17 137:15 138:16
  145:12, 14, 17 146:4, 16
  147:6, 18 150:14 153:11
  173:1, 6, 17, 24 174:22
  175:3, 6, 9, 17 176:5, 12,
  23, 25 177:2, 13, 19 178:9
  179:3, 10 182:5
Political 10:9
portion 29:3 124:18
  128:1 184:17
portions 82:21
pose 107:15
position 117:24
possible 101:9 102:2, 5,
  16 103:10
possibly 33:6 52:13
  150:18 151:1 152:5
posted 113:17 115:5
  124:6, 20 125:6, 12, 17
  126:4, 22
posts 118:8
potential 107:16 108:18
practice 49:17, 20 56:25
  57:23 61:14 63:14 68:1,
  20 69:6, 7 93:23 94:2, 13,
  21
practices 109:3 110:1, 9
  119:6 129:16 134:23
  163:6 185:21
predict 152:15
preparation 84:24 104:17
prepare 8:15 9:1, 8
prepared 47:9
preparing 64:20
prescribed 84:13
presence 3:12, 16 74:18

Case: 2:21-cv-00102-DLB   Doc #: 151   Filed: 12/10/25   Page: 212 of 217 - Page
ID#: 3714
Deposition of Captain Amanda Caton
Jason Laible, et al., vs. Timothy Lanter, et al.,

199:*11*
**presences** 106:*18*
**PRESENT** 2:*23* 9:*11*
39:*3, 9, 13* 40:*1* 46:*2*
51:*13, 16* 77:*1* 101:*20*
108:*6* 125:*15* 173:*19*
**presentation** 164:*11*
**presented** 138:*2*
**preserve** 93:*24*
**pretty** 12:*11* 183:*14*
**previously** 33:*24* 34:*9*
45:*8* 72:*18* 151:*11*
**primary** 118:*7*
**principle** 57:*19*
**print** 162:*16, 24*
**prior** 10:*18* 19:*9* 33:*11,
14* 73:*6* 108:*22* 111:*13*
138:*19* 143:*21*
**prisoner** 26:*1*
**proactive** 71:*23, 24*
**probably** 6:*14* 10:*5*
26:*23* 30:*12* 32:*3* 33:*4*
36:*18, 24, 25* 50:*23* 51:*11*
83:*24* 86:*25* 94:*18* 96:*14*
171:*2* 190:*22*
**problem** 7:*21* 117:*14*
**problems** 99:*16*
**procedural** 130:*1*
**procedurally** 130:*2*
**Procedure** 1:*14* 3:*7*
27:*14* 74:*13* 78:*13, 19, 23*
79:*16* 99:*11, 25* 101:*13,
14, 15* 128:*12, 13, 14*
137:*9* 138:*22, 24* 147:*4*
169:*10, 13*
**procedures** 35:*5, 8* 67:*19*
69:*21* 70:*5, 11, 13* 71:*3, 6*
72:*7* 74:*3* 79:*12* 109:*11*
110:*8* 117:*15, 17* 123:*6*
124:*24* 128:*23, 25* 129:*4,
9* 130:*4, 7, 15, 18* 131:*10,
12* 132:*10* 133:*7, 12*
134:*5, 9, 15, 23* 137:*17, 19,
23* 139:*10* 141:*10, 18*
149:*17* 150:*14* 151:*18*
152:*22* 168:*15* 179:*12*
181:*24* 183:*15* 191:*18, 21*
192:*5*
**proceedings** 120:*23*
**Process** 17:*9, 25* 18:*8, 13*
62:*7* 161:*4* 169:*1*
**produce** 29:*11* 96:*2*
181:*10*
**produced** 81:*6* 197:*17, 20*
**production** 197:*19, 22*
**program** 137:*2*
**progressive** 144:*3*
**prohibited** 174:*6* 175:*12*
**prohibiting** 175:*15*

**prohibition** 175:*18* 176:*7,
14*
**prohibitions** 173:*17*
174:*1, 23* 176:*22* 178:*9,
13, 19* 179:*3, 9*
**promoted** 11:*15, 19, 20,
22* 12:*18, 22* 13:*6*
**promotion** 81:*20*
**promotions** 11:*11*
**proper** 35:*3* 43:*9* 44:*10*
66:*24* 67:*17* 68:*9* 69:*24*
70:*8, 17, 24* 71:*16* 97:*21*
121:*14* 128:*24* 131:*17*
**property** 14:*14*
**protocol** 131:*10*
**protocols** 35:*4* 67:*19*
128:*22, 25* 129:*4, 9* 130:*4,
15, 17, 20* 131:*12* 133:*7,
13* 134:*5* 137:*9, 17*
191:*18, 21*
**provide** 33:*24* 79:*3, 10*
**provided** 36:*20* 49:*1, 6*
63:*15* 92:*12* 104:*6*
132:*24* 161:*22* 185:*25*
**provides** 71:*9*
**provision** 147:*18* 177:*2,
11*
**provisions** 85:*12*
**Public** 1:*21* 55:*6, 19*
147:*25* 148:*4* 149:*9*
186:*7* 199:*5, 20*
**Public-Court** 3:*11, 17*
199:*11*
**pull** 40:*13* 86:*9* 158:*17*
**purpose** 33:*19, 21* 34:*19,
24* 35:*16, 23* 43:*4* 53:*2*
61:*8, 18* 79:*1, 8* 88:*18*
117:*19, 21* 129:*8*
**purposes** 38:*10* 42:*21, 25*
81:*9* 122:*15* 131:*7, 14*
**pursuant** 1:*13, 14* 3:*6*
79:*22* 90:*24* 199:*8*
**pursue** 146:*17* 149:*4, 16*
152:*20*
**pursuing** 108:*3* 110:*1*
118:*13, 22* 119:*9* 126:*8*
140:*3, 12, 16* 146:*6* 152:*2,
21*
**pursuit** 30:*18* 32:*6* 33:*2,
15* 34:*16* 43:*19, 20, 22*
44:*10, 16, 20* 50:*25* 53:*24*
54:*1, 7, 15* 55:*6, 14, 20*
60:*5* 72:*1, 11, 25* 73:*3*
74:*3, 6* 75:*3, 6, 9* 76:*14,
18* 77:*2, 7, 12* 86:*9, 13, 14,
16* 87:*12, 14, 16* 90:*7, 18,
20, 23* 91:*18, 20, 22* 93:*6*
97:*21* 98:*19, 25* 99:*6, 11,
13, 15, 22, 23, 24* 100:*2, 9,
12, 14, 20, 21, 23* 101:*6, 10,*

