12.545

# 12.545   USE OF FORCE

### *References:*

Graham vs. Connor, 490 US 386, 396 (1989)
Tennessee vs. Garner, 471 US 1 (1985)
Estate of Corey Hill vs. Christopher Miracle, 853 F 3d 306 (6th Cir., 2017)
National Consensus Policy on Use of Force (2017)
Manual of Rules and Regulations - 1.01, 1.21, 1.22, 1.23, 1.24, 1.25, 2.12, 2.26A&B, 4.05
Procedure 12.140, Canine Operations
Procedure 12.150, Plan for Control for Disorders at Hamilton County Adult
                 Correctional Facilities
Procedure 12.155, Juvenile Youth Center Disorders
Procedure 12.170, Civil Disturbance Operation Procedure
Procedure 12.536, Foot Pursuits
Procedure 12.540, Body Worn Camera System
Procedure 12.550, Discharging of Firearms by Police Personnel
Procedure 12.554, Investigatory Stops
Procedure 12.600, Prisoners:  Securing, Handling, and Transporting
Procedure 12.625, Flying Armed on Official Business
Procedure 12.905, Fingerprinting and Photographing of Juveniles
Procedure 15.100, Citizen Complaints and Reports of Favorable Police Conduct
Procedure 19.106, Post Critical Incident Trauma
Procedure 19.110, Peer Support Crisis Intervention Team
Am. Sub. H.B. No. 8

### *Definitions:*

**Actively Resisting Arrest –** When the subject is making physically evasive movements **to defeat the officer's attempt at control**, including fleeing, bracing, tensing, pushing, or verbally signaling an intention to avoid or prevent being taken into or retained in custody.

**Carotid Arteries –**The carotid arteries are major blood vessels that supply blood to the brain, neck, and face. They are located on each side of the neck and extend from the lower jawbone to the collar bone.

**Choke Holds –** The courts could consider a choke hold or other similar type holds as deadly force.  Choke holds are prohibited unless a situation arises where the use of deadly force is permissible under existing law and Department policy.  The use of any type of choke hold to prevent the swallowing of evidence is prohibited.

**Crowd Control –** The use of police action to stop the activities of persons assembled.

**Crowd Management –** The observing, monitoring, and facilitating the activities of persons assembled.

**Deadly Force –** Force likely to cause, or capable of causing, death.

**De-escalation –** Using non-confrontational verbal skills, empathy and active listening to stabilize a person in crisis.

PLAINTIFF'S
EXHIBIT
13

1

12.545

De-escalation may also incorporate the use of additional time, distance, and resources as well as persuasion, command presence, repositioning, and warnings, to reduce the intensity of a potentially violent situation to decrease the potential need to use force.

**Escorting –** The use of light pressure to guide a person or keep a person in place.

**Force –** Any physical strike, instrumental contact with a person, or any significant physical contact that restricts movement of a person. The term includes, but is not limited to, the use of firearms, Conducted Energy Weapons (Pregnant), chemical irritant, choke holds or hard hands, the taking of a subject to the ground, or the deployment of a canine. The term does not include escorting or handcuffing a person with no or minimal resistance.

**40mm Foam Marking Round –** Rounds which are similar to, and are used in the same manner as, the 40mm foam rounds. The 40mm foam marking rounds are designed to leave a green powder substance on the subject(s) struck by these rounds.

**Grenadier –** Officers who have been specially trained by the SWAT & Tactical Support Unit (TSU) or the Civil Disturbance Response Team (CDRT) to operate as 2-person teams during periods of civil unrest. These officers are trained in deployment of the Beanbag shotgun, PepperBall launcher, 40mm foam rounds, Oleoresin Capsicum (OC) and 2-Chlorobenzalmalononitrile (CS) blast grenades, and OC aerosol canisters. Beanbag shotgun grenadiers are independent assets and will support the 2-person teams as needed.

**Hard Hands –** The use of physical pressure to force a person against an object or the ground, use of physical strength or skill that causes pain or leaves a mark, leverage displacement, joint manipulation, pain compliance, and pressure point control tactics.

**OC Aerosol Canister –** The OC aerosol canister is a hand-held device with a steel "pull-ring" type safety pin which prevents accidental discharges. This chemical irritant offers a non-lethal alternative for use in crowd control situations to aid in controlling and dispersing crowds.

**OC or CS Blast Grenade –** The OC or CS blast grenade is a rubber ball type device approximately the size of a tennis ball, with a steel "pull-ring" safety pin which is pulled before deploying the device into a crowd. The blast grenade contains a non-lethal chemical irritant which is used in crowd control situations to aid in controlling and dispersing crowds.

**Objective Reasonableness –** The standard, as set forth by the Fourth Amendment U.S. Constitution and defined by Supreme Court of the United States, by which all uses of force will be judged.

**Original Documents (Definition pertaining to this procedure only) –** Photographs, DVR discs or video files, and any documents that are handwritten or contain an original signature.

**Self-Defense –** The act of protecting oneself or another from physical harm or serious physical harm.

12.545

**Serious Use of Force** – Any action that involves: a critical firearm discharge; the use of deadly force; a baton strike to the head; or a use of force in which the person is seriously injured or requires hospital admission, with the exception of individuals admitted for psychiatric evaluation not suffering a serious injury.

**Serious Injury/Serious Physical Harm to Persons** – Any physical harm that carries a substantial risk of death, permanent incapacity, temporary substantial incapacity, permanent disfigurement, or temporary serious disfigurement.

### *Policy:*

The Cincinnati Police Department (CPD) recognizes the value of all human life and is committed to respecting the Constitutional rights and dignity of every individual. Officers shall act within the boundaries of the United States Constitution, the laws and constitution of the state of Ohio, the charter and ordinances of the city of Cincinnati, this use of force procedure, and all other relevant CPD procedures, policies, practices and training.

A police officer's right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion, or threat thereof, to effect it. Determining whether the force used to affect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. The decision to use force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight …the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them" (Graham v. Connor, 1989).

A number of factors may be taken into consideration to evaluate whether an officer has used objectively reasonable force. These factors include, but are not limited to:

- The conduct of the person being confronted as reasonably perceived by the officer at the time, including the level of threat or resistance presented by the subject.

- The officer's and subject's factors, including but not limited to size, age, relative strength, skill level, injuries sustained, level of exhaustion or fatigue and the number of officers versus subjects.

- The influence of drugs or alcohol and the subject's mental capacity, if known.

- The proximity of weapons.

- The distance between the officer and subject.

- The degree to which the subject has been effectively restrained and his / her ability to resist despite being restrained.

- Time and circumstances permitting, the availability of other options (resources that are reasonably available to the officer under the circumstances).

12.545

- The seriousness of the suspected offense or reason for the contact with the individual.
- The training and experience of the officer.
- The potential for injury to citizens, officers and suspects.
- Whether the conduct of the individual being confronted reasonably appears to pose an imminent threat to the officers or others.
- The prior knowledge of the subject's propensity for violence.
- Any other exigent circumstance or special knowledge.

Courtesy in all public contacts encourages understanding and cooperation. The most desirable method for effecting an arrest is where a suspect complies with clear and concise directions given by an officer.

Whenever possible, de-escalation techniques shall be employed to gain voluntary compliance by a subject. Officers shall use only the level of force that is objectively reasonable to effect an arrest or while protecting the safety of the officer and others.

Officers should attempt to achieve control through advice, delay, warnings, and/or persuasion when confronted with a situation where control is required to effect an arrest or protect the public's safety. The suspect should be allowed to submit to arrest before force is used unless this causes unnecessary danger to the officer or others.

**When officers have a right to make an arrest, they may use whatever force is reasonably necessary to apprehend the offender or effect the arrest and no more. Just as officers must be prepared to respond appropriately to rising levels of resistance, they must likewise be prepared to promptly de-escalate the use of force as the subject de-escalates or comes under police control.**

Officers must avoid using unnecessary violence. Their privilege to use force is not limited to that amount of force necessary to protect themselves or others, but extends to that amount reasonably necessary to enable them to effect the arrest of an **actively resistant** subject. Although a criminal offense, a subject who spits on an officer without engaging in any other actions/resistance is not a violent attack. Officers are prohibited from using physical strikes to protect themselves from a subject who is solely spitting on them.

An officer has a duty to stop, prevent and report the use of excessive force by another officer. Officers who use excessive force will be subject to discipline, possible criminal prosecution, and/or civil liability.

