Jason Laible, et al.,

vs.

Timothy Lanter, et al.,

In the United States District Court
For the Eastern District of Kentucky
at Covington
Case No. 2:21-cv-00102

# Sergeant Charles Fink

Taken on Tuesday, April 22, 2025





Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918  fax: 216-241-3935

1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland, OH 44114

www.table8litigationsolutions.com

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 2 of 220 - Page ID#: 3941

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF KENTUCKY
 2                        AT COVINGTON

 3       JASON LAIBLE,              :
         et al.,                    :
 4                                  :   CASE NO.
                                    :   2:21-cv-00102
 5          Plaintiffs,             :
                                    :
 6       vs.                        :   Judge David L.
                                    :   Bunning
 7       TIMOTHY LANTER,            :
         et al.,                    :   Magistrate Judge
 8                                  :   Candace J. Smith
                                    :
 9          Defendants.             :

10          Zoom and in-person deposition of

11     SERGEANT CHARLES FINK, a witness herein,

12     taken by the plaintiffs as upon

13     cross-examination, pursuant to the Federal

14     Rules of Civil Procedure and pursuant to

15     Notice of counsel as to the time and place

16     and stipulations hereinafter set forth, at

17     the offices of Taft Stettinius &  Hollister,

18     425 Walnut Street, Suite 1800, Cincinnati,

19     Ohio, at 9:35 a.m., Tuesday, April 22, 2025,

20     before Stacey J. Murrin, a Court Reporter and

21     Notary Public, within and for the State of

22     Ohio.

23

24                        -  -  -

25
```

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 3 of 220 - Page ID#: 3942

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        APPEARANCES:

 2        FOR THE PLAINTIFFS,    JACQUELINE GREENE, ESQ.
          ESTATES OF RAYMOND     ELIJAH HACK, ESQ.
 3        AND GAYLE LAIBLE:      Friedman, Gilbert &
                                 Gerhardstein
 4                               35 East 7th Street
                                 Suite 201
 5                               Cincinnati, Ohio 45202

 6                               And

 7        FOR THE PLAINTIFFS,    ROULA ALLOUCH, ESQ.
          STEVEN AND MARIBETH    Bricker Graydon, LLP
 8        KLEIN:                 2400 Chamber Center Drive
                                 Suite 300
 9                               Ft. Mitchell, KY 41017

10        FOR THE DEFENDANTS,    SPENCER S. COWAN, ESQ.
          CITY OF CINCINNATI,    Taft Stettinius &
11        TIMOTHY LANTER and     Hollister
          BRETT THOMAS:          425 Walnut Street
12                               Suite 1800
                                 Cincinnati, Ohio 45202
13
          FOR THE DEFENDANT,     MARVA BENJAMIN, ESQ.
14        CITY OF CINCINNATI:    (Via Zoom.)
                                 City Solicitor
15                               801 Plum Street
                                 Cincinnati, Ohio 45202
16
          FOR THE DEFENDANT,     TRISTAN PALMER, ESQ.
17        TRAVELERS CASUALTY     Casey Bailey & Maines
          INSURANCE COMPANY:     3151 Beaumont Centre Circle
18                               Suite 200
                                 Lexington, KY 40513
19
          FOR THE DEFENDANTS     KIMBERLY A. RUTOWSKI, ESQ.
20        TIMOTHY LANTER and     Lazarus Law, LLC
          BRETT THOMAS,          The Huntington Center
21        INDIVIDUALLY:          525 Vine Street
                                 Suite 2210
22                               Cincinnati, Ohio 45202

23
          ALSO PRESENT:  Jason Laible (Via Zoom.)
24                       Timothy Lanter
                         Maribeth Klein (Via Zoom.)
25                       Elise Marrinan
```

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1                S T I P U L A T I O N S
2          It is stipulated by counsel for the
3     respective parties that the deposition of
4     SERGEANT CHARLES FINK, a witness herein, may
5     be taken at this time by the plaintiffs as
6     upon cross-examination and pursuant to the
7     Federal Rules of Civil Procedure and Notice
8     to take deposition, all other legal
9     formalities being waived by agreement; that
10    the deposition may be taken in stenotype by
11    the Notary Public-Court Reporter and
12    transcribed by her out of the presence of the
13    witness; that the transcribed deposition was
14    made available to the witness for examination
15    and signature and that signature may be
16    affixed out of the presence of the Notary
17    Public-Court Reporter.
18
19
20
21
22
23
24
25
```

```
 1                          INDEX

 2      WITNESS          DIRECT  CROSS  RE-     RE-
                                       DIRECT  CROSS
 3
        SERGEANT CHARLES FINK
 4      BY MS. GREENE:                5

 5      EXHIBIT IDENTIFIED                      PAGE

 6      Exhibit 37                               59
        Exhibit 38                               62
 7      Exhibit 39                               63
        Exhibit 40                               65
 8      Exhibit 41                               79
        Exhibit 42                               80
 9      Exhibit 43                               82
        Exhibit 44                               83
10      Exhibit 45                               84
        Exhibit 46                               86
11      Exhibit 47                               87
        Exhibit 48                               88
12      Exhibit 49                               88

13      OBJECTIONS                              PAGE

14      MR. COWAN:                              152
        MR. COWAN:                              153
15      MR. COWAN:                              153
        MR. COWAN:                              153
16      MR. COWAN:                              154
        MR. COWAN:                              155
17      MR. COWAN:                              180
        MR. COWAN:                              180
18
        EXHIBITS REFERENCED            PAGE LINE
19
        Exhibit 3                      8     24
20      Exhibit 18                     11     6
        Exhibit 1                      11    19
21      Exhibit 12                     51    12
        Exhibit 15                     52     3
22      Exhibit 30                     52    17
        Exhibit 26                     56    25
23      Exhibit 10                     93     7

24

25
```

```
 1                    SERGEANT CHARLES FINK,
 2        a witness herein, of lawful age, having been
 3        first duly sworn as hereinafter certified,
 4        was examined and testified as follows:
 5                     THE WITNESS:  I do.
 6                     THE COURT REPORTER:  Thank you.
 7                      CROSS-EXAMINATION
 8        BY MS. GREENE:
 9             Q.    All right.  Good morning.
10             A.    Good morning.
11             Q.    My name is Jacqueline Greene.
12        I'm one of the attorneys representing the
13        plaintiffs from the Laible Estates in the
14        matter we're here today to discuss.  If we
15        could just briefly do introductions around
16        the table for the record.
17                     MS. ALLOUCH:  Roula Allouch here
18        for the Klein plaintiffs.  And Maribeth Klein
19        is available on the Zoom link as well.
20                     MR. HACK:  Elijah Hack for the
21        plaintiffs.
22                     MR. PALMER:  Tristan Palmer for
23        the defendant Travelers.
24                     MS. MARRINAN:  Elise Marrinan,
25        I'm just observing.
```

1          MR. LANTER:  Tim Lanter,

2  Cincinnati Police.

3          MS. RUTOWSKI:  Kim Rutowski

4  representing Tim Lanter and Brett Thomas.

5          MR. COWAN:  And Spencer Cowan

6  for the officers and the City of Cincinnati.

7          MR. FINK:  And Sergeant Charles

8  Fink, Cincinnati Police.

9  BY MS. GREENE:

10         Q.    Thanks for being here today,

11  Sergeant.  Your name is Charles Fink.  I

12  think we all know to spell that, so I would

13  ask you to spell it for a record, but,

14  Sergeant, I'm sure you've spoken about this

15  with counsel, and you've probably testified

16  in court before, let me ask, do you,

17  generally, have an understanding of how

18  testimony works and the practices we're gonna

19  follow to make sure things run smoothly?

20         A.    Some -- I mean, trial testimony,

21  yes.  I've never been in a deposition before,

22  but, yes.

23         Q.    Okay.  So there a couple things

24  that are a little bit different.  You've

25  probably spoken about this with counsel, but

```
 1          just like in court, we'll do our best to

 2          speak one at a time so our court reporter can

 3          take down a clear record.

 4                       And we'll ask for verbal

 5          answers, so yes, no, other verbal answers

 6          rather than shakes or nods of the head and

 7          uh-huh's and uh-uh's because those are hard

 8          to write down.  Fair enough?

 9               A.    Yes.  I'm sorry.

10               Q.    Well, that's all right.  And

11          beyond that, if there's an objection to any

12          of my questions at some point, and there may

13          be from Mr. Cowan or other lawyers in the

14          room, if that happens, unlike in court, just

15          let them finish their objection.

16                       And when they're done, unless

17          you're specifically instructed otherwise, you

18          can just go ahead and answer.  Okay?

19               A.    Yes.

20               Q.    And if at any point I ask a

21          question you don't understand, need me to

22          clarify, rephrase, follow up, whatever it is,

23          just let me know.  I'll be happy to do that.

24                       If you do go ahead and answer

25          the question, I will assume that you
```

 1    understood, though.  Fair enough?

 2            A.    Yes.

 3            Q.    All right.  And if you need a

 4    break, too, also no problem.  Just give us a

 5    shout, we'll take a break.  The only

 6    exception would be if I've already asked a

 7    question and it's pending --

 8            A.    Sure.

 9            Q.    -- I'll ask you to answer that

10    before the break.  Okay?

11            A.    Yes.

12            Q.    All right.  And other than that,

13    I think we're probably good to go.

14                  So are you affected today by any

15    medical or memory or other circumstance that

16    would impact your ability to testify

17    truthfully and accurately?

18            A.    No.

19            Q.    And, Sergeant Fink, what did you

20    do to prepare for your deposition?

21            A.    I reviewed the -- some of the

22    case folder, but mostly the IIS report as it

23    was written.

24            (Exhibit 3 was referenced.)

25    BY MS. GREENE:

1   Q.   Okay.  And the IIS report, just

2   to establish that, I'm handing you what was

3   previously marked as Exhibit 3.  Is this the

4   IIS report you just mentioned?

5   A.   Yes, ma'am.

6   Q.   Okay.  And we can set that aside

7   for now.  We'll come back to it in a bit.

8           You said you reviewed the case

9   folder.  What is the case folder?

10   A.   I -- I actually contacted

11   Internal to get information, things that I

12   had put into the case folder and it was

13   provided in an electronic -- the documents

14   electronically.

15           And I saw the titles of some of

16   them.  Some of -- the vast majority I didn't

17   review.  The one I know I did review was one

18   that counsel had asked me about, which I

19   think was a BWC transmission or translation,

20   excuse me.

21           MR. COWAN:  And I just want to

22   just put on the record advising you not to

23   disclose communications that we had.  She's

24   not really asking for that --

25           THE WITNESS:  Oh, okay.

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 11 of 220 - Page
ID#: 3950
Deposition of Sergeant Charles Fink                Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              MR. COWAN:  -- but I just
 2     wanted...
 3     BY MS. GREENE:
 4          Q.    Yeah.  And as we speak, if
 5     there's some document or something you want
 6     to look at with counsel, you can talk about
 7     that, but I'm not ever gonna be asking you
 8     specifically about the discussion you had --
 9          A.    Sure.
10          Q.    -- with lawyers.  Okay?  Okay.
11     So you said a BWC translation?
12          A.    Correct.
13          Q.    Is that like some kind of
14     transcript of a body-worn camera?
15          A.    Basically -- yeah, basically
16     of -- yes, exactly, BWC.  I watched it and
17     basically put my notations of what I heard.
18          Q.    Is this like your handwritten
19     notes?
20          A.    No.  I think I typed it, if I --
21     if I remember right.
22          Q.    Okay.
23          A.    Yeah, it was typed.
24          Q.    And that was included, you said,
25     in the case folder then?
```

```
 1              A.    Correct.

 2              Q.    What else did you look at from

 3   the case folder?

 4              A.    The written reprimand.

 5              Q.    Okay.

 6         (Exhibit 18 was referenced.)

 7   BY MS. GREENE:

 8              Q.    Okay.  And I'll hand you now

 9   just for the sake of reviewing, I'm handing

10   you what was marked as Exhibit 18 previously.

11   Is this the written reprimand you just

12   referenced?

13              A.    Correct.

14              Q.    Okay.  And so you looked at

15   this.  And what else did you look at?

16              A.    Looked at the procedure for the

17   Pursuit Policy 12.535 as it stood at that

18   time.

19         (Exhibit 1 was referenced.)

20   BY MS. GREENE:

21              Q.    Okay.  I'm handing you

22   Exhibit 1.  Is that the policy for pursuits

23   that you just referenced?

24              A.    That's correct.

25              Q.    Okay.  And what else did you
```

```
 1    review?
 2              A.    I know I looked at the
 3    employee's summary, their -- the disciplinary
 4    summary.  So, like, it was a three-year
 5    lookback that was particular to IIS if we
 6    would look back at a, you know, 36-month
 7    period on each employee.
 8              Q.    Okay.  And what else did you
 9    look at?
10              A.    I believe -- I don't believe
11    anything else.
12              Q.    Okay.  Did you look at any
13    body-worn camera or audio files or anything
14    like that?
15              A.    No.  I don't -- no.
16              Q.    Okay.
17              A.    No.
18              Q.    Did you look at any photographs
19    or other multimedia?
20              A.    No, I don't think there were any
21    photographs that I recall.
22              Q.    And did you look at any other
23    written documentation other than what you've
24    described so far?
25              A.    I don't believe so.
```

1    Q.    Okay.  Did you speak to anybody

2    in preparation for your deposition other than

3    counsel?

4    A.    No.

5    Q.    Okay.  All right.

6    Sergeant Fink, what's your educational

7    background?

8    A.    A Bachelor's in psychology and a

9    Master's in business administration.

10   Q.    And when did you earn your

11   Bachelor's in psychology?

12   A.    '94 from UC.

13   Q.    Okay.  And what about your

14   Master's?

15   A.    2003 from Xavier.

16   Q.    Okay.  And do you have any other

17   educational degrees or certificates,

18   licensures?

19   A.    Not completed, no.

20   Q.    And what's your employment

21   history prior to the CPD?

22   A.    Oh, gosh.

23   Q.    Well, let me ask you this, how

24   old were you when you started working for the

25   police department?

1        A.    Thirty-one.

2        Q.    Okay.  So, briefly in summary,

3   what did you do before that?

4        A.    Financial services, basically.

5        Q.    Okay.  And then what year did

6   you start working for CPD?

7        A.    '03.

8        Q.    Okay.  And can you, please, walk

9   me through from your time of hire to now the

10  ranks --

11       A.    Progression?

12       Q.    -- and assignments you've had?

13       A.    Roughly speaking, so September

14  '03 started the academy.  In February of '04,

15  I was sent to District 5 as a probationary

16  police officer, remained there until January,

17  I believe, of '06.

18              And after a year or so -- year

19  and a half or so, they like to transfer you

20  to a new district, so they transferred me to

21  District 3, District 3 on patrol.  I stayed

22  there until February of 2010.

23              And then I was transferred to

24  the -- at the time it was called the

25  Central -- Central Patrol Vice Section, yeah,

1    so Vice, until February of 2012.

2    February 2012, I was -- I transferred out

3    back to patrol, District 5.

4              Let's see.  So I think it was

5    February of 2019 is when I was promoted to

6    sergeant, and then transferred to District 4

7    in patrol, remained there until I believe

8    August of '19.

9              I was then transferred to

10   Internal Investigations Section until first

11   week of July of '22.  And then I went to --

12   at the time, it was Personal Crimes

13   supervisor, now it's the supervisor of the

14   entire Major Offenders Unit.

15             THE COURT REPORTER:  Major what

16   unit?

17             THE WITNESS:  Major Offenders

18   Unit.

19             THE COURT REPORTER:  Thank you.

20   BY MS. GREENE:

21        Q.    Okay.  And that's where you are

22   now?

23        A.    Correct.

24        Q.    Major Offenders Unit, is that

25   like a detective-bureau-type thing?

1      A.    It's all encompassing with the

2    Personal Crimes/Financial Crimes

3    Unit/Poligraphy, the Rapid Indictment

4    Program.

5              So, yeah, it's over -- over --

6    Personal Crimes is mainly like the sexual

7    assault offenses, things of that nature, and

8    then Financial Crimes, any of, like, the bank

9    robberies or larger -- larger money fraud

10   cases.

11      Q.    Okay.  And so that doesn't

12   include homicides, does it?

13      A.    No, homicide is distinctly

14   different.

15      Q.    Okay.  And the Central Patrol

16   Vice that you mentioned, is that like a

17   detective role --

18      A.    Correct.

19      Q.    -- or was that -- okay.  It was?

20      A.    Yeah, more -- more long-term

21   investigations, kind of a mix at the time

22   of -- in the moment, it was prostitution,

23   liquor control board stuff, and drug

24   investigation.  I was primarily on the drug

25   investigation side.

1       Q.    Okay.  So then you were in IIS,

2    or Internal Investigations Section, you said

3    from August of 2019 until early July of 2022?

4            A.    Yeah, I believe July 3rd or

5    something like that, yes.

6       Q.    Approximately --

7            A.    Yeah.

8       Q.    -- give or take a few days?

9            A.    Yeah.  Yeah.

10       Q.    I'm pretty impressed, actually,

11   at the specificity of your -- your memory of

12   those dates is pretty good.

13                Okay.  So in IIS, what was your

14   role?

15           A.    The long/short of it was to

16   investigate allegations of police misconduct.

17       Q.    And can you just explain to me

18   the structure of the IIS?

19           A.    You mean, the -- like the

20   hierarchy of the employees or --

21       Q.    Yeah, like the organizational

22   structure.

23           A.    There was -- well, at the time,

24   oh, gosh, I think there was five of us.  You

25   had to be a sergeant to be an Internal

```
1    investigated -- or investigator, Internal
2    Investigations investigator, was a sergeant
3    level above us was a lieutenant who oversaw
4    the investigations, and then a captain who
5    signed off of them before they, you know,
6    went up to the assistant chief and chief.
7         Q.    And you said there were five
8    officers assigned to that unit?
9         A.    Let me think real quick.  Five
10   or -- because we had two that -- I mean, we
11   had two officers that -- that did lower level
12   and worked investigations and sometimes like
13   citizen complaints and things, so those two.
14         I believe at times -- I mean, it
15   fluctuated because one came and went, I think
16   we had five supervisors -- sergeants at the
17   time and two officers.
18        Q.    Five sergeants plus two officer
19   level --
20        A.    Correct.
21        Q.    Okay.  So it was seven total
22   plus the supervisors over that?
23        A.    Plus the lieutenant and the
24   captain, yes.
25        Q.    Okay.  And your role there was
```

1    to investigate allegations of police

2    misconduct, you said, what does that mean?

3         A.    So basically that encompassed

4    any allegations of criminal behavior, sexual

5    misconduct, discrimination, harassment, any

6    serious breaches of policy and procedure and

7    administrative reviews of, like, critical

8    incidents.

9              And those could have been

10   brought to us by, like, CCA, citizen

11   complaint, or at the request of the police

12   chief.

13        Q.    And were those the two ways in

14   which an investigation would be open and

15   brought to you by the CCA or from request of

16   the chief?

17        A.    Yeah, or a citizen -- a citizen

18   complaint, I mean, as opposed to through CCA.

19        Q.    Okay.  So citizen complaints

20   made directly to the police department?

21        A.    Correct.

22        Q.    -- would trigger an

23   investigation by IIS?

24        A.    Correct.

25        Q.    And then, otherwise, it was

1    request of the chief or a CCA referral?

2          A.    Correct.

3          Q.    And when we say CCA, we're

4    talking about the Citizen Complaint

5    Authority, right?

6          A.    Yes.

7          Q.    Okay.  And you said

8    investigations of critical incidents were

9    part of your duties there.  What are critical

10   incidents?

11         A.    Well, for instance, like a --

12   any action that was -- like taken by a police

13   officer that could directly or indirectly

14   result in an injury or death of -- of

15   another.

16         Q.    Okay.  So where an officer

17   causes or -- or indirectly causes the death

18   of a person; is that what you're saying?

19         A.    Or a serious physical injury.

20         Q.    Okay.  And then you also said

21   serious breaches of policy or procedure, what

22   does that mean?

23         A.    I'm trying to think of an

24   example as opposed to -- like a discourtesy

25   that would be handled at the district level.

1   I probably covered them in all the other

2   things that I referred to so far as the

3   discrimination, harassment, criminal conduct,

4   sexual misconduct.

5       **Q.    Okay.  So you said some things**

6   **would be covered at the district level, and**

7   **other policy violations would be covered by**

8   **investigations -- investigations at IIS,**

9   **right?**

10      A.    Correct.

11      **Q.    And what is the line between**

12  **what's covered at the district level versus**

13  **IIS?**

14      A.    There's a -- I mean, ultimately,

15  it comes down to the -- if it's not

16  specifically defined to fall under, like,

17  what you said, the sexual harassment, racial

18  discrimination, criminal offense, then it

19  would be -- it most likely would be handled

20  at the -- the district level.

21          Discourtesies, I'm trying to

22  think of some things small, I don't think

23  there was a definitive this here versus --

24  you know, versus an Internal as opposed to

25  the way I just described it.

1    Q.    And in terms of a referral from

2    the chief to do an investigation, is that

3    typically in cases of critical incidents?

4         A.    I -- I don't follow you.

5         Q.    Sorry.  Earlier you said the

6    chief can say, IIS, you're investigating

7    this, right?

8         A.    Right.

9         Q.    Is that typically after a

10   critical incident occurs, the chief would

11   give that instruction?

12        A.    It could be under literally

13   anything.  I mean, it could be something that

14   we've never investigated before.  I mean,

15   it's literally at the -- at the request of

16   the chief.

17             So it could be -- I mean,

18   critical incident was part of what we were

19   known to do, administrative oversight of it,

20   like an officer, a PO, an officer involved,

21   like a shooting, something of that nature.

22             But, yeah, it literally -- it

23   could be anything at the chief's request.

24   Because there'd be times, maybe, the chief

25   would have us do something that may generally

1    fall under the district, you know, level, but

2    the request, for one reason or another, and

3    we didn't question why.  We just --

4         Q.    Just do it.

5         A.    -- act accordingly, yes.

6         Q.    It's the chief's order, right,

7    you do it.  Okay.

8              So for commencing an

9    investigation, when it comes to you, however

10   it comes to you, how do you know whether it

11   is, for example, a criminal investigation

12   versus an administrative investigation; is

13   that told to you?

14        A.    I'm not sure I understand what

15   you mean.

16        Q.    Let me back up.  So at IIS you

17   can investigate allegations of criminal

18   conduct --

19        A.    Sure.

20        Q.    -- by officers, right?  Yes?

21        A.    Yes.

22        Q.    And some of the investigations

23   that you conduct are administrative in

24   nature, meaning they relate to employment and

25   disciplinary matters and those kinds of

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 25 of 220 - Page
ID#: 3964
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    things, correct?

2         A.    Yes.

3         Q.    And so when an investigation is

4    assigned to you, are you told you that it's

5    gonna be a criminal versus an administrative

6    investigation?

7         A.    I don't know so -- so much where

8    it's defined.  Like, I mean, because there's

9    the potential for a criminal aspect to be in

10   in any investigation, I suppose.  But, I

11   mean, obviously, there's something like

12   theft, which is a criminal investigation.

13             But otherwise, it wouldn't be --

14   it wouldn't be defined as, like, here's what

15   you're looking at as opposed to one or the

16   other.

17        Q.    So then when you undertake an

18   investigation, do you conduct an

19   investigation to gather all the evidence that

20   could go toward either an administrative or a

21   criminal --

22        A.    It's an --

23        Q.    -- outcome?

24        A.    -- open-ended book.  It's just a

25   collection of the facts, everything that

1    occurred.

2            Q.    Okay.  And in terms of receiving

3    assignments to conduct investigations,

4    generally, how does that happen?

5            A.    In terms of?

6            Q.    Receiving an assignment to start

7    an investigation, how does that start?

8            A.    Luck of the draw.  There's a

9    lieutenant -- but, I mean, I really can't

10   speak for how they determine it, but it was

11   fairly evenly distributed.

12                "A" would get a case.  The next

13   one would go to the next person, unless there

14   might be someone that was proficient in a

15   particular area or who had done, you know, a

16   case that was, you know, strict focus here

17   and maybe have some -- more of an expertise

18   of it.

19                But, generally speaking, it's

20   just equally distributed throughout the, you

21   know, the...

22            Q.    And do you receive those

23   assignments from the lieutenant then?

24            A.    Sometimes from the lieutenant.

25   Generally, it was from -- we had -- one of

```
 1        the officers was considered the
 2        administrative assistant in the office.
 3                   So he would do the -- create the
 4        case folder, and it could be as simple as a
 5        manilla envelope with, you know, some numbers
 6        on it, and then he'd just throw it on the
 7        desk.
 8             Q.    When you show up in the morning,
 9        there's an envelope on your desk?
10             A.    He loved -- he loved that part
11        of his job, yes.
12             Q.    All right.  So there wasn't like
13        an e-mail or anything that would assign the
14        investigation to you?
15             A.    Uh-uh.
16             Q.    No?  It would just be an
17        envelope on the desk?
18             A.    Yeah.  He would usually wait
19        till you were there, so he could walk over
20        and smile and hand it to you.
21             Q.    Okay.  So does that folder,
22        that's the case file you were referencing
23        earlier?
24             A.    Uh-huh.
25             Q.    That's a yes?
```

```
 1              A.    Yes.  I'm sorry.

 2              Q.    That's okay.

 3              A.    Yeah.

 4              Q.    And --

 5              A.    The folder, it's depending on

 6    what kind of investigation.  It could be a

 7    manilla folder with one sheet like the

 8    complaint, or it could be -- it just depends

 9    on what it was.

10              Q.    What's the case folder file --

11              A.    Accordion file.

12              Q.    -- like on the outside?

13              A.    Oh --

14              THE COURT REPORTER:  Can we

15    wait -- I'm sorry, we're talking over each

16    other.

17              Q.    Yeah.  Sorry.  Yeah, we're

18    talking over each other too much.  So try

19    to -- I know a lot of times you know exactly

20    where I'm going with my question.  Try to let

21    me get there, and I'll try to let you finish,

22    too.  I think we're both doing it.  So sorry

23    about that.

24              A.    That's all right.

25              Q.    Okay.  So what does the case
```

1    file physically look like?

2            A.    I believe -- like I said,

3    sometimes it was a manilla folder like that,

4    other times it was an accordion file like

5    that.

6            Q.    Okay.  I see.  Depends on how

7    much information was available --

8            A.    Correct.

9            Q.    -- at the start of the

10    investigation?

11            A.    Correct.

12            Q.    And what does it say on the

13    outside?

14            A.    I don't recall, to be honest

15    with you.

16            Q.    Just, generally speaking, what

17    does it say?

18            A.    I don't recall.

19            Q.    Okay.  Handwritten, typewritten,

20    label?

21            A.    I'm picturing -- because in my

22    office, I work with the same thing daily in

23    ours, it's a little white sticker, so I don't

24    want to -- I don't recall.

25            Q.    That's okay.  But some kind of

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    little white sticker with a case name on it?

2         A.    I don't even want to say that.

3         Q.    All right.  All right.  Well, in

4    any case, it's labeled some way, I'm sure,

5    right?

6         A.    I would imagine so.

7         Q.    Okay.  And when you get the

8    folder, then you open it up, and what do you

9    do from there?

10        A.    It's open-ended.  It just

11   depends on what type of investigation it is.

12   I mean, ultimately, it's a collection of all

13   the facts and information that we can gather

14   to -- to analyze for the report.  It could be

15   body-worn cameras, mobile video recorders,

16   department member statements, witness

17   statements, cell phone footage.  It just

18   depends on what it is.

19        Q.    And as the sergeant assigned to

20   a particular investigation, do you make the

21   request, for example, for the body-worn

22   camera or the cruiser camera to be given to

23   you?

24        A.    Most of that was accessible

25   through our electronic means system, yes.

```
 1          Q.    Through the Internal department

 2    computer system?

 3          A.    Correct.

 4          Q.    And what -- what is CPD's

 5    software, what's the name of it?

 6          A.    Axon.

 7          Q.    Axon.  It's Axon.  Okay, that

 8    makes sense.  So when you referenced the

 9    body-worn camera summary earlier, was that an

10    Axon summary?

11          A.    Refresh my memory about the

12    body-worn camera --

13          Q.    Yeah, sure.  Earlier you --

14          A.    Oh, okay.

15          Q.    I apologize.

16          A.    Okay.

17          Q.    We were talking earlier about

18    things you reviewed for this case and you

19    mentioned the body-worn camera summary.  Was

20    that an Axon summary?

21          A.    It would have been a review

22    of -- I mean, the body-worn camera is located

23    in Axon, so, yeah.

24          Q.    And Ax --

25          A.    We would have watched the
```

Case: 2:21-cv-00102-DLB   Doc #: 152   Filed: 12/10/25   Page: 32 of 220 - Page
ID#: 3971
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    body-worn camera and then transcribed it.

2         Q.    And does -- does Axon provide a

3    transcription for you?

4         A.    I believe they have some kind of

5    transcription service now.  I don't know that

6    it was available at that point, but it --

7    it's horrible.

8              Yeah.  You can read it as

9    it's -- as the -- the video is playing and

10   it's quite often defunct.  So it's not

11   something most any of us ever used.

12        Q.    You can't rely on it very much?

13        A.    Right.

14        Q.    Okay.  So the transcription you

15   were referencing, that was one you

16   personally --

17        A.    Strictly mine.

18        Q.    Okay.  And -- all right.

19              So going back to the process of

20   an investigation then, as -- as the

21   investigator assigned to a particular case,

22   is it your responsibility to ensure you

23   collect all of the available evidence?

24        A.    Correct.

25        Q.    And it's your responsibility to

1    ensure that you gather information about all

2    the available facts, right?

3            A.    Correct.

4            Q.    And in terms of that collection

5    of information and facts, you use clearly the

6    information that's available through the CPD

7    software system, right?

8            A.    Correct.

9            Q.    And what other sources, if any,

10   do you gather information from, generally?

11           A.    Again, it really depends.  I

12   mean, interviews are a large source of it,

13   and it -- it can be, you know, witness

14   statements, civilian statements, department

15   member statements, like I said, body-worn

16   cameras, DVRs, any of those electronics.

17                 It might be downloads of -- of

18   the taser, if it's involved, any kind of --

19   we have our Realtime Crime Center has the

20   cameras all throughout the City, so sometimes

21   we pull footage from there.  We pull footage

22   from businesses, residents that

23   are cooperative.

24           Q.    Like, surveillance footage from

25   private --

```
 1          A.    Ring doorbells from -- from
 2    residences, surveillance footage from
 3    businesses, yes.
 4          Q.    Okay.  All right.  So then once
 5    you gather the information, you create a
 6    report, right?
 7          A.    Correct.
 8          Q.    And in that you summarize all of
 9    the evidence and information you've been able
10    to gather?
11          A.    Correct.
12          Q.    Do you make recommendations on
13    the outcome of the investigation in your
14    reports?
15          A.    After the summarization, yes.
16    We'll do a conclusion and will say, based on
17    this information, here's my recommendation
18    for a complaint or case closure.
19          Q.    Okay.
20          A.    And that could include
21    discipline or not.
22          Q.    And in that conclusion section,
23    do you evaluate officer conduct against the
24    requirements of CPD policies?
25          A.    Correct.
```

1      Q.    And you identify policy

2   violations as well, right?

3          A.    Correct.

4          Q.    Okay.  And then that report

5   while you're working on it, do you consult

6   with any other members of the department

7   while you're putting it together?

8          A.    Within the office, generally,

9   we -- we often talked about cases, yes.

10         Q.    So like within the IIS?

11         A.    Yes, not outside the office.

12         Q.    And then when you finish your

13  report, is there a review of it by your

14  lieutenant?

15         A.    Correct.

16         Q.    And there's a chain of command

17  review that goes all the way up to the chief,

18  right?

19         A.    Correct.

20         Q.    During that chain of command

21  review, does it happen that there are edits,

22  changes, et cetera, suggested by those

23  supervisory officers?

24         A.    It certainly can be, yes.

25         Q.    Does it happen often?

1    A.    It depends on your ability to

2    write, sometimes.  I mean, it can be anything

3    from grammatical to recommendations.  Like,

4    if they see something that maybe you may have

5    missed and you may want to consider.

6         Q.    Like, for example, an additional

7    policy violation?

8         A.    Correct.

9         Q.    Okay.  And so when you finish

10   your report, do you personally hand it off in

11   hardcopy to your supervising lieutenant?

12        A.    Yeah.  We generally hand it to

13   them, or they add it -- add it on their desk.

14        Q.    And then once you've handed it

15   over to your lieutenant, other than if

16   there's some edit that comes back to you, do

17   you hear about it again?

18        A.    Pretty much always hear about it

19   because there's usually -- there's always

20   something.  It could -- like I said, it could

21   be as simple as grammatical.

22             It could be -- it just depends.

23   But you'll generally have a discussion.  The

24   first -- first run is rarely the -- goes

25   straight through.

```
 1              Q.    Okay.  All right.  So you're

 2      aware of a vehicle pursuit involving CPD

 3      Officer Sergeant Lanter, Officer Thomas, and

 4      other officers from August 7th, 2020, right?

 5              A.    Correct.

 6              Q.    How do you first become aware of

 7      that pursuit?

 8              A.    I believe we -- we may have

 9      still been in the office, and we -- I know we

10      were called out to the scene.  It was one of

11      the critical incidents that we would go to

12      and kind of monitor the investigation.

13              Q.    And when you say we were called

14      out to the scene, who does that include?

15              A.    The Internal Investigations

16      Office.

17              Q.    So the entirety of IIS that was

18      on duty at the time?

19              A.    There might have even been some

20      recall.  I don't -- I don't recall.

21              Q.    So several officers from IIS --

22              A.    Yes.

23              Q.    -- went to the scene?  And what

24      did you do there?

25              A.    I mean, our -- our task is to
```

1    monitor the situation to -- to ensure that

2    the investigative bodies are doing what

3    they're supposed to do.

4              But in this particular case, it

5    was really up to -- I mean, the crash

6    occurred over there, so it was -- the

7    investigation on -- going on right there was

8    Newport in, I believe, Campbell County, major

9    accident reconstruction team that was doing

10   the work.

11        Q.    So you're observing that major

12   accident reconstruction process as it was

13   going on?

14        A.    Just for a short bit.  Because

15   once the -- the occupants of that vehicle

16   were removed from the scene and -- and gone,

17   we left shortly thereafter.

18        Q.    Okay.  Did you speak to any

19   officers from any agency while you were at

20   the scene?

21        A.    Not that I recall.  I mean,

22   not -- not of anything other than are you

23   okay, you know, the simple in passing, but

24   not that I recall.

25        Q.    And you said several officers

1    from IIS went.  Do you recall who else was

2    there with you?

3          A.    I do not.

4          Q.    Do you remember anybody of that

5    group who was there?

6          A.    I just -- no, because I don't

7    want to say someone that wasn't there, no.

8          Q.    Is there any kind of record that

9    would be available that would indicate who

10   went?

11         A.    Nothing in regards to my

12   investigation, so I doubt it, frankly.

13         Q.    And with several officers from

14   IIS present, did you divide different

15   responsibilities among yourself at -- at --

16   yourself at the scene?

17         A.    Generally speaking, when we

18   respond to any one of those kind of scenes,

19   we just kind of space out.  And if there's,

20   you know, a ranking individual there, they'll

21   advise if they need us to do something

22   specific, get information or something of

23   that nature.

24         Q.    Okay.  And do you recall that

25   happening while you were there, a ranking

Jason Laible, et al., vs. Timothy Lanter, et al.,

1    officer telling you you had to get into

2    info -- information?

3         A.    Not on this -- this particular

4    case.  Again, because like I said, most of

5    the activity going on there was all outside

6    of our jurisdiction, so...

7         Q.    Okay.  And you said you weren't

8    there very long.  Do you remember about how

9    long it was?

10        A.    Maybe 15 minutes or so.

11        Q.    And then from there, where did

12   you go?

13        A.    Returned back to the IIS office.

14        Q.    And was that all of the IIS

15   officers who had gone returned at that time?

16        A.    I don't know.

17        Q.    When you got back to the office,

18   what happened next?

19        A.    Don't recall.

20        Q.    Okay.  How did you become aware

21   that you were the person who was gonna

22   conduct the investigation in this case?

23        A.    I don't recall.

24        Q.    You were the other person who

25   was --

1    A.    Yes.

2        Q.    -- heading it up?

3    A.    Yeah.  I -- I -- I would imagine

4  the same way it always was.  I mean, it

5  wasn't anything out of the ordinary that I --

6  that I recall, so...

7        Q.    And what's the first thing you

8  did when you began working on this file?

9    A.    I know I looked into the BWCs

10 because I believe someone had already --

11 maybe someone in -- I don't know who did it,

12 but someone had already pulled two or three

13 of the BWCs -- or, not BWCs, excuse me, the

14 MVRs from our vehicles that were involved.

15        If there was a receipt for the

16 -- we have a property receipt that we fill

17 out saying removed from equipment, such and

18 such.  And so I looked into whether we had

19 those downloaded or not at that point.

20        Q.    And when you say "MVRs," that's

21 the cruiser camera, right?

22    A.    Correct, the video recorder.

23        Q.    And you just said there's a

24 property receipt associated with that pulling

25 of the video?

1    A.    Correct.

2    Q.    **And --**

3    A.    It's not customary necessarily.

4    I think it was just covering all bases in

5    this case because it was the type of incident

6    that occurred.  But it was -- it -- a

7    Form 330 is a property receipt that we

8    utilize for recordkeeping purposes,

9    basically.

10    **Q.    And you said somebody had**

11    **already pulled two or three of those MVR**

12    **recordings and filled out a property receipt?**

13    A.    Correct.

14    **Q.    And that's a Form 330?**

15    A.    Correct.

16    **Q.    And so then did you pull any**

17    **other MVRs?**

18    A.    I know that Harper,

19    Specialist Harper, Officer Thompson (sic),

20    and Sergeant Lanter, those might have been --

21    well, they were two, if not, all three of

22    the three.

23                Because I believe one of those

24    cars was not scene any longer or wasn't on

25    scene at all, and that's why there was two of

1   the three removed.  I don't recall looking at

2   any other vehicles.

3           Q.    Okay.  And you said Thompson,

4   did you mean Thomas?

5           A.    Oh, I'm sorry, Thomas, yes.

6           Q.    That's okay.  And you also said

7   you looked into the BWC, that's the body-worn

8   camera, right?

9           A.    Correct.

10          Q.    And did you pull body-worn

11  camera footage then?

12          A.    I'm sure that day they were told

13  to doc those because the only way we get that

14  is if they doc them and it downloads.  It

15  probably wasn't looked at that day, I don't

16  know, but, ultimately, looked at the

17  body-worn camera, yes.

18          Q.    And do you recall whose

19  body-worn camera you looked at?

20          A.    The same three, Sergeant Lanter,

21  Officer Thomas, and Specialist Harper.  Also,

22  Officer Gabel.  He was unrelated to the

23  pursuit, but there was an incident that

24  occurred on the scene of the accident that

25  was investigated.

```
 1         Q.    Like a discourteousness?

 2         A.    Correct.

 3         Q.    Yeah.  Okay.  So those four

 4   body-worn cameras then were pulled and,

 5   ultimately, you reviewed at some stage,

 6   right?

 7         A.    Correct.

 8         Q.    And was there any other video

 9   footage that you gathered by any means for

10   this investigation?

11         A.    Yes.  Some was provided to me, I

12   believe, through Officer Egner, who was the

13   administrative assistant.  There was a

14   snippet from the news of the pursuit across

15   from the bridge, some video of that, crossing

16   the Roebling Bridge.

17               There was some footage from, I

18   believe, a bank at -- at 5th and Monmouth,

19   and a street camera at the same general

20   location.

21         Q.    Okay.  And the bank footage from

22   5th and Monmouth --

23         A.    I believe it was a bank.  I'm

24   not a hundred percent.  I know it was a

25   business there.
```

1    Q.    Okay.  So some business at 5th

2  and Monmouth, that video footage --

3         A.    Correct.

4         Q.    -- how -- do you know how that

5  came to be in the case file?

6         A.    I do not.

7         Q.    And then you said there was a

8  street camera also at 5th and Monmouth?

9         A.    I believe at that intersection.

10         Q.    And do you know how that came to

11  be.

12         A.    I do not.

13         Q.    But you did look at those two

14  things in any case, right?

15         A.    Yes, I did.

16         Q.    And you said a snippet from the

17  news.  Do you remember what channel that was?

18         A.    No, I do not.

19         Q.    And did you look or direct

20  anyone else to look for other media footage

21  of the -- of this pursuit?

22         A.    I did not.

23         Q.    Is that something that IIS does

24  in investigations ever?

25         A.    To -- in my experience, I've

1    never referred to the news for any type of

2    footage.

3            Q.    And then for -- well, have you

4    ever heard of other investigators doing that?

5            A.    No, not news media.

6            Q.    For the footage from the

7    business and the street camera at

8    approximately 5th and Monmouth, do you -- do

9    you know whether there was any request for

10   footage from other businesses or locations

11   along the pursuit route that have the same

12   kind of type of surveillance footage?

13           A.    I do not.

14           Q.    Did you make any specific

15   request for that?

16           A.    I did not.

17           Q.    Okay.  Is that something that

18   IIS typically would consider and look for in

19   an investigation?

20           A.    I've never heard of that for a

21   pursuit.  Generally speaking, a pursuit is

22   covered through the mobile video recorders or

23   -- but in the case mobile video recorders and

24   body-worn cameras?

25           Q.    Okay.  All right.  What other

Deposition of Sergeant Charles Fink                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    types of evidence or information did you

2    gather?

3         A.    Outside of the interviews of --

4    of department member staff, I believe that

5    was about it.

6         Q.    Okay.  And you conducted an

7    interview of many staff members, right?

8         A.    Correct.

9         Q.    Okay.  And those were all video

10   recorded?

11        A.    I believe if not video recorded,

12   they were at least audio recorded.

13        Q.    Okay.  And the interviews you

14   conducted were of Officer Brett Thomas,

15   right?

16        A.    Yes.

17        Q.    Included Sergeant Lanter, right?

18        A.    Yes.

19        Q.    Also, Officer Steven Fox, right?

20        A.    No.

21        Q.    No?

22        A.    Sergeant Steven Fox was an IIS

23   member, and he may have sat shotgun in one of

24   the interviews.

25        Q.    Okay.  There was an interview of

Deposition of Sergeant Charles Fink                         Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Mark Bode conducted, right?

2              A.    Yes.

3              Q.    And Christopher Vogelpohl?

4              A.    Yes.

5              Q.    What about an Ed Shively?

6              A.    No.   I believe he was an ATF

7    special agent.

8              Q.    Kevin Broering, was he

9    interviewed?

10             A.    Yes.

11             Q.    Brett Stratmann interviewed?

12             A.    Yes.

13             Q.    Daniel Kowalski interviewed?

14             A.    Yes.

15             Q.    Sergeant Don Scalf interviewed?

16             A.    Yes.

17             Q.    And Ryan Olthaus was

18   interviewed?

19             A.    I don't recall that.

20             Q.    And then Specialist Harper was

21   interviewed as well, right?

22             A.    Yes.

23             Q.    Anybody else you can think of

24   who was interviewed for this case?

25             A.    I don't believe so.

1    Q.    Okay.  So for this particular

2    investigation, what was your understanding of

3    the purpose of it when it began?

4         A.    Purpose of?

5    Q.    Of the investigation.

6         A.    Of my investigation?

7    Q.    Yeah.

8         A.    Just a -- it's not specific

9    necessarily to this.  It's just that the

10   purpose is it's an administrative oversight

11   and to identify -- and we gather the facts,

12   review all the information that we have

13   available, and then to identity any kind of

14   criminal, operational, administrative

15   violation that may have occurred.

16   Q.    Okay.  And so you're

17   investigating a critical incident for this

18   case, right?

19        A.    Correct.

20   Q.    And so in terms of the critical

21   incident label, is that -- is that something

22   that you would in your conclusions come to a

23   finding that, yes, this was a critical

24   incident or it wasn't a critical incident?

25        A.    No.  It would -- it would -- the

1    critical incident identifier would have been

2    what preceded the -- the overall review in

3    the first place.

4         **Q.    Do you know who applied that**

5    **particular label to this matter?**

6         A.    I mean, by definition it was,

7    but I don't know who specifically said it

8    now.

9         **Q.    And when you say by definition**

10   **it was, what do you mean?**

11        A.    Well, it's one of -- one of our

12   identifiers of a critical incident, like I

13   said before, was that you have any police

14   activity, whether directly or indirectly

15   results in physical -- serious physical harm

16   or a death of another.

17        **Q.    And that's what happened here?**

18        A.    Correct.

19        **Q.    Okay.  And in terms of the**

20   **purpose of your investigation, part of that**

21   **purpose was to determine if the officers**

22   **involved acted consistently with CPD policies**

23   **and training, right?**

24        A.    Correct.

25        **Q.    And you're also evaluating**

```
 1      whether they employed proper tactics,

 2      correct?

 3           A.    In this case, it's particularly

 4      pertaining to pursuits, I was looking at

 5      whether there were administrative,

 6      operational, or equipment violations.

 7           Q.    Okay.

 8           A.    So administrative -- well,

 9      operational would be anything that would have

10      been a traffic violation.  Administrative,

11      all things other, and equipment being

12      something like failing to activate a BWC or a

13      DVR or an MVR during the process.

14           Q.    Understood.  So operational

15      violations are strictly traffic violations?

16           A.    Correct.

17           Q.    And then equipment violations

18      relate to how the officers used or didn't use

19      their equipment?

20           A.    Correct.

21           Q.    And then administrative

22      violations are everything else --

23           A.    Correct.

24           Q.    -- all types of

25      policy violations --
```

1    A.    Correct.

2    Q.    -- that could occur?  That's a

3  yes?

4    A.    Yes.

5    Q.    Okay.  And other than what we've

6  talked about so far, what other information

7  or evidence did you use in putting together

8  your report?

9    A.    The Manual of Rules and

10  Regulations, which contains the disciplinary

11  matrix, policies and procedures.

12    (Exhibit 12 was referenced.)

13  BY MS. GREENE:

14    Q.    Okay.  And just to have that for

15  the record, the Manual of Rules and

16  Regulations you just referenced, I'm handing

17  you Exhibit 12; is that the manual?

18    A.    Correct.

19    Q.    Okay.  And then when you say

20  policy and procedure, is that the entirety of

21  the CPD --

22    A.    Correct.

23    Q.    -- Policy and Procedure Manual?

24    A.    Obviously, an initial focus on

25  535, which was the pursuit, but we would have

```
 1    looked at any number of things that come up

 2    throughout the investigation.

 3         (Exhibit 15 was referenced.)

 4    BY MS. GREENE:

 5         Q.    Okay.  And I'm just gonna hand

 6    you another document and ask you a quick

 7    question.  This is Plaintiffs' Exhibit 15

 8    previously marked as an Investigations

 9    Manual.

10              Is this a set of the policies

11    that you would have considered in your

12    investigation?

13         A.    I don't know if I -- if I

14    utilized the Investigations Manual at all on

15    this particular instance, but we often use

16    this or the Tactical Patrol Guide.

17         (Exhibit 30 was referenced.)

18    BY MS. GREENE:

19         Q.    Okay.  And the Tactical Patrol

20    Guide then -- I'm handing you what was marked

21    as Exhibit 30.  Is that the Tactical Patrol

22    Guide you just referenced?

23         A.    Yes.

24         Q.    Okay.  And so you said IIS, in

25    your investigations, you do -- sometimes you
```

1    use the Investigations Manual or the Tactical

2    Patrol Guide?

3             A.    Yes.

4             Q.    And how do you use those?

5             A.    Well, in Internal, since we're

6    kind of tasked with being somewhat

7    all-knowing, we're not.

8             So we have to, you know, refer

9    to our own manuals at times and confer with

10   them to ensure that we're -- or that all the

11   policies and procedures were correctly

12   adhered to in whatever investigation we're

13   referring to.

14            Q.    In IIS investigations, is it

15   ever the case that the Tactical Patrol Guide,

16   for example, would be used to say there was a

17   policy violation based on what was written in

18   that Tactical Patrol Guide.

19            A.    I don't know that I would ever

20   quote that so much as if whatever it may be,

21   whatever the subject matter may be, then

22   identify it in the procedure manual, to be

23   able to refer to the procedure manual under,

24   you know, procedure X, Y, Z.

25            Q.    Okay.  And the same question

1    about the Investigations --

2            A.    Same thing.

3            Q.    -- Manual?

4            A.    Same thing, yes.

5            Q.    Are there other -- there are

6    other guides and guidebooks and other types

7    of policies that aren't contained in the

8    policy and procedure manual for this

9    department, right?

10           A.    Say that question again.  I'm

11   sorry.

12           Q.    There are other guides or other

13   manuals that are not part of the policy and

14   procedure manual that CPD has, right?

15           A.    I don't know, the policy and

16   procedure manual is pretty exhaustive.

17           Q.    It is.  But I guess what I'm

18   asking is, you know, we have this

19   Investigations Manual and this Tactical

20   Patrol Guide, those are not part of the

21   policy and procedure manual --

22           A.    No, they're not.

23           Q.    -- right?

24           A.    No.

25           Q.    Are there other sets of policies

Case: 2:21-cv-00102-DLB   Doc #: 152   Filed: 12/10/25   Page: 56 of 220 - Page
ID#: 3995
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1   like those, meaning, you know, they have

2   other topics that they cover, but they are

3   similar in style and function to the Tactical

4   Patrol Guide or the Investigations Manual?

5           A.    The only other thing that might

6   be somewhat similar would be maybe a training

7   bulletin or something to that effect, but

8   they're -- they're usually a page to two

9   pages as opposed to an act -- a full manual.

10          Q.    And so those training bulletins,

11  likewise are not the kind of thing you would

12  cite to show --

13          A.    Right.

14          Q.    -- a policy violation --

15          A.    Right.

16          Q.    -- correct?

17          A.    Correct.

18          Q.    All right.  So it's really just

19  the Manual of Rules and Regulations and the

20  policy and procedure manual that forms the

21  basis of --

22          A.    Correct.

23          Q.    -- policy violation findings?

24          A.    Yes.

25          Q.    Okay.

Deposition of Sergeant Charles Fink                     Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Sorry.
 2              Q.    We can set those two aside as
 3      well.  I'll take those back.
 4              A.    (Handed.)
 5              Q.    Thanks.  Okay.  Thank you.
 6              A.    Yes.
 7              Q.    All right.  So going back to
 8      this particular case, you said you looked at
 9      the -- the pursuit driving policy, right?
10              A.    Yes.
11              Q.    And then, of course, the Manual
12      of Rules and Regulations, right?
13              A.    Yes.
14              Q.    And then any other policies that
15      you reviewed for this -- this investigation?
16              A.    I don't believe so.
17              Q.    All right.  And is there any
18      other information or evidence that you
19      considered when you were putting together
20      your report?
21              A.    There was a -- one other -- I
22      know another document.  I think off the top
23      of my head was the ATF Operational Plan --
24      ATF Operational Plan.
25              (Exhibit 26 was referenced.)
```

```
 1    BY MS. GREENE:
 2            Q.    Okay.  So I'm gonna hand to you
 3    what we previously marked as Exhibit 26.  And
 4    is this the ATF Operational Plan you just
 5    referenced?
 6            A.    Yes.
 7            Q.    Okay.  And how did you end up
 8    receiving a copy of the ATF plan?
 9            A.    I believe Sergeant Scalf was the
10    one who actually provided it to me.
11            Q.    And how did it come to be that
12    he gave it to you, like did you request it --
13            A.    Yes, I requested it.
14            Q.    -- did you talk to him?  And did
15    you make that request in person, an e-mail,
16    some other way?
17            A.    I don't recall.  I just know I
18    asked, was there an operation plan first.
19    And when they said, oh, absolutely, I
20    requested a copy of it.
21                  Actually, I believe, if I
22    remember -- if I remember correctly, I know I
23    asked him in the interview as well, the
24    actual Internal interview.
25            Q.    Okay.  Is there any other
```

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 59 of 220 - Page
ID#: 3998
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    evidence or information that you considered

2    other than what we've talked about so far for

3    the basis of your report?

4              A.    None that comes to mind right

5    now.

6              MS. GREENE:  Okay.  All right.

7    So I'd like to take a quick break off the

8    record before we continue.  I'll pause the

9    recording now.

10       (Off the record.)

11             MS. GREENE:  We are back on the

12   record, and we just took a break to gather

13   some documentation.  Thank you to counsel for

14   defendants and the witness to -- for doing

15   that.

16   BY MS. GREENE:

17             Q.    All right.  So going back to

18   your investigation in this matter, we were

19   talking about various documentation, evidence

20   information that you had reviewed.

21             One of the things that you

22   mentioned reviewing was a summary of

23   body-worn camera, I believe; is that right?

24             A.    I didn't review it.  I created

25   it.

```
 1          Q.     I'm sorry.  That's what I meant
 2     to say.  You created a summary of the
 3     body-worn camera.
 4                 MS. GREENE:  We're gonna go
 5     ahead and mark this as our next exhibit and
 6     that will be Exhibit --
 7                 THE COURT REPORTER:  37.
 8          Q.     -- 37.  Wonderful.  Thank you so
 9     much.
10          (Exhibit 37 was marked.)
11     BY MS. GREENE:
12          Q.     So we've got Exhibit 37 in front
13     of you.  And, Sergeant Fink, then this is the
14     summary that you created?
15          A.     Correct.
16          Q.     And you did that by watching the
17     body-worn camera from which officer?
18          A.     All of -- all of the officers
19     involved, primarily 8310, which was
20     Sergeant Lanter.  But if there were any
21     discrepancies or anything I needed to clear
22     up, like, maybe I didn't hear the radio on
23     one of them because I did an audio/visual, I
24     included the other ones.
25          Q.     Okay.  And so this is kind of
```

1    a -- a combined summary of the body-worn

2    camera from Lanter, Thomas, and Harper?

3         A.    Correct.  I mean, I don't

4    believe -- I don't believe that the -- the

5    visual of the BWC is here for the other ones.

6    It's the audio.

7              So I -- I watched the other

8    ones.  I believe the document was created

9    from 8310 -- Sergeant Lanter's, excuse me,

10   based on his visual as well as audio.

11             But if I didn't hear something

12   like on the radio, or it wasn't clear on his,

13   I watched all of them and then I would

14   include it there for clarification.

15        Q.    Okay.  And did you reference

16   radio traffic recordings as well when

17   creating this summary, or just the body-worn

18   camera?

19        A.    Just the -- or, I'm sorry, say

20   that again.

21        Q.    Did you reference the audio

22   recordings of radio traffic, or did you just

23   listen to the body-worn camera to create this

24   document?

25        A.    On this one, just the body-worn

1    camera with the radio transmissions.

2         Q.   Okay.  Did you also make a

3    summary of radio transmissions?

4         A.   There's another document that is

5    radio transmissions, correct.

6         Q.   I think I have that one, so

7    we'll come to that in a moment.

8              But just for the sake of clarity

9    on this particular document, **Exhibit 37**, the

10   numbers that you list next to the names of

11   these individuals at the top of the first

12   page, those are their badge numbers; is that

13   right?

14        A.   They're -- really, they're car

15   numbers.

16        Q.   Car numbers.  Okay.  And so then

17   wherever we see reference to those particular

18   numbers in the transcript that you created,

19   that means that's the individual associated

20   with that number from this key at the top of

21   the first page?

22        A.   Correct.

23        Q.   Okay.  Thank you.  All right.

24   So you created this document from the

25   body-worn camera.

```
 1                    And then since we just talked
 2      about radio transmissions -- okay.
 3                    MS. GREENE:  For the radio
 4      transmissions, we are gonna mark this as 38.
 5                    THE WITNESS:  Thank you.
 6             (Exhibit 38 was marked.)
 7      BY MS. GREENE:
 8             Q.    And, Sergeant Fink, are these
 9      the radio transmission summaries that you
10      referenced a moment ago?
11             A.    They are.
12             Q.    And you typed this up?
13             A.    I did.
14             Q.    Okay.  And you have a legend on
15      the end again with the car numbers indicating
16      various speakers, right?
17             A.    Yes.
18             Q.    And -- all right.  So we have
19      these two documents.  Are there other
20      documents you generated other than the IIS
21      report?
22             A.    I don't believe so.
23             Q.    I have a couple other I just
24      want -- a couple other documents I want to
25      ask about briefly then, just to make sure
```

 1    because I'm not sure of the source of some of

 2    these.

 3         (Exhibit 39 was marked.)

 4    BY MS. GREENE:

 5         Q.    We're gonna mark this as

 6    Exhibit 39.  All right.  Sergeant Fink,

 7    you've just been handed what we have marked

 8    as Exhibit 39.  Is this document familiar to

 9    you?

10         A.    This actually looks like it's

11    more than one document.  It looks like

12    there's a couple documents here.

13         Q.    Okay.  Well, are these documents

14    then in Exhibit 39 familiar to you?

15         A.    Yes.

16         Q.    And what are they?

17         A.    Prior to my interviews, I often,

18    depending on the complexity and in-depth of

19    the interview, I'll often create what I think

20    might be best line of questions to get all

21    the information from whoever I may be

22    speaking to.  And that's what this is.

23         Q.    Okay.  And so then you said this

24    is multiple documents.  Can you describe what

25    the -- what is contained in Exhibit 39?

1    A.    So I don't know which was which.

2    So the first one is -- is a copy of the

3    questions I may have asked an individual.  I

4    can look at that in a note to kind of see if

5    I can find who.

6              The second page is similar.  It

7    may -- may have different questions because

8    they're involvement may have been different.

9    So the second and third page is interview

10   questions for another individual.

11             The fourth and fifth is for

12   another.  Page 5 was for someone, and page 6

13   was for someone.

14   **Q.    Okay.  And as you look at these,**

15   **do you know who these specific sets of**

16   **questions were for?**

17   A.    If you give me a moment, I might

18   be able to identify.

19   **Q.    Sure.**

20   A.    (Witness reading.)  The first

21   page appears that would have been

22   Sergeant Scalf.

23   **Q.    Okay.**

24   A.    The second and third page would

25   be Sergeant Lanter.  The fourth and fifth, I

```
 1   believe, is Officer Thomas.  The sixth would

 2   have been Specialist Harper.

 3               And then I believe the seventh

 4   was kind of a generic one for those that

 5   weren't involved in the actual driving in the

 6   pursuit, so the surveillance units,

 7   electronic...

 8        Q.    Thank you.  Did anyone review

 9   these questions prior to you conducting the

10   interviews other than yourself?

11        A.    No.

12        Q.    Okay.  And so then this is

13   essentially the outline of questions you

14   worked off while you were interviewing these

15   individuals?

16        A.    Potentially.  It just depends on

17   the -- the interview it often will take

18   another -- but it's a framework of things

19   that I thought of prior to.

20               MS. GREENE:  Okay.  I'm going to

21   mark another exhibit.  This will be

22   Exhibit 40.

23        (Exhibit 40 was marked.)

24   BY MS. GREENE:

25        Q.    Okay.  You have Exhibit 40 in
```

1    front of you.  Are you familiar with this

2    document?

3            A.    So this looks like my summary of

4    -- of both the Injury to Prisoner and the two

5    investigative reports, an Injury to Prisoner

6    and the pursuit.

7            Q.    And so the Injury to Prisoner

8    that has the letters and numbers F18I next to

9    it, right?

10           A.    Correct.

11           Q.    Is that a type of report title?

12           A.    Yeah.

13           Q.    And this is a narrative that you

14   typed up for that particular report?

15           A.    It generally -- or often I would

16   do it on, like, a Word document only because

17   the actual reporting system structure has

18   very small spacing and stuff.  It didn't

19   allow for spellcheck and things of that

20   nature.

21               So oftentimes, I would do it in

22   Microsoft Word, or something of that nature

23   so I could review it in its entirety and make

24   sure it was what I wanted before I would then

25   cut and paste it into the actual

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 68 of 220 - Page
ID#: 4007
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    investigative report.

2         Q.    Okay.  So there's a separate

3    actual F18I form that you pasted this into?

4         A.    I believe so.  But until I saw

5    this document, I didn't actually recall the

6    Injury to Prisoner aspect, but, yes, it would

7    be.

8         Q.    Okay.  And then you also have

9    this Pursuit F34 section that follows through

10    the remaining pages of the document, right?

11         A.    Correct.

12         Q.    And what's in the F34 form?

13         A.    So this is an investigative

14    report, a review of the -- it's kind of

15    unusual because in Internal this is something

16    I would normally review as opposed to

17    actually commit and complete.

18              But the Injury to Prisoner and

19    the pursuit, the pursuit, it's just a basic

20    summary of all things that led to the pursuit

21    and how the pursuit proceeded --

22         Q.    Okay.

23         A.    -- and then came to a

24    conclusion.

25         Q.    And so this document, this is

1    something you wrote, this entire collection

2    here?

3              A.    Correct.

4              Q.    The F18I and F34 forms?

5              A.    Yes.

6              Q.    And you said it's somewhat

7    unusual that you would write these

8    narratives?

9              A.    Very in Internal.  Because it's

10   not something -- normally, like as I say

11   for -- in the event of an excessive use of

12   force, we would get the -- the investigative

13   report, which is the use of force that the

14   supervisor would review -- or the supervisor

15   of the district would have completed, then

16   we'd review it and go with it from there.

17              Same thing with something like

18   this, the OIC would generally create the

19   pursuit investigative report.

20             Q.    And here instead, you were asked

21   to create it in Internal, as an Internal

22   Investigations Section instead?

23             A.    Correct.

24             Q.    And how did that come to be?

25             A.    I don't recall.  I know -- I --

1    I recall myself and one of the other guys

2    saying that it was unusual.  I don't know

3    whether it was because it was a critical

4    incident review or if it -- or not.

5              Because we, like, as I said, you

6    know, we reviewed uses of force.  That's the

7    one thing I can think of.  I don't know if I

8    had more pursuits in Internal to review, but

9    we reviewed uses of force quite often, and

10   they were always done by the unit, the

11   district affected OIC.

12             And the procedure specifically

13   states the OIC of the pursuit will complete

14   the pursuit paperwork as well.

15        Q.    Okay.  And who asked you to

16   create these in this case, if you remember?

17        A.    I don't.

18        Q.    All right.  All right.  Did

19   you -- have you ever completed these forms,

20   the F34 or the F18I in your role in Internal

21   Investigations before this case?

22        A.    Not that I recall, no.

23        Q.    And do you know what the reason

24   was here that you were asked to do it?

25        A.    No.  No, I don't.  As I said, I

```
 1    recall actually asking -- you know, I recall

 2    my partner, the guy that sat next to me

 3    because we toss ideas back and forth a lot,

 4    and neither of us knew precisely why.

 5          Q.   Okay.  So you talked about it

 6    with him, your partner?

 7          A.   Well, not in any extent other

 8    than that.  I mean, everybody in the office

 9    discussed all the cases, basically.  I mean,

10    they weren't a secret inside the office.

11          Q.   But you'd say it something along

12    the line of weird, or what -- what did you

13    talk about?

14          A.   Yeah.  I just -- yeah.  That's

15    precisely what I said.  I said, I don't know

16    why I would do that because, like I said, I'd

17    never done it before.

18          Q.   Okay.  And did you ever learn at

19    any time why you were asked to do this here?

20          A.   No.

21          Q.   Okay.  And who was the partner

22    you talked about it with?

23          A.   Jarrod Cotton.

24               THE COURT REPORTER:  Cotton?

25               THE WITNESS:  Cotton, like the
```

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 72 of 220 - Page
ID#: 4011
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    fabric.

2    BY MS. GREENE:

3         Q.    And then who did you end up

4    submitting this particular report and summary

5    to?

6         A.    I don't individually recall

7    sending this, but I would suppose it went to

8    the lieutenant as well.  Everything that --

9    all of our work product went through to our

10   lieutenant.

11        Q.    That's the lieutenant over the

12   IIS section?

13        A.    Yes, Lieutenant Briede.

14        Q.    Okay.  Was it part of your case

15   file, or was it separate?

16        A.    You mean the total IIS case

17   file?

18        Q.    Yes.

19        A.    I would imagine it was part of

20   it.

21        Q.    Okay.  All right.  So do you

22   recall having any back and forth about edits

23   or finalizing this particular document with

24   anybody in the department?

25        A.    I mean, with every case -- this

1    particular one, I think -- the only thing I

2    can think of is with Lieutenant Briede after

3    a particular interview, we discussed with it

4    Sergeant Scalf, and she said something about

5    it being reasonable.  He was explaining

6    his -- his basis for not saying more on the

7    radio.

8                 And then -- and I -- and she

9    also is the one who noted the speeds on the

10   BWC because she -- she would review things

11   quite frequently, parallel investigation of

12   sorts.

13                 She, obviously, couldn't do it

14   for all of them.  But she mentioned the --

15   observing the speeds on the BWC of one of the

16   units, and that's what caused me to then look

17   at all of them.

18        **Q.    Okay.  And who was that?**

19        A.    Lieutenant Briede.

20        **Q.    You said Brady?**

21        A.    Briede, B-R-I-E-D-E.

22        **Q.    Was Lieutenant Briede in IIS?**

23        A.    Yes.

24        **Q.    And did she oversee IIS**

25   **sergeants?**

1    A.    Yes, she's a lieutenant.

2    Q.    Okay.  And so she personally

3  then reviewed the body-worn camera here?

4    A.    I can't -- well, I imagine she

5  did.  I know that she brought to my attention

6  that it was observed in the body-worn camera,

7  so my assumption would be she observed it.

8    Q.    Okay.  Tell me about the

9  conversations you had with Lieutenant Briede

10 about this matter.

11    A.    That those are the two points

12 that I recall specifically about the -- this

13 investigation.

14    Q.    And did you talk to her prior to

15 the completion of your IIS report?

16    A.    Well, both of those times would

17 have been prior to completion, yes.

18    Q.    And did she give you any

19 direction on conducting this investigation?

20    A.    Direction?  I mean, she --

21 her -- her role basically is when -- when we

22 would turn the report in, it certainly would

23 be reviewed by her.  And it's -- it may come

24 back for grammar.  It may come back for

25 consideration.  If there's something that's

1    glaring that may be someone may have missed,

2    it may come back, any number of things.

3              But so far as direction, I mean,

4    if you suggest that pointing out the -- the

5    BWC spotting of the -- of the speed,

6    direction.

7         Q.    And did she review your IIS

8    report prior to it being finalized?

9         A.    So I turned it in -- the first

10   time I turned it in was October 7th of 2020.

11   I don't -- once it's turned in, I move on.

12             I had plenty of Internal reports

13   on my desk to work on.  So I don't know --

14   yes, she reviewed it.  I don't know when I

15   got it back, but...

16        Q.    Okay.  But you don't remember

17   any other discussions with Briede about this

18   matter?

19        A.    Nothing specific about it, like,

20   other than what I've already said.

21        Q.    Do you remember any kind of

22   general topics of conversation with her other

23   than what you've described so far?

24        A.    Go ahead.  I'm sorry.

25        Q.    Do you remember any general

1    topics of conversations with her about his

2    case other than what you described so far?

3          A.    Other than I told her I had

4    driven and walked and reviewed some of the

5    pursuit pathway basically.

6          Q.    Which parts of the pathway did

7    you drive?

8          A.    All of it, actually.  I mean,

9    I -- I got out and walked some of it, but

10   ultimately, I drove it as well.

11         Q.    And what parts did you walk?

12         A.    The alleyway.  I don't recall

13   what the name of the alleyway was, and at

14   the -- at the finalization of 5th and

15   Monmouth.

16         Q.    And when you were driving the

17   course of the pursuit, what was the purpose

18   of that?

19         A.    Because driving, a lot of the

20   view I had was -- initially was very static.

21   It's an MVR.  The MVR is very

22   one-dimensional.

23               It faces the way the wheel of

24   the car is, where I could look, you know,

25   with my head on a swivel and see all the

1    surroundings.  I wanted to get a better feel

2    for a human view of it, as opposed to the

3    camera.

4              Q.    And the purpose of walking those

5    portions of the pursuit, what was that?

6              A.    The same kind of thing.  I don't

7    know that there was anything in particular.

8              Q.    And when you drove and walked

9    the pursuit path, what did you notice?

10             A.    I just -- it was taking -- I

11   don't know.  I was just taking it all in.  I

12   wanted -- like as I said, I wanted to see

13   what the intersections looked like, the

14   breath of vision as opposed to -- because the

15   MVR is incredibly restrictive.

16             The BWC the same -- same way,

17   even more so in -- under this circumstance

18   because it's, obviously, blocked by a

19   steering column and the dashboard, but...

20             Q.    Was there anything that struck

21   you or stood out to you during your driving

22   or walking of the pursuit path?

23             A.    Nothing in particular, no.

24             Q.    Okay.  But that was information

25   that you used then in evaluating the officer

```
 1    conduct here, right?

 2            A.    I imagine so.  I mean, you know,

 3    I had performed it, so...

 4            Q.    Okay.  All right.  I'm gonna

 5    walk through a few other documents with you.

 6    Let me -- actually, if you don't mind, if you

 7    could open Exhibit 3, which is the IIS

 8    report.

 9                  And if you would go, please, to

10    page 11 of your report, which is stamped at

11    the bottom City 326.

12            A.    Okay.

13            Q.    And starting on this page and

14    carrying on until page City 22 -- or, excuse

15    me, 329, this is a list of all of the items

16    that were obtained and reviewed for the

17    purpose of creating the report, right?

18            A.    You said to page 329?  I'm

19    sorry.

20            Q.    Yes.

21            A.    I believe so.  There's one item

22    or so that I -- I don't recall, but if I have

23    it there, I'm sure at some point I was able

24    to view it.  The Campbell County Inmate

25    Summary Booking Summary Sheet, I don't recall
```

1    that at all.  But I imagine if I have it here

2    at some point I reviewed these items.

3            Q.    And all of these items would be

4    included in the IIS case file, right?

5            A.    Yeah.  If I had -- if I had them

6    and I had them listed here, I would expect

7    them to be there, yes.

8            Q.    Okay.  And I'll note here on

9    page 328 to 329, there's a section where

10   you're talking about Digital Video Recorder,

11   or DVR footage.  Do you see that?

12           A.    328 to 329, you said?

13           Q.    Yes.

14           A.    Yes.

15           Q.    Is that the same thing as MVR?

16           A.    Yes, just mobile video recorder

17   versus digital video record, DVR.

18           Q.    And that's the cruiser camera?

19           A.    Yeah, DVR.  DVR is just the

20   upgraded version of it.

21           Q.    All right.  We'll come back to

22   the content of report later then.

23                 Let me just go through a few

24   other items with you at this stage.  We'll

25   mark this as Exhibit 41.

1              (Exhibit 41 was marked.)

2       BY MS. GREENE:

3              Q.    Okay.  Sergeant Fink, you have

4       Exhibit 41 in front of you.  Do you recognize

5       the e-mails contained in this exhibit?

6              A.    I don't exactly recall writing

7       these.

8              Q.    These are e-mails between you

9       and a Detective Jason Gabbard of the --

10             A.    Maybe, Newport?

11             Q.    -- of Newport Police Department,

12      right.

13             A.    That could be.

14             Q.    And here he talks about getting

15      the black box from the Ford Focus for you,

16      right?

17             A.    Correct.

18             Q.    Did he ever provide that?

19             A.    I don't recall that, to be

20      honest.

21             Q.    And then you also in one of your

22      e-mails here indicated that you would want a

23      copy of the squad records indicating

24      injuries, meaning the emergency medical

25      responders, EMS run reports, medical records

```
 1    relating to injuries at the scene, right?

 2            A.    Correct.

 3            Q.    And do you know whether he ever

 4    provided that to you?

 5            A.    Whether it was him or not, I

 6    know I received some kind of squad record,

 7    yes.

 8            Q.    Okay.  And did you consider that

 9    information in writing your report?

10            A.    I believe I put that in the

11    Injury to Prisoner aspect.  I don't know that

12    it went into the Internal report, but the

13    Injury to Prisoner.

14            Q.    Okay.  And so that's the

15    Exhibit 40 --

16            A.    Yes.

17            Q.    -- F18I form summary, right?

18            A.    Yes.

19          (Exhibit 42 was marked.)

20    BY MS. GREENE:

21            Q.    Okay.  We will mark this e-mail

22    set as Exhibit 42.  And we have here more

23    e-mails between you and Jason Gabbard from

24    the New -- Newport Police, correct?

25            A.    That's appears so, yes.
```

1    Q.    And in this continuing

2    conversation with Detective Gabbard, it looks

3    as though you requested some additional

4    documents in this e-mail from September 9th,

5    2020, including evidence recovered from the

6    vehicle, arrest paperwork, Mr. Meyer's squad

7    report, and you're looking for the

8    Vance Bailey squad report as well, right?

9         A.    That appears to be the case.

10        Q.    Do you know whether you were

11   provided this information from Newport

12   Police?

13        A.    I do recall having the

14   information referencing the -- what was found

15   in the vehicle, firearms and drugs.  I don't

16   recall who it was provided by.

17             I don't recall actually

18   reviewing arrest paperwork, including the

19   charges, maybe, but I don't recall it.

20        Q.    Okay.  So as you sit here right

21   now, you're not sure if you got all those

22   things from --

23        A.    Right.  I'm not -- same thing

24   with Vance Bailey, I don't recall the -- I

25   don't recall.  My recollection is neither

1    were seriously injured and then were

2    transported to jail shortly thereafter their

3    review at the hospital.  So I don't recall if

4    there was anything additional about

5    Vance Bailey either.

6         (Exhibit 43 was marked.)

7    BY MS. GREENE:

8         Q.    I gonna provide for you what

9    we'll mark as Exhibit 43 next.  All right.

10   You have Exhibit 43 in front of you now.

11   It's an e-mail from you to a

12   Michelle Snodgrass, right?

13        A.    Yes.

14        Q.    And is she in the Prosecutor's

15   Office for Campbell County?

16        A.    I believe so.  She --

17        Q.    No, sorry.  Go ahead.

18        A.    -- I know she's a prosecutor, I

19   believe it was Campbell County.

20        Q.    And it looks as though you were

21   reiterating the requests you had made to

22   Detective Gabbard at Newport Police to

23   Ms. Snodgrass, right?

24        A.    Correct.

25        Q.    And do you know whether she

```
 1        provided any of this information for you?
 2              A.    I do not.
 3              Q.    Do you know whether the Campbell
 4        County Prosecutor's Office provided you with
 5        any -- you or the CPD with any evidence or
 6        information relating to this case during the
 7        course of the investigation?
 8              A.    I know I have a Kentucky Crash
 9        Report.  I don't know who that -- whether
10        that came through the Campbell County
11        Accident Reconstruction Team in Newport.
12                    And as I said, I mentioned
13        before I know there was information about the
14        evidence that was recovered from the vehicle.
15        That's the only thing I can remember clearly.
16        Who had provided it, I don't recall.
17           (Exhibit 44 was marked.)
18        BY MS. GREENE:
19              Q.    Okay.  And we'll mark this as
20        44.  And Exhibit 44 is in front of you now.
21        It looks like it's a continuation of that
22        e-mail chain with Ms. Snodgrass and you,
23        right?
24              A.    Yes.
25              Q.    And on September 11th in the
```

```
 1      afternoon you were still waiting on those

 2      materials from her at that time, right?

 3           A.    It appears as such, yes.

 4           Q.    Okay.  And do you know whether

 5      she provided you with anything after this

 6      exchange on September 11th?

 7           A.    I do not.

 8           (Exhibit 45 was marked.)

 9      BY MS. GREENE:

10           Q.    Okay.  All right.  I'm going to

11      mark this as Exhibit 45.  And, Sergeant Fink,

12      I think this is an e-mail between you and

13      Steven Fox, right?

14           A.    Correct.

15           Q.    And who is Steven Fox?

16           A.    He was another supervisor in the

17      Internal Investigations Section at the time.

18           Q.    Okay.  And it looks though -- as

19      though you've shared with him your Injury to

20      Prisoner and Pursuit Form 34 documents that

21      we looked at earlier and marked as

22      Exhibit 40, right?

23           A.    Correct.

24           Q.    And did you talk about those

25      documents with -- with Fox?
```

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1          A.    Well, clearly, there's an e-mail

2     exchange, but -- and I -- this refreshes my

3     memory so far as that, but so far as any

4     conversation, I don't recall.

5          Q.    Okay.  And do you recall having

6     any conversation with him about this matter

7     in general?

8          A.    I do not.  I know he was the

9     secondary in at least one of the interviews

10    with Sergeant Scalf.  I don't know if he sat

11    in on the others or not.

12         Q.    Okay.  Were there other

13    supervisors in IIS that you spoke about this

14    matter with that we haven't talked about so

15    far?

16         A.    Not that I'm aware of.

17         Q.    Are there other members of IIS

18    that you spoke about this matter with that we

19    haven't talked about so far, meaning other

20    sergeants or --

21         A.    In IIS?

22         Q.    -- and above officer level in

23    IIS?

24         A.    Not that I -- not that I recall,

25    no.

1          MS. GREENE:  Okay.  We'll mark

2     this as Exhibit 46.

3          (Exhibit 46 was marked.)

4     BY MS. GREENE:

5          Q.    And, Sergeant Fink --

6          MS. GREENE:  Oh, I'm sorry.

7          THE COURT REPORTER:  You're

8     okay.

9     BY MS. GREENE:

10         Q.    Sergeant Fink, it looks as

11    though this is a continuation of your

12    conversation with Ms. Snodgrass where she

13    provided you an e-mail with information that

14    you'd requested but didn't transmit any

15    actual records; is that fair?

16         A.    Correct.

17         Q.    Okay.  And looking at this, does

18    this refresh your recollection about any

19    other exchange, verbal, written, et cetera,

20    with Ms. Snodgrass about this case that you

21    have?

22         A.    It does not, but it makes sense,

23    now the -- the pathway here.

24         Q.    Okay.  But she didn't give you

25    any records at any point that you're aware

1    of, did she?

2              A.    Not that I recall, no.

3                    MS. GREENE:  Okay.  We'll mark

4    this as Exhibit 48 -- are we on --

5                    THE COURT REPORTER:  47.

6                    MS. GREENE:  -- sorry, 47.

7    Thank you.

8         (Exhibit 47 was marked.)

9    BY MS. GREENE:

10             Q.    All right.  Sergeant Fink, do

11   you recognize the e-mail in Exhibit 47?

12             A.    I recognize it as something I

13   clearly wrote, but I don't -- I didn't -- I

14   don't recall writing this.

15             Q.    Okay.  Who's Jenny Schrage?

16             A.    She's the head of our Court

17   Property Unit.

18             Q.    Okay.  Do you know whether you

19   were at any point able to view or otherwise

20   interact with the actual property recovered

21   in the vehicle or in subject's possession?

22             A.    Did I review it?

23             Q.    Yeah.  Did you view it or in any

24   other way?

25             A.    Not that I recall, no.  I -- I

```
 1    know, like I said, the -- the understanding

 2    of what was in there, what was important,

 3    and, obviously, Michelle Snodgrass provided

 4    that.  But, yeah, I don't -- I don't recall

 5    any other interaction in regards to our court

 6    property room for this.

 7                    MS. GREENE:  Okay.  And we'll

 8    mark this as 48.

 9         (Exhibit 48 was marked.)

10    BY MS. GREENE:

11         Q.    All right.  Sergeant Fink, is

12    this an e-mail exchange that you had with

13    Captain Kevin Drohan of the Newport Police

14    Department?

15         A.    Correct.

16         Q.    And this is follow up on you

17    trying to get some of that information you

18    wanted from Newport, right?

19         A.    That appears as such, yes.

20                    MS. GREENE:  And I'm gonna go

21    ahead and mark 49, and then ask a couple more

22    questions.

23         (Exhibit 49 was marked.)

24    BY MS. GREENE:

25         Q.    Here's 49.  Okay.  And so,
```

1    Sergeant Fink, this is the continuation of

2    your conversation with Captain Drohan of

3    Newport Police, right?

4         A.    Yes.

5         Q.    And here he's offered to you on

6    October 14th to get together and swap that

7    stuff relating to the requests that you made,

8    right?

9         A.    Correct.

10         Q.    And then you responded the next

11    day saying, Happy to meet, just let me know,

12    right?

13         A.    Yes.

14         Q.    And did you end up meeting with

15    Captain Drohan to get that evidence and

16    information?

17         A.    I did.

18         Q.    And is there any kind of record

19    of that, if you know?

20         A.    Of the meeting?

21         Q.    Yes.

22         A.    No.  I went down to their

23    station and met him there.  And I believe it

24    was a manilla envelope that he provided me.

25         Q.    Okay.  So other than these

```
 1    exchanges we've looked at and the e-mail
 2    here, do you know whether you wrote or
 3    received any other e-mails about this matter?
 4              A.   I really don't recall.
 5              Q.   When you conduct investigations,
 6    do you keep a log of the investigation
 7    activities that you undertake relating to a
 8    case?
 9              A.   Like an investigative note of
10    daily things?
11              Q.   Yeah.
12              A.   I'm trying not to confuse it
13    with what I do now.  Because where I am now,
14    we have a very specific form for that very
15    feature where the call, you know, the date it
16    says I called so and so.  In Internal, I
17    don't believe I did.
18              Q.   And that wasn't a practice of
19    the Internal Investigations Section at the
20    time?
21              A.   I believe some -- some of them
22    did, but I don't believe I did.
23              Q.   Okay.  So you're not aware of
24    any written log --
25              A.   Right.  I know I didn't keep,
```

```
 1    like, on this day, at this time, you know, as
 2    a -- as a continual thing.  I may have done
 3    it if I was expecting someone to call back,
 4    or something of the nature, but it -- there
 5    was no continual investigative log.
 6             Q.    Did you maintain notes of any
 7    kind about your activities as they occurred?
 8             A.    The only time -- I mean, so far
 9    as like going out doing that, no.  I mean, I
10    just really didn't do that.
11             Q.    And did you generate any
12    official reports or records about
13    investigative activities as they occurred?
14             A.    No.  Nothing that wasn't in --
15    you know, if I went somewhere and picked
16    something up that was pertinent to the -- the
17    particular investigation, it would have been
18    documented directly in the report, but no
19    ongoing log or -- of that nature.
20             Q.    Okay.  Earlier we talked about
21    interviews that you conducted of various
22    department members relating to this case.
23             Did you maintain any notes or
24    take any notes relating to those interviews?
25             A.    On this particular case, I don't
```

Deposition of Sergeant Charles Fink                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1    know.  Sometimes what you showed before, and
2    I don't know what document it was, 39, with
3    the interview questions, sometimes on that
4    document, I would, you know, write notes down
5    on, like, a response.
6           Q.    Do you know in this case if you
7    did that?
8           A.    I don't recall.
9           Q.    If you did that, would that
10   document be --
11          A.    It would have been in the
12   folder.
13          Q.    -- in the case file?
14          A.    Yes, ma'am.
15          Q.    Okay.  And any other notes that
16   you took, would you have placed them in the
17   case file?
18          A.    Yes.
19          Q.    And that would include both
20   handwritten and typewritten notes --
21          A.    Correct.
22          Q.    -- about the investigation,
23   right?
24          A.    Yes.
25          Q.    Okay.  And there's no other
```

```
 1      location that any notes that you would have

 2      about this matter would be located other than

 3      in the case file?

 4              A.    No, ma'am.  I mean, everything

 5      is in the case file, electronic and -- and

 6      physical copy.

 7          (Exhibit 10 was referenced.)

 8      BY MS. GREENE:

 9              Q.    Okay.  All right.  Let me just

10      identify one more document, briefly, before I

11      ask you some more questions.  I'm gonna show

12      you what was previously marked as Exhibit 10,

13      and I'll hand that to you now.  This is a

14      document you're familiar with, right?

15              A.    Yes, ma'am.

16              Q.    This was one of the documents

17      you reviewed in creating your report?

18              A.    Correct.

19              Q.    Okay.  All right.  So you

20      gathered a lot of information and evidence,

21      and then, ultimately, synthesized it into

22      your report, which we have in front of you as

23      Exhibit 3, right?

24              A.    Yes.

25              Q.    And for your report, at any time
```

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    did you conceive of this investigation or

2    report as reflecting a criminal investigation

3    into any officer conduct?

4         A.    Criminal investigation on the

5    officers' behalf?

6         Q.    Yes.

7         A.    Well, now that the report is

8    completed, I can say no.  But I don't -- I

9    mean, nothing during each leg of the process

10   did -- at any time did I stop and say, you

11   know, this is a criminal.

12            But I can't make that call until

13   it's over and done, but I can say no.

14        Q.    Okay.  But at the conclusion of

15   your investigation and drafting your report,

16   then you didn't find any criminal violations

17   by the officers; is that correct?

18        A.    Correct.

19        Q.    You did find policy violations,

20   right?

21        A.    Administrative and operational,

22   yes.

23        Q.    And in your report, you

24   summarized the evidence that you gathered,

25   right?

1      A.    The things I reviewed and

2  evidence, yes.

3      Q.    And you've have an opportunity

4  to review your report before you came in

5  today for your deposition, right?

6      A.    A little bit, yes.

7      Q.    So you feel re-familiarized with

8  the contents of your report?

9      A.    Some of it, but I'll -- I'll --

10  I'll refer to it, if need be.

11      Q.    Okay.  Fair enough.  So in terms

12  of the facts that you summarized for the

13  pursuit in your report, they included that

14  Mason Meyer fled from the police, right?

15      A.    Correct.

16      Q.    And in your review of the

17  evidence, you found that he tried to elude

18  the police, right?

19      A.    Correct.

20      Q.    He tried to get away from them,

21  right?

22      A.    Yes.

23      Q.    And how long did this pursuit

24  last in its entirety?

25      A.    Well, let's see.  It was only

1    minutes.  It looked like about seven minutes.

2         Q.    In your work in the police

3    department, you're aware of other pursuits,

4    right?

5         A.    Sure.  Yes.

6         Q.    And how would you characterize

7    the length of time of seven minutes in

8    relation to your knowledge about pursuits by

9    officers in the CPD, meaning average, longer,

10   shorter?

11        A.    It's hard to say.  It just -- it

12   really depends on actions of the -- the one

13   being pursued.  I mean, I guess I've been in

14   one 35 minutes that was at a high speed, you

15   know, all over the City and through -- in and

16   out of City limits.  So it's really hard to

17   say.  They're all quite unique.

18        Q.    Seven minutes, fair to say is

19   not a short pursuit, though, right?

20        A.    Reasonably short compared to 35

21   minutes.

22        Q.    Well, compared to 35, but 35 is

23   an outlier; isn't it?

24        A.    Yeah.  I mean, but I wouldn't

25   say seven minutes is -- it certainly isn't

1    long.  It just -- it really depends on all --

2    all the conditions and what have you.

3           I mean, if you're on an open

4    highway, seven minutes could be really short.

5    And if you're in a -- it just depends on the

6    individual pursuit.

7        Q.    You said on a highway, a

8    highway, seven minutes could be short, but --

9        A.    It just depends.  I mean, all

10   things -- all the circumstances depend, I

11   mean, if seven minutes -- but I wouldn't

12   consider it a long pursuit.

13       Q.    You mentioned that you've been

14   involved in a 35-minute pursuit --

15       A.    Uh-huh.

16       Q.    -- previously?  That's a yes?

17       A.    Yes.  Sorry.

18       Q.    Tell me about that pursuit,

19   please.

20       A.    Tell you about it?

21       Q.    Yeah.

22       A.    I recall it started in the

23   Winton/Terrace area with I attempted to stop

24   a vehicle.  The vehicle continued onto the

25   highway, up Mitchell Avenue to the highway,

1    threw bags of cocaine out, and then threw a

2    gun out several miles down the road on the

3    highway.

4                   We went in and out of each

5    district, ended up in Norwood at his mom's

6    house, just wanted to get the car home to

7    mom.

8            Q.    When was that?

9            A.    This is more than a decade ago.

10   I haven't been the police in a -- in a long

11   time in patrol.  So it would have -- I don't

12   know to be honest with you.

13           Q.    And did that pursuit result in

14   any fatalities?

15           A.    Fatalities?

16           Q.    Yeah.

17           A.    No.

18           Q.    Did it result in any injuries?

19           A.    I don't recall if the guy got

20   out of the car with a wrap on his leg and was

21   already on a crutch of some sort.  So I

22   don't -- I don't recall if he had any

23   injuries.

24           Q.    Were there any injuries to third

25   parties?

```
 1           A.    No.

 2           Q.    Injuries to officers?

 3           A.    Indirectly, there was a -- I

 4   think -- I don't know what -- he's not one of

 5   our officers.  It was an officer trying to

 6   throw stop sticks out on the highway.

 7           Q.    Okay.  All right.  So how many

 8   pursuits have you been involved in personally

 9   over the course of your career?

10           A.    Never telling.  Under --

11   probably under -- under ten, under a dozen,

12   somewhere in there.

13           Q.    And over the course of your

14   career with the CPD, as a patrol supervisor

15   and in IIS, how many pursuits did you review

16   officer conduct for?

17           A.    I was a patrol supervisor for

18   about seven months.  So I -- if I did, one,

19   maybe two there, and then in Internal, the

20   one.

21           Q.    Did you review pursuits in any

22   other capacity in your roles at the CPD?

23           A.    No, ma'am.

24           Q.    Did you feel equipped to conduct

25   the review of this particular pursuit based
```

1    on your training and experience in the police

2    department?

3         A.   Equipped, I don't know if that's

4    the word, but -- but I would say short on

5    experience to do it.

6         Q.   What do you mean by that?

7         A.   Well, as I said, I don't know

8    that I've even did two, maybe one or two as a

9    supervisor in patrol because I was in patrol

10   for such a short period of time as a

11   supervisor.  And then none in Internal other

12   than this one.

13        Q.   And so you felt you were short

14   on experience.  Did you consult with anyone

15   to aid you in your review of this matter

16   because of that feeling?

17        A.    I don't really recall if that

18   e-mail was referenced just to the Injury to

19   Prisoner, but I would imagine in some aspect

20   because Injury to Prisoner is related

21   directly to the pursuit, obviously,

22   Sergeant Fox, whether I spoke to other people

23   or not, I -- I don't recall.

24        Q.    Okay.  And then if you go back

25   to your Exhibit 3 and look at this first page

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    with me for a moment, please.

2            A.    That is the report, yeah.  The

3    first page?

4            Q.    Yeah.

5            A.    Okay.

6            Q.    And by that, I mean, the cover

7    sheet.  Sorry.  On this cover sheet, we see

8    the chain of command review --

9            A.    Uh-huh.

10           Q.    -- documented here, right?

11           A.    Correct.

12           Q.    And so after you completed your

13   report, you handed it off to Lieutenant

14   Colin Vaughn?

15           A.    So I don't recall handing it off

16   to him.  As I said, the initial report was on

17   October 7th of '20.  It was handed to

18   Lieutenant Briede.  And then the -- the final

19   report, I don't know -- I don't know who --

20   who had given it back to me at that point,

21   but it was January 13th of '21 that I

22   submitted it.

23                 And if -- if asked, I would have

24   said I resubmitted it to Briede, but it may

25   have been Colin Vaughn at the time.  On the

Deposition of Sergeant Charles Fink                           Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    26th, Colin would have been definitely the
 2    only lieutenant there.  But at the time of
 3    the submission of my report, I believe
 4    Lieutenant Briede was still there.
 5            Q.    Okay.  And so you said that was
 6    October 7th, 2020, at your initial
 7    submission?
 8            A.    Correct.
 9            Q.    And how do you know it was that
10    day specifically?
11            A.    Because they're -- they're -- on
12    certain reports I kept record of when I
13    submitted it.
14            Q.    And when you say "on certain
15    reports," what do you mean?
16            A.    I just failed to do it on all of
17    them.  When I turned them in, I'd submit it,
18    and say, here, I submitted it on this day.  I
19    would just keep my record of it.
20            Q.    Is there -- would that be
21    written on the cover of your draft
22    report or --
23            A.    No.
24            Q.    -- is there anywhere else that
25    you wrote it down?
```

```
 1              A.    No.

 2              Q.    It's just you know it --

 3              A.    Just something I would keep,

 4     yeah.  I didn't do it for all of my reports,

 5     like I said.

 6              Q.    Okay.  I'm a little confused.

 7     When you say it's not something you would do

 8     for all of your reports, but it's something

 9     you would keep.  What form of keeping are we

10     talking about?

11              A.    Right here (indicating), in my

12     memory.

13              Q.    Okay.

14              A.    Yeah.  I -- I believe this one

15     because, unfortunately, Lieutenant Briede,

16     often after having a report, and sometimes

17     they'd have them, I don't know specifically

18     dates, weeks, what have you, but sometimes

19     she'd say, are you sure you gave me that

20     report?

21                    And so I wasn't gonna be in the

22     position on this one.  I knew when I

23     submitted this originally.

24              Q.    I see.  She was anxious to

25     receive it.
```

```
 1        A.    Yeah.  She -- like I said, she

 2   did, to the best of my understanding,

 3   basically a parallel investigation of sorts

 4   because she was responsible as well.

 5              So she would -- she did a lot of

 6   work on each of them, but she had the

 7   entirety of the unit reports submitted to

 8   her.  So I don't know how great depth.  I'm

 9   sure she had certain ones that she paid more

10   attention to.

11              And this was one, like I said, I

12   didn't -- I didn't -- when I submitted it, I

13   didn't want it to be, you know, weeks later

14   if I -- had I turned it in, so...

15        Q.    And you said that

16   Lieutenant Briede was doing the parallel

17   investigation?

18        A.    That's my assumption.  I mean,

19   because she -- she oversees it, so she has to

20   look at all the same information.

21              Sometimes she gets to it prior

22   to me looking at it.  Like, she may review

23   the body-worn camera.  There's also plenty of

24   things, I'm sure, that they don't review

25   because it would just be exhausting and she
```

Case: 2:21-cv-00102-DLB   Doc #: 152   Filed: 12/10/25   Page: 106 of 220 - Page
ID#: 4045
Deposition of Sergeant Charles Fink                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1    wouldn't be able to do that for every

2    investigative report that's turned into her.

3           Q.    And so when you say parallel

4    investigation, was she conducting an

5    independent investigation --

6           A.    No.  She -- she doesn't go out

7    and do interviews or anything like that, just

8    more of a review than -- scratch the

9    investigation of sorts, it's more of a review

10   of all of the same information that I would

11   have.

12                And if there's something

13   missing, then she could then say, you may

14   want to ask for this, you know, from another

15   agency, another -- you know, something like

16   that.

17          Q.    For her review of the matter, is

18   there documentation of that that you're aware

19   of?

20          A.    No idea.

21          Q.    Have you ever known her to add

22   her notes to a case file for a parallel

23   investigation, as you're describing it?

24          A.    Notes?  The only notes would

25   normally be if -- if it was grammatical or

Deposition of Sergeant Charles Fink                         Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1   something or a strike or something that was
 2   like -- because I was known to, like, when I
 3   first got there, my first report was 30
 4   pages.
 5              And they said make that 13
 6   because I was very robust at times with
 7   things, so it was like let's cut this down,
 8   that kind of thing.  If it was something
 9   specific to a point of something, generally
10   it would be a conversation.
11        Q.   And in her review of evidence,
12   do you know whether she keeps any notes or
13   kept notes?
14        A.   No idea.
15        Q.   Okay.  In any case for this
16   specific investigation, were there any
17   particular issues that she drew your
18   attention to after you gave her your report?
19        A.   I don't recall if this was
20   before or after.  I would imagine it was
21   before.
22              As I mentioned before, she made
23   reference to the BWC picking up the speed
24   on -- I don't know which it was, maybe
25   Specialist Harper or Thompson -- or Thomas,
```

Deposition of Sergeant Charles Fink                              Jason Laible, et al., vs. Timothy Lanter, et al.,

1    excuse me, or Lanter's BWC, and I reviewed

2    them all again to see if I could see that.

3              And then reference to

4    Sergeant Scalf's interview, and I remember

5    her saying something about it being

6    reasonable.  In his explanation -- when we

7    had a conversation about his explanation as

8    to why he didn't say more during the pursuit.

9         Q.    Okay.  So October 7th, 2020, you

10   hand over the draft version of your IIS

11   report to Lieutenant Briede, right?

12        A.    Final for me.  I mean, but it's

13   generally a draft because you get it back,

14   you know, once or twice.

15        Q.    And did you get it back?

16        A.    I did.

17        Q.    In this case, you got it back.

18   How many times did you get it back?

19        A.    The only thing I recall was in

20   January resubmitting, which I'm assuming had

21   to be the final because it was just days

22   before all of these signatures were on it.

23        Q.    And when you would receive this

24   report back, it contained edits and

25   suggestions for changes, right?

```
 1              A.    Again, it would be -- generally,

 2      it would be grammar, things of that nature,

 3      or -- or there would be question mark or see

 4      me or whatever.

 5              Most of it was conversation that

 6      we would have if -- if it couldn't be quickly

 7      corrected or edited on there.

 8              Q.    And when you received it back,

 9      did it come to you by e-mail?

10              A.    No, I don't believe so.  I think

11      they were always paper documents.

12              Q.    So printed out --

13              A.    Printed --

14              Q.    -- with handwritten

15      notifications?

16              A.    Yes.

17              Q.    And those printed copies of the

18      handwritten notifications, do those go into

19      the case file?

20              A.    I don't believe the draft --

21      well, when I say a draft because it comes

22      back with, like, writing like scratch a

23      sentence or something out.  I think it's the

24      finalized copy that goes into the report.

25              Q.    Those versions with the red ink
```

1    on them, where do they get saved?

2          A.    I don't -- I don't know.

3          Q.    You never threw any of them in

4    the trash, did you?

5          A.    I don't recall doing that.  I

6    don't -- I just -- I don't know if they're

7    kept in the file or not.  I just know that --

8    I know that I personally get the finalized

9    copy and put it in there.

10          Q.    You mentioned

11    Lieutenant Briede's comment about

12    Sergeant Scalf's explanation for what he said

13    or didn't say on the radio?

14          A.    Correct.

15          Q.    And you said that she thought it

16    was reasonable, right?

17          A.    Correct.

18          Q.    And so any discussion of that

19    particular issue in the final IIS report in

20    this case, is that based on

21    Lieutenant Briede's evaluation?

22          A.    No.  I mean, ultimately, it

23    would be based on mine.  I mean...

24          Q.    Okay.  So going back to the

25    draft versions of the report and the various

1    notes and comments.  In your experience

2    working at IIS, are those retained?

3         A.    I don't know.  I don't know what

4    their retention policy is.  I don't know

5    what -- what else was kept in the ultimate

6    file.

7         Q.    Would you get those versions

8    with the red ink back to a reviewing

9    supervisor when you provided an updated copy?

10        A.    I believe they were with her

11   because I recall, how do I know that you've

12   changed the language, if, you know, if I

13   don't know what was, you know, stricken from

14   the original?

15        Q.    Okay.  So the last time you saw

16   those marked up versions of the report, it

17   was in Lieutenant Briede's possession?

18        A.    I would imagine.  I mean, that's

19   -- that's -- I just know it's attached to

20   the -- the updated version basically.

21        Q.    Okay.

22             MS. GREENE:  For the record, I

23   don't believe those draft versions have ever

24   been produced, and so we would ask that they

25   be produced as well.

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 112 of 220 - Page
ID#: 4051
Deposition of Sergeant Charles Fink                         Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    BY MS. GREENE:
 2            Q.    Okay.  So then January 13th,
 3    2021, is when you resubmit the report in what
 4    you believe was its final form, correct?
 5            A.    Correct.
 6            Q.    And do you remember how many
 7    iterations there were between October 7th and
 8    January 13th?
 9            A.    I do not.
10            Q.    And then when you hand it over
11    as the final version, what happens from
12    there?
13            A.    Well, I move on, so I'm not a
14    hundred percent, but I presume that the
15    lieutenant reviews it, puts their blessing on
16    it, basically, then it goes to the captain
17    who does the same.
18            The captain then passes it to
19    the assistant chief.  If there's
20    discipline -- or if there's not discipline,
21    the assistant chief signs off on it.  If
22    there is discipline, it goes to the chief.
23            And then they review the
24    recommendation -- the findings, the
25    recommendations, and then they, ultimately,
```

1    offer a sentence if there is -- if it goes so

2    far as disciplinary action.

3          Q.    And in your initial reviews with

4    Lieutenant Briede, she's reviewing your

5    report for accuracy as one of the things

6    she's looking for, right?

7          A.    Sure.

8          Q.    And she's also looking at the

9    policy violations you identify as well,

10   right?

11         A.    Correct.

12         Q.    And she's looking at

13   disciplinary recommendations as well,

14   correct?

15         A.    Correct.

16         Q.    And, ultimately, the version

17   that then is turned in as the final version

18   for Lieutenant Vaughn is written on this

19   chain of command review is the version that

20   reflects all of Lieutenant Briede's views on

21   facts, findings, and recommendations, right?

22         A.    It reflects -- it reflects mine,

23   but it may -- will likely be consistent with

24   Briede's.  Not always, but will likely be

25   consistent with, in that case, because Briede

```
 1      was there.

 2                     As I said, I don't know who,

 3      how, when signed the -- I mean, I -- clearly

 4      on this page, that's Lieutenant Vaughn that

 5      signed this as lieutenant, but all of the

 6      correspondence I recall having was with

 7      Lieutenant Briede.

 8             Q.     And when you say

 9      "correspondence," that's e-mails?

10             A.     We didn't really e-mail much.

11      We were only like -- we were a couple desks

12      away, so we usually just walk and talk.

13             Q.     Maybe some e-mails, mostly walk

14      and talk?

15             A.     Maybe some e-mails?  I don't --

16      not that I recall.

17             Q.     Okay.  In any case then, the

18      chain of command review that follows that

19      involves a review by each of these

20      individuals for the facts, the findings, the

21      policy violations identified, and

22      disciplinary recommendations, right?

23             A.     Correct.

24             Q.     And so each of these individuals

25      reviews everything in the report to make sure
```

1    they agree with it all, right?

2          A.    I can't say that they do.

3    That's what -- I would suppose they do, but

4    they each put their name on it, so...

5          Q.    Okay.  Do -- do you know whether

6    they look at the case file or just the

7    report?

8          A.    Well, the lieutenant I know

9    without question looks at -- particularly

10   Lieutenant Briede, she was very, very

11   involved.

12          I don't know who, ultimately,

13   which lieutenant looked at this at the end of

14   the day when we signed off.  Same thing with

15   the captain, I don't know what his

16   particular -- you know, some people look at

17   things and say they, you know, they -- like I

18   have -- I have a bunch of interviews now, and

19   I have to assume that their transcriptions of

20   the interviews that they do are -- are

21   accurate.

22          I don't go back and watch every

23   interview they do.  I just -- there's no way

24   I could.  So I can't speak for what they do.

25          Q.    Who does the transcriptions of

1       the interviews?

2               A.      Like in this?

3               Q.      Yeah.

4               A.      What do you mean the

5       transcriptions?

6               Q.      Sorry.  You just mentioned

7       transcriptions of the interviews --

8               A.      No.  I was saying, like, in my

9       investigation now --

10              Q.      Okay.

11              A.      -- when they -- they -- like

12      they do a similar report that's not Internal.

13      They do a similar report, and they do a

14      transcription of their interviews with the

15      victims and whatnot.

16                      And I have to assume when they

17      say there's a disclosure, for instance, that

18      there's a disclosure.

19              Q.      You don't go back and listen to

20      the entire interview?

21              A.      Right, there's no way I could.

22              Q.      But in this case, you wrote all

23      those summaries of the interviews, right?

24              A.      Correct.

25              Q.      Okay.  All right.  So there's

1    also some handwriting on the top portion of

2    that document in front of you, right?

3         A.    Yes.

4         Q.    Is that -- that's Chief Eliot --

5         A.    Chief Eliot Isaac, yeah.

6         Q.    Okay.  And did you have any

7    conversation with Chief Eliot about this

8    matter at any time?

9         A.    I did not.

10        Q.    Did you have any conversation

11   with then Lieutenant Chief Teresa Theetge

12   about this matter?

13        A.    I did not.  I apologize.  She

14   one day stopped me, or we ran into each other

15   in the hallway, this was maybe two -- two,

16   three weeks after the -- this incident

17   occurred and asked how I was doing with it,

18   and if I had a chance to view -- I don't know

19   if it was the body camera or the MVR, or what

20   it was.

21             And I said, I have, but there's

22   a lot more to come.  And, obviously, there's

23   no decisions made at that point.  So other

24   than that, no.

25        Q.    Did she say anything else to you

1    in that conversation?

2         A.    No.

3         Q.    Did you have any conversation

4    with Captain Douglas Snider about this

5    matter?

6         A.    None that I recall.  He was -- I

7    think he started maybe the same month that

8    the final report was, so I don't know.

9    Obviously, he signed off on it, but I believe

10    he started that that month.

11         Q.    Meaning in January of '21?

12         A.    Yes, in -- in Internal.

13         Q.    Okay.  And then

14    Lieutenant Vaughn, did you talk with him

15    about this matter?

16         A.    I don't recall talking to him

17    about it either.

18         Q.    So other than that one

19    conversation with then Lieutenant Chief --

20         A.    Chief, sure.

21         Q.    -- Theetge, and your

22    conversations with Lieutenant Briede, do you

23    recall any other conversations with any other

24    member about CPD -- of CPD while you were

25    conducting this investigation?

```
 1            A.    No, ma'am.

 2            Q.    Do you recall any conversations

 3    with any member of CPD after your

 4    investigation was completed?

 5            A.    Nothing specific.  I'm sure -- I

 6    mean, oftentimes over -- like, when I have --

 7    no, nothing specific.

 8            Q.    Do you have any general

 9    memories?

10            A.    No.  I just -- sometimes guys

11    will ask me about cases in particular, but --

12    and I'll discuss cases, but I -- this

13    particular case, I don't recall -- I don't

14    recall discussing it with anyone.

15            Q.    Okay.  So going back to the

16    content of your report, can you describe the

17    route that the pursuit took?

18            A.    How do you want me to describe

19    it?

20            Q.    How would you characterize it as

21    the investigator who summarized all the

22    evidence?

23            A.    Well, for the most part, it was

24    the intersections that they -- I mean, it was

25    residential neighborhoods at first, Mt. Hope
```

1    to Price to Hawthorne to Warsaw, mainly

2    residential neighborhoods.

3              But they were -- the

4    intersections that they traveled through were

5    wide-open intersections for the most part you

6    could see in all directions.  I think there

7    was a field, then two or three intersections

8    there, then they get down onto Warsaw Avenue.

9              Warsaw down to 6th Street

10   Viaduct.  Sixth Street Viaduct is, I don't

11   want to call it a business area, I mean, it's

12   a small stretch of highway and past the

13   75 Exit to, gosh, went to -- down to --

14   ultimately, down to 2nd Street in the City.

15             Once across the Roebling Bridge,

16   it was back into -- it was back more into

17   business areas.  I don't recall the street

18   names there.  I don't know if you -- if you

19   want those or not, but most of that was

20   business area.

21             Turned up a residential area,

22   through an alleyway, across a bridge, and

23   back into business areas.

24        Q.    And when you said earlier the

25   6th Street Viaduct past the 75 Exit --

```
 1    75 Exit to 2nd Street, that's downtown
 2    Cincinnati, right?
 3         A.   Correct.
 4         Q.   And then across the bridge over
 5    the Ohio River into what you described as a
 6    business areas and residential areas, and
 7    then business areas again in Covington and
 8    Newport, right?
 9         A.   Covington and Newport, correct.
10         Q.   And this pursuit happened during
11    business hours, right?
12         A.   Approximately 4:30.
13         Q.   On a Friday afternoon?
14         A.   On a Friday afternoon.
15         Q.   And how would you characterize
16    the weather on that day?
17         A.   The weather, I'll tell you, the
18    weather, the traffic, and everything was --
19    the weather was bright and sunny, clear
20    skies, dry roads, little to no traffic, other
21    than in one or two spots where they were
22    coming to a stop.
23              I believe it was the height of
24    COVID at the time, so that probably impacted
25    the number of people out.  No pedestrian
```

1  traffic, very little vehicular traffic.  Like

2  I said, the roads were dry, sunny and warm

3  day.

4          Q.    In terms of evaluating the

5  traffic rate and flow, how did you go about

6  doing that in the course of your

7  investigation?

8          A.    Most of that was via the MVRs,

9  direct view by the MVRs.

10         Q.    And then you just mentioned

11 pedestrians, how did you characterize

12 pedestrian presence over the course of the

13 pursuit?

14         A.    The same.  The BWC was able to

15 be utilized a little bit, but, you know, when

16 they were in the vehicles, the BWC captured

17 little for most of these guys because they're

18 short, but -- but it was mainly the MVRs.

19         Q.    And the MVRs, meaning the

20 cruiser cams, those you were able to see the

21 other traffic and pedestrians?

22         A.    Yes.

23         Q.    As you mentioned, though, they

24 don't capture a full 360 view?

25         A.    They give -- no.  They give a

```
 1   pretty good view of -- of the direction the
 2   vehicle is going and -- you know.
 3        Q.    Do you recall -- well, strike
 4   that.
 5             Did you ever count pedestrians
 6   along the path?
 7        A.    Like, when I was viewing it on
 8   the MVR?
 9        Q.    Sure.
10        A.    I did not.  I don't recall
11   seeing -- I don't recall seeing any right --
12   as I sit here today, I -- if -- I do recall
13   that it was -- I recall saying that it was
14   little to no vehicle and pedestrian traffic.
15        Q.    Except for in some areas there
16   were some vehicles and pedestrians, right?
17        A.    Correct.  There was vehicles,
18   not pedestrians that I'm aware of, but
19   vehicles.
20        Q.    Do you recall in which areas
21   those were?
22        A.    Yeah.  I mean, so going up Price
23   Avenue, I think you passed a car, and I'm
24   referring to Sergeant Lanter at this point.
25   I believe you passed a car, you know, like
```

1    sparsely, like a car there, maybe a car on

2    Price Avenue, another on Hawthorne to Warsaw.

3              The -- the cars of any amount

4    weren't until they hit the 6th Street Viaduct

5    and, you know, for what you would normally

6    assume -- I mean, presumably rush hour on a

7    Friday you would think there would be all

8    kinds of cars, but it was very minimal cars

9    on that stretch until you hit the high -- the

10   75 Exit, the highway.

11             That's where I presume that

12   Mason Meyer didn't take that exit because it

13   was -- it's typical backed all the way up,

14   but it wasn't part of the path, so they went

15   to 2nd Street.

16             I think the next spot that there

17   were any -- more than one car at any given

18   point was three or four cars stopped at the

19   roundabout.

20             There were a couple cars

21   crossing the Roebling Bridge, on the bridge

22   itself.  Once they got over the bridge and

23   transferred to that area there at the

24   roundabout, there were no cars.

25             Again, I don't -- without

1    looking at these, I don't recall the names of

2    the streets there, but those streets, there

3    were very few cars.

4              The few cars that were there,

5    like when they went the wrong way on the

6    one-way was a significant distance ahead, and

7    it stopped immediately when Mason Meyer was

8    approaching them in the wrong direction.  And

9    so Sergeant Lanter was clear they were

10   stopped --

11             THE COURT REPORTER:  What was

12   clear?

13        A.    Sorry.  Sergeant Lanter was

14   cleared because that -- that vehicle had

15   stopped for Mason Meyer.  The only other spot

16   that there was any amount of cars was, I

17   think it's the 4th Street Bridge going into

18   Newport.

19             And they were all -- the only

20   reason I think there was any cars there was

21   because they were all either at a stop or

22   coming to a stop crossing the bridge.

23        Q.    And your evaluation of traffic

24   levels is based on your viewing of the MVR

25   from Sergeant Lanter's car?

```
 1        A.    From all -- from all the cars,

 2   yes.

 3        Q.    And do you recall seeing cars

 4   having to pull over to get out of the way of

 5   this pursuit?

 6        A.    Let's see.  So let me just redo

 7   the pursuit in my head.  I mean,

 8   Sergeant Lanter had his emergency lights and

 9   sirens activated, so it would have been right

10   for all of the cars to pull to the right.

11            Unfortunately, in pursuits, they

12   don't always do that.  They sometimes freeze

13   where they are.  But the cars they -- they

14   went around the first -- or at the roundabout

15   on 2nd -- or not 2nd Street, that's -- oh,

16   gosh -- I forget what that road is down

17   there, right before you cross the Roebling

18   Bridge, those cars were all at a stop, they

19   went under them.

20        Q.    Freedom Way?

21        A.    It might be Freedom Way there.

22   I believe they passed a car on -- on the

23   bridge.  The only time I recall a car that

24   was -- or that was slowing down or stopping,

25   was the motorcycle on the 4th Street Bridge,
```

1    but he was already coming to a stop.

2                    Now, when Mason Meyer

3    transversed the lanes, yes, the cars kind of

4    split because he just shot across from the

5    eastbound lane across both westbound lanes,

6    then a car swerved to avoid him.

7                    Sergeant Lanter, when he crossed

8    the double yellow on the 4th Street Bridge,

9    he -- he stayed proximate to the -- to the

10   lane he was already traveling in eastbound,

11   but he went over the double yellow line.

12                   And then the motorcycle went

13   wide of him, but he hit his brakes there.

14   The motorcycle went wide.  The motorcycle was

15   already slowing to a stop because of all the

16   stopped traffic there.  That's the only car I

17   recall.

18        **Q.    Do you recall an accident with**

19   **another vehicle, not the motorcycle, but**

20   **another vehicle?**

21             A.    I do.  That was Mason Meyer,

22   when he was going to the 75/71 south -- my

23   guess is he saw the amount of traffic and

24   that he was -- he was landlocked.

25                   So he was on that exit and he

Deposition of Sergeant Charles Fink                                Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    started to shoot across traffic to the
 2    2nd Street exit, and I believe he may have
 3    bumped along the passenger side of a --
 4    somebody's vehicle down there.
 5            Q.    So a minor accident, right?
 6            A.    Yes.
 7            Q.    And the motorcycle was a near
 8    accident situation, right?
 9            A.    I wouldn't call it a near
10    accident, no.  He was -- he was already
11    coming to a stop and he was slowing.
12            And he didn't -- as I said, just
13    prior to that, Mason Meyer cut across both
14    lanes and the car that he -- his -- was the
15    lane he took, which was the far left
16    eastbound lane -- or, excuse me, westbound
17    lane, he was going the wrong way, that car
18    had swerved over to avoid hitting him.
19            The motorcycle was already
20    starting to slow, and he just went to the far
21    westbound lane.  I wouldn't say it was a near
22    accident.
23            Q.    So there were cars that had to
24    swerve out of the way from Meyer's vehicle,
25    right?
```

1       A.      From Meyer's vehicle, yes.

2       Q.      And it's true that during the

3   pursuit, the fleeing vehicle could create a

4   risk of serious injury or death for third

5   parties in the vicinity, right?

6       A.      Absolutely --

7       Q.      And that --

8       A.      -- that's the primary cause.

9       Q.      And that danger continues until

10  the fleeing ends, right?

11      A.      Correct.

12      Q.      And that continues over the

13  duration of the pursuit, right?

14      A.      It can, yes.

15      Q.      All right.  So you concluded in

16  your report that the officers involved in

17  this pursuit drove at high rates of speed,

18  right?

19      A.      Correct.

20      Q.      And how did you reach that

21  conclusion?

22      A.      So for Specialist Harper and

23  Officer Thomas, I was able to view it on

24  their BWC.  As I said, they -- and when

25  they -- at the initiation of the pursuit,

1    they all activate their BWCs, and that

2    captured on their speedometer where it would

3    take basically a still shot, I believe.  One

4    was 103 and maybe the other was 100.  If

5    you'd give me a second -- yes, according to

6    the BWC, Officer Thomas was at 103,

7    Officer Harper at 100.

8              It did not have the same

9    information for Officer Lanter -- or

10   Sergeant Lanter, excuse me.  Actually, for

11   Sergeant Lanter, we made the -- the

12   assumption that since Officer Thomas had

13   exceeded the speed limit by more than

14   20 miles an hour and he didn't appear to gain

15   ground on Sergeant Lanter in that small

16   stretch of the 6th Street Viaduct, that

17   Officer Lanter was himself driving over

18   20 miles per hour of the speed limit as well.

19        Q.    And the -- Officer Thomas,

20   103 miles an hour, you said that was the 6th

21   Street Viaduct area?

22        A.    Correct.

23        Q.    And Officer Harper going 100,

24   what area was that?

25        A.    I believe his was the 6th Street

1    Viaduct as well.

2             Q.    Were there other areas during

3    the pursuit that you determined that there

4    were high rates of speed for the officers

5    involved?

6             A.    No.   There was a short section

7    of the 6th Street Viaduct that, I believe,

8    there was -- roughly, they had transversed

9    that within 30 to 40 seconds, the entirety of

10   it.

11            And so I don't -- I can't tell

12   you how long they were doing it because it

13   would have taken some time to get to that

14   speed in the first place for those two,

15   but...

16            Q.    Did you evaluate speeds of these

17   officers at other portions of the pursuit?

18            A.    Did I what?  Sorry.

19            Q.    Evaluate speeds of these

20   officers' vehicles at other portions of the

21   pursuit?

22            A.    I looked for the same thing.

23   Once that was discovered, I looked for the

24   same thing to -- you know, to observe it, but

25   I didn't see it.

Deposition of Sergeant Charles Fink                         Jason Laible, et al., vs. Timothy Lanter, et al.,

1    Q.    Meaning, you didn't see the

2    speedometer on the body-worn camera at other

3    times?

4    A.    Or over the 20-mile-per-hour

5    constraint.

6    Q.    And how did you evaluate that

7    specifically?  Meaning, in other portions of

8    the pursuit, were you able, based on the

9    information you were looking at, to evaluate

10   whether these officers were going more than

11   20 miles an hour over the speed limit at

12   other times?

13   A.    I don't think I follow you.

14   Q.    So we know that you saw the

15   speedometer of Harper and Thomas at --

16   A.    Right.

17   Q.    -- on the 6th Street Viaduct

18   area, right?

19   A.    Right.

20   Q.    You weren't able to see the

21   speedometer at other times; is that correct?

22   A.    I don't recall without reviewing

23   it.  I mean, after seeing it, I'm sure I

24   reviewed the entirety of it for that

25   particular aspect.  I watched the BWC from

```
 1    beginning to end on all of them.
 2              But I would -- I'm certain I
 3    would have watched the entirety of it for
 4    that specific aspect, too.
 5         Q.    And were there any other sources
 6    of information used to determine officer
 7    speed over the course of the pursuit,
 8    meaning, other than the body-worn camera
 9    showing the speedometer?
10         A.    No.  I mean, not specific
11    speeds, no.  I mean, we -- we have alerts on
12    the screen that will say brake, you know,
13    lights, siren, brake, things like that, the
14    revving of an engine, just different things
15    that may indicate that a car is speeding up
16    or slowing down, but so far specific speed,
17    no.
18         Q.    Did you look at the speed of
19    these police vehicles in relation to other
20    vehicles traveling in the vicinity?
21         A.    Yes.
22         Q.    And did you at any time see that
23    they were traveling at a markedly faster
24    speed?
25         A.    At a what?  I'm sorry.
```

```
1          Q.    At a faster speed.

2          A.    Well, I do know -- and

3   specifically for Sergeant Lanter anyway, he

4   lost ground on Mason Meyer on the 6th Street

5   Viaduct because he actually navigated the

6   traffic reasonably well.

7                When there was a car in front of

8   him and he -- you know, he's lights and

9   sirens the whole time.

10               And, as I said, in pursuits,

11  sometimes people freeze, sometimes they get

12  over, sometimes, you know -- so when he had a

13  car in front of him, whether pushing that car

14  in front or he had to wait for a moment to

15  get over safely and by the time Meyer had

16  distanced himself from -- from

17  Sergeant Lanter.

18         Q.    So were there other comparators

19  that you used other than the speedometer to

20  determine officer speed at any point during

21  the pursuit?

22         A.    Not that I can think of, no.

23         Q.    And do you know whether you or

24  Lieutenant Briede attempted to identify

25  speeds at other points of the pursuit other
```

1    than using this body-worn camera speedometer

2    numbers that you've described?

3         A.    No, I don't know how we would.

4         Q.    Okay.  So as you sit here then,

5    you don't know whether or not they were going

6    more than 20 miles an hour over the speed

7    limit at any other portion of the pursuit?

8         A.    Do I know?  No.  It would be --

9    it would be fairly -- I don't want to say

10   impossible, but because of the direction and

11   the location of the pursuit and the distance,

12   the only reasonable spot that offered any

13   straightaway to even accelerate to that speed

14   would have been the 6th Street Viaduct.

15        Q.    You just don't know how far over

16   the speed limit they were or were not at any

17   given time other than the --

18        A.    Correct.

19        Q.    -- 6th Street Viaduct area,

20   right?

21        A.    Correct.

22        Q.    Okay.  All right.  So any other

23   notable conditions you recall about the

24   circumstances that day during the pursuit?

25        A.    I'm sorry.  Any other?

Jason Laible, et al., vs. Timothy Lanter, et al.,

1        Q.    Notable circumstances that you

2    recall that day during the pursuit, based on

3    your evaluation of the evidence and

4    information?

5        A.    I think we touched already on

6    the conditions of the road, conditions of

7    the -- the -- for the weather, people,

8    nothing that -- off the top of my head.

9        Q.    Okay.  How would you describe

10   Sergeant Lanter's role in this pursuit?

11       A.    As the primary pursuit vehicle.

12       Q.    And in that role, he authorized

13   other vehicles to join the pursuit, right?

14       A.    Yes, I believe so.

15       Q.    And he authorized vehicles to

16   travel the wrong way on one-way streets,

17   right?

18       A.    Correct.

19       Q.    And he acted as the supervisor

20   of Officers Thomas and Harper during the

21   pursuit, correct?

22       A.    Yes.  Yes, he's a sergeant, so

23   he could, you know, formally take the role of

24   supervisor, yes.

25       Q.    And Sergeant Don Scalf, he was

```
 1        asked at one point over the radio if the
 2        pursuit would continue into Kentucky, right?
 3             A.    Correct.
 4             Q.    And he responded affirmative,
 5        correct?
 6             A.    Correct.
 7             Q.    Sergeant Scalf did not give any
 8        orders during the pursuit, did he?
 9             A.    Any orders?  I think the only
10        thing other than giving the affirmative and
11        advising that he was the -- the OIC in the
12        beginning of the pursuit is that he requested
13        once or twice to have Kentucky notified
14        because they thought at that time the pursuit
15        was going into Kentucky at 71 and 75 south
16        there.
17             Q.    Is it fair to say he asked
18        whether Kentucky had been notified instead of
19        that he instructed that Kentucky be notified?
20             A.    Sergeant Lanter is the one who
21        instructed to have Kentucky and District 1
22        notified, but I believe Sergeant Scalf may
23        have asked, yeah.
24             Q.    And Scalf then gave no orders
25        during the pursuit, right?
```

1    A.    Not that I recall.

2    Q.    And he gave no direction to the

3    officers involved in the pursuit over the

4    course of the pursuit, right?

5    A.    Not that I recall, no.

6    Q.    On this particular day, you're

7    aware that there had been a surveillance

8    operation that was a joint operation among a

9    few law enforcement agencies relating to

10   Mason Meyer, right?

11   A.    Yes, ma'am.

12   Q.    And on that day, the CPD

13   Gang Unit was having some of its members

14   assist in that operation, right?

15   A.    Correct.

16   Q.    And, likewise, a Canine handler

17   officer was called in to assist, correct?

18   A.    I believe two were.

19   Q.    It was first Officer Harper then

20   Officer Thomas, right?

21   A.    Yeah.  I believe officer -- it's

22   the way -- it started -- it was reverse roles

23   so far as in the pursuit, but I believe

24   Harper was first in -- in the discussion

25   process, and then Thomas was called.

```
 1              I think he was at the -- maybe
 2    at the Canine -- up at the police academy
 3    range that I think he was called on the phone
 4    to join them.
 5         Q.    And so those Canine Unit
 6    officers and Gang Unit officers who were
 7    assisting, they were there in their CPD
 8    capacity, correct?
 9         A.    Correct.
10         Q.    And I'd like to look at some
11    certain aspects of your report and ask you
12    some follow-up questions.  But before I do,
13    let me just ask you, do you stand by the
14    contents of this report today?
15         A.    As I know it now, yes.
16         Q.    Okay.  So if you would join me,
17    please, in your report, Exhibit 3, on page --
18         A.    Excuse me.
19         Q.    -- on page 15, which is stamped
20    at the bottom City 330.
21         A.    Okay.  Yes.
22         Q.    So this is the beginning of the
23    Conclusion section of your report, right?
24         A.    Yes, ma'am.
25         Q.    And what's the purpose of the
```

```
 1    Conclusion section of this report?
 2              A.    To bring all the facts together.
 3              Q.    And so you analyze key facts and
 4    identify policy violations in this section,
 5    right?
 6              A.    Correct.
 7              Q.    And you identify disciplinary
 8    recommendations as well, right?
 9              A.    Yes.   Those would be associated
10    with the particular violation.
11              Q.    Okay.   And as we look at your
12    Conclusion section here, I'd like to go,
13    please, to page 18 of your report stamped
14    City 333.
15              And maybe halfway down the page
16    or so, this is where you begin to identify
17    policy violations by the involved officers,
18    correct?
19              A.    You said 333?  I'm sorry.
20              Q.    Yes.
21              A.    Yes, ma'am.
22              Q.    Okay.   And so starting in the
23    middle of the page, you summarized that the
24    IIS investigation determined Sergeant Lanter
25    authorized operation of police vehicles the
```

1    wrong way on one-way streets while actively

2    involved in the pursuit and not acting as the

3    pursuit OIC, right?

4        A.    Yes, ma'am.

5        Q.    And so what does that mean, not

6    acting as the pursuit OIC?

7        A.    Well, he was the primary pursuit

8    vehicle.  The OIC was already identified as

9    Sergeant Scalf.

10        Q.    And so Lanter was authorizing

11    things that Scalf was the one --

12        A.    Should have.

13        Q.    -- who was supposed to have been

14    authorizing?

15        A.    Correct.

16        Q.    And so Lanter was acting as

17    de facto OIC, so to speak?

18        A.    Of sorts.

19        Q.    And you note then that while on

20    6th Street Viaduct, Officer Thomas markedly

21    exceeded the posted speed limit by more than

22    20 miles an hour and only gains minimal

23    distance on the pursuit indicating

24    Sergeant Lanter is also driving more than 20

25    miles an hour in excess of the speed limit,

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1            correct?

 2                    A.      Correct.

 3                    Q.      So this is that portion we were

 4            talking about earlier where you're

 5            determining the speed based on body-worn

 6            camera, right?

 7                    A.      Yes.

 8                    Q.      You go on to say,

 9            Sergeant Lanter's actions are in violation of

10            Rule 1.03 of the Manual of Rules and

11            Regulations and Disciplinary Process for the

12            Cincinnati Police Department, which states:

13            1.03, Members shall exercise the

14            responsibility and authority of the position

15            to which they are assigned in accordance with

16            Department Position Classification/Job

17            Description, Civil Service Classification

18            Specifications, and work rules.

19                            What does that mean, that

20            particular rule in your application of it

21            here?

22                    A.      103?

23                    Q.      Uh-huh.

24                    A.      It's -- it's considered the job

25            spec rule, which basically means your
```

1    specific job specifications and all things

2    other that were required in that position.

3            So in this particular case, it's

4    referencing him acting as the OIC by

5    authorizing that, when his specific role

6    there was as the pursuit -- pursuit vehicle.

7        Q.    Okay.  And so effectively

8    summarizing that Sergeant Lanter exceeded the

9    supervisory responsibilities he was supposed

10   to exercise in this particular event, meaning

11   the pursuit?

12       A.    I don't know if exceeded is the

13   perfect word, but...

14       Q.    So how would you say it?

15       A.    That's a good question.  Because

16   as -- as a -- well, I mean -- well, let's

17   stick with that for the -- for the time

18   being.

19       Q.    What do you mean, stick with --

20   stick with what?

21       A.    With he exceeded the capacity of

22   the role that he was -- he was in.

23       Q.    Okay.  And then moving down

24   towards the bottom of the page you say, And,

25   procedure 12.535 Emergency Operation of

1    Police Vehicles and Pursuit Driving, in part,

2    there you're -- you're noting that he also

3    violated that particular policy on pursuit

4    driving, right?  It's at the very bottom of

5    page 333.

6            A.    Oh, that was according to the

7    portion of it, so, yes.

8            Q.    Okay.  And then on the following

9    page, 334, you recite an excerpt from that

10   policy, which reads, Officers will not pursue

11   vehicles the wrong way on the interstate or

12   other controlled access highway, divided

13   roadways, or other one-way streets unless

14   specifically authorized by the pursuit

15   officer in charge.

16            And then for the Procedure

17   section, you say that Emergency operation of

18   police vehicles, in Section A, requires that

19   when driving in emergency mode, the operator

20   will conform to all applicable traffic laws

21   and regulations, right?

22            A.    Yes.

23            Q.    And so it's mandatory that CPD

24   Police officers engaged in pursuit conform to

25   all applicable traffic laws and regulations,

1    **right?**

2              A.    To -- to an extent.  It says

3    will conform to them, but when it comes to,

4    like, stop signs and intersections, things of

5    that nature, they don't have to come to a

6    complete stop, where a civilian might when

7    they come to it.  They have to approach with

8    due caution in regards to safety and proceed

9    in that fashion.

10              So far as -- there are times

11   that there are exigent circumstances that may

12   allow for -- like, let's say with the 20

13   miles per hour, there are times where 20

14   miles an hour -- I'm trying to think if

15   there's anything else in here that's

16   referring to it, but there might be exigent

17   circumstances that could be then explained in

18   the Form 30 -- the pursuit form that would

19   allow for those -- we call it violation

20   because it wouldn't be considered a violation

21   at that point, but there are exigent

22   circumstances that allow for a breach of

23   that.

24         **Q.    There were no such exigent**

25   **circumstances identified in this particular**

1    pursuit, correct?

2         A.    Not in the actual pursuit form,

3    no.

4         Q.    Okay.  And so there were no

5    exceptions in this particular case other than

6    the specifically enumerated exceptions, like

7    the stop signs you noted in the policy that

8    would have allowed the officers in this

9    pursuit to violate applicable traffic laws

10   and regulations, correct?

11        A.    That's -- that's -- when I

12   referred to this form earlier, that is one of

13   the reasons why I had an issue with doing it.

14              Because the OIC overseeing these

15   specific pursuits and being involved in a

16   pursuit with the information in the pursuit

17   may have written it differently and done it

18   differently that would allow for those

19   exigent circumstances.  But the way it was

20   written by me, there was not.

21        Q.    And so you didn't find any

22   exigent circumstances in your review,

23   correct?

24        A.    Correct.

25        Q.    And you conducted that review on

1    behalf of the City of Cincinnati and its

2    police department, right?

3        A.    Correct.

4        Q.    And there were no exigent

5    circumstances that you're aware of that were

6    identified by any of the officers in the

7    chain of command review above you, right?

8        A.    Correct.

9        Q.    Okay.  So here on down to the

10   next section you note that Sergeant Lanter

11   also violated Section D on Pursuit Driving

12   and Notification, Section D(2), which

13   requires a pursuing officer to immediately

14   relay information to the ECC, including car

15   number, location, direction, description of

16   vehicle, license number and occupants, reason

17   for pursuit, and speeds involved, right?

18       A.    I believe he failed to identify

19   speeds involved.  Otherwise, I believe all

20   the rest were covered.

21       Q.    And so officers in the CPD are

22   required to transmit over the radio their

23   speeds as they engage in pursuits, correct?

24       A.    That is correct.

25       Q.    And how frequently are they

1    supposed to do that?

2            A.    There's no time frame on it, but

3    the officer can do it and/or the OIC is

4    responsible for asking speeds, direction,

5    location, if -- if they have failed to do it.

6            Q.    And Sergeant Lanter then failed

7    to transmit that speed information here,

8    right?

9            A.    Correct.

10           Q.    Carrying on, you note that while

11   on the 6th Street Viaduct, Officer Thomas

12   markedly exceeded the posted speed limit by

13   more than 20 miles an hour as you did on the

14   page we noted before.

15               And so this is where you're

16   evaluating Officer Lanter's speeds, again, in

17   association with this pursuit driving

18   investigation requirement, right?

19           A.    Correct.

20           Q.    Okay.  So carrying on down the

21   page here, you then write that

22   Sergeant Lanter's actions are in violation of

23   Rule 1.01(B) of the Manual of Rules and

24   Regulations and Disciplinary Process for the

25   Cincinnati Police Department, which states

1    that, members shall not commit any acts or

2    omit any acts, which constitute a violation

3    of any of the rules, regulations, procedures,

4    directives, or orders of the department,

5    right?

6              A.    Correct.

7              Q.    And that's a mandatory rule that

8    all officers must follow, correct?

9              A.    Correct.

10              Q.    And the subsection violation

11    that you found here was that Sergeant Lanter

12    had committed a negligent violation which may

13    lead to the risk of physical injury to

14    another or financial loss to the City, right?

15              A.    Correct.

16              Q.    And so Sergeant Lanter's pursuit

17    driving in this case was a negligent

18    violation that could lead to risk of physical

19    injury to another person or a financial loss

20    to the City, right?

21              A.    Say that question again.  I'm

22    sorry.

23              Q.    Sergeant Lanter's pursuit

24    driving in this case was determined by you in

25    this City review of the pursuit to constitute

1    a negligent violation that may lead to risk

2    of physical injury to others or financial

3    loss to the City, correct?

4         A.    Well, the driving -- so the

5    101(B) is based primarily on the failure to

6    transmit speeds.  It's not so much the

7    driving.

8              The -- the assumption of the

9    excess of the speed limit would be one aspect

10   of the driving itself as opposed to all

11   things other -- I mean, as I said, the

12   transmitting speeds doesn't lead to risk of

13   physical injury to another or financial loss

14   to the City.

15             The same thing with -- I'm

16   sorry, it's the other one, it's the

17   authorization for going the wrong way on a

18   one-way.  But potentially to the driving

19   aspect if -- if he's exceeding the speed of

20   20 miles an hour.

21        Q.    So this negligent violation --

22   rule violation that's noted on this page 334,

23   that relates to the failing to transmit

24   speeds, right?

25        A.    Correct.

1    Q.    It relates to being involved in

2    a pursuit that went the wrong way on one-way

3    streets, right?

4         A.    Correct.

5         Q.    It relates to traveling markedly

6    above the speed limit by more than 20 miles

7    an hour, right?

8         A.    Correct.

9         Q.    And it relates to the pursuit

10   policies requirements around emergency

11   operation of police vehicles and pursuit

12   driving, right?

13        A.    The 101(B) does, correct.

14             MR. COWAN:  Jacqueline, when you

15   wrap this line of questioning, can we take a

16   break?

17             MS. GREENE:  Yeah, sure.  I'm

18   almost there.

19   BY MS. GREENE:

20        Q.    Ultimately, Sergeant Fink, you

21   made the same finding with respect to

22   Officer Thomas as well, right, this 101(B)

23   violation?

24        A.    It's the same violation.  I

25   don't believe it was for all of the same

```
 1    instances.
 2            Q.    Looking at page 20 of the report
 3    stamped City 335 toward the bottom of the
 4    page, your evaluation of Officer Thomas'
 5    violation of 101(B) related to Officer Thomas
 6    driving the wrong way on one-way streets,
 7    right?
 8            A.    Yeah.  So I do recall writing
 9    that, that aspect, but we -- we had looked at
10    that as he -- he -- let me -- just give me
11    one moment, if you would.
12            Q.    Sure.
13            A.    Okay.  I'm sorry.  What was your
14    question?
15            Q.    The determination that you made
16    about Officer Thomas violating Rule 101(B)
17    related in part to him driving the wrong way
18    on one-way streets, right?
19            A.    Yes.
20            Q.    And related to the finding that
21    he had driven his marked vehicle in excess of
22    20 miles over the speed limit, right?
23            A.    Correct.
24            Q.    And related to his failure to
25    follow the notification requirements of the
```

Deposition of Sergeant Charles Fink

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1        pursuit policy as well, right?
 2             A.    Yes.
 3             Q.    And related to his emergency
 4        operation of his police vehicle, correct?
 5             A.    The same thing, yes.
 6             Q.    And he also violated applicable
 7        traffic laws and regulations, right?
 8             A.    If you're referencing the
 9        20 miles per hour, yes.
10             Q.    Okay.  And, ultimately, you
11        found that that conduct during the pursuit by
12        Officer Thomas was a negligent violation of
13        the -- of the department's policies, right?
14             A.    Correct.
15             Q.    And that that violation could
16        lead to the risk of physical injury or to
17        another -- or to another or to financial loss
18        for the City, right?
19             A.    Correct.
20             Q.    And so this driving by Thomas
21        and Lanter during the pursuit involved
22        negligent conduct, right?
23                   MR. COWAN:  Objection.
24             Q.    Go ahead.
25             A.    Say the question again.  I'm
```

```
 1    sorry.

 2            Q.    This pursuit driving by Lanter

 3    and Thomas involved negligent conduct, right?

 4                 MR. COWAN:  Objection.

 5            Q.    You're allowed to answer.  And I

 6    can ask it a different way.

 7                 In your review of this matter,

 8    you concluded that the pursuit driving by

 9    Sergeant Lanter and Officer Thomas did

10    include negligent conduct, right?

11                 MR. COWAN:  Objection.

12            Q.    And you can answer.  Go ahead.

13            A.    Ask that question again.  I'm

14    sorry.

15            Q.    In your review of this matter,

16    based on all of the evidence and information

17    available to you, you concluded in your

18    report on behalf of the Cincinnati Police

19    Department that the driving by

20    Sergeant Lanter and Officer Thomas in this

21    case involved negligent conduct, right?

22                 MR. COWAN:  Objection.

23            A.    It would be -- I don't know that

24    when I -- in doing this, I considered

25    necessarily negligent, but it be negligent to
```

1    the rule as this is written here.

2                It's a violation that may lead

3    to the risk of physical injury to another or

4    a financial loss for the City.

5         Q.    And so the driving by

6    Sergeant Lanter and Officer Thomas then, did,

7    in the eyes of the City through your report,

8    indicate a risk of physical injury to persons

9    while they're driving -- were driving in the

10   pursuit, right?

11               MR. COWAN:  Objection.

12        A.    Every pursuit that's entered

13   into, there's a risk.  So I don't have an

14   issue with saying -- saying yes to that.

15        Q.    And not every pursuit results in

16   recommendations for discipline for rule

17   violations, right?

18        A.    I'd probably say just about

19   every pursuit does.

20        Q.    It does?

21        A.    That's exactly -- that's why

22   they tell you not to do it at all because

23   it's -- I would say I don't know one that

24   hasn't resulted in something.

25        Q.    Pursuit driving is dangerous;

1    isn't it?

2            A.    It can be.

3            Q.    And it brings with it an

4    inherent risk of physical injury to others,

5    right?

6                    MR. COWAN:  Objection.

7            A.    So it's -- I can't -- I can only

8    speak for when I've been involved, but the

9    risk is -- is initiated by the one being

10   pursued.

11                   Ultimately and overall, the one

12   being pursued has the -- the ability and the

13   obligation to stop, which would terminate

14   any -- any kind of a pursuit.

15                   The officers just have to

16   proceed with their due caution in regard for

17   safety for all -- all involved, not only

18   themselves, but the person they're pursuing

19   as well as the people that they pass.

20           Q.    And while engaging in a pursuit,

21   officers must terminate pursuits when they

22   become too unsafe to carry on, right?

23           A.    If an officer involved in a

24   pursuit feels that it's too unsafe, the risk

25   outweighs the reward, then, yes.

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 157 of 220 - Page
ID#: 4096
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              MR. COWAN:  Jacqueline, I don't
 2     want to disrupt your flow, but are we close
 3     to taking a break?
 4              MS. GREENE:  Close.  Yes.
 5              MR. COWAN:  Can you give me --
 6              MS. GREENE:  Just give me a
 7     couple more minutes.
 8     BY MS. GREENE:
 9         Q.    The department's policy on
10     pursuit driving that you've used in this
11     case, you used it for the purpose of
12     evaluating whether or not these officers
13     engaged in an unsafe pursuit, right?
14         A.    No.  I just used it to identify
15     whether there's an operational, equipment,
16     or -- or an administrative violation.
17         Q.    And you found administrative
18     violations, right?
19         A.    An administrative violation,
20     yes.
21         Q.    And those administrative
22     violations reflect a finding of negligent
23     violation of police policies by these
24     officers?
25         A.    The administrative violation was
```

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    the one referencing -- there's just but one,

2    it was the one referencing Sergeant Lanter

3    acting as the OIC with the permissions he

4    gave.

5           Q.    And can you explain that to me a

6    little more?

7           A.    I don't know how -- he

8    authorized three cars in the pursuit and

9    authorized one way -- wrong one on a one-way

10   acting as the OIC, per se, in the absence of

11   Sergeant Scalf authorizing the same.

12          Sergeant Scalf had advised -- he

13   tried several times to go over the air to do

14   the same thing and to approve the

15   authorization, but was unable, that would be

16   the administrative violation.  There

17   weren't -- there weren't multiple

18   administrative violations.

19          Q.    And that conduct that you just

20   described, that creates -- could create a

21   risk of physical injury to others, right?

22          A.    In and of itself, I don't

23   believe so, no.

24          MS. GREENE:  Let's take a break.

25   Off the record.

```
 1              (Off the record.)

 2      BY MS. GREENE:

 3              Q.    All right.  We're back on the

 4      record.

 5                    Sergeant Fink, I'd like for you

 6      to, please, turn to Exhibit 1, the pursuit

 7      policy, which is in the stack of papers in

 8      front of you somewhere.

 9              A.    Yeah.

10              Q.    Okay.  Great.  So you've got

11      that document in front of you.  This is a CPD

12      pursuit policy that applied at the time of

13      the pursuit in this case, correct?

14              A.    Yes.

15              Q.    And it includes all the

16      requirements for officers when they engage in

17      pursuits, right?

18              A.    Yes.

19              Q.    And this policy requires

20      officers to be aware of a number of factors

21      as they engage in pursuits, correct?

22              A.    Yes, ma'am.

23              Q.    And it requires them to use

24      those factors to -- to either continue or

25      terminate the pursuit, right?
```

Deposition of Sergeant Charles Fink                              Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              A.    Correct.

 2              Q.      And the factors that are

 3      required include, for example, the degree of

 4      risk created by the pursuit to others, the

 5      officer, and the suspect, right?

 6              A.    Yes, ma'am.

 7              Q.      They also include the location

 8      where the pursuit will take place?

 9              A.    Yes, ma'am.

10              Q.      They include traffic conditions?

11              A.    Yes.

12              Q.      They include the amount of

13      pedestrian traffic?

14              A.    Yes.

15              Q.      They include road conditions?

16              A.    Yes, ma'am.

17              Q.      They include the time of day of

18      the pursuit?

19              A.    Yes.

20              Q.      They include the weather during

21      the pursuit?

22              A.    Yes.

23              Q.      They include the volume, type,

24      speed, and direction of vehicular traffic and

25      the direction of pursuit, right?
```

1    A.    Yes.

2         Q.    They include the nature and

3    seriousness of the suspected crime committed

4    by the fleeing party, right?

5         A.    Correct.

6         Q.    They include the condition of

7    the police vehicle and the suspect's vehicle

8    during the pursuit, right?

9         A.    Correct.

10        Q.    They include any circumstance

11   that could lead to a situation in which the

12   pursuing officer or officers will not be able

13   to maintain control of their police vehicles?

14        A.    Correct.

15        Q.    And they include any

16   circumstances that could lead the fleeing

17   suspect to not be able to maintain control of

18   their police -- or, their vehicles, right?

19        A.    Say -- I'm sorry?

20        Q.    Do they also include the

21   circumstances that could lead to a situation

22   where the fleeing individual may not be able

23   to contain -- maintain control of their

24   vehicle?

25        A.    Presumably.  That's not stated

1    there necessarily, but, yes.

2         Q.    They also include the type of

3    vehicle being pursued, right?

4         A.    Yes.

5         Q.    And they include the likelihood

6    of successful apprehension of the suspect,

7    right?

8         A.    Correct.

9         Q.    They also include whether the

10   identity of the suspect is known to the point

11   that a later apprehension is possible, right?

12        A.    Correct.

13        Q.    Any other factors that are

14   required for officers to be aware of during

15   pursuits that you know of?

16        A.    No.  I think that's fairly

17   comprehensive.

18        Q.    Okay.  Now, with regard to the

19   degree of risk created by the pursuit to

20   others, the officer, and the suspect, why is

21   that a factor that's important for an officer

22   to know during a pursuit?

23        A.    Why is it a factor that's

24   important?

25        Q.    Yeah.

```
 1            A.    Ultimately, we don't anyone

 2      hurt, whether it be a civilian, the suspect,

 3      or the officer.

 4            Q.    And so that degree of risk is

 5      important for an officer to know at all

 6      points in time during the course of a

 7      pursuit, right?

 8            A.    Yeah.  I think that's something

 9      to ascertain and to evaluate.  I don't know

10      that they -- they necessarily know, but --

11      and it can be constantly changing throughout

12      a pursuit.

13            Q.    And as factors change in a

14      pursuit, it could become dangerous to the

15      point that it must be terminated under the

16      policy, right?

17            A.    It could be.

18            Q.    Why is it important for officers

19      to know about the location where the pursuit

20      is taking place?

21            A.    School is the perfect example,

22      we've seen them go -- you know, a fleeing

23      vehicle fly through a school zone.

24      Obviously, we don't want to pursue the same,

25      so zones such as that.
```

Deposition of Sergeant Charles Fink                          Jason Laible, et al., vs. Timothy Lanter, et al.,

1       Construction zones, one-way --

2   not one-way streets, but residential streets

3   where, you know, it's ten miles an hour and

4   kids are playing, things of that nature.

5       Q.    In heavily populated business

6   areas, for example?

7       A.    Sure.

8       Q.    Why does it matter for an

9   officer to know about the traffic conditions

10  during a pursuit?

11      A.    Well, the traffic conditions and

12  I was gonna -- kind of plays into the road

13  conditions and the weather.  All of them are

14  kind of uniquely tied together.

15          Because, you know, if --

16  depending on the -- the suspect, you know,

17  oftentimes when we make a traffic stop, the

18  suspect is -- we're stopping him for a red

19  light violation, not knowing, you know, that

20  he's been involved in a murder/homicide, what

21  have you.

22          So this person is gonna flee,

23  you know, to -- they have no option but to

24  flee.  We're thinking they just violated a --

25  you know, a red light.  So a lot of it

Deposition of Sergeant Charles Fink                                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1      depends really on what the -- the person in
 2      front of us does.
 3              Like, Mason Meyer, the
 4      information that they had on him and what he
 5      had said, what he had -- what their
 6      informants and sources of information
 7      provided about him, and what he'd shown
 8      throughout the pursuit was that -- that he
 9      was willing to take risks that the officers
10      didn't -- didn't also assume.
11              Kind of like, as I said, on the
12      6th Street Viaduct, where Timmy --
13      Sergeant Lanter, excuse me, started losing
14      Mr. Meyer because he had to -- he was
15      remaining pursuant to the policy here in
16      taking in regard the safety of the other
17      civilians, other traffic on the road into
18      consideration where Mr. Meyer did not.
19          Q.    So with regard to traffic
20      conditions, why do officers need to know
21      about that during a pursuit?
22          A.    Depending on -- I mean, are we
23      talking about traffic so far as how heavy it
24      is, things of that nature?
25          Q.    Well, the policy requires that
```

1    officers are aware of traffic conditions

2    during a pursuit, right?

3          A.    Yeah.  So --

4          Q.    So why is that important?

5          A.    Well, so they can minimize the

6    risk of anyone getting injured.

7          Q.    And if there are other cars on

8    the road, there's a risk to those other

9    motorists, right?

10         A.    There's always gonna be other

11   cars, but I think it refers more to --

12   similar with it says a mount of pedestrian

13   traffic.  It refers more to the -- what type

14   of traffic is there.  Is it, you know, rush

15   hour, is it a lazy Sunday afternoon, that

16   kind of thing.

17         Q.    Or the middle of the night,

18   right?

19         A.    Right.

20         Q.    Is it the wee hours of the

21   morning, right?

22         A.    Right.

23         Q.    Is it in the middle of a lovely

24   sunny afternoon, right?

25         A.    Correct.

1    Q.    When there are people likely to

2    be out and about, right?

3        A.    Not that day, it didn't seem.

4        Q.    With regard to pedestrian

5    traffic, why is that a factor that officers

6    must be aware of during the pursuit?

7        A.    Same.  Same with traffic.  I

8    mean, obviously, if you've got a lot of

9    pedestrians and a pedestrian, obviously,

10   can't move out of the way of a car as quickly

11   as another car might be able to as well.

12        And if you have, you know, other

13   cars that are -- that you're not capable of

14   knowing how that car is gonna react, I mean,

15   then they don't have the same regard

16   necessarily for pedestrian traffic, so...

17        Q.    So it's an officer's

18   responsibility during a pursuit to be aware

19   of pedestrians because of the possibility

20   that the fleeing vehicle --

21        A.    Minimize --

22        Q.    -- could hit pedestrians, right?

23        A.    Minimize the chance for anybody

24   getting hurt.

25        Q.    Road conditions and weather, why

do those matter during a pursuit?

A.    Same thing.  Obviously, if you're on wet road as opposed to a dry, sunny day and visibility is diminished or driving capability is diminished when you're taking turns and going at a higher rate of speed, you know, obviously, wet roads or snowy roads are be much more hazardous than a dry, sunny day.

Q.    Why does the time of day matter?

A.    Generally, for the amount of vehicle/pedestrian traffic that might be out there, and visibility if you're talking day versus night and whether the road is lit or not.

Q.    Why is the volume, type, speed and direction of vehicular traffic and direction of pursuit matter?

A.    So, again, that would be -- it all plays into the traffic conditions, basically.  I mean, how fast are the other cars going around you?  In this case, the -- the only time that there was any real traffic the cars were coming to a stop or were at a stop.

1          The volume was minimal.  The

2    type, just passenger cars.  I mean, all of

3    these things all play into, you know,

4    minimizing the risk of whether an officer, a

5    victim -- or, excuse me, the suspect, or a

6    civilian getting hurt.

7          **Q.    And what about the condition of**

8    **the police vehicle and the suspect's vehicle,**

9    **why do those factors matter during pursuits?**

10         A.    We missed one.  I don't know if

11   you want that or not.  Condition of police

12   vehicle and suspect's vehicle --

13         **Q.    Yeah.**

14         A.    -- did you say?  Well, if the

15   suspect's vehicle, for instance, like if we

16   did a stop stick on a vehicle, which wasn't

17   able to be done that day, you know, the --

18   and then the one suspect continues to flee at

19   a high rate of speed escalates the chance of

20   him losing control of that vehicle.

21              If it's a non-road-worthy

22   vehicle, the same thing with the officer's

23   vehicle, what they know about it.  How -- if

24   it's a vehicle that they commonly drive.  Are

25   they comfortable with the vehicle?

1    Q.    And the suspect vehicle, that

2    matters why?

3              A.    I think I just covered that.

4    Q.    Sorry, maybe I misunderstood.

5              A.    That's all right.  I mean, if

6    it's not a road-worthy vehicle, you know, and

7    it's -- or like if we stop-stick it and it's

8    got two flat tires, or any number of things,

9    all of these conditions refer to minimizing

10   the chance of anyone, the suspect, the

11   officer, or the civilian gets hurt.

12   Q.    Okay.  And what about the nature

13   or seriousness of the suspected crime, why

14   does that matter for officers to know during

15   a pursuit?

16             A.    I mean, because it's far less

17   important probably that if -- if I'm pulling

18   over a vehicle for a red light violation and

19   they flee and that's all I know about them.

20             I mean, there's nothing that

21   tells me that I have to get this vehicle

22   stopped as opposed to someone that's wanted,

23   you know, for a felonious assault, or has

24   like a history, is involved in multiple

25   crimes.

1              Like, in this case, Mason Meyer,

2      homicidal/suicidal, you know, sources of

3      information, the CIs talk about his

4      involvement in kidnapping, assault of people

5      who hadn't paid debts.  He bragged about a

6      man he shot in Dayton, Ohio, or a man he

7      killed in Dayton, Ohio.

8              He talked about two other

9      shootings he was involved in, had an

10     inoperable tumor, terminal illness that made

11     it clear that he was not going back to jail

12     and he'll die suicide by cop before that

13     happens.

14              So the nature of Mr. Meyer and

15     his crimes and his mindset were -- were

16     incredibly important.  Because one of the

17     things that I think to take into

18     consideration is a guy like this when you

19     don't stop him, then the next officer who,

20     you know, doesn't know Mason Meyer from, you

21     know, the next guy, Mason knows who he is and

22     he knows what the police know about him.

23              But I'm just coming up to stop

24     him for a red light violation, I could be

25     dead walking up on a guy I think that just

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    went through a red light as opposed to -- so

2    I think that's the nature of his crimes and

3    his mindset, and that's what was taken into

4    consideration on the day of the pursuit.

5         Q.    How do you know that that's what

6    was taken into consideration the day of the

7    pursuit?  Have you ever seen a statement or a

8    report or anything that says these are the

9    reasons we definitely continued this pursuit

10   on this day?

11        A.    Well, I mean --

12        Q.    Or are you making an assumption?

13        A.    Well, I mean, the -- I mean,

14   that's part of the pursuit.  And I think each

15   of them explained that they were aware of the

16   pursuit policy, part of the pursuit policy is

17   the nature and seriousness of the suspected

18   crime.

19             And each of them that I spoke to

20   in their interview, one of the things that

21   they stressed majorly, I couldn't get one of

22   them off of it, I had to ask other questions,

23   I was trying to redirect, was he had to be

24   stopped.  He had to be stopped, and here is

25   why, and then an explanation of those things.

Deposition of Sergeant Charles Fink

Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.    Were you aware of whether the
 2    department has made any official findings
 3    about whether or not he had to be stopped on
 4    that day?
 5          A.    Well, I don't -- I don't know
 6    that there's -- there's any other official
 7    finding.  I don't know what do you mean.
 8          Q.    There is no official finding
 9    that Lanter -- or, excuse me, that
10    Mason Meyer had to be stopped on August 7th,
11    to 2020, correct?
12          A.    We don't do that for any
13    pursuit.
14          Q.    Okay.  But getting back to the
15    nature and the seriousness of the suspected
16    crime, it is important for an officer to know
17    that to determine if, in fact, the suspect
18    should be apprehended at that time and it
19    can't wait, right?
20          A.    Say the question again.  I'm
21    sorry.
22          Q.    The nature and seriousness of
23    the suspected crime, is that important
24    because the officer engaged in a pursuit
25    needs to know whether or not the apprehension
```

```
1    must happen on that day or whether it can

2    wait?

3         A.    Yeah, that's incredibly

4    important.

5         Q.    Okay.  And what about the

6    likelihood of successful apprehension, why

7    does that matter as a factor that officers

8    must know that during pursuits?

9         A.    Because if somehow, I don't know

10   how you would gauge it, but if somehow,

11   somewhere, unless, you know, an officer

12   decides that there is no chance maybe if

13   someone is driving a Hellcat and I'm driving,

14   you know, one of our old Chevy Capris, and I

15   know I'm not -- there's no chance of me

16   catching this vehicle.

17             There's no sense of me

18   continuing to engage in any kind of behavior

19   in an effort to apprehend him.  I've lost

20   sight of him.  Actually, it's part of our

21   pursuit policy anyway, once you've lost sight

22   of a vehicle, the pursuit has to be

23   terminated, so...

24        Q.    And it's mandatory that when a

25   police officer loses sight of the fleeing
```

1    vehicle, that the pursuit must be terminated,

2    right?

3         A.    If they are not able to identify

4    the vehicle up ahead them, yes.

5         Q.    And whether the identity of a

6    suspect is known to the point that a later

7    apprehension is possible, why is that factor

8    important for an officer during a pursuit?

9         A.    Because there's the potential of

10   apprehending, like you said, at a later

11   point.  It could be down the road, under

12   different conditions, at his house, it could

13   be whatever.

14         But that goes back to the nature

15   and seriousness of the crime.  If the

16   officers involved and engaged in the pursuit

17   or the operation don't feel like -- or feel

18   like the seriousness of his apprehension

19   outweighs waiting, then that's -- the pursuit

20   would continue.

21         Q.    Where it's possible to apprehend

22   a person later and there's not a threat of an

23   imminent violent act, does this policy that

24   the City has require termination of a

25   pursuit?

1      A.     On this pursuit, I don't believe
2   it would.
3      Q.     No, I'm asking about the policy,
4   not about this pursuit.  Is that what the
5   policy requires --
6      A.     Say that again.
7      Q.     Does the Cincinnati Police
8   policy on pursuits require that where
9   officers would be able to apprehend a fleeing
10  suspect later because they know their
11  identity and there is no imminent threat --
12  or, excuse me, imminent -- yeah, imminent
13  threat of a violent act, must officers
14  terminate the pursuit?
15     A.     No.  The pursuit policy doesn't
16  say that.  It feeds back into -- nothing says
17  that it must terminate it.  It feeds back
18  into the nature and the seriousness of the
19  crime itself.
20           And, again, I know one of the
21  things that was reiterated time and time
22  again was the example of allowing this guy
23  who's done all the things I've said already,
24  who's threatened to kill one of his own, one
25  acting -- there was a source of information

Deposition of Sergeant Charles Fink                          Jason Laible, et al., vs. Timothy Lanter, et al.,

```
1     who was intimate to the drug and gun
2     trafficking operation that he was involved
3     in, and he had threatened to kill him, and he
4     had put guns to his head on multiple
5     occasions.
6                    And he was the one that gave the
7     information about witnessing the assault and
8     the kidnappings of previous people.  I think
9     the -- the officers articulated repeatedly
10    that his current state of mind and his -- the
11    threats that he had -- he had overtly done as
12    well as what could be expected was more
13    important than to apprehend him that day as
14    opposed to allowing some -- some unknown
15    officer or anyone else, frankly, to stumble
16    into him at a later point.
17         Q.    The information that you
18    conveyed about what was purportedly known
19    about Mason Meyer during the course of this
20    pursuit, you have no idea whether that
21    information was reliable, correct?
22         A.    It was just -- it was provided
23    to me from I believe it was Brett --
24    actually, it was several officers reiterated,
25    but originally it was Brett Stratmann, who
```

1    was the case officer for the ATF Task Force

2    Officer, and it was from a confidential

3    reliable informant from the DEA and Northern

4    Kentucky Drug Strike Force, as well as a

5    source of information intimate to the gun and

6    drug operation with Mason Meyer.

7        Q.    How do you know it was a

8    confidential reliable informant?

9        A.    Just the information from the

10   task force officer.

11       Q.    When you say confidential

12   informant, you're referring to a person who

13   is serving in an -- in a officially

14   designated role as a confidential

15   informant --

16       A.    Correct.

17       Q.    -- to the agency?

18       A.    Correct.

19       Q.    Were you also referring to a

20   separate individual who made allegations

21   beyond the confidential informant?

22       A.    Correct.  They're a source of

23   information.  The source of information is

24   very similar to a confidential informant.

25   They just may not have been, say, certified,

Deposition of Sergeant Charles Fink                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1    maybe they haven't done -- it could be a
 2    number of reasons why they're not yet
 3    confidential informants.
 4               Some did not want to be in that
 5    capacity.  Informants are, you know, often
 6    consideration in different ways.  But -- but
 7    the source of information corroborated all
 8    the information that their confidential
 9    informant provided.
10         Q.    And confidential informant, you
11    said, they're often given considerations,
12    that means they're given, for example,
13    leniency and plea deals in other cases they
14    may have or other types of --
15         A.    It could be.
16         Q.    -- consideration like that?
17         A.    It could be.  It just depends on
18    what capacity they -- they work with.
19         Q.    Who's the confidential informant
20    in this case?
21         A.    I don't know.
22         Q.    You don't know who they were?
23         A.    No, ma'am.
24         Q.    And do you know how or whether
25    the reliability of their information was
```

```
 1        evaluated for?

 2              A.    I'm sorry, say again.

 3              Q.    Do you know how or whether the

 4        information they provided was evaluated for

 5        reliability?

 6              A.    I don't, no.

 7              Q.    And you said there was also

 8        another source, right?

 9              A.    Correct.

10              Q.    Who's that?

11              A.    I don't know.

12              Q.    And you don't whether that

13        information was reliable, right?

14              A.    I do not know.

15              Q.    And you have no information that

16        establishes that the officers engaged in the

17        pursuit here knew whether or not that those

18        allegations about Meyer were reliable,

19        correct?

20              A.    I'm sorry, just ask that again.

21              Q.    You have no information that

22        establishes that the information from those

23        sources, the confidential informant and the

24        source, was reliable as far as the officers

25        involved in the pursuit were aware, right?
```

Deposition of Sergeant Charles Fink                        Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1              MR. COWAN:  Objection.
 2         Q.    Go ahead.
 3         A.    Yeah, I don't know what the
 4    officers in the pursuit knew about any other
 5    officers --
 6         Q.    And you don't know -- sorry.
 7         A.    -- or people involved in the
 8    pursuit.
 9         Q.    And you don't know whether or
10    not they knew the information they had about
11    Meyer was reliable, right?
12              MR. COWAN:  Objection.
13         A.    I don't know.  Say again.
14         Q.    You don't know if the officers
15    involved in this pursuit knew whether any
16    information they had about Meyer was or was
17    not reliable at the time of the pursuit,
18    right?
19         A.    I just knew it was consistent
20    across the board from the different officers
21    I spoke to, whether they were involved in the
22    pursuit or the surveillance operation.
23              Anyone involved in the briefing
24    all across the different people that I talked
25    to, whether they were, you know, commissioned
```

Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

1    with the ATF as the -- or, excuse me, the ATF

2    Task Force Officers, with the Gang Unit, or

3    just the -- well, we didn't have any regular

4    officers across the units that were

5    interviewed, their information was

6    consistent.

7         Q.    But you don't know whether these

8    officers involved in the pursuit knew if the

9    information about Meyer was reliable or not

10   to you?

11        A.    I couldn't know that, no.

12        Q.    Okay.  The pursuit policy of the

13   Cincinnati Police Department requires that if

14   officers are gonna engage in a pursuit, that

15   they do so in such a way that risk to the

16   public is minimized, right?

17        A.    Correct.

18        Q.    And that includes risk to the

19   public posed by the fleeing driver, right?

20        A.    The officer can't so much

21   control that, but...

22        Q.    But if an officer is gonna

23   engage in a pursuit of a fleeing driver,

24   they're required to do so in such a way that

25   contemplates risks posed to the public by the

```
 1    fleeing driver, right?
 2           A.    Okay.
 3           Q.    Is that correct?
 4           A.    I'm not -- I guess I'm not
 5    understanding exactly what you're saying.
 6           Q.    I'm asking a question about the
 7    policy, the pursuit policy.
 8           A.    Is it a specific thing that
 9    you're citing here --
10           Q.    No.
11           A.    -- so I can go to it.
12           Q.    I'm asking you based on the
13    entirety of the policy if it requires that
14    officers engaging in a pursuit if they're
15    gonna do so engage in that pursuit in a
16    manner that contemplates the risk posed to
17    the public by --
18           A.    That's one of the --
19           Q.    -- the fleeing driver?
20           A.    -- factors, sure.
21           Q.    And it also requires that those
22    officers, if they will engage in the pursuit,
23    then do so in a way that to the extent
24    they're able to control the risk that
25    minimizes the risk posed to the public by the
```

1    fleeing driver, right?

2          A.    Yes.

3          Q.    Okay.  The CPD policy on

4    pursuits specifically forbids officers from

5    pursuing vehicles on the wrong way on any

6    type of roadway without specific

7    authorization from the pursuit OIC, right?

8          A.    Yes.

9          Q.    And the pursuit policy -- excuse

10   me -- strike that.

11              Under CPD pursuit policy and

12   procedures, officers are forbidden from

13   operating their vehicle in emergency mode

14   with reckless disregard for the safety of

15   citizens, right?

16         A.    Correct.

17         Q.    And what does that mean,

18   reckless disregard for the safety of

19   citizens?

20         A.    I guess absolutely without

21   caution or care, going through intersections

22   without slowing/stopping, attending to the

23   traffic, whether it be vehicular or

24   pedestrian around them.

25              Reckless would be -- would

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 185 of 220 - Page

Deposition of Sergeant Charles Fink                ID#: 4124                Jason Laible, et al., vs. Timothy Lanter, et al.,

1    almost -- wanton disregard, no concern for

2    others at all.

3         Q.    You just used the word "wanton,"

4    is that a word you're aware of from Ohio case

5    law?

6         A.    I've heard it before.  I don't

7    know that I -- not a particular case or

8    anything.

9         Q.    Are you aware of the

10   distinctions between recklessness and

11   wantonness under Ohio law?

12        A.    No.

13        Q.    Okay.  So operating a vehicle in

14   a pursuit in a manner that disregards the

15   safety of pedestrians, that's forbidden under

16   the policy, right?

17        A.    It would follow under not

18   operating with reckless disregard for the

19   safety of other citizens.

20        Q.    Okay.  Under CPD pursuit

21   policies and procedures, officers are

22   required to maintain a vehicle speed that's

23   reasonable for the conditions, right?

24        A.    Correct.

25        Q.    And what does that mean,

1    reasonable for the conditions?

2         A.    Well, if the speed limit is 50

3    and it's pouring down rain in the middle of

4    the night and it's not a lighted roadway, I

5    would say 60, 70 probably wouldn't be

6    reasonable for the conditions.

7         Q.    And the policy specifically

8    finds that speeds greater than 20 miles an

9    hour over the speed limit are not reasonable,

10   right?

11        A.    That's what that indicates,

12   correct.

13        Q.    What does it mean to have

14   undertaken a noncompliant pursuit under the

15   policy?

16        A.    What does it mean to -- to have

17   done what?  I'm sorry.

18        Q.    Undertaken a noncompliant

19   pursuit.  That term "noncompliant pursuit"

20   appears in the policy.  I'm asking, what does

21   that mean?

22        A.    Right.  I don't know specific to

23   where you're talking about, but a pursuit is

24   noncompliant when -- when you have a

25   violation of the operational, the

administrative, or the equipment violations.

                    So it could be noncompliant

for -- let me see if it's actually in here --

okay.  Okay.  It's equipment, that's what I

thought.  Okay.

                    So equipment -- an equipment

violation like that, a BWC not activated or

an MVR or a seat belt not engaged, something

like that, wouldn't be -- wouldn't cause a

pursuit to be compliant.

                    Any administrative or

operational violations would cause a pursuit

to be noncompliant.

    Q.    And that means --

    A.    So just if all the things were

equal and Sergeant Lanter decided to say --

authorize as the primary pursuit vehicle, and

he says three cars can go out, three cars on

the street, but all cars can go the wrong one

on a one-way, that alone would call --

consider the pursuit noncompliant.

    Q.    Okay.  Ultimately, in your

report and the findings that you reached

here, along with the chain of command review

that followed, it all led to sustained

1    findings for violation of rules and policies

2    of the department, right?

3         A.    Correct.

4         Q.    And in that evaluation, it was

5    considered whether or not there was a

6    justification for the conduct that would have

7    allowed the rule or policy violation, right?

8         A.    During the process of coming to

9    this conclusion?

10        Q.    Yes.

11        A.    So, again, yes.  The -- the only

12   issue I have is in having -- being the author

13   of all of this, I don't know, like I said,

14   it's strange to me to be author -- authoring

15   the pursuit -- we'll use the pursuit, for

16   instance (mumbling) to work with.

17             But as the Internal, I write in

18   a very -- here's the rules, here's the

19   violations, here's the procedures, where

20   there -- an OIC authoring this may have

21   looked at it and offered, you know, the

22   difference in exigent circumstances that

23   existed during this pursuit or could have

24   existed during this pursuit, and then it

25   would have been considered more so in the

```
 1        conclusion aspect.
 2                Q.    And in conducting your
 3        investigation, though, you interviewed all
 4        the involved officers and others who
 5        participated in the operation that day,
 6        right?
 7                A.    Not all of them.
 8                Q.    All of the involved officers in
 9        the pursuit?
10                A.    Oh, yes.  I'm sorry.
11                Q.    And that included
12        Sergeant Scalf, for example?
13                A.    Yes.
14                Q.    And in your interviews of those
15        individuals and in your review of all of the
16        documentary evidence that you summarized
17        here, you -- you took an objective view of
18        the facts and circumstances of this pursuit,
19        correct?
20                A.    As best I could, yes.
21                Q.    And in your review, you did not
22        document or find any justifications for these
23        rules violations that would have led to the
24        recommendations for discipline not being made
25        by you, right?
```

```
 1            A.    No.  I simply identified the --

 2    based on the information I had already

 3    generated and compiled, I simply identified

 4    operational/administrative violations from

 5    that point forth.

 6            Q.    And the information that you

 7    provided through your report to the chain of

 8    command review, again, was an objective view

 9    of the facts, right?

10            A.    Correct.

11            Q.    And, ultimately, the chain of

12    command review led to the disciplinary

13    recommendations being sustained all the way

14    up through the chief of police, correct?

15            A.    Correct.

16            Q.    And so there was not any

17    justification for those rules violations

18    identified over the course of that chain of

19    command review, right?

20            A.    I'm sorry.  Can you repeat that?

21            Q.    There was not any justification

22    for the policy and rules violations

23    identified over the course of that chain of

24    command review, right?

25            A.    Not in this report.
```

1    Q.    Okay.  And not in the chain of

2    command review, right?

3         A.    I imagine.  I can't speak to

4    what they did, but based on here, they

5    offered these findings.

6         Q.    And based on the sustaining of

7    the findings, right?

8         A.    Correct.

9         Q.    Okay.  All right.  Are you aware

10    of the convening of the CIRB, or Critical

11    Incident Review Board, relating to this case?

12         A.    Am I aware of what?  I'm sorry.

13         Q.    The convening of the Critical

14    Incident Review Board relating to this

15    matter?

16         A.    I know it happened.

17         Q.    Did you contribute any

18    information to that process?

19         A.    No, ma'am.

20         Q.    Are you aware of the outcome of

21    that process?

22         A.    No, ma'am.

23         Q.    Did you talk to anyone about it

24    at any time?

25         A.    No, ma'am.

Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

```
 1          Q.      And are you aware of the Citizen
 2    Complaint Authority report and findings
 3    relating to this case?
 4          A.      I imagine they did a parallel
 5    investigation because that's what they do,
 6    but I know nothing about their findings,
 7    their interests, or anything of that nature.
 8          Q.      Did you talk to anyone about the
 9    CCA investigation or findings in this matter?
10          A.      Not that I recall at all.
11          Q.      Did you ever talk to any of the
12    officers involved in the pursuit about this
13    matter other than in the official interviews
14    that you conducted?
15          A.      During this investigation?
16          Q.      At any time.
17          A.      Not that I recall.
18          Q.      So during the investigation or
19    after fact --
20          A.      During the investigation --
21          Q.      -- up until today, have you
22    talked to any of the involved officers?
23          A.      And you said about the findings
24    here?
25          Q.      No, about this pursuit, about
```

1    the matter.

2              A.    Oh.  I don't even like to

3    suggest that I may have because it's not

4    uncommon.  It's usually more common that I do

5    it right after the fact.

6                    But this was a pretty big case

7    and it was kind of quiet for a long time

8    after, but it's not uncommon for officers to

9    say something, or me to say, hey, next time

10   you have this, do this, kind of thing when I

11   was in Internal, but I don't recall.

12             Q.    Did you do anything like that in

13   this case say --

14             A.    That's what I said --

15             Q.    -- hey, next time we have this,

16   do this?

17             A.    -- I don't recall, anything

18   specific anyway.

19             Q.    Did you ever talk to anybody

20   else in the department of any rank at any

21   time about this matter at a time that we

22   haven't yet discussed today?

23             A.    Outside of everybody that's in

24   here -- you said anybody inside the

25   department?  The assistant chief asked me to

Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    come see him, but I never did, so, no, not

2    that I -- no.

3         Q.    When you say the assistant

4    chief, was that Paul Neudigate?

5         A.    Correct.

6         Q.    And what did he ask you?

7         A.    He asked me -- third party, he

8    asked through one of the other members of

9    Internal, said have him come down, but I

10   didn't go down.

11        Q.    And when was that?

12        A.    A day or so after this occurred.

13        Q.    And why didn't you go down?

14        A.    Because I believe, ultimately,

15   because Lieutenant Briede probably reached

16   out to him.  I don't know if she did or she

17   didn't.

18             But it wouldn't be my place to

19   go down.  I mean, there's no conversation to

20   be had.  The only thing I had at that point

21   was the body-worn -- or, excuse me, the

22   mobile video recorders.

23             And there was no reason to have

24   any discussion.  I mean, I knew better than

25   to say anything even if I did, but I had no

```
1    idea what he wanted or whatever.  So I had no

2    interest and didn't go down.

3         Q.    What was your understanding of

4    the request to come down about, what was it

5    to address?

6         A.    I didn't have one.  It was just

7    I asked to come down.

8         Q.    And then you said there wouldn't

9    be any reason to go down or to talk, like

10   what do you mean?  Can you explain that

11   further?

12        A.    Because he's not involved -- he

13   wasn't involved in the process.  And even if

14   there was an idea that he had a question

15   about the process, he's not -- not to be

16   involved in the process.  So there would be

17   nothing that I would -- I don't -- I wouldn't

18   report anything to him.

19              And, ultimately, once it's said

20   and done, he might be able to get a copy of

21   it, but he's not in the chain of command for

22   me, so...

23        Q.    Did you -- were you ever aware

24   of any meeting among the high-ranking

25   supervisory officers of the department about
```

1    this matter?

2          A.    I mean, everything I knew was

3    speculative.  I just know in a day or so, I

4    believe it was Neudigate, that called the

5    assistant chiefs, and maybe the following

6    week he called the -- all the captains and

7    everybody together to discuss it.

8                And then I think Sergeant Lanter

9    and Officer Thomas were removed from -- I

10   don't recall.  I believe they were removed

11   from their position and -- and put somewhere

12   else long before I knew the facts or

13   information came in.

14         Q.    What do you know about these

15   meetings and what --

16         A.    I know nothing about them.

17         Q.    What did you hear about these

18   meetings?

19         A.    Like I said, I think the day

20   after the -- he called the assistant.  I

21   don't know, if it was the assistant chief or

22   who, but the following week was probably the

23   command staff discussed it.

24                And I don't know if they

25   discussed this or what they discussed.  But I

Deposition of Sergeant Charles Fink                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

1    know -- I believe he made the decision to

2    remove Officer Thomas and Sergeant Lanter

3    from their position at that point.

4         Q.    And when you say removed from

5    their position, what do you mean?

6         A.    If memory serves me correctly, I

7    just feel like they were put somewhere else.

8    I don't recall.  Maybe it was Officer Thomas

9    because he was in -- in Canine at the time.

10        Q.    Put on desk duty or something?

11        A.    I don't recall.

12        Q.    When that happens, is there

13   documentation of it?

14        A.    I don't know.  I don't make

15   those decisions at all, so...

16        Q.    I mean, in your experience

17   working in the department, have you ever --

18        A.    It's never happened to me, so I

19   don't know.

20        Q.    You don't know.  But that was,

21   you said, Assistant Chief Paul Neudigate who

22   did that?

23        A.    I believe so.

24        Q.    Okay.  What else did you hear

25   about this matter outside of your report?

```
 1              A.    That's it.

 2              Q.    So these are questions I ask of

 3      everyone.  Have you ever been the subject of

 4      an Internal investigation at the department?

 5              A.    Yes.

 6              Q.    And tell me about that, please?

 7              A.    I couldn't tell you.  I don't

 8      remember.  It's been more than a dozen years.

 9      I believe they were -- I remember one was a

10      discourtesy complaint, but it was stricken

11      from my record completely because it was

12      basically using what they call -- referred to

13      it Verbal Judo, to stun the individual based

14      on the circumstances of the incident.  Other

15      than that, I don't recall.  Sorry.  There's

16      one other, 2007, I had a DUI.

17              Q.    And that was a conviction

18      outside of the department, meaning you had a

19      conviction for a DUI that led to an Internal

20      investigation?

21              A.    Correct.  Well, the charge leads

22      to it and then, yeah.

23              Q.    Okay.  And were you disciplined

24      for that?

25              A.    Yes.
```

```
1        Q.    What was the discipline?

2        A.    The formal discipline, I don't

3   recall because I was on the desk for a couple

4   of months while the process played out.  I

5   don't recall if the formal discipline was a

6   written reprimand or something of that

7   nature --

8        Q.    Okay.

9        A.    -- but that was back in 2007.

10       Q.    And the discourtesy, when was

11  that?

12       A.    I couldn't tell you.  They --

13  they were all in -- before my days in Vice,

14  which was 2010, so years ago.

15       Q.    Okay.  And did that lead to a

16  finding of sustained or --

17       A.    It led to a removed from my

18  record all together.  You may not even

19  find it or searchable.

20       Q.    And when you say removed, just

21  for my own understanding, does that mean

22  there was, ultimately, a finding that the

23  complaint was sustained, but it was

24  subsequently removed from your record, or

25  does it mean that it was not sustained and
```

1    it's just --

2             A.    I don't remember, to be honest

3    with you.  I just -- I know I wrote at the

4    time it was only an ESL.  And I think the

5    second one was -- it turned it into -- I

6    don't know why it was an Internal, to be

7    honest with you.

8             I don't know if they did the

9    same thing way back then or not.  Back then,

10   there was only sustained, not sustained.  And

11   I found that now there's two other findings

12   and a bunch of other things that have to be

13   considered.

14            Q.    Okay.  Have you ever been a

15   defendant in any lawsuit relating to your

16   duties with the police department?

17            A.    Never that materialized in the

18   courtroom, no.

19            Q.    And what do you mean by that?

20            A.    Somebody sued me for, I forget

21   what it was -- again, this is 2005, '06,

22   somewhere in there, but it was just thrown

23   out.  It was thrown out.  I provided my

24   response to whatever, and then it was just

25   dismissed, so...

```
 1            Q.    And that's the only one?

 2            A.    That I can remember, yes.

 3                  MS. GREENE:  Okay.  All right.

 4       At this time, I have no further questions for

 5       you.  I will note that to the extent we

 6       receive the case file and there are any new

 7       documents or information there that -- or

 8       otherwise produced in this case that requires

 9       reopening the deposition, we would pursue

10       that at that time.  But for now, no further

11       questions.  Thank you.  We're off the record.

12

13

14

15                       _____
                         SERGEANT CHARLES FINK
16

17

18

19                       *  *  *

20            (DEPOSITION CONCLUDED AT 2:12 P.M.)

21                       *  *  *

22

23

24

25
```

201

1                    C E R T I F I C A T E

2

    STATE   OF   OHIO
3                       :  SS
    COUNTY OF WARREN

4

5              I, Stacey J. Murrin, the
    undersigned, a duly qualified notary public
    within and for the State of Ohio, do hereby
6   certify that SERGEANT CHARLES FINK was by me
    first duly sworn to depose the truth and
7   nothing but the truth; foregoing is the
    deposition given at said time and place by
8   said witness; deposition was taken pursuant
    to stipulations hereinbefore set forth;
9   deposition was taken by me in stenotype and
    transcribed by me by means of computer; that
10  the transcribed deposition was made available
    to the witness for examination and signature
11  and that signature may be affixed out of the
    presence of the Notary Public-Court Reporter.
12  I am neither a relative of any of the parties
    or any of their counsel; I am not, nor is the
13  court reporting firm with which I am
    affiliated, under a contract as defined in
14  Civil Rule 28(D) and have no financial
    interest in the result of this action.
15      IN WITNESS WHEREOF, I have hereunto set my
    hand and official seal of office at
16  Cincinnati, Ohio this 14th day of May, 2025.

17

18                        _Stacey J. Murrin_

19  My commission expires:   Stacey J. Murrin
        August 17, 2025,   Notary Public - State of Ohio

20

21

22

23

24

25

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 203 of 220 - Page
ID#: 4142
Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

## WORD INDEX

**< 0 >**
**03** 14:7, *14*
**04** 14:*14*
**06** 14:*17* 199:*21*

**< 1 >**
**1** 4:*20* 11:*19, 22* 136:*21* 158:6
**1.01(B** 147:*23*
**1.03** 141:*10, 13*
**10** 4:*23* 93:*7, 12*
**100** 129:*4, 7, 23*
**101(B** 149:*5* 150:*13, 22* 151:*5, 16*
**103** 129:*4, 6, 20* 141:*22*
**11** 4:*20* 77:*10*
**11th** 83:*25* 84:6
**12** 4:*21* 51:*12, 17*
**12.535** 11:*17* 142:*25*
**13** 106:*5*
**13th** 101:*21* 111:*2, 8*
**14th** 89:*6* 201:*16*
**15** 4:*21* 39:*10* 52:*3, 7* 138:*19*
**152** 4:*14*
**153** 4:*14, 15*
**154** 4:*16*
**155** 4:*16*
**17** 4:*22* 201:*19*
**18** 4:*20* 11:*6, 10* 139:*13*
**180** 4:*17*
**1800** 1:*18* 2:*12*
**19** 4:*20* 15:*8*

**< 2 >**
**2:12** 200:*20*
**2:21-cv-00102** 1:*4*
**20** 101:*17* 129:*14, 18* 131:*11* 134:*6* 140:*22, 24* 144:*12, 13* 147:*13* 149:*20* 150:*6* 151:*2, 22* 152:*9* 185:*8*
**200** 2:*18*
**2003** 13:*15*
**2005** 199:*21*
**2007** 197:*16* 198:*9*
**201** 2:*4*
**2010** 14:*22* 198:*14*
**2012** 15:*1, 2*
**2019** 15:*5* 17:*3*
**2020** 36:*4* 74:*10* 81:*5* 102:*6* 107:*9* 172:*11*
**2021** 111:*3*
**2022** 17:*3*
**2025** 1:*19* 201:*16, 19*
**20-mile-per-hour** 131:*4*
**21** 101:*21* 117:*11*

**22** 1:*19* 15:*11* 77:*14*
**2210** 2:*21*
**24** 4:*17*
**2400** 2:*8*
**25** 4:*22*
**26** 4:*22* 56:*25* 57:*3*
**26th** 102:*1*
**28(D** 201:*14*
**2nd** 119:*14* 120:*1* 123:*15* 125:*15* 127:*2*

**< 3 >**
**3** 4:*17, 21* 8:*24* 9:*3* 14:*21* 77:*7* 93:*23* 100:*25* 138:*17*
**30** 4:*22* 52:*17, 21* 106:*3* 130:*9* 144:*18*
**300** 2:*8*
**3151** 2:*17*
**326** 77:*11*
**328** 78:*9, 12*
**329** 77:*15, 18* 78:*9, 12*
**330** 41:*7, 14* 138:*20*
**333** 139:*14, 19* 143:*5*
**334** 143:*9* 149:*22*
**335** 151:*3*
**34** 84:*20*
**35** 2:*4* 96:*14, 20, 22*
**35-minute** 97:*14*
**360** 121:*24*
**36-month** 12:*6*
**37** 4:*6* 59:*7, 8, 10, 12* 61:*9*
**38** 4:*6* 62:*4, 6*
**39** 4:*7* 63:*3, 6, 8, 14, 25* 92:*2*
**3rd** 17:*4*

**< 4 >**
**4** 15:*6*
**4:30** 120:*12*
**40** 4:*7* 65:*22, 23, 25* 80:*15* 84:*22* 130:*9*
**40513** 2:*18*
**41** 4:*8* 78:*25* 79:*1, 4*
**41017** 2:*9*
**42** 4:*8* 80:*19, 22*
**425** 1:*18* 2:*11*
**43** 4:*9* 82:*6, 9, 10*
**44** 4:*9* 83:*17, 20*
**45** 4:*10* 84:*8, 11*
**45202** 2:*5, 12, 15, 22*
**46** 4:*10* 86:*2, 3*
**47** 4:*11* 87:*5, 6, 8, 11*
**48** 4:*11* 87:*4* 88:*8, 9*
**49** 4:*12* 88:*21, 23, 25*
**4th** 124:*17* 125:*25* 126:*8*

**< 5 >**

**5** 4:*4* 14:*15* 15:*3* 64:*12*
**50** 185:*2*
**51** 4:*21*
**52** 4:*21, 22*
**525** 2:*21*
**535** 51:*25*
**56** 4:*22*
**59** 4:*6*
**5th** 43:*18, 22* 44:*1, 8* 45:*8* 75:*14*

**< 6 >**
**6** 4:*20* 64:*12*
**60** 185:*5*
**62** 4:*6*
**63** 4:*7*
**65** 4:*7*
**6th** 119:*9, 25* 123:*4* 129:*16, 20, 25* 130:*7* 131:*17* 133:*4* 134:*14, 19* 140:*20* 147:*11* 164:*12*

**< 7 >**
**7** 4:*23*
**70** 185:*5*
**71** 136:*15*
**75** 119:*13, 25* 120:*1* 123:*10* 136:*15*
**75/71** 126:*22*
**79** 4:*8*
**7th** 2:*4* 36:*4* 74:*10* 101:*17* 102:*6* 107:*9* 111:*7* 172:*10*

**< 8 >**
**8** 4:*17*
**80** 4:*8*
**801** 2:*15*
**82** 4:*9*
**83** 4:*9*
**8310** 59:*19* 60:*9*
**84** 4:*10*
**86** 4:*10*
**87** 4:*11*
**88** 4:*11, 12*

**< 9 >**
**9:35** 1:*19*
**93** 4:*23*
**94** 13:*12*
**9th** 81:*4*

**< A >**
**a.m** 1:*19*
**ability** 8:*16* 35:*1* 155:*12*
**able** 33:*9* 53:*23* 64:*18* 77:*23* 87:*19* 105:*1* 121:*14, 20* 128:*23* 131:*8, 20* 160:*12, 17, 22* 166:*11*

**168:*17* 174:*3* 175:*9* 182:*24* 194:*20*
**absence** 157:*10*
**absolutely** 57:*19* 128:*6* 183:*20*
**academy** 14:*14* 138:*2*
**accelerate** 134:*13*
**access** 143:*12*
**accessible** 29:*24*
**accident** 37:*9, 12* 42:*24* 83:*11* 126:*18* 127:*5, 8, 10, 22*
**Accordion** 27:*11* 28:*4*
**accuracy** 112:*5*
**accurate** 114:*21*
**accurately** 8:*17*
**act** 23:*5* 55:*9* 174:*23* 175:*13*
**acted** 49:*22* 135:*19*
**acting** 140:*2, 6, 16* 142:*4* 157:*3, 10* 175:*25*
**action** 20:*12* 112:*2* 201:*14*
**actions** 96:*12* 141:*9* 147:*22*
**activate** 50:*12* 129:*1*
**activated** 125:*9* 186:*7*
**actively** 140:*7*
**activities** 90:*7* 91:*7, 13*
**activity** 39:*5* 49:*14*
**acts** 148:*1, 2*
**actual** 57:*24* 65:*5* 66:*17, 25* 67:*3* 86:*15* 87:*20* 145:*2*
**add** 35:*13* 105:*21*
**additional** 35:*6* 81:*3* 82:*4*
**address** 194:*5*
**adhered** 53:*12*
**administration** 13:*9*
**administrative** 19:*7* 22:*19* 23:*12, 23* 24:*5, 20* 26:*2* 43:*13* 48:*10, 14* 50:*5, 8, 10, 21* 94:*21* 156:*16, 17, 19, 21, 25* 157:*16, 18* 186:*1, 11*
**advise** 38:*21*
**advised** 157:*12*
**advising** 9:*22* 136:*11*
**affiliated** 201:*13*
**affirmative** 136:*4, 10*
**affixed** 3:*16* 201:*11*
**afternoon** 84:*1* 120:*13, 14* 165:*15, 24*
**age** 5:*2*
**agencies** 137:*9*
**agency** 37:*19* 105:*15* 177:*17*
**agent** 47:*7*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 204 of 220 - Page
ID#: 4143
Deposition of Sergeant Charles Fink

Jason Laible, et al., vs. Timothy Lanter, et al.,

**ago** 62:*10* 98:*9* 198:*14*
**agree** 114:*1*
**agreement** 3:*9*
**ahead** 7:*18, 24* 59:*5*
74:*24* 82:*17* 88:*21* 124:*6*
152:*24* 153:*12* 174:*4*
180:*2*
**aid** 100:*15*
**air** 157:*13*
**al** 1:*3, 7*
**alerts** 132:*11*
**allegations** 17:*16* 19:*1, 4*
23:*17* 177:*20* 179:*18*
**alleyway** 75:*12, 13* 119:*22*
**all-knowing** 53:*7*
**ALLOUCH** 2:*7* 5:*17*
**allow** 66:*19* 144:*12, 19,
22* 145:*18*
**allowed** 145:*8* 153:*5*
187:*7*
**allowing** 175:*22* 176:*14*
**amount** 123:*3* 124:*16*
126:*23* 159:*12* 167:*11*
**analyze** 29:*14* 139:*3*
**and/or** 147:*3*
**answer** 7:*18, 24* 8:*9*
153:*5, 12*
**answers** 7:*5*
**anxious** 103:*24*
**anybody** 13:*1* 38:*4*
47:*23* 71:*24* 166:*23*
192:*19, 24*
**anyway** 133:*3* 173:*21*
192:*18*
**apologize** 30:*15* 116:*13*
**appear** 129:*14*
**APPEARANCES** 2:*1*
**appears** 64:*21* 80:*25*
81:*9* 84:*3* 88:*19* 185:*20*
**applicable** 143:*20, 25*
145:*9* 152:*6*
**application** 141:*20*
**applied** 49:*4* 158:*12*
**apprehend** 173:*19*
174:*21* 175:*9* 176:*13*
**apprehended** 172:*18*
**apprehending** 174:*10*
**apprehension** 161:*6, 11*
172:*25* 173:*6* 174:*7, 18*
**approach** 144:*7*
**approaching** 124:*8*
**approve** 157:*14*
**Approximately** 17:*6* 45:*8*
120:*12*
**April** 1:*19*
**area** 25:*15* 97:*23* 119:*11,
20, 21* 123:*23* 129:*21, 24*
131:*18* 134:*19*
**areas** 119:*17, 23* 120:*6, 7*

**122:**15, 20* 130:*2* 163:*6*
**arrest** 81:*6, 18*
**articulated** 176:*9*
**ascertain** 162:*9*
**aside** 9:*6* 56:*2*
**asked** 8:*6* 9:*18* 57:*18, 23*
64:*3* 68:*20* 69:*15, 24*
70:*19* 101:*23* 116:*17*
136:*1, 17, 23* 192:*25*
193:*7, 8* 194:*7*
**asking** 9:*24* 10:*7* 54:*18*
70:*1* 147:*4* 175:*3* 182:*6,
12* 185:*20*
**aspect** 24:*9* 67:*6* 80:*11*
100:*19* 131:*25* 132:*4*
149:*9, 19* 151:*9* 188:*1*
**aspects** 138:*11*
**assault** 16:*7* 169:*23*
170:*4* 176:*7*
**assign** 26:*13*
**assigned** 18:*8* 24:*4*
29:*19* 31:*21* 141:*15*
**assignment** 25:*6*
**assignments** 14:*12* 25:*3,
23*
**assist** 137:*14, 17*
**assistant** 18:*6* 26:*2*
43:*13* 111:*19, 21* 192:*25*
193:*3* 195:*5, 20, 21*
196:*21*
**assisting** 138:*7*
**associated** 40:*24* 61:*19*
139:*9*
**association** 147:*17*
**assume** 7:*25* 114:*19*
115:*16* 123:*6* 164:*10*
**assuming** 107:*20*
**assumption** 73:*7* 104:*18*
129:*12* 149:*8* 171:*12*
**ATF** 47:*6* 56:*23, 24* 57:*4,
8* 177:*1* 181:*1*
**attached** 110:*19*
**attempted** 97:*23* 133:*24*
**attending** 183:*22*
**attention** 73:*5* 104:*10*
106:*18*
**attorneys** 5:*12*
**audio** 12:*13* 46:*12* 60:*6,
10, 21*
**audio/visual** 59:*23*
**August** 15:*8* 17:*3* 36:*4*
172:*10* 201:*19*
**author** 187:*12, 14*
**authoring** 187:*14, 20*
**Authority** 20:*5* 141:*14*
191:*2*
**authorization** 149:*17*
157:*15* 183:*7*
**authorize** 186:*17*

**authorized** 135:*12, 15*
139:*25* 143:*14* 157:*8, 9*
**authorizing** 140:*10, 14*
142:*5* 157:*11*
**available** 3:*14* 5:*19* 28:*7*
31:*23* 32:*2, 6* 38:*9*
48:*13* 153:*17* 201:*10*
**Avenue** 97:*25* 119:*8*
122:*23* 123:*2*
**average** 96:*9*
**avoid** 126:*6* 127:*18*
**aware** 36:*2, 6* 39:*20*
85:*16* 86:*25* 90:*23* 96:*3*
105:*18* 122:*18* 137:*7*
146:*5* 158:*20* 161:*16*
165:*1* 166:*6, 18* 171:*15*
172:*1* 179:*25* 184:*4, 9*
190:*9, 12, 20* 191:*1*
194:*23*
**Ax** 30:*24*
**Axon** 30:*6, 7, 10, 20, 23*
31:*2*

**< B >**
**Bachelor's** 13:*8, 11*
**back** 9:*7* 12:*6* 15:*3*
23:*16* 31:*19* 35:*16* 39:*13,
17* 56:*3, 7* 58:*11, 17* 70:*3*
71:*22* 73:*24* 74:*2, 15*
78:*21* 91:*3* 100:*24*
101:*20* 107:*13, 15, 17, 18,
24* 108:*8, 22* 109:*24*
110:*8* 114:*22* 115:*19*
118:*15* 119:*16, 23* 158:*3*
170:*11* 172:*14* 174:*14*
175:*16, 17* 198:*9* 199:*9*
**backed** 123:*13*
**background** 13:*7*
**badge** 61:*12*
**bags** 98:*1*
**Bailey** 2:*17* 81:*8, 24* 82:*5*
**bank** 16:*8* 43:*18, 21, 23*
**based** 33:*16* 53:*17* 60:*10*
99:*25* 109:*20, 23* 124:*24*
131:*8* 135:*2* 141:*5* 149:*5*
153:*16* 182:*12* 189:*2*
190:*4, 6* 197:*13*
**bases** 41:*4*
**basic** 67:*19*
**Basically** 10:*15, 17* 14:*4*
19:*3* 41:*9* 70:*9* 73:*21*
75:*5* 104:*3* 110:*20*
111:*16* 129:*3* 141:*25*
167:*21* 197:*12*
**basis** 55:*21* 58:*3* 72:*6*
**Beaumont** 2:*17*
**began** 40:*8* 48:*3*
**beginning** 132:*1* 136:*12*
138:*22*

**behalf** 94:*5* 146:*1* 153:*18*
**behavior** 19:*4* 173:*18*
**believe** 12:*10, 25* 14:*17*
15:*7* 17:*4* 18:*14* 28:*2*
31:*4* 36:*8* 37:*8* 40:*10*
41:*23* 43:*12, 18, 23* 44:*9*
46:*4, 11* 47:*6, 25* 56:*16*
57:*9, 21* 58:*23* 60:*4, 8*
62:*22* 65:*1, 3* 67:*4* 77:*21*
80:*10* 82:*16, 19* 89:*23*
90:*17, 21, 22* 102:*3*
103:*14* 108:*10, 20* 110:*10,
23* 111:*4* 117:*9* 120:*23*
122:*25* 125:*22* 127:*2*
129:*3, 25* 130:*7* 135:*14*
136:*22* 137:*18, 21, 23*
146:*18, 19* 150:*25* 157:*23*
175:*1* 176:*23* 193:*14*
195:*4, 10* 196:*1, 23* 197:*9*
**belt** 186:*8*
**BENJAMIN** 2:*12*
**best** 7:*1* 63:*20* 104:*2*
188:*20*
**better** 76:*1* 193:*24*
**beyond** 7:*11* 177:*21*
**big** 192:*6*
**bit** 6:*24* 9:*7* 37:*14* 95:*6*
121:*15*
**black** 79:*15*
**blessing** 111:*15*
**blocked** 76:*18*
**board** 16:*23* 180:*20*
190:*11, 14*
**Bode** 47:*1*
**bodies** 37:*2*
**body** 116:*19*
**body-worn** 10:*14* 12:*13*
29:*15, 21* 30:*9, 12, 19, 22*
31:*1* 32:*15* 42:*7, 10, 17,
19* 43:*4, 24* 58:*23*
59:*3, 17* 60:*1, 17, 23, 25*
61:*25* 73:*3, 6* 104:*23*
131:*2* 132:*8* 134:*1* 141:*5*
193:*21*
**book** 24:*24*
**Booking** 77:*25*
**bottom** 77:*11* 138:*20*
142:*24* 143:*4* 151:*3*
**box** 79:*15*
**Brady** 72:*20*
**bragged** 170:*5*
**brake** 132:*12, 13*
**brakes** 126:*13*
**breach** 144:*22*
**breaches** 19:*6* 20:*21*
**break** 8:*4, 5, 10* 58:*7, 12*
150:*16* 156:*3* 157:*24*
**breath** 76:*14*
**BRETT** 2:*11, 20* 6:*4*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 205 of 220 - Page
ID#: 4144
Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

46:14  47:11  176:23, 25
**Bricker**  2:7
**bridge**  43:15, 16  119:15,
22  120:4  123:21, 22
124:17, 22  125:18, 23, 25
126:8
**Briede**  71:13  72:2, 19, 21,
22  73:9  74:17  101:18, 24
102:4  103:15  104:16
107:11  112:4, 25  113:7
114:10  117:22  133:24
193:15
**B-R-I-E-D-E**  72:21
**Briede's**  109:11, 21
110:17  112:20, 24
**briefing**  180:23
**briefly**  5:15  14:2  62:25
93:10
**bright**  120:19
**bring**  139:2
**brings**  155:3
**Broering**  47:8
**brought**  19:10, 15  73:5
**bulletin**  55:7
**bulletins**  55:10
**bumped**  127:3
**bunch**  114:18  199:12
**Bunning**  1:6
**business**  13:9  43:25  44:1
45:7  119:11, 17, 20, 23
120:6, 7, 11  163:5
**businesses**  32:22  33:3
45:10
**BWC**  9:19  10:11, 16
42:7  50:12  60:5  72:10,
15  74:5  76:16  106:23
107:1  121:14, 16  128:24
129:6  131:25  186:7
**BWCs**  40:9, 13  129:1

**< C >**
**call**  90:15  91:3  94:12
119:11  127:9  144:19
186:20  197:12
**called**  14:24  36:10, 13
90:16  137:17, 25  138:3
195:4, 6, 20
**camera**  10:14  12:13
29:22  30:9, 12, 19, 22
31:1  40:21  42:8, 11, 17,
19  43:19  44:8  45:7
58:23  59:3, 17  60:2, 18,
23  61:1, 25  73:3, 6  76:3
78:18  104:23  116:19
131:2  132:8  134:1  141:6
**cameras**  29:15  32:16, 20
43:4  45:24
**Campbell**  37:8  77:24
82:15, 19  83:3, 10

**cams**  121:20
**Candace**  1:8
**Canine**  137:16  138:2, 5
196:9
**capability**  167:5
**capable**  166:13
**capacity**  99:22  138:8
142:21  178:5, 18
**Capris**  173:14
**captain**  18:4, 24  88:13
89:2, 15  111:16, 18
114:15  117:4
**captains**  195:6
**capture**  121:24
**captured**  121:16  129:2
**car**  61:14, 16  62:15
75:24  98:6, 20  122:23, 25
123:1, 17  124:25  125:22,
23  126:6, 16  127:14, 17
132:15  133:7, 13  146:14
166:10, 11, 14
**care**  183:21
**career**  99:9, 14
**carry**  155:22
**carrying**  77:14  147:10, 20
**cars**  41:24  123:3, 8, 18,
20, 24  124:3, 4, 16, 20
125:1, 3, 10, 13, 18  126:3
127:23  157:8  165:7, 11
166:13  167:22, 24  168:2
186:18, 19
**CASE**  1:4  8:22  9:8, 9,
12  10:25  11:3  25:12, 16
26:4, 22  27:10, 25  29:1, 4
30:18  31:21  33:18  37:4
39:4, 22  41:5  44:5, 14
45:23  47:24  48:18  50:3
53:15  56:8  69:16, 21
71:14, 16, 25  75:2  78:4
81:9  83:6  86:20  90:8
91:22, 25  92:6, 13, 17
93:3, 5  105:22  106:15
107:17  108:19  109:20
112:25  113:17  114:6
115:22  118:13  142:3
145:5  148:17, 24  153:21
156:11  158:13  167:22
170:1  177:1  178:20
184:4, 7  190:11  191:3
192:6, 13  200:6, 8
**cases**  16:10  22:3  34:9
70:9  118:11, 12  178:13
**Casey**  2:17
**CASUALTY**  2:17
**catching**  173:16
**cause**  128:8  186:9, 12
**caused**  72:16
**causes**  20:17
**caution**  144:8  155:16
183:21

**CCA**  19:10, 15, 18  20:1,
3  191:9
**cell**  29:17
**Center**  2:8, 20  32:19
**Central**  14:25  16:15
**Centre**  2:17
**certain**  102:12, 14  104:9
132:2  138:11
**certainly**  34:24  73:22
96:25
**certificates**  13:17
**certified**  5:3  177:25
**certify**  201:6
**cetera**  34:22  86:19
**chain**  34:16, 20  83:22
101:8  112:19  113:18
146:7  186:24  189:7, 11,
18, 23  190:1  194:21
**Chamber**  2:8
**chance**  116:18  166:23
168:19  169:10  173:12, 15
**change**  162:13
**changed**  110:12
**changes**  34:22  107:25
**changing**  162:11
**channel**  44:17
**characterize**  96:6  118:20
120:15  121:11
**charge**  143:15  197:21
**charges**  81:19
**CHARLES**  1:11  3:4  4:2
5:1  6:7, 11  200:15  201:6
**Chevy**  173:14
**chief**  18:6  19:12, 16  20:1
22:2, 6, 10, 16, 24  34:17
111:19, 21, 22  116:4, 5, 7,
11  117:19, 20  189:14
192:25  193:4  195:21
196:21
**chiefs**  195:5
**chief's**  22:23  23:6
**Christopher**  47:3
**Cincinnati**  1:18  2:5, 10,
12, 14, 15, 22  6:2, 6, 8
120:2  141:12  146:1
147:25  153:18  175:7
181:13  201:16
**CIRB**  190:10
**Circle**  2:17
**circumstance**  8:15  76:17
160:10
**circumstances**  97:10
134:24  135:1  144:11, 17,
22, 25  145:19, 22  146:5
160:16, 21  187:22  188:18
197:14
**CIs**  170:3
**cite**  55:12
**citing**  182:9

**citizen**  18:13  19:10, 17,
19  20:4  191:1
**citizens**  183:15, 19  184:19
**CITY**  2:10, 14  6:6  32:20
77:11, 14  96:15, 16
119:14  138:20  139:14
146:1  148:14, 20, 25
149:3, 14  151:3  152:18
154:4, 7  174:24
**Civil**  1:14  3:7  141:17
201:14
**civilian**  32:14  144:6
162:2  168:6  169:11
**civilians**  164:17
**clarification**  60:14
**clarify**  7:22
**clarity**  61:8
**Classification**  141:17
**Classification/Job**  141:16
**clear**  7:3  59:21  60:12
120:19  124:9, 12  170:11
**cleared**  124:14
**clearly**  32:5  83:15  85:1
87:13  113:3
**close**  156:2, 4
**closure**  33:18
**cocaine**  98:1
**Colin**  101:14, 25  102:1
**collect**  31:23
**collection**  24:25  29:12
32:4  68:1
**column**  76:19
**combined**  60:1
**come**  9:7  48:22  52:1
57:11  61:7  68:24  73:23,
24  74:2  78:21  108:9
116:22  144:5, 7  193:1, 9
194:4, 7
**comes**  21:15  23:9, 10
35:16  58:4  108:21  144:3
**comfortable**  168:25
**coming**  120:22  124:22
126:1  127:11  167:24
170:23  187:8
**command**  34:16, 20
101:8  112:19  113:18
146:7  186:24  189:8, 12,
19, 24  190:2  194:21
195:23
**commencing**  23:8
**comment**  109:11
**comments**  110:1
**commission**  201:19
**commissioned**  180:25
**commit**  67:17  148:1
**committed**  148:12  160:3
**common**  192:4
**commonly**  168:24
**communications**  9:23

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 206 of 220 - Page
ID#: 4145
Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

**COMPANY** 2:*17*
**comparators** 133:*18*
**compared** 96:*20, 22*
**compiled** 189:*3*
**complaint** 19:*11, 18* 20:*4*
*27:8* 33:*18* 191:*2* 197:*10*
198:*23*
**complaints** 18:*13* 19:*19*
**complete** 67:*17* 69:*13*
144:*6*
**completed** 13:*19* 68:*15*
*69:19* 94:*8* 101:*12* 118:*4*
**completely** 197:*11*
**completion** 73:*15, 17*
**complexity** 63:*18*
**compliant** 186:*10*
**comprehensive** 161:*17*
**computer** 30:*2* 201:*9*
**conceive** 94:*1*
**concern** 184:*1*
**concluded** 128:*15* 153:*8,
17* 200:*20*
**conclusion** 33:*16, 22*
67:*24* 94:*14* 128:*21*
138:*23* 139:*1, 12* 187:*9*
188:*1*
**conclusions** 48:*22*
**condition** 160:*6* 168:*7, 11*
**conditions** 97:*2* 134:*23*
135:*6* 159:*10, 15* 163:*9,
11, 13* 164:*20* 165:*1*
166:*25* 167:*20* 169:*9*
174:*12* 184:*23* 185:*1, 6*
**conduct** 21:*3* 23:*18, 23*
24:*18* 25:*3* 33:*23* 39:*22*
77:*1* 90:*5* 94:*3* 99:*16, 24*
152:*11, 22* 153:*3, 10, 21*
157:*19* 187:*6*
**conducted** 46:*6, 14* 47:*1*
91:*21* 145:*25* 191:*14*
**conducting** 65:*9* 73:*19*
105:*4* 117:*25* 188:*2*
**confer** 53:*9*
**confidential** 177:*2, 8, 11,
14, 21, 24* 178:*3, 8, 10, 19*
179:*23*
**conform** 143:*20, 24* 144:*3*
**confuse** 90:*12*
**confused** 103:*6*
**consider** 35:*5* 45:*18*
80:*8* 97:*12* 186:*21*
**consideration** 73:*25*
164:*18* 170:*18* 171:*4, 6*
178:*6, 16*
**considerations** 178:*11*
**considered** 26:*1* 52:*11*
56:*19* 58:*1* 141:*24*
144:*20* 153:*24* 187:*5, 25*
199:*13*

**consistent** 112:*23, 25*
180:*19* 181:*6*
**consistently** 49:*22*
**constantly** 162:*11*
**constitute** 148:*2, 25*
**constraint** 131:*5*
**Construction** 163:*1*
**consult** 34:*5* 100:*14*
**contacted** 9:*10*
**contain** 160:*23*
**contained** 54:*7* 63:*25*
79:*5* 107:*24*
**contains** 51:*10*
**contemplates** 181:*25*
182:*16*
**content** 78:*22* 118:*16*
**contents** 95:*8* 138:*14*
**continual** 91:*2, 5*
**continuation** 83:*21* 86:*11*
89:*1*
**continue** 58:*8* 136:*2*
158:*24* 174:*20*
**continued** 97:*24* 171:*9*
**continues** 128:*9, 12*
168:*18*
**continuing** 81:*1* 173:*18*
**contract** 201:*13*
**contribute** 190:*17*
**control** 16:*23* 160:*13, 17,
23* 168:*20* 181:*21* 182:*24*
**controlled** 143:*12*
**convening** 190:*10, 13*
**conversation** 74:*22* 81:*2*
85:*4, 6* 86:*12* 89:*2*
106:*10* 107:*7* 108:*5*
116:*7, 10* 117:*1, 3, 19*
193:*19*
**conversations** 73:*9* 75:*1*
117:*22, 23* 118:*2*
**conveyed** 176:*18*
**conviction** 197:*17, 19*
**cooperative** 32:*23*
**cop** 170:*12*
**copies** 108:*17*
**copy** 57:*8, 20* 64:*2* 79:*23*
93:*6* 108:*24* 109:*9* 110:*9*
194:*20*
**Correct** 10:*12* 11:*1, 13,
24* 15:*23* 16:*18* 18:*20*
19:*21, 24* 20:*2* 21:*10*
24:*1* 28:*8, 11* 30:*3* 31:*24*
32:*3, 8* 33:*7, 11, 25* 34:*3,
15, 19* 35:*8* 36:*5* 40:*22*
41:*1, 13, 15* 42:*9* 43:*2, 7*
44:*3* 46:*8* 48:*19* 49:*18,
24* 50:*2, 16, 20, 23* 51:*1,
18, 22* 55:*16, 17, 22* 59:*15*
60:*3* 61:*5, 22* 66:*10*
67:*11* 68:*3, 23* 79:*17*
80:*2, 24* 82:*24* 84:*14, 23*

86:*16* 88:*15* 89:*9* 92:*21*
93:*18* 94:*17, 18* 95:*15, 19*
101:*11* 102:*8* 109:*14, 17*
111:*4, 5* 112:*11, 14, 15*
113:*23* 115:*24* 120:*3, 9*
122:*17* 128:*11, 19* 129:*22*
131:*21* 134:*18, 21* 135:*18,
21* 136:*3, 5, 6* 137:*15, 17*
138:*8, 9* 139:*6, 18* 140:*15*
141:*1, 2* 145:*1, 10, 23, 24*
146:*3, 8, 23, 24* 147:*9, 19*
148:*6, 8, 9, 15* 149:*3, 25*
150:*4, 8, 13* 151:*23* 152:*4,
14, 19* 158:*13, 21* 159:*1*
160:*5, 9, 14* 161:*8, 12*
165:*25* 172:*11* 176:*21*
177:*16, 18, 22* 179:*9, 19*
181:*17* 182:*3* 183:*16*
184:*24* 185:*12* 187:*3*
188:*19* 189:*10, 14, 15*
190:*8* 193:*5* 197:*21*
**corrected** 108:*7*
**correctly** 53:*11* 57:*22*
196:*6*
**correspondence** 113:*6, 9*
**corroborated** 178:*7*
**Cotton** 70:*23, 24, 25*
**counsel** 1:*15* 3:*2* 6:*15,
25* 9:*18* 10:*6* 13:*3* 58:*13*
201:*12*
**count** 122:*5*
**County** 37:*8* 77:*24*
82:*15, 19* 83:*4, 10* 201:*3*
**couple** 6:*23* 62:*23, 24*
63:*12* 88:*21* 113:*11*
123:*20* 156:*7* 198:*3*
**course** 56:*11* 75:*17* 83:*7*
99:*9, 13* 121:*6, 12* 132:*7*
137:*4* 162:*6* 176:*19*
189:*18, 23*
**COURT** 1:*1, 20* 5:*6*
6:*16* 7:*1, 2, 14* 15:*15, 19*
27:*14* 59:*7* 70:*24* 86:*7*
87:*5, 16* 88:*5* 124:*11*
201:*13*
**courtroom** 199:*18*
**cover** 55:*2* 101:*6, 7*
102:*21*
**covered** 21:*1, 6, 7, 12*
45:*22* 146:*20* 169:*3*
**covering** 41:*4*
**COVID** 120:*24*
**COVINGTON** 1:*2* 120:*7,
9*
**COWAN** 2:*10* 4:*14, 15,
16, 17* 6:*5* 7:*13* 9:*21*
10:*1* 150:*14* 152:*23*
153:*4, 11, 22* 154:*11*
155:*6* 156:*1, 5* 180:*1, 12*

**CPD** 13:*21* 14:*6* 32:*6*
33:*24* 36:*2* 49:*22* 51:*21*
54:*14* 83:*5* 96:*9* 99:*14,
22* 117:*24* 118:*3* 137:*12*
138:*7* 143:*23* 146:*21*
158:*11* 183:*3, 11* 184:*20*
**CPD's** 30:*4*
**crash** 37:*5* 83:*8*
**create** 26:*3* 33:*5* 60:*23*
63:*19* 68:*18, 21* 69:*16*
128:*3* 157:*20*
**created** 58:*24* 59:*2, 14*
60:*8* 61:*18, 24* 159:*4*
161:*19*
**creates** 157:*20*
**creating** 60:*17* 77:*17*
93:*17*
**Crime** 32:*19* 160:*3*
169:*13* 171:*18* 172:*16, 23*
174:*15* 175:*19*
**Crimes** 15:*12* 16:*2, 6, 8*
169:*25* 170:*15* 171:*2*
**Crimes/Financial** 16:*2*
**criminal** 19:*4* 21:*3, 18*
23:*11, 17* 24:*5, 9, 12, 21*
48:*14* 94:*2, 4, 11, 16*
**critical** 19:*7* 20:*8, 9* 22:*3,
10, 18* 36:*11* 48:*17, 20, 23,
24* 49:*1, 12* 69:*3* 190:*10,
13*
**CROSS** 4:*2* 125:*17*
**crossed** 126:*7*
**cross-examination** 1:*13*
3:*6* 5:*7*
**crossing** 43:*15* 123:*21*
124:*22*
**cruiser** 29:*22* 40:*21*
78:*18* 121:*20*
**crutch** 98:*21*
**current** 176:*10*
**customary** 41:*3*
**cut** 66:*25* 106:*7* 127:*13*

**< D >**
**D(2** 146:*12*
**daily** 28:*22* 90:*10*
**danger** 128:*9*
**dangerous** 154:*25* 162:*14*
**Daniel** 47:*13*
**dashboard** 76:*19*
**date** 90:*15*
**dates** 17:*12* 103:*18*
**David** 1:*6*
**day** 42:*12, 15* 89:*11* 91:*1*
102:*10, 18* 114:*14* 116:*14*
120:*16* 121:*3* 134:*24*
135:*2* 137:*6, 12* 159:*17*
166:*3* 167:*4, 9, 10, 13*
168:*17* 171:*4, 6, 10* 172:*4*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 207 of 220 - Page
ID#: 4146
Deposition of Sergeant Charles Fink                      Jason Laible, et al., vs. Timothy Lanter, et al.,

173:*1* 176:*13* 188:*5*
193:*12* 195:*3, 19* 201:*16*
**days** 17:*8* 107:*21* 198:*13*
**Dayton** 170:*6, 7*
**de** 140:*17*
**DEA** 177:*3*
**dead** 170:*25*
**deals** 178:*13*
**death** 20:*14, 17* 49:*16*
128:*4*
**debts** 170:*5*
**decade** 98:*9*
**decided** 186:*16*
**decides** 173:*12*
**decision** 196:*1*
**decisions** 116:*23* 196:*15*
**DEFENDANT** 2:*12, 15*
5:*23* 199:*15*
**Defendants** 1:*9* 2:*10, 18*
58:*14*
**defined** 21:*16* 24:*8, 14*
201:*13*
**definitely** 102:*1* 171:*9*
**definition** 49:*6, 9*
**definitive** 21:*23*
**defunct** 31:*10*
**degree** 159:*3* 161:*19*
162:*4*
**degrees** 13:*17*
**department** 13:*25* 19:*20*
29:*16* 30:*1* 32:*14* 34:*6*
46:*4* 54:*9* 71:*24* 79:*11*
88:*14* 91:*22* 96:*3* 100:*2*
141:*12, 16* 146:*2* 147:*25*
148:*4* 153:*19* 172:*2*
181:*13* 187:*2* 192:*20, 25*
194:*25* 196:*17* 197:*4, 18*
199:*16*
**department's** 152:*13*
156:*9*
**depend** 97:*10*
**depending** 27:*5* 63:*18*
163:*16* 164:*22*
**depends** 27:*8* 28:*6* 29:*11,*
18* 32:*11* 35:*1, 22* 65:*16*
96:*12* 97:*1, 5, 9* 164:*1*
178:*17*
**depose** 201:*6*
**deposition** 1:*10* 3:*3, 8, 10,*
13* 6:*21* 8:*20* 13:*2* 95:*5*
200:*9, 20* 201:*7, 8, 9, 10*
**depth** 104:*8*
**describe** 63:*24* 118:*16, 18*
135:*9*
**described** 12:*24* 21:*25*
74:*23* 75:*2* 120:*5* 134:*2*
157:*20*
**describing** 105:*23*
**Description** 141:*17*

146:*15*
**designated** 177:*14*
**desk** 26:*7, 9, 17* 35:*13*
74:*13* 196:*10* 198:*3*
**desks** 113:*11*
**detective** 16:*17* 79:*9*
81:*2* 82:*22*
**detective-bureau-type**
15:*25*
**determination** 151:*15*
**determine** 25:*10* 49:*21*
132:*6* 133:*20* 172:*17*
**determined** 130:*3* 139:*24*
148:*24*
**determining** 141:*5*
**die** 170:*12*
**difference** 187:*22*
**different** 6:*24* 16:*14*
38:*14* 64:*7, 8* 132:*14*
153:*6* 174:*12* 178:*6*
180:*20, 24*
**differently** 145:*17, 18*
**Digital** 78:*10, 17*
**diminished** 167:*4, 5*
**DIRECT** 4:*2* 44:*19*
121:*9*
**direction** 73:*19, 20* 74:*3,*
6* 122:*1* 124:*8* 134:*10*
137:*2* 146:*15* 147:*4*
159:*24, 25* 167:*17, 18*
**directions** 119:*6*
**directives** 148:*4*
**directly** 19:*20* 20:*13*
49:*14* 91:*18* 100:*21*
**disciplinary** 12:*3* 23:*25*
51:*10* 112:*2, 13* 113:*22*
139:*7* 141:*11* 147:*24*
189:*12*
**discipline** 33:*21* 111:*20,*
22* 154:*16* 188:*24* 198:*1,*
2, 5*
**disciplined** 197:*23*
**disclose** 9:*23*
**disclosure** 115:*17, 18*
**discourteousness** 43:*1*
**Discourtesies** 21:*21*
**discourtesy** 20:*24* 197:*10*
198:*10*
**discovered** 130:*23*
**discrepancies** 59:*21*
**discrimination** 19:*5* 21:*3,*
18*
**discuss** 5:*14* 118:*12*
195:*7*
**discussed** 70:*9* 72:*3*
192:*22* 195:*23, 25*
**discussing** 118:*14*
**discussion** 10:*8* 35:*23*
109:*18* 137:*24* 193:*24*

**discussions** 74:*17*
**dismissed** 199:*25*
**disregard** 183:*14, 18*
184:*1, 18*
**disregards** 184:*14*
**disrupt** 156:*2*
**distance** 124:*6* 134:*11*
140:*23*
**distanced** 133:*16*
**distinctions** 184:*10*
**distinctly** 16:*13*
**distributed** 25:*11, 20*
**DISTRICT** 1:*1* 14:*15, 20,*
21* 15:*3, 6* 20:*25* 21:*6, 12,*
20* 23:*1* 68:*15* 69:*11*
98:*5* 136:*21*
**divide** 38:*14*
**divided** 143:*12*
**doc** 42:*13, 14*
**document** 10:*5* 52:*6*
56:*22* 60:*8, 24* 61:*4, 9, 24*
63:*8, 11* 66:*2, 16* 67:*5, 10,*
25* 71:*23* 92:*2, 4, 10*
93:*10, 14* 116:*2* 158:*11*
188:*22*
**documentary** 188:*16*
**documentation** 12:*23*
58:*13, 19* 105:*18* 196:*13*
**documented** 91:*18* 101:*10*
**documents** 9:*13* 62:*19,*
20, 24* 63:*12, 13, 24* 77:*5*
81:*4* 84:*20, 25* 93:*16*
108:*11* 200:*7*
**doing** 27:*22* 37:*2, 9* 45:*4*
58:*14* 91:*9* 104:*16* 109:*5*
116:*17* 121:*6* 130:*12*
145:*13* 153:*24*
**Don** 47:*15* 135:*25*
**doorbells** 33:*1*
**double** 126:*8, 11*
**doubt** 38:*12*
**Douglas** 117:*4*
**downloaded** 40:*19*
**downloads** 32:*17* 42:*14*
**downtown** 120:*1*
**dozen** 99:*11* 197:*8*
**draft** 102:*21* 107:*10, 13*
108:*20, 21* 109:*25* 110:*23*
**drafting** 94:*15*
**draw** 25:*8*
**drew** 106:*17*
**Drive** 2:*8* 75:*7* 168:*24*
**driven** 75:*4* 151:*21*
**driver** 181:*19, 23* 182:*1,*
19* 183:*1*
**driving** 56:*9* 65:*5* 75:*16,*
19* 76:*21* 129:*17* 140:*24*
143:*1, 4, 19* 146:*11*
147:*17* 148:*17, 24* 149:*4,*
7, 10, 18* 150:*12* 151:*6, 17*

152:*20* 153:*2, 8, 19* 154:*5,*
9, 25* 156:*10* 167:*4*
173:*13*
**Drohan** 88:*13* 89:*2, 15*
**drove** 75:*10* 76:*8* 128:*17*
**drug** 16:*23, 24* 176:*1*
177:*4, 6*
**drugs** 81:*15*
**dry** 120:*20* 121:*2* 167:*3,*
8*
**due** 144:*8* 155:*16*
**DUI** 197:*16, 19*
**duly** 5:*3* 201:*5, 6*
**duration** 128:*13*
**duties** 20:*9* 199:*16*
**duty** 36:*18* 196:*10*
**DVR** 50:*13* 78:*11, 17, 19*
**DVRs** 32:*16*

< E >
**Earlier** 22:*5* 26:*23* 30:*9,*
13, 17* 84:*21* 91:*20*
119:*24* 141:*4* 145:*12*
**early** 17:*3*
**earn** 13:*10*
**East** 2:*4*
**eastbound** 126:*5, 10*
127:*16*
**EASTERN** 1:*1*
**ECC** 146:*14*
**Ed** 47:*5*
**edit** 35:*16*
**edited** 108:*7*
**edits** 34:*21* 71:*22* 107:*24*
**educational** 13:*6, 17*
**effect** 55:*7*
**effectively** 142:*7*
**effort** 173:*19*
**Egner** 43:*12*
**either** 24:*20* 82:*5* 117:*17*
124:*21* 158:*24*
**electronic** 9:*13* 29:*25*
65:*7* 93:*5*
**electronically** 9:*14*
**electronics** 32:*16*
**ELIJAH** 2:*2* 5:*20*
**Eliot** 116:*4, 5, 7*
**Elise** 2:*25* 5:*24*
**elude** 95:*17*
**e-mail** 26:*13* 57:*15*
80:*21* 81:*4* 82:*11* 83:*22*
84:*12* 85:*1* 86:*13* 87:*11*
88:*12* 90:*1* 100:*18* 108:*9*
113:*10*
**e-mails** 79:*5, 8, 22* 80:*23*
90:*3* 113:*9, 13, 15*
**emergency** 79:*24* 125:*8*
142:*25* 143:*17, 19* 150:*10*
152:*3* 183:*13*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 208 of 220 - Page
ID#: 4147
Deposition of Sergeant Charles Fink                          Jason Laible, et al., vs. Timothy Lanter, et al.,

employed 50:*1*
employee 12:*7*
employees 17:*20*
employee's 12:*3*
employment 13:*20* 23:*24*
EMS 79:*25*
encompassed 19:*3*
encompassing 16:*1*
ended 98:*5*
ends 128:*10*
enforcement 137:*9*
engage 146:*23* 158:*16, 21*
173:*18* 181:*14, 23* 182:*15,*
*22*
engaged 143:*24* 156:*13*
172:*24* 174:*16* 179:*16*
186:*8*
engaging 155:*20* 182:*14*
engine 132:*14*
ensure 31:*22* 32:*1* 37:*1*
53:*10*
entered 154:*12*
entire 15:*14* 68:*1* 115:*20*
entirety 36:*17* 51:*20*
66:*23* 95:*24* 104:*7* 130:*9*
131:*24* 132:*3* 182:*13*
enumerated 145:*6*
envelope 26:*5, 9, 17* 89:*24*
equal 186:*16*
equally 25:*20*
equipment 40:*17* 50:*6, 11,*
*17, 19* 156:*15* 186:*1, 4, 6*
equipped 99:*24* 100:*3*
escalates 168:*19*
ESL 199:*4*
ESQ 2:*2, 7, 10, 12, 15, 18*
essentially 65:*13*
establish 9:*2*
establishes 179:*16, 22*
F.STATE.S 2:*2* 5:*13*
et 1:*3, 7* 34:*22* 86:*19*
evaluate 33:*23* 130:*16, 19*
131:*6, 9* 162:*9*
evaluated 179:*1, 4*
evaluating 49:*25* 76:*25*
121:*4* 147:*16* 156:*12*
evaluation 109:*21* 124:*23*
135:*3* 151:*4* 187:*4*
evenly 25:*11*
event 68:*11* 142:*10*
everybody 70:*8* 192:*23*
195:*7*
evidence 24:*19* 31:*23*
33:*9* 46:*1* 51:*7* 56:*18*
58:*1, 19* 81:*5* 83:*5, 14*
89:*15* 93:*20* 94:*24* 95:*2,*
*17* 106:*11* 118:*22* 135:*3*
153:*16* 188:*16*
exactly 10:*16* 27:*19* 79:*6*

154:*21* 182:*5*
examination 3:*14* 201:*10*
examined 5:*4*
example 20:*24* 23:*11*
29:*21* 35:*6* 53:*16* 159:*3*
162:*21* 163:*6* 175:*22*
178:*12* 188:*12*
exceeded 129:*13* 140:*21*
142:*8, 12, 21* 147:*12*
exceeding 149:*19*
exception 8:*6*
exceptions 145:*5, 6*
excerpt 143:*9*
excess 140:*25* 149:*9*
151:*21*
excessive 68:*11*
exchange 84:*6* 85:*2*
86:*19* 88:*12*
exchanges 90:*1*
excuse 9:*20* 40:*13* 60:*9*
77:*14* 107:*1* 127:*16*
129:*10* 138:*18* 164:*13*
168:*5* 172:*9* 175:*12*
181:*1* 183:*9* 193:*21*
exercise 141:*13* 142:*10*
exhausting 104:*25*
exhaustive 54:*16*
EXHIBIT 4:*5, 6, 7, 8, 9,*
*10, 11, 12, 17, 20, 21, 22, 23*
8:*24* 9:*3* 11:*6, 10, 19, 22*
51:*12, 17* 52:*3, 7, 17, 21*
56:*25* 57:*3* 59:*5, 6, 10, 12*
61:*9* 62:*6* 63:*3, 6, 8, 14,*
*25* 65:*21, 22, 23, 25* 77:*7*
78:*25* 79:*1, 4, 5* 80:*15, 19,*
*22* 82:*6, 9, 10* 83:*17, 20*
84:*8, 11, 22* 86:*2, 3* 87:*4,*
*8, 11* 88:*9, 23* 93:*7, 12, 23*
100:*25* 138:*17* 158:*6*
EXHIBITS 4:*17*
exigent 144:*11, 16, 21, 24*
145:*19, 22* 146:*4* 187:*22*
existed 187:*23, 24*
Exit 119:*13, 25* 120:*1*
123:*10, 12* 126:*25* 127:*2*
expect 78:*6*
expected 176:*12*
expecting 91:*3*
experience 44:*25* 100:*1, 5,*
*14* 110:*1* 196:*16*
expertise 25:*17*
expires 201:*19*
explain 17:*17* 157:*5*
194:*10*
explained 144:*17* 171:*15*
explaining 72:*5*
explanation 107:*6, 7*
109:*12* 171:*25*
extent 70:*7* 144:*2*

182:*23* 200:*5*
eyes 154:*7*

< F >
F18I 66:*8* 67:*3* 68:*4*
69:*20* 80:*17*
F34 67:*9, 12* 68:*4* 69:*20*
fabric 71:*1*
faces 75:*23*
fact 172:*17* 191:*19* 192:*5*
facto 140:*17*
factor 161:*21, 23* 166:*5*
173:*7* 174:*7*
factors 158:*20, 24* 159:*2*
161:*13* 162:*13* 168:*9*
182:*20*
facts 24:*25* 29:*13* 32:*2, 5*
48:*11* 95:*12* 112:*21*
113:*20* 139:*2, 3* 188:*18*
189:*9* 195:*12*
failed 102:*16* 146:*18*
147:*5, 6*
failing 50:*12* 149:*23*
failure 149:*5* 151:*24*
Fair 7:*8* 8:*1* 86:*15*
95:*11* 96:*18* 136:*17*
fairly 25:*11* 134:*9*
161:*16*
fall 21:*16* 23:*1*
familiar 63:*8, 14* 66:*1*
93:*14*
far 12:*24* 21:*2* 51:*6*
58:*2* 74:*3, 23* 75:*2* 85:*3,*
*15, 19* 91:*8* 112:*7* 127:*15,*
*20* 132:*16* 134:*15* 137:*23*
144:*10* 164:*23* 169:*16*
179:*24*
fashion 144:*9*
fast 167:*21*
faster 132:*23* 133:*1*
fatalities 98:*14, 15*
feature 90:*15*
February 14:*14, 22* 15:*1,*
*2, 5*
Federal 1:*13* 3:*7*
feeds 175:*16, 17*
feel 76:*1* 95:*7* 99:*24*
174:*17* 196:*7*
feeling 100:*16*
feels 155:*24*
felonious 169:*23*
felt 100:*13*
field 119:*7*
fifth 64:*11, 25*
file 26:*22* 27:*10, 11* 28:*1,*
*4* 40:*8* 44:*5* 71:*15, 17*
78:*4* 92:*13, 17* 93:*3, 5*
105:*22* 108:*19* 109:*7*
110:*6* 114:*6* 200:*6*

files 12:*13*
fill 40:*16*
filled 41:*12*
final 101:*18* 107:*12, 21*
109:*19* 111:*4, 11* 112:*17*
117:*8*
finalization 75:*14*
finalized 74:*8* 108:*24*
109:*8*
finalizing 71:*23*
Financial 14:*4* 16:*8*
148:*14, 19* 149:*2, 13*
152:*17* 154:*4* 201:*14*
find 64:*5* 94:*16, 19*
145:*21* 188:*22* 198:*19*
finding 48:*23* 150:*21*
151:*20* 156:*22* 172:*7, 8*
198:*16, 22*
findings 55:*23* 111:*24*
112:*21* 113:*20* 172:*2*
186:*23* 187:*1* 190:*5, 7*
191:*2, 6, 9, 23* 199:*11*
finds 185:*8*
finish 7:*15* 27:*21* 34:*12*
35:*9*
FINK 1:*11* 3:*4* 4:*2* 5:*1*
6:*7, 8, 11* 8:*19* 13:*6*
59:*13* 62:*8* 63:*6* 79:*3*
84:*11* 86:*5, 10* 87:*10*
88:*11* 89:*1* 150:*20* 158:*5*
200:*15* 201:*6*
firearms 81:*15*
firm 201:*13*
first 5:*3* 15:*10* 35:*24*
36:*6* 40:*7* 49:*3* 57:*18*
61:*11, 21* 64:*2, 20* 74:*9*
100:*25* 101:*3* 106:*3*
118:*25* 125:*14* 130:*14*
137:*19, 24* 201:*6*
five 17:*24* 18:*7, 9, 16, 18*
flat 169:*8*
fled 95:*14*
flee 163:*22, 24* 168:*18*
169:*19*
fleeing 128:*3, 10* 160:*4,*
*16, 22* 162:*22* 166:*20*
173:*25* 175:*9* 181:*19, 23*
182:*1, 19* 183:*1*
flow 121:*5* 156:*2*
fluctuated 18:*15*
fly 162:*23*
focus 25:*16* 51:*24* 79:*15*
folder 8:*22* 9:*9, 12* 10:*25*
11:*3* 26:*4, 21* 27:*5, 7, 10*
28:*3* 29:*8* 92:*12*
follow 6:*19* 7:*22* 22:*4*
88:*16* 131:*13* 148:*8*
151:*25* 184:*17*
followed 186:*25*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 209 of 220 - Page
ID#: 4148
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

following 143:8 195:5, 22
follows 5:4 67:9 113:18
follow-up 138:12
footage 29:17 32:21, 24
   33:2 42:11 43:9, 17, 21
   44:2, 20 45:2, 6, 10, 12
   78:11
forbidden 183:12 184:15
forbids 183:4
force 68:12, 13 69:6, 9
   177:1, 4, 10 181:2
Ford 79:15
foregoing 201:7
forget 125:16 199:20
Form 41:7, 14 67:3, 12
   80:17 84:20 90:14 103:9
   111:4 144:18 145:2, 12
formal 198:2, 5
formalities 3:9
formally 135:23
forms 55:20 68:4 69:19
forth 1:16 70:3 71:22
   189:5 201:8
found 81:14 95:17
   148:11 152:11 156:17
   199:11
four 43:3 123:18
fourth 64:11, 25
Fox 46:19, 22 84:13, 15,
   25 100:22
frame 147:2
framework 65:18
frankly 38:12 176:15
fraud 16:9
Freedom 125:20, 21
freeze 125:12 133:11
frequently 72:11 146:25
Friday 120:13, 14 123:7
Friedman 2:3
front 59:12 66:1 79:4
   82:10 83:20 93:22 116:2
   133:7, 13, 14 158:8, 11
   164:2
Ft 2:9
full 55:9 121:24
function 55:3
further 194:11 200:4, 10

< G >
Gabbard 79:9 80:23
   81:2 82:22
Gabel 42:22
gain 129:14
gains 140:22
Gang 137:13 138:6
   181:2
gather 24:19 29:13 32:1,
   10 33:5, 10 46:2 48:11
   58:12

gathered 43:9 93:20
   94:24
gauge 173:10
GAYLE 2:3
general 43:19 74:22, 25
   85:7 118:8
generally 6:17 22:25
   25:4, 19, 25 28:16 32:10
   34:8 35:12, 23 38:17
   45:21 66:15 68:18 106:9
   107:13 108:1 167:11
generate 91:11
generated 62:20 189:3
generic 65:4
Gerhardstein 2:3
getting 79:14 165:6
   166:24 168:6 172:14
Gilbert 2:3
give 8:4 17:8 22:11
   64:17 73:18 86:24
   121:25 129:5 136:7
   151:10 156:5, 6
given 29:22 101:20
   123:17 134:17 178:11, 12
   201:7
giving 136:10
glaring 74:1
go 7:18, 24 8:13 24:20
   25:13 36:11 39:12 59:4
   68:16 74:24 77:9 78:23
   82:17 88:20 100:24
   105:6 108:18 114:22
   115:19 121:5 139:12
   141:8 152:24 153:12
   157:13 162:22 180:2
   182:11 186:18, 19 193:10,
   13, 19 194:2, 9
goes 34:17 35:24 108:24
   111:16, 22 112:1 174:14
going 27:20 31:19 37:7,
   13 39:5 56:7 58:17
   65:20 84:10 91:9 109:24
   118:15 122:2, 22 124:17
   126:22 127:17 129:23
   131:10 134:5 136:15
   149:17 167:6, 22 170:11
   183:21
gonna 6:18 10:7 24:5
   39:21 52:5 57:2 59:4
   62:4 63:5 77:4 82:8
   88:20 93:11 103:21
   163:12, 22 165:10 166:14
   181:14, 22 182:15
Good 5:9, 10 8:13 17:12
   122:1 142:15
gosh 13:22 17:24 119:13
   125:16
grammar 73:24 108:2
grammatical 35:3, 21

105:25
Graydon 2:7
great 104:8 158:10
greater 185:8
GREENE 2:2 4:4 5:8,
   11 6:9 8:25 10:3 11:7,
   20 15:20 51:13 52:4, 18
   57:1 58:6, 11, 16 59:4, 11
   62:3, 7 63:4 65:20, 24
   71:2 79:2 80:20 82:7
   83:18 84:9 86:1, 4, 6, 9
   87:3, 6, 9 88:7, 10, 20, 24
   93:8 110:22 111:1
   150:17, 19 156:4, 6, 8
   157:24 158:2 200:3
ground 129:15 133:4
group 38:5
guess 54:17 96:13
   126:23 182:4 183:20
Guide 52:16, 20, 22 53:2,
   15, 18 54:20 55:4
guidebooks 54:6
guides 54:6, 12
gun 98:2 176:1 177:5
guns 176:4
guy 70:2 98:19 170:18,
   21, 25 175:22
guys 69:1 118:10 121:17

< H >
HACK 2:2 5:20
half 14:19
halfway 139:15
hallway 116:15
hand 11:8 26:20 35:10,
   12 52:5 57:2 93:13
   107:10 111:10 201:15
handed 35:14 56:4 63:7
   101:13, 17
handing 9:2 11:9, 21
   51:16 52:20 101:15
handled 20:25 21:19
handler 137:16
handwriting 116:1
handwritten 10:18 28:19
   92:20 108:14, 18
happen 25:4 34:21, 25
   173:1
happened 39:18 49:17
   120:10 190:16 196:18
happening 38:25
happens 7:14 111:11
   170:13 196:12
happy 7:23 89:11
harassment 19:5 21:3, 17
hard 7:7 96:11, 16
hardcopy 35:11
harm 49:15
Harper 41:18, 19 42:21
   47:20 60:2 65:2 106:25

128:22 129:7, 23 131:15
   135:20 137:19, 24
Hawthorne 119:1 123:2
hazardous 167:8
head 7:6 56:23 75:25
   87:16 125:7 135:8 176:4
heading 40:2
hear 35:17, 18 59:22
   60:11 195:17 196:24
heard 10:17 45:4, 20
   184:6
heavily 163:5
heavy 164:23
he'd 26:6 164:7
height 120:23
he'll 170:12
Hellcat 173:13
hereinafter 1:16 5:3
hereinbefore 201:8
hereunto 201:15
hey 192:9, 15
hierarchy 17:20
high 96:14 123:9 128:17
   130:4 168:19
higher 167:6
high-ranking 194:24
highway 97:4, 7, 8, 25
   98:3 99:6 119:12 123:10
   143:12
hire 14:9
history 13:21 169:24
hit 123:4, 9 126:13
   166:22
hitting 127:18
Hollister 1:17 2:11
home 98:6
homicidal/suicidal 170:2
homicide 16:13
homicides 16:12
honest 28:14 79:20
   98:12 199:2, 7
Hope 118:25
horrible 31:7
hospital 82:3
hour 123:6 129:14, 18, 20
   131:11 134:6 140:22, 25
   144:13, 14 147:13 149:20
   150:7 152:9 163:3
   165:15 185:9
hours 120:11 165:20
house 98:6 174:12
human 76:2
hundred 43:24 111:14
Huntington 2:20
hurt 162:2 166:24 168:6
   169:11

< I >
idea 105:20 106:14

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 210 of 220 - Page
ID#: 4149
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

176:20  194:1, 14
**ideas** 70:3
**IDENTIFIED** 4:5  113:21
140:8  144:25  146:6
189:1, 3, 18, 23
**identifier** 49:1
**identifiers** 49:12
**identify** 34:1  48:11
53:22  64:18  93:10  112:9
133:24  139:4, 7, 16
146:18  156:14  174:3
**identity** 48:13  161:10
174:5  175:11
**IIS** 8:22  9:1, 4  12:5
17:1, 13, 18  19:23  21:8,
13  22:6  23:16  34:10
36:17, 21  38:1, 14  39:13,
14  44:23  45:18  46:22
52:24  53:14  62:20  71:12,
16  72:22, 24  73:15  74:7
77:7  78:4  85:13, 17, 21,
23  99:15  107:10  109:19
110:2  139:24
**illness** 170:10
**imagine** 29:6  40:3  71:19
73:4  77:2  78:1  100:19
106:20  110:18  190:3
191:4
**immediately** 124:7  146:13
**imminent** 174:23  175:11,
12
**impact** 8:16
**impacted** 120:24
**important** 88:2  161:21,
24  162:5, 18  165:4
169:17  170:16  172:16, 23
173:4  174:8  176:13
**impossible** 134:10
**impressed** 17:10
**incident** 22:10, 18  41:5
42:23  48:17, 21, 24  49:1,
12  69:4  116:16  190:11,
14  197:14
**incidents** 19:8  20:8, 10
22:3  36:11
**include** 16:12  33:20
36:14  60:14  92:19
153:10  159:3, 7, 10, 12, 15,
17, 20, 23  160:2, 6, 10, 15,
20  161:2, 5, 9
**included** 10:24  46:17
59:24  78:4  95:13  188:11
**includes** 158:15  181:18
**including** 81:5, 18  146:14
**incredibly** 76:15  170:16
173:3
**independent** 105:5
**in-depth** 63:18
**INDEX** 4:1

**indicate** 38:9  132:15
154:8
**indicated** 79:22
**indicates** 185:11
**indicating** 62:15  79:23
103:11  140:23
**Indictment** 16:3
**indirectly** 20:13, 17
49:14  99:3
**individual** 38:20  61:19
64:3, 10  97:6  160:22
177:20  197:13
**INDIVIDUALLY** 2:21
71:6
**individuals** 61:11  65:15
113:20, 24  188:15
**info** 39:2
**informant** 177:3, 8, 12, 15,
21, 24  178:9, 10, 19
179:23
**informants** 164:6  178:3, 5
**information** 9:11  28:7
29:13  32:1, 5, 6, 10  33:5,
9, 17  38:22  39:2  46:1
48:12  51:6  56:18  58:1,
20  63:21  76:24  80:9
81:11, 14  83:1, 6, 13
86:13  88:17  89:16  93:20
104:20  105:10  129:9
131:9  132:6  135:4
145:16  146:14  147:7
153:16  164:4, 6  170:3
175:25  176:7, 17, 21
177:5, 9, 23  178:7, 8, 25
179:4, 13, 15, 21, 22
180:10, 16  181:5, 9  189:2,
6  190:18  195:13  200:7
**inherent** 155:4
**initial** 51:24  101:16
102:6  112:3
**initially** 75:20
**initiated** 155:9
**initiation** 128:25
**injured** 82:1  165:6
**injuries** 79:24  80:1
98:18, 23, 24  99:2
**injury** 20:14, 19  66:4, 5,
7  67:6, 18  80:11, 13
84:19  100:18, 20  128:4
148:13, 19  149:2, 13
152:16  154:3, 8  155:4
157:21
**ink** 108:25  110:8
**Inmate** 77:24
**inoperable** 170:10
**in-person** 1:10
**inside** 70:10  192:24
**instance** 20:11  52:15
115:17  168:15  187:16

**instances** 151:1
**instructed** 7:17  136:19, 21
**instruction** 22:11
**INSURANCE** 2:17
**interact** 87:20
**interaction** 88:5
**interest** 194:2  201:14
**interests** 191:7
**Internal** 9:11  15:10  17:2,
25  18:1  21:24  30:1
36:15  53:5  57:24  67:15
68:9, 21  69:8, 20  74:12
80:12  84:17  90:16, 19
99:19  100:11  115:12
117:12  187:17  192:11
193:9  197:4, 19  199:6
**intersection** 44:9
**intersections** 76:13
118:24  119:4, 5, 7  144:4
183:21
**interstate** 143:11
**interview** 46:7, 25  57:23,
24  63:19  64:9  65:17
72:3  92:3  107:4  114:23
115:20  171:20
**interviewed** 47:9, 11, 13,
15, 18, 21, 24  181:5  188:3
**interviewing** 65:14
**interviews** 32:12  46:3, 13,
24  63:17  65:10  85:9
91:21, 24  105:7  114:18,
20  115:1, 7, 14, 23  188:14
191:13
**intimate** 176:1  177:5
**introductions** 5:15
**investigate** 17:16  19:1
23:17
**investigated** 18:1  22:14
42:25
**investigating** 22:6  48:17
**investigation** 16:24, 25
19:14, 23  22:2  23:9, 11,
12  24:3, 6, 10, 12, 18, 19
25:7  26:14  27:6  28:10
29:11, 20  31:20  33:13
36:12  37:7  38:12  39:22
43:10  45:19  48:2, 5, 6
49:20  52:2, 12  53:12
56:15  58:18  72:11  73:13,
19  83:7  90:6  91:17
92:22  94:1, 2, 4, 15  104:3,
17  105:4, 5, 9, 23  106:16
115:9  117:25  118:4
121:7  139:24  147:18
188:3  191:5, 9, 15, 18, 20
197:4, 20
**Investigations** 15:10
16:21  17:2  18:2, 4, 12
20:8  21:8  23:22  25:3
36:15  44:24  52:8, 14, 25

53:1, 14  54:1, 19  55:4
68:22  69:21  84:17  90:5,
19
**investigative** 37:2  66:5
67:1, 13  68:12, 19  90:9
91:5, 13  105:2
**investigator** 18:1, 2  31:21
118:21
**investigators** 45:4
**involved** 22:20  32:18
40:14  49:22  59:19  65:5
97:14  99:8  114:11
128:16  130:5  137:3
139:17  140:2  145:15
146:17, 19  150:1  152:21
153:3, 21  155:8, 17, 23
163:20  169:24  170:9
174:16  176:2  179:25
180:7, 15, 21, 23  181:8
188:4, 8  191:12, 22
194:12, 13, 16
**involvement** 64:8  170:4
**involves** 113:19
**involving** 36:2
**Isaac** 116:5
**issue** 109:19  145:13
154:14  187:12
**issues** 106:17
**item** 77:21
**items** 77:15  78:2, 3, 24
**iterations** 111:7
**its** 66:23  95:24  111:4
137:13  146:1

< J >

**JACQUELINE** 2:2  5:11
150:14  156:1
**jail** 82:2  170:11
**January** 14:16  101:21
107:20  111:2, 8  117:11
**Jarrod** 70:23
**JASON** 1:3  2:22  79:9
80:23
**Jenny** 87:15
**job** 26:11  141:24  142:1
**join** 135:13  138:4, 16
**joint** 137:8
**Judge** 1:6, 7
**Judo** 197:13
**July** 15:11  17:3, 4
**jurisdiction** 39:6
**justification** 187:6
189:17, 21
**justifications** 188:22

< K >

**keep** 90:6, 25  102:19
103:3, 9
**keeping** 103:9
**keeps** 106:12

Case: 2:21-cv-00102-DLB   Doc #: 152   Filed: 12/10/25   Page: 211 of 220 - Page
ID#: 4150
Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

**KENTUCKY** 1:*1* 83:*8*
136:*2, 13, 15, 18, 19, 21*
177:*4*
**kept** 102:*12* 106:*13*
109:*7* 110:*5*
**Kevin** 47:*8* 88:*13*
**key** 61:*20* 139:*3*
**kidnapping** 170:*4*
**kidnappings** 176:*8*
**kids** 163:*4*
**kill** 175:*24* 176:*3*
**killed** 170:*7*
**Kim** 6:*3*
**KIMBERLY** 2:*18*
**kind** 10:*13* 16:*21* 27:*6*
28:*25* 31:*4* 32:*18* 36:*12*
38:*8, 18, 19* 45:*12* 48:*13*
53:*6* 55:*11* 59:*25* 64:*4*
65:*4* 67:*14* 74:*21* 76:*6*
80:*6* 89:*18* 91:*7* 106:*8*
126:*3* 155:*14* 163:*12, 14*
164:*11* 165:*16* 173:*18*
192:*7, 10*
**kinds** 23:*25* 123:*8*
**KLEIN** 2:*8, 24* 5:*18*
**knew** 70:*4* 103:*22*
179:*17* 180:*4, 10, 15, 19*
181:*8* 193:*24* 195:*2, 12*
**know** 6:*12* 7:*23* 9:*17*
12:*2, 6* 18:*5* 21:*24* 23:*1,*
*10* 24:*7* 25:*15, 16, 21*
26:*5* 27:*19* 31:*5* 32:*13*
36:*9* 37:*23* 38:*20* 39:*16*
40:*9, 11* 41:*18* 42:*16*
43:*24* 44:*4, 10* 45:*9* 49:*4,*
*7* 52:*13* 53:*8, 19, 24*
54:*15, 18* 55:*1* 56:*22*
57:*17, 22* 64:*1, 15* 68:*25*
69:*2, 6, 7, 23* 70:*1, 15*
73:*5* 74:*13, 14* 75:*24*
76:*7, 11* 77:*2* 80:*3, 6, 11*
81:*10* 82:*18, 25* 83:*3, 8, 9,*
*13* 84:*4* 85:*8, 10* 87:*18*
88:*1* 89:*11, 19* 90:*2, 15,*
*25* 91:*1, 15* 92:*1, 2, 4, 6*
94:*11* 96:*15* 98:*12* 99:*4*
100:*3, 7* 101:*19* 102:*9*
103:*2, 17* 104:*8, 13*
105:*14, 15* 106:*12, 24*
107:*14* 109:*2, 6, 7, 8*
110:*3, 4, 11, 12, 13, 19*
113:*2* 114:*5, 8, 12, 15, 16,*
*17* 116:*18* 117:*8* 119:*18*
121:*15* 122:*2, 25* 123:*5*
130:*24* 131:*14* 132:*12*
133:*2, 8, 12, 23* 134:*3, 5, 8,*
*15* 135:*23* 138:*15* 142:*12*
153:*23* 154:*23* 157:*7*
161:*15, 22* 162:*5, 9, 10, 19,*
*22* 163:*3, 9, 15, 16, 19, 23,*

*25* 164:*20* 165:*14* 166:*12*
167:*7* 168:*3, 10, 17, 23*
169:*6, 14, 19, 23* 170:*2, 20,*
*21, 22* 171:*5* 172:*5, 7, 16,*
*25* 173:*8, 9, 11, 14, 15*
175:*10, 20* 177:*7* 178:*5,*
*21, 22, 24* 179:*3, 11, 14*
180:*3, 6, 9, 13, 14, 25*
181:*7, 11* 184:*7* 185:*22*
187:*13, 21* 190:*16* 191:*6*
193:*16* 195:*3, 14, 16, 21,*
*24* 196:*1, 14, 19, 20* 199:*3,*
*6, 8*
**knowing** 163:*19* 166:*14*
**knowledge** 96:*8*
**known** 22:*19* 105:*21*
106:*2* 161:*10* 174:*6*
176:*18*
**knows** 170:*21, 22*
**Kowalski** 47:*13*
**KY** 2:*9, 18*

**< L >**
**label** 28:*20* 48:*21* 49:*5*
**labeled** 29:*4*
**LAIBLE** 1:*3* 2:*3, 22* 5:*13*
**landlocked** 126:*24*
**lane** 126:*5, 10* 127:*15, 16,*
*17, 21*
**lanes** 126:*3, 5* 127:*14*
**language** 110:*12*
**LANTER** 1:*7* 2:*11, 20,*
*24* 6:*1, 4* 36:*3* 41:*20*
42:*20* 46:*17* 59:*20* 60:*2*
64:*25* 122:*24* 124:*9, 13*
125:*8* 126:*7* 129:*9, 10, 11,*
*15, 17* 133:*3, 17* 136:*20*
139:*24* 140:*10, 16, 24*
142:*8* 146:*10* 147:*6*
148:*11* 152:*21* 153:*2, 9,*
*20* 154:*6* 157:*2* 164:*13*
172:*9* 186:*16* 195:*8*
196:*2*
**Lanter's** 60:*9* 107:*1*
124:*25* 135:*10* 141:*9*
147:*16, 22* 148:*16, 23*
**large** 32:*12*
**larger** 16:*9*
**Law** 2:*20* 137:*9* 184:*5,*
*11*
**lawful** 5:*2*
**laws** 143:*20, 25* 145:*9*
152:*7*
**lawsuit** 199:*15*
**lawyers** 7:*13* 10:*10*
**Lazarus** 2:*20*
**lazy** 165:*15*
**lead** 148:*13, 18* 149:*1, 12*
152:*16* 154:*2* 160:*11, 16,*

*21* 198:*15*
**leads** 197:*21*
**learn** 70:*18*
**led** 67:*20* 186:*25* 188:*23*
189:*12* 197:*19* 198:*17*
**left** 37:*17* 127:*15*
**leg** 94:*9* 98:*20*
**legal** 3:*8*
**legend** 62:*14*
**length** 96:*7*
**leniency** 178:*13*
**letters** 66:*8*
**level** 18:*3, 11, 19* 20:*25*
21:*6, 12, 20* 23:*1* 85:*22*
**levels** 124:*24*
**Lexington** 2:*18*
**license** 146:*16*
**licensures** 13:*18*
**lieutenant** 18:*3, 23* 25:*9,*
*23, 24* 34:*14* 35:*11, 15*
71:*8, 10, 11, 13* 72:*2, 19,*
*22* 73:*1, 9* 101:*13, 18*
102:*2, 4* 103:*15* 104:*16*
107:*11* 109:*11, 21* 110:*17*
111:*15* 112:*4, 18, 20*
113:*4, 5, 7* 114:*8, 10, 13*
116:*11* 117:*14, 19, 22*
133:*24* 193:*15*
**light** 163:*19, 25* 169:*18*
170:*24* 171:*1*
**lighted** 185:*4*
**lights** 125:*8* 132:*13*
133:*8*
**likelihood** 161:*5* 173:*6*
**likewise** 55:*11* 137:*16*
**limit** 129:*13, 18* 131:*11*
134:*7, 16* 140:*21, 25*
147:*12* 149:*9* 150:*6*
151:*22* 185:*2, 9*
**limits** 96:*16*
**LINE** 4:*17* 21:*11* 63:*20*
70:*12* 126:*11* 150:*15*
**link** 5:*19*
**liquor** 16:*23*
**list** 61:*10* 77:*15*
**listed** 78:*6*
**listen** 60:*23* 115:*19*
**lit** 167:*14*
**literally** 22:*12, 15, 22*
95:*6* 103:*6* 120:*20* 121:*1,*
*15, 17* 122:*14* 157:*6*
**LLC** 2:*20*
**LLP** 2:*7*
**located** 30:*22* 93:*2*
**location** 43:*20* 93:*1*
134:*11* 146:*15* 147:*5*
159:*7* 162:*19*
**locations** 45:*10*
**log** 90:*6, 24* 91:*5, 19*

**long** 39:*8, 9* 95:*23* 97:*1,*
*12* 98:*10* 130:*12* 192:*7*
195:*12*
**long/short** 17:*15*
**longer** 41:*24* 96:*9*
**long-term** 16:*20*
**look** 10:*6* 11:*2, 15* 12:*6,*
*9, 12, 18, 22* 28:*1* 44:*13,*
*19, 20* 45:*18* 64:*4, 14*
72:*16* 75:*24* 100:*25*
104:*20* 114:*6, 16* 132:*18*
138:*10* 139:*11*
**lookback** 12:*5*
**looked** 11:*14, 16* 12:*2*
40:*9, 18* 42:*7, 15, 16, 19*
52:*1* 56:*8* 76:*13* 84:*21*
90:*1* 96:*1* 114:*13* 130:*22,*
*23* 151:*9* 187:*21*
**looking** 24:*15* 42:*1* 50:*4*
81:*7* 86:*17* 104:*22* 112:*6,*
*8, 12* 124:*1* 131:*9* 151:*2*
**looks** 63:*10, 11* 66:*3*
81:*2* 82:*20* 83:*21* 84:*18*
86:*10* 114:*9*
**loses** 173:*25*
**losing** 164:*13* 168:*20*
**loss** 148:*14, 19* 149:*3, 13*
152:*17* 154:*4*
**lost** 133:*4* 173:*19, 21*
**lot** 27:*19* 70:*3* 75:*19*
93:*20* 104:*5* 116:*22*
163:*25* 166:*8*
**loved** 26:*10*
**lovely** 165:*23*
**lower** 18:*11*
**Luck** 25:*8*

**< M >**
**ma'am** 9:*5* 92:*14* 93:*4,*
*15* 99:*23* 118:*1* 137:*11*
138:*24* 139:*21* 140:*4*
158:*22* 159:*6, 9, 16*
178:*23* 190:*19, 22, 25*
**Magistrate** 1:*7*
**Maines** 2:*17*
**maintain** 91:*6, 23* 160:*13,*
*17, 23* 184:*22*
**Major** 15:*14, 15, 17, 24*
37:*8, 11*
**majority** 9:*16*
**majorly** 171:*21*
**making** 171:*12*
**man** 170:*6*
**mandatory** 143:*23* 148:*7*
173:*24*
**manilla** 26:*5* 27:*7* 28:*3*
89:*24*
**manner** 182:*16* 184:*14*
**Manual** 51:*9, 15, 17, 23*
52:*9, 14* 53:*1, 22, 23* 54:*3,*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 212 of 220 - Page
ID#: 4151
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

*8, 14, 16, 19, 21*  55:*4, 9, 19, 20*  56:*11*  141:*10*  147:*23*
**manuals**  53:*9*  54:*13*
**MARIBETH**  2:*7, 24*  5:*18*
**Mark**  47:*1*  59:*5*  62:*4*  63:*5*  65:*21*  78:*25*  80:*21*  82:*9*  83:*19*  84:*11*  86:*1*  87:*3*  88:*8, 21*  108:*3*
**marked**  9:*3*  11:*10*  52:*8, 20*  57:*3*  59:*10*  62:*6*  63:*3, 7*  65:*23*  79:*1*  80:*19*  82:*6*  83:*17*  84:*8, 21*  86:*3*  87:*8*  88:*9, 23*  93:*12*  110:*16*  151:*21*
**markedly**  132:*23*  140:*20*  147:*12*  150:*5*
**Marrinan**  2:*25*  5:*24*
**MARVA**  2:*12*
**Mason**  95:*14*  123:*12*  124:*7, 15*  126:*2, 21*  127:*13*  133:*4*  137:*10*  164:*3*  170:*1, 20, 21*  172:*10*  176:*19*  177:*6*
**Master's**  13:*9, 14*
**materialized**  199:*17*
**materials**  84:*2*
**matrix**  51:*11*
**matter**  5:*14*  49:*5*  53:*21*  58:*18*  73:*10*  74:*18*  85:*6, 14, 18*  90:*3*  93:*2*  100:*15*  105:*17*  116:*8, 12*  117:*5, 15*  153:*7, 15*  163:*8*  167:*1, 10, 18*  168:*9*  169:*14*  173:*7*  190:*15*  191:*9, 13*  192:*1, 21*  195:*1*  196:*25*
**matters**  23:*25*  169:*2*
**mean**  6:*20*  17:*19*  18:*10, 14*  19:*2, 18*  20:*22*  21:*14*  22:*13, 14, 17*  23:*15*  24:*8, 11*  25:*9*  29:*12*  30:*22*  32:*12*  35:*2*  36:*25*  37:*5, 21*  40:*4*  42:*4*  49:*6, 10*  60:*3*  70:*8, 9*  71:*16, 25*  73:*20*  74:*3*  75:*8*  77:*2*  91:*8, 9*  93:*4*  94:*9*  96:*13, 24*  97:*3, 9, 11*  100:*6*  101:*6*  102:*15*  104:*18*  107:*12*  109:*22, 23*  110:*18*  113:*3*  115:*4*  118:*6, 24*  119:*11*  122:*22*  123:*6*  125:*7*  131:*23*  132:*10, 11*  140:*5*  141:*19*  142:*16, 19*  149:*11*  164:*22*  166:*8, 14*  167:*21*  168:*2*  169:*5, 16, 20*  171:*11, 13*  172:*7*  183:*17*  184:*25*  185:*13, 16, 21*  193:*19, 24*  194:*10*  195:*2*  196:*5, 16*  198:*21, 25*  199:*19*

**meaning**  23:*24*  55:*1*  79:*24*  85:*19*  96:*9*  117:*11*  121:*19*  131:*1, 7*  132:*8*  142:*10*  197:*18*
**means**  29:*25*  43:*9*  61:*19*  141:*25*  178:*12*  186:*14*  201:*9*
**meant**  59:*1*
**media**  44:*20*  45:*5*
**medical**  8:*15*  79:*24, 25*
**meet**  89:*11*
**meeting**  89:*14, 20*  194:*24*
**meetings**  195:*15, 18*
**member**  29:*16*  32:*15*  46:*4, 23*  117:*24*  118:*3*
**members**  34:*6*  46:*7*  85:*17*  91:*22*  137:*13*  141:*13*  148:*1*  193:*8*
**memories**  118:*9*
**memory**  8:*15*  17:*11*  30:*11*  85:*3*  103:*12*  196:*6*
**mentioned**  9:*4*  16:*16*  30:*19*  58:*22*  72:*14*  83:*12*  97:*13*  106:*22*  109:*10*  115:*6*  121:*10, 23*
**met**  89:*23*
**Meyer**  95:*14*  123:*12*  124:*7, 15*  126:*2, 21*  127:*13*  133:*4, 15*  137:*10*  164:*3, 14, 18*  170:*1, 14, 20*  172:*10*  176:*19*  177:*6*  179:*18*  180:*11, 16*  181:*9*
**Meyer's**  81:*6*  127:*24*  128:*1*
**Michelle**  82:*12*  88:*3*
**Microsoft**  66:*22*
**middle**  139:*23*  165:*17, 23*  185:*3*
**miles**  98:*2*  129:*14, 18, 20*  131:*11*  134:*6*  140:*22, 25*  144:*13, 14*  147:*13*  149:*20*  150:*6*  151:*22*  152:*9*  163:*3*  185:*8*
**mind**  58:*4*  77:*6*  176:*10*
**mindset**  170:*15*  171:*3*
**mine**  31:*17*  109:*23*  112:*22*
**minimal**  123:*8*  140:*22*  168:*1*
**minimize**  165:*5*  166:*21, 23*
**minimized**  181:*16*
**minimizes**  182:*25*
**minimizing**  168:*4*  169:*9*
**minor**  127:*5*
**minutes**  39:*10*  96:*1, 7, 14, 18, 21, 25*  97:*4, 8, 11*  156:*7*
**misconduct**  17:*16*  19:*2, 5*

21:*4*
**missed**  35:*5*  74:*1*  168:*10*
**missing**  105:*13*
**misunderstood**  169:*4*
**Mitchell**  2:*9*  97:*25*
**mix**  16:*21*
**mobile**  29:*15*  45:*22, 23*  78:*16*  193:*22*
**mode**  143:*19*  183:*13*
**mom**  98:*7*
**moment**  16:*22*  61:*7*  62:*10*  64:*17*  101:*1*  133:*14*  151:*11*
**mom's**  98:*5*
**money**  16:*9*
**monitor**  36:*12*  37:*1*
**Monmouth**  43:*18, 22*  44:*2, 8*  45:*8*  75:*15*
**month**  117:*7, 10*
**months**  99:*18*  198:*4*
**morning**  5:*9, 10*  26:*8*  165:*21*
**motorcycle**  125:*25*  126:*12, 14, 19*  127:*7, 19*
**motorists**  165:*9*
**mount**  165:*1*
**move**  74:*11*  111:*13*  166:*10*
**moving**  142:*23*
**Mt**  118:*25*
**multimedia**  12:*19*
**multiple**  63:*24*  157:*17*  169:*24*  176:*4*
**mumbling**  187:*16*
**murder/homicide**  163:*20*
**Murrin**  1:*20*  201:*3, 19*
**MVR**  41:*11*  50:*13*  75:*21*  76:*15*  78:*15*  116:*19*  122:*8*  124:*24*  186:*8*
**MVRs**  40:*14, 20*  41:*17*  121:*8, 9, 18, 19*

**< N >**
**name**  5:*11*  6:*11*  29:*1*  30:*5*  75:*13*  114:*4*
**names**  61:*10*  119:*18*  124:*1*
**narrative**  66:*13*
**narratives**  68:*8*
**nature**  16:*7*  22:*21*  23:*24*  38:*23*  66:*20, 22*  91:*4, 19*  108:*2*  144:*5*  160:*2*  163:*4*  164:*24*  169:*12*  170:*14*  171:*2, 17*  172:*15, 22*  174:*14*  175:*18*  191:*7*  198:*7*
**navigated**  133:*5*
**near**  127:*7, 9, 21*

**necessarily**  41:*3*  48:*9*  153:*25*  161:*1*  162:*10*  166:*16*
**need**  7:*21*  8:*3*  38:*21*  95:*10*  164:*20*
**needed**  59:*21*
**needs**  172:*25*
**negligent**  148:*12, 17*  149:*1, 21*  152:*12, 22*  153:*3, 10, 21, 25*  156:*22*
**neighborhoods**  118:*25*  119:*2*
**neither**  70:*4*  81:*25*  201:*12*
**Neudigate**  193:*4*  195:*4*  196:*21*
**never**  6:*21*  22:*14*  45:*1, 20*  70:*17*  99:*10*  109:*3*  193:*1*  196:*18*  199:*17*
**new**  14:*20*  80:*24*  200:*6*
**Newport**  37:*8*  79:*10, 11*  80:*24*  81:*11*  82:*22*  83:*11*  88:*13, 18*  89:*3*  120:*8, 9*  124:*18*
**news**  43:*14*  44:*17*  45:*1, 5*
**night**  165:*17*  167:*14*  185:*4*
**nods**  7:*6*
**noncompliant**  185:*14, 18, 19, 24*  186:*2, 13, 21*
**non-road-worthy**  168:*21*
**normally**  67:*16*  68:*10*  105:*25*  123:*5*
**Northern**  177:*3*
**Norwood**  98:*5*
**notable**  134:*23*  135:*1*
**Notary**  1:*21*  3:*11, 16*  201:*5, 11, 19*
**notations**  10:*17*
**note**  64:*4*  78:*8*  90:*9*  140:*19*  146:*10*  147:*10*  200:*5*
**noted**  72:*9*  145:*7*  147:*14*  149:*22*
**notes**  10:*19*  91:*6, 23, 24*  92:*4, 15, 20*  93:*1*  105:*22, 24*  106:*12, 13*  110:*1*
**Notice**  1:*15*  3:*7*  76:*9*
**Notification**  146:*12*  151:*25*
**notifications**  108:*15, 18*
**notified**  136:*13, 18, 19, 22*
**noting**  143:*2*
**number**  52:*1*  61:*20*  74:*2*  120:*25*  146:*15, 16*  158:*20*  169:*8*  178:*2*
**numbers**  26:*5*  61:*10, 12, 15, 16, 18*  62:*15*  66:*8*  134:*2*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 213 of 220 - Page
ID#: 4152
Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

**< O >**
**objection** 7:*11, 15* 152:*23*
153:*4, 11, 22* 154:*11*
155:*6* 180:*1, 12*
**OBJECTIONS** 4:*13*
**objective** 188:*17* 189:*8*
**obligation** 155:*13*
**observe** 130:*24*
**observed** 73:*6, 7*
**observing** 5:*25* 37:*11*
72:*15*
**obtained** 77:*16*
**obviously** 24:*11* 51:*24*
72:*13* 76:*18* 88:*3* 100:*21*
116:*22* 117:*9* 162:*24*
166:*8, 9* 167:*2, 7*
**occasions** 176:*5*
**occupants** 37:*15* 146:*16*
**occur** 51:*2*
**occurred** 25:*1* 37:*6* 41:*6*
42:*24* 48:*15* 91:*7, 13*
116:*17* 193:*12*
**occurs** 22:*10*
**October** 74:*10* 89:*6*
101:*17* 102:*6* 107:*9*
111:*7*
**Offenders** 15:*14, 17, 24*
**offense** 21:*18*
**offenses** 16:*7*
**offer** 112:*1*
**offered** 89:*5* 134:*12*
187:*21* 190:*5*
**office** 26:*2* 28:*22* 34:*8,
11* 36:*9, 16* 39:*13, 17*
70:*8, 10* 82:*15* 83:*4*
201:*15*
**officer** 14:*16* 18:*18*
20:*13, 16* 22:*20* 33:*23*
36:*3* 39:*1* 41:*19* 42:*21,
22* 43:*12* 46:*14, 19* 59:*17*
65:*1* 76:*25* 85:*22* 94:*3*
99:*5, 16* 128:*23* 129:*6, 7,
9, 12, 17, 19, 23* 132:*6*
133:*20* 137:*17, 19, 20, 21*
140:*20* 143:*15* 146:*13*
147:*3, 11, 16* 150:*22*
151:*4, 5, 16* 152:*12* 153:*9,
20* 154:*6* 155:*23* 159:*5*
160:*12* 161:*20, 21* 162:*3,
5* 163:*9* 168:*4* 169:*11*
170:*19* 172:*16, 24* 173:*11,
25* 174:*8* 176:*15* 177:*1, 2,
10* 181:*20, 22* 195:*9*
196:*2, 8*
**officers** 6:*6* 18:*8, 11, 17*
23:*20* 26:*1* 34:*23* 36:*4,
21* 37:*19, 25* 38:*13* 39:*15*
49:*21* 50:*18* 59:*18* 94:*5,
17* 96:*9* 99:*2, 5* 128:*16*

130:*4, 17, 20* 131:*10*
135:*20* 137:*3* 138:*6*
139:*17* 143:*10, 24* 145:*8*
146:*6, 21* 148:*8* 155:*15,
21* 156:*12, 24* 158:*16, 20*
160:*12* 161:*14* 162:*18*
164:*9, 20* 165:*1* 166:*5*
169:*14* 173:*7* 174:*16*
175:*9, 13* 176:*9, 24*
179:*16, 24* 180:*4, 5, 14, 20*
181:*2, 4, 8, 14* 182:*14, 22*
183:*4, 12* 184:*21* 188:*4, 8*
191:*12, 22* 192:*8* 194:*25*
**officer's** 166:*17* 168:*22*
**offices** 1:*17*
**official** 91:*12* 172:*2, 6, 8*
191:*13* 201:*15*
**officially** 177:*13*
**oftentimes** 66:*21* 118:*6*
163:*17*
**Oh** 9:*25* 13:*22* 17:*24*
27:*13* 30:*14* 42:*5* 57:*19*
86:*6* 125:*15* 143:*6*
188:*10* 192:*2*
**Ohio** 1:*19, 22* 2:*5, 12, 15,
22* 120:*5* 170:*6, 7* 184:*4,
11* 201:*1, 5, 16, 19*
**OIC** 68:*18* 69:*11, 13*
136:*11* 140:*3, 6, 8, 17*
142:*4* 145:*14* 147:*3*
157:*3, 10* 183:*7* 187:*20*
**Okay** 6:*23* 7:*18* 8:*10*
9:*1, 6, 25* 10:*10, 22* 11:*5,
8, 14, 21, 25* 12:*8, 12, 16*
13:*1, 5, 13, 16* 14:*2, 5, 8*
15:*21* 16:*11, 15, 19* 17:*1,
13* 18:*21, 25* 19:*19* 20:*7,
16, 20* 21:*5* 23:*7* 25:*2*
26:*21* 27:*2, 25* 28:*6, 19,
25* 29:*7* 30:*7, 14, 16*
31:*14, 18* 33:*4, 19* 34:*4*
35:*9* 36:*1* 37:*18, 23*
38:*24* 39:*7, 20* 42:*3, 6*
43:*3, 21* 44:*1* 45:*17, 25*
46:*6, 9, 13, 25* 48:*1, 16*
49:*19* 50:*7* 51:*5, 14, 19*
52:*5, 19, 24* 53:*25* 55:*25*
56:*5* 57:*2, 7, 25* 58:*6*
59:*25* 60:*15* 61:*2, 16, 23*
62:*2, 14* 63:*13, 23* 64:*14,
23* 65:*12, 20, 25* 67:*2, 8,
22* 69:*15* 70:*5, 18, 21*
71:*14, 21* 72:*18* 73:*2, 8*
74:*16* 76:*24* 77:*4, 12*
78:*8* 79:*3* 80:*8, 14, 21*
81:*20* 83:*19* 84:*4, 10, 18*
85:*5, 12* 86:*1, 8, 17, 24*
87:*3, 15, 18* 88:*7, 25*
89:*25* 90:*23* 91:*20* 92:*15,
25* 93:*9, 19* 94:*14* 95:*11*

99:*7* 100:*24* 101:*5* 102:*5*
103:*6, 13* 106:*15* 107:*9*
109:*24* 110:*15, 21* 111:*2*
113:*17* 114:*5* 115:*10, 25*
116:*6* 117:*13* 118:*15*
134:*4, 22* 135:*9* 138:*16,
21* 139:*11, 22* 142:*7, 23*
143:*8* 145:*4* 146:*9*
147:*20* 151:*13* 152:*10*
158:*10* 161:*18* 169:*12*
172:*14* 173:*5* 181:*12*
182:*2* 183:*3* 184:*13, 20*
186:*4, 5, 22* 190:*1, 9*
196:*24* 197:*23* 198:*8, 15*
199:*14* 200:*3*
**old** 13:*24* 173:*14*
**Olthaus** 47:*17*
**omit** 148:*2*
**once** 33:*4* 35:*14* 37:*15*
74:*11* 107:*14* 119:*15*
123:*22* 130:*23* 136:*13*
173:*21* 194:*19*
**one-dimensional** 75:*22*
**ones** 59:*24* 60:*5, 8* 104:*9*
**one-way** 124:*6* 135:*16*
140:*1* 143:*13* 149:*18*
150:*2* 151:*6, 18* 157:*9*
163:*1, 2* 186:*20*
**ongoing** 91:*19*
**open** 19:*14* 29:*8* 77:*7*
97:*3*
**open-ended** 24:*24* 29:*10*
**operating** 183:*13* 184:*13,
18*
**operation** 57:*18* 137:*8,
14* 139:*25* 142:*25* 143:*17*
150:*11* 152:*4* 174:*17*
176:*2* 177:*6* 180:*22*
188:*5*
**operational** 48:*14* 50:*6, 9,
14* 56:*23, 24* 57:*4* 94:*21*
156:*15* 185:*25* 186:*12*
**operational/administrative**
189:*4*
**operator** 143:*19*
**opportunity** 95:*3*
**opposed** 19:*18* 20:*24*
21:*24* 24:*15* 55:*9* 67:*16*
76:*2, 14* 149:*10* 167:*3*
169:*22* 171:*1* 176:*14*
**option** 163:*23*
**order** 23:*6*
**orders** 136:*8, 9, 24* 148:*4*
**ordinary** 40:*5*
**organizational** 17:*21*
**original** 110:*14*
**originally** 103:*23* 176:*25*
**outcome** 24:*23* 33:*13*
190:*20*

**outlier** 96:*23*
**outline** 65:*13*
**outside** 27:*12* 28:*13*
34:*11* 39:*5* 46:*3* 192:*23*
196:*25* 197:*18*
**outweighs** 155:*25* 174:*19*
**overall** 49:*2* 155:*11*
**oversaw** 18:*3*
**oversee** 72:*24*
**overseeing** 145:*14*
**oversees** 104:*19*
**oversight** 22:*19* 48:*10*
**overtly** 176:*11*

**< P >**
**P.M** 200:*20*
**PAGE** 4:*5, 13, 17* 55:*8*
61:*12, 21* 64:*6, 9, 12, 21,
24* 77:*10, 13, 14, 18* 78:*9*
100:*25* 101:*3* 113:*4*
138:*17, 19* 139:*13, 15, 23*
142:*24* 143:*5, 9* 147:*14,
21* 149:*22* 151:*2, 4*
**pages** 55:*9* 67:*10* 106:*4*
**paid** 104:*9* 170:*5*
**PALMER** 2:*15* 5:*22*
**paper** 108:*11*
**papers** 158:*7*
**paperwork** 69:*14* 81:*6, 18*
**parallel** 72:*11* 104:*3, 16*
105:*3, 22* 191:*4*
**part** 20:*9* 22:*18* 26:*10*
49:*20* 54:*13, 20* 71:*14, 19*
118:*23* 119:*5* 123:*14*
143:*1* 151:*17* 171:*14, 16*
173:*20*
**participated** 188:*5*
**particular** 12:*5* 25:*15*
29:*20* 31:*21* 37:*4* 39:*3*
48:*1* 49:*5* 52:*15* 56:*8*
61:*9, 17* 66:*14* 71:*4, 23*
72:*1, 3* 76:*7, 23* 91:*17, 25*
99:*25* 106:*17* 109:*19*
114:*16* 118:*11, 13* 131:*25*
137:*6* 139:*10* 141:*20*
142:*3, 10* 143:*3* 144:*25*
145:*5* 184:*7*
**particularly** 50:*3* 114:*9*
**parties** 3:*3* 98:*25* 128:*5*
201:*12*
**partner** 70:*2, 6, 21*
**parts** 75:*6, 11*
**party** 160:*4* 193:*7*
**pass** 155:*19*
**passed** 122:*23, 25* 125:*22*
**passenger** 127:*3* 168:*2*
**passes** 111:*18*
**passing** 37:*23*
**paste** 66:*25*
**pasted** 67:*3*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 214 of 220 - Page
ID#: 4153
Deposition of Sergeant Charles Fink                                    Jason Laible, et al., vs. Timothy Lanter, et al.,

path 76:9, 22 122:6
123:14
pathway 75:5, 6 86:23
patrol 14:21, 25 15:3, 7
16:15 52:16, 19, 21 53:2,
15, 18 54:20 55:4 98:11
99:14, 17 100:9
Paul 193:4 196:21
pause 58:8
pedestrian 120:25 121:12
122:14 159:13 165:12
166:4, 9, 16 183:24
pedestrians 121:11, 21
122:5, 16, 18 166:9, 19, 22
184:15
pending 8:7
people 100:22 114:16
120:25 133:11 135:7
155:19 166:1 170:4
176:8 180:7, 24
percent 43:24 111:14
perfect 142:13 162:21
performed 77:3
period 12:7 100:10
permissions 157:3
person 20:18 25:13
39:21, 24 57:15 148:19
155:18 163:22 164:1
174:22 177:12
Personal 15:12 16:2, 6
personally 31:16 35:10
73:2 99:8 109:8
persons 154:8
pertaining 50:4
pertinent 91:16
phone 29:17 138:3
photographs 12:18, 21
physical 20:19 49:15
93:6 148:13, 18 149:2, 13
152:16 154:3, 8 155:4
157:21
physically 28:1
picked 91:15
picking 106:23
picturing 28:21
place 1:15 49:3 130:14
159:8 162:20 193:18
201:7
placed 92:16
Plaintiffs 1:5, 12 2:2, 7
3:5 5:13, 18, 21 52:7
Plan 56:23, 24 57:4, 8, 18
play 168:3
played 198:4
playing 31:9 163:4
plays 16:12 167:20
plea 178:13
please 14:8 77:9 97:19
101:1 138:17 139:13

158:6 197:6
plenty 74:12 104:23
Plum 2:15
plus 18:18, 22, 23
PO 22:20
point 7:12, 20 31:6
40:19 77:23 78:2 86:25
87:19 101:20 106:9
116:23 122:24 123:18
133:20 136:1 144:21
161:10 162:15 174:6, 11
176:16 189:5 193:20
196:3
pointing 74:4
points 73:11 133:25
162:6
Police 6:2, 8 13:25 14:16
17:16 19:1, 11, 20 20:12
49:13 79:11 80:24 81:12
82:22 88:13 89:3 95:14,
18 96:2 98:10 100:1
132:19 138:2 139:25
141:12 143:1, 18, 24
146:2 147:25 150:11
152:4 153:18 156:23
160:7, 13, 18 168:8, 11
170:22 173:25 175:7
181:13 189:14 199:16
policies 33:24 49:22
51:11 52:10 53:11 54:7,
25 56:14 150:10 152:13
156:23 184:21 187:1
Policy 11:17, 22 19:6
20:21 21:7 34:1 35:7
50:25 51:20, 23 53:17
54:8, 13, 15, 21 55:14, 20,
23 56:9 94:19 110:4
112:9 113:21 139:4, 17
143:3, 10 145:7 152:1
156:9 158:7, 12, 19
162:16 164:15, 25 171:16
173:21 174:23 175:3, 5, 8,
15 181:12 182:7, 13
183:3, 9, 11 184:16 185:7,
15, 20 187:7 189:22
populated 163:5
portion 116:1 134:7
141:3 143:7
portions 76:5 130:17, 20
131:7
posed 181:19, 25 182:16,
25
position 103:22 141:14,
16 142:2 195:11 196:3, 5
possession 87:21 110:17
possibility 166:19
possible 161:11 174:7, 21
posted 140:21 147:12
potential 24:9 174:9

Potentially 65:16 149:18
pouring 185:3
practice 90:18
practices 6:18
preceded 49:2
precisely 70:4, 15
preparation 13:2
prepare 8:20
presence 3:12, 16 121:12
201:11
PRESENT 2:22 38:14
presumably 123:6 160:25
presume 111:14 123:11
pretty 17:10, 12 35:18
54:16 122:1 192:6
previous 176:8
previously 9:3 11:10
52:8 57:3 93:12 97:16
Price 119:1 122:22 123:2
primarily 16:24 59:19
149:5
primary 128:8 135:11
140:7 186:17
printed 108:12, 13, 17
prior 13:21 63:17 65:9,
19 73:14, 17 74:8 104:21
127:13
Prisoner 66:4, 5, 7 67:6,
18 80:11, 13 84:20
100:19, 20
private 32:25
probably 6:15, 25 8:13
21:1 42:15 99:11 120:24
154:18 169:17 185:5
193:15 195:22
probationary 14:15
problem 8:4
Procedure 1:14 3:7
11:16 19:6 20:21 51:20,
23 53:22, 23, 24 54:8, 14,
16, 21 55:20 69:12
142:25 143:16
procedures 51:11 53:11
148:3 183:12 184:21
187:19
proceed 144:8 155:16
proceeded 67:21
process 31:19 37:12
50:13 94:9 137:25
141:11 147:24 187:8
190:18, 21 194:13, 15, 16
198:4
produced 110:24, 25
200:8
product 71:9
proficient 25:14
Program 16:4
Progression 14:11
promoted 15:5
proper 50:1

property 40:16, 24 41:7,
12 87:17, 20 88:6
prosecutor 82:18
Prosecutor's 82:14 83:4
prostitution 16:22
provide 31:2 79:18 82:8
provided 9:13 43:11
57:10 80:4 81:11, 16
83:1, 4, 16 84:5 86:13
88:3 89:24 110:9 164:7
176:22 178:9 179:4
189:7 199:23
proximate 126:9
psychology 13:8, 11
Public 1:21 181:16, 19,
25 182:17, 25 201:5, 19
Public-Court 3:11, 17
201:11
pull 32:21 41:16 42:10
125:4, 10
pulled 40:12 41:11 43:4
pulling 40:24 169:17
purportedly 176:18
purpose 48:3, 4, 10 49:20,
21 75:17 76:4 77:17
138:25 156:11
purposes 41:8
pursuant 1:13, 14 3:6
164:15 201:8
pursue 143:10 162:24
200:9
pursued 96:13 155:10, 12
161:3
pursuing 146:13 155:18
160:12 183:5
Pursuit 11:17 36:2, 7
42:23 43:14 44:21 45:11,
21 51:25 56:9 65:6 66:6
67:9, 19, 20, 21 68:19
69:13, 14 75:5, 17 76:5, 9,
22 84:20 95:13, 23 96:19
97:6, 12, 14, 18 98:13
99:25 100:21 107:8
118:17 120:10 121:13
125:5, 7 128:3, 13, 17, 25
130:3, 17, 21 131:8 132:7
133:21, 25 134:7, 11, 24
135:2, 10, 11, 13, 21 136:2,
8, 12, 14, 25 137:3, 4, 23
140:2, 3, 6, 7, 23 142:6, 11
143:1, 3, 14, 24 144:18
145:1, 2, 9, 16 146:11, 17
147:17 148:16, 23, 25
150:2, 9, 11 152:1, 11, 21
153:2, 8 154:10, 12, 15, 19,
25 155:14, 20, 24 156:10,
13 157:8 158:6, 12, 13, 25
159:4, 8, 18, 21, 25 160:8
161:19, 22 162:7, 12, 14,
19 163:10 164:8, 21

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 215 of 220 - Page
ID#: 4154
Deposition of Sergeant Charles Fink                    Jason Laible, et al., vs. Timothy Lanter, et al.,

165:2  166:6, 18  167:1, 18
169:15  171:4, 7, 9, 14, 16
172:13, 24  173:21, 22
174:1, 8, 16, 19, 25  175:1,
4, 14, 15  176:20  179:17,
25  180:4, 8, 15, 17, 22
181:8, 12, 14, 23  182:7, 14,
15, 22  183:7, 9, 11  184:14,
20  185:14, 19, 23  186:10,
12, 17, 21  187:15, 23, 24
188:9, 18  191:12, 25
**pursuits**  11:22  50:4  69:8
96:3, 8  99:8, 15, 21
125:11  133:10  145:15
146:23  155:21  158:17, 21
161:15  168:9  173:8
175:8  183:4
**pushing**  133:13
**put**  9:12, 22  10:17  80:10
109:9  114:4  176:4
195:11  196:7, 10
**puts**  111:15
**putting**  34:7  51:7  56:19

< Q >
**qualified**  201:5
**question**  7:21, 25  8:7
23:3  27:20  52:7  53:25
54:10  108:3  114:9
142:15  148:21  151:14
152:25  153:13  172:20
182:6  194:14
**questioning**  150:15
**questions**  7:12  63:20
64:3, 7, 10, 16  65:9, 13
88:22  92:3  93:11  138:12
171:22  197:2  200:4, 11
**quick**  18:9  52:6  58:7
**quickly**  108:6  166:10
**quiet**  192:7
**quite**  31:10  69:9  72:11
96:17
**quote**  53:20

< R >
**racial**  21:17
**radio**  59:22  60:12, 16, 22
61:1, 3, 5  62:2, 3, 9  72:7
109:13  136:1  146:22
**rain**  185:3
**ran**  116:14
**range**  138:3
**rank**  192:20
**ranking**  38:20, 25
**ranks**  14:10
**Rapid**  16:3
**rarely**  35:24
**rate**  121:5  167:6  168:19
**rates**  128:17  130:4

**RAYMOND**  2:2
**reach**  128:20
**reached**  186:23  193:15
**react**  166:14
**read**  31:8
**reading**  64:20
**reads**  143:10
**real**  18:9  167:23
**really**  9:24  25:9  32:11
37:5  55:18  61:14  90:4
91:10  96:12, 16  97:1, 4
100:17  113:10  164:1
**Realtime**  32:19
**reason**  23:2  69:23
124:20  146:16  193:23
194:9
**reasonable**  72:5  107:6
109:16  134:12  184:23
185:1, 6, 9
**Reasonably**  96:20  133:6
**reasons**  145:13  171:9
178:2
**recall**  12:21  28:14, 18, 24
36:20  37:21, 24  38:1, 24
39:19, 23  40:6  42:1, 18
47:19  57:17  67:5  68:25
69:1, 22  70:1  71:6, 22
73:12  75:12  77:22, 25
79:6, 19  81:13, 16, 17, 19,
24, 25  82:3  83:16  85:4, 5,
24  87:2, 14, 25  88:4  90:4
92:8  97:22  98:19, 22
100:17, 23  101:15  106:19
107:19  109:5  110:11
113:6, 16  117:6, 16, 23
118:2, 13, 14  119:17
122:3, 10, 11, 12, 13, 20
124:1  125:3, 23  126:17,
18  131:22  134:23  135:2
137:1, 5  151:8  191:10, 17
192:11, 17  195:10  196:8,
11  197:15  198:3, 5
**receipt**  40:15, 16, 24  41:7,
12
**receive**  25:22  103:25
107:23  200:6
**received**  80:6  90:3  108:8
**receiving**  25:2, 6  57:8
**recite**  143:9
**reckless**  183:14, 18, 25
184:18
**recklessness**  184:10
**recognize**  79:4  87:11, 12
**recollection**  81:25  86:18
**recommendation**  33:17
111:24
**recommendations**  33:12
35:3  111:25  112:13, 21
113:22  139:8  154:16
188:24  189:13

**reconstruction**  37:9, 12
83:11
**record**  5:16  6:13  7:3
9:22  38:8  51:15  58:8, 10,
12  78:17  80:6  89:18
102:12, 19  110:22  157:25
158:1, 4  197:11  198:18,
24  200:11
**recorded**  46:10, 11, 12
**recorder**  40:22  78:10, 16
**recorders**  29:15  45:22,
23  193:22
**recording**  58:9
**recordings**  41:12  60:16,
22
**recordkeeping**  41:8
**records**  79:23, 25  86:15,
25  91:12
**recovered**  81:5  83:14
87:20
**red**  108:25  110:8  163:18,
25  169:18  170:24  171:1
**redirect**  171:23
**redo**  125:6
**re-familiarized**  95:7
**refer**  53:8, 23  95:10
169:9
**reference**  60:15, 21  61:17
106:23  107:3
**REFERENCED**  4:17
8:24  11:6, 12, 19, 23  30:8
51:12, 16  52:3, 17, 22
56:25  57:5  62:10  93:7
100:18
**referencing**  26:22  31:15
81:14  142:4  152:8  157:1,
2
**referral**  20:1  22:1
**referred**  21:2  45:1
145:12  197:12
**referring**  53:13  122:24
144:16  177:12, 19
**refers**  165:11, 13
**reflect**  156:22
**reflecting**  94:2
**reflects**  112:20, 22
**Refresh**  30:11  86:18
**refreshes**  85:2
**regard**  155:16  161:18
164:16, 19  166:4, 15
**regards**  38:11  88:5  144:8
**regular**  181:3
**Regulations**  51:10, 16
55:19  56:12  141:11
143:21, 25  145:10  147:24
148:3  152:7
**reiterated**  175:21  176:24
**reiterating**  82:21
**relate**  23:24  50:18

**related**  100:20  151:5, 17,
20, 24  152:3
**relates**  149:23  150:1, 5, 9
**relating**  80:1  83:6  89:7
90:7  91:22, 24  137:9
190:11, 14  191:3  199:15
**relation**  96:8  132:19
**relative**  201:12
**relay**  146:14
**reliability**  178:25  179:5
**reliable**  176:21  177:3, 8
179:13, 18, 24  180:11, 17
181:9
**rely**  31:12
**remained**  14:16  15:7
**remaining**  67:10  164:15
**remember**  10:21  38:4
39:8  44:17  57:22  69:16
74:16, 21, 25  83:15  107:4
111:6  197:8, 9  199:2
200:2
**remove**  196:2
**removed**  37:16  40:17
42:1  195:9, 10  196:4
198:17, 20, 24
**reopening**  200:9
**repeat**  189:2
**repeatedly**  176:9
**rephrase**  7:22
**report**  8:22  9:1, 4  29:14
33:6  34:4, 13  35:10  51:8
56:20  58:3  62:21  66:11,
14  67:1, 14  68:13, 19
71:4  73:15, 22  74:8  77:8,
10, 17  78:22  80:9, 12
81:7, 8  83:9  91:18  93:17,
22, 25  94:2, 7, 15, 23  95:4,
8, 13  101:2, 13, 16, 19
102:3, 22  103:16, 20
105:2  106:3, 18  107:11,
24  108:24  109:19, 25
110:16  111:3  112:5
113:25  114:7  115:12, 13
117:8  118:16  128:16
138:11, 14, 17, 23  139:1,
13  151:2  153:18  154:7
171:8  186:23  189:7, 25
191:2  194:18  196:25
**Reporter**  1:20  3:11, 17
5:6  7:2  15:15, 19  27:14
59:7  70:24  86:7  87:5
124:11  201:11
**reporting**  66:17  201:13
**reports**  33:14  66:5
74:12  79:25  91:12
102:12, 15  103:4, 8  104:7
**representing**  5:12  6:4
**reprimand**  11:4, 11  198:6

Case: 2:21-cv-00102-DLB   Doc #: 152   Filed: 12/10/25   Page: 216 of 220 - Page
ID#: 4155
Deposition of Sergeant Charles Fink
Jason Laible, et al., vs. Timothy Lanter, et al.,

request 19:*11, 15* 20:*1*
22:*15, 23* 23:*2* 29:*21*
45:*9, 15* 57:*12, 15* 194:*4*
requested 57:*13, 20* 81:*3*
86:*14* 136:*12*
requests 82:*21* 89:*7*
require 174:*24* 175:*8*
required 142:*2* 146:*22*
159:*3* 161:*14* 181:*24*
184:*22*
requirement 147:*18*
requirements 33:*24*
150:*10* 151:*25* 158:*16*
requires 143:*18* 146:*13*
158:*19, 23* 164:*25* 175:*5*
181:*13* 182:*13, 21* 200:*8*
residences 33:*2*
residential 118:*25* 119:*2,
21* 120:*6* 163:*2*
residents 32:*22*
respect 150:*21*
respective 3:*3*
respond 38:*18*
responded 89:*10* 136:*4*
responders 79:*25*
response 92:*5* 199:*24*
responsibilities 38:*15*
142:*9*
responsibility 31:*22, 25*
141:*14* 166:*18*
responsible 104:*4* 147:*4*
rest 146:*20*
restrictive 76:*15*
resubmit 111:*3*
resubmitted 101:*24*
resubmitting 107:*20*
result 20:*14* 98:*13, 18*
201:*14*
resulted 154:*24*
results 49:*15* 154:*15*
retained 110:*2*
retention 110:*4*
Returned 39:*13, 15*
reverse 137:*22*
review 9:*17* 12:*1* 30:*21*
34:*13, 17, 21* 48:*12* 49:*2*
58:*24* 65:*8* 66:*23* 67:*14,
16* 68:*14, 16* 69:*4, 8*
72:*10* 74:*7* 82:*3* 87:*22*
95:*4, 16* 99:*15, 21, 25*
100:*15* 101:*8* 104:*22, 24*
105:*8, 9, 17* 106:*11*
111:*23* 112:*19* 113:*18, 19*
145:*22, 25* 146:*7* 148:*25*
153:*7, 15* 186:*24* 188:*15,
21* 189:*8, 12, 19, 24* 190:*2,
11, 14*
reviewed 8:*21* 9:*8* 30:*18*
43:*5* 56:*15* 58:*20* 69:*6, 9*
73:*3, 23* 74:*14* 75:*4*

77:*16* 78:*2* 93:*17* 95:*1*
107:*1* 131:*24*
reviewing 11:*9* 58:*22*
81:*18* 110:*8* 112:*4*
131:*22*
reviews 19:*7* 111:*15*
112:*3* 113:*25*
revving 132:*14*
reward 155:*25*
right 5:*9* 7:*10* 8:*3, 12*
10:*21* 13:*5* 20:*5* 21:*9*
22:*7, 8* 23:*6, 20* 26:*12*
27:*24* 29:*3, 5* 31:*13, 18*
32:*2, 7* 33:*4, 6* 34:*2, 18*
36:*1, 4* 37:*7* 40:*21* 42:*8*
43:*6* 44:*14* 45:*25* 46:*7,
15, 17, 19* 47:*1, 21* 48:*18*
49:*23* 54:*9, 14, 23* 55:*13,
15, 18* 56:*7, 9, 12, 17* 58:*4,
6, 17, 23* 61:*13, 23* 62:*16,
18* 63:*6* 66:*9* 67:*10*
69:*18* 71:*21* 77:*1, 4, 17*
78:*4, 21* 79:*12, 16* 80:*1,
17* 81:*8, 20, 23* 82:*9, 12,
23* 83:*23* 84:*2, 10, 13, 22*
87:*10* 88:*11, 18* 89:*3, 8,
12* 90:*25* 92:*23* 93:*9, 14,
19, 23* 94:*20, 25* 95:*5, 14,
18, 21* 96:*4, 19* 99:*7*
101:*10* 103:*11* 107:*11, 25*
109:*16* 112:*6, 10, 21*
113:*22* 114:*1* 115:*21, 23,
25* 116:*2* 120:*2, 8, 11*
122:*11, 16* 125:*9, 10, 17*
127:*5, 8, 25* 128:*5, 10, 13,
15, 18* 131:*16, 18, 19*
134:*20, 22* 135:*13, 17*
136:*2, 25* 137:*4, 10, 14, 20*
138:*23* 139:*5, 8* 140:*3*
141:*6* 143:*4, 21* 144:*1*
146:*2, 7, 17* 147:*8, 18*
148:*5, 14, 20* 149:*24*
150:*3, 7, 12, 22* 151:*7, 18,
22* 152:*1, 7, 13, 18, 22*
153:*3, 10, 21* 154:*10, 17*
155:*5, 22* 156:*13, 18*
157:*21* 158:*3, 17, 25*
159:*5, 25* 160:*4, 8, 18*
161:*3, 7, 11* 162:*7, 16*
165:*2, 9, 18, 19, 21, 22, 24*
166:*2, 22* 169:*5* 172:*19*
174:*2* 179:*8, 13, 25*
180:*11, 18* 181:*16, 19*
182:*1* 183:*1, 7, 15* 184:*16,
23* 185:*10, 22* 187:*2, 7*
188:*6, 25* 189:*9, 19, 24*
190:*2, 7, 9* 192:*5* 200:*3*
Ring 33:*1*
risk 128:*4* 148:*13, 18*
149:*1, 12* 152:*16* 154:*3, 8,

13* 155:*4, 9, 24* 157:*21*
159:*4* 161:*19* 162:*4*
165:*6, 8* 168:*4* 181:*15, 18*
182:*16, 24, 25*
risks 164:*9* 181:*25*
River 120:*5*
road 98:*2* 125:*16* 135:*6*
159:*15* 163:*12* 164:*17*
165:*8* 166:*25* 167:*3, 14*
174:*11*
roads 120:*20* 121:*2*
167:*7*
roadway 183:*6* 185:*4*
roadways 143:*13*
road-worthy 169:*6*
robberies 16:*9*
robust 106:*6*
Roebling 43:*16* 119:*15*
123:*21* 125:*17*
role 16:*17* 17:*14* 18:*25*
69:*20* 73:*21* 135:*10, 12,
23* 142:*5, 22* 177:*14*
roles 99:*22* 137:*22*
room 7:*14* 88:*6*
Roughly 14:*13* 130:*8*
ROULA 2:*7* 5:*17*
roundabout 123:*19, 24*
125:*14*
route 45:*11* 118:*17*
Rule 141:*10, 20, 25*
147:*23* 148:*7* 149:*22*
151:*16* 154:*1, 16* 187:*7*
201:*14*
Rules 1:*14* 3:*7* 51:*9, 15*
55:*19* 56:*12* 141:*10, 18*
147:*23* 148:*3* 187:*1, 18*
188:*23* 189:*17, 22*
run 6:*19* 35:*24* 79:*25*
rush 123:*6* 165:*14*
RUTOWSKI 2:*18* 6:*3*
Ryan 47:*17*

< S >
safely 133:*15*
safety 144:*8* 155:*17*
164:*16* 183:*14, 18* 184:*15,
19*
sake 11:*9* 61:*8*
sat 46:*23* 70:*2* 85:*10*
saved 109:*1*
saw 9:*15* 67:*4* 110:*15*
126:*23* 131:*14*
saying 20:*18* 40:*17* 69:*2*
72:*6* 89:*11* 107:*5* 115:*8*
122:*13* 154:*14* 182:*5*
says 90:*16* 144:*2* 165:*12*
171:*8* 175:*16* 186:*18*
Scalf 47:*15* 57:*9* 64:*22*
72:*4* 85:*10* 135:*25* 136:*7,

22, 24* 140:*9, 11* 157:*11,
12* 188:*12*
Scalf's 107:*4* 109:*12*
scene 36:*10, 14, 23* 37:*16,
20* 38:*16* 41:*24, 25* 42:*24*
80:*1*
scenes 38:*18*
School 162:*21, 23*
Schrage 87:*15*
scratch 105:*8* 108:*22*
screen 132:*12*
se 157:*10*
seal 201:*15*
searchable 198:*19*
seat 186:*8*
second 64:*6, 9, 24* 129:*5*
199:*5*
secondary 85:*9*
seconds 130:*9*
secret 70:*10*
Section 14:*25* 15:*10*
17:*2* 33:*22* 67:*9* 68:*22*
71:*12* 78:*9* 84:*17* 90:*19*
130:*6* 138:*23* 139:*1, 4, 12*
143:*17, 18* 146:*10, 11, 12*
see 15:*4* 28:*6* 35:*4*
61:*17* 64:*4* 75:*25* 76:*12*
78:*11* 95:*25* 101:*7*
103:*24* 107:*2* 108:*3*
119:*6* 121:*20* 125:*6*
130:*25* 131:*1, 20* 132:*22*
186:*3* 193:*1*
seeing 122:*11* 125:*3*
131:*23*
seen 162:*22* 171:*7*
sending 71:*7*
sense 30:*8* 86:*22* 173:*17*
sent 14:*15*
sentence 108:*23* 112:*1*
separate 67:*2* 71:*15*
177:*20*
September 14:*13* 81:*4*
83:*25* 84:*6*
SERGEANT 1:*11* 3:*4*
4:*2* 5:*1* 6:*7, 11, 14* 8:*19*
13:*6* 15:*6* 17:*15* 18:*2*
29:*19* 36:*3* 41:*20* 42:*20*
46:*17, 22* 47:*15* 57:*9*
59:*13, 20* 60:*9* 62:*8* 63:*6*
64:*22, 25* 72:*4* 79:*3*
84:*11* 85:*10* 86:*5, 10*
87:*10* 88:*11* 89:*1, 10* 100:*22*
107:*4* 109:*12* 122:*24*
124:*9, 13, 25* 125:*8* 126:*7*
129:*10, 11, 15* 133:*3, 17*
135:*10, 22, 25* 136:*7, 20,
22* 139:*24* 140:*9, 24*
141:*9* 142:*8* 146:*10*
147:*6, 22* 148:*11, 16, 23*
150:*20* 153:*9, 20* 154:*6*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 217 of 220 - Page
Deposition of Sergeant Charles Fink                                    ID#: 4156
Jason Laible, et al., vs. Timothy Lanter, et al.,

157:2, *11, 12*  158:5
164:*13*  186:*16*  188:*12*
195:8  196:2  200:*15*
201:6
**sergeants**  18:*16, 18*  72:25
85:20
**serious**  19:6  20:*19, 21*
49:*15*  128:4
**seriously**  82:*1*
**seriousness**  160:3  169:*13*
171:*17*  172:*15, 22*  174:*15,*
*18*  175:*18*
**serves**  196:6
**service**  31:5  141:*17*
**services**  14:4
**serving**  177:*13*
**set**  1:*16*  9:6  52:*10*  56:2
80:22  201:8, *15*
**sets**  54:25  64:*15*
**seven**  18:*21*  96:*1, 7, 18,*
*25*  97:4, *8, 11*  99:*18*
**seventh**  65:3
**sexual**  16:6  19:4  21:*4, 17*
**shakes**  7:6
**shared**  84:*19*
**she'd**  103:*19*
**sheet**  27:7  77:25  101:7
**Shively**  47:5
**shoot**  127:*1*
**shooting**  22:*21*
**shootings**  170:9
**short**  37:*14*  96:*19, 20*
97:4, *8*  100:*4, 10, 13*
121:*18*  130:6
**shorter**  96:*10*
**shortly**  37:*17*  82:2
**shot**  126:4  129:3  170:6
**shotgun**  46:*23*
**shout**  8:5
**show**  26:8  55:*12*  93:*11*
**showed**  92:*1*
**showing**  132:9
**shown**  164:7
**sic**  41:*19*
**side**  16:25  127:3
**sight**  173:*20, 21, 25*
**signature**  3:*15*  201:*10, 11*
**signatures**  107:22
**signed**  18:5  113:*3, 5*
114:*14*  117:9
**significant**  124:6
**signs**  111:*21*  144:4  145:7
**similar**  55:*3, 6*  64:6
115:*12, 13*  165:*12*  177:*24*
**simple**  26:4  35:*21*  37:*23*
**simply**  189:*1, 3*
**siren**  132:*13*
**sirens**  125:9  133:9
**sit**  81:*20*  122:*12*  134:4

**situation**  37:*1*  127:8
160:*11, 21*
**sixth**  65:*1*  119:*10*
**skies**  120:*20*
**slow**  127:*20*
**slowing**  125:*24*  126:*15*
127:*11*  132:*16*
**slowing/stopping**  183:*22*
**small**  21:*22*  66:*18*
119:*12*  129:*15*
**smile**  26:*20*
**Smith**  1:*8*
**smoothly**  6:*19*
**Snider**  117:*4*
**snippet**  43:*14*  44:*16*
**Snodgrass**  82:*12, 23*
83:*22*  86:*12, 20*  88:*3*
**snowy**  167:*7*
**software**  30:5  32:7
**Solicitor**  2:*14*
**somebody**  41:*10*  199:*20*
**somebody's**  127:*4*
**somewhat**  53:6  55:6  68:6
**sorry**  7:9  22:5  27:*1, 15,*
*17, 22*  42:5  54:*11*  56:*1*
59:*1*  60:*19*  74:24  77:*19*
82:*17*  86:6  87:6  97:*17*
101:7  115:6  124:*13*
130:*18*  132:25  134:25
139:*19*  148:22  149:*16*
151:*13*  153:*1, 14*  160:*19*
169:4  172:*21*  179:2, *20*
180:6  185:*17*  188:*10*
189:*20*  190:*12*  197:*15*
**sort**  98:*21*
**sorts**  72:*12*  104:3  105:9
140:*18*
**source**  32:*12*  63:*1*
175:25  177:5, *22, 23*
178:7  179:8, *24*
**sources**  32:9  132:5
**south**  126:22  136:*15*
**space**  38:*19*
**spacing**  66:*18*
**sparsely**  123:*1*
**speak**  7:2  10:4  13:*1*
25:*10*  37:*18*  114:*24*
140:*17*  155:*8*  190:*3*
**speakers**  62:*16*
**speaking**  14:*13*  25:*19*
28:*16*  38:*17*  45:*21*  63:22
**spec**  141:*25*
**special**  47:*7*
**Specialist**  41:*19*  42:*21*
47:*20*  65:2  106:*25*
128:*22*
**specific**  38:*22*  45:*14*
48:*8*  64:*15*  74:*19*  90:*14*
106:9, *16*  118:5, *7*  132:4,

*10, 16*  142:*1, 5*  145:*15*
182:8  183:6  185:22
192:*18*
**specifically**  7:*17*  10:8
21:*16*  49:7  69:*12*  73:*12*
102:*10*  103:*17*  131:7
133:*3*  143:*14*  145:6
183:*4*  185:7
**Specifications**  141:*18*
142:*1*
**specificity**  17:*11*
**speculative**  195:*3*
**speed**  74:5  96:*14*  106:23
128:*17*  129:*13, 18*  130:4,
*14*  131:*11*  132:7, *16, 18,*
*24*  133:*1, 20*  134:6, *13, 16*
140:*21, 25*  141:5  147:7,
*12*  149:9, *19*  150:6
151:22  159:24  167:6, *16*
168:*19*  184:22  185:2, 9
**speeding**  132:*15*
**speedometer**  129:2  131:2,
*15, 21*  132:9  133:*19*
134:*1*
**speeds**  72:9, *15*  130:*16,*
*19*  132:*11*  133:25  146:*17,*
*19, 23*  147:4, *16*  149:6, *12,*
*24*  185:8
**spell**  6:*12, 13*
**spellcheck**  66:*19*
**SPENCER**  2:*10*  6:5
**split**  126:4
**spoke**  85:*13, 18*  100:22
171:*19*  180:*21*
**spoken**  6:*14, 25*
**spot**  123:*16*  124:*15*
134:*12*
**spots**  120:*21*
**spotting**  74:5
**squad**  79:23  80:6  81:6, *8*
**SS**  201:*3*
**Stacey**  1:*20*  201:*3, 19*
**stack**  158:7
**staff**  46:*4, 7*  195:23
**stage**  43:5  78:24
**stamped**  77:*10*  138:*19*
139:*13*  151:*3*
**stand**  138:*13*
**start**  14:6  25:6, 7  28:9
**started**  13:*24*  14:*14*
97:22  117:7, *10*  127:*1*
137:22  164:*13*
**starting**  77:*13*  127:*20*
139:22
**State**  1:*21*  176:*10*  201:*1,*
*5, 19*
**stated**  160:25
**statement**  171:7
**statements**  29:*16, 17*
32:*14, 15*

**STATES**  1:*1*  69:*13*
141:*12*  147:25
**static**  75:20
**station**  89:23
**stayed**  14:*21*  126:9
**steering**  76:*19*
**stenotype**  3:*10*  201:9
**Stettinius**  1:*17*  2:*10*
**STEVEN**  2:7  46:*19, 22*
84:*13, 15*
**stick**  142:*17, 19, 20*
168:*16*
**sticker**  28:*23*  29:*1*
**sticks**  99:6
**stipulated**  3:*2*
**stipulations**  1:*16*  201:8
**stood**  11:*17*  76:*21*
**stop**  94:*10*  97:*23*  99:6
120:22  124:*21, 22*  125:*18*
126:*1, 15*  127:*11*  144:*4, 6*
145:7  155:*13*  163:*17*
167:*24, 25*  168:*16*  170:*19,*
*23*
**stopped**  116:*14*  123:*18*
124:7, *10, 15*  126:*16*
169:22  171:*24*  172:*3, 10*
**stopping**  125:*24*  163:*18*
**stop-stick**  169:7
**straight**  35:*25*
**straightaway**  134:*13*
**strange**  187:*14*
**Stratmann**  47:*11*  176:25
**Street**  1:*18*  2:*4, 11, 15, 21*
43:*19*  44:8  45:7  119:9,
*10, 14, 17, 25*  120:*1*  123:4,
*15*  124:*17*  125:*15, 25*
126:8  127:2  129:*16, 21,*
*25*  130:7  131:*17*  133:4
134:*14, 19*  140:*20*  147:*11*
164:*12*  186:*19*
**streets**  124:2  135:*16*
140:*1*  143:*13*  150:3
151:6, *18*  163:2
**stressed**  171:*21*
**stretch**  119:*12*  123:9
129:*16*
**stricken**  110:*13*  197:*10*
**strict**  25:*16*
**Strictly**  31:*17*  50:*15*
**strike**  106:*1*  122:3  177:4
183:*10*
**struck**  76:*20*
**structure**  17:*18, 22*  66:*17*
89:7
**stuff**  16:*23*  66:*18*  89:7
**stumble**  176:*15*
**stun**  197:*13*
**style**  55:*3*
**subject**  53:*21*  197:3
**subject's**  87:*21*

submission 102:3, 7
submit 102:17
submitted 101:22 102:13, 18 103:23 104:7, 12
submitting 71:4
subsection 148:10
subsequently 198:24
successful 161:6 173:6
sued 199:20
suggest 74:4 192:3
suggested 34:22
suggestions 107:25
suicide 170:12
Suite 1:18 2:4, 8, 12, 18, 21
summaries 62:9 115:23
summarization 33:15
summarize 33:8
summarized 94:24 95:12 118:21 139:23 188:16
summarizing 142:8
summary 12:3, 4 14:2 30:9, 10, 19, 20 58:22 59:2, 14 60:1, 17 61:3 66:3 67:20 71:4 77:25 80:17
Sunday 165:15
sunny 120:19 121:2 165:24 167:3, 8
supervising 35:11
supervisor 15:13 68:14 84:16 99:14, 17 100:9, 11 110:9 135:19, 24
supervisors 18:16, 22 85:13
supervisory 34:23 142:9 194:25
suppose 24:10 71:7 114:3
supposed 37:3 140:13 142:9 147:1
sure 6:14, 19 8:8 10:9 23:14, 19 29:4 30:13 42:12 62:25 63:1 64:19 66:24 77:23 81:21 96:5 103:19 104:9, 24 112:7 113:25 117:20 118:5 122:9 131:23 150:17 151:12 163:7 182:20
surroundings 76:1
surveillance 32:24 33:2 45:12 65:6 137:7 180:22
suspect 159:5 160:17 161:6, 10, 20 162:2 163:16, 18 168:5, 18 169:1, 10 172:17 174:6 175:10
suspected 160:3 169:13 171:17 172:15, 23

suspect's 160:7 168:8, 12, 15
sustained 186:25 189:13 198:16, 23, 25 199:10
sustaining 190:6
swap 89:6
swerve 127:24
swerved 126:6 127:18
swivel 75:25
sworn 5:3 201:6
synthesized 93:21
system 29:25 30:2 32:7 66:17

< T >
table 5:16
Tactical 52:16, 19, 21 53:1, 15, 18 54:19 55:3
tactics 50:1
Taft 1:17 2:10
take 3:8 7:3 8:5 17:8 56:3 58:7 65:17 91:24 123:12 129:3 135:23 150:15 157:24 159:8 164:9 170:17
taken 1:12 3:5, 10 20:12 130:13 171:3, 6 201:8, 9
talk 10:6 57:14 70:13 73:14 84:24 113:12, 14 117:14 170:3 190:23 191:8, 11 192:19 194:9
talked 34:9 51:6 58:2 62:1 70:5, 22 85:14, 19 91:20 170:8 180:24 191:22
talking 20:4 27:15, 18 30:17 58:19 78:10 103:10 117:16 141:4 164:23 167:13 185:23
talks 79:14
taser 32:18
task 36:25 177:1, 10 181:2
tasked 53:6
team 37:9 83:11
Tell 73:8 97:18, 20 120:17 130:11 154:22 197:6, 7 198:12
telling 39:1 99:10
tells 169:21
ten 99:11 163:3
Teresa 116:11
term 185:19
terminal 170:10
terminate 155:13, 21 158:25 175:14, 17
terminated 162:15 173:23 174:1
termination 174:24

terms 22:1 25:2, 5 32:4 48:20 49:19 95:11 121:4
testified 5:4 6:15
testify 8:16
testimony 6:18, 20
Thank 5:6 15:19 56:5 58:13 59:8 61:23 62:5 65:8 87:7 200:11
Thanks 6:10 56:5
Theetge 116:11 117:21
theft 24:12
thing 15:25 28:22 40:7 54:2, 4 55:5, 11 68:17 69:7 72:1 76:6 78:15 81:23 83:15 91:2 106:8 107:19 114:14 130:22, 24 136:10 149:15 152:5 157:14 165:16 167:2 168:22 182:8 192:10 193:20 199:9
things 6:19, 23 9:11 16:7 18:13 21:2, 5, 22 24:1 30:18 44:14 50:11 52:1 58:21 65:18 66:19 67:20 72:10 74:2 81:22 90:10 95:1 97:10 104:24 106:7 108:2 112:5 114:17 132:13, 14 140:11 142:1 144:4 149:11 163:4 164:24 168:3 169:8 170:17 171:20, 25 175:21, 23 186:15 199:12
think 6:12 8:13 9:19 10:20 12:20 15:4 17:24 18:9, 15 20:23 21:22 27:22 41:4 47:23 56:22 61:6 63:19 69:7 72:1, 2 84:12 99:4 108:10, 23 117:7 119:6 122:23 123:7, 16 124:17, 20 131:13 133:22 135:5 136:9 138:1, 3 144:14 161:16 162:8 165:11 169:3 170:17, 25 171:2, 14 176:8 195:8, 19 199:4
thinking 163:24
third 64:9, 24 98:24 128:4 193:7
Thirty-one 14:1
THOMAS 2:11, 20 6:4 36:3 42:4, 5, 21 46:14 60:2 65:1 106:25 128:23 129:6, 12, 19 131:15 135:20 137:20, 25 140:20 147:11 150:22 151:4, 5, 16 152:12, 20 153:3, 9, 20 154:6 195:9 196:2, 8
Thompson 41:19 42:3 106:25

thought 65:19 109:15 136:14 186:5
threat 174:22 175:11, 13
threatened 175:24 176:3
threats 176:11
three 40:12 41:11, 21, 22 42:1, 20 116:16 119:7 123:18 157:8 186:18
three-year 12:4
threw 98:1 109:3
throw 26:6 99:6
thrown 199:22, 23
tied 163:14
till 26:19
Tim 6:1, 4
time 1:15 3:5 7:2 11:18 14:9, 24 15:12 16:21 17:23 18:17 36:18 39:15 70:19 74:10 84:2, 17 90:20 91:1, 8 93:25 94:10 96:7 98:11 100:10 101:25 102:2 110:15 116:8 120:24 125:23 130:13 132:22 133:9, 15 134:17 136:14 142:17 147:2 158:12 159:17 162:6 167:10, 23 172:18 175:21 180:17 190:24 191:16 192:7, 9, 15, 21 196:9 199:4 200:4, 10 201:7
times 18:14 22:24 27:19 28:4 53:9 73:16 106:6 107:18 131:3, 12, 21 144:10, 13 157:13
Timmy 164:12
TIMOTHY 1:7 2:11, 20, 24
tires 169:8
title 66:11
titles 9:15
today 5:14 6:10 8:14 95:5 122:12 138:14 191:21 192:22
told 23:13 24:4 42:12 75:3
top 56:22 61:11, 20 116:1 135:8
topics 55:2 74:22 75:1
toss 70:3
total 18:21 71:16
touched 135:5
traffic 50:10, 15 60:16, 22 120:18, 20 121:1, 5, 21 122:14 124:23 126:16, 23 127:1 133:6 143:20, 25 145:9 152:7 159:10, 13, 24 163:9, 11, 17 164:17, 19, 23 165:1, 13, 14 166:5,

Case: 2:21-cv-00102-DLB   Doc #: 152   Filed: 12/10/25   Page: 219 of 220 - Page
ID#: 4158
Deposition of Sergeant Charles Fink                          Jason Laible, et al., vs. Timothy Lanter, et al.,

*7, 16* 167:*12, 17, 20, 23*
183:*23*
**trafficking** 176:*2*
**training** 49:*23* 55:*6, 10*
100:*1*
**transcribed** 3:*12, 13* 31:*1*
201:*9, 10*
**transcript** 10:*14* 61:*18*
**transcription** 31:*3, 5, 14*
115:*14*
**transcriptions** 114:*19, 25*
115:*5, 7*
**transfer** 14:*19*
**transferred** 14:*20, 23*
15:*2, 6, 9* 123:*23*
**translation** 9:*19* 10:*11*
**transmission** 9:*19* 62:*9*
**transmissions** 61:*1, 3, 5*
62:*2, 4*
**transmit** 86:*14* 146:*22*
147:*7* 149:*6, 23*
**transmitting** 149:*12*
**transported** 82:*2*
**transversed** 126:*3* 130:*8*
**trash** 109:*4*
**travel** 135:*16*
**traveled** 119:*4*
**TRAVELERS** 2:*17* 5:*23*
**traveling** 126:*10* 132:*20,
23* 150:*5*
**trial** 6:*20*
**tried** 95:*17, 20* 157:*13*
**trigger** 19:*22*
**TRISTAN** 2:*15* 5:*22*
**true** 128:*2*
**truth** 201:*6, 7*
**truthfully** 8:*17*
**try** 27:*18, 20, 21*
**trying** 20:*23* 21:*21*
88:*17* 90:*12* 99:*5* 144:*14*
171:*23*
**Tuesday** 1:*19*
**tumor** 170:*10*
**turn** 73:*22* 158:*6*
**turned** 74:*9, 10, 11*
102:*17* 104:*14* 105:*2*
112:*17* 119:*21* 199:*5*
**turns** 167:*6*
**twice** 107:*14* 136:*13*
**two** 18:*10, 11, 13, 17, 18*
19:*13* 40:*12* 41:*11, 21, 25*
44:*13* 55:*8* 56:*2* 62:*19*
66:*4* 73:*11* 99:*19* 100:*8*
116:*15* 119:*7* 120:*21*
130:*14* 137:*18* 169:*8*
170:*8* 199:*11*
**type** 29:*11* 41:*5* 45:*1, 12*
66:*11* 159:*23* 161:*2*
165:*13* 167:*16* 168:*2*
183:*6*

**typed** 10:*20, 23* 62:*12*
66:*14*
**types** 46:*1* 50:*24* 54:*6*
178:*14*
**typewritten** 28:*19* 92:*20*
**typical** 123:*13*
**typically** 22:*3, 9* 45:*18*

< U >
**UC** 13:*12*
**Uh-huh** 26:*24* 97:*15*
101:*9* 141:*13*
**uh-huh's** 7:*7*
**Uh-uh** 26:*15*
**uh-uh's** 7:*7*
**ultimate** 110:*5*
**ultimately** 21:*14* 29:*12*
42:*16* 43:*5* 75:*10* 93:*21*
109:*22* 111:*25* 112:*16*
114:*12* 119:*14* 150:*20*
152:*10* 155:*11* 162:*1*
186:*22* 189:*11* 193:*14*
194:*19* 198:*22*
**unable** 157:*15*
**uncommon** 192:*4, 8*
**undersigned** 201:*5*
**understand** 7:*21* 23:*14*
**understanding** 6:*17* 48:*2*
88:*1* 104:*2* 182:*5* 194:*3*
198:*21*
**understood** 8:*1* 50:*14*
**undertake** 24:*17* 90:*7*
**undertaken** 185:*14, 18*
**unfortunately** 103:*15*
125:*11*
**unique** 96:*17*
**uniquely** 163:*14*
**Unit** 15:*14, 16, 18, 24*
18:*8* 69:*10* 87:*17* 104:*7*
137:*13* 138:*5, 6* 181:*2*
**Unit/Poligraphy** 16:*3*
**UNITED** 1:*1*
**units** 65:*6* 72:*16* 181:*4*
**unknown** 176:*14*
**unrelated** 42:*22*
**unsafe** 155:*22, 24* 156:*13*
**unusual** 67:*15* 68:*7* 69:*2*
**updated** 110:*9, 20*
**upgraded** 78:*20*
**use** 32:*5* 50:*18* 51:*7*
52:*15* 53:*1, 4* 68:*11, 13*
158:*23* 187:*15*
**uses** 69:*6, 9*
**usually** 26:*18* 35:*19* 55:*8*
113:*12* 192:*4*
**utilize** 41:*8*
**utilized** 52:*14* 121:*15*

< V >
**Vance** 81:*8, 24* 82:*5*

**various** 58:*19* 62:*16*
91:*21* 109:*25*
**vast** 9:*16*
**Vaughn** 101:*14, 25*
112:*18* 113:*4* 117:*14*
**vehicle** 36:*2* 37:*15* 81:*6,
15* 83:*14* 87:*21* 97:*24*
122:*2, 14* 124:*14* 126:*19,
20* 127:*4, 24* 128:*1, 3*
135:*11* 140:*8* 142:*6*
146:*16* 151:*21* 152:*4*
160:*7, 24* 161:*3* 162:*23*
166:*20* 168:*8, 12, 15, 16,
20, 22, 23, 24, 25* 169:*1, 6,
18, 21* 173:*16, 22* 174:*1, 4*
183:*13* 184:*13, 22* 186:*17*
**vehicle/pedestrian** 167:*12*
**vehicles** 40:*14* 42:*2*
121:*16* 122:*16, 17, 19*
130:*20* 132:*19, 20* 135:*13,
15* 139:*25* 143:*1, 11, 18*
150:*11* 160:*13, 18* 183:*5*
**vehicular** 121:*1* 159:*24*
167:*17* 183:*23*
**verbal** 7:*4, 5* 86:*19*
197:*13*
**version** 78:*20* 107:*10*
110:*20* 111:*11* 112:*16, 17,
19*
**versions** 108:*25* 109:*25*
110:*7, 16, 23*
**versus** 21:*12, 23, 24*
23:*12* 24:*5* 78:*17* 167:*14*
**Viaduct** 119:*10, 25* 123:*4*
129:*16, 21* 130:*1, 7*
131:*17* 133:*5* 134:*14, 19*
140:*20* 147:*11* 164:*12*
**Vice** 14:*25* 15:*1* 16:*16*
198:*13*
**vicinity** 128:*5* 132:*20*
**victim** 168:*5*
**victims** 115:*15*
**video** 29:*15* 31:*9* 40:*22,
25* 43:*8, 15* 44:*2* 45:*22,
23* 46:*9, 11* 78:*10, 16, 17*
193:*22*
**view** 75:*20* 76:*2* 77:*24*
87:*19, 23* 116:*18* 121:*9,
24* 122:*1* 128:*23* 188:*17*
189:*8*
**viewing** 122:*7* 124:*24*
**views** 112:*20*
**Vine** 2:*21*
**violate** 145:*9*
**violated** 143:*3* 146:*11*
152:*6* 163:*24*
**violating** 151:*16*
**violation** 35:*7* 48:*15*
50:*10* 53:*17* 55:*14, 23*
139:*10* 141:*9* 144:*19, 20*

147:*22* 148:*2, 10, 12, 18*
149:*1, 21, 22* 150:*23, 24*
151:*5* 152:*12, 15* 154:*2*
156:*16, 19, 23, 25* 157:*16*
163:*19* 169:*18* 170:*24*
185:*25* 186:*7* 187:*1, 7*
**violations** 21:*7* 34:*2*
50:*6, 15, 17, 22, 25* 94:*16,
19* 112:*9* 113:*21* 139:*4,
17* 154:*17* 156:*18, 22*
157:*18* 186:*1, 12* 187:*19*
188:*23* 189:*4, 17, 22*
**violent** 174:*23* 175:*13*
**visibility** 167:*4, 13*
**vision** 76:*14*
**visual** 60:*5, 10*
**Vogelpohl** 47:*3*
**volume** 159:*23* 167:*16*
168:*1*
**vs** 1:*6*

< W >
**wait** 26:*18* 27:*15* 133:*14*
172:*19* 173:*2*
**waiting** 84:*1* 174:*19*
**waived** 3:*9*
**walk** 14:*8* 26:*19* 75:*11*
77:*5* 113:*12, 13*
**walked** 75:*4, 9* 76:*8*
**walking** 76:*4, 22* 170:*25*
**Walnut** 1:*18* 2:*11*
**want** 9:*21* 10:*5* 28:*24*
29:*2* 35:*5* 38:*7* 62:*24*
79:*22* 104:*13* 105:*14*
118:*18* 119:*11, 19* 134:*9*
156:*2* 162:*24* 168:*11*
178:*4*
**wanted** 10:*2* 66:*24* 76:*1,
12* 88:*18* 98:*6* 169:*22*
194:*1*
**wanton** 184:*1, 3*
**wantonness** 184:*11*
**warm** 121:*2*
**WARREN** 201:*3*
**Warsaw** 119:*1, 8, 9* 123:*2*
**watch** 114:*22*
**watched** 10:*16* 30:*25*
60:*7, 13* 131:*25* 132:*3*
**watching** 59:*16*
**way** 21:*25* 29:*4* 34:*17*
40:*4* 42:*13* 57:*16* 75:*23*
76:*16* 87:*24* 114:*23*
115:*21* 123:*13* 124:*5*
125:*4, 20, 21* 127:*17, 24*
135:*16* 137:*22* 140:*1*
143:*11* 145:*19* 149:*17*
150:*2* 151:*6, 17* 153:*6*
157:*9* 166:*10* 181:*15, 24*
182:*23* 183:*5* 189:*13*

Case: 2:21-cv-00102-DLB    Doc #: 152    Filed: 12/10/25    Page: 220 of 220 - Page
Deposition of Sergeant Charles Fink                        ID#: 4159
Jason Laible, et al., vs. Timothy Lanter, et al.,

199:*9*
**ways** 19:*13* 178:*6*
**weather** 120:*16, 17, 18, 19*
135:*7* 159:*20* 163:*13*
166:*25*
**wee** 165:*20*
**week** 15:*11* 195:*6, 22*
**weeks** 103:*18* 104:*13*
116:*16*
**weird** 70:*12*
**well** 5:*19* 7:*10* 13:*23*
17:*23* 20:*11* 29:*3* 34:*2*
41:*21* 45:*3* 47:*21* 49:*11*
50:*8* 53:*5* 56:*3* 57:*23*
60:*10, 16* 63:*13* 69:*14*
70:*7* 71:*8* 73:*4, 16* 75:*10*
81:*8* 85:*1* 94:*7* 95:*25*
96:*22* 100:*7* 104:*4*
108:*21* 110:*25* 111:*13*
112:*9, 13* 114:*8* 118:*23*
122:*3* 129:*18* 130:*1*
133:*2, 6* 139:*8* 140:*7*
142:*16* 149:*4* 150:*22*
152:*1* 155:*19* 163:*11*
164:*25* 165:*5* 166:*11*
168:*14* 171:*11, 13* 172:*5*
176:*12* 177:*4* 181:*3*
185:*2* 197:*21*
**went** 15:*11* 18:*6, 15*
36:*23* 38:*1, 10* 71:*7, 9*
80:*12* 89:*22* 91:*15* 98:*4*
119:*13* 123:*14* 124:*5*
125:*14, 19* 126:*11, 12, 14*
127:*20* 150:*2* 171:*1*
**we're** 5:*14* 6:*18* 8:*13*
20:*3* 27:*15, 17, 22* 53:*5, 7,
10, 12* 59:*4* 63:*5* 158:*3*
163:*18, 24* 200:*11*
**westbound** 126:*5* 127:*16,
21*
**wet** 167:*3, 7*
**we've** 22:*14* 51:*5* 58:*2*
59:*12* 90:*1* 162:*22*
**whatnot** 115:*15*
**wheel** 75:*23*
**WHEREOF** 201:*15*
**white** 28:*23* 29:*1*
**wide** 126:*13, 14*
**wide-open** 119:*5*
**willing** 164:*9*
**Winton/Terrace** 97:*23*
**witness** 1:*11* 3:*4, 13, 14*
4:*2* 5:*2, 5* 9:*25* 15:*17*
29:*16* 32:*13* 58:*14* 62:*5*
64:*20* 70:*25* 201:*8, 10, 15*
**witnessing** 176:*7*
**Wonderful** 59:*8*
**Word** 66:*16, 22* 100:*4*
142:*13* 184:*3, 4*

**work** 28:*22* 37:*10* 71:*9*
74:*13* 96:*2* 104:*6* 141:*18*
178:*18* 187:*16*
**worked** 18:*12* 65:*14*
**working** 13:*24* 14:*6* 34:*5*
40:*8* 110:*2* 196:*17*
**works** 6:*18*
**wrap** 98:*20* 150:*15*
**write** 7:*8* 35:*2* 68:*7*
92:*4* 147:*21* 187:*17*
**writing** 79:*6* 80:*9* 87:*14*
108:*22* 151:*8*
**written** 8:*23* 11:*4, 11*
12:*23* 53:*17* 86:*19* 90:*24*
102:*21* 112:*18* 145:*17, 20*
154:*1* 198:*6*
**wrong** 124:*5, 8* 127:*17*
135:*16* 140:*1* 143:*11*
149:*17* 150:*2* 151:*6, 17*
157:*9* 183:*5* 186:*19*
**wrote** 68:*1* 87:*13* 90:*2*
102:*25* 115:*22* 199:*3*

< X >
**Xavier** 13:*15*

< Y >
**Yeah** 10:*4, 15, 23* 14:*25*
16:*5, 20* 17:*4, 7, 9, 21*
19:*17* 22:*22* 26:*18* 27:*3,
17* 30:*13, 23* 31:*8* 35:*12*
40:*3* 43:*3* 48:*7* 66:*12*
70:*14* 78:*5, 19* 87:*23*
88:*4* 90:*11* 96:*24* 97:*21*
98:*16* 101:*2, 4* 103:*4, 14*
104:*1* 115:*3* 116:*5*
122:*22* 136:*23* 137:*21*
150:*17* 151:*8* 158:*9*
161:*25* 162:*8* 165:*3*
168:*13* 173:*3* 175:*12*
180:*3* 197:*22*
**year** 14:*5, 18*
**years** 197:*8* 198:*14*
**yellow** 126:*8, 11*

< Z >
**zone** 162:*23*
**zones** 162:*25* 163:*1*
**Zoom** 1:*10* 2:*14, 22, 24*
5:*19*