IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

| | |
|---|---|
| JASON LAIBLE, EXECUTOR OF THE ESTATES OF RAYMOND AND GAYLE LAIBLE, <br><br> and <br><br> STEVEN KLEIN AND MARIBETH KLEIN, <br><br>   Plaintiffs, <br><br> -vs- <br><br> TIMOTHY LANTER, *ET AL.* | Case No. 2:21-cv-00102 <br><br> Judge David L. Bunning <br><br> Magistrate Judge Candace J. Smith <br><br><br> **PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS LANTER AND THOMAS (DOC. 143) AND DEFENDANT CITY OF CINCINNATI (DOC. 144)** |

Respectfully submitted,

*/s/ Jacqueline Greene*
Jacqueline Greene (OH 0092733)
Alphonse A. Gerhardstein (OH 0032053)
Elijah Hack (KBA #99726)
Friedman, Gilbert + Gerhardstein
35 East 7th Street, Suite 201
Cincinnati, Ohio 45202
T: 513-572-4200 / F: 216-621-0427
jacqueline@FGGfirm.com
al@FGGfirm.com
elijah@FGGfirm.com

*Counsel for the Estates of Raymond and Gayle Laible*

*/s/ Roula Allouch*
J. Stephen Smith (KBA #86612)
Roula Allouch (KBA #91594)
BRICKER GRAYDON LLP
909 Wright's Summit Parkway Suite 300
Ft. Wright, KY 41011
T: 513-629-2805
F: 513-333-4358
ssmith@brickergraydon.com
rallouch@brickergraydon.com

*Counsel for Steven and Maribeth Klein*

TABLE OF CONTENTS

Introduction…………………………………………………………………..……………1

Facts……………………………………………………………………………………….2

I.  Cincinnati Police Department Officers, Including Defendants Lanter and Thomas, Participated in a Joint Operation to Attempt to Arrest Mason Meyer……………………..2

II. The Cincinnati Police Department Promulgated Policy Defining its Officers' Mandatory Duties During Vehicular Pursuits……………………………………………………….3

   A.  The Pursuit Policy Required an Officer in Charge to Maintain Offsite Supervision of the Pursuit to Direct the Officers in the Pursuit and Make Pursuit Decisions……4

   B.  The Pursuit Policy Required Officers to Drive Safely During Pursuits……………4

   C.  The Pursuit Policy Required Officers to Terminate Pursuits in Specific Circumstances……………………………………………………………………..5

III. Before August 7, 2020, Both Lanter and Thomas Most Recently Received Pursuit Driving Training in 2013. ………………………………………………………………………..5

IV. Defendants Lanter and Thomas had Each Been Involved in Vehicular Pursuits Before August 7, 2020. …………………………………………………………………………6

V.  Before the Pursuit Began, Defendants Lanter and Thomas Had Knowledge of the Specific Safety Risks Posed by Pursuing Mason Meyer. ………………………………………..6

VI. Before Initiating the Pursuit, Defendants Lanter and Thomas Knew it was Not Necessary to Immediately Apprehend Mason Meyer. ……………………………………………..7

VII. Defendants Lanter and Thomas Engaged in the Pursuit of Meyer That Caused the Subject Collision. ……………………………………………………………………………….8

   A.  During the Pursuit, Defendants Drove Unsafely Along a Route with Heavy Vehicular and Pedestrian Traffic. ……………………………………………….8

   B.  Meyer Admittedly Drove Unsafely Only Because Defendants Pursued Him…….12

VIII. After the August 7, 2020 Pursuit, Three Cincinnati Investigatory Bodies Determined that Defendants Lanter and Thomas Violated Mandatory Duties Imposed by the Pursuit Policy……………………………………………………………………………………..12

   A.  The Cincinnati Police Department Internal Investigations Section Found Violations of the Pursuit Policy That Were Sustained by the Chief of Police………………12

i

B.      The Critical Incident Review Board Found that Defendants Lanter and Thomas Knowingly Disregarded the Pursuit Policy and Their Training.....................14

C.      The Citizen Complaint Authority Found that Defendants Lanter and Thomas Should Have Terminated the Pursuit on Two Separate Occasions Before the Subject Collision. ………………………………………………………………...16

Analysis and Argument………………………………………………………………...17

I.      Summary Judgment Standard………………………………………………………17

II.     Kentucky Law Governs the Claims and Defenses in This Action, Including the Determination of Whether Any Defendant is Entitled to Immunity From Plaintiffs' Kentucky Tort Claims. ………………………………………………………...17

A.      Kentucky Law Applies to Tort Claims That Have *Any* "Significant Contact" with Kentucky, Specifically Including Tort Claims Arising From Accidents That Occurred in Kentucky. ………………………………………………...17

B.      Lanter and Thomas Cite No Law Supporting Application of Ohio Law………….19

C.      City of Cincinnati Cites No Law Supporting Application of Ohio Law………….20

III.    Under Kentucky Law, Defendants Lanter and Thomas Are Not Entitled to Qualified Official Immunity. …………………………………………………………23

A.      Kentucky Law Prohibits Conferring Qualified Official Immunity for the Negligent Performance of Ministerial Functions. ………………………………………..23

B.      Defendants Lanter and Thomas are Not Entitled to Qualified Official Immunity Because They Negligently Breached Ministerial Duties…………………………25

1.      Defendants Lanter and Thomas Negligently Violated Ministerial Duties Requiring Them to Drive Safely During the Pursuit……………………25

2.      Defendants Lanter and Thomas Negligently Violated Ministerial Duties Requiring Them to Terminate the Pursuit Before the Subject Collision….28

i.      Defendants Lanter and Thomas Were Subject to a Ministerial Duty to Terminate the Pursuit Before the Subject Collision Because Mason Meyer's Identity was Established and His Immediate Apprehension was Not Required…………………………………28

ii.     Defendants Lanter and Thomas Were Subject to a Ministerial Duty to Terminate the Pursuit Before the Subject Collision Because the

Safety Risks of the Continued Pursuit Outweighed the Consequences of Mason Meyer's Escape…………………………...31

iii.    Alternatively, If the Court Determines that Defendants Lanter's and Thomas's Duty to Terminate the Pursuit When the Safety Risks of Continued Pursuit Outweighed the Consequences of Mason Meyer's Escape was a Discretionary Duty, Defendants Lanter and Thomas are Still Not Entitled to Immunity…………………………39

IV.    Even if Ohio Immunity Law Applied to the State-Law Claims in this Case, Defendants Would Not Be Entitled to Immunity………………………………………………………...41

    A.    Under Ohio Law, Lanter and Thomas Are Not Entitled to Statutory Immunity if Genuine Issues of Material Fact Exist Regarding Whether Their Actions Were "Reckless." ……………………………………………………………………41

    B.    The Application of Ohio Law Requires Denying Statutory Immunity to Defendants Lanter and Thomas Because, at Minimum, Genuine Issues of Material Fact Remain Regarding Whether Their Actions Were Reckless. ………………………………42

    C.    Defendants Lanter and Thomas Failed to Demonstrate Their Entitlement to Ohio Statutory Immunity.

        1.    Defendants Lanter and Thomas Misconstrued the Ohio Recklessness Standard. ……………………………………………………………………45

        2.    Defendants Lanter and Thomas Relied Upon Genuinely Disputed Material Facts and Irrelevant Facts to Argue That They Did Not Act Recklessly….46

        3.    Lanter and Thomas Failed to Cite Any Case in Which Officers Received Statutory Immunity for Similar Conduct Violating Similar Policies…….47

V.    Defendants Lanter and Thomas Were a Proximate Cause of the Subject Collision……….48

    A.    Kentucky Law Permits a Finding that Defendants Lanter and Thomas Proximately Caused Plaintiffs' Damages. ……………………………………………………..48

    B.    Ohio Law Permits a Finding that Defendants Lanter and Thomas Proximately Caused Plaintiffs' Damages. ……………………………………………………...50

VI.    The City of Cincinnati is Not Entitled to Immunity……………………………………51

    A.    Defendant City is Not Immune from Plaintiff's Claims for Vicarious Liability for its Employees' Negligent Performance of Ministerial Duties……………………51

    B.    Defendant City is Not Immune from Plaintiff's Claim for Negligent Training and

iii

Supervision..................................................................................................52

1.     The Immunity Conferred for Claims Against Local Governments Related to Workers' Compensation Claims, Taxation, and the Exercise of Judicial, Quasi-Judicial, Legislative, or Quasi-Legislative Authority Does Not Apply to Plaintiffs' Claim. ...................................................................53

2.     The Immunity Conferred for Claims Against Local Governments for the Adoption of or Failure to Adopt Any Ordinance, Resolution, Order, Regulation, or Rule Does Not Apply to Plaintiffs' Claim...................54

3.     The Immunity Conferred for Claims Against Local Governments for the Exercise of Discretion When Allocating Resources in the Face of Competing Demands Does Not Apply to Plaintiffs' Claim...................55

        i.     *Morales v. City of Georgetown* Does Not Support Summary Judgment on Negligent Supervision...............................55

        ii.    *Morales v. City of Georgetown* Does Not Support Summary Judgment on Negligent Training.....................................57

C.     Regardless of Immunity, Defendant City of Cincinnati is Not Entitled to Summary Judgment Because, At Minimum, Genuine Issues of Material Fact Remain Regarding Plaintiffs' Claims Against It...........................................59

Conclusion...................................................................................................59

**TABLE OF AUTHORITIES**

**Cases**

*Adam v. J.B. Hunt Transport, Inc*., 130 F.3d 219 (6th Cir. 1997) ................................... 23
*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) ............................................... 17
*Anderson v. Massillon*, 2012-Ohio-5711 ............................................................ passim
*Anderson v. Westlake*, 2021-Ohio-4582 (9th Dist.).............................................. 42, 43
*Argabrite v. Neer*, 2016-Ohio-8374 ................................................................... 51
*Arnett v. Thompson*, 433 S.W. 2d 109 (Ky. 1968) ........................................ 18, 20, 21
*Ashby v. City of Louisville*, 841 S.W.2d 184 (Ky. App. 1992) ...................................... 54
*Bell v. Babcock & Wilcox Co*., Case No. 15887, 1993 WL 329900 (9th Dist. 1993) .................. 50
*Bevelacqua v. Tancak*, 2025-Ohio-217 (9th Dist.)................................................. 45, 50
*Bolden v. City of Covington*, 803 S.W.2d 577 (Ky. 1991) ........................................... 54
*Booker v. GTE.net LLC*, 350 F.3d 515 (6th Cir. 2003) ............................................... 53
*Brackens v. Louisville Jefferson Cnty. Metro Gov't*, Case No. 3:12-cv-0280, 2015 WL 5786818
   (W.D. Ky. Sep. 30, 2015), *aff'd sub nom*., 680 F. App'x 362 (6th Cir. 2017)......................... 19

*Britton v. Wooten*, 817 S.W.3d 443 (Ky. 1991) ............................................................... 49

*Browder v. Fentress*, Case No. 2013-CA-002178, 2018 WL 3202975 (Ky. App. Jun. 29, 2018) 29

*Browning v. Edmonson County*, 18 F. 4th 516 (6th Cir. 2021) ...................................... 38

*Chambers v. Ideal Pure Milk Co.*, 245 S.W.3d (Ky. 1952) .......................................... 48

*City of Brooksville v. Warner*, 533 S.W.3d 688 (Ky. App. 2017) .......................... 28, 57

*City of Paintsville v. Haney*, 718 S.W.3d 812 (Ky. 2025) ........................................... 59

*Clark v. Johnston*, 413 F.App'x 804 (6th Cir. 2011) .................................................. 17

*Clinger v. Duncan*, 166 Ohio St. 216 (1957) .............................................................. 50

*Com., Transp. Cabinet, Dept. of Highways v. Sexton*, 256 S.W.3d 29 (Ky. 2008) ............... 26, 57

*Cox v. Cross*, Case No. 2016-CA-001945-MR, 2019 WL 2554214 (Ky. App. Jun. 21, 2019) .... 28

*Elsamady v. Old Republic Ins. Co.*, Case No. 3:23-cv-0085, 2024 WL 3969361 (E.D. Ky. Aug. 28, 2024) ....................................................................................................... 19, 20

*Ensminger v. Cincinnati Bell Wireless, LLC*, 434 F. Supp.2d 464 (E.D. Ky. Jun. 19, 2006).. 22, 23

*Fabrey v. McDonald Village Police Dept.,* 1994-Ohio-368, 70 Ohio St.3d 351 (Ohio 1994)...... 42

*Foster v. Leggett*, 484 S.W. 2d 827 (Ky. 1972)................................................. 18, 21, 23

*Gaither v. Just. & Pub. Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014) .......................... 25

*Gates v. Leonbruno*, 2016-Ohio-5627 (8th Dist.) ...................................................... 42

*Gonzalez v. Johnson*, 581 S.W.3d 529 (Ky. 2019) ........................................ 48, 49, 50

*Goodwin v. City of Painesville*, 781 F. 3d 314 (6th Cir. 2015) .............................. 41, 45

*Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840 (Ky. 2005) ................. 59

*Grant v. Bill Walker Pontiac-GMC, Inc.*, 523 F.2d 1301 (6th Cir. 1975) ..................... 18

*Haney v. Monsky*, 311 S.W.3d 235 (Ky. 2010) ................................................... passim

*Hardesty v. Alcantara*, 2015-Ohio-4591 (8th Dist.) .............................................. 41, 44

*Harris Corp. v. Comair, Inc.*, 712 F.2d 1069 (6th Cir. 1983)......................... 18, 19, 20

*Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606 (6th Cir. 2009)............................ 17

*Heeter v. Bowers*, 99 F.4th 900 (6th Cir. 2024) ......................................................... 42

*Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984) .............................................................. 49

*Hoffman v. Gallia County Sheriff's Office*, 2017-Ohio-9192 (4th Dist.) ............................ 42, 43

*House v. Kellerman*, 519 S.W.2d 380 (Ky. 1974) ..................................................... 50

*Hutchinson v. Estate of Skeens by and through Skeens*, Case Nos. 2019-CA-0877-MR and 2019-CA-0878-MR, 2021 WL 753084 (Ky. App. Feb. 26, 2021) .................................... 30

*Jones v. Lathram*, 150 S.W.3d 50 (Ky. 2004) ................................................ 26, 27, 57

*Kennedy v. Ziesman*, 522 F. Supp. 730 (E.D. Ky. Sep. 24, 1981)................................ 21

*Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941) ..................... 18

*Lewis v. Meyers*, Case No. 5:09-cv-00156, 2010 WL 3829200 (W.D. Ky. Sep. 24, 2010) .......... 53

*Lexington-Fayette Urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128 (Ky. 2004).......................... 21

*Mabrey v. Simpson*, Case No. 2018-CA-000515-MR, 2019 WL 1422645 (Ky. App. Mar. 29, 2019) ............................................................................................................ 35

*Marson v. Thomason*, 438 S.W.3d 292 (Ky. 2014) ................................................ 35, 38

*Mattingly v. Mitchell*, 425 S.W.3d 85 (Ky. App. 2013)........................................ passim

*McDonald's Corp. v. Ogborn*, 309 S.W.3d 274 (Ky. App. 2009) ................................................ 53

*Meinhart v. Louisville Metro Government*, 627 S.W.3d 824 (Ky. 2021) .............................. passim

*Memorial Hall Museum, Inc. v. Cunningham*, 455 F. Supp.3d 347 (W.D. Ky. Apr. 17, 2020) .... 18

*Mercer v. Athens Cnty., Ohio*, 72 F.4th 152 (6th Cir. 2023) ........................................................ 42

*Miller v. Hace*, 2015-Ohio-3591 (8th Dist.)................................................................................. 42

*Miller Truck Lines, LLC v. Cent. Refrigerated Serv., Inc.*, 781 F. Supp.2d 488 (W.D. Ky. Mar. 17, 2011) ...................................................................................................................................... 20

*Morales v. City of Georgetown*, 709 S.W.3d 146 (Ky. 2024) ............................................... passim

*Oakley v. Flor-Shin, Inc.*, 964 S.W.3d 438 (Ky. App. 1998)....................................................... 59

*Ohio v. Great Lakes Minerals*, LLC, 597 S.W.3d 169 (Ky. 2019).............................................. 21

*Osborn v. Griffin*, 865 F.3d 417 (6th Cir. 2017).......................................................................... 18

*Patton v. Bickford*, 529 S.W.3d 717 (Ky. 2016).......................................................................... 38

*Petro v. Jones*, Case No. 11-0151, 2013 WL 756756 (E.D. Ky. Feb. 27, 2013).......................... 19

*Petronis v. Churchill Downs, Inc*., 2005-CA-001925-MR, 2007 WL 1520018 (Ky. App. May 25, 2007) ...................................................................................................................................... 20

*Pile v. City of Brandenburg*, 215 S.W.3d 36 (Ky. 2006)....................................................... 26, 57

*Piqua v. Morris*, 98 Ohio St. 42 (1918) ...................................................................................... 50

*Pittman v. Rutherford*, Case No. 19-00036, 2020 WL 6386489 (E.D. Ky. Jul. 7, 2020), adopted by 2020 WL 6384726 (E.D. Ky. Oct. 30, 2020) ............................................................... 20, 21

*Pyles v. Russell*, 36 S.W.3d 365 (Ky. 2000)................................................................................. 23

*Reichwein v. Jackson Purchase Energy Corp*., 397 S.W.3d 413 (Ky. App. 2012) ................ 19, 20

*Rowan County v. Sloas*, 201 S.W.3d 469 (Ky. 2006)............................................................. 53, 57

*Saleba v. Schrand*, 300 S.W.3d 177 (Ky. 2009)........................................................................... 20

