# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON

| | | |
|---|---|---|
| **JASON LAIBLE,** *et al.*, | : | **Case No. 2:21-cv-00102** |
| | : | |
| **Plaintiffs** | : | **Judge David L. Bunning** |
| | : | |
| | : | |
| **v.** | : | **DEFENDANTS TIMOTHY LANTER,** |
| | : | **BRETT THOMAS, AND THE CITY** |
| **TIMOTHY LANTER,** *et al.*, | : | **OF CINCINNATI'S** |
| | : | **CONSOLIDATED REPLY IN** |
| **Defendants.** | : | **SUPPORT OF THEIR MOTIONS** |
| | : | **FOR SUMMARY JUDGMENT** |

Plaintiffs' Response in Opposition rests on a remarkable premise: that the consequences of letting Mason Meyer escape again were "minimal." (Doc. 155, Resp. in Opp. at PageID 4251.) But nothing in the record supports that characterization.

Consider these undisputed facts. Mason Meyer was the leader of an interstate drug-and-gun trafficking organization. He had repeatedly evaded law enforcement, including just one week before the police pursuit at issue. He had outstanding warrants for violent felonies. He had pistol-whipped a victim, boasted of committing murder, and discharged a firearm outside a home. He told sources he was terminally ill, had no concern for human life, and intended to die in a shootout with police rather than return to prison. And moments before the pursuit, members of the ATF Task Force watched him place a rifle case into his vehicle. His possession of the rifle was itself a felony. And what, exactly, Meyer planned to do with that rifle is unknown—although it was reasonable to assume that it was in pursuit of his drugs-and-guns conspiracy.

Plaintiffs ask this Court to ignore all of that—and to substitute Plaintiffs' post-hoc judgment for the Officers' judgment. The law does not permit that result. If Ohio's immunity law applies, the Officers are entitled to immunity because the undisputed facts fall far short of the

onerous burden to establish that they acted recklessly. And under Kentucky's qualified immunity framework, the outcome is the same: the Officers' pursuit decisions were discretionary, not ministerial. The CPD pursuit policy contains none of the bright-line termination triggers present in the cases Plaintiffs cite; it requires officers to weigh factors and exercise professional judgment. The Officers did exactly that—and their conduct is protected.

The City of Cincinnati is also entitled to summary judgment—both because the Officers are immune, defeating any vicarious liability or negligent training and supervision claims, and because the City's training and supervision decisions are discretionary governmental functions protected under Kentucky and Ohio law.

If law enforcement cannot pursue a suspect as dangerous as Meyer, it is hard to imagine when they could ever engage in a pursuit. Plaintiffs' position would effectively render police pursuits unlawful, rewriting CPD policy, and Ohio and Kentucky law, by fiat. For these reasons, this Court should grant summary judgment to the Officers and the City.

## ARGUMENT

### I.    This Court should grant summary judgment to the Officers.

#### A.    Ohio immunity law governs Plaintiffs' claims against the Officers.

The Officers agree with Plaintiffs on one point: Kentucky's substantive tort law governs the elements of their wrongful death and personal injury claims. But Plaintiffs' reliance on choice-of-law principles for substantive tort law—and their accusation that the Officers are "conflating the choice-of-law standard for tort claims with that for contract claims"—are incorrect. (Doc. 155, Resp. in Opp. at PageID 4237.) As this Court explained in another case involving the immunity of an Ohio public entity, "differing choice-of-law considerations in tort actions and contract actions" are irrelevant to a choice-of-law dispute involving immunity. *See*

*Pittman v. Rutherford*, No. 19–36–DLB–CJS, 2020 WL 6386489, at \*3 (E.D. Ky. July 7, 2020),

adopted, 2020 WL 6384726 (E.D. Ky. Oct. 30, 2020) (Bunning, J.). The question here is not

which state's negligence law applies, but "which state's law Kentucky would apply after

considering the specific legal dispute at issue, here immunity." *Id.* at \*3. That inquiry favors

applying Ohio's immunity law.

When the focus is correctly placed on immunity, the relevant contacts are

overwhelmingly Ohio-centered. Lieutenant Lanter and Officer Thomas are CPD officers, trained,

certified, and supervised under Ohio's law enforcement statutory regime, and subject to CPD

policies adopted under Ohio law. The decisions Plaintiffs challenge—how the Officers

understood and applied CPD's pursuit rules, coordinated with their Ohio supervisor, and

exercised judgment while performing CPD duties—arose from that Ohio framework. Moreover,

the pursuit itself was initiated and primarily conducted in Ohio before Meyer crossed the bridge

into Kentucky.

And the practical consequences of Plaintiffs' position is unworkable. If the immunity law

of bordering states were to automatically govern whenever a fleeing suspect crossed a state

border, officers patrolling near state lines would be subject to shifting immunity standards based

solely on where a pursuit happened to end, rather than on the state responsible for their

employment, training, and supervision. To avoid that outcome, this Court should apply Ohio's

immunity law.

**B.** **The Officers are entitled to immunity under Ohio law because they did not act in a reckless manner.**

If this Court applies Ohio's immunity framework, the Officers are entitled to immunity.

Contrary to Plaintiffs' arguments, the Officers did not act recklessly by disregarding a known or

obvious risk of harm. There is no genuine issue of material fact on recklessness, and this Court can resolve that question at summary judgment.

