**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 21-102-DLB**

**JASON LAIBLE, et al.**                                                          **PLAINTIFFS**

**v.**                                    <u>**MEMORANDUM OPINION AND ORDER**</u>

**TIMOTHY LANTER, et al.**                                                       **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.   INTRODUCTION

This matter is before the Court upon Motions for Summary Judgment by Defendants Timothy Lanter and Brett Thomas (Doc. # 143) and Defendant City of Cincinnati (Doc. # 144).  Plaintiffs Jason Laible, Steven Klein and Maribeth Klein having filed their Response (Doc. # 155), and Defendants having filed their Reply (Doc. # 158), the Motion is ripe for the Court's review.  For the reasons set forth herein, Defendants Lanter and Thomas's Motion for Summary Judgment (Doc. # 143) is **denied**, and Defendant City of Cincinnati's Motion for Summary Judgment (Doc. # 144) is **denied in part** and **granted in part**.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This case has a lengthy and complicated factual and procedural history stemming from a tragedy that took place on August 7, 2020.  In the summer of 2020, federal agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Kentucky state agents with the Northern Kentucky Drug Strike Force ("NKDSF"), and City of Cincinnati Police Department ("CPD") officers (collectively "the task force") began investigating the

1

criminal dealings of Defendant Mason Meyer.  (Doc. # 136-9).  Meyer operated drug and weapons trafficking operations and had been convicted of several felonies prior to August 2020.  (*Id*. at 3).  The task force had been tracking Meyer since July 2020, when Kentucky police obtained a warrant for his arrest for a gun discharge in Newport.  (*Id*. at 2).  Following an unsuccessful attempt by Kentucky police officers in late July to the apprehend Meyer in a traffic stop, the task force took steps to formally arrest Meyer and put an end to his operation.  (Doc. # 135 at 235:2–240:5).  The plan involved surveilling Meyer's last known location and apprehending him via a traffic stop pursuant to CPD policy when the situation called for it.  (Doc. # 136-9 at 4).  ATF agents were instructed not to engage in a traffic stop without CPD officers.  (*Id*.).

The task force executed its plan on August 7, 2020.  (Doc. # 134-3 at 2).  That morning, officers surveilled a residence Meyer frequented, located at 721 Steiner Avenue in Cincinnati.  (*Id*. at 3).  At approximately 3:00 p.m., officers saw Meyer exit the residence with a weapons case and walk toward a black Ford Focus.  (*Id*. at 16).  Officers could not determine whether Meyer entered the vehicle, so they delayed engaging him until they identified that Meyer was, in fact, in the vehicle.  (*Id*.).  Shortly after the Focus pulled away from the residence, officers identified Meyer as the driver of the car and started following him.  (*Id*. at 17).

Having identified Meyer as the driver, CPD Sergeant Timothy Lanter[1] took the lead in the pursuit and turned on his car's lights and siren as Meyer turned onto Mt. Hope

---

[1]    The record reflects that Defendant Lanter held the rank of Sergeant when the events of this case took place.  (Doc. # 135 at 219:14–16).  The record also reflects that Defendant has since been promoted to the rank of Lieutenant.  (*Id*. at 6:22–24).  For the sake of simplicity and consistency, the Court will refer to him as Sergeant Lanter in the context of August 7, 2020 and Defendant Lanter in the context of the present suit.

Avenue. (*Id*.; *see also* Doc. # 135 at 112:2–12). Meyer then attempted to flee from the pursuing officers. (Doc. # 134-3 at 17). Sergeant Lanter then notified other officers he was going to pursue Meyer. (*Id*.; *see also* Doc. # 135 at 112:13–15). CPD Officers Brett Thomas and Michael Harper joined the pursuit, while Sergeant Donald Scalf took the role of Officer in Charge ("OIC"). (Doc. # 134-3 at 17).

The pursuit continued through the streets of the Price Hill neighborhood in Cincinnati. (*Id*. at 17–18; *see also* Doc. # 135 at 115:15–116–10). As Meyer continued to drive evasively, Sergeant Lanter took measures to keep up with him. (Doc. # 135 at 113:2–17, 114:12–14). Meyer led officers onto the Sixth Street Viaduct toward downtown Cincinnati. (*Id*. at 116:11–13). At that point, Sergeant Lanter asked OIC Scalf if he should continue into Kentucky if required, and Scalf affirmed that he should. (Doc. # 134-3 at 17). Body camera footage and testimony from the officers shows that Officers Lanter and Thomas both drove at speeds greatly exceeding the speed limit on the Sixth Street Viaduct. (Doc. # 152 at 129–130; Doc. # 135 at 100:9–14).

After crossing the Sixth Street Viaduct, the chase continued toward Interstate 71/75 South before Meyer abruptly changed course and drove onto Second Street in downtown Cincinnati instead. (Doc. # 134-3 at 17). In making this maneuver, Meyer sideswiped another car on the road, although pursuing officers claim they did not see the collision. (*Id*.; Doc. # 135 at 109–110). The pursuit continued into Cincinnati's Business District, turning right onto Elm Street near Paycor Stadium. (Doc. # 134-3 at 17–18; Doc. # 135 at 119:20–120:3). Meyer then headed eastbound on Freedom Way in The Banks district—an area known for its public attractions—with officers following closely behind.

(Doc. # 135 at 120:7–18).  Both Meyer and the pursuing officers crossed over double-yellow centerlines on Elm Street and Freedom Way.  (Doc. # 134-3 at 17–18).