*12* 102:*13* 106:*3, 19, 21,
25* 107:*25* 108:*2, 14, 22*
109:*1, 4, 6, 11, 13, 16, 23*
110:*12, 22* 111:*5, 10, 14,
20* 112:*1, 4, 12, 19* 113:*10,
24* 115:*15, 16* 116:*2, 4, 11,
19* 117:*12, 13, 17, 22, 23*
118:*2, 5, 6, 9* 119:*10, 13,
24* 121:*5, 6, 10, 23* 122:*13,
14, 20* 123:*16* 124:*4, 14*
125:*1, 7, 18* 126:*14* 127:*1*
128:*1* 129:*14, 18, 22*
130:*1, 23* 132:*5, 6* 134:*20,
24* 135:*4, 16, 21* 137:*12,
15, 21* 138:*14, 16, 19, 22*
139:*19* 140:*1, 7, 9, 19, 21,
22* 141:*10, 11, 13, 14*
142:*1* 143:*4, 9, 18, 20*
144:*9, 12, 16* 145:*12, 19*
146:*21* 147:*4* 148:*19*
149:*1, 11, 13, 21, 24* 150:*4,
11, 13* 151:*10, 15, 17*
152:*1, 12* 153:*10* 155:*11*
156:*11* 157:*18* 164:*15*
166:*1* 171:*25* 172:*11, 16,
25* 173:*6, 7, 11, 17, 19, 24*
175:*7* 177:*7* 178:*15*
183:*4, 22* 184:*7* 185:*5, 16,
17, 21* 186:*3, 4* 187:*9, 18*
188:*9, 14, 19*
**pursuits** 73:*19, 25* 91:*21*
107:*14, 20* 110:*10* 129:*5*
147:*9* 170:*15* 175:*13*
182:*20* 183:*13* 187:*22, 23*
188:*5*
**pushed** 190:*20, 21*
**put** 36:*18, 25* 65:*12*
96:*13* 105:*2* 106:*23*
124:*13* 128:*11* 139:*17*
142:*14* 147:*25* 148:*3*
158:*6* 167:*12* 171:*19*
174:*20* 180:*4*
**putting** 128:*8*

**< Q >**
**qualified** 199:*5*
**quality** 26:*13* 61:*10, 15,
16*
**question** 7:*14, 17, 22*
22:*15* 23:*9* 34:*18* 35:*20*
40:*12* 53:*20* 68:*12* 69:*6*
92:*11* 99:*7* 107:*3* 130:*17*
144:*10* 153:*2* 158:*16*
173:*3* 191:*9*
**questions** 7:*10* 30:*13*
56:*3* 81:*24* 145:*13*
160:*21* 178:*23* 185:*1*
189:*2, 21* 197:*10* 198:*2*
**quick** 85:*24* 158:*15*

191:*8*
**quite** 71:*21* 83:*6* 95:*2*
**quote** 59:*25* 128:*17*
**quoted** 128:*15* 139:*24*
**quotes** 169:*12*
**quoting** 128:*12*

**< R >**
**radar** 12:*1*
**radio** 120:*4*
**range** 17:*4, 12*
**rank** 5:*20* 11:*11, 16* 12:*9*
**rapes** 194:*8*
**RAYMOND** 2:*3*
**reach** 118:*20* 158:*3*
174:*15*
**reached** 61:*3, 5*
**reaching** 132:*23*
**reactive** 71:*20, 23, 25*
**read** 17:*4* 45:*24* 67:*8*
81:*19*
**reading** 45:*20, 22*
**reads** 47:*6* 97:*19* 99:*3*
133:*3*
**real** 81:*23*
**realize** 153:*21*
**really** 22:*22* 49:*8* 80:*23*
116:*14* 133:*24* 142:*13*
153:*2, 3* 158:*15* 161:*18*
171:*18* 188:*6, 7*
**realm** 137:*4*
**reason** 92:*16* 95:*10*
98:*22, 23, 25* 126:*8, 13*
**reasonable** 113:*13* 115:*1,
7*
**reassign** 118:*7*
**REBECCA** 2:*3*
**recall** 31:*15* 51:*15* 53:*6*
55:*11* 78:*11* 96:*6* 97:*11*
103:*14, 17, 22* 114:*19*
188:*13*
**received** 31:*10*
**recency** 197:*22*
**recited** 113:*24*
**reciting** 43:*3*
**reckless** 147:*14, 21, 25*
148:*3, 17* 149:*4, 6* 153:*6,
8* 176:*2* 179:*23*
**recklessly** 179:*20*
**recognize** 173:*10, 11*
**recognized** 79:*13*
**recollection** 50:*2, 5*
**recommend** 128:*24*
**Recommendations** 138:*11*
144:*1* 145:*2* 157:*25*
**recommended** 139:*2*
144:*5* 158:*12*
**recommending** 139:*14*
**recommends** 138:*12*
139:*18* 141:*3*

Case: 2:21-cv-00102-DLB   Doc #: 151   Filed: 12/10/25   Page: 213 of 217 - Page
ID#: 3715

Deposition of Captain Amanda Caton                      Jason Laible, et al., vs. Timothy Lanter, et al.,

record 5:17 7:12 17:5, 7
28:10 37:3, 7, 8, 11 48:25
63:21 80:24 81:4 84:9
86:3, 4, 5, 8 113:9 153:22
154:1, 2, 5 181:7 198:15
recorded 124:2
recording 37:6, 10 86:7
93:13 154:1, 4
recordings 48:3
Records 13:8 83:17
84:23
record's 184:13
red 148:6, 7, 9, 11, 15
redacted 84:10 184:20
197:14
redactions 81:9
reference 47:22 127:13
130:22, 25 166:18 167:13,
18, 22
REFERENCED 4:22
17:21 28:17 34:2 45:3
72:15 75:24 82:14 124:4,
8, 17 136:6 167:3, 19
183:18 191:22
references 76:8
referencing 45:10 146:11
164:16
referring 131:23 169:9,
11
reflect 15:8 47:25 62:6
82:22
reflected 63:23 129:15
187:3
reflects 15:22 75:22
192:2
refresher 136:3, 9, 11, 18,
19 138:13 139:1, 5, 18
141:3, 16 145:2 155:6, 24
156:1, 17 157:13 158:5, 9
163:24, 25 164:4
regard 53:13 63:2
148:13
regardless 68:23
regs 166:20 167:8 169:13
Regulations 17:8, 24
79:12 131:3 168:15, 25
related 15:4 20:19 53:23
60:8 69:19 95:19 134:24
165:25 186:10 196:1
relating 34:15 50:3 79:2
186:8 188:13, 18, 23
195:25
relation 44:19 89:23
124:16 132:8 144:13
164:15 184:6 197:13, 14,
19
relative 199:12
relevance 100:17