All members have a duty to ensure all use of force incidents and any citizen allegation of excessive force are reported to the Police Department. Whenever employees use any type of force; or confront resistance that results in an injury or complaint of injury to a citizen; or have knowledge of any of the above; or are aware of a citizen complaint of excessive force, they will promptly notify a supervisor. The supervisor or command officer investigating the incident must be of at least the next higher rank than the officer(s) who used force. The only exception is when a lieutenant uses force and there is no captain or above working, but an acting Night Chief is available. In this case, the acting Night Chief can conduct the investigation.

12.545

The Criminal Investigation Section (CIS) will respond for all shots fired and death investigations involving police, and for other incidents at the direction of the bureau commander. Internal Investigations Section (IIS) will respond and investigate all deadly and serious uses of force and canine bites that cause serious injury or hospital admission. This includes, but may not be limited to:

- Action that directly or indirectly results in a person being seriously injured, admitted to a hospital, or killed (including injuries that are self-inflicted).
- All head strikes with an impact weapon.
- All uses of a carotid/choke hold.

Following any use of force resulting in a citizen's injury, officers will summon Cincinnati Fire Department (CFD) personnel to provide emergency medical treatment. Once the scene is stabilized and it is safe to do so, officers will administer lifesaving CPR or basic first aid consistent with their training, if appropriate.

Officers will receive annual training specifically pertaining to Use of Force. Officers will acknowledge and be tested on their understanding of the procedure.

**Use of Force in Crowd Control:** Officers will not initiate the use of force or chemical irritant against crowds or a group of individuals except when reasonable and necessary to protect the officer, the subject, or another party from a risk of death or physical harm; or is necessary to effect the arrest of an **actively resisting** subject; or to prevent the escape of that subject.

Officers encountering crowds will evaluate the situation and determine if there is a current or future need requiring crowd control or crowd management. Prior to police action, the officers will promptly summon a supervisor to the scene. If crowd control is or will be required, the supervisor will summon a command officer to the scene. Once on the scene, the command officer will direct all police action and authorize the use of weapons, tools, or tactics needed to resolve the situation. The approval of a supervisor is required any time chemical irritant is used against a crowd, absent exigent circumstances.

Use of force (including the beanbag shotgun, the 40mm foam round, OC aerosol canister, OC or CS blast grenade, and the PepperBall launcher) as well as the use of chemical irritant during periods of civil unrest or for crowd control is restricted. A command officer must be present and must authorize the deployment of these devices, absent exigent circumstances.

Command officers must give verbal notice prior to deploying these devices into a crowd unless it would present a danger to the officer or others to give such a warning.

Any deployment of the beanbag shotgun, 40mm foam round, or PepperBall launcher during crowd control requires:

- Specific targeting of a subject to be arrested or who represents an imminent risk of death or physical injury to the officer or others, except when using the PepperBall launcher as an area saturation tool.
- The officer must be reasonably sure the weapons will not strike other individuals in the crowd who pose no threat of violence.

12.545

If demonstrators or protesters are in a place they have a legal right to be and are conducting themselves in a non-violent and lawful manner, an officer cannot make their conduct criminal by ordering them to disperse and arresting them if they refuse.

***Information:***

**Use of Force Continuum:** Force situations often do not allow for an ordinal progression up a continuum of force and officers must be ready to escalate or de-escalate as the situation evolves.

**Examples of Subject Resistance**

- Uncooperative:  Subject fails to respond to verbal commands or other directions.

- Active resistance:  Subject is making physically evasive movements to defeat the officer's attempt at control, including bracing, tensing, pushing, fleeing, or verbally signaling an intention to avoid or prevent being taken into or retained in custody.

- Assault or threat of assault:  Subject assumes fighting stance, charges, strikes, or kicks an officer or verbally or physically indicates an intention to commit an assault combined with the subject's capability to assault.

- Life threatening assault or assault likely to cause serious physical harm:  Subject commits an attack using an object, a weapon, or an empty hand assault, wherein the officer reasonably believes the assault will result in serious physical harm and/or death.

**Examples of Officer/Subject Factors**
- Physical size
- Influence of alcohol or drugs on subject
- Subject's mental capacity or impairment
- Multiple suspects

**Examples of Special Circumstances**
- Environmental factors
- Distance from subject
- Officer injury or exhaustion
- Proximity of a weapon
- Officer on ground
- Special knowledge
- Crime involved
- History/knowledge of subject

**Force Options**
- Officer presence
- Verbal skills
- CEW/Chemical irritant
- Escort techniques
- Balance displacement
- Hard hands (pressure points/strikes)
- Monadnock PR-24
- PepperBall launcher (Non-lethal)
- Beanbag shotgun (Less than lethal)
- 40mm foam round (Less than lethal)
- Monadnock Auto-Lock baton
- Deadly force

12.545

Each force situation is unique, and this continuum is intended only as an illustration of the various force options available to an officer facing a given level of subject resistance. This continuum is not intended to preclude a force option when that option would not exceed the amount of force reasonably necessary to effect a lawful arrest (Graham v. Connor, 1989). Good judgment and the circumstances of each situation will dictate the level on the continuum of force at which an officer will start.

Depending on the circumstances, officers may find it necessary to escalate and de-escalate the use of force by progressing up and down the force continuum. It is not the intent of this continuum to require officers to try each of the options before moving to the next, as long as the level of force used is reasonable under the circumstances.

Disengagement is a reasonable option in consideration of officer safety and the necessity to apprehend promptly. Disengagement, area containment, surveillance, waiting-out a subject, summoning reinforcements, or calling in specialized units may be an appropriate response to a situation and should be considered.

Force options may be used simultaneously, for instance, combining verbal commands with use of chemical irritant. An officer must choose the necessary response based on law, department policy, training and experience. An officer must exercise proper use of force decision making, which means the use of reasonable force, including proper tactics, and de-escalation techniques.

**Beanbag Shotgun:** The beanbag shotgun is an impact projectile device that offers a less lethal alternative for subduing or incapacitating a subject and to prevent imminent physical harm, while maintaining officer safety. The beanbag shotgun is restricted for use by SWAT personnel, grenadiers, and supervisors trained by the Tactical Support Unit (TSU), Civil Disturbance Response Team (CDRT), or the Firearms Training Squad.

**40mm Roam Rounds:** The 40mm foam rounds are impact projectile devices that offer a less lethal alternative for subduing or incapacitating a subject and to prevent imminent physical harm, while maintaining officer safety. The 40mm foam rounds are restricted for use by SWAT personnel and grenadiers trained by TSU or CDRT.

**Conducted Energy Weapon:** A conducted energy weapon (CEW) is an electronic control device that is a non-lethal force alternative used to assist officers in the performance of their duties. A CEW is designed for self-defense or to temporarily immobilize a subject who **is actively resisting arrest**. It generates electricity in a small, hand-held, battery operated unit about the size of a handgun.

CPD utilizes the TASER 7 CEW.

When properly used, a CEW generates electrical impulses that cause Neuro Muscular Incapacitation (NMI). NMI occurs when the CEW causes involuntary stimulation of both the sensory nerves and the motor nerves. Subjects become physically incapacitated and unable to control muscle movement, allowing officers to gain control.

A CEW may be used in situations where time and conditions permit. It can be an extremely effective control device for close range incapacitation.

12.545

When deploying a cartridge from the CEW, frontal shots are prohibited except in situations of self-defense or defense of another. The preferred target area is the back of the individual **actively resisting arrest**. If a frontal shot **must** be taken, target the lower torso and legs. The CEW should never be deployed on an individual operating a moving vehicle.

In rare circumstances, there have been medical concerns raised about CEW probes deployed to the chest region causing sudden cardiac arrest. According to the manufacturer of the CEW used by CPD, the aforementioned preferred target areas increase the distance of the dart-to-heart safety margin. When deployed in the drive stun mode, the neck up and groin **should not** be targeted.

CEWs are uploaded automatically as part of the battery charging process. Each battery will be uploaded and charged monthly. Districts will upload and recharge on the following monthly schedule: first shift week one; second shift week two; third shift week three; Investigative Unit, VCS, NLU and Admin week four. Remaining sections and units will create a plan to ensure the monthly requirement is met. All plans will be added to the SOPs of each respective district, section, unit.

Supervisors will review CEW data for their personnel in evidence.com bi-annually utilizing the listed dates below:

- **April 1 – September 30, review completed by October 20**
- **October 1 – March 31, review completed by April 20**

District/section/unit commanders will ensure a supervisor reviews the uploads for activations not consistent with daily spark tests or previously documented use of force incidents.

The following activations require the investigating supervisor to provide a concise response on a Form 17 to the affected district/section/unit commander justifying the activation, including the corresponding Axon Standards Event number, if applicable:

- Activations not consistent with daily spark tests or previously documented use of force incidents.
- Activations lasting ten seconds or longer in duration.
- Three or more consecutive activations with minimal time in between the activations.