*Sanborn v. Parker*, 629 F. 3d 554 (6th Cir. 2010)...................................................................... 58

*Sheehy v. Volentine*, 706 S.W.3d 229 (Ky. 2024)................................................................... passim

*Shepard Claims Serv. v. William Darrah & Assocs*., 796 F.2d 190 (6th Cir. 1986)..................... 17

*Smith v. Norton Hosps*., 488 S.W.3d 23 (Ky. App. 2016) ........................................................... 59

*Spillman v. Beauchamp*, 362 S.W.2d 33 (Ky. 1962) ................................................................... 39

*Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 727 (Ky. 2009)........................................ 59

*Tufts-Carter v. Hymes*, 2020-Ohio-3967 (8th Dist.) ............................................................ 42, 45

*United States Fidelity & Guaranty v. Preston*, 26 S.W.3d 145 (Ky. 2000) ................................. 23

*Upchurch v. Clinton County*, 330 S.W.2d 428 (Ky. 1959)............................................... 22, 24, 35

*Waugh v. Chakonas*, 2011-Ohio-2764 (9th Dist.) ...................................................................... 50

*Wessling v. Paris*, 417 S.W.2d 259 (Ky. 1967) ......................................................................... 18

*Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001)........................................................................... passim

## Statutes

Fed. R. Civ. P. 56.......................................................................................................................... 42

Ky. Rev. Stat. § 65.2003 ......................................................................................................... passim

Ky. Rev. Stat. § 95.955 .................................................................................................................. 58

Ohio Civ.R. 56(C) ...................................................................................................... 42

Ohio Rev. Code § 2744.03(A)(6)(b) .......................................................................... 42

Ohio Rev. Code §2744.02 .................................................................................. 21, 22

**Treatises**

63C Am.Jur.2d, Public Officers and Employees, §§ 309, 322, 324, 325 (1997) ......................... 24

Black's Law Dictionary, Sixth Edition (1990) ............................................................ 54

Restatement (Second) of Conflicts § 145 ................................................................... 19

Restatement (Second) of Torts, § 431 ........................................................................ 49

Restatement (Second) Torts, § 895D cmts. g, h............................................................ 24

Restatement (Second) Torts, § 500 (1965), cmt. (a) ................................................... 41

**Regulations**

Ohio Adm. Code § 109:2-18-02............................................................................... 58

# INTRODUCTION

On August 7, 2020, Defendants Timothy Lanter and Brett Thomas, both Cincinnati Police Department officers, engaged in a vehicular pursuit of Mason Meyer in which they created known and obvious risks to members of the public, including vehicle and pedestrian traffic. Lanter and Thomas had countless opportunities to terminate the pursuit, especially as keeping pace with Meyer required increasingly dangerous driving maneuvers and speeds exceeding 100 mph. But "Turbo" Lanter,[1] who was driving the primary pursuit unit, was so determined to apprehend Meyer that day—despite his knowledge that other agencies were surveilling Meyer and had other means of arrest, and despite no information requiring his immediate arrest or immediate threat of danger to the general public—that he concealed the dangerous conditions of the pursuit from the offsite Officer in Charge tasked with making pursuit decisions. Because Defendant City of Cincinnati failed to ensure proper pursuit supervision practices and adequate pursuit training, the OIC sat silently without questioning the pursuit speeds and conditions, allowing Lanter's tunnel vision to dictate the course of three CPD officers' actions. Although the City had promulgated a Pursuit Policy intended to guard against the obvious foreseeable risks pursuits pose to innocent third parties, Lanter and Thomas ignored the Pursuit Policy requirements, even after Meyer struck a vehicle right in front of Lanter, before the pursuit had even entered Kentucky. Tragically, the pursuit culminated in the realization of this obvious risk: Defendants chased Meyer through densely populated areas until he lost control of his vehicle and struck pedestrians dining at Press on Monmouth, killing Raymond and Gayle Laible and seriously injuring Steven and Maribeth Klein.

---

[1] Scalf Dep., Doc. 138, PID #2381.

FACTS

I.  **Cincinnati Police Department Officers, Including Defendants Lanter and Thomas, Participated in a Joint Operation to Attempt to Arrest Mason Meyer.**

The August 7, 2020 vehicle pursuit of Mason Meyer by Defendants Lanter and Thomas arose from a joint operation among the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the Northern Kentucky Drug Strike Force ("NKDSF"), and the Cincinnati Police Department ("CPD"). ATF Operational Plan, Doc. 136-9, PID #2158. On July 6, 2020, NKDSF executed a search warrant at 423 W 13th Street, Newport, Kentucky in response to a report of shots fired at the residence, and the search recovered drugs and firearms. *Id*. at PID #2159; Doc. 136-7, Rpt. of Investigation, PID #2153. An occupant of the residence told police that after he heard a gunshot, Meyer asked him to hide a gun. *Id*.

On July 31, 2020, a Boone County Sheriff's Deputy attempted to stop Meyer driving a Ford Escape. Meyer fled, prompting a pursuit. ATF Operational Plan, Doc. 136-9, PID #2158; Lanter Dep., Doc. 135, PID ##1575–80; Scalf Dep., Doc. 138, PID ##2278–79. The Deputy terminated the pursuit when he realized Meyer was attempting to "evad[e] this Deputy by driving in a reckless manner and continuing to pick up his high rate of speed." KYIBRS Report, Doc. 136-11, PID #2176. CPD located the Ford Escape, but it was occupied by two other people. ATF Operational Plan, Doc. 136-9, PID #2159.

On August 6, 2020, ATF and NKDSF agents interviewed a confidential informant. Rpt. of Investigation, Doc. 136-8, PID ##2154–57; Occhipinti Dep., Doc. 136, PID #2095. The informant said Meyer was always armed, had threatened the informant for failing to pay a drug debt, had multiple people selling crystal methamphetamine for him, and would assault or kidnap drug buyers for nonpayment. *Id.* The informant told police Meyer had little concern for life due to an inoperable brain tumor and terminal illness. Critical Incident Review, Doc. 134-3, PID# 1281. The informant

Page **2** of **60**

said that Meyer had no intention of going back to jail. Lanter Dep., Doc. 135, PID ##1586–87. The informant claimed Meyer told the informant that he would shoot it out with police, and that police would have to kill him. Rpt. of Investigation, Doc. 136-8, PID #2156.

The operation plan for August 7, 2020 was to "[e]stablish surveillance on [Meyer], positively ID him, and then utilize our tactics on ATF side to attempt to effect an arrest of Mr. Meyer." Occhipinti Dep., Doc. 136, PID #2022. The ATF Operational Plan stated that after ATF identified the suspects, ATF agents "will respond accordingly to situations which present themselves," and CPD would make traffic stops of Meyer and associates if identified in vehicles. Doc. 136-9, PID #2161. The Plan expressly contemplated the need for pursuits and identified CPD as responsible for any pursuits, stating that "[a]ny vehicle pursuits will be initiated and monitored by CPD pursuit policy." *Id.*; Occhipinti Dep., Doc. 136, PID ##2031–32, 2065–66, 2107–12; *see also* Caton Dep., Doc. 151, PID ##3592–93.

## II.   The Cincinnati Police Department Promulgated Policy Defining its Officers' Mandatory Duties During Vehicular Pursuits.

The Cincinnati Police Department's Policy and Procedure 12.535, Emergency Operation of Police Vehicles and Pursuit Driving ("Pursuit Policy") referenced by the ATF Operational Plan for August 7, 2020 was implemented for the stated purpose of "[e]nsur[ing] the safety of citizens and police officers during the emergency operation of police vehicles." CPD Pursuit Policy, Doc. 134-1, PID #1264. It prohibited officers from operating their vehicles "in a reckless manner that could put the public at risk." Caton Dep., Doc. 151, PID ##3650–52, 3682. The Pursuit Policy, in its entirety, is mandatory and binding upon officers. Cincinnati Fed. R. Civ. P. 30(b)(6) Dep., Doc. 139, PID ##2457–58; Lanter Dep., Doc. 135, PID ##1391–93, 1595; Thomas Dep., Doc 141, PID ##3027, 3041–43; Caton Dep., Doc. 151, PID ##3574, 3576–77, 3679–80.

**A.**  **The Pursuit Policy Required an Officer in Charge to Maintain Offsite Supervision of the Pursuit to Direct the Officers in the Pursuit and Make Pursuit Decisions.**

The Pursuit Policy specifically requires offsite supervision of the pursuit by a singular Officer in Charge who is not actively participating in the pursuit and is able to make objective decisions about the pursuit. Doc. 134-1, PID ##1268–73; Caton Dep., Doc. 151, PID ##3620–21. When a pursuit begins, the Pursuit Policy requires that the Emergency Communications Center ("ECC") dispatcher "immediately notify the initiating pursuit unit's supervisor[,]" (or "a district supervisor where the pursuit began"), who "becomes the pursuit OIC [Officer in Charge]" and is responsible for directing the pursuit until its end." *Id*., PID #1268, Procedure §D(3)(a); *see also* Doc. 151, PID #3579–80. The ECC must broadcast the pursuit on available radio channels to facilitate pursuit communications. *Id*., Procedure, §D(3)(e).

The Pursuit Policy delineates the OIC's responsibilities. Doc. 134-1, PID ##1268–69, Procedure §D(4). The OIC is required to "retain control and continually monitor and assess the situation" and to "direct specific units in or out of the pursuit, reassign primary or secondary units, set posts, authorize roadblocks, and terminate the pursuit." *Id*., PID #1268, Procedure §D(4)(a). Significantly, "[f]inal decisions will rest with the pursuit OIC." *Id*., Procedure §D(4)(a)(1). To facilitate OIC supervision, pursuing officers have reciprocal mandatory reporting obligations under the Pursuit Policy: "A pursuing officer(s) **will** immediately relay the following information…2) Location. 3) Direction…6) Speeds involved." *Id.*, Procedure, § D(2)(a), Doc. 134-1, PID #1268 (emphasis supplied); *see also* Scalf Dep., Doc. 138, PID ##2249–50.

**B.**  **The Pursuit Policy Required Officers to Drive Safely During Pursuits.**

The Pursuit Policy imposed specific requirements for safe driving during pursuits:

- "Officers **will not** pursue vehicles the wrong way on the Interstate or other controlled access highway, divided roadways, or one-way streets unless specifically authorized

by the pursuit officer in charge (OIC)." Pursuit Policy, Doc. 134-1, PID #1265 (emphasis supplied);

- "When driving in emergency mode, the operator **must** maintain a vehicle speed which is reasonable for the conditions, including but not limited to: time of day, road conditions, pedestrian and vehicle traffic, and weather; The operator **will not** exceed the posted speed limit by more than 20 miles per hour." *Id.*, Procedure, § A(3)(b), Doc. 134-1, PID #1266 (emphases supplied); and

- "When driving in emergency mode, the operator **will** conform to all applicable traffic laws and regulations." *Id.*, Procedure, § A(3), Doc. 134-1, PID #1266 (emphasis supplied).

CPD officers were required to conduct pursuit driving in compliance with CPD policies, procedures, and training. Caton Dep., Doc. 151, PID #3575.

### C.    The Pursuit Policy Required Officers to Terminate Pursuits in Specific Circumstances.

The Pursuit Policy mandated terminating pursuits in defined situations, including:

- "Officers **will** terminate pursuits under any of the following conditions:…(b) Establishment of the suspect's identity allowing for apprehension at a later time and there is no longer a need for immediate apprehension." Pursuit Policy, Procedure § E(1), Doc. 134-1, PID #1269 (emphasis supplied).

- "Officers **must** terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape." *Id.*, PID #1264. (emphasis supplied).

CPD officers identify circumstances where risks outweigh consequences of escape not as a matter of decision making, but instead as a circumstance that either is present or not based on their training—"[W]hen you see it, you know it." Lanter Dep., Doc. 135, PID ##1507, 1513–14; Scalf Dep., Doc. 138, PID #2262 ("[I]t's one of those things that can you see it, you know what it is.").

### III.    Before August 7, 2020, Both Lanter and Thomas Most Recently Received Pursuit Driving Training in 2013.

On August 7, 2020, neither Lanter nor Thomas had received training on pursuit driving for about seven years. Lanter received training on pursuit driving in 2007, 2008, 2010, 2012, and 2013.

Lanter Dep., Doc. 135, PID ##1429–36. Thomas received training on pursuit driving in 2007, 2008, 2010, and 2013. Thomas Dep., Doc. 141, PID ##3061–70. *See also* Doc. 134-8, PID #1326.

Defendant City of Cincinnati admitted that CPD officers receive pursuit and defensive driving training during initial police academy training but "[o]nce that is completed, they become a patrol officer, we do not have a mechanism to continue to conduct vehicle pursuit training" unless remedial training is required. Doc. 139, PID ##2466–67; *see also* Caton Dep., Doc. 151, PID ##3634–39. The City required remedial training "most often" for "repeated noncompliance" with the Pursuit Policy but did not require it for each violation. *Id.*, PID #2468, 2470.

## IV. Defendants Lanter and Thomas had Each Been Involved in Vehicular Pursuits Before August 7, 2020.

Defendant Lanter estimated that he had been involved in five to ten pursuits as a pursuing officer and six or less as an OIC. Doc. 135, PID ##1522–23. He had no memory of ever terminating a pursuit as an OIC or witnessing another OIC terminate a pursuit. *Id.*, PID ##1523–24. Lanter testified that most pursuits end because the officer(s) lost sight of the suspect vehicle and that "in a lot of pursuits…stop sticks end them." *Id.*, PID ##1524–26. He also acknowledged that pursuits were otherwise terminated when "the pursuit vehicle crashed." *Id.*, PID ##1527. Prior to August 7, 2020, Lanter was involved in a pursuit resulting in two fatalities on March 11, 2011. *Id.*, PID #1678.

Thomas estimated that he had been involved in 10 pursuits during his career. Doc. 141, PID #3050. One pursuit before August 7, 2020 involved a suspect vehicle that crashed into a store, causing injuries to the occupants of the suspect vehicle. *Id.*, PID #3052.

## V. Before the Pursuit Began, Defendants Lanter and Thomas Had Knowledge of the Specific Safety Risks Posed by Pursuing Mason Meyer.

When the pursuit began, Defendant Lanter knew that Meyer had fled from an attempted

traffic stop on July 31. ATF Operational Plan, Doc. 136-9, PID #2158; Lanter Dep., Doc. 135, PID ##1570, 1575–80, 1627–28. Lanter knew the nature of Meyer's alleged crimes (drugs and firearms dealing and/or trafficking, assaulting drug buyers). Doc. 135, PID #1539, 1586; *see also* Sweeney Expert Rpt., Doc. 149-1, PID #3428; Ex. 1. Thomas knew, based on ATF Resident Agent in Charge ("RAC") Occhipinti's broadcasts, that Meyer was wanted for felonies and likely armed. Thomas Dep., Doc. 141, PID #3141; Occhipinti Dep., Doc. 136, PID ##1980–81.

Lanter and Thomas knew that a confidential informant claimed Meyer had an inoperable brain tumor and would rather engage police in a shootout to be killed than return to prison if apprehended. Lanter Dep., Doc. 135, PID ##1586–87; Thomas Dep., Doc. 141, PID ##3081, 3096. They did not know if the information provided by the confidential informant was reliable or accurate. Doc. 135, PID## 1586–90; Doc. 141, PID ##3082–83.

## VI.   Before Initiating the Pursuit, Defendants Lanter and Thomas Knew it was Not Necessary to Immediately Apprehend Mason Meyer.

ATF RAC Occhipinti specifically informed dispatch that if the joint operation team was unable to arrest Meyer that day, they would still be able to arrest him at a later time because they were able to track his phone. Occhipinti Dep., Doc.136, PID #2077. RAC Occhipinti had no concerns about their ability to arrest Meyer at a later time. *Id.* Lanter understood that the ATF was tracking Meyer through "phone pings." Lanter Dep., Doc. 135, PID #1587.

Defendant Thomas testified that he never became aware of any information indicating that it was necessary to apprehend Meyer on August 7, 2020. Doc. 141, PID #3146. Lanter testified that he told Thomas "everything [he] knew" before the pursuit, indicating that Lanter likewise did not know or convey information indicating that Meyer's immediate arrest was necessary. Doc. 135, PID #1599. During the pursuit, there was no discussion among officers that Meyer **must** be arrested that day. Bode Dep., Doc. 134, PID #1223. Captain Caton, who conducted the CPD

Critical Incident Review Board investigation, received no information showing that it was necessary for the officers to arrest Meyer on August 7, 2020. Caton Dep., Doc. 151, PID #3608.

## VII. Defendants Lanter and Thomas Engaged in the Pursuit of Meyer That Caused the Subject Collision.

### A. During the Pursuit, Defendants Drove Unsafely Along a Route with Heavy Vehicular and Pedestrian Traffic.

After Meyer exited 721 Steiner Avenue, Defendant Lanter followed him on River Road and turned on to State at a traffic light. Lanter Dep., Doc. 135, PID #1462. Lanter attempted a traffic stop at Mt. Hope and Elberon. *Id.*, PID #1463. Meyer refused to stop, so Lanter began the pursuit at 4:34 p.m. *Id.*, PID ##1456, 1463; *see also* Sweeney Exp. Rpt., Doc. 149-1, PID ##3436–49 (detailing route of pursuit and officers' actions). Sergeant Donald Scalf tentatively volunteered to be the pursuit OIC, broadcasting "if you don't have an OIC, I'm on it." Doc. 138, Scalf Dep., PID #2323. Thomas joined as the second unit. Lanter then authorized Specialist Michael Harper to join as the third unit in the pursuit, despite that being the OIC's role. Doc. 134-9, PID ##1331–32.