### 1.    Plaintiffs do not identify any "known or obvious" risk that the Officers consciously disregarded.

Plaintiffs incorrectly assert that the Officers addressed only the "known risk" component of recklessness in their opening brief and ignored the "obvious risk" component. But the Officers' opening memorandum addressed both components, and the same undisputed facts apply to each. (Doc. 143, Mem. ISO Summ. J. at PageID 3305–11.) More fundamentally, Ohio courts do not distinguish "known" risks from "obvious" risks in pursuit cases. They ask whether, viewing the totality of the circumstances, the officer consciously disregarded an unreasonable risk of harm. *See Hoffman v. Gallia Cnty. Sheriff's Off.*, 103 N.E.3d 1, 18 (Ohio Ct. App. 2017) (identifying non-exclusive factors for assessing willful, wanton, or reckless pursuit conduct).

Those factors—including the seriousness of the offense, time and place, traffic conditions, whether lights and sirens were used, whether the officer made contact with the suspect's vehicle, and whether there is evidence of a deliberate choice to ignore a high probability of harm—cut strongly in the Officers' favor. For example:

- The pursuit was part of a planned joint operation to apprehend a known, armed, violent felon wanted on serious charges, not a routine traffic stop.

- The Officers activated their lights and sirens and never made physical contact with Meyer's vehicle.

- The crash occurred only after Meyer, on his own, lost control and struck the Laibles and the Kleins; the Officers' cruisers hit no one.

- Internal CPD reviews did not find that the pursuit itself, or the decision to continue it, created an obvious, intolerable risk that the Officers disregarded.

In the end, Plaintiffs argue that the Officers should have weighed the risks of pursuing Meyer differently. But that is a disagreement over a discretionary judgment call—not evidence that the Officers consciously disregarded an intolerable risk.

> ## 2. *Hardesty v. Alcantara* turned on material fact disputes and credibility problems that are not present here.

Plaintiffs rely on *Hardesty v. Alcantara*, 48 N.E.3d 127 (Ohio Ct. App. 2015), to argue that summary judgment is improper, but the key facts in *Hardesty* bear little resemblance to the facts here. In *Hardesty*, an officer initiated a traffic stop after witnessing a vehicle impeding traffic. *Id.* at 128–29. The officer did not know who was driving, only that the vehicle's registered owner had an arrest warrant for domestic violence. *Id.* at 129. When the vehicle refused to stop, the officer engaged in a pursuit. *Id.* The fleeing suspect ultimately crashed into an innocent third party. *Id.* at 130. Seconds before that crash, the pursuing officer radioed: "Still westbound. Doing about 100 radio. 100 miles an hour. Still westbound. Traffic's very heavy." *Id.* at 135.

After the crash, the officer's supervisor agreed that the pursuit should have been terminated because "the risk to the public [during the pursuit] was too high." *Id.* at 130. And during the ensuing litigation, the officer's testimony contradicted his own radio transmissions: he claimed he was not traveling at 100 mph (only the fleeing vehicle was) and that he had terminated the pursuit before the crash. *Id.* at 130. The court also found fact disputes about whether the officer's siren was ever activated. *Id*. Based on these disputed facts, the court denied summary judgment. But this case is different in every material respect:

**Suspect's identity.** The Officers here were not guessing whether a wanted felon was driving. They knew Mason Meyer was the driver, and they had him under surveillance as part of a federal task force operation. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 126–27.)

**Seriousness of the offense.**  The Officers initiated the stop as part of a planned operation to apprehend a violent, armed fugitive—not based on a minor traffic infraction like impeding traffic. (*See generally id.*)

**Supervisory finding.**  Unlike in *Hardesty*, CPD's Internal Investigations Section ("IIS") and the Critical Incident Review Board ("CIRB") here did not find that the Officers should have terminated the pursuit, and the CIRB found the decision to pursue was "proper." (Doc. 134–9, CIRB Report at PageID 1333.)

**Siren activation.**  There is no dispute that the Officers' sirens were activated throughout the pursuit. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 129.)

In sum, *Hardesty* turned on disputed facts and serious officer credibility problems, none of which exist here. Plaintiffs simply disagree with the Officers' decision to pursue Meyer—but they forget that there is always a judgment call. Law enforcement officers have a duty to protect the public and cannot "sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further." *Argabrite v. Neer*, 75 N.E.3d 161, 169 (Ohio 2016). Although high-speed pursuits may innately include some level of danger, "[t]he danger of a high-speed chase alone is not enough to present a genuine issue of material fact concerning whether an officer has acted with a malicious purpose, in bad faith or in a wanton or reckless manner." *Id.* at 166. Without more, the innate danger of a pursuit is not enough to show that the Officers acted recklessly.

### 3.     *Sidi v. City of Cincinnati* supports the Officers' entitlement to immunity.

Plaintiffs try to minimize *Sidi v. City of Cincinnati*, but their own quoted passage reinforces the Officers' point. *See* No. 1:13-cv-242, 2015 WL 9269440, at *5 (S.D. Ohio Dec. 21, 2015). *Sidi* rejected the argument that an alleged violation of CPD's pursuit policy—failing

to terminate when danger outweighed necessity—created a triable issue of fact about the

officer's recklessness:

> As for the conclusion that the officers violated the policy and procedures by not
> terminating the pursuit because the dangers outweighed the necessity for
> immediate apprehension, that argument is a non-starter because, under the policy,
> the officer is required to terminate the pursuit when the pursuit OIC or the
> primary unit makes the discretionary determination that the level of danger
> created by the pursuit outweighs the necessity for immediate apprehension.