Meyer then crossed the John A. Roebling Suspension Bridge into Kentucky.  (*Id.* at 18).  Both Meyer and the officers crossed over the double-yellow centerline on the two-lane bridge.  (*Id.*; Doc. # 135 at 121:11–22).  Once on the Kentucky side of the Ohio River, Meyer, followed by Sergeant Lanter and Officer Thomas, turned the wrong way into a roundabout off the bridge before turning onto East Third Street in Covington.  (Doc. # 134 at 210:14–212:2; Doc. # 134-3 at 18).  Meyer led officers through the streets of Covington, down one-way streets and back alleys, before crossing the Fourth Street Bridge into Newport.  (Doc. # 134-3 at 18; Doc. # 135 at 123:10–126:21).  The pursuing officers never received clearance from OIC Scalf before traveling down Covington's one-way streets against the flow of traffic.  (Doc. # 138 at 145:15–146:8).

After crossing into Newport, Meyer continued driving erratically on West Fifth Street with Sergeant Lanter and other officers in tow.  (Doc. # 134-3 at 18).  As he approached Monmouth Street, Meyer swerved to avoid traffic and lost control of his vehicle.  (*Id.*).  His car went off the road and onto the sidewalk, hitting a building and two pedestrians at the intersection of Monmouth Street and Fifth Street outside Press on Monmouth.  (*Id.*).  Gayle and Raymond Laible were killed, and Maribeth and Steven Klein were seriously injured by debris from the accident.  (Doc. # 79 ¶¶ 1, 88–89; *see also* Doc. # 134-3 at 19).  Meyer was subsequently arrested and charged with two counts of Murder for the deaths of the Laibles, two counts of Wanton Endangerment, one count of Fleeing or Evading Police, and one count of Criminal Mischief.  (Doc. # 143-2).  Meyer pled guilty to the charges and is currently serving a life sentence at Little Sandy Correctional

Complex in Sandy Hook, Kentucky.  (*Id*.; *see also* Offender Information, COMMONWEALTH OF KENTUCKY DEP'T OF CORR., http://kool.corrections.ky.gov/KOOL/Details/314023 (search "Mason Meyer")).

The City of Cincinnati initiated three separate investigations into Sergeant Lanter and Officer Thomas's roles in the pursuit.  First, the Cincinnati Police Department's Internal Investigations Section ("IIS") investigated the pursuing officers' roles in the chase and resulting accident.  (*See* Doc. # 134-3; Doc. # 152 at 37:1–16).  IIC officials looked at officers' body camera footage and mobile video recording footage ("cruiser footage"), as well as third-party footage from the scene of the crash.  (Doc. # 152 at 41:7–45:18).  IIC also interviewed Sergeant Lanter, Officer Thomas and other officers about their roles in the pursuit.  (*Id*. at 47:6–48:25).

The IIS investigation determined that Sergeant Lanter "authorized operation of police vehicles the wrong way on one-way streets while actively involved in the pursuit and not acting as the pursuit [officer-in-charge]" which violated Rule 1.03 of the CPD Manual of Rules and Regulations and Disciplinary Process.[2]  (Doc. # 134-3 at 19).  The IIC further found that Sergeant Lanter "failed to transmit speeds while involved in the pursuit and drove the wrong way on a one-way street" in violation of Rule 1.01(b) of the CPD Manual of Rules and Regulations and Disciplinary Process.[3]  (*Id*.).  In making its determinations, the IIC found that Sergeant Lanter violated CPD's Pursuit Policy and

---

[2]    Rule 1.03 states "Members shall exercise the responsibility and authority of the position to which they are assigned in accordance with Department Position Classification/Job Description, Civil Service Classification Specifications, and work rules."  (Doc. # 134-3 at 19).

[3]    Rule 1.01(b) states "Members shall not commit any acts or omit any acts, which constitute a violation of any of the rules, regulations, procedures, directives, or orders of the Department[,]" including "[a] negligent violation which may lead to risk of physical injury to another or financial loss to the City."  (Doc. # 134-3 at 19).

Procedures, which prohibit officers from traveling the wrong way on one-way streets without express permission from the OIC and require officers to relay their speeds when in a pursuit. (*Id*. at 21). The IIS investigation also determined that Officer Thomas violated Rule 1.01(b) by going more than twenty miles per hour over the posted speed limit during the pursuit. (*Id*.). Sergeant Lanter received a written reprimand from CPD for his actions on March 27, 2021, while Officer Thomas received written counseling. (Doc. # 151-6; Doc. # 141 at 268:11–269:2).

The Cincinnati Critical Incident Review Board ("CIRB") also evaluated the officers' roles in the fatal crash. (*See* Doc. # 134-9). The CIRB looked at the officers' actions during the pursuit to determine whether they utilized tactics that complied with CPD policies and whether the tactics used were appropriate for the circumstances. (Doc. # 151 at 35:22–36:14). The CIRB determined the officers had the knowledge, skills and resources necessary to perform their jobs and that they had undergone training on the protocols and procedures of the CPD. (Doc. # 134-9 at 5). However, the CIRB concluded that Sergeant Lanter and Officer Thomas committed several operational and administrative violations during the pursuit—the same violations noted by the IIS in its investigation—that stemmed from the officers' "disregard [of] the Department's protocols, procedures, and training." (*Id*.; *see also* Doc. # 151 at 116:25–117:9. 193:1–9). Finally, the CIRB recommended the officers undergo refresher training about "risk versus reward and pursuit driving." (*Id*.).