relevant 8:10 30:9 62:15
87:1 108:16 128:10, 16
134:19
reliable 62:15
rely 63:14
remained 95:7
remember 11:15 21:14,
23 22:13 24:21, 24 31:11,
17, 18 32:1, 2, 9 33:3, 9
36:23 41:16 42:15, 17
48:4, 6, 19, 20 49:7, 23, 25
50:16 51:1, 4, 10, 17, 21
52:2, 17, 22, 25 53:11, 12,
16, 17, 19 54:8, 11, 17, 20,
24, 25 55:9, 16 57:10
58:7, 8, 11 59:3, 10 63:11,
19 64:8, 14 65:3 80:16
82:9, 23 85:3 86:24
92:18 93:11, 12, 18 94:19
96:11 107:8 111:18, 22,
23 113:7 117:3 119:19,
21, 25 120:4 121:24
122:3, 22, 23 132:22
142:12, 13 143:11, 19
144:19 147:1 154:25
161:1 164:21 165:5
166:5 183:10, 11, 13
186:5, 14 187:15, 25
188:3 190:17, 18, 20
191:6, 7
renewed 12:5
rephrase 7:15 106:24
179:1
replaces 28:13
report 8:20, 21 28:16
31:13, 23, 25 33:6, 22
34:10, 12 35:13 36:9, 10,
16 37:12 38:6, 10 43:2
44:25 45:7, 9 46:20, 24
47:9, 14, 15, 17, 18, 23
48:10, 12 49:8, 10, 12, 13,
18 50:18 51:3 56:14, 17,
22 61:4, 24 63:24 64:10,
20 65:5, 7, 8, 12, 14 66:13
80:12 87:7, 19 88:24
92:5, 7, 10, 13, 21 93:12
94:4, 6 97:14, 17 99:10
104:21 105:25 107:10
110:6 113:20 117:4, 5, 7
120:10, 14, 15, 25 122:24
123:2, 25 124:13 126:25
127:19 128:15 130:5
132:3 138:21, 22 139:25
141:21, 24 142:3 143:2, 7
145:1 156:16 157:16
158:6, 18 159:22 160:12,
14, 22 161:14 163:16, 19
164:17 166:9 182:14
185:8 191:9, 10 192:1

193:3
reported 47:18
Reporter 1:21 3:11, 17
5:6 6:25 77:24 80:14
155:8 199:11
reporting 199:13
reports 19:4 20:5 21:9
25:12, 16, 18, 22 26:9, 21
48:3 63:7
represented 166:14
representations 48:1
represented 47:22
representing 5:12
represents 168:12 174:3
182:5
reprimand 164:14, 18
165:2, 18, 24 166:4, 10
168:12, 23
reprimanded 166:14
request 27:14 184:21
requested 81:6
require 109:3, 12 110:1
required 41:1 136:17
145:24
requires 71:20 145:17
reserved 116:3 193:12,
18, 23 195:2, 9
reside 65:22
resources 35:11 44:19
131:13 133:5 134:12
191:16
respect 35:10 44:15
89:21 129:17 165:1
respective 3:3
respond 195:21
response 186:2
responsibilities 75:15, 19,
22, 23 76:5 83:17 84:21
118:2 177:7
responsibility 90:7
123:11, 20
responsible 14:12, 14, 15
20:4, 8 56:14 129:16
rest 147:3
restaurant 10:25
resting 25:15
rests 118:9
result 129:1 144:25
199:14
resulted 188:14
retain 93:23 118:2 177:7
review 8:15, 18, 20 14:21
19:4 20:5 23:3, 6 25:12,
18, 21, 22, 24 26:5 27:8,
11 28:21 30:6, 23 32:17
34:14 45:16 46:5, 12, 13
48:23 54:19 59:2, 17
60:2, 13 63:7 65:17
90:11 91:12, 19 99:22
103:7 104:16 106:16

121:2 122:15, 18 123:19
131:16 132:20 137:22
140:5 142:10 155:5
157:2, 3 161:3, 4, 7, 13
183:9 186:15, 17, 24
187:3 198:9
reviewed 27:16 35:12
44:13 45:12, 13 46:7
57:13, 16, 24 58:12 60:4
61:11 91:15 121:20
122:19 123:13 188:1
reviewing 26:9 43:15, 17,
21 44:4, 8 45:19 46:19
61:17 67:23 91:17
104:20 106:2 118:17
122:17 143:20
reviews 59:13 68:14, 21
94:8 160:19
revised 28:13 73:6
revisions 28:23
revisit 141:16 197:25
reward 138:14 139:19,
22 155:10 157:18 170:15,
25 171:8, 15, 25 172:11,
15 173:12 174:5, 16
right 8:6, 7, 12 15:23
17:1, 15 18:9, 13 19:7, 11,
18, 21 24:25 25:5 26:4
27:8, 19 28:6, 21 29:24
30:20 32:20, 23 34:16
35:17 36:8, 10, 13, 18
38:3, 11 39:3, 10, 13, 20
41:3, 21 42:21 43:6, 9, 12,
13, 23 44:2, 16, 21 45:10
46:23 53:15 56:9 57:22
60:15 61:1, 7 62:12, 15,
19 64:15 66:21, 25 67:20
68:4, 16, 25 69:15 70:9,
13, 19 71:6, 11, 16 73:4,
13, 25 74:7, 21, 23 75:17,
24 76:14, 18 77:8, 17, 23
78:20 79:6, 14, 18, 24
80:7, 8 82:16 84:7, 11, 25
85:8, 23 86:2, 19 87:18
89:20 90:1, 8, 24 91:6
92:7 95:23 96:5 97:10
98:14, 19 99:16 100:23
101:19 106:4, 9, 11, 19, 23
108:15, 24 110:22 111:6
115:2 116:21 119:18
120:8, 19 123:9, 10, 24
124:7, 21 125:18 126:23
127:16, 17, 18, 23 128:2, 5,
16 130:2, 16 131:9
132:25 133:19 134:20, 24,
25 135:5, 10 137:5, 9
138:8 139:3 140:9, 24
141:4 145:10, 20, 22
146:7 147:10, 18 150:7
153:4, 5 156:4, 12 157:18