Unresolved activations which require further investigation must be documented on a Form 17 to the Police Chief.

**Vagal Nerve Stimulator (VNS):** This device sends pulses of very low current electricity to the brain to prevent seizures in epileptic persons. Officers with knowledge an individual has a VNS should avoid the use of CEWs as a force option.

**Chemical irritant:** Chemical Irritant is a hand-held canister containing a temporarily disabling aerosol that is composed partly of oleoresin capsicum (OC) and causes irritation and blinding of the eyes and inflammation of the nose, throat, and skin. Chemical irritant offers a non-lethal alternative for controlling, subduing, or apprehending a suspect(s) who is **actively resisting arrest**.

12.545

Chemical irritant leaves an invisible ultraviolet, light-sensitive dye on an individual, which can aid in identification. The use of chemical irritant, including the use of chemical irritant against a crowd or a group of individuals is only permitted in those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm; or is necessary to effect the arrest of an **actively resisting** subject; or prevent the escape of that subject.

Chemical irritant and/or the CEW are the primary response for self-defense, defense of another or gaining compliance from a person(s) **actively** resisting arrest.

The use of chemical irritant or a CEW in the drive stun mode **(do not target the neck)** on an individual attempting to swallow evidence or contraband is only permitted when **all** the following apply:

- There is a clear indication the object or substance in the subject's mouth is contraband and;
- There are exigent circumstances such as the imminent destruction of evidence or medical emergency and;
- The officer has issued verbal commands to spit out any contraband and the subject refuses to comply.

Personnel may only use chemical irritant when verbal commands and other techniques that do not require the use of force would be ineffective or where issuing verbal commands would present a danger to the officer or others.

When possible, a verbal warning must be issued to the subject that chemical irritant will be used prior to the use of chemical irritant, unless exigent circumstances exist that would make it imprudent to do so. When possible, the officer will defer using chemical irritant for a reasonable time to allow the subject to comply with the warning. Chemical irritant should only be aimed at the subject's face.

**Axon Standards Reporting System:** If Axon Standards (Standards) is down due to maintenance or mechanical problems, supervisors should document a use of force incident on the appropriate form on the H: drive. Supervisors should complete a draft copy of the use of force report and fax it to the required units. Supervisors should then retain the draft document until Standards is operational, at which point the information from the draft document should be entered into Standards and processed according to this procedure.

**Monadnock PR-24/ Monadnock Auto-Lock Batons:** Monadnock PR-24 and Auto-Lock batons are impact tools that offer a less lethal method for self-defense, defense of another, or subduing and apprehending subjects who are **actively resisting arrest**. Compared to empty hand counter strikes, the baton is less likely to cause injury to the officer and provides added distance from the subject. Officers should target center mass of a subject's torso, arms, and legs, and avoid the subject's head, throat, neck, heart, and groin, unless threatened with serious physical harm.

12.545

All Department members who have attended crowd control training have been trained in the use of the Monadnock PR-24 batons. Personnel may use the PR-24 only when deployed in crowd control formations. Twenty (20) PR-24 batons are stored in each of the five (5) district Civil Disturbance Operation Procedure (CDOP) vans.

**PepperBall:** The PepperBall launcher is a non-lethal tool that provides another alternative for self-defense, defense of another or apprehending subjects who are **actively resisting arrest**. This impact and chemical irritant device is capable of incapacitating subjects, thereby reducing their ability to continue aggressive action.

**Restraining Pregnant Females:** The law prohibiting the handcuffing of charged and pregnant offenders **does not** apply to original arrests or detainments, even if there is a warrant or capias **unless** the offender has been previously processed and booked, e.g., is out on bond. Refer to Procedure 12.600, Prisoners: Securing, Handling, and Transporting.

**Critical Incident Review Board:**

The Police Chief may convene a **Critical Incident Review Board (CIRB)** for the purpose of conducting a detailed and comprehensive review of any critical officer-involved event. A review board may be convened to review a use of force, a firearms discharge, another critical incident, or an incident involving more than one of these events. A Critical Incident review will begin at the Police Chief's direction. If a criminal investigation into an officer's actions is warranted, the review will commence after the completion of any criminal investigation or court proceedings into the matter.

**Board Members:**

1) Affected Bureau Commander(s) (One designated as Chair)

2) Inspections Section Commander (Coordinator)

3) Affected District/Section Commander(s)

4) Training Section Commander

5) Internal Investigations Section Commander

6) SWAT and Tactical Coordination Unit Commander

7) Assistant City Solicitor

The Inspections Section Commander will serve as the coordinator of the CIRB. The Coordinator is responsible for coordinating all meetings and ensuring all relevant material compiled during any criminal or administrative investigation is reviewed. The coordinator is also responsible for submitting a written report to the Police Chief within established timelines.

The Police Chief may appoint additional CIRB members as needed. The Police Chief may disqualify a member from the board at any time.

12.545

**CIRB Criteria:**

1) **Use of Force**

   a.   A use of force resulting in hospitalization or serious injury to a subject or police officer involved in a use of force incident.

   b.   A use of force that includes a citizen's complaint of unnecessary or excessive force by an officer, if recommended by the Police Chief.

   i.   A consolidated review of all uses of force that includes a citizen's complaint of unnecessary or excessive force will be completed annually by the Inspections Section Commander, upon completion of Internal Investigations.

   c.   Any use of force incident recommended for review by a district/section/unit commander and approved by the Police Chief.

2) **Firearms Discharge**

   a.   All shots fired by Department employees except: Beanbag Rounds, 40 MM Foam Rounds, at animals, while hunting, during military service, and training accidents when proper safety procedures were followed.

3) **Other Critical Incident**

**Content to be Reviewed:**

Criminal Investigations Section (CIS) and Internal Investigations Section (IIS) investigative files and interviews of the principle CIS and IIS investigators.

**Timeline:**

The review will be conducted within 90 days of commencement. All efforts will be made to conclude reviews within the established timelines. The Police Chief may extend established timelines if extenuating circumstances exist.

**Purpose and Authority:**

The CIRB will act as a quality control mechanism for the incident being reviewed. The CIRB will also have authority and responsibility to recommend to the Police Chief changes in investigative protocols, procedures, and training.

**Investigative Format and Report:**

Proceedings are to be conducted informally, directed towards the issues of the appropriateness of Department policies and procedures, member's judgement and the training adequacies with respect to the member's knowledge, skill, and resources. The chairperson will determine what evidence is relevant and reliable, without regard for technical or formal rules of evidence. The chairperson will determine the need to call witnesses and may order witnesses to be separated during the review.

12.545

The coordinator will prepare a final report to the Police Chief that will become part of the investigation file. The report will include a description of the incident (including all uses of force), a summary and analysis of all relevant evidence, proposed findings and analysis to support those findings. In particular, the board will determine: a) whether all uses of force during the encounter were consistent with Department policy and training, b) whether the officer(s) involved employed proper tactics, c) whether lesser force options were available, and d) whether changes to protocols, procedures, and training may be appropriate.

### *Procedure:*

A.    Use of CEWs

1.    A CEW may be deployed on a suspect **actively resisting arrest** when there is probable cause to arrest the suspect, or to defend one's self or another from active aggression.

a.    An individual simply fleeing from an officer, absent additional justification, (i.e., reasonable suspicion to detain or probable cause to arrest) does not warrant the use of a CEW.

b.    Officers shall consider the following prior to utilization of a CEW as a force option:

1)    The severity of the crime at issue.

2)    The risk of danger posed to others if the suspect is not promptly apprehended.

3)    The potential risk of secondary injury to the suspect due to environmental conditions.

2.    When possible, give the subject a verbal warning before a CEW is deployed unless exigent circumstances exist that would make it imprudent to do so. If a warning arc is displayed, it **must** be accompanied by a verbal warning. **A warning arc cannot be displayed unless the threshold is met for a probe deployment.**

a.    A warning arc with a probe deployment will be addressed in the narrative of the Form 18TBFP.

b.    A warning arc absent a probe deployment will be reported as follows:

1)    The officer displaying the warning arc will notify a supervisor.

2)    The supervisor will complete a Form 17ARC located in Records Management System (RMS) and submit it up the chain of command prior to the completion of their shift.

3)    Police Records Section will flag the appropriate BWC video.

12.545

3. Officers should avoid using a CEW on persons who reasonably appear to be, or are known to be, young children, elderly, medically infirm, pregnant, or users of a cardiac pacemaker. Officers are not prohibited from using a CEW on such persons, but use is limited to those exceptional circumstances where the potential benefit of using a CEW (i.e., injury reduction) reasonably outweighs the risks and concerns.