The pursuit proceeded up the hill on Mt. Hope and approached the Incline District, an entertainment district with a coffee shop, restaurant, and theatre. Lanter Dep., Doc. 135, PID #1463; Bode Dep., Doc. 134, PID #1179. The contour of the hill on Mt. Hope made it difficult for Thomas to visualize the pursuit. Thomas Dep., Doc. 141, PID #3111. While on Mt. Hope, Lanter drove his cruiser on the left side of the two-way street. Doc. 135, PID #1464. Lanter observed other vehicles pull to the side to avoid the pursuit on Mt. Hope. *Id.,* PID #1464. At Mt. Hope and 8th Street, Lanter drove through a stop sign without stopping. *Id.*, PID #1465.

At the top of Price Hill on Mt. Hope, the pursuit turned left onto Price Street, where it passed through a school zone before turning right on Hawthorne, approaching the traffic light on

Warsaw. Lanter Dep., Doc. 135, PID ##1465–66. Lanter ran the red light turning right on to Warsaw. *Id.,* Page ID #1466. The pursuit then traveled downhill on Warsaw towards the 6th Street Viaduct. *Id.,* PID #1467. Both Lanter and Thomas drove in excess of 20 mph over the speed limit while on the 6th Street Viaduct. Internal Investigations Service ("IIS") Report, Doc. 134-3, PID ##1297–98; Notice of Reprimand, Doc. 151-6. Thomas's body worn camera video captured his vehicle speed at 103 mph on the 6th Street viaduct—which was not fast enough to allow him to keep pace with Lanter. Thomas Dep., PID #3177; IIS Report, Doc. 134-3, PID #1291; Fink Dep., Doc. 152, PID ##4068–69.

Lanter saw other traffic on the 6th Street Viaduct, which was congested with merging cars. Lanter Dep., Doc. 135, PID ##1451, 1457. As the pursuit approached downtown and the I-71/75 bridge to Kentucky, Lanter saw that bridge traffic was at a standstill, which was "normal" for the area and time of day. *Id*., Page ID #1457. It was rush hour. Caton Dep., Doc. 151, PID ##3609.

As Lanter approached the 2nd Street exit from the 6th Street viaduct, Meyer sideswiped the passenger side of another vehicle "when he veered left across the roadway to exit onto 2nd Street" in front of Lanter, as shown on Lanter's dashcam video. CCA Rpt., Doc. 134-8, PID ##1316–17; Fink Dep., Doc. 152, PID #4066. Lanter claimed he did not see this sideswipe collision. Lanter Dep., Doc. 135, Page ID ##1460–61.

The pursuit then took the left split for the 2nd Street exit ramp into the downtown Cincinnati Business District. Lanter Dep., Doc. 135, PID ##1469–70. Next, the pursuit turned right on Elm, where Lanter crossed the centerline into the opposite lane of travel. *Id.,* PID #1471. Near the Bengals stadium, the pursuit turned onto eastbound Freedom Way. *Id.*, PID #1471; Thomas Dep. PID #3124. Freedom Way is in The Banks area of downtown Cincinnati, a commercial hub with restaurants, theaters, and heavy pedestrian traffic. Bode Dep. Doc. 134, PID #1190. On

Freedom Way, both Lanter and Thomas saw pedestrians walking near the street. Doc. 135, PID #1454; Doc. 141, PID #3125.

From Freedom Way, the pursuit turned onto Rosa Parks, proceeded right on the roundabout, and onto the Roebling Suspension Bridge into Kentucky. Lanter Dep., Doc 135, PID #1471. The Roebling Bridge is a sightseeing landmark in Cincinnati with pedestrian traffic on, at, and around the bridge. Bode Dep., Doc 134, PID #1190. Thomas knew the area around the Roebling Bridge roundabout was usually congested with "bumper to bumper" or "gridlock" traffic. Thomas Dep., Doc. 141, PID #3126. As he entered the roundabout and traveled towards the Roebling Bridge, Lanter drove left of center to get around a car that was stopped at the roundabout. Doc. 135, PID #1472. On the Roebling Bridge, Lanter again crossed the double yellow line. *Id.,* PID #1472.

As the pursuit crossed the Roebling Bridge into Covington, Kentucky, plainclothes officer Mark Bode followed the pursuit, observing Lanter and Thomas driving the wrong way on a one-way street against the flow of traffic without authorization. Bode Dep., Doc 134, PID ##1192–93. Bode lost track of the pursuit because he was unable to maintain the same speeds as Lanter and Thomas in traffic. *Id.,* PID #1213.

From the roundabout, the pursuit turned left onto Court Street, then left again onto Park Street passing the Keystone restaurant. Lanter Dep., Doc 135, PID #1475. Next, the pursuit turned right onto Greenup Street, with Lanter driving the wrong way on the one-way roadway as he continued his pursuit. *Id.,* PID #1444. From Greenup, the pursuit cut left into a gas station parking lot and then turned left onto 4th Street. *Id.,* PID #1444. Lanter again traveled the wrong way, this time on one-way 4th Street toward the intersection with Garrard but had not received authorization to drive the wrong way on this or any one-way street in Kentucky. *Id.,* PID #1444–45.

At the intersection of 4th and Garrard, the pursuit turned left onto northbound Garrard

briefly, then right on 3rd street. Lanter Dep., Doc 135, PID #1476. After turning right, 3rd Street came to a dead end, but the pursuit turned right into the Sanford Alley, which circled back to exit left onto southbound Garrard. *Id.,* PID #1477. The pursuit then turned left at the intersection of Garrard and 4th Street and crossed the 4th Street connector bridge into Newport, KY. *Id.,* PID #1477. On the 4th Street bridge into Newport, both Lanter and Thomas recalled seeing some traffic waiting on the redlight at the intersection. *Id.,* PID #1458; Thomas Dep., Doc. 141, PID #3144. Lanter recalled a motorcyclist swerving to avoid the pursuit after Lanter crossed the double yellow line on the 4th Street Bridge. *Id*., PID ##1460, 1477.

After that, the pursuit followed 4th Street to another roundabout, where the vehicles took the first exit on the right of the roundabout, but then doubled back, and Lanter again traveled in the wrong lane of travel. Lanter Dep., Doc 135, PID ##1478–79. The pursuit continued straight onto 5th Street in Newport, heading toward heavy pedestrian areas with restaurants, as well as the Newport Aquarium and movie theater at Newport on the Levee. *Id.* at PID #1479; Bode Dep., Doc 134, PID ##1190. The pursuit ended at the intersection of 5th Street and Monmouth when Meyer lost control of his vehicle, struck and killed Raymond and Gayle Laible, and injured Steven and Maribeth Klein. *Id*., PID #1459; Thomas Dep., Doc. 141, PID #3149; Doc. 134-3, IIS Report, PID #1297. The total distance covered in the pursuit was 6.4 miles, and the pursuit lasted about seven minutes. Sweeney Exp. Rpt., Doc. 149-1, PID #3439; Fink BWC Summary, Doc. 152-1, PID## 4160, 4162.

During the pursuit, Lanter admitted he never broadcast his speeds for evaluation by Scalf as purported OIC, and Scalf never authorized driving at any particular speed. Lanter Dep., Doc. 135, PID ##1446, 1449; Scalf Dep., Doc. 138, PID #2329. Lanter likewise did not broadcast that a motor vehicle collision had occurred in front of him when Meyer sideswiped a vehicle. CCA

Rpt., Doc. 134-8, PID #1319. Scalf intentionally avoided making unnecessary broadcasts over the radio to leave "dead air" for the involved officers to broadcast information relevant to the safety of the pursuit. Scalf Dep., Doc. 138, PID ##2325–28. During the seven-minute pursuit, there were approximately three minutes and 30 seconds of "dead air" on the radio.  Lanter Body-Worn Camera video, Doc. 79-1-B.

### B. Meyer Admittedly Drove Unsafely Only Because Defendants Pursued Him.

Before the police attempted to stop him on August 7, 2020, Mason Meyer had been driving safely, consistent with his practice in summer of 2020 to "drive safely and obey traffic laws to avoid police noticing [him] or trying to stop [his] car." Doc. 153-1, Aff. of Mason Meyer, PID #4202, ¶¶ 2, 5; Bode Dep., Doc. 134, PID #1167. Meyer admittedly "drove at high speeds, made quick turns, and used other dangerous driving tactics" in efforts to "get away from the police." *Id*. at ¶¶ 6–8. Meyer "would have stopped driving dangerously" if "the police stopped following [him] that day" so he could "avoid being pulled over or noticed by police." *Id*., PID ##4202–03, ¶¶ 9, 13. He "did not want to hurt anyone." *Id*., PID #4202, ¶ 12. But Meyer engaged in "dangerous driving at extremely high speeds without regard for traffic laws through densely populated traffic area" during the "high speed chase," so the pursuit created an "obvious risk" of "death or serious physical injuries to others." Doc. 143-2, Meyer Plea Agreement, PID #3326.

### VIII. After the August 7, 2020 Pursuit, Three Cincinnati Investigatory Bodies Determined that Defendants Lanter and Thomas Violated Mandatory Duties Imposed by the Pursuit Policy.

#### A. The Cincinnati Police Department Internal Investigations Section Found Violations of the Pursuit Policy That Were Sustained by the Chief of Police.

The CPD Internal Investigations Section ("IIS"), through Sergeant Charles Fink, investigated the subject pursuit to determine whether involved officers acted consistently with CPD policies and training. Fink Dep., Doc. 152, PID ##3976, 3989. Fink reviewed the pursuing

officers' body-worn camera ("BWC") video and mobile video recording ("MVR") video and other video from the news and a bank surveillance camera, and interviewed Lanter and Thomas (as well as other officers). *Id.*, PID ##3980, 3982–83, 3986–87.

The IIS investigation determined that Lanter drove the wrong way on one-way streets and "authorized operation of police vehicles the wrong way on one-way streets while actively involved in the pursuit and not acting as the pursuit OIC." IIS Report, Doc. 134-3, PID ##1297–98. The IIS found that Lanter's actions violated the Pursuit Policy[2] and Rule 1.03 of CPD's Manual of Rules and Regulation and Disciplinary Process, which require CPD officers to "exercise the responsibility and authority of the position to which they are assigned." *Id*. Per IIS recommendation, the Chief of Police sustained Lanter's violation of Rule 1.03, and Lanter received a written reprimand for this violation. *Id*., PID #1301; Cincinnati Fed. R. Civ. P. 30(b)(6) Dep., Doc. 139, PID ##2553–54; Notice of Reprimand, Doc. 151-6.

The IIS also determined that both Lanter and Thomas exceeded the speed limit by more than 20 miles per hour during the pursuit, which violated the Pursuit Policy[3] as well as Rule 1.01(b) of the Manual of Rules and Regulations and Disciplinary Process for the CPD. IIS Rpt., Doc. 134-3, PID ##1298–1300; *see* Fink Dep., Doc. 152, PID ##4068–69, 4091. Rule 1.01(b) stated that officers "shall not commit any acts or omit any acts, which constitute a violation of any of the rules, regulations, procedures, directives, or orders of the Department[,]" including "B. A negligent violation which may lead to risk of physical injury to another or financial loss to the

---

[2] "Officers **will not** pursue vehicles the wrong way on the Interstate or other controlled access highway, divided roadways, or one-way streets unless specifically authorized by the pursuit officer in charge (OIC)." Pursuit Policy, Doc. 134-1, PID #1265.
[3] "When driving in emergency mode, the operator **must** maintain a vehicle speed which is reasonable for the conditions, including but not limited to: time of day, road conditions, pedestrian and vehicle traffic, and weather; The operator **will not** exceed the posted speed limit by more than 20 miles per hour." Pursuit Policy, Procedure, § A(3)(b), Doc. 134-1, PID #1266.

City." *Id*., PID #1298. Based on IIS recommendation, the Chief sustained both Lanter's and Thomas's violations of Rule 1.01(B), and both received corrective action (Evaluation Supplement Log for Thomas, written reprimand for Lanter) for these violations. *Id*., PID #1301; Cincinnati Fed. R. Civ. P. 30(b)(6) Dep., Doc. 139, PID ##2651–52; Notice of Reprimand, Doc. 151-6. The IIS investigation also determined that Lanter failed to transmit his speeds during the pursuit, in violation of the Pursuit Policy.[4] Doc. 134-3, PID #1298. Other violations may have been committed beyond what was documented or disciplined pursuant to IIS investigation. Caton Dep., Doc. 151, PID ##3630–31; Cincinnati Fed. R. Civ. P. 30(b)(6) Dep., Doc. 139, PID ##2569–70.

Although CPD had an unwritten practice of authorizing exceptions to the Pursuit Policy based on "exigent circumstances," Scalf did not authorize any exceptions other than his single response of "Affirmative" when Lanter asked, "Don Scalf, we going to Kentucky if he goes?" Fink Dep., Doc.152, PID ##4128–4130. CPD, in turn, did not retroactively authorize any exceptions to the Pursuit Policy to cure officers' violations. Cincinnati Fed. R. Civ. P. 30(b)(6) Dep., Doc. 139, PID ##2581–82; Caton Dep., Doc. 151, PID ##3577–78, 3628–30.

### B. The Critical Incident Review Board Found that Defendants Lanter and Thomas Knowingly Disregarded the Pursuit Policy and Their Training.

The Cincinnati Critical Incident Review Board ("CIRB") evaluates incidents, in part, to determine whether the involved officers acted consistently with CPD policy and training. Caton Dep., Doc. 151, PID #3572. For this pursuit, the CIRB considered whether the pursuing officers (including Lanter and Thomas) violated the Pursuit Policy, employed proper tactics that complied with CPD policies, and had training deficiencies, and whether the IIS report was accurate. *Id*., PID ##3534, 3547–48, 3573, 3589–90.

---

[4] "A pursuing officer(s) **will** immediately relay the following information:… 6) Speeds involved." Pursuit Policy, Procedure, § D(2)(a), Doc. 134-1, PID #1268.

The CIRB determined that "the decision to stop the vehicle and initially engage in the pursuit was proper" but that Defendants Lanter's and Thomas's "tactics and judgment after the initial engagement of the pursuit come into question." Doc. 134-9, PID #1333. The CIRB found the initial stop and decision to start pursuit proper because Meyer "had warrants[,]" which provided a "legitimate reason" to stop him and engage in pursuit. Caton Dep., Doc. 151, PID ##3600–01. The CIRB found Lanter's and Thomas's subsequent tactics questionable because they violated the Pursuit Policy, as both the IIS and CIRB concluded. *Id.*, PID ##3573–74, 3602.

The CIRB determined that Lanter and Thomas violated the Pursuit Policy by traveling more than 20 mph over the speed limit and that their speeds were not reasonable for the location and the pedestrian and vehicle traffic. Caton Dep., Doc. 151, PID #3618. The CIRB also found that several of the Pursuit Policy's enumerated safety factors, about which officers must be aware before and during pursuits, were present.[5] *Id.*, PID #3603. "Traffic conditions were heavy" during the pursuit and that "[f]rom the outset of the pursuit, Mr. Meyer, a known suspect, was driving in an erratic manner." Doc. 134-9, PID #1333; Caton Dep., Doc. 151, PID #3609. The pursuit occurred at around 4:30 p.m. on a Friday (during rush hour), when vehicular and pedestrian traffic

---

[5] The Pursuit Policy stated:

> During the emergency operation of police vehicles, and prior to and during a pursuit, officers **must** weigh the following factors:
> - Degree of risk created by pursuit to others, officer and suspect.
> - Location where pursuit will take place.
> - Traffic conditions and amount of pedestrian traffic.
> - Road conditions.
> - Time of day.
> - Weather.
> - Volume, type, speed and direction of vehicular traffic and direction of pursuit.
> - Nature/seriousness of suspected crime.
> - Condition of police vehicle and suspect's vehicle.
> - Any circumstance that could lead to a situation in which the pursuing officers will not be able to maintain control of the police vehicle.
> - Type of vehicle being pursued.
> - Likelihood of successful apprehension.
> - Whether the identity of the suspect is known to the point that later apprehension is possible.

Doc. 134-3, PID ##1264–65 (emphasis supplied).

were heavy in the pursuit areas. Caton Dep., Doc. 151, PID ##3609; Lanter MVR GB0000201, Doc. 133 at 16:36:27-16:37:48; 16:38:46-16:39:11; 16:40:34-16:40:54.[6] As Captain Caton, Lanter, and Thomas acknowledged, conducting pursuits in areas with heavy pedestrian traffic risks injury to pedestrians. *Id.*, PID #3610; Doc 135, PID #1532; Doc. 141, PID ##3000–01.

The CIRB found no deficiencies in training or CPD policy requiring correction. Doc. 134-9, PID #1334. All CPD officers receive pursuit driving training in the police academy, and "they're all guided by [the] Pursuit Policy[,]" which it was their duty to know and understand. Caton Dep., Doc. 151, PID ##3634–39. CPD relied upon the driving training provided in the police academy and conducted refresher driving training as needed after on-duty accidents. *Id.*, PID #3639.

The CIRB further determined that Defendants Lanter and Thomas had "the knowledge, skills and resources necessary to perform their duties and they ha[d] full knowledge of the Department's protocols, procedures, and training. However, during this incident, the officers chose to disregard the Department's protocols, procedures, and training." Doc. 134-9, PID #1334; *see also* Caton Dep., Doc. 151, PID #3640. This finding reflected the CIRB's understanding that the officers knowingly disregarded department policies and training. Caton Dep., Doc. 151, PID #3695. The CIRB recommended that Lanter and Thomas "undergo refresher training focusing on risk versus reward, and pursuit driving." Doc. 134-9, PID #1334

### C. The Citizen Complaint Authority Found that Defendants Lanter and Thomas Should Have Terminated the Pursuit on Two Separate Occasions Before the Subject Collision.