*Id.*

The same is true here. Neither Lanter (as primary unit) nor Scalf (as OIC) determined that

the "level of danger created by the pursuit" had outweighed the need for Meyer's immediate

apprehension. To the contrary, both testified they believed the pursuit remained justified and that

nothing they observed required that they terminate the pursuit. Plaintiffs cannot transform their

disagreement with the Officers' discretionary judgment into an automatic policy violation that

proves recklessness. *See Argabrite*, 75 N.E.3d at 168 (evidence of a policy violation does not

create a genuine issue of material fact on recklessness, absent evidence the officer knew injury

was "in all probability" going to occur).

Finally, Plaintiffs' attempt to distinguish *Sidi* based on wording differences in the policy

goes nowhere; they never explain how the variation changes the fundamental point that CPD's

policy entrusts termination decisions to the discretionary assessment of the primary unit and the

OIC, rather than supplying a self-executing recklessness standard.

### 4. Under Ohio's "onerous" recklessness standard, the undisputed facts warrant summary judgment here.

Plaintiffs are wrong that the recklessness determination here must go to a jury. The Ohio

Supreme Court has made clear that the "burden necessary to deny immunity [to police officers]

is onerous." *Argabrite*, 75 N.E.3d at 169. So, Ohio courts routinely resolve the recklessness

question at summary judgment, when the undisputed facts fail to establish reckless conduct. *See Johnson v. Greater Cleveland Regional Transit Auth.*, 171 N.E.3d 422, 449 (Ohio Ct. App. 2021) ("[C]ourts have not hesitated to find summary judgment appropriate where the facts, when construed in favor of the nonmoving party, fail to rise to the level of wanton or reckless conduct."); *O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio Ct. App. 2008) ("[T]he standard for showing recklessness is high, so summary judgment can be appropriate . . . where the individual's conduct does not demonstrate a disposition to perversity.").

The same is true here. Plaintiffs emphasize disputes over details—precise speeds at particular points, the exact following distance, and other tactical judgments—but even accepting their version, those details do not show that the Officers deliberately ignored a risk that would "in all probability" result in injury to third parties, as *Argabrite* requires. *See* 75 N.E.3d at 169. At most, Plaintiffs identify disagreements with how the Officers conducted a difficult pursuit, but that is nowhere close to showing recklessness. Here, the material facts relevant to the recklessness standard are not genuinely disputed, and under Ohio's onerous burden for denying immunity to officers, those facts do not rise above negligence. The Court should hold that the Officers are entitled to immunity.

### C.    If Kentucky immunity law applies, the Officers are immune.

If this Court applies Kentucky immunity law, the outcome is the same: the Officers are entitled to immunity. Plaintiffs' effort to defeat Kentucky qualified immunity presumes that the Officers were performing rote tasks. They were not. Operating under high pressure, the Officers weighed a variety of factors while attempting to arrest a violent, armed felon who had evaded law enforcement just days earlier, was observed trafficking firearms moments before the pursuit, and had expressed his intention to die in a shootout with police rather than return to prison. The

decision to initiate and continue a pursuit under these circumstances is a quintessential exercise of law enforcement discretion that Kentucky's qualified immunity doctrine protects.

### 1.    Plaintiffs ignore what the CPD pursuit policy actually demands.

Plaintiffs focus myopically on certain terms in the CPD pursuit policy—"must," "shall," and "will"—and ask this Court to infer, based on those words, that the decision to initiate or continue a pursuit is ministerial. (*See, e.g.*, Doc. 155, Resp. in Opp. at Page ID 4244-4245.) But a policy's mere inclusion of those words does not categorically render it ministerial. To resolve the discretionary/ministerial distinction, courts must look beyond isolated words and examine "the *dominant* nature of the act." *See Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (emphasis in original).

Plaintiffs' argument proves too much. By their logic, any internal policy with a "must" or "shall" or "will" would automatically create a ministerial duty, even if it expressly directs the officer to exercise judgment and discretion. But if that is so, virtually every discretionary function would be stripped of immunity, the moment a department issued written guidance about it. This interpretation would eviscerate qualified immunity for police officers and other public employees who must act under the guidance of internal policies.

This Court's immunity analysis does not hinge on whether the policy contains "must," "shall," or "will." This Court instead must consider the nature of the policy—specifically, whether it requires on-the-spot judgment or whether it involves the "execution of a specific act arising from fixed and designated facts." *See Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 832 (Ky. 2021). Analyzing the CPD pursuit policy under that framework confirms that the Officers' conduct was discretionary and that they therefore are entitled to qualified immunity.

The core issue here—whether the Officers were justified in initiating and continuing the police pursuit—is a textbook balancing test. CPD's pursuit policy directed the Officers to "***weigh***" a series of factors, including: the risk to public, officers and the suspect; location; time of day; traffic and pedestrians; weather; road conditions; the seriousness of the offense; the likelihood of later apprehension; and the suspect's known behavior. (Doc. 134–1, CPD Policy at PageID 1264–65 (emphasis added).) Simultaneously, the Officers had to consider whether the "level of danger created by the pursuit ***outweighs*** the necessity for immediate apprehension." (*Id.* at PageID 1269 (emphasis added).) Both policies required the Officers to exercise discretion, and Plaintiffs do not argue that the Officers did not weigh the factors. They argue only that the Officers weighed them incorrectly.

### 2. The Officers' safe-driving obligations do not transform their pursuit decisions into ministerial acts.

Plaintiffs conflate two distinct issues: (1) whether the Officers drove safely during the pursuit, and (2) whether the Officers should have initiated or terminated the pursuit. Even if certain driving-related obligations were ministerial, such as compliance with speed limits or lane-of-travel requirements, that does not convert the fundamentally discretionary decision to pursue a dangerous felon into a ministerial act. *See Mattingly v. Mitchell*, 425 S.W.3d 85, 90 (Ky. Ct. App. 2013) ("The issue is not how [the officer] operated the police vehicle during the pursuit, but whether he should have initiated the pursuit or terminated the pursuit earlier.").