Finally, the City of Cincinnati's Citizen Complaint Authority ("CCA"), tasked with assessing whether the officers' conduct created a danger to the citizens of Cincinnati, investigated the officers' roles in the pursuit. (*See* Doc. # 134-8). The CCA determined

Sergeant Lanter and Officer Thomas should have stopped their pursuit when they reached speeds over 100 miles per hour and when Meyer sideswiped a vehicle on Interstate 75 in front of Sergeant Lanter. (*Id*. at 21).

On August 4, 2021, Plaintiffs Jason Laible, the executor of the estates of Raymond and Gayle Laible, and Steven and Maribeth Klein filed suit against Timothy Lanter, Brett Thomas, Donald Scalf and the City of Cincinnati in Campbell County Circuit Court.[4] (Doc. # 1-1). On August 26, 2021, Defendants removed the case to this Court, claiming the officers were federal officers with a right of removal under 28 U.S.C. § 1442 because they were part of a federal ATF taskforce. (Doc. # 1 ¶¶ 7–8).

Shortly after, Plaintiffs filed a Motion to Remand, claiming the Court did not have subject matter jurisdiction because Defendants failed to obtain Westfall certification under 28 U.S.C. § 2679. (Doc. # 64 at 5). Defendants then filed a Motion to Dismiss several of Plaintiffs' claims. (Doc. # 10). After the United States declined to issue Defendants' Westfall certification, Defendants petitioned this Court for Westfall certification. (Doc. # 34).

This Court ruled on the Motion to Remand, Petition for Westfall Certification and Motion to Dismiss on June 3, 2022. (Doc. # 64). First, the Court denied Plaintiffs' Motion to Remand, determining that one of the removing officers was a federal officer acting under color of federal office, which gave him the ability to remove the case to federal court. (*Id*. at 11–29). Next, the Court denied Defendants' Petition for Westfall Certification, finding that none of the officers satisfied the two-part test for Westfall certification. (*Id*. at 31–44). Finally, the Court denied as moot Defendants' Motion to

---

4       Plaintiffs also included Mason Meyer, Austin Lagory and Travelers Casualty Insurance Company of America. (*See* Doc. # 1-1).

Dismiss Plaintiffs' claims under the Federal Tort Claims Act ("FTCA"), finding that the FTCA did not apply in this case.  (*Id*. at 44).

Defendants then appealed the Court's decision to the Sixth Circuit Court of Appeals as it pertained to Defendants' Westfall Certification.  (Doc. # 65).  The Sixth Circuit issued its Judgment on January 23, 2024, affirming this Court's decision as to Defendants Lanter and Thomas, but reversing this Court's decision as to Defendant Scalf.  *Laible v. Lanter*, 91 F.4th 438, 445–46 (6th Cir. 2024).  Accordingly, Defendant Scalf was deemed immune under the Westfall Act and the United States was substituted as a party in his place.  *Id*. at 446.

Defendants filed their Answer (Doc. # 95) to Plaintiffs' Amended Complaint (Doc. # 79) on May 29, 2024.  On that same day, the United States filed a Motion to Dismiss all claims against it.  (Doc. # 96).  Nearly a month later, on June 20, 2024, Plaintiffs filed a Motion to Drop the United States as a Party.  (Doc. # 98).  Plaintiffs' Motion went unopposed, and the Court granted the Motion on July 12, 2024.  (Doc. # 103).

With the United States removed as a named defendant, the Parties engaged in extensive discovery from July 2024 to November 2025.  On November 7, 2025, Defendants filed two Motions for Summary Judgment—one by Lanter and Thomas (Doc. #143) and one by the City of Cincinnati (Doc. # 144).  With Plaintiffs having filed their Response (Doc. # 155) and Defendants having filed their consolidated Reply (Doc. # 158), the matter is now ripe for the Court's review.

III.     ANALYSIS

A.     Standard of Review

Defendants move for summary judgment on Plaintiffs' three claims.  Counts One and Two for personal injury and wrongful death are filed against all three Defendants, while Count Three for negligent supervision and hiring is only filed against Defendant City of Cincinnati.  (Doc. # 79 ¶¶ 142–165).

Federal Rule of Civil Procedure 56 allows for the granting of summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party or parties bear the burden of showing an absence of a genuine issue of material fact.  *Sigler v. Am. Honda Motor Co.*, 532 F. 3d 469, 483 (6th Cir. 2008).  A genuine dispute as to a material fact exits where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*. at 586. At this stage, the Court must not weigh evidence or make credibility determinations but instead must ascertain whether there is a genuine issue for trial.  *Moran v. Al Basit LLC*, 788 F. 3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249).  In making this determination, the Court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472,

1479–80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact."  *In re Morris*, 260 F. 3d 654, 665 (6th Cir. 2001).

### B.    Choice of Law

Before addressing Defendants' claims, the Court first must determine the threshold issue of which state's law to apply.  Defendants concede that district courts exercising supplemental jurisdiction over state law claims must "apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction."  (Doc. # 143 at 14 (quoting *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F. 3d 733, 741 (6th Cir. 1999)).  This includes determining which state's laws apply where each state has an interest in its law being applied.  *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010).  Further, a court only needs to go through the choice-of-law analysis when a conflict actually occurs between two states' laws.  *Id*. at 667–68.  Thus, this Court will apply Kentucky's choice-of-law rules.