Case: 2:21-cv-00102-DLB   Doc #: 151   Filed: 12/10/25   Page: 214 of 217 - Page
ID#: 3716
Deposition of Captain Amanda Caton
Jason Laible, et al., vs. Timothy Lanter, et al.,

158:*14*  159:*8, 23*  161:*9*
163:*11, 17*  165:*8*  166:*1*
168:*8, 20*  169:*2, 4*  170:*16,*
*21, 25*  171:*8, 15*  172:*6*
173:*1, 4, 7, 20*  174:*6, 21*
175:*10, 12, 18, 19*  176:*6, 8,*
*15, 23*  177:*3, 14, 21*  178:*1*
179:*4, 7, 16*  180:*1, 25*
181:*5*  182:*6, 7, 25*  183:*5,*
*22*  184:*2, 9, 11*  185:*4*
186:*19*  187:*6*  191:*24*
194:*19*  195:*16*  197:*9*
198:*3, 14*
**Rights** 197:*7*
**risk** 101:*5*  106:*23*  107:*2,*
*15*  108:*6*  129:*17*  138:*13*
139:*19, 21, 25*  140:*6, 8*
148:*1, 4*  151:*21*  152:*7*
155:*10*  157:*17*  168:*18*
169:*6, 7, 23, 25*  170:*15, 24*
171:*7, 14, 24*  172:*10, 15*
173:*12, 19*  174:*4, 16*
178:*15*  179:*24*
**road** 108:*20*  113:*15*
174:*8, 14*
**roadblocks** 118:*8*
**roadways** 146:*20*
**Robinson** 40:*9*
**role** 14:*8*  18:*22*  19:*7*
25:*1, 4, 8*  27:*5*  29:*25*
37:*18*  39:*5, 16*  42:*6*  58:*8,*
*14, 25*  62:*22*  64:*7*  95:*17*
116:*20, 23*  193:*6*
**roles** 11:*2*  14:*10, 11, 23*
20:*13, 14*
**roll** 51:*23*
**room** 38:*24*  50:*10*  52:*7*
180:*8*
**rough** 58:*17*
**ROULA** 2:*8*  28:*4*
**routine** 79:*5*
**rule** 6:*19, 20*  164:*19*
167:*12*  199:*14*
**Rules** 1:*14*  3:*7*  6:*19*
17:*8, 24*  72:*12*  79:*12*
132:*10*  166:*19*  167:*8*
168:*15, 25*  169:*13*
**rush** 106:*8*
**RUTOWSKI** 2:*19*

< S >
**safe** 130:*2*
**safely** 179:*14*
**safety** 147:*15, 21*  148:*18*
149:*7*  153:*6*  176:*3*
**sake** 27:*23*  184:*13*
**salary** 12:*3*
**SALLEY** 2:*3*  180:*22*
**satisfaction** 160:*23*  161:*6*
**satisfactory** 160:*15*

**saw** 50:*6*  53:*22*  54:*4*
66:*20*
**saying** 105:*10, 12*  121:*23*
125:*24*  150:*6, 20*  152:*16*
174:*8, 14*
**says** 38:*19*  56:*13*  57:*16*
60:*16*  61:*9*  62:*11, 24*
67:*13*  75:*2*  76:*12*  117:*8*
118:*1*  128:*4*  129:*3*  147:*1,*
*23*  164:*17*  175:*17*  176:*5,*
*9, 13, 25*  183:*13*  192:*1*
**scene** 190:*18*
**schedule** 94:*21*
**science** 10:*9*
**screen** 180:*5, 7, 18*  181:*3*
**seal** 199:*15*
**search** 90:*4*
**second** 17:*5*  47:*1*  56:*11*
87:*21*  99:*3*  115:*23*
191:*13*
**secondary** 118:*7*
**Section** 12:*21, 25*  13:*8, 9,*
*17, 21*  15:*4, 14, 17*  18:*23*
19:*10, 14*  39:*23*  44:*1, 25*
47:*2, 10*  49:*13*  56:*5*
57:*16, 17, 18*  58:*5*  61:*8,*
*20, 23*  76:*2, 7*  78:*13*
79:*17*  82:*7, 15, 21*  83:*14*
84:*3, 6, 9*  85:*9, 14, 20, 21*
87:*8, 10, 22*  95:*5, 12*
97:*17*  101:*3, 12*  106:*1*
113:*23*  124:*5, 16*  128:*21*
147:*7, 13*  153:*11*  168:*11*
169:*14*  175:*25*  177:*6*
187:*20*  191:*12, 13*  193:*15*
194:*1, 16, 23, 25*
**sections** 13:*11*  75:*16*
85:*17*  182:*15*  184:*14*
195:*5*
**see** 18:*4*  28:*23*  41:*5*
47:*4*  62:*1*  64:*22*  67:*1*
84:*4*  88:*5*  104:*18*  119:*8*
127:*4*  139:*13*  142:*10*
145:*12*  146:*13*  147:*15*
148:*13*  155:*22*  158:*10*
159:*11, 12*  175:*22, 23*
176:*3*  177:*8, 19*  180:*18*
181:*3*  182:*20*  184:*14*
197:*7*
**seeing** 119:*21*
**seek** 63:*17*
**seen** 35:*25*  36:*2*  78:*8*
89:*3*  114:*22*  165:*3*  166:*3*
**sees** 160:*12*
**send** 49:*18*  142:*10*  161:*5*
**sending** 49:*21*  155:*19*
158:*2*
**sense** 77:*2*  153:*3*  171:*12,*
*20*