4. Officers should avoid using a CEW on individuals who are on an elevated surface or are operating or riding any moving device or vehicle when a fall from such surface, or interrupted operation of such moving device or vehicle would likely cause serious injury or death, unless the encounter rises to the level of a deadly force situation.

5. Officers should, if possible, obtain backup before using a CEW to control the subject.

   a. Deploy personnel in such a manner that will enable them to use other means to de-escalate the situation or subdue the subject if a CEW is ineffective.

   b. Officers will use caution and avoid standing near the subject.

6. Depressing the trigger on a CEW will propel two probes from the attached cartridge. Once the CEW is fired, it will automatically cycle for five seconds. The officer can turn it off before the five-second cycle stops. However, it is recommended officers permit the CEW to cycle for the full five seconds to maximize effectiveness. Officers should give commands to the suspect and attempt to gain compliance.

   a. It is necessary for both probes in a cartridge to hit some part of the suspect's clothing or body with a proper spread to achieve NMI. However, if only one probe penetrates the subject, the CEW is only partially effective. Should this occur **and** the subject continues to act aggressively, deploy the second cartridge. If NMI is still not achieved, place the CEW against the subject's body to complete the circuit, causing complete incapacitation.

7. If a first shot is ineffective, the officer may deploy a second shot by pulling the trigger a second time. The CEW can operate in the drive stun mode with or without the fired cartridge(s) attached by pressing the ARC switch on the side of the CEW. Pressing the ARC switch does not deploy probes.

   a. While operating the CEW in the drive stun mode, the forearms and outer thighs are the preferred target areas of the body. A drive stun is described as pushing the CEW aggressively against the subject's body while pressing the ARC switch. This will deliver a shock to that area of the body. A drive stun can be used for self-defense, defense of another, or to gain compliance from a subject(s) **actively resisting arrest**, and persons attempting to swallow evidence or contraband.

12.545

8. Due to the high voltage electronic spark of CEWs, **NEVER fire a CEW near flammable materials (such as chemical irritant with an alcohol-based propellant, gasoline, kerosene, or in a natural gas environment).**

   a. Department issued chemical irritant (Sabre Red Crossfire) uses a **NON-FLAMMABLE** formulation and is compatible with the use of a CEW.

   b. Officers should not deploy a CEW on subjects who are known to have been recently sprayed with chemical irritant by a private citizen or outside agency.

9. **Avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges.**

   a. Use of a CEW should be combined with physical restraint techniques to minimize the total duration of the struggle and CEW use.

      1) Additional officers on the scene of a CEW deployment should attempt to restrain and handcuff a subject during an active CEW cycle.

      2) Officers should transition to a different force option if multiple CEW deployments fail to gain compliance or continued CEW applications are not making sufficient progress toward gaining compliance.

10. Discharging a CEW at Animals

    a. A CEW is an effective tool for stopping the aggressive behavior of wild or potentially dangerous animals. A CEW is especially effective for vicious and/or dangerous dogs.

    b. Officers using a CEW on an animal may need to adjust their aim to ensure contact is made with both probes.

11. After an officer has fired a CEW cartridge, a new cartridge will be issued to the officer by their immediate supervisor.

12. Standard Medical Treatment

    a. Officers will obtain appropriate medical treatment for suspects when necessary. Request Cincinnati Fire Department (CFD) respond to evaluate the subject under the following circumstances:

       1) After a CEW deployment that immobilized or partially immobilized the subject.

       2) After a CEW deployment where **at least one** probe made contact with the suspect's skin or clothing.

       3) After a drive stun.

       4) If the subject requests medical treatment.

12.545

b. Officers should usually have CFD remove probes. Officers may remove probes embedded in a subject's skin using the appropriate technique provided the probes are not embedded in soft body tissue, i.e., genitals, breast tissue, or any area above the collar bone.

    1) If the probes are embedded in the soft body tissue described above:

        a) Transport to University Hospital for treatment and probe removal any person 13 years of age and older.

        b) Transport to Children's Hospital for treatment and probe removal any person 12 years of age and younger.

    2) The TASER 7 Cartridge safety clip can be used to remove probes from an individual. The safety clip has a notch built into the end. Remove the probes as follows:

        a) Slide the safety clip between the probe and the subject, catching the probe between the probe body and the probe point.

        b) Pull the safety clip (and the probe with it) straight out. Place your thumb on the top of the probe base to stabilize it. **Do not twist the safety clip or probe as the barbed tip may cause additional injury.**

    3) Used CEW cartridges, safety clips, and probes are considered a biohazard. Place the used cartridge(s), safety clips, and probes in a biohazard receptacle at a fire station or hospital.

13. Emergency Medical Treatment

a. In rare situations following a CEW deployment in which the CEW probes embed in a suspect's upper-chest area **and** the suspect becomes immediately unconscious, rapid emergency medical treatment is necessary due to the possibility of ventricular fibrillation leading to cardiac arrest.

    1) Promptly notify the Emergency Communications Center (ECC) to expedite dispatch of CFD personnel.

    2) Begin administering CPR while awaiting arrival of EMS/EMTs once the scene is stabilized and it is safe to do so.

    3) Ensure an officer accompanies the suspect to the hospital during transportation by ambulance, in the event the suspect becomes combative upon regaining consciousness.

12.545

B.  Use of Chemical Irritant

1.  When possible, a verbal warning must be issued to the subject that chemical irritant will be used prior to the use of chemical irritant unless exigent circumstances exist that would make it imprudent to do so.

2.  When feasible, officers will defer using the chemical irritant a reasonable time to allow the individual to comply with the verbal warning.

3.  Officers may only use chemical irritant on a restrained individual when the restrained individual is likely to escape or suffer injury; or another person is likely to suffer injury, absent the use of the chemical irritant.

4.  If it is necessary to use chemical irritant on a violent prisoner who is handcuffed and in the rear seat of the police vehicle, officers will not open the rear doors of the police vehicle to spray the prisoner.

    a.  If the vehicle is equipped with a Plexiglas partition, officers can either slide the partition to an open position and spray the prisoner through the opening or spray the prisoner through the rear door window nearest the prisoner's face.

    b.  This should be rare and used only after officers issue a verbal warning and when other uses of force would be ineffective.

5.  When spraying chemical irritant, target an individual's face.  If possible, stay five to ten feet away from an individual and administer the chemical irritant in 1-2 second bursts.

6.  Officers may not keep a sprayed individual in a face-down position any longer than necessary to handcuff or end the threat of harm or escape.

7.  Absent exigent circumstances, officers will offer to decontaminate every sprayed individual within 20 minutes of the use of chemical irritant.

    a.  Once the subject is restrained and it is safe to do so:

        1)  Remove them from the contaminated area.

        2)  Assess potential medical concerns.

        3)  Reassure the subject the effects are temporary.

        4)  Flush eyes and skin with cool, clean water or a decontamination wipe.

        5)  Encourage the subject to strobe their eyes, creating natural tears. Ask the subject to close their eyes tightly and then open widely and repeat several times.

12.545

    b.    Individuals should not rub or hold their faces, or use any oils, creams, or ointments.

  8.    Officers are required to request medical assistance for sprayed individuals in the following circumstances:

    a.    When the individual complains of continued effects after having been decontaminated.

    b.    The individual indicates they have a pre-existing medical condition that may be aggravated by the chemical irritant, e.g., asthma, emphysema, bronchitis, heart ailment, etc.

    c.    Promptly request a supervisor and CFD respond to the scene if a person is suspected of putting in their mouth, swallowing, or attempting to swallow any substance or item suspected as capable of causing physical harm, injury, or death.

        1)    If necessary, CFD will transport the suspect for prompt medical treatment.  If CFD requests the Police Department transport the suspect, officers will:

            a)    Promptly transport to University Hospital any person 13 years of age and older.

            b)    Promptly transport to Children's Hospital any person 12 years of age and younger.

C.    Use of the OC Aerosol Canister and OC or CS Blast Grenade

  1.    Only trained SWAT officers and grenadiers are permitted to deploy the OC aerosol or OC and CS blast grenades in crowd control situations.

    a.    During periods of civil unrest, at the direction of a command officer, grenadiers are permitted to deploy PepperBall launchers, 40mm foam rounds, OC canisters and OC or CS grenades.

  2.    Grenadiers will work as a 2-person team during crowd control and civil unrest situations.  One grenadier will carry a 40mm launcher while another grenadier will carry the PepperBall launcher and deploy the OC or CS grenades and canisters.