The CCA determined that Defendants Lanter and Thomas should have terminated the pursuit based on two different events. Doc. 134-8, PID #1326. First, the CCA found that they

---

[6] Referenced time stamps refer to visible date/time in upper right hand corner of Lanter Motor Vehicle Recording. The time stamps in the Lanter Motor Vehicle Recording are not in sync with the time stamps from Lanter's Body Worn Camera. *See* Doc. 79-1, Ex. B.

should have ended pursuit when they reached speeds higher than 100 mph, "which should have let them know their speeds were excessive." *Id*. Second, "[t]he pursuit should have ended when Mr. Meyer struck a vehicle," which occurred when "Meyer sideswiped another vehicle on Interstate 75-S in front of Sergeant Lanter, which was not communicated to ECC." *Id*., PID ##1326, 1319.

**ANALYSIS AND ARGUMENT**

## I.    Summary Judgment Standard

Summary judgment is merited when the evidence, "taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Hartman v. Great Seneca Fin. Corp*., 569 F.3d 606, 611 (6th Cir. 2009); Fed. R. Civ. P. 56(a). At summary judgment, the Court's must "determine whether there is a genuine issue for trial" but leave determinations of credibility and weight of the evidence to the jury. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 255 (1986). "[T]he federal courts have a strong preference for trials on the merits." *Clark v. Johnston*, 413 F.App'x 804, 819 (6th Cir. 2011).  In this case, genuine disputes of material fact exist regarding all of Plaintiffs' claims, so summary judgment must be denied.

## II.   Kentucky Law Governs the Claims and Defenses in This Action, Including the Determination of Whether Any Defendant is Entitled to Immunity From Plaintiffs' Kentucky Tort Claims.

### A.    Kentucky Law Applies to Tort Claims That Have *Any* "Significant Contact" with Kentucky, Specifically Including Tort Claims Arising From Accidents That Occurred in Kentucky.

In this litigation, Plaintiffs make tort claims under Kentucky law against Defendants Lanter, Thomas, and the City of Cincinnati based on a motor vehicle collision that occurred in Kentucky. *See* Am. Compl., Doc. 79, PID ##673–76, ¶¶142–65. Federal courts determine choice of state law issues by applying the forum state's (here, Kentucky's) "conflict of laws" rules. *Harris*

*Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983), citing *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 495–97 (1941); *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017).

Kentucky courts apply Kentucky's substantive law "*whenever possible.*" *Harris Corp.*, 712 F.2d at 1071 (emphasis original), citing *Wessling v. Paris*, 417 S.W.2d 259, 260–61 (Ky. 1967) (reversing summary judgment based on Indiana defense; holding Kentucky law applied to lawsuit arising from motor vehicle accident occurring in Kentucky); *Arnett v. Thompson*, 433 S.W. 2d 109, 113–14 (Ky. 1968) (applying Kentucky law to Ohio parties in lawsuit arising from motor vehicle accident occurring in Kentucky); *Foster v. Leggett*, 484 S.W. 2d 827, 829 (Ky. 1972) (holding that lawsuit arising from motor vehicle accident between Kentucky residents occurring in Ohio was governed by Ohio law because "if there are significant contacts—not necessarily the most significant contacts—with Kentucky, then Kentucky law should be applied"); *Grant v. Bill Walker Pontiac-GMC, Inc.*, 523 F.2d 1301, 1303–05 (6th Cir. 1975) (affirming application of Kentucky law to lawsuit arising from accident occurring in Kentucky where plaintiff's decedent was a Kentucky resident).

It is dispositive that Plaintiffs' tort claims arise from an accident occuring in Kentucky: "[t]he occurrence of an accident in Kentucky is, by itself, sufficient to justify application of Kentucky law." *Harris*, 712 F.2d at 1071, citing *Arnett*, 433 S.W.2d at 114. This logically follows from Kentucky's settled law that when Kentucky courts have "jurisdiction of the parties," their "primary responsibility is to follow [Kentucky's] own substantive law." *Foster*, 484 S.W.2d at 829.

For tort claims, "*any* significant contact with Kentucky is sufficient to allow an application of Kentucky law." *Memorial Hall Museum, Inc. v. Cunningham*, 455 F. Supp.3d 347, 358 (W.D. Ky. Apr. 17, 2020), quoting *Reichwein v. Jackson Purchase Energy Corp.*, 397 S.W.3d 413, 416

(Ky. App. 2012) (emphasis original). Courts determine whether *any* sufficiently significant Kentucky contact exists by evaluating: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, or place of business of the parties; (4) the place where the relationship, if any, between the parties is centered." *Elsamady v. Old Republic Ins. Co*., Case No. 3:23-cv-0085, 2024 WL 3969361, at *2 (E.D. Ky. Aug. 28, 2024), quoting *Petro v. Jones*, Case No. 11-0151, 2013 WL 756756, at *8 (E.D. Ky. Feb. 27, 2013) (citing in turn Restatement (Second) of Conflicts § 145). Multiple significant contacts with Kentucky exist in the present case, where the accident and injuries occurred in Kentucky; part of the conduct causing the injuries occurred in Kentucky; all Plaintiffs are domiciled in Kentucky; and the Plaintiffs' relationship with Defendants, to the extent one exists, is centered in the location of the accident, which is Kentucky. As a result, Kentucky law plainly applies to the claims and defenses in this lawsuit, including these Defendants' state-law immunity defenses.

### B.      Lanter and Thomas Cite No Law Supporting Application of Ohio Law.

Defendants Lanter and Thomas provide no relevant legal authority justifying their argument that Ohio law governs whether they are immune from Plaintiffs' claims. Doc. 143, PID##3301–02. Although they cite *Harris Corp.*, 712 F.2d at 1071 (6th Cir. 1983) for the proposition that "Kentucky law will not always apply, particularly when there are 'overwhelming interests to the contrary,'" Defendants offer no cases in which a court found sufficiently "overwhelming interests" to apply state law other than Kentucky's tort claims arising from an accident that happened in Kentucky. *See* Doc. 143, PID##3301–02.[7] The mere possibility that another state's law could apply as acknowledged in *Harris Corp.*, without more, does not justify

---

[7] Defendants Lanter and Thomas instead cite a case where the Court's sister district admittedly applied Kentucky law to a pursuit case with an accident occurring in Kentucky. Doc. 143, PID ##3301–02, citing *Brackens v. Louisville Jefferson Cnty. Metro Gov't*, Case No. 3:12-cv-0280, 2015 WL 5786818, at *8 (W.D. Ky. Sep. 30, 2015), *aff'd sub nom*., 680 F. App'x 362 (6th Cir. 2017).

ignoring Kentucky's strong preference for applying its own law as set forth above.

Further, the argument advanced by Defendants Lanter and Thomas errs by conflating the choice-of-law standard for tort claims with that for contract claims, which requires courts to apply the "most significant relationship" test to determine whether the law of Kentucky or another state should be applied. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009); *Miller Truck Lines, LLC v. Cent. Refrigerated Serv., Inc.*, 781 F. Supp.2d 488, 491 (W.D. Ky. Mar. 17, 2011). Unlike claims arising in contract, which require courts to weigh the interests of various states, tort claims are subject to Kentucky's law for **any** "significant contact," including a motor vehicle accident. *Elsamady*, 2024 WL 3969361, at \*3, citing *Reichwein*, 397 S.W.3d at 416, and *Petronis v. Churchill Downs, Inc*., 2005-CA-001925-MR, 2007 WL 1520018, at \*2 (Ky. App. May 25, 2007).

Indeed, in *Harris Corp.*, which Lanter and Thomas cite, the court applied Kentucky law to dismiss the tort claims arising from a plane crash in Kentucky and applied Ohio law only to the claim for contractual indemnification for workers' compensation benefits paid by the Ohio employer to the Ohio employee-decedent. *Harris*, 712 F.2d at 1071–72. The present lawsuit is limited to tort claims against these Defendants and does not include claims based on Ohio-centered contracts, so Kentucky law applies to the claims and whether any Defendant should receive immunity. *Id.*, citing *Arnett*, 433 S.W.2d at 114.

C.    **City of Cincinnati Cites No Law Supporting Application of Ohio Law.**

Defendant City of Cincinnati argues that interstate comity considerations required applying Ohio law but cites no law standing for that proposition. Instead, the City relied upon an inapposite case, *Pittman v. Rutherford*, Case No. 19-00036, 2020 WL 6386489 (E.D. Ky. Jul. 7, 2020), adopted by 2020 WL 6384726 (E.D. Ky. Oct. 30, 2020). The City's discussion of *Pittman* misstates the legal context and holding of that case, which do not apply to claims against cities under

Kentucky law. Doc. 144, PID ##3388–89. *Pittman* addressed whether an Ohio county—not an Ohio city—was entitled to immunity. *Id.*, 2020 WL 6384726 at *3.

The distinction matters because "[b]oth states have a general policy of immunity for their counties." *Pittman*, 2020 WL 6384726 at *3. Whereas Ohio counties (like cities) are "political subdivisions" subject to the immunity granted by Ohio Rev. Code §2744.02, Kentucky counties are not subject to the same "local government" immunity as cities under Ky. Rev. Stat. § 65.2003: they are "considered arms of the state and thus benefit from the state's inherent sovereign immunity." *Id.* at *4, citing *Lexington-Fayette Urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004). Although the two states afforded immunity to counties under different legal mechanisms, the *Pittman* court found that a county would be immune under either Kentucky or Ohio law. *Id.* at **3–6. The Court in *Pittman* distinguished this scenario from other cases in which "the plaintiffs actually stood to benefit from the application of Kentucky law" such that "the foreign state's law in these cases was, in a very real sense, 'obnoxious' to Kentucky public policy." *Id.* at *5, citing *Foster*, 484 S.W.2d at 827–28; *Arnett*, 433 S.W.2d at 114; *Kennedy v. Ziesman*, 522 F. Supp. 730, 731 (E.D. Ky. Sep. 24, 1981).

Defendant City also references *Pittman*'s citation to *Ohio v. Great Lakes Minerals*, LLC, 597 S.W.3d 169, 173–74 (Ky. 2019) as "[r]ecent caselaw from the Kentucky Supreme Court suggest[ing] that Kentucky would defer to Ohio's immunity law on comity grounds." Doc. 144, PID #3389. But *Great Lakes Minerals* is distinguishable because it addressed whether the state of Ohio and the Ohio Tax Commissioner (a state official) were entitled to immunity against 42 U.S.C. § 1983 claims (not, as here, Kentucky tort claims). *Pittman*, 2020 WL 6384726 at *4, citing *Great Lakes Minerals* at 173–74. Like *Pittman*, *Great Lakes Minerals* did not determine which state's immunity law would apply to an Ohio *city*—or any city—for Kentucky tort claims. *Id.*

Although Ohio and Kentucky have similar rules for counties' immunity, they have different and conflicting statutes for cities' immunity. Kentucky's statute expressly provides for a city's vicarious liability for its employees' acts: subject to specific exceptions, "[n]othing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties." Ky. Rev. Stat. § 65.2003. Ministerial duties, as detailed below, are "imperative" and involve "merely execution of a specific act arising from fixed and designated facts[,]" although the officer may be required to ascertain underlying facts and may have some discretion regarding the means of performing the act. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001), citing *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky. 1959).

Contrast Ohio's immunity statute, which vests political subdivisions with immunity, subject to certain limited exceptions, and generally prohibits vicarious liability, regardless of whether the municipal employee's duty was mandatory or discretionary. Ohio Rev. Code §2744.02. This Court (Bertelsman, J.) found that Ohio's statutory immunity for cities impermissibly conflicted with Kentucky's immunity statute in *Ensminger v. Cincinnati Bell Wireless, LLC*, 434 F. Supp.2d 464 (E.D. Ky. Jun. 19, 2006), where the Court refused to apply Ohio's law on municipal immunity to the City of Cincinnati for a tort claim arising from Kentucky events. There, a Kentucky resident called 911 to report a fire at his home and was routed to a dispatch center in Cincinnati, where the dispatcher mistakenly dispatched the fire department to the wrong address. *Id*., 434 F. Supp.2d at 465. When Cincinnati moved to dismiss based on municipal immunity for performing governmental functions under Ohio Rev. Code § 2744.02(B), the plaintiff argued that Kentucky law applied and that "Kentucky has abrogated immunity for municipal corporations." *Id*. at 466.

The *Ensminger* Court found that Kentucky law governed, because "[n]o state is required to adopt the statutes of another state which are in conflict with their own in the absence of a statute of that forum requiring them to do so." *Id*. at 465–66, citing *Pyles v. Russell*, 36 S.W.3d 365, 367 (Ky. 2000). More specifically, "applying Ohio's law on municipal liability and the public duty doctrine would be contrary to Kentucky's public policy, which favors allowing recovery for injuries resulting from negligence[,]" and "Kentucky would not apply Ohio law on municipal liability…as a matter of comity." *Id*., 434 F.Supp. 2d at 466. Recognizing that Kentucky courts apply Kentucky law "'if there are significant contacts—not necessarily the most significant contacts—with Kentucky,'" the Court found "significant contacts" with Kentucky (plaintiff's residence, plaintiff's 911 call from Kentucky, plaintiff's property damages in Kentucky) and denied immunity to Cincinnati under Kentucky law. *Id*., quoting *Adam v. J.B. Hunt Transport, Inc*., 130 F.3d 219, 230 (6th Cir. 1997) (quoting in turn *Foster*, 484 S.W.2d at 829).

Interstate comity does not require the Court to apply Ohio law to the municipal immunity inquiry in this case. Instead, the rule of *Ensminger* applies because Kentucky's law regarding local government immunity remains the same and stands in direct conflict with Ohio's law for political subdivision immunity. Indeed, "[l]aws unique to other jurisdictions…should not bind and define the public policy of Kentucky." *United States Fidelity & Guaranty v. Preston*, 26 S.W.3d 145, 147–48 (Ky. 2000). The Court should apply Kentucky law to determine whether the City is immune.

III.    **Under Kentucky Law, Defendants Lanter and Thomas Are Not Entitled to Qualified Official Immunity.**

    A.    **Kentucky Law Prohibits Conferring Qualified Official Immunity for the Negligent Performance of Ministerial Functions.**

Qualified official immunity applies only to public employees' negligent performance of "(1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment,

or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the

employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001), citing 63C Am.Jur.2d,

Public Officers & Employees, §§309, 322 (1997) and Restatement (Second) Torts, § 895D cmt. g.

Qualified official immunity may never be granted to a public employee for the negligent

performance of a ministerial act, which is "one that requires only obedience to the orders of others,

or when the officer's duty is absolute, certain, and imperative, involving merely execution of a

specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522. Importantly, "[a]n

act is not necessarily 'discretionary' just because the officer performing it has some discretion with

respect to the means or method to be employed." *Id*., citing *Upchurch v. Clinton County*, 330

S.W.2d 428, 430 (Ky. 1959). "That a necessity may exist for the ascertainment of those facts does

not operate to convert the act into one discretionary in nature." *Id*., quoting *Upchurch*, 330 S.W.2d

at 430; citing Restatement (Second) Torts, *supra*, § 895D, cmt. h; 63C Am.Jur.2d, Public Officers

& Employees, §§ 324, 325 (1997).

The Supreme Court of Kentucky has set forth a two-part analysis for deciding qualified

official immunity:

> First, a court must look at the defendant and whether he is a government official
> acting within the scope of his duty and review the relevant statute, regulation, rule,
> or policy to determine if the action is ministerial or discretionary. **If ministerial
> then that is the end of the inquiry; trial courts do not proceed to the question
> of whether the conduct constitutes negligence**…On the other hand, "[o]nce the
> officer or employee has shown prima facie that the act was performed within the
> scope of his/her discretionary authority, the burden shifts to the plaintiff to establish
> by direct or circumstantial evidence that the discretionary act was not performed in
> good faith."

*Sheehy v. Volentine*, 706 S.W.3d 229, 237 (Ky. 2024) (emphasis supplied), quoting *Yanero*, 65

S.W.3d at 523. The *Sheehy* Court cautioned:

> These two steps must not be confused. The first has the burden upon the defendant
> but does not consider the actions of the defendant, i.e., whether they were negligent

or acting in good faith. The second step shifts the burden to the plaintiff **only after the defendant has made a *prima facie* showing that his actions were discretionary and within the scope of his authority**.

*Id*. (emphasis supplied).

The determination of whether any particular function is ministerial or discretionary often turns on "the government agency's own internal rules, policies, [and] regulations[,]" which "necessarily constrain the individual discretion of government employees" to varying degrees, including by making the duties ministerial. *Morales v. City of Georgetown*, 709 S.W.3d 146, 155 (Ky. 2024). In addition to written policies, "unwritten yet generally known rule[s] or polic[ies] can impart ministerial obligations on public employees." *Id*., citing *Yanero*, 65 S.W.3d at 529; *Gaither v. Just. & Pub. Safety Cabinet*, 447 S.W.3d 628, 635–36 (Ky. 2014).

### B.    Defendants Lanter and Thomas are Not Entitled to Qualified Official Immunity Because They Negligently Breached Ministerial Duties.