Plaintiffs rely heavily on *Jones v. Lathram*, 150 S.W.3d 50 (Ky. 2004), for the proposition that "safely driving a police cruiser" is ministerial. (Doc. 155, Resp. in Opp. at PageID 4274.)  But *Jones* is not on point. It involved an officer who collided with another vehicle while responding to an emergency call—and the question was whether he negligently operated his vehicle. *Jones*, 150 S.W.3d at 53 ("Trooper Lathram undertook a ministerial act in

responding to an emergency call for assistance from a fellow officer."). There was no police pursuit, no fleeing suspect, and no question about whether to initiate or terminate a chase. *Jones* does not address the discretionary calculus that the Officers made.

Here, the Officers did not collide with the Laibles or the Kleins. Mason Meyer did. Plaintiffs fault the Officers for speeding on an expressway in Cincinnati—miles away from the Newport, Kentucky crash site—and for briefly driving on a one-way street in Covington, Kentucky, without receiving authorization from a supervisor. But these are, at most, technical infractions that occurred miles from the crash site and had no causal connection to Meyer's decision to flee. The CPD pursuit policy does not require an officer to terminate a pursuit if he exceeds a certain speed limit or crosses a center line.

As important, CPD's IIS and CIRB reports treated the speed and one-way street driving as technical violations warranting a reprimand and counseling. But neither investigation found that the Officers violated any directive about the decision to initiate or continue the pursuit, and the CIRB expressly determined that the Officers' decision to pursue Meyer was proper. (Doc. 134–9, CIRB Report at PageID 1333.) Plaintiffs cite no authority holding that such technical violations strip officers of immunity for their discretionary pursuit decisions.

### 3.    The Officers' decision to initiate and continue the pursuit was a discretionary decision for which they are entitled to immunity.

Plaintiffs offer two reasons for why the Officers' decision to initiate and continue the pursuit involved ministerial duties. First, Plaintiffs claim that the Officers had a ministerial duty to terminate the pursuit (or to not initiate it in the first place) because they knew that Mason Meyer was inside the fleeing Ford Focus. Second, they contend that the Officers had a ministerial duty to terminate the pursuit because the safety risks of continuing outweighed the

11

consequences of Meyer's escape. Neither argument withstands scrutiny under Kentucky's qualified immunity framework, the CPD pursuit policy, or the undisputed record.

> **a.**      **The Officers had no ministerial duty to terminate the pursuit, simply because they knew Meyer was inside the fleeing Ford Focus.**

*First*, Plaintiffs incorrectly suggest that the Officers had a ministerial duty to terminate the pursuit, once they learned that it was Mason Meyer inside the fleeing Ford Focus. (*See* Doc. 155, Resp. in Opp. at PageID 4245.) But the policy provision Plaintiffs invoke does not create a bright-line rule that would render it ministerial. To the contrary, the policy language that Plaintiffs invoke required the Officers to exercise discretion.

Under CPD pursuit policy 12.535(E)(1)(b), an officer must terminate a pursuit if "[e]stablishment of the suspect's identity allowing for apprehension at a later time and there is no longer a need for immediate apprehension."  (Doc. 134–1, CPD Policy at PageID 1269.) At least two predicate, discretionary judgments are embedded in that directive. First, the officer must determine whether later apprehension of the suspect is feasible, given what the officer knows about the suspect. Second, the officer must determine whether there remains a "need for immediate apprehension," given the suspect's criminal history and the nature of his offense. (*Id.*) So the officer must consider:

- Whether the suspect has tried to evade law enforcement before;

- Whether law enforcement can feasibly apprehend the suspect in the future;

- The seriousness of the suspect's offense;

- The suspect's criminal history and propensity for violence; and

- The risks the suspect poses—to the public, confidential sources, and law enforcement, among others—if he is allowed to escape.

12

These are not "fixed and designated facts" that automatically dictate a single outcome. They are factors that are weighed in a risk assessment. *See Meinhart*, 627 S.W.3d at 832 (citation omitted). Deciding, in real time, whether later apprehension is acceptable for a known, violent fugitive is exactly the kind of judgment call that Kentucky law treats as discretionary. *Id.* at 834 (pursuit decisions are discretionary when the policy "gives a list of factors to be considered . . . but leaves to the officer's individual professional judgment to weigh the law enforcement goals and the specific factors of a situation").

Apprehending Meyer sometime later was far from certain. Meyer had already evaded law enforcement just one week earlier, when he swapped vehicles mid-pursuit to escape. (Doc. 58–1, ATF Operational Plan at PageID 443; Doc. 135, Lanter Dep., 223:2–8 at PageID 1573.) And Meyer went through multiple phones to avoid tracking. (Doc. 135, Lanter Dep., 199:21–200:5 at PageID 1550–51; *id.*, 240:19–241:3 at PageID 1591–92.) Even when law enforcement was tracking the correct phone, the technology was not always precise: on the morning of the pursuit, law enforcement was surveilling the wrong house because the phone believed to be Meyer's was not sending pings. (Doc. 136, Occhipinti Dep., 143:5–144:11 at PageID 2048–49.) Given Meyer's demonstrated ability to evade surveillance, the Officers reasonably concluded that allowing him to escape again would make future apprehension more difficult, if not impossible.[1]

On the other hand, the Officers *did know* that Meyer posed an immediate threat. He had just been observed placing a rifle case in the Ford Focus. (Doc. 10–1, Ex. A, Critical Incident

___

[1] Plaintiffs cite ATF Resident-Agent-in-Charge Frank Occhipinti's deposition and inaccurately claim that the "ATF had implemented surveillance of Meyer through several methods that would allow them to continue tracking Meyer until he could be arrested at a safer location." (Doc. 155, Resp. in Opp. at PageID 4247.) Special Agent Occhipinti testified that real-time tracking depended on Meyer's cellphone remaining in use; if Meyer discarded or changed phones, agents could not continue to track him in the same way. (Doc. 136, Occhipinti Dep., 172:11–173:1 at PageID 2077–78.)