"Kentucky courts 'are very egocentric or protective concerning choice of law questions.'"  *Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 358 (W.D. Ky. 2020) (quoting *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. App. 1987)).  This means that "[u]nder Kentucky choice-of-law rules 'there is a strong preference . . . for applying Kentucky law.'"  *Novolex Holdings, LLC v. Wurzburger*, No. CV 19-145-DLB-CJS, 2020 WL 4758360, at *4 (E.D. Ky. Aug. 17, 2020) (quoting *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707 (W.D. Ky. 2013)).  For tort claims, "'if there are significant contacts—not necessarily the most significant contacts— with Kentucky, the Kentucky law should be applied."  *Brackens v. Louisville Jefferson*

*Cnty. Metro Gov't*, No. 3:12-CV-280-DJH-DW, 2015 WL 5786818, at *8 (W.D. Ky. Sept. 30, 2015), *aff'd sub nom. Est. of Brackens v. Louisville Jefferson Cnty. Metro Gov't*, 680 F. App'x 362 (6th Cir. 2017) (quoting *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)). This is cut and dried for Plaintiffs' tort claims.  Plaintiffs assert — and Defendants agree — that Kentucky's substantive tort laws govern Plaintiffs' tort claims.  (Doc. # 155 at 17–19; Doc. # 158 at 2).

Defendants, both the Officers and the City of Cincinnati, have several contentions as to which state's immunity laws should apply.  Defendants Lanter and Thomas implore the Court to apply Ohio's qualified immunity laws because they claim there are more significant and substantive contacts with Ohio in this case.  (Doc. # 143 at 15).  Lanter and Thomas lean on three facts to support the application of Ohio's qualified immunity law: (1) there were no Kentucky officers involved in the pursuit and no Kentucky officers named in the litigation, whereas there are two Ohio employees and an Ohio municipality named; (2) the case involves a determination about whether the respective officers complied with CPD policy and trainings, which are governed and designed by Ohio law; and (3) the pursuit bringing about the claims took place primarily in Ohio.  (*Id.*).  In their Reply, Lanter and Thomas make a policy argument that a Court's determination that Kentucky's immunity law applies would be "unworkable" because it would make officers "subject to shifting immunity standards based solely on where a pursuit happened to end, rather than on the state responsible for their employment, training, and supervision." (Doc. # 158 at 3).

The City of Cincinnati launches a similar argument.  The City urges the Court to promote the principle of comity and apply Ohio immunity law, as the City claims this Court

has done before.  (Doc. # 144 at 10–11 (citing *Pittman v. Rutherford*, No. 19-36-DLB-CJS, 2020 WL 6386489 (E.D. Ky. July 7, 2020), *adopted by* 2020 WL 6384726 (E.D. Ky. Oct 30, 2020))).

Given Kentucky's strong preference for applying its own substantive laws, the Court finds that Kentucky law will govern all relevant state law claims and defenses in this matter.  Put plainly, Kentucky has numerous significant contacts with this case that make its laws appropriate for adjudicating this matter.  *Brackens*, 2015 WL 5786818, at *8.  First, a significant portion of the car chase between Officers and Defendant Meyer took place in Kentucky.  (Doc. # 143 at 9–10).  Indeed, much of the conduct Plaintiffs base their suit on—crossing double-yellow lines, going the wrong way on one-way streets, speeding through high-traffic areas, to name a few—took place on the Kentucky side of the Ohio River.  (Doc. # 155 at 10–11).  Further, the chase concluded in Kentucky when Meyer wrecked his car in Newport.  (*Id*. at 11; Doc. # 134-3 at 18).  Most importantly, both the Laibles and the Kleins reside in Kentucky.

This Court has often found that a plaintiff's residence is a significant contact that justifies the application of Kentucky law because Kentucky tort laws are intended to protect and compensate Kentucky residents when they are harmed.  *Wurzburger*, 2020 WL 4758360, at *5; *Warndorf v. Otis Elevator Co.*, No. 2:17-cv-159-DLB-CJS, 2019 WL 137585, at *2 (E.D.  Ky. Jan. 8, 2019); *Aces High Coal Sales, Inc. v. Cmty. Tr. & Bank of W. Ga.*, No 2:15-cv-161-DLB-HAI, 2017 WL 3122661, at *12 (E.D. Ky. July 21, 2017).  Given the grave harm to Kentucky citizens on Kentucky soil in this case, it makes logical sense that Kentucky's tort laws and corresponding defenses—including its laws on immunity—will apply.  *See O'Bryan v. Holy See*, 556 F.3d 361, 383 (6th Cir. 2009)

("Because the conduct alleged by the named plaintiffs occurred in Kentucky, Kentucky law applies to the instant case"); *see also Zdrowski v. Rieck*, 119 F.Supp.3d 643, 675 (E.D. Mich. 2015) (addressing state governmental immunity as a defense to tort claims).

### C.    Qualified Immunity

Having determined Kentucky's law will apply to this case, the Court must now decide if the doctrine of qualified immunity shields Defendants Lanter and Thomas from liability.   In Kentucky, qualified immunity protects officers from liability for "good faith judgment calls made in a legally uncertain environment."  *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  Public officials and employees are entitled to qualified immunity for conduct deemed to be (1) discretionary acts or functions; (2) taken in good faith; and (3) within the scope of the employee's authority.  *Id*.  Kentucky's qualified immunity analysis utilizes a burden-shifting framework that first requires the officer to show their actions were discretionary, as opposed to ministerial.  *Sheehy v. Volentine*, 706 S.W.3d 229, 237 (Ky. 2024).  This first step requires the reviewing court to review the relevant statute, regulation, rule or policy to determine whether the act was discretionary or ministerial.  *Id*. If the defendant can show that the duties were discretionary, the burden shifts to the plaintiffs to show evidence that the officers' actions were not taken in good faith.  *Id*.

First, an officer's act must be discretionary in nature, meaning it must be one of "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment[.]"  *Yanero*, 65 S.W.3d at 522.  Discretionary acts "require the exercise of reason in the adaption of means to an end, and discretion in determining how or whether the act shall be done or the course pursued."  *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. 1959).