**sent** 49:*23*  51:*11*  57:*8*
155:*17*
**sentence** 56:*13*  97:*18*
101:*20*  112:*23*  113:*19*
**separate** 65:*24*  136:*7*
**sergeant** 11:*19*  12:*18, 19,*
*22*  23:*15*  30:*18*  99:*4*
112:*12, 16*  113:*22*  114:*6,*
*10*  115:*12, 21*  116:*1*
117:*9*  120:*18*  123:*9*
132:*18*  138:*6*  144:*7, 12*
160:*1, 6*  161:*25*  162:*1*
164:*18*  165:*2, 3, 25*
166:*13*  167:*21*  168:*4, 13*
186:*16*  187:*4*  192:*12*
**sergeants** 25:*11*  167:*15*
**serious** 15:*1, 5, 10, 23*
16:*12*
**seriously** 108:*24*
**serve** 88:*19*
**served** 19:*1*  161:*9*
**serves** 18:*1*  30:*4*
**service** 16:*4*
**Services** 39:*22*
**set** 1:*16*  18:*20*  77:*17*
80:*7*  118:*7*  170:*13*
171:*17*  199:*8, 15*
**sets** 129:*25*
**seven** 40:*25*  41:*2*
**severity** 126:*7, 13, 15*
**sexual** 16:*7*  193:*10, 16,*
*22*  194:*5, 7, 8*
**shakes** 7:*11*
**she'll** 161:*5, 6*
**shift** 193:*1*
**shifts** 193:*2*
**shooting** 60:*11*  195:*21*
**shootings** 59:*10*  60:*4*
**shoot-out** 151:*12*  152:*4*
**shots** 59:*6*
**show** 72:*17*  80:*10*  154:*6*
180:*2*
**showed** 53:*16, 18*
**showing** 34:*8*  78:*5*
169:*18*
**shown** 53:*14*
**shows** 54:*1*
**sic** 76:*4*
**sideswiped** 107:*9*
**sign** 148:*15*  198:*10*
**signature** 3:*15*  35:*17, 22,*
*24*  36:*3*  142:*18*  198:*13*
199:*10, 11*
**signed** 60:*21*  157:*7*
**signify** 160:*2*
**sit** 31:*14*  50:*1*  96:*5*
164:*3*
**situation** 70:*1*  118:*4*
**six** 59:*15*

**Sixteen** 154:*10, 11*
**skill** 35:*10*  44:*19*
**skills** 133:*4*  191:*15*
**skinny** 190:*3, 4*
**slightly** 40:*19*
**SLOVIN** 2:*13*
**slow** 155:*9*
**slowing** 148:*10*
**Smith** 1:*8*
**smoothly** 6:*20*
**Snider** 39:*25*  160:*17*
**sole** 147:*1, 2*
**Solicitor** 2:*15*  41:*6, 13*
42:*12*
**solicitors** 42:*4*
**sorry** 13:*22*  19:*19*  70:*15*
87:*2*  115:*22*  120:*10*
124:*9, 11*  130:*11*  153:*20*
154:*22*  155:*10*  156:*22*
165:*10, 11*  167:*5, 6, 20*
169:*11*  170:*19*  173:*23*
180:*20*  186:*20*  194:*21*
**sought** 63:*5, 25*
**sounded** 70:*21*
**sources** 46:*21*
**speak** 6:*24*  9:*17*  102:*9*
114:*17*  119:*12*
**speaking** 32:*15*  42:*7*
63:*13*  195:*14*
**spec** 167:*11*
**Special** 12:*25*  39:*22*
194:*11, 15, 17*
**specialist** 11:*16*  99:*5*
112:*13*  113:*22*  114:*2*
120:*19*  138:*7*  156:*3*
186:*17*  187:*5*
**specialized** 20:*20, 22*
89:*15*  195:*1*
**specific** 20:*19*  32:*25*
44:*14*  72:*12*  74:*5*  79:*10*
81:*24*  85:*4, 11*  103:*19*
110:*16*  118:*6, 11*  132:*18*
136:*2*  139:*11*  166:*3*
167:*8*  174:*2, 22*  178:*20*
182:*25*  184:*13*  187:*21*
188:*12*  193:*17*  195:*2*
**specifically** 7:*4*  29:*25*
32:*7*  53:*6*  67:*25*  83:*2*
90:*6*  110:*4, 8*  135:*22*
146:*5, 21*  170:*3*  173:*13*
175:*11*
**specifications** 167:*14, 17*
**specifics** 36:*9*
**speculating** 108:*11*  114:*8*
118:*24*
**speed** 113:*13, 17*  114:*1, 2,*
*16*  115:*5*  124:*20*  125:*1, 6,*
*12, 17*  126:*4, 6, 22*

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 215 of 217 - Page
ID#: 3717
Deposition of Captain Amanda Caton                    Jason Laible, et al., vs. Timothy Lanter, et al.,

speeds  113:*3, 5, 21*  114:*7, 12, 18, 23, 25*  115:*7*  124:*1*  138:*25*
spell  5:*16*
spelling  162:*19*
SPENCER  2:*11*  9:*12*
spoke  6:*16*  9:*5*
spot  162:*1*  172:*8*
Squad  88:*2, 10, 13, 19*  89:*7*
SS  199:*3*
Stacey  1:*20*  6:*25*  199:*3, 19*
stamped  75:*12*  83:*12*  92:*10*  127:*22*  142:*24*  181:*8*
stamps  81:*2*
stand  97:*1*
standard  84:*23*
standards  79:*11*
stands  22:*14*  24:*24*  127:*10*  164:*21*
start  11:*7*  21:*1*  51:*23*  145:*16*
started  5:*15*  6:*18*  14:*8*  37:*10*  111:*19*  154:*8*  184:*17*
starting  10:*18*  60:*24*  96:*16*  101:*2, 5*
starts  83:*11*  87:*25*  147:*7*
State  1:*22*  5:*16*  197:*23*  199:*1, 5, 20*
stated  7:*4, 6*
statement  163:*16*  189:*22*
statements  47:*7, 20, 22*  48:*2, 14*  174:*3*
STATES  1:*1*  66:*23*  79:*1*
stating  138:*11*
stayed  10:*21*
stenotype  3:*10*  199:*9*
Stettinius  1:*17*  2:*11*
STEVEN  2:*8*
sticking  80:*17*
stipulate  73:*9, 11*
stipulated  3:*2*
stipulations  1:*16*  199:*8*
stop  97:*20*  98:*13, 14, 23, 24*  148:*15*  154:*1*  182:*18, 19*
stopping  148:*7*
Street  1:*18*  2:*5, 12, 16, 22*  113:*2*  117:*11*
streets  112:*18*  115:*14*  146:*20*
strictly  157:*24*
strike  19:*19*  22:*8*  51:*14*  53:*21*  68:*13*  86:*20*  88:*8*  91:*20*  115:*20, 22*  117:*20*
struck  107:*6*