D.    Use of PepperBall Launcher

  1.    PepperBall launchers will be assigned to the districts at the discretion of the Police Chief.

  2.    The PepperBall round consists of a small, hard, plastic sphere containing OC pepper powder.

12.545

3. The PepperBall launcher is a semi-automatic, shoulder-mounted, high capacity weapon, powered by compressed air.

   a. Each district will be assigned one Self Contained Breathing Apparatus (SCBA) compressed air tank and a PepperBall fill adapter.

   b. SCBA tanks can be refilled by the CFD at their facility located on West 5th Street at Central Avenue.

4. Only supervisors and officers trained in the use of PepperBall launchers are permitted to use the weapons.

   a. The presence of a second officer is highly recommended in the event the officer using the PepperBall launcher encounters lethal resistance.

   b. If serious injury requiring hospitalization occurs from the use of the PepperBall, follow the notification process for shots fired as outlined in Procedure 12.550, Discharging of Firearms by Police Personnel.

5. When using the PepperBall launcher, aim at center mass. Avoid the head, neck, throat, and genitals, if possible. The effective range of the PepperBall is 0 to 30 feet for targeting individuals; and up to 100 feet for area saturation.

   a. Generally, four to ten rounds should be deployed at a subject. More rounds may be utilized if, in the opinion of the officer, the additional rounds will assist in gaining compliance of the individual.

   b. Heavy clothing can hinder the effectiveness of the PepperBall rounds. If a subject is wearing heavy clothing, consider targeting the legs.

   c. Subjects struck with PepperBall rounds often lower their head and turn away from the source of impact. It is important to anticipate this reaction when employing PepperBall rounds.

   d. Decontamination for individuals exposed to PepperBall OC powder is fresh air and clear, cool water.

6. Officers should avoid using the PepperBall launcher on persons who reasonably appear to be, or are known to be, young children, elderly, medically infirm, pregnant, or users of a cardiac pacemaker. Officers are not prohibited from using the PepperBall launcher on such persons, but use is limited to those exceptional circumstances where the potential benefit of using the PepperBall launcher (i.e., injury reduction) reasonably outweighs the risks and concerns.

7. PepperBall rounds can be used to saturate an area with OC powder by aiming the rounds at solid objects such as buildings, walls, or the ground.

12.545

8. After using the PepperBall launcher, and after the individual is under control, inform onlookers the PepperBall launcher is a non-lethal alternative designed to apprehend individuals without causing serious injury.

   a. Officers are exempt from the notification requirements during incidents involving civil unrest.

E. Use of Beanbag Shotgun

   1. Only SWAT officers, grenadiers, and supervisors trained by TSU, CDRT, or the Firearms Training Squad in the use of the beanbag shotgun are permitted to use it.

   2. A beanbag shotgun shell is a standard 2 3/4 inch, 12 gauge shotgun shell with a transparent hull.

      a. Stocks on beanbag shotguns are orange and clearly labeled as "less-lethal".

      b. Never load regular shotgun ammunition into beanbag shotguns or vice versa.

   3. Beanbag shotguns are carried in CDOP vans and may be carried in Patrol supervisor vehicles.

      a. Beanbag shotguns carried in CDOP vans will be secured in the provided racks, completely unloaded, with the action forward, de-cocked and safety on.

      b. Beanbag shotguns carried in Patrol supervisor vehicles will be carried with the action open, safety on, and completely unloaded in a secure case with two boxes of 5 beanbag rounds, stored in the trunk or rear compartment of the vehicle.

         1) A green breakaway seal will be on each case.

         2) Do not remove and inspect the beanbag shotgun at the beginning of each shift.

            a) Check that the green breakaway seal is intact.

            b) If the green breakaway seal is broken, the supervisor will inspect the beanbag shotgun, ensuring it is completely empty and there are two boxes of 5 beanbag rounds. Place it back in the case with the action open and safety on with the accompanying beanbag rounds. Replace the green breakaway seal.

12.545

    c.    If a beanbag shotgun is removed during the shift, it is the responsibility of the officer/supervisor utilizing the beanbag shotgun to ensure it is completely empty prior to loading the provided beanbag rounds.

        1)    After use, a supervisor will ensure the beanbag shotgun is completely empty and placed back in its original carry mode.

4.    When using a beanbag shotgun, the recommended distance is no less than 20 feet and no more than 75 feet from a suspect. Beanbag rounds have an optimal effective range of 20 to 50 feet with a maximum effective range of 75 feet.

    a.    Using a beanbag shotgun within 20 feet of an individual increases the chance of serious injury. When used as an alternative to deadly force when deadly force would be appropriate, the use of the beanbag round at a distance less than 20 feet is acceptable.

    b.    If serious injury requiring hospitalization occurs from using a beanbag shotgun, follow the notification process for shots fired as outlined in Procedure 12.550.

5.    When using a beanbag shotgun, target a specific part of the body. Avoid the head, neck, throat, heart, and genitals, if possible.

    a.    Transport any person 13 years of age and older struck with a beanbag round to University Hospital for medical evaluation.

    b.    Transport any person 12 years of age and younger struck with a beanbag round to Children's Hospital for medical evaluation.

6.    Officers should avoid using the beanbag shotgun on persons who reasonably appear to be, or are known to be, young children, elderly, medically infirm, pregnant, or users of a cardiac pacemaker.

    Officers are not prohibited from using the beanbag shotgun on such persons, but use is limited to those exceptional circumstances where the potential benefit of using the beanbag shotgun (i.e., injury reduction) reasonably outweighs the risks and concerns.

7.    While multiple beanbag rounds may be expended as necessary, no more than two beanbag shotguns should be simultaneously deployed on an individual.

8.    If four rounds prove to be ineffective, officers need to consider another option.

9.    After using a beanbag shotgun, and after an individual is under control, notify onlookers a beanbag shotgun, not a regular shotgun, was used. Inform the onlookers the beanbag shotgun is a less lethal alternative designed to apprehend individuals without causing serious injury.

    a.    Officers are exempt from the notification requirements during incidents involving civil unrest.

12.545

F.    Use of 40mm Foam Round

    1.    Only SWAT officers and grenadiers trained in the use of the 40mm foam round launcher are permitted to use this system.

        a.    The presence of a second officer is highly recommended in the event the officer using the 40mm foam round launcher encounters lethal resistance.

        b.    Where the distance between the officer and the target makes it practical, verbal warnings will be given prior to use, absent exigent circumstances.  When feasible, officers will allow a reasonable time between the warning and use of the foam round.

        c.    If serious injury requiring hospitalization occurs from using a 40mm foam round, follow the notification process for shots fired as outlined in Procedure 12.550.

    2.    The 40mm foam round consists of a soft rubber sponged nose attached to a hard plastic carrier.

    3.    The 40mm foam round launcher is a single shot, shoulder-mounted weapon.

    4.    When using the 40mm foam round, target a specific part of the body.  Avoid the head, neck, throat, heart, and genitals, if possible.  The 40mm foam round will prove most successful for incapacitation when used within its optimal energy range of approximately 10 to 75 feet, although it may be used in situations from 5 to 120 feet.

        a.    Transport any person 13 years of age and older struck with a 40mm foam round to University Hospital for medical evaluation.

        b.    Transport any person 12 years of age and younger struck with a 40mm foam round to Children's Hospital for medical evaluation.

    5.    Officers should avoid using the 40mm foam round on persons who reasonably appear to be, or are known to be, young children, elderly, medically infirm, pregnant, or users of a cardiac pacemaker.  Officers are not prohibited from using the 40mm foam round on such persons, but use is limited to those exceptional circumstances where the potential benefit of using the 40mm foam round (i.e., injury reduction) reasonably outweighs the risks and concerns.

    6.    If four rounds prove to be ineffective, officers need to consider another option.

    7.    After using the 40mm foam round launcher, and after an individual is under control, inform onlookers the 40mm foam round is a less lethal alternative designed to apprehend individuals without causing serious injury.

        a.    Officers are exempt from the notification requirements during incidents involving civil unrest.

12.545

G.  Use of the Monadnock Auto-Lock Baton and Monadnock PR-24 Baton

1.  The Monadnock Auto-Lock Baton may be deployed on a suspect **actively resisting arrest** when there is probable cause to arrest the suspect, or to defend one's self or another from active aggression.

a.  Uniformed personnel assigned to patrol must have the Auto-Lock baton readily available.