As explained above, Kentucky's qualified official immunity analysis employs a burden-shifting framework, under which defendants asserting immunity must first establish that their actions were governed by discretionary, not ministerial, duties. *Sheehy*, 706 S.W.3d at 237. Defendants Lanter and Thomas failed to carry their burden. Although they acknowledged that determining whether a duty is discretionary or ministerial requires analyzing the relevant internal policies and the dominant nature of the acts, they only cite cases with factually distinguishable policies explicitly conferring discretion. Doc. 143, PID ##3313–14 and 3312, citing *Meinhart v. Louisville Metro Government*, 627 S.W.3d 824, 832 (Ky. 2021), and *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010).

### 1.    Defendants Lanter and Thomas Negligently Violated Ministerial Duties Requiring Them to Drive Safely During the Pursuit.

The Supreme Court of Kentucky has repeatedly held that "the act of safely driving a police

cruiser" is a ministerial act. *Jones v. Lathram*, 150 S.W.3d 50, 53–54 (Ky. 2004); *Haney*, 311 S.W.3d at 246; *see also id.*, n. 15 (noting that Court had reaffirmed the holding in *Jones v. Lathram*, citing *Pile v. City of Brandenburg*, 215 S.W.3d 36, 40 (Ky. 2006); *Com., Transp. Cabinet, Dept. of Highways v. Sexton*, 256 S.W.3d 29, 33 (Ky. 2008)). While recognizing that "decisions [are] required in the course of driving," driving a police car, "even in an emergency, is not an act that typically requires any deliberation or the exercise of judgment" but instead "requires reactive decisions based on duty, training, and overall consideration of public safety." *Jones* at 53. Indeed, as the Supreme Court of Kentucky has since noted: "[d]riving a motor vehicle is clearly one of the most intensely regulated, trained, tested, and supervised activities that an individual may perform." *Haney*, 311 S.W.3d at 246.

The mandatory language of the Cincinnati Police Department's Pursuit Policy supports the application of this black-letter law that safe police driving is a ministerial duty. As noted above, the CPD's "own internal rules, policies, [and] regulations" are relevant to the determination of whether a duty is ministerial or discretionary. *Morales*, 709 S.W.3d at 155. Internal policies that use mandatory language impose ministerial duties. *Mattingly v. Mitchell*, 425 S.W.3d 85, 90 (Ky. App. 2013), citing *Yanero*, 65 S.W.3d at 522 and *Haney*, 311 S.W.3d at 245. Here, Plaintiffs have made tort claims based on Defendants Lanter's and Thomas's violations of portions of the CPD's Pursuit Policy that contain this mandatory language, thus imposing ministerial duties for CPD officers' driving during a pursuit. Specifically, Plaintiffs have presented competent summary judgment evidence showing that Defendants Lanter and Thomas:

- Drove the wrong way on both one-way and divided roadways during the pursuit of Meyer without authorization, in violation of the Pursuit Policy's mandate that "[o]fficers **will not** pursue vehicles the wrong way on the Interstate or other controlled access highway, divided roadways, or one-way streets unless specifically authorized by the pursuit officer in charge (OIC)" Pursuit Policy, Doc. 134-1, PID #1265 (emphasis supplied) (Lanter Dep., Doc. 135, PID ##1443–46,

1449, 1464, 1473–74; Thomas Dep., Doc. 141, PID ##3137–38; Bode Dep., Doc. 134, PID ##1193–94;  Sweeney Exp. Rpt., Doc. 149-1, PID ##3444, 3447);

- Drove at speeds more than 20 mph above the posted speed limit, including speeds exceeding 100 mph, during the pursuit of Meyer, in violation of CPD Pursuit Policy mandate that "[t]he operator **will not** exceed the posted speed limit by more than 20 miles per hour" Pursuit Policy, Doc. 134-1, PID #1266 (emphases supplied) (CCA Report, Doc. 134-8, PID #1326; IIS Report, Doc. 134-3, PID #1297–99; Becker Exp. Rpt., Doc. 149-2, PID ##3479–86; Ex. 2);

- Never broadcast their speeds during the pursuit, in violation of CPD Pursuit Policy requirement that "[a] pursuing officer(s) **will** immediately relay the following information to ECC:… 6) Speeds involved" CPD Pursuit Policy Doc. 134-1, PID #1268 (emphasis supplied) (Lanter Dep., Doc. 135, PID ##1446, 1449; IIS Report, Doc. 134-3, PID ##1298–99;);

  Failed to stop at stop signs, failed to stop at red lights, failed to stay within their lanes of travel, almost struck vehicles at 5th Street and Monmouth, and often exceeded the posted speed limit during the pursuit, all in violation of Pursuit Policy's requirement that "[w]hen driving in emergency mode, the operator **will** conform to all applicable traffic laws and regulations" Pursuit Policy, Doc. 134-1, PID #1266 (emphasis supplied) (Lanter Dep., Doc. 135, PID ##1450–52, 1454, 1465–66, 1471–72, 1477; Sweeney Exp. Rpt., Doc. 149-1, PID ##3444, 3447).

- In addition to all of the above referenced actions, Lanter failed to broadcast that Meyer struck a vehicle directly within his field of vision and failed to otherwise seek help for the third party involved in this collision, in violation of the CPD Pursuit Policy requirement that officers "[w]ill not operate" a police vehicle in emergency mode "with reckless disregard for the safety of other citizens." Pursuit Policy, Doc. 134-1, PID #1266 (emphases supplied) (Caton Dep., Doc. 151, PID #3613; Sweeney Exp. Rpt., Doc. 149-1, PID #3444; CCA Report, Doc. 134-8, PID #1326).

Whether Defendants Lanter and Thomas actually violated these ministerial duties in a negligent manner that caused Plaintiffs' damages is a question reserved for the jury under Kentucky law, but Plaintiffs' showing of genuine issues of material fact regarding whether Defendants violated ministerial duties precludes immunity. *Sheehy*, 706 S.W.3d at 237. Courts applying Kentucky law routinely deny qualified official immunity to officers when claims arise from their allegedly negligent and unsafe driving during a pursuit or emergency. *See Jones v. Lathram*, 150 S.W.3d 50, 53–54 (Ky. 2004) (reversing grant of qualified official immunity to

officer who allegedly drove negligently when responding to emergency call); *City of Brooksville v. Warner*, 533 S.W.3d 688, 694–95 (Ky. App. 2017) (affirming denial of qualified official immunity to officer who allegedly drove negligently during pursuit); *Cox v. Cross*, Case No. 2016-CA-001945-MR, 2019 WL 2554214, at **2–3 (Ky. App. Jun. 21, 2019) (affirming denial of qualified official immunity for officer who allegedly drove negligently during pursuit).

Defendants made no argument that these policy provisions contemplated discretionary duties—nor that safe driving during a pursuit was a discretionary function generally. Doc. 143, PID ##3311–17. Both the policy language and black-letter Kentucky law require a finding that these policy provisions are directed to ministerial functions. Defendants have failed to carry their burden to obtain qualified official immunity for their allegedly negligent conduct by driving unsafely during the pursuit. Under Kentucky's qualified official immunity law, as set forth in controlling jurisprudence, the Court must deny immunity to Defendants Lanter and Thomas. *Sheehy*, 706 S.W.3d at 237.

### 2.  Defendants Lanter and Thomas Negligently Violated Ministerial Duties Requiring Them to Terminate the Pursuit Before the Subject Collision.

Defendants Lanter and Thomas were subject to ministerial duties under CPD Pursuit Policy regarding when to terminate the pursuit. Thus, qualified official immunity must be denied as to their failure to terminate before the collision. *Morales*, 709 S.W.3d at 155; *Mattingly*, 425 S.W.3d at 90, citing *Yanero*, 65 S.W.3d at 522 and *Haney*, 311 S.W.3d at 245; *Sheehy*, 706 S.W.3d at 237.

### i.  Defendants Lanter and Thomas Were Subject to a Ministerial Duty to Terminate the Pursuit Before the Subject Collision Because Mason Meyer's Identity was Established and His Immediate Apprehension was Not Required.

The Pursuit Policy mandated: "Officers **will** terminate pursuits under any of the following conditions:…(b) Establishment of the suspect's identity allowing for apprehension at a later time

and there is no longer a need for immediate apprehension." CPD Pursuit Policy, Procedure § E(1), Doc. 134-1, PID #1269 (emphasis supplied). The mandatory language of this provision ("will") indicates that this duty is ministerial. *Morales*, 709 S.W.3d at 155; *Mattingly*, 425 S.W.3d at 90, citing *Yanero*, 65 S.W.3d at 522 and *Haney*, 311 S.W.3d at 245. The provision as a whole "imposes a duty that 'is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Sheehy*, 706 S.W.3d at 241.

The Supreme Court of Kentucky found that a similar policy provision governing terminating pursuits was ministerial in *Sheehy*, and its analysis is instructive. *Sheehy*, 706 S.W.3d at 241. There, the policy stated: "Deputies Will Terminate a Pursuit When… No Field Supervisor or higher authority can be contacted to approve the pursuit's continuation." *Id*.[8] The *Sheehy* Court explained that this provision "leaves no discretion to the pursuing officer to not contact a higher authority in his chain of command or otherwise to continue a pursuit based on his own judgment" and "contains no caveats or exceptions." *Id*. Instead, "[o]nce engaged in a pursuit (the fixed and designated fact) [the deputy] was required to get approval of a higher authority in his chain of command to continue it. Absent approval, he was required to terminate it." *Id*. The Court rejected the deputy's argument that he reasonably believed he was empowered to determine whether to continue the pursuit because he was the most senior officer on duty and the higher authorities in his chain of command were not available to contact. *Id*. The Court explained that "[t]he failure of the chain of command and the inability to obtain approval to continue pursuit only makes the ministerial duty to end the pursuit all the more emphatic—it does not transform a ministerial duty into a discretionary authority." *Id*. at 242. The question of whether the deputy reasonably violated

---

[8] *See also Browder v. Fentress*, Case No. 2013-CA-002178, 2018 WL 3202975 at **2, 3, 5 (Ky. App. Jun. 29, 2018) (denying qualified official immunity to officer where evidence implicated ministerial duty to contact supervisor based on policy stating "Deputies Will Terminate a Pursuit When…No Field Supervisor or higher authority can be contacted to approve the pursuit's continuation").

this ministerial duty was a fact question for the jury and not relevant to qualified official immunity. *Id*.

In *Hutchinson v. Estate of Skeens by and through Skeens*, Case Nos. 2019-CA-0877-MR and 2019-CA-0878-MR, 2021 WL 753084 at *4 (Ky. App. Feb. 26, 2021), the Kentucky Court of Appeals similarly held that a pursuit termination policy was ministerial when it stated that pursuits "shall be terminated" upon entering roadways where the speed limit was less than 55 mph, subject to certain inapplicable exceptions. The officer argued that his actions were subject to discretionary duties and that he "complied with any duty to terminate the pursuit" when entering a roadway where the speed limit was less than 55 mph by "slowing down and turning off his emergency lights" and "advis[ing] his supervisor" that he had terminated the pursuit. *Id*. at *5. The court found that while "at least under certain circumstances whether to initiate or continue a pursuit appears to be discretionary under [the policy], there also appear to be clearly defined duties to do specific things (like…terminating on a road with a speed limit under 55 miles per hour) which are not matters for the officer's discretion." *Id*. at *6. As a result, the court found that "the dominant nature" of the officer's actions was ministerial. *Id*. Further, the court was unpersuaded that the officer complied with the duty to terminate because the officer continued to follow the suspect after slowing down and turning off his emergency lights. *Id*. at *5.

Here, it is undisputed that Defendants Lanter and Thomas, along with all other law enforcement officials involved in the joint operation, knew Meyer's identity. *See* Doc. 136-9. It is further undisputed that the ATF had implemented surveillance of Meyer through several methods that would allow them to continue tracking Meyer until he could be arrested at a safer location. Occhipinti Dep., Doc.136, PID #2077. No one told Lanter and Thomas that it was imperative to apprehend Meyer that day. Doc. 141, PID #3146; Doc. 135, PID #1599; Doc. 134, PID #1223;

Doc. 151, PID #3608; Doc.136, PID #2077

The existence of these "fixed and designated facts" compelled "execution of a specific act": terminating the pursuit. *Sheehy*, 706 S.W.3d at 241. Defendants' duty to terminate the pursuit was "absolute, certain, and imperative" based on the mandatory "will terminate" language of the policy provision and the facts establishing Meyer's identity and that immediate apprehension was not necessary. *Id*.; Pursuit Policy, Doc. 134-1, PID #1269. This provision thus imposes a ministerial duty, and Defendants' only argument touching on this provision merely raises factual disputes about whether they violated its requirement, which is immaterial to qualified official immunity. *Sheehy*, 706 S.W.3d at 237; *Yanero*, 65 S.W.3d at 523 (no immunity for ministerial duties). The Court must deny qualified official immunity on this basis.

> ii.  **Defendants Lanter and Thomas Were Subject to a Ministerial Duty to Terminate the Pursuit Before the Subject Collision Because the Safety Risks of the Continued Pursuit Outweighed the Consequences of Mason Meyer's Escape.**

CPD Pursuit Policy imposed a ministerial duty upon Defendants Lanter and Thomas to terminate the pursuit by requiring that "[o]fficers **must** terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape." Doc. 134-1, PID #1264 (emphasis supplied). Although Defendants *never specifically address this provision*, *see* Doc. 143, they argue that "the decision to engage or terminate" a pursuit is discretionary because the CPD Pursuit Policy as a whole "require[s] the law enforcement officer to weigh factors." Doc. 143, PID #3316. Putting aside Defendants' failures to address this provision or distinguish between requirements for initiating and terminating pursuits, controlling Kentucky case law definitively rejects Defendants' argument that a policy requiring an officer to weigh facts is necessarily discretionary. Defendants' testimony likewise shows that the presence of factors requiring

termination of a pursuit does not give rise to deliberation or decision making.

      The Supreme Court of Kentucky found a substantially similar policy to be ministerial in *Sheehy*. That policy stated: "Deputies Will Terminate a Pursuit When: … The circumstances of the pursuit present an extreme safety hazard to the public, the deputy, or the suspect." *Sheehy*, 706 S.W.3d at 242. The Kentucky appellate court had granted qualified immunity to the officer, deeming this policy discretionary based on reasoning similar to Defendants' here: "[a]lthough the wording of the [policy] appears mandatory or ministerial, it requires an officer's discretion to determine when the 'circumstances of the pursuit present an extreme safety hazard to the public, the deputy, or the suspect.'" *Id*. at 242–43.

      The Supreme Court of Kentucky reversed, explaining:

> We reject this rationale. In *Yanero*, when we held that a ministerial duty exists 'involving merely execution of a specific act arising from fixed and designated facts[,]' we immediately stated "[t]hat [because] a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in nature.'

*Sheehy* at 243, quoting *Yanero*, 65 S.W.3d at 522. Indeed, "[t]he simple truth is in practically every situation where a ministerial duty arises there is a threshold determination by the officer to ascertain the underlying facts giving rise to that ministerial duty. That reality does not transform a ministerial act into a discretionary one." *Id*.

      Just as the necessity of ascertaining the underlying facts regarding whether a pursuit "presents an extreme safety hazard to the public, the deputy, or the suspect" did not render the duty to terminate a pursuit discretionary in *Sheehy*, the need for Defendants Lanter and Thomas to ascertain whether "the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape" does not overcome the predominantly ministerial nature of their duty in this case. The *Sheehy* rule applies because the

"threshold determination" at issue involved "fixed and designated facts" known to Lanter and Thomas based on the CPD Pursuit Policy, their training, and their observations.

Lanter and Thomas understood that officers were required to discontinue a pursuit when they had facts showing that safety risks to others outweighed the need to apprehend the suspect at that time. Lanter Dep., Doc. 135, PID #1514; Thomas Dep., Doc. 141, PID ##3015–16. Lanter described his understanding of when this threshold was reached as "when you see it, you know it" based on knowledge of the safety factors and "19 years of training and experience and hands-on in activities and being placed in these circumstances[.]" *Id.*, PID ##1507, 1513–14; *See also* Scalf Dep., Doc. 138, PID #2262 (stating, regarding reckless disregard for citizens' safety in vehicle operation: "it's one of those things that can you see it, you know what it is").

Lanter's explanation that "when you see it, you know it" demonstrates that the duty to terminate the pursuit is instantly triggered by the officer's knowledge of the risks and benefits of the pursuit. The termination threshold is immediately apparent upon knowledge and observation, just as *Sheehy* contemplates. Here, as detailed above, the officers knew, *inter alia*, that immediate apprehension of Meyer was not necessary, that Meyer's identity was known, that multiple agencies' surveillance of Meyer allowed for safer apprehension at a later time, that Meyer's speed and their speeds were excessive (100 mph+) and unsafe, that Meyer and they had driven the wrong way on roadways, that Meyer had sideswiped a vehicle, and that vehicles had been required to move to avoid collisions. *See* Facts, §§ V–VI, *supra*.

Defendants' only argument that the consequences of not apprehending Meyer that day outweighed the safety risks of the pursuit was based on the information from the informant about Meyer's alleged intent to engage police in a shootout. Lanter Dep., Doc. 135, PID ##1555–57. Lanter speculated that terminating the pursuit would endanger other officers, who may

unknowingly conduct a traffic stop of Meyer that resulted in a shootout. *Id*. But Lanter had no basis for such a belief when Meyer had demonstrated a clear tendency to flee from traffic stops on both July 31 and August 7. (Further, Lanter obviously could have communicated warnings to other officers about Meyer through dispatch or otherwise.) More significantly, Defendants have it backwards: Meyer's alleged intention to engage in a shootout made it *more* dangerous to continue the pursuit, especially through areas of heavy vehicular and pedestrian traffic. The risks to members of the public from Meyer shooting out of a moving vehicle or after exiting his vehicle (and law enforcement returning fire) are grave and obvious. Sweeney Exp. Rpt., Doc. 149-1, PID ##3427–29.