Review at PageID 113.) He had outstanding warrants for violent felonies. (Doc. 58–1, ATF Operational Plan at PageID 442–45.) He was known to have kidnapped, assaulted, and threatened the families of those who owed him money. (*Id*. at PageID 443.) Sources reported that he intended to engage police in a fatal shootout rather than return to prison. (Doc. 10–1, Ex. A, Critical Incident Report at PageID 118.) And his continued drug-and-guns trafficking, in which he played a leadership role, was itself a significant danger to the community. (ECF No. 517, Sentencing Tr. at PageID 2928–29, 2931.) Under these circumstances, the Officers' determination that Meyer required immediate apprehension was a reasonable exercise of discretion, not a violation of a ministerial duty.

Plaintiffs' attempt to compare this CPD policy to the ministerial policy in *Sheehy v. Volentine* is unavailing. *See* 706 S.W.3d 229, 241 (Ky. 2024). The policy in *Sheehy* required the police officer to terminate a pursuit if "no field supervisor or higher authority can be contacted to approve the pursuit's continuation." *Id.* That is a textbook example of a binary, ministerial policy: it "leaves no discretion to the pursuing officer to not contact a higher authority in his chain of command or otherwise to continue a pursuit based on his own judgment," contains "no caveats or exceptions," and imposes a duty that is "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id*. Put simply, if the police officer cannot reach his supervisor, he has no judgment to exercise; he must terminate the pursuit.

Here, by contrast, the CPD pursuit policy asks officers to make precisely the kind of nuanced risk-benefit analysis—assessing the feasibility of later apprehension and the need for immediate arrest of a dangerous suspect—that Kentucky law treats as discretionary and thus subject to qualified immunity.

14

Plaintiffs' reliance on *Hutchinson v. Estate of Skeens by and through Skeens*, is also misplaced. *See* 2021 WL 753084, at \*4 (Ky. Ct. App. Feb. 26, 2021). In *Hutchinson*, the Kentucky Court of Appeals affirmed the denial of qualified immunity to a police officer and his supervisor because they violated several specific, bright-line rules that required them to terminate a pursuit. *Id.* Most notably, the pursuit policy mandated that an officer terminate a pursuit on a "roadway where the posted speed limit is less than 55 MPH." *Id.* (citation omitted). But the police officer in *Hutchinson* defied that policy by continuing to follow the suspect along a lower-speed, curvy road, and the supervisor admitted that he should have ordered the police officer to terminate the pursuit "immediately." *Id.* at \*5–6. Even then, the Kentucky Court of Appeals acknowledged that "at least under certain circumstances whether to initiate or continue a pursuit appears to be discretionary." *Id.* at \*6. But because that same policy imposed "clearly defined duties to do specific things" and the officers "failed to comply with essentially ministerial duties to terminate the pursuit immediately under certain circumstances," they were not entitled to qualified immunity. *Id.*

The CPD pursuit policy contains no comparable bright-line rule. Instead, initiation and termination is the product of a multi-factor, situational assessment—leaving the ultimate judgment to the officers in the field and the supervising officer in charge. That is the hallmark of a discretionary function.

> **b.    Weighing the safety risks of the pursuit against the consequences of Meyer's escape was an inherently discretionary exercise.**

*Second*, Plaintiffs claim that the CPD pursuit policy imposed a ministerial duty to terminate, based on *their view* that "the safety risks of the continued pursuit outweighed the consequences of Mason Meyer's escape." (Doc. 155, Resp. in Opp. at PageID 4248.) Plaintiffs

simply substitute their ex-post view of Meyer's danger (unsubstantiated by the record) for the

risk assessment that the Officers performed in real time. But this Court cannot let hindsight bias

inform its qualified immunity analysis. The undisputed evidence—all of which law enforcement

knew at the time of the pursuit—demonstrates that the Officers confronted a genuinely

dangerous suspect whose escape posed grave risks:

- Meyer had outstanding warrants for first-degree wanton endangerment and first-degree fleeing and evading. (Doc. 58–1, ATF Operational Plan at PageID 442–45.)

- Meyer pistol-whipped a victim in July 2020, boasted of murdering a Dayton, Ohio, man, and discharged a gun outside a Newport, Kentucky, home. (Doc. 58–1, ATF Operational Plan at PageID 443.)

- Meyer told sources that he was terminally ill, had little concern for human life, was suicidal, repeatedly threatened to kill police, and wanted to die in a police shootout rather than return to jail. (Doc. 10–1, Ex. A, Critical Incident Review at PageID 113, 118.)

- Law enforcement officers saw Meyer place a rifle case into the black Ford Focus that departed from the Steiner Avenue home under surveillance. (*Id.* at PageID 113–14.)

- Meyer was the leader of an interstate drug-and-gun trafficking organization that had pioneered the use of drones to deliver narcotics. (Doc. 136, Occhipinti Dep., 96:25–97:17 at PageID 2001–02.)

- Meyer routinely assaulted or kidnapped subordinates who failed to remit drug proceeds and had surveilled the mother of a debtor as a threat. (Doc. 58–1, ATF Operational Plan at PageID 443; Doc. 135, Lanter Dep., 236:1–12 at PageID 1587.)