13

These differ from ministerial acts, which are those "that require[] only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id*. A ministerial act "is one that the government employee must do 'without regard to his or her own judgment or opinion concerning the propriety of the act to be performed.'" *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014) (quoting 63C Am.Jur.2d *Public Officers and Employees* § 318). Put neatly, "[t]he distinction between discretionary acts and mandatory acts is essentially the difference between making higher-level decisions and giving orders to effectuate those decisions, and simply following orders." *Id*. To make the determination of whether an act is ministerial or discretionary, courts must look for the "dominant nature of the act." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010).

Not surprisingly, the parties differ on which of Defendants' actions the Court should focus on in its analysis. Defendants maintain that the action of initially engaging in and continuing the pursuit of Meyer required their discretion, which entitles them to immunity. (Doc. # 143 at 27). Plaintiffs focus their argument on the officers' individual actions taken during the pursuit—safely operating the vehicle in emergency conditions and failing to terminate the pursuit—as opposed to the whole pursuit. (Doc. # 155 at 34–47). For the purposes of qualified immunity analysis, the Court finds that the "dominant nature of the act" is Defendants' pursuit of Mason Meyer. However, there are several provisions of CPD Policy that apply to the officers' conduct during the pursuit. The first is the policy regarding their decision to initiate a pursuit of Meyer. The second is the policy regarding the decision to terminate—or in this case, not to terminate—the pursuit as it progressed.

14

The Court will begin with a discussion of Defendants' decision to engage in and continue the pursuit.

### 1.    CPD Policy on Pursuit Driving

In determining whether an official is entitled to qualified immunity in Kentucky, reviewing courts must analyze the policy governing the officer at the time they committed the act in question.  *See Sheehy*, 706 S.W.3d at 237; *see also Browning v. Edmonson Cnty., Ky.*, 18 F.4th 516, 533 (6th Cir. 2021) (finding that Kentucky courts' findings on ministerial or discretionary acts have differed when the policies grant less discretion). Thus, to adjudicate whether Defendants Lanter and Thomas acted with discretion or pursuant to orders, the Court must analyze the Cincinnati Police Department's policies on law enforcement operating vehicles and engaging in police pursuits.

Section 12.525 of the Cincinnati Police Department's Procedure Manual is titled "Emergency Operation of Police Vehicles and Pursuit Driving." (Doc. # 134-1).  Intuitively, this section outlines how CPD officers should conduct themselves in emergency situations and during police chases.  According to the policy, "[o]fficers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape."  (*Id*. at 2).  Officers are required to weigh a series of factors when operating vehicles in emergency circumstances or engaging in vehicle pursuits.  (*Id*.). These factors include:

- the degree of risk created by pursuit to others, the officer and the suspect;
- the location where the pursuit will take place;
- traffic conditions and the amount of pedestrian traffic;
- road conditions;
- the time of day;

- the weather;
- the volume, type, speed and direction of vehicular traffic and direction of pursuit;
- the nature/seriousness of the suspected crime;
- the condition of the officer's vehicle and the suspect's vehicle involved in the pursuit;
- any circumstance that could lead to a situation where the pursuing officer(s) would lose control of their vehicle;
- the type of vehicle being pursued;
- the likelihood of successful apprehension of the suspect;
- and whether the identity of the suspect is known to the point that later apprehension is possible.

(*Id*. at 2–3).

The policy further mandates that officers "will not pursue vehicles the wrong way on the interstate or other controlled access highway, divided roadways, or one-way streets unless specifically authorized by the [OIC]." (*Id*. at 3).

Section 12.525 also establishes the procedures CPD officers should adhere to in emergency situations and vehicle pursuits. Pertinent to this case are subsections A, D and E, which cover Emergency Operation of Police Vehicles, Pursuit Driving, and Termination of the Pursuit, respectively. (*Id*. at 3–4, 5–8). Section 12.525(A)(2)(a) mandates that officers operating a vehicle in emergency mode—using lights and sirens— "will not operate [the vehicle] with reckless disregard for the safety of other citizens." (*Id*. at 4). Further, the Policy requires that officers "conform to all applicable traffic laws and regulations" while driving in emergency mode. (*Id*.). This includes "maintain[ing] a vehicle speed which is reasonable for the conditions," and "not exceed[ing] the posted speed limit by more than 20 miles per hour." (*Id*.).

Section 12.525(D) covers Pursuit Driving. The policy allows officers to initiate a motor vehicle pursuit in several circumstances, including to pursue a known or suspected felon. (*Id*. at 5). Upon engaging in a vehicle pursuit, the pursuing officer is required to

16

relay details about the pursuit to CPD's Emergency Communications Center, including the officer's car number, the location of the pursuit, the direction of the pursuit, a description of the target vehicle and its occupants, the reason for the pursuit, and the speeds involved in the pursuit. (*Id*.). As mentioned, officers are expected to maintain reasonable vehicle speeds for the conditions. (*Id*. at 4).

The CPD Pursuit Policy mirrors the policy the Supreme Court of Kentucky analyzed in *Meinhart v. Louisville Metro Government*, 627 S.W.3d 824. There, the court concluded that the Louisville Metro Police Department's pursuit policies, which mandated that an officer weigh a list of factors to ascertain the immediate or potential danger to the public before engaging in a pursuit, required officers to use their discretionary when engaging in a pursuit. *Id*. at 835. While the court held that some provisions of the policies were ministerial, the overall policy required "the exercise of significant, independent professional judgment" that rendered the officer's actions discretionary. *Id*.