structure  21:*16*  119:*9*
stuck  94:*9*
student  11:*4*
studied  81:*20*
stuff  34:*4*  63:*9*  194:*11*
subject  97:*25*  189:*3, 12, 21*
subjective  111:*1*
submit  19:*5*  36:*14*  161:*6*
submits  160:*8*
submitted  156:*15*
submitting  56:*14*
subordinate  85:*20*
subsections  18:*4*
subsequent  95:*11*
substantiated  191:*5*
subtract  57:*4*
sufficient  135:*14*
suggest  137:*25*
suggested  104:*6*  119:*22*
suggestion  142:*11*
suggestions  161:*12, 21*
suggests  152:*17, 19*
suicidal  105:*1*  152:*10*
suit  196:*2*
suitable  105:*8, 22*
Suite  1:*18*  2:*5, 9, 13, 19, 22*
summarized  98:*6*
summary  47:*9, 16, 17*  63:*14, 18*  67:*1*  92:*4, 6, 12, 17*  104:*10, 21*
summer  11:*21*  106:*11*
supervised  85:*14*
supervising  77:*6*
supervision  77:*10, 13*
supervisor  75:*14, 23*  76:*14, 16, 21, 23*  77:*3, 8*  95:*11*  116:*11, 15, 18*  123:*19*  179:*11*
supervisors  26:*17*
supervisory  20:*14*  75:*18, 22*  116:*20*  118:*1*  144:*7, 13*  177:*6*
supposed  60:*13*  70:*10*  83:*22*  110:*12*
sure  6:*16*  7:*9*  10:*6*  12:*11*  15:*13*  21:*2*  26:*16*  30:*10*  32:*1, 2*  33:*3*  37:*5*  45:*5*  51:*12*  54:*3, 8*  57:*10*  59:*22*  65:*24*  67:*8*  75:*21*  83:*7*  88:*13*  90:*10*  103:*7*  109:*20*  125:*3*  140:*5*  151:*8*  153:*25*  169:*17*  180:*22*  185:*23*  196:*14*
surveillance  88:*5*  185:*10*
survey  185:*21*
suspect  26:*1*  100:*15*  101:*7, 21*  102:*1, 15*  109:*9, 19, 23*  111:*11*  126:*19*

140:*1, 8*  151:*11*  152:*4, 10*  189:*8*
suspects  84:*24*
SWAT  40:*7*
Swingley  39:*20*
switched  161:*25*  162:*2*
sworn  5:*3*  199:*6*

< T >
Table  18:*5*  82:*14*  83:*10*  89:*1*  182:*13, 21*
tactic  126:*23*  146:*24*
Tactical  40:*7*  181:*5, 14*  182:*3, 9, 12, 23*  183:*8, 12, 21*  184:*4, 8*
tactics  35:*3*  43:*9*  44:*11*  54:*15*  66:*25*  67:*17*  68:*9*  69:*25*  70:*2, 3, 4, 8, 18, 24*  71:*13, 15*  83:*3, 8, 20, 21*  84:*12*  85:*4*  97:*18*  99:*5*  106:*1*  121:*9, 15*  122:*7*  174:*2*  175:*11*  178:*14*  179:*4*  182:*18, 25*  183:*2*
Taft  1:*17*  2:*11*
tailored  139:*11, 15*
take  3:*8*  6:*25*  7:*23*  17:*3*  62:*5*  85:*24*  86:*3*  94:*15*  110:*5*  140:*3*  153:*19, 22*  174:*18*  185:*2*  186:*6*  198:*12*
taken  1:*12*  3:*5, 10*  7:*12*  34:*23*  93:*14, 17, 24*  105:*6, 11, 21*  131:*9*  140:*15*  199:*8*
talk  25:*2*  26:*23*  29:*4, 24*  30:*15*  36:*9*  42:*24*  66:*10*  87:*20*  108:*15*  144:*21*
talked  31:*15*  38:*9*  91:*23*  139:*6*  143:*14*  181:*20*  185:*6, 11*
talking  24:*2*  37:*13*  38:*8*  45:*7*  53:*14*  66:*8*  101:*1*  124:*10*  132:*15*  142:*21*  158:*16*  159:*7*  170:*14*  172:*20*  174:*10, 21*  175:*3, 5*
talks  64:*19*
target  189:*15, 16, 20*  190:*12*
tasing  25:*25*  59:*11*  60:*5, 10*
Task  22:*10, 18*  23:*4, 10, 21*  24:*19*  38:*2*
tasked  122:*17*
tasks  22:*1*
taught  71:*14*  110:*10*  170:*21, 24*  171:*3*
teach  12:*4*  171:*22*  172:*3, 14*  173:*9, 15*

teaches  171:*6*
teaching  11:*4*  12:*6*
Techniques  182:*16*
Technology  181:*13*
tell  9:*5*  31:*9*  50:*7*  54:*9*  62:*5*  131:*18*  188:*11*  196:*10*
tells  176:*18*
tenure  195:*18*
term  65:*20*  127:*6*  177:*13*
terminate  118:*8*
termination  16:*17*  83:*15*  84:*22*
terms  22:*25*  40:*21*  45:*16*  46:*12*  48:*21*  57:*23*  64:*2*  71:*13, 24*  82:*2, 24*  101:*19*  102:*12*  105:*24*  110:*9*  114:*19*  115:*25*  131:*16*  134:*10*  135:*12, 21*  141:*17*  144:*7*  145:*15*  146:*4*  157:*15*  159:*25*  169:*4, 7*
testified  5:*4*  6:*5*
testify  8:*6*
testimony  6:*14*
testing  14:*16*
text  47:*3*
Thank  5:*6*  18:*20*  69:*23*  80:*15*  86:*12*  154:*11*  159:*20*  170:*12*  177:*18*
Thanks  17:*6*  29:*16*  38:*5*  78:*3*
Theetge  160:*25*
thing  74:*14*  149:*6*  160:*19*  161:*3*
things  6:*20*  25:*25*  26:*1*  45:*25*  46:*1*  63:*3*  65:*5*  128:*18*  140:*15*  177:*3*
think  10:*4*  11:*13, 18, 21*  13:*12*  14:*3, 5*  36:*24*  42:*14*  46:*22*  50:*23*  53:*25*  57:*9*  59:*15*  63:*11*  64:*1, 9, 13*  78:*12*  82:*7, 10*  85:*22*  88:*25*  92:*19*  97:*3*  105:*2*  110:*3*  117:*1*  119:*25*  121:*4*  127:*9*  131:*15*  132:*21*  143:*10, 24*  144:*17*  148:*17*  149:*25*  151:*4, 5*  152:*9*  153:*12*  157:*9*  161:*17*  162:*4, 8*  165:*4*  173:*4, 13, 14*  174:*7*  185:*23*  186:*13*  187:*21*  190:*6, 9, 10, 11, 15*  192:*14*  194:*4*  195:*12*  196:*5, 15*
third-party  109:*25*
THOMAS  2:*12, 21*  30:*19*  99:*4*  112:*13*  113:*21, 25*  114:*9, 14, 24*  120:*8, 19*  121:*2, 16, 19*  122:*1*  124:*1*  132:*19*  138:*6*  139:*3*