1)  Uniformed personnel have the option of wearing the Auto-Lock baton on the gun belt if space is available. The baton may also be carried on the exterior vest carrier.

b.  When using the Monadnock Auto-Lock Baton, target the center mass on a subject's torso, arms, and legs.  Avoid the head, neck, throat, heart, and genitals unless threatened with serious physical harm.

c.  Officers should avoid using the Monadnock Auto-Lock Baton on persons who reasonably appear to be, or are known to be, young children, elderly, medically infirm, pregnant, or users of a cardiac pacemaker.  Officers are not prohibited from using the Monadnock Auto-Lock Baton on such persons, but use is limited to those exceptional circumstances where the potential benefit of using the Monadnock Auto-Lock Baton (i.e., injury reduction) reasonably outweighs the risks and concerns.

2.  Use of the Monadnock PR-24 Baton is restricted to officers in crowd control formations only.

a.  All PR-24 batons must remain stored in the district CDOP vans at all other times.

12.545

## H.    Reporting a Use of Force

| Force Used | Reporting Requirement |
|---|---|
| Deployment of police canine (no bite). | Form 18C, explaining circumstances that led to the deployment. |
| Escorting or handcuffing a person, with no or minimal resistance. | No special reporting required other than the narrative of the arrest report. |
| "Hard hands" use of force by means of leverage displacement, joint manipulation, pain compliance, or pressure point control tactics without injury or complaint. | The officer(s) are required to notify a supervisor.  A supervisor will respond, investigate, and complete Form 18NC, Noncompliant Suspect/Arrestee Report. The narrative should include the events leading up to the use of force, subject's form(s) of resistance and the officer's specific defensive tactic used to overcome that resistance. An evaluation of the tactics used by the officer should also be included. |
| "Hard hands" use of force with injury or complaint of injury. | The officer(s) are required to notify a supervisor.  The supervisor's report (Form 18I) will include the following information in the narrative portion of the report: description of the events leading to the use of force; description of the subject's resistance; description of the use of force by police to overcome resistance, including a description of all empty hand controls used by the officer; supervisor's evaluation of the propriety of the initial contact and the propriety of the use of force; supervisor's evaluation of a foot pursuit if applicable. |
| Force using any physical strike or instrumental contact with a person; chemical irritant; OC aerosol canister, OC/CS blast grenade, deployment of a canine resulting in a bite; beanbag shotgun and 40mm foam rounds; CEW; or PepperBall. | Supervisors will be called to the scene and conduct a supervisory investigation including the supervisor's narrative description of the events preceding the use of force, the officer(s)' description of events, and digital audio recorded statements of all witnesses including the officer(s), subject(s), medical treating personnel (if practicable), and third-parties. For chemical irritant use and CEW deployment, digitally recorded statements are only required if the use occurs after handcuffing. |
| All deadly and serious uses of force and canine bites that cause serious injury or hospital admission.  This includes, but may not be limited to:<br><br>• Action that directly or indirectly results in a person being seriously injured, admitted to a hospital, or killed (including injuries that are self-inflicted)<br>• All head strikes with an impact weapon<br>• All uses of a carotid/choke hold | IIS will respond to the scene to investigate.  CIS will respond for all shots fired and death investigations involving police, and for other incidents at the direction of the Bureau commander. |

12.545

1. The investigating supervisor will promptly notify the district/section/unit OIC (officer in charge), or the Night Chief, if on duty. The use of force will not be investigated by any officer who used force or chemical irritant, whose conduct led to an injury to a prisoner, or who authorized the conduct that led to the reportable incident.

   a. If none of the above are on duty, ensure the next command officer who comes on duty is notified.

   b. Contact the IIS Commander, the CIS Commander, and the officer's district/section/unit commander for all deadly/serious uses of force and all canine bites which cause serious injury or hospital admission.

   c. Contact the IIS Commander and the officer's district/section/unit commander if more than the necessary amount of force appears to have been used, or the injuries are inconsistent with the reported force.

2. The supervisor will conduct a preliminary fact-finding interview of witnesses and officers at the scene and search for evidentiary materials. The supervisor will then conduct a thorough investigation and evaluate the propriety of the action taken. The supervisor or command officer investigating the incident must be of at least the next higher rank than the officer(s) who used force. The only exception is when a lieutenant uses force and there is no captain or above working, but an acting Night Chief is available. In this case, the acting Night Chief can conduct the investigation.

   a. Other than a use of chemical irritant, CEW, or hard hands, a supervisor will ensure neutral officers transport the prisoner to the appropriate facility, if applicable.

      1) Officers may remove a prisoner to a safe location to prevent an escalation of the incident.

   b. Detail supervisors will be responsible for the investigation of a use of force involving officers under their supervision.

   c. A supervisor in the district where the force occurred will investigate and report incidents when the officer is off duty.

      1) If a use of force occurs outside the city limits, a supervisor from the closest district will investigate the incident.

   d. If an officer is involved in a use of force outside a 50-mile radius of the city, the officer will promptly contact an ECC supervisor and make a notification of the use of force. The officer will leave a phone number where he/she can be contacted.

      1) ECC will contact the involved officer's assigned district/section/unit commander and notify him/her of the incident.

      2) The district/section/unit commander will call the officer to determine the correct course of action.

12.545

3. After the preliminary fact-finding interview, utilize a digital recorder to record all further interviews with the arrested, civilian witnesses, and police officer witnesses in incidents involving canine bites or the physical use of force. Attach the interview digital recording(s) to the Use of Force Investigation Case in the Evidence.com system.

   a. The digitally recorded interview will contain the following information:

      1) Date, time, and location of interview.

      2) Interviewer's name and title.

      3) Reason for the interview, e.g., "I am investigating the arrest of John Doe which took place at 1012 Ludlow Avenue."

      4) Identity of the person interviewed.

      5) Explanation of what happened with specific reference to how the injury occurred.  Do not ask leading or suggestive questions.

   b. If more information is needed, ask the appropriate questions.

   c. Upon completion, conclude the digitally recorded interview by identifying yourself, the person interviewed, and state the time, e.g., "This is Sergeant Dees concluding this interview with Mr. John Doe. The time is 2000 hours."

4. The investigating supervisor will review any involved and witnessing officers' Body Worn Camera (BWC) footage and ensure it is uploaded and categorized for proper retention.  Refer to Procedure 12.540, Body Worn Camera System.

5. The investigating supervisor will interview and examine the subject of the use of force.  Be sure the arrested is fully aware of the supervisor's rank and purpose of the interview.  The supervisor is responsible for examining the subject for any injuries and is responsible to ensure any necessary medical attention is secured.

   a. The investigating supervisor will take photographs of the subject.  Take specific photos of any injury, or claimed injury, to the subject.

      1) The investigating supervisor will attach the photographs to the Use of Force Investigation Case in Evidence.com.

   b. Anytime the subject of a use of force goes to a hospital, a supervisor will respond and:

      1) Ask permission of the medical staff to view the arrested to note the total extent of the injuries.

      2) Interview the arrested, digitally recording the interview.

12.545

3) Interview the treating physician and include the diagnosis in the report. Utilize a digital recorder while conducting the interview if the physician permits it.

    a) If the treating physician cannot release a diagnosis of the subject's injuries due to doctor-patient confidentiality, the supervisor will note it in the report.

4) If possible, obtain a voluntary hospital and Department release for medical records from the arrested (Form 652). If the arrested refuses to sign, note the refusal on the release. Attach the release to the Use of Force Investigation Case in Evidence.com.

5) Note on the Standards Investigation Report if the subject refuses treatment at the hospital.

6. If the arrested is seriously injured or admitted to a hospital, promptly notify the district/section/unit commander of the involved officer, the IIS Commander, the CIS Commander, and the Night Chief/Duty Officer, if on duty.

    a. The Homicide Unit and IIS will conduct an investigation with the assistance of the effected district/section/unit when the serious injury is a result of the use of force.

        1) The district/section/unit commander will coordinate the investigation in the absence of an IIS investigator.

            a) The CIS and IIS Commanders will forward all findings and reports to the Police Chief's Office through command channels.

            b) When IIS or the Homicide Unit is conducting the use of force investigation, the unit responsible for the primary investigation will complete an Axon Standards Investigation Report.

    b. If the arrested is admitted to a hospital for psychiatric evaluation only, without serious injury (PES, etc.), the above notifications are not required.

    c. If the arrested remains at a hospital for observation purposes as the result of the use of force, notify the affected Assistant Police Chief and the Night Chief /Duty Officer, who will determine whether CIS and IIS will be notified.

7. The investigating supervisor will complete an appropriate Form 18F Investigation Report in Standards. The investigating supervisor will not need to create a hard copy Use of Force Case Jacket if all documentation can be uploaded to the Use of Force Case in Evidence.com, e.g. digital interviews, pictures, and other scanned documents.