In light of the minimal consequences of Meyer's "escape," the facts known to Defendants Lanter and Thomas triggered their ministerial duty to terminate the pursuit because they revealed "obvious" risks, and "the danger to the community was much greater than the benefit of apprehending Meyer," as shown by the serious injuries and deaths caused by the collision. Sweeney Exp. Rpt., Doc. 149-1, PID #3449. The findings of the IIS, CIRB, and CCA support this conclusion. *See* Docs. 134-3, 134-8, 134-9.

Other cases have denied qualified official immunity based on finding that similar policies imposed ministerial duties. In *Mattingly v. Mitchell*, 425 S.W.3d 85 (Ky. App. 2013), the Kentucky Court of Appeals denied qualified official immunity to an officer, finding this policy to be ministerial: "Pursuits shall be terminated when the risks created by continuing the pursuit outweigh the need for immediate apprehension." *Id*. at 87–88. The court found that the policy's use of "shall" established "that compliance with its provisions involve 'merely execution [or nonperformance] of a specific act arising from fixed and designated facts.'" *Id*. at 90, quoting *Yanero*, 65 S.W.3d at 522 (brackets original to *Mattingly*). The term "shall" imposed a binary directive in which

"compliance was not a matter of degree," so the officer "either violated the policies or he did not[,]" thus establishing a ministerial duty. *Id*., citing *Haney*, 311 S.W.3d at 245.[9] The same applies here, where the term "must" imparted a binary directive to terminate a pursuit when the risks of the pursuit outweighed the consequences of a suspect's escape.

*Mabrey v. Simpson*, Case No. 2018-CA-000515-MR, 2019 WL 1422645 (Ky. App. Mar. 29, 2019), addressed the same policy that was the subject of *Mattingly*. *Id*. at *2. *Mabrey* closely tracked the reasoning of *Mattingly*, finding that mandatory language like "shall" established ministerial duties. *Id*. at *3, citing *Mattingly* at 90; *Yanero*, 65 S.W.3d at 522; *Upchurch*, 330 S.W.2d at 430. Although the *Mabrey* officer disputed plaintiff's allegations that he violated the relevant S.O.P.s (unlike in *Mattingly*, where the violations were undisputed), the court found this distinction immaterial to its denial of qualified official immunity because "'whether a ministerial act was performed properly, i.e., non-negligently, is a separate question from whether the act is ministerial," and "'immunity applies only to discretionary acts.'" *Id*. at *3, quoting *Marson v. Thomason*, 438 S.W.3d 292, 297–98 (Ky. 2014). The *Mabrey* court affirmed the denial of the officer's motion for summary judgment seeking qualified official immunity. *Id*.

For their argument that their pursuit of Meyer involved only discretionary functions, Lanter and Thomas relied primarily upon an overly expansive reading of *Meinhart v. Louisville Metro Government*, 627 S.W.3d 824 (Ky. 2021). Significantly, the *Meinhart* Court stated that "[t]he question presented in this appeal is whether a police officer is entitled to qualified official immunity from liability for **the decision to initiate a police pursuit**[.]" *Id*. at 827 (emphasis supplied). Its holding was likewise limited to determining that a policy governing **initiation** of a

---

[9] Although the *Mattingly* officer was disciplined based on findings that he violated internal policies, it is not necessary to determine whether an officer violated a policy providing ministerial duties to deny qualified official immunity upon summary judgment. *Mattingly*, 425 S.W.3d at 87; *Sheehy*, 706 S.W.3d at 237.

pursuit was discretionary. *Id*. at 834–35. The Court "set out verbatim" all policies applicable to pursuits, *id*. at 832–34, and explained that they "contain a mixture of discretionary and ministerial elements." *Id.* at 834. One of these policies, Standard of Practice 12.1.3, "gives a list of factors to be considered prior to the initiation of a pursuit but leaves to the officer's individual professional judgment to weigh the law enforcement goals and the specific factors of a situation." *Id*.[10] The appellate court relied upon this S.O.P. to find the officer entitled to qualified official immunity for initiating the pursuit because it imposed a discretionary duty, and the *Meinhart* Court affirmed. *Id*.

    *Meinhart* is inapposite to the determination of whether Defendants Lanter and Thomas should receive immunity for failing to terminate the pursuit because *Meinhart* is directed solely to whether those officers should have **initiated** a pursuit under a policy with vastly different language that explicitly contemplated discretion. Although the *Meinhart* opinion briefly referenced a termination policy similar to the CPD policy at issue here, it did not find this policy to impose a discretionary duty. When listing all internal policies related to police pursuits, *Meinhart* included S.O.P. 12.1.10, which stated in part: "Pursuits shall be terminated when the risks created by continuing the pursuit outweigh the need for immediate apprehension." *Id*. at 834. *Meinhart* did not address this provision nor pronounce its duties ministerial or discretionary. *Id*. at 834–36.[11]

    Further, neither *Meinhart* nor any other law supports Defendants' suggestion that an

---

[10] This policy provided in pertinent part, before listing safety factors: "The decision to initiate a pursuit must be based on the pursuing officer's reasonable belief that the suspect is a felon or suspected felon. The officer must weigh the immediate danger or potential danger to the public should the suspect be allowed to remain at large against the danger or potential danger created by the pursuit itself." *Id*. at 833.

[11] If anything, *Meinhart* supports a finding that the subject CPD Pursuit Policy provision was ministerial because the only reference to the analogous policy stated that it was ministerial, not discretionary. *Id*. at 834. Indeed, *Meinhart* only ever mentioned S.O.P. 12.1.10 to say that it "contain[ed] explicit restrictions on…termination of pursuits which are simple and definite, leaving nothing to the discretion of the officer. These too create ministerial duties." *Id*. at 834. The opinion did not specify to which portion(s) of S.O.P. 12.1.10 this reasoning applied, and S.O.P. 12.1.10 contained other provisions requiring termination. *Id*. Given this lack of specificity, Plaintiffs do not contend that *Meinhart* specifically determined the relevant provision was ministerial. But, by the same token, Defendants cannot reasonably argue that *Meinhart* deemed the provision discretionary based on the opinion.

officer's subjective understanding of a duty as discretionary is dispositive to the ministerial/discretionary inquiry. Lanter and Thomas assert that "[j]ust as the law enforcement officer exercised discretion in *Meinhardt* [sic], so, too, did the Officers here" and cite **their own testimony** stating that CPD grants officers discretion to terminate pursuits, without citing law supporting the use of this evidence to determine the meaning of a policy. Doc. 143, PID #3316.

Curiously, Lanter and Thomas also cited a portion of the Fed. R. Civ. P. 30(b)(6) testimony of the City of Cincinnati that would support a finding that the policy is ministerial: "the officer, based on their training and their experience and the totality of the circumstances in front of them, should be able to make a decision to continue or discontinue a vehicle pursuit knowing all the parameters that are outlined in the policy and procedure." Doc. 143, PID #3316, citing Doc. 139, PID #2579. This testimony comports with the City of Cincinnati Critical Incident Review Board's determination that Lanter and Thomas had "the knowledge, skills and resources necessary to perform their duties and they ha[d] full knowledge of the Department's protocols, procedures, and training" but "during this incident…chose to disregard the Department's protocols, procedures, and training" as well as Lanter's testimony that "when you see it, you know it." Doc. 134-9, PID #1334; Doc. 135, PID ##1507, 1513–14.[12]

Contrary to Defendants' arguments, *Sheehy*, not *Meinhart*, is directly on point—and *Sheehy* requires denying qualified official immunity. It bears emphasis that the Supreme Court of Kentucky's decisions in *Meinhart* and *Sheehy* are not in conflict. The two decisions are factually

---

[12] The City's Fed. R. Civ. P. 30(b)(6) testimony confirmed that the City stands by those findings and that the CPD Chief reviewed and approved of the Critical Incident Review Board findings. Doc. 139, PID ##2652–53. Properly understood, the City's testimony support Plaintiffs' argument that the CPD Pursuit Policy's requirement to terminate pursuits when safety risks outweigh the consequences of the suspect's escape was ministerial because it "imposed a binary directive" requiring "execution of a specific act arising from fixed and designated facts" (namely, the facts known to Defendants based on their training and observations). *Mattingly*, 425 S.W.3d at 90; *Yanero*, 65 S.W.3d at 522.

distinguishable, as explained above. Further, *Sheehy* (decided in 2024) specifically referenced *Meinhart* (decided in 2021) multiple times but still did not find that *Meinhart* supported granting qualified official immunity to the *Sheehy* officers. *Sheehy*, 706 S.W. 3d at 236, 237, 238, 240, 241, 244. Lanter and Thomas should be denied immunity here, just as the *Sheehy* Court denied the officers immunity for failing to terminate their pursuit.

Defendants also cite *Browning v. Edmonson County*, 18 F. 4th 516 (6th Cir. 2021), which is inapposite because the policy in that case specifically stated that it was discretionary. *Id*. at 532. The policy stated: "The decision to initiate pursuit…driving will be discretionary with each individual officer" and that "[t]he officer will use his discretion and terminate the pursuit if the danger to human life is greater than the need to continue the pursuit." *Id*. at 532–33. The policy itself also specifically referred to its own provisions as "guidelines." *Id*. at 532. *Browning* is further distinguishable because, unlike here, the "plaintiffs [did] not argue, and the district court did not identify, any mandatory procedures in the [Edmonson County Sheriff's Office] policy that [the defendant] violated during the pursuit." *Id*. at 535.

The Court should resist Defendants' efforts to oversimplify the legal distinction between ministerial and discretionary duties. As the Supreme Court of Kentucky cautioned: "We have previously warned, and must now warn again, that '[r]ecasting an otherwise ministerial duty as discretionary simply because it required some modicum of discretion of judgment 'would undermine the rule that an act can be ministerial even though it has a modicum of discretion.'"" *Sheehy*, 706 S.W.3d at 243, quoting *Patton v. Bickford*, 529 S.W.3d 717, 728 (Ky. 2016) (quoting in turn *Marson v. Thomason*, 438 S.W.3d 292, 302 (Ky. 2014)). Any arguable exercise of discretion does not defeat the ministerial character of Defendants' duty to terminate the pursuit under this provision of the Pursuit Policy, which "imposed a binary directive" requiring "execution of a

specific act arising from fixed and designated facts." *Mattingly*, 425 S.W.3d at 90; *Yanero*, 65 S.W.3d at 522. The Court should deny qualified official immunity to Lanter and Thomas.

> **iii.    Alternatively, If the Court Determines that Defendants Lanter's and Thomas's Duty to Terminate the Pursuit When the Safety Risks of Continued Pursuit Outweighed the Consequences of Mason Meyer's Escape was a Discretionary Duty, Defendants Lanter and Thomas are Still Not Entitled to Immunity.**

Even if the Court determines that Defendants Lanter and Thomas's duties were discretionary (which it should not), qualified official immunity should be denied because Lanter and Thomas did not act in good faith. Under Kentucky law, "good faith" requires an officer's assertions to have a reasonable basis in fact. *Sheehy*, 706 S.W.3d at 241. The Supreme Court of Kentucky in *Sheehy* analyzed whether an officer acted in good faith when initiating a pursuit, which was a discretionary duty in that case. The policy governing initiation of a pursuit "limited [pursuits] only to known or suspected felons" and "the felonies had to be violent, using force that could cause death or serious physical injury or the threat of such force." *Id*. at 238. The officer "testified that he believed such a use of force occurred because he though [the suspect] struck a female with his car and almost struck a male with his car." *Id*. But video evidence contradicted the officer's testimony, showing that no pedestrian was struck by the suspect (or anywhere near the suspect's car) before the suspect drove away. *Id*. The trial court found that the officer lacked good faith, but the appellate court reversed. *Id*. at 239–40.

The Supreme Court of Kentucky agreed with the trial court finding that the officer was not entitled to qualified official immunity. *Sheehy*, 706 S.W.3d at 240–41. The *Sheehy* Court deemed it proper that "the trial court required [the officer's] belief to have a reasonable basis in fact; that it is insufficient merely to assert a good faith belief." *Id*. at 240, citing *Spillman v. Beauchamp*, 362 S.W.2d 33, 37 (Ky. 1962). Citing to the policy's requirements that the officer ascertain underlying

facts to form reasonable suspicion before initiating the pursuit, the *Sheehy* Court found that "[i]f the perception of the underlying factual events forming the suspicion is itself unreasonable then the suspicion can also be rendered unreasonable." *Id*. at 240–41. *Sheehy* reversed the grant of qualified official immunity to the officer because the officer's "professed belief" was "unreasonable and the decision to initiate pursuit cannot be considered to have been taken in good faith." *Id*. at 241.

Accordingly, the Court should not accept Defendants' assertions that they acted in good faith based on their own self-serving testimony (*see* Doc. 143, PID #3317) and should instead apply *Sheehy* to determine whether Defendants' "professed belief[s]" and "perception of underlying factual events" were reasonable. *Sheehy*, 706 S.W.3d at 240–41. In their argument asserting good faith, Defendants Lanter and Thomas cite no *facts* to support their citation to Lanter's testimony "that he thought he made the right decision to continue the pursuit, that there were no factors that would have required him to terminate the pursuit, and that 'nothing along that route…made myself or Officer Thomas…think that…the pursuit was too high risk.'" Doc. 143, PID #3317, citing Lanter Dep., Doc. 135 at PID #1671.

Nor will Defendants Lanter and Thomas be able to cite sufficient facts to show that they acted reasonably and in good faith upon reply, given the facts cited by Plaintiffs. *See* Facts, §§ V–VII, *supra*. It was unreasonable (and reckless) for Defendants to continue the pursuit after they reached speeds exceeding 100 mph and after Meyer struck another vehicle. (And the Court need not credit Lanter's feigned ignorance of his speed and Meyer striking another vehicle when both his speedometer and the collision were in his field of view while driving in the pursuit and corroborated by video evidence.) Defendants had no reasonable belief that their pursuit would end safely, given the serious and continuing risks posed by all involved vehicles' unsafe driving and

the potential for Meyer to initiate a shootout. Plaintiffs have thus carried their burden to demonstrate that Defendants Lanter and Thomas did not act in good faith.

IV.     **Even if Ohio Immunity Law Applied to the State-Law Claims in this Case, Defendants Would Not Be Entitled to Immunity.**

A.     **Under Ohio Law, Lanter and Thomas Are Not Entitled to Statutory Immunity if Genuine Issues of Material Fact Exist Regarding Whether Their Actions Were "Reckless."**

Under Ohio's law governing immunity for employees of political subdivisions, an employee is not entitled to immunity for "reckless" actions. Ohio Rev. Code 2744.03(A)(6)(b). "Reckless conduct is characterized by the conscious disregard of or indifference to a known **or obvious** risk of harm to another that is unreasonable under the circumstances and substantially greater than negligent conduct." *Anderson v. Massillon*, 2012-Ohio-5711, at ¶ 34 (emphasis supplied). Importantly, when a risk is "obvious," a defendant need not have knowledge of the facts demonstrating an obvious risk of harm nor actually realize or appreciate the degree of risk. *Anderson* at ¶ 29, citing Restatement (Second) Torts, § 500 (1965), cmt. (a). *See also Goodwin v. City of Painesville*, 781 F. 3d 314, 334–35 (6th Cir. 2015) (affirming denial of Ohio statutory immunity to officers, finding that Ohio recklessness does not require "awareness of a given risk" because "[a]n actor can be found to be reckless either based on his actual knowledge of a risk of harm or under an objective standard (that the risk is 'obvious')").

It is "well established" in Ohio jurisprudence that a defendant's violation of "a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability for a course of conduct." *Anderson*, 2012-Ohio-5711, at ¶ 37; *Hardesty v. Alcantara*, 2015-Ohio-4591, ¶ 45 (8th Dist.).

The determination of whether an officer was reckless in a pursuit is particularly fact-intensive because Ohio courts may use a "totality of the circumstances" standard based on fourteen

non-exclusive factors, in which no one factor is dispositive:

> (1) the officer's speed; (2) whether the officer was traveling in the correct lane of travel; (3) whether the officer had the right-of-way; (4) the time of day; (5) the weather; (6) the officer's familiarity with the road; (7) the road contour and terrain; (8) whether traffic was light or heavy; (9) whether the officer made invasive maneuvers (i.e., attempting to force the vehicle from the road) or evasive maneuvers (i.e., attempting to avoid a collision); (10) the nature and seriousness of the offense that prompted the emergency; (11) whether the officer possessed a safer alternative; (12) whether the officer admitted disregarding the consequences of his actions; (13) whether the officer activated the vehicle's lights and siren[]; and (14) whether the officer violated any applicable departmental policy.

*Anderson v. Westlake*, 2021-Ohio-4582, at ¶ 15 (9th Dist.), quoting *Hoffman v. Gallia County Sheriff's Office*, 2017-Ohio-9192, at ¶ 49 (4th Dist.); *see also Tufts-Carter v. Hymes*, 2020-Ohio-3967, at ¶ 26 (8th Dist.), quoting *Gates v. Leonbruno*, 2016-Ohio-5627, ¶ 40 (8th Dist.).

Whether a political subdivision employee acted recklessly under Ohio Rev. Code § 2744.03(A)(6)(b) is a fact question usually left to the jury. *Fabrey v. McDonald Village Police Dept.,* 1994-Ohio-368, 70 Ohio St.3d 351, 356 (Ohio 1994); *Miller v. Hace*, 2015-Ohio-3591, ¶ 17 (8th Dist.);[13] *see also Mercer v. Athens Cnty.*, Ohio, 72 F.4th 152, 165–66 (6th Cir. 2023) (reversing summary judgment regarding recklessness); *Heeter v. Bowers*, 99 F.4th 900, 922 (6th Cir. 2024) (affirming denial of summary judgment on recklessness).