Plaintiffs ignore that evidence. Astonishingly, they even declare that the consequences of

Meyer's escape were "*minimal*."[2] (Doc. 155, Resp. in Opp. at PageID 4251 (emphasis added).)

---

[2] Plaintiffs cite no expert testimony—not even from their own expert—to support the proposition that the consequences of Meyer's escape were nil. Instead, they rely on an affidavit from Meyer, who implausibly averred that he was a model driver during Summer 2020 and only "drove at high speeds, made quick turns, and used other dangerous driving tactics" on the day of the pursuit to "get away from the police." (Doc. 155, Resp. in Opp. at PageID 4229 (quoting Doc.

But if that is so, it is hard to imagine whose escape would pose a serious enough risk to outweigh the dangers inherent to any police pursuit. Plaintiffs' position would effectively rewrite the CPD pursuit policy so pursuits are never justified, no matter the danger that the fleeing suspect poses.

Of course, the CPD pursuit policy says no such thing. It instructs officers, "prior to and during a pursuit," to weigh whether "the safety risks of continued pursuit outweigh the consequences of the suspect's escape." (Doc. 134–1, CPD Pursuit Policy at PageID 1264–65.) That balancing test is exactly the kind of analysis that the Kentucky Supreme Court held to be discretionary in *Meinhart*. 627 S.W.3d at 834.

Plaintiffs revisit the same small group of cases—and again, they stretch them too far. Turning again to *Sheehy*, Plaintiffs highlight a pursuit policy that required officers to terminate a pursuit if the "circumstances present an extreme safety hazard to the public, the deputy, or the suspect." *Sheehy*, 706 S.W.3d at 235. The Kentucky Supreme Court treated that policy as ministerial; even though the policy contemplated some factual assessment, the officer *had to* terminate a pursuit upon concluding that an "extreme safety hazard" existed. *Id.* at 243. The officer in *Sheehy* **admitted that an extreme safety hazard existed**. He "testified without equivocation that the pursuit presented an extreme safety hazard to the public," and yet he still continued the pursuit. *Id.* at 235.

The CPD pursuit policy here is structured differently: it does not use "extreme safety hazard" as an automatic trigger, but requires officers to weigh multiple factors and decide whether the risks of pursuit outweigh the consequences of Meyer's escape. And unlike in *Sheehy*, no Officer testified that he ever believed a policy-defined, binary "must terminate"

---

153–1, Mason Meyer Aff. ¶¶ 2, 5, 9, 13 at PageID 4202-4203 ).)  It is an odd tactic to rely on the statement of the person convicted of murdering the Laibles—a defendant here—to try to create a disputed fact.

17

condition had been met. To the contrary, the Officers testified that they believed the pursuit was justified, given Meyer's danger and the risk he posed to the public. (Doc. 135, Lanter Dep., 270:21–23 at PageID 1621 (testifying that he thought he made the right decision to continue the pursuit, that there were no factors that would have required him to terminate the pursuit, and that "nothing along that route…made myself or Officer Thomas…think that…the pursuit was too high risk."); *Id.*, at 223:24–25; 224:8–15 at PageID 1574–75 (testifying that before the pursuit, he knew that Meyer was a violent criminal); *see also* Doc. 138, Scalf Dep., 151:1–20 at PageID 2334 (testifying that he believed they were justified in pursuing and not terminating the pursuit of Meyer).)

Plaintiffs' reliance on *Mattingly* offers no support, either. 425 S.W.3d at 86. In *Mattingly*, the Kentucky Court of Appeals affirmed the trial court's denial of qualified immunity to a police officer who violated several pursuit-policy directives. Under that policy, officers "shall not initiate or participate in a pursuit" when, for example, "the offense is a traffic infraction or misdemeanor." *Id.* at 88. The officer in *Mattingly* disregarded that bright-line rule by pursuing a fleeing suspect at high speeds for a mere traffic infraction. Because the officer's conduct was an "identifiable deviation from an absolute, certain, imperative order," the Kentucky Court of Appeals held that he was not entitled to qualified immunity. *Id.* at 90–91 (citation and internal quotation marks omitted).

There is no comparable categorical prohibition at issue here. Instead, the CPD pursuit policy frames initiation and termination as the product of a multi-factor, situational assessment— leaving the ultimate judgment to the officers in the field. The Officers' decision to pursue Meyer falls squarely within the policy's contemplated exercise of discretion and therefore is protected by qualified immunity.

### D. Plaintiffs fail to meet their burden on good faith.

Plaintiffs come nowhere close to meeting their burden on good faith. "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority," Kentucky law requires the plaintiff to "establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001). Plaintiffs shoulder the burden to overcome the good-faith presumption—either by showing that the Officers "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive" or by demonstrating that the Officers' conduct was objectively unreasonable. *Id*. Plaintiffs do not argue that the Officers acted with malice or corrupt motive. Instead, they contend that the Officers' continued pursuit of Meyer was objectively unreasonable.

Once again, Plaintiffs return to *Sheehy*—this time to suggest that the Officers' decision to pursue Meyer was objectively unreasonable. But *Sheehy*'s good faith discussion only highlights why this case is distinct. The officer in *Sheehy* defended his decision to pursue by claiming that the fleeing suspect hit one woman and nearly hit another man with his speeding car (and in doing so, committed first degree assault and wanton endangerment that justified a police pursuit). 706 S.W.3d at 234. But objective video footage showed that no one was near the fleeing suspect's car, and the officer offered no evidence to the contrary. *Id.* at 238. Thus, the officer's decision to pursue—premised on the suspect's supposedly dangerous driving that video footage refuted—"could not be considered reasonable." *Id.* at 241. And his lying about it no doubt undermined his "good faith" argument.