The policy also mirrors that of the Edmonson County Sheriff's Office's pursuit policy in *Browning*. *See Browning*, 18 F.4th 516. Applying Kentucky law, the Sixth Circuit concluded that the Edmonson County's policy gave officers discretionary duties because the policy did not mandate when officers were to engage in pursuits and gave officers discretion on when to begin their pursuits. *Id*. at 533. Further, the Sixth Circuit found that the initiation of the pursuit was discretionary because "the policy does not set any absolute constraints on the officer's exercise of discretion to continue a pursuit—it merely provides factors for the officer to consider." *Id*.

There is a common thread that exists in Louisville Police's policies, Edmonson County's policies and CPD policies — officers have discretion about whether to engage

17

in a pursuit.  It is true that the language of CPD's policy requires officers to weigh a number of factors before pursuing a fleeing vehicle.  (Doc. # 134-1 at 2–3).  Implicit in that, however, is the idea that after weighing the requisite factors, an officer could decide *against* engaging in a pursuit.  Here, the officers had to make the decision to pursue Meyer based on the codified factors, which still granted them the discretion to act.  While they are subject to mandatory guideposts during a pursuit, the decision to actually pursue lays entirely with the pursuing officer based on his or her professional judgment. *Meinhart*, 627 S.W.3d at 834 ("Of course, this discretionary duty is necessarily tempered by the ministerial duties imposed by other [operating practices].  However, those limitations do not completely remove the decision to initiate, continue, or terminate a pursuit from the realm of discretionary acts.").

Having found that the officers involved in the pursuit here performed a discretionary act, the Court now moves to whether the Defendants acted in good faith. The burden falls on Plaintiffs to show that Defendants' actions were taken in bad faith. Kentucky courts recognize that "bad faith" in a qualified immunity analysis can be shown through either objective unreasonableness, meaning the officers knew or should have known their conduct would lead to a violation of the plaintiff's rights, or through willful or malicious intent from the officers to harm the plaintiff.  *Yanero*, 65 S.W.3d at 523.

Plaintiffs allege that Defendants' decisions to continue the pursuit after reaching speeds of 100 miles per hour and watching Meyer hit other cars on the highway constitute a bad faith continuation of the pursuit.  (Doc. # 155 at 40–41).  Plaintiffs assert that "given the serious and continuing risks posed by all involved vehicles' unsafe driving and the potential for Meyer to initiate a shootout[,]" Defendants could not have reasonably

believed the pursuit would end safely.  (*Id*. at 40).  Plaintiffs do not mention Defendants' decision to start the pursuit.

Here, the Court finds that Defendants' decision to initially pursue Meyer in a vehicle pursuit was taken in good faith.  The officers started pursuing Meyer as part of an APD operation to apprehend a known criminal who had several outstanding warrants.  (*See* Doc. # 134-8).  Defendants were part of the unit assigned to surveil Meyer's residence and pursue him if he attempted to flee.  (*Id*.).  There is nothing in the record that indicates Defendants initially pursued Meyer with malicious intent.  In consideration of the circumstances, the Court finds that Defendants' decisions to initiate a pursuit of Mason Meyer was reasonable under CPD policy.

### 2.   *CPD Policy on Termination of Pursuits*

As mentioned *supra*, CPD policy states that "[o]fficers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) outweigh the consequences of the suspect's escape."  (Doc. # 134-1 at 2).  Section 12.525(E) of the CPD Pursuit Policy specifically covers the Termination of Pursuits.  Per the policy, officers are required to terminate pursuits when the pursuit OIC or the primary unit determines the level of danger created by the pursuit outweighs the necessity of immediate apprehension.  (*Id*. at 7).

Plaintiffs rely largely on *Sheehy* to support their position that Defendants' acts were ministerial.  (Doc. # 155 at 45–46).  In *Sheehy*, the Supreme Court of Kentucky concluded that an officer with the Hardin County Office of Sheriff ("HCOS") was not entitled to qualified immunity because Hardin County's policies on termination of vehicle pursuits required the officer to terminate the pursuit under several circumstances that arose during

19

that case's pursuit. *Sheehy*, 706 S.W.3d at 241–243. The first occurred when "No Field Supervisor or higher authority [could] be contacted to approve the pursuit's continuation," in violation of HCOS Standard Operating Procedure ("SOP") 17.9(B)(4)(C)(2). *Id*. at 241. The second occurred when "the circumstances of the pursuit presented an extreme safety hazard to the public, the deputy, or the suspect", in violation of HCOS SOP 17.9(B)(4)(c)(1). *Id*. at 242. The Kentucky Supreme Court held that the language of the respective provisions, each of which began with the words "Deputies Will Terminate a Pursuit When. . .", were ministerial because officers were accorded no discretion to decide whether to terminate the pursuit under either provision. *Id*. at 241–245.

The Kentucky Supreme Court's analysis on the latter of those provisions is instructive here. Leaning on its holding in *Yanero*, the court found that a ministerial duty existed under that provision because ascertainment of the facts of the pursuit scenario did not convert an officer's act into a discretionary one. *Id*. at 243. The court further concluded that "in practically every situation where a ministerial duty arises there is a threshold determination by the officer to ascertain the underlying facts giving rise to that ministerial duty." *Id*. In holding the policy placed ministerial duties on the officers, the court warned that "'[r]ecasting an otherwise ministerial duty as discretionary simply because it required some modicum of discretion of judgment "would undermine the rule that an act can be ministerial even though it has a component of discretion."'" *Id*.