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 216 of 217 - Page
ID#: 3718
Deposition of Captain Amanda Caton                          Jason Laible, et al., vs. Timothy Lanter, et al.,

156:4 164:24 186:16
187:4 191:23
**thoroughly** 26:20
**thought** 195:6
**three** 123:1 139:14
141:4 193:1
**threshold** 171:13
**Thursday** 1:19
**time** 1:15 3:5 6:4, 24
7:21 13:10 14:6 19:1, 25
20:12 21:17 29:15 30:9
31:5, 20 33:7 34:6 36:12,
22 39:18 41:10 50:8
52:1, 3 55:11 59:14 60:3
65:4 78:9 84:10 85:24
96:13, 17 97:6 104:4
105:5 111:18 113:15
114:22 115:2, 8 129:15
135:5 142:15 143:2, 6, 16
144:23 153:21 156:2, 15
159:1 160:24 161:2
168:5 174:17 187:10, 12,
14, 19 190:22 192:11
197:11 199:7
**timeline** 60:17
**timelines** 56:16
**times** 6:3, 7 26:25 95:3
**TIMOTHY** 1:7 2:12, 21,
25
**title** 88:22
**titled** 28:11 47:2 61:23
78:16 80:25 83:15 84:3
97:17
**Tobacco** 88:3
**today** 5:13 6:16 8:5, 14
9:19 30:15 31:14 43:3
50:1 80:17 81:7, 10
94:25 96:6 115:24 124:7
164:4 181:14, 21 185:6,
12, 18 188:20, 24 192:17
197:13
**told** 31:20 33:8 53:1
192:18
**top** 28:11 47:2 64:18
128:5 158:20 181:12
**totality** 174:18
**totally** 7:16
**toured** 22:23 24:1
**track** 27:24
**traditionally** 160:3
**Traffic** 100:13 106:6, 13
107:10 108:16 110:20
111:3, 25 112:5 113:16
126:11 182:19
**trained** 135:15
**training** 35:2, 5, 9 39:18
43:6 44:14 63:2 67:7, 16,
20 68:4, 8, 23 69:15, 18,
22 71:9, 14 72:3 110:11
128:23 129:1, 4 131:10,

17, 20, 22, 25 132:1, 5, 13,
18, 24 133:8, 12, 15, 22
134:8, 16 135:12, 13, 18,
23 136:2, 4, 5, 9, 12, 18, 20
137:9, 17, 20, 24 138:13
139:1, 6, 9, 11, 14, 18
141:4, 8, 16 145:2 155:6,
7, 16, 21, 24 156:1, 17
157:13, 15 158:3, 5, 9
163:24 164:1, 4, 8 170:21,
23 171:4, 6, 21 191:19, 21
192:5, 8
**trainings** 129:10
**transcribed** 3:12, 13
199:9
**transcript** 198:9
**transition** 155:3
**transmission** 162:14
**transmissions** 120:5
**transmitted** 48:22
**transporting** 189:8
**traveled** 106:19, 25
**TRAVELERS** 2:18
**traveling** 106:22
**Travis** 188:15
**trial** 196:13, 17
**TRISTAN** 2:16 28:3
**true** 22:7 38:1 69:5
92:1 125:9
**truth** 199:6, 7
**truthfully** 8:6
**Try** 27:1 102:21, 22, 25
**trying** 69:3 133:25
181:12
**turn** 29:3 40:16 46:24
47:1 64:15 92:9 127:18
**Twenty** 153:23
**two** 13:11 14:6, 11 16:24
37:3 65:24 75:3 96:23
164:19 165:11 195:12
197:21
**two-hour** 96:22
**type** 94:22 126:6 146:23
165:19 194:11
**types** 18:7, 16 24:16
26:4 79:21 83:20 193:17
**typical** 32:12

< U >
**Uh-huh** 9:6 15:16, 21
18:24 22:3 23:11 38:7
48:24 52:9, 12, 14 57:21
64:4 76:3 77:5 78:18, 21
105:14 109:8 118:18
124:3 126:3 143:15
147:16 156:9 158:22
169:21 170:17, 18 173:25
175:8 186:25 194:20
**Uh-uh** 103:24

**umbrella** 83:25
**Umm** 6:8
**unclear** 7:15
**undergo** 131:19, 22
138:12 139:18
**undergoes** 28:23
**undergone** 24:20
**undersigned** 199:3
**understand** 8:8 40:19
59:23 125:3 134:1 135:9
140:5 178:24
**understanding** 42:19
62:6 68:1 90:12 102:12,
17 104:11 114:5 115:25
121:7 122:6 168:1 192:3
**understood** 7:18 60:12
**undertake** 90:7
**undertaken** 15:3 23:20,
21
**undertaking** 22:1 37:18
109:23 151:10
**unfortunately** 180:3
**Unit** 20:21, 22 21:12, 16
22:2, 21 23:14, 18 24:4, 8
37:14, 17, 19 38:2 76:17
77:11 88:1, 9, 12, 21
89:14, 15 119:4 187:14
193:7, 13, 19, 24 194:11,
12, 15
**UNITED** 1:1
**units** 12:14 20:20, 22
21:8 37:13 88:11 90:14,
15, 17 118:6, 7 195:1
**unit's** 76:14
**University** 9:25 10:1
**unquote** 60:1
**unredacted** 81:6 184:22
**use** 26:5 27:18 28:11
43:5, 15 67:24 68:15
69:19 70:8, 23 81:10
131:9 175:12
**use-of-force** 27:14 28:16
29:22 34:23 40:14 41:7
44:2 55:25 60:8 61:21
68:24 121:13
**uses** 20:6 25:10 26:3
34:25 67:5, 14 68:6
**usually** 96:15

< V >
**vague** 59:21 118:23
**vagueness** 156:23
**various** 20:13 79:20
131:22 161:22
**Vaughn** 160:10
**vehicle** 30:18 97:20
98:14 106:20 108:3
109:9 110:14 113:1, 13,
16 115:10 121:18 138:18
147:8, 24 149:16 151:14