12.545

a.  A hard copy Use of Force Case Jacket will be necessary if there is a copy of a video disc or other file that cannot be uploaded to the Use of Force Case in Evidence.com because of its size, e.g. MVR video. Hard copy Use of Force Case Jackets will be routed through the chain of command.

b.  Ensure all blocks are completed. Multiple blocks may be checked, as applicable, in the following defined categories:

- **Ceased All Movement**: Subject fails to comply with verbal commands from an officer to submit to arrest and abruptly stops all movement. This is often a behavioral cue the subject is forming a plan to resist the officer.

- **Conspicuously Ignoring**: Subject fails to comply with verbal commands from an officer to submit to arrest and fails to respond to questions or orders, refuses to acknowledge the officer's presence, engages in other activities, or attempts to leave the area.

- **Resistive Tension**: Subject fails to comply with verbal commands from an officer to submit to arrest and makes their body rigid by tensing the muscles. This rigidity can be full body resistance or a particular body part. The goal of the action is to prevent control by means of superior strength.

- **Exaggerated Movement**: Subject fails to comply with verbal commands from an officer to submit to arrest and exhibits rapid body movements, such as flailing of the arms, excited pacing, bouncing or similar actions. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.

- **Excessive Emotional Tension**: Subject fails to comply with verbal commands from an officer to submit to arrest and is belligerent, yelling or argumentative towards the officer or another person. Actions are often behavioral cues indicating preparation for physical exertion to avoid having the officer take control.

- **Combative/Assaultive**: Subject fails to comply with verbal commands from an officer to submit to arrest and attempts, threatens or succeeds in physically assaulting an officer or another person by means of body weapons (hands, feet, kicks, punches, elbow strikes, spitting, biting, etc.).

- **Armed**: Subject fails to comply with verbal commands from an officer to submit to arrest and displays or claims to possess a weapon, threatens to obtain or use a weapon, makes overt actions consistent with being armed, or is reported to be armed.

c.  Include concise statements addressing corroboration or contradiction for each witness.

12.545

    d.   Type a brief summary of the use of force incident on the Form 18 and include the following information:

        1)   Decision to arrest, including the basis for the stop and seizure.

        2)   How the subject resisted arrest.

        3)   Subject's resistive behavior.

        4)   Officer's tactics and actions to counter resistance/assault.

        5)   The supervisor's analysis of the propriety of the officer's use of force.

        6)   A statement indicating the subject of the use of force was interviewed as part of the investigation. Include the identity of the supervisor who conducted the interview.

8.   If while investigating a use of force, an individual alleges excessive force, the investigating supervisor will complete a Standards Citizen Complaint and include it in the Standards Event. The supervisor will investigate the complaint thoroughly while all participants and witnesses are present. If the original use of force does not require the investigation to be digitally recorded, but if there is an excessive force allegation in conjunction with the use of force, the supervisor will digitally record the interview of the subject of the use of force. This is only required when an excessive force complaint accompanies a use of force investigation. The main focus of the interview should be the complaint allegation, not the use of force. Refer to Procedure 15.100, Citizen Complaints and Reports of Favorable Police Conduct, for routing of the form.

9.   The investigating supervisor will ensure the completion of and sign the Form 527, Arrest and Investigation Report, and Form 527A, Case and Bond Information Sheet, listing the prisoner's physical condition. The Form 527 will accompany the prisoner to Central Intake at the Hamilton County Justice Center (HCJC).

11.   The district/section/unit commander will review the original report and evaluate the propriety of the initial contact, any associated foot or vehicle pursuit, and the use of force and will note their findings on the Form 18. The district/section/unit commander will complete a use of force supplement if required by this procedure, which will be attached to the appropriate Use of Force Case in Evidence.com. The district/section/unit commander will promptly forward the digitally recorded statements and photos to the Police Chief's Office through the affected Assistant Police Chief.

12.   If an additional investigation is required, note it on the supplement.

13.   The investigating supervisor will make a blotter entry describing the incident and action taken.

14.   Following each use of force investigation conducted by a supervising officer, an officer at the rank of lieutenant or higher will review the investigation. The reviewing lieutenant will:

12.545

      a.   Identify any discrepancies and require the supervising officer who conducted the investigation to correct any such deficiencies.  Appropriate non-disciplinary corrective action and/or disciplinary action will be taken when a supervising officer fails to conduct a thorough investigation or fails to properly adjudicate an incident, or when a reviewing lieutenant neglects to recommend appropriate corrective action.

      b.   Conduct a review of the involved officer(s) ETS and Standards history, indicating if a pattern of behavior exists requiring intervention.

I.   Reporting Process for Use of Physical Strikes, Auto-Lock Baton, or Instrumental Contact

   1.   Supervisors must complete a detailed Form 18F, Use of Force, in Standards after an officer utilizes a physical strike, the Auto-Lock Baton, or any other instrumental contact.

   2.   Workflow the Form 18F to the district/section/unit commander through the chain of command; attach copies of any original documents, photographs, or digital recordings to the Use of Force Case in Evidence.com.

      a.   When work flowing the Form 18F, "Add Notification" for the following units:

         1)   Internal Investigations Section

         2)   Inspections Section

         3)   Patrol Bureau

      b.   The district/section/unit commander will review the original report and evaluate the propriety of the initial contact, any associated foot or vehicle pursuit, and the use of force and will note their findings on the Form 18F.

      c.   After review, the district/section/unit commander shall workflow the report to Inspections Section through the affected Assistant Police Chief.

      d.   No supplementary report is necessary unless requested by the Police Chief, an Assistant Police Chief, or a district/section/unit commander.

   3.   The investigating supervisor will make a blotter entry describing the incident and action taken.

J.   Reporting Process for Use of a CEW, Beanbag Shotgun, 40mm Foam Round, or PepperBall Launcher

   1.   Supervisors must complete a detailed Form 18TBFP, Use of TASER/ Beanbag/40mm Foam Round/PepperBall, in Standards after an officer uses one of the above tools.  A Form 18TBFP must be completed whether or not an individual is struck with a beanbag, 40mm foam round, PepperBall round, or CEW probe.

12.545

    a.   After each CEW deployment, the investigating supervisor will retrieve the data stored on the CEW, create a firing log for the deployment, and record the necessary information on the Form 18TBFP. The supervisor will then attach the firing log to the Use of Force Case in Evidence.com.

        1)   Report any accidental discharges on a Form 17 and route via the chain of command.

        2)   Report any discharges at an animal on a Form 18A, Weapons Discharge at an Animal, and route via the chain of command.

        3)   The location on a subject's body where CEW probes make contact should not be listed as an injury, unless embedded in a subject's soft body tissue and/or requiring transportation to a hospital for removal.

   2.   Workflow the Form 18TBFP to the district/section/unit commander through the chain of command; attach copies of any original documents, photographs, or digital recordings to the Use of Force Case in Evidence.com.

    a.   When work flowing the Form 18TBFP, "Add Notification" for the following units:

        1)   Inspections Section

        2)   Patrol Bureau

    b.   The district/section/unit commander will review the original report and evaluate the propriety of the initial contact, any associated foot or vehicle pursuit, and the use of force and will note their findings on the Form 18TBFP.

    c.   After review, the district/section/unit commander shall workflow the report to Inspections Section through the affected Assistant Police Chief.

    d.   No supplementary report is necessary unless requested by the Police Chief, an Assistant Police Chief, or a district/section/unit commander.

   3.   The investigating supervisor will make a blotter entry describing the incident and action taken.

K.   Reporting and Notification Process for an Injury to Prisoner

   1.   Supervisors must complete a detailed Form 18I, Injury to Prisoner, in Standards for any injury to the arrested not the result of the use of force, while under or just prior to police control, and as a result of police activity, including the ingestion of contraband.

12.545

    a.   If the arrested has ingested contraband which results in either seizures, convulsions, loss of consciousness, or other serious medical conditions; or if the arrested remains at a hospital for observation purposes, or is admitted to a hospital, promptly notify the affected Assistant Police Chief and the Night Chief/Duty Officer who will determine whether CIS and IIS will be notified.

    b.   In the event of an incident wherein the underlying police use of force meets the threshold that requires a supervisor to complete a Form 18NC, Noncompliant Suspect/Arrestee Report, to document the incident, and the subject is injured or complains of injury as a result of the force, the incident will be investigated by a supervisor as an injury to prisoner and documented on a Form 18I.

        1)   If a serious injury occurs, follow the notification process as outlined in Section H.5. of this procedure.