### B.    The Application of Ohio Law Requires Denying Statutory Immunity to Defendants Lanter and Thomas Because, at Minimum, Genuine Issues of Material Fact Remain Regarding Whether Their Actions Were Reckless.

A reasonable jury could easily find that Defendants Lanter and Thomas acted recklessly by driving unsafely during the pursuit and failing to terminate the pursuit, so the Court should deny summary judgment based on immunity under Ohio Rev. Code § 2744.03(A)(6)(b). Defendants'

---

[13] Ohio's Rules of Civil Procedure prescribe a summary judgment standard functionally identical to Fed. R. Civ. P. 56: summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ohio Civ.R. 56(C). (Compare Fed. R. Civ. P. 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.")

decisions to continue the pursuit and not to terminate the pursuit, despite their observations and knowledge regarding the risks, represented the "conscious disregard of or indifference to a known **or obvious** risk of harm to another that is unreasonable under the circumstances and substantially greater than negligent conduct" that defines Ohio recklessness. *Anderson*, 2012-Ohio-5711, at ¶ 34 (emphasis supplied). Lanter's and Thomas's violations of the Pursuit policy further support this finding, because CPD expected them to have knowledge of and adhere to the cited policy provisions, which were specifically directed to protecting members of the public from exactly the type of collision that occurred. Their failures to broadcast speeds and Lanter's failure to broadcast that Meyer had struck a vehicle in front of him further support their culpability because a reasonable jury could infer that they intended to conceal the dangers of the pursuit from the ECC and Scalf to avoid receiving orders to terminate pursuit.

Applying the non-exclusive "totality of the circumstances" factors, in which no factor is dispositive, supports denying summary judgment. *Anderson v. Westlake*, 2021-Ohio-4582, at ¶ 15 (9th Dist.), *Hoffman*, 2017-Ohio-9192, at ¶ 49 (4th Dist.). The officers traveled at unsafe rates of speed often throughout the pursuit and traveled outside the correct lane of travel without having the right-of-way multiple times (first, second, and third factors). The time of day was rush hour, which presented heavy vehicular and pedestrian traffic (fourth and eighth factors). The officers were not familiar with the road and area where the collision occurred, which was outside their jurisdiction (sixth factor). While the offense prompting the pursuit was serious, the nature of Meyer's alleged crimes did not indicate that he posed a risk of violence to the general public, requiring immediate apprehension at all costs (tenth factor). The officers knew of safer alternatives to pursuit, such as later arrest based on his known identity and location through surveillance (eleventh factor). Both Lanter and Thomas violated provisions of the CPD Pursuit Policy in their

pursuit driving and failure to terminate the pursuit (fourteenth factor). The ninth factor is neutral, as Defendants were not making either invasive or evasive maneuvers at the time of the collision.

The factors favorable to Defendants do not outweigh those indicating that Defendants' actions were reckless. While the weather and road terrain did not create additional danger (fifth and seventh factors), they likewise did not negate the dangerous conditions detailed above. And while the officers had lights and sirens activated (thirteenth factor), that did not provide warning to the Laibles and Kleins that a high-speed suspect vehicle would come careening into them from the street. Further, that Defendants refused to admit that they disregarded the consequences of their actions (twelfth factor) does not supplant the facts supporting the clear inference that they did so.

Ohio courts applying the recklessness standard, particularly after *Anderson v. Massillon*, routinely deny summary judgment based on facts similar to those in the present case. For example, in *Hardesty v. Alcantara*, 2015-Ohio-4591 (8th Dist.), an Ohio appellate court affirmed the denial of summary judgment to a police officer seeking statutory immunity in a case arising from a vehicular police pursuit, finding genuine issues of material fact regarding whether the officer acted recklessly. *Id*. at ¶¶ 1–2.

The *Hardesty* plaintiff alleged that the officer acted recklessly after he began the pursuit, causing the suspect's vehicle to strike the plaintiff's vehicle. *Hardesty*, 2015-Ohio-4591 at ¶¶ 14, 36. The factual record indicated that although traffic was light when the officer initiated the pursuit, both vehicles soon entered a "busy road" during "rush hour" when traffic was heavy. *Id*. at ¶¶ 37–38. Although the officer testified that he had only reached 70 mph, evidence from dispatch transmissions indicated that he exceeded 80 and 100 mph during the pursuit. *Id*. at ¶ 38. The officer was disciplined for failing to terminate the pursuit, and this—coupled with other departmental policy violations—presented a jury question on recklessness. *Id*. at ¶¶ 45–46. Like in *Hardesty*,

Plaintiff has presented evidence that the pursuit was conducted amidst heavy traffic during rush hour, the relevant entities determined that Lanter and Thomas violated departmental policies, and Lanter and Thomas exceeded 100 mph during the pursuit. *See* Facts, §§ II–VIII, *supra*.

See also *Tufts-Carter v. Hymes*, 2020-Ohio-3967, at ¶¶ 1–5, 38–39 (8th Dist.) (affirming denial of summary judgment on recklessness where officers allegedly recklessly conducted a vehicular pursuit by driving at high rate of speed and failing to activate lights and siren and caused a suspect vehicle to crash into an innocent third-party vehicle); *Bevelacqua v. Tancak*, 2025-Ohio-217, at ¶¶ 1, 27, 34–35 (9th Dist.) (affirming denial of summary judgment on recklessness where issues of fact remained on whether deputy followed suspect motorcycle too closely and at excessive rate of speed).[14]

**C      Defendants Lanter and Thomas Failed to Demonstrate Their Entitlement to Ohio Statutory Immunity.**

**1.   Defendants Lanter and Thomas Misconstrued the Ohio Recklessness Standard.**

Defendants' argument is premised upon the misunderstanding that recklessness requires disregarding a "known" risk. Defendants argued (based on their own self-serving testimony) that "the ensuing crash was not a *known* risk of harm when they initiated and continued the pursuit." *See* Doc. 143, PID #3307. This is legally incorrect because Ohio's incorporation of "obvious risk" into its recklessness standard means a defendant need not have *actual knowledge* of the risk at issue. *Anderson*, 2012-Ohio-5711 at ¶ 29; *Goodwin*, 781 F. 3d at 334–35.

---

[14] Cases predating *Anderson v. Massillon* also support denying Ohio immunity. *See Peoples v. Willoughby*, 70 Ohio App.3d 848–50, 852–53 (11th Dist. 1990) (affirming denial of summary judgment to officer who, when responding to an emergency, drove on the wrong side of road, failed to proceed slowly through intersection, failed to activate siren going through intersection, exceeded speed limit by about 15 mph, and struck the plaintiff's vehicle); *Wagner v. Heavlin*, 136 Ohio App.3d 719, 731–33 (7th Dist. 2000) (reversing summary judgment to officer for actions during high-speed pursuit, based on facts indicating that officer knew suspect's identity and could have apprehended him later, officer exceeded 100 mph during the pursuit, officer continued  pursuit into unfamiliar area, officer's close following distance, and officer's admissions that he was not thinking of potentially striking suspect).

Defendants' argument is also factually untenable, as both Lanter and Thomas acknowledged that officers in pursuit should consider the risks created by the pursuit to third parties, including the risk of collisions with third parties. Lanter Dep., Doc. 135, PID ##1441–42, 1532; Thomas Dep., Doc. 141, PID ##3025, 3006, 3050–52.[15] But the Court need not evaluate whether the factual record would support a jury finding that the collision was a known risk— although it was—because Ohio recklessness law only requires evidence that the risk was "obvious." *Anderson*, 2012-Ohio-5711 at ¶¶ 29, 34. Here, Plaintiff has presented ample evidence that Defendants Lanter and Thomas disregarded the obvious risk that the pursuit would cause a motor vehicle collision, *see* Facts, §§VII–VIII, *supra*, requiring that summary judgment be denied.

### 2. Defendants Lanter and Thomas Relied Upon Genuinely Disputed Material Facts and Irrelevant Facts to Argue That They Did Not Act Recklessly.

Defendants' argument that they did not act recklessly focuses on the initiation of the pursuit, which is not dispositive because Plaintiffs contend that Lanter and Thomas acted recklessly by driving unsafely during the pursuit and failing to terminate the pursuit. See Doc. 143, PID ##3308–09. But Defendants' focus on alternatives to the pursuit, *see id*., underscores Plaintiffs' argument that other methods of apprehending Meyer were available and should have been used. *See* Facts, § VI, *supra*; Doc. 149-1, at PID ##3427–35 (detailing alternatives) Under Ohio's statutory immunity analysis, these factual disputes about other avenues to apprehend Meyer are evident both in Defendants' testimony (*see*, e.g., Lanter Dep., Doc. 135, PID ## 1526 ("And you know what I mean, in a lot of pursuits, I'll tell you, stop sticks end them. And that's how pursuits terminate. You know, we might start and then, hey, he turned the corner, your four tires

---

[15] Lanter, a member of the Gang Unit from 2018 to 2021, also had knowledge of the danger and risks of pursuit and that they could be prevented with stop sticks. Doc. 135, PID #1366; D. Schofield email, Doc. 139-12, PID #2763 (stating that CPD Gang Unit "has always taken significant precautions to avoid dangerous pursuits" and that "[s]ince January 1, 2019" the unit used stop sticks 51 times, preventing 33 pursuits and reducing speeds in 17 pursuits).

are down. Okay. And then you get to the next one, you're like, I'm done. So stop sticks stop a lot of pursuits or stop sticks prevent a lot of pursuits.")) and in Plaintiffs' expert opinions Sweeney Exp. Rpt., Doc. 149-1, at PID ##3427–35.

Further, Defendants' statements about their driving during the pursuit and the pursuit conditions rely on disputed facts. Doc. 143, PID #3309. Whereas Defendants claim traffic was light based on their own testimony, Plaintiffs have presented contrary testimony that traffic was heavy. Doc. 134-9, PID #1333; Doc. 151, PID #3609. Similarly, Defendants' statement (unsupported by record citations) that they violated no other policies than for speeding and going the wrong way is disputed, as Plaintiffs detailed above. And Defendants' arguments about whether their pursuit driving caused Meyer to crash are too factually intensive to determine upon summary judgment, particularly where Defendants have cited no evidence of why Meyer crashed when and how he did and Plaintiffs have presented evidence that Meyer was driving unsafely only because Defendants were chasing him and he would have returned to driving safely but for Defendants' pursuit of him. *See id.*, PID #3310; Doc. 153-1, PID ##4202–03; Fed. R. Civ. P. 56.

### 3. Lanter and Thomas Failed to Cite Any Case in Which Officers Received Statutory Immunity for Similar Conduct Violating Similar Policies.

In support of their argument that they were not reckless for failing to terminate the pursuit, Defendants argued that *Sidi v. City of Cincinnati*, Case No. 1:13-cv-0242, 2015 WL 9269440, at *5 (S.D. Ohio Dec. 21, 2015) found Plaintiffs' argument that they should have terminated because they knew Meyer's identity and had other means to apprehend him later "to be a 'non-starter,'" but *Sidi* says no such thing. The plaintiff in *Sidi* did not make this argument but instead urged that "the conclusion that the officers violated the policy and procedures by not terminating the pursuit because the dangers outweighed the necessity for immediate apprehension" was a "non-starter" because the Court found that the policy required terminating the pursuit "when the pursuit OIC or

the primary unit makes the discretionary determination that the level of danger created by the pursuit outweighs the necessity for immediate apprehension." *Id.* at *5. In *Sidi*, "neither the OIC nor the primary unit made that determination," so there was no "plain violation of the policy." *Id*.

Although *Sidi* arises from a fatal collision arising from a 2011 pursuit conducted by Lanter, and it involved a CPD policy, the wording of the policy provision at issue was different from the provisions Plaintiffs invoke herein. *See id*. at *5. *Sidi* contains no discussion of the policies argued by Plaintiffs, as detailed above. Further, the *Sidi* plaintiff argued that violating speed limits or department policy was sufficient to establish recklessness, standing alone, which Plaintiffs do not contend. Defendants have failed to prove their entitlement to summary judgment on Ohio immunity.

## V.      Defendants Lanter and Thomas Were a Proximate Cause of the Subject Collision.

Defendants Lanter and Thomas argue that they did not proximately cause the collision and Plaintiffs' damages because Meyer's actions represented a superseding and intervening cause that terminated the chain of causation. Doc. 143, PID ##3317–18. This argument is wrong under both Kentucky and Ohio law.

### A.      Kentucky Law Permits a Finding that Defendants Lanter and Thomas Proximately Caused Plaintiffs' Damages.

Defendants' argument that they were not the proximate cause of Plaintiffs' damages has been decisively rejected by the Supreme Court of Kentucky in *Gonzalez v. Johnson*, 581 S.W.3d 529, 535 (Ky. 2019), when it held that a police officer "can be the cause-in-fact and legal cause of damages inflicted upon a third party as a result of a negligent pursuit." *Id. Gonzalez* explicitly overruled the rule of *Chambers v. Ideal Pure Milk Co*., 245 S.W.3d 589 (Ky. 1952) that a police officer's actions "could, as a matter of law, never be the proximate or legal cause of damages suffered by a third party struck by a fleeing suspect." *Id*. at 532, 535.

A Kentucky negligence claim requires a plaintiff to show cause-in-fact and legal (or proximate) causation. *Gonzalez*, 581 S.W.3d at 532. Legal causation "concerns the concepts of foreseeability and the public policy consideration on limiting the scope of responsibility for damages." *Id.*, citing *Lewis v. B&R Corp.*, 56 S.W.3d 432, 437 (Ky. App. 2001). It exists when a defendant's actions are "a substantial factor in bringing about the harm," and "there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." *Id.* at 534, quoting *Deutsch v. Shein*, 597 S.W.2d 141, 144 (Ky. 1980) (*abrogated on other grounds by Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012), quoting Restatement (Second) of Torts, § 431.[16] As Defendants point out, an "intervening criminal act does not relieve one for liability for his or her negligent acts or omissions, where the criminal act is a reasonably foreseeable consequence of the defendant's negligent act." *Waldon v. Housing Auth. of Paducah*, 854 S.W.2d 777, 779 (Ky. App. 1991). *See* Doc. 143, PID #3318.

Additionally, Kentucky applies a comparative fault approach to tort claims, which recognizes that multiple actors can proximately cause an injury and "allows a jury to apportion liability to the parties of a negligence suit in direct proportion to their individual fault." *Id.* at 534, citing *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984).

Here, the actions of Lanter and Thomas in continuing to pursue Meyer were a "substantial factor" in his continued flight and loss of control of his vehicle. It was foreseeable to Lanter and Thomas that Meyer would continue to drive unsafely until he collided with something or someone based on their knowledge that he had previously fled, Lanter's acknowledgment that pursuits often end in crashes, and the Pursuit Policy's directives. *See* Facts, §§ II–VII, *supra.* The resulting

---

[16] *See also Britton v. Wooten*, 817 S.W.3d 443, 449 (Ky. 1991) (rejecting "any all-inclusive general rule" that "criminal acts of third parties…relieve the original negligent party from liability," noting that "[t]his archaic doctrine has been rejected everywhere" and recognizing that intentional or criminal acts of third parties are not superseding causes when among the hazards that make the defendant negligent).

injuries to Plaintiffs were the "natural and probable" consequence of Lanter's and Thomas's negligence in driving unsafely during pursuit and failing to terminate the pursuit based on the risk of injuries to third parties. *House v. Kellerman*, 519 S.W.2d 380, 382 (Ky. 1974). The Pursuit Policy's mandatory duties, as discussed above, were specifically directed to avoiding that natural, probable, and foreseeable consequence. Just as the *Gonzalez* Court reversed summary judgment based on its rejection of an argument that a police officer was not the proximate cause of injuries caused by a suspect colliding with the bystander plaintiff during a pursuit, *id.* at 532–34, the Court should deny summary judgment here.

### B. Ohio Law Permits a Finding that Defendants Lanter and Thomas Proximately Caused Plaintiffs' Damages.

If the Court applied Ohio law (which it should not), Defendants Lanter and Thomas would still not be entitled to summary judgment based on proximate cause. Under Ohio law, "'[t]he proximate cause' of a result is that which in a natural and continued sequence contributes to produce the result, without which it would not have happened.'" *Bevelaqua*, 2025-Ohio-217, ¶12, quoting *Waugh v. Chakonas*, 2011-Ohio-2764, ¶8 (9th Dist.), quoting in turn *Bell v. Babcock & Wilcox Co.*, Case No. 15887, 1993 WL 329900, at *2 (9th Dist. 1993), and quoting *Piqua v. Morris*, 98 Ohio St. 42 (1918). A "sequence of events" may form probable cause for a given result. *Id.* at ¶13, citing *Waugh* at ¶8 and *Piqua* at ¶1 of syllabus. Generally, "where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability." *Id.* at ¶12, quoting *Clinger v. Duncan*, 166 Ohio St. 216, 222 (1957).

Under these Ohio law principles, pursuing officers can be a proximate cause of a suspect's collision with an innocent third party. *Bevelacqua* at ¶¶16–19 (reversing grant of summary

judgment); *see also Argabrite v. Neer*, 2016-Ohio-8374, ¶¶ 11–12 (abrogating common-law rule that officers engaged in pursuit are not proximate cause of injuries caused by suspect's collision with third parties unless officer acted in "extreme or outrageous manner").

## VI.    The City of Cincinnati is Not Entitled to Immunity.

### A.    Defendant City is Not Immune from Plaintiff's Claims for Vicarious Liability for its Employees' Negligent Performance of Ministerial Duties.

Kentucky law applies to Plaintiffs' claims against Defendant City of Cincinnati and the determination of whether the City is entitled to immunity. *See* Analysis, § II, *supra*. Two of Plaintiffs' claims against the City are for Personal Injury and Wrongful Death, and Plaintiffs specifically urged the City's vicarious liability for its employees' negligent performance of their ministerial duties. Doc. 79, PID ##673–76, ¶¶ 142–160. Plaintiffs have shown that Defendants Lanter and Thomas, who were undisputedly employees of the City of Cincinnati at all relevant times, were performing ministerial functions while driving during the pursuit and when failing to terminate the pursuit. *See* Analysis, § III, *supra*.

Kentucky's local government immunity statute specifically exempts Plaintiffs' claims for the City's vicarious liability from its grant of immunity. Kentucky Rev. Stat. § 65.2003. Specifically, the statute provides that a local government shall not be liable for any of the following:

> (1)    Any claim by an employee of the local government which is covered by the Kentucky workers' compensation law;
> (2)    Any claim in connection with the assessment or collection of taxes;
> (3)    Any claim arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government, which shall include by example, but not be limited to:
>> (a)    The adoption or failure to adopt any ordinance, resolution, order, regulation, or rule;
>> (b)    The failure to enforce any law;
>> (c)    The issuance, denial, suspension, revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval,

order or similar authorization;

(d)   The exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources; or

(e)   Failure to make an inspection.

**Nothing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties.**

*Id.* (emphasis supplied). Plainly, the enumerated exceptions in (1)–(3) do not apply, as Plaintiffs' claims that the City is vicariously liable for Personal Injury and Wrongful Death are not claims for workers' compensation and are not related to taxes. Nor do these claims arise from the City's "exercise of judicial, quasi-judicial, legislative or quasi-legislative authority" or "the exercise of judgment or discretion vested in the local government" because they are premised solely upon the actions of the City's employees. As a result, the final provision of Kentucky Rev. Stat. § 65.2003 preserving municipal liability "arising out of acts or omissions of its employees in carrying out their ministerial duties" applies to these claims.

The primary case relied upon by the Defendant City of Cincinnati supports this conclusion. The Supreme Court of Kentucky stated that this portion of Kentucky Rev. Stat. § 65.2003 "makes clear that, to the extent a municipal employee is performing a ministerial function, the municipality is not immune from claims arising from the employee's alleged negligence" and held that the municipal defendant in that case was not entitled to immunity for such claims. *Morales v. City of Georgetown*, 709 S.W.3d 146, 164 (Ky. 2024).

**B.    Defendant City is Not Immune from Plaintiff's Claim for Negligent Training and Supervision.**

Plaintiffs' third claim against Defendant City of Cincinnati is for "Negligence in Supervision and Training." Doc. 79, PID #676. Plaintiffs alleged that the City "knew or had reason to know of the danger created by employees in engaging in police pursuits, both specifically in

regard to Defendant Lanter and generally." *Id.*, ¶162. Plaintiffs further alleged that the City "failed to adequately train, supervise, and discipline its employees to ensure that they followed CPD pursuit policies, and as a result, employees of Defendant City, including Defendants Lanter, Thomas, and Scalf engaged in dangerous and unnecessary police pursuits, causing harm to innocent bystanders, including the Laibles and Kleins, as a result." *Id.*, ¶164.

Kentucky law recognizes claims for negligent supervision and training, including against municipalities. *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 291 (Ky. App. 2009) (recognizing claim for negligent training and supervision and affirming jury verdict of employer liability), citing, *inter alia*, *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) (negligent supervision); *Rowan County v. Sloas*, 201 S.W.3d 469, 477 (Ky. 2006) ("negligent supervision and/or insufficient or improper training of staff"); *Lewis v. Meyers*, Case No. 5:09-cv-00156, 2010 WL 3829200 at *5 (W.D. Ky. Sep. 24, 2010) (recognizing viability of Kentucky claim against a city for negligent "hiring, supervision, and retention" of police officer but finding city immune based on underlying finding that officer did not act negligently).

### 1. The Immunity Conferred for Claims Against Local Governments Related to Workers' Compensation Claims, Taxation, and the Exercise of Judicial, Quasi-Judicial, Legislative, or Quasi-Legislative Authority Does Not Apply to Plaintiffs' Claim.

Plaintiffs' claim for negligent supervision and training does not implicate the immunity provided by Kentucky Rev. Stat. §§ 65.2003(1) and (2) for claims by local employees covered under workers' compensation law or related to taxes because Plaintiffs make no such claims here.

Similarly, Plaintiffs' claim does not arise "from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority" by the City as contemplated by the immunity conferred in Kentucky Rev. Stat. § 65.2003(3). The Supreme Court of Kentucky has defined "quasi-judicial power" to mean the "power of an administrative agency to adjudicate the rights of persons before

it" and defined "quasi-legislative power" to refer to power of an administrative agency to engage in rule-making." *Bolden v. City of Covington*, 803 S.W.2d 577, 581 (Ky. 1991), quoting Black's Law Dictionary, Sixth Edition (1990), p. 1245; *see also Ashby v. City of Louisville*, 841 S.W.2d 184, 188 (Ky. App. 1992). Although the City may, in other factual contexts, exercise quasi-judicial and quasi-legislative authority, Plaintiffs have not alleged that the City was negligent in adjudicating or rulemaking.

> **2.     The Immunity Conferred for Claims Against Local Governments for the Adoption of or Failure to Adopt Any Ordinance, Resolution, Order, Regulation, or Rule Does Not Apply to Plaintiffs' Claim.**

Defendant City of Cincinnati argues that it is immune from liability for negligent supervision and training on two bases. First, the City urges that "Plaintiffs' negligent training and supervision claim challenges the City's adoption (or decision not to adopt) specific policy [*sic*] related to pursuits or training" and contends that "policy choices are an 'inherently discretionary' exercise of municipal power that cannot form the basis for liability" that are subject to statutory immunity for the adoption of "any ordinance, resolution, order, regulation, or rule." Doc. 144, PID #3393, citing Kentucky Rev. Stat. §65.2003(3)(a).

This argument misstates Plaintiffs' negligent supervision and training claim, which includes no allegations regarding the City's decisions to enact or not enact certain policies. *See* Doc. 79, PID #676. Tellingly, the City cited nothing to support this interpretation of Plaintiffs' claim. *See* Doc. 144, PID #3393. As a result, whether policy choices about supervision and training are discretionary or constitute the adoption of an "ordinance, resolution, order, or rule" under Ky. Rev. Stat. § 65.2003(3) is irrelevant. The Court should disregard Defendant City of Cincinnati's argument for immunity against a claim Plaintiffs did not make.

3.    **The Immunity Conferred for Claims Against Local Governments for the Exercise of Discretion When Allocating Resources in the Face of Competing Demands Does Not Apply to Plaintiffs' Claim.**

Second, the City argues that "the nature and amount of training that the City required of the Officers" was a matter of discretion subject to statutory immunity. Doc. 144, PID #3393, citing Ky. Rev. Stat. § 65.2003(3)(d). The City relied upon *Morales v. City of Georgetown*, 709 S.W.3d 146 (Ky. 2024), which is distinguishable on several grounds as to supervision and training.

i.    ***Morales v. City of Georgetown* Does Not Support Summary Judgment on Negligent Supervision.**

First, the plaintiff in *Morales* did not make a negligent supervision claim against the defendant municipality, as Plaintiffs have made against Defendant City of Cincinnati, so *Morales* never addresses negligent supervision. *See Morales*, 709 S.W.3d at 163–65. The *Morales* plaintiff's claim that a city failed to select appropriately qualified and trained officers for a given task is far narrower than Plaintiffs' negligent supervision claim.

Whereas *Morales* involved a city's discretionary allocation of personnel resources, Plaintiffs' negligent supervision claim is directed to the City's broader failure to ensure pursuit supervision under the express dictates of the CPD Pursuit Policy. The City abdicated supervisory responsibility to the point that its officers were flouting known rules and disregarding known risks. Specifically, Scalf had minimal involvement as purported OIC and did not provide adequate supervision, including when he failed to ask questions despite ample "dead air" on the radio channel. Scalf Dep., Doc. 138, PID ##2323–29. By contrast, Lanter rejected offsite OIC supervision and made decisions reserved to the OIC under the Pursuit Policy, testifying that "[Y]es, there's an identified OIC. However, I'm still a supervisor at that point, and I don't—I don't take this badge off and say, hey give me a PO badge. I'm faulting [sic] back to what I'm at. Those were responsibilities and decisions that I make." Doc. 135, PID #1625. Lanter also withheld information

he was supposed to provide the OIC, including the pursuit speeds and the motor vehicle collision that occurred in front of him. *See*, *inter alia*, Doc. 151-6; Doc. 134-8, PID #1319. Lanter thus acted as the de facto OIC "[o]f sorts" when Scalf did not control supervision of the pursuit. Fink Dep., Doc. 152, PID #4080; Sweeney Exp. Rpt., Doc. 149-1, PID #3450. Although Thomas and Harper accompanied Lanter in the pursuit and Bode followed along, no evidence indicates that any of these officers questioned Lanter's assumption of control or his failure to provide information to Scalf. *See* IIS Summary of Radio Transmissions, Doc. 152-2.

Expert David Sweeney opined that this evidence demonstrates "a permissive departmental culture" regarding pursuit supervision requirements that "led Lanter to utilize and exercise authority and dangerous policing practices that pose a risk to others." Sweeney Exp. Rpt., Doc. 149-1, PID #3450. Based on this information, a reasonable jury could find that the City, through its practice of failing to ensure appropriate supervision of pursuits, thereby allowed officers in hot pursuit to act as pursuit OICs, despite the City's acknowledgment of this danger in the CPD Pursuit Policy. Doc. 134-1; *see also* Sweeney Exp. Rpt., Doc. 149-1, PID #3450 (addressing need for objective pursuit supervision). A reasonable jury could also find that the City's practice of failing to ensure actual and objective off-site supervision of pursuits caused Lanter and Thomas to violate the Pursuit Policy in the ways detailed above. Unlike *Morales*, this case does not involve decisions about "when, how, or to what degree" to supervise. *Id*., 709 S.W. at 158. Here, the Pursuit Policy dictates that an offsite OIC *must* supervise pursuits and provide authorization for specific actions, but the City failed to ensure that pursuits received this supervision, enabling Lanter to reject OIC supervision during this deadly pursuit along with the safety built into objective, off-site pursuit control. A reasonable jury could find the City liable for negligent supervision based on these facts.

ii.     *Morales v. City of Georgetown* Does Not Support Summary Judgment on Negligent Training.

*Morales* is further distinguishable with respect to negligent training claims. *Morales* involved claims that a city "negligently failed to train their employees in accordance with" an internal policy's requirements and "negligently failed to select qualified and adequately trained" officers to participate in a specific operation. *Morales*, 709 S.W.3d at 164. Plaintiffs here do not allege that Defendant City of Cincinnati failed to train the Defendant officers to comply with training requirements in a specific municipal or departmental policy. *See* Doc. 79, PID #676.

Rather, Plaintiffs more broadly contend that the City negligently failed to train the officers for the jobs they were required to do. Defendants Lanter's and Thomas's jobs included pursuit or emergency driving, which is a ministerial function under Kentucky law. Doc. 79, PID #676; *Jones*, 150 S.W.3d at 53–54; *Haney*, 311 S.W.3d at 246; *Pile*, 215 S.W.3d at 40; *Sexton*, 256 S.W.3d at 33; *City of Brooksville*, 533 S.W.3d at 694–95; *Cox*, 2019 WL 2554214, at **2–3; *see also Rowan County*, 201 S.W.3d at 480–81 (explaining that "[m]inisterial training is where you are mandated to train to avoid the event that occurred"). The Supreme Court of Kentucky has determined that safely driving a police cruiser is a ministerial function because it is it "one of the most intensely regulated, *trained*, tested, and supervised activities that an individual may perform" and does not require "any deliberation or the exercise of judgment" because it "requires reactive decisions based on duty, *training*, and overall consideration of public safety." *Haney*, 311 S.W.3d at 246; *Jones*, 150 S.W.3d at 53 (emphases supplied). As reflected in this language, the requirement to sufficiently train police officers on pursuit and emergency driving so they can make reactive decisions without delay or deliberation in real time is inherent to these holdings and the nature of ministerial duties. *Id*. The City cannot disclaim its responsibility to train officers on this ministerial function.

The City's argument that its training decisions are discretionary under Ky. Rev. Stat. §

65.2003(3)(d) is further misplaced because its factual statement that it "must weigh those training decisions against competing interests, including the costs of diverting a limited pool of officers away from their active law enforcement duties" is incorrect. *See* Doc. 144 at PID #3393. The Court should disregard this factual assertion because the City cited no evidence to substantiate it.

The Court should further reject the City's assertion that the decision to train officers is discretionary because both Kentucky's and Ohio's legal requirements for officers to receive continuing training. Kentucky requires police officers to complete at least 40 hours of in-service training per year, and Ohio requires officers to complete at least 24 hours of continuing professional training annually. Ky. Rev. Stat. § 95.955(2)–(3); Ohio Adm. Code § 109:2-18-02(A). Given these requirements, the City was not required to take police officers off the street to ensure adequate driving training—continuing training was a legally required part of the officers' jobs.

The City had ample opportunity to send Defendants Lanter and Thomas for additional pursuit and emergency driving training between their last such trainings in 2013 and August 7, 2020—a total of 168 required continued professional training for each of them.[17] That it chose not to do so, especially when it had knowledge of the risks posed by pursuits,[18] does not negate the City's legal duty to train its officers on the necessary responsibilities of their jobs, including those duties designated ministerial in Kentucky, which CPD's Pursuit Policy authorized the City's officers to enter. Procedure § F(4), Doc. 134-1, PID #1270. A reasonable jury could find that the City should have provided more training to Defendants Lanter and Thomas on the ministerial duty

---

[17] The City did send Lanter to remedial driving training in 2017, but there is no evidence that this training addressed pursuit driving. Cincinnati Fed. R. Civ. P. 30(b)(6) Dep., Doc. 139, PID #2496; Lanter Dep., Doc. 135, PID ##1432, 1689–90 (Lanter did not know why he took remedial driving; may have been in car accident, but it was unrelated to 2011 pursuit fatality).

[18] *See* D. Schofield email, Doc. 139-12, PID #2763 (stating that CPD Gang Unit "has always taken significant precautions to avoid dangerous pursuits" and that "[s]ince January 1, 2019" the unit has used stop sticks 51 times and prevented 33 pursuits and reduced speeds in 17 pursuits).

of driving safely before the subject collision.

### C. Regardless of Immunity, Defendant City of Cincinnati is Not Entitled to Summary Judgment Because, At Minimum, Genuine Issues of Material Fact Remain Regarding Plaintiffs' Claims Against It.

For a government entity in Kentucky to be liable for negligently training and/or supervising its employees, the plaintiff must make a threshold showing that the employees committed a tort. *City of Paintsville v. Haney*, 718 S.W.3d 812, 839 (Ky. 2025), citing *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 727, 730 (Ky. 2009). Plaintiffs have made this showing. *See* Facts, §§ I–VII, *supra*; Analysis, §§ III–V.

A plaintiff must next show that "the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed" and that "the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." *Smith v. Norton Hosps.*, 488 S.W.3d 23, 32 (Ky. App. 2016), quoting *Ten Broeck Dupont, Inc.*, 283 S.W.3d at 733 (citing *Oakley v. Flor-Shin, Inc.*, 964 S.W.3d 438, 442 (Ky. App. 1998)). *See also Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). Plaintiffs have also made this showing, as shown by the same evidence that demonstrates the City is not entitled to immunity for these claims. *See* Analysis, §§ VI(A)–(B), *supra*. The City knew the dates and contents of Lanter's and Thomas's pursuit training and knew or should have known about the CPD departmental practice of pursuits not adhering to the Pursuit Policy's OIC supervisory requirements.

### CONCLUSION

Plaintiffs respectfully submit that the Motions for Summary Judgment by Defendants Lanter and Thomas (Doc. 143) and Defendant City of Cincinnati (Doc. 144) should be denied.

Respectfully submitted,

*/s/ Jacqueline Greene*
Jacqueline Greene (OH 0092733)
Alphonse A. Gerhardstein (OH 0032053)
Elijah Hack (KBA #99726)
Friedman, Gilbert + Gerhardstein
35 East 7th Street, Suite 201
Cincinnati, Ohio 45202
T: 513-572-4200 / F: 216-621-0427
jacqueline@FGGfirm.com
al@FGGfirm.com
elijah@FGGfirm.com

*Counsel for the Estates of Raymond and Gayle Laible*

*/s/ Roula Allouch*
J. Stephen Smith (KBA #86612)
Roula Allouch (KBA #91594)
BRICKER GRAYDON LLP
909 Wright's Summit Parkway Suite 300
Ft. Wright, KY 41011
T: 513-629-2805
F: 513-333-4358
ssmith@brickergraydon.com
rallouch@brickergraydon.com

*Counsel for Steven and Maribeth Klein*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, the foregoing was filed through the Court's CM/ECF system, which will serve notice of the filing on all counsel of record, and was served via regular mail upon the following:

Mason Meyer
505 Prisoner Connector
Sandy Hook KY 41171
*Defendant*

Austin Lagory
13718 Beaver Road
Union, KY 41091
*Defendant*

*/s/ Jacqueline Greene*
Jacqueline Greene
*One of the Attorneys for Plaintiffs*