Here, the record confirms that the Officers' decision to pursue Meyer was objectively reasonable. The Officers knew that Meyer was a violent felon with outstanding warrants and had

19

evaded law enforcement just one week earlier. They knew that he had been observed moments before placing a rifle case into the vehicle, that he routinely injured others, and that he had threatened to kill police officers and die in a shootout rather than return to prison. And they knew he led a sophisticated criminal organization responsible for drug trafficking, firearms offenses, and acts of violence. Under these circumstances, the Officers' belief that immediate apprehension was necessary—and that the risks of pursuit were justified—was reasonable.

And unlike the officer in *Sheehy*, who admitted that the pursuit presented an extreme safety hazard that required termination, the Officers never believed that their conduct violated any CPD pursuit policy. (*See, e.g.*, Doc. 135, Lanter Dep., 206:9–208:11 at PageID 1557–59; Doc. 141, Thomas Dep., 255:14–20 at PageID 3168.) Because Plaintiffs have failed to raise a genuine dispute of material fact on good faith, the Officers are entitled to qualified immunity.

> **E.    The Officers were not the proximate cause of the Laible's deaths or the Kleins' injuries.**

Plaintiffs mischaracterize the Officers' proximate cause argument. The Officers do not contend that police can never be the proximate cause of injuries inflicted by a fleeing suspect. *Gonzalez v. Johnson* rejected that categorical rule. *See* 581 S.W.3d 529, 532 (Ky. 2019). Rather, the Officers contend that Meyer's criminal conduct was an intervening, superseding cause that severs any causal connection between the pursuit and Plaintiffs' injuries. That argument is especially compelling here, given that Meyer has pleaded guilty to murdering the Laibles and injuring the Kleins.

Under both Ohio and Kentucky law, an intervening criminal act may break the causal chain unless the act was reasonably foreseeable. *See Herndon v. Torres,* 249 F. Supp. 3d 878, 889 (N.D. Ohio 2017); *Waldon v. Hous. Auth. of Paducah*, 854 S.W.2d 777, 779 (Ky. Ct. App. 1991). The question, then, is whether Meyer's specific conduct—colliding into four

pedestrians—was a reasonably foreseeable consequence of the Officers' pursuit. It was not. Although it may be foreseeable that a fleeing suspect will engage in evasive maneuvers, it is not foreseeable that the suspect will commit murder. Meyer's criminal conduct was the intervening cause of the Laibles' deaths and the Kleins' injuries.

**II.      This Court should grant summary judgment to the City of Cincinnati.**

**A.      The City is not liable for Plaintiffs' claims because the Officers are immune from liability.**

Under Ohio and Kentucky law, the City is not liable for negligent training or supervision, nor can it be liable through vicarious liability, because the Officers are immune from liability. *See City of Paintsville v. Haney,* 718 S.W.3d 812, 839 (Ky. 2025) (employer is not liable for negligent training or supervision if there is no "finding that those employees committed a tort" and that "primary liability by employees" is required to find vicarious liability); *Nat'l Union Fire Ins. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939, 944 (Ohio 2009) ("an underlying requirement in actions for negligent supervision and negligent training" and for vicarious liability is that the employee or agent must be individually liable for the underlying tort). Here, the Officers are immune from liability, and Plaintiffs cannot establish that the Officers proximately caused their injuries. So under Kentucky or Ohio law, Plaintiffs' claims for negligent training and supervision and vicarious liability fail.

**B.      This Court should apply Ohio's immunity law to resolve Plaintiffs' claims against the City.**

The Court should apply Ohio's political-subdivision immunity framework to the claims against the City. Kentucky's choice-of-law rules, comity doctrine, and prior decisions from this District favor applying Ohio law when an Ohio governmental entity is sued for its own

training/supervision decisions and Ohio has enacted a comprehensive immunity code that would govern that entity's conduct in its home state.

Plaintiffs' chief authority, *Ensminger v. Cincinnati Bell Wireless, LLC*, involved a Kentucky homeowner's negligence claim arising from a misrouted 911 call. 434 F. Supp. 2d 464, 465 (E.D. Ky. Jun. 19, 2006). The court there declined to apply Ohio's municipal-immunity statute and public-duty doctrine because it concluded that importing Ohio's rules "would be contrary to Kentucky's public policy, which favors allowing recovery for injuries resulting from negligence." *Id.* at 466. *Ensminger* turned on a specific perceived conflict: Ohio's municipal-immunity statute would have given the City of Cincinnati broader protection than a similarly situated Kentucky city would have enjoyed under Kentucky law. So the Court declined to apply Ohio's immunity law.

*Ensminger*'s analysis does not fit the facts here. First, the claim here is not a direct negligence claim; it is a negligent training and supervision claim directed at high-level pursuit-training, policy, and staffing decisions made by an Ohio political subdivision under Ohio law. Second, since *Ensminger*, Kentucky courts have applied the Claims Against Local Governments Act to shield municipalities from negligent hiring, training, and supervision claims that challenge discretionary policy decisions about staffing and resource allocation. *See Morales v. City of Georgetown*, 709 S.W.3d 146, 165 (Ky. 2024). So *Ensminger* no longer supports Plaintiffs' argument.

Finally, *Pittman*—decided after *Ensminger*—confirms that the Kentucky Supreme Court's current approach in immunity disputes is to favor interstate comity. Relying on the Kentucky Supreme Court's decision in *Ohio v. Great Lakes Mins., LLC*, 597 S.W.3d 169 (Ky. 2019), this Court observed that "recent caselaw from the Kentucky Supreme Court suggests that

Kentucky would defer to Ohio's immunity law on comity grounds" when deciding whether an Ohio local entity is immune in a Kentucky forum. *See Pittman*, 2020 WL 6386489, at *3–4 (E.D. Ky. July 7, 2020). *Pittman* therefore treats *Great Lakes Minerals* as the best indication of Kentucky's stance toward interstate state immunity—and recognizes that Kentucky courts generally give effect to another state's immunity scheme unless doing so would conflict with Kentucky's own public policy. Because there is no such conflict here, this Court should apply Ohio's immunity law to resolve Plaintiffs' claims against the City.

### C.      The City is immune under Ohio law.

Plaintiffs do not even attempt to show that the City could be liable, if Ohio's Political Subdivision Tort Liability Act applies. Indeed, their Response in Opposition does not address liability under Ohio law. That makes sense because under Ohio law, a city cannot be held liable for "consequences arising from an employee's training or the supervision of that employee in operating the motor vehicle." *See McConnell v. Dudley*, 144 N.E.3d 369, 371 (Ohio 2019). Under that framework, this Court should dismiss Plaintiffs' claim against the City.

### D.      Under Kentucky's immunity law, the City is immune.

The City is entitled to immunity if Kentucky's immunity law applies because Plaintiffs' negligent training and supervision theories target discretionary, policy-level decisions that both states protect from liability. Plaintiffs argue that no provision of Kentucky's Claims Against Local Governments Act ("CALGA"), applies to their claims for negligent training and supervision. They are wrong, and the Kentucky Supreme Court's recent decision in *Morales* is directly on point. *See* 709 S.W.3d 146, 165 (Ky. 2024). In *Morales*, the court held that CALGA immunizes municipalities against claims for negligent training and supervision of police officers under two provisions: (a) "[t]he adoption or failure to adopt any ordinance, resolution, order,

regulation, or rule," Ky. Rev. Stat. § 65.2003(3)(a); and (d) "[t]he exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources." Ky. Rev. Stat. § 65.2003(3)(d); *see also Morales*, 709 S.W.3d at 164.

The court interpreted "these statutory provisions as broad enough to preclude [the plaintiffs'] claims that the City and [the police department] negligently failed to train the [task force officers] in accordance with their delineated training requirements." *Id.* It also held that a police department's supervisory duties "are inherently discretionary in nature, and therefore cannot be a basis for liability in this instance because it is not a tort for government to govern." *Id.* at 165 (internal quotation marks and citation omitted). In response, Plaintiffs make two attempts to distinguish *Morales*, but neither succeeds.

*First*, Plaintiffs argue that their "negligent supervision claim is directed to the City's broader failure to ensure pursuit supervision under the express dictates of the CPD Pursuit Policy." (Doc. 155, Resp. in Opp. at PageID 4272). They assert that their claim focuses on "when, how, or to what degree" supervision should occur, whereas *Morales* focused on a supervisory duty to hire and select task force members. (*See id.* at 56.) But this is a distinction without a difference. Decisions about "when, how, or to what degree" to supervise are quintessentially discretionary decisions—precisely what *Morales* held to be immune.

Plaintiffs cannot reframe their claims to evade *Morales*. Their First Amended Complaint alleges that the "City of Cincinnati failed to adequately train, supervise, and discipline its employees to ensure that they followed CPD pursuit policies." (Doc. 79, Am. Compl. ¶ 164, at PageID 676.) That is a challenge to the City's institutional training and supervision decisions—not to Lieutenant Lanter's conduct during the pursuit. Plaintiffs cannot amend their theory of liability in a summary judgment opposition. *See In re Welding Fume Prods. Liab. Litig.*, No.

1:03-CV-17000, 2010 WL 2403355, at *8 (N.D. Ohio June 11, 2010) ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour.").

*Second*, Plaintiffs argue that their negligent training claim is different because they allege the City "failed to train the officers for the jobs they were required to do" rather than failing to train them on a specific policy. (Doc. 155, Resp. in Opp. at PageID 4274.) But *Morales* held that training decisions are "inherently discretionary in nature, and therefore cannot be a basis for liability." *See* 709 S.W.3d at 165. The same is true here. Because Plaintiffs' negligent training and supervision claims challenge discretionary governmental functions, the City is entitled to immunity under CALGA.

## CONCLUSION

For these reasons, this Court should grant summary judgment to the Officers and the City of Cincinnati.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig, *pro hac vice*
Chad R. Ziepfel (93903)
Spencer S. Cowan, *pro hac vice*
Kenneth A. Foisy (97478)
Elise L. Marrinan (101353)
Taft Stettinius & Hollister LLP
301 E. Fourth Street, Suite 2800
Cincinnati, OH 45202
Phone: 513-381-2838
Fax: 513-381-0205
aherzig@taftlaw.com
cziepfel@taftlaw.com
scowan@taftlaw.com
kfoisy@taftlaw.com
emarrinan@taftlaw.com

*Counsel for Defendants City of Cincinnati, Timothy Lanter, and Brett Thomas*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2026, a copy of the foregoing was filed through the Court's CM/ECF system, which will serve notice of the filing on all counsel of record, and was served via regular mail upon the following:

Mason Meyer
Little Sandy Correction Complex
505 Prison Connector
Sandy Hook, KY  41171

*Defendant*

Austin Lagory
9626 Shane Lane
Union, KY 41091

*Defendant*

/s/ Aaron M. Herzig