The language of CPD's Pursuit Policy is nearly identical to the HCOS's policy in *Sheehy* that the Kentucky Supreme Court determined was ministerial. CPD's policy says that officers must terminate their involvement in pursuits when the situation calls for it and the risks of the pursuit outweigh the consequences of the suspect's escape. (Doc. # 134-

20

1).  By its nature, this calls for officers to weigh the danger of continuing the pursuit to themselves, the public, and the suspect against the consequences of the suspect getting away—an act requiring discretion.  But the policy gives officers no wiggle room to continue a pursuit that is dangerous to the public.  *Sheehy*, 706 S.W.3d at 243.  Indeed, the language of the policy—"Officers *must* terminate their involvement in motor vehicle pursuits whenever the risks . . . outweigh the consequences of the suspect's escape"— require CPD officers to stop pursuits before they become too dangerous.  (Doc. # 134-1 at 2) (emphasis added).  This is the kind of ministerial duty with a "modicum of discretion of judgment" the Supreme Court of Kentucky recognized in *Sheehy* and this Court recognizes here.

At this stage, it is not within the Court's province to rule on whether or not Defendants negligently performed their ministerial duty to terminate the pursuit.  That determination will be made by a jury.  *Marson*, 438 S.W.3d at 297.  However, it is the Court's determination that Defendants Lanter and Thomas are not shielded by qualified immunity for their actions in this matter.

## D.    Proximate Cause

Having determined Defendants are not shielded by qualified immunity in this case, the Court now moves to the issue of whether Defendants were the proximate cause of Plaintiffs' injuries.  Defendants contend that Plaintiffs cannot prove this critical element of Plaintiffs' wrongful death and personal injury tort claims because of Mason Meyer's intervening, superseding criminal conduct, which Defendants claim breaks the causal connection between their conduct and Plaintiffs' injuries.  (Doc. # 143 at 31–32).

Kentucky courts maintain that intervening criminal acts by third parties will not break the causal connection if the criminal act was reasonably foreseeable. *James v. Meow Media, Inc.*, 300 F.3d 683, 699 (6th Cir. 2002) (citing *Britton v. Wooten*, 817 S.W.2d 443, 449–50 (Ky. 1991)); *see also Ross v. Papler*, 68 F. Supp. 2d 790, 792 (W.D. Ky. 1998) *aff'd sub nom. Ross ex rel. Ross v. Papler*, 1 F. App'x 300 (6th Cir. 2001) ("The most important factor in this analysis is foreseeability because an intervening criminal act will not relieve a defendant from liability for her alleged negligent acts or omissions if the criminal act was 'a reasonably foreseeable consequence of [her] negligent act.'"). Police officers "can be the cause-in-fact and legal cause of damages inflicted upon a third party as a result of a negligent pursuit." *Gonzalez v. Johnson*, 581 S.W.3d 529, 535 (Ky. 2019).

The issue of whether an act was or was not a superseding intervening cause is a legal issue for this Court to decide. *Patton v. Bickford*, 529 S.W.3d 717, 731 (Ky. 2016). Kentucky law directs courts to look to the Restatement (Second) of Torts on superseding intervening conduct. *See Britton*, 817 S.W.2d at 449–50; *see also Howard v. Spradlin*, 562 S.W.3d 281, 288–89 (Ky. Ct. App. 2018).

Section 448 of the Restatement (Second) of Torts provides that a third person's commission of an intentional tort or crime is a superseding cause of harm that breaks the causal chain "unless the actor [defendant] at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." Restatement (Second) of Torts § 448 (Am. L. Inst. 1965). Section 449 builds on that principle, stating "[i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent,

22

intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." *Id.* § 449.  Kentucky courts further require that these two Restatement sections be read in conjunction with Restatement (Second) of Torts § 302B, which states "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." *Britton*, 817 S.W.2d at 449 (citing Restatement (Second) of Torts § 302B (Am. L. Inst. 1965)).

Put together, Kentucky law establishes that a third party's tortious or criminal act can be a superseding cause of harm, *unless* the defendant knew or should have known his or her conduct could cause the third party to commit the harmful act.  That effectively describes the situation here.  The record shows that Meyer outran law enforcement for a few days, a fact which was well known to the task force that included Defendants Lanter and Thomas.  (Doc. # 134-3 at 6, 10; Doc. # 135 at 232:24–234:9).  It is reasonable to believe that the officers could have foreseen that Meyer would run when pursued, since he had done it a week earlier.  The record further shows that Defendants Lanter and Thomas knew Meyer was dangerous and potentially volatile.  (Doc. # 135 at 235:2–236:12; Doc. # 141 at 169:18–171:9).  Given their training and experience, the officers should have known that engaging in a high-speed pursuit of a wanted felon through congested city streets could have resulted in serious injuries to pedestrians.  (Doc. # 135 at 78:2–85:3, 326:25–328:9; Doc. # 141 at 138:14–24, 148:10–159:17).  Indeed, the officers' decisions to continue the pursuit—despite traveling the wrong way down one-way streets and at speeds over 100 miles-per-hour on the freeway—are the kinds of

"unreasonable risk[s] of harm through the conduct of another" that negates Meyer's criminal conduct. *Britton*, 817 S.W.2d at 449. Accordingly, there is a genuine issue of material fact as to the proximate cause of Plaintiffs' injuries that is best determined by a jury. As such, the Court declines to enter summary judgment for the officers, and Defendants Lanter and Thomas's Motion (Doc. # 143) is hereby **denied**.

### E.     Municipal Liability

The Court now turns to Defendant City of Cincinnati's Motion for Summary Judgment. Plaintiffs brought three claims against the City—claims for personal injury and wrongful death under a vicarious liability theory and a claim for negligence in training and supervision. (Doc. # 79 ¶¶ 142–165). The City first claims it is immune from liability for Plaintiffs' injuries under Kentucky law on all of Plaintiffs' claims.[5] (Doc. # 144 at 14–16). Alternatively, if the Court determines the City is not immune, Defendants contend that Plaintiffs' claims for negligent training and supervision fail as a matter of law. (*Id*. at 16–20).

Kentucky's Claims Against Local Governments Act ("CALGA") provides municipalities with a shield against liability from several types of tort claims. *See* KY. REV. STAT. § 65.200–2006. Relevant to this case is Section 65.2003, which provides three buckets of claims from which local governments are immune from liability.[6] *Id*. § 65.2003. Section 65.2003(3) provides municipalities immunity from "[a]ny claim arising from the

---

[5]     For the same reasons stated *supra*, the Court concludes that Kentucky law, as opposed to Ohio law, governs Plaintiffs' claims against the City of Cincinnati. Kentucky's interests in this case outweigh Ohio's, even where Defendant is an Ohio municipality.

[6]     Sections 65.2003(1) and (2) provide municipalities liability from claims covered by workers' compensation law and claims involving assessment or collection of taxes. Ky. Rev. Stat. §§ 65.2003(1)–(2). This case involves neither workers' compensation claims nor taxation claims.

24

exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government[.]"  *Id*. § 65.2003(3). Specific examples of barred claims include those claims involving:

> (a) The adoption or failure to adopt any ordinance, resolution, order, regulation, or rule;
> (b) The failure to enforce any law;
> (c) The issuance, denial, suspension, revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization;
> (d) The exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources; or
> (e) Failure to make an inspection.

*Id*. § 65.2003(3)(a)–(e).

Following the list of examples is a caveat that reads, "[n]othing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties." *Id*. § 65.2003(3).

It thus follows that CALGA does not shield a municipality when its employees allegedly commit a negligent performance of a ministerial function. *See Morales v. City of Georgetown*, 709 S.W.3d 146, 164 (Ky. 2024) (denying municipal immunity to a city whose police officers' negligent performance of ministerial duties caused a plaintiff's injuries). The Court concluded *supra* that Defendants Lanter and Thomas were engaged in ministerial duties in their pursuit of Mason Meyer. Thus, because two of the City's officers were accused of negligently performing ministerial functions, the City may be held liable and is not immune from Plaintiffs' personal injury and wrongful death claims. Accordingly, the City's Motion (Doc. # 144) is **denied** as to Counts One and Two of the Amended Complaint.

25

However, the Court concludes that the City is immune from liability on Plaintiffs' negligent training and supervision claims. Count Three of Plaintiffs' Amended Complaint alleges that "[Plaintiffs'] injuries were proximately caused by the failure to supervise and train employees. Specifically, [the City] failed to adequately train, supervise, and discipline its employees to ensure that they followed CPD pursuit policies . . . ." (Doc. # 79 ¶ 164).

Plaintiffs' allegations are similar to the allegations made in *Morales*. *Morales*, 709 S.W.3d at 164–65. In that case, the Supreme Court of Kentucky upheld summary judgment for the city, finding that the city's decisions around its officer training programs were types of claims immunized by CALGA. *Id*. at 164. The *Morales* court concluded that the Georgetown Police Department's training, enforcement and selection of police officers were "exercises in discretion made during the City's and the [Georgetown Police Department's] consideration of how to best manage and operate the SRT within its finite personnel and resources." *Id*. at 165. The court continued that "[t]hese considerations are inherently discretionary in nature, and therefore cannot be a basis for liability in this instance because 'it is not a tort for government to govern.'" *Id*.

The same principles hold true here. Decisions on its officer training programs required the City to exercise its discretion in utilizing the resources it had available, including its money, programming, and manpower. *See* KY. REV. STAT. § 65.2003(3)(d). Kentucky courts interpret these statutes broadly, and the failure to train officers falls within those broad categories of conduct that allow for a grant of immunity. *Morales*, 709 S.W.3d at 164. Further, even if the City failed to adequately follow its own training rules, regulations or guidelines as Plaintiffs allege, the City is still immune from suits alleging its

26

"failure to enforce any of the laws [it has] adopted." *Id*. (quoting KY. REV. STAT § 65.2003(3)(b)). Thus, the City is immune from liability on Plaintiffs' negligent supervision and training claims.

Accordingly, Defendant City of Cincinnati's Motion (Doc. # 144) is **granted** as to Count Three of the Amended Complaint.

## IV.   CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1)   Defendants Lanter and Thomas's Motion for Summary Judgment (Doc. # 143) is **DENIED**.

(2)   Defendant City of Cincinnati's Motion for Summary Judgment (Doc. # 144) is **GRANTED IN PART** and **DENIED IN PART**, being **granted** with respect to Count Three, and **denied** with respect to Counts One and Two.

(3)   The parties are **DIRECTED** to file a **Joint Status Report within thirty (30) days from the date of entry of this Order** indicating whether they would be amendable to pursuing mediation, either privately or court-facilitated, as to the remaining claims.

(4)   Upon receiving the Status Report referenced in paragraph (3) above, the Court will enter a follow-up pre-trial Order addressing next steps in this case, including the scheduling of this matter for trial.

This 2nd day of April, 2026.



Signed By:

David L. Bunning   *DB*

**Chief United States District Judge**

G:Judge-DLB\DATA\ORDERS\Cov2021\21-102 MOO re MSJ.docx