**umbrella**

**vehicles** 72:22, 24 108:4
112:17 115:13 117:10
119:9 144:9, 15 146:6, 18
151:15 152:6 175:7
179:17, 20, 23
**version** 28:13 29:12, 14
40:20 62:4 73:2, 16 81:7,
11 162:12 184:20, 22
**versions** 161:14, 19
**versus** 138:13 139:19, 22
155:10 157:17 172:11, 15
174:16
**Vice** 194:14, 15, 17
**video** 32:3, 4, 8, 10, 20
33:6 48:2 50:6, 11, 14
51:9 52:15, 19, 21, 24
53:2, 9, 13, 14, 23 114:20,
22
**videos** 49:24, 25 50:3
63:9
**view** 107:14, 20
**viewing** 50:2 53:2
**Vine** 2:22
**violated** 15:18 16:18
99:11, 13 123:5 137:14
183:16
**violation** 15:9 16:7
99:23 164:24 168:2, 7, 11,
14, 17 169:7, 22
**violations** 99:19 112:15,
24 137:13, 21 140:19
141:13, 17, 20 164:18, 19
166:14 168:24
**Vortex** 20:22
**vs** 1:6

< W >
**Wait** 67:1
**waived** 3:9
**walk** 12:14 67:10 77:21
141:1
**Walnut** 1:18 2:12
**want** 11:23 17:1, 3 30:7
42:24 56:2 59:22 80:8,
10 125:2 145:10 147:6
153:19 168:10 182:10
191:8 197:12 198:6, 9
**wanted** 12:4 51:5
**wants** 27:16
**warrant** 75:5
**warrants** 98:1 104:23
**WARREN** 199:3
**watch** 50:10 51:8 53:8
**watching** 52:19
**way** 36:6 42:11 46:4
69:7 79:4 83:21 84:19
109:21 112:17 117:11
134:2 146:6, 18 152:13

Case: 2:21-cv-00102-DLB    Doc #: 151    Filed: 12/10/25    Page: 217 of 217 - Page
Deposition of Captain Amanda Caton
ID#: 3719
Jason Laible, et al., vs. Timothy Lanter, et al.,

153:*1* 157:*9* 161:*13*
162:*9* 171:*2* 173:*15*
175:*16* 180:*24* 184:*1*
**weather** 113:*16*
**weigh** 138:*20* 140:*13*
171:*9*
**weigh-in** 171:*1*
**weighing** 148:*22, 23*
**weighs** 111:*4*
**Well** 15:*25* 16:*2* 17:*16*
18:*11* 20:*13* 22:*8* 29:*13*
44:*18* 48:*13* 61:*15* 68:*6,
15* 69:*20* 74:*12* 75:*8, 21*
76:*19* 81:*23* 84:*12, 16*
86:*20* 88:*8* 92:*2* 97:*16*
108:*10* 111:*1, 15* 115:*3,
20* 116:*17* 118:*16, 25*
122:*7* 131:*2* 135:*2*
139:*17* 142:*7* 145:*3*
149:*5* 150:*5, 20* 151:*3, 8*
159:*18* 160:*3* 174:*7*
175:*23* 189:*14, 23* 196:*3*
**went** 10:*15* 12:*18, 20, 24*
13:*1, 3, 7, 8, 15, 17, 20, 23*
14:*3, 22* 19:*16, 20, 25*
42:*25* 52:*6* 94:*24* 115:*3*
121:*11* 126:*2* 160:*24*
**we're** 5:*13* 17:*14* 30:*15*
37:*11* 45:*6* 53:*14* 65:*2*
68:*24* 86:*8* 100:*22*
127:*21* 154:*4, 20* 158:*16*
159:*7* 175:*2* 180:*4, 16*
181:*9*
**we've** 45:*9* 78:*6* 81:*5*
85:*25* 163:*12* 173:*4*
184:*21* 188:*20*
**WHEREOF** 199:*15*
**white** 171:*12*
**wished** 92:*15, 23*
**witness** 1:*11* 3:*4, 13, 14*
4:*2* 5:*2, 5* 41:*23* 73:*14*
83:*19* 189:*12, 18* 198:*11*
199:*7, 10, 15*
**witnesses** 62:*18* 64:*3, 12*
190:*10*
**wondering** 170:*10*
**word** 147:*2*
**wording** 113:*8* 167:*7*
**words** 159:*16*
**work** 9:*21* 10:*23* 12:*19*
13:*3* 22:*25* 80:*9* 85:*19*
142:*8* 192:*17*
**worked** 10:*22, 25* 27:*6*
**working** 10:*13* 104:*4*
187:*20*
**works** 76:*10* 192:*16, 19*
**worry** 82:*1*
**write** 94:*4* 100:*11*
112:*12* 128:*21* 130:*3, 9,
10* 138:*11* 142:*4* 157:*23*

**writing** 88:*23* 92:*16*
157:*25*
**written** 56:*14* 63:*6*
67:*25* 68:*19* 69:*4* 78:*20*
79:*3* 83:*2* 129:*15* 141:*24*
155:*23* 161:*14* 164:*23*
165:*2*
**wrong** 112:*17* 115:*14*
117:*11* 127:*5* 146:*6, 18*
175:*16*
**wrote** 31:*13* 50:*17*
101:*21* 128:*5* 155:*1*
156:*6* 157:*10*

**< X >**
**Xavier** 9:*25* 10:*5*

**< Y >**
**yeah** 6:*12* 9:*14* 12:*11*
19:*25* 20:*10* 21:*13, 20, 24*
22:*14, 16* 24:*14* 26:*12, 18*
28:*22* 29:*2* 32:*13* 34:*17,
22* 35:*21* 46:*3, 9* 51:*1*
53:*12, 25* 54:*2* 56:*23*
61:*2* 64:*1* 66:*6* 67:*4*
76:*10* 82:*19* 85:*7* 87:*4*
88:*18* 89:*5* 97:*9* 101:*14,
15* 102:*22* 113:*25* 114:*3*
117:*1, 8* 118:*24* 122:*3, 14*
126:*24* 127:*21* 130:*11, 13*
134:*14* 135:*17* 137:*18*
138:*4* 141:*2* 144:*11*
145:*23* 149:*10, 19* 150:*25*
153:*10, 15, 20* 155:*14, 19*
156:*13, 20* 159:*2, 9* 167:*3,
10* 168:*6* 169:*19, 24*
170:*11* 171:*1* 172:*24*
175:*1* 180:*16* 181:*25*
182:*11* 186:*22* 187:*24*
189:*18, 25* 191:*3* 192:*7*
193:*21* 194:*2, 13* 196:*3*
198:*8*
**year** 11:*19* 12:*20* 13:*12,
22, 23* 131:*21* 156:*10*
**years** 13:*25* 81:*21* 119:*3*
**Yep** 167:*1*

**< Z >**
**zoned** 186:*21*
**Zoom** 1:*10* 2:*23* 180:*20*