  2.   The narrative section of the Form 18I will be concise, containing the information in the Reporting a Use of Force Chart (see Section H). If the incident also involved the use of chemical irritant, the narrative must address the circumstances warranting chemical irritant usage as well as the circumstances of the injury.

  3.   Workflow the Form 18I to the district/section/unit commander through the chain of command; attach copies of any original documents, photographs, or digital recordings to the Use of Force Case in Evidence.com.

    a.   When workflowing the Form 18I, "Add Notification" for the following units:

        1)   Inspections Section

        2)   Patrol Bureau

    b.   The district/section/unit commander will review the original report and evaluate the propriety of the initial contact, any associated foot or vehicle pursuit, and the use of force and will note their findings on the Form 18I.

    c.   After review, the district/section/unit commander shall workflow the report to Inspections Section through the affected Assistant Police Chief.

    d.   No supplementary report is necessary unless requested by the Police Chief, an Assistant Police Chief, or a district/section/unit commander.

  4.   The investigating supervisor will make a blotter entry describing the incident and action taken.

12.545

L.   Reporting Process for Use of Chemical Irritant, OC Aerosol Canister and OC or
CS Blast Grenade.

1.   Supervisors will complete a detailed Form 18CI in Standards when reporting
the use of chemical irritant, OC aerosol canister, and OC or CS blast
grenade.

2.   Workflow the Form 18CI to the district/section/unit commander through the
chain of command; attach copies of any original documents, photographs, or
digital recordings to the Use of Force Case in Evidence.com.

a.   When work flowing the Form 18CI, "Add Notification" for the following
units:

1)   Inspections Section

2)   Patrol Bureau

b.   The district/section/unit commander will review the original report and
evaluate the propriety of the initial contact, any associated foot or
vehicle pursuit, and the use of force and will note their findings on the
Form 18CI.

c.   After review, the district/section/unit commander shall workflow the
report to Inspections Section through the affected Assistant Police
Chief.

d.   No supplementary report is necessary unless requested by the Police
Chief, an Assistant Police Chief, or a district/section/unit commander.

3.   The investigating supervisor will make a blotter entry describing the incident
and action taken.

M.   Reporting Process for Use of Hard Hands

1.   Supervisors will complete a detailed Form 18NC in Standards when reporting
the use of hard hands.

2.   Workflow the Form 18NC to the district/section/unit commander through the
chain of command; attach copies of any original documents, photographs, or
digital recordings to the Use of Force Case in Evidence.com.

a.   When work flowing the Form 18NC, "Add Notification" for the following
units:

1)   Inspections Section

2)   Patrol Bureau

b.   The district/section/unit commander will review the original report and
evaluate the propriety of the initial contact, any associated foot or
vehicle pursuit, and the use of force and will note their findings on the
Form 18NC.

12.545

    c.    After review, the district/section/unit commander shall workflow the report to Inspections Section through the affected Assistant Police Chief.

    d.    No supplementary report is necessary unless requested by the Police Chief, an Assistant Police Chief, or a district/section/unit commander.

    3.    The investigating supervisor will make a blotter entry describing the incident and action taken.

N.    Priority of Forms

    1.    If more than one act by an individual occurs, only one report is needed, e.g., use of force and a use of beanbag shotgun.

    2.    Listed below is the order in which a report is made, with "**a.**" being the highest priority:

        a.    Form 18F, Use of Force

            1)    Includes Forms 18TBFP, 18I, 18CI, and 18NC.

        b.    Form 18 TBFP, TASER /Beanbag Shotgun /40mm Foam Round/PepperBall.

            1)    Includes Forms 18I, 18CI, and 18NC.

        c.    Form 18C, Canine Deployment

            1)    If a canine deployment results in a bite, the Form 18C will include the Form 18I.

            2)    If there is no bite associated with a canine deployment, a Form 18I will be completed for an injured subject.

        d.    Form 18I, Injury to Prisoner

            1)    Includes Forms 18CI and 18NC.

        e.    Form 18CI, Chemical Irritant

            1)    Includes Form 18NC.

        f.    Form 18NC, Noncompliant Suspect/Arrestee Report

O.    Documentation Needed for Each Form

    1.    Form 18F, Use of Force:

        a.    Digitally recorded statement(s)

        b.    Photos

            1)    Face

            2)    Full Body

            3)    Location of strikes/injuries

12.545

    c.    Form 527, Arrest and Investigation Report

    d.    Computer Aided Dispatch (CAD) Incident History

    e.    Medical release, if treated

    f.    Summary of doctor's diagnosis, if treated

    g.    Copy of DVR disc/file if incident is captured on video

    h.    BWC footage

    i.    ETS and Standards Review of involved officer(s)

2.    Form 18TBFP, Use of TASER/Beanbag/40mm Foam Round/PepperBall:

    a.    Digitally recorded statement(s) (CEW deployment is exempt from this requirement unless the subject was handcuffed at the time of use, or unless there is a complaint of excessive force in conjunction with the use of force investigation)

    b.    Photos

        1)    Face

        2)    Full Body

        3)    Location of strikes/injuries

    c.    Form 527, Arrest and Investigation Report

    d.    Computer Aided Dispatch (CAD) Incident History

    e.    Medical release, if treated

    f.    Summary of doctor's diagnosis, if treated

    g.    CEW firing log, if applicable

    h.    Copy of DVR disc/file if incident is captured on video

    i.    BWC footage

    j.    ETS and Standards Review of involved officer(s)

3.    Form 18C, Use of Canine:

    a.    Digitally recorded statement(s)

    b.    Photos

        1)    Face

        2)    Full Body

        3)    Location of bite/injuries

    c.    Form 527, Arrest and Investigation Report

    d.    Computer Aided Dispatch (CAD) Incident History

12.545

    e.    Medical release, if treated

    f.    Summary of doctor's diagnosis, if treated

    g.    Copy of DVR disc/file if incident is captured on video

    h.    BWC footage

    i.    ETS and Standards Review of involved officer(s)

4.    Form 18CI, Use of Chemical Irritant:

    a.    Short narrative

    b.    Form 527, Arrest and Investigation Report

    c.    Computer Aided Dispatch (CAD) Incident History

    d.    Digitally recorded statement(s) (Only if the subject was handcuffed at the time or there is an excessive force complaint in conjunction with the use of force investigation.)

    e.    Copy of DVR disc/file if incident is captured on video.

    f.    BWC footage

    g.    ETS and Standards Review of involved officer(s)

5.    Form 18I, Injury to Prisoner:

    a.    Photos

        1)    Face

        2)    Full Body

        3)    Location of injuries

    b.    Form 527, Arrest and Investigation Report

    c.    Computer Aided Dispatch (CAD) Incident History

    d.    Digitally recorded statement(s) (Only if there is an excessive force allegation in conjunction with the use of force investigation.)

    e.    Brief, concise narrative to include information from the Reporting Use of Force Chart (see Section H.)

    f.    Medical release, if treated

    g.    Summary of doctor's diagnosis, if treated

    h.    Copy of DVR disc/file if incident is captured on video

    i.    BWC footage

    j.    ETS and Standards Review of involved officer(s)

12.545

6. Form 18NC, Noncompliant Suspect/Arrestee Report:

    a. Brief, concise narrative of resistance met and force used

    b. Form 527, Arrest and Investigation Report

    c. Computer Aided Dispatch (CAD) Incident History

    d. Digitally recorded statement(s) (Only if there is an excessive force allegation in conjunction with the use of force investigation.)

    e. Copy of DVR disc/file if incident is captured on video

    f. BWC footage

    g. ETS and Standards Review of involved officer(s)

7. Supervisors will attach copies of the appropriate documentation to the Use of Force Case in Evidence.com.

    a. For BWC footage, supervisors will utilize Evidence.com to create a Use of Force Case file with the corresponding Standards Event number. Refer to CPD's intranet web page for a link to Body Worn Camera Information.

P. Responsibilities of Inspections Section to Insure Policy and Procedure Compliance and Implementation:

1. Inspections Section will review, evaluate in writing, and submit for the Police Chief's approval all supervisor reported use of force, use of beanbag shotgun, 40mm foam round, Auto-Lock baton, and all canine bites (except those causing serious injury or hospital admission).

    a. Inspections Section is exempt from reviewing use of force cases assigned to the Use of Force Review Board.

2. Inspections Section will review, evaluate, and submit for the Police Chief's approval all investigations of CEW or chemical irritant use on handcuffed individuals.

    a. Inspections Section will promptly notify the Police Chief whenever a CEW is used on an individual 17 years of age or younger.

        1) The Police Chief or his/her designee will notify the chair of Law and Public Safety.

3. Inspections Section will review all Forms 18NC for trends and